JOSEPH W. COTCHETT (Admitted *pro hac vice*)
STEVEN N. WILLIAMS (Admitted *pro hac vice*)
**COTCHETT, PITRE, SIMON & McCARTHY**
840 Malcolm Road, Suite 200
Burlingame CA 94010
650-697-6000

STANLEY GROSSMAN (Admitted *pro hac vice*)
H. ADAM PRUSSIN (Admitted *pro hac vice*)
SHAHEED RUSHD
**POMERANTZ HAUDEK BLOCK GROSSMAN & GROSS LLP**
100 Park Avenue
New York NY 10017
212-661-1100

Attorneys for Plaintiffs

## MDL DOCKET NO. 1446

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

*(Transferred from the United States District Court for the Southern District of New York,*
*Southern District Case No. 02cv8881 (GEL), pursuant to order of the Judicial Panel on Multidistrict Litigation)*

| | |
|---|---|
| In re ENRON CORPORATION SECURITIES, DERIVATIVE & "ERISA" LITIGATION | MDL 1446 |
| This Document Relates To: | **Civil Action No. H-03-0815** |
| **SILVERCREEK MANAGEMENT INC.; SILVERCREEK LIMITED PARTNERSHIP; SILVERCREEK II LIMITED; OIP LIMITED; and PEBBLE LIMITED PARTNERSHIP,** | **1. VIOLATIONS OF 15 OF THE SECURITIES ACT** |
| **Plaintiffs,** | **2. VIOLATIONS OF 11 OF THE SECURITIES ACT** |
| **v.** | **3. NEGLIGENT MISREPRESENTATION** |
| | **4. FRAUD AND DECEIT** |
| **CITIGROUP, INC.; J.P. MORGAN SECURITIES, INC.; J.P. MORGAN CHASE & COMPANY; CREDIT SUISSE FIRST BOSTON LLC; CREDIT SUISSE FIRST BOSTON (USA), INC.; PERSHING LLC; DEUTSCHE BANK ALEX. BROWN, INC.; DEUTSCHE BANK AG;** | **5. VIOLATIONS OF 10(b) AND 20(a) OF THE EXCHANGE ACT** |
| | **6. VIOLATION OF ARTICLE 81-1 et. seq. OF THE TEXAS SECURITIES ACT** |
| [Caption continued on the following page.] | **JURY TRIAL DEMANDED** |

**BARCLAY'S CAPITAL INC.;** )
**BARCLAY'S PLC;** )
**MERRILL LYNCH & CO.;** )
**ANDERSEN WORLD WIDE S.C.;** )
**ANDERSEN CO.;** )
**ARTHUR-ANDERSEN-PUERTO RICO;** )
**ANDERSEN LLP;** )
**ARTHUR ANDERSEN-BRAZIL;** )
**ARTHUR ANDERSEN;** )
**JOSEPH F. BERARDINO;** )
**THOMAS H. BAUER;** )
**DEBRA A. CASH;** )
**DAVID STEPHEN GODDARD, JR.;** )
**GARY B. GOOLSBY;** )
**MICHAEL M. LOWTHER;** )
**BENJAMIN S. NEUHAUSEN;** )
**MICHAEL C. ODOM;** )
**RICHARD R. PETERSEN;** )
**JOHN E. STEWART;** )
**MICHAEL L. BENNETT;** )
**WILLIAM E. SWANSON;** )
**MICHAEL D. JONES;** )
**PHILIP A. RANDALL;** )
**ROMAN W. McALINDON;** )
**VINSON & ELKINS L.L.P.;** )
**ESTATE OF KENNETH LAY;** )
**JEFFREY K. SKILLING;** )
**ANDREW S. FASTOW;** )
**RICHARD CAUSEY;** )
**RICHARD BUY; and** )
**JOHN V. DERRICK, JR.** )
)
Defendants. )
)
————————————————————— )

# TABLE OF CONTENTS

                                                                              **Page(s)**

I.     NATURE OF THIS ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.   THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     A.    Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     B.    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          1.    Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
          2.    The Underwriters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

               a.    Citigroup/Salomon . . . . . . . . . . . . . . . . . . . . . . . . . . 5
               b.    JP Morgan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
               c.    CSFB . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
               d.    Deutsche Bank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
               e.    Barclay's . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

          3.    Merrill Lynch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
          4.    The Andersen Entities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
          5.    The Senior Officers/Management Committee . . . . . . . . . . . . . . . 10

IV.   ENRON'S FINANCIAL STATEMENTS, 1997-2001 . . . . . . . . . . . . . . . . . . . . . 12

     A.    Enron's Annual and Quarterly Financial
          Statements for 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
     B.    Enron's Annual and Quarterly Financial
          Statements for 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
     C.    Enron's Annual and Quarterly Financial
          Statements for 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
     D.    Enron's Annual and Quarterly Financial
          Statements for 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
     E.    Additional Representations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
     F.    Enron's First Quarter 2001 Financial Statements . . . . . . . . . . . . . . . 16
     G.    Enron's Second Quarter 2001 Financial Statements . . . . . . . . . . . . . . 16
     H.    Public Statements by Defendants about Enron in 2001 . . . . . . . . . . . . 16

V.    PLAINTIFFS' INVESTMENTS IN ENRON DEBT SECURITIES . . . . . . . . . . . . . . 21

VI.  ENRON'S REVELATIONS AND FINANCIAL COLLAPSE . . . . . . . . . . . . . . . . . . 22

     A.    Failure to Consolidate Special Purpose
          Entities Violation of Gaap . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
     B.    The Collapse of the Merger with Dynegy . . . . . . . . . . . . . . . . . . . . . . 26
     C.    Enron's Chapter 11 Filing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

VII.   THE ENRON NOTE OFFERINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    A.   The Exchangeable Notes Offering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        1.   Offering Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
        2.   Misstatements and Omissions . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    B.   The Zero Coupon Note Offering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        1.   Offering Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
        2.   Misstatements and Omissions . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    C.   Plaintiffs' Note Purchases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        1.   Summary of Purchases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        2.   Reliance on Prospectuses and Historic Financial Information  . . . . . . . 35
        3.   Reliance on Publicly Available Information  . . . . . . . . . . . . . . . . . . . . 36
        4.   Economic Losses Suffered as a Direct Result of Reliance
            on Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

VIII.  WRONGFUL FINANCIAL MANIPULATIONS, SCHEMES AND
      CONTRIVANCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    A.   The Off-Book Financial Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        1.   The Purposes and Effects of Enron's Use of Special
            Purpose Entities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
        2.   Specific Examples of Improper Use of Special Purpose Entities  . . . . . . 42

            a.   JEDI and Chewco . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
            b.   LJM1 and LJM2  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
            c.   The Raptors  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
            d.   The Whitewing Transactions . . . . . . . . . . . . . . . . . . . . . . . 55
            e.   Fishtail, Bacchus, Sundance and Slapshot Transactions  . . . . . . 56
            f.   Nikita Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

    B.   Hidden and Disguised Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

        1.   Prepays/Equity Forward Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . 58
        2.   Minority Interest Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

    C.   Tax Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

    D.   Defendants' Involvement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

        1.   Underwriters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

            a.   Citigroup/Salomon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

                (i)   Structured Transactions . . . . . . . . . . . . . . . . . . . . . . . 69

                    (A)   LJM 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

|  |  | (B) | Project Bacchus | 70 |
|  |  | (C) | Project Nahanni | 71 |
|  |  | (D) | Other Transactions | 72 |
|  | (ii) | **Prepay Transactions** |  | 74 |
|  |  | (A) | Delta | 75 |
|  |  | (B) | Yosemite I-IV | 79 |
|  |  | (C) | Roosevelt | 81 |
|  | (iii) | Analyst Coverage |  | 82 |
|  | (iv) | Citigroup's Knowledge of Enron's True Financial Position |  | 84 |
|  | (v) | Citigroup/Salomon's Role as Underwriter of the Exchangeable Notes and the Zero Coupon Notes |  | 85 |

b. Barclay's . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

(i) SPE Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

    A. Chewco . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
    B. Nikita . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

(ii) The SO$_2$ Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . 97
(iii) Prepay Transactions . . . . . . . . . . . . . . . . . . . . . . . . . 99
(iv) Barclays' Knowledge of Enron's Fraudulent Reporting Practices . . . . . . . . . . . . . . . . . . . . . . 100
(v) Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

c. Deutsche Bank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

(i) Tax Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

    (A) Steele Transaction . . . . . . . . . . . . . . . . . . 113
    (B) Cochise Transaction . . . . . . . . . . . . . . . . . 115
    (C) Teresa Transaction . . . . . . . . . . . . . . . . . . 118
    (D) Tomas Transaction . . . . . . . . . . . . . . . . . . 121

(ii) Structured Transactions . . . . . . . . . . . . . . . . . . . . . . 124
(iii) Analyst Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . 127
(iv) Deutsche Bank's Knowledge of Enron's True Financial Position . . . . . . . . . . . . . . . . . . . . . . . . 128

d. JP Morgan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

(i) Prepay Transactions . . . . . . . . . . . . . . . . . . . . . . . . . 134
(ii) Structured Transactions . . . . . . . . . . . . . . . . . . . . . . 145
(iii) Analyst Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . 147
(iv) JP Morgan's Knowledge of Enron's True Financial Position . . . . . . . . . . . . . . . . . . . . . . . . 148

       e.    CSFB . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

          (i)    Structured Transactions . . . . . . . . . . . . . . . . . . . . . . . . 152
          (ii)   Prepay Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

               (A)   LJM1/Rhythms Hedging Transaction . . . . . . . 157
               (B)   Raptors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158
               (C)   LJM2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159
               (D)   Stock Triggers . . . . . . . . . . . . . . . . . . . . . . . . 161
               (E)   Other Transactions . . . . . . . . . . . . . . . . . . . . . . 163

          (iii)  Analyst Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164
          (iv)  CSFB's Knowledge of Enron's True
               Financial Position . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

   2.    Merrill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

       (a)   LJM2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176
       (b)   Nigerian Barge Transaction . . . . . . . . . . . . . . . . . . . . . . . . . 178
       (c)   Unwinding of Nigerian Barges Transaction . . . . . . . . . . . . . . 182
       (d)   Analyst Research . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183
       (e)   Electricity Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184
       (f)   Merrill's Knowledge of Enron's True Financial
           Position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

   3.    Andersen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

   4.    Enron Management and Directors . . . . . . . . . . . . . . . . . . . . . . . . . 195


X.    CAUSES OF ACTION

COUNT ONE
    AGAINST CITIGROUP/SALOMON FOR VIOLATION OF
    SECTION 11 OF THE SECURITIES ACT – EXCHANGEABLE NOTES . . . . . . . . 195

COUNT TWO
    AGAINST THE STATUTORY UNDERWRITER DEFENDANTS FOR VIOLATIONS
    OF SECTION 11 OF THE SECURITIES ACT ZERO COUPON NOTES . . . . . . . . 197

COUNT THREE
    AGAINST ALL DEFENDANTS, FOR NEGLIGENT MISREPRESENTATION . . . 198

COUNT FOUR
    FRAUD AND DECEIT AGAINST ALL UNDERWRITER AND STATUTORY
    UNDERWRITER DEFENDANTS, MERRILL, THE ANDERSEN
    DEFENDANTS, VINSON & ELKINS, LAY, SKILLING, BUY, CAUSEY,
    AND FASTOW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

COUNT FIVE
 VIOLATION OF 10(b) AND 20(a) OF THE SECURITIES EXCHANGE ACT AND
 RULE 10b-5 THEREUNDER AGAINST ALL UNDERWRITER AND STATUTORY
 UNDERWRITER DEFENDANTS, MERRILL, THE ANDERSEN DEFENDANTS,
 VINSON & ELKINS, LAY, SKILLING, BUY, CAUSEY, AND FASTOW . . . . . . . . 203

COUNT SIX
 VIOLATIONS OF SECTION 11 AND SECTION 15 AGAINST OFFICER
 DEFENDANTS AND ANDERSEN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

COUNT SEVEN
 VIOLATIONS OF ARTICLE 581-1 ET SEQ. OF THE TEXAS SECURITIES ACT
 AGAINST ALL DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

XI. PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207

XII. JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

Plaintiffs, as and for their second amended complaint, allege as follows upon information and belief based, inter alia, upon investigation conducted by Plaintiffs and their counsel, except as to those allegations pertaining to Plaintiffs personally, which are alleged upon knowledge. The original complaint in this action was filed in the United States District Court for the Southern District of New York on November 7, 2002.

## I.

## NATURE OF THIS ACTION

1.     In October 2001, Plaintiffs invested over $100 million in 7% Exchangeable Notes (the "Exchangeable Notes") and Zero Coupon Notes, both of which were issued by Enron Corporation ("Enron"). At the time of the Plaintiffs' investment, Enron was the world's largest energy trader, engaged in one out of every four electricity and natural gas sales. Enron was also engaged in a myriad of other businesses, including pipelines, telecommunications, and water. According to the 2001 Fortune 500 rankings, Enron was the seventh largest company in the world, ahead of IBM, reporting revenue for 2000 of over $100 billion and net income of approximately $1 billion.

2.     Shortly after Plaintiffs purchased the Exchangeable Notes and Zero Coupon Notes, Enron was forced to restate its financial results for the previous four years, drastically reducing its reported income and increasing its reported debt.

3.     It soon became evident that this restatement was just the beginning and that additional restatements would become necessary, as a significant number of previously undisclosed off-balance sheet transactions and entities surfaced.

4.     Enron's demise followed swiftly. It filed for bankruptcy, and within a few months, its auditor, defendant Arthur Andersen LLP ("Andersen"), was found guilty of criminal violations and was, for all intents and purposes, forced out of business. One of Enron's ex-officers has pleaded guilty to charges of money laundering and fraud. Andrew Fastow, its former

1

Chief Financial Officer, pled guilty to two counts of wire and securities fraud. Other Enron officers have pled guilty to, or been convicted of, numerous federal criminal charges. Enron's underwriters and financial advisers also became the focal point of numerous governmental investigations concerning their role in Enron's collapse. The demise of Enron is one of the largest and most infamous financial debacles in U.S. business history.

5.      In deciding to invest in Enron debt securities, Plaintiffs relied upon the information contained in the prospectuses for the Exchangeable Notes and Zero Coupon Notes, public disclosures and other representations made by management, the directors, and the other defendants. At no time prior to Plaintiffs' investment did Defendants, or anyone else, disclose Enron's overstatements of earnings, understatements of debt, or the existence and magnitude of the off-balance sheet transactions that were distorting Enron's reported financial results. It was primarily Plaintiffs' belief in the accuracy of the historical financial information from 1994 to 2000 that resulted in their purchases of the Enron notes. Plaintiffs believed in the history and core strength of Enron.

6.      In this action Plaintiffs seek to hold accountable those individuals and entities responsible for their massive losses. These individuals and entities include: the underwriters of the Exchangeable Notes and the Zero Coupon Note offerings, and the directors who signed the registration statements for those offerings, all of whom are responsible for the false and misleading registration statements for the Notes; controlling persons of Andersen, which certified Enron's false financial statements; and the banks, law firms and financial services companies which (a) set up, invested in, and profited from the special purpose entities which Enron used to conceal debt and inflate earnings, and (b) made and participated in making false statements about Enron's financial condition.

2

## II.

## JURISDICTION AND VENUE

7.      This action asserts claims under  11 and  15 of the Securities Act, 15 U.S.C. 77k and 77o, under § 10(b) and § 20 of the Securities Exchange Act, 15 U.S.C. § 78j and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, 15 U.S.C. § 78t(a), and under the common law.  Federal subject matter jurisdiction exists pursuant to § 22(a) of the Securities Act, 15 U.S.C. § 77v(a), § 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question).  Supplemental jurisdiction over the state law claims exists pursuant to 28 U.S.C. § 1367(a).

8.      Venue is appropriate in the Southern District of New York because several Defendants have their principal places of business there, and several are incorporated in the State of New York.  The majority of Plaintiffs' purchases and sales of Enron notes took place in the Southern District of New York.  While this Action was transferred to the United States District Court for the Southern District of Texas, Houston Division, for coordination or consolidation pursuant to the order of the Judicial Panel on Multidistrict Litigation (Docket No. 1446), the trial of this action shall take place in the Southern District of New York pursuant to *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).

## III.

## THE PARTIES

**A.      Plaintiffs**

9.      Plaintiff  Silvercreek Management, Inc. ("Silvercreek") is an investment manager with its principal place of business in Toronto, Province of Ontario, Canada.  Silvercreek is incorporated under the Business Corporations Act of Ontario.

10.     Plaintiff Silvercreek Limited Partnership is a limited partnership organized under the laws of the Province of Ontario, with its principal place of business in Toronto, Province of Ontario, Canada.

3

11.     Plaintiff Silvercreek II Limited is a mutual fund incorporated as a limited liability company in the Cayman Islands, British West Indies.

12.     Plaintiff OIP Limited ("OIP") is incorporated under the Business Corporations Act of Ontario, with its principal place of business in Toronto, Province of Ontario, Canada.

13.     Plaintiff Pebble Limited Partnership is a limited partnership under the laws of the Province of Ontario, with its principal place of business in Toronto, Province of Ontario, Canada.

**B.      Defendants**

**1.      Preliminary Statement**

14.     Pursuant to this Court's May 19, 2005 Order denying Silvercreek's Motion to Extend the Date to Opt Out of the Bank of America and Outside Director Class Action Settlements (*Silvercreek* Doc. 15; *Newby* Doc. 3485), this Second Amended Complaint does not include previously pled claims against Bank of America Corporation or Director Defendants Robert A. Belfer; Norman P. Blake; Ronnie C. Chan; John H. Duncan; Joe H. Foy; Wendy L. Gramm; Kenneth L. Harrison; Robert K. Jaedicke; Charles A. LeMaistre; Rebecca Mark-Jubasche; John Mendelsohn; Jerome J. Meyer; Paulo V. Ferraz Pereira; Frank Savage; John A. Urquhart; John Wakeham; or Herbert S. Winokur, Jr.  This filing is without prejudice to Plaintiffs' rights of appeal from this Court's October 18, 2005 Order of Final Judgment and Dismissal as to Bank of America (*Newby* Doc. 4048) or any judgment subsequently rendered as to the Director Defendants.

**2.      The Underwriters**

15.     The entities identified and described below as statutory underwriters of the Zero Coupon Notes are sometimes referred to herein as the "Statutory Underwriter Defendants".  The Statutory Underwriter Defendants along with the entities identified and discussed below as underwriters of the Exchangeable Notes are sometimes referred to herein collectively as the "Underwriter Defendants."

4

### a.   Citigroup/Salomon

16.     Defendant Citigroup Inc. is a financial services company which provides banking and investment services, including through its subsidiary Salomon Smith Barney Inc. ("Salomon").  Collectively, Citigroup and Salomon are referred to herein as "Citigroup/Salomon."  Citigroup's headquarters are in New York, N.Y.  Citigroup, through Salomon, was an underwriter of the Exchangeable Notes and a statutory underwriter of the Zero Coupon Notes, and also provided commercial and investment banking services, commercial loans, and advisory and financial services to Enron.  Citigroup/Salomon acted as an underwriter in the sale of securities to the public and provided investment analysis and opinions through reports by its securities analysts.

### b.   JP Morgan

17.     J.P. Morgan Securities Inc. is a corporation doing business in the Southern District of New York as an investment banker and securities analyst.  It is a subsidiary of Defendant J.P. Morgan Chase & Co.

18.     Defendant J.P. Morgan Chase & Co. is an integrated financial services institution with its principal place of business in New York, N.Y.  Directly and through its subsidiaries and divisions, including J.P. Morgan Securities, Inc. (collectively "JP Morgan"), it provides commercial and investment banking services and advisory services. JP Morgan was a statutory underwriter and initial purchaser of the Zero Coupon Notes offering, and also provided other banking services to Enron.

### c.   CSFB

19.     Defendant Credit Suisse First Boston LLC (n/k/a Credit Suisse Securities (USA) LLC), is an investment bank with its principal place of business in New York, N.Y.

20.     Defendant Credit Suisse First Boston (USA), Inc., (n/k/a Credit Suisse (USA), Inc.) is an investment bank with its principal place of business in New York, N.Y.

21.     At all relevant times, defendant Pershing LLC (f/k/a Donaldson, Lufkin & Jenrette Securities Corporation) was a wholly-owned subsidiary of Credit Suisse First Boston (USA), Inc.

22.     Defendant Credit Suisse First Boston LLC (Credit Suisse Securities (USA) LLC), Defendant Credit Suisse First Boston (USA), Inc. (Credit Suisse (USA), Inc.) and Defendant Pershing LLC (Donaldson, Lufkin & Jenrette Securities Corporation) are referred to herein collectively as "CSFB."

23.     CSFB was a statutory underwriter of the Zero Coupon Notes offering, and also provided commercial banking and investment banking services to Enron.

### d.     Deutsche Bank

24.     Defendant Deutsche Bank Alex. Brown, Inc. is an investment bank with its principal place of business in Baltimore, Maryland, and offices in the Southern District of New York.  Deutsche Bank was a statutory underwriter and initial purchaser of the Zero Coupon Notes, and also provided other banking services to Enron.

25.     Defendant Deutsche Bank AG is the parent of Deutsche Bank Alex. Brown. Deutsche Bank AG and Deutsche Bank Alex. Brown are referred to herein collectively as "Deutsche Bank."

### e.     Barclay's

26.     Defendant Barclay's Capital Inc. is an investment bank with its principal place of business in London, England.  It maintains offices in New York, N.Y.  Barclay's was a statutory underwriter and initial purchaser of the Zero Coupon Notes offering.  It also provided other banking services to Enron.

27.     Defendant Barclay's PLC is the parent of Barclay's Capital Inc.  Barclay's PLC and Barclay's Capital Inc. are referred to herein collectively as "Barclay's".

### 3.     Merrill Lynch

28.     Defendant Merrill Lynch & Co. ("Merrill") is an investment bank with headquarters in New York, N.Y.  Merrill engaged in schemes and artifices including but not

6

limited to sham transactions with Enron in which loans which were mischaracterized as purchase and sale transactions so that Enron could hide debt from the public and falsify its reported earnings.

        **4.**     **The Andersen Entities**

     29.     Non-party Arthur Andersen, Enron's auditor, was part of an integrated world-wide entity. The umbrella organizations are defendant Andersen Worldwide Organization ("AWO"), a Swiss cooperative entity and defendant Arthur Andersen & Co. Société Coopérative ("AWSC"), which is an umbrella entity for all of the other Andersen entities and Andersen's individual partners. All of these Defendants are collectively referred to herein as "Andersen," and each included person or entity is set forth below.

     30.     All of these Defendants comprise a single, unified business entity. The partners in each of Andersen's local offices are partners of the worldwide Andersen entities. All of the firms share revenues and profits. The worldwide companies establish standards for the operations of all of the other Andersen entities The operations of the worldwide entities are integrated as a single unit.

     31.     Defendant Andersen Worldwide S.C. ("Andersen Worldwide") consists of Société Coopérative, Switzerland, a partnership organized under the Swiss Federal Code of Obligations ("AWSC"), all local Andersen offices, and the individual partners of Andersen Worldwide. Many of these individual partners were involved in the audits of Enron during the period 1997-2000. Andersen Worldwide and Arthur Andersen LLP set the policies and procedures governing all Andersen offices worldwide.

     32.     Andersen Co. ("Andersen-India") is part of Andersen Worldwide and participated in the 1997-2000 audits of Enron.

     33.     Defendant Arthur Andersen-Puerto Rico ("Andersen-Puerto Rico") is part of Andersen Worldwide and participated in the 1997-2000 audits of Enron.

7

34. Defendant Andersen LLP ("Andersen-Cayman Islands") is part of Andersen-Worldwide and participated in the 1997-2000 audits of Enron.

35. Defendant Arthur Andersen-Brazil ("Andersen-Brazil") is part of Andersen Worldwide and participated in the 1997-2000 audits of Enron.

36. Defendant Arthur Andersen ("Andersen-United Kingdom") is part of Andersen Worldwide and participated in the 1997-2000 audits of Enron.

37. These Andersen companies and partnerships are sometimes referred to collectively as the "Andersen Entities".

38. Defendant Joseph F. Berardino was the Chief Executive Officer and managing partner of Andersen Worldwide until he resigned on 3/26/02.

39. Defendant Thomas H. Bauer was an Andersen partner who worked exclusively on Enron projects.

40. Defendant David B. Duncan was the lead Andersen partner since 1997 on the Enron project. Enron was Duncan's only client. Duncan has pled guilty to criminal charges resulting from his work for Enron.

41. Defendant Debra A. Cash was a partner of Andersen and participated in the Enron audit and consulting projects.

42. Defendant Donald Dreyfuss was a partner at Andersen Worldwide's headquarters in Chicago.

43. Defendant James A. Friedlieb was a partner in Andersen-Worldwide's headquarters in Chicago.

44. Defendant David Stephen Goddard, Jr. was the managing partner for the Houston office of Andersen beginning in 1997. Goddard worked on Enron audit and consulting projects.

45. Defendant Gary B. Goolsby was Andersen's partner in charge of Global Risk Management, and Consulting Practice Director of the Houston office. Goolsby played a key role in the Enron audit and consulting projects.

8

46. Defendant Michael M. Lowther was Andersen's concurring partner on the Enron audit since 1997.

47. Defendant Benjamin S. Neuhausen was an Andersen partner in the Chicago Business Unit Management office. Neuhausen played a key role in the Enron audit and consulting projects.

48. David Michael C. Odom was Andersen's Audit Practice Director for the Gulf Coast Market Circle. Odom played a key role in the Enron audit and consulting projects.

49. Defendant Richard R. Petersen was a partner in Andersen's Professional Service Group. Petersen played a key role in the Enron audit and consulting projects.

50. Defendant John E. Stewart is an Andersen partner and played a key role in the Enron audit and consulting projects.

51. Defendant Michael L. Bennett was an Andersen partner in the Houston office and played a key role in the Enron audit and consulting engagements.

52. Defendant William E. Swanson was a partner of Andersen, and played a key role in the Enron audit and consulting projects.

53. Defendant Roger D. Willard was an Andersen partner and played a key role in the Enron audit and consulting projects.

54. Defendant Michael D. Jones was an Andersen partner and played a key role in the Enron audit and consulting projects.

55. Defendant Gregory W. Hale was a partner of Andersen and played a key role in the Enron audit and consulting projects.

56. Defendant John E. Sorrells was a partner of Andersen based in the Houston office and played a key role in the Enron audit and consulting projects.

57. Defendant Danny D. Rudloff was a partner of Andersen based in the Houston office and played a key role in the Enron audit and consulting projects.

58. Defendant Philip A. Randall was a partner of Andersen and Managing Partner-Global Operations.

59. Defendant Roman W. McAlindon was a partner of Andersen.

60. Defendant C.E. Andrews is Andersen's Global Finance Director and Managing Partner. All of these Defendants comprise a single, unified business entity. The partners in each of Andersen's local offices are partners of the worldwide Andersen entities. All of the firms share revenues and profits. The worldwide companies, Andersen Worldwide and Arthur Andersen, LLP, establish standards for the operations of all of the other Andersen entities The operations of the worldwide entities are integrated as a single unit.

61. Each individual defendant listed in Paragraphs 38 through 59 was a partner and/or employee of the Andersen Entities. They were involved in the auditing and consulting functions on the Enron account. These individual defendants, together with the Andersen Entities, are collectively referred to herein as the "Andersen Defendants".

62. Defendants Berardino, Bauer, Cash, Goddard, Goolsby, Lowther, Neuhausen, Odom, Petersen, Stewart, Bennett, Swanson, Jones, Randall, and McAlindon are named herein as control persons of Andersen and the Andersen Entities pursuant to 20(a) of the 1934 Act and 15 of the 1933 Act and Article 581-33(F)(2) of the Texas Securities Act. All of these defendants are control persons as a result of their day-to-day participation in the audits and their power to control Andersen's audit of Enron.

### 5. The Senior Officers/Management Committee

63. The Defendants listed below (the "Officer Defendants") were directors and/or officers of Enron during the relevant period and signed the registration statements for the note offerings indicated below and for the Enron 10-Ks that included the false and misleading annual financial statements, indicated below:

/ / /

10

| Director | Zeros | Exchangeable | 10-Ks | | | |
|---|---|---|---|---|---|---|
| | | | 1997 | 1998 | 1999 | 2000 |
| Kenneth Lay | X | X | X | X | X | X |
| Andrew Fastow | X | X | X | X | X | X |
| Jeffrey Skilling | X | X | X | X | X | X |
| Richard A. Causey | X | X | X | X | X | X |

64.     Kenneth Lay, decedent of Defendant Estate of Kenneth Lay, was, at all relevant times, the Chairman of the Board of Enron (beginning in 1986), Chief Executive Officer of Enron (1986 to February 2001, and August 2001 to bankruptcy), and a Director of Enron (beginning in 1985).

65.     Defendant Jeffrey K. Skilling was, at all relevant times and until his resignation as an officer in August 2001, the President of Enron (from 1997 to August 2001), Chief Operating Officer of Enron (from January 1997 through February 2001), a Director of Enron (beginning in 1997), and Chief Executive Officer of Enron (February to August 2001).

66.     Defendant Andrew S. Fastow was the Executive Vice President of Enron (July 1999 to October 2001) and, Chief Financial Officer (March 1998 to October 2001) of Enron. Fastow had previously been, Senior Vice President of Enron (March 1998 to July 1999), and Senior Vice President of Finance for Enron (January 1997 to March 1998), and became an officer of Enron in January 1993.

67.     Defendant Richard Causey was Enron's Executive Vice President and Chief Accounting Officer.

68.     Defendant Richard Buy was an Executive Vice President and Chief Risk Officer of Enron.

69.     Defendant John V. Derrick, Jr., was an Executive Vice President and General Counsel of Enron. Prior to joining Enron, Derrick was a partner at Vinson & Elkins.

/ / /

11

# IV.

## ENRON'S FINANCIAL STATEMENTS, 1997-2001

**A.    Enron's Annual and Quarterly Financial Statements for 1997**

70.    On May 14, 1997, Enron filed with the Securities and Exchange Commission ("SEC") its financial statements for the first quarter of 1997 on Form 10-Q for the period ended March 31, 1997.

71.    On August 14, 1997, Enron filed with the SEC its financial statements for the second quarter of 1997 on Form 10-Q for the period ended June 30, 1997.

72.    On November 14, 1997, Enron filed with the SEC its financial statements for the third quarter of 1997 on Form 10-Q for the period ended September 30, 1997.

73.    On March 31, 1998, Enron filed with the SEC its Form 10-K for 1997, which included its audited annual financial statements for the period ended December 31, 1997. The financial statements were prefaced by an unqualified audit opinion from Andersen stating that those financial statements:

> [P]resent fairly, in all material respects, the financial position of Enron Corp. and subsidiaries as of December 31, 1997 and 1996, and the results of their operations, cash flows and changes in shareholders' equity for each of the three years in the period ended December 31, 1997,  in conformity with generally accepted accounting principles.

Neither the financial statements nor the 10-K disclosed the significant off-balance sheet transactions and hidden liabilities described herein.

74.    Andersen also certified that it had conducted its audit in accordance with Generally Accepted Auditing Standards ("GAAS").  GAAS requires an auditor to plan and perform an audit to obtain assurance that the financial statements are free of material misstatement.  To comply with GAAS, an auditor must examine evidence and assess the accounting principles used and the significant estimates made by management, and must perform an overall evaluation of the financial statement presentation. As discussed below, Andersen did not conduct its audit in accordance with GAAS.

**B.**   **Enron's Annual and Quarterly Financial Statements for 1998**

75.    On May 15, 1998, Enron filed with the SEC its financial statements for the first quarter of 1998 on Form 10-Q for the period ended March 31, 1998.

76.    On August 14, 1998, Enron filed with the SEC its financial statements for the second quarter of 1998 on Form 10-Q for the period ended June 30, 1998.

77.    On November 16, 1998, Enron filed with the SEC its financial statements for the third quarter of 1998 on Form 10-Q for the period ended September 30, 1998.

78.    On March 31, 1999, Enron filed with the SEC its Form 10-K for 1998, which included its audited annual financial statements for the period ended December 31, 1998. Once again, those financial statements were prefaced by an unqualified audit opinion letter from Andersen, certifying that the financial statements:

> [P]resent fairly, in all material respects, the financial position of Enron Corp. and subsidiaries as of December 31, 1998 and 1997, and the results of their operations, cash flows and changes in shareholders' equity for each of the three years in the period ended December 31, 1998, in conformity with generally accepted accounting principles.

79.    Andersen also certified, once again, that it had conducted its audit in accordance with GAAS.

80.    This 1998 10-K was later incorporated by reference into the registration statement for the Exchangeable Notes, as was Andersen's certification of those financial statements. The underwriters for the Exchangeable Notes were Goldman Sachs, Banc of America, and Citigroup/Salomon.  Neither the financial statements, the 10-K, nor the prospectus for the Exchangeable Notes disclosed the significant off-balance sheet transactions and hidden liabilities described herein.

**C.**   **Enron's Annual and Quarterly Financial Statements for 1999**

81.    On May 14, 1999, Enron filed with the SEC its financial statements for the first quarter of 1999 on Form 10-Q for the period ended March 31, 1999. The underwriters for the

Exchangeable Notes were Goldman Sachs, Banc of America, and Citigroup/Salomon. This financial statement was later incorporated by reference into the registration statement for the Exchangeable Notes.

82.     On August 16, 1999, Enron filed with the SEC its financial statements for the second quarter of 1999 on Form 10-Q for the period ended June 30, 1999.

83.     On November 15, 1999, Enron filed with the SEC its financial statements for the third quarter of 1999 on Form 10-Q for the period ended September 30, 1999.

84.     On March 30, 2000, Enron filed with the SEC its Form 10-K for 1999, including its audited annual financial statements for the period ended December 31, 1999. Those financial statements were prefaced, once again, by an unqualified audit opinion from Andersen stating that the financial statements:

> [P]resent fairly, in all material respects, the financial position of Enron Corp. and subsidiaries as of December 31, 1999 and 1998, and the results of their operations, cash flows and changes in shareholders' equity for each of the three years in the period ended December 31, 1999, in conformity with generally accepted accounting principles.

Neither the financial statements, the 10-K, nor the prospectus for the Zero Coupon Notes disclosed the significant off-balance sheet transactions and hidden liabilities described herein.

85.     Andersen also certified, once again, that it had conducted its audit in accordance with GAAS.

**D.      Enron's Annual and Quarterly Financial Statements for 2000**

86.     On May 15, 2000, Enron filed with the SEC its financial statements for the first quarter of 2000 on Form 10-Q for the period ended March 31, 2000.

87.     On August 14, 2000, Enron filed with the SEC its financial statements for the second quarter of 2000 on Form 10-Q for the period ended June 30, 2000.

88.     On November 14, 2000, Enron filed with the SEC its financial statements for the third quarter of 2000 on Form 10-Q for the period ended September 30, 2000.

/ / /

89.     On April 2, 2001, Enron filed with the SEC its Form 10-K for 2000, which included its audited annual financial statements for the period ended December 31, 2000.  Once again, those statements were prefaced by an unqualified audit opinion from Andersen, certifying that the financial statements:

> [P]resent fairly, in all material respects, the financial position of Enron Corp. and subsidiaries as of December 31, 2000 and 1999, and the results of their operations, cash flows and changes in shareholders' equity for each of the three years in the period ended December 31, 2000, in conformity with generally accepted accounting principles.

90.     Andersen also certified, once again, that it had conducted its audit in accordance with GAAS.

91.     This 10-K was later incorporated by reference into the registration statement for the Zero Coupon Notes, as was Andersen's certification of the 2000 financial statements.  Led by by Citigroup/Salomon, the initial purchasers of the Zero Coupon Notes also included Defendants Deutsche Banc Alex. Brown, JP Morgan, and Barclay's Capital.  Neither the financial statements, the 10-K, the offering memorandum, nor the prospectus for the Zero Coupon Notes disclosed the significant off-balance sheet transactions and hidden obligations described herein.

**E.     Additional Representations**

92.     Footnote 1 to the 2000 audited annual financial statements of Enron, as set forth on Form 10-K, documented by management, and approved by Andersen, represented that the financial statements were in conformity with Generally Accepted Accounting Principles ("GAAP") as to consolidation of financial statements:

> Consolidation Policy and Use of Estimates.  The accounting and financial reporting policies of Enron Corp. and its subsidiaries conform to generally accepted accounting principles and prevailing industry practices.  The consolidated financial statements include the accounts of all subsidiaries controlled by Enron Corp. after elimination of significant intercompany accounts and transactions.

93.     In its 2000 Form 10-K, Enron represented that its "senior unsecured long-term debt is currently rated BBB+ by Standard & Poor's Corporation and Fitch IBCA and Baa1 by Moody's Investor Services.  Enron's continued investment grade status is critical to the success

15

of its wholesale businesses as well as its ability to maintain adequate liquidity. Enron's management believes it will be able to maintain its credit rating."

**F.     Enron's First Quarter 2001 Financial Statements**

94.    On May 15, 2001, Enron filed with the SEC its financial statements for the first quarter of 2001 on Form 10-Q for the period ended March 31, 2001. These first quarter financial statements were prepared by management and reviewed and approved by Andersen prior to filing with the SEC. These financial statements were later incorporated by reference into the registration statement for the Zero Coupon Notes. The registration statement for the Zero Coupon Notes did not disclose the magnitude of the off balance sheet activities and liabilities of Enron.

**G.     Enron's Second Quarter 2001 Financial Statements**

95.    On August 14, 2001, Enron filed with the SEC its financial statements for the second quarter of 2001 on Form 10-Q for the period ended June 30, 2001. These second quarter financial statements were prepared by management and reviewed and approved by Andersen prior to filing with the SEC.

**H.     Public Statements by Defendants about Enron in 2001**

96.    Set forth below are some of the representations that were being made by Enron management and other defendants with respect to the financial condition and future prospects of Enron during the months leading up to its financial collapse.

97.    In August 2001, Skilling resigned as President and CEO of Enron, citing personal reasons. Skilling admitted that part of the reason for his resignation was the pressure associated with the decline in the market price of Enron common stock during his six-month tenure as CEO. Upon Skilling's resignation, Lay reassumed his position as CEO.

98.    Also in August 2001, Chairman and CEO Lay sent email messages to Enron employees, encouraging them to invest in Enron stock. An email from Lay dated August 14, 2001 stated: "Our performance has never been stronger; our business model has never been

more robust. . . . We have the finest organization in American business today."

99.    An email from Lay dated August 27, 2001 discussed the Enron Employee Stock Ownership Plan, with Lay stating that he anticipated "a significantly higher price" for Enron stock in the future.

100.    On October 9, 2001, Merrill issued an analyst report on Enron, raising its long term rating on Enron from "accumulate" to "buy" and projecting a five year growth rate for earnings per share of 17%.

101.    On the same day JP Morgan increased its rating on Enron to a "top pick" and continued to forecast earnings per share for the company of $1.82 and $2.17 for 2001 and 2002, respectively, projecting that Enron would be able to sustain 20% earnings growth over the long term.

102.    On October 9, 2001, Goldman Sachs disseminated a market analyst report calling Enron "the best of the best" and "strongly reiterating [its] Recommended List" rating.

103.    On  October 16, 2001, Enron issued a press release reporting its financial results for the quarter ending September 30, 2001.  Enron announced that it had recorded a $1 billion after-tax charge to its third quarter 2001 earnings to recognize asset impairments, restructuring costs, and losses associated with certain investments.  Enron put a positive spin on this one-time charge and stated that its core businesses were strong. Enron's press release stated:

> Enron Corp. announced today recurring earnings per diluted share of $0.43 for the third quarter of 2001, compared to $0.34 a year ago.  Total recurring net income increased to $393 million, versus $292 million a year ago.
>
> "Our 26 percent increase in recurring earnings per diluted share shows the very strong results of our core wholesale and retail energy businesses and our natural gas pipelines," said Kenneth L. Lay, Enron Chairman and CEO.  The continued excellent prospects in these businesses and Enron's leading market position make us very confident in our strong earnings outlook.
>
> Non-recurring charges totaling $1.01 billion after-tax, or $(1.11) loss per diluted share, were recognized for the third quarter of 2001.  The total net loss for the quarter, including non-recurring items, was $(618) million, or $(0.84) per diluted share.

/ / /

17

"After a thorough review of our businesses, we have decided to take these charges to clear away issues that have clouded the performance and earnings potential of our core energy businesses," said Lay.

104. Enron and its banks, including the underwriter defendants, downplayed the impact of the write-offs and represented to the public that Enron had resolved the improper balance sheets, taken all appropriate losses, and was going to achieve strong profitable growth due to the strength of its core businesses.

105. Chairman Lay and Enron management told the public that Enron was in strong financial condition, and that performance in the third quarter of 2001 included a 35% increase in recurring net income and a 26% increase in diluted recurring earnings per share. Lay told the public that Enron's core energy business fundamentals were excellent, and that the company would meet its fourth-quarter and year-end earnings targets.

106. Of particular importance to debt investors, Lay said that Enron's liquidity was excellent, with a debt to total capital ratio of about 50%, and that Enron did not foresee any credit downgrades.

107. When questioned, Chairman Lay denied that Enron would be taking further write-offs.

108. On October 16, 2001, Citigroup/Salomon issued an analyst report on Enron rating Enron stock a "Buy" and declaring that the write-offs would "clear the balance sheet of under-performing non-core assets which have been an overhang on the stock. View write-offs positively in the long run."

109. Also on that day, Bank of America released a report on Enron that continued to rate the company a "strong buy" and included its optimistic forecast for Enron earnings in 2001 and 2002. An energy analyst for Bank of America represented that "we like the energy marketing and trading industry, and we like Enron, being the biggest energy trader. It's an industry that is benefitting from deregulation in the United States and Europe. Volatility we think will be a positive. Enron does risk management and we see that as a good, long term

18

investment". Goldman Sachs continued to keep Enron on its Recommended List, its top rating.

110. Another Bank of America analyst statement on October 16, 2001, said "we believe the company has cleared the woods and therefore its investment outlook is positive. We reiterate our Strong Buy recommendation and $45 price target."

111. Goldman Sachs continued to keep Enron on its Recommended List, its top rating. On October 17, Goldman Sachs issued a statement that "we remain confident that Enron's core businesses have high and sustained growth prospects, that Enron can grow at an over 20% rate long term and that charges to dispose of non-core operations will undershoot fears." Enron remained on Goldman Sachs' Recommended List.

112. Also on October 17, 2001, JP Morgan issued a report on Enron, continuing to rate it a "Buy" and commenting that Enron had released "strong third quarter results" the day before.

113. Two days later, on October 19, 2001, Citigroup/Salomon issued a report rating Enron a "Buy" and maintaining its forecast for healthy earnings in 2001 and 2002; it "reiterated [its] buy rating on Enron after untangling part of a complicated story involving their balance sheet, cash flow and business practices."

114. On October 20, 2001, JP Morgan issued another report on Enron, rating the company a "long term buy," maintaining its previous earnings forecasts, and commenting that, despite the recent disclosures by the Company, "there is scant evidence of business impairment."

115. On October 22, 2001, Enron issued a press release disclosing that the SEC had commenced an informal inquiry into its accounting for certain related party transactions. In this press release, Enron stated that these transactions had been approved by the Enron Board of Directors, legal counsel, and Andersen.

116. On October 23, 2001, on a conference call with investors, Enron management expressed disappointment with its stock price and dismissed emerging criticisms of LJM[1] –

---

[1]     LJM, discussed below at ¶¶ 203 through 234, was one of the special purpose entities which were used to hide debt and inflate earnings.

which it termed a "private equity partnership." Management stated that LJM transactions had been reviewed by inside and outside auditors and lawyers, and approved by the Board of Directors of Enron. Management reaffirmed its "faith and confidence" in Mr. Fastow and praised his work as CFO. Management denied that there was any impropriety in its transactions with LJM and other special purpose entities, and claimed that the earnings from its transactions with SPEs would have been the same even if the transactions had been with unrelated third parties. Management told the public that a Chinese wall[2] and other prophylactic structures were in place to ensure that the paramount interests in any transactions with LJM were the company and its well-being.

117. On October 23, 2001, CSFB issued a research report reiterating its "STRONG BUY" recommendation and a $54 target.

118. That same day, JP Morgan issued another report on Enron continuing its "buy" rating "in the wake of severe price underperformance," which it attributed to "a crisis of perception that Enron can address through further clarity and transparency," and asserting that the SEC inquiry "will be concluded relatively quickly."

119. On October 24, 2001, Goldman Sachs reiterated its Recommended List rating (its top rating) and stated "we believe these concerns are very much exaggerated."

120. On October 24, 2001, Goldman Sachs reiterated its Recommended List rating (its top rating) and stated "we believe these concerns are very much exaggerated."

---

[2] Section 15(f) of the Exchange Act, 15 U.S.C. § 78o(f) provides, "Every registered broker or dealer shall establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of such broker's or dealer's business, to prevent misuse . . .of material, nonpublic information by such broker or dealer or any person associated with such broker or dealer." The Act also permits the SEC to make appropriate rules or regulations about these policies and procedures. See 17 C.F.R. §§230.137, 230.138, and 230.139. Thus an investment bank is required to erect a Chinese wall between its securities analysts' research department and its divisions providing commercial banking, underwriting, or other services to issuers of securities to prevent information from the latter from influencing the former.

121.    On October 26, 2001 CSFB reiterated its "STRONG BUY" rating and $54 target.

## V.

### PLAINTIFFS' INVESTMENTS IN ENRON DEBT SECURITIES

122.    Plaintiffs relied upon publicly available information in investing in Enron debt securities. They reviewed and considered Enron's financial statements in order to assess the current and recent financial condition of the company, including Enron's profitability, cash flow, outstanding debt, and capital structure. Plaintiffs reviewed historical data concerning Enron in order to confirm that Enron had demonstrated the ability to generate positive cash flow sufficient to service its debt.

123.    Particularly important to Plaintiffs was their review of the offering documents for the Exchangeable Notes and Zero Coupon Notes.  The offering documents are required to include a number of disclosures that are important to investors including, but not limited to, the relative seniority of the offering, terms of the debt, the tax implications of the offering, and an assessment of the key risk factors that investors should consider in advance of investing in the securities.  The prospectus/registration statements were key to Plaintiffs' review process, and they relied upon those documents in making their investment decision.  Plaintiffs believed in the competency of the underwriter defendants, and relied on their ability to complete due diligence on the company and their obligation to insure that the disclosures were complete and accurate.

124.    Plaintiffs also relied upon the trustworthiness of other publicly available information concerning Enron, including the reports of so-called independent research analysts, including Defendants.

125.    Because Plaintiffs were investing in debt securities, a key consideration in investing was their determination that Enron would be capable of returning Plaintiffs' capital in full, and of servicing the outstanding debt with timely coupon payments.

126.    Plaintiffs relied upon the information disclosed by Enron, documented by management, and confirmed by Andersen and the underwriters as a basis for their investment

decisions. This information was both filed directly with the SEC and was also incorporated by reference in the registration statements for the Exchangeable Notes and Zero Coupon Notes in which the Plaintiffs invested. The Plaintiffs relied on the representations made by the Defendants and believed the representations to be complete, accurate, and timely. This reliance on the historic public information resulted directly in the massive losses suffered by the Plaintiffs.

127. The publicly disclosed information failed to consolidate off-balance sheet entities in accordance with GAAP, failed to disclose off-balance sheet and hidden obligations in accordance with GAAP, and failed to disclose the off-balance-sheet entities and transactions and their associated hidden obligations as a possible risk factor.

## VI.

## ENRON'S REVELATIONS AND FINANCIAL COLLAPSE

128. On October 31, 2001, the SEC's inquiry became a formal investigation.

129. On October 31, 2001, a Merrill analyst wrote:

Once the dust settles and some semblance of credibility returns, we do think [Enron] should ultimately return to a more traditional p/e valuation . . . [Enron] valuation looks like $24.70 to $31.50.

130. On November 1, 2001, Enron issued a press release stating:

ENRON SECURES COMMITMENTS FOR ADDITIONAL $1 BILLION IN FINANCING

Enron Corp. announced today that J.P. Morgan (the investment banking arm of JP Morgan Chase & Co.) and Salomon Smith Barney Inc. (the investment banking arm of Citigroup Inc.) as co-arrangers have executed commitment letters to provide $1 billion of secured credit lines . . .. The proceeds will be used to supplement short-term liquidity and to refinance maturing obligations. . . .

"With more than $1 billion in cash currently on our balance sheet, this additional credit capacity will further solidify Enron's standing as the leading market maker in wholesale energy markets," said Kenneth L. Lay, Enron chairman and CEO. "We very much appreciate the support of two of our longstanding banking partners, JP Morgan and Citigroup."

/ / /

"This is yet another step in our efforts to enhance market and investor confidence," said Jeffrey McMahon, Enron's newly appointed chief financial officer. "We are moving aggressively to  strengthen our balance sheet and maintain our investment grade credit rating."

131.    On November 5, 2001, CSFB issued a research report continuing to recommend Enron with a "STRONG BUY" rating.

132.    On November 8, 2001, Enron announced that it would be restating its audited annual financial statements for 1997, 1998, 1999, and 2000, and its quarterly financial statements for all of 1997, 1998, 1999, 2000 and for the first two quarters of 2001.

133.    Also on November 8, 2001, Enron filed a Form 8-K with the SEC, signed by Richard Causey as Enron's Executive Vice President and Chief Accounting Officer, which included its restated financials for 1997 through 2001, and disclosed information concerning its off-book, related party transactions.  In this filing, Enron stated that:

a.    It had been forced to restate its annual and quarterly financial statements for the years ended December 31, 1997 through December 31, 2000 and its quarterly financial statements for the periods ended March 31, 2001 and June 30, 2001;

b.    None of the quarterly and annual financial statements from 1997 through 2001 "should not be relied upon";

c.    The restatement of prior period financial statements would reflect and include: (1) a $1.2 billion reduction to shareholders' equity to be booked in the third quarter of 2001, which was previously reported as an increase in assets and shareholders' equity; and (2) the consolidation of financial statements of three entities which engaged in related party transactions and/or in which Enron had an ownership interest, as required under GAAP;

d.    That a Special Committee had been created, headed by a newly appointed director, to review the related party, off-book transactions;

23

e.     That Enron's Chief Financial Officer Andrew Andrew Fastow ran related party limited partnerships, with which Enron engaged in off-book transactions, and for which Fastow received management fees of at least $30 million;

f.     The financial statements and financial activities of Chewco and JEDI should have been consolidated with the financial statements of Enron beginning in November 1997; and

g.     The financial statements and financial activities of LJM1 and its subsidiary should have been consolidated with the financial statements of Enron beginning in 1999.

134.    Enron's annual financials were restated as follows:

| RESTATEMENTS | | | | |
|---|---|---|---|---|
| | 1997 | 1998 | 1999 | 2000 |
| Recurring Overstatements of Net Income | $96,000,000 | $113,000,000 | $250,000,000 | $132,000,000 |
| Understatement of Debt | $711,000,000 | $561,000,000 | $685,000,000 | $628,000,000 |
| Overstatement of Shareholders' Equity | $313,000,000 | $448,000,000 | $834,000,000 | $1,164,000,000 |

135.    These restatements constitute an admission that the representations made in the original financial statements and other financial information contained in the registration statements and prospectuses concerning the compliance of those financial statements with GAAP were materially false and misleading when made.  Under GAAP, financial statements are to be restated only when the facts that necessitate the restatement were material and known or knowable at the time the financial statements were originally issued. Similarly, restatements may only be made and are required where material accounting errors or irregularities existed at the time the financial statements were prepared.

/ / /

136.     As large as the 1997 to 2000 financial restatements were, they just scratched the surface of the true extent of the prior falsification of Enron's financial statements because Enron, its advisors, and the banks were still trying to keep Enron afloat and trying to conceal how extensive the abuse had been.  At this point in time Enron had disclosed debt on its balance sheet of approximately $13 billion.  Ultimately, over 24,000 liquidated proofs of claim reflecting *$840 billion* in claims were filed in the Enron bankruptcy.  Allowed Enron North America debenture claims exceeded $51 billion, and allowed claims on Enron's Exchangeable Notes exceeded $402 million, claims on the Zero Coupon Notes exceeded $1.25 Billion, and there were billions more in claims on Enron's other senior debt.

137.     At the time the restatements were issued, most of the underwriter defendants were still recommending that investors purchase Enron securities.

## A.     Failure to Consolidate Special Purpose Entities Violation of Gaap

138.     Enron's financial statements from 1997 through 2001 were materially false and misleading, and therefore had to be restated, primarily because of the improper use of so-called special purpose entities to engage in off-book or off balance sheet transactions with Enron.  A special purpose entity (sometimes referred to as an "SPE") is an entity created by a sponsor to carry out a specified purpose or activity, such as to consummate a specific transaction or series of transactions with a narrowly defined purpose.  SPEs are generally used as financing vehicles in which assets are sold to a trust or similar entity in exchange for cash or other assets funded by debt issued by the trust.  SPEs are often used in a structured transaction or series of transactions to achieve off-balance-sheet treatment for accounting purposes.  Special purpose entities were used by Enron to hide debt, hide underperforming assets and manipulate its revenue, earnings and cash flow from operations.  Enron would  purport to "sell" assets to special purpose entities at prices that Enron never could have received in a true arms-length sale, creating the appearance that Enron was generating cash from operations, rather than from financing through non arms-length deals.

25

139.    The effect of those transactions was to artificially inflate Enron's revenue, earnings and cash flow from operations, and improperly exclude billions of dollars of debt from Enron's balance sheet.

**B.    The Collapse of the Merger with Dynegy**

140.    On November 9, 2001, Enron announced the signing of a definitive merger agreement with its competitor Dynegy.  Under the deal, Dynegy would acquire Enron for approximately $9 billion in Dynegy stock and the assumption of $13 billion in debt.  With this merger agreement it appeared to the public that Enron had value and would survive.

141.    A November 20, 2001 Merrill report stated, "Merger (with Dynegy) unshaken."

142.    On November 20, 2001, CSFB issued a report continuing to rate Enron as a "Strong Buy."

143.    On November 12, 2001, Goldman Sachs issued a report describing the Enron/Dynegy merger as a "Strong Combination" with "strong accretion to Dynegy."  Enron was maintained on Goldman Sachs' Recommended List with a price target of $11 to $12.

144.    On November 27, 2001, it was reported that the Dynegy deal was being renegotiated and that new terms would be announced.  The Chairman of JP Morgan and Vice Chairman of Citigroup/Salomon called Moody's to pressure them to keep Enron's investment grade credit rating in place.  Citigroup/Salomon was paid a fee of $45 million for their efforts to arrange the merger with Dynegy.

145.    On November 28, 2001, Dynegy announced the termination of the merger agreement with Enron, and Enron's debt securities were downgraded to "junk bond" status (*i.e.*, below investment grade).  After these announcements, the value of Enron's securities, both debt and equity, collapsed.  After a market price high of $90.75 in 2000 and a price of approximately $85 per share at the beginning of 2001, Enron common stock plummeted to a mere 26 cents by the end of November 2001.

/ / /

26

## C.  **Enron's Chapter 11 Filing**

146.    On December 2, 2001, Enron filed Chapter 11 bankruptcy, constituting what was then the largest bankruptcy in U.S. history.

147.    The disclosures and revelations of October and November, 2001, were just the beginning.  After it filed for bankruptcy, Enron's equity and debt securities were practically worthless; the Exchangeable Notes were trading at approximately seven cents on the dollar. Assuming Enron had approximately $60 billion in obligations, based on its market capitalization of approximately $22 billion as of October 1, 2001, Enron investors suffered over $75 billion of losses over a two month period from October 1 to December 1, 2001.

148.    The November restatement, although material, did not scratch the surface of the extent of the Enron scandal.  This was confirmed in April 2002 in a court filing by Stephen Cooper, the Chief Restructuring Officer for Enron.  This document stated:

> [C]urrent management of the Company has not undertaken, and does not intend to undertake, a comprehensive review of accounting adjustments, including asset impairments and write-downs, relating to previously reported financial information, and has not prepared a consolidated balance sheet of the Company as of December 31, 2001 prepared in accordance with generally accepted accounting principles.  However, current management believes that, if such a review were conducted and balance sheet prepared, a significant write-down of assets on such balance sheet would be required, which current management estimates would be approximately $ 14 billion. . . .
>
> [A] material portion of such estimated amount would relate to valuations of several assets the historical carrying value of which current management believes may have been overstated due to possible accounting errors or irregularities.
>
> In addition to the aforesaid write-down of assets, current management has identified potential downward adjustments on certain price risk management assets and collateral subject to set-off. . . . [C]urrent management believes that these adjustments could fall in the range of $8 billion - $10 billion.

149.    The magnitude of the fraud is also confirmed in the evidence presented by the Permanent Subcommittee on Investigations The Role of the Financial Institutions in Enron's Collapse (See Exhibits C) and the Reports by the Court Appointed Examiner, Neal Batson. According to Batson, "Enron so engineered its reported financial position and results of

27

operations that its financial statements bore little resemblance to its actual financial condition or performance."

## VII.

## THE ENRON NOTE OFFERINGS

### A.     The Exchangeable Notes Offering

#### 1.     Offering Summary

150.     In July of 1999, Enron made a public offering of 7% Exchangeable Notes, exchangeable into common stock of EOG Resources, Inc. (formerly named Enron Oil & Gas Company ("EOG Resources")). EOG Resources had formerly been a subsidiary of Enron, but is now an independent public company. Upon maturity of the Exchangeable Notes, Enron was contractually required to deliver its remaining EOG shares to the holders of the Exchangeable Notes in satisfaction of the principal. After the Exchangeable Notes offering, Enron owned enough shares of EOG Resources to satisfy that obligation. In essence, Enron pre-sold its remaining 11.5 million EOG shares, through the Exchangeable Notes, with delivery expected at maturation of the notes, July 31, 2002.

151.     Enron filed the preliminary prospectus and prospectus with the SEC on Form S-3 filed July 23, 1999, Form S-3/A as the Amendment No. 1 filed August 2, 1999, and Form S-3/A as the Amendment No. 2 filed August 10, 1999 (collectively, the "registration statement"). Those signing the registration statement included Lay, Skilling, Causey, and Fastow.  Defendant Citigroup/Salomon was among the underwriters.

152.     The registration statement for the Exchangeable Notes incorporated by reference Enron's annual financial statements for the year 1998 and for the first quarter of 1999:

> The SEC allows us to  incorporate by reference' the information we file with them, which means that we can disclose important information to you by referring you to those documents.  The information incorporated by reference is an important part of this prospectus, and information that we file later with the SEC will automatically update and supersede this information.  We incorporate by reference the documents listed below and any future filings made with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act until we sell all of the securities:

28

- Our Annual Report on Form 10-K for the year ended December 31, 1998;

- Our Quarterly Report on Form 10-Q for the quarter ended March 31, 1999; and

- Our Current Reports on Form 8-K, filed January 26, 1999 and March 18, 1999.

153. The amendments to the registration statements incorporated

- [Enron's] Annual Report on Form 10-K for the fiscal year ended December 31, 1998, as amended by Amendment No. 1 on Form 10-K/A; and

- [Enron's] Quarterly Report on Form 10-Q for the quarter ended March 31, 1999.

* * *

The consolidated financial statements included in our Current Report on Form 8-K dated March 18, 1999 and the consolidated financial statements and schedules included in our Annual Report on Form 10-K for the year ended December 31, 1998, incorporated by reference in this prospectus and elsewhere in the registration statement, have been audited by Arthur Andersen LLP, independent public accountants, as indicated in their reports with respect thereto, and are incorporated by reference herein in reliance upon the authority of said firm as experts in giving said reports.

154. Also incorporated as part of the registration statement for the Exchangeable Notes offering, with Andersen's written consent, was its audit opinion for Enron's 1998 annual financial statements:

CONSENT OF INDEPENDENT PUBLIC ACCOUNTANTS

As independent public accountants, we hereby consent to the incorporation by reference in this registration statement of our report on the consolidated financial statements of Enron Corp. and subsidiaries dated March 5, 1999, included in Enron Corp.'s Form 10-K, for the year ended December 31, 1998, and to all references to our Firm included in this registration statement.

s/ ARTHUR ANDERSEN LLP

Houston, Texas
July 23, 1999

/ / /

29

155.    The prospectus for the Exchangeable Notes contained financial information for Enron for the period 1994 through March 31, 1999. This financial history painted a picture of a company that was strong and profitable. The assessment of historical financial information is particularly important for debt investors because they are looking for evidence that they will get their money back. The assessment of historic performance and trends is critical for debt investors because, unlike equity investors, they are not participating in the future growth of the company.

### 2.    <u>Misstatements and Omissions</u>

156.    In addition to the acknowledged material errors in the financial statements that resulted in the November restatements of Enron's financial statements for the 1997 to 2000 period, there was virtually no disclosure included in the prospectus as to the full existence and magnitude of the company's off balance sheet activities and obligations. This information was not disclosed or even mentioned as a risk.

157.    As described in the first report by Neal Batson, the court-appointed examiner in the bankruptcy, the disclosure of Enron's obligations related to the SPE transactions was not in accordance with GAAP.

158.    The off-balance sheet transactions were very sophisticated and relied on a particular legal interpretation and accounting treatment to ensure that they were properly excluded from Enron's financial statements. Given the evolution of both legal interpretations and accounting methodology with respect to financing vehicles, and the fact that any small change in legal interpretation or accounting practice could have resulted in the consolidation of the off-balance sheet structures, the risk that these transactions might be required to be included in Enron's financial statements should have been disclosed to investors. If these structures had been identified as a possible risk, potential investors would have been able to take the necessary steps to assess the impact these transactions would have had on the value and viability of this investment.

159.    For example, Plaintiffs believed they were investing in a company with $7.4 billion in debt obligations as of December 1998.  Instead, the true obligations, as revealed after Enron's restatements, totaled $29.5 billion, an understatement of $22.1 billion.  This was a material misrepresentation.  Enron's assets and liabilities were consistently and grossly understated from 1994 through 1999:

| (All Figures In $ Millions) | Dec. '99 | Dec. '98 | Dec. '97 | Dec. '96 | Dec. '95 | Dec. '94 |
|---|---|---|---|---|---|---|
| **Assets on Balance Sheet** | 33,381 | 29,350 | 22,552 | 16,137 | 13,239 | 11,966 |
| **Total Assets** | 60,364 | 51,475 | 36,103 | 27,690 | 23,798 | 21,132 |
| **Understatement** | 26,983 | 22,125 | 13,551 | 11,553 | 10,559 | 9,166 |
| **Long Term Debt on Balance Sheet** | 7,151 | 7,357 | 6,254 | 3,349 | 3,065 | 2,805 |
| **Actual Long Term Debt** | 34,134 | 29,482 | 19,805 | 14,902 | 13,624 | 11,971 |
| **Understatement** | 26,983 | 22,125 | 13,551 | 11,553 | 10,559 | 9,166 |

160.    The financial picture and risk factors that were disclosed in the prospectus were materially incomplete and incorrect, resulting in the Plaintiffs' inability to fairly evaluate Enron's financial condition.  Plaintiffs relied on the accuracy of the historical financial information contained in the prospectus for the Exchangeable Notes in making their investment decisions.

**B.      The Zero Coupon Note Offering**

**1.      Offering Summary**

161.    In a private placement on February 7, 2001, Enron sold $1.9 billion in Zero Coupon Notes, convertible into common stock of Enron to a group of financial institutions (the "Initial Purchasers"). These Initial Purchasers then sold the notes to institutional purchasers, and then to the public, once the registration statement for these notes had become effective. Citigroup/Salomon was the lead underwriter on the transaction.

162.     The public offering of these notes began in June of 2001.  Enron filed the preliminary prospectus and prospectus with the SEC on Form S-3 dated June 1, 2001, Form S-3/A as the Amendment No. 1 dated July 13, 2001, a Form 424(b)(3) prospectus dated July 25, 2001, and supplements 1-4 to the Form 424(b)(3) prospectus dated August 3, 2001, August 17, 2001, September 26, 2001, and October 12, 2001, respectively (collectively, the "Registration Statement").  Those signing the Registration Statement for these notes included Lay, Skilling, Fastow, and Causey.

163.     Enron, in desperate need of cash, sold the Zero Coupon Notes to the banks, which then resold the Notes or hedged their risk of loss on the notes by shorting Enron's  common stock.  Enron registered the Zero Coupon Notes with the SEC in order for the purchasers to resell the notes.  The proceeds were used by Enron to reduce its short-term debt, *i.e.*, commercial paper and/or bank debt to JP Morgan and/or Citigroup in order to keep the Underwriter scheme alive.

164.     Citigroup/Salomon, Deutsche Bank, JP Morgan, and Barclay's were the initial purchasers/underwriters of the Zero Coupon Notes.  Subsequent buyers in the private placement (including CSFB and Goldman Sachs) purchased with the intent to re-sell the Notes they had purchased.  CSFB and Goldman Sachs purchased some of the private placement and is are statutory underwriters.

165.     The Registration Statement for these Notes stated that the private placement purchasers would be required to be named as a selling securityholder in the related prospectus; would be required to deliver a copy of the form S-3 to purchasers; would be "subject to certain of the civil liability provisions under the Securities Act in connection with such sales," and "may be deemed to be underwriters within the meaning of the Securities Act."  Defendants purchased the Zero Coupon Notes with a view to the distribution of those securities and were statutory underwriters of this offering.

166.     The Registration Statement for the Zero Coupon Notes stated:

We incorporate by reference in this prospectus the following documents filed
by us with the SEC:

32

- Our Annual Report on Form 10-K for the year ended December 31, 2000;

- Our Quarterly Report on Form 10-Q for the quarter ended March 31, 2001;

- Our Current Reports on Form 8-K filed with the SEC on January 31, 2001 and February 28, 2001; and

- The description of our capital stock set forth in our Registration Statement on Form 8-B filed on July 2, 1997.

* * *

The consolidated financial statements and schedule included in our Annual Report on Form 10-K for the year ended December 31, 2000, incorporated by reference in this prospectus and elsewhere in the registration statement, have been audited by Arthur Andersen LLP, independent public accountants, as indicated in their reports with respect thereto, and are incorporated by reference herein in reliance upon the authority of said firm as experts in giving said reports.

167. Andersen had given its written consent to incorporation of its audit opinion for Enron's 2000 annual financial statements as part of the Prospectus and Form S-3s on the Zero Coupon Notes:

CONSENT OF INDEPENDENT PUBLIC ACCOUNTANTS

As independent public accountants, we hereby consent to the incorporation by reference in this Registration Statement of our reports dated February 23, 2001 included in Enron Corp.'s Form 10-K, for the year ended December 31, 2000, and to all references to our Firm included in this Registration Statement.

s/ ARTHUR ANDERSEN LLP

Houston, Texas
May 31, 2001

**2.** **Misstatements and Omissions**

168. In addition to the materially misstated revenue, earnings, cash flow from operations and debt (acknowledged in the November restatement and further confirmed in the April 2002 report by the Chief Restructuring Officer, the Powers Report, and the Reports of the Court Examiner Neal Batson), the prospectus for the Zero Coupon Notes did not disclose the full existence and magnitude of Enron's off balance sheet activities and true financial obligations.

33

169.     Defendants Citigroup/Salomon, Deutsche Bank, Barclay's, JP Morgan, and CSFB, were statutory underwriters of the Zero Coupon Notes.  The registration statement for the Zero Coupon Notes did not disclose the magnitude of the off balance sheet activities and hidden liabilities of Enron described herein. They were not even mentioned as a risk factor.  As discussed earlier, Enron disclosed debt of approximately $13 billion on its balance sheet, its total debt was in the hundreds of billions of dollars.  In addition to the materially incorrect financial statements, all the financial ratios in the prospectus were wrong and misleading.  Historic financial ratios are of particular importance to an investor in debt securities.

**C.     Plaintiffs' Note Purchases**

**1.     Summary of Purchases**

170.     The Plaintiffs purchased Enron debt securities in October of 2001, and were damaged thereby.  Prior to making any debt purchases, Plaintiffs, through their agent Silvercreek Management, Inc.,  read the prospectus for the Exchangeable Notes and the offering memorandum and prospectus for the Zero Coupon Notes and relied on the accuracy and completeness of the information contained therein.  At the time that Plaintiffs were making their investments, Enron was one of the most highly recommended companies by the analysts on Wall Street, including by the Underwriter Defendants.  It was a BBB+ investment grade credit, with a multi-billion dollar equity market capitalization and a long history of stable financial performance.  Because Plaintiffs were investing in senior bonds, Enron would have had to lose at least $20 billion of equity value before Plaintiffs' investment would potentially start to be impaired.  Plaintiffs were not buying distressed securities.  They were buying senior bonds of a BBB+ rated highly regarded company.  Plaintiffs' investments were or should have been relatively low-risk yield-oriented trades.  Unlike a common equity investment (or a distressed security investment), there was not a large potential upside.  To be successful, all that was required was that the company stay solvent – which, at the time that investments were made,

seemed certain.  However, the financial information in the prospectuses did not reflect the company's true financial condition.

171.    The Plaintiffs purchased the Enron securities as follows:

a.      Plaintiff Silvercreek II Limited initially purchased Exchangeable Notes in October 2000.  This position was completely sold prior to October 24, 2001.  Plaintiff Silvercreek II Limited re-purchased Exchangeable Notes on October 24 and 25, 2001, and purchased Zero Coupon Notes on October 18 through October 26, 2001;

b.      Plaintiff OIP Limited initially purchased Exchangeable Notes in October 2000.  This position was completely sold prior to October 24, 2001.  Plaintiff OIP Limited re-purchased Exchangeable Notes on October 24, 25, and 26, 2001, and purchased Zero Coupon Notes on October 19 through October 24, 2001;

c.      Plaintiff Pebble Limited Partnership initially purchased Exchangeable Notes in October 2000.  This position was completely sold prior to October 24, 2001.  Plaintiff Pebble Limited Partnership re-purchased Exchangeable Notes on October 24 and 26, 2001, and purchased Zero Coupon Notes on October 19 through 24, 2001; and

d.      Plaintiff Silvercreek Limited Partnership initially purchased Exchangeable Notes in October 2000.  This position was completely sold prior to October 24, 2001. Plaintiff Silvercreek Limited Partnership re-purchased Exchangeable Notes on October 24 and 25, 2001, and purchased Zero Coupon Notes on October 19 through 31, 2001.

**2.      <u>Reliance on Prospectuses and Historic Financial Information</u>**

172.    Prior to Plaintiffs' purchases of the Zero Coupon Notes, Enron had not made

generally available to security holders an earnings statement covering a period of at least 12 months beginning after the effective date of the registration statement for those Notes. The prospectus was dated July 25, 2001, with supplements dated as late as October 12, 2001.

173. In purchasing the Zero Coupon Notes, Plaintiffs relied on the offering memorandum, the Registration Statement, and the financial statements incorporated by reference therein.

174. Prior to Plaintiffs' initial purchases of the Exchangeable Notes, Enron had not made generally available to security holders an earnings statement covering a period of at least 12 months beginning after the effective date of the registration statement for these Notes. Prior to Plaintiffs repurchase of the Exchangeable Notes, Enron had not made generally available to security holders an earnings statement covering the year 2001. In fact, given the November 2001 restatement, Enron had not made generally available a valid, accurate earnings statement for any 12 month period between the effective date of the registration statement for the Exchangeable Notes and the date of Silvercreek's purchases.

175. In purchasing the Exchangeable Notes, Plaintiffs relied on the Registration Statement, the financial information contained therein, and the financial statements incorporated by reference therein.

**3.** **Reliance on Publicly Available Information**

176. In making the purchases of these Enron debt securities, Plaintiffs, and each of them, either directly or through their agent Silvercreek, read, reviewed, and relied upon the following:

      a.    The registration statement for the Zero Coupon Notes, and all information and documents incorporated therein by reference;

      b.    The offering memorandum prepared by the Statutory Underwriter Defendants for the Zero Coupon Notes;

c.     The Registration Statement for the Exchangeable Notes, and all information and documents incorporated therein by reference;

d.     Enron's Annual Reports, including but not limited to the 1999 and 2000 Annual Reports, and the 1999 and 2000 Form 10-Ks filed with the SEC, including the financial statements and auditor's opinions contained therein;

e.     Enron's quarterly financial statements as filed with the SEC on Form 10-Q, including but not limited to financial statements for the fiscal years of 1999 and 2000, and the first two quarters of 2001;

f.     Enron's press releases and earnings announcements, including but not limited to public announcements as to the financial results for Enron for the years 1999 and 2000, and the first two quarters of 2001;

g.     Information contained in the Enron Website;

h.     Public credit ratings for the Enron notes purchased by Plaintiffs, including ratings, press releases, and information from S&P, Moody's and Fitch;

i.     Investment research regarding Enron provided by securities brokerages, including but not limited to the Underwriter Defendants named in this complaint;

j.     Representations made by Defendants' research analysts including but not limited to the Defendants named in this complaint, who all commented favorably on the October 2001 announced financial results of Enron and reiterated their "buy" ratings on the company; and

k.     Representations made by Enron officers and representatives in conference calls with investors on October 16 and October 23, 2001.

**4.     <u>Economic Losses Suffered as a Direct Result of Reliance on Information</u>**

177.     As reflected in Exhibit A, Plaintiffs have sustained economic losses as follows:

a.　　Plaintiff Silvercreek II Limited has sustained economic losses in excess of **$41.9 million** on Enron Exchangeable Notes and in excess of **$12.4 million** on Enron Zero Coupon Notes;

b.　　Plaintiff OIP Limited has sustained economic losses in excess of **$28.7 million** on Enron Exchangeable Notes and almost **$3 million** in Enron Zero Coupon Notes;

c.　　Plaintiff Pebble Limited Partnership has sustained economic losses in excess of **$10.3 million** on Enron Exchangeable Notes and in excess of **$2.1 million** n Enron Zero Coupon Notes;

d.　　Plaintiff Silvercreek Limited Partnership has sustained economic losses in excess of **$18.6 million** on Enron Exchangeable Notes and in excess of **$4.3 million** on Enron Zero Coupon Notes; and

e.　　Due to the reversal of accrued fees as a result of the Enron losses, Plaintiff Silvercreek Management Inc.'s direct share of the total has suffered losses of almost **$18  million** as to the Enron Exchangeable Note trades and in excess of **$4.1 million** as to the Enron Zero Coupon trades.  In addition, Plaintiff Silvercreek Management, Inc.  has suffered additional losses to its business, in an amount to be determined at trial, as a result of the acts complained of herein.

## VIII.

## WRONGFUL FINANCIAL MANIPULATIONS, SCHEMES AND CONTRIVANCES

A.　　**The Off-Book Financial Transactions**

　　1.　　**The Purposes and Effects of Enron's Use of Special Purpose Entities**

178.　Enron's use of special purpose entities to manipulate its reported financial statements was a primary reason why the financial statements were materially false and misleading.

179.     The purpose and effect of the SPE transactions was to artificially inflate Enron's revenue, earnings and cash flow from operations and improperly exclude billions of dollars of recourse debt from Enron's balance sheet.  The recourse debt was not disclosed and the proceeds from these obligations were actually reported as revenue and cash flow from operations.  The investment bank defendants directly participated in many of these transactions, and invested in many of the special purpose entities, knowing that they were being used to mislead the public, to generate false profits for Enron, and to hide debt and liabilities.

180.     Ordinarily, majority owned subsidiaries of a company must be consolidated with the parent for financial reporting purposes, unless the parent does not actually exercise control over that subsidiary, or such control is temporary.  If owned by a special purpose entity, the financial statements need not be consolidated if the parent does not maintain control over the assets transferred to that entity. As discussed below, Enron, with the active participation of the Defendants, created a series of SPEs that appeared to own assets; in reality, Enron actually controlled and continued to own the assets.

181.     Enron took the position that an entity did not have to be consolidated if there was as little as 3% independent ownership of the entity. Although that position had no clear foundation, many of the SPEs never even had 3% independent equity ownership, despite the deceptive efforts of several of the Defendants, described below, to make it appear that 3% independent ownership did exist. It was improper under GAAP to exclude these SPEs from Enron's reported financial results.

182.     Enron's extensive use of SPEs resulted in a massive understatement of its obligations and overstatement of its earnings and cash flow.  For example, according to the Powers Report, which was commissioned by Enron, SPEs resulted in Enron reporting earnings for the third quarter of 2000 through the third quarter of 2001 that were almost $1 billion higher than should have been reported.  At a private meeting with its bankers on November 19, 2001, Enron disclosed that in addition to the $13 billion in debt on its balance sheet it also had an

additional $25.1 billion in debt that was not disclosed as debt on its financial statements. Of this additional $25.1 billion, $13 billion was attributed to transactions with SPEs. Ultimately, this deceptive practice defrauded investors, including Plaintiffs of billions of dollars and resulted in the collapse of the company.

183. The SPE transactions were of two general types: asset "sales" (in reality disguised loans) and purported "hedging" transactions (such as the Rhythms transaction and Raptors transactions discussed below). Each transaction type was fraudulent and neither disclosed nor accounted for properly.

184. In an asset "sale" transaction, an Enron entity purported to sell an asset to an SPE (typically an underperforming asset at an inflated price) in exchange for cash and other consideration. That cash was obtained through a loan to the SPE from a financial institution (including Defendants Citigroup/Salomon, Barclay's, CSFB, and J.P. Morgan). However, unlike most transactions in which a person sells an asset, in these SPE transactions, Enron:

(i)    agreed to repay the debt incurred by the SPE to finance the purchase price (typically through an <u>undisclosed</u> total return swap with the financial institution);

(ii)    continued to control the "sold" asset;

(iii)    retained the full economic risk of the asset (both upside and downside); and in some cases,

(iv)    treated the transaction as a loan for tax purposes.

185. In reality, the asset was not sold to the SPE and the funds received from the financial institution were actually a disguised loan to Enron and should have been disclosed as such. Instead, Enron:

(i)    recorded a <u>gain</u> from the "sale" of the asset (*i.e.*, manufactured revenue and earnings);

(ii)    categorized the loan proceeds from the financial institution as "cash from operations" (should have been cash from financing); and

(iii)    did not consolidate the asset, thereby moving any debt associated with the asset off-balance sheet, including the additional debt associated with the funding of the "sale" (*i.e.*, substantial debt was hidden).

186.    As stated by the court-appointed examiner, Neal Batson, in his First Interim Report, "the only common characteristics in most of the Selected Transactions that support a sale characterization are the express terms of the documents that, among other things, state that the relevant transfers are sales and that Enron accounted for most of these transactions as "sales,'" (*i.e.*, they were "papered" as sales but in reality were loans).

187.    It is clear that the lenders "investors" in these transactions (e.g., Citigroup/Salomon, Barclays, J.P. Morgan, CSFB, etc.) viewed the arrangements as Enron debt (not an investment dependent upon the financial performance of the underlying assets). Defendants did not take a back-up security interest nor did they require delivery to them of legal opinions on true sale and non-substantive consolidation - the lenders were really lending money to Enron.  In addition, the loan pricing was based on Enron's credit.  However, they worked with Enron to create documentation (including the creation of phony "equity") that had the appearance of a sale, thereby misleading investors, including Plaintiffs.

188.    In return for acting as the front man on these transactions, the SPEs (which had many financial institutions as investors including Citigroup/Salomon,  J.P. Morgan, Deutsche Bank, Merrill and CSFB) received a very attractive "specified return on their equity," and Enron guaranteed their debt.  The SPEs did not take on any economic risk but were paid for a "service" (*i.e.*, to create and further the artifice and scheme to hide debt and inflate revenue and earnings).

189.    In the "hedging" transactions, the SPEs were used to manufacture earnings and hide substantial losses on underperforming assets.  These were highly improper transactions as Enron was, in effect, "hedging" with itself.  The company retained the risk associated with the assets and the sole benefit was the ability to deceptively manipulate its financial statements.  These had a material impact on Enron's financial statements.  Two examples are the Rhythms

transaction and the Raptors transactions, described later. Defendants Citigroup/Salomon, JP Morgan, Deutsche Bank and Merrill earned extraordinary returns from these transactions.

190. For example, the rates of return on the four Raptor transactions were 193%, 278%, 2500%, and a projected 125% respectively. According to the Powers Report "LJM2 was largely assured of a windfall from the inception of the transaction."

191. Hence, there was an economic cost to these transactions as the SPE, such as LJM2, was paid to act as a "front man" for the fraudulent scheme.

192. According to the First Interim Report of Court Examiner, Neal Batson, "Enron's obligations . . . entered into in connection with the SPE transactions were not properly disclosed in Enron's financial statements as required by GAAP."

### 2. Specific Examples of Improper Use of Special Purpose Entities

193. There are a number of examples of SPEs that Enron and its bankers and other advisers used to deceive investors. The following sections summarize a few structures that are representative of the financial manipulation perpetrated by Enron and its investment bankers and advisors.

#### a. JEDI and Chewco

194. Joint Energy Development Investments Limited Partnership, which Enron called "JEDI," is a Delaware limited partnership. From June 1993 through November 1997, Enron Capital Management LP of Houston served as JEDI's general partner, and the California Public Employees' Retirement System ("CalPERS") was the limited partner. Because CalPERS was a genuinely independent entity, there was originally a legitimate basis for excluding JEDI's financial results from Enron's.

195. In November 1997 CalPERS bowed out as limited partner of JEDI, and no substitute independent investor could be found to take its place. The departure of CalPERS created a significant issue for Enron. As long as there was a truly independent limited partner, Enron was not required to consolidate JEDI in its financial statements and it was able to record a

number of profitable transactions it had executed with JEDI. Unless the ownership structure of JEDI could be restructured and a new, independent investor added, Enron would be deemed to have control of JEDI and therefore would be required to consolidate JEDI into its financial statements. The impact of consolidating JEDI would have been material. Approximately 40% of Enron's profits in 1997 had been generated through transactions with JEDI. In addition, approximately $700 million in debt would have been added to Enron's outstanding debt obligations. Instead of consolidating JEDI, Enron, working with its bankers and advisors, created another entity, Chewco Investments LP ("Chewco"). Enron purchased CalPERS' limited partnership interest in JEDI, and then sold the interest to Chewco for $383 million, ($132 million financed by an interest-bearing loan from JEDI to Chewco, $240 million from Barclay's Bank PLC), and affiliate of Defendant Barclay's, (guaranteed by Enron) and $11.4 million in "equity" loans from Barclay's Bank PLC. The Barclay's loan was supported by a guarantee from Enron. In an attempt to create the appearance that an independent investor had a 3% stake in JEDI, Barclay's provided $11.4 million in "equity loans" to entities investing in Chewco. These were actually loans, but were "papered" in such a way as to facilitate their mischaracterization as equity contributions; however, the borrowers were required to deposit $6.6 million into cash reserve accounts, diluting Barclay's alleged "equity exposure" to well below the 3% level.

196. The documentation for the "equity" loans was intended to allow Barclays to characterize the advances as loans while allowing Enron and Chewco to characterize them as equity contributions. However, Barclays required that undisclosed reserve accounts be funded with $6.6 million in cash at closing and that the reserve accounts be fully pledged to secure repayment of the $11.4 million. The existence of this cash collateral was fatal to Chewco's compliance with the 3% equity requirement. As a result Chewco should have been consolidated into Enron's financial statements from the outset (November 1997).

197. Barclay's knew that its so-called "equity loans" were being used as a pretext to justify the exclusion of Chewco and JEDI from Enron's financial statements.

198.     In fact, it was apparent to Barclay's, and to anyone else who was aware of Chewco's operations, that Chewco (and therefore JEDI) was not independent of Enron, but was under Enron's complete control.  Chewco was managed by an Enron Global Finance employee, Michael Kopper, who reported to CFO Fastow.  Kopper was an investor in the general partner of Chewco and, at the time of the purchase, was also the manager of the Chewco general partner. Defendant Vinson & Elkins prepared the legal documentation for JEDI and Chewco.  On December 12, 1997, Kopper transferred his ownership interest in a deceptive manner to make it appear that Enron had no formal interest in Chewco. Dodson received $12.6 million from Chewco, which was a huge gain on the $125,000 which was originally provided to fund Little River LLC and Big River LLC (the entities which invested in Chewco) by Kopper and Dodson.

199.     Enron's financial statements improperly failed to consolidate the financial results, assets and liabilities of JEDI and Chewco. When Enron restated its financial results in November 2001, the revised statements consolidated JEDI and Chewco, which represents an admission that JEDI and Chewco should have been included in those financial statements since 1997.

200.     The failure to consolidate JEDI and Chewco's financial results caused Enron to overstate its earnings by over $400 million during the 1997-2000 period, and to exclude, improperly, debts of over half a billion dollars.

201.     Defendant Andersen knew, or recklessly disregarded, the fact that JEDI and Chewco were not independent of Enron and therefore had to be consolidated into Enron's financial statements.  As the key lender, Barclay's also had intimate knowledge of the transaction and was aware of the hidden debt.  Likewise, Defendant Vinson & Elkins had full knowledge of this transaction, but issued a misleading "true issuance" opinion to conceal the true terms of the transaction.

      **b.**     **LJM1 and LJM2**

202.     LJM Cayman LP, commonly referred to by Enron as LJM1, and LJM2 Co-Investment, L.P., commonly referred to by Enron as LJM2, were private investment limited

partnerships formed in 1999. The LJM entities represented themselves as private investment companies engaged in acquiring or investing in energy and communications-related investments, primarily involving either assets that Enron wanted to sell, or risk management activities designed to limit Enron's exposure to price and value fluctuations as to its assets.

203.    In fact, the LJM entities were solely a construct utilized to manufacture revenue and earnings and hide debt.  They did not make any true investments and had no purpose other than to hide Enron's true financial condition.  The investors in LJM, including Defendants Citigroup/Salomon, JP Morgan, Deutsche Bank, Merrill, and CSFB, directly participated in this fraudulent scheme and expected to earn extraordinary returns in exchange for their participation. Enron guaranteed specified returns to the LJM entities and they never lost money on a transaction, even when the "purchased" asset declined in value.

204.    Enron entered into more than 20 distinct transactions with the two LJM partnerships.   These transactions had a significant effect on Enron's financial statements.  Taken together, they resulted in substantial recognition of false revenue and income, the avoidance of substantial recognition of loss, and the hiding of massive  amounts of debt.

205.    LJM1 was formed in June 1999.  Enron raised $15 million from two limited partners.   ERNB Ltd. (affiliated with CSFB) and Campsie Ltd. (affiliated with Nat. West). LJM1 entered into three transactions with Enron:

(i)     An effort to "hedge" Enron's position in Rhythms stock;

(ii)    The purchase of a portion of Enron's interest in a Brazilian power project
        (Cuiaba); and

(iii)   An investment in Osprey Trust (an entity used to fund SPE transactions).

206.    Among those who invested in and helped structure the LJM2 entities were Defendants Merrill, Citigroup/Salomon, CSFB, JP Morgan, and Deutsche Bank.

/ / /

207.     Defendants Fastow and Merrill solicited prospective investors for LJM2 using a Private Memorandum that detailed the "unusually attractive investment opportunities resulting from the partnership's connection to Enron," and that Fastow's "access to Enron's information pertaining to potential investments will contribute to superior returns."

208.     Merrill was unable to raise the necessary funds from outside before the year end 1999, hence, defendants J.P. Morgan, CIBC, Citigroup, Deutsche Bank, CSFB, Lehman Brothers and Merrill became the underwriters of LJM2. The underwriters were aware that Enron officers would control both sides of the transactions and thus insure high returns. On December 22, 1999, the banks loaned almost 100% of the funds needed to fund LJM2. JP Morgan provided an additional $65 million credit line to LJM2. This funding enabled Enron to do deals involving Whitewing, collateralized loan obligations, the Nowa Sarzyna power plant, MEGS natural gas and Yosemite certificates to create phony profits and conceal debt before the year's end. The investors were rewarded by exorbitant returns – up to 2,500% on one deal and 51% overall within the first year.

209.     The investment banks were eager to participate in LJM2 because of promises made to them by Enron that LJM2 would benefit (and they did benefit) by engaging in lucrative self-dealing transactions with Enron that would be arranged by Defendant Fastow. The banks, including Defendants Citigroup/Salomon, JP Morgan, CSFB, Merrill, and Deutsche Bank provided "extraordinary" assistance to Enron in the set up of LJM2. The banks provided pre-funding to the partnership at the end of 1999, a critical point in time for the company. LJM2 used the money in the final days of 1999 to buy several Enron assets that the company had failed to sell to other parties. In addition to moving debt off the balance sheet, this enabled Enron to report large gains and to overstate its revenue and profits for 1999. Hence, through an unusual pre-funding arrangement, the banks, including Citigroup/Salomon, JP Morgan, CSFB, Merrill, and Deutsche Bank directly helped Enron to create fake revenue and profits and hide debt

(thereby artificially propping up the value of Enron's public securities).   The banks also provided separate and substantial hidden loans to fund the transactions undertaken by LJM2.

210.   As with Chewco and JEDI, Enron was in complete control of both LJM1 and LJM2. Fastow was the managing member of the general partner of both entities from the time of their creation until approximately July 31, 2001; yet Fastow was contemporaneously an officer and employee of Enron, serving as its Executive Vice President and Chief Financial Officer. Fastow received at least $30 million in "management fees" for his services as the managing member of the general partner of these two entities, while contemporaneously being paid by Enron.

211.   Part of the arrangement between Enron and the LJM entities was a "services agreement" whereby Enron made available to LJM1 and LJM2 the services of certain Enron officers and employees to provide "administrative assistance" to the general partners of LJM1 and LJM2.  In other words, officers and employees of Enron were used by Fastow to put together the paperwork, legal work, and other necessary aspects of the subject off-book transactions. Enron also paid the LJM entities management fees and transaction fees, and reimbursed them for transaction costs.

212.   Enron's transactions with these entities entailed obvious conflicts of interest, the most blatant of which were conflicts for Fastow.  Enron's Chairman Lay, Chief Accounting Officer Causey, and Chief Risk Officer Buy were supposed to review and sign off on every single transaction between LJM1 or LJM2 and Enron.  The Chief Accounting Officer Richard Causey is a former employee of Andersen, and worked as an accountant at Andersen immediately prior to his employment with Enron.  The Enron Board's Audit and Compliance Committee was required to conduct annual reviews of transactions between Enron and LJM1 and LJM2 completed during the prior year. These facts reflect the realization that LJM1 and LJM2 were not independent entities.

/ / /

213.     From June 1999 through September 2001, Enron and Enron-related entities entered into dozens of business relationships involving hundreds of millions of dollars in which LJM1 or LJM2 participated.

214.     These relationships were of several general types, including: (a) mutual sales of assets between Enron and LJM2; (b) LJM 1's and/or LJM2's purchases of debt or equity interests in Enron-sponsored special purpose entities; (c) LJM1's and/or LJM2's purchases of debt or equity interests in Enron affiliates or other entities in which Enron was an investor; (d) LJM1's or LJM2's purchases of equity investments in Special Purpose Entities designed to reduce market risk in Enron's investments; (e) LJM2's sale of a call option and put option on assets; and (f) LJM2 obtained a subordinated loan from an Enron affiliate.  Although these were all self-dealing transactions with controlled subsidiaries, in each case Enron accounted for them as if they had been made with unrelated third parties, typically booking profits on the transactions while excluding from its balance sheet the debts incurred by these entities in financing these transactions.  These entities generated hundreds of millions of dollars of earnings for Enron in the second half of 1999.

215.     Enron engaged in "hedging" transactions with many special purpose entities created by Enron, its investments banks, and the LJM entities.  These included price swap derivatives, call options, and put options to allegedly hedge Enron's risk in certain investments having an aggregate notional amount of approximately $1.9 billion.  Enron provided credit support to the creditors of special purpose entities through the use of financial guarantees and hedging contracts (typically total return swaps).  Many of these transactions were not real hedges. They did not transfer risk and were not entered into with an independent counterpart.

216.     LJM1's first deal was the Rhythms Net Connections, Inc. ("Rhythms") transaction.  This transaction was significant for several reasons.  It was the first time that Enron transferred its own stock to an SPE and used the SPE to "hedge" an Enron merchant investment. In this respect, Rhythms was the precursor to the Raptor vehicles (described later).  Rhythms also

provided the first example of how transactions resulted in economic terms that were skewed toward the LJM entities and their investors.

217. Enron booked millions of dollars of pre-tax earnings based upon unrealized gains on its investment in Rhythms. As justification for recording this income, Enron took the position that it had hedged its investment risk by entering into a "put" agreement for those shares with an LJM1 affiliate ("Swap Sub"). This hedge was illusory, because it was a hedge with Enron's own alter ego. Swap Sub's ability to perform its obligations under the hedging agreement was entirely dependent on the value of its principal assets, which were shares of Enron stock that Enron had transferred to it. The net effect of this transaction was that Enron was "hedging" its risk with itself. There was no true economic hedge as Enron retained the economic risk of a loss. Under such circumstances, it was therefore improper, under GAAP, for Enron to book these profits in its Rhythms stock and to avoid the booking of losses. In addition, LJM1 borrowed against the Rhythms investment and the obligation was hidden from Enron investors.

218. The Rhythms "hedge" was unwound in March 2000. The unwind transaction resulted resulting in a huge windfall for LJM1. Several Enron employees including Defendants Fastow, Kopper, Glisan, Kristina Mordaunt, Kathy Lynn and Anna Yaeger Patel had financial interests in the Rhythms' unwind.

219. On November 8, 2001, Enron announced that Swap-Sub was not properly capitalized with outside equity and should have been consolidated. As a result, Enron restated prior period financial statements to reflect the consolidation which had the effect of decreasing Enron's net income by $95 million in 1999 and $8 million in 2000.

220. In another example of an LJM1 transaction, in September 1999, Enron sold LJM1 a 13% stake in a company that was building a power plant in Cuiaba, Brazil. This sale, for approximately $11.3 million, altered Enron's accounting treatment of a related gas supply contract and enabled Enron to claim $34 million of income in the third quarter of 1999 and another $31 million in the fourth quarter. In August 2001, LJM1 sold its interest in Cuiaba back

49

to Enron for $14.4 million (a large profit for LJM1 despite serious technical and environmental problems associated with the asset).

221.    The first seven LJM2 transactions (all at the end of 1999) entailed the sale of poorly performing assets to LJM2 and enabled Enron to move debt off its balance sheet and inflate its revenue and earnings and cash flow from operations for its 1999 statements (thereby meeting financial targets and Wall Street expectations). In most of these transactions, Enron repurchased the asset (at a profit for LJM2).

222.    According to the Report prepared by the Permanent Subcommittee on Investigations regarding the Role of the Board of Directors in Enron's Collapse:

> The final list of Enron-LJM transactions included Enron sales of turbines, Nigerian barges and dark fiber to LJM2; LJM1 and LJM2's participation in Whitewing and the Osprey debt certificates; monetization deals in which LJM1 or LJM2 purchased interests in Enron power plants in Brazil, Poland and elsewhere; LJM2's participation in prepay transactions called Yosemite and Bob West Treasure; and LJM2's participation in the four Raptor transactions.

223.    The LJM entities were a significant element of the fraudulent scheme to make Enron's financial condition appear better than it was through deceptive asset "sales" and other complex financial transactions that appeared to eliminate Enron debt and generate revenue, earnings or cash flow for Enron's financial statements.

224.    On December 21, 1999, Enron sold to LJM2 a 75% interest in a company that owned the Nowa Sarzyna power plant in Poland. Enron did not want to consolidate the asset in its balance sheet. Enron intended to sell the asset but was unable to find a buyer before year-end. LJM2 paid $30 million -- part loan and part equity. Enron recorded a gain of $16 million on the sale. On March 29, 2000, Enron and Whitewing (another SPE, described below) bought out LJM2's interest providing a return of approximately 25%.

225.    On December 29, 1999, Enron sold to LJM2 a 90% equity interest in a company, MEGS LLC, that owned a natural gas gathering system in the Gulf of Mexico. Enron had attempted to sell the interest to another party but was unable to close the transaction by year end. Again, it wanted to avoid consolidating the asset for year-end reporting purposes. LJM2

purchased notes and equity in MEGS for a combined amount of almost $50 million.  On March 6, 2000, Enron repurchased LJM2's interests, paying the amount necessary to provide LJM2 a 25% return.  Subsequently, Enron recorded an impairment on the asset due to diminished performance.

226.    In June 2000, under pressure to meet financial targets for the second quarter, Enron arranged the "sale" of fiber optic cable assets to LJM2.  This transaction generated $67 million in earnings and $100 million in "cash from operations" for Enron.  In fact, it was just a loan with LJM2 acting as a front man to hide the true nature of the deal.  In December 2000, less than six months later, LJM2 transferred the assets to another Enron SPE, earning a very attractive return in the process.

227.    In two transactions, LJM2 made direct and indirect investments in stock (and warrants convertible into stock) of New Power Holdings, Inc.  ("New Power") New Power initially was a wholly-owned subsidiary of Enron formed in November 1999, and in October 2000 became a public company.  New Power is engaged in the retail marketing and sale of commodities, products and services, including natural gas and electricity, to residential and small commercial customers in the United States.  By taking New Power public and entering into a non-arm's length transaction with LJM2 to "crystallize" that value, Enron was able to take millions of dollars into income right at the end of 2000.  However, the New Power shares were not truly sold and Enron was still exposed to a decline in their value.  When the price of New Power's stock collapsed, Enron did not take the losses into income but claimed they were "hedged" via the Raptors transactions described below.  In addition, Enron borrowed money against the New Power shares through LJM2 and hid its obligation for this debt in the SPE.

228.    Enron's financial statements improperly failed to include the financial results, assets, and liabilities of LJM1. When Enron restated its financial results, its revised financial statements for 1997 to 2001 included LJM1, constituting an admission that these results should have been consolidated all along. Moreover, Enron's financial statements improperly included as

51

income alleged profits on transactions between Enron and these LJM entities, and/or entities created by, and affiliated with, the LJM entities. Enron's obligations relating to the LJM transactions were not properly disclosed according to GAAP.

229. All the LJM transactions had the purpose and effect of manipulating Enron's financial results, by creating the illusion of profits in transactions that Enron was doing, for all intents and purposes, with itself, while hiding from investors the massive debt obligations that were being incurred in these transactions. The investment banks who participated in these LJM entities, and the multifarious transactions they spawned, were well aware that this was the purpose of all these transactions. Yet they were eager to participate in them, and to help design them in order to reap the outsized fees and other financial rewards Enron was handing out.

230. On or about July 31, 2001, Defendant Fastow sold his ownership interests in LJM1 and LJM2 to Kopper, and Fastow ceased to be the managing member of their general partners. Kopper, an officer and employee of Enron who worked directly under Fastow, resigned from Enron immediately before purchasing Fastow's interests.

231. Kopper also was the controlling partner of a limited partnership that (through another limited partnership) in March 2000 purchased interests in affiliated subsidiaries of LJM1. In addition, four of the six limited partners of the purchaser were, at the time of the investment, officers or employees of Enron (assigned to work for LJM1 and LJM2), and a fifth limited partner was an entity associated with Fastow.

232. Kopper has recently pleaded guilty to a series of criminal charges brought against him that arise from his participation in these and other financial transactions.

233. On September 29, 2002, Fastow was indicted for criminal conduct, including mail fraud and wire fraud, arising from his time at Enron.

/ / /

c.      **The Raptors**

234.    Another example of Enron's undisclosed off the books activity that had a dramatic negative impact on the company are the Raptor transactions.  Four special purpose entities known as Raptor I, Raptor II, Raptor III, and Raptor IV (collectively, the "Raptors") were created in 2000 to permit Enron to supposedly "hedge" market risk in certain of its investments.  The Powers Report described them as "an improper attempt by Enron to use the value of its own stock to offset losses in its investment portfolio and a highly complex accounting construct that was destined to collapse."  In effect, Enron was using the Raptors to hedge with itself.  These transactions had a very large impact on Enron's financial statements. The Raptors were funded principally with Enron's own stock (or contracts for the delivery of Enron stock) that was intended to hedge against declines in the value of a large group of Enron's merchant investments. LJM2 also invested in these entities.  As part of the capitalization of these entities, Enron issued common stock in exchange for a note receivable.  Enron increased notes receivable and shareholders' equity to reflect this transaction.

235.    Under GAAP, the note receivable should have been booked as a reduction to shareholders' equity (similar to a shareholder loan), not as an increase in assets and increase in shareholders' equity.  Accordingly, in violation of GAAP, the financial statements of Enron overstated both notes receivable and shareholders' equity by approximately $172 million in each of the second quarter, third quarter, and year-end financial statements (audited by Andersen) for the year 2000.

236.    In the Raptor transactions, Enron and the investment banks created four SPEs and arranged for LJM2 to invest $30 million in the SPE.  Enron and Andersen deemed this investment to be the "independent equity" necessary to permit the SPE to qualify for separate accounting treatment, *i.e.*, to not be consolidated with Enron's financials.  Enron guaranteed LJM2 that it would recoup its money and make an additional $10 million within six months of each SPE's creation.  These payments took place as promised, giving LJM2 not only its $30

million but also about $10 million profit on each Raptor deal. According to an October 2000 report to LJM2 investors, the rates of return on the four Raptor transactions were 193%, 278%, 250%, and a projected 125% respectively. In addition, in September 2001, Enron paid LJM2 another $35 million to wind-up the Raptors.

237.     Enron asserted that it could use these "hedges" to offset growing losses in other investments which it would otherwise have to report. In a single year Enron hid almost $1 billion in losses through this ruse.

238.     The Raptor SPEs were not well-planned or executed. The assets declined in value, and the value of Enron stock and contracts supporting the Raptor SPEs' creditworthiness also fell. As a result, there was no economic value to the Raptor SPEs. Enron, Vinson & Elkins, CSFB, and Andersen engaged in several desperate schemes to prop up the Raptors, to no avail. The last restructuring effort occurred in March 2001 and entailed placing additional Enron shares at risk in exchange for additional notes receivable.

239.     Again, Enron increased notes receivable and shareholders' equity to reflect this transaction. Under GAAP, the note receivable should have been booked as a reduction to shareholders' equity (similar to a shareholder loan), not as an increase in assets and increase in shareholders' equity. Accordingly, in violation of GAAP, Enron financial statements (reviewed by Andersen) overstated both notes receivable and shareholders' equity by $828 million during the first quarter of 2001. As a result of the improper, false, and misleading accounting of these transactions by Enron, shareholders' equity and notes receivable were overstated by a total of $1 billion in the quarterly financial statements of Enron at March 31 and June 30, 2001.

240.     According to a Senate Investigations Subcommittee Report, by the Fall of 2001:

> Andersen had changed their opinion of the proper accounting for the Raptors and no longer supported the capacity of the Raptor SPEs to continue to hedge Enron's investment losses.
>
> The result was that, in October, at the end of the third quarter of 2001, Enron terminated the Raptor hedges and recorded a $710 million charge to earnings and a $1.2 billion reduction in shareholder equity. The earnings charge reflected the investment losses that the Raptors no longer concealed, while the equity reduction

reflected an accounting charge that Andersen made after determining that an earlier methodology it had used for the Raptors did not comply with generally accepted accounting principles. (footnotes omitted)

The sole purpose of the Raptors transactions was to manipulate Enron's financial statements.

241. The impact of the Raptors transactions is summarized in the table below:

| Quarter | Income Reported ($ millions) | Income Excluding Raptors Transactions ($ millions) | Impact from Raptors ($ millions) |
|---|---|---|---|
| Sept. 30/00 | $364 | $295 | $69 |
| Dec. 31/00 | $286 | ($176) | $462 |
| Mar. 31/01 | $536 | $281 | $255 |
| June 30/01 | $530 | $490 | $40 |
| Sept. 30/01 | ($210) | ($461) | ($251) |
| **Total** | **$1,506** | **$429** | **$1,077** |

(Source: Powers Report)

242. All of the above transactions were known to the employees and partners of Andersen who served on the Enron engagement as part of the audit team and/or risk management team and to certain of their banks and underwriters Underwriter Defendants.

### d. **The Whitewing Transactions**

243. Whitewing Associates LLP ("Whitewing") is another Enron "unconsolidated affiliate," meaning that Enron has an ownership interest in it and engaged in financial transactions with it, but did not consolidate Whitewing's financial statements with those of Enron. Whitewing was co-owned by Enron and by Osprey Trust, another SPE, as partners.

244. In December 1999, Whitewing, along with LJM2, purchased certain high risk Enron loans receivable (collateralized loan obligations "CLOs"), which enabled Enron to record earnings with respect to those sales. However, Enron had secretly guaranteed to Whitewing's investors that it would hold them harmless from any losses on the loans. The existence of this guaranty meant that Enron had not transferred the risk of non-payment of the loans, and that it was therefore improper for Enron to record any profits on the "sale" of the loans.

/ / /

55

245.     Apparently Whitewing has 75 subsidiaries of its own, used as part of the off-book transactions with Enron.  Whitewing entered into at least 11 transactions with Enron from 1999 to 2001 to buy at least $2 billion of Enron assets.  These sales were part of the scheme to reduce disclosed debt levels and move assets with low returns into unconsolidated affiliates that Enron effectively controlled.  The transactions were funded by Osprey Trust.  Enron pledged millions of its shares as collateral for Osprey debt.  Enron's obligations for the Osprey debt were not disclosed.  Underwriters for Osprey included Defendants Deutsche Bank, CSFB and Citigroup/Salomon.  The underwriters for Osprey were clearly aware of Enron's potential substantial obligations related to Osprey.  However, they chose not to disclose these material potential obligations in either Enron's registration statements or research reports.

e.     **Fishtail, Bacchus, Sundance and Slapshot Transactions**

246.     A December 11, 2002, report by the U.S. Senate Permanent Subcommittee on Investigations contains a detailed analysis of several fraudulent Enron transactions including Fishtail, Bacchus, Sundance and Slapshot that were funded and facilitated by U. S. financial institutions including Citigroup/Salomon and JP Morgan.  This report, along with a statement by Senator Carl Levin, is attached as Exhibit C.

247.     All four of the above structured transactions enabled Enron to keep debt off its balance sheet or manufacture immediate returns to report better financial results than the company actually produced.

248.     The first three transactions (initiated in December 2000), Fishtail, Bacchus and Sundance, resulted in the sham transfer of assets at inflated values from Enron to special purpose entities.  As set forth in the Subcommittee report:

> In effect, Enron transferred its assets to a sham joint venture, Fishtail; arranged, in the Bacchus transaction, for a shell company to borrow $200 million from Citigroup to "purchase" purchase' Enron's Fishtail interest, without disclosing that Enron was guaranteeing the full purchase price; used the sham sale revenue to inflate its year-end 2000 earnings by $112 million; and then quietly returned the $200 million to Citigroup six months later via another sham joint venture, Sundance.  The result was that the three transactions enabled Enron to

produce misleading financial statements that made Enron's financial condition appear better than it was.

The $200 million should have been accounted for as a loan.

249. These deceptive transactions could not have been completed without the participation of Defendants Citigroup/Salomon and JP Morgan. JP Morgan provided a valuation analysis of the assets transferred and a $42 million "commitment" referred to as an "unfunded capital" investment. This "commitment" was never intended to be used.

250. In return for pretending to provide some financing for the Fishtail transaction, J.P. Morgan received $500,000. LJM2 also participated in these transactions earning a fee of $350,000 and an attractive 15% return (guaranteed by Enron) on a six-month "investment." Citigroup/Salomon was central to these deceptive transactions, contributing $200 million in funding (*i.e.*, a disguised loan). In return for the Bacchus transaction, Citigroup received a $500,000 fee, $5 million in interest payments and $450,000 in "yield" related to a $6 million "equity investment." For the Sundance transaction, Citigroup/Salomon received a $1.5 million payment described as "breakage costs" (presumably due to early repayment of the Bacchus loan), another fee of $725,000 and a $1.1 million return on its Sundance "investment." As described in the subcommittee report, internal Citigroup/Salomon memos and emails show that Citigroup/Salomon was aware of the deceptive nature of the transactions (see Exhibit C).

251. Without Citigroup/Salomon's complicity and financial resources, Enron would not have been able to complete the deal and manipulate its financial statements to meet Wall Street expectations for its 2000 earnings.

252. Just prior to the closing of the Sundance transaction, three senior Citigroup/Salomon officials strongly warned against proceeding with the deal. A Citigroup/Salomon memo stated: "Risk management has not approved this transaction for the following reasons . . . The GAAP accounting is aggressive and a franchise risk to us if there is publicity." Despite strongly worded warnings from senior personnel, the Sundance transaction went forward on June 1, 2001.

253.    The fourth transaction, Slapshot, took place in June 2001.  Slapshot was a deceptive tax avoidance scheme that centered on utilizing a one-day $1 billion "loan" from JP Morgan to generate approximately $60 million in Canadian tax benefits; as well as $65 million in financial statement benefits for Enron.  JP Morgan provided Enron with access to its "proprietary" structured finance arrangement which utilized a sham $1 billion "loan" intended to be issued and repaid within a matter of hours.  The Slapshot structure was designed to enable Enron to claim tax deductions as if a real $1 billion loan had been issued and remained outstanding.  JP  Morgan provided Enron with a step-by-step description of how the Slapshot transaction was to be executed.  Citigroup/Salomon also assisted in this transaction by providing a $1 billion daylight overdraft authorization for Enron.

254.    All of the above transactions were known to Defendant employees and partners of Andersen who served on the Enron engagement as part of the audit team and/or risk management team, Vinson & Elkins, and to certain of its Defendant banks and underwriters.

### f.    Nikita Transaction

255.    In another SPE transaction referred to as Nikita, Enron "sold" EOTT Partnership units to an SPE.  This transaction was financed by CSFB ($8.1 million) and Barclays ($71.9 million) and closed September 28, 2001.

256.    The SPE's ability to repay the financing was supported through a total return swap guaranteed by Enron.  In effect, this transaction was a loan, not a sale.  In its accounting for the Nikita transaction, Enron recognized approximately $10 million as a "gain on sale," thereby generating artificial revenue and earnings and $80 million in cash from operations.  It should have been accounted for as a loan and resulted in Enron and its banks hiding another $80 million of debt and overstating earnings.

## B.    Hidden and Disguised Loans

### 1.    Prepays/Equity Forward Contracts

257.    In addition to manipulating its financial reporting through SPE transactions,

Enron was also able to falsify its financial health and conceal the true extent of its debt through hidden/disguised loans which took the form of prepay contracts ("prepays"). The prepays should have been booked as debt. As the name would imply, a "prepay" is an agreement to pay in advance for a service or product to be delivered at some point in the future. Enron's use (and abuse) of prepays is reviewed in significant detail in the testimony of Robert Roach, Chief Investigator, to the Permanent Subcommittee on Investigations, July 23, 2002. A copy of this testimony is attached hereto as Exhibit B. As stated in this testimony:

> Enron constructed elaborate, multiparty commodity trades that they called prepays in order to book the proceeds from the prepays as cash flow from operations. But when all the bells and whistles are stripped away, the basic transaction fails as a prepay and what remains is a loan to Enron using a bank and an obligation on Enron's part to repay the principal plus interest. With that being true, the proceeds of the so-called prepay transaction should have been booked as debt and cash flow from financing, not as a trading liability and cash flow from operations.

258. According to the Chief Investigator's testimony:

> Enron used these so-called 'prepay' transactions to obtain more than $8 billion in financing over approximately 6 years, including $3.7 billion from 12 transactions with [JP Morgan] and $4.8 billion from 14 transactions with Citigroup. This $8 billion figure is a conservative estimate for the 6 year period, based on the documents we were able to review; the full amount since Enron began using prepays in 1992 may be much larger. Barclays, Credit Suisse First Boston, FleetBoston, Royal Bank of Scotland, and Toronto Dominion participated in over $1 billion of the prepay transactions.

> Accounting for 'prepay' proceeds as cash flow from operations, rather than cash from financing gave the impression that the money from the prepays was part of Enron's ordinary business activities and not debt. Moreover, the Subcommittee has learned that Enron was simultaneously treating the prepay transactions as loans on its tax returns in order to claim the interest expense as a business deduction.

259. Enron's financial statements for 2000 show total debt at year end of $10 billion and funds flow from operations of approximately $3.2 billion. Had the approximately $4 billion in so-called "prepays" been properly accounted for (as debt), total debt would have increased by 40% and funds flow from operations would have dropped by almost 50%. The impact on financial ratios, which are used by investors to evaluate a prospective investee company's financial health, is significant. The Chief Investigator's testimony states:

59

If Enron had properly accounted for these transactions, its total debt would have increased by about 40% to about $14 billion, and its funds flow from operations would have dropped by almost 50% to about $1.7 billion. Those are dramatic changes. . . . With the inclusion of the prepays as debt, Enron's debt to equity ratio would have risen from about 69% to about 96%. Its debt to total capital ratio would have risen from 40% to 49%. And its funds flow interest coverage, a key measure of a company's ability to meet its financing obligations, would have dropped by almost half, from 4.07 to 2.37.

260. The congressional investigator found that JP Morgan had engaged in prepay

transactions with Enron for nine years, and that these prepays totaled approximately $3.7 billion.

The report states:

Typically, Enron would initiate the prepay transaction near the end of a financial reporting period when Enron determined it needed to report more cash flow from operations on its financial statement. Enron would contact [JP Morgan] and request that [JP Morgan] arrange a prepay. A [JP Morgan] employee familiar with the Enron prepays said he was not aware of any instances when [JP Morgan] refused Enron's request (although occasionally, the size of the prepay would be reduced from Enron's original request).

[JP Morgan] set up a special purpose entity or SPE called Mahonia Ltd. to serve as the "independent" third party in the Enron prepays."

261. According to the Chief Investigator:

Citigroup . . . was a major provider of prepays and financing to Enron. Beginning in 1993, Citigroup led 14 separate prepay transactions totaling $4.8 billion for Enron. The total outstanding Citigroup prepay debt at the time of Enron's bankruptcy was $2.5 billion.

Citigroup created an offshore entity called Delta Energy Corporation in the Cayman Islands, which along with Enron and Citibank, would form the familiar triangle used to structure the prepays and remove price risk from the transaction.

The most prominent structural differences between the Enron/[JP Morgan] transactions and the Enron/Citigroup transactions was the manner in which the later Enron/Citigroup transactions were financed. The first Enron/Citigroup transactions involved financing similar to the Enron/[JP Morgan] transactions, in which the bank served as the source of funds that went through the special purpose entity, Delta, and on to Enron. Later Enron/Citibank transactions, representing $2.4 billion of the total $4.8 billion in prepay transactions between the two parties, were financed through bond offerings. "Yosemite" was the name of a series of six synthetic Enron bond offerings used to raise the $2.4 billion. All of these bonds, with maturities ranging from five to seven years, remained outstanding at the time of the Enron bankruptcy.

262. The parties involved in the Enron prepays were aware of the entire structure and

its accounting purpose. Internal communications show that the financial institutions not only

understood that Enron intended to engage in this deceptive accounting, they actively substantially participated with Enron in return for fees and favorable business dealings. These financial institutions knowingly allowed investors, including Plaintiffs, to rely on Enron financial statements that the financial institutions knew were misleading.

263. One CSFB lawyer raised concerns that the Enron "prepay" was an "accounting driven transaction" and recommended vetting it through the firm's "Reputational Risk Review" process. CSFB, however, approved the transaction and funded the prepay. CSFB did not disclose the existence of these liabilities in its research reports or in prospectuses for transactions it underwrote.

264. Both JP Morgan and Citigroup actively marketed prepays as "balance sheet friendly" financing and "non-debt financing that improves cash flow from operations." They designed and implemented these financial structures that created and maintained the fiction that the transactions were trades rather than loans. These transactions would not have been possible without the willingness of the financial institution Defendants to provide the funds, supporting paperwork, and a sham offshore trading partner.

265. Enron also hid debt through equity forward contracts. Under a typical equity forward contract, an issuer will sell securities to a counterparty for cash equal to the current price and agree to repurchase the same number of equity securities from the counterparty in the future for the original price plus a premium. Enron internal documents indicate that on September 30, 2000, Enron had obligations to CSFB and Lehman Brothers Inc. for "Enron Equity Forward Purchase Settlements" aggregating $304 million.

266. Details of the prepays as engaged in by JP Morgan and Citigroup are detailed in Appendix C of Exhibit B.

### 2. Minority Interest Transactions

267. Enron also hid substantial debt ($2.75 billion) through the improper use of

minority interest financing. In a minority interest financing, the amount financed is reflected on the company's balance sheet as a minority interest in a consolidated subsidiary, instead of debt. Through this deceptive device Enron replaced on-balance-sheet debt with minority interests thereby making its credit position appear much stronger than it really was.

268.    Employment of this practice was initiated after a 1996 presentation by Citigroup/Salomon to Enron regarding the minority interest financing structure (*i.e.* Citigroup/Salomon initiated this deception). Over the period from 1997 to 2000 Enron raised $2.75 billion through minority interest financing. These include:

    a.      Nighthawk (December 1997) - $500 million, Citigroup/Salomon deal;

    b.      Rawhide (December 1998) - $750 million, Citigroup/Salomon deal;

    c.      Choctaw (May 1999) - $500 million, JP Morgan deal;

    d.      Nahanni (December 1999) - $500 million, Citigroup/Salomon deal;

    e.      Zephyrus (November 2000) - $500 million, JP Morgan deal

Lenders in these transactions required "additional arrangements" to provide direct recourse to Enron. In substance, these transactions were loans to Enron and should have been disclosed as

such. For at least one transaction Citigroup/Salomon obtained a surety bond to protect its credit exposure.

**C.    Tax Transactions**

269.    Enron employed highly questionable tax driven transactions (such as Slapshot, described earlier) that enabled the company to create accounting income. Over $1 billion of income was generated through these tax "strategies." This "income" significantly exaggerated the size and strength of Enron's operations. As reported in the Washington Post on May 22, 2002, "In 2000 alone, $296 million, or 30% of the profit that Enron recorded in its annual report to shareholders, came from these one-time tax savings strategies   rather than the company's energy

supply and trading businesses, former Enron managing director and general counsel Robert J. Hermann," told the Washington Post.

270. Enron completed 11 tax deals over the period from 1995 to 2001. With the exception of one transaction, all of the tax transactions were promoted to Enron by third parties, including Defendants Andersen, Deutsche Bank (through Bankers Trust) and JP Morgan.

271. These transactions relied on aggressive interpretations of both the tax law and accounting rules and, in fact, violated both sets of rules. The result was the material overstatement of Enron's income in its financial statements.

### D.    Defendants' Involvement

272. In his testimony to the Permanent Subcommittee on Investigations, the Chief Investigator said:

> Numerous major financial institutions, both here and broad, engaged in extensive and complex financial transactions with Enron. The evidence we reviewed showed that, in some cases, the financial institutions were aware that Enron was using questionable accounting. Some financial institutions not only knew, they actively aided Enron in return for fees and favorable consideration in other business dealings. The evidence indicates that Enron would not have been able to engage in the extent of the accounting deceptions it did, involving billions of dollars, were it not for the active participation of major financial institutions willing to go along with and even expand upon Enron's activities. **The evidence also indicates that some of these financial institutions knowingly allowed investors to rely on Enron financial statements they knew or should have known were misleading.** (emphasis added).

See Exhibit B.

### 1.    Underwriters

273. Enron's investment bankers sold Enron's debt and equity securities to the public, while also creating, executing, and financing many of the transactions that were used to manipulate Enron's financial results. These transactions included special purpose entities as well as hidden loans (prepays, and minority interest financings). As the congressional investigators' testimony states, "[t]he evidence indicates that Enron would not have been able to engage in the

extent of the accounting deceptions it did, involving billions of dollars, were it not for the active participation of major financial institutions willing to go along with and even expand upon Enron's activities." The investment bank Defendants provided the financial grease which let Enron appear to grow into the nation's seventh largest company, and in the process these firms earned hundreds of millions in underwriting fees alone, and much more for lending, derivatives trading, and merger advice. The Underwriter Defendants had extensive dealings with Enron over the years, and participated in multiple offerings and other financial transactions on behalf of Enron and its subsidiaries and affiliates.

274. Each of the Underwriter and Statutory Underwriter Defendants knew that Enron was using SPEs, including but not limited to the LJM entities, to manipulate its reported earnings and debt. These Defendants were also well aware of Enron's use of prepay transactions to hide or disguise loans. Investors in the SPEs, including Citigroup/Salomon, JP Morgan, CSFB, Deutsche Bank, Merrill, and Barclay's were earning tremendous profits, through the falsification of Enron's reported earnings and debt were falsified. Billions of dollars of debts and liabilities were hidden from the public. Exhibit D, an excerpt from formerly secret LJM documents, shows the extent of Enron's off-balance sheet activities which were known to the Underwriter Defendants. LJM was one of the SPEs used by Enron to artificially inflate its reported earnings while moving large amounts of debt off its balance sheet.

275. The Underwriter and Statutory Underwriter Defendants knew that Enron's real financial condition was much worse than was being represented to the public. They knew that Enron's profitability was far less than publicly reported, that its true debt level was much higher than what was being publicly reported, and that its *creditworthiness, liquidity and overall financial condition were much worse than publicly known*. For example, the Chief Investigator testified "[b]y design and intent, the prepays as structured by Enron and the financial institutions made it impossible for investors, analysts, and other financial institutions to uncover the true level of Enron's indebtedness." (emphasis added).

276.     The Underwriter and Statutory Underwriter Defendants knew that Enron had engaged in multiple transactions with the SPEs which could require Enron to issue millions of shares of Enron common stock if its stock reached certain trigger prices.  The SPEs' debt would become recourse to Enron if Enron's credit rating was lowered   and the underwriting defendants knew that Enron's credit rating would be lowered if rating agencies ever learned Enron's true financial condition.

277.     Banks are required by their individual internal procedures and by governmental regulation and oversight to perform an extensive credit analysis of any applicant for a commercial loan or credit facility, and banks are required to retain the specific documentation in their files.  The analysis must include the borrower's actual and contingent liabilities, its liquidity position, any equity insurance obligations with the potential of adversely affecting its shareholders' equity, any potential debt (even if it is not directly on the borrower's books), the quality of the borrower's earnings, and its actual liquidity including the source of funds to repay any loans.  For larger loans for commitments to credit facilities for a corporation, banks are required to monitor the company closely, frequently review the financial condition and ongoing operations for material changes, and to cause the borrower's top financial officers to keep the bank informed of the borrower's current business and financial condition.

278.     The banks knew about Enron's actual touch-and-go financial position and false public disclosures, false financial results, and manipulation of its accounting.  The banks further knew that Enron  was utilizing the SPEs to secretly move debt off its own balance sheet.

279.     Enron's underwriters knew that the company's prospectuses and public disclosures contained material omissions and misrepresentations.  They were directly responsible for many of them.  Yet, despite this knowledge, they continued to misrepresent the true financial condition of the company and sell securities to the public, including Plaintiffs, at substantially inflated values.

/ / /

### a. Citigroup/Salomon

280. Citigroup/Salomon provided commercial and investment banking services, commercial loans, and advisory services regarding the structuring of financial transactions, including those relating to derivatives and hedging to Enron. Citigroup/Salomon also acted as an underwriter in the sale of securities to the public and provided investment analysis and opinions through reports by its securities analysts.

281. In 2000 alone, Citigroup/Salomon received more than $20 million in fees from Enron. From 1999 to 2001, Citigroup/Salomon underwrote 4 stock/convertible transactions, participated in 4 syndicated loans, and advised on 4 merger and acquisition transactions. Citigroup/Salomon earned more than $167 million in fees and income from Enron from 1997 to 2001.

282. Citigroup/Salomon participated – and invested – in the creation of Enron SPEs that were used to mislead the public about Enron's financial condition. In an internal document, Citigroup/Salomon described the benefit of these transactions as removing "certain items from plain view, thus enhancing the appearance of the balance sheet"; another benefit was "minimal footnote disclosure."

283. Citigroup/Salomon's senior executives interacted virtually daily with top executives at Enron. Citigroup/Salomon participated directly in the wrongful scheme through: loans to Enron of over $4 billion; helping Enron raise over $2 billion from the investing public through security sales based on misrepresented financial information; helping structure and finance some of the partnerships or SPEs that Enron used to inflate its revenue and earnings and conceal Enron's debt; hiding $1.75 billion of Enron debt through minority interest financings; and hiding more than $4.6 billion of Enron debt through prepay transactions. Citigroup/Salomon's senior executives interacted virtually daily with top executives at Enron. Citigroup/Salomon participated directly in the wrongful scheme through: loans to Enron of over $4 billion; helping Enron raise over $2 billion from the investing public through security sales

based on misrepresented financial information; helping structure and finance some of the partnerships or SPEs that Enron used to inflate its earnings and conceal Enron's debt; hiding $1.75 billion of Enron debt through minority interest financings; and hiding more than $3.8 billion of Enron debt through prepay transactions.

284.    In the Congressional hearing on the banks' role in Enron's collapse, Carl Levin stated, "Citigroup Inc. and JP Morgan Chase & Co. helped Enron design sham transactions to inflate profit, hide debt and evade taxes.  You aren't the victims of Enron, you folks helped perpetrate these deceptions," said Levin, chairman of the Senate Governmental Affairs Permanent Subcommittee on investigations.

285.    Committee investigators said documents and interviews about the transactions show that Citigroup and JP Morgan ignored their own internal guidelines to satisfy a client, helping Enron deceive investors and tax authorities.  The two firms substantially participated with Enron in return for substantial fees and favorable consideration in other business dealings.

286.    As Carl Levin said in one statement, "By concocting elaborate schemes of so-called structured finance with no legitimate business purpose other than tax and accounting manipulation, "Citigroup [Salomon] and Chase helped Enron deceive the investing public."

287.    In Appendix D ("Role of Citigroup and its Affiliates") to the Third Report of Neal Batson, Court-Appointed Examiner (Exhibit E), a substantial volume of evidence with respect to Citigroup's role in the Enron debacle was reviewed.  The Examiner concluded that the evidence would permit a fact-finder to conclude:

- Citigroup assisted Enron in completing the Citigroup Prepays, with gross proceeds totaling over $4.6 billion, even though Citigroup knew that Enron's accounting for these transactions, with no other meaningful related disclosure, would result in misleading financial presentation;

- Citigroup assisted Enron in structuring and completing the credit linked notes fundings for the Yosemite I and II Citigroup Prepays, even though Citigroup had a substantial belief that Enron should have consolidated the borrowing entities in those transactions for accounting purposes and, therefore, should have reflected the approximately $1.1 billion of note proceeds as debt on its balance sheet;

- Citigroup designed and helped Enron implement the Nighthawk Minority Interest Transaction, allowing Enron to raise $500 million of year-end financing without reflecting that amount on its balance sheet as debt, even though Citigroup had a substantial belief that Enron should have consolidated the Nighthawk minority investor and, therefore, that the $500 million should have been reflected as debt on Enron's balance sheet;

- Citigroup proposed that Enron sell U.S. Treasury Securities in the Nahanni Minority Interest Transaction, in order to record $500 million of cash flow from operating activities, with knowledge that such securities likely did not qualify as merchant investments making such cash flow reporting inappropriate, and with the knowledge that the sale of the securities would bridge Enron's year end and be repaid only three to four weeks later;

- Citigroup invested $28.5 million in the Sundance Industrial transaction, agreeing to structure the investment as partnership equity in order for Enron to keep its forest products assets and related debt (in excess of $375 million) off its balance sheet, even though Citigroup considered the investment to be a loan and had a substantial belief that Enron should consolidate the partnership;

- Also in Sundance Industrial, Citigroup used $20 million of its investment to purchase a .01% equity interest in an Enron SPE and then immediately contributed that equity to the partnership, despite having no business purpose for owning the equity, solely to assist Enron in recording "true sale"

  treatment on the purported purchase and, thereby, $20 million of income [and revenue] from gain on sale;

- In Bacchus, Citigroup relied upon Enron's verbal support of its 3% equity investment, knowing that the existence of such support would preclude Enron from receiving the accounting treatment that it desired for that transaction; and

- Citigroup agreed to fund the Bacchus transaction with $200 million at year-end 2000, despite a substantial belief that Enron's sole purpose for completing the transaction was to record a material amount of earnings from gain on sale of an asset and that the transaction was structured so that no "true sale" occurred.

288. Based on Citigroup's internal documents, the volume of revenues increased significantly from 1997 through to 2001. It would appear that the level of revenues earned by Citigroup was directly correlated to its participation in fraudulent transactions. Revenues earned grew from $16.8 million in 1997 to $61.6 million in 2001 – an increase of over 360% in four years. There are a number of documents that indicate that the growing relationship and the increased reliance of Enron-related fees put pressure on Citigroup's internal evaluation of Enron

transactions. For example, as part of the Global Loans Approval Memorandum regarding Project Bacchus (dated December 6, 2000), it was noted that:

> As part of Citi's broader relationship with Enron, we have been asked to support this transaction. Given the importance of this relationship to GEM [Global Energy and Mining], it is difficult if not impossible to deny this request.

289. Citigroup's active participation in the Enron debacle may be summarized under three main categories:

    (a)    Structured transactions;

    (b)    Prepay transactions; and

    (c)    Analyst coverage.

### (i) Structured Transactions

### (A) LJM 2

290. Citigroup/Salomon, and/or its top executives, were given a private invitation to invest and did invest $15 million in LJM2. The purpose of LJM2 was to create a vehicle that would enter into transactions with Enron to enable it to move debt off its balance sheet and generate fraudulent revenue and profits. Citigroup/Salomon was aware of conflicts of interest such as the fact that Fastow would be wearing two hats and would have an obvious opportunity for self-dealing. They expected to be, and were, rewarded with unusually high returns on their investment - as a result of Enron's "inside track." They were also aware of the magnitude of Enron's off-balance sheet activities. See Exhibit D.

291. Citigroup/Salomon actively participated in the scheme by helping structure and finance the LJM2 partnership. Citigroup/Salomon pre-funded the vehicle on or around December 22, 1999 so LJM2 would have the cash to fund several transactions with Enron to create millions in 11th hour profits for Enron so it could meet its 1999 revenue and profit forecasts and continue to prop up its stock price.

/ / /

69

292.     Citigroup/Salomon assisted in the administration of LJM2 from 1999 to 2001 and had access to information about LJM2's financial operations and transactions. These included the Fishtail, Bacchus, and Sundance transactions (financed by Citigroup/Salomon) which served to inflate Enron's revenue and earnings and understate its debt.

293.     As described earlier, these transactions were the subject of the most recent report by the Subcommittee on Investigations looking into the involvement of financial institutions in the fraud related to Enron. See Exhibit C for detail.

### (B)     Project Bacchus

294.     Citigroup regularly violated prudent operating procedures on behalf of Enron to the detriment of investors and credit rating agencies. In December 2000, Citigroup participated in Project Bacchus (described earlier and in detail in Exhibit C). Through this transaction, Enron generated revenue and income "gain" of $112 million on the "sale" to Citigroup of pulp and paper assets and $200 million in cash flow from operations to meet its 2000 earnings targets. An SPE entitled Caymus, was established to purchase these assets using a $200 million Citigroup loan. The loan contained a 3% equity contribution in order to subject it to off-balance sheet treatment for accounting purposes. Enron made oral guarantees to Citigroup that its 3% equity stake would not be at risk as well as entering into a total return swap which guaranteed the repayment of the loan amount with interest. The oral guarantee and total return swap made treating the transaction as an asset sale inappropriate and not in accordance with GAAP.

295.     Citigroup was well aware of Enron's motivation. In a November 24, 2000 email Steve Baillie, Houston's Citigroup Relationship Manager, wrote: "Enron's motivation in the deal now appears to be writing up the asset in question from a basis of about $100MM to as high as $250MM, thereby creating earnings." Despite Baillie expressing "concerns" about the "appropriateness" of the deal, "since there is now an earnings dimension to this deal, which was not there before," Project Bacchus was executed by Citigroup. Citigroup's motivation was equally clear: "Sounds like we made a lot of exceptions to our standard policies. I am sure we

70

have gone out of our way to let them know that we are bending over backwards for them...let's remember to collect this iou [*sic*] when it really counts..."

296.     Citigroup was well aware of Enron's fraudulent internal accounting.  On December 13, 2000,  Shirley Elliot, financial analyst for Citigroup's Corporate Bank in Houston, commented:

> In terms of total balance sheet size, it appears that Bacchus is immaterial; however, the $200 million represents 16.3% and 22.4% of operating cash flow and net income, respectively, for the 12 months ended December 31, 1999.  Bacchus represents 22.2% and 11.6% of cash EBITDA for nine months ended 9/20/00 and twelve months ended 12/31/00, respectively.

William Fox, a Citigroup Relationship Manager, replied:

> Many thanks; 1.  Based on 1999 numbers would appear that Enron significantly dresses up its balance sheet for year end; suspect we can expect the same this year.

### (C)     Project Nahanni

297.     Similar to Bacchus, Project Nahanni was a Citigroup loan inappropriately accounted for as an asset sale.  Citigroup established an SPE with a $500 million loan, three percent of which was in the form of a supposed "equity" contribution to ensure that the loan received off-balance sheet treatment for accounting purposes.  The SPE used the loan to buy Treasury Bills.  After acquiring the T-Bills, the SPE would "sell" the T-Bills generating operating income from the transaction.  In turn, Enron reported the proceeds of the Treasury bill "sale" as revenue and operating income.  This transaction was completed on December 29, 1999, with Enron guaranteeing the loan repayment in January, 2000.  As described in a Citigroup Exposure Spreadsheet, this was nothing but "year-end window dressing" on Enron's 1999 reported earnings.

298.     Citigroup knew that Enron inflated operating cash flows using Nahanni and other structured finance transactions.  In an earlier version of the Nahanni Execution Memo, wording that was dropped in the final document states: "Specifically, Enron manages the change in total assets less total liabilities year over year."  Citigroup dropped this revealing language from the

71

final documents. On July 24, 2001, James F. Reilly, Managing Director in the Energy/Power Group of the Investment Bank, commented that Nahanni was, "essentially, an insurance policy for YE 'balancing,' inquiring about their intentions in simple enough."

299. Citigroup/Salomon provided the genesis of the idea to employ minority interest financings to enable Enron to hide debt and manipulate its financial statement presentation. Through this deceptive device Enron hid $2.75 billion in debt. Of this $2.75 billion, Citigroup/Salomon financed $1.75 billion. These financings were not properly disclosed and should have appeared as debt on Enron's balance sheet. Citigroup/Salomon actively participated in these transactions despite knowing that it was being used to manipulate Enron's financial statements, and in return, Citigroup/Salomon received substantial fees. Enron would not have been able to complete these transactions without the direct support and participation of a major financial institution.

### (D)    Other Transactions

300. Citigroup/Salomon was a manager in raising financing for Osprey Trust. Through Whitewing, Osprey Trust provided the funds for the movement of at least $2 billion in underperforming assets off Enron's balance sheet. The Osprey debt was collateralized/guaranteed by Enron shares. This Enron obligation was not disclosed but was clearly known by Citigroup/Salomon.

301. Citigroup/Salomon served as a paid "advisor" to Enron on its acquisition of a 33% interest in Azurix in 2000 – one of the "unconsolidated" affiliates of Enron.

302. Citigroup/Salomon also assisted Enron in the execution of a fraudulent tax avoidance transaction called Slapshot through the provision of a $1 billion overdraft authorization. (See Exhibit C for details.)

303. The financial relationship between Enron and Citigroup/Salomon was so intertwined that Citigroup/Salomon provided hundreds of millions of dollars in secured financing when Enron was on the verge of financial collapse in an effort to protect itself. Between

November 16 and 21, 2001, Enron obtained secured credit lines from Citigroup/Salomon and JP Morgan for a total of $1 billion. The credit lines were secured by assets of Enron's Northern Natural Gas Company and Enron's Transwestern Pipeline Company. Enron used part of the proceeds to pay off an earlier, unsecured $250 million loan it had received from Citigroup.

304. Citigroup/Salomon also participated in a financing for Northern Border Partners LP, an Enron controlled partnership, and was involved in Enron securitization transactions.

305. In 1999 and 2000, Citigroup/Salomon provided professional services in regard to the registration of Rhythms Netconnections Inc. – an entity involved in the special purpose entity transactions which were wrongfully off-book and not consolidated into the Enron financial statements.

306. Citigroup/Salomon was the lead underwriter for the huge New Power initial public offering in October 2000 (27.6 million shares at $21 per share). As described, Enron and Citigroup/Salomon took New Power public to create a market for its shares so they could create a profit through a sham sale to an SPE (Hawaii 125-0). This transaction enabled Enron to record a $370 million in fourth quarter 2000 revenue and profit on its New Power shares. Citigroup/Salomon made a loan (ostensibly) to Hawaii 125-0 to fund the transaction. However, Citigroup/Salomon received a secret guarantee from Enron through a total return swap. The existence of this total return swap turns the transaction into a loan. It was not a true sale. Hence, there was no true profit and the "loan" should have been recorded as debt by Enron. Subsequently Enron "hedged" its New Power investment through the disastrous Raptor vehicles described previously.

307. In addition to its extensive underwriting, structuring and advisory relationships with Enron, Citigroup/Salomon was one of the principal lending banks to Enron, acting with JP Morgan as lead bank in Enron's main credit facilities and helping syndicate over $4 billion in bank loans to Enron. Citigroup/Salomon received enormous fees for its loan and syndication services.

73

308.     Other Citigroup/Salomon loan activities to Enron and Enron affiliates include: a May 1998 $500 million loan to JEDI; a June 2001 loan of over $600 million to the Indian Dabhol power project; a July 2001 loan to Enron of $582 million; a $3 billion transaction for an Enron credit facility to back up commercial paper in August 2001; and a November 2001 $1 billion secured loan to Enron.

### (ii)     **Prepay Transactions**

309.     With respect to Citigroup's knowledge of prepay transactions and its knowledge with respect to how Enron was accounting for the structures, the Examiner concluded the following:

> Citigroup understood how Enron accounted for the Citigroup Prepays and the effect that the Citigroup Prepays had on Enron's reported financial condition, including income, assets, liabilities and cash flow.

310.     The Examiner supported his conclusion with reference to a number of internal Citigroup documents and e-mails.  In particular:

> The transaction provides favorable accounting treatment for the customer. Although the deal is effectively a loan, the form of the transaction would allow the customer to reflect it as "liabilities from price risk management activity" on their on their [sic]
> balance sheet and also provide a favorable [sic] impact on reported cash flow from operations.  Minutes of Citibank CMAC, June 22, 1999.

> The prepaid forward structure will allow Enron to raise funds without classifying the proceeds from this transaction (Roosevelt) as debt (it is accounted for as 'deferred revenue').  Global Loans Approval Memorandum, regarding Project Roosevelt, December 21, 1998.

> This form of financing is advantageous to Enron in that it allows the borrowing to be reported as 'price risk management' liability rather than debt.  In addition, because of the way Enron classifies trading assets/liabilities on the balance sheet, the amount of the borrowing actually is recorded as cash from operations. Summary of Enron's Capital Market Exposure with Citibank, October 26, 2001.

> Enron uses prepay transactions to raise quarter-end non-debt funding.  Also, the mark-to-market accounting method used in the trading business results in earnings recognition prior to receipt of the associated cash flow.  A prepay transaction essentially monetizes this value creation, and helps to balance earnings with cash flow.  Memorandum from Michael Nepveux, Citigroup, to Bill Fox, Citigroup, September 19, 2001.

/ / /

311.  The Examiner concluded:

From its involvement in the Citigroup Prepays, Citigroup knew that Enron was inflating its reported cash flows from operating activities by including the proceeds from transactions that were effectively debt, that the magnitude of these transactions had a material effect on Enron's financial statements, and that Enron failed to disclose information publicly that would have allowed investors to understand the true nature and impact of the Citigroup Prepays.

312.  Citigroup/Salomon established a sham offshore shell corporation, Delta, so that Enron could disguise its debt and inflate its trading activity.  Citigroup/Salomon has admitted that Delta was set up *solely* as a means to hide Enron debt and inflate cash flow from operations. Delta was to appear independent but in reality it was controlled by the bank.  Citigroup/Salomon was not only an active participant in Enron's prepay transactions that served to conceal considerable debt from investors, it in fact was the architect of the Delta structure.

### (A)  Delta

313.  To pursue its fraudulent scheme of hiding debt and overstating cash flow from operations, Enron required a third party to create the appearance that the opposing commodity purchase and commodity sale transactions were "de-linked."  Citigroup was only too happy to fraudulently facilitate this requirement by establishing Delta.  Six of the nine prepay transactions that Citigroup participated in used Citigroup's SPE, Delta – Roosevelt, Yosemite I through IV and the June 2001 Prepay transaction.

314.  The Examiner found evidence that Arthur Andersen had provided guidance with respect to what the required accounting would be on the commodity swap structure.  In particular, the Examiner noted:

Andersen had advised Enron that there needed to be a "substantive business purpose" for structuring the sale and purchase as separate steps, which meant that the conduit entity needed to have a business purpose for entering into the commodity transaction.  Andersen apparently believed that the conduit could not satisfy this criteria if it were an SPE.  Andersen also apparently believed that the conduit entity needed to be independent of the financial institution, and Citigroup was aware of this accounting position.

/ / /

315.    Citigroup was clearly aware that for the prepay structures to meet their deceptive accounting objectives, Delta needed to be independent of Citigroup.  Handwritten notes on a presentation prepared by Citigroup relating to the Yosemite I transaction noted "Enron's Accountants don't want us to be seen to be controlling Delta."  Further, on a diagram relating to the Citigroup prepay transaction from June 2001 there were handwritten notes attributed to Steve Wagman, Citigroup, that said, "[T]hey sell it to their accountants by saying Citi gets paid by a combination of Enron & [sic] independent third party."

316.    Despite the knowledge that the accounting standards required an independent entity with a "substantive business purpose," Citigroup formed Delta for the purpose of participating in Enron's fraudulent prepay structures.  The Examiner noted that:

> Delta never received more than a small fee for entering into the transactions.  The stock of Delta was owned by a charitable trust in the Cayman Islands, but on various occasions Citigroup paid the administrative costs – including registration fees – relating to Delta, its attorneys' fees and its transaction fees.  Additionally, forms establishing a Citigroup bank account for Delta listed Delta's address as c/o Citigroup North America, Inc., described the account as an "internal account" to be controlled by Citigroup, and identified three Citigroup employees as authorized signatories.  Citigroup employees referred to Delta as a shell corporation/SPV, an affidavit that Citigroup provided to the PSI in July 2002 described Delta as a 'special purpose entity,' and even an internal Citigroup lawyer referred to it as an SPV.

317.    Clearly Delta was controlled by Citigroup and was established, not for any "substantive business purpose," but rather for the sole purpose of defrauding investors in Enron securities.

318.    Not only did Citigroup establish an entity, which it knew didn't qualify under the required standards,  to serve as the conduit to perpetuate the fraudulent understatement of Enron's debt, but it took its involvement in the fraudulent scheme one step further by providing misleading representations to Arthur Andersen.  The Examiner found evidence of two occasions when Delta was required to make certain representations to Arthur Andersen.  In particular, the Examiner noted that:

> Andersen requested that Delta make representations that included, notably, (I) that Delta had undertaken business with a number of entities; (ii) that Delta had assets

other than those acquired through the transactions with Enron; and (iii) that Delta had unencumbered assets available to the Yosemite lenders upon default.

319.     Citigroup provided the representations to Arthur Andersen but the representations were provided in a manner that was intended to deceive.  Rick Caplan, Citigroup, testified, and detailed in an e-mail to Steve Wagman, Citigroup, that he was not aware of any business Delta had conducted in 1999, 2000 or 2001 that was not directly connected to the Enron prepay transactions.  He also testified that Delta had assets consisting of about $1,000 that represented pre-funding of the director fees and initial capital.

320.     Citigroup understood the importance of an independent third party that had a "substantive business purpose" so it 'manufactured' one and made misleading representations to Arthur Andersen to ensure it went undetected.  It knew that an SPE structure would not meet the accounting requirements but it went ahead and established one anyway.  It established a facade surrounding Delta designed to deceive Arthur Andersen, Enron's credit rating agencies and Enron's investors.  Citigroup knew that the prepay transactions in and of themselves were fraudulent and it also knew that Delta was a fraudulent structure established for the sole purpose of creating a false impression of revenues and cash flows from operations and concealing debt. Citigroup was a primary violator of U.S. securities laws.

321.     Not only did Citigroup aggressively market the prepay structure to Enron, but it actively participated in deceiving the investors and credit agencies by creating conduit entities, such as the SPE, Delta.  Delta, Citigroup/Salomon's Cayman Island subsidiary provided over $2.4 billion to Enron.  Former Citigroup CFO Barbara Yastine, admitted in her affidavit that Delta was controlled by Citigroup.

322.     These transactions were described as "prepaid swaps,"  but Delta made all its payments up front, while Enron was obligated to make payments to Delta over a five year period. These transactions were, in fact, loans.  However, Enron accounted for these transactions as trading obligations, thus hiding substantial amounts of debt while disclosing the stated cash

flows as "cash flow from operations." Interestingly, Enron treated the prepays as debt for tax purposes.

323. Accounting for prepaid transactions as cash flows from operations rather than debt (i.e., cash flow from financing activities) materially understated Enron's debt obligations and materially impacted financial ratios considered by rating agencies. In testimony before the Senate Subcommittee on July 23, 2002, John C. Diaz, Managing Director of Moody Investor Services, Inc.'s Power & Energy Group, noted that:

> If such transactions had been accounted for as a loan, Enron's operating cash flow would have been reduced and its debt would have been greater. The disclosure of these transactions as loans would have exerted downward pressure on Enron's credit rating.

324. On the same day, Pamela M. Stumpp, Managing Director and Chief Credit Officer of Moody's Investor Services, Inc.'s Corporate Finance Group, told the Senate Subcommittee that:

> When a company improperly reports cash flows generated by or used in financings as cash generated from typical business operations [then investors, analysts and credit rating agencies will be mislead [sic] as to the financial health of a company and its ability to meet future commitments on cash.

Citigroup/Salomon thus directly participated in Enron's acts of hiding obligations and falsifying its true financial condition, liquidity, and creditworthiness.

325. In 1999, a Salomon banker prepared an internal Enron capitalization report. It included information taken from Enron's audited financial statements, analyses conducted by Moody's, and an analysis based on Salomon's knowledge of the company. The internal Salomon report showed a level of debt which included prepays and which was materially higher than what was reported in Enron's financial statements. In Enron's financial statements, the prepays were not shown as debt. A Citigroup Exposure Memo dated October 2001 states:

> This form of financing is advantageous to Enron in that it allows the borrowing to be reported as price risk management liability rather than debt. In addition, because of the way Enron classifies trading assets/liabilities on the balance sheet, the amount of the borrowing is recorded as cash from operations.

/ / /

326.     Clearly, Salomon considered the prepays to be debt but did not disclose this information in either of the prospectuses for the Exchangeable Notes or Zero Coupon Notes. Again in 2000 and 2001, Citigroup/Salomon prepared internal Enron credit analyses that categorized the prepays as debt.  In all instances, the internal reports show levels of indebtedness that are significantly higher than what is reported in Enron's financial statements. Citigroup/Salomon's representation of Enron's financial condition in the Exchangeable Note and Zero Coupon Note prospectuses is contrary to its own internal analyses.

## (B)     Yosemite I-IV

327.     Citigroup/Salomon used Delta to facilitate the Yosemite transactions.  A September 26, 2001, Citigroup e-mail acknowledges the true purpose of Yosemite. A prepay "gives some oomph to revenues" adding later in the message "E [(Enron)] gets money that gives them cflow [(cash flow)] but does not show up on the books as big D, debt."  Yosemite was more than a "dressed-up" loan.  According to a Citigroup Exposure Memo: "The investors have effectively loaned Enron the money, not Citigroup."

328.     Citigroup/Salomon provided a major component of Enron's secret prepay scheme when it designed the Yosemite structures in 1999.  Citigroup structured the Yosemite prepays to deliberately thwart disclosure to the credit rating agencies and other investors.  This characteristic was referred to by both Citigroup and Salomon as the "black box."  The trusts functioned as a "black box" by preventing investors from knowing that the Yosemite proceeds were being used to fund Enron prepays.  These structures offered investments in Enron-related securities and did not reveal the specific investments into which the funds were being placed.  Investors in Yosemite were led to believe that they were buying assets that produced revenue.

329.     Citigroup/Salomon's development of the Yosemite structures enabled it to move some of the hidden loan risk to the public and reduce its own exposure to Enron.  This is further highlighted by a Citigroup/Salomon Credit-Linked Notes (CLNs) Presentation which stated, "Benefits of CLNs includes:...Eliminates the need for Capital market disclosure, keeping

structure mechanics private....Allows structure transaction access to the Capital markets...However, structure remains private-no Capital Markets disclosure...Capital markets look to the credit swap and do not see the structure."

330. A Salomon Credit Committee Memo referring to a credit meeting on April 16, 2001 stated: "The primary purpose of this transaction [Yosemite] is to permit Enron to refinance certain borrowings, with proceeds from the Offering, while allowing Enron to maintain the advantageous accounting and rating agency treatment of these financings." Thus, Citigroup was aware of and actively participated in Enron's failure to disclose the true nature of the prepays (as debt) to the market and to credit rating agencies.

331. Citigroup/Salomon underwrote four Yosemite offerings which produced $2.4 billion in funds for prepays. Citigroup/Salomon even participated as an equity owner in the trusts which were a key element in these structures. Some of the Yosemite proceeds were actually used to repay Citigroup/Salomon and reduce its own Enron credit exposure.

332. Citigroup participated with Enron in its market deception by designing the Yosemite structure which accessed capital markets as a source of funds for the prepay loans. This allowed Citigroup to continue to earn lucrative fees from the origination of the prepays while transferring the risk to financial market investors who were unaware of the true nature of Enron's precarious financial position. The lack of disclosure of prepays as debt instruments made it impossible for investors to uncover the true level of Enron's indebtedness. An April 6, 1999 Yosemite Transaction Memorandum states: "Investors and rating agencies see a simple Enron Credit Linked Notes [*sic*] with repayment similar to an investment in a direct Enron obligation." Finally, on October 25, 2001, Paul Deards, Head of Derivative Capital Markets, emailed Rick Caplan, Managing Director of the Credit Derivatives Unit, ." . . also wanted to get your confirmation that (apart from the fact we put deals together on enron [*sic*] which we knew confused the rating agencies) there is no skellington in the closet . . .."

/ / /

80

### (C)   Roosevelt

333.   In the 1999 "Roosevelt" deal, senior credit officers of Citigroup/Salomon misrepresented the full nature of the transaction with Enron so that Enron could ignore accounting requirements and hide its true financial condition.  The records and interviews with investigators show that Citigroup/Salomon intentionally manipulated the written record to enable Enron to keep $125 million of debt off its balance sheet.  Citigroup/Salomon left an oral agreement out of the written record to allow Enron to account for the transaction in a way that they knew was fraudulent.

334.   Between 1998 and 2001 the prepay transactions that Citigroup facilitated accounted for over $4.6 billion.  The Examiner concluded that:

Enron's Prepay Transactions were simply debt packaged as commodity swaps. Citigroup itself considered the Citigroup Prepays to be debt for its own regulatory accounting purposes and when analyzing Enron's debt to capital ratios.

335.   The Examiner concluded that the impact of the Citigroup Prepay transactions was material on both cash flow from operations as well as Enron's reported debt obligations. Considering Citigroup Prepay transactions only (*i.e.*, excluding prepay transactions that Enron executed with other counterparties) the Examiner found the impact to be as follows:

### Impact on Enron's Operating Cash Flows

| For year ended | Reported Cash Flow from Operating Activities (millions) | Net Cash Flows from Citigroup Prepays (millions) | Cash Flows From Operating Activities Without Citigroup Prepays (millions) | Percentage Decrease |
|---|---|---|---|---|
| 1999 | $1,228 | $935 | $293 | 76% |
| 2000 | $4,779 | $546 | $4,233 | 11% |

/ / /

### Impact on Enron's Debt

| As of December 31 | Reported Debt (Does Not Include Prepay Transactions) (millions) | Amount Outstanding on Citigroup Prepays (millions) | Debt Including Amount Outstanding on Citigroup Prepays (millions) | Percentage Increase |
|---|---|---|---|---|
| 1999 | $8,152 | $1,125 | $9,277 | 14% |
| 2000 | $10,229 | $1,671 | $11,900 | 16% |

336. Citigroup/Salomon developed the deceptive prepays as a financial product and sold it as so-called "balance sheet friendly" financing earning millions in fees. Details of the prepays as engaged in by Citigroup/Salomon are detailed in Appendix C of Exhibit B.

### (iii)     Analyst Coverage

337. Citigroup's relationship with Enron was so close that Enron was able to exert pressure on Citigroup to ensure a positive rating from Citigroup's equity analyst. From 1997 through 2001, Don Dufresne was the equity analyst that covered Enron on behalf of Citigroup. Dufresne was terminated from Citigroup at the end of 1999 and the Examiner has identified evidence to suggest that his removal was related to his position on Enron's stock. In particular, the Examiner noted:

> In March 1999, Fastow expressed displeasure with Dufresne's rating of Enron. Robert Holloman, a Citigroup employee who spoke with Fastow about the matter, reported that Fastow said Dufresne was not constructive in his views on Enron" and the Enron also did not believe Don had fully supported the company in its recent equity offering and that this was reflected in the fact that [Citigroup] sold less stock than any other manager. Fastow also told Holloman that Enron's displeasure with Dufresne was the one reason Enron did not allow Citigroup to have more than a trivial role in the $750 million initial public offering of Azurix, Enron's water subsidiary. Fastow sent Citigroup, through Holloman, a strong message … that Enron would like to see some progress in our equity research view on Enron before the relationship with SSB can really progress.

338. Raymond Niles, who assumed coverage of Enron for Citigroup after Dufresne was terminated, upgraded Enron's rating and commenced coverage with a "1H" rating – the '1' reflected Citigroup's highest possible buy recommendation for a stock.

/ / /

339.    Although it was well aware of, and had participated in, Enron's illicit practices, Citigroup/Salomon nevertheless published analyst reports and investment research reports that fraudulently touted Enron's financial strength and performance, and recommended that investors purchase Enron securities. Citigroup/Salomon issued similarly favorable reports and recommendations on  January 27, 1999; May 25, 1999; July 20, 1999; August 20, 1999; September 20, 1999; October 20, 1999; April 12, 2000; September 21, 2000; March 12, 2001; March 22, 2001; May 18, 2001; June 7, 2001; July 13, 2001; October 2, 2001, October 16, 2001, and October 19, 2001.

340.    Citigroup/Salomon was selling Enron securities to reduce its exposure to Enron even as it was continuing to recommend purchase of the company's securities to the public.  In fact, Citigroup trader, Eric Hage, sold Silvercreek 26 million Enron zero coupon notes while concurrently referring to Enron as "busted crap" and committing accounting fraud.

341.    Citigroup/Salomon was the lead underwriter for the Zero Coupon Notes and an underwriter for the Exchangeable Notes.  At the time of each registration statement, Citigroup/Salomon knew that the information in the prospectuses was inaccurate and materially misleading.  The magnitude of and potential risks associated with Enron's off-balance sheet activities and hidden obligations were not disclosed.  In the congressional investigator's testimony, reference is made to an internal analysis presented to Citigroup/Salomon's Investment Grade Debt Commitment Committee, in which Enron's publicly reported indebtedness figure was adjusted upwards to reflect the impact of prepays.  The congressional investigator's testimony states "[c]learly, Citigroup had better insight into Enron's true financial condition than most other actors . . . .. It is safe to conclude that analysts and investors also would have been interested in evaluating these outstanding Enron commitments; *in the case of so-called prepays, that analysis was impossible for outsiders.*"  Citigroup/Salomon knew that its research reports were inaccurate and misleading.  Citigroup/Salomon substantially participated with Enron in executing transactions to hide billions of dollars of debt and to generate inflated profits.

342.     As Enron's situation deteriorated in 2000-2001, Citigroup/Salomon greatly increased the money flowing to the company through disguised loans (prepays) in an effort to prop up Enron's diminished finances and continue the underwriter scheme.

### (iv)     Citigroup's Knowledge of Enron's True Financial Position

343.     Citigroup was extensively involved with Enron and was one of Enron's Tier 1 banks.  Citigroup acknowledged the extent of its relationship with Enron in an internal memo dated October 1999.  It noted that "Salomon Smith Barney is in frequent dialogue with Enron's management team regarding the company's, and each of its subsidiaries', operating and financial results and business outlook."  Indeed in an a separate memo related to Citigroup's involvement in Yosemite I it was noted that "We [Citigroup] maintain regular contact at Management levels throughout the organization including CEO, COO, CFO and SVP Finance.  In addition, we have frequent contact with the business groups as a result of the broad range of deals under consideration."

344.     Based on the depth of its relationship with Enron, Citigroup was able to prepare a thorough analysis of Enron's financial position and did so as part of its regular credit review of Enron.  The Examiner noted that:

> When Citigroup prepared its analyses of Enron, it often included detailed descriptions of Enron's debt and other obligations, recharacterizing as debt many types of obligations that Enron did not report as debt, or taking into account obligations that Enron did not report at all in its consolidated financial statements. These obligations included such items as prepays, structured financings, leases, receivables securitizations and guarantees of unconsolidated subsidiaries.

345.     Using the information that Citigroup had at its disposal as a result of its relationship with Enron, it compared Enron's publicly reported debt levels and related debt ratios with the more comprehensive ratios that it was able to prepare.  The difference between the two sets of ratios was effectively the extent to which Enron was fraudulently concealing debt from its investors.  Specifically, Citigroup prepared two calculations:

a)     SSB Base Case Analysis – which incorporated certain off-balance sheet obligations but excluded contingent equity secured transactions; and

b) SSB Alternative Analysis – which included all obligations including contingent equity secured transactions.

346.   The results are staggering.  The following is a comparison of Enron's publicly disclosed debt levels against Citigroup's internal metrics:

| Period | Publicly Disclosed (billions) | SSB Base Case Analysis (billions) | SSB Alternative Analysis (billions) |
|---|---|---|---|
| Nov. 1999 | $10.3 | $14.1 | n/a |
| Aug. 2000 | $11.1 | $16.1 | $18.2 |
| April 2001 | $10.2 | $16.1 | $19.7 |
| August 2001 | $11.9 | $18.8 | $22.8 |

347.   Based on the insider information it had gained through its involvement in a myriad of fraudulent structures,  Citigroup knew that Enron's total outstanding obligations were nearly double those that were being disclosed in Enron's financial reporting and related disclosures.

348.   In all instances, the internal reports show levels of indebtedness that are significantly higher than what is reported in Enron's financial statements.  Citigroup's representation of Enron's financial condition in the Exchangeable Note and Zero Coupon Note prospectuses is contrary to its own analysis.  Clearly, Citigroup considered the prepays to be debt but did not disclose this information in either of the prospectuses for the Exchangeable Notes or Zero Coupon Notes.

**(v)   Citigroup/Salomon's Role as Underwriter of the Exchangeable Notes and the Zero Coupon Notes**

349.   Citigroup/Salomon knew that Enron's financial condition was bleak, and went out of its way to lessen its credit exposure to Enron while continuing to mislead the market. Citigroup/Salomon created securities, issued from August 2000 to May 2001, which would permit it to shift any risk of loss to investors if Enron collapsed, providing itself with protection against a total of $1.4 billion of potential losses from Enron.  Citigroup/Salomon used companies in the Channel Islands to sell investors credit-linked notes, securities which permitted

85

Citigroup/Salomon, in the event of Enron's bankruptcy, to take possession of highly rated securities and leave investors with worthless, unsecured Enron debt. There is no precedent in the history of Citigroup/Salomon for such an insurance policy against potential losses. Other examples of Citigroup/Salomon protecting itself at the expense of public investors include the creation of the Yosemite vehicles and the November 2001 $1 billion secured loan. Proceeds from both Yosemite and the secured loan were used to repay Citigroup/Salomon.

350. As long as Enron retained its investment-grade credit rating and continued to report strong financial results with credible forecasts of future revenue and profit growth, Citigroup/Salomon would have continued to enjoy enormous profits and/or fees on interest payments for the loans and syndication services provided to Enron. Enron's access to capital markets permitted Enron to regularly raise enormous sums of money and fresh capital from public investors which Enron could then use to repay its existing commercial and bank indebtedness – including Citigroup/Salomon.

351. Despite analyst reports recommending Enron securities to its clients, evidence shows that Citigroup was trying to reduce its exposure to Enron by 'pushing' its proprietary Enron holdings on its clients. Eric Hage was the convertible bond salesperson that was assigned to cover Citigroup's relationship with Silvercreek David Kennedy and David House were both convertible bond traders at Citigroup. Based on the messages that Mr. Hage was sending out and receiving in during October 2001 it is clear that he was actively trying to sell Enron bonds to Silvercreek and actively trying to reduce Citigroup's proprietary exposure to Enron credit.

352. In a Bloomberg instant message sent from Eric Hage, Citigroup, to David Kennedy, Citigroup, on October 19, 2001 he states:

> CNBC about to discuss ENE [Enron] after commercial … you still trying to sell bonds at 57.5? Trying to get this crazy account Silvercreek to buy them[.]

353. A message sent by Mr. Hage to Dave House, Citigroup, on October 22, 2001 makes it clear that Citigroup was actively trying to reduce its own exposure to Enron debt. The message says:

Dave … I know we are in a bind in ENE 0% (*i.e.* long $100 MM)…But I did just trade 2MM 55 to 55.75 … I think we should just advertise the purchase at 55.75…

354.    Late in October 2001, Citigroup became increasingly aggressive in trying to reduce its own exposure.  For example, in a message to Mr. Hage, David House on October 22, 2001 details: "ENE 0% 30MM trade at 55.75 .. come out 55 ½ - 56 size."

355.    Later in the same day Mr. Hage had an exchange of Bloomberg messages with Gary Jacobs, Citigroup.  In response to Mr Jacobs question "Is ENE a foreshadowing of SSB [Salomon Smith Barney] Equity Derivatives?"  Mr. Hage responds: "Depends what accting [accounting] standard is in place."

356.    As further evidence that Citigroup was trying to reduce its exposure to Enron, Mr. Hage had the following dialogue with Thomas Birkett, CIBC, on October 24, 2001:

| Mr. Hage: | Hearing ENE trading at 54 in the street … haven't seen a natural buyer yet this morning |
|---|---|
| Mr. Birkett: | Are you the underwriter? |
| Mr. Hage: | Oh yeah  … and we didn't quite sell them all |
| Mr. Birkett: | When it came or now? |
| Mr. Hage: | Sold almost none of them when it came … got the position down to a reasonable level over time, but not down to zero. |

357.    Citigroup/Salomon functioned as a unified entity without any adequate Chinese wall to prevent its analysts from sharing and using information collected by Citigroup/Salomon's commercial and banking services.  The lack of Chinese walls is evidenced by Citigroup's agreement to separate research and investment-banking activities and its settlement with regulatory bodies related to stock analysts' conflicts of interest and complaints that biased reports were issued to win investment banking business.  Citigroup/Salomon settled claims it misled customers with biased stock research for $2 billion.  All knowledge and scienter possessed by Citigroup/Salomon's commercial investment entity should be attributed to its securities analysts.

358.     Substantial evidence supporting Silvercreek's allegations against Citigroup has been uncovered in the nearly five (5) years since Enron declared bankruptcy.  To date Citigroup has:

•     Settled an outstanding complaint brought by the SEC by agreeing to pay the SEC a total of $101 million; and

•     Agreed to pay $2.0 billion to settle claims brought against it by the Enron Class Action case - substantially the same claims that Silvercreek is alleging herein.

359.     As soon as accurate financial information, information that Citigroup had knowledge of and direct responsibility, was broadly disseminated to the general public, the value of Enron securities dropped almost to zero.  Silvercreek lost substantially its entire investment in a matter of weeks.  Citigroup is directly responsible for Silvercreek's losses.

360.     Citigroup/Salomon was an underwriter of the Exchangeable Notes and the lead statutory underwriter of the Zero Coupon Notes.  Citigroup/Salomon sold these securities to investors, including Plaintiffs, knowing that the registration statements were inaccurate, highly misleading, and did not provide investors with a true picture of the financial condition of Enron. The registration statements materially overstated Enron's revenue, earnings and cash flow from operations and did not disclose the existence and magnitude of Enron's off-balance sheet obligations and activities.  If such disclosures had been made, investors would have been able to make a more accurate assessment of Enron's ability to repay its obligations, which is a key consideration when contemplating a debt investment.  In addition to making false and misleading statements in the registration statements for the Notes, Citigroup/Salomon made false and misleading statements in analysts' reports and knowingly participated in the scheme to falsify Enron's financial statements and mislead investors.  Through these activities, Citigroup/Salomon earned enormous fees and commissions.  Plaintiffs relied on the information misrepresented by Citigroup/Salomon in making their investment decisions.

/ / /

### b.   Barclay's

361.   Barclays is another large financial institution that had an extremely close relationship with Enron.  Barclays is a financial services institution, which provided commercial banking and investment banking services to Enron and helped Enron structure and finance its SPEs.

362.   Barclays was a placement agent and/or reseller of the Zero Coupon Notes, and underwrote $240 million of 8.75% Yosemite Enron-linked obligations.  Yosemite was specifically developed to help Enron hide debt through the use of prepays.  The underwriters benefitted from the Yosemite offering, in that the offering shifted Enron credit risk to the public and reduced the underwriters' exposure.   Prepays were used to hide billions of dollars in Enron obligations.

363.   Barclays was the lead lender on a $2.3 billion debt facility relating to Enron's purchase of Wessex Water in 1998 and was a co-arranger of a $250 million loan to Enron in November 1997.  Barclays engaged in $4 billion in credit facilities which Enron used to back up its commercial paper debt, and was part of a $500 million credit facility for JEDI in May 1998.  Barclays participated in a $1 billion credit facility for Enron in 1998 and a $3 billion debt facility in 2001, both of which were used to back Enron's commercial paper debt.

364.   Barclays' senior executives interacted with Enron's almost daily and discussed the details of Enron's business and finances.  Because of its extensive access to Enron's internal business and financial information, Barclays knew that Enron was falsifying its financial results.  Barclays provided loans to Enron of over $3 billion, helped raise approximately $2 billion from investors through the sale of securities based on misrepresented information, and participated in Enron's structuring and financing of the SPEs and partnerships that Enron used to falsify its financial results. Barclays' willful participation in these fraudulent transactions deceived Enron investors.

/ / /

365.    In Appendix F ("Role of Barclays and its Affiliates") to the Third Interim Report of Neal Batson, Court-Appointed Examiner (Exhibit F), a substantial volume of evidence with respect to Barclays' role in the Enron debacle was reviewed.  The Examiner concluded:

> Barclays' conduct in respect of the Chewco Transaction, the J.T.  Holdings Transaction, the Nikita FAS 140 Transaction, the SO2 Transaction and the three Prepays enabled Enron to; (i) receive approximately $410 million of income that should not have been recorded; (ii) receive cash flow from financings of approximately $1 billion, all of which Enron erroneously recorded as cash flow from operating activities; and (iii) erroneously omit almost $1.77 billion of debt in its 1997, 1998, 1999, 2000 and 2001 financial statements.

366.    The Examiner concluded further that:

The evidence would allow a fact-finder to conclude that Barclays:

- Obtained verbal assurances from Enron in which Enron promised to cover Barclays' equity risk positions in two SPEs, likely knowing that the assurances would not be disclosed to Enron's auditors and that, had they been disclosed, Enron could not have accounted for the transactions as it did;

- Structured and closed the $SO_2$ Transactions knowing the transaction was not a true sale, that it was designed to manipulate the Debtors' financial statements, and that it resulted in the dissemination of financial information known to be materially misleading;

- Caused Enron to structure a transaction involving an SPE such that Enron covered 60% of the equity risk position in the SPE, knowing that would prevent Enron from properly giving the structure off-balance sheet accounting treatment; and

- Participated in three Prepay Transactions and one monetization transaction that Barclays knew were designed to manipulate the Debtors' financial

  statements and did result in the dissemination of financial information known to be materially misleading.

Barclays' active participation in the Enron debacle may be summarized under three main categories:

      (a)    SPE Transactions;

      (b)    $SO_2$ Transactions; and

      (c)    Prepay transactions.

/ / /

### (i)  SPE Transactions

367.  Barclays was no passive investor (or even lender) in its dealings with Enron.  To the contrary, Barclays played an active, essential role in the design of the Enron SPEs.  In Barclays' annual review of Enron dated July 2, 1999, Barclays Credit Group Director John Meyer described the many debt-like structured finance transactions that Barclays designed for Enron, listing the following types of transactions: "synthetic leases," "company-obligated preferred shares of subsidiary companies," "deferred revenue financing," "minority interest financing," "structured sale of equity interest," and "nonrecourse asset sales."  Meyer described "Company-Obligated Preferred Shares of Subsidiary Companies ([COP]s)" as follows: "This structure allows debt to 'masquerade' as preferred equity on a company's balance sheet…As noted earlier, Enron has $1.0 billion of [COP]s outstanding."  Moreover, the same list of Enron transactions continues:

> Minority Interest Financing – Enron had two such structures outstanding at year-end: Rawhide and Nighthawk.  They totaled $1.3 billion.  In the structure, debt masquerades as a limited partnership interest and is therefore included in Minority Interest.

Thus, Barclays was an active participant in Enron's debt transactions that "masqueraded" as operational transactions.  Barclays' substantial and long-standing active participation in hiding debt in Enron's many structured finance transactions was integral to the very deceptive devices and contrivances that were the heart of the scheme to deceive investors and credit rating agencies.

### A.  Chewco

368.  Barclays helped structure and finance Enron SPEs, including transactions between Chewco and JEDI.  Barclays had a direct role in the creation of Chewco in 1997.  Barclays provided the funds to create Chewco with full knowledge of its purpose, and demanded secret cash deposits to be made to protect Barclays against the risk of losing its investment.  From that time forward, Barclays was well aware that no Enron financial statement was accurate.

Nevertheless, Barclays continued as an active participant in the Enron Ponzi scheme, including acting as an underwriter of securities purchased by Silvercreek.

369.    In March 1996, Enron approached Barclays to structure the Chewco Transaction, which consisted of the creation of a minority interest limited partnership (Chewco Investments LLC) to acquire CalPERS' interest in JEDI.  The minutes of the Barclays Operation Committee Meeting on October 20, 1997, show that Barclays tried to structure the investment as collateralized debt.  Enron and Barclays worked closely to arrive at a structure that would satisfy Enron's objective of keeping the transaction off the balance sheet and still offer Barclays the protection of its principal (loan) investment, although those were mutually exclusive objectives.

370.    Under the rules governing the accounting treatment of SPEs, at least 3 percent of Chewco's capital had to come from independent investors in order for Chewco's financials to not be consolidated with Enron's.  Chewco was funded using a 3% equity minority interest that was surreptitiously collateralized by the provision of a 60% cash protection by Enron to Barclays. The investment in Chewco actually came from two entities called Little River LLC and Big River LLC, two straw men.  As Barclays well knew, this structure invalidated Enron's accounting treatment of Chewco,  since Barclays' investment was not really at risk.  Despite their knowledge that this would invalidate the off-balance sheet treatment of this asset sale, Barclays sought guarantees from Enron to protect its investment.

371.    Barclays advanced $11.4 million for Big River's Chewco investment, calling it an "equity loan."  Barclays knew that an independent investor was lacking and therefore insisted that the borrowers, *i.e.*, Enron, secretly establish cash reserve accounts to secure repayment of the Barclays "equity" investment.  As a result, Barclays' advance was secured by $6.6 million in secret cash collateral (or reserve accounts).  The supposed equity investment was actually a loan. To fund the  reserve accounts, JEDI wired $6.58 million to Barclays on December 30, 1997, thus reducing by half Chewco's 3 percent equity interest in JEDI.  As a consequence, Chewco did not

have the requisite equity at risk and did not qualify as an adequately capitalized SPE. JEDI and Chewco should have been combined into Enron's consolidated financial statements from the commencement. Barclays knew that Chewco was an integral part of Enron's concealment of debt and risk, yet, nonetheless acted as an underwriter for Enron and sold securities to the public based on false information. This act of underwriting was fraudulent and intended to deceive the investing public.

372.    Since Enron guaranteed the $240 million unsecured loan from Barclays to Chewco in December 1997, Chewco agreed to pay Enron a guarantee fee of $10 million up front (cash at closing) plus extraordinary charges based on the loan's average outstanding balance. The fee calculation was not based on the risk involved, as would have been the case for a *bona fide* financing transaction, but on the benefit Enron received in being able to falsify its financial statements. JEDI paid Enron $17.4 million under the fee arrangement, payments which were called "structuring fees." Enron recognized <u>revenue</u> from these transactions even though the transactions involved only Enron and had no legitimate business purpose for either entity.

373.    Barclays played an integral role in the creation and funding of Chewco and other SPEs (including Colonade Limited and Nikita). Barclays' contributions were integral to Enron accomplishing its scheme of concealing the true debt levels by hiding billions of dollars of debt in the SPEs it created and controlled**.** SPE transactions also were used to inflate the revenue and earnings of Enron.

374.    Barclays knew that neither Chewco nor JEDI was a valid SPE because neither met the requirements for non-consolidation. Chewco was not only established to allow Enron to report JEDI revenues of $45 million, inflating Enron's 1997 reported revenues and earnings and keeping $700 million of debt off Enron's books, but also provided Enron with a "front man" for non-arm's-length-transactions with any Enron-controlled entity. Knowing that Chewco was not legitimately capitalized, but instead was funded by loans, Barclays thereafter knew that each and every Enron financial statement was materially false and misleading.

93

375.     With respect to the Chewco transaction the Examiner noted:

Evidence exists from which it could be inferred that Barclays knew that by giving Barclays close to 60% cash collateral at closing, the Chewco structure eliminated close to 60% of the necessary equity risk in Chewco and therefore failed the 3% Equity Test.  Eventually, even Enron acknowledged that the Chewco equity was not sufficiently at risk and on November 19, 2001 restated its financial statements back to 1997, when Chewco and JEDI first should have been consolidated with Enron.

## B.     Nikita

376.     Barclays knowingly participated in Enron's scheme to report hundreds of millions of dollars of false revenue and income.  For example, J.T.  Holdings and Nikita Transactions were structured as non-recourse, off-balance sheet "true" asset sales.  However, in order to proceed with the deals, Barclays demanded and received verbal assurances from Enron that protected Barclays "equity" investment from being at risk and therefore invalidated Enron's off-balance sheet treatment of the deals as non-recourse true asset sales.  An example of this is Barclays Investment Banking Director Richard Williams' November 14, 2000 Transaction Comment, where Williams wrote:

We [Barclays] have had a number of conversations with Enron about the transaction risks and have agreed to go forward on the basis of explicit verbal support from the company's Treasurer.  Specifically, Ben Glisan will commit to us that under all circumstances Enron will execute its purchase option at a price sufficient to repay in full the holders of the B notes and Certificates.

This verbal guarantee was obviously not conveyed to the public or Arthur Andersen, because the release of this information would have revealed the invalidity of the transaction.

377.     The use of verbal agreements to circumvent the requirement that Barclays have an at-risk equity investment in the deal intentionally and improperly hid the true nature of the asset sales from investors and credit rating agencies.  Indeed, Barclays executives knew, as early as 1997, that fully-disclosed written guarantees would have invalidated these transactions since Enron treated the asset sales as off-balance sheet, non-recourse true sales.  For example, when Barclays Investment Banking Director Richard Williams was asked whether he believed "that a written guarantee [in Nikita] would have destroyed that at risk requirement?" he answered, "I

believe it would have put it in jeopardy." Barclays' verbal guarantee had the purpose and effect of concealing Enron's true fiscal condition from the investing public.

378. On August 28, 2001, Barclays Directors Richard Williams and John Sullivan received an Enron powerpoint presentation detailing the Nikita Transaction. In this presentation, Enron made it clear that it was "interested in selling this financial asset for accounting purposes." Knowing there was to be no sale, and having known since at least 1997 that Enron's public financial statements were false and misleading, Barclays nevertheless proceeded with the transaction.

379. On September 25, 2001, days before Barclays would provide $71.9 million in financing for the Nikita transaction, John Sullivan sent an e-mail to Richard Williams and Barclays Head of Loan Syndications Eric Chilton in which he commented with respect to Nikita, "This 'trust me' total [EOTT's stock price total] is somewhat mitigated by $740k in u/w [underwriting] and arranging fees, and $150k in front end fees... I just wanted to point out that in a realistic scenario, we are not just taking a blind leap of faith on a 'trust me' from Enron for $8.5m in three years time; rather, taking an expected $5.5m position is a critical element in our ability to earn nearly $750k in front end fees, and an additional $2m in net interest income." Barclays knew that Enron was not as strong as it represented to the investing public, but because Barclays would profit from underwriting and arranging fees it financed Nikita.

380. Barclays clearly understood its role in Nikita to be that of a lender, as evidenced by: (a) the involvement of Head of Loan Syndications Eric Chilton; and (b) the undisclosed total return swap that transferred responsibility for the financing to Enron. Nevertheless, Barclays falsely documented Nikita as financing for an asset purchase by an SPE. This transaction generated $10 million of artificial revenue and earnings and $80 million in "cash from operations" for Enron. Through this transaction, Barclays, Enron and CSFB hid another $80 million in Enron debt from the public and inflated Enron's reported revenue and earnings.

/ / /

95

381.    In the First Interim Report of Neal Batson, Court-Appointed Examiner, the

Examiner noted that:

> The Nikita Transaction can only be understood when viewed in its totality.  When
> so viewed, the transaction appears to be, from both an economic and risk
> allocation perspective, a loan rather than a sale of an asset.

382.    The Examiner found evidence that indicated that Enron recognized a gain on sale

of approximately $10 million in the third quarter of 2001.  The corresponding cash flows were

reported as cash flow from operations rather than cash flows from financing activities – further

concealing Enron's true debt levels from investors.

383.    With respect to the Nikita transaction, the Examiner noted:

> The Nikita Transaction, though structured to appear as a sale of Enron's interests
> in EOTT, was in substance a loan from Barclays to Enron.  … Barclays
> understood that the Total Return Swap represented a direct payment obligation of
> Enron to pay the principal and interest due on the loan made to the SPE.  Finally,
> Barclays understood that Total Return Swaps were booked on Enron's financial
> statements as Equity Derivatives but that they were not broken out separately so
> the actual amount of Enron's Total Return Swap obligations could not be
> accurately determined from Enron's financial statements.  Despite understanding
> that the Nikita Transaction would create a direct payment obligation of Enron that
> could not be determined by reference to Enron's financial statements, Barclays
> helped structure and close the transaction.

384.    The Examiner's review of the evidence related to the Nikita transaction caused

him to note:

> While Barclays would have preferred a written guarantee, it knew that a written
> guarantee likely would have precluded the off-balance sheet accounting treatment
> that Barclays understood was a principal purpose of the transaction from Enron's
> point of view.

385.    The verbal assurances that Barclays required to close the transaction as well as the

Total Return Swap were critical to the fraud.  Barclays knew that if the guarantees it required

were included in the transaction documents the Nikita transaction would not have met Enron's

objectives.  Despite its knowledge with respect to Enron's accounting objectives and its concerns

regarding the enforceability of the guarantee, Barclays closed the Nikita transaction.  Graham

McGahen, Managing Director, Barclays, believed the verbal assurances were sufficient *"[g]iven*

*Enron's impeccable record in this regard to date."*  Mr. McGahen's comments also demonstrate

96

that this was not the first time that Barclays had executed transactions with Enron based on oral commitments.

386.    It should be noted that the Nikita transaction (as with the other SPE transactions) was more than just a hidden misleading financing.  It was also employed to create the illusion of revenue, earnings, and cash flow from operations.

### (ii)    The SO$_2$ Transaction

387.    In another questionable 11th hour transaction completed in October 2001, Enron "raised" cash of approximately $93 million.  This transaction entailed the transfer of SO$_2$ emission credits to SPE Colonnade Limited, a Guernsey company, that appears to be affiliated with Barclays.  Barclays also funded the transaction.  Again, in substance, the transaction was a loan, but was held out to the public as an asset purchase to permit Enron to falsify its revenue, earnings and cash flow from operations.

388.    Barclays participated in Enron's market deception by sponsoring the SPE, Colonnade Limited, to create the tripartite arrangement that turned the asset sales deals into the economic equivalent of secured loans.  In order to pass Andersen's "smell test" for SPEs required to receive off-balance sheet treatment, Barclays planned and executed two short-dated trades designed to give Colonnade the appearance of an independent firm with a legitimate history of transactions.  Moreover, a letter from Benoit de Vitry, Managing Director of Barclays stated that Enron "will pay all out of pocket expenses (including legal fees) which are incurred by Barclays Capital in connection with the creation of an insolvency remote cell for Swap Co [*i.e.*, Colonnade]."  Barclays actively participated in the Enron fraud by entering into sham transactions calculated to mislead the investing public.

389.    Enron, through a series of transactions, referred to herein as SO$_2$, sought to monetize assets.  Through a series of call/put options between itself and Colonnade, Enron recorded this transaction as cash flow from operating activities.  Enron and Barclays then entered into a circular transaction with Colonnade to eliminate the market risk so that Enron could report

the $SO_2$ transaction as cash flow from operating activities. This transaction, which lacked any legitimate commercial purpose, presented internal problems for Barclays. In a committee meeting, those unfamiliar with the $SO_2$ transaction questioned whether the $SO_2$ transaction had any purpose other than accounting or reporting. "The values of Barclays Bank suggest that we would be reluctant to do a deal that was done solely for accounting reasons." Barclays began recommending a "reduce exposure policy," but never publicly communicated any negative information it had about Enron to anyone outside the bank.

390.    Based on his review of the evidence related to the $SO_2$/Colonnade transaction, the Examiner noted:

> The apparent intent of the parties was to structure a financing transaction that shared the economic characteristics of a loan but would permit Enron to record the proceeds of the borrowing as cash flow from operating activities.

391.    Barclays' involvement in the perpetuation of the fraud was so deep that in 2001 when Arthur Andersen increased its scrutiny of SPEs and in particular, the achievement of off-balance sheet accounting, Barclays further accommodated Enron's nefarious accounting practices by "seasoning" a new structure.

392.    In his August 30, 2001 New Product Proposal, Martin Woodhams, Director, Barclays, noted that:

> Recent tightening of US GAAP regulations with regard to SVPs, has led to the need of incorporating an SVP that closely resembles an operating company. To this end the SVP will before it transacts with Enron, undertake a small number of short dated FX, metal funding and murabaha transactions. This diverse transactional trading history is crucial to the success of achieving off-balance sheet treatment for our client. Once the Enron transaction closes it is not intended that any further transactions will be entered into by the SPV.

393.    As further evidence that the Colonnade structure was controlled by Enron (and therefore should have been consolidated), in its engagement letter for the $SO_2$ Transaction, Benoit de Vitry, Managing Director, Barclays, details that Enron "will pay all out of pocket expenses (including legal fees) which are incurred by Barclays Capital in connection with the creation of an insolvency remote cell for SwapCo."

394.     The Examiner found evidence to suggest that Barclays knew that the $SO_2$ Transaction could not qualify as a "true sale."  Pritesh Pankhania, Barclays, noted in an e-mail to Martin Woodhams, Director, Barclays, "[T]he economic risk and rewards of the commodity assets held by the SPV will remain with the client by virtue of the back-to-back hedging transactions."

395.     Barclays engaged PricewaterhouseCoopers ("PWC") to review the Colonnade structure and confirm that Barclays would not need to consolidate the SPE into its financial statements.  The Examiner found evidence that, although PWC believed that Barclays would not need to consolidate Colonnade, it believed that Enron probably would need to consolidate Colonnade.  For example, James Hewer, PWC, noted in an e-mail to Martin Woodhams, "First thoughts are that the energy company is likely to be the sponsor of the SPV and hence will be required to consolidate the SPV…"

396.     The Examiner found evidence to conclude that Barclays understood that concern with respect to the "true sale" assumption was the primary concern that PWC had with respect to the Colonnade structure.

### (iii)     Prepay Transactions

397.     Barclays had a very good understanding of the Enron Prepay transactions.  John Meyer, Director, Barclays, the credit office in charge of the Enron relationship, detailed his understanding of the transactions in an e-mail to Jonathan Taylor, Barclays:

> Prepaid Crude Oil and Natural Gas – Don't for a second think that Enron is satisfying an operating need by selling these commodities forward.  Although notionally they are agreeing to deliver the commodities in satisfaction of an obligation established at the time the banks pay for the commodities, in actual fact they are borrowing money.  Their accountant will credit the Revenue account, debit Cash, debit Revenue and credit Deferred Revenue.  In other words, he sees a sale but sets up a liability that is satisfied only as the commodities are delivered.  When calculating the amount of debt Enron has incurred, CRMD (and any analyst who wasn't born yesterday) will take any balance in the deferred revenue account and add it one-for-one to debt.

398.     Meyers also noted that the sheer size of the physical deliveries that would be necessary to honor the contracts if they were not circular made it "painfully obvious that the

transaction's essence is not about deferred revenue but rather about plain ol' debt." In other words, ***physical delivery of the commodity never happened, and was never intended to happen***.

399.     With respect to Barclays' involvement in Enron's prepay transactions, the Examiner concluded:

> Barclays participated in the Prepay Transactions knowing that they resulted in misrepresentation of Enron's financial statements, that Enron inadequately disclosed the transactions and that the true effects of the Prepay Transactions could not be determined from Enron's published financial statements.

### (iv)     Barclays' Knowledge of Enron's Fraudulent Reporting Practices

400.     In his sworn statement, John Meyer, Director, Barclays, confirmed that Barclays understood Enron's objectives and purpose for entering into structured financings and he further confirmed that Barclays understood the effect that such structures could have on Enron's financial statements.

401.     As noted by the Examiner:

> **Barclays agrees, however, that no outsider could reasonably evaluate the magnitude or effect of some of Enron's other financing structures, such as its inventory financing, Prepay Transactions and Total Return Swap obligations incurred in connection with the FAS 140 Transactions.**

402.     Meyer further confirmed in his sworn statement that by the end of 1998, Barclays had started to become increasingly concerned with the quantum of Enron's undisclosed liabilities. In an e-mail from Henry Pullman, Director, Barclays, to Richard Williams, Director, Barclays, Meyer and blind copy to Robert Clemmens, Chief Credit Officer, Pullman noted:

> Enron's creativity in arranging interesting and highly structured financings, many of which are off balance sheet and may tend to present a challenge to financial analysts (ourselves included) to understand and appreciate the full picture of Enron's financial condition.

403.     The Minutes of the Barclays Group Credit Committee meeting for July 7, 1999 noted that after investigating concerns with respect to the level of Enron's off-balance sheet financings, Barclays concluded that Enron's material off-balance sheet structures increased Enron's 1998 year end debt by over 62% from $7.4 billion to $12 billion.

404. The magnitude of Enron's reliance on deceptive and misleading off-balance sheet financings resulted in the following being noted in the minutes to the July 1999 Group Credit Committee Minutes:

> [I]t could not shed the belief that Enron was paddling underneath the surface to hold on to its investment grade status as it became harder and harder to replicate the previous years' strong performances.

405. Barclays understood Enron's motives for its increasing use of sophisticated financing structures. It knew that the financial reporting for such structures was deceptive, misleading and in most cases simply a clear cut violation of U.S. GAAP. Barclays and Enron were using the transactions to create a false sense of revenues and earnings, overstate cash flows from operations and conceal billions in debt.

### (v) <u>Summary</u>

406. Barclays knowingly participated with Enron on transactions whose sole purpose was to conceal debt and artificially inflate revenue and earnings in order to perpetuate Enron's fraudulent scheme. By reason of its intimate involvement in serial SPE financings, the $SO_2$ transaction and the Prepay transactions, Barclays knew or should have known that the financial statements contained in the prospectus for the Enron Zero Coupon Notes were materially false and misleading, and that the public would be deceived thereby.

407. Barclays was a primary violator in the Enron fraud. Barclays and Enron engaged in transactions (e.g. the SPE transaction, Nikita) whose sole purpose and effect were to create a false appearance of revenue, earnings and cash flow from operations intended to deceive investors in Enron's securities. These transactions were more than "financings." By inflating revenue and earnings they allowed Enron to meet quarterly targets that supported the price of Enron securities. Other transactions such as the prepays were complete shams in that no commodities were ever intended to be delivered and, in addition to concealing debt, they gave the appearance of trading activity.

/ / /

101

408.    Approximately five weeks before the bankruptcy, Enron pledged and transferred $59.5 million dollars to Barclays as security for obligations owing to Barclays or those entities in which Barclays "has an interest." Subsequent to Enron's bankruptcy, Barclays terminated certain swap agreements and applied the $59.5 million to "satisfy" alleged claims against Enron.

409.    Although acting, *inter alia*, as an underwriter of the Zero Coupon Notes, Barclays never disclosed the material facts concerning Enron's off-balance sheet obligations or the false revenue and profits being reported by Enron, on the disguised loans made by Barclays. Accordingly, Barclays underwriting of Enron offerings was a fraudulent act intended to deceive the public.

410.    For the work described above and other work for Enron, Barclays received enormous fees for investment banking, interest payments, and syndication fees. Plaintiffs relied on the information misrepresented by Barclays in making their investment decisions.

411.    Barclays acted as a unified entity without effective Chinese walls to preclude information from its commercial and investment banking divisions from reaching its security analysts and thus all knowledge and scienter of the former should be imputed to its securities analysts.

### c.    Deutsche Bank

412.    Deutsche Bank is a large financial services organization that had an extremely close relationship with Enron. Deutsche Bank's top officials had daily communications with Enron's executives about Enron's business and financial situation. Deutsche Bank knew that Enron was falsifying its financial reports. Deutsche Bank also provided Enron with commercial banking and investment banking services, helped structure the SPEs and partnerships, and helped Enron falsify and misrepresent its financial statements and projections, all while Deutsche Bank was issuing glowing reports about Enron. According to the Examiner's Report, Deutsche Bank participated in 11 SPE transactions during the 1995 - 2000 time period, including the Teresa, Steele, and Cochise tax deduction sales and the Osprey, Marlin and e-Next asset "sale"

transactions. Deutsche Bank directly participated in at least the following fraudulent Enron schemes:

- Deutsche Bank helped to create and fund LJM2, committing to invest $10 million in LJM2, knowing that it was designed to enable Enron to move debt off its balance sheet and generate fraudulent profits;

- Deutsche Bank managed the sale of Marlin Water Trust bonds in 1998 and 2001, a partnership for Enron to hold its Azurix water utility assets. Deutsche Bank was also an underwriter for Osprey I and Osprey II Notes. Deutsche Bank's involvement was predicated on Enron's pledge of its own stock to support the structure. Enron's pledge was an essential part of the Marlin and Osprey transactions, a significant obligation for Enron that was not disclosed to Enron's investors;

- Deutsche Bank acted as an underwriter in one of the Yosemite offerings, a prepay transaction which enabled Enron to fraudulently record loans as operating cash flow;

- Deutsche Bank and Enron engaged in a money laundering scheme through the $2 billion Valhalla transaction; and

- Deutsche Bank structured at least four tax driven transactions (the "Tax Transactions"), pursuant to which Enron created over $1 billion in false income and Deutsche Bank received over $40 million in fees.

413.    As a participant in the fraudulent scheme, Deutsche Bank was also one of the principal commercial lending banks to Enron, acting with full knowledge of Enron's improper purposes.

414.    Deutsche Bank, along with Citigroup/Salomon was a lead bank on Enron's main credit facilities, lending over a billion dollars to Enron, while helping to syndicate over $4 billion in bank loans to Enron or related entities. Deutsche Bank was involved in over $2 billion in

103

loans to Enron and helped to raise over $5 billion from the investing public through securities sales that were based on grossly misleading and misrepresented information. Deutsche Bank helped structure and finance some of the partnerships and SPEs and engaged in transactions with Enron to disguise loans to Enron which helped falsify its actual financial condition, liquidity, and creditworthiness.

415. Deutsche Bank functions as a unified entity without effective Chinese walls to prevent its securities analysts from accessing information obtained by its commercial and investment banking departments. Because of this knowledge, scienter should be attributed to Deutsche Bank as a whole.

416. A November 29, 2000 internal memorandum from George Tyson of Deutsche Bank to Marcus Tarkington of Deutsche Bank sums up Deutsche Bank's relationship with Enron:

> We are frequently brought into unique and lucrative transactions for Enron, such as the highly successful Marlin and Osprey Trust transactions that we developed with DLJ. To maintain this position with Enron, we need to demonstrate that we execute transactions quickly when necessary.
>
> During the past four years, we have earned gross advisory, underwriting and structuring fees as follows: $10 million in 1997, $20 million in 1998, $7 million in 1999, and $2 million plus annual tax benefits resulting from a structured tax transaction of $50 million in 2000.

417. As one of Enron's Tier 1 banks, Deutsche Bank participated in a number of different transactions with Enron including traditional commercial lending to participation in debt and equity offerings as well as structured financings through the Tax Transactions. From 1997 until Enron filed for bankruptcy protection, Deutsche Bank was paid approximately $11 million in fees associated with lending and structured finance (other than the Tax Transactions), $18 million in fees associated with public and private securities offerings, and $43 million in fees associated with the Tax Transactions.

418. Deutsche Bank was also very important to Enron. An internal memo dated November 5, 1999, from Kelly Boots, Enron, and Sarah Heineman, Enron, to Andy Fastow,

/ / /

Enron, and Paul Chivers, Enron, regarding Deutsche Bank, confirms that Enron consistently ranked Deutsche Bank as a Tier I bank.

419.    Deutsche Bank's close relationship with Enron provided it with access to senior management and financial information that was not publicly available. An e-mail dated April 25, 2000 from Paul Cambridge, Deutsche Bank's former Senior Relationship Manager for Enron, to Alexander T. Mason, Deutsche Bank, indicates that Deutsche Bank had access to members of Enron's senior management including Fastow, Glisan, and McMahon. In his sworn statement, he elaborated on his e-mail and indicated that contacts with Enron senior management enabled Deutsche Bank to discuss the "facts behind the numbers" in Enron's financial results.

420.    Deutsche Bank was also aware that Enron's accounting practices were aggressive and that the true extent of Enron's off-balance sheet obligations could not be discerned from its financial statements and related note disclosure. As indicated in an e-mail dated May 23, 2001 from Marcus Tarkington, Deutsche Bank, to Jana Mills, Enron, and also indicated in an e-mail dated June 1, 2001 from Marcus Tarkington, Deutsche Bank, to Greg Caudell, Enron, Deutsche Bank held several meetings with Enron senior management to gain further details on the dependency of Enron on its trading activities and asset sales to meet earnings targets. Deutsche Bank Credit Officer Calli Hayes and Paul Cambridge both confirmed in their sworn statements that it was during these meetings that Deutsche Bank was given information about the significance of the increase in Enron's revenues from trading activity as well as the level of off-balance sheet obligations.

421.    In his sworn statement, Paul Cambridge indicated that one of the key objectives of these private meetings was to enable Deutsche Bank to determine Enron's total debt in one form or another in order to assess whether or not Enron's financial reporting "reflected reality."

422.    The sworn statements of both Calli Hayes and Paul Cambridge, as well as an e-mail dated June 4, 2001 from Marcus Tarkington of Deutsche Bank to Paul Cambridge, show that Deutsche Bank held two meetings with Enron senior management to discuss Enron's 2000

annual report. Deutsche Bank's objective during the meetings was to ascertain the extent to which sales of merchant assets to SPEs contributed to Enron's reported cash flow from operating activities.

423.    In his sworn statement, Paul Cambridge confirmed the following:

- Deutsche Bank was aware of its own work for Enron in structuring transactions for "balance sheet management" purposes, including liquidating assets that Enron no longer wished to carry on its balance sheet, moving debt off the balance sheet, and improving Enron's accounting ratios; and

- Deutsche Bank was aware that Enron engaged in other structured transactions, including prepay transactions, but did not have a good understanding of the magnitude.

424.    Despite Deutsche Bank's detailed knowledge of non-public information and Enron's true financial condition, its Equity Research Analysts continued to issue upbeat research reports that contained false and/or misleading statements and information. Despite Deutsche Bank's detailed knowledge of non-public information and Enron's true financial condition, it continued to refer to and incorporate materially misstated financial statements in offering documents for which it was acting as underwriter.

425.    Based on its access to management and its participation in a number of different transactions, Deutsche Bank was very aware of Enron's off-balance sheet activities and resulting, unsound financial condition. As noted in its October 9, 2001 Amended Minutes, Deutsche Bank's Underwriting Committee refused to authorize any additional Enron credit exposure. It was also noted in those same minutes that although Enron credit was "externally rated BBB+/Baa1...***Enron has considerable off-balance sheet liabilities [and] lacks transparency with respect to its hedging activities (despite a number of Company visits)***."

426.    Deutsche Bank helped to create and fund LJM2, with its executives investing more than $10 million in LJM2, knowing that they would reap enormous returns due to the

improper nature of LJM2 and Fastow's dual roles.  Deutsche Bank provided advance funding for LJM2 at the end of 1999 so it could complete some 11th hour transactions to generate phony profits to meet its 1999 profit targets.

427.    Both Deutsche Bank and Bankers Trust were Tier 1 Enron banks – following the merger of the two entities, Deutsche Bank was consistently a Tier 1 bank  for Enron and Enron was a top client for Deutsche Bank.

428.    Deutsche Bank engaged in six different Tax Transactions with Enron between 1997 and 2001.  Note only did Deutsche Bank participate in these transactions, but it was the architect of the structures and actively marketed its deceptive structures to Enron.  The two REMIC Carryover Basis Transactions that Deutsche Bank coordinated for Enron enabled Enron to fraudulently report nearly $144 million in potential tax benefits as pre-tax income.

429.    Over a four year period, from 1997 through 2001, Deutsche Bank earned over $72 million in fees from Enron - $43 million of which related to deceptive Tax Transactions that were not accounted for in accordance with U.S. GAAP.

430.    In Appendix G ("Role of BT/Deutsche Bank and its Affiliates") to the Third Report of Neal Batson, Court-Appointed Examiner (Exhibit H), a substantial volume of evidence with respect to Deutsche Bank's role in the Enron debacle was reviewed.  The Examiner concluded that:

> BT/Deutsche Bank's conduct in the BT/Deutsche Bank Tax Transactions enabled Enron to:  (i) erroneously record approximately $158 million of income from the two REMIC Carryover Basis Transactions, $143.7 million of which Enron erroneously recorded as pre-tax income; and (ii) erroneously record a $229 million increase in after-tax net income by reporting the Teresa Transaction in a manner that did not comply with GAAP.

> The evidence would allow a fact-finder to conclude that BT/Deutsche Bank:

> •    acted as a conduit for the sale of the Cochise Planes from Enron to Oneida Leasing, Inc. ("Oneida") in the second quarter of 2000 for the purpose of enabling Enron to erroneously report $36.5 million of gain on the sale, an amount equal to more than 10% of Enron's reported net income for the quarter;

- designed, promoted and participated in the Teresa Transaction while knowing that the transaction was not expected to reduce Enron's tax liability on a present value basis and served no substantial business purpose for Enron other than enabling Enron to "generate income for financial accounting purposes";

- designed, promoted and participated in the Steele Transaction while knowing that the transaction served no substantial business purpose for Enron other than enabling Enron to report the potential benefit of speculative future tax deductions in an erroneous and misleading manner as pre-tax income; and

- designed, promoted and participated in the Cochise Transaction while knowing that the transaction served no substantial business purpose for Enron other than enabling Enron to report the potential benefit of speculative future tax deductions in an erroneous and misleading manner as gain on the sale of the Cochise Planes and other pre-tax income.

431.    Deutsche Bank's active participation in the Enron debacle may be summarized under three main categories:

(i)     Tax transactions;

(ii)    Structured transactions; and

(iii)   Analyst coverage.

### (i)      Tax Transactions

432.    The Deutsche Bank Tax Transactions were essentially artificial transactions lacking a legitimate business purpose.  In violation of the "business purpose" rule, which requires that every transaction have a valid business purpose, the Tax Transactions had no purpose other than to artificially inflate pre-tax revenue and pre-tax profit.  Deutsche Bank received over $40 million in fees for assisting Enron in the creation, development, and promotion/implementation of these purely tax-driven transactions. The Tax Transactions enabled Enron to create over $1 billion in income over a six-year period.  The recording of many of Enron's Tax Transactions did not comply with Generally Accepted Accounting Principles ("GAAP").  These transactions were utilized to accelerate the recognition of income and create a misleading picture of Enron's earnings power.  Deutsche Bank employees who knew that the Tax Transactions violated Tax Laws or GAAP include, but are not limited to:

| DB/BT Employee | Title | Role |
|---|---|---|
| Paul F. Cambridge | Managing Director | Knew of DB/BT investment in LJM2<br>Had close relationships with Andy Fastow, Ben Glisan, Jeff McMahon, Paul Chivers, Mike Jakubik<br>Participated in Marlin<br>Participated in Osprey<br>Participated in the Steele Transaction |
| George Tyson | Vice President | Knew of the Tax Transactions and the fees and tax benefits DB/BT received<br>Participated in Marlin<br>Participated in Osprey |
| Thomas Finley | Managing Director | Participated in the Cochise Transaction<br>Participated in the Steele Transaction<br>Participated in the Teresa Transaction |
| Christine Levinson | Principal | Participated in the Cochise Transaction<br>Participated in the Steele Transaction<br>Participated in the Teresa Transaction |
| Paul Bloshuk | Vice President | Participated in the Cochise Transaction<br>Participated in the Steele Transaction |
| Brian McGuire | Vice President | Participated in the Cochise Transaction<br>Participated in the Steele Transaction<br>Participated in the Teresa Transaction |
| John Tsai | Associate | Participated in the Cochise Transaction<br>Participated in the Steele Transaction |
| John Addis | Associate | Participated in the Cochise Transaction |
| Viktoria Antoniades | Analyst | Participated in the Cochise Transaction |
| Leon Kozak | Managing Director | Helped develop tax technology in Tax Transactions<br>Participated in the Cochise Transaction<br>Participated in the Steele Transaction<br>Participated in the Teresa Transaction<br>Participated in the Tomas Transaction |
| Mary Harmon | Managing Director | Reviewed/analyzed the Tax Transactions<br>Participated in the Cochise Transaction<br>Participated in the Steele Transaction |
| David Newman | Managing Director | Participated in the Cochise Transaction |
| William Boyle | Managing Director | Participated in the Cochise Transaction<br>Participated in the Steele Transaction |

| DB/BT Employee | Title | Role |
|---|---|---|
| Richard Coll | Managing Director and Counsel | Participated in the Steele Transaction |
| Paul Glover | Principal | Participated in the Cochise Transaction<br>Participated in the Teresa Transaction |
| Justin Davies | Analyst | Participated in the Cochise Transaction |
| Gregg Grauer | Vice President | Participated in the Cochise Transaction |
| Daniel Wan | Principal | Participated in the Cochise Transaction |
| Marcus Tarkington | | Knew of the Tax Transactions and the fees and tax benefits DB/BT received |
| Calli Hayes | | Knew of Marlin<br>Participated in the due diligence of the Osprey Notes<br>Participated in the due diligence of the Yosemite Notes<br>Participated in the Teresa Transaction<br>Participated in the Steele Transaction<br>Participated in the Cochise Transaction |
| John Wadsworth | Tax Director | Determined whether it was appropriate to enter into the transaction from a task risk point of view |
| Duncan Hennes | Sr. Vice President | Participated in the Tomas Transaction |
| Stuart Macfarlane | | Participated in the Teresa Transaction |
| David K. Thomas | | Participated in the Teresa Transaction |
| Stephen P. Jankovitz | | Participated in the Teresa Transaction<br>Participated in the Tomas Transaction |
| Peggy Capomaggi | | Participated in the Cochise Transaction<br>Participated in the Steele Transaction |
| Jean M. Mazarella | | Participated in the Tomas Transaction |
| Bruce Classon | | Participated in the Teresa Transaction |
| Paul Nelson | | Participated in the Teresa Transaction |
| Michael A. Mangravite | | Participated in the Cochise Transaction<br>Participated in the Steele Transaction |
| Vito Arno | | Participated in the Cochise Transaction<br>Participated in the Steele Transaction |
| Thomas Boggiano | | Participated in the Cochise Transaction<br>Participated in the Steele Transaction |

| DB/BT Employee | Title | Role |
|---|---|---|
| Jody Blumenfeld | | Participated in the Tomas Transaction |
| Mark Leiman | | Participated in the REMIC transactions |
| Ann Griffith | | Participated in the REMIC transactions |
| Ken Abbott | | Participated in the REMIC transactions |
| Sean Cullinan | | Participated in the Cochise Transaction<br>Participated in the Tomas Transaction |
| Debra Benning | | Participated in the Tomas Transaction |
| Jane Naddeo | | Participated in the Cochise Transaction<br>Participated in the Tomas Transaction |

433.     Highlighting the closeness of the relationship between Deutsche Bank and Enron, in at least two of Enron's Tax Transactions the beneficiary was Deutsche Bank.

434.     The four structured transactions Deutsche Bank designed for Enron between 1997 and 2000 (Teresa (03/1997), Steele (10/1997), Tomas (09/1998) and Cochise (01/1999)) resulted in increased pre-tax income and/or reduced tax expenses to Enron.  For its services in designing these shams, Deutsche Bank collected fees of approximately $38 million from 1997 through 2001.  The primary objective of these four Tax Transactions was the creation of financial statement income.  These "enhancements" to Enron's reported performance were derived from the manipulation of differences in tax accounting and GAAP accounting, and were not at all related to Enron's normal business operations.

435.     All of the Tax Transactions violated GAAP and tax laws.  Enron's accounting benefits could only be legitimately booked if the transaction had a legitimate business purpose recognized by GAAP and tax laws.  According to United States Tax Code §269, it requires that a transaction have a legitimate business purpose beyond the creation of tax benefits.  Neither Steele, Cochise, Teresa, or Tomas had a legitimate business purpose recognizable by either GAAP or tax laws.  It has been stated by the tax opinion authored by King and Spalding that Enron's predominant business purposes for entering into the Tax Transactions was to generate income for financial accounting purposes.  A number of Deutsche Bank internal memoranda

regarding the Tax Transactions also specifically state that, "The principal purpose of the Transaction for the Client will be to generate significant amounts of accounting and investment income."

436.    Deutsche Bank justified the magnitude of its fees on different transactions by comparing it them to the impact that transactions would have on a client's accounting income. As summarized by the Examiner, William Boyle, Deutsche Bank, noted in an accounting memo:

> "[A] business entity would be willing to pay… little, if any, fee" for potential tax benefits absent accounting benefits, a "moderate fee" if the transaction generated financial accounting benefits in the form of pre-tax income, and "a substantial fee" if the transaction generated accelerated pre-tax income.

437.    The Deutsche Bank Tax Transactions created substantial deferred tax assets on Enron's balance sheet and provided Deutsche Bank with substantial fees.  The following table summarizes the impact of the four Tax Transactions on Enron's net income and the associated fees to Deutsche Bank:

| Transaction | Closing Date | Impact on Net Income | Deutsche Bank Fees (Original) | Deutsche Bank Fees (Collected) |
|---|---|---|---|---|
| Teresa | 3/97 | $228.7 million | $10 million | $6.6 million |
| Steele | 10/97 | $61.2 million | 10 million | 8.2 million |
| Tomas | 9/98 | $52.8 million | 10 million | 11.9 million |
| Cochise | 1/99 | $96.1 million | 15 million | 11.3 million |
| Total | | $438.8 million | $45 million | $38.0 million |

438.    The Steele and Cochise Transactions involved the use of special purpose entities to acquire REMIC Residual Interests from affiliates of Deutsche Bank.  The tax goal of the Steele and Cochise Transactions was to avoid federal income tax to the Enron special purpose entity ("SPE") on the Phantom Income from the REMIC Residual Interests, all the while enabling hundreds of millions of dollars of Phantom Losses from the REMIC Residual Interests to be deducted on Enron's consolidated return in the future.  In a memo from Brian McGuire to Calli Hayes regarding REMIC Residual Interests it states:

112

The REMIC Residual Interests generate non-cash "phantom" taxable income in the early years and an equal amount of non-cash phantom taxable losses in the later years. As the phantom taxable income is recognized, the owners' tax basis in the REMIC Residual Interest increases and would decrease as the phantom losses are recognized in the future...The REMIC Residual Interests are expected to generate approximately $280 million of additional taxable phantom income after contribution to the REIT.

439.     Overall, the Steele and Cochise Transactions resulted in millions of dollars of pre-tax income being reported from 1997 through September 2001 on Enron's consolidated financial statements; this did not comply with GAAP.

### (A)      Steele Transaction

440.     Deutsche Bank and Enron formed a limited partnership called ECT in connection with the Steele transaction. Deutsche Bank contributed $4.4 million cash (for which it received a promissory note from ECT) and Real Estate Mortgage Investment Conduit Residual Interest ("REMIC") with a stated fair value of $7.5 million (for which it received 75,300 shares of Class B ECT stock). An internal Deutsche Bank memo titled "Closing of Project Steele Transaction" stated that Enron should record deferred tax assets or liabilities associated with the acquired assets on Enron's financial statements at the time of the acquisition. According to this memo, Deutsche Bank was aware that Enron would record a deferred credit on its balance sheet.

441.     Deutsche Bank developed the Steele transaction because it was looking for an efficient way to sell REMIC Residual Interests that it had acquired in the course of its business. The SPE formed to purchase the REMIC Residual Interests was ECT Investing Partners, L.P., which was owned by various Enron subsidiaries and two Deutsche Bank affiliates. For its services as Enron's financial advisor, Deutsche Bank received $10 million in fees.

442.     The Steele Transaction, which closed in October 1997, allowed Enron to record $121.8 million of pre-tax financial statement income for the potential benefit of speculative future tax deductions for Phantom Losses from acquired REMIC Residual Interests. The amortization of the Deferred Credit into pre-tax income and the selection of the period over which to amortize the Deferred Credit were the two most aggressive and misleading aspects of

113

Enron's accounting for the Steele transaction. Deutsche Bank was intimately familiar with the tax and accounting treatment of the Steele Transaction because of its role in the development and promotion of the Steele Transaction. Leon Kozak of Bankers Trust testified: "I believe an articulated reason for the Steele transaction in part were accounting benefits." A further Bankers Trust memorandum stated: "The principal purpose of the transaction for Enron Corp. is to generate significant amounts of pre-tax accounting and investment income."

443. The Steele Transaction specifically violated GAAP because Enron was to amortize into pre-tax income over a period of approximately five years the deferred credit derived from the speculative future tax deductions created by the REMICs over their life span. The Steele Transaction violated GAAP in at least three ways:

(a)     In order to record a Deferred Tax Asset, GAAP requires that it is "probable" that the tax position that gave rise to the recording of the Deferred Tax Asset can be sustained.

(b)     To the extent that the Phantom Losses were a tax position that could be sustained, GAAP requires a "valuation allowance" (*i.e.*, tax cushion) if based on the available evidence it is more likely than not that some or all of the deferred tax asset will not be realized. The accounting for the Steele Transaction did not provide a valuation allowance for either; a) the risk that there would not be sufficient taxable income available to benefit from the Phantom Losses; or b) the risk that the IRS would deny the deduction for the Phantom Losses.

(c)     GAAP requires that the amortization period for the Deferred Credit be determined with reference to the asset giving rise to the deferred tax benefit. In the Steele Transaction the Deferred Tax Asset should have been amortized with reference to the REMIC Residual Interest and not the

114

short dated corporate bonds (*i.e.*, the facilitating asset).  By using an

artificially short-dated reference asset, the benefit was overstated.

444.    With respect to the Steele Transaction the Examiner noted that:

BT/Deutsche Bank developed the Steele Transaction because it was looking for an efficient way to sell or monetize REMIC Residual Interests that it had acquired in the course of its business.  The transaction that it had developed could be used to generate significant accounting benefits for its counterparty. ... BT/Deutsche Bank first promoted the Steele Transaction to Enron in June 1997.  BT/Deutsche Bank marketed the transaction as a means of generating pre-tax financial accounting income.

445.    The tax opinion for the Steele Transaction explicitly noted that Enron "undertook

the Transaction for the principal purpose of generating financial accounting benefits" and that

Enron "would not have entered into the Transaction in the absence of the anticipated **accelerated**

accounting benefit of reducing a deferred tax liability and recording a deferred tax asset."

446.    The Examiner concluded in the Second Interim Report that Enron's accounting

treatment of the Steele Transaction did not comply with GAAP and was misleading because a

reader of Enron's financial statements had no way of knowing that purported pre-tax income

from operations actually consisted of the potential benefit of speculative future tax deductions for

Phantom Losses from acquired REMIC Residual Interests.

### (B)    Cochise Transaction

447.    The Cochise transaction occurred in connection with Enron's restructuring its

dormant subsidiary Maliseet as a real estate investment trust (REIT).  Deutsche Bank contributed

$2.7 million portfolio of mortgage securities and REMIC Securities valued at $165, 000, with a

tax basis of $120 million.  Enron contributed two leased airplanes, purchased by an Enron

subsidiary from Deutsche Bank subsidiary BT Ever for $46.7 million, to Maliseet.  In June 2000

(18 months later), Maliseet sold the airplanes back to Deutsche Bank for $36.5 million as

suggested in the June 1997 Deutsche Bank model.  Because the book value of the airplanes was

written down to $0 at the inception of Cochise, the sale of the airplanes for $46.7 million in 1999

resulted in a gain from the sale of these assets of $36.5 million in 2000.  In fact, rather than an

economic gain of $36.5 million, Enron experienced an economic loss of $10.2 million from the sale of the airplanes. As stated in the Examiner's Report, Enron's accounting entry was not materially different from the entry Deutsche Bank suggested in its internal memos regarding Cochise.

448.    A November 7, 1997 memo to Enron titled "financial accounting for the REMIC subco transaction" from Thomas Finley of Bankers Trust concluded that "in summary, it should be apparent from the above discussion that the Transaction is a deal driven by the accounting benefits. If a client were interested in the tax benefits, other less expensive alternatives exist to generate equivalent tax benefits. Moreover, it is our professional opinion that a business entity would be willing to pay (1) little, if any, fee for Transaction #1, (2) a moderate fee for transaction #2 and (3) a substantial fee for Transaction #3."

449.    Steele took on the form that was described as Scenario #2 in the June 2, 1997 memo. Cochise took on the form that was described as Scenario #3 in the June 2, 1997 memo. For both transactions, the primary purpose was to create the appearance of revenue and pre-tax income for financial statement purposes. As stated in an internal Deutsche Bank memo dated Jan 10, 1999:

> The principal purpose of the Transaction for Enron will be to generate significant amounts of accounting earnings and investment income. For its participation, BTCo would be paid a significant advisory fee and would earn an attractive return on its investment in the REIT.

450.    In addition to the financial incentives, Deutsche Bank believed the Steele transaction "significantly enhanced BTCo's [Deutsche Bank] relationship as a major investment bank for Enron."

451.    The Cochise Transaction closed in January 1999. Deutsche Bank developed the transaction because it was looking for an efficient way to sell or monetize its REMIC Residual Interests. The purpose of the transaction was to enable Enron to record $75 million in pre-tax accounting income and $79 million in earnings through the tax provision in Enron's income statement. In a memo from a number of Bankers Trust employees regarding the REMIC REIT it

116

states, "The principal purpose of the Transaction for the Client will be to generate significant amounts of accounting and investment income. For its participation, BTCo would be paid an advisory fee [$15 million] and would earn an attractive return on its investment."

452. The SPE formed to acquire the REMIC Residual Interests from Deutsche Bank was Maliseet Properties. Initially, Maliseet was owned by Enron until Enron began selling preferred stock and common stock to at least 100 shareholders to qualify as a real estate investment trust (REIT). The London branch of Bankers Trust purchased common stock in Maliseet.

453. The Cochise Transaction was structured to allow a major portion of the potential benefit to be recognized as pre-tax income on the sale of the Cochise Planes, and to allow the remainder to be amortized into pre-tax income over a period of five years. In the Executive Summary of a Project Cochise presentation it states, "The Transaction is structured in a manner which allows the credit, and the benefit of the bargain purchase, to be amortized into pre-tax income over a relatively short time frame."

454. The Cochise Transaction specifically violated GAAP because Enron amortized/intended to amortize into pre-tax income over a period of approximately five years the deferred credit derived from the speculative future tax deductions created by the REMICs over their life span. The Cochise Transaction violated GAAP in at least three ways:

      (a)    In order to record a Deferred Tax Asset, GAAP requires that it is "probable" that the tax position that gave rise to the recording of the Deferred Tax Asset can be sustained.

      (b)    Even if deduction of the Phantom Losses was a tax position that could be sustained, GAAP requires a "valuation allowance" (*i.e.*, tax cushion) if based on the available evidence it is more likely than not that some or all of the deferred tax asset will not be realized. The accounting for the Cochise Transaction did not provide a valuation allowance for either; a)

117

the risk that there would not be sufficient taxable income available to benefit from the Phantom Losses; or b) the risk that the IRS would deny the deduction for the Phantom Losses.

(c)     GAAP requires that the amortization period for the Deferred Credit be determined with reference to the asset giving rise to the deferred tax benefit.  In the Cochise Transaction the deferred credit related solely to the REMIC Residual Interest and, therefore, the reduction in the tax basis of the aircraft (*i.e.*, the facilitating asset) was a clear violation of GAAP.

455.     With respect to the Cochise Transaction, the Examiner concluded that:

there is sufficient evidence to support a finding that the transfer of the Cochise Planes to BT/Deutsche Bank should not have been recorded as a sale under GAAP because Enron and BT/Deutsche Bank had reached an understanding to return the Cochise Planes to Enron by means of a transfer to Oneida.

*** 

Enron's accounting treatment of the Cochise Transaction did not comply with GAAP and was misleading because a reader of Enron's financial statements had no way of knowing that purported pre-tax income from operations actually consisted of the potential benefit of speculative future tax deductions for Phantom Losses from acquired REMIC Residual Interests.

### (C)     Teresa Transaction

456.     The Teresa transaction was the product of a limited partnership, Enron Leasing Partners (ELP), between EN-BT (an affiliate of Deutsche Bank) and OPI, Enron Property management Corp.  The ultimate goal of the Teresa transaction was to create tax deductions in the form of enhanced depreciation deduction on the leasehold interest of the Enron North Office Building over a 39.5 year period, potentially beginning in 2003.  Enron Liquids preferred stock was created specifically for the Teresa Transaction.  Enron began to redeem its preferred stock from ELP after ELP was in place.  Enron anticipated that Enron Liquids would fully redeem all of its stock for approximately $1.3 billion, and therefore, the basis in the Enron North Office Building would be $1.3 billion.  Enron would then receive the benefits of the additional depreciation on a higher tax basis over 39.5 years, beginning in 2003.  Enron recorded total net

permanent deferred tax benefits of $228.7 million ($244 million deferred tax benefit and $15.2 million current tax expense) on its consolidated income statements from 1997 through 2001.

457.    The Teresa Transaction was promoted to Enron by Deutsche Bank in May 1996. The goal of the Teresa Transaction was to use an SPE in combination with a series of asset transfers among Enron affiliates to achieve a future increase in the tax basis of Enron's corporate headquarters building.  The SPE formed for the Teresa Transaction was Enron Leasing Partners, L.P. in which Organizational Partner, Inc. was a 98% limited partner.  Deutsche Bank assisted Enron in issuing shares of OPI stock to third parties in order to prevent OPI from qualifying as a member of Enron's consolidated group for federal income tax purposes.  The stock Deutsche Bank helped Enron issue was issued to an affiliate of Deutsche Bank.

458.    Enron reported approximately $229 million of after-tax financial statement income from recording Deferred Tax Assets for the tax benefit created by an anticipated future step-up in the tax basis of the Enron North Building.  Deutsche Bank knew that the tax benefit of the transaction would not be available for years, until the undetermined future date when the Enron North Building was eventually distributed to Enron and Enron began to take increased depreciation deductions.  In an internal Deutsche Bank memo it states that, "[T]he transaction is expected to generate approximately $240 million of after-tax book income for Enron recognized over the life of the transaction," and "Enron will have the opportunity to record approximately $240 million of after-tax accounting earnings over the next six years."  Acting as Enron's financial advisor on the Teresa Transaction, Deutsche Bank received $6.625 million dollars in fees.

459.    The Teresa Transaction specifically violated GAAP because it was improper to recognize earnings resulting from the future tax deductions purportedly created by Teresa without a reasonable basis for believing Enron would in fact use those deductions in the foreseeable future, which Enron never did because it filed for bankruptcy prior to recognizing any tax deductions.  The Teresa Transaction violated GAAP in at least three ways:

119

(a)     In order to record the Deferred Tax Asset, GAAP requires that it is "probable" that the tax position that gave rise to the recording of the Deferred Tax Asset can be sustained.

(b)     GAAP does not permit the deduction of Temporary Differences (and the corresponding recording of a Deferred Tax Asset) related to an investment in a partnership unless they will reverse in the "foreseeable future."  In practice, "foreseeable future" has been linked to the definition of a "measurement date" included in the Accounting Principles Board Opinion Number 30 ("APB 30") which provides that the "measurement date" is the date that management commits itself to a formal plan of disposal.  In the Teresa Transaction, there was no formal plan of disposal and, therefore, the recording of the Deferred Tax Asset would not be permitted under GAAP.

(c)     Even if there had been a formal plan of disposal in the Teresa Transaction and the recording of the Deferred Tax Asset determined to be appropriate, GAAP requires a "valuation allowance" (*i.e.*, tax cushion) if based on the available evidence it is more likely than not that some or all of the deferred tax asset will not be realized.  The accounting for the Teresa Transaction did not provide a valuation allowance for either; a) the risk that there would not be sufficient taxable income available to benefit from the increased depreciation due to the increased tax basis; or b) the risk that the IRS would successfully challenge the structure in its entirety.

460.    The Teresa Transaction also violated various anti-abuse provisions of the U.S. tax laws including:

(a)     United States Tax Code §269;

/ / /

120

(b)      The anti-abuse provision of the Treasury Regulations on consolidated returns; and

(c)      The anti-abuse provisions of the Treasury Regulations on partnership taxation.

461.    With respect to the Teresa Transaction the Examiner concluded:

Because of BT/Deutsche Bank's role in developing and promoting the transaction, BT/Deutsche Bank was intimately familiar with the tax and accounting treatment of the Teresa Transaction. BT/Deutsche Bank knew that the tax benefit of the transaction would not be available for years, until the undetermined future date when the Enron North Building was eventually distributed to Enron and Enron began to take increased depreciation deductions. BT/Deutsche Bank knew that, on a present value basis, the Teresa Transaction was not expected to result in any tax savings to Enron. BT/Deutsche Bank knew that the purpose of the Teresa Transaction was to generate financial accounting income by recording Deferred Tax Assets well in advance of future tax deductions, and even before the increased basis resulting from the transaction could attach to a depreciable asset. The Examiner has concluded that the financial accounting for the Teresa Transaction was erroneous and misleading because Deferred Tax Assets were recorded prematurely, in violation of GAAP, long before the increased basis could attach to a depreciable asset.

### (D)      Tomas Transaction

462.    The Tomas transaction was the product of yet another Enron-Deutsche Bank partnership. On September 9, 1998 Portland General Holdings, Inc, a wholly-owned Enron subsidiary and Deutsche Bank formed Seneca Leasing Partners, L.P. Deutsche Bank contributed $11.21 million in cash and received 5% Initial Percentage Interest.

463.    As described in a February 16, 1998 Deutsche Bank memorandum, the Tomas transaction followed a proprietary structure designed by Deutsche Bank.

464.    The Tomas Transaction was brought to Enron's tax department by Deutsche Bank in 1998. The Tomas transaction arose out of a portfolio of leased assets with a low tax basis that Enron acquired with the purchase of Portland General. Enron's goal was to dispose of the assets without incurring federal income tax, while also reporting a significant gain for financial accounting purposes. The Tomas Transaction allowed Enron to book $25.6 million in pre-tax

gains in 1998 and $18 million in pre-tax gains in 2000. Acting as Enron's financial advisor on the Tomas Transaction, Deutsche Bank received $10 million dollars in fees.

465. Deutsche Bank and Enron worked out a structured transaction that included the formation of an SPE named Seneca and another company named Oneida. The tax planning for the deal required a representation by Enron and Deutsche Bank that Oneida would engage in leasing business. However, Oneida engaged in only one lease (for the two Cochise Planes). The two airplanes being leased to commercial airlines were transferred into Oneida to give the appearance that leasing activities were occurring.

466. Enron and Deutsche Bank engaged in a fraudulent two-step transaction to allow Enron to record the transfer of the Cochise Planes as a sale, a transfer which allowed Enron to get the planes back after selling them, which did not comply with GAAP. Enron and Deutsche Bank devised the plan of transferring the planes back to Enron after the sale to a Deutsche Bank subsidiary through Oneida. The Cochise Planes were initially owned by ECT Investments Holding Corp., an Enron subsidiary which then sold the planes to Deutsche Bank via the BT Leasing Corp. for $36.5 million. BT Leasing was selected to purchase the planes because it was a general partner of Seneca, in which Enron was also a limited partner. One month later BT Leasing Corp. sold the planes to Oneida for $36 million so that Oneida would have some leased assets and to give the appearance that Oneida was in the leasing business. From that point it was easy for Deutsche Bank to transfer the planes back to Enron via Oneida as Enron owned 95% of Oneida through its limited partnership in Seneca and Oneida was an affiliate of Bankers Trust and was "wholly-controlled by BT." The transfer of the planes from BT Leasing to Oneida (back to Enron essentially) did not require the signature of any Enron employees because of Deutsche Bank's control over both entities.

467. An IRS Corporate Income Tax Examination of the Tax Years Ended December 31, 1996 through December 31, 2001 concluded that Enron failed to report a gain from the sale or disposition of assets leased to Seneca in the amount of $261,501,050 for the taxable year

122

ended December 31, 1998. The IRS concluded that the lease was in fact a disguised sale. In recording the Tomas transaction the way Deutsche Bank had suggested, Enron's financial statements had understated income tax expense in either 1998 or 2000 by between $45.7 and $91.6 million.

468.    The Tomas Transaction specifically violated GAAP because the transfer of the airplanes should not have been recorded as a sale. Enron and Deutsche Bank engaged in a fraudulent transaction to transfer the planes from BT Leasing to Oneida, a company which was predominantly owned by Enron. Oneida was also a company that was supposed to be in the leasing business although the only assets leased were the Cochise Planes.

469.    With respect to the Tomas Transaction, the Examiner concluded that:

> The tax planning for the Tomas Transaction relied on representations by Enron and BT/Deutsche Bank that Oneida would engage in a leasing business. The BT Affiliates were engaged to act as Oneida's leasing agent for a fee of $300,000 per year. Prior to June 2000, however, when PGH gave notice of its intent to withdraw from Seneca, Oneida had not engaged in any leasing business.

470.    Enron's transfer of the airplanes was not a "sale" recognizable under GAAP and it should not have recognized any income from the transfer of the airplanes. The Tomas Transaction violated GAAP in at least the following  ways:

(a)    Even if the recording of the Deferred Tax Asset was determined to be appropriate, GAAP requires a "valuation allowance" (*i.e.*, tax cushion) if based on the available evidence it is more likely than not that some or all of the deferred tax asset will not be realized. The Tomas Transaction did not have a valuation allowance or tax cushion.

(b)    The sale of the Cochise Planes was not a true "sale" recognized under GAAP, it was a transfer booked as a sale by Enron.

471.    Irrespective of when they were formed, each of the Tax Transactions resulted in the artificial inflation of Enron's reported financial results as stated in the Zero Coupon Note and Exchangeable Notes offering circulars, in that each transaction resulted in the fraudulent

123

recognition of pre-tax income, the false appearance of revenue, and purported tax savings going forward.

472.    With respect to all the Tax Transactions that Deutsche Bank was involved in, the Examiner concluded that:

> BT/Deutsche Bank was responsible for designing, promoting and participating in the BT/Deutsche Bank Tax Transactions. The BT/Deutsche Bank Tax Transactions were intended to have, and in fact did have, the effect of increasing Enron's reported net income by approximately $423 million over the period from 1997 to 2001. However, Enron had little business purpose for the BT/Deutsche Bank Tax Transactions other than creating accounting income.
>
> ***
>
> BT/Deutsche Bank developed the basis tax and accounting structures of each of the BT/Deutsche Bank Tax Transactions. BT/Deutsche Bank prepared presentations to promote the structures to Enron as a means of generating accounting income and in effect sold the products to Enron.

473.    Enron and Deutsche Bank entered into the Valhalla transaction in May 2000. The transaction was structured as a $50 million loan; Deutsche Bank in Frankfurt loaned $2 billion to Rheingold (an Enron subsidiary), and Enron in turn loaned $1.95 billion to Deutsche Bank in New York. Unlike the Tax Transactions, the Valhalla Transaction did not produce significant tax or accounting benefits to Enron but did produce favorable tax benefits for Deutsche Bank. From Deutsche Bank's perspective the transaction was structured to create $40 million of annual tax benefits for Deutsche Bank.

474.    In entering into the Valhalla transaction, Deutsche Bank knew that it was engaging in a money laundering scheme. In an email regarding the handling of Project Valhalla, a Deutsche Bank representative in Germany stated, "As I have already mentioned some weeks ago, I firmly believe that the booking of the Genuβscheine from Rheingold is not correct...This is clearly against §154 Abgabenordnung and against money laundry law."

### (ii)    Structured Transactions

475.    Bankers Trust Investment Partners, acquired by Deutsche Bank in June 1999, had committed to investing $10 million into private investment limited partnership LJM2. The LJM2

partnership represented itself as a private investment company engaged in acquiring or investing in energy and communications-related investments, primarily either assets that Enron wanted to sell, or risk management activities designed to limit Enron's exposure to price and value fluctuations as to its assets. In fact, LJM2's sole purpose was to allow Enron to manufacture earnings and hide debt.

476. Paul Cambridge, Ted Virtue, Charlie Kiley, and Bill Walsh participated in an initial meeting with Andy Fastow regarding Deutsche Bank's possible commitment to investing in LJM2. Paul Cambridge has confirmed in sworn testimony that both Mr. Kiley and Mr. Virtue expressed concerns about the potential conflicts of interest from investing in LJM2, yet Deutsche Bank ultimately committed to investing $10 million in LJM2 through BT Investment Partners. In an email from Paul Cambridge to Alexander Mason, Cambridge stated, "We invested $10MM in LJM, an independent fund managed by Andy Fastow which looks at leveraged equity investments in structured transactions, including those sponsored by Enron...I am closest to Andy Fastow CFO, Ben Glisan the newly announced Treasurer, Jeff McMahon (the exiting Treasurer)." In addition, a Deutsche Bank affiliate placed a designee on the LJM2 Advisory Committee, thereby permitting Deutsche Bank to regularly obtain information concerning Enron's transactions with LJM2, including the sale of turbines, Nigerian barges, and dark fiber, participation in Whitewing and Osprey debt certificates, prepay transactions such as Yosemite and Bob West Treasure, and participation in the four Raptor transactions.

477. Deutsche Bank also managed a sale of Marlin Water Trust bonds in 1998. Marlin Water Trust was set up as a partnership for Enron to hold its water utility assets. The Marlin bonds were backed by a pledge of Enron stock to make up for any potential shortfall in the value of Marlin's assets. Investors were promised that if Enron's credit rating declined to a certain point, Enron would issue new shares of stock to Marlin to pay back bondholders. Again, there was no way for investors in Enron bonds and stock to know about the details of this pledge, which threatened the value of their investments. This material obligation was not disclosed.

478.    Deutsche Bank acted as an underwriter for billions of dollars of Enron securities, including Enron capital preferred shares, Enron common stock, and the Enron Zero Coupon Notes.

479.    In addition, Deutsche Bank underwrote billions of dollars of other Enron-related securities, including a billion dollars of Marlin Water Trust I and Marlin Water Capital Corporation II notes (described above) and a billion dollars of Osprey Trust and Osprey I Inc. notes. Both Osprey Trust and Marlin Trust were employed in the scheme to conceal Enron's true financial position. Like Marlin, the Osprey Trust also contained a "stock trigger" feature which created billions in potential obligations for Enron. These obligations were not disclosed. As lead underwriter in the Marlin and Osprey issues, Deutsche Bank was aware of this undisclosed material Enron obligation. Nevertheless, it chose not to disclose this information in the prospectuses for Enron securities that it underwrote, including the Zero Coupon Notes.

480.    Deutsche Bank was an underwriter in one of the Yosemite offerings. Yosemite invested in Enron prepay transactions, utilized to conceal vast amounts of debt. All the Yosemite underwriters understood the fraudulent nature and purpose of the Enron prepay transactions. Investors in Yosemite were misled as to the true purpose of the financing. Deutsche Bank was an underwriter of one of the Yosemite offerings. The Deutsche Bank employees who were involved in the Yosemite Offering include, but are not limited to: Craig Orchant, Ross Newman, Mike Jakubik, and Calli Hayes.

481.    In a letter regarding "Structuring Future Yosemite Transactions" from Craig Orchant and Ross Newman of Deutsche Bank to Doug McDowell and Craig Clark of Enron Global Finance it states, "We appreciate that disclosure on the trust assets is a sensitive issue. We do not believe that full disclosure on the underlying trust assets, such as the commercial terms of prepay transactions, would be needed." Orchant and Newman clearly understood the inherently fraudulent character of the prepay transactions and the Yosemite offering, as they gave advice to Enron on how to structure future Yosemite transactions.

126

482.     Deutsche Bank was the lead underwriter in the Azurix IPO on June 9, 1999, selling 38.5 million shares at $19 each. Enron sold at least 19.5 million shares of Azurix stock to obtain $370 million in much needed capital.

483.     Deutsche Bank, along with Citigroup, functioned as leads on Enron's main credit facilities, lending billions of dollars to Enron while helping to syndicate over $4 billion in loans to Enron or related entities. For instance, Deutsche Bank gave Enron a credit line of $582 million in November 1998 and a credit line of $650 million in July 2001.

484.     Deutsche Bank was a lender to the Firefly SPE transaction (described below). Like the other SPE transactions, Enron provided an undisclosed guarantee to the lenders through a "swap" arrangement. This obligation was not disclosed to investors. As a result of the "swap": arrangement, Firefly was not accounted or in accordance with GAAP and should have been consolidated in the financial statements of Enron. As a party to this transaction, Deutsche Bank directly participated in the scheme to misrepresent Enron's financial position.

**(iii)     <u>Analyst Coverage</u>**

485.     Although it was well aware of, and had participated in, Enron's illicit practices, Deutsche Bank nonetheless published analyst reports and investment research reports that improperly touted Enron's financial strength and performance, and recommended that investors purchase Enron securities. Silvercreek relied on the "buy" recommendations and the positive statements made by the analysts regarding Enron and its financial condition. The statements made by Deutsche Bank in its analyst reports were false and misleading as they contained information Deutsche Bank knew was incorrect. In addition, Deutsche Bank failed to fully disclose the conflict of interest inherent in its status as an investor in LJM2, as well as the substantial fees Deutsche Bank earned from its transactions with Enron, including those that involved the creation and implementation of fraudulent tax schemes.

486.     Misleading equity research reports issued by Deutsche Bank regarding Enron include, but are not limited to, reports dated: January 13, 1999; January 20, 1999; April 13, 1999;

May 7, 1999; May 25, 1999; July 13, 1999; July 21, 1999; November 8, 1999; January 28, 2000; April 14, 2000; May 26, 2000; July 19, 2000; July 25, 2000; and September 15, 2000.

487. Misleading fixed-income research reports issued by Deutsche Bank regarding Enron include, but are not limited to, reports dated: April 14, 2000; May 12, 2000; May 25, 2000; May 30, 2000; September 11, 2000; October 3, 2000; October 6, 2000; January 23, 2001; February 13, 2001; March 30, 2001; June 26, 2001; July 12, 2001; August 17, 2001; October 5, 2001; October 16, 2001; October 19, 2001; October 26, 2001; November 2, 2001; and November 9, 2001.

488. With respect to all the Tax Transactions that Deutsche Bank was involved in, the Examiner concluded that:

> BT/Deutsche Bank was responsible for designing, promoting and participating in the BT/Deutsche Bank Tax Transactions. The BT/Deutsche Bank Tax Transactions were intended to have, and in fact did have, the effect of increasing Enron's reported net income by approximately $423 million over the period from 1997 to 2001. However, Enron had little business purpose for the BT/Deutsche Bank Tax Transactions other than creating accounting income.
>
> ***
>
> BT/Deutsche Bank developed the basis tax and accounting structures of each of the BT/Deutsche Bank Tax Transactions. BT/Deutsche Bank prepared presentations to promote the structures to Enron as a means of generating accounting income and in effect sold the products to Enron.

### (iv) Deutsche Bank's Knowledge of Enron's True Financial Position

489. In its role as a Tier 1 Enron bank Deutsche Bank had frequent and direct access to Enron's senior executives including Andy Fastow, Enron CFO. As Paul Cambridge, Deutsche Bank's former Senior Relationship Manager for Enron, noted in his sworn statement, the access that Deutsche Bank had to senior executives (and at least two Board members), enabled it to understand "the facts behind the numbers" with respect to Enron's financial reporting.

490. Marcus Tarkington, Deutsche Bank, noted in an e-mail to Jana Mills, Enron, Deutsche Bank recognized that Enron used off-balance sheet financings and understood that the disclosure of such transactions made it impossible to understand the total extent of the

obligations. He indicated that Deutsche Bank would need to meet with Enron to get a better appreciation for Enron's increasing reliance on trading activities [prepay transactions] Calli Hayes, Deutsche Bank, indicated in her sworn statement that Enron consistently reported off-balance sheet obligations of $9 billion to $10 billion to Deutsche Bank during these meetings.

491. Despite what external credit rating agencies were saying about Enron's credit Deutsche Bank assigned its own internal measure to Enron credit based on the information it had about Enron's true financial condition. Despite an investment grade credit rating from external rating agencies that based their analysis on publicly available information, Deutsche Bank rated Enron credit B+ based on its awareness and participation in the fraudulent scheme that it knew weakened Enron's credit significantly.

492. Through its involvement in a myriad of deceptive transactions, underwritings and the Tax Transactions, Deutsche Bank had direct knowledge that Enron's financial statements were fraudulently misrepresented. Deutsche Bank actively participated in and promoted transactions that were designed to conceal Enron's true financial position and perpetuate the fraud and were willing to do so in exchange for lucrative fees. Through its involvement in LJM2 and the Tax Transactions, Deutsche Bank knew that Enron's revenue, earnings and cash flow from operations were artificially overstated, its debt obligations massively understated and that Enron's financial statement disclosure was so opaque that it was impossible for anyone not involved with the fraudulent manipulation of the statements to have a true understanding of Enron's true financial condition. Deutsche Bank was a primary violator.

493. As soon as information that Deutsche Bank had concealed was disseminated to the general public, the value of Enron securities dropped almost to zero. Silvercreek lost substantially its entire investment in a matter of weeks. Deutsche Bank is directly responsible for Silvercreek's losses.

/ / /

494.    Given Deutsche Bank's extensive involvement in fraudulent transactions with Enron, transactions designed solely to manipulate Enron's financial statements and mislead the investing public, Deutsche Bank is directly responsible for the false information conveyed to the public and to Silvercreek.  In particular, as an underwriter of the Zero Coupon Notes, Deutsche Bank knowingly disseminated an Offering Memorandum and a prospectus that contained materially incorrect information with respect to the financial position of Enron.

495.    Deutsche Bank was a statutory  underwriter of the Zero Coupon Notes.  At the time of the registration statement, Deutsche Bank knew that the prospectus was materially inaccurate, fraudulent and misleading.  Deutsche Bank also knew that its research reports were inaccurate.  Deutsche Bank substantially participated in hiding debt from its investors and generating fake profit information.

496.    Silvercreek relied on the agreement by Deutsche Bank to serve as an underwriter for the Zero Coupon Notes, believing that Deutsche Bank had conducted a proper due diligence and was not itself improperly engaged in fraudulent transactions with Enron in order to manipulate the accounting books of Enron.  The Registration Statement for the Zero Coupon Notes stated:

> We incorporate by reference in this prospectus the following documents filed by us with the SEC:
>
> –    Our Annual Report on Form 10-K for the year ended December 31, 2000;
>
> –    Our Quarterly Report on Form 10-Q for the quarter ended March 31, 2001;
>
> –    Our Current Reports on Form 8-K filed with the SEC on January 31, 2001 and February 28, 2001; and
>
> –    The description of our capital stock set forth in our Registration Statement on Form 8-B filed on July 2, 1997.

497.    The financial information contained in the offering memorandum and S-3 Registration Statement for the Zero Coupon Notes, as well as the financial information incorporated by reference therein, was false, fraudulent and misleading due to the fact that Deutsche Bank assisted Enron in inflating its revenues and earnings and hiding debt by creating,

developing, and promoting/implementing a number of fraudulent transactions such as Marlin, Osprey, Valhalla, and the Tax Transactions.

498.     Deutsche Bank's design and participation in fraudulent transactions with Enron resulted in the dissemination of financial information to the investing public that was materially false and misleading.  This false information significantly inflated the values at which both the Zero Coupon Bonds and the Exchangeable Notes were sold.  *In addition, the false financial information created by Deutsche Bank was included in the prospectuses for both the Zero Coupon Notes and the Exchangeable Notes and formed the basis upon which both securities were sold.*

499.     In investing in Enron's debt via the 7% Exchangeable Notes and Zero Coupon Notes, Silvercreek relied upon the accuracy of Enron's financials, the inaccuracy of which was  a direct result of Deutsche Bank's fraudulent SPE and Tax Transactions, as well as Deutsche Bank analyst reports and ratings which provided false and misleading information to the public about Enron's financial condition.

500.     Deutsche Bank earned enormous fees from its Enron-related activities.  Plaintiffs relied on information misrepresented by Deutsche Bank in making their investment decisions.

### d.     JP Morgan

501.     Like the other financial institutions, JP Morgan had extensive business relationships with Enron.  JP Morgan provided commercial and investment banking and advisory services to Enron, among other things acting as an underwriter in the sale of Enron securities and issuing investment analyses and opinions regarding Enron.  From 1997 through 2001, JP Morgan facilitated seven deceptive prepay transactions worth $2.63 billion for Enron.  JP Morgan received approximately $86.3 million in "relationship revenues" from Enron from 1996 to 2000.  JP Morgan acted as a consolidated, unified entity without Chinese walls to seal off from its securities analysts information garnered by its commercial and investment banking divisions.

/ / /

131

The knowledge and scienter of JP Morgan's commercial and investment entity should be imputed to its analysts.

502.    In addition to acting as an underwriter of the Zero Coupon Notes, JP Morgan underwrote several other Enron offerings between 1997 and 2001.  JP Morgan lent billions of dollars to Enron, JEDI, and various other illicit SPE's during this period, including entities known as  Sequoia, Choctaw, Cherokee and Cheyenne. These entities were integral to Enron's scheme to conceal its true level of debt and to improperly generate revenue and profits on non-arm's length transactions with the SPEs.  Importantly, JP Morgan was instrumental in creating, structuring and financing LJM2.  JP Morgan provided a substantial equity investment in LJM2, and also provided a $65 million line of credit.  JP Morgan executives invested at least $25 million in LJM2.  Investors in LJM2 were promised, and were rewarded with, exorbitant returns.  JP Morgan was aware of the activities of LJM2, and knew that Enron controlled LJM2 but was not consolidating LJM2 with Enron's own financial statements, and instead was using it to hide almost billions of dollars of Enron debt and to create the appearance of false profits.  JP Morgan had access to Enron's internal business and financial information, and worked closely and interacted practically daily with Enron's top executives.  Like the other banks, JP Morgan prefunded LJM2 to enable it to complete several illicit 11th hour profit enhancing transactions in December 1999.

503.    An example of JP Morgan's deceptive use of its sham corporation, Mahonia, to disguise billions in loans as commodity trades follows.  Between December 1997 and December 2000, Enron entered into six such agreements (characterized as "forward sales contracts") supposedly to provide for the delivery of oil and gas over four to five years to Mahonia.  However, Mahonia never intended to take delivery of the commodity (***despite falsely representing and warranting that it had the capacity and intended to take delivery of the commodity and that it was acquiring the commodity in the ordinary course of business***) and Enron never intended to deliver it.  Instead Enron and Mahonia would set up exactly offsetting

contracts. As an example, on December 28, 2000, Enron entered into a gas "forward sales contract" with Mahonia and was paid $330 million on that day for the supposed delivery of gas. On the same day, it entered in to an offsetting contract by which Enron agreed to buy back the same quantities of gas on the same supposed delivery schedule, but with $394 million to be paid at specified future dates, in other words, a $330 million loan to be repaid with interest at a rate of 7%. The transaction falsely created the appearance of operating business/revenue activity and hid $330 million in debt.

504. In Appendix E ("Role of JP Morgan Chase and its Affiliates") to the Third Report of Neal Batson, Court-Appointed Examiner (Exhibit I), a substantial volume of evidence with respect to JP Morgan's role in the Enron debacle was reviewed. The Examiner concluded that:

> With respect to the Mahonia Transactions, the evidence would allow a fact-finder to conclude that:
>
> • JP Morgan Chase designed and promoted the structure of the Mahonia Transactions, in part to help Enron satisfy its accounting objectives; and
>
> • JP Morgan Chase funded and assisted Enron in completing twelve Mahonia Transactions, which totaled over $3.7 billion, even though JP Morgan Chase knew that Enron's accounting for these transactions, with no other meaningful related disclosure, would result in misleading financial presentation.

505. Based on JP Morgan's internal documents, the volume of revenues increased significantly from 1997 through to 2001. It would appear that the level of revenues earned by JPMorgan was directly correlated to its participation in fraudulent transactions. Revenues earned grew from $4.6 million in 1996 to $30.1 million in 1999 – an increase of over 650% in four years.

506. In addition to its role in the Mahonia Transactions, JPMorgan also acted as an underwriter of Enron securities, including:

| Date | Security |
| --- | --- |
| October 1997 | $100 million 6 5/8% Enron notes |
| May 1998 | 35 million shares Enron common stock at $25 per share |

| | |
|---|---|
| July 1998 | $500 million 6.40% and 6.95% Enron notes |
| February 1999 | 27.6 million shares Enron common stock at $31.34 per share |
| February 2001 | $1.9 billion Enron zero coupon convertible notes |

507.    JPMorgan's active participation in the Enron debacle may be summarized under three main categories:

(i)      Prepay transactions;

(ii)     Structured transactions; and

(iii)    Analyst coverage.

**(i)      Prepay Transactions**

508.    Between 1997 and 2001 the prepay transactions that JPMorgan executed with Enron accounted for billions in fraudulent cash flow from operations and concealed debt.  The twelve Mahonia transactions that JPMorgan completed provided over $3.7 billion.

509.    With respect to the Mahonia transactions, the Examiner concluded that they were, in fact, unsecured loans and were not accounted for in accordance with GAAP.  This fact was made clearly by Rick Walker, JPMorgan, in a memo to file regarding Enron's prepay structures dated December 15, 1994.  He noted that a prepay "represents a term loan embedded in a commodity swap…"

510.    JP Morgan was clearly aware that deceiving rating agencies and investors was one of the primary motivations for the prepay structures.  In an e-mail from Rick Walker, JP Morgan, to Jeffrey Dellapina, JPMorgan, he noted that "[the rating agencies] haven't figured out prepays." Similarly, in an e-mail from George Serice, JP Morgan Chase, to Karen Simon, JP Morgan, he noted that "Enron loves these deals as they are able to ***hide funded debt from their equity analysts*** because they (at the very least) book it as deferred rev [revenue] or (better yet) bury it in their trading liabilities."

511.    The Examiner concluded that:

134

There is sufficient evidence for a fact-finder to conclude that JP Morgan Chase knew these facts and that it considered the accounting treatment employed by Enron to be a central benefit of the Mahonia Transaction structure:

- "Attractive accounting impact by converting funded debt to 'deferred revenue', or long-term trade payable."

- "Attractive Accounting Treatment:  Obligation to deliver hydrocarbons in the future is classified as *deferred revenue* vs. funded debt.  Most users of the prepay structure believe the transaction to be 'rating agency friendly.'"

- "Funded debt ratios will likely improve as deferred revenue is not included in debt/capital ratios."

- "Treated as commercial obligations; *balance sheet 'friendly'*."

512.     The Examiner concluded that the impact of the JP Morgan Prepay transactions was material on both cash flow from operations as well as Enron's reported debt obligations. Considering the Mahonia Prepay transactions only (*i.e.*, excluding prepay transactions that Enron executed with other counterparties) the Examiner found the impact to be as follows:

**Impact on Enron's Operating Cash Flows**

| For year ended | Reported Cash Flow from Operating Activities (millions) | Net Cash Flows from JPMorgan Prepays (millions) | Cash Flows From Operating Activities Without JPMorgan Prepays (millions) | Percentage Decrease |
|---|---|---|---|---|
| 1999 | $1,228 | $348 | $880 | 28% |
| 2000 | $4,779 | $981 | $3,798 | 21% |

**Impact on Enron's Debt**

| As of December 31 | Reported Debt (Does Not Include Prepay Transactions) (millions) | Amount Outstanding on JPMorgan Prepays (millions) | Debt Including Amount Outstanding on JPMorgan Prepays (millions) | Percentage Increase |
|---|---|---|---|---|
| 1999 | $8,152 | $1392 | $9,481 | 16% |
| 2000 | $10,229 | $2,310 | $12,539 | 23% |

/ / /

135

513.    Accounting for prepaid transactions as cash flows from operations rather than debt (i.e., cash flow from financing activities) materially understated Enron's debt obligations and materially impacted financial ratios considered by rating agencies. It also gave investors a substantially flawed and overstated picture of Enron's business operations and their ability to generate cash. In testimony before the Senate Subcommittee on July 23, 2002, John C. Diaz, Managing Director of Moody Investor Services, Inc.'s Power & EnergyGroup, noted that:

> If such transactions had been accounted for as a loan, Enron's operating cash flow would have been reduced and its debt would have been greater. The disclosure of these transactions as loans would have exerted downward pressure on Enron's credit rating.

514.    On the same day, Pamela M. Stumpp, Managing Director and Chief Credit Officer of Moody's Investor Services, Inc.'s Corporate Finance Group, told the Senate Subcommittee that:

> When a company improperly reports cash flows generated by or used in financings as cash generated from typical business operations [then investors,
>
> analysts and credit rating agencies will be mislead [sic] as to the financial health of a company and its ability to meet future commitments on cash.

515.    Not only was JPMorgan Chase participating in the fraudulent prepay structure, it was actively marketing the program to other clients. The Examiner found evidence of "Prepay Pitch Presentations." The Examiner also found evidence of JP Morgan Chase's participation in prepay structures with other organizations, as well as evidence that JP Morgan Chase knew the accounting for prepays as cash flow from operations was wrong. For example, when JP Morgan determined that another client was correctly accounting for prepays as a loan, Jeffrey Dellapina, JP Morgan Chase, sent the following e-mail to Marcelo M de Estrada, JP Morgan Chase:

> Did you see the email from [redacted entity name]? They call the prepay a "loan" in their financials. That is not helpful – I told [name redacted].

516.    The prepays were not accounted for in accordance with U.S. GAAP accounting and should have been disclosed as debt and cash flow from financing.

/ / /

517.    JP Morgan was not only an active participant in Enron's prepay transactions that served to conceal considerable debt from investors, it in fact was the architect and secretly controlled the Mahonia structure. JP Morgan used Mahonia, Ltd., an offshore entity which it controlled, to enter into a series of sham transactions that took the form of commodity prepay forward contracts ("prepays") but which in reality were loans from JP Morgan to Enron. JP Morgan bankers Jeffrey Dellapina and Robert Traband discussed ways "to make sure that Mahonia seem[ed] independent,"while another Mahonia Director, Richard Jeune appointed JP Morgan as agent "for the purpose of arranging all our physical natural gas receipts and deliveries until further notice."

518.    JP Morgan was involved in every aspect of the setting up and operation of Mahonia and even represented to the Texas Gas Transmission Corporation in 1995 that Chase was the agent "appointed" by Mahonia "for the purposes of arranging all our physical natural gas receipts and deliveries until further notice." Dellapina, in an email to fellow JP Morgan banker Gary Wright, described Mahonia as "a special purpose company which works exclusively on Chase arranged transactions." Mahonia received documents executed by and annotated by JP Morgan, which required only their signature for execution. Thus, JP Morgan implemented the prepays by providing Enron with the conduit needed to construct the deals. A "call report" summarizing the substance of an October 3, 1997 phone conversation, states: "In speaking with Dinsa [Dinsa Mehta, JP Morgan Derivatives Trading Manager] earlier this week, he indicated that we are now doing all prepays in Chase's name and are no longer working with Mahonia." JP Morgan, however, continued to use Mahonia as an SPE in Enron transactions through 2001 and acknowledged its central role in assisting and participating with Enron in implementing the prepays.

519.    Without funding from JP Morgan, Mahonia was incapable of financing the prepaid forward agreement between it and Enron. The terms of Mahonia's agreement with JP Morgan were always for approximately the same monetary amount, same quantity, same

137

underlying commodity, and used the same delivery points, as that stated in the forward sales contract between Enron and Mahonia. These transactions were included in Enron's financial records as trading obligations and the resulting cash flow included in "cashflow from operations." Pursuant to GAAP, these contracts should have been included as debt on Enron's balance sheet. JP Morgan was one of the originators of Enron's practice of concealing loans as "commodity trades" via so-called prepays.

520. Mahonia was overseen by Mark Shapiro, a senior credit officer at JP Morgan. Utilizing its control over Mahonia, JP Morgan participated in falsifying Enron's financial condition through prepays. After Enron's collapse, JP Morgan sought to have its insurers cover its losses on these prepay transactions. The insurers refused, because the trades were not *bona fide* forward contracts but instead disguised loans to Enron. In January, 2003, JP Morgan and its insurers settled an action in which the insurers refused to pay JP Morgan claims because the transactions which underlay the claims were loans rather than commodity trades. Internal JP Morgan documents uncovered as part of that lawsuit reveal that JP Morgan itself considered the transactions to be disguised loans.

521. In a May 10, 1999 email from JP Morgan's Head of Retail Banking Donald Layton, to Credit Derivatives Banker Dennis Oakley, Layton states, "THERE IS A CATEGORY OF 'DISGUISED LOAN' THAT SHOWS UP IN MANY UNITS OF GLOBAL MARKETS. THIS [PREPAID OIL SWAP] IS JUST ONE EXAMPLE." Two days later, Layton wrote to David Pflug, Senior Credit Executive: "WE ARE MAKING DISGUISED LOANS, USUALLY BURIED IN COMMODITIES OR EQUITIES DERIVATIVES (AND I'M SURE IN OTHER AREAS), WITH A FEW [*sic*] EXCEPTIONS, THEY ARE UNDERSTOOD TO BE DISGUISED LOANS AND APPROVE[D] AS SUCH, BUT I AM QUEASY ABOUT THE PROCESS..."

522. JP Morgan actively participated in the disguise of billions of debt through back-and-forth transactions in which Enron sold oil and gas contracts to Mahonia, but then secretly

repurchased the contracts. Executives repeatedly noted that the prepays were actually loans; *there was no actual or intended delivery of any commodity.* In a November 25, 1998 email from George Serice to Karen Simon and Jeffrey Dellapina regarding Enron's prepays and the use of Surety Bonds, Serice wrote: "Enron loves these deals as they are able to hide funded debt from their equity analysts because they (at the very least) booked it as deferred rev [(revenue)] or (better yet) bury it in their trading liabilities."

523.    JP Morgan participated with Enron to hide $3.7 billion in debt through Mahonia. These transactions were frequently entered into at quarter and year ends, with the bank charging higher than normal rates, yielding an extra $120 million per year to be collected from Enron. Having long known the economic substance of prepays, contributed to their structuring, and created the means by which Enron hid their value, JP Morgan knew that this obfuscation would be detrimental to investors and credit rating agencies.

524.    An example of this is the e-mail exchange between Richard Walker, Investment Banker, and George Serice, Vice President of the Syndicated and Leverage Finance Group, on October 24, 2001. Walker relayed a message to Serice commenting, "$5B in Prepays!!!!!!!!" and Serice responded, "shutup and delete this email."

525.    Had this information been known to the public, potential investors like Silvercreek would not have received false information regarding Enron's financial position. Silvercreek based its investment decisions on Enron financial information that was materially false and misleading.

526.    JP Morgan, fully aware that Enron did not classify the prepays as debt, internally accounted for prepays as debt. In a May 11, 1999 letter from Managing Director of Global Oil & Gas Richard Walker and Vice President of Global Oil & Gas Robert Traband, to Vice President of Enron Capital Management Bill Brown, Walker and Traband comment: "As you can see from the above areas of focus, an underlying theme is both the level and structure of consolidated and non-consolidated cash flows used to support the varying on and off-balance sheet debt structures.

Attached is our understanding of how ENE's financial statement might be impacted by various project structures." Attached to this letter was a copy of Enron's cash flow statement with indications of how prepays and other JP Morgan transactions were being accounted.

527.    JP Morgan willfully remained silent as Enron continued to fraudulently account for the Prepays as cash flow from operations, thereby deceiving the general public. In a September 20, 2001 email discussing Enron exposure, Robert Traband wrote to James Ballentine: "Attached is a revised exposure summary with the above lines highlighted... Additionally, I have attached the credit stats including the prepays as debt."

528.    This apathy toward faithful and ethical public disclosure is highlighted by a Richard Walker memo: "The syndication memo is admittedly very skimpy. This is because *we have never let the market know anything about the underlying structure and the emphasis is totally on the letter of credit backed by the Enron Corp.*" As long as Enron provided JP Morgan with a continual stream of fees, clients, investors, and credit rating agencies would never receive full and accurate disclosure.

529.    On September 25, 2001, JP Morgan lent Enron $350 million under a transaction disguised as a trading contract in a desperate attempt to shore up the company's disastrous financial condition and continue the underwriter scheme.

530.    JP Morgan used additional efforts to insure itself against default on the loans made to Enron by purchasing performance bonds from several insurance companies. JP Morgan knew the transactions were manipulative devices and knew that Enron's financial condition was perilous; JP Morgan insured the contracts to protect itself from loss. After Enron filed for bankruptcy and JP Morgan filed claims with the insurance carriers that had issued surety bonds for the trades between Enron and JP Morgan-controlled entities, the carriers refused to pay on the grounds that the trades were fraudulent and were in reality a series of loans from JP Morgan to Enron.

/ / /

531.    JP Morgan's Vice Chairman Donald H. Layton described some of these transactions as "disguised loans" in e-mails. The following was a recording from a conversation on September 20, 2001 discussing Enron prepays: "They are not hedging. They are just - they do the back-to-back swap. Yeah it's totally financing. They've always had on as a piece of their capital structure."

532.    Another JP Morgan banker said that Enron would get heartburn if the transactions were disclosed to the public for what they were, "actual funded debt."

533.    In JP Morgan employee Sandra Aultman's deposition, she stated that her boss called the prepays "smoke and mirrors." A recorded conversation with her boss on October 29, 2001 says, "Yeah, it took five to ten years to put all the smoke and mirrors up."

534.    JP Morgan conceived the prepays to get Enron secret, undisclosed loans - and to get JP Morgan what it wanted, high premium transactions with the risk of the transaction being laid off on its insurance companies. In addition to interest payments, JP Morgan also received enormous up front fees for arranging the prepays.

535.    As the Enron Ponzi scheme continued to grow, JP Morgan became increasingly integral to the Enron fraud. JP Morgan knew that Enron was relying on it to facilitate the quarter end manipulation of its financial statements and JP Morgan was happy to increase its participation given the very lucrative fees that it was earning.

536.    The Examiner noted that:

JP Morgan Chase came to understand and expect that Enron would repeatedly rely on financial statement management techniques, such as those associated with the Mahonia Transactions, to satisfy its need for cash while simultaneously improving the reported results of its operations:

- In October 1997, George Serice ("Serice") alerted others at JP Morgan Chase regarding Enron's desire to complete $150 to $300 million in Prepay Transactions by the end of the year, noting: "These transactions are balance-sheet advantaged and are used as a year-end management tool. Enron is thus enticed to pay a premium for these transactions."

- In October 1999, Traband wrote Walker and others at JP Morgan Chase (including Serice) regarding the possibility of another

Prepay Transaction: "Spoke with Jung Suh [Enron] this morning as well. He indicated that any prepay would still go throught [sic] Joe Deffner and that Joe did not think there would be another one this year." Serice replied: "I think we have heard that in each of the past 4 years."

- An internal "call report" concerning Enron's desire to complete a prepay transaction in the fourth quarter of 2000 stated: "Sounds like typical Enron with year-end transactions. Yes, we should focus on creative solutions – happy to help."

- In August 2001, when asked by Walker about assembling a group of JP Morgan Chase personnel for "listening to some of Enron's ideas and challenges regarding its interest in selling down some assets," Christopher Teague replied: "Rick, as you will recall, we had some conceptual discussion on this about 6 weeks ago. We had begun to focus [sic] on it from the point of view of trying to free up capacity in the bank market. Is that the goal here or is this another hide the debt structure?"

537.    JP Morgan continued to willingly participate in the deception despite the fact that it knew that the Mahonia transactions were not being appropriately disclosed and Enron's true debt levels were being hidden from credit rating agencies, creditors and investors.

538.    JP Morgan knew that the Mahonia Prepay Transactions were loans and were not accounted for in accordance with U.S. GAAP.  In 1994 JP Morgan sent a letter to the Office of the Comptroller of the Currency seeking approval to enter into prepaid forward commodity contracts.  In his letter to the regulator, Garland Sims, Vice President and Senior Associate Counsel, JP Morgan, stated that:

Chase would analyze credit risk resulting from the advance of funds under a pre-paid forward as it would if making a loan on an unsecured basis… In sum, we believe that the proposed pre-paid forward transactions are part of the business of banking because such transactions are the functional equivalent of extension of credit and delivery of the Eligible Commodity is incidental to that extension of credit.

539.    Internal communications at JP Morgan further support the allegation that it knew that the Prepay Transactions were loans.  In a letter dated June 23, 1993, Mark Webster, Director, JP Morgan Chase, to Ian James, Director, Mahonia, stated that "[t]he transactions described above are representative in effect, of a fixed interest rate loan by [The Chase Manhattan Bank] to Enron."

142

540.     With respect to JP Morgan Chase's knowledge as to how Enron was accounting for the prepay transactions, the Examiner noted:

There is evidence that JP Morgan Chase knew:

(i)      Enron reported its obligations related to the Mahonia Transactions as "Price Risk Management Liabilities" instead of debt; and

(ii)     Enron reported the cash proceeds from the Mahonia Transactions as cash flow from operating activities instead of cash flow from financing activities.

541.     It is clear that JP Morgan understood that one of Enron's key motivations for the Mahonia Transactions was to mislead the credit rating agencies and investors.  According to Robert Traband, Vice President, JP Morgan, "the rating agencies had also indicated they wanted to see them [Enron] get more cash out of their trading book …the prepays which resulted in cash coming in and a liability from price risk management, met these objectives."

542.     With respect to JP Morgan's knowledge as to how Enron was disclosing the prepay transactions in its financial statements, the Examiner noted:

There is evidence that JP Morgan Chase understood that creditors and other users of Enron's financial statements would not be able to discern the impact of the Mahonia Transactions.

543.     JP Morgan would price the prepaid transactions with reference to how important it thought the structure was to Enron.  In the transcript of a taped phone call amongst JP Morgan employees it is noted, "I think what we're trying to gauge is how, how aggressive they are to pay for this stuff now, which is discreetly get, you know, several hundred million dollars and have no market knowledge of what's going on …"

544.     JP Morgan marketed the prepaid structure to other clients but noted that the "pickup with the rating agencies" was to some extent limited by the size of the client's existing trading book.  Basically, the fraudulent accounting for and disclosure of prepaid transactions would not go undetected by the credit rating agencies if the volume of the prepay deals was disproportionate to the legitimate trading book.

/ / /

143

545.    The Examiner summarized the fraudulent disclosure of the prepay transactions by concluding that:

> There is evidence from which a fact-finder could conclude that the Mahonia Transactions were designed to achieve market invisibility, and that market invisibility was a feature of those transactions known to and promoted by JP Morgan Chase.

546.    In the fall of 2001, Arthur Andersen began to 'push back' with respect to the accounting for the Mahonia Transactions.  To meet the U.S. GAAP requirements necessary to perpetuate the fraudulent accounting for and disclosure of the prepay transactions, Arthur Andersen required a representation letter stating that Mahonia was independent of JP Morgan. Lisa Bills, Enron, wrote in her September 20, 2001 e-mail to Jeffrey Dellapina, JP Morgan Chase, that:

> [W]e have been requested by our auditors to include another representation.  It will state (in words not yet crafted, so any you want to propose are welcome) that
>
> Mahonia and Chase are unrelated entities which are not consolidated on a legal or accounting basis with each other[.]

547.    Ian James, Director, Mahonia, provided the necessary letter to Arthur Andersen on September 28, 2001.  Mahonia, however, was NOT independent of JP Morgan.  Mahonia was established by JP Morgan for the sole purpose of assisting in the prepay transactions.  Phil Levy, JP Morgan, testified that Mahonia did not participate in the structuring of the Mahonia Transactions (this was done by JP Morgan staff) and all funds required in the Mahonia Transactions was sourced by JP Morgan.  With respect to the independence of Mahonia, the Examiner concluded that:

(i)     Notwithstanding the representation letter procured for Andersen, Mahonia was an SPE doing only the bidding of JP Morgan Chase; and

(ii)    JP Morgan Chase was aware of this fact at the time the requested representation letter was obtained.

548.    With respect to the Mahonia Transactions, the Examiner concluded that:

JP Morgan Chase knew:

(i)     the Mahonia Transactions were loans in economic substance;

144

(ii)    Enron entered into the Mahonia Transactions for the purpose of reporting the proceeds of these financings as cash flow from operating activities and the obligation to repay these proceeds as price risk management liabilities; and

(iii)   the impact of the Mahonia Transactions on Enron's financial condition and results of operations would not be apparent to Enron's other creditors, analysts and other third-party users of Enron's financial statements.

There is also evidence that JP Morgan Chase assisted Enron in connection with the Mahonia Transactions by:

(i)    designing the structure specifically for Enron;

(ii)    lending its own funds in all twelve of the transactions; and

(iii)   providing an SPE, Mahonia, to serve as the conduit entity that Enron believed was necessary to obtain its desired accounting treatment.

549.    Details of the JP Morgan prepays are included in Exhibit B.

### (ii)   <u>Structured Transactions</u>

550.    In addition to its participation in various underwritings and the Mahonia Prepay transactions, JP Morgan was also actively directly involved in perpetuating the Enron scheme through its participation in various deceptive SPE structures.  As listed by the Examiner, fraudulent SPE transactions in which JP Morgan was directly involved include the following:

JP Morgan Chase participated in a number of Enron's other SPE transactions that have been described in the Examiner's prior reports:

- **JEDI II:**  In 1997, JP Morgan Chase provided $100 million of a $200 million short-term bridge loan to JEDI II.  In 1998, JP Morgan Chase acted as administrative agent for a $500 million syndicated revolving credit facility providing credit to JEDI II.

- **Chewco:**  In 1997, JP Morgan Chase provided a short-term bridge loan of $188 million to Chewco, the purchaser of the interest in JEDI held by CalPERS.

- **Project Firefly:**  In 1998, JP Morgan Chase acted as administrative agent for a $400 million syndicated loan facility in connection with Project Firefly.  Later, in 1999, JP Morgan Chase acted as administrative agent for a $415 million senior secured lending facility related to Project Firefly.

- **Choctaw:**  In 1999, JP Morgan Chase advised Enron in connection with structuring and implementing the Choctaw Minority Interest

145

Transaction, also acting as the agent bank for a $485 million syndicated loan made to Choctaw as part of the structure.

- **LJM2:** In 1999, JP Morgan Chase acted as the agent bank in connection with a $65 million syndicated loan to LJM2.

- **Project Rawhide:** In 1999, JP Morgan Chase participated in a $720 million syndicated loan arranged in connection with Project Rawhide.

- **Project Fishtail:** In connection with Project Fishtail, which closed in 2000, JP Morgan Chase provided a $42 million credit facility to Annapurna, LLC, a member of a joint venture that held the economic interests in Enron's pulp and paper trading business.

- **Zephyrus:** In 2000, JP Morgan Chase acted as agent bank for a $500 million syndicated loan to an SPE in connection with the Zephyrus Minority Interest Transaction.

- **Hawaii:** In 2000, JP Morgan Chase participated in a $550 million syndicated loan in connection with the Hawaii FAS 140 transaction.

- **Marlin:** In 2001, JP Morgan Chase acted as one of five co-managers on a $475 million notes offering, to be used to redeem the outstanding debt of a prior Marlin Water Trust notes offering.

- **Slapshot:** In 2001, JP Morgan Chase structured and acted as lender and agent bank in connection with a transaction designed to provide $375 million in off-balance sheet financing for certain of Enron's forest product assets and to save Enron $100 to $150 million in Canadian income taxes.

551. JP Morgan was an underwriter in the Marlin offering. Marlin Trust was utilized in the scheme to conceal Enron's true financial position. In addition, the Marlin structure was supported by Enron through various "stock triggers." Enron's massive potential obligations under these triggers were not disclosed in its registration statements.

552. JP Morgan, along with Citigroup, administered the financial affairs of LJM2, about which they were fully knowledgeable. As described earlier, LJM2 was a key vehicle employed by Enron to hide billions in debt and generate billions in false revenue and profits and cash flow from operations.

/ / /

146

553.    JP Morgan designed the "tax technology" employed in the Enron Slapshot transaction described earlier.   This transaction demonstrates that JP Morgan was part of a broad scheme to help Enron manipulate its financial statements to deceive the public.

554.    JP Morgan also participated in the deceptive Fishtail transaction as described in the report from the Senate Subcommittee investigating the role of financial institutions in the collapse of Enron (Exhibit C).  JP Morgan provided an inflated valuation analysis for the assets transferred and a $42 million "commitment" referred to as an "unfunded capital investment." This "commitment" was never intended to be used.  It was strictly a construct to create the appearance of an asset sale when no sale really occurred.  In return for pretending to finance the Fishtail transaction, JP Morgan received $500,000.

555.    JP Morgan led $1.0 billion in minority interest financings; a technique by which Enron improperly hid $2.75 billion in debt.

556.    JP Morgan structured several highly questionable tax transactions for Enron (including Slapshot, described earlier) and received millions in fees.  These transactions are being investigated by regulators.

### (iii)    Analyst Coverage

557.    JP Morgan acted as unified entity without effective Chinese walls to preclude information from its commercial and investment banking services from reaching its security analysts.  Hence, all knowledge and scienter should be imputed to its research analysts.

558.    Although it was well aware of, and had participated in, Enron's improper practices, JP Morgan nonetheless published analyst reports and investment research reports that improperly touted Enron's financial strength and performance, and recommended that investors purchase Enron securities. JP Morgan issued favorable reports and recommendations on June 9, 1999; July 15, 1999; September 23, 1999; November 26, 1999, January 1, 2000; February 9, 2000; May 3, 2000; May 15, 2000; July 3, 2000; July 19, 2000; September 15, 2000; September 27, 2000;  March 13, 2001; March 23, 2001; May 18, 2001; June 15, 2001; July 10, 2001; July

147

12, 2001; August 15, 2001; August 17, 2001; on October 9, 17, 20 and 23, 2001; and November 2, 2001.

559.    JP Morgan knew that if the value of Enron's stock fell below the various "trigger" prices, Enron would have to issue millions of additional shares of stock, thus reducing shareholder's equity by billions  and endangering its investment-grade rating and access to capital markets.

560.    JP Morgan's head of equity research, Peter Haughton sent a memo to the bank's equity analysts in March 2001 stating that the analysts were required to consult both the company concerned and JP Morgan's investment banker before publishing research that regarded one of JP Morgan's corporate clients.

### (iv)    JP Morgan's Knowledge of Enron's True Financial Position

561.    From 1997 through to the date Enron declared bankruptcy in 2001, JP Morgan had participated in over 70 different transactions with Enron – averaging over one a month.

562.    The Examiner noted that:

JP Morgan Chase's consistent achievement of Tier 1 status among Enron's banks, and its steady flow of Enron's transactions, provided JP Morgan Chase with multiple benefits, such as:

- •    Particularized knowledge of at least some of Enron's off-balance sheet financing;

- •    Personal access to Enron's Chief Operating Officer, Skilling, and its Senior Vice President and Chief Financial Officer, Fastow;

- •    Access to Enron's strategic plans;

- •    The ability to seek and obtain specially arranged presentations regarding Enron's on- and off-balance sheet obligations; and

- •    Early access to not-yet-public information concerning organizational changes at Enron.

563.    Through its involvement in a myriad of deceptive transactions, underwritings and the Mahonia Prepay Transactions, JP Morgan had direct knowledge that Enron's financial statements were fraudulently misrepresented.  JP Morgan actively participated in transactions

that were designed to perpetuate the fraud and were willing to do so in exchange for lucrative fees. Through its involvement in LJM2 and the Mahonia Prepay Transactions, JP Morgan knew that Enron's revenue, earnings and cash flow from operations were artificially overstated, its debt obligations massively understated and that Enron's financial statement disclosure was so opaque that it was impossible for anyone not involved with the fraudulent manipulation of the statements to have a true understanding of Enron's true financial condition. JP Morgan was a primary violator.

564.    Substantial evidence supporting Silvercreek's allegations against JP Morgan has been uncovered in the nearly five years since Enron declared bankruptcy. To date JP Morgan has:

- Settled an outstanding complaint brought by the SEC by agreeing to pay the SEC a total of $135 million; and

- Agreed to pay $2.2 billion to settle claims brought against it by the Enron Class Action case - substantially the same claims that Silvercreek is alleging herein.

565.    As soon as information that JP Morgan had concealed was disseminated to the general public, the value of Enron securities dropped almost to zero. Silvercreek lost substantially its entire investment in a matter of weeks. JP Morgan is directly responsible for Silvercreek's losses.

566.    JP Morgan was an underwriter of the Zero Coupon Notes purchased by Plaintiffs. As a result of its close relationship with Enron and its intimate involvement in Enron's deceptive SPEs and off-balance sheet activities, JP Morgan knew that the registration statement was materially inaccurate and misleading. The existence and magnitude of Enron's off-balance sheet obligations were not disclosed. JP Morgan knew that its research reports were materially inaccurate and misleading. JP Morgan participated with Enron in moving billions of dollars of debt off its balance sheet and in inflating its revenue and profits by millions of dollars.

567.     JP Morgan's participation in this scheme enabled it to earn enormous profits by charging excessive interest rates and fees.  Plaintiffs relied on the information misrepresented by JP Morgan in making their investment decisions, and suffered substantial losses as a result of that reliance.

e.     **CSFB**

568.     Like the other investment bank defendants, CSFB had a long and close relationship with Enron which made it privy to material facts about Enron's financial condition which the public did not know.  CSFB acted as a unified entity without an effective Chinese wall to preclude information from its commercial and investment banking services from reaching CSFB's securities analysts.  Hence, all knowledge and scienter should be attributed to CSFB as an entity.

569.     CSFB acted as underwriter for numerous Enron securities, including the Zero Coupon Notes.  CSFB was the number one underwriter of Enron securities since 1985, having arranged $7.4 billion in offerings.   As reported in a February 26, 2002 Dow Jones News Service article that noted the "long gravy train of stock and bond offerings that Enron sent the Streets' way over the past decade," CSFB obtained approximately 20% of the company's underwriting work between 1990 and the Enron collapse.  By CSFB's own count, it underwrote over 30 Enron-related transactions — 8 involving SPEs — between 1997 and the Enron collapse, earning at least $94.1 million in fees.

570.     Enron consistently viewed CSFB as a "Tier 1" bank, and CSFB in turn treated Enron as a firm-wide priority.  As early as 1998, Jeffrey Skilling noted to Andrew Fastow CSFB's willingness to "deliver balance sheet strategically."

571.     CSFB acted as underwriter for approximately $2 billion in Enron-related securities, including $1 billion in notes for the Osprey Trust Entities, $500 million in 6.19% and 6.31% notes for the Marlin Water Capital Corporation II/Marlin Trust, and $650 million in 10.375% and 10.75% senior notes for Azurix.

572.     CSFB also advised Enron on mergers and acquisitions, was advisor to Enron on the $2 billion sale of Portland General Electric, and helped Enron dispose of $5 billion to $7 billion in assets in its international portfolio in 2001, some sold to SPEs at inflated values.

573.     CSFB was one of the principal commercial lending banks to Enron. CSFB loaned or arranged to secure over $4 billion, as well as helping Enron to raise over $3 billion by publicly selling securities.

574.     In addition to the stream of investment banking income CSFB's participation in the Enron offerings provided, those offerings also provided Enron a stream of income to fund its obligations to CSFB under the Enron-CSFB off-balance sheet transactions. Keeping silent about Enron's fraudulent accounting of CSFB loans as asset "sales," CSFB fraudulently underwrote a series of offerings to ensure that Enron would be able to repay those debts. Among the offerings CSFB underwrote as part of its fraudulent scheme to siphon off Enron income for itself were:

| Date | Security Sold |
|---|---|
| 6/9/99 | 36.6 million shares Azurix stock at $19 per share |
| 9/23/99 | $1,400,000,000 8.31% Osprey Trust, Osprey I, Inc. Senior Secured Notes due 03 |
| 2/11/00 | $440 million and £100 million Azurix 10.375% and 10.75% Senior Notes |
| 9/28/00 | $750,000,000 7.797% Osprey Trust, Osprey I, Inc. Senior Secured Notes due 2003; $315,000,000 6.375% Senior Secured Notes due 2003 |
| 10/00 | 27.6 million shares New Power at $21 per share |
| 7/12/01 | $475,000,000 6.31% Marlin Water Trust II, Marlin Water Capital Corp. II Senior Secured Notes due 03; $515,000,000 6.19% Senior Secured Notes due 03 |

575.     CSFB participated in the Enron scheme for colossal profits via syndication and

investment banking fees and interest payments. The capital from public investors allowed Enron to pay off its commercial paper debt and loans from the banks, limiting CSFB's risk. CSFB also designed, structured and funded the SPEs that were utilized by Enron to falsify its financial condition and misrepresent profits.

576. In Appendix F ("Role of CSFB and its Affiliates") to the Final Report of Neal Batson, Court-Appointed Examiner (Exhibit G), a substantial volume of evidence with respect to CSFB's role in the Enron debacle was reviewed. The Examiner concluded that the evidence would permit a fact-finder to conclude that CSFB:

- Participated with Fastow and The Royal Bank of Scotland PLC ("RBS") in the formation and funding of LJM1, knowing that Enron would use LJM1 to enter into non-economic hedging transactions;

- Assisted Enron in completing the CSFB Prepay, even though CSFB knew that Enron's accounting for transactions of this type, with no other meaningful related disclosure, would result in misleading financial presentation; and

- Obtained assurances from Enron in the Nile transaction wherein Enron assured repayment of CSFB's equity interest in the SPE in the Nile transaction, knowing that the assurances precluded the accounting treatment Enron sought for such transactions and that Enron nonetheless intended to account for these transactions as if no assurances of repayment had been provided.

577. CSFB's active participation in the Enron debacle may be summarized under three main categories:

(a) Structured transactions

(b) Prepay transactions; and

(c) Analyst coverage.

### (i) Structured Transactions

578. CSFB was involved in a number of different FAS 140 Transactions including Iguana in December 1999 and Nikita and Nile in September 2001. Almost always, CSFB's participation in SPE structures came at the end of a fiscal quarter as Enron was struggling to fraudulently "prop up" earnings through the use of deceptive financial engineering.

152

579.    For both the Nikita and Iguana transactions CSFB participated as the holder of the 3% supposed "equity" component.

580.    With respect to the Nile transaction, the Examiner concluded that CSFB knew that its participation in the scheme enabled Enron to create a false appearance of revenues by recording approximately $18.9 million in revenues that should never have been recognized and conceal nearly $24 million in debt from Enron's balance sheet.

581.    Based on his review of internal documents and the sworn statement of James Moran, Director, CSFB, the Examiner concluded that:

> Although CSFB understood that its equity position in the Sphinx Trust "needed to be at risk" to satisfy the accounting treatment that Enron gave the overall transaction, the evidence indicates that Enron agreed to repurchase CSFB's 3% equity in Project Nile "at par." An internal CSFB document describes the "credit risk" of the equity as being "100% Enron via put."

582.    The existence of a put that permitted CSFB to return its 3% equity back to Enron at par value fully removes any risk to the equity. The only risk CSFB had on the structure was that Enron would not honor its obligation under the put, in other words, CSFB was expose to credit risk on the debt that had been extended to Enron. Although it was wrapped up in a sophisticated structure, CSFB knew that it was simply extending credit to Enron and it also understood Enron's motives for structuring simple debt as a sophisticated SPE structure – to deceive investors and credit agencies by overstating its revenues, overstating its cash flow from operations and understating its true debt obligations.

583.    CSFB made loans to Enron that were disguised as trades. One example of such a disguised loan was a December 2000 $150 million transaction with Enron that was characterized as a "swap" (prepay). CSFB paid the $150 million up front, in exchange for which Enron was to make payments to CSFB over a 2 year period. Although papered as a swap, in substance, it was a loan. In fact, CSFB treated the transaction as a loan on its own books. Enron did not, instead posting the money as "assets from price risk management" in order to hide the obligation.

Hence, CSFB actively participated in and furthered the scheme by helping Enron hide its true credit situation.

584.   CSFB was aware of the deceptive nature of the prepay loans. On September 17, 2001, Osman Abib, a CSFB banker, sent an e-mail to a colleague, James Moran, asking about the prepay. "Please remind me as to who at Enron originally asked for this deal and why we agreed to do it (and most importantly what did CSFB get from it besides being nice guys again)."

### (ii)   Prepay Transations

585.   CSFB was clearly aware that the CSFB Prepay structure did not expose CSFB to any commodity risk whatsoever.  In James Moran's, Director, CSFB, sworn statement he notes that CSFB's exposure to oil is netted out with the swaps and the net result operates as a loan between CSFB and Enron.  In fact, there were no physical deliveries of the commodity, and none was ever intended.  CSFB's awareness of the true nature of the CSFB Prepay transaction is further illustrated in an e-mail dated December 12, 2000 from Ian Emmett, CSFB, to Steven Wootton, Director, CSFB.  In the e-mail Emmett asks "Is it OK for us to be entering into such an 'obvious' loan transaction?"  Emmett sent another e-mail to Geoff Smailes, CSFB, on that same day noting that "I am being asked to quote on a structure for Enron that enables Enron to borrow USD that are treated as price risk management rather than debt on balance sheet."

586.   A CSFB employee, internal lawyer Steve Wootton, raised concerns that the Enron "prepay" was an "accounting driven transaction" in a December 14, 2000 e-mail.  In the internal communications that followed, Mr. Wootton raised the issue of whether the transaction would be documented with "the Firm's standard representations for accounting driven transactions."

587.   In accordance with CSFB's written guidelines, any transaction that is deemed to be "accounting driven" requires the approval of the "reputational risk" department.  After discussing the nature of the structure, it was determined that to mitigate any reputational risk to CSFB, it would collect a series of representations from Enron.  The Examiner noted that these insurances included *inter alia* that:

154

- Enron had discussed the CSFB Prepay with its external auditors;

- Those auditors had confirmed that the accounting treatment was appropriate;

- The CSFB Prepay and Enron's accounting therefore were consistent with applicable laws and regulations; and

- The CSFB prepay, and its accounting and tax treatment, are consistent with regulatory requirements.

588.    The evidence documents a back and forth between Enron and CSFB – Enron doing its best to minimize the need for specific representations and CSFB reiterating the importance of such representations.  According to a sworn statement from CSFB Director James Moran, Enron was not comfortable with CSFB's standard assurances.  A December 15, 2000 e-mail from CSFB's Nicolas Tjandramaga to Marc Steglitz of CSFB's reputational risk group stated that it was "very important" for Enron that the prepay documents "DO NOT include any representations on accounting driven transactions."  However, despite the fact that CSFB had some concerns regarding the prepay structure, in particular concerns regarding the firm's reputational risk, it went ahead and funded the transaction.  Moreover, in entering into the prepay transactions without that standard representation, CSFB actively concealed the true nature of the transaction.

589.    CSFB knew that the prepay transaction was a loan – when discussing the transaction with Enron employees, terms such as "quarterly interest payments" and "principal repayment" were used.  Internal e-mails clearly show that CSFB was fully aware of what the structure was and how Enron intended to account for the structure.  Despite raising some initial concern over the transaction, CSFB backed down and financed the fraudulent structure and assisted Enron in recording $150 million in cash flow from operations and concealing $150 million in debt.

590.    Through its participation in the prepay structures, its knowledge of the "accounting driven" nature, and its knowledge of how Enron would account for such structures, CSFB was an active participant in Enron's fraudulent understatement of debt.  Despite its

155

knowledge of these transactions, CSFB did not disclose the existence of the off-balance sheet obligations in its research reports or in the prospectuses for those transactions for which it was an underwriter. Despite its legal obligation to ensure that the information included in securities offering documents was accurate, CSFB failed to meet its statutory requirement and actively participated in fraudulently deceiving investors.

591.	CSFB made huge profits from hidden loans to Enron.

592.	CSFB, through a group of ten bankers hired by DLJ from Citigroup/Salomon and headed by Laurence Nath, a managing director at CSFB, created several unlawful SPEs, including Marlin, Firefly, Mariner, Osprey, Whitewing, and the Raptors. CSFB helped Enron sell assets at inflated prices to these entities despite the fact that Enron could never have sold the assets at such prices in arm's length transactions, thereby creating sham revenue and profits and concealing massive debt. Laurence Nath and CSFB worked closely with Vinson & Elkins and Arthur Andersen to create and document the SPEs.

593.	CSFB would send Laurence Nath to the Enron Corporate office for a few weeks to meet with Enron's treasury and global finance departments, including Jeff McMahon and Ben Glisan, to create a quick-fix solution for Enron's books. The buzz word to describe such transactions was "monetising," which meant that Enron needed to sell an asset to an SPE in order to remove that asset from Enron's books. Such transactions artificially inflated revenue, earnings and cash flow from operations and concealed debt.

594.	For example, in July 1998, Enron formed a new company called Azurix Corp. to penetrate the global water business. Enron acquired Wessex Water plc for $2.6 billion as Azurix' centerpiece. To keep Azurix' debt off Enron's balance sheet, Enron tapped Lawrence Nath at CSFB to design a structure that would maintain it as an unconsolidated entity. This was achieved by the Marlin Water Trust ("Marlin") which was set up in 1998 to move water assets and debt off Enron's balance sheet. The Marlin debt was backed by Enron stock. Enron's obligations to Marlin were not disclosed to its investors. CSFB also underwrote the Azurix IPO,

selling 38.5 million shares of Azurix stock at $19 per share. Enron received $370 million of new capital for selling 19.5 million shares in the offering.

595.    CSFB acted as lead underwriter in the New Power IPO on October 4, 2000, selling 27.6 million shares at $21, enabling Enron to create large – and false – profits for the 2000 financial year. Enron took New Power public to create a trading market in its stock in order to recognize a profit through a sham sale to an SPE (Hawaii 125-0). Subsequently, Enron "hedged" its New Power investment through the infamous Raptor vehicles (described above). CSFB made a sham loan to the SPE (Hawaii 125-0) utilized to "purchase" Enron's New Power shares. This loan was secretly guaranteed by Enron through a total return swap and led to Enron's recording of a $370 million manufactured profit. By entering into a secret total return swap, CSFB would have known that its loan was a deceptive device.

### (A)    LJM1/Rhythms Hedging Transaction

596.    CSFB designed the concept of Enron using its own stock to backstop obligations. This concept formed the basis for Enron's share trust structures (such as Marlin and Osprey) as well as several "hedging" transactions, including the Rhythms transaction and the Raptors. CSFB created LJM1 and engineered the Rhythm transaction, and the Rhythms transaction in turn formed the template for the Raptors. Enron created SPE LJM1 for the purpose of hedging Enron's market risk on its equity position in Rhythms NetConnections stock (the "Rhythms transaction"). Enron engaged in the Rhythms transaction for the sole purpose of managing financial reporting results. The transaction had little or no economic substance but it did enrich Enron insiders and the limited partners of LJM1, including CSFB.

597.    The Examiner concluded in his Second Interim Report that LJM1 was created and existed primarily to execute hedging transactions with Enron at non-arm's length terms that a truly independent third party would never accept. With respect to the LJM1/Rhythms Hedging Transaction, the Examiner concluded that:

> CSFB knew that LJM1 would enter into the LJM1/Rhythms Hedging Transaction with Enron and CSFB was in possession of all the facts necessary to conclude that

the LJM1/Rhythms Hedging Transaction was a non-economic hedge. CSFB was also in possession of all the facts necessary to conclude that Enron paid significant value in a transaction in which it had no possibility of obtaining an economic return and that the transaction was designed to give Enron only a potential financial statement benefit.

### (B)     Raptors

598.    The Raptor transactions were developed using the Rhythms transaction structure that was created by CSFB. Similar to the Rhythms transaction, the Raptor transactions were designed to reduce the reported earnings volatility on a number of Enron's investments. Another SPE, LJM2, served as the purported "outside investor" for the Raptors. CSFB was a limited partner in LJM2, as well. CSFB invested $15 million in equity in LJM2 and provided an additional $30 million to LJM2's $120 million credit facility.

599.    The Raptors received their Enron stock through contingent forward contracts purchased from Peregrine, a wholly-owned subsidiary of Enron that owned a contingent right to receive shares from Whitewing. The Raptors would not receive their shares unless the Enron common stock price was above certain levels. Whitewing was a structure set up by Laurence Nath's structured finance team at CSFB, and was funded with over $2 billion in Osprey notes and certificates. Having created the fraudulent structure, CSFB proceeded to underwrite the notes.

600.    With respect to the Raptors transactions, Bankruptcy Examiner Neal Batson concluded that, "The hedging transactions, designed ostensibly to manage Enron's investment risk, were not real economic hedges, but were merely accounting hedges – apparently designed to generate favorable financial statement results without serving any commercial purpose." Enron retained the economic exposure in all the Raptors and the transactions were not accounted for properly. However, in order to pursue this "financial statement management," Enron paid LJM2 $69.9 million, thereby enriching the LJM2 investors, including CSFB.

/ / /

## (C)  LJM2

601.  CSFB was fully aware of the importance of the Raptor Transactions to Enron and was equally aware of how lucrative its participation in the Raptor Transactions via LJM2 could be.  In the presentation handout for the "LJM Investments – Annual Partnership Meeting" dated October 26, 2000, CSFB is identified as a partner in LJM2 as well as a "Meeting Attendee."  As part of the presentation package, the Raptor I transaction is reviewed as a sample investment:

Sample Investments: Raptor I

- Raptor is a structured finance vehicle, capitalized with an Enron stock derivative and LJM equity, that will enter into derivative transactions with Enron related to investments in Enron's merchant investment portfolio

- Raptor helps Enron manage the impact of the price volatility of its merchant investment portfolio on its income statement

- Major risk to LJM is that Enron stock price drops below $48.00 per share (43% decline) six months after closing

- LJM's return is projected to be 84%

- LJM used for speed, flexibility, complexity of transaction, and confidentiality."

The final page of this document highlights that LJM2 is of "Strategic importance to Enron."

602.  The offering memorandum for the LJM2 partnership stressed the "unusually attractive investment opportunity" resulting from LJM2's connection to Enron.  It explained that "[t]he Partnership expects that Enron will be the Partnership's primary source of investment opportunities" and that it "expects to benefit from having the opportunity to invest in Enron-generated investment opportunities that would not be available otherwise to outside investors."  The offering memorandum specifically noted that Fastow's "access to Enron's information pertaining to potential investments will contribute to superior returns."  Finally, investors were

/ / /

told about similar Fastow controlled partnerships that had done deals with Enron similar to those contemplated by LJM2 and that those investors had tripled their money in 2 years.

603. The presentation document also outlined the investment profits for the Raptor transactions and provided the internal rate of return ("IRR") for each investment. The details of the Raptor structures are included as follows:

| Investment Name | Total Profits | IRR |
|---|---|---|
| Raptor | $40,366,667 | 193% |
| Raptor I-A | $2,542,969 | 12% |
| Raptor II | $41,050,000 | 278% |
| Raptor II-A | $450,621 | 12% |
| Raptor III | $39,550,000 | 2503% |
| Raptor IV | $41,050,000 | 125% |

604. CSFB was given a private invitation to invest and did invest in LJM2 (some of its senior executives invested $22.5 million in equity money through DLJ Fund Investing Trust Partners and Merchant Capital ("DLJ") and CSFB provided a $120 million credit line to LJM2). CSFB was "promised," and, indeed, received extraordinary returns on its investment in LJM2. In fact, CSFB helped structure and finance LJM2. CSFB injected money near the end of 1999 to fund some SPE transactions so that Enron could create false revenue and earnings and misrepresent that it had met its profit forecasts for 1999. CSFB repeatedly loaned money to LJM2 to enable it to engage in transactions with SPEs and Enron. These were transactions that involved blatant conflicts of interest.

605. By investing in LJM2, CSFB was able to: i) to continue to develop its relationship with Enron; and ii) achieve exceptional returns — returns ultimately funded through a series of fraudulent Enron securities offerings — with substantially no risk. CSFB was fully aware of how Enron was using the Raptor Transactions to inflate its accounting earnings and was also aware that Enron was not providing any meaningful disclosure with respect to the Raptor transactions

/ / /

in its financial reporting.  As such, it knowingly participated in a scheme to steal Enron income from Enron investors and divert that income to investors in LJM2, including CSFB.

### (D)   Stock Triggers

606.    In July 1999, Lawrence Nath and his CFSB team designed a similarly structured off-balance sheet deal called Osprey Trust.  It held debt and assets such as natural gas pipelines and power plants.  Osprey's primary purpose was to raise $1.07 billion for Whitewing LP (described earlier), another off balance sheet entity.  Osprey was also linked to LJM2.  Like Marlin, Osprey also issued debt that was supported by Enron stock.  If Enron's stock price fell below certain defined levels (the "stock triggers") Enron was required to contribute more stock to the structure to support the debt.  These "stock triggers" were a CSFB signature.

607.    The signature CSFB "stock triggers" would play an integral role in both Enron's financial statement concealment, its increasingly precarious position, and ultimately, its downfall. The "stock triggers" required Enron to inject more shares if the price of Enron stock declined below specified levels.  In addition, there could be a forced liquidation if Enron's credit were downgraded, in which event the SPE's debt would become recourse to Enron.  Were its credit rating to fall, Enron's ability to raise new capital (and in the process pay its investment banks lucrative underwriting fees) would be compromised.   The result was a CSFB-designed house of cards, built on a succession of offerings that concealed Enron's mounting off-balance sheet debt.

608.    CSFB pitched even more off balance sheet deals supported by Enron stock. According to the memo of an interview on December 17, 2001, between Ryan Siurek, an Enron employee, and lawyers from the special investigating committee, "Investment banks were always presenting different hedging vehicles to Enron."

609.    The "stock triggers" in the CSFB-designed structures, *i.e.*, the pledges of Enron stock which underlay many of the special purpose entities -- triggered by falls in Enron's stock price -- prices between $83-$19 per share -- created a time bomb.  An Enron insider was quoted

/ / /

in the March 1, 2002 Financial Times stating: "There's no question that senior people at CSFB knew what was going on and that it was a house of cards."

> They [the CSFB bankers] said: "If this thing hits $20, you better run for the hills." There was no question that they knew exactly what lay inside the structures when the triggers went off – everything. You could almost say they knew more about the company than people in Enron did.

610. The only way for CSFB to defuse the "time bomb" was to continue to offer unduly optimistic analyst reports, continue to underwrite offerings, and continue to conceal from the purchasers to whom it sold Enron securities — including but not limited to Silvercreek — the massive amount of material nonpublic information CSFB possessed concerning Enron's false financial statements and mounting debt.

611. CSFB bankers knew the nature and extent of Enron's off-balance sheet exposure as evidenced by incredulous statements they made to Enron employees in response to the employees' public claims that Enron stock was undervalued. Despite this knowledge, CSFB continued to participate in Enron's schemes and to recommend through public statements purchase of the stock.

612. CSFB bankers, in particular, knew that the decline in Enron's share price was creating an extraordinary risk that the Raptors would be unwound and Enron's debt balance would come due. In fact, two CSFB managers expressed their amazement at Enron's continued failure to own up to the dire circumstances the undisclosed triggers presented, asking, "How can you guys keep doing this?" The CSFB managers specifically noted that Enron was at a "critical point" where further declines in Enron's stock price would cause the Raptors transaction to be unwound and the massive credit support Enron had been providing to become due. CSFB bankers knew that Enron had at least eight to twelve billion dollars of off-balance sheet debt. The CSFB bankers secretly warned Enron employees that if Enron's stock price reached $20 per share "you [Enron] guys are gonna be fucked." Despite this knowledge, CSFB issued a "Strong Buy" with a price target of $84.

/ / /

162

### (E)    Other Transactions

613.    Another SPE, Firefly, also created by CSFB, was used to acquire the Elektro utility in Brazil. JP Morgan loaned approximately $1.25 billion to Enron for this purchase. The transaction was structured so that Enron could keep $435 million in debt off its balance sheet.

614.    CSFB also provided the pretend "equity" financing for the September 2001 Nikita transaction described earlier. As a direct participant, CSFB knew that the transaction was not a true asset sale and was solely a construct to generate revenue and earnings and hide debt. Again, CSFB acted as the front man in this transaction.

615.    In June 1999, CSFB affiliate ERNB Ltd., invested $7.5 million in LJM1, an entity (as described earlier) used as the straw man for fraudulent SPE transactions.

616.    In the SAILS transaction (developed by CSFB to hedge its interest in the Enron stock in LJM1 and protect the gain it stood to realize - described in Appendix F to the Final Report of the Bankruptcy Examiner) CSFB enabled Enron's CFO, Andy Fastow, to receive funds derived from the value of Enron stock held in LJM1 in violation of Fastow's representations to the Enron Board in connection with its approval of LJM1 and contrary to the related terms of the Amended Partnership Agreement. This transaction also provided a significant return to CSFB.

617.    As described, CSFB was a leader in the creation of many SPEs which Enron used to increase reported revenue and profits and hide billions of debt, including Marlin, Firefly, Mariner, Osprey, Whitewing, LJM2, and the Raptors. Enron sold assets to these entities at inflated prices generating phony profits and hiding billions of dollars of debt. CSFB knew and understood the purpose of these entities, yet continued to participate and later acted as an underwriter for Enron selling securities to an unsuspecting public based on false financial information.

618.    Many of the vehicles created by CSFB were particularly damaging to Enron investors (including the Marlin and Osprey partnerships) as they used Enron shares to bolster the partnerships' credit ratings and to attract more investors. Pledges of Enron stock obliged Enron

to issue more shares if its stock price fell. They could also force their liquidation if Enron's credit rating was downgraded and the debt of the SPEs became recourse to Enron in such circumstances.

### (iii)    Analyst Coverage

619.    Although it was well aware of, had directly participated in and initiated some of Enron's improper  practices, CSFB nonetheless published analyst reports and investment research reports that improperly touted Enron's financial strength and performance, and recommended that investors purchase Enron securities.  CSFB issued favorable reports and recommendations on July 6, 1999; July 13, 1999; September 2, 1999; September 22, 1999; October 12, 1999; November 30, 1999; January 18, 2000; January 21, 2000; February 28, 2000; April 13, 2000; October 18, 2000; February 20, 2001; April 17, 2001; August 14, 2001; August 17, 2001; October 19, 2001; and October 23, 2001.

620.    On October 26, 2001, a research report refers to a "scenario of issuance of $2 billion in new stock" to support its off-balance sheet debt.  This is clearly misleading in light of the fact that CSFB knew that Enron had at least "8-12 billion" in hidden debt, as discussed in a June 2001 meeting with the company.

621.    In an indication that misleading research is not just related to Enron, but a fraudulent scheme perpetuated by CSFB, is a fraud complaint filed in October 2002 by Massachusetts regulators contending that the firm's investment advice had been tainted by its hunger for fees from corporate clients (reported by The New York Times October 2, 2002).

622.    The Examiner reviewed a significant quantity of documents with respect to the analyst coverage of Enron that CSFB made available to its clients.  Although the Examiner expressed some significant concerns with respect to the fact that an analyst at CSFB maintained his "strong buy" recommendation on Enron stock for longer than all but one other Wall Street analyst that covered Enron, his greater concern was the analyst coverage that was not made available to CSFB's clients.

623. Curt Launer, CSFB, the analyst whose research was made available to CSFB's external clients, including Silvercreek, continued to rate Enron a "strong buy" until November 23, 2001 when Enron's stock price had dropped to $4.71. It is worth noting that Enron declared bankruptcy just over a week later. The Examiner, however, found that the analyst whose coverage was not made available to CSFB's external clients was not nearly so positive. What is even more alarming is that the evidence shows that the negative information regarding Enron was made available to CSFB's internal trading desks such that they were able to benefit from it.

624. In her sworn statement, Jill Sakol, CSFB fixed income analyst, noted that by the fall of 2001 she believed that Enron's debt should be downgraded. She further reported that she was, in the words of the Examiner:

> Discouraged from publishing her candid assessment of Enron even though she contemporaneously communicated this assessment to CSFB bond traders in London and New York, at least one of whom thereafter used that information successfully to divest CSFB of its holdings of the Marlin share trust notes.

625. CSFB had a complete disregard for the concept of "Chinese walls" and the need for equity analysts to be independent of other business units within the firm. The Examiner found evidence that shows that Sakol's research was being edited by CSFB's investment bankers in an effort to put a more positive spin on a couple of the transactions CSFB's investment banking department was working on. In an e-mail dated October 19, 2001 from Michael Davis, CSFB, Jill Sakol, he noted "added two paragraphs … that may help accounts in both US and Europe get more comfortable with the share trust deals."

626. Sakol also testified that although she had a negative view of Enron debt, she was concerned about expressing her views publicly to investors because she was concerned about how others at CSFB may react given the importance of Enron as a client to CSFB. Specifically, she testified that William Battey, Head of CSFB's analyst department, as summarized by the Examiner:

> Called her to his office where he quizzed her about Enron, praised her for getting timely information to CSFB's bond traders, and reminded her of the importance of the Enron relationship to CSFB.

165

627.     A memo prepared by Osmar Abib, Managing Director, CSFB, for Tony James, CSFB's co-head of investment banking, makes it clear that CSFB was attempting to leverage a "Strong Buy" rating on Enron stock all the while seeking ways to reduce its exposure to Enron credit.  In advance of a meeting that James was scheduled to have with Andy Fastow, Enron CFO, Abib noted that CSFB's equity analyst has maintained a "Strong Buy" on Enron stock.  In the same memo, Abib details that "CSFB currently has net credit exposure of $625 million to Enron and CSFB's internal credit team has determined that this net exposure position needs to be reduced to $500 million by the end of October."  Later, on October 28, 2001 in an e-mail from Abib to Greg Whalley, Enron, Abib touts the CSFB equity analyst as a way CSFB "can be of value to Enron … [Launer] was the most visible and supportive equity research analyst on Enron."

628.     The Examiner discovered a number of different internal documents and e-mails that further supports the allegation that CSFB was aware of significant problems with Enron but chose to act on the negative information for its internal benefit while at the same time touting Enron securities to its investors – including Silvercreek.  For example, in an e-mail from Wade Suki, Associate Analyst, JP Morgan Chase, to Andy DeVries, Equity Research Associate, CSFB, dated February 26, 2002, Suki writes:

> I'm sure Curt [Launer's] testimony will NOT include the fact that you guys knew about this crap in August (at the latest) but still didn't write about it or bring it to the attention of investors … shall I forward your emails to the justice department???  The ones warning me to stay away from ENE – these date waaaaaay back … now if you were telling me and everyone on your sales force (as you claim) to stay away, don't you think Congress would like to know about this???

629.     With respect to CSFB's analyst coverage of Enron, the Examiner concludes:

> [A] fact-finder could conclude that CSFB sought to support its relationship with Enron and Enron's stock price through the publication of positive equity analyst reports while simultaneously acting internally on more negative analyst reports in making its own investment decisions.

### (iv)     CSFB's Knowledge of Enron's True Financial Position

630.     CSFB had enjoyed a very long relationship with Enron and had very close and

direct relationships with Enron executives. These relationships provided CSFB with an ability to gain considerable intelligence with respect to Enron's true financial position. Indeed the Examiner concluded that:

> CSFB possessed detailed knowledge of Enron's operations through its many contacts with the company and the due diligence that it completed in connection with its over thirty underwritings of Enron securities. Through its involvement in Enron's many failed asset sales, CSFB had first-hand knowledge that many of Enron's assets could not be sold at prices that would avoid requiring Enron to record a loss. Through its investments in LJM1 and LJM2, CSFB was aware of Enron's use of non-economic hedges…

631.    CSFB was also heavily involved in Enron's off-balance sheet financings and knew that Enron had some significant off-balance sheet obligations. CSFB also understood that Enron's off-balance sheet structures were complex and could not be deciphered by looking at Enron's financial statements and related note disclosure. In fact, in July 1999, Carmen Marino, Managing Director at CSFB, sent out an e-mail to another Managing Director at CSFB noting that "running a pipeline business can't take much time – Enron seems to spend all its available man hours on various, convoluted financing schemes."

632.    On September 16, 1999, Wesley Jones, VP, CSFB Global Energy and Project Finance, sent an e-mail to Jonathan Yellen, VP, CSFB Investment Banking, describing Osprey as "a vehicle enabling Enron to raise disguised debt which appears as equity on Enron's balance sheet…Osprey serves the added purpose for Enron of being an off balance sheet parking lot for certain assets."

633.    Summarizing a call that CSFB executives had with Andy Fastow and Ben Glisan on August 27, 2001, Robert Jeffe, Managing Director, CSFB, noted in his report that Fastow disclosed to the group that Enron's total on and off-balance sheet debt was $36 billion. The Examiner notes that following this August 27, 2001 meeting:

> CSFB accelerated the process of reducing its exposure to Enron. For example, CSFB: (i) decided to reduce its "Enron exposure" to $500 million and then to $300 million (and in fact reduced it to $167 million), in October and November, (ii) completed the Nile transaction and renewed the CSFB Prepay without incurring additional credit exposure to Enron; and (iii) reduced its holdings of Enron debt.

167

634. CSFB was a statutory underwriter on the Zero Coupon Notes. CSFB knew that the registration statements for which it was responsible as an underwriter were materially inaccurate and misleading. CSFB also published research reports which were grossly inaccurate and misleading and knowingly assisted Enron in its illicit schemes to hide its true levels of debt and to manipulate its earnings.

635. CSFB was a direct part of the fraudulent scheme. The Registration Statements and Prospectuses for the Zero Coupon Notes for which CSFB was one of the statutory underwriters contained materially false and misleading statements concerning both Enron's financial condition and the nature of CSFB's relationship with Enron.

636. CSFB was part of the group of purchasers of the Zero Coupon Notes private placement, and purchased the notes for the purpose of reselling them to the public. The registration statement for the Zero Coupon Notes provided, *inter alia*, that purchasers such as CSFB would be required to be named as selling securityholder in the related prospectus and "may be deemed to be underwriters within the meaning of the Securities Act."

637. The registration statement for the Zero Coupon Notes further stated:

We incorporate by reference in this prospectus the following documents filed by us with the SEC:

Our Annual Report on Form 10-K for the year ended December 31, 2000;

Our Quarterly Report on Form 10-Q of the quarter ended March 31, 2001;

Our Current Reports on Form 8-K filed with the SEC on January 31, 2001 and February 28, 2001; and

The description of our capital stock set forth in our Registration Statement on Form 8-B filed on July 2, 1997."

638. Annex A of the January 31, 2001 Offering Memorandum, "Form of Selling Securityholder Notice and Questionnaire" (the "Questionnaire") provided that each

[B]eneficial owner of Registrable Securities generally will be required to be named as a selling securityholder in the related prospectus, deliver a prospectus to purchasers of Registrable Securities and be bound by those provisions of the Registration Rights Agreement applicable to such beneficial owner (including certain indemnification provisions…).

168

639.    Question 5 of the Questionnaire relates to "Relationship with the Company" and asks Selling Securityholders to detail their relationship with the Company.  In particular:

> Except as set forth below, neither the undersigned nor any of its affiliates, directors or principal equity holders (5% or more) has held any position or office or has had any other material relationship with the Company (or its predecessor or affiliates) during the past three years.

640.    The Zero Coupon Notes prospectus that was filed with the SEC as part of the registration statement (Registration No. 333-62168) dated July 18, 2001 lists Credit Suisse First Boston as a Selling Securityholder, indicating that CSFB completed and signed the Questionnaire.  Under the column titled "Material Relationship," the prospectus indicates "None" for CSFB.  This statement was materially false and misleading.  It omitted to disclose the extensive relationship between CSFB and Enron, including but not limited to CSFB's investment in LJM2, CSFB's role in the establishment and funding of LJM1, and CSFB's involvement in various SPE structures, and CSFB's involvement in the prepay transactions.

641.    The Zero Coupon Notes prospectus failed to disclose the massive credit support Enron received from its sham hedging transactions with the CSFB-designed SPEs.  For example, CSFB was well aware of the risk to the Raptors structure from any decline in Enron stock prices.  In fact, two CSFB managers met with Enron managers during June 2001 to discuss that very subject.  The CSFB managers expressed their amazement at Enron's continued failure to own up to the dire circumstances the undisclosed triggers presented, asking, "How can you guys keep doing this?"  The CSFB managers specifically noted that Enron was at a "critical point" where further declines in Enron's stock price would cause the Raptors transaction to be unwound and the massive credit support Enron had been providing to become due.  CSFB executives knew, but in underwriting the Zero Coupon Notes failed to disclose, the massive amount of Enron's off-balance sheet debt — debt they estimated to be between $8 and $12 billion.

642.    Through its involvement in securities underwritings, asset sales, SPE structuring, and prepay transactions and its investment in the illicit LJM partnerships, CSFB was fully aware that Enron's financial reporting was fraudulent and misleading.  CSFB actively participated in

169

perpetuating the fraud by directly assisting Enron in creating a false appearance of revenues and earnings, overstating cash flow from operations and understating massive amounts of debt. CSFB was a primary violator under U.S. Securities laws. Despite its knowledge of the considerable misstatements in Enron's financial statements, it continued to act as an underwriter for Enron securities and continue to incorporate financial statements and SEC filings, that it knew were materially false and misleading, in the offering documents of such securities – including the Zero Coupon Notes that Silvercreek purchased. Finally, when the demise of the Enron Ponzi scheme was near and the declaration of bankruptcy inevitable – CSFB continued to promote Enron securities to its investors like Silvercreek all the while using its detailed knowledge of Enron's finances to reduce its own exposure to Enron.

643. CSFB brought the "opportunity" to invest in Enron Zero Coupon Notes to Silvercreek's attention, encouraged the investment and actually sold the Zero Coupon Notes to Silvercreek as principal, thereby reducing its own exposure.

644. CSFB is liable for its participation in the resale of the Zero Coupon Notes on and after 7/18/01, including but not limited to sales it made to Silvercreek.

645. CSFB participated in these schemes in order to earn enormous profits. Plaintiffs relied on the information misrepresented by CSFB in making their investment decisions.

## 2. **Merrill**

646. Merrill is a large financial services firm that had an extensive and extremely close relationship with Enron. It provided investment banking services to Enron, helped structure and finance one or more of Enron's SPEs and issued very positive research reports on the business and financial strength of Enron. For these services Merrill earned enormous fees. Furthermore, Elizabeth Tilney, the wife of Schuyler Tinley (head of Merrill's Energy Investment banking operations) was a Senior Vice President involved in Enron's EES operations. This relationship provided Tinley with access to information about the serious problems affecting the EES operations, discussed below. Merrill participated in Enron's conduct and business by helping to

170

raise billions of dollars from investors through the sale of new securities based on misleading financial information, as well as aiding in structuring and financing some of Enron's SPEs and partnerships.

647.    Enron and its banks - including Merrill - told investors that an area of tremendous growth for Enron was its retail energy services business ("EES") - whereby Enron purportedly undertook to manage the energy needs of corporate consumers for multi-year periods in return for fees to be paid over a number of years.  Enron and its banks presented this business as achieving tremendous success by constantly signing new multi-million or even billion dollar contacts which allowed EES to exceed internal forecasts.  This division purportedly turned profitable at the end of 1999 and achieved substantial gains in its profitability thereafter.

648.    However, EES was actually losing hundreds of millions of dollars.  In order to induce large enterprises to sign long-term energy management contracts and "jumpstart" this business so it could appear to obtain huge contract volumes, Enron was entering into EES contracts which it knew would likely result in losses.  However, by utilizing mark-to-market accounting, Enron grossly overvalued the ultimate value of these contracts and created greatly inflated current period revenues and profits from transactions which generated little, if any, current period cash, and which would likely actually result in long-term losses.  As contained in an August 29, 2001 letter written to Enron's Board by an EES manager just after Skilling "resigned":

> One can only surmise that the removal of Jeff Skilling was an action taken by the board to correct the wrongdoings of the various management teams at Enron . . . (*i.e.*, EES's management's...hiding losses/SEC violations)
>
> *            *            *
>
> It became obvious that EES had been doing deals for 2 years and was losing money on almost all the deals they had booked.
>
> *            *            *
>
> It will add up to over $500 mm that EES is losing and trying to hide in Wholesale. Rumor on the 7th floor is that it is closer to $1 billion . . . [t]hey decided . . . to hide the $500mm in losses that EES was experiencing . . .  EES has knowingly

171

misrepresented EES['s] earnings. This is common knowledge among all the EES employees, and is actually joked about. But it should be taken seriously."

649.    Merrill was willing to engage and participate in the Enron scheme because such participation created enormous profits for its executives and for the company as a whole. Among other things, 97 senior Merrill executives committed to invest $16.6 million in ML/LJM2 Co-Investment LLP, and LJM2 investor, notwithstanding the conflicts of interest Mr. Fastow's dual roles at Enron and LJM2 presented. Through its affiliate's investment in LJM2, Merrill knew or was reckless in not knowing of the following fraudulent Enron transactions: Raptor, Condor/Whitewing, Chewco, Cuiaba, EES, ETOL II, ETOL II, JEDI, JEDI II, Osprey Trusts, ENA Collatealized Loan Obligation Trust, MEGS, Backbone, Bob West Treasure, New Power IPO, New Power, Yosemite Crude Oil Swap ("Nixon"), Yosemite I, Yosemite II, Yosemite III, Yosemite IV, Rawhide Minority Interest financing, Rawhide, Rhythms, Sarlux Power Project, Cortez Energy, Margaux, LAB Trust, Avici, Talon, Bobcat, Porcupine, Timberwolf, Project Backbone, Project Condor, and the Fishtail transaction. As reflected in Merrill Lynch's LJM2 Private Placement Memorandum, Merrill officers received material nonpublic information about Enron by reason of their involvement in LJM2, including but not limited to the fact that although Enron listed $34 billion in assets on its balance sheet, it owned or managed over $51 billion in assets; the placement memo noted that the $17 billion difference represented off balance sheet transactions. The fraudulent character of the LJM2 enterprise was confirmed at an October 26, 2000 partnership meeting, during which the investors were shown a chart depicting a stark contrast between Enron's assets as represented to the public and Enron's assets when its unconsolidated affiliates were included, as well as a summary of several LJM2 transactions. Promising a 69% rate of return, the presentation showed Enron to be the counterparty to almost all of LJM2's transactions. Among the Merrill Lynch officers who invested in LJM2 were Jim Brown (head of Merrill's Strategic Asset and Lease Group), Daniel Bayly (head of Merrill's Global Investment Banking division) and Robert Furst (a Daniel Bayly subordinate), all of whom were directly involved in the Nigerian barges asset parking scheme.

650.     Merrill also managed sales of Enron bonds.  Enron promised to give bond underwriting business to Merrill in return for Merrill investments in some of the off-balance sheet partnerships set up by Fastow.  Merrill was one of the Wall Street investment banks that rode "the long gravy train of stock and bond offerings that Enron sent the Street's way" (Dow Jones News Services, Feb. 26, 2002), underwriting the sale of one-third of Enron's bond issues.

651.     Merrill was aware of and directly involved in Enron transactions designed to mislead the public about its financial state.  In late 1999, as it was helping to falsify Enron's results via the LJM2 contrivance, Merrill also assisted Enron in cooking its books by pretending to purchase an Enron asset when it was really engaged in a loan.

652.     Although it was well aware of, and had participated in, Enron's wrongful practices, Merrill nonetheless published analyst reports and investment research reports that improperly touted Enron's financial strength and performance, and recommended that investors purchase Enron securities.

653.     Merrill utilized misleading positive research on Enron to win investment  banking business.  Investors relied on these misleading public research reports.  This activity was not restricted to Enron and clearly is part of a scheme to defraud.  In 2002, a New York State investigation unearthed the fact that Merrill analysts were recommending securities they privately believed to be undesirable.  Merrill reached a $100 million settlement and implemented a new set of disclosures specified by the Attorney General's office.

654.     Merrill's knowledge of, and involvement in, Enron's deception was demonstrated in an internal Merrill document which stated that Enron executives had "informed Merrill that it is at a distinct disadvantage because of Merrill's reluctance to use its balance sheet to support Enron's business activities" and that Merrill had thereafter invested in Enron ventures in order to "improve its relationship" with Enron.

655.     On at least one occasion, Merrill accepted a short term loss on an Enron transaction in order to perpetuate the scheme.

173

656.    On February 20, 2003, Merrill agreed to pay $80 million to resolve civil charges that it was involved in Enron's earnings overstatements.  The SEC had charged that Merrill improperly participated in conduct in Enron's overstatement of earnings for 1999 through the barge transaction and sham energy trades described above.

657.    Merrill knowingly issued false and misleading statements in the registration statements for the issues it underwrote and in its research reports.  It knowingly participated with Enron in the manipulative devices it employed to artificially inflate Enron's revenues and earnings and keep billions of dollars of debt hidden.  Merrill had access to Enron's internal business and financial information as one of Enron's main underwriters and financial advisors, and its virtually daily interactions with Enron executives.

658.    Keeping silent about Enron's fraudulent accounting of Merrill loans as asset "sales," Merrill fraudulently underwrote a series of offerings to ensure that Enron would continue to have a stream of income to repay those debts.  Merrill received lucrative fees from underwriting the following Enron offerings:

| Date | Security |
|------|----------|
| 11/96 | 8 million shares 8.3% Enron Capital Trust I preferred securities at $25 per share |
| 1/97 | 6 million shares 8-1/8% Enron Capital Trust II preferred securities at $25 per share |
| 11/97 | $200 million Enron reset notes |
| 9/98 | $250 million Enron floating rate notes |
| 2/99 | 27.6 shares of Enron common stock at $31.34 per share |
| 6/99 | 36.6 million shares Azurix stock at $19 per share |
| 10/99 | $100 million Enron "weather" bonds |
| 2/00 | $440 million and £100 million Azurix 10.375% and 10.75% Senior Notes |

174

All told, Merrill worked on approximately 23 Enron debt and equity offerings between 1997 and 2001, serving as co-manager for two.

659.    In February 2000, Merrill acted as the lead underwriter for the Azurix IPO of 38.5 million shares at $19 per share, which raised $370 million in badly needed cash for Enron and later as lead underwriter of over $650 million in 10.375% and 10.75% Azurix senior notes reaping millions of dollars for Azurix.  Azurix was Enron's purported worldwide water company.

660.    Merrill functioned as a unified entity without an effective Chinese wall to keep its ecurities analysts from information obtained by Merrill's commercial and investment banking services, so that all knowledge and scienter can be imputed to the securities analysts.

661.    In Appendix I ("Role of Merrill Lynch and its Affiliates") to the Third Report of Neal Batson, Court-Appointed Examiner (Exhibit J), a substantial volume of evidence with respect to Merrill's role in the Enron debacle was reviewed.  The Examiner concluded that the evidence would permit a fact-finder to conclude that:

> Merrill Lynch's conduct and participation in the Nigerian Barge and the 1999 electricity trade transactions allowed Enron to book improper gains of approximately $60 million for the fourth quarter of 1999.  These gains increased Enron's earnings per share for 1999 from $1.09 to $1.17, and allowed Enron to meet its earning targets for the year.  These transactions thus had a material impact on Enron's reported financial performance for 1999.

> The evidence would allow a fact-finder to conclude that Merrill Lynch:

> •    entered into an oral agreement with Enron whereby Enron promised to take Merrill Lynch out of the Nigerian Barge transaction within six months at a specified rate of return, knowing that if such an agreement were disclosed to Enron's auditors, Enron could not have accounted for the transaction as a sale; and

> •    entered into two virtually offsetting electricity derivative transactions with Enron that Merrill Lynch knew Enron was using to achieve earnings targets at year-end 1999 and with respect to which Merrill Lynch believed Enron's accounting to be improper.

662.    Merrill's active participation in the Enron debacle may be summarized under four main categories:

(a)   LJM2;

(b)   Nigerian Barge transaction;

(c)   1999 Electricity Trade transaction; and

(d)   Analyst coverage.

**(a)   LJM2**

663.   An engagement letter dated September 16, 1999 confirms that Merrill Lynch was engaged to serve as the private placement agent for LJM2.  Part of Merrill's role was to raise capital to participate in the illicit transactions that Andy Fastow, Enron CFO, and Merrill would orchestrate.  Of the approximately $390 million in commitments for the LJM2 partnership, a significant amount was provided by Merrill and its executives.  Schuyler Tilney, former Head of Global Energy and Power division at Merrill, invested $750,000 and Robert Furst, former Managing Director in Investment Banking at Merrill, invested $200,000.

664.   With respect to Merrill's participation in LJM2 the Examiner notes that:

In the private placement memorandum for LJM2, Merrill Lynch described how Enron had $34 billion in assets, but had $51 billion in assets under management, noting that the $17 billion difference was created by assets that Enron had financed off balance sheet.  Thus, Merrill Lynch appears to have had knowledge regarding Enron's substantial use of off-balance sheet vehicles during this period.

665.   Merrill was a principal architect in the structure and financing of LJM2.  Hired to act as private placement agent on September 16, 1999, Merrill helped market LJM2 to a select group of favored executives and banks who were provided an opportunity to invest in LJM2 in order to reap the huge rewards which would flow from the fact that Fastow was managing LJM2.  See Exhibit D for excerpt from LJM2 marketing material.

666.   Merrill knew that LJM2 was not independent of Enron and that the partnership would be used for non-arm's length transactions to boost Enron's reported profits while improperly keeping debt off its balance sheet.  Merrill also provided more than $120 million in credit to LJM2 so that it could engage in transactions with fraudulent SPEs, permitting Enron to engage in even more financial fraud.

667.   The LJM2 marketing document was not made public.  This document stated that LJM2 would benefit from investment opportunities that "would not be available otherwise to outside investors" and thus was an "unusually attractive investment opportunity" because Fastow's  "access to Enron's information pertaining to potential investments will continue to contribute to superior returns."  Merrill told potential investors in LJM2 of the enormous returns previously generated by similar entities run by Fastow.  In fact, some "investments" generated returns as high as 2500%.

668.   Almost 100 Merrill executives invested more than $16 million in LJM2, including Vice Chairman Thomas Davis, investment banking chief Daniel Bayly, and Schuyler Tinley, the head of Merrill's energy investment-banking department – who, along with Davis, later refused on Fifth Amendment grounds to testify before the United States Congress.  Merrill also sold $349 million worth of shares in LJM2 in a private offering.  Merrill knew that LJM2 would be engaged in self-dealing transactions with Enron that would enable Enron to inflate its revenue and earnings and hide its debts while earning extraordinarily high, virtually guaranteed returns for investors.

669.   As described earlier, Merrill was one of the banks that pre-funded LJM2 in December 1999 to enable it to complete several 11th hour transactions to generate millions in illusory revenue and profits for the company.  Merrill put up the money to pre-fund LJM2 in December 1999 because they knew that these transactions were required to generate sufficient revenue and profits by Enron to meet its earnings targets (and avoid a decline in its stock price).  These vital year end deals included the sale of (I) collateralized loan obligations (CLOs); (ii) an interest in the Nowa Sarzyna power plant; (iii) an interest in MEGS LLC; and (iv) Yosemite certificates. Merrill's participation in creating LJM2 is an essential part of the scheme because of Merrill's awareness that Enron officials would be operating on both sides of the transaction, virtually ensuring enormous profits for the investing partners.

/ / /

177

670.    Enron also asked Merrill to extend a line of credit to LJM2.  An internal Merrill document advocating the credit request states, "committing to this LJM2 facility will build ML's relationship with Andy Fastow, and assist ML in securing future investment banking opportunities with Enron."  Other Merrill e-mails warned against it, citing the lack of a rating and the nature of the credit risk.  Nevertheless, two witnesses that testified before the Senate Subcommittee on Investigations requested an exception to bank policy for the loan for the following reasons: "Enron is an excellent client. $40 mm in revenue in 1999 [;] $20 mm in revenue for 2000 year to date[;] Andy Fastow is in an influential position to direct business to Merrill."  In the end, the prospect of more lucrative business from Enron trumped those at Merrill who urged caution.

### (b)    Nigerian Barge Transaction

671.    The Nigerian Barge Transaction was accounting sham involving the sale of an interest in three Nigerian barges with floating power generating plants.  Enron wanted to sell these barges before the end of calendar year 1999, so it could report the sales income as earnings and cash flow in its 1999 financial statements.  However, Enron was unable to find a legitimate, arms-length buyer willing to complete the sale before the end of the year.

672.    In December 1999, Enron asked Merrill, as a favor, to set up its own special purpose vehicle (Ebarge) to temporarily assume ownership of three power-generating barges then held by Enron's APACHI energy division.  The ostensible purchase price was to be $28 million, including a $7 million cash payment from Merrill and an interest-free loan of $21 million from Enron Nigeria Power Holding Ltd. to Ebarge.  Merrill otherwise took no part in the development, operation or maintenance of the barges.  Moreover, Merrill did absolutely no due diligence prior to executing the transaction and did not negotiate at all with respect to the "price" for the barges.  Merrill closed the transaction with Enron less than two weeks after Enron approached it with the concept even though the barges were not even operational at the close.  This transaction had no other purpose than to allow Enron's African division to book sales income of $12.5 million.

673.     Merrill agreed, but only after receiving Enron's commitment that it would find a buyer for Merrill's interest in the barges within 6 months or repurchase the barges itself.  Merrill also received assurances of a 15 percent return on its $7 million plus an immediate payment of $250,000.  This so-called sale arrangement violated fundamental accounting rules which allow a seller to book sales income only for a transaction that is a true sale.  Enron's guarantee to Merrill functioned as an ongoing obligation that kept Merrill from assuming the risks accompanying ownership.  In a real sale, the risks and rewards of the asset are completely transferred from the seller.  The entire transaction was nothing more than an asset parking scheme; Merrill never truly assumed the risk of any investment, nor did it intend to.

674.     The evidence is clear that Enron and Merrill were aware of this accounting problem and, in order to facilitate Enron booking the transaction as a sale, it had to keep Enron's oral guarantee a secret, omitting it from the documentation and leaving it as an oral understanding.  An internal Merrill document refers to a "conference call with senior management of Enron confirming this commitment to guarantee the ML take out within 6 months."

675.     With respect to the evidence of an oral agreement between Merrill and Enron the Examiner concluded:

> There is substantial evidence to support the existence of such an agreement, including:
>
> - Appropriation Request regarding the Nigerian Barge transaction dated Dec. 23, 1999 stating:  "Enron is viewing this as a bridge to permanent equity and they have assured us that we will be taken out of our investment within six months … Dan Bayly will have a conference call with senior management of Enron confirming this commitment to guaranty the ML takeout within six months."  The Appropriation Request also indicated a "[t]akeout by 6/30/00."
>
> - Merrill Lynch Credit Flash Report for week ending December 23, 1999 describing the Nigerian Barge transaction as a "relationship loan" and stating:  "IBK [investment banking] was supportive based on Enron relationship (approx. $40mm in annual revenues) and assurances from Enron management that we will be taken out of our $7mm investment within the next 3-6 months."

- March 2, 2001 email from Brown referencing oral assurances in Nigerian Barge transaction: "We had a similar precedent with Enron last year, and we had Fastow get on the phone with Bayly and lawyers and promise to pay us back no matter what. Deal was approved and all went well."

- June 13, 2000 email from Kira Toone to Alan Hoffman, counsel for Merrill Lynch in the Nigerian Barge transaction: "As we approach June 30, 2000 I am getting questions concerning Ebarge, LLC. It was our understanding that Merrill Lynch IBK Positions would be repaid its equity investment as well as a return on its equity by this date. Is this on schedule to occur?"

- Joseph Valenti, the controller in charge of the Merrill Lynch entity that funded the $7 million in the Nigerian Barge transaction, testified that he understood, at the time the transaction was executed, that Merrill Lynch was to receive a return of 15% on its investment."

- January 18, 2002 email in which a Merrill Lynch executive described the Nigerian Barge transaction as follows: "The funding was considered by Enron as a bridge to permanent equity and the arrangement called for them to pay interest of 15% per annum on such investment. The equity bridge was taken out on 6/29/00 for $7.525M ($525K interest @ 15% for six months)."

- Merrill Lynch accountants determined that Merrill Lynch was not required to consolidate Ebarge, the SPE formed by Merrill Lynch and through which it made its $7 million investment in the Nigerian Barge transaction, under FAS 94 because of the temporary nature of the investment – the "hold" being for less than six months.

676. The Examiner also found evidence within Enron's internal documents and e-mails that led him to conclude that Enron recognized the existence of the oral contract to take Merrill out of the Nigerian Barge Transaction within six months. In particular, the Examiner noted:

Further, internal communications at Enron from the same period demonstrate Enron's understanding of its agreement to take Merrill Lynch out of the transaction within six months at an agreed rate of return:

- Internal Enron email from Dan Boyle regarding the Nigerian Barge transaction: "The deal with ML was to get them a total annualized return of roughly 20%. ML is expecting to receive a minimum of $7.525 million when they sell there [sic] equity on June 30, 2000 (15% annualized return on this portion). In addition, we paid ML a $250,000 advisory fee at closing, which, combined with the ML take out on June 30, results in a return of approximately 20%."

- Internal Enron DASH report regarding the Nigerian Barge transaction, noting that: "Enron will have to 'un-wind' the Merrill Lynch transaction by 2nd quarter 2000."

- Dan Boyle, in a document highlighting his accomplishments for the year 2000, made specific reference to the Nigerian Barge transaction and his role in effecting the promised takeout of Merrill Lynch, noting that: "ML stated intention (with ENE commitment) is to sell the equity position by 6/30/00 but business unit not in a position to market ML equity to third party investor by deadline. Negotiated and executed sale of the ML equity to LJM, fulfilling obligation to ML."

677.   Additionally, a May 19, 2000 e-mail from former Merrill Managing Director of Investment Banking Robert Furst to Merrill investment bankers David Sullivan, Benjamin Sullivan, Schuyler Tilney (who had orchestrated the removal of Merrill's research analyst, Mr. Olson), Jack Weingart, Bowen Diehl and Alexander Moomjy, Mr. Furst wrote, "Off balance sheet debt – not a primary driver because Enron believes they can structure anything to be off balance sheet."   Others within Merrill were concerned, as well.   Consulted by Robert Furst, a Merrill executive whose primary responsibility was the Enron relationship, Katherine Zrike, Merrill's chief counsel for Global Investment Banking, expressed concerns with the unusual nature of the transaction, its timing (year end) and the absence of due diligence.   Jim Brown, the head of Merrill's Strategic Asset and Lease Finance Group, also sent Mr. Furst an e-mail expressing his concern with Merrill's "reputational risk" were it found to have aided "Enron income stmt. manipulation."

678.   Merrill's purposes in participating in the Nigerian barges asset parking scheme had nothing to do with customary and prudent investment banking considerations, but as described in an internal document Mr. Furst authored:

Enron is a top client to Merrill Lynch.  Enron views the ability to participate in transactions like this as a way to differentiate ML from the pack and add significant value.

In other words, Merrill was again making an accommodation aimed at preserving its lucrative stream of Enron investment banking business.

/ / /

181

(c)     **Unwinding of Nigerian Barges Transaction**

679.    On June 29, 2000, one day before the 6-month deadline, LJM2, an investment vehicle run by Enron's Chief Financial Officer, Andy Fastow, stepped in and took over the interest in the barges from Merrill at the previously agreed-upon terms.  It paid Merrill the $7.525 million that had been assured to Merrill by Enron at the beginning of the transaction – the $7 million principal and 15% interest over 6 months – and assumed the $21 million note that Enron initially loaned to Ebarge.  Ebarge never paid any interest on the note, notwithstanding loan documents that required it to do so.  Three months later, in September 2000, Enron and LJM2 sold the barge interest to a third party.  Among the factors that demonstrate that this was not a real sale:

•       Through an unwritten side agreement, Enron provided a guarantee to take Merrill out of the deal within 6 months.

•       Merrill was guaranteed and received a specified 15% return on its $7 million payment.

•       Merrill never received the periodic cash flow payments from the operation of the barges as promised under the agreement and never complained about it to Enron.

•        Ebarge, the Merrill special purpose vehicle, didn't pay any interest on the $21 million loan advanced by Enron.

•       Enron paid all of the costs associated with the formation, operation and management of Ebarge.

•       The risks of owning Ebarge weren't transferred to Merrill.

680.    Internal Merrill documents called the payment it had made a "relationship loan" made in order to gain favor with Enron so that Merrill would receive future investment banking deals.

/ / /

681.    James Brown, Merrill's structured finance group head, told members of Merrill's powerful commitment committee that he had doubts about the barge transactions. The congressional panel obtained handwritten notes that outlined Brown's concerns that Enron was doing the barge transaction solely to bolster its reported profits for 1999. Concerns included: "[r]eputational risk, *i.e.*, *aid and abet Enron income statement manipulation*." Thus, Merrill understood that Enron was using the transaction in order to deceive the public about its financial statements -- yet it still went forward with the deal.

682.    The Nigerian Barge deal and sham energy trade were both done at the same time that Merrill was soliciting investors for LJM2.

683.    In a September 17, 2003 agreement with the Department of Justice, Merrill accepted responsibility for its employees' conduct in connection with the Nigerian Barge transaction and two 1999 electricity trade transactions.

### (d)    Analyst Research

684.    The Examiner uncovered evidence that demonstrates the control Enron had over Merrill regarding equity analyst research coverage. In particular, the Examiner found evidence of a strong connection between 'upbeat' analyst reports and Merrill's participation in various Enron financings.

685.    Merrill caved in to Enron pressure to provide positive analyst ratings. In July of 1997, John Olson, a former Merrill analyst, lowered Enron's rating to "neutral." In April 1998, Mr. Fastow informed Merrill that Enron would not be including Merrill in an upcoming $750 million stock offering because of Merrill's equity coverage of Enron's stock. The day after Merrill's former Houston investment banking group Schuyler M. Tilney — who later refused to testify before Congress about his Enron dealings — wrote Merrill president Herbert Allison a memo complaining that Merrill had lost the Enron deal because of Enron executives' anger at Merrill equity analyst John Olson's negative analysis of Enron stock. In the memo, the Merrill executives complained "our research relationship with Enron has been strained for a long period

183

of time," and that Olson "has not been a real supporter of the Company, even though it is the largest, most successful company in the industry." Finally, Messrs. Tilney and Gordon informed Mr. Allison that Mr. Olson's negative reports had led Enron to exclude Merrill from underwriting an upcoming $750 million Enron offering — Merrill had lost Enron business "based solely on the research issue." Despite Mr. Olson's 35 years of experience as an energy analyst, Merrill removed Mr. Olson as its Enron analyst, and later fired him. In so doing, Merrill concealed from the market negative information about Enron.

686.    After Olson was replaced with Donato Eassey, Merrill quickly upgraded Enron stock to a "buy." In May 1998, Enron made Merrill co-manager of one of its offerings. Another memo was written to Allison stating that Enron's anger had "dissipated" and "to that end" Merrill had won business from Enron which would generate $45 million in fees. Merrill cemented its *quid quo pro* relationship with Enron by issuing favorable analyst reports on January 20, 1999; March 31, 1999; April 13, 1999; April 15, 1999; July 14, 1999; October 2, 1999; January 18, 2000; January 21, 2000; January 24, 2000; April 12, 2000; April 13, 2000; July 24, 2000; July 25, 2000; October 17, 2000; April 18, 2001; October 9, 2001; and October 17, 2001.

687.    The Examiner found that:

> Olson's firing appears to have been directly related to his equity coverage on Enron and the criticisms of Tilney and Gordon. When asked whether he believe that Merrill Lynch had fired him because of his coverage of Enron, Olson testified: "100 percent."

### (e)    Electricity Transaction

688.    Merrill also entered into a pair of offsetting energy call contracts with Enron in December 1999, as a result of which Enron booked $60 million in false profits. This crucial deception permitted Enron to meet earnings expectations - thereby propping up the price of its securities and perpetuating the fraudulent scheme. As reported August 3, 2002, in *The New York Times*:

> Desperate to meet a year-end profit target. Enron Corp. struck a sham energy deal with Merrill Lynch that let Enron book a $60 million profit in the final days of December 1999, according to former Enron executives involved in the transaction.

184

The executives said that the energy deal, a complex set of gas and power trades, was intended to inflate Enron's profits and drive up its stock price. Enron and Merrill Lynch, they said, agreed that the deal would be canceled after Enron booked the profits, it later was.

"This was absolutely a sham transaction, and it was an 11th hour deal," said one former Enron executive who was briefed on the deal. "We did this deal to get 1999 earnings." This account was confirmed by five other former executives who either worked on the deal or were briefed on it.

Merrill executives were so concerned about Enron's accounting for the deal that they obtained a letter signed by Richard A. Causey, Enron's chief accounting officer, stating that Enron did not rely on Merrill Lynch for accounting advice, former executives said.

689.    Like the Olson removal, the energy trades were the handiwork of Schuyler Tilney. Among other incomplete power plant projects in the Midwest, Enron owned a peaker generating plant called Midwest Continental. Enron asked Merrill to purchase contracts for future delivery of electricity from that plant in exchange for a promise that Merrill would receive a profit from a subsequent cancellation or repurchase of those contracts. The structure of the transaction was to include the sale of a physically settled electricity call option from Enron to Merrill, accompanied by the sale of a mirror image financially settled electricity call option from Merrill to Enron. As a condition to participating in the transactions, Merrill insisted that the swaps be cancelled as soon as Enron reported its earnings for 1999. In other words, neither party intended to engage in a *bona fide* commodity sale.

690.    The energy contracts were cancelled in April 2000 — after Enron reported its Q4 1999 results, and before the Midwest Continental plant was even completed. No energy was ever exchanged pursuant to the 1999 Merrill - Enron trades, nor did Merrill ever exercise any rights under those agreements.

691.    A December 29, 1999 Global Power Trading Group memo stated, "The proposed transaction is 'back-to-back' and is therefore delta-neutral." "The quantities, pricing points, market locations and term are 'mirror' image," the memo admitted. In other words, the sham energy trades had all of the earmarks of what have become infamous as "wash trades" — pre-arranged, offsetting transactions of an equivalent amount of electricity or natural gas with no net

change in ownership and no economic risk to either party. They are independently illegal under the Commodity Exchange Act, and in the wake of the 2000-2001 energy crisis, FERC enacted regulations specifically outlawing them, as well.

692. Like the Nigerian Barges Transaction, the Midwest Continental deal was the product of Merrill's quest for additional investment banking business from Enron. For $40 million in revenues from Enron in 1999, and an additional $20 million in the first half of 2000, Merrill was all too happy not only to remain silent about its extensive knowledge concerning Enron's sham transactions, but to actively participate in them, as well.

693. With respect to Merrill's participation in the 1999 Electricity Trade Transaction, the Examiner concluded that:

> Merrill Lynch knew that Enron intended to book earnings of approximately $50 million - $60 million from the 1999 electricity trade transactions. Merrill Lynch also knew that this gain would allow Enron to achieve year-end earnings targets, and that this gain could impact Enron's stock price and the compensation of Enron senior management, as indicated in an email from Tilney to Dan Gordon: "we were clearly helping them make earnings for the quarter and year (which had a great value in their stock price, not to mention personal compenstation)."#In addition to retaining its place as a favored Enron investment banker, Merrill had independent reasons for taking part in Enron's deceptive scheme. Merrill's business included selling "credit default puts" — essentially, guarantees of Enron notes, including but not limited to Enron's Zero Coupon Convertible notes. Were Enron to default, Merrill would be liable for those investors' losses. Merrill's motive in deceiving the market was in part to insulate itself from liability under those puts.

694. Moreover, were Enron's credit rating to fall, it would be required to issue additional shares, issuance that would dilute its share value and jeopardize Merrill's future stream of underwriting income. Through the deceptive year-end 1999 deals, Merrill deceived the credit rating agencies, the market, and ultimately, every investor who relied on Enron financials in making investment decisions.

### (f)  Merrill's Knowledge of Enron's True Financial Position

695. Merrill had enjoyed a very long relationship with Enron and had very close and direct relationships with Enron executives. These relationships provided Merrill with an ability to gain considerable intelligence with respect to Enron's true financial position.

696.    The Examiner noted that:

Merrill Lynch was involved in approximately thirty-five transactions with Enron and Enron-related entities from 1997 through the Petition Date. These transactions included underwritings, private placements of debt and equity, structured finance transactions, derivative transactions and participation as a syndicate member in several credit facilities.

697.    Enron's internal documents indicate that although Merrill was a Tier 3 bank, it was the top fee earner for Enron in 1999 when it earned $40 million. Prior to 1999, the fees earned by Merrill were relatively modest. Of the fees earned by Merrill in 1999, over 20% of the fees related to the Nigerian Barge Transaction and the 1999 Electricity Trade Transaction – both of which were consummated in December of 1999.

698.    Through its involvement in a myriad of deceptive transactions, underwritings and asset sales, Merrill had direct knowledge that Enron's financial statements were fraudulently misrepresented. Merrill actively participated in transactions that were designed to perpetuate the fraud and were willing to do so in exchange for lucrative fees. Through its involvement in LJM2, Merrill knew that Enron's debt obligations were massively understated and that Enron's financial statement disclosure was so opaque that it was impossible for anyone not involved with the fraudulent manipulation of the statements to have a true understanding of Enron's true financial condition. Merrill was a primary violator.

699.    Substantial evidence supporting Silvercreek's allegations against Merrill has been uncovered in the nearly five (5) years since Enron declared bankruptcy and much of the evidence. To date:

• Merrill has agreed to pay $80 million to resolve civil charges that it was involved in Enron's earnings overstatements. The SEC had charged that Merrill improperly participated in conduct that resulted in Enron's overstatement of earnings for 1999. In particular, the SEC charged that the Nigerian Barge Transaction and the 1999 Electricity Trade Transactions were deliberate accounting frauds;

187

- In 2002, a New York State investigation unearthed the fact that Merrill analysts were recommending securities they privately believed to be undesirable. Merrill reached a $100 million settlement and implemented a new set of disclosures specified by the Attorney General's office;

- On September 17, 2003, Merrill reached an agreement with the U.S. Department of Justice accepting responsibility for its employees' conduct in connection with the Nigerian Barge Transaction and the 1999 Electricity Trade Transactions;

- A number of Merrill executives directly involved in the fraudulent structures, in particular the Nigerian Barge Transaction, were found guilty of criminal charges.

700. As soon as accurate financial information, information that Merrill had knowledge of and direct responsibility, was broadly disseminated to the general public, the value of Enron securities dropped almost to zero. Silvercreek lost substantially its entire investment in a matter of weeks. Merrill is directly responsible for Silvercreek's losses.

701. Silvercreek relied on the information misrepresented by Merrill in making their investment decisions.

### 3. **Andersen**

702. Andersen was the purportedly "independent" auditor of Enron at all relevant times herein, and audited the Company's financial statements. In addition to auditing the annual financial statements of Enron and issuing an unqualified audit opinions thereon, Andersen also conducted reviews of the quarterly financial statements of Enron. Andersen also provided other professional services to Enron, beyond acting as its auditor, including tax advice and services, accounting advice and services, and operations and management advice and services, for which Andersen was additionally compensated.

703. During 2000, Andersen received fees totaling $52 million from Enron; specifically, $25 million for services as the "independent" auditor for the 2000 financial audit and for review of Enron's quarterly financial statements, and $27 million for professional

services such as business process and risk management consulting, tax compliance and consulting, due diligence procedures related to acquisitions or other activities, and work performed in connection with registration statements. Enron was one of the largest clients of Andersen nationwide.

704. Limited to fees for non-auditing professional services, Andersen admits it received at least the following from Enron for the year 2000: (a) $2.4 million for work on registration statements and comfort letters; (b) $3.5 million for tax work; (c) $3.2 million for review of internal controls and accounting systems of Enron; and (d) $4 million for consulting services through Andersen's subsidiary, and now affiliate, Andersen Consulting or Accenture. Despite all of this, Andersen improperly deemed itself to be "independent" as an auditor of Enron.

705. Although Andersen was aware that the practices of Enron were in violation of GAAP, Andersen continued to provide "clean" audits of Enron's records in order to continue earning lucrative fees for the auditing, tax, financial, and other consulting services that it had provided. As a result of Andersen's wrongful conduct, Enron's investors, shareholders, bondholders, noteholders, the public, and the SEC Plaintiffs were provided materially false information concerning Enron's revenues, earnings, income, assets, liabilities, and shareholders' equity. Andersen's accounting judgments in certifying audits and reports which it knew were materially incorrect, and which it knew were erroneous, were such that no reasonable accountant would have made the same decisions if confronted with the same facts. Andersen knew that the statements it released concerning the Company were false, and were in violation of GAAP.

706. Under the applicable accounting literature and standards, which constitute a part of GAAP, and particularly the Emerging Issues Task Force of the Financial Accounting Standards Board pronouncements EITF Issue No. 90-15, EITF Issue No. 96-21 and EITF Topic No. D-14, all pertaining to special purpose entities, it is required that two conditions be met in order to be allowed to book special purpose entities and related transactions as off-balance-sheet.

189

First, the assets must be sold to the special purpose entity without existing legal ties of those assets to the seller, and second, a completely independent third party owner that has made a substantive capital investment – which amounts to <u>at least</u> 3 % of the special purpose entity's total capitalization – must both control the special purpose entity and possess the substantive risks and rewards of owning the special purpose entity's assets. Indeed, the 3% Rule is not simply fulfilled by mere ownership, but the equity investments must be "at risk" from the investor's perspective. If the investor's return is guaranteed or not "at risk," the seller is required to consolidate the special purpose entity into its financial statements.

707. The required "legal isolation" and control by a third party did not exist in the subject transactions between Enron and its affiliates, as set forth in detail above. Accordingly, the booking of these transactions off-balance-sheet was contrary to GAAP.

708. GAAP requires that notes receivable from entities, such as the special purpose entities as discussed above, which arise from transactions involving the company's capital stock (here Enron's stock), are required to be recognized in the financial statements as deductions from shareholders' equity and not booked as assets. Accordingly, the booking of such transactions by Enron, as set forth in detail above, was contrary to GAAP.

709. Andersen violated GAAS General Standard No. 2, which requires the auditor to maintain independence in mental attitude in all matters relating to the audit.

710. Andersen violated GAAS General Standard No. 3 which requires the auditor to exercise due professional care in the performance of the audit and preparation of the audit report.

711. Andersen violated GAAS Field Standard No. 1, and the standards set forth in AICPA Auditing Standards ("AU") sections 310, 320, 327, and others, by failing to adequately plan its audit and properly supervise the work of assistants so as to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities which would have a material effect upon the financial statements.

/ / /

190

712.     Andersen violated GAAS Field Standard No. 2 which requires the auditor to make a proper study of existing internal controls, including accounting, financial and managerial controls, to determine whether reliance thereon is justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied.

713.     Andersen violated GAAS Reporting Standard No. 1 which requires the audit report to state whether the financial statements are presented in accordance with GAAP, as Andersen's audit opinion falsely represented that the Enron financial statements complied with GAAP.

714.     Andersen violated Auditing Standard AU section 316.16, which requires the auditor to plan and perform its examination of the financial statements with professional skepticism Andersen violated Auditing Standard AU section 316.25, which sets forth the steps an auditor should take upon suspecting accounting irregularities.

715.     Andersen violated Auditing Standard AU section 341.02, which requires the auditor to evaluate and report on the company's ability to continue as a going concern, including whether there is a substantial doubt about the company's ability to continue as a going concern for a reasonable period of time.

716.     Andersen violated Auditing Standard AU section 722, which requires the auditor to ensure that the Audit Committee of the Board of Directors is aware of, and responds appropriately to, any irregularities that the auditor discovers as part of a review of interim financial information to be filed with a regulatory agency, such as the SEC.

717.     By the statements of its Managing Partner and Chief Executive Officer Joseph F. Berardino to the United States Congress, Andersen admitted to the Committee on Financial Services of the House of Representatives, on December 12, 2001, that:

a.       Andersen has "some explaining to do";

b.       Andersen "made errors in judgment";

c.       Andersen received $52 million in fees from Enron;

191

d.      Andersen had told Enron that it should make "adjustments," *i.e.*, change the
         reporting of its financial statements, which "adjustments" Enron did not timely
         make, yet Andersen still gave an unqualified audit opinion on the annual financial
         statements of Enron;

e.      Andersen raised adjustments of approximately $51 million which should have
         been made by Enron in its audited financial statements for 1997, wherein Enron
         reported net income of $105 million, yet the adjustments were improperly deemed
         "immaterial" and not made; and Andersen decided to agree that the failure to
         make the adjustments was not "material" under GAAS and GAAP;

f.      "Special purpose entities," which were affiliates of Enron and/or were entities in
         which Enron had an ownership interest, should have been consolidated into the
         financial statements of Enron, rather than being treated (for accounting purposes)
         as arm's length transactions and merely being discussed in the footnotes to the
         audited financial statements;

g.      Enron's shareholders' equity is erroneous as presented in its 2000 audited annual
         financial statements and in its quarterly financial statements for 2001;

h.      Enron's shareholders' equity for 2000 was overstated by $172 million, as this
         amount was recorded as an asset, but should have been booked as a reduction in
         shareholders' equity – and this transaction was not even reviewed as part of
         Andersen's annual audit for the 2000 financial statements;

i.      As the transaction causing an overstatement of $172 million in shareholders'
         equity was not questioned by Andersen, Enron similarly booked several more
         transactions during the first quarter of 2001 causing an additional overstatement
         of shareholders' equity of approximately $828 million;

j.      Andersen had previously discussed with Enron accounting personnel the proper
         accounting treatment of such transactions, and simply assumed for purposes of

192

their 2000 audit, that Enron had properly accounted for those transactions;

k.     Andersen notified the Audit Committee of the Enron Board of Directors on November 2, 2001 of possible illegal acts by officers and employees of Enron within the company;

l.     The requirements of GAAP require a "reclassification" of $1.2 billion in shareholders' equity of Enron for 2001, of which $172 million was misclassified in the audited financial statement of Enron for 2000;

m.     Andersen did not properly exercise professional judgment as to the appropriate accounting treatment for at least one of the SPEs and its transactions with Enron;

n.     Approximately 80% of the restatements by Enron arise out of transactions with the special purpose entity named "Chewco" and its involvement in the JEDI partnership commencing in 1997;

o.     As Enron and Chewco jointly owned JEDI, JEDI's financial statements were required to be consolidated into the financial statements of Enron commencing in 1997, because there was less than 3% ownership of Chewco by parties unrelated to Enron;

p.     Chewco's financial statements were required to be consolidated into the financial statements of Enron commencing in 1997, because there was less than 3% ownership of Chewco by parties unrelated to Enron;

q.     Approximately 20% of the restatements by Enron arise out of transactions with the special purpose entity named "LJM1" and its Enron-created subsidiary Swap Sub commencing in 1999;

r.     LJM1's financial statements, including Swap Sub, were required to be consolidated into the financial statements of Enron commencing in 1999, because there was less than 3% ownership by parties unrelated to Enron; and

/ / /

193

s.      Enron entered into "unconsolidated structured financial transactions" that should have been consolidated into the Enron financial statements, but instead were erroneously not recorded and, at best, were merely referenced in the footnotes to the audited annual financial statements.

718.    On January 10, 2002, it was publicly disclosed that Andersen had admitted to Congressional investigators of the House Energy and Commerce Committee that Andersen employees had destroyed a "significant" number of documents, both physical documents and electronic files, regarding the audit of Enron, over several months prior to the bankruptcy filing of Enron -- which destruction occurred at least during the months of September, October and November of 2001, and consisted of at least thousands of documents. Andersen also notified the SEC and the U.S. Department of Justice of its admitted destruction of evidence.

719.    According to Andersen's own public statement on January 10, 2002, "in recent months individuals in the firm involved with the Enron engagement disposed of a significant but undetermined number of electronic and paper documents and correspondence relating to the Enron engagement." Andersen acknowledged that it was the subject of a Congressional subpoena in November 2001 which required preservation of documents, yet admitted that it was unsure whether or not the document destruction continued after service of the subpoena. Andersen also immediately hired former U.S. Senator John Danforth to head up a review of its records management policies, and to advise Andersen of "appropriate remedial and disciplinary actions."

720.    Congressional investigators uncovered an internal memorandum of Andersen dated October 12, 2001 confirming such destruction and explicitly ordering its employees to destroy material related to Andersen's audit of Enron.

721.    On June 15, 2002, Andersen was convicted of obstruction of justice for having intentionally interfered with an official investigation of Enron by destroying tons of documents and a large quantity of electronic information.

194

722.     Andersen earned enormous fees through its participation in Enron's schemes. Plaintiffs relied on the accuracy of the information misrepresented by Andersen in making their investment decisions.

### 4.     Enron Management and Directors

723.     Defendants Lay, Skilling, Buy, Causey, and Fastow were directly involved in creating and overseeing these off-book entities and financial transactions, for the purpose of inflating Enron's reported earnings and under-reporting Enron's debt.  These defendants benefitted personally through the payment of inflated bonuses by Enron, insider sales of stock at inflated prices, and potentially illegal payments from the various SPEs.  Enron's Board of Directors waived its Ethics Code on two separate occasions in 1999 to allow Enron to create various entities with insiders, which resulted in financial gains for certain Enron insiders to the detriment of Enron and other investors.

# X.

## CAUSES OF ACTION

### COUNT ONE

### AGAINST CITIGROUP/SALOMON FOR VIOLATION OF

### SECTION 11 OF THE SECURITIES ACT – EXCHANGEABLE NOTES

724.     Plaintiffs repeat and reallege all allegations set forth above in §§ 1-810 above, except for those relating to scienter or fraudulent intent.

725.     Plaintiffs purchased bonds underwritten by Defendant Citigroup/Salomon.

726.     This claim is brought against Citigroup/Salomon pursuant to Section 11 of the Securities Act.  This claim does not sound in fraud, and neither fraud nor scienter is an element of this claim.

727.     Citigroup/Salomon served as an underwriter of the Enron Exchangeable Notes under the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. §  77b(a)(11).

As such, Citigroup/Salomon participated in the solicitation, offering, and sale of the notes to the investing public pursuant to the Prospectus and S-3s. Plaintiffs purchased or acquired the notes pursuant to, or traceable to, the Prospectus and S-3s.

728.    The Prospectus and S-3s, at the time they were issued and became effective, were inaccurate and misleading, contained untrue statements of material fact and/or omitted to state material facts necessary to make the statements made therein not misleading, as set forth above. The matters detailed above would have been material to a reasonable person reviewing the Prospectus and S-3s and the financial statements incorporated therein.

729.    Due to their role as underwriters of the Enron Exchangeable Notes, Citigroup/Salomon was responsible for the contents and dissemination of the Prospectus and S-3s and are liable under Section 11 of the Securities Act for any material misrepresentations or omissions contained therein. Citigroup/Salomon did not make a reasonable investigation and did not possess reasonable grounds for believing that the statements contained in the Prospectus and S-3s were true, did not omit any material fact, and were not materially misleading.

730.    Plaintiffs did not know or in the exercise of reasonable diligence could not have known of the misstatements and omissions of material fact contained in the Prospectus and S-3s.

731.    Plaintiffs relied on the misleading information in the prospectuses for the Exchangeable Notes and have suffered damages as a result of the misstatements and omissions of material fact contained in the Prospectus and Form S-3s for which they are entitled to compensation.

732.    Less than one year has passed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the date when the initial complaint in this action was filed.

WHEREFORE, Plaintiffs pray for relief as set forth below.

/ / /

## COUNT TWO

### AGAINST THE STATUTORY UNDERWRITER DEFENDANTS FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT   ZERO COUPON NOTES

733.     Plaintiffs repeat and reallege all allegations set forth above in  1-808 above, except for those relating to scienter or fraudulent intent.

734.     This claim is brought  pursuant to  11 of the Securities Act, against the Statutory Underwriter Defendants Citigroup/Salomon, JP Morgan, Deutsche Bank, CSFB and Barclay's. This claim does not sound in fraud, and neither fraud nor scienter is an element of this claim. For purposes of this claim, Plaintiffs disclaim any allegation of scienter or recklessness.

735.     These Defendants served as statutory underwriters of the Zero Coupon Notes offering, under the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11).  As such, they participated in the solicitation, offering, and sale of the Notes to the investing public pursuant to the registration statement. Plaintiffs purchased or acquired the notes pursuant to, or traceable to, the registration statement for these Notes.

736.     The registration statement, at the time it was issued and became effective, was inaccurate and misleading, contained untrue statements of material fact and/or omitted to state material facts necessary to make the statements made therein not misleading, as set forth above. The matters detailed above would have been material to a reasonable person reviewing the registration statement and the financial statements incorporated therein.

737.     Due to their role as statutory underwriters of the Zero Coupon Notes, these Defendants were responsible for the contents and dissemination of the registration statement for those Notes and are liable under Section 11 of the Securities Act for any material misrepresentations or omissions contained therein. None of them made a reasonable investigation and none of them possessed reasonable grounds for believing that the statements contained in the registration statement were true, did not omit any material fact, and were not materially misleading.

197

738.    Plaintiffs did not know or in the exercise of reasonable diligence could not have known of the misstatements and omissions of material fact contained in the registration statement.

739.    Plaintiffs relied on the misleading information in the Registration Statement and have sustained damages as a result of the misstatements and omissions of material fact contained in the Registration Statement for which they are entitled to compensation.

740.    Less than one year has passed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based.  Less than three years have elapsed from the time that the securities upon which this count is brought were offered to the public to the time of filing of this complaint. and the date of the filing of the initial complaint in this action.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT THREE

## AGAINST ALL DEFENDANTS, FOR NEGLIGENT MISREPRESENTATION

741.    Plaintiffs repeat and reallege all allegations set forth above in  1-808 above, except for those relating to scienter or fraudulent intent.

742.    The Officer Defendants, Underwriter and Statutory Underwriter defendants  made material false representations, concealments and nondisclosures to Plaintiffs in the registration statements for the Exchangeable Notes and the Zero Coupon Notes. The Officer Defendants made additional negligent misrepresentations in Enron's Annual Reports and quarterly reports issued between 1997 and 2001 which were not included in the registration statements for the notes.  The Underwriter Defendants, Statutory Underwriter Defendants, and Merrill also made negligent misrepresentations in "research reports" and "ratings analysis" reports disseminated to the public.

743.    Andersen made negligent misrepresentations by issuing unqualified opinion letters certifying Enron's 1997-2001 financial statements as conforming to GAAP and as having

been audited in accordance with GAAS. The Andersen Defendants participated in, substantially assisted, and/or are vicariously liable for the negligent misrepresentations of Andersen.

744.     The Officer Defendants, the Andersen Defendants, the Underwriter Defendants, and the Statutory Underwriter Defendants, and each of them, intended that the registration statements would be used for the purpose of dissemination to Plaintiffs and other investors, and intended that Plaintiffs and other investors would rely upon them and be induced to purchase such debt securities.

745.     In making the representations and omissions, and in doing the above things alleged, Defendants, and each of them, acted without any reasonable grounds for believing their representations were true, and intended by said representations to induce the reliance of the Plaintiffs to purchase Enron debt securities or to induce their clients to purchase Enron debt securities.  Plaintiffs relied upon these false representations, concealments, and nondisclosures by Defendants, and each of them, and each purchased Enron debt securities or induced its customers to purchase Enron debt securities.  Plaintiffs were ignorant of the falsity of Defendants' representations and were ignorant of the full and true facts suppressed by Defendants, and such reliance was justified.

746.     Plaintiffs were directly in privity with underwriter/statutory underwriter Defendants CSFB, and Citigroup/Salomon, who directly sold Enron debt securities to Plaintiffs.

747.     These Defendants, and each of them, possessed superior knowledge, not readily available to Plaintiffs   who, unlike Defendants, did not have access to the corporate records of Enron   and Defendants, and each of them, knew that Plaintiffs were induced to purchase Enron debt securities on the basis of mistaken knowledge, given that the prospectuses of the Underwriter Defendants on the subject debt securities purchased by Plaintiffs were false and misleading, and incorporated by reference the false and misleading Enron financial statements and the unqualified audit opinions of Andersen.

/ / /

748.     As a result of the Defendants', and each of their, wrongful conduct, Plaintiffs have suffered and will continue to suffer economic losses and other general and specific damages, all in an amount to be determined according to proof.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT FOUR

## FRAUD AND DECEIT

## AGAINST ALL UNDERWRITER AND STATUTORY UNDERWRITER DEFENDANTS, MERRILL, THE ANDERSEN DEFENDANTS, VINSON & ELKINS, LAY, SKILLING, BUY, CAUSEY, AND FASTOW

749.     Plaintiffs repeat and reallege all allegations set forth above in  1-808 above, except for those relating to scienter or fraudulent intent.

750.     Defendants, and each of them, made material representations and omissions to Plaintiffs which were false and misleading.  These material misrepresentations and omissions are contained in and reflected in the registration statements, auditor's opinions, rating and research reports and financial statements disseminated by Defendants during the relevant time period and are set forth above in detail.

751.     The conduct of Defendants, and each of them, constituted a fraud against Plaintiffs.  Defendants made material false representations, concealments, and nondisclosures, with the intent to defraud Plaintiffs.  Defendants, and each of them, knew or should have known of the falsity of their representations, concealments, and nondisclosures.  Said misrepresentations were made with the intent to defraud the public, in general, and Plaintiffs, in particular.

752.     When Defendants, and each of them, failed to disclose information and suppressed information they had a duty to divulge to Plaintiffs, Defendants knew or should have known of the misleading nature of such omissions, and by these omissions, Defendants, and each of them, intended to defraud and deceive Plaintiffs, and intended to induce Plaintiffs to purchase Enron debt securities or otherwise induce related others to purchase Enron debt securities.

200

753.     Plaintiffs were directly in privity with Defendants CSFB, and Citigroup/Salomon, who directly sold Enron debt securities to Plaintiffs.  The Underwriter Defendants and Statutory Underwriter Defendants, and each of them, primarily intended that the false and misleading prospectuses would be for the purpose of dissemination to Plaintiffs and other investors, and intended that Plaintiffs and other Enron investors would rely upon the prospectuses for the subject Enron debt securities and be induced to purchase such debt securities.

754.     Andersen issued unqualified opinions certifying that Enron's financial statements for 1997-2001 were in compliance with GAAP and had been audited in compliance with GAAS. Those representations were materially false and misleading. The Andersen Defendants participated in, substantially assisted, and/or are vicariously liable for the fraud and deceit of Andersen.

755.     Defendants, and each of them, possessed superior knowledge, not readily available to Plaintiffs who, unlike Defendants, did not have access to the corporate records of Enron and Defendants, and each of them, knew or should have known that Plaintiffs were induced to purchase Enron debt securities on the basis of mistaken knowledge, given that the prospectuses of the Underwriter Defendants and Statutory Underwriter Defendants on the subject debt securities purchased by Plaintiffs were false and misleading, and incorporated by reference the false and misleading Enron financial statements and the unqualified audit opinions of Andersen.

756.     Plaintiffs relied upon these false representations, concealments, and nondisclosures by Defendants, and each of them, by which reliance they purchased Enron debt securities or induced their clients to purchase Enron debt securities.  Plaintiffs were ignorant of the falsity of Defendants' representations and were ignorant of the full and true facts suppressed by Defendants.  Such reliance was justified, and to the detriment of Plaintiffs.

757.     Defendants, and each of them, aided and abetted, encouraged and rendered substantial assistance to the other Defendants in defrauding Plaintiffs, as alleged herein.  In

taking action, as particularized herein, to aid and abet and substantially assist the commissions of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

758.     Defendants, and each of them, pursued a conspiracy, common enterprise, and common course of conduct to accomplish the wrongs complained of herein.  The purpose and effect of the conspiracy, common enterprise and common course of conduct complained of was, inter alia, to financially benefit Defendants at the expense of Plaintiffs by engaging in fraudulent activities.  Defendants accomplished their conspiracy, common enterprise and common course of conduct by misrepresenting and concealing material information regarding the financial status and operations of Enron; and by taking steps and making statements in furtherance of their wrongdoing as specified herein.  Each Defendant was a direct, necessary and substantial participant in the conspiracy, common enterprise and common course of conduct complained of herein, and was aware of its overall contribution to and furtherance thereof.  Defendants' wrongful acts include, inter alia, all of the acts that each of them are alleged to have committed in furtherance of the wrongful conduct complained of herein.

759.     As a result of the Defendants', and each of their, wrongful conduct, Plaintiffs have suffered and will continue to suffer economic losses and other general and specific damages, all in an amount to be determined according to proof.

760.     The aforementioned acts of Defendants, and each of them, were done maliciously, oppressively, and with intent to defraud, and Plaintiffs are entitled to punitive and exemplary damages in an amount to be shown according to proof.

WHEREFORE, Plaintiffs pray for relief as set forth below.

/ / /

## COUNT FIVE

## VIOLATION OF 10(b) AND 20(a) OF THE SECURITIES EXCHANGE ACT AND RULE 10b-5 THEREUNDER AGAINST ALL UNDERWRITER AND STATUTORY UNDERWRITER DEFENDANTS, MERRILL, THE ANDERSEN DEFENDANTS, VINSON & ELKINS, LAY, SKILLING, BUY, CAUSEY, AND FASTOW

761.    Plaintiffs repeat and reallege all allegations set forth above in  1-808 above, except for those relating to scienter or fraudulent intent.

762.    As described in detail above, each of the above Defendants directly  participated in the wrongful scheme, the implementation of manipulative devices, and the preparation of registration statements, annual and quarterly financial statements, analyst reports and other public disclosures, which they knew were misleading, or recklessly disregarded whether they were misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

763.    Defendants violated  10(b) and/or 20(a) of the Securities Exchange Act, and Rule 10b-5 thereunder, by employing devices, schemes, and artifices to defraud; making untrue statements of material fact or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or by engaging in acts, practices, and courses of business that operated as a fraud or deceit upon Plaintiffs in connection with their purchases of the Notes.

764.    Defendants acted knowingly and/or in reckless disregard of the truth, for the purpose and effect of concealing Enron's true financial results, operating condition and prospects, and of artificially inflating the market prices of Enron's securities, including the Notes.

765.    In purchasing Notes, Plaintiffs relied not only upon the false and misleading registration statements, financial statements and analyst reports concerning Enron, but also on the

/ / /

203

integrity of the market in Enron securities. Plaintiffs purchased Enron Notes at prices artificially inflated by Defendants' misconduct.

766.     Merrill, the Underwriter Defendants and the Statutory Underwriter Defendants were controlling persons of Enron and had knowledge of, and culpably participated in, the violations alleged herein.

767.     The Officer Defendants were also controlling persons of Enron and had knowledge of, and culpably participated in, the violations alleged herein.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT SIX

## VIOLATIONS OF SECTION 11 AND SECTION 15 AGAINST OFFICER DEFENDANTS AND ANDERSEN

768.     Plaintiffs repeat and reallege all allegations set forth above in  1-808 above, except for those relating to scienter or fraudulent intent.

769.     Plaintiffs incorporate herein those claims asserted against the purchased Exchangeable Notes and Zero Coupon Notes issued pursuant to a Registration statement. Plaintiffs purchased or acquired the notes pursuant to, or traceable to, the Registration statement signed by or on behalf of the Officer Defendants.

770.     This claim is brought against the Officer Defendants pursuant to Section 11 of the Securities Act.  This claim does not sound in fraud, and neither fraud, recklessness  nor scienter is an element of this claim. For purposes of this claim, Plaintiffs expressly disclaim any allegation of scienter or recklessness.

771.     The Registration statement, at the time it was issued and became effective, was inaccurate and misleading, contained untrue statements of material fact and/or omitted to state material facts necessary to make the statements made therein not misleading, as set forth above. The matters detailed above would have been material to a reasonable person reviewing the Registration statement and the financial statements incorporated therein.

204

772.     Due to their role as directors of Enron, who had signed the Prospectus and S-3s, these defendants were responsible for the contents and dissemination of the Registration statement and are liable under Section 11 of the Securities Act for any material misrepresentations or omissions contained therein.  The Officer Defendants did not make a reasonable investigation and did not possess reasonable grounds for believing that the statements contained in the Registration statement were true, did not omit any material fact, and were not materially misleading.

773.     Plaintiffs did not know or in the exercise of reasonable diligence could not have known of the misstatements and omissions of material fact contained in the Registration Statement.

774.     Plaintiffs have sustained damages as a result of the misstatements and omissions of material fact contained in the Registration statement for which they are entitled to compensation.

775.     Less than one year has passed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the date that this complaint was filed.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT SEVEN

## VIOLATIONS OF ARTICLE 581-1 ET SEQ. OF THE TEXAS SECURITIES ACT AGAINST ALL DEFENDANTS

776.     Plaintiffs repeat and reallege all allegations set forth above in  1-808 above, except for those relating to scienter or fraudulent intent.

777.     This claim is brought against all Defendants for violations of Article 581-1 et seq. of the Texas Securities Act in connection with their role as sellers of the Exchangeable Notes and Zero Coupon Notes.

/ / /

778.    Defendants participated in the offering and sale of the Exchangeable Notes and Zero Coupon Notes, as described more fully above, by preparing, reviewing, and/or signing the Registration Statements and/or prospectuses for the Exchangeable Notes and/or Zero Coupon Notes.

779.    The Registration Statements and prospectuses for the Exchangeable Notes and/or Zero Coupon Notes contained untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

780.    Defendants knew, or in the exercise of reasonable care would have known, of the untruth or the omission.

781.    The Officer Defendants are control persons under Article 581-33(f) in that they had actual power and/or influence over Enron and/or said defendants induced and/or participated in the violation.

782.    All other defendants are liable as aiders and abettors under Article 581-33(F)(2) of the Texas Securities Act in that they directly and/or indirectly with intent to deceive, defraud, and/or with reckless disregard for the truth of the law materially aided the other defendants in selling the Exchangeable Notes and Zero Coupon Notes.

783.    Pursuant to Article 581-33(D)(1) of the Texas Securities Act, Plaintiffs are entitled to rescission for those notes they still hold including consideration paid  for the notes plus interest at the legal rate from the time of purchase.  Plaintiffs hereby tender those notes to Defendants.

784.    Pursuant to Article 581-33(D)(3) of the Texas Securities Act, Plaintiffs are entitled to damages for those notes they have sold based upon the consideration Plaintiffs paid for the notes plus interest at the legal rate from the time of purchases less the value of the notes at the time Plaintiffs sold them.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## XI.

### **PRAYER FOR RELIEF**

1.      Compensatory and general damages according to proof;

2.      Special damages according to proof;

3.      Prejudgment interest at the maximum legal rate;

4.      Punitive and exemplary damages according to proof;

5.      Costs of the proceedings herein;

6.      Reasonable attorneys' fees; and

7.      All such other and further relief as the Court deems just.

DATED: August 18, 2006                    COTCHETT, PITRE, SIMON & McCARTHY


By:   /s/ Steven N. Williams
          STEVEN N. WILLIAMS
          Attorney in Charge
          Admitted pro hac vice

          JOSEPH W. COTCHETT (pro hac vice)
          STEVEN N. WILLIAMS  (pro hac vice)
          San Francisco Airport Office Center
          840 Malcolm Road, Suite 200
          Burlingame, CA  94010
          (650) 697-6000

207

# XII.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all issues so triable.


DATED: August 18, 2006                    COTCHETT, PITRE, SIMON & McCARTHY


                                          By:   */s/ Steven N. Williams*
                                                STEVEN N. WILLIAMS
                                                Attorney in Charge
                                                Admitted pro hac vice

                                                JOSEPH W. COTCHETT (pro hac vice)
                                                STEVEN N. WILLIAMS  (pro hac vice)
                                                San Francisco Airport Office Center
                                                840 Malcolm Road, Suite 200
                                                Burlingame, CA  94010
                                                (650) 697-6000

                                                Attorneys for Plaintiffs