Bruce S. Sperling (Admitted pro hac vice)
Eugene J. Frett (Admitted pro hac vice)
Scott F. Hessell (Admitted pro hac vice)
**SPERLING & SLATER, P.C.**
55 West Monroe, Suite 3200
Chicago, IL 60603
(312) 641-3200

Attorneys for Plaintiffs

**MDL DOCKET NO. 1446**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re ENRON CORPORATION SECURITIES, DERIVATIVE & "ERISA" LITIGATION | ) ) ) ) ) |
| | MDL 1446 |
| This Document Relates To: | ) ) |
| | **Civil Action No. H-03-0815** |
| **SILVERCREEK MANAGEMENT INC.; SILVERCREEK LIMITED PARTNERSHIP; SILVERCREEK II LIMITED; OIP LIMITED; and PEBBLE LIMITED PARTNERSHIP,** | ) ) ) ) ) ) ) |
| | **1. AIDING AND ABETTING FRAUD** |
| | **2. CONSPIRACY TO COMMIT FRAUD** |
| Plaintiffs, | ) ) |
| **v.** | ) ) |
| | **3. AIDING AND ABETTING NEGLIGENT MISREPRESENTATION** |
| | **4. FRAUD AND DECEIT** |
| **JPMORGAN SECURITIES, INC.; JPMORGAN CHASE & COMPANY; CREDIT SUISSE FIRST BOSTON LLC; CREDIT SUISSE FIRST BOSTON (USA), INC.; PERSHING LLC; DEUTSCHE BANK ALEX. BROWN, INC.; DEUTSCHE BANK AG; BARCLAYS CAPITAL INC.; BARCLAYS PLC; MERRILL LYNCH & CO.; ESTATE OF KENNETH LAY; JEFFREY K. SKILLING; ANDREW S. FASTOW; RICHARD CAUSEY; RICHARD BUY; and JAMES V. DERRICK, JR.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | **5. NEGLIGENT MISREPRESENTATION** |
| | **6. VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT** |
| | **7. VIOLATIONS OF SECTION 12(a)(2) OF THE SECURITIES ACT** |
| | **8. VIOLATIONS OF ARTICLE 581-1 et. seq. OF THE TEXAS SECURITIES ACT** |
| | **9. VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT** |
| Defendants. | ) |
| | **JURY TRIAL DEMANDED** |

**THIRD AMENDED COMPLAINT**

TABLE OF CONTENTS

Page(s)

I.     NATURE OF THIS ACTION .................................................................................... 1

II.    JURISDICTION AND VENUE ................................................................................. 3

III.   THE PARTIES ............................................................................................................ 4

       A.  Plaintiffs ........................................................................................................... 4

       B.  Defendants ........................................................................................................ 6

           1.  The Bank Defendants ............................................................................. 6

               a.    Barclays .................................................................................... 6

               b.    Deutsche Bank ......................................................................... 6

               c.    JPMorgan .................................................................................. 8

               d.    CSFB ........................................................................................ 8

               e.    Merrill Lynch ......................................................................... 10

           2.  The Officer Defendants ........................................................................ 11

IV.    ENRON'S FINANCIAL STATEMENTS, 1997-2001 ........................................... 16

       A.  Enron's Annual and Quarterly Financial Statements for 1997 ...................... 16

       B.  Enron's Annual and Quarterly Financial Statements for 1998 ...................... 17

       C.  Enron's Annual and Quarterly Financial Statements for 1999 ...................... 18

       D.  Enron's Annual and Quarterly Financial Statements for 2000 ...................... 19

       E.  Additional Representations .............................................................................. 20

       F.  Enron's First Quarter 2001 Financial Statements ........................................... 20

       G.  Enron's Second Quarter 2001 Financial Statements ...................................... 21

       H.  Public Statements by Defendants about Enron in 2001 .................................. 21

V.     PLAINTIFFS' INVESTMENTS IN ENRON DEBT SECURITIES ...................... 29

VI.    ENRON'S REVELATIONS AND FINANCIAL COLLAPSE ............................... 30

       A.  Failure to Consolidate Special Purpose Entities in Violation of GAAP ........ 34

       B.  The Collapse of the Merger with Dynegy ...................................................... 35

       C.  Enron's Chapter 11 Filing .............................................................................. 36

VII.   THE ENRON NOTE OFFERINGS ........................................................................ 37

     A.  The 7% Notes Offering ................................................................ 37

        1.  Offering Summary ............................................................... 37

        2.  Misstatements and Omissions ............................................. 39

     B.  The Zero Notes Offering ............................................................ 41

        1.  Offering Summary ............................................................... 41

        2.  Misstatements and Omissions ............................................. 44

     C.  Plaintiffs' Note Purchases ......................................................... 44

        1.  Summary of Purchases ........................................................ 44

        2.  Reliance on Prospectuses and Historic Financial Information ........... 46

        3.  Reliance on Publicly Available Information ......................... 47

        4.  Economic Losses Suffered as a Direct Result of Silvercreek's Reliance on Materially Misleading Information ............................................... 48

VIII.  WRONGFUL FINANCIAL MANIPULATIONS, SCHEMES AND CONTRIVANCES ............................................................. 48

     A.  The Off-Book Financial Transactions ....................................... 48

        1.  The Purposes and Effects of Enron's Use of Special Purpose Entities ............... 49

        2.  Specific Examples of Improper Use of Special Purpose Entities ........... 53

            a.  JEDI and Chewco ........................................................ 54

            b.  LJM1 and LJM2 ......................................................... 56

            c.  The Raptors ................................................................. 66

            d.  The Whitewing Transactions ...................................... 69

            e.  Fishtail, Bacchus, Sundance and Slapshot Transactions ............. 70

            f.  Nikita Transaction ...................................................... 71

     B.  Hidden and Disguised Loans ..................................................... 72

        1.  Prepays/Equity Forward Contracts ..................................... 72

        2.  Minority Interest Transactions ............................................ 75

     C.  Tax Transactions ....................................................................... 76

     D.  Defendants' Involvement ........................................................... 76

        1.  Enron Management .............................................................. 77

        2.  Enron Bank Defendants ....................................................... 79

            a.  Barclays ....................................................................... 85

(i)    SPE Transactions ............................................................. 88

(ii)   The SO$_2$ Transaction ..................................................... 95

(iii)  Prepay Transactions ....................................................... 98

(iv)   Barclays' Knowledge of Enron's Fraudulent Reporting Practices ... 98

(v)    Fastow Declaration ......................................................... 100

(vi)   Summary .................................................................... 104

b.  Deutsche Bank .................................................................... 107

(i)    Tax Transactions ............................................................ 114

(ii)   Tax Accommodation Transactions ........................................ 135

(iii)  Structured Transactions With Disguised Enron Affiliates ............. 136

(iv)   Analyst Coverage .......................................................... 140

(v)    Deutsche Bank's Knowledge of Enron's True Financial Position .. 141

(vi)   Summary – Fastow Declaration ....................................... 146

c.  JPMorgan ......................................................................... 147

(i)    Prepay Transactions ....................................................... 151

(ii)   Structured Transactions ................................................... 173

(iii)  Analyst Coverage .......................................................... 175

(iv)   JPMorgan's Knowledge of Enron's True Financial Position ......... 177

(v)    Summary .................................................................... 179

d.  CSFB ............................................................................... 180

(i)    Structured Transactions ................................................... 183

(ii)   CSFB Prepay Transactions ............................................... 184

(iii)  Analyst Coverage .......................................................... 196

(iv)   CSFB's Knowledge of Enron's True Financial Position .............. 200

(v)    CSFB's Direct Dealings with Plaintiffs ................................ 205

(vi)   Summary – Fastow Declaration ....................................... 208

e.  Merrill Lynch ..................................................................... 209

(i)    Merrill Lynch's Agreement with the US Department of Justice ... 214

(ii)   Merrill Lynch's Consent Decree with the SEC .......................... 215

(iii)  Criminal Case against Merrill Lynch's Employees ..................... 215

iii

(iv)  Merrill Lynch's Settlement with the NY Attorney General .......... 216

(v)   Merrill Lynch's Underwriting Activities ...................................... 218

(vi)  Merrill Lynch's Active Role in the Enron Fraud .......................... 219

(vii) Merrill Lynch's Knowledged of Enron's True Financial Position 242

(viii) Silvercreek's Direct Dealings with Merrill Lynch ........................ 243

(ix)  Summary – Fastow Declaration ................................................... 245

X.   CAUSES OF ACTION ................................................................................ 249

COUNT ONE – AGAINST ALL BANK DEFENDANTS, FOR AIDING AND
ABETTING FRAUD ................................................................................ 249

COUNT TWO – AGAINST ALL BANK DEFENDANTS, FOR CONSPIRACY TO
COMMIT FRAUD .................................................................................... 251

COUNT THREE – AGAINST ALL BANK DEFENDANTS, FOR AIDING AND
ABETTING NEGLIGENT MISREPRESENTATION ................................ 254

COUNT FOUR – FRAUD AND DECEIT AGAINST OFFICER DEFENDANTS,
MERRILL LYNCH AND CSFB .............................................................. 256

A.  Officer Defendants ......................................................................... 257

B.  Merrill Lynch and CSFB ................................................................ 258

COUNT FIVE – AGAINST OFFICER DEFENDANTS, MERRILL LYNCH AND
CSFB FOR NEGLIGENT MISREPRESENTATION ................................ 260

A.  Officer Defendants ......................................................................... 260

B.  Merrill Lynch and CSFB ................................................................ 262

COUNT SIX – AGAINST JPMORGAN, DEUTSCHE BANK, BARCLAYS
AND CSFB FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT ...... 264

COUNT SEVEN – AGAINST THE OFFICER DEFENDANTS FOR VIOLATIONS
OF SECTION 11 OF THE SECURITIES ACT ........................................... 266

COUNT EIGHT – AGAINST CSFB FOR VIOLATIONS OF SECTION 12(a)(2)
OF THE SECURITIES ACT ...................................................................... 268

COUNT NINE – VIOLATIONS OF ARTICLE 581 ET SEQ. OF THE TEXAS
SECURITIES ACT AGAINST ALL DEFENDANTS (EXCEPT MERRILL
LYNCH) .................................................................................................. 270

COUNT TEN – VIOLATIONS OF 10(b) OF THE SECURITIES EXCHANGE
ACT AND RULE 10(b)(5) AGAINST OFFICER DEFENDANTS ............... 272

XI.  PRAYER FOR RELIEF ............................................................................. 274

XII.   JURY DEMAND ........................................................................................275

Plaintiffs, for their third amended complaint, allege as follows upon information and belief based, inter alia, upon investigations conducted by (i) Plaintiffs and their counsel; (ii) the United States Department of Justice and New York Attorney General; (iii) the United States Securities and Exchange Commission; (iv) the United States Congress; (v) Lead counsel in the *Newby* class action; and (vi) the Bankruptcy Examiners in the Enron bankruptcy, except as to those allegations pertaining to Plaintiffs personally, which are alleged upon knowledge.  The original complaint in this action was filed in the United States District Court for the Southern District of New York on November 7, 2002.

## I.

## NATURE OF THIS ACTION

1.      In October 2001, Plaintiffs invested over $100 million in 7% Exchangeable Notes (the "7% Notes") and Zero Coupon Exchangeable Notes (the "Zero Notes"), both of which were issued by Enron Corporation ("Enron").  At the time of Plaintiffs' investments, Enron was the world's largest energy trader, engaged in one out of every four electricity and natural gas sales. Enron was also engaged in a myriad of other businesses, including energy generation, pipeline delivery, telecommunications, and potable water supply.  According to the 2001 Fortune 500 rankings, Enron was the seventh largest company in the world, ahead of IBM, reporting revenue for 2000 of over $100 billion and net income of approximately $1 billion.

2.      Shortly after Plaintiffs purchased the 7% Notes and Zero Notes, Enron was forced to restate its financial results for the previous four years (1997-2000), reducing its reported income and increasing its reported debt.  This restatement was just the beginning as a significant

1

number of previously undisclosed off-balance-sheet transactions and affiliated, but unconsolidated entities surfaced in the ensuing weeks and months.

3.     Enron's demise followed swiftly.  It filed for bankruptcy, and within a few months, its auditor, Arthur Andersen LLP ("Andersen"), was found guilty of criminal violations and was, for all intents and purposes, forced out of business.  Andrew Fastow, its former Chief Financial Officer, pled guilty to two counts of wire and securities fraud.  Michael Kopper, an Enron officer who reported to Fastow, pled guilty to charges of money laundering and fraud. Other Enron officers have pled guilty to, or been convicted of, numerous federal criminal charges.  Enron's underwriters and financial advisers also became the focal point of numerous governmental investigations concerning their roles in Enron's collapse, including securities and federal criminal complaints.  The demise of Enron is one of the largest and most infamous financial debacles in U.S. business history.

4.     In deciding to invest in Enron debt securities, Plaintiffs relied upon, among other things, the information contained in and incorporated in the prospectuses and registration statements for the 7% Notes and Zero Notes, public disclosures and other representations made by Enron management, as well as research reports and commentary by analysts from investment banks, including the defendant investment banks herein.  At no time prior to Plaintiffs' investment did Defendants, or anyone else, disclose Enron's massive overstatements of earnings and understatements of debt and cash from operations, or the existence and magnitude of the off-balance-sheet transactions that were distorting Enron's reported financial results.  Plaintiffs relied on the accuracy and completeness of Enron's historical financial information from 1994 to 2001 for their purchases of the Enron Notes.  Plaintiffs, as investors in debt securities, believed

2

in the reported history and core strength of Enron, including its apparent solvency and ability to readily service its indebtedness.

5. In this action Plaintiffs seek to hold individuals and entities responsible for their substantial losses. These individuals and entities include: (i) the underwriters of the Zero Notes offering, as well as the Enron officials who signed the registration statements for the 7% and Zero Notes offerings, all of whom are responsible for the false and misleading registration statement and prospectus for the Zero Notes and the 7% Notes, respectively; and (ii) the banks and financial services companies who (a) devised, created, set up, invested in, and profited from the special purpose entities which Enron used to conceal debt and inflate earnings, (b) made materially misleading statements about Enron's financial condition; and (c) aided and abetted Enron in carrying out its vast Ponzi scheme.

## II.

## JURISDICTION AND VENUE

6. This action asserts claims under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, under Sections 10(b) and 20 of the Securities Exchange Act, 15 U.S.C. § 78j and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, 15 U.S.C. § 78t(a), and under state statutory and common law. Federal subject matter jurisdiction exists pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1332 (diversity of citizenship). Supplemental jurisdiction over the state law claims also exists pursuant to 28 U.S.C. § 1367(a).

3

7.      Venue is appropriate in the Southern District of New York because several Defendants have their principal places of business there, and several are incorporated in the State of New York.  The majority of Plaintiffs' purchases and sales of Enron Notes took place in the Southern District of New York.  While this Action was transferred to the United States District Court for the Southern District of Texas, Houston Division, for coordination or consolidation pursuant to the order of the Judicial Panel on Multidistrict Litigation (Docket No. 1446), the trial of this action will take place in the Southern District of New York pursuant to *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).

## III.

## THE PARTIES

**A.      Plaintiffs**

8.      Plaintiff Silvercreek Management Inc. ("SMI") is an Ontario corporation with its principal place of business in Toronto, Canada.  SMI has three shareholders, and its shares are not and have never been publically traded.  In or about October and November 2001 SMI had less than 100 shareholders.

9.      Plaintiff Pebble Limited Partnership ("Pebble") is an Ontario limited partnership with it principal place of business in Toronto, Canada.  Pebble has 1 general partner and 6 limited partners.  Until October 2005, Pebble's general partner was Pebble Capital Inc., an Ontario Corporation ("Pebble Capital").  Pebble's current general partner is Pebble GP Limited, an Ontario corporation that is wholly owned by SMI.  The general and limited partnership interests in Pebble are not and have never been publically traded.  In or about October and November 2001 Pebble had less than 100 general and limited partners combined.

4

10.     Plaintiff Silvercreek Limited Partnership ("Silvercreek LP") is an Ontario limited partnership with it principal place of business in Toronto, Canada.  Silvercreek LP has one general partner and one limited partner.  Silvercreek LP's  general partner is Silvercreek GP II Limited, an Ontario corporation that is wholly owned by SMI.  The general and limited partnership interests in Silvercreek LP are not and have never been publically traded.  In or about October and November 2001 Silvercreek LP had less than 100 general and limited partners combined.

11.     Plaintiff OIP Limited ("OIP"), formerly known as Onex Industrial Partners Limited, is an Ontario corporation with its principal place of business in Toronto, Canada.  OIP's successor in interest (as of June 2007) is OMI Quebec, Inc. ("OMI"), also an Ontario corporation with its principal place of business in Toronto, Canada.  On information and belief, OIP and OMI are affiliated with Onex Corporation.  Neither OIP nor OMI's shares are or ever have been publically traded.  In or about October and November 2001 OIP had less than 100 shareholders.

12.     Plaintiff Silvercreek II Limited ("Silvercreek II") is a Cayman Islands corporation with its principal place of business in the Cayman Islands.  Silvercreek II has one shareholder, and its shares are not and have never been publically traded.  In or about October and November 2001 Silvercreek II Limited had less than 100 shareholders.

13.     Plaintiff SMI is an investment manager, and manages, among other things, the investments of the other four Plaintiffs.  The five Plaintiffs will sometimes be referred to hereafter collectively as "Silvercreek."

**B.**     **Defendants**

    *1.*     *The Bank Defendants*

        a.     <u>**Barclays**</u>

14.     Defendant Barclays PLC ("Barclays") is a financial services institution engaged in retail and commercial banking, investment banking, wealth management and investment management services.  Barclays is incorporated under the laws of the United Kingdom, and has its headquarters in London, England.  Barclays acts through its many subsidiaries, all of whom are consolidated for accounting and legal reporting purposes.  Accordingly, references to "Barclays" include, collectively, Barclays and its subsidiaries.

15.     Defendant Barclays Capital Inc. is an investment bank with its principal place of business in New York, NY.  Barclay's Capital Inc. is one of Barclays' subsidiaries, and was the entity through which Barclays acted as an underwriter of the Zero Notes.

16.     Barclays provided commercial and investment banking services to Enron.  In this connection, and among other wrongdoing, Barclays (i) helped Enron to structure and finance one or more of Enron's illicit off-balance-sheet partnerships or SPEs; (ii) participated in sham transactions with Enron in which loans were mischaracterized as purchase and sale transactions; and (iii) helped finance phony prepay transactions, all so that Enron, in order to mislead outside investors (like Silvercreek), and others, could falsely inflate its reported revenues and income and hide its true indebtedness.

        b.     <u>**Deutsche Bank**</u>

17.     Defendant Deutsche Bank AG ("Deutsche Bank") is a financial services institution which provides a wide array of commercial and investment banking services to

corporate and institutional clients along with private and business clients.  Services include sales, trading, and origination of debt and equity; mergers and acquisitions; risk management products, such as derivatives; corporate finance, wealth management, retail banking, brokerage and research, fund management, and transaction banking.  Deutsche Bank is incorporated under the laws of Germany, and has its headquarters in Frankfurt, Germany.  Deutsche Bank acts through its many subsidiaries, all of whom are consolidated for accounting and legal reporting purposes. Accordingly, references to "Deutsche Bank" include, collectively, Deutsche Bank and its subsidiaries.

18.     Defendant Deutsche Bank Alex. Brown, Inc. is an investment bank with its principal place of business in Baltimore, MD, and offices in New York, NY.  Deutsche Bank Alex. Brown, Inc. is one of Deutsche Bank's subsidiaries, and was the entity through which Deutsche Bank acted as an underwriter of the Zero Notes.

19.     In or about 2000 and 2001, Deutsche Bank had a business relationship with Silvercreek, including providing brokerage services to Silvercreek.

20.     Deutsche Bank provided commercial and investment banking services to Enron. In this connection, and among other wrongdoing, Deutsche Bank helped Enron to (i) structure abusive and manipulative tax-related transactions; (ii) set up and finance ostensibly "independent" vehicles to off load Enron debt; and (iii) finance one or more of Enron's illicit off-balance-sheet partnerships or SPEs, all so that Enron, in order to mislead outside investors (like Silvercreek), and others, could falsely inflate its reported revenues and income and hide its true indebtedness.

7

### c. JPMorgan

21.     Defendant JPMorgan Chase & Co. ("JPMorgan") is an integrated, global financial services firm with assets of $2.1 trillion and operations in more than 60 countries. The firm engages in investment banking, financial services for consumers, small business and commercial banking, financial transaction processing, asset management, and private equity. JPMorgan is Delaware corporation with its principal place of business in New York, N.Y. JPMorgan acts through its many subsidiaries, all of whom are consolidated for accounting and legal reporting purposes. Accordingly, references to "JPMorgan" include, collectively, JPMorgan and its subsidiaries.

22.     Defendant JPMorgan Securities Inc. is an investment bank with its principal place of business in New York, NY. JPMorgan Securities Inc. is one of JPMorgan's subsidiaries, and was the entity through which JPMorgan acted as an underwriter of the Zero Notes.

23.     JPMorgan provided commercial and investment banking services to Enron. In this connection, and among other wrongdoing, JPMorgan (i) orchestrated and participated with Enron in multiple phony prepay transactions; and (ii) helped Enron to finance and structure numerous of Enron's illicit off-balance-sheet partnerships or SPEs, all so that Enron, in order to mislead outside investors (like Silvercreek), and others, could falsely inflate its reported revenues and income and hide its true indebtedness.

### d. CSFB

24.     Defendant Credit Suisse First Boston (USA), Inc., n/k/a Credit Suisse (USA) ("CSFB") is a Delaware corporation with its principal place of business in New York, NY. At all times pertinent to this complaint, CSFB served as the authorized representative of and the

8

vehicle through which Credit Suisse Group AG and Credit Suisse AG conducted business in the United States, including the transactions with Enron alleged in this complaint.  Credit Suisse Group AG is the holding company for the Credit Suisse business operations and Credit Suisse AG is the operating entity.  Both companies are Swiss corporations with principal places of business in Zurich, Switzerland.  On information and belief, CSFB is wholly owned by Credit Suisse AG, which is in turn wholly owned by Credit Suisse Group AG.

25.     CSFB is an integrated financial services institution that provides, among other things, commercial and investment banking services, commercial loans and advisory services, business structuring and hedging transactions, securities underwriting, and securities research and investment advice.

26.     On information and belief, Defendant Credit Suisse First Boston LLC (n/k/a Credit Suisse Securities (USA) LLC), is an affiliate of CSFB with its principal place of business in New York, N.Y.  Upon information and belief, Credit Suisse First Boston Corp. was another affiliate of CSFB, but has since been merged into CSFB.

27.     On information and belief, Defendant Pershing LLC (f/k/a Donaldson, Lufkin & Jenrette Securities Corporation) was also a subsidiary or affiliate of CSFB engaged primarily in underwriting activities, including several Enron-related offerings.

28.     CSFB, through one of its Credit Suisse First Boston subsidiaries or affiliates, was an underwriter of the Zero Notes offering.

29.     CSFB acts through its many subsidiaries or affiliates, and also acts on behalf of and as representative of its affiliated corporate owners, all of whom are consolidated for

9

accounting and legal reporting purposes.  Accordingly, references to "CSFB" include, collectively, CSFB and its affiliated companies, including its subsidiaries and corporate owners.

30.     In or about 2000 and 2001, CSFB had a business relationship with Silvercreek, including providing brokerage services to Silvercreek, as well as research reports and investment advice.

31.     CSFB provided commercial and investment banking services to Enron.  In this connection, and among other wrongdoing, CSFB helped to (i) structure and then participate with Enron in phony prepay transactions; and (ii) structure and finance many of Enron's illicit off-balance-sheet partnerships or SPEs, all so that Enron, in order to mislead outside investors (like Silvercreek), and others, could falsely inflate its reported revenues and income and hide its true indebtedness.

      e.     **Merrill Lynch**

32.     Defendant Merrill Lynch & Co. ("Merrill Lynch") is a Delaware corporation with its principal place of business in Charlotte, NC, and offices in New York, NY.  In 2009, Merrill Lynch became a wholly owned subsidiary of Bank of America Corporation.

33.     Merrill Lynch is, and at all times pertinent to this complaint was in the business of providing a wide array of commercial and investment banking services to institutional, corporate and governmental clients, as well as investment advice, brokerage and research to investors. Merrill Lynch acts through its subsidiaries, including Merrill Lynch, Pierce, Fenner & Smith Inc., all of whom are consolidated for accounting and legal reporting purposes.  Accordingly, references to "Merrill Lynch" include, collectively, Merrill Lynch and its subsidiaries.

34.     In or about 2000 and 2001, Merrill Lynch had a business relationship with Silvercreek, including maintaining brokerage accounts for Silvercreek, and providing Silvercreek with research reports and investment advice.

35.     Merrill Lynch provided commercial and investment banking services to Enron.  In this connection, and among other wrongdoing, Merrill Lynch helped Enron to structure and finance one or more of Enron's illicit off-balance-sheet partnerships or SPEs, and participated in sham transactions with Enron in which (i) loans were mischaracterized as purchase and sale transactions, and (ii) wash trades were mischaracterized as bona fide sale transactions, all so that Enron, in order to mislead outside investors (like Silvercreek), and others, could falsely inflate its reported revenues and income and hide its true indebtedness.

### 2.     The Officer Defendants

36.     The Defendants listed below (the "Officer Defendants") were officers of Enron (two of them – Lay and Skilling also served as directors) during the relevant period and signed the registration statements for the Note offerings indicated below, and signed the Enron 10-Ks that included the false and misleading annual financial statements indicated below:

11

Case 1:02-cv-08881-JPO   Document 49-11   Filed 08/24/16   Page 18 of 282

| Officer/Director | Zeros | 7%s | 10-Ks | | | |
|---|---|---|---|---|---|---|
| | | | 1997 | 1998 | 1999 | 2000 |
| Kenneth Lay | X | X | X | X | X | X |
| Andrew Fastow | X | X | X | X | X | X |
| Jeffrey Skilling | X | X | X | X | X | X |
| Richard A. Causey | X | X | X | X | X | X |

37.     Kenneth L. Lay, decedent of Defendant Estate of Kenneth Lay, was, at all relevant times, the Chairman of the Board of Enron (beginning in 1986), Chief Executive Officer of Enron (1986 to February 2001, and August 2001 to bankruptcy), and a Director of Enron (beginning in 1985).  Lay was a member of Enron's management committee, which was responsible for the day-to-day business operations of Enron.  The management committee was aware of and approved significant business transactions of Enron, including the numerous illicit off-balance-sheet transactions engaged in by Enron.  Lay benefited directly from Enron's wrongdoing, receiving, among other things, huge bonuses based on phony profits, as well as selling company stock at massive gains before the price collapsed when Enron's fraud was finally revealed.

38.     As more fully set forth in the trial transcripts and related docket entries, *U.S. v. Skilling*, Cr. No. H-04-25 (S.D. Tex.), Lay was convicted of wire and bank fraud, including making false and misleading statements concerning Enron's financial performance and financial condition.  Lay died before he was sentenced.

39.     Defendant Jeffrey K. Skilling was, at all relevant times and until his resignation as an officer in August 2001, the President of Enron (from 1997 to August 2001), Chief Operating

Officer of Enron (from January 1997 through February 2001), a Director of Enron (beginning in 1997), and Chief Executive Officer of Enron (February to August 2001). Skilling was a member of Enron's management committee and benefited directly from Enron's wrongdoing, receiving, among other things, huge bonuses based on phony profits, as well as selling company stock at massive gains before the price collapsed when Enron's fraud was finally revealed.

40.     As more fully set forth in the trial transcripts and related docket entries, *U.S. v. Skilling*, Cr. No. H-04-25 (S.D. Tex.), Skilling was convicted of, among other things, securities fraud, including making false and misleading statements concerning Enron's financial performance and financial condition. Skilling was sentenced to 24 years in prison, and fined $45 million. Skilling's conviction was recently affirmed in part, vacated in part, and remanded by the United States Supreme Court, --- U.S.---, 2010 WL 2518587 (June 24, 2010).

41.     Defendant Andrew S. Fastow was the Executive Vice President of Enron (July 1999 to October 2001), and Chief Financial Officer of Enron (March 1998 to October 2001). Fastow had previously been Senior Vice President of Enron (March 1998 to July 1999), and Senior Vice President of Finance for Enron (January 1997 to March 1998), and became an officer of Enron in January 1993. Fastow was a member of Enron's management committee and benefited directly from Enron's wrongdoing by (i) receiving, among other things, huge bonuses based on phony profits and diverted income from the off-balance-sheet transactions, and (ii) selling company stock at massive gains before the price collapsed when Enron's fraud was finally revealed.

42.     As more fully set forth in his plea agreement, Fastow pled guilty to wire and securities fraud, and admitted that he made materially misleading statements concerning Enron's

13

Case 1:02-cv-08881-JPO   Document 49-15   Filed 08/05/16   Page 20 of 282

financial performance and financial condition, fraudulently manipulated Enron's publically reported financial results, and assisted others in doing the same.  Fastow was sentenced to 6 years in prison, and was ordered to forfeit $23.8 million.

43.     Defendant Richard A. Causey was Enron's Executive Vice President and Chief Accounting Officer.  Causey also was a member of Enron's management committee and benefited directly from Enron's wrongdoing by (i) receiving, among other things, huge bonuses based on phony profits and (ii) selling company stock at massive gains before the price collapsed when Enron's fraud was finally revealed.

44.     As more fully set forth in his plea agreement, Causey pled guilty to securities fraud, and admitted that he made materially misleading statements concerning Enron's financial performance and financial condition, and assisted others in doing the same.  Causey was sentenced to 5-1/2 years in prison, and was ordered to forfeit $1.25 million.

45.     Defendant Richard B. Buy was an Executive Vice President and Chief Risk Officer of Enron from March 1999 until February 2002, when he was fired.  Buy was Senior Vice President of Enron from March 1999 to July 1999 and Executive Vice President of Enron from July 1999 to February 2002.  Buy also was a member of Enron's management committee and benefited directly from Enron's wrongdoing by (i) receiving, among other things, huge bonuses based on phony profits and (ii) selling company stock at massive gains before the price collapsed when Enron's fraud was finally revealed.  As chief risk officer, it was Buy's duty to warn company executives and Enron's shareholders of the problematic transactions being proposed by the other Officer Defendants and the Bank Defendants.  Instead, Buy approved the transactions and helped structure, support and conceal them.

14

46.     Defendant James V. Derrick, Jr., was an Executive Vice President and General Counsel of Enron.  Derrick was also a member of Enron's management and audit committees. As general counsel, Derrick was intimately involved in Enron's extensive legal reporting obligations, and had a duty to warn company executives and Enron's security-holders of the problematic transactions being proposed and executed by the other Officer Defendants and the Bank Defendants.  Derrick's general counsel obligations, included, *inter alia*, (i) acting as Secretary for the board meeting minutes, with responsibility to review and edit such minutes, (ii) receiving monthly updates from Enron's corporate legal department listing all of the various "financings" and "credit support" projects then being worked on, including the off-balance-sheet transactions at the center of Enron's fraud, (iii) oversight responsibility for the legal department's review and preparation of Enron's securities filings, and (iv) signed verifications of numerous of Enron securities filings and registration statements, including the registration statements for the Zero and 7% Notes purchased by Plaintiffs.  Derrick was also directly involved in various of the fraudulent SPEs that were used to conceal debt and manufacture earnings.  For example, Derrick served as director for several of the off-balance-sheet entities, such as LJM2 and Enron Nigeria Barges Ltd., and was involved with the year-end "sale" of the Nigerian energy barges used to manipulate Enron's financial statements.

15

# IV.

## ENRON'S FINANCIAL STATEMENTS, 1997-2001

**A.     Enron's Annual and Quarterly Financial Statements for 1997**

47.     On May 14, 1997, Enron filed with the Securities and Exchange Commission ("SEC") its financial statements for the first quarter of 1997 on Form 10-Q for the period ended March 31, 1997.

48.     On August 14, 1997, Enron filed with the SEC its financial statements for the second quarter of 1997 on Form 10-Q for the period ended June 30, 1997.

49.     On November 14, 1997, Enron filed with the SEC its financial statements for the third quarter of 1997 on Form 10-Q for the period ended September 30, 1997.

50.     On March 31, 1998, Enron filed with the SEC its Form 10-K for 1997, which included its audited annual financial statements for the period ended December 31, 1997.  The financial statements were prefaced by an unqualified audit opinion from Andersen certifying that the financial statements:

> [P]resent fairly, in all material respects, the financial position of Enron Corp. and subsidiaries as of December 31, 1997 and 1996, and the results of their operations, cash flows and changes in shareholders' equity for each of the three years in the period ended December 31, 1997, in conformity with generally accepted accounting principles.

Neither the financial statements nor the 10-K disclosed the significant off-balance-sheet transactions and hidden liabilities described herein.

51.     Andersen also certified that it had conducted its audit in accordance with Generally Accepted Auditing Standards ("GAAS").

16

**B.    Enron's Annual and Quarterly Financial Statements for 1998**

52.    On May 15, 1998, Enron filed with the SEC its financial statements for the first quarter of 1998 on Form 10-Q for the period ended March 31, 1998.

53.    On August 14, 1998, Enron filed with the SEC its financial statements for the second quarter of 1998 on Form 10-Q for the period ended June 30, 1998.

54.    On November 16, 1998, Enron filed with the SEC its financial statements for the third quarter of 1998 on Form 10-Q for the period ended September 30, 1998.

55.    On March 31, 1999, Enron filed with the SEC its Form 10-K for 1998, which included its audited annual financial statements for the period ended December 31, 1998. Once again, those financial statements were prefaced by an unqualified audit opinion letter from Andersen, certifying that the financial statements:

> [P]resent fairly, in all material respects, the financial position of Enron Corp. and subsidiaries as of December 31, 1998 and 1997, and the results of their operations, cash flows and changes in shareholders' equity for each of the three years in the period ended December 31, 1998, in conformity with generally accepted accounting principles.

56.    Andersen also certified, once again, that it had conducted its audit in accordance with GAAS.

57.    This 1998 10-K was later incorporated by reference into the registration statement and prospectus for the 7% Notes, as was Andersen's certification of those financial statements. Neither the financial statements, the 1998 10-K, the registration statement for the 7% Notes nor the prospectus disclosed the significant off-balance-sheet transactions and hidden liabilities described herein.

17

**C.      Enron's Annual and Quarterly Financial Statements for 1999**

58.      On May 14, 1999, Enron filed with the SEC its financial statements for the first quarter of 1999 on Form 10-Q for the period ended March 31, 1999.  This financial statement was later incorporated by reference into the registration statement and prospectus for the 7% Notes.

59.      On August 16, 1999, Enron filed with the SEC its financial statements for the second quarter of 1999 on Form 10-Q for the period ended June 30, 1999.

60.      On November 15, 1999, Enron filed with the SEC its financial statements for the third quarter of 1999 on Form 10-Q for the period ended September 30, 1999.

61.      On March 30, 2000, Enron filed with the SEC its Form 10-K for 1999, including its audited annual financial statements for the period ended December 31, 1999. Those financial statements were prefaced, once again, by an unqualified audit opinion from Andersen stating that the financial statements:

> [P]resent fairly, in all material respects, the financial position of Enron Corp. and subsidiaries as of December 31, 1999 and 1998, and the results of their operations, cash flows and changes in shareholders' equity for each of the three years in the period ended December 31, 1999, in conformity with accounting principles generally accepted in the United States.

Neither the financial statements, the 1999 10-K, nor the offering memorandum for the Zero Notes (which incorporated the 1999 10-K) disclosed the significant off-balance-sheet transactions and hidden liabilities described herein.

62.      Andersen also certified, once again, that it had conducted its audit in accordance with GAAS.

18

**D.    Enron's Annual and Quarterly Financial Statements for 2000**

63.    On May 15, 2000, Enron filed with the SEC its financial statements for the first quarter of 2000 on Form 10-Q for the period ended March 31, 2000.

64.    On August 14, 2000, Enron filed with the SEC its financial statements for the second quarter of 2000 on Form 10-Q for the period ended June 30, 2000.

65.    On November 14, 2000, Enron filed with the SEC its financial statements for the third quarter of 2000 on Form 10-Q for the period ended September 30, 2000.

66.    On April 2, 2001, Enron filed with the SEC its Form 10-K for 2000, which included its audited annual financial statements for the period ended December 31, 2000.  Once again, those statements were prefaced by an unqualified audit opinion from Andersen, certifying that the financial statements:

> [P]resent fairly, in all material respects, the financial position of Enron Corp. and subsidiaries as of December 31, 2000 and 1999, and the results of their operations, cash flows and changes in shareholders' equity for each of the three years in the period ended December 31, 2000, in conformity with accounting principles generally accepted in the United States.

67.    Andersen also certified, once again, that it had conducted its audit in accordance with GAAS.

68.    The 2000 10-K was later incorporated by reference into the registration statement and prospectus for the Zero Notes, as was Andersen's certification of the 2000 financial statements.  The initial purchasers of the Zero Notes in stage one of the offering included Defendants Deutsche Bank, JPMorgan, and Barclays.  Resellers in stage two of the offering included Defendants JPMorgan, Deutsche Bank and CSFB.  Neither the financial statements, the

19

10-K, the offering memorandum, registration statement, nor the prospectus for the Zero Notes

disclosed the significant off-balance-sheet transactions and hidden obligations described herein.

### E.   Additional Representations

69.   Footnote 1 to the 2000 audited annual financial statements of Enron, as set forth

on Form 10-K, documented by management, and approved by Andersen, represented that the

financial statements were in conformity with GAAP as to the consolidation in the financial

statements of all subsidiaries controlled by Enron:

> Consolidation Policy and Use of Estimates.  The accounting and financial
> reporting policies of Enron Corp. and its subsidiaries conform to generally
> accepted accounting principles and prevailing industry practices.  The
> consolidated financial statements include the accounts of all subsidiaries
> controlled by Enron Corp. after the elimination of significant
> intercompany accounts and transactions.

70.   In its 2000 Form 10-K, Enron represented that its "senior unsecured long-term

debt is currently rated BBB+ by Standard & Poor's Corporation and Fitch IBCA and Baa1 by

Moody's Investor Service.  Enron's continued investment grade status is critical to the success of

its wholesale businesses as well as its ability to maintain adequate liquidity.  Enron's

management believes it will be able to maintain its credit rating."

### F.   Enron's First Quarter 2001 Financial Statements

71.   On May 15, 2001, Enron filed with the SEC its financial statements for the first

quarter of 2001 on Form 10-Q for the period ended March 31, 2001.  These first quarter financial

statements were prepared by management and reviewed and approved by Andersen prior to

filing with the SEC.  These financial statements were later incorporated by reference into the

registration statement and prospectus for the Zero Notes.  Neither the registration statement nor

the prospectus for the Zero Notes disclosed the nature and magnitude of the off-balance-sheet transactions and liabilities of Enron.

## G.    Enron's Second Quarter 2001 Financial Statements

72.    On August 14, 2001, Enron filed with the SEC its financial statements for the second quarter of 2001 on Form 10-Q for the period ended June 30, 2001.  These second quarter financial statements were prepared by management and reviewed and approved by Andersen prior to filing with the SEC.

## H.    Public Statements by Defendants about Enron in 2001

73.    Set forth below are some of the representations that were being made by the Officer Defendants, the Bank Defendants and others with respect to the financial condition and future prospects of Enron during the months leading up to its financial collapse. On January 22, 2001, Enron issued a press release announcing its financial results for the fourth quarter 2000 and fiscal year 2000, the period ending December 31, 2000.  The Company reported earnings of $0.41 per share for the fourth quarter, an increase of 32 percent:

> "Our strong results reflect breakout performance in all of our operations," said Kenneth L. Lay, Enron's chairman and CEO.  "Our wholesale services, retail energy and broadband businesses further expanded their leading market positions as reflected in record levels of … profitability. … Enron also announced a very successful fourth quarter of 2000, generating recurring earnings of $0.41 per diluted share, an increase of 32 percent from $0.31 a year ago.

74.    On January 22, 2001, Skilling appeared on CNN and stated:  "[W]e had a strong quarter, really almost across the company … and it was across the board. …  It was pretty much everything."

75.    On January 25, 2001, Enron issued a press release announcing that, at its annual investor's conference, it will "discuss today its confidence in increasingly strong business

prospects for 2001.  The company is comfortable with estimates for 2001 recurring earnings of $1.70 to $1.75 per diluted share."

76.    On January 31, 2001, Skilling appeared on National Public Radio and stated:

"In summary, we had a tremendous year in the year 2000.  Strong results reflect what we believe is breakout performance in all of our operations.  The results also further demonstrate our leading market positions in each of our major businesses."

77.    During this same period, defendants JPMorgan, Deutsche Bank and Barclays helped prepare and distribute the offering memorandum for the Zero Notes to prospective buyers, including Silvercreek, and encouraged unwitting investors to purchase the Zero Notes. This offering memorandum contained materially false and misleading information (including grossly misstated financial information covering the 1995 to 2000 period).  Despite knowing the information about Enron's financial condition was wrong, JPMorgan, Deutsche Bank and Barclays directly communicated this misleading information to Silvercreek.

78.    On March 5, 2001, Fortune published an article about Enron which included a vehement defense of Enron's financials by the Officer Defendants:

By almost every measure, the company turned in a virtuoso performance: Earnings increased 25%, and revenues more than doubled, to over $100 billion. Not surprisingly, the critics are gushing: "Enron has built unique and, in our view, extraordinary franchises in several business units in very large markets," says Goldman Sachs analyst David Fleischer.

…At a late-January meeting with analysts in Houston, the company declared that it should be valued at $126 a share, more than 50% above current levels.

Enron vehemently disagrees with any characterization of its business as black box-like ....  "We are not a trading company," CFO Andrew Fastow emphatically declares  .... Both Skilling, who describes Enron's wholesale business as "very simple to model," and Fastow note that the growth in Enron's profitability tracks the growth in its volumes almost perfectly.  "People who raise questions are

people who have not gone through [our business] in detail and who want to throw rocks at us," says Skilling.

79.    On or about March 31, 2001, Enron filed its 2000 Annual Report on Form 10-K with the SEC.  The 10-K contained Enron's 1999 and 2000 fraudulent annual financial statements.

80.    In early March 2001, Enron issued its Annual Report to Shareholders, which contained a letter from Lay and Skilling, stating:

> Enron's performance in 2000 was a success by any measure. . . .  In our largest business, wholesale services, we experienced an enormous increase of 59 percent in physical energy deliveries.  Our retail energy business achieved its highest level ever of total contract value. Our newest business, broadband services, significantly accelerated transaction activity ... The company's net income reached a record $1.3 billion in 2000.

> Enron has built unique and strong businesses that have tremendous opportunities for growth.  These businesses - wholesale services, retail energy services, broadband services ... can be significantly expanded within their very large existing markets and extended to new markets with enormous growth potential. At a minimum, we see our market opportunities company-wide tripling over the next five years.

> *    *    *

> Enron is increasing earnings per share and continuing our strong returns to shareholders. Recurring earnings per share have increased steadily since 1997 and were up 25 percent in 2000.

> ...Our results put us in the top tier of the world's corporations. We have a proven business concept that is eminently scalable in our existing businesses and adaptable enough to extend to new markets.

> Our talented people, global presence, financial strength ... have created our sustainable and unique businesses.

> We are positioned to dramatically increase our profitability in 2001.  Retail energy earnings will be fueled by the rapid growth of our U.S. and European businesses and the strong execution and extension of existing contracts.

23

81.     On March 22, 2001, Enron issued a press release in which it "reaffirmed today that the company continues to be confident with strong business prospects for 2001 . . . recurring earnings of $1.70 to $1.75 per diluted share."

82.     In August 2001, Skilling resigned as President and CEO of Enron, citing personal reasons.  Skilling admitted that part of the reason for his resignation was the pressure associated with the decline in the market price of Enron common stock during his six-month tenure as CEO.  Upon Skilling's resignation, Lay reassumed his position as CEO.

83.     Also in August 2001, Chairman and CEO Lay sent email messages to Enron employees, encouraging them to invest in Enron stock.  An email from Lay in August 2001 stated:  "Our performance has never been stronger; our business model has never been more robust. … We have the finest organization in American business today."

84.     Another email from Lay in August 2001 discussed the Enron Employee Stock Ownership Plan, with Lay stating that he anticipated "a significantly higher price" for Enron stock in the future.

85.     On October 9, 2001, Merrill Lynch issued an analyst report on Enron, raising its long term rating on Enron from "accumulate" to "buy" and projecting a five year growth rate for earnings per share of 17%.

86.     Also on October 9, 2001, JPMorgan increased its rating on Enron to a "top pick" and continued to forecast earnings per share for the company of $1.82 and $2.17 for 2001 and 2002, respectively, projecting that Enron would be able to sustain 20% earnings growth over the long term.

87.     On October 9, 2001, Goldman Sachs disseminated a market analyst report calling Enron "the best of the best" and "strongly reiterating [its] Recommended List" rating.

88.     On October 16, 2001, Enron issued a press release reporting its financial results for the quarter ending September 30, 2001.  Enron announced that it had recorded a $1 billion after-tax charge to its third quarter 2001 earnings to recognize asset impairments, restructuring costs, and losses associated with certain investments.  Enron put a positive spin on this one-time charge and claimed that its core businesses were strong.  Enron's press release stated:

> Enron Corp. announced today recurring earnings per diluted share of $0.43 for the third quarter of 2001, compared to $0.34 a year ago.  Total recurring net income increased to $393 million, versus $292 million a year ago.
>
> "Our 26 percent increase in recurring earnings per diluted share shows the very strong results of our core wholesale and retail energy businesses and our natural gas pipelines," said Kenneth L. Lay, Enron chairman and CEO.  "The continued excellent prospects in these businesses and Enron's leading market position make us very confident in our strong earnings outlook."
>
> Non-recurring charges totaling $1.01 billion after-tax, or $(1.11) loss per diluted share, were recognized for the third quarter of 2001.  The total net loss for the quarter, including non-recurring items, was $(618) million, or $(0.84) per diluted share.
>
> "After a thorough review of our businesses, we have decided to take these charges to clear away issues that have clouded the performance and earnings potential of our core energy businesses," said Lay.

89.     Enron and its banks, including the Bank Defendants, downplayed the impact of the write-offs and represented to the public that Enron had resolved any balance sheet issues, taken all appropriate losses, and was going to achieve strong profitable growth due to the strength of its core businesses.

90.     In an October 16, 2001 conference call, Chairman Lay and Enron management told the public that Enron was in strong financial condition, and that its performance in the third

25

quarter of 2001 included a 35% increase in recurring net income and a 26% increase in diluted recurring earnings per share.  Lay told the public that Enron's core energy business fundamentals were excellent, and that the company would meet its fourth-quarter and year-end earnings targets.

91.     Of particular importance to debt investors, Lay said that Enron's liquidity was excellent, with a debt-to-total-capital ratio of about 50%, and that Enron did not foresee any credit downgrades.

92.     When questioned, Chairman Lay denied that Enron would be taking further write-offs.

93.     On October 16, 2001, Citigroup/Salomon issued an analyst report on Enron rating Enron stock a "Buy" and declaring that the write-offs would "clear[ ] the balance sheet of under-performing non-core assets which have been an overhang on the stock.  We . . . view these write-offs positively in the long run."

94.     Also on October 16, Bank of America released a report on Enron that continued to rate the company a "strong buy" and included its optimistic forecast for Enron earnings in 2001 and 2002.  An energy analyst for Bank of America advised that "we like the energy marketing and trading industry, and we like Enron, being the biggest energy trader.  It's an industry that is benefitting from deregulation in the United States and Europe.  Volatility we think will be a positive.  Enron does risk management and we see that as a good, long term investment."

95.     Another Bank of America analyst commented on October 16, 2001: "we believe the company has cleared the woods and therefore its investment outlook is positive.  We reiterate our Strong Buy recommendation and $45 price target."

96.     Goldman Sachs continued to keep Enron on its Recommended List, its top rating. On October 17, Goldman Sachs issued a statement that "we remain confident that [Enron's] core businesses have high and sustained growth prospects, that [Enron] can grow at an over 20% rate [long term] and that [charges] to dispose of non-core operations will undershoot fears."  Enron remained on Goldman Sachs' Recommended List.

97.     Also on October 17, 2001, JPMorgan issued a report on Enron, continuing to rate it a "Buy," and commenting that Enron had released "strong third quarter results" the day before.

98.     Two days later, on October 19, 2001, Citigroup/Salomon issued a report rating Enron a "Buy" and maintaining its forecast for healthy earnings in 2001 and 2002; it "reiterate[ed] [its] Buy rating on Enron after untangling part of a complicated story involving their balance sheet, cash flow and business practices."

99.     On October 20, 2001, JPMorgan issued another report on Enron, rating the company a "long term buy," maintaining its previous earnings forecasts, and commenting that, despite the recent disclosures by the Company, "there is scant evidence of business impairment."

100.     On October 22, 2001, Enron issued a press release disclosing that the SEC had commenced an informal inquiry into its accounting for certain related party transactions.  In this press release, Enron stated that these transactions had been approved by the Enron Board of Directors, legal counsel, and Andersen.

101.    On October 23, 2001, on a conference call with investors, Enron management expressed disappointment with its stock price and dismissed emerging criticisms of LJM[1] – which it termed a "private equity partnership."  Lay stated that LJM Transactions had been reviewed by inside and outside auditors and lawyers, and approved by the Board of Directors of Enron.  Lay reaffirmed "faith and confidence" in Mr. Fastow and praised his work as CFO. Management denied that there was any impropriety in its transactions with LJM and other special purpose entities, and claimed that the earnings from its transactions with SPEs would have been the same even if the transactions had been with unrelated third parties.  Management told the public that a Chinese wall[2] and other prophylactic structures were in place to ensure that any transactions with LJM served the paramount interests of the company and its well-being.

102.    On October 23, 2001, CSFB issued a research report reiterating its "STRONG BUY" recommendation and a $54 target.

103.    That same day, JPMorgan issued another report on Enron continuing its "buy" rating "in the wake of severe price underperformance," which it attributed to "a crisis of perception that Enron can address through further clarity and transparency," and asserting that the SEC inquiry "will be concluded relatively quickly."

---

[1]  The LJM entities, discussed below at ¶¶ 192 - 226, were special purpose entities which Enron used to hide debt and inflate earnings.

[2]  Section 15(f) of the Exchange Act, 15 U.S.C. § 78o(f) provides, "Every registered broker or dealer shall establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of such broker's or dealer's business, to prevent misuse … of material, nonpublic information by such broker or dealer or any person associated with such broker or dealer."  The Act also permits the SEC to make appropriate rules or regulations about these policies and procedures. See 17 C.F.R. §§230.137, 230.138, and 230.139.  Thus an investment bank is required to erect a Chinese wall between its securities analysts' research department and its divisions providing commercial banking, underwriting, or other services to issuers of securities to prevent inside information garnered by the latter from influencing the former.

104.     On October 24, 2001, Goldman Sachs reiterated its Recommended List rating (its top rating) and stated "we believe these concerns are very much exaggerated."

105.     On October 26, 2001 CSFB reiterated its "STRONG BUY" rating and a $54 target.

## V.

## PLAINTIFFS' INVESTMENTS IN ENRON DEBT SECURITIES

106.     Plaintiffs relied upon publicly available information in investing in Enron debt securities.  They reviewed and considered Enron's financial statements in order to assess the current and recent financial condition of the company, including Enron's profitability, cash flow from operations, outstanding indebtedness, and capital structure.  Plaintiffs reviewed historical data concerning Enron in order to confirm that Enron had demonstrated the ability to generate positive cash flow sufficient to service its debt.

107.     Particularly important to Plaintiffs was their review of the offering documents for the 7% Notes and Zero Notes.  The offering documents are required to include a number of disclosures that are important to investors including, but not limited to, the relative seniority of the offering, terms of the debt, the tax implications of the offering, and an assessment of the key risk factors that investors should consider in advance of investing in the securities.  The registration statements/prospectuses were key to Plaintiffs' review process, and they relied upon those documents in making their investment decision.  Plaintiffs believed in the professional competency of Enron's underwriters, including the Bank Defendants, and relied on their unique ability to conduct due diligence on the company and their obligation to do so in a meaningful fashion to further insure that the disclosures were complete and accurate.

29

108.     Plaintiffs also relied upon the trustworthiness of other publicly available information concerning Enron, including the reports of ostensibly independent research analysts, including those employed by the Bank Defendants.

109.     Because Plaintiffs were investing in debt securities, a key consideration in deciding whether to invest was the likelihood that Enron would be capable of returning Plaintiffs' capital in full, and of servicing the outstanding debt with timely interest payments.

110.     Plaintiffs relied upon the information disclosed by Enron, documented by management, and confirmed by Andersen and the bank underwriters in making their investment decisions.  This information was both filed directly with the SEC and was also incorporated by reference in the registration statements and prospectuses for the 7% Notes and Zero Notes in which the Plaintiffs invested.  Plaintiffs relied on the representations made by the Defendants and believed the representations to be complete, accurate, and timely.  This reliance on the reported historic public information concerning Enron caused the massive losses suffered by the Plaintiffs.

111.     The publicly disclosed information failed to consolidate off-balance-sheet affiliated entities in accordance with GAAP, failed to disclose off-balance-sheet transactions, including prepays and other hidden obligations, in accordance with GAAP, and failed to disclose the associated hidden obligations of the off-balance-sheet entities and transactions as a possible risk factor.

## VI.

### ENRON'S REVELATIONS AND FINANCIAL COLLAPSE

112.     On October 31, 2001, the SEC's inquiry became a formal investigation.

30

113.    On October 31, 2001, a Merrill Lynch analyst wrote:

Once the dust settles and some semblance of credibility returns, we do think
[Enron] should ultimately return to a more traditional P/E valuation … [Enron]
valuation looks like $24.70 to $31.50.

114.    On November 1, 2001, Enron issued a press release stating:

ENRON SECURES COMMITMENTS FOR ADDITIONAL $1 BILLION IN
FINANCING

Enron Corp. announced today that JPMorgan (the investment banking arm of
JPMorgan Chase & Co.) and Salomon Smith Barney Inc. (the investment banking
arm of Citigroup Inc.) as co-arrangers have executed commitment letters to
provide $1 billion of secured credit lines. … The proceeds will be used to
supplement short-term liquidity and to refinance maturing obligations.…

"With more than $1 billion in cash currently on our balance sheet, this additional
credit capacity will further solidify Enron's standing as the leading market maker
in wholesale energy markets," said Kenneth L. Lay, Enron chairman and CEO.
"We very much appreciate the support of two of our longstanding banking
partners, JPMorgan and Citigroup."

"This is yet another step in our efforts to enhance market and investor
confidence," said Jeffrey McMahon, Enron's chief financial officer.  "We are
moving aggressively to strengthen our balance sheet and maintain our investment
grade credit rating."

115.    On November 5, 2001, CSFB issued a research report continuing to recommend

Enron with a "STRONG BUY" rating.

116.    On November 8, 2001, Enron announced that it would be restating its audited

annual financial statements for 1997, 1998, 1999, and 2000, and its quarterly financial statements

for the first two quarters of 2001.

117.    Also on November 8, 2001, Enron filed a Form 8-K with the SEC, signed by

Richard Causey as Enron's Executive Vice President and Chief Accounting Officer, which

included its restated financials for 1997 through 2001, and disclosed partial information

concerning its off-book, related party transactions.  In this filing, Enron stated that:

a.   It had been forced to restate its annual and quarterly financial statements for the years ended December 31, 1997 through December 31, 2000 and its quarterly financial statements for the periods ended March 31, 2001 and June 30, 2001;

b.   The quarterly and annual financial statements from 1997 through 2001 "should not be relied upon";

c.   The restatement of prior period financial statements would reflect and include: (1) a $1.2 billion reduction to shareholders' equity to be booked in the third quarter of 2001, related to a transaction that had been previously reported as an increase in assets and shareholders' equity; and (2) the consolidation of the financial statements of three entities which engaged in related party transactions with Enron and/or in which Enron had an ownership interest, as required under GAAP;

d.   That a Special Committee had been created, headed by a newly appointed director, to review the related party, off-book transactions;

e.   That Enron's Chief Financial Officer Andrew Fastow ran related party limited partnerships, with which Enron engaged in off-book transactions, and for which Fastow received management fees of at least $30 million;

f.   The financial statements and financial activities of Chewco and JEDI should have been consolidated with the financial statements of Enron beginning in November 1997; and

g.   The financial statements and financial activities of a LJM1 subsidiary should have been consolidated with the financial statements of Enron beginning in 1999.

118.   Enron's annual financials were restated as follows:

| RESTATEMENTS | | | | |
|---|---|---|---|---|
| | 1997 | 1998 | 1999 | 2000 |
| Recurring Overstatements of Net Income | $96,000,000 | $113,000,000 | $250,000,000 | $132,000,000 |
| Understatement of Debt | $711,000,000 | $561,000,000 | $685,000,000 | $628,000,000 |
| Overstatement of Share-holders' Equity | $313,000,000 | $448,000,000 | $834,000,000 | $1,164,000,000 |

119.     These restatements constitute an admission that the representations made in the
original financial statements and other financial information contained in the registration
statements and prospectuses for the 7% and Zero Notes, including the asserted compliance of
those financial statements with GAAP, were materially false and misleading when made.  Under
GAAP, financial statements are restated only when the facts that necessitate the restatement were
material and known or knowable at the time the financial statements were originally issued.
Similarly, restatements may only be made and are required where material accounting errors or
irregularities existed at the time the financial statements were prepared.

120.     As large as the 1997 to 2000 financial restatements were, they just scratched the
surface of the true extent of the prior falsification of Enron's financial statements because Enron,
its advisors, and the banks were still trying to keep Enron afloat and trying to conceal how
extensive the abuse had been.  At this point in time Enron had disclosed debt on its balance sheet
of approximately $13 billion.  Ultimately, over 24,000 liquidated proofs of claim reflecting $840
billion in claims were filed in the Enron bankruptcy.  Allowed Enron North America debenture
claims exceeded $51 billion, and allowed claims on Enron's 7% Notes exceeded $402 million,

33

claims on the Zero Notes exceeded $1.25 billion, and there were billions more in claims on Enron's other senior debt.

121.     At the time the restatements were issued, the Bank Defendants were still recommending that investors purchase Enron securities.

**A.     Failure to Consolidate Special Purpose Entities in Violation of GAAP**

122.     Enron's financial statements from 1997 through 2001 were materially false and misleading, and therefore had to be restated, primarily because of the improper use of so-called special purpose entities to engage in off-book or off-balance-sheet transactions with Enron.  A special purpose entity (sometimes referred to "SPE") is an entity created by a sponsor to carry out a specified purpose or activity, such as to consummate a specific transaction or series of transactions with a narrowly defined purpose.  SPEs are generally used as financing vehicles in which assets are sold to a trust or similar entity in exchange for cash or other assets funded by debt issued by the trust.  SPEs are often used in a structured transaction or series of transactions to achieve off-balance-sheet treatment for accounting purposes.  Special purpose entities were used by Enron to hide debt, hide underperforming assets and manipulate its revenue, earnings and cash flow from operations.  Enron would purport to "sell" assets to special purpose entities at prices that Enron never could have received in a true arms-length sale, creating the appearance that Enron was generating cash from operations, rather than from financing through non arms-length deals.

123.     The effect of these SPE transactions was to artificially inflate Enron's revenue, earnings and cash flow from operations, and improperly exclude billions of dollars of debt from Enron's balance sheet.

34

**B.     The Collapse of the Merger with Dynegy**

124.     On November 9, 2001, Enron announced the signing of a definitive merger agreement with its competitor Dynegy.  Under the deal, Dynegy would acquire Enron for approximately $9 billion in Dynegy stock and the assumption of $13 billion in debt.  With this merger agreement it appeared to the public that Enron had value and would survive.

125.     A November 20, 2001, Merrill Lynch report stated, "Merger (with Dynegy) unshaken."

126.     On November 20, 2001, CSFB issued a report continuing to rate Enron as a "Strong Buy."

127.     On November 12, 2001, Goldman Sachs issued a report describing the Enron/Dynegy merger as a "Strong Combination" with "major accretion to Dynegy."  Enron was maintained on Goldman Sachs' Recommended List with a price target of $11 to $12.

128.     On November 27, 2001, it was reported that the Dynegy deal was being renegotiated and that new terms would be announced.  The Chairman of JPMorgan and Vice Chairman of Citigroup/Salomon called Moody's to pressure them to keep Enron's investment grade credit rating in place.

129.     On November 28, 2001, Dynegy announced the termination of the merger agreement with Enron, and S&P downgraded Enron's debt securities to "junk bond" status (*i.e.*, below investment grade).  After these announcements, the value of Enron's securities, both debt and equity, collapsed.  From a market price high of $90.75 in 2000, and a price of approximately $85 per share at the beginning of 2001, Enron common stock plummeted to a mere 26 cents by the end of November 2001.

C.      **Enron's Chapter 11 Filing**

130.    On December 2, 2001, Enron filed Chapter 11 bankruptcy, constituting what was then the largest bankruptcy in U.S. history.

131.    The disclosures and revelations of October and November 2001, were just the beginning.  After it filed for bankruptcy, Enron's equity and debt securities were practically worthless; the 7% Notes were trading at approximately seven cents on the dollar.  Assuming Enron had approximately $60 billion in obligations, based on its market capitalization of approximately $22 billion as of October 1, 2001, Enron investors suffered over $75 billion of losses over a two month period from October 1 to December 1, 2001.

132.    The November restatement, although material, did not scratch the surface of the extent of the Enron fraud.  This was confirmed in April 2002 in a court filing by Stephen F. Cooper, the Chief Restructuring Officer for Enron.  This document stated:

> [C]urrent management of the Company has not undertaken, and does not intend to undertake, a comprehensive review of accounting adjustments, including asset impairments and write-downs, relating to previously reported financial information, and has not prepared a consolidated balance sheet of the Company as of December 31, 2001 prepared in accordance with generally accepted accounting principles.  However, current management believes that, if such a review were conducted and balance sheet prepared, a significant write-down of assets on such balance sheet would be required, which current management estimates would be approximately $14 billion. …
>
> [A] material portion of such estimated amount would relate to valuations of several assets the historical carrying value of which current management believes may have been overstated due to possible accounting errors or irregularities.
>
> In addition to the aforesaid write-down of assets, current management has identified potential downward adjustments on certain price risk management assets and collateral subject to set-off. … [C]urrent management believes that these adjustments could fall in the range of $8 billion – $10 billion.

36

133.    The magnitude of the fraud is also confirmed in the evidence presented by the

U.S. Senate Permanent Subcommittee on Investigations "The Role of the Financial Institutions

in Enron's Collapse" (attached hereto as Exhibit B) and the Reports by the Court Appointed

Examiner, Neal Batson (the "Examiner") (attached hereto, in parts, as Exhibits E-I).  According

to the Examiner, "Enron so engineered its reported financial position and results of operations

that its financial statements bore little resemblance to its actual financial condition or

performance."

## VII.

## THE ENRON NOTE OFFERINGS

A.    **The 7% Notes Offering**

  *1.    Offering Summary*

134.    In July of 1999, Enron made a public offering of 7% Exchangeable Notes,

exchangeable into common stock of EOG Resources, Inc. (formerly named Enron Oil & Gas

Company ("EOG Resources")).  EOG Resources had originally been a subsidiary of Enron, but

had been spun off and was now an independent public company.  Upon maturity of the 7%

Notes, Enron was contractually required to deliver its remaining EOG shares to the holders of the

7% Notes in satisfaction of the principal.  At the time of the 7% Notes offering, Enron owned

enough shares of EOG Resources to satisfy that obligation.  In essence, Enron pre-sold its

remaining 11.5 million EOG shares, through the 7% Notes, with delivery expected at maturation

of the notes, July 31, 2002.

135.    Enron filed the preliminary registration statement and prospectus with the SEC on

Form S-3 filed July 23, 1999, Form S-3/A as amendment No. 1 filed August 2, 1999, Form S-

3/A as amendment No. 2 filed August 10, 1999, and a Form 424(b)(1) prospectus filed August 11, 1999 (collectively, the "registration statement").  Those signing the registration statement included Defendants Lay, Skilling, Causey, and Fastow.

136.    The registration statement for the 7% Notes incorporated by reference Enron's annual financial statements for the year 1998 as well as for the first quarter of 1999:

> The SEC allows us to "incorporate by reference" the information we file with them, which means that we can disclose important information to you by referring you to those documents.  The information incorporated by reference is an important part of this Prospectus, and information that we file later with the SEC will automatically update and supersede this information.  We incorporate by reference the documents listed below and any future filings made with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act until we sell all of the securities:
>
> -    Our Annual Report on Form 10-K for the year ended December 31, 1998;
>
> -    Our Quarterly Report on Form 10-Q for the quarter ended March 31, 1999; and
>
> -    Our Current Reports on Form 8-K, filed January 26, 1999 and March 18, 1999.
>
>     The amendments to the Registration Statements incorporated [Enron's] Annual Report on Form 10-K for the fiscal year ended December 31, 1998, as amended by Amendment No. 1 on Form 10-K/A; and
>
> -    [Enron's] Quarterly Report on Form 10-Q for the quarter ended March 31, 1999.

137.    The prospectus for the 7% Notes contained financial information for Enron for the period 1994 through March 31, 1999.  This financial history painted a picture of a company that was strong, profitable and capable of servicing its indebtedness.  The assessment of historical financial information is particularly important for debt investors because they are looking for evidence that they will get their money back.  The assessment of historic performance and trends

38

is critical for debt investors because, unlike equity investors, they are not participating in the future growth of the company.

### 2.    Misstatements and Omissions

138.    In addition to the acknowledged material errors in the financial statements that resulted in the November 2001 restatements of Enron's financial statements for the 1997 to 2000 period, there was virtually no disclosure included in the registration statement or prospectus for the 7% Notes as to the type, number and magnitude of the company's related-party and off-balance-sheet activities and resulting obligations.  This information was not disclosed or even mentioned as a risk.

139.    As described in the first report by the Examiner, the disclosure of Enron's obligations related to the SPE transactions was not in accordance with GAAP.

140.    The off-balance-sheet transactions were very sophisticated and relied on a particular legal interpretation and accounting treatment to ensure that they were properly excluded from Enron's financial statements.  Given the evolution of both legal interpretations and accounting methodology with respect to financing vehicles, and the fact that any small change in legal interpretation or accounting practice could trigger consolidation of the off-balance-sheet structures (to say nothing of Enron's secret guarantees, oral promises and other contrivances), the risk that these transactions might be required to be included in Enron's financial statements should have been disclosed to investors.  If these structures had been identified as a possible risk, potential investors would have been able to take the necessary steps to assess the impact these transactions would have had on the value and viability of this investment.

39

141.    For example, Plaintiffs believed they were investing in a company with $7.4

billion in debt obligations as of December 1998.  Instead, Enron's obligations, as revealed after

the restatements, totaled $29.5 billion, an understatement of $22.1 billion.  This was a material

misrepresentation.  Enron's assets and liabilities were consistently and grossly understated from

1994 through 1999:

| (All Figures In $ Millions) | Dec. '99 | Dec. '98 | Dec. '97 | Dec. '96 | Dec. '95 | Dec. '94 |
|---|---|---|---|---|---|---|
| Assets on Balance Sheet | 33,381 | 29,350 | 22,552 | 16,137 | 13,239 | 11,966 |
| Total Assets | 60,364 | 51,475 | 36,103 | 27,690 | 23,798 | 21,132 |
| Understatement | 26,983 | 22,125 | 13,551 | 11,553 | 10,559 | 9,166 |
| Long Term Debt on Balance Sheet | 7,151 | 7,357 | 6,254 | 3,349 | 3,065 | 2,805 |
| Actual Long Term Debt | 34,134 | 29,482 | 19,805 | 14,902 | 13,624 | 11,971 |
| Understatement | 26,983 | 22,125 | 13,551 | 11,553 | 10,559 | 9,166 |

142.    The financial picture and risk factors that were disclosed in the July 1999

registration statement and prospectus were materially incomplete, incorrect and misleading,

resulting in Plaintiffs' inability to fairly evaluate Enron's financial condition.  Plaintiffs relied on

the accuracy of the historical financial information contained in these offering materials for the

7% Notes in making their investment decisions.

**B.    The Zero Notes Offering**

*1.    Offering Summary*

143.    The Zero Notes were issued in a two-step process.  The first stage was an ostensible private placement.  However, the private placement explicitly contemplated a subsequent, second stage public offering of the same Notes within a few months.

144.    In this regard, under Enron's agreement with the initial underwriters of the Zero Notes, including Defendants JPMorgan, Deutsche Bank and Barclays, Enron was obligated to complete the registration of the Zero Notes within 180 days of the initial offering.

145.    To ensure that the registration in fact took place, and the public offering went to market as agreed, Enron was subject to liquidated damages in the event of a breach of its registration obligations.

146.    The initial underwriters and any resellers in the subsequent public offering were given the right to participate in the preparation of the registration statement and the prospectus included therein, and were given access to Enron's books and records, as well as Enron personnel, to conduct a reasonable investigation of Enron's business and finances.  The initial underwriters also helped to prepare and then disseminate the offering memorandum for the stage one offering to prospective buyers, including Silvercreek.

147.    Except for the incorporation of later SEC filings by Enron, the prospectus for the stage two public offering of the Zero Notes was substantially identical to the offering memorandum for the stage one private placement.

148.     The initial underwriters, including JPMorgan, Deutsche Bank and Barclays are prominently featured on the front page of the offering memorandum, and participated in the preparation and distribution of the memorandum.

149.     In the initial stage one private placement on February 7, 2001, Enron sold $1.9 billion in Zero Notes, convertible into common stock of Enron, to the initial underwriters, including Defendants JPMorgan, Deutsche Bank and Barclays.  The initial underwriters then resold some of the Notes to institutional purchasers, including Defendant CSFB, and resold the balance in the stage two public offering, once the registration statement for these Notes had become effective.  Several of the institutional purchasers, including Defendant CSFB, likewise resold the Zero Notes in the public offering.

150.     The public offering of the Zero Notes began in June of 2001.  Enron filed the preliminary registration statement and prospectus with the SEC on Form S-3 dated June 1, 2001.  Enron also filed Form S-3/A as amendment No. 1 dated July 13, 2001, a Form 424(b)(3) prospectus dated July 18, 2001, and supplements 1-4 to the Form 424(b)(3) prospectus dated August 3, 2001, August 15, 2001, September 21, 2001, and October 11, 2001, respectively (collectively, the "registration statement").  Those signing the registration statement for the Zero Notes included Defendants Lay, Skilling, Fastow, and Causey.

151.     Enron, in desperate need of cash, sold the Zero Notes to the initial underwriters, who then resold the Notes or hedged their risk of loss on the Notes by shorting Enron's common stock.  Enron registered the Zero Notes with the SEC to enable the initial underwriters and the reselling purchases to sell the Notes in the broader public market.  The proceeds were used by

Enron to reduce its short-term debt, *i.e.*, commercial paper and/or bank debt owed to JPMorgan, among others, in order to keep the Ponzi scheme alive.

152.    Deutsche Bank, JPMorgan, and Barclays were initial underwriters of the Zero Notes.  Subsequent buyers in the private placement (including CSFB) purchased with the intent to re-sell the Notes in the public market.  CSFB is likewise an underwriter of the Zero Notes.

153.    The registration statement for the Zero Notes stated that the resellers in the public offering would be required to be named as a selling securityholder in the related prospectus; would be required to deliver a copy of the prospectus to purchasers; and would be "subject to certain of the civil liability provisions under the Securities Act in connection with such sales." Further, selling securityholders and those other entities who participated in the distribution of the Notes "may be deemed to be underwriters within the meaning of the Securities Act."  Defendants JPMorgan, Deutsche Bank, Barclays, and CSFB purchased the Zero Notes with a view to the distribution of those securities and were underwriters of this offering.

154.    The registration statement and prospectus for the Zero Notes stated:

We incorporate by reference in this Prospectus the following documents filed by us with the SEC:

- Our Annual Report on Form 10-K for the fiscal year ended December 31, 2000;

- Our Quarterly Report on Form 10-Q for the quarter ended March 31, 2001;

- Our Current Reports on Form 8-K filed with the SEC on January 31, 2001 and February 28, 2001; and

- The description of our capital stock set forth in our Registration Statement on Form 8-B filed on July 2, 1997.

### 2.    *Misstatements and Omissions*

155.    In addition to the materially misstated revenue, earnings, cash flow from operations and debt (acknowledged in the November 2001 restatement and further confirmed in the April 2002 report by the Chief Restructuring Officer, the Powers Report, and the Reports of the Examiner), the offering memorandum, registration statement and prospectus for the Zero Notes did not disclose the type, number and magnitude of Enron's related-party and off-balance-sheet activities and resulting obligations.  This information was not disclosed or even mentioned as a risk.

156.    As alleged above, Enron disclosed debt of approximately $13 billion on its balance sheet, whereas its actual total debt was many billions of dollars more.  In addition to the materially incorrect financial statements, all the financial ratios in the prospectus were wrong and misleading.  Historic financial ratios are of particular importance to an investor in debt securities.

157.    Each of Deutsche Bank, JPMorgan, Barclays, and CSFB knew that the information contained in the offering memorandum and subsequent prospectus was materially misleading, did not reflect the true financial condition of Enron, and was intended to deceive.

### C.    **Plaintiffs' Note Purchases**

### 1.    *Summary of Purchases*

158.    Plaintiffs purchased Enron debt securities in October of 2001, and were damaged thereby.  Prior to making any debt purchases, Plaintiffs, through their agent Plaintiff SMI, read the prospectus for the 7% Notes and the offering memorandum and prospectus for the Zero Notes and relied on the accuracy and completeness of the information contained therein.  At the time that Plaintiffs were making their investments, Enron was one of the most highly

44

Case 1:02-cv-08881-JPO   Document 49-15   Filed 08/24/16   Page 51 of 282

recommended companies by the analysts on Wall Street, including the Bank Defendants' analysts. It was reported to be a Baa1/BBB+ investment grade credit, with a multi-billion dollar equity market capitalization and a long history of stable financial performance. Because Plaintiffs were investing in senior bonds, Enron would have had to lose at least $20 billion of equity value before Plaintiffs' investment would potentially start to be impaired. Plaintiffs were not buying distressed securities. They were buying senior bonds of an investment grade highly regarded company. Plaintiffs' investments were or should have been relatively low-risk, yield-oriented trades. Unlike a common equity investment (or a distressed security investment), there was not a large potential upside. To be successful, all that was required was that the company stay solvent – which, at the time that Silvercreek's investments were made, seemed certain. However, the financial information in the prospectuses did not reflect the company's true financial condition.

159. The Plaintiffs purchased Enron debt securities as follows:

    a.    Plaintiff Silvercreek II Limited initially purchased 7% Notes in October 2000. This position was closed out prior to October 24, 2001. Plaintiff Silvercreek II Limited re-purchased 7% Notes on October 24 and 25, 2001, and purchased Zero Notes on October 18 through October 26, 2001;

    b.    Plaintiff OIP Limited initially purchased 7% Notes in October 2000. This position was closed out prior to October 24, 2001. Plaintiff OIP Limited re-purchased 7% Notes on October 24, 25, and 26, 2001, and purchased Zero Notes on October 19 through October 24, 2001;

    c.    Plaintiff Pebble Limited Partnership initially purchased 7% Notes in October 2000. This position was closed out prior to October 24, 2001. Plaintiff Pebble Limited Partnership re-purchased 7% Notes on October 24 and 26, 2001, and purchased Zero Notes on October 19 through 24, 2001; and

    d.    Plaintiff Silvercreek Limited Partnership initially purchased 7% Notes in October 2000. This position was closed out prior to October 24, 2001.

Plaintiff Silvercreek Limited Partnership re-purchased 7% Notes on October 24 and 25, 2001, and purchased Zero Notes on October 19 through 26, 2001.

### 2. Reliance on Prospectuses and Historic Financial Information

160.     Prior to Plaintiffs' purchases of the Zero Notes, Enron had not made generally available to securityholders an earnings statement covering a period of at least 12 months beginning after the effective date of the registration statement for those Notes.  The prospectus was dated July 18, 2001, with supplements dated as late as October 11, 2001.

161.     In purchasing the Zero Notes, Plaintiffs relied on the offering memorandum, the registration statement, including the prospectus, the financial information contained therein, and the financial statements incorporated by reference therein.

162.     Prior to Plaintiffs' initial purchases of the 7% Notes, Enron had not made generally available to securityholders an earnings statement covering a period of at least 12 months beginning after the effective date of the registration statement for those Notes.  Prior to Plaintiffs repurchase of the 7% Notes, Enron had not made generally available to securityholders an earnings statement covering the year 2001.  In fact, given the November 2001 restatement, Enron had not made generally available a valid, accurate, non-misleading earnings statement for any 12 month period between the effective date of the registration statement for the 7% Notes and the date of Silvercreek's purchases.

163.     In purchasing the 7% Notes, Plaintiffs relied on the registration statement, including the prospectus, the financial information contained therein, and the financial statements incorporated by reference therein.

### 3.      *Reliance on Publicly Available Information*

164.    In making the purchases of these Enron debt securities, Plaintiffs, and each of

them, either directly or through their agent, Plaintiff SMI,  read, reviewed, and relied upon the

following:

a.      The registration statement for the Zero Notes, including the prospectus, and all information and documents incorporated therein by reference;

b.      The offering memorandum for the Zero Notes, which the initial underwriters helped to prepare, including Defendants JPMorgan, Deutsche Bank and Barclays;

c.      The registration statement for the 7% Notes, including the prospectus, and all information and documents incorporated therein by reference;

d.      Enron's Annual Reports, including but not limited to the 1999 and 2000 Annual Reports, and the 1999 and 2000 Form 10-Ks filed with the SEC, including the financial statements contained therein;

e.      Enron's quarterly financial statements as filed with the SEC on Form 10-Q, including but not limited to financial statements for the fiscal years of 1999 and 2000, and the first two quarters of 2001;

f.      Enron's press releases and earnings announcements, including but not limited to public announcements as to the financial results for Enron for the years 1999 and 2000, and the first two quarters of 2001;

g.      Information contained in the Enron Website;

h.      Public credit ratings for the Enron notes purchased by Plaintiffs, including ratings, press releases, and information from S&P, Moody's and Fitch;

i.      Investment research regarding Enron provided by securities brokerage firms, including but not limited to the Bank Defendants named in this complaint;

j.      Representations made by securities research analysts including but not limited to those employed by the Bank Defendants, who all commented favorably on the October 2001 announced financial results of Enron and reiterated their "Buy" ratings on the company; and

47

    k.     Representations made by Enron officers and representatives in conference calls with investors on October 16 and October 23, 2001.

**4.**    ***Economic Losses Suffered as a Direct Result of Silvercreek's Reliance on Materially Misleading Information***

165.    As reflected in Exhibit A, Plaintiffs have sustained economic losses as follows:

    a.     Plaintiff Silvercreek II Limited has sustained economic losses in excess of **$41.9 million** on Enron 7% Notes and in excess of **$12.4 million** on Enron Zero Notes;

    b.     Plaintiff OIP Limited has sustained economic losses in excess of **$28.7 million** on Enron 7% Notes and almost **$3 million** on Enron Zero Notes;

    c.     Plaintiff Pebble Limited Partnership has sustained economic losses in excess of **$10.3 million** on Enron 7% Notes and in excess of **$2.1 million** on Enron Zero Notes;

    d.     Plaintiff Silvercreek Limited Partnership has sustained economic losses in excess of **$18.6 million** on Enron 7% Notes and in excess of **$4.3 million** on Enron Zero Notes; and

    e.     Due to the reversal of accrued fees as a result of the Enron losses, Plaintiff SMI's direct share of the total losses comes to almost **$18 million** as to the Enron 7% Note trades and in excess of **$4.1 million** as to the Enron Zero Note trades.

166.    In addition, Plaintiffs are entitled to lost opportunity cost and/or prejudgement interest; Plaintiff SMI also suffered business damages including lost income from reduced assets under management and the withdrawal of existing clients.

## VIII.

## WRONGFUL FINANCIAL MANIPULATIONS, SCHEMES AND CONTRIVANCES

**A.**    **The Off-Book Financial Transactions**

### 1.    The Purposes and Effects of Enron's Use of Special Purpose Entities

167.    Enron's use of special purpose entities to manipulate its reported financial results was a primary reason why its financial statements were materially false and misleading.

168.    The purpose and effect of the SPE transactions was to artificially inflate Enron's revenue, earnings and cash flow from operations and improperly exclude billions of dollars of recourse debt from Enron's balance sheet.  The recourse debt was not disclosed and the proceeds from these obligations were actually reported as revenue and cash flow from operations.  The Bank Defendants directly participated in many of these transactions, and invested in many of the special purpose entities, knowing that they were being used to mislead the public, to generate false profits for Enron, and to hide debt and liabilities.

169.    Ordinarily, majority owned subsidiaries must be consolidated with the parent for financial reporting purposes, unless the parent does not actually exercise control over that subsidiary, or if such control is temporary.  If ownership is with a special purpose entity, the financial statements need not be consolidated if the parent does not maintain control over the assets transferred to that entity.  As discussed below, Enron, with the active participation of the Bank Defendants, created a series of SPEs that appeared to own assets; in reality, Enron actually controlled and continued to own the assets.

170.    Enron took the position that an entity did not have to be consolidated if there was as little as 3% independent ownership of the entity.  Although that position had no clear foundation, many of the SPEs never even had 3% independent equity ownership, despite the deceptive efforts of several of the Bank Defendants, described below, to make it appear that 3%

49

independent ownership did exist.  It was improper under GAAP to exclude these SPEs from Enron's reported financial results.

171.    Enron's extensive use of SPEs resulted in a massive understatement of its obligations and overstatement of its earnings and cash flow.  For example, according to the Powers Report, which was commissioned by Enron, SPEs resulted in Enron over-reporting its earnings for the third quarter of 2000 through the third quarter of 2001 by almost $1 billion.  At a private meeting with its bankers in November 2001, Enron disclosed that in addition to the $13 billion in debt on its balance sheet it also had an additional $25.1 billion in undisclosed debt.  Of this additional $25.1 billion, $13 billion was attributed to transactions with SPEs.  In the end, this deceptive practice defrauded investors, including Plaintiffs, of billions of dollars and resulted in the collapse of the company.

172.    The SPE transactions were of two general types:  asset "sales" (in reality disguised loans) and purported "hedging" transactions (such as the Rhythms and Raptors Transactions discussed below).  Each transaction type was fraudulent and neither was disclosed nor accounted for properly.

173.    In an asset "sale" transaction, an Enron entity purported to sell an asset (typically an underperforming asset "sold" at an inflated price) to an SPE in exchange for cash and other consideration.  That cash was obtained through a loan to the SPE from a financial institution (including Defendants Barclays, CSFB, Merrill Lynch and JPMorgan).  However, unlike most transactions in which a person sells an asset, in these SPE transactions, Enron:

> a.    agreed to repay the debt incurred by the SPE to finance the purchase price (typically through an undisclosed total return swap with the financial institution);

Case 1:02-cv-08881-JPO   Document 49-15   Filed 08/04/16   Page 57 of 282

     b.        continued to control the "sold" asset;

     c.        retained the full economic risk of the asset (both upside and downside); and

     d.        in some cases, treated the transaction as a loan for tax (but not balance sheet) purposes.

174.     In reality, the asset was not sold to the SPE and the funds received from the SPE via the financial institution were actually a disguised loan to Enron and should have been disclosed as such.  Instead, Enron:

     a.        recorded a gain from the "sale" of the asset (*i.e.*, manufactured revenue and earnings);

     b.        categorized the loan proceeds as "cash from operations" (it was actually cash from financing); and

     c.        did not consolidate the asset, thereby moving any debt associated with the asset off-balance-sheet, including the additional debt associated with the funding of the "sale" (*i.e.*, substantial debt was hidden).

175.     As stated by the Examiner in his First Interim Report, "the only common characteristics in most of the Selected Transactions that support a sale characterization are the express terms of the documents that, among other things, state that the relevant transfers are sales, and that Enron accounted for most of these transactions as sales," (*i.e.*, they were "papered" as sales but in reality were loans).

176.     It is clear that the "lenders/investors" in these transactions (*e.g.*, Barclays, JPMorgan, CSFB, Merrill Lynch, etc.) viewed the arrangements as Enron debt (and not as an investment dependent upon the financial performance of the underlying assets).  Defendants Barclays, JPMorgan, and CSFB did not take a back-up security interest from the SPE, nor did they require legal opinions on true sale and non-substantive consolidation – the lenders were

really lending money to Enron.  In addition, the loan pricing was based on Enron's credit. However, the Bank Defendants worked with Enron to create documentation (including the creation of phony "equity") that had the appearance of a sale, thereby misleading investors, including Plaintiffs.

177.    In return for acting as the "front man" on these transactions, the SPEs (which had JPMorgan, Deutsche Bank, Merrill Lynch and CSFB as investors) received a very attractive "specified return on their equity," and Enron guaranteed their debt.  The SPEs did not take on any economic risk but were paid for a "service" (*i.e.*, to create and further the artifice and scheme to hide Enron debt and inflate its revenue and earnings).

178.    In the "hedging" transactions, the SPEs were used to manufacture earnings and hide substantial losses on underperforming assets.  These were highly improper transactions as Enron was, in effect, "hedging" with itself.  The company retained the risk associated with the assets and the sole benefit was the ability to deceptively manipulate its financial statements. These had a material impact on Enron's financial statements.  Two examples are the Rhythms Transaction and the Raptors Transactions, described later.  Defendants JPMorgan, Deutsche Bank and Merrill Lynch earned extraordinary returns from these transactions.

179.    For example, the rates of return on the four Raptor Transactions were 193%, 278%, 2500%, and a projected 125%.  According to the Powers Report "LJM2 was largely assured of a windfall from the inception of the transaction."

180.    Hence, there was an economic cost to these transactions as the SPE, such as LJM2, was paid to act as a "front man" for the fraudulent scheme.

181.     According to the First Interim Report of the Examiner, "Enron's obligations …
entered into in connection with the [SPE] Transactions were not properly disclosed in Enron's
financial statements as required by GAAP."

182.     Andrew Fastow further confirmed, in his November 2006 deposition,  that the
Bank Defendants were centrally involved in the deception that motivated Enron's structured
finance transactions:

> As a general rule and for most of the – related to most of the structured finance
> transactions in which I was engaged or involved or directed at Enron, they were
> done for one simple reason.
>
> When you boil it all down, Enron wanted to paint a picture of itself to the outside
> world that was different from the reality inside Enron.  And these structured
> finance transactions, along with other things that Enron did, created that
> deception.
>
> *   *   *
>
> There were many people involved in these transactions other than management of
> Enron.  Bankers, lawyers, accountants contributed in different ways … My
> personal view is that the people who were critical to doing these deals with Enron,
> creating these deals with Enron, based on my conversations with them, based
> upon what they did as a reaction to my description of Enron's financial reporting
> problems, understood the intent of these transactions.
>
> And the intent of these transactions was to make Enron look different to the
> outside world than it looked internally.  I believe that was a deception, and it
> caused a misrepresentation of Enron's true position.

### 2.     *Specific Examples of Improper Use of Special Purpose Entities*

183.     There are a number of examples of SPEs that Enron and its bankers used to
deceive investors.  The following sections summarize a few of the structures that are
representative of the financial manipulation perpetrated by Enron and its investment bankers.

### a.　　JEDI and Chewco

184.　　Joint Energy Development Investments Limited Partnership, which Enron called "JEDI," was a Delaware limited partnership.  From June 1993 through November 1997, Enron Capital Management LP of Houston served as JEDI's general partner, and the California Public Employees' Retirement System ("CalPERS") was the limited partner.  Because CalPERS was a genuinely independent entity, there was originally an arguable basis for the off-balance-sheet treatment of JEDI's financial results and JEDI's transactions with Enron (*i.e.*, non-consolidation).

185.　　In November 1997 CalPERS bowed out as the limited partner of JEDI, and no substitute independent investor could be found to take its place.  The departure of CalPERS created a significant issue for Enron.  As long as there was a truly independent limited partner, Enron was not required to consolidate JEDI in its financial statements, and it was able to record a number of profitable transactions it had executed with JEDI.  Unless the ownership structure of JEDI could be restructured and a new, independent investor added, Enron would be deemed to have control of JEDI and therefore would be required to consolidate JEDI into its financial statements. The impact of consolidating JEDI would have been material.  Approximately 40% of Enron's profits in 1997 were generated through transactions with JEDI.  In addition, approximately $700 million in debt would have been added to Enron's outstanding indebtedness.

186.　　Instead of consolidating JEDI, Enron, working with its bankers, created another entity, Chewco Investments LP ("Chewco").  Enron purchased CalPERS' limited partnership interest in JEDI, and then sold the interest to Chewco for $383 million, ($132 million financed by an interest-bearing loan from JEDI to Chewco, a $240 million loan from Barclays (guaranteed by Enron), and $11.4 million in "equity" loans from Barclays.  In an attempt to create the

appearance that an independent investor had a 3% stake in JEDI, Barclays' "equity loans" were "papered" in such a way as to facilitate their mischaracterization as equity contributions; however, the borrowers were required to deposit $6.6 million into cash reserve accounts with Barclays as security, thereby diluting Barclay's alleged "equity exposure" to well below the 3% level.

187.    The documentation for the "equity" loans was intended to allow Barclays to characterize the advances as loans while allowing Enron and Chewco to characterize them as equity contributions.  However, the existence of the cash collateral was fatal to Chewco's compliance with the 3% equity requirement.  As a result, Chewco should have been consolidated into Enron's financial statements from the outset (November 1997).

188.    Barclays knew that its so-called "equity loans" were being used as a pretext to justify the exclusion of Chewco and JEDI from Enron's financial statements.

189.    In fact, it was apparent to Barclays, and to anyone else who was aware of Chewco's operations, that Chewco (and therefore JEDI) was not independent of Enron, but was under Enron's complete control.  Chewco was managed by an Enron Global Finance employee, Michael J. Kopper, who reported to CFO Fastow.  In December 1997, Kopper deceptively transferred his ownership interest (but not management control) in Chewco to make it appear that Enron had no formal interest in Chewco.

190.    Enron's financial statements improperly failed to consolidate the financial results, assets and liabilities of JEDI and Chewco.  When Enron restated its financial results in November 2001, the revised financial statements consolidated JEDI and Chewco, which

represented an admission that JEDI and Chewco should have been included in Enron's financial statements since 1997.

191.     The failure to consolidate JEDI and Chewco's financial results enabled Enron to overstate its earnings by over $400 million during the 1997-2000 period, and to understate its indebtedness by over half a billion dollars.

### b.     LJM1 and LJM2

192.     LJM Cayman LP, commonly referred to by Enron as LJM1, and LJM2 Co-Investment, L.P., commonly referred to by Enron as LJM2, were private investment limited partnerships formed in 1999.  The LJM entities represented themselves as private investment companies engaged in acquiring or investing in energy and communications-related investments, primarily involving either assets that Enron wanted to sell, or risk management activities designed to limit Enron's exposure to price and value fluctuations pertaining to its assets.

193.     In fact, the LJM entities were solely a construct utilized to manufacture revenue and earnings, and hide debt for Enron.  They did not make any bona fide investments and had no purpose other than to hide Enron's true financial condition.  The investors in the LJM entities, including Defendants JPMorgan, Deutsche Bank, Merrill Lynch, and CSFB, directly participated in this fraudulent scheme and expected to earn extraordinary returns in exchange for their participation.  Enron guaranteed specified returns to the LJM entities, and they never lost money on a transaction, even when the "purchased" asset declined in value.

194.     Enron entered into more than 20 distinct transactions with the two LJM partnerships.  These transactions had a significant effect on Enron's financial statements.  Taken

together, they resulted in recognition of substantial amounts of false revenue and false income, avoidance in recognizing substantial losses, and the hiding of massive amounts of debt.

195.    LJM1 was formed in June 1999.  Enron raised $15 million from two limited partners: ERNB Ltd. (affiliated with CSFB) and Campsie Ltd. (affiliated with National West). LJM1 entered into three transactions with Enron:

    a.    A misleading attempt to "hedge" Enron's position in Rhythms stock;

    b.    The phony "purchase" of a portion of Enron's interest in a Brazilian power project (Cuiaba); and

    c.    An investment in Osprey Trust (an entity used to fund SPE transactions).

196.    Among those who invested in and helped structure the LJM2 entities were Defendants Merrill Lynch, CSFB, JPMorgan, and Deutsche Bank.

197.    Defendants Fastow and Merrill Lynch solicited prospective investors for LJM2 using a private memorandum that touted the benefits of this "insider" deal – Enron could control everything because it was on both sides of the transactions.  As stated in the memorandum, LJM2 presented "unusually attractive investment opportunities" resulting from the partnership's connection to Enron, and Fastow's "access to Enron's information pertaining to potential investments will contribute to superior returns."

198.    Merrill Lynch did not raise the necessary funds before the year-end 1999, and turned to, among others, Defendants JPMorgan, Deutsche Bank, CSFB, and Merrill Lynch itself to be underwriters of LJM2.  The Bank Defendants were eager to participate in LJM2 because of promises made to them by Enron that LJM2 would benefit (which it did) by engaging in lucrative self-dealing transactions with Enron that would be arranged by Defendant Fastow.  In

57

this regard, the underwriters were aware that Enron officers would control both sides of the transactions and thus insure high returns.

199.    JPMorgan, CSFB, Merrill Lynch, and Deutsche Bank provided "extraordinary" assistance to Enron in the set up of LJM2.  The banks provided pre-funding to the partnership at the end of 1999, which, being the close of Enron's annual reporting period, was a critical point in time for Enron.  The banks loaned almost 100% of the monies needed to fund LJM2.  JPMorgan provided an additional $65 million credit line to LJM2.

200.    LJM2 used the money in the final days of 1999 to buy several Enron assets that the company had failed to sell to other parties in arms-length transactions.  This enabled Enron to do deals involving Whitewing, collateralized loan obligations, the Nowa Sarzyna power plant, MEGS natural gas and Yosemite certificates, all to create phony revenue and profits and move debt off the balance sheet before the year-end reporting period.  The investors were rewarded by exorbitant returns – up to 2,500% on one deal and 51% overall within the first year.

201.    Hence, through an unusual pre-funding arrangement, the banks, including JPMorgan, CSFB, Merrill Lynch, and Deutsche Bank, directly helped Enron to manufacture fake revenue and profits and hide debt (thereby artificially propping up the value of Enron's public securities).  The banks also provided separate and substantial hidden loans to fund the transactions undertaken by LJM2.

202.    As with Chewco and JEDI, Enron was in complete control of both LJM1 and LJM2.  Fastow was the managing member of the general partner of both entities from the time of their creation until approximately July 31, 2001; during this same period Fastow was contemporaneously an officer and employee of Enron, serving as its Executive Vice President

and Chief Financial Officer.  Fastow received at least $30 million in "management fees" for his services as the managing member of the general partner of these two entities, while contemporaneously being paid by Enron.

203.    Part of the arrangement between Enron and the LJM entities was a "services agreement" whereby Enron made available to LJM1 and LJM2 the services of certain Enron officers and employees to provide "administrative assistance" to the general partners of LJM1 and LJM2.  In other words, officers and employees of Enron were used by Fastow to put together the paperwork, legal work, and other necessary aspects of the off-book transactions.  Enron also paid the LJM entities' management fees and transaction fees, and reimbursed them for transaction costs.

204.    Enron's transactions with these entities entailed obvious conflicts of interest, the most blatant of which were conflicts for Fastow.  Enron's Chairman Lay, Chief Accounting Officer Causey, and Chief Risk Officer Buy were supposed to review and sign off on every single transaction between LJM1 or LJM2 and Enron.  The Enron Board's Audit and Compliance Committee was required to conduct annual reviews of transactions between Enron and LJM1 and LJM2 completed during the prior year. These facts reflect the realization that LJM1 and LJM2 were not independent entities.

205.    From June 1999 through September 2001, Enron and Enron-related entities entered into dozens of business relationships involving hundreds of millions of dollars in which LJM1 or LJM2 participated.

206.    These relationships were of several general types, including: (a) mutual sales of assets between Enron and LJM2; (b) LJM1's and/or LJM2's purchases of debt or equity interests

59

in Enron-sponsored special purpose entities; (c) LJM1's and/or LJM2's purchases of debt or equity interests in Enron affiliates or other entities in which Enron was an investor; (d) LJM1's or LJM2's purchases of equity investments in SPEs, designed to reduce market risk in Enron's investments; (e) LJM2's sale of a call option and put option on certain assets; and (f) LJM2 obtaining a subordinated loan from an Enron affiliate.  Although these were all self-dealing transactions with controlled subsidiaries, in each case Enron accounted for them as if the transactions had been made with unrelated third parties, typically booking profits on the transactions while excluding from its balance sheet the debts incurred by these entities in financing these transactions.  These entities generated hundreds of millions of dollars of false earnings for Enron in the second half of 1999.

207.    Enron engaged in "hedging" transactions with many of the special purpose entities, whether created by Enron, its investments banks, or the LJM entities.  These included price swap derivatives, call options, and put options to allegedly hedge Enron's risk in certain investments having an aggregate notional amount of approximately $1.9 billion.  Enron provided credit support to the creditors of special purpose entities through the use of financial guarantees and hedging contracts (typically total return swaps).  Many of these transactions were not real hedges.  They did not transfer risk and were not entered into with an independent counterparty.

208.    LJM1's first deal was the Rhythms NetConnections, Inc. ("Rhythms") Transaction.  This transaction was significant for several reasons.  It was the first time that Enron transferred its own stock to an SPE and used the SPE to "hedge" an Enron merchant investment. In this respect, Rhythms was the precursor to the Raptor vehicles (described later).  Rhythms

60

also provided the first example of how transactions resulted in economic terms that were skewed toward the LJM entities and their investors.

209. Enron booked millions of dollars of pre-tax earnings based upon unrealized gains on its investment in Rhythms. As justification for recording this income, Enron took the position that it had hedged its investment risk by entering into a "put" agreement for those shares with an LJM1 affiliate ("Swap Sub"). This hedge was illusory, because it was a hedge with Enron's own alter ego. Swap Sub's ability to perform its obligations under the hedging agreement was entirely dependent on the value of its principal assets, which were shares of Enron stock that Enron had transferred to it. The net effect of the Rhythms Transaction was that Enron was "hedging" its risk with itself. There was no true economic hedge as Enron retained the economic risk of a loss. Under such circumstances, it was improper GAAP accounting for Enron to book profits in Rhythms stock and to avoid the booking of losses. In addition, LJM1 borrowed against the Rhythms investment and the obligation (debt) was hidden from Enron investors.

210. The Rhythms "hedge" was unwound in March 2000. The unwinding of this transaction resulted in a huge windfall for LJM1. Several Enron employees including Defendant Fastow had financial interests in the Rhythms' unwind.

211. On November 8, 2001, Enron announced that Swap Sub was not properly capitalized with outside equity and should have been consolidated. As a result, Enron restated prior period financial statements to reflect the consolidation, which had the effect of decreasing Enron's net income by $95 million in 1999 and $8 million in 2000.

212. In another example of an LJM1 transaction, in September 1999, Enron "sold" LJM1 a 13% stake in a company that was building an over-budget power plant in Cuiaba, Brazil.

This sale, for approximately $11.3 million, altered Enron's accounting treatment of a related gas supply contract and enabled Enron to claim $34 million of income in the third quarter of 1999 and another $31 million in the fourth quarter.  In August 2001, LJM1 sold its interest in Cuiaba back to Enron for $14.4 million (a large profit for LJM1 despite serious technical and environmental problems associated with the asset).  Enron didn't announce the deal until Fastow had sold his interest in LJM (to conceal Fastow's improper involvement.)

213.    The first seven LJM2 transactions (all at the end of 1999) entailed the sale of poorly performing assets to LJM2, and enabled Enron to move debt off its balance sheet and inflate its revenues, earnings and cash flow from operations for its 1999 financial statements (thereby meeting financial targets and Wall Street expectations).  In most of these transactions, Enron later repurchased the assets (at a profit for LJM2).

214.    According to the Report prepared by the Senate Permanent Subcommittee on Investigations regarding the Role of the Board of Directors in Enron's Collapse:

> The final list of Enron-LJM Transactions included Enron sales of turbines, Nigerian barges and dark fiber to LJM2; LJM1 and LJM2's participation in Whitewing and the Osprey debt certificates; monetization deals in which LJM1 or LJM2 purchased interests in Enron power plants in Brazil, Poland and elsewhere; LJM2's purchase of two tranches of Enron North America Credit Linked Obligations ("ENACLO"); LJM2's participation in Prepay Transactions called Yosemite and Bob West Treasure; and LJM2's participation in the four Raptor Transactions.

215.    The LJM entities were a significant element of the fraudulent scheme to make Enron's financial condition appear better than it was through deceptive asset "sales" and other complex financial transactions that appeared to eliminate Enron debt and generate revenue, earnings or cash flow on Enron's financial statements.

216.     In December 1999, Enron "sold" to LJM2 a 75% interest in a company that owned the Nowa Sarzyna power plant in Poland.  Enron did not want to consolidate this asset in its balance sheet.  Enron intended to sell the asset but was unable to find a buyer before year-end.  LJM2 paid $30 million – part loan and part equity.  Enron recorded a gain of $16 million on the sale.  On March 29, 2000, Enron and Whitewing (another SPE, described below) bought out LJM2's interest providing a return of approximately 25%.

217.     In December 1999, Enron "sold" to LJM2 a 90% equity interest in a company, MEGS LLC, that owned a natural gas gathering system in the Gulf of Mexico.  Enron had attempted to sell its interest to another party but was unable to close the transaction by year end.  Again, it wanted to avoid consolidating this asset for year-end reporting purposes.  LJM2 purchased notes and equity in MEGS for a combined amount of almost $50 million.  On March 6, 2000, Enron repurchased LJM2's interest, paying the amount necessary to provide LJM2 a 25% return.  Subsequently, Enron recorded impairment on the asset due to diminished performance.

218.     In June 2000, under pressure to meet financial targets for the second quarter, Enron arranged the "sale" of fiber optic cable assets to LJM2.  This transaction ostensibly generated $67 million in earnings and $100 million in "cash from operations" for Enron.  In fact, it was just a loan with LJM2 acting as a front man to hide the true nature of the deal.  In December 2000, less than six months later, LJM2 transferred the assets to another Enron SPE, earning a very attractive return in the process.

219.     In two transactions, LJM2 made direct and indirect investments in stock (and warrants convertible into stock) of New Power Holdings, Inc. ("New Power").  New Power,

formed in November 1999, was initially a wholly-owned subsidiary of Enron, and in October 2000 became a public company. New Power was engaged in the retail marketing and sale of commodities, products and services, including natural gas and electricity, to residential and small commercial customers in the United States. By taking New Power public and entering into a non-arm's length transaction with LJM2 to "crystallize" that value, Enron was able to take millions of dollars into income right at the end of 2000. However, Enron's New Power shares were not truly "sold," and Enron was still exposed to a decline in their value. When the price of New Power's stock collapsed, Enron did not take the losses against income but claimed they were "hedged" via the Raptors Transactions described below. In addition, Enron borrowed money against the New Power shares through LJM2, and hid its obligation for this debt in that SPE.

220.    Enron's financial statements improperly failed to include the financial results, assets, and liabilities of LJM1. When Enron restated its financial results in November 2001, it included a subsidiary of LJM1 in the revised financial statements, constituting an admission that these results should have been consolidated all along. Moreover, Enron's financial statements improperly included as income alleged profits on transactions between Enron and these LJM entities, and/or entities created by, and affiliated with, the LJM entities. Enron's obligations relating to the LJM Transactions were not properly disclosed according to GAAP.

221.    All the LJM Transactions had the purpose and effect of manipulating Enron's financial results, by creating the illusion of profits in transactions that Enron was doing, for all intents and purposes, with itself, while hiding from investors the massive debt obligations that were being incurred in these transactions. The Bank Defendants who participated in these LJM

64

entities, and the multifarious transactions they spawned, were well aware there was no legitimate business purpose for these transactions. Yet they were eager to participate in them, and to help design them in order to reap the outsized fees and other financial rewards Enron was handing out.

222.    In or about July 2001, Defendant Fastow sold his ownership interests in LJM1 and LJM2 to Kopper, and Fastow ceased to be the managing member of their general partners. Kopper, an officer and employee of Enron who worked directly under Fastow, resigned from Enron immediately before purchasing Fastow's interests.

223.    Kopper also was the controlling partner of a limited partnership that (through another limited partnership) in March 2000 purchased interests in affiliated subsidiaries of LJM1. In addition, four of the six limited partners of the purchaser were, at the time of the investment, officers or employees of Enron (assigned to work for LJM1 and LJM2), and a fifth limited partner was an entity associated with Fastow.

224.    Kopper pleaded guilty to a series of criminal charges brought against him that arose from his participation in these and other financial transactions, and was sentenced to over 3 years in federal prison.

225.    In September 2002, Fastow was indicted for criminal conduct, including mail fraud and wire fraud, arising from his time at Enron. In January 2004, Fastow pleaded guilty to conspiracy to commit wire fraud and conspiracy to commit wire and securities fraud. He was sentenced to six years in federal prison and was ordered to pay a $23.9 million forfeiture penalty.

226.    As part of their plea agreements with the government, the SEC also permanently banned Kopper and Fastow from ever again acting as officers or directors of a publicly traded company.

###     c.    The Raptors

227.    Another example of Enron's undisclosed off-the-books shenanigans that had a decidedly deleterious impact on the company is the Raptor Transactions.  Four special purpose entities known as Raptor I, Raptor II, Raptor III, and Raptor IV (collectively, the "Raptors") were created in 2000 to allow Enron to supposedly "hedge" market risk in certain of its investments.  The Powers Report described them as "an improper attempt by Enron to use the value of its own stock to offset losses in its investment portfolio and a highly complex accounting construct that was destined to collapse."  In effect, Enron was using the Raptors to hedge with itself.

228.    The Raptor transactions had a very large impact on Enron's financial statements. The Raptors were funded principally with Enron's own stock (or contracts for the delivery of Enron stock) that was intended to hedge against declines in the value of a large group of Enron's merchant investments.  LJM2 also invested in the Raptors.  As part of the capitalization of these entities, Enron issued common stock in exchange for a note receivable.  Enron increased notes receivable and shareholders' equity to reflect the transactions.

229.    Under GAAP, the note receivable should have been booked as a reduction to shareholders' equity (similar to a shareholder loan), not as an increase in assets and increase in shareholders' equity.  Accordingly, in violation of GAAP, the financial statements of Enron

overstated both notes receivable and shareholders' equity by approximately $172 million in each of Enron's second quarter, third quarter, and year-end financial statements for the year 2000.

230.    In the Raptor transactions, Enron and the investment banks created four SPEs and arranged for LJM2 to invest $30 million. This investment was deemed to be the "independent equity" necessary to permit the SPEs to qualify for separate accounting treatment, *i.e.*, to not be consolidated with Enron's financials. Enron guaranteed LJM2 that it would recoup its money and make an additional $10 million within six months of each SPE's creation. These payments took place as promised, giving LJM2 not only its $30 million but also about $10 million profit on each Raptor deal. According to an October 2000 report to LJM2 investors, the rates of return on the four Raptor Transactions were 193%, 278%, 2500%, and a projected 125% respectively. In addition, in September 2001, Enron paid LJM2 another $35 million to wind-up the Raptors.

231.    Enron asserted that it could use these "hedges" to offset growing losses in other investments which it would otherwise have to report. In a single year Enron hid almost $1 billion in losses through this ruse.

232.    The Raptors were not well-planned or executed. The assets declined in value, and the value of Enron stock and contracts supporting the Raptors' creditworthiness also fell. As a result, there was no economic value to the Raptors. Enron and CSFB engaged in several desperate schemes to prop up the Raptors, to no avail. The last restructuring effort occurred in March 2001 and entailed placing additional Enron shares at risk in exchange for additional notes receivable.

233.    Once again, Enron increased notes receivable and shareholders' equity to reflect this transaction. And once again, under GAAP, the note receivable should have been booked as

67

a reduction to shareholders' equity, not as an increase in assets and increase in shareholders' equity.  Accordingly, in violation of GAAP, Enron financial statements for the first quarter of 2001 overstated both notes receivable and shareholders' equity by $828 million; this overstatement had reached $1 billion by the end of June 2001.

     234.    According to the U.S. Senate Permanent Subcommittee Report, by the Fall of 2001, quoting a September 2001 internal Enron memo:

> Andersen had "changed their opinion of the proper accounting" for the Raptors and no longer supported the capacity of the Raptor SPEs to continue to "hedge" Enron's investment losses.

> The result was that, in October at the end of the third quarter of 2001, Enron terminated the Raptor "hedges" and recorded a $710 million charge to earnings and a $1.2 billion reduction in shareholder equity.  The earnings charge reflected the investment losses that the Raptors no longer concealed, while the equity reduction reflected an accounting charge that Andersen made after determining that an earlier methodology it had used for the Raptors did not comply with generally accepted accounting principles.  (footnotes omitted)

The sole purpose of the Raptors transactions was to manipulate Enron's financial statements.

     235.    The impact of the Raptors transactions is summarized in the table below:

| Quarter | Income  Reported ($ millions) | Income Excluding Raptors Transactions ($ millions) | Impact from Raptors ($ millions) |
|---------|------------------------------|---------------------------------------------------|----------------------------------|
| Sept. 30, 2000 | $364 | $295 | $69 |
| Dec. 31, 2000 | $286 | ($176) | $462 |
| Mar. 31, 2001 | $536 | $281 | $255 |
| June 30, 2001 | $530 | $490 | $40 |
| Sept. 30, 2001* | ($210) | ($461) | $251 |
| **Total** | **$1,506** | **$429** | **$1,077** |

(Source:  Powers Report)

68

* "Third quarter 2001 figures exclude the $710 million pre-tax charge to earnings related to the termination of the Raptors."

236.   All of the above transactions were known to and were facilitated by one or more of the Bank Defendants, as set forth below.

**d.   The Whitewing Transactions**

237.   Whitewing Associates LLP ("Whitewing") is another Enron "unconsolidated affiliate," meaning that Enron had an ownership interest in it and engaged in financial transactions with it, but did not consolidate Whitewing's financial statements with those of Enron.  Whitewing was co-owned by Enron and Osprey Trust, another SPE, as partners.

238.   In December 1999, Whitewing, along with LJM2, purchased certain high risk Enron loans receivable (collateralized loan obligations "CLOs"), which enabled Enron to record earnings with respect to those sales.  However, Enron had secretly guaranteed to Whitewing's investors that it would hold them harmless from any losses on the loans. The existence of this guaranty meant that Enron had not transferred the risk of non-payment of the loans, and that it was therefore improper for Enron to record any profits on the "sale" of the loans.

239.   Whitewing had multiple subsidiaries of its own, which were also used by Whitewing in ostensibly off-book transactions with Enron.  Whitewing entered into at least 11 transactions with Enron from 1999 to 2001 to "buy" at least $2 billion of Enron assets.  These sales were part of the scheme to reduce Enron's disclosed debt levels and move assets with low returns into unconsolidated affiliates that Enron effectively controlled.  The transactions were funded by Osprey Trust.  Enron pledged millions of its own shares as collateral for Osprey debt. Enron's obligations for the Osprey debt were not disclosed in its financial statements. Underwriters for Osprey included Defendants Deutsche Bank and CSFB.  The underwriters for

Osprey were clearly aware of Enron's substantial exposure related to Osprey.  However, they chose not to disclose these material obligations and the resulting exposure in either Enron's registration statements for the securities which their banks were underwriting, or their own research reports.

### e.   **Fishtail, Bacchus, Sundance and Slapshot Transactions**

240.    A December 2002 report by the U.S. Senate Permanent Subcommittee on Investigations contains a detailed analysis of several fraudulent Enron transactions including Fishtail, Bacchus, Sundance and Slapshot that were funded and facilitated by investment banks, including Defendant JPMorgan.  This report, along with a statement by Senator Carl Levin, is attached hereto as Exhibit C.

241.    All four of the above structured transactions enabled Enron to keep debt off its balance sheet or manufacture immediate revenues to report better financial results than the company actually produced.

242.    The first three transactions (initiated in December 2000), Fishtail, Bacchus and Sundance, resulted in the sham transfer of assets at inflated values from Enron to ostensibly "independent" special purpose entities.  As set forth in the Subcommittee report:

> In effect, Enron transferred its assets to a sham joint venture, Fishtail; arranged for a shell company in Bacchus to borrow $200 million from Citigroup to "purchase" Enron's Fishtail interest, without disclosing that Enron was guaranteeing the full purchase price; used the sham sale revenue to inflate its year-end 2000 earnings by $112 million; and then quietly returned the $200 million to Citigroup six months later via another sham joint venture, Sundance. The result was that the three transactions enabled Enron to produce misleading financial statements that made Enron's financial condition appear better than it was.

The $200 million was a disguised loan and should have been accounted for as such.

70

243.     These deceptive transactions could not have been completed without the participation of Defendant JPMorgan.  JPMorgan provided a valuation analysis of the assets transferred and a $42 million "commitment" referred to as an "unfunded capital" investment. This "commitment" was never intended to be used.

244.     In return for pretending to provide some financing for the Fishtail transaction, JPMorgan received $500,000.  LJM2 also participated in these transactions earning a fee of $350,000 and an attractive 15% return (guaranteed by Enron) on a six-month "investment."

245.     The fourth transaction, Slapshot, took place in June 2001.  Slapshot was a deceptive tax avoidance scheme predicated on a one-day $1 billion "loan" from JPMorgan to generate approximately $60 million in Canadian tax benefits, as well as $65 million in financial statement benefits for Enron (increased reported earnings).  JPMorgan provided Enron with access to its "proprietary" structured finance arrangement which utilized the sham $1 billion "loan" (which was intended to be issued and repaid within a matter of hours).  The Slapshot structure was designed to enable Enron to claim tax deductions as if a real $1 billion loan had been issued and remained outstanding.  JPMorgan provided Enron with a step-by-step description of how the bogus Slapshot Transaction was to be executed.

246.     All of the above transactions were known to one or more of the Bank Defendants.

        f.       **Nikita Transaction**

247.     In another SPE transaction referred to as Nikita, Enron "sold" EOTT Partnership units to a supposedly "independent" SPE.  This transaction was financed by CSFB ($8.1 million) and Barclays ($71.9 million) and closed September 28, 2001.

71

248.    The SPE's ability to repay the financing was supported through a total return swap guaranteed by Enron.  In effect, this transaction was a loan, not a sale.  In its accounting for the Nikita transaction, Enron recognized approximately $10 million as a "gain on sale," thereby generating artificial revenue and earnings and $80 million in cash from operations.  It should have been accounted for as a loan.  As a result of this transaction Enron, with the aid and support of its banks, hid another $80 million of debt and overstated its earnings.

**B.      Hidden and Disguised Loans**

*1.      Prepays/Equity-Forward Contracts*

249.    In addition to manipulating its financial reporting through SPE transactions, Enron was also able to falsify its financial health and conceal the true extent of its debt through hidden/disguised loans which took the form of prepay contracts ("prepays").  The prepays should have been booked as debt.  As the name would imply, a "prepay" is an agreement to pay in advance for a service or product to be delivered at some point in the future.  Enron's use (and abuse) of prepays is reviewed in significant detail in the testimony of Robert Roach, Chief Investigator to the Senate Permanent Subcommittee on Investigations.  A copy of this testimony is attached hereto as Exhibit B.   As stated in this testimony:

> Enron constructed elaborate, multiparty commodity trades that they called
> prepays in order to book the proceeds from the prepays as cash flow from
> operations.  But when all the bells and whistles are stripped away, the basic
> transaction fails as a prepay and what remains is a loan to Enron using a bank and
> an obligation on Enron's part to repay the principal plus interest.  With that being
> true, the proceeds of the so-called "prepay" transaction should have been booked
> as debt and cash flow from financing, not as a trading liability and cash flow from
> operations.

250.    According to the Chief Investigator:

Enron used these so-called Prepay Transactions to obtain more than $8 billion in financing over approximately 6 years, including $3.7 billion from 12 transactions with [JPMorgan] and $4.8 billion from 14 transactions with Citigroup.  This $8 billion figure is a conservative estimate for the 6 year period, based on the documents we were able to review; the full amount since Enron began using prepays in 1992 may be much larger.  Barclays, Credit Suisse First Boston, FleetBoston, Royal Bank of Scotland, and Toronto Dominion participated in over $1 billion of the Prepay Transactions.

Accounting for "prepay" proceeds as cash flow from operations, rather than cash from financing gave the impression that the money from the prepays was part of Enron's ordinary business activities and not debt.  Moreover, the Subcommittee has learned that Enron was simultaneously treating the Prepay Transactions as loans on its tax returns in order to claim the interest expense as a business deduction.

251.     Enron's financial statements for 2000 show total debt at year end of $10 billion and funds flow from operations of approximately $3.2 billion.  Had the approximately $4 billion in so-called "prepays" been properly accounted for (as debt), total debt would have increased by 40% and funds flow from operations would have dropped by almost 50%.  The impact on financial ratios, which are used by investors to evaluate a prospective investee company's financial health, is significant.  As the Chief Investigator stated:

If Enron had properly accounted for these transactions, its total debt would have increased by about 40% to about $14 billion, and its funds flow from operations would have dropped by almost 50% to about $1.7 billion.  Those are dramatic changes.…  With the inclusion of the prepays as debt, Enron's debt to equity ratio would have risen from about 69% to about 96%.  Its debt to total capital ratio would have risen from 40% to 49%.  And its funds flow interest coverage, a key measure of a company's ability to meet its financing obligations, would have dropped by almost half, from 4.07 to 2.37.

252.     The congressional investigator found that JPMorgan had engaged in prepay transactions with Enron for nine years, and that these prepays totaled approximately $3.7 billion:

Typically, Enron would initiate the Prepay Transaction near the end of a financial reporting period when Enron determined it needed to report more cash flow from operations on its financial statement.  Enron would contact [JPMorgan] and

73

request that [JPMorgan] arrange a prepay.  A [JPMorgan] employee familiar with the Enron prepays said he was not aware of any instances when [JPMorgan] refused Enron's request (although occasionally, the size of the prepay would be reduced from Enron's original request).

[JPMorgan] set up a Special Purpose Entity or SPE called Mahonia Ltd. to serve as the "independent" third party in the Enron prepays."

253.    The parties involved in the Enron prepays, including several Bank Defendants, were aware of the entire structure and its accounting purpose.  Internal communications show that the financial institutions not only understood that Enron intended to use the prepays to engage in deceptive accounting, they actively aided and participated with Enron in return for fees and further lucrative business dealings.  These financial institutions knowingly allowed investors, including Plaintiffs, to rely on Enron financial statements that the financial institutions knew were misleading.

254.    In December 2000, CSFB lawyer Steve Wooton raised concerns that an Enron "prepay" – the $150 million oil-linked prepay transacted between CSFB, Enron North America, and Morgan Stanley, executed in December 2000 on a 9-month term and extended in September 2001 – was an "accounting driven transaction" and recommended vetting it through the firm's "Reputational Risk Review" process.  CSFB, however, approved the transaction and funded the prepay.  CSFB did not disclose the existence of these liabilities in its research reports or in the prospectuses for Enron-related securities offerings it underwrote.

255.    JPMorgan actively marketed prepays as "balance sheet friendly" financing and "non-debt financing that improves cash flow from operations."  It designed and implemented these financial structures that created and sustained the fiction that the transactions were trades rather than loans.  These transactions would not have been possible without the willingness of

the Bank Defendants to provide the funds, supporting paperwork, and a sham offshore trading partner.

256.     Enron also hid debt through equity forward contracts.  Under a typical equity forward contract, an issuer will sell securities for future delivery to a counterparty for cash equal to the current price of the securities to lock in that price.  Enron, however, agreed to repurchase the same number of securities from the counterparty in the future for the original price plus a premium, effectively negating the "hedge" and creating a disguised loan.  Enron internal documents indicate that in September 2000, Enron had obligations to CSFB and Lehman Brothers Inc. for "Enron Equity Forward Purchase Settlements" aggregating $304 million.

257.     Details of the prepays engaged in by JPMorgan are detailed in Appendix C of Exhibit B.

### 2.     *Minority Interest Transactions*

258.     Enron also hid substantial debt ($2.75 billion) through the improper use of minority interest financing.  In a minority interest financing, the amount financed is reflected on the company's balance sheet as a minority interest in a consolidated subsidiary, instead of debt.  Through this deceptive device Enron replaced on-balance-sheet debt with minority interests, thereby making its credit position appear much stronger than it actually was.

259.     Over the period from 1997 to 2000 Enron raised $2.75 billion through minority interest financing.  These include:

a.     Choctaw (May 1999) – $500 million, JPMorgan deal; and

b.     Zephyrus (November 2000) – $500 million, JPMorgan deal.

75

Lenders in these transactions required "additional arrangements" to provide direct recourse to Enron.  In substance, these transactions were loans to Enron and should have been disclosed as such.

### C.    Tax Transactions

260.    Enron employed highly questionable tax driven transactions (such as Slapshot, described earlier) that enabled the company to create artificial accounting income. Over $1 billion of income was generated through these tax "strategies." This "income" significantly exaggerated the size and strength of Enron's operations.  As reported in the Washington Post in May 2002, "In 2000 alone, $296 million, or 30 percent of the profit that Enron recorded in its annual report to shareholders, came from these one-time tax-saving strategies – rather than the company's energy supply and trading businesses, former Enron managing director and general counsel Robert J. Hermann, told The Washington Post."

261.    Enron completed 11 tax deals over the period from 1995 to 2001.  With the exception of one transaction, all of the tax transactions were promoted to Enron by third parties, including Defendants Deutsche Bank (through Bankers Trust) and JPMorgan.

262.    These transactions relied on aggressive interpretations of both the tax law and accounting rules and, in fact, violated the separate requirements of each of them. The result was the material overstatement of Enron's income in its financial statements.

### D.    Defendants' Involvement

263.    In his testimony to the Senate Permanent Subcommittee on Investigations, the Chief Investigator said:

> Numerous major financial institutions, both here and abroad, engaged in extensive and complex financial transactions with Enron.  The evidence

76

we reviewed showed that, in some cases, the financial institutions were aware that Enron was using questionable accounting.  Some financial institutions not only knew, they actively aided Enron in return for fees and favorable consideration in other business dealings.  The evidence indicates that Enron would not have been able to engage in the extent of the accounting deceptions it did, involving billions of dollars, were it not for the active participation of major financial institutions willing to go along with and even expand upon Enron's activities.  **The evidence also indicates that some of these financial institutions knowingly allowed investors to rely on Enron financial statements that they knew or should have known were misleading**. (emphasis added).

Exhibit B.

### 1. *Enron Management*

264.    Officer Defendants Lay, Skilling, Buy, Causey, and Fastow were directly involved in creating and overseeing the off-book entities and sham financial transactions which were used to inflate Enron's reported earnings and underreport Enron's debt.  These Officer Defendants benefitted personally through (i) Enron's payment of inflated bonuses predicated on Enron's fabricated earnings; (ii) insider sales of stock at inflated prices; and (iii) separate payments from the various SPEs.  Enron's Board of Directors waived its Ethics Code on two separate occasions in 1999 to allow Enron to create SPEs managed by Enron insiders, which resulted in financial gains to the insiders to the detriment of Enron's outside investors.

265.    Officer Defendants Lay, Skilling, Buy, Causey, and Fastow knowingly allowed, and in many cases participated in and executed, the following:

a.      Enron's "off-the-books," "asset light" strategies, and other actions to move billions of dollars in assets off its balance sheet to supposedly "independent" but in actuality affiliated companies.  Indeed, as of October 2000, Enron had a total of $60 billion in assets, of which $27 billion, or nearly 50 percent, were held by Enron's "unconsolidated affiliates."

77

b.      The use of huge loans disguised as business deals to falsely report inflated income and cash from operations, rather than debt, and to deceive Enron's investors and business partners.

c.      The use of aggressive accounting practices that "pushed the limits" and were "at the edge" of acceptable accounting practices, including Enron's increasing reliance on complicated transactions with convoluted financing and accounting structures, multiple special purpose entities, hedges, derivatives, swaps, forward contracts, prepays, and other forms of structured finance.

d.      The establishment of numerous special purpose entities, the issuance of Enron preferred shares, the pledge of Enron's stock to support Enron's massive off-the-books activities, and inadequate disclosure concerning the creation and structure of the special purpose entities, allowing Enron to move at least $27 billion off its balance sheet.

e.      The use of questionable valuation methodologies to overvalue assets reported on Enron's financial statements.

f.      The misrepresentations of the nature and purpose of the Whitewing, LJM, and Raptor transactions.

g.      The use of almost 3,000 related entities, with over 800 of them organized in well-known offshore havens, including about 120 in the Turks and Caicos, and about 600 using the same post office box in the Cayman Islands.

h.      The creation of the LJM1 and LJM2 partnerships and the Rhythms stock hedge to move debt off Enron's financial statements, report inflated earnings and cash flow from operations, and protect Enron's income statement in the event Enron's stock were to drop in price.

i.      Numerous transactions involving clear conflicts of interest in violation of Enron's code of conduct, including the LJM1 and LJM2 partnerships, which allowed Defendant Fastow to reap tremendous profits.

j.      The change of Whitewing from a consolidated to an unconsolidated entity, allowing Enron to pledge approximately $2.5 billion as collateral for Whitewing debt and allowing Whitewing to purchase over $2 billion in Enron assets as part of an "asset light" strategy to reduce debt levels on Enron's financial statements and move assets with relatively low returns over to unconsolidated affiliates that Enron secretly controlled.

78

k.      The creation of and use of Whitewing, Osprey Trust and Yosemite Trust as off-balance-sheet vehicles to purchase Enron assets and create the appearance of increased equity investments and lower debt ratios.

l.      Authorization of the Raptor hedge transactions despite high-risk accounting, no true independent third party, lack of economic substance, no assets involved other than Enron stock and stock contracts, and no counter-party creditworthiness.

m.      Other extensive undisclosed off-the-books transactions and so-called "Balance Sheet Management" efforts involving numerous other sham entities including Hawaii 125-0 Trust and Black Hawk.

266.    Officer Defendants Lay, Skilling, Buy, Causey, and Fastow, through affirmative acts and omissions, each actively participated in the foregoing artifices, manipulations, and schemes as well as the foregoing false and misleading statements, aided and abetted the publication by Enron of financial statements that were materially false and misleading, or negligently allowed Enron to make the foregoing false and misleading statements.

## 2.    *Enron Bank Defendants*

267.    The Bank Defendants sold Enron's debt and equity securities to the public, while also creating, executing, and financing many of the transactions that manipulated Enron's financial results. These transactions included special purpose entities secretly controlled or supported by Enron, as well as prepays and other hidden loans. As the Senate Chief Investigator stated: "[t]he evidence indicates that Enron would not have been able to engage in the extent of the accounting deceptions it did, involving billions of dollars, were it not for the active participation of major financial institutions willing to go along with and even expand upon Enron's activities." The Bank Defendants provided the financial grease which let Enron appear to grow into the nation's seventh largest company, and in the process these firms earned hundreds of millions of dollars in underwriting fees alone, and much more from lending,

79

derivatives trading, and merger advice.  The Bank Defendants had extensive dealings with Enron over the years, and participated in multiple offerings and other financial transactions on behalf of Enron and its subsidiaries and affiliates.

268.    Each of the Bank Defendants knew that Enron was using SPEs, including but not limited to the LJM entities, to manipulate its reported earnings and debt.  These Defendants were also well aware of Enron's use of prepay transactions to disguise loans.  Investors in the SPEs, including JPMorgan, CSFB, Deutsche Bank, Merrill Lynch, and Barclay's, were earning tremendous profits, through the falsification of Enron's reported earnings and debt.  Billions of dollars of indebtedness and liabilities were hidden from the public.   Exhibit D, an excerpt from formerly secret LJM documents, shows the extent of Enron's off-balance-sheet activities which were known to the Bank Defendants.  LJM was one of the SPEs used by Enron to artificially inflate its reported earnings while moving large amounts of debt off its balance sheet.

269.    The Bank Defendants knew that Enron's real financial condition was much worse than was being represented to the public.  They knew that Enron's profitability was far less than publicly reported, that its true debt level was much higher than what was being publicly reported, and that its creditworthiness, liquidity and overall financial condition were much worse than publicly known.  As the Senate Chief Investigator noted, "[b]y design and intent, the prepays as structured by Enron and the financial institutions made it impossible for investors, analysts, and other financial institutions to uncover the true level of Enron's indebtedness."

270.    The Bank Defendants knew that Enron had engaged in multiple transactions with SPEs which could require Enron to issue millions of shares of Enron common stock if its stock reached certain trigger prices, and that SPE debt could become recourse to Enron if Enron's

credit rating was lowered.  Moreover, the Bank Defendants knew that Enron's credit rating would be lowered and its stock prices decline if the rating agencies and the investing public ever learned of Enron's true financial condition.

271.    Banks are required by their individual internal procedures and by governmental regulation and oversight to perform an extensive credit analysis of any applicant for a commercial loan or credit facility, and banks are required to retain the specific documentation in their files.  The analysis must include the borrower's actual and contingent liabilities, its liquidity position, any equity issuance obligations with the potential of adversely affecting its shareholders' equity, any potential debt (even if it is not directly on the borrower's books), the quality of the borrower's earnings, and its actual liquidity including the source of funds to repay any loans.  For larger loans and credit facilities, banks are required to closely monitor the company, continually review its financial condition and ongoing operations for material changes, and require the borrower's top financial officers to keep the bank informed of the borrower's current business and financial condition.

272.    The Bank Defendants knew about Enron's actual touch-and-go financial position, false public disclosures, phony financial results, and manipulation of its accounting.  The Banks further knew that Enron was utilizing the SPEs to secretly move debt off its own balance sheet.

273.    The Bank Defendants knew that the company's offering memoranda, prospectuses and public disclosures contained material omissions and misrepresentations.  The Bank Defendants were directly responsible for many of them.  Yet, despite this knowledge, the underwriters continued to misrepresent the true financial condition of Enron and continued to sell Enron-related securities to the public, including Plaintiffs, at knowingly inflated values.

274.   The Bank Defendants assisted Enron to create secretly-controlled partnerships and special purpose entities for the sole purpose of engaging in economically meaningless transactions to conceal debt and inflate revenues.  The Bank Defendants purposefully made loans to Enron described as commodity transactions, underwrote public offerings of Enron stock and debt based on representations about Enron's financial health the Bank Defendants knew were false, and assisted Enron in reversing, once the reporting period had passed, the very same financial arrangements that the Bank Defendants had participated in immediately prior to the reporting deadline.

275.   The Bank Defendants, and their senior officers and executives, invested in Enron controlled partnerships themselves in order to realize returns far in excess of those available to the investing public.

276.   Enron's former Chief Financial Officer, Andrew S. Fastow, after pleading guilty to criminal charges, confirmed under oath the following facts:

> From 1998 through October 2001, I was the Company's Chief Financial Officer, and I led the Global Finance department.
>
> *   *   *
>
> While head of the Global Finance Group, and as CFO, I was involved with Enron's dealings with a number of financial institutions, including Citibank ("Citi"), JPMorgan Chase ("Chase"), Canadian Imperial Bank of Commerce ("CIBC"), Credit Suisse First Boston ("CSFB"), Barclays, Merrill Lynch ("Merrill Lynch"), Royal Bank of Scotland ("RBS"), Royal Bank of Canada ("RBC"), Toronto Dominion Bank ("TD"), and Deutsche Bank ("Deutsche"). Among these were some of our Tier-1 Banks, which included Citi, Chase, CSFB, CIBC, Deutsche, Barclays, and RBS.  I had frequent contact with some of their executives in connection with the transactions Enron did with them.
>
> I pleaded guilty to criminal charges resulting from my actions while Enron's CFO, including [manipulating and falsifying] the Company's financial statements.  As stated in my plea agreement, while CFO, I and other members of Enron's senior

82

management fraudulently manipulated Enron's publicly reported financial results. Our purpose was to mislead investors and others about the true financial position of Enron and, consequently, to artificially inflate the price of Enron's stock and fraudulently maintain Enron's credit rating. I testified as a government witness in United States v. Skilling and Lay, No. H-04-25 (S.D. Tex.). I understand that several Enron officers with whom I worked closely have pleaded guilty to charges arising from their involvement in Enron's financial and business affairs.

I acknowledge my conduct for which I pleaded guilty. I will neither mitigate, justify, nor excuse what I did. In many instances, the financial transactions in which I engaged related to Enron, were done with the knowledge of senior management, some of Enron's banks, and others, and were done primarily to meet Enron's financial reporting and credit-rating targets.

I believe that my work made the Company look more healthy and profitable than it actually was. I worked with certain banks to accomplish this goal and I viewed certain banks as problem solvers. In many instances, the banks primarily devised the financial structures, which contributed to Enron achieving its financial reporting objectives. I believe that based on conversations with certain bankers, they knew that the prepays and some of the share-trust transactions created the false appearance of funds flow from operations and that some of the FAS 125 and 140 transactions and LJM Partnerships' Transactions created the false appearance of earnings and funds flow from operations, and reduced reported debt.

I am neither a lawyer nor a CPA. My views are based on my experience as an Enron executive and my personal interaction with bankers, accountants, lawyers, and others. I and others, including certain of Enron banks worked together, intentionally and knowingly, to engage in transactions that would affect Enron's financial statements. I believe that an investor would have had great difficulty understanding the true financial condition of Enron due to certain transaction structures and how they were disclosed, including the prepays. Some of the structured-finance transactions, which were structured and arranged by the banks and the Global Finance Group contributed to Enron's reported financial results. The structured-finance transactions were typically sized to compensate for the difference between Enron's actual financial performance and its goals, which included a 15 % after-tax earnings-per-share growth rate, an approximate 40% debt to capitalization level, and an approximately 4.0 times funds flow from operations to interest expense ratio. Enron management discussed that they believed that the market would require these financial metrics, among others, in order to justify Enron's stock price or to continue to transact business on existing terms.

Certain Enron banks, particularly Merrill Lynch, CSFB, RBS and Barclays, worked to solve certain of our financial problems. We told certain banks of our

financial objectives and they, in many instances, created solutions utilizing complex financial structures, including prepays, FAS 125/140 deals, share trusts, minority interests, and synthetic leases. I believe that the manner in which some of those deals were reflected in Enron's financial statements might make it difficult for an investor to understand Enron's true financial condition and was deceptive.  I believe that the banks presented these structured-finance transactions in response to the problems we described to them.  We paid a premium – in the aggregate, hundreds of millions of dollars – in order to engage in structured-finance transactions that contributed to causing Enron to report its financial statements in the desired manner.

My conversations with senior bankers led me to believe that certain banks understood that some of the transactions were done primarily for generating certain accounting benefits and financial-reporting objectives for Enron, including higher funds flow from operations, lower debt and increased (current period) income.

I was hired at Enron by Mr. Skilling in 1990 primarily to execute off-balance-sheet financings.  In 1997, when I assumed responsibility for finance at Enron, I engaged in transactions, such as Nighthawk and Nahanni, with certain of Enron's banks that had a material impact on Enron's financial statements.  Nighthawk, presented to me by Citi's Larry Nath before he moved to DLJ/CSFB, enabled Enron to report a healthier balance sheet than it otherwise would have.  Mr. Nath explained to me that the purpose of Nighthawk was to convert debt into minority interest. Nahanni, also designed by Citi, was done primarily to generate funds flow from operations.  I cannot think of another reason why, in practical business terms, a BBB+ rated firm like Enron would buy and monetize T-Bills, as Enron did in Nahanni other than to generate funds flow from operations. I can recall no real business purpose associated with Nahanni or Nighthawk.

Enron paid a premium – above what a bank would earn for an on-balance-sheet financing – for off-balance-sheet structures that created funds flow from operations and other financial reporting benefits. In some reporting periods, structured-finance transactions had a material impact for Enron in meeting its financial reporting objectives.

As the General Partner, I controlled LJM1 and LJM2, while at the same time I was Enron's CFO. I told investors in LJM that LJM would usually not manage or operate the assets it received from Enron.  I emphasized that the assets would generally be held for a short term and that Enron would continue to manage them. I made presentations intending to convey to the bank investors in LJM that I believed that it was in Enron's best interest for Enron to find a way for LJM to exit its investments without loss.  Merrill Lynch and I made joint presentations to

potential investors, which indicated that LJM2 would be used to manage Enron's balance sheet and income statement.

I am aware that I, or other Enron executives, provided Merrill Lynch, Barclays, CSFB, RBS, and other Enron banks with oral assurances or structural features that I believe would have assured them of the following in certain structured finance transactions: (1) a return of their investment capital; (2) a return on capital at a specified rate; and (3) an exit from investments within a defined period of time. I believe that without these assurances or structural features, the banks would not have entered into all of these transactions. Based on conversations I had with certain bankers, I believe that they understood that the assurances and certain other features would have caused the accounting and financial-reporting to be different than if it were documented.

As Enron's CFO, I was responsible for the Company's funding and credit agency relationships, among other things. I talked to rating agencies and analysts at times. On occasion, we engaged banks to help us with rating agency presentations. I believe that Merrill Lynch and CSFB participated in some of our presentations to the rating agencies. I did not disclose any earnings manipulation to the rating agencies. I understand that people who worked for me intentionally understated the funds-flow effect of certain transactions at meetings with credit-rating agencies.

### a.  **Barclays**

277.    Barclays is a large financial institution that had a close relationship with Enron. Barclays provided commercial and investment-banking services to Enron, helped to structure and finance one or more of Enron's off-the-books partnerships and SPEs, and helped Enron inflate revenues and hide billions of dollars of debt that should have been disclosed on Enron's financial statements.

278.    In addition, Barclays helped Enron by (i) participating in syndicated loans to Enron of over $3 billion; and (ii) raising almost $2 billion for Enron from the sale of new securities.

279.    As one of Enron's primary lenders, and based on its close relationships with Enron's senior officers and employees, including the Officer Defendants, Barclays knew that

Enron was providing false financial information in its public reports and disclosures, and that its true financial condition was far different from what it was reporting to the public. Barclays substantially assisted Enron in this deception.

280.    Barclays was an initial purchaser and underwriter of the Zero Notes, and also underwrote $240 million of 8.75% Yosemite Enron-linked obligations.  Yosemite SecuritiesCo. Ltd. was specifically developed to help Enron hide debt through the use of prepays.  Prepays were used to conceal billions of dollars in Enron obligations.  The underwriters, including Barcleys, benefitted from both the Zero Notes and the Yosemite offerings, in that these offerings shifted Enron credit risk to the public and reduced the underwriters' own exposure to Enron.

281.    Barclays was the lead lender on a $2.3 billion debt facility relating to Enron's purchase of Wessex Water in 1998 and was a co-arranger of a $250 million loan to Enron in November 1997.  Barclays also engaged in a combined $4 billion in credit facilities (in 1998 and 2001 respectively), which Enron used to back up its commercial paper debt.

282.    Barclays' senior executives interacted with Enron's senior executives on a frequent basis, and discussed the details of Enron's business and finances.  Because of its extensive access to Enron's internal business and financial information, Barclays knew that Enron was falsifying its financial results.

283.    In an appendix ("Role of Barclays and its Affiliates") to the Examiner's Third Interim Report (attached hereto as Exhibit E), a substantial volume of evidence with respect to Barclays' role in the Enron fraud was reviewed.  The Examiner concluded:

> Barclays' conduct in respect of the Chewco Transaction, the J.T. Holdings
> Transaction, the Nikita FAS 140 Transaction, the SO2 Transaction and the three

Prepays enabled Enron to: (i) record approximately $410 million of income that should not have been recorded; (ii) receive cash flow from financings of approximately $1 billion, all of which Enron erroneously recorded as cash flow from operating activities; and (iii) erroneously omit almost $1.77 billion of debt in its 1997, 1998, 1999, 2000 and 2001 financial statements.

284.    The Examiner concluded further that:

The evidence would allow a fact-finder to conclude that Barclays:

- Obtained verbal assurances from Enron in which Enron promised to cover Barclays' equity risk positions in two SPEs, likely knowing that the assurances would not be disclosed to Enron's auditors and that, had they been disclosed, Enron could not have accounted for the transactions as it did;

- [S]tructured and closed the SO2 Transactions knowing the transaction was not a "true sale," that it was designed to manipulate the Debtors' financial statements, and that it resulted in the dissemination of financial information known to be materially misleading;

- [C]aused Enron to structure a [Chewco] Transaction involving an SPE such that Enron covered 60% of the equity risk position in the SPE, knowing that would prevent Enron from properly giving the structure off-balance-sheet accounting treatment; and

- [P]articipated in three Prepay Transactions and one monetization transaction that Barclays knew were designed to manipulate the Debtors' financial statements and did result in the dissemination of financial information known to be materially misleading.

285.    Barclays' direct and active participation in the Enron fraud may be summarized under three main categories:

        a.    SPE Transactions;

        b.    SO2 Transaction; and

        c.    Prepay Transactions.

### (i)   SPE Transactions

286.   Barclays was far from a passive investor (or more accurately lender) in its dealings with Enron.  To the contrary, Barclays played an active, essential role in the design of many of the Enron SPEs.  In Barclays' July 1999 annual review of Enron, Barclays Credit Group Director John Meyer described these debt-like structured finance transactions that Barclays designed for Enron, listing the following types of transactions: "synthetic leases," "company-obligated preferred shares of subsidiary companies," "deferred revenue financing," "minority interest financing," "structured sale of equity interest," and "nonrecourse asset sales."  Meyer described "Company-Obligated Preferred Shares of Subsidiary Companies ([COP]s)" as follows: "This structure allows debt to 'masquerade' as preferred equity on a company's balance sheet…As noted earlier, Enron has $1.0 billion of [COP]s outstanding."  Moreover, the same list of Enron transactions continues:

> Minority Interest Financing – Enron had two such structures outstanding at year-end: Rawhide and Nighthawk.  They totaled $1.3 billion.  In the structure, debt masquerades as a limited partnership interest and is therefore included in Minority Interest.

Thus, Barclays was an active participant in Enron's debt transactions that "masqueraded" as operational, arms-length transactions.  Barclays' substantial and long-standing active participation in helping Enron to hide debt through its many structured finance transactions was integral to Enron's scheme to deceive investors and credit rating agencies.

### (A)   Chewco

287.   At year-end 1997, Barclays helped Enron structure Chewco to buy the outside investor's interest in JEDI.  Barclays knew that if Enron could not find a legitimate independent third-party investor to replace the outside investor's interest in JEDI, Enron would be forced to

consolidate JEDI, restate profits it had earlier reported during 1997 from transactions with JEDI (some $40 million), and put millions of dollars of debt back on its balance sheet (some $70 million).

288. To help Enron avoid the disastrous consequences associated with having to restate profits and report greatly increased debt, Barclays agreed to (i) loan $240 million to Chewco (the ostensible "independent" replacement) on unusually favorable terms, receiving not only high interest-rate payments but significant commitment and lending fees, as well as Enron's guarantee of the loan; and (ii) make available approximately $11.4 million in "equity loans" to the purported equity investors in Chewco. Barclays knew the so-called "equity investors" were, in fact, strawmen controlled by Enron, who did not have any real credit standing. Barclays required Chewco to secretly deposit $6.6 million in a reserve account with Barclays to secure the "equity loans." Thus, Barclays knew that (i) the Chewco partnership was a sham with little outside equity; (ii) Enron formed Chewco to prevent restatement of Enron's previously reported 1997 profits; and (iii) Enron could and would use JEDI and Chewco to engage in other non-arm's-length transactions to falsely create artificial profits and move billions of dollars of debt off its financial statements.

289. The October 1999 minutes of the Barclays Operation Committee Meeting confirm that Barclays tried to structure its "investment" in Chewco as collateralized debt. Enron and Barclays worked together to arrive at a structure that would satisfy Enron's objective of keeping the transaction off its balance sheet and still offer Barclays protection for its (disguised loan) investment; of course these were mutually exclusive objectives, and Enron was ultimately forced in November of 2001 to consolidate JEDI and Chewco.

290.    Under the rules governing the accounting treatment of SPEs, at least 3 percent of Chewco's capital had to come from independent investors in order for Chewco's (and JEDI's) financials to not be consolidated with Enron's.  Chewco was funded using a 3 percent equity minority interest that was surreptitiously collateralized by Enron's provision of a substantial cash reserve for the benefit of Barclays, amounting to 60% of Barclays supposed "equity" investment. The investment in Chewco came from two entities called Little River LLC and Big River LLC. But, as Barclays well knew, these so-called "equity investors" were, in fact, straw men controlled by Enron, and did not have any real credit standing of their own.

291.    Enron's accounting treatment of Chewco required that Barclays' investment actually be at risk.  But Barclays sought guarantees from Enron to protect its investment, despite its knowledge that this would invalidate the off-balance-sheet treatment of the transaction.

292.    Barclays advanced $11.4 million for Big River's Chewco investment, calling it an "equity loan."  Barclays knew that an independent investor was lacking and therefore insisted that the borrowers, *i.e.*, Enron, secretly establish cash reserve accounts to secure repayment of the Barclays "equity" investment.  As a result, Barclays' advance was secured by $6.6 million in secret cash collateral (or reserve accounts).  Thus, the supposed equity investment was actually a loan.

293.    To fund the reserve accounts, JEDI wired $6.58 million to Barclays in December 1997, thereby reducing by half Chewco's 3 percent equity interest in JEDI.  As a consequence, Chewco did not have the requisite equity at risk and did not qualify as an adequately capitalized SPE.  JEDI and Chewco should have been combined into Enron's consolidated financial statements from the outset.

90

294.    Barclays knew that Chewco was an integral part of Enron's scheme to inflate earnings and conceal debt (and risk), but nonetheless continued to act as an underwriter for Enron and sold securities to the public based on false information.  Barclays' underwriting activities were fraudulent and intended to aid Enron in deceiving the investing public, including Silvercreek.

295.    Since Enron guaranteed the $240 million unsecured loan from Barclays to Chewco in December 1997, Chewco agreed to pay Enron a guarantee fee of $10 million up front (cash at closing) plus extraordinary charges based on the loan's average outstanding balance. The fee calculation was not based on the risk involved, as would have been the case for a bona fide financing transaction, but on the benefit Enron received in being able to falsify its financial statements.  JEDI paid Enron $17.4 million under the fee arrangement, payments which were called "structuring fees."  Enron recognized revenue from these transactions even though the transactions involved only Enron and had no legitimate business purpose for either entity.

296.    Barclays knew that neither Chewco nor JEDI was a valid SPE because neither met the requirements for non-consolidation.  Knowing that Chewco was not legitimately capitalized, but instead was funded by loans, Barclays thereafter knew that each and every Enron financial statement was materially false and misleading.

297.    With respect to the Chewco Transaction the Examiner noted:

Evidence exists from which it could be inferred that Barclays knew that by giving Barclays close to 60% cash collateral at closing, the Chewco structure eliminated close to 60% of the necessary equity risk in Chewco and therefore failed the 3% Equity Test.  Eventually, even Enron acknowledged that the Chewco equity was not sufficiently at risk and on November 19, 2001 restated its financial statements back to 1997, when Chewco and JEDI first should have been consolidated with Enron.

91

### (B)     Nikita

298.     Barclays knowingly participated in Enron's scheme to report hundreds of millions of dollars of false revenue and income.

299.     As a further example, the J.T. Holdings and Nikita Transactions were structured as non-recourse, off-balance-sheet "true" asset sales.  However, in order to proceed with the deals, Barclays demanded and received oral assurances from Enron that protected Barclays' "equity" investment from being at risk and therefore invalidated Enron's off-balance-sheet treatment of the deals as non-recourse true asset sales.  This is confirmed in Barclays Investment Banking Director Richard Williams' November 2000 Transaction Comment, where Williams wrote:

> We [Barclays] have had a number of conversations with Enron about the transaction risks and have agreed to go forward on the basis of explicit verbal support from the company's Treasurer.  Specifically, Ben Glisan will commit to us that under all circumstances Enron will execute its purchase option at a price sufficient to repay in full the holders of the B notes and Certificates.

Enron's oral guarantee was not disclosed to the public or Arthur Andersen, because the release of this information would have revealed the invalidity of the transaction.

300.     The use of oral agreements to circumvent the requirement that Barclays have an at-risk equity investment in the deals intentionally and improperly hid the true nature of the asset sales from investors and credit rating agencies.  Barclays executives knew, as early as 1997, that fully-disclosed written guarantees would have invalidated these transactions.  When Barclays Director Williams was asked whether he believed "that a written guarantee [in Nikita] would have destroyed that at risk requirement?" he answered, "I believe it would have put it in

jeopardy." Barclays' resort to oral guarantees had the purpose and effect of concealing Enron's true financial condition from the investing public.

301.    In August 2001, Barclays Directors Williams and John Sullivan received an Enron PowerPoint presentation detailing the Nikita Transaction. In this presentation, Enron made it clear that it was "interested in selling this financial asset for accounting purposes." Knowing there was to be no sale, and having known since at least 1997 that Enron's public financial statements were false and misleading, Barclays nevertheless proceeded with the transaction.

302.    In September 2001, days before Barclays would provide $71.9 million in financing for the Nikita Transaction, Sullivan sent an e-mail to Williams and Barclays' Head of Loan Syndications Eric Chilton, in which he commented with respect to Nikita, "This 'trust me' total [stock price of the Enron affiliate] is somewhat mitigated by $740k in [underwriting] and arranging fees, and $150k in front end fees... I just wanted to point out that in a realistic scenario, we are not just taking a blind leap of faith on a 'trust me' from Enron for $8.5m in three years time; rather, taking an expected $5.5m position is a critical element in our ability to earn nearly $750k in front end fees, and an additional $2m in net interest income…." Barclays knew that Enron was not as strong as it represented to the investing public, but because Barclays would profit from underwriting and arranging fees, it financed Nikita.

303.    Barclays understood its role in Nikita to be that of a lender, as evidenced by: (i) the involvement of its Head of Loan Syndications, Eric Chilton; and (ii) the undisclosed total return swap that transferred responsibility for the financing to Enron. Nevertheless, Barclays falsely documented Nikita as financing for an asset purchase by an SPE. This transaction

generated $10 million of artificial revenue and earnings and $80 million in bogus "cash from operations" for Enron in the Fall of 2001. Barclays (and CSFB) thereby helped Enron hide another $80 million in Enron debt from the public and inflate Enron's reported revenue and earnings – right at the time Silvercreek was investing in Enron securities.

304. In his First Interim Report, the Examiner noted that:

The Nikita Transaction can only be understood when viewed in its totality. When so viewed, the transaction appears to be, from both an economic and risk allocation perspective, a loan rather than a sale of an asset.

305. The Examiner further explained:

The Nikita Transaction, though structured to appear as a sale of Enron's interests in EOTT, was in substance a loan from Barclays to Enron. … Barclays understood that the Total Return Swap represented a direct payment obligation of Enron to pay the principal and interest due on the loan made to the SPE. Finally, Barclays understood that Total Return Swaps were booked on Enron's financial statements as Equity Derivatives but that they were not broken out separately so the actual amount of Enron's Total Return Swap obligations could not be accurately determined from Enron's financial statements. Despite understanding that the Nikita Transaction would create a direct payment obligation of Enron that could not be determined by reference to Enron's financial statements, Barclays helped structure and close the transaction.

306. Finally, the Examiner noted Barclays' complicity in disguising the Nikita loan as a sale:

While Barclays would have preferred a written guarantee, it knew that a written guarantee likely would have precluded the off-balance-sheet accounting treatment that Barclays understood was a principal purpose of the transaction from Enron's point of view.

307. The oral assurances that Barclays required to close the transaction, as well as the Total Return Swap, were critical to the fraud. Barclays knew that if the guarantees it required were included in the transaction documents the Nikita Transaction would not have met Enron's fraudulent accounting objectives. Barclays closed the Nikita Transaction because it was willing

94

to rely on Enron's oral guarantee – which Enron had always honored in the past. As observed by Graham McGahen, Managing Director, Barclays, Enron's oral assurances were sufficient "[g]iven Enron's impeccable record in this regard to date." Mr. McGahen's comments also confirm that this was not the first time that Barclays had executed transactions with Enron based on oral commitments.

308. Aside from concealing debt by moving the financing off of Enron's financials, the Nikita Transaction also created the illusion of revenue, earnings, and cash flow from operations.

### (ii)     The SO₂ Transaction

309. Barclays' involvement in the perpetration of Enron's fraud was not deterred when Arthur Andersen, in 2001, increased its scrutiny of SPEs and in particular, the achievement of off-balance-sheet accounting. Instead, Barclays aided Enron in creating a new structure that would allow it to continue engaging in sham, off-balance-sheet transactions.

310. This eleventh hour transaction, completed in October 2001, entailed the transfer of SO2 emission credits to an SPE – Colonnade Ltd – apparently affiliated with Barclays. Barclays also funded the transaction. Again, in substance, the transaction was a loan, but was presented to the public as an asset purchase to permit Enron to falsify its revenue, earnings and cash flow from operations.

311. In his August 2001 New Product Proposal, Martin Woodhams, Director, Barclays, noted that:

> Recent tightening of US GAAP regulations with regard to SVPs, has led to the need of incorporating an SVP that closely resembles an operating company. To this end the SVP will before it transacts with Enron, undertake a small number of short dated FX, metal funding and Murabaha Transactions. This diverse transactional trading history is crucial to the success of achieving off-balance-sheet treatment for our client. Once the Enron transaction closes it is not intended

95

that any further transactions will be entered into by the SPV.

312.    Confirming that the Colonnade structure was controlled by Enron (and therefore should have been consolidated), in its engagement letter for the SO2 Transaction, Benoit de Vitry, Managing Director, Barclays, details that Enron "will pay all out of pocket expenses (including legal fees) which are incurred by Barclays Capital in connection with the creation of an insolvency remote cell for SwapCo [*i.e.*, Colonade]."

313.    Barclays sponsored Colonnade to create the tripartite arrangement that was used to turn the asset sales into the economic equivalent of secured loans.  In order to pass Andersen's "smell test" for off-balance-sheet SPEs, Barclays planned and executed two short-dated trades designed to give Colonnade the appearance of an independent firm with a legitimate history of transactions.

314.    Enron and Barclays then entered into a series of circular transactions with Colonnade to eliminate the market risk, yet enable Enron to report the transaction as cash flow from operating activities.  The SO2 Transaction lacked any legitimate commercial purpose.

315.    In a committee meeting, those unfamiliar with the SO2 transaction questioned whether the SO2 Transaction had any purpose other than accounting or reporting.  Because of the evident artifice of the transactions, some at Barclays questioned whether Barclays should be involved: "The values of Barclays Bank suggest that we would be reluctant to do a deal that was done solely for accounting reasons."  Also, Barclays began recommending a "reduce exposure policy," but never publicly communicated any negative information it had about Enron to anyone outside the bank.  Despite these stated misgivings, Barclays completed the SO2 Transaction in

October 2001, and thereby enabled Enron to falsely report $93 million in cash flow from operations, a metric particularly important to a debt investor like Silvercreek.

316.    Based on his review of the evidence related to the SO2/Colonnade Transaction, the Examiner noted:

> The apparent intent of the parties was to structure a financing transaction that shared the economic characteristics of a loan but would permit Enron to record the proceeds of the borrowing as cash flow from operating activities.

317.    The Examiner also found evidence that Barclays knew that the SO2 Transaction could not qualify as a "true sale." Pritesh Pankhania, Barclays, noted in an e-mail to Martin Woodhams, Director, Barclays, "[T]he economic risk and rewards of the commodity assets held by the SPV will remain with the client by virtue of the back-to-back hedging transactions."

318.    Moreover, Barclays engaged PricewaterhouseCoopers ("PWC") to review the Colonnade structure and confirm that Barclays would not need to consolidate the SPE into its financial statements – which could only happen if the SO2 Transaction was not a true sale and Enron effectively controlled the SPE. The Examiner found evidence that, although PWC believed that Barclays would not need to consolidate Colonnade, it believed that Enron would need to consolidate Colonnade. For example, James Hewer, PWC, noted in an e-mail to Martin Woodhams, "First thoughts are that the energy company is likely to be the sponsor of the SPV and hence will be required to consolidate that SPV...."

319.    Barclays actively participated in the Enron accounting fraud by entering into this sham transaction calculated to mislead the investing public, including Silvercreek.

97

### (iii)   Prepay Transactions

320.   Barclays had a good understanding of the Enron prepay transactions.  John Meyer, Director, Barclays, the credit officer in charge of the Enron relationship, detailed his understanding of the transactions in an e-mail to Jonathan Taylor, Barclays:

> Prepaid Crude Oil and Natural Gas – Don't for a second think that Enron is satisfying an operating need by selling these commodities forward.  Although notionally they are agreeing to deliver the commodities in satisfaction of an obligation established at the time the banks pay for the commodities, in actual fact they are borrowing money.  Their accountant will credit the Revenue account, debit Cash, debit Revenue and credit Deferred Revenue.  In other words, he sees a sale but sets up a liability that is satisfied only as the commodities are delivered. When calculating the amount of debt Enron has incurred, CRMD (and any analyst who wasn't born yesterday) will take any balance in the deferred revenue account and add it one-for-one to debt.

321.   Meyers also noted that the sheer size of the physical deliveries that would be necessary to honor the contracts if they were not circular made it "painfully obvious that the transaction's essence is not about deferred revenue but rather about plain ol' debt."  In other words, physical delivery of the commodity never happened, and was never intended to happen.

322.   With respect to Barclays' involvement in Enron's prepay transactions, the Examiner concluded:

> Barclays participated in the Prepay Transactions knowing that they resulted in misrepresentation of Enron's financial statements, that Enron inadequately disclosed the transactions and that the true effects of the Prepay Transactions could not be determined from Enron's published financial statements.

### (iv)   Barclays' Knowledge of Enron's Fraudulent Reporting Practices

323.   In his sworn statement, John Meyer, Director, Barclays, confirmed that Barclays understood Enron's objectives and purpose for entering into structured financings and he further

confirmed that Barclays understood the effect that such structures could have on Enron's

financial statements.

324.    As noted by the Examiner:

Barclays agrees, however, that no outsider could reasonably evaluate the
magnitude or effect of some of Enron's other financing structures, such as its
inventory financings, Prepay Transactions and Total Return Swap obligations
incurred in connection with the FAS 140 Transactions.

325.    Meyer further confirmed in his sworn statement that by the end of 1998, Barclays

had started to become increasingly concerned with the quantum of Enron's undisclosed

liabilities.  In an e-mail from Henry Pullman, Director, Barclays, to Richard Williams, Director,

Barclays, Meyer, and blind copy to Robert Clemmens, Chief Credit Officer, Pullman noted:

Enron's creativity in arranging interesting and highly structured financings, many
of which are off-balance-sheet and may tend to present a challenge to financial
analysts (ourselves included) to understand and appreciate the full picture of
Enron's financial condition.

326.    The July 1999 Minutes of the Barclays Group Credit Committee meeting noted

that after investigating concerns with respect to the level of Enron's off-balance-sheet financings,

Barclays concluded that Enron's material off-balance-sheet structures increased Enron's 1998

year end debt by over 62% from $7.4 billion to $12 billion.

327.    The magnitude of Enron's reliance on deceptive and misleading off-balance-sheet

financings resulted in the following being noted in the minutes to the July 1999 Group Credit

Committee Minutes:

[I]t could not shed the belief that Enron was paddling underneath the surface to
hold on to its investment grade status as it became harder and harder to replicate
the previous years' strong performances.

99

328.     Barclays understood Enron's motives for its increasing use of sophisticated financing structures.  It knew that the financial reporting for such structures was deceptive, misleading and in most cases a clear cut violation of U.S.  GAAP.  Barclays was aiding Enron in using these transactions to create a false picture of revenues and earnings, overstate cash flows from operations and conceal billions in debt.

### (v)     Fastow Declaration

329.     Enron's former Chief Financial Officer, Andrew Fastow, confirmed under oath the following facts:

> Barclays, one of Enron's Tier-I Banks, engaged in at least eight transactions during 1997 to 2001, including Chewco, J.T. Holdings, Nikita, Prepays, Metals and SO2.  These transactions contributed to causing Enron to report lower balance sheet debt and created the false appearance of funds flow from operations.

> Barclays required assurances or structural enhancements to certain transactions in order to minimize Barclays' financial risk.  I intended those assurances to operate as guarantees, and I do not believe that Barclays would have entered into the transaction without them. In connection with the verbal assurances, I discussed with certain bankers at Barclays that it would not make sense for Enron to allow a bank to lose money on a relatively small equity investment because it would damage our relationship with that bank and would negatively impact Enron's ability to access capital from that bank, which was vital to Enron's growth. I believe that Barclays received fees on these eight transactions above what it would have earned for standard loans.  I discussed the purpose of these transactions with the bankers involved and I believe that they understood they were being paid a premium because of the impact of these structures on Enron's public financial statements.

> I discussed with certain Barclays bankers the 3% equity-at-risk requirements under SPE accounting necessary for a company to record a sale and to deconsolidate an asset.  In doing these eight transactions, I or my staff met or spoke with Richard Williams, Eric Chilton, John Sullivan, George McKean, Bob Diamond and others at the bank.

> I have seen a 2002 Barclays "post-mortem" document detailing the bank's conduct with Enron over the previous years.  This post mortem states that the Company had a history of protecting lenders to its SPEs through verbal

100

assurances, which translated into "guarantees," and that "Enron was always willing to pay higher compensation" for this type of arrangement. This memo indicates that Barclays understood that the purpose for its Enron transactions "was mostly to achieve an accounting objective rather than shed risk," and that "[t]he driving force for each SPV Transaction was to raise debt that was either (i) off the balance sheet entirely or (ii) if on the balance sheet, then disguised as an operating liability." The bank characterized our verbal assurances as "near virtual guarantees," in deals "transacted purely for accounting reasons." I believe that, based on my interactions with Barclays's executives, these are generally accurate descriptions.

### JEDI/Chewco – December 1997

JEDI/Chewco accounted for a significant portion of Enron's 1997 income. It also contributed to Enron's reported earnings in 1998-2000. Chewco was an SPE set up at year-end 1997 in order to take the place of CalPERS in an existing joint venture known as JEDI. Chewco was formed to buy CalPERS's 50% interest. I and Michael Kopper, who had a carried interest in Chewco, controlled the entity. I believe that Chewco should have been consolidated with Enron because it did not have at least 3 % at-risk equity, which was required for SPE accounting of the entity. Chewco did not have 3 % at-risk equity because of two structural features, including one in which Barclays required that its equity loan be partially secured by cash collateral.

The bank required that cash-reserve accounts be established at Barclays in order to provide security for its loan that funded the 3 % equity. I discussed with senior Barclays executives how the cash-reserve account would become funded. The process is described in a side letter.

### J T. Holdings – December 2000

In late 2000, I understand that an existing off-balance-sheet synthetic-lease structure – J.T. Holdings – was set to expire, which would have caused millions of dollars of debt to be consolidated with Enron's balance sheet. I recall that Enron had entered into a lease transaction in 1995 by which Enron/NGL Trust, an SPE, purchased assets from the Company, which then leased the assets back from Enron/NGL Trust for five years.  When that lease was about to expire, Enron/NGL Trust had only two assets left – a methanol plant and a storage facility.  I recall that Barclays worked with Enron to create a new structure to keep the lease off our balance sheet.  It is my understanding, based upon my interactions with Barclay's bankers and discussions with my staff, that Barclays believed that the leased assets were overvalued.  I understand that Ben Glisan was told that the bank would participate only if it were to receive assurance from Enron that it would not lose its 3% equity and that certain structural features, intended to minimize its risk, were made part of the structure.  I understand that Ben Glisan gave such an assurance.

I have seen bank documents that state:

- Barclays and Enron agreed that J.T. Holdings would be a "'trust me' deal."

- The J.T. Holdings synthetic lease "should not have given rise to market risk but Barclays accepted a de facto guarantee from Enron to cover a perceived deficiency in the methanol plant's value."

- "[Barclays] would be relying on Enron's strong verbal assurance that it [was] not the intention of Enron to shift the residual value risk to the banks."

- "[Barclays] agreed to go forward on the basis of explicit verbal support from the company's Treasurer."

- "Specifically, Ben Glisan ... [committed] to [Barclays that] under all circumstances Enron [would] exercise its purchase option at a price sufficient to repay Barclays....."

- This is all consistent with my understanding of the verbal assurances that Mr. Glisan provided to Barclays.

## Nikita/Besson Trust - September 2001

This FAS 140 deal was structured by Barclays and Enron, in late September 2001, to look like a true sale of the Company's interest in EOTT. I understand that Barclays considered the value of the underlying assets to be insufficient to justify the value of the deal; as a result, Barclays required and received an oral assurance from Ben Glisan that the Company would repay the bank's 3% equity investment in the SPE.

I have seen bank documents that state:

•   "The market risk, however, had been covered by verbal assurances."

•   Barclays was "relying on [Enron's] verbal understanding to make [the bank] whole."

•   "Barclays would rely on assurances from Enron's Treasurer that Enron would make up any short fall in the equity return."

•   "Enron intended to account for the Nikita Transaction off-balance-sheet," which was the principle [sic] purpose of the transaction, and that Barclays understood Enron's objective in this deal "[was to] significantly [understate] the debt level ... on [its] balance sheet."

These bullet points are consistent with my understanding of the transaction.

## SO$_2$

Barclays and Enron engaged in two SO2 Transactions, one in September and another in October 2001, providing the Company with funds through a structure that was intended to appear to be a sale of Enron SO2 credits. I understand that the transaction was executed via an entity called Colonnade, a vehicle that Barclays organized and controlled. I remember talking to Ben Glisan about whether he thought the bank could set up and execute the transaction. Mr. Glisan indicated to me that Barclays would control Colonnade.

I have seen a bank document that states: "These transactions have the effect of significantly under-stating the debt level and assets on the balance sheet." I believe this is a fair characterization.

**Metals/Camelot I and II**

I understand that Barclays and Enron engaged in two separate Metals transactions – Camelot I and II – in September and December 2000. I have seen a document that indicates Enron assured the Bank that it would exercise the option component in these transactions: "The first thing that needs to be established is that these are being priced on the understanding that the options are going to be exercised, *i.e.*, it is understood that the purpose of the option is to meet accounting requirements not to give a trading opportunity." I believe that the accounting for these transactions was wrong if there was a side agreement regarding the option exercise.

#### (vi)    Summary

330.    Barclays and Enron engaged in a series of transactions whose sole purpose and effect were to create a false appearance of revenue, earnings and cash flow from operations and to conceal debt, all intended to deceive investors in Enron's securities and help further Enron's fraudulent scheme. These transactions were more than "financings." By inflating revenue and earnings they allowed Enron to meet quarterly targets that supported the price of Enron securities. Other transactions such as the prepays were complete shams in that no commodities were ever intended to be delivered and, in addition to overstating cash flow and concealing debt, they gave the appearance of trading activity.

331.    By reason of Barclays' intimate involvement in serial SPE financings, the SO2 Transaction, the Prepay Transactions and others, Barclays knew that the financial statements contained in the offering memorandum and prospectus for the Enron Zero Notes were materially false and misleading, and that the investing public would be deceived thereby.

332.    Nevertheless, Barclays: (i) agreed to participate in the Zero Notes offering as an underwriter; (ii) had its name prominently displayed in the offering memorandum for the stage one private placement; (iii) knew that the transaction expressly contemplated the subsequent

stage two public offering and benefited from the higher price it obtained in the private placement as a consequence of the tie-in with the public offering; (iv) had the right and opportunity to participate in the preparation of the offering memorandum and the prospectus which largely tracks the memorandum, and otherwise conduct a reasonable investigation of Enron and its finances; (v) disseminated that offering memorandum knowing that it contained false and misleading information about Enron's financial condition; and (vi) never disclosed the material facts concerning Enron's off-balance-sheet obligations or the false revenue, profits and cash flow being reported by Enron, or the disguised loans made by Barclays, all of which were materially misrepresented and concealed in the offering documents.

333.    Approximately five weeks before the bankruptcy, Enron pledged and transferred $59.5 million dollars to Barclays as security for obligations owing to Barclays or those entities in which Barclays "has an interest." Subsequent to Enron's bankruptcy, Barclays terminated certain swap agreements and applied the $59.5 million to "satisfy" alleged claims against Enron.

334.    Barclays functioned as a unified entity without effective Chinese walls separating its various divisions. Accordingly, for purposes of its business activities, knowledge possessed by any one sector of the company should be attributed to Barclays as a whole.

335.    As information about Enron's actual financial condition (that Barclays had helped Enron to conceal) was finally disseminated to the general public, the value of Enron securities dropped almost to zero. Silvercreek lost substantially its entire investment in a matter of weeks. Barclays played a significant role and is directly responsible for Silvercreek's losses as an aider and abettor of Enron's fraud.

336.   Given Barclays' extensive involvement in fraudulent transactions with Enron, transactions designed solely to manipulate Enron's financial statements and mislead the investing public, Barclays is directly responsible for the false information conveyed to the public, including Silvercreek.  In particular, as an underwriter of the Zero Notes, Barclays knowingly disseminated an offering memorandum and the related registration statement and prospectus that contained materially untrue and misleading information with respect to the financial position of Enron.

337.   Barclays knew that the offering memorandum, registration statement and prospectus for the Zero Notes were materially untrue, misleading and fraudulent.  Silvercreek relied on Barclays' professional competence as an underwriter for the Zero Notes, believing that Barclays had conducted proper due diligence and was not itself engaged in fraudulent transactions with Enron to help Enron manipulate its accounting books and records.  The offering memorandum for the Zero Notes stated:

> We incorporate by reference in this prospectus the following documents filed by us with the SEC:
>
> –   Our Annual Report on Form 10-K for the year ended December 31, 1999;
>
> –   Our Quarterly Report on Form 10-Q for the quarters ended March 31, 2000, June 30, 2000 and September 30, 2000;
>
> –   Our Current Reports on Form 8-K filed with the SEC on May 19, 2000, and January 31, 2001; and
>
> –   The description of our capital stock set forth in our Registration Statement on Form 8-B filed on July 2, 1997.

The prospectus for the Zero Notes incorporated similar but updated SEC filings.

106

338.    The financial information contained in the offering memorandum, the S-3 registration statement and the prospectus for the Zero Notes, as well as the financial information incorporated by reference therein, was materially false, fraudulent and misleading due in significant part to the fact that Barclays assisted Enron in (i) inflating its revenues, earnings and cash flow; and (ii) hiding its true indebtedness, by creating, developing, promoting and implementing a number of fraudulent transactions such as Chewco, Nikita, SO2  and the Prepays.

339.    Barclays' design of and participation in fraudulent transactions with Enron resulted in the dissemination of financial information to the investing public that was materially false and misleading.  This false information significantly inflated the values at which both the Zero Bonds and the 7% Notes were sold.  In addition, the false financial information which Barclays helped create was included in the offering memorandum and prospectus for the Zero Notes, as well as the prospectus for the 7% Notes, and formed the basis upon which both securities were sold and purchased.

340.    In investing in Enron's debt via the 7% Notes and the Zero Notes, Silvercreek relied upon the accuracy of Enron's financials, especially its cash flow from operations and debt levels, which Barclays  materially assisted Enron in misstating.

**b.    Deutsche Bank**

341.    Deutsche Bank is another large financial services organization that had a close relationship with Enron.  Deutsche Bank's top officials had frequent communications with Enron's executives about Enron's business and financial situation.  Deutsche Bank knew that Enron was falsifying its financial reports. Deutsche Bank also provided Enron with commercial

banking and investment banking services, helped structure "off-the-books" SPEs and partnerships, and helped Enron falsify and misrepresent its financial statements and projections, all while Deutsche Bank research analysts were issuing positive and glowing reports about Enron. According to the Examiner's Report, Deutsche Bank participated in 11 SPE Transactions during the 1995 - 2001 time period, including the manipulative Teresa, Steele, and Cochise "convert tax deductions into income" transactions, and the Osprey and Marlin asset "sale" transactions. Deutsche Bank directly participated in at least the following fraudulent Enron schemes:

- Deutsche Bank helped to create and fund LJM2, and committed to invest $10 million in LJM2, knowing that it was designed to enable Enron to move debt off its balance sheet and generate fraudulent profits. LJM investors were well aware of the key role LJM2 played in the fraudulent scheme;

- Deutsche Bank managed the sale of Marlin Water Trust bonds in 1998 and 2001. Martin was an ostensibly "independent" partnership which Enron used to move its Azurix water utility assets and related debt off of Enron's books. Deutsche Bank was also an underwriter for the Osprey I and Osprey II Notes. Osprey was another "off-the-books" accounting scam. Deutsche Bank's involvement in both vehicles was conditioned on Enron's pledge of its own stock to support the structures, a significant obligation for Enron that was not disclosed to Enron's investors;

- Deutsche Bank acted as an underwriter in one of the Yosemite offerings, a Prepay Transaction which enabled Enron to fraudulently record loans as operating cash flow and to hide debt;

- Deutsche Bank and Enron engaged in a money laundering scheme through the $2 billion Valhalla Transaction; and

- Deutsche Bank structured at least four tax-driven transactions (the "Tax Transactions"), pursuant to which Enron created over $1 billion in false income and Deutsche Bank received over $40 million in fees.

342. Deutsche Bank was also one of the principal commercial lending banks to Enron. Deutsche Bank was a lead bank on Enron's main credit facilities, lending over $1 billion dollars

to Enron, while helping to syndicate over $4 billion in bank loans to Enron or related entities. Deutsche Bank also helped to raise over $5 billion from the investing public through securities sales that were based on grossly misleading and misrepresented information. Deutsche Bank helped structure and finance some of the Enron off-the-books partnerships and SPEs and engaged in transactions with Enron to help disguise loans. In short, Deutsche Bank helped Enron to falsify its actual financial condition, liquidity, and creditworthiness.

343.   Deutsche Bank functioned as a unified entity without an effective Chinese wall. Information obtained by Deutsche Bank's commercial and investment banking personnel was not quarantined from Deutsche Bank's research analysts. On the contrary, Deutsche Bank used its research analysts as a marketing arm for its investment banking business. Accordingly, for purposes of its business activities, knowledge possessed by any one sector of the company should be attributed to Deutsche Bank as a whole.

344.   Prior to the merger of Deutsche Bank and Bankers Trust in June 1999, both banks had established relationships with Enron. Enron considered Deutsche Bank a "Tier 1" bank, and before its acquisition by Deutsche Bank, Bankers Trust also was rated a "Tier 1" bank.

345.   Deutsche Bank knew that it was engaged in fierce competition for Enron business with other investment banks. Deutsche Bank accordingly wanted to please and accommodate Enron. Deutsche Bank bankers (such as Mike Jakubik) pushed for an aggressive approach to obtaining Enron business through participating in transactions that could artificially allow Enron to "bring forward" earnings.

346.    Deutsche Bank's contacts with Enron were so extensive that Deutsche Bank could and did set up meetings with Enron officers to discuss "the facts behind the numbers" in Enron's financial statements.

347.    A November 2000 internal memorandum from George Tyson of Deutsche Bank to Marcus Tarkington of Deutsche Bank sums up Deutsche Bank's relationship with Enron:

> [W]e are frequently brought into unique and lucrative transactions for Enron, such as the highly successful Marlin and Osprey Trust Transactions that we developed with DLJ.…  To maintain this position with Enron, we need to demonstrate that we execute transactions quickly when necessary.
>
> *   *   *
>
> During the past four years, we have earned gross advisory, underwriting and structuring fees as follows: $10 million in 1997, $20 million in 1998, $7 million in 1999, and $2 million plus annual tax benefits resulting from a structured Tax Transaction of $50 million in 2000.

348.    As one of Enron's Tier 1 banks, Deutsche Bank participated in a number of different transactions with Enron – ranging from traditional commercial lending to participation in debt and equity offerings, as well as structured financings through the Tax Transactions. From 1997 until Enron filed for bankruptcy protection, Deutsche Bank was paid $43 million in fees associated with the Tax Transactions, approximately $11 million in fees associated with other lending and structured finance and $18 million in fees associated with public and private securities offerings.

349.    Deutsche Bank was also very important to Enron.  A November 1999 internal memo from Enron officers, including Andy Fastow, regarding Deutsche Bank, confirms that Enron consistently ranked Deutsche Bank as a Tier 1 bank.

350.    Deutsche Bank was aware that Enron's accounting practices were aggressive and that the true extent of Enron's off-balance-sheet obligations could not be discerned from its financial statements and attendant notes.  For example, in 2001 Deutsche Bank held several meetings with Enron senior management to gain further insight into the dependency of Enron on its trading activities and asset sales to meet earnings targets.  Deutsche Bank Credit Officer Calli Hayes and Paul Cambridge (Deutsche Bank) both confirmed in their sworn statements that it was during these meetings that Deutsche Bank was given information about (i) the significance of Enron's trading activity as a vehicle for increasing Enron's reported revenues, as well as (ii) the level of off-balance-sheet obligations.

351.    In his sworn statement, Cambridge indicated that one of the key objectives of these private meetings was to enable Deutsche Bank to determine Enron's total debt in one form or another in order to assess whether Enron's financial reporting "reflected reality."

352.    The sworn statements of Calli Hayes and Paul Cambridge, as well as e-mail correspondence from Marcus Tarkington of Deutsche Bank, show that Deutsche Bank met with Enron senior management to discuss Enron's 2000 annual report.  Deutsche Bank's objective was to ascertain the extent to which sales of merchant assets to SPEs contributed to Enron's reported cash flow from operating activities.

353.    In his sworn statement, Paul Cambridge confirmed the following:

- Deutsche Bank was aware of its own work for Enron in structuring transactions for "balance sheet management" purposes, including liquidating assets that Enron no longer wished to carry on its balance sheet, moving debt off the balance sheet, and improving Enron's accounting ratios; and

- Deutsche Bank was aware that Enron engaged in other structured transactions, including Prepay Transactions, but did not have a good understanding of the magnitude.

111

354.    Despite Deutsche Bank's detailed knowledge of non-public information and Enron's true financial condition, (i) its equity research analysts continued to issue positive and upbeat research reports that contained false and/or misleading statements and information; and (ii) it continued to refer to and incorporate materially misleading financial statements in offering documents for Enron-related securities transactions in which it was acting as underwriter, including the offering memorandum and prospectus for the Zero Notes.

355.    Based on its access to management and its participation in a number of different transactions, Deutsche Bank had knowledge of Enron's off-balance-sheet activities and resulting, unsound financial condition.  As noted in October 2001 Amended Minutes, Deutsche Bank's Underwriting Committee refused to authorize any additional Enron credit exposure.  It was also noted in those same minutes that although Enron credit was "externally rated BBB+/Baa1...Enron has considerable off-balance-sheet liabilities [and] lacks transparency with respect to its hedging activities (despite a number of Company visits)."

356.    Deutsche Bank helped to create and fund LJM2, with its executives investing more than $10 million in LJM2, knowing that they would reap enormous returns due to the duplicitous structure of LJM2, including Fastow's dual roles in Enron and the supposedly separate partnership.  Deutsche Bank provided advance funding for LJM2 at the end of 1999 so it could complete some 11th hour transactions to generate phony profits to meet Enron's 1999 profit targets.  LJM investors were provided with information concerning the amount of Enron's concealed debt and the misleading nature of LJM2's transactions with Enron.

357.    Deutsche Bank engaged in six different Tax Transactions with Enron between 1997 and 2001.  Not only did Deutsche Bank participate in these transactions, but it was the

112

architect of the structures and actively marketed its deceptive structures to Enron.  The two Real Estate Mortgage Investment Conduit ("REMIC") Carryover Basis Transactions that Deutsche Bank coordinated for Enron alone enabled Enron to fraudulently report nearly $144 million in potential tax benefits as pre-tax income.

358.    In an appendix to the Third Interim Report of the Examiner ("Role of BT/Deutsche Bank and its Affiliates"), a substantial volume of evidence with respect to Deutsche Bank's role in the Enron fraud was reviewed.  *See* Exhibit F hereto.  The Examiner concluded that:

> BT/Deutsche Bank's conduct in the BT/Deutsche Bank Tax Transactions enabled Enron to:  (i) erroneously record approximately $158 million of income from the two REMIC Carryover Basis Transactions, $143.7 million of which Enron erroneously recorded as pre-tax income; and (ii) erroneously record a $229 million increase in after-tax net income by reporting the Teresa Transaction in a manner that did not comply with GAAP.

> The evidence would allow a fact-finder to conclude that BT/Deutsche Bank:

> •    acted as a conduit for the sale of the Cochise planes from Enron to Oneida Leasing, Inc. ("Oneida") in the second quarter of 2000 for the purpose of enabling Enron to erroneously report $36.5 million of gain on the sale, an amount equal to more than 10% of Enron's reported net income for the quarter;

> •    designed, promoted and participated in the Teresa Transaction while knowing that the transaction was not expected to reduce Enron's tax liability on a present value basis and served no substantial business purpose for Enron other than enabling Enron to "generate income for financial accounting purposes";

> •    designed, promoted and participated in the Steele Transaction while knowing that the transaction served no substantial business purpose for Enron other than enabling Enron to report the potential benefit of speculative future tax deductions in an erroneous and misleading manner as pre-tax income; and

> •    designed, promoted and participated in the Cochise Transaction while

113

knowing that the transaction served no substantial business purpose for Enron other than enabling Enron to report the potential benefit of speculative future tax deductions in an erroneous and misleading manner as gain on the sale of the Cochise planes and as other pre-tax income.

359.    Deutsche Bank's active participation in the Enron fraud may be summarized under four main categories:

      a.     Tax Transactions;

      b.     Tax Accommodation Transactions;

      c.     Structured Transactions with disguised Enron affiliates; and

      d.     Analyst coverage.

### (i)    Tax Transactions

360.    The Deutsche Bank Tax Transactions were essentially artificial transactions lacking a legitimate business purpose.  In violation of the "business purpose" rule, which requires that every transaction have a valid business purpose, the Tax Transactions had no purpose other than to artificially inflate pre-tax revenue and pre-tax profit, by creating supposed future tax deductions.

361.    These transactions were unrelated to Enron's stated business activities, created one-time paper profits and generated no real income and little or no cash for Enron.  These transactions were done without useful or meaningful disclosure to the readers of Enron's financial statements. As a result, these transactions overstated Enron's income, distorted Enron's financial performance, and caused Enron's financial statements to be misleading.

362.    Deutsche Bank received over $40 million in fees for assisting Enron in the creation, development, promotion and implementation of these purely tax-driven transactions. As the promoter of these abusive tax shelters (including advising Enron on the improper

114

accounting treatment of each of the transactions), Deutsche Bank helped cause Enron's financial statements to be materially misleading. The Tax Transactions enabled Enron to create over $1 billion in income over a six-year period. Deutsche Bank actually justified its huge fees in part by reference to the large amount of accounting income the Tax Transactions would generate for Enron.

363. The recording of these transactions did not comply with GAAP, and were utilized to accelerate the recognition of income and create a misleading picture of Enron's actual earnings. Deutsche Bank employees who knew that the Tax Transactions violated tax laws or GAAP include, but are not limited to:

| DB/BT Employee | Title | Role |
|---|---|---|
| Paul F. Cambridge | Managing Director | Knew of DB/BT investment in LJM2<br>Had close relationships with Andy Fastow, Ben Glisan, Jeff McMahon, Paul Chivers, Mike Jakubik<br>Participated in Marlin<br>Participated in Osprey<br>Participated in the Steele Transaction |
| George Tyson | Vice President | Knew of the Tax Transactions and the fees and tax benefits DB/BT received<br>Participated in Marlin<br>Participated in Osprey |
| Thomas Finley | Managing Director | Participated in the Cochise Transaction<br>Participated in the Steele Transaction<br>Participated in the Teresa Transaction |
| Christine Levinson | Principal | Participated in the Cochise Transaction<br>Participated in the Steele Transaction<br>Participated in the Teresa Transaction |
| Paul Bloshuk | Vice President | Participated in the Cochise Transaction<br>Participated in the Steele Transaction |

| Brian McGuire | Vice President | Participated in the Cochise Transaction<br>Participated in the Steele Transaction<br>Participated in the Teresa Transaction |
| John Tsai | Associate | Participated in the Cochise Transaction<br>Participated in the Steele Transaction |
| John Addis | Associate | Participated in the Cochise Transaction |
| Viktoria Antoniades | Analyst | Participated in the Cochise Transaction |
| Leon Kozak | Managing Director | Helped develop tax technology in Tax Transactions<br>Participated in the Cochise Transaction<br>Participated in the Steele Transaction<br>Participated in the Teresa Transaction<br>Participated in the Tomas Transaction |
| Mary Harmon | Managing Director | Reviewed/analyzed the Tax Transactions<br>Participated in the Cochise Transaction<br>Participated in the Steele Transaction |
| David Newman | Managing Director | Participated in the Cochise Transaction |
| William Boyle | Managing Director | Participated in the Cochise Transaction<br>Participated in the Steele Transaction |
| Richard Coll | Managing Director and Counsel | Participated in the Steele Transaction |
| Paul Glover | Principal | Participated in the Cochise Transaction<br>Participated in the Teresa Transaction |
| Justin Davies | Analyst | Participated in the Cochise Transaction |
| Gregg Grauer | Vice President | Participated in the Cochise Transaction |
| Daniel Wan | Principal | Participated in the Cochise Transaction |
| Marcus Tarkington | | Knew of the Tax Transactions and the fees and tax benefits DB/BT received |

116

| Calli Hayes | Credit Officer | Knew of Marlin<br>Participated in the due diligence of the Osprey Notes<br>Participated in the due diligence of the Yosemite Notes<br>Participated in the Teresa Transaction<br>Participated in the Steele Transaction<br>Participated in the Cochise Transaction |
|---|---|---|
| John Wadsworth | Tax Director | Determined whether it was appropriate to enter into the transaction from a task risk point of view |
| Duncan Hennes | Sr. Vice President | Participated in the Tomas Transaction |
| Stuart Macfarlane | | Participated in the Teresa Transaction |
| David K. Thomas | | Participated in the Teresa Transaction |
| Stephen P. Jankovitz | | Participated in the Teresa Transaction<br>Participated in the Tomas Transaction |
| Peggy Capomaggi | | Participated in the Cochise Transaction<br>Participated in the Steele Transaction |
| Jean M. Mazarella | | Participated in the Tomas Transaction |
| Bruce Classon | | Participated in the Teresa Transaction |
| Paul Nelson | | Participated in the Teresa Transaction |
| Michael A. Mangravite | | Participated in the Cochise Transaction<br>Participated in the Steele Transaction |
| Vito Arno | | Participated in the Cochise Transaction<br>Participated in the Steele Transaction |
| Thomas Boggiano | | Participated in the Cochise Transaction<br>Participated in the Steele Transaction |
| Jody Blumenfeld | | Participated in the Tomas Transaction |
| Mark Leiman | | Participated in the REMIC transactions |
| Ann Griffith | | Participated in the REMIC transactions |
| Ken Abbott | | Participated in the REMIC transactions |

| Sean Cullinan | | Participated in the Cochise Transaction<br>Participated in the Tomas Transaction |
| Debra Benning | | Participated in the Tomas Transaction |
| Jane Naddeo | | Participated in the Cochise Transaction<br>Participated in the Tomas Transaction |

364.    The four Tax Transactions Deutsche Bank designed for Enron between 1997 and 2000 (Teresa (03/1997), Steele (10/1997), Tomas (09/1998) and Cochise (01/1999)) resulted in increased reported pre-tax income and/or reduced tax expenses to Enron.  The primary objective of these four Tax Transactions was the creation of financial statement income.  These "enhancements" to Enron's reported performance were derived from the manipulation of differences in tax accounting and GAAP accounting, and were not at all related to Enron's normal business operations.

365.    All of the Tax Transactions violated GAAP and tax laws.  According to United States Tax Code § 269, a transaction must have a legitimate business purpose beyond the creation of tax benefits.  However, neither Teresa, Steele, Cochise nor Tomas had a legitimate business purpose.  Indeed, a tax opinion authored by King & Spalding stated that Enron's predominant business purposes for entering into the Tax Transactions was to generate income for financial accounting purposes.  A number of Deutsche Bank internal memoranda regarding the Tax Transactions also specifically state that, "The principal purpose of the Transaction for the Client will be to generate significant amounts of accounting and investment income."

366.    The following table summarizes the impact of the four Tax Transactions on Enron's net income and the associated fees to Deutsche Bank:

118

| Transaction | Closing Date | Impact on Net Income | Deutsche Bank Fees (Original) | Deutsche Bank Fees (Collected) |
|---|---|---|---|---|
| Teresa | 3/97 | $228.7 million | $10 million | $6.6 million |
| Steele | 10/97 | $61.2 million | 10 million | 8.2 million |
| Tomas | 9/98 | $52.8 million | 10 million | 11.9 million |
| Cochise | 1/99 | $96.1 million | 15 million | 11.3 million |
| Total | | $438.8 million | $45 million | $38.0 million |

367.    In simple terms, Deutsche Bank structured transactions that generated current financial accounting income for Enron – including large amounts of pre-tax income – by creating, at best, questionable future tax deductions.

368.    Enron characterized the speculative future tax benefit as a deferred tax credit that Enron would take as accounting income over the lifetime of the credit. But as structured by Deutsche Bank, the tax transactions created artificially short lives for the deferred tax credits. The improper design of the Deutsche Bank Tax Transactions allowed Enron to include large amounts of accounting income on its statements over just a few years even though the deferred tax asset involved in the particular transaction might reflect a projected tax deduction many years or even decades in the future.

369.    That Enron failed to set aside reserves for the potential that the speculative tax benefits would never be realized is further proof that each of the Tax Transactions was a sham. The Examiner concluded that the Tax Transactions simply did not comply with GAAP.

370.    Enron's use and dependence upon the Tax Transactions for manipulating its financial statements was summed up by Robert J. Herman, the former head of Enron's tax

119

department. The Bankruptcy Examiner quotes Hermann describing Enron's reliance on BT/Deutsche Tax Transactions for balance-sheet manipulation as "kind of like cocaine-they got kind of hooked on it."

### (A)    Teresa Transaction

371.    Teresa, the first of the Tax Transactions, was developed by Deutsche Bank and promoted to Enron in 1996 as a method for generating financial accounting income.

372.    Although designed to superficially appear as a tax avoidance transaction, Teresa was not in reality intended to give Enron present-value tax savings.  Instead, Teresa was designed solely to generate financial accounting benefits.

373.    Teresa was structured as a "tax basis step-up" transaction – a legitimate tax-avoidance structure when properly implemented.  As designed by Deutsche Bank for Enron, however, the tax basis step-up transaction was, in the Examiner's words, among the "most egregious" of the structures used for manipulating financial accounting rules.

374.    Teresa provided a $1.3 billion tax basis step-up for Enron's Houston corporate headquarters building. For this asset, Enron quantified the increased basis as a future tax benefit and recorded that quantified benefit as current accounting income over an artificially short period of time.  The basis for the step-up scheme was the passing of Enron's interest in the corporate headquarters building to a partnership, with later distribution of the property to an Enron affiliate that had achieved an increased basis in its interest in the partnership.  Based on the theory used in the transaction, Enron expected the increased tax basis in the partnership interest eventually to be reflected as an increase in the basis of the corporate headquarters building and expected depreciation deductions over a period of 39.5 years.

120

375.    A convoluted series of transactions and numerous Enron and Deutsche Bank-controlled SPEs were used to conceal the true purpose of the Teresa Transaction.

376.    The SPE formed for the Teresa Transaction was Enron Leasing Partners, L.P. in which Organizational Partner, Inc. ("OPI") was a 98% limited partner.  Deutsche Bank assisted Enron in issuing shares of OPI stock to third parties in order to prevent OPI from qualifying as a member of Enron's consolidated group for federal income tax purposes.  Some of the stock Deutsche Bank helped Enron issue went to an affiliate of Deutsche Bank.

377.    Deutsche Bank knew that the tax benefits of the transaction would not be available for years, until the undetermined future date when the Enron headquarters building was eventually distributed to Enron and Enron began to take increased depreciation deductions.  Deutsche was well aware that, on a present-value basis, Teresa would not provide Enron with tax savings.  This structure, however, was in accord with Enron's true goal: to generate financial accounting income by improperly recording deferred tax assets in advance of future tax deductions – even before the resulting increased basis could attach to a depreciable asset.

378.    In an internal Deutsche Bank memo it states that, "[T]he transaction is expected to generate approximately $240 million of after-tax book income for Enron recognized over the life of the transaction," and "Enron will have the opportunity to record approximately $240 million of after-tax accounting earnings over the next six years."

379.    Teresa enabled Enron to improperly create $229 million of after-tax "income." This income was reported on Enron's financial statements.

380.    The Teresa Transaction specifically violated GAAP because it was improper to recognize earnings resulting from the future tax deductions purportedly created by Teresa

without a reasonable basis for believing Enron would in fact use those deductions in the foreseeable future, which Enron never did because it filed for bankruptcy prior to recognizing any tax deductions.  The Teresa Transaction violated GAAP in at least three ways:

a.  In order to record the Deferred Tax Asset, GAAP requires that it is "probable" that the tax position that gave rise to the recording of the Deferred Tax Asset can be sustained.

b.  GAAP does not permit the deduction of Temporary Differences (and the corresponding recording of a Deferred Tax Asset) related to an investment in a partnership unless they will reverse in the "foreseeable future."  In practice, "foreseeable future" has been linked to the definition of a "measurement date" included in the Accounting Principles Board Opinion Number 30, which provides that the "measurement date" is the date that management commits itself to a formal plan of disposal.  In the Teresa Transaction, there was no formal plan of disposal and, therefore, the recording of the Deferred Tax Asset would not be permitted under GAAP.

c.  Even if there had been a formal plan of disposal in the Teresa Transaction and the recording of the Deferred Tax Asset determined to be appropriate, GAAP requires a "valuation allowance" (*i.e.*, tax cushion) if, based on the available evidence, it is more likely than not that some or all of the deferred tax asset will not be realized.  The accounting for the Teresa Transaction did not provide a valuation allowance for either: (i) the risk that there would not be sufficient taxable income available to benefit from the increased depreciation due to the increased tax basis; or (ii) the risk that the IRS would successfully challenge the structure in its entirety.

381.   The Teresa Transaction also violated various anti-abuse provisions of the U.S. tax laws including:

a.  United States Tax Code § 269;

b.  The anti-abuse provision of the Treasury Regulations on consolidated returns; and

c.  The anti-abuse provisions of the Treasury Regulations on partnership taxation.

382.   With respect to the Teresa Transaction the Examiner concluded:

122

Because of BT/Deutsche Bank's role in developing and promoting the transaction, BT/Deutsche Bank was intimately familiar with the tax and accounting treatment of the Teresa Transaction. BT/Deutsche Bank knew that the tax benefit of the transaction would not be available for years, until the undetermined future date when the Enron North Building was eventually distributed to Enron and Enron began to take increased depreciation deductions. BT/Deutsche Bank knew that, on a present value basis, the Teresa Transaction was not expected to result in any tax savings to Enron. BT/Deutsche Bank knew that the purpose of the Teresa Transaction was to generate financial accounting income by recording Deferred Tax Assets well in advance of future tax deductions, and even before the increased basis resulting from the transaction could attach to a depreciable asset. The Examiner has concluded that the financial accounting for the Teresa Transaction was erroneous and misleading because Deferred Tax Assets were recorded prematurely, in violation of GAAP, long before the increased basis could attach to a depreciable asset.

### (B) Steele Transaction

383. Steele was the first of two REMIC transactions designed by Deutsche Bank for Enron. The second REMIC transaction was Cochise.

384. "REMIC" refers to a real-estate mortgage-investment conduit, which, in general terms, is an entity owning a collateralized pool of real-estate mortgaged and related securities that, based on their financial characteristics, satisfy certain technical requirements of the Internal Revenue Code.

385. The REMIC transactions allowed Enron, in the Examiner's words, to engage in "egregious manipulation" of its financial statements:

Although the REMIC Carryover Basis Transactions appear complex, each transaction basically involved the acquisition of REMIC Residual Interests and a limited amount of additional assets (the "Facilitating Assets"). The Facilitating Assets had low economic returns and were acquired for the purpose of enabling Enron to portray the potential benefit of speculative future tax deductions for Phantom Losses as pretax income for financial accounting purposes.

386. Deutsche Bank developed the Steele Transaction because it was looking for an efficient way to sell REMIC Residual Interests that it had acquired in the course of its business.

123

The SPE formed to purchase the REMIC Residual Interests was ECT Investing Partners, L.P., which was owned by various Enron subsidiaries and two Deutsche Bank affiliates.  For its services as Enron's financial advisor, Deutsche Bank received $10 million in fees.

387.    Enron paid the high fees because Deutsche Bank was able to design extremely complicated structures that concealed the true, underlying transaction.

388.    Deutsche Bank designed Steele to appear as a legitimate tax-avoidance structure that acquired and managed a portfolio of real estate and other financial assets with an enhanced earnings profile.  The low-yielding nature of the Facilitating Assets, and Enron's admission that it would not have closed Steele but for its accounting benefits make clear, however, that as a tax-avoidance mechanism, the transaction was a sham.

389.    Deutsche Bank designed the transaction to improperly generate financial accounting benefits by amortizing a large portion of the deferred tax credit associated with the acquisition of the REMIC Residual Interests into pre-tax accounting income over the life of the Facilitating Assets – in Steele's case, five-year corporate bonds.  The amortization of the associated tax benefit into pre-tax income, combined with the artificially short period of time over which that amortization was conducted, made the transaction particularly misleading.

390.    The Steele Transaction, which closed in October 1997, allowed Enron to record $121.8 million of pre-tax financial statement income based on the potential benefit of speculative future tax deductions for phantom losses from acquired REMIC Residual Interests.  The amortization of the Deferred Credit into pre-tax income and the selection of the period over which to amortize the Deferred Credit were the two most aggressive and misleading aspects of Enron's accounting for the Steele Transaction.

124

391.    Deutsche Bank was intimately familiar with the tax and accounting treatment of the Steele Transaction because of its role in the development and promotion of that transaction. Leon Kozak of Bankers Trust testified: "I believe an articulated reason for the Steele Transaction in part were accounting benefits."  A January 10, 1999 Bankers Trust memorandum stated: "The principal purpose of the Transaction for Enron Corp. will be to generate significant amounts of accounting earnings and investment income."

392.    Indeed, the goal of generating "accounting income" rather than tax savings was Deutsche Bank's selling point from the start.  In a June 1997 PowerPoint presentation for Enron titled "Discussion Material for Enron," Deutsche Bank promoted Steele as a transaction designed to create approximately $121.8 million of pre-tax financial statement income for Enron.

393.    In a November 1997 memo sent to Enron tax strategist and senior director Davis Maxey, Deutsche Bank advised that "the accounting benefits of the transaction are derived from treating the transaction as a 'bargain purchase' of assets for accounting purposes, even though there is no bargain purchase from an economic perspective ..."

394.    Still further, Akin, Gump, Straus, Hauer & Field LLP, engaged by Enron to obtain a tax opinion, stated: (i) "The Company and the Enron Subsidiaries undertook the [Steele] Transaction for the principal purpose of generating financial accounting benefits to the Company's accounting group . . .;" and (ii) Enron "would not have entered into the Transaction in the absence of the anticipated accelerated accounting benefit…."

395.    The Steele Transaction specifically violated GAAP because Enron was to amortize into pre-tax income over a period of approximately five years, the deferred credit

derived from the speculative future tax deductions created by the REMICs over their much longer life span.

396.    Enron and Deutsche Bank knew that proper accounting required a rational, systematic method with respect to the amortization period.  Deutsche Bank also knew that the deferred tax assets could only be attributed to REMIC Residual Interests with an estimated life of 27 years.  Nevertheless, Deutsche Bank designed the transaction to have Enron amortize the deferred credit over five years—the life of the corporate bonds and not, as required, the life of the REMIC Residual Interests.

397.    The Steele Transaction violated GAAP in at least three ways:

    a.    In order to record a Deferred Tax Asset, GAAP requires that it is "probable" that the tax position that gave rise to the recording of the Deferred Tax Asset can be sustained.

    b.    To the extent that the phantom losses were a tax position that could be sustained, GAAP requires a "valuation allowance" (*i.e.*, tax cushion) if, based on the available evidence, it is more likely than not that some or all of the deferred tax asset will not be realized.  The accounting for the Steele Transaction did not provide a valuation allowance for either: (i) the risk that there would not be sufficient taxable income available to benefit from the phantom losses; or (ii) the risk that the IRS would deny the deduction for the phantom losses.

    c.    GAAP requires that the amortization period for the Deferred Credit be determined with reference to the asset giving rise to the deferred tax benefit.  In the Steele Transaction the Deferred Tax Asset should have been amortized with reference to the REMIC Residual Interests and not the short dated corporate bonds (*i.e.*, the facilitating asset).  By using an artificially short-dated reference asset, the benefit was overstated.

398.    With respect to the Steele Transaction the Examiner noted that:

BT/Deutsche Bank developed the Steele Transaction because it was looking for an efficient way to sell or monetize REMIC Residual Interests that it had acquired in the course of its business.  The transaction that it developed could be used to generate significant accounting benefits for its counterparty. … BT/Deutsche

126

Bank first promoted the Steele Transaction to Enron in June 1997. BT/Deutsche Bank marketed the transaction as a means of generating pre-tax financial accounting income.

399.    The Examiner concluded in the Second Interim Report that:

Enron's accounting treatment of the Steele Transaction did not comply with GAAP and was misleading because a reader of Enron's financial statements had no way of knowing that purported pre-tax income from operations actually consisted of the potential benefit of speculative future tax deductions for Phantom Losses from acquired REMIC Residual Interests.

### (C)    Tomas Transaction

400.    The Tomas Transaction was brought to Enron's tax department by Deutsche Bank in 1998. The Tomas Transaction arose out of a portfolio of leased assets with a low tax basis that Enron acquired with its purchase of Portland General Holdings, Inc.

401.    PowerPoint presentation material prepared by Deutsche Bank boasted of the benefits Tomas provided to Enron: "This structure generated tax basis in a portfolio of 'burnt out' leveraged lease assets, which Portland General originally acquired and provided a mechanism for liquidating the portfolio at a substantial gain."

402.    It is clear that Deutsche Bank created Tomas for the express purpose of papering over a loss and making the sale of the low tax-basis assets appear as an accounting income gain.

403.    Enron's goal was to dispose of the assets without incurring federal income tax, while also reporting a significant gain for financial accounting purposes. The Tomas Transaction allowed Enron to book $25.6 million in pre-tax gains in 1998 and $18 million in pre-tax gains in 2000. Acting as Enron's financial advisor on the Tomas Transaction, Deutsche Bank received $10 million dollars in fees.

404.    Deutsche Bank and Enron worked out a structured transaction that included the formation of an SPE named Seneca and the involvement of another Enron affiliate named Oneida.

405.    Enron and Deutsche Bank engaged in a fraudulent two-step transaction to allow Enron to record the transfer of the Cochise planes as a sale, a transfer which allowed Enron to get the planes back after selling them; this accounting did not comply with GAAP.  Enron and Deutsche Bank devised the plan of transferring the planes back to Enron after the sale to a Deutsche Bank subsidiary through the Oneida vehicle.  Enron contributed assets to the Tomas structure that Enron wanted to sell and that had a low basis for both accounting and tax purposes. Deutsche Bank designed the structure to allow Enron to swap out low tax-basis stock of Oneida that had a valuation equal to the sales value of the low-basis assets. The low-basis stock could then be liquidated without Enron having to recognize tax gain.

406.    As part of the Tomas transactional documentation, Deutsche Bank and Enron had represented that Oneida, an Enron-controlled SPE, would engage in a leasing business. These representations were needed for compliance with certain IRS regulations. By June 2000, however, Oneida had not done any leasing. In order to create the appearance Oneida was indeed an operating business concern, Deutsche Bank and Enron transferred the Cochise airplanes (the Facilitating Assets from the Cochise Transaction) – to Oneida in the summer of 2000.

407.    Because Enron wanted to recognize accounting gains as quickly as possible, Enron and Deutsche Bank had an unwritten understanding that the structure would be unwound in two years and one day. Under applicable tax rules, certain favorable presumptions arise when a contributing partner receives a liquidating distribution more than two years after its

contribution. The favorable tax-related presumptions, however, do not apply where there is an understanding that liquidation had been planned at the outset of the transaction.

408.     Enron and Deutsche Bank both knew that, because Enron intended to unwind the transaction in two years and one day, the tax treatment that Enron gave it was risky and subject to uncertainty. Enron, despite the impropriety and risk, and without disclosing that risk, recorded the full tax benefit from the avoidance of the built-in capital gain at the end of the two years.

409.     Deutsche Bank also knew that the price paid for the airplanes was much higher than their true value. The price was supported by Enron's internal valuation but was flatly contradicted by a third-party appraisal that Deutsche Bank had commissioned.

410.     Enron and Deutsche arranged the sale of the Cochise aircrafts in such a way that Enron booked the entire proceeds of $36.5 million as net income from the sale. This "revenue" recognition was only made possible by inappropriate purchase accounting adjustments that had reduced Enron's book basis in the Cochise airplanes to zero.

411.     In sum, Tomas allowed Enron to recognize gains of $25.6 million in 1998 and $18 million in 2000.

412.     The Tomas Transaction specifically violated GAAP because the transfer of the airplanes from the Enron affiliate to the Deutsche Bank affiliate should not have been recorded as a sale.  Among other things, Enron and Deutsche Bank had agreed to return the airplanes to Enron through a fraudulent re-transfer of the planes from BT Leasing (the Deutsche Bank affiliate) to Oneida (the Enron affiliate).  Oneida was also a company that was supposed to be in the leasing business although the only assets leased were the Cochise planes.

413.     With respect to the Tomas Transaction, the Examiner concluded that:

The tax planning for the Tomas Transaction relied on representations by Enron and BT/Deutsche Bank that Oneida would engage in a leasing business. The BT Affiliates were engaged to act as Oneida's leasing agent for a fee of $300,000 per year. Prior to June 2000, however, when PGH [Portland Holdings, Inc.] gave notice of its intent to withdraw from Seneca, Oneida had not engaged in any leasing business.

414.    Enron's transfer of the airplanes was not a "sale" recognizable under GAAP and it should not have recognized any income from the transfer of the airplanes. The Tomas Transaction violated GAAP in at least the following ways:

> a.    Even if the recording of the Deferred Tax Asset was determined to be appropriate, GAAP requires a "valuation allowance" (*i.e.*, tax cushion) if, based on the available evidence, it is more likely than not that some or all of the deferred tax asset will not be realized. The Tomas Transaction did not have a valuation allowance or tax cushion.

> b.    The sale of the Cochise planes was not a true "sale" recognized under GAAP, it was a transfer booked as a sale by Enron.

415.    In addition, Enron initially held the Cochise airplanes for a period of time simply to create the impression that they had not been purchased for resale, even though Enron intended from the outset to dispose of the airplanes (to record a "sale"). Deutsche Bank knew Enron's plans because Deutsche Bank had devised a structure that would allow it.

416.    Also, applying purchase accounting adjustments to reduce the book basis of the Cochise airplanes violated GAAP because the purchase of the Cochise airplanes was unrelated to the acquisition of the REMIC Residual Interests in Cochise.

417.    The IRS has concluded that the Tomas Transaction was pre-arranged and predetermined and was entered into for the purpose of tax avoidance. As a result, Deutsche Bank promoted a structure which understated the income tax expense of Enron by tens of millions of dollars

130

### (D)   Cochise Transaction

418.   In July 1998, Deutsche Bank approached Enron and presented Cochise (a variation on the Steele Transaction) as another transaction for generating accelerated pre-tax accounting income.

419.   Deutsche Bank sold the structure to Enron by claiming that Cochise could generate $75 million in pre-tax accounting income and $79 million in accounting earnings from the future benefit of future tax deductions.

420.   As a means of concealing the true purpose of the Cochise Transaction, numerous SPEs and intra-SPE transactions were employed.

421.   Deutsche Bank contributed a $2.7 million portfolio of mortgage securities and REMIC securities valued at $165 million with a tax basis of $120 million.  Enron contributed two leased airplanes, purchased by an Enron subsidiary from a Deutsche Bank subsidiary for $46.7 million.  In June 2000 (18 months later), Maliseet Properties Inc. (the Enron SPE vehicle) sold the airplanes back to Deutsche Bank for $36.5 million as suggested in the June 1997 Deutsche Bank model.  Because the book value of the airplanes was written down to $0 at the inception of Cochise, the purchase of the airplanes for $46.7 million in 1999 resulted in a gain from the sale of these assets of $36.5 million in 2000.  In fact, rather than an economic gain of $36.5 million, Enron experienced an economic loss of $10.2 million from the sale of the airplanes.  Enron's misleading accounting entry was not materially different from the entry Deutsche Bank suggested in its internal memos regarding Cochise.

422.   A November 1997 Bankers Trust memo regarding financial accounting for the REMIC Subco transactions concluded, "[i]n summary, it should be apparent from the above

131

discussion that the Transaction is a deal driven by the accounting benefits.  If a client were interested in the tax benefits, other less expensive alternatives exist to generate equivalent tax benefits."

423.     Thus, the primary purpose of Cochise (like Steele) was to create the appearance of revenue and pre-tax income for financial statement purposes.  As stated in an internal Deutsche Bank January 1999 memo:

> The principal purpose of the transaction for Enron will be to generate significant amounts of accounting earnings and investment income.  For its participation, BTCo would be paid a significant advisory fee and would earn an attractive return on its investment in the REIT.

424.     The Cochise Transaction was structured to allow a major portion of the potential benefit to be recognized as pre-tax income on the sale of the Cochise planes, and to allow the remainder to be amortized into pre-tax income over a period of five years.  In the Executive Summary of a Project Cochise presentation it states, "The Transaction is structured in a manner which allows the credit, and the benefit of the bargain purchase, to be amortized into pre-tax income over a relatively short time frame."

425.     Cochise, like Steele, was based upon speculative tax deductions and was not reported by Enron in accordance with GAAP.

426.     According to a March 2001 Tax Opinion from McKee Nelson Ernst & Young LLP to Davis Maxey (Enron), the "most important purposes of members of the Enron Affiliated Group for participating in [the Cochise Transaction] included ... increasing the pre- tax financial accounting income and the net earnings on the Enron consolidated financial statements as a result of the Transactions."

132

427.    The Cochise Facilitating Assets differed from those used in Steele.  While Steele used corporate bonds, the Cochise Facilitating Assets were comprised of interests in two airplanes purchased from a Deutsche Bank affiliate.  The airplanes were purchased to allow the transactions to be treated as a business combination and to obtain an asset where the financial accounting basis could be reduced to zero.  The basis reduction was needed to offset the deferred tax asset that acquisition of the REMIC Residual Interests generated.

428.    Deutsche Bank designed Cochise for one purpose: to generate financial accounting benefits without it appearing that way.  Deutsche Bank understood that Enron planned to recognize a gain on the sale equal to the full fair value of the airplanes and amortize the remaining deferred credit into pre-tax income over a five-year period. Amortizing the credit over five years was not rational or allowable from an accounting standpoint because the deferred tax assets were attributable solely to REMIC Residual Interests with a much longer life.

429.    The Cochise Transaction specifically violated GAAP because Enron amortized/intended to amortize into pre-tax income over a period of approximately five years the deferred credit derived from the speculative future tax deductions created by the REMICs over their life span.  The Cochise Transaction violated GAAP in at least three ways:

a.    In order to record a Deferred Tax Asset, GAAP requires that it is "probable" that the tax position that gave rise to the recording of the Deferred Tax Asset can be sustained.

b.    Even if deduction of the phantom losses was a tax position that could be sustained, GAAP requires a "valuation allowance" (*i.e.*, tax cushion) if, based on the available evidence, it is more likely than not that some or all of the deferred tax asset will not be realized.  The accounting for the Cochise Transaction did not provide a valuation allowance for either: (i) the risk that there would not be sufficient taxable income available to benefit from the phantom losses; or (ii) the risk that the IRS would deny the deduction for the phantom losses.

133

    c.      GAAP requires that the amortization period for the Deferred Credit be determined with reference to the asset giving rise to the deferred tax benefit. In the Cochise Transaction the deferred credit related solely to the REMIC Residual Interests and, therefore, the reduction in the tax basis of the aircraft (*i.e.*, the facilitating asset), and the use of its amortization period, was a clear violation of GAAP.

430.    With respect to the Cochise Transaction, the Examiner concluded that:

[T]here is sufficient evidence to support a finding that the transfer of the Cochise planes to BT/Deutsche Bank should not have been recorded as a sale under GAAP because Enron and BT/Deutsche Bank had reached an understanding to return the Cochise planes to Enron by means of a transfer to Oneida.

*   *   *

Enron's accounting treatment of the Cochise Transaction did not comply with GAAP and was misleading because a reader of Enron's financial statements had no way of knowing that purported pre-tax income from operations actually consisted of the potential benefit of speculative future tax deductions for Phantom Losses from acquired REMIC Residual Interests.

431.    With respect to all the Tax Transactions that Deutsche Bank was involved in, the

Examiner concluded that:

BT/Deutsche was responsible for designing, promoting and participating in the BT/Deutsche Tax Transactions. The BT/Deutsche Tax Transactions were intended to have, and in fact did have, the effect of increasing Enron's reported net income by approximately $423 million over the period from 1997 to 2001. However, Enron had little business purpose for the BT/Deutsche Tax Transactions other than creating accounting income.

*   *   *

BT/Deutsche Bank developed the basic tax and accounting structures of each of the BT/Deutsche Bank Tax Transactions. BT/Deutsche Bank prepared presentations to promote the structures to Enron as a means of generating accounting income and in effect sold the products to Enron.

432.    Irrespective of when they were formed, each of the Tax Transactions resulted in

the artificial inflation of Enron's reported financial results as stated in the Zero Notes and 7%

134

Notes offering documents, in that each transaction resulted in the fraudulent recognition of pre-tax income, the false appearance of revenue, and purported tax savings going forward.

**(ii)     Tax Accommodation Transactions**

433.     Further evidencing their close relationship and readiness to engage in accounting fraud, Deutsche Bank and Enron entered into the Valhalla Transaction in May 2000.  The transaction was structured as a $50 million loan; Deutsche Bank in Frankfurt loaned $2 billion to Rheingold (an Enron subsidiary), and Enron in turn loaned $1.95 billion to Deutsche Bank in New York.  Unlike the Tax Transactions, the Valhalla Transaction did not produce significant tax or accounting benefits to Enron but did produce favorable tax benefits for Deutsche Bank.  From Deutsche Bank's perspective the transaction was structured to create $40 million of annual tax benefits for Deutsche Bank.

434.     In entering into the Valhalla Transaction, Deutsche Bank knew that it was engaging in a money laundering scheme.  In a November 2000 email regarding the handling of Project Valhalla, a Deutsche Bank representative in Germany stated, "[A]s I have already mentioned some weeks ago, I firmly believe that the booking of the Genußscheine from Rheingold is not correct...This is clearly against … money laundry law."

435.     Deutsche Bank and Enron entered into another improper tax transaction, "Project Renegade," also for the benefit of Deutsche Bank.  In exchange for Enron's agreement to participate in Renegade, Deutsche Bank reduced its fee as financial advisor on Teresa from $8 million to $6.625 million.

### (iii)   Structured Transactions With Disguised Enron Affiliates

#### (A)   LJM2

436.   LJM2 was created in 1999 as a vehicle for hiding Enron debt and allowing Enron to report inflated earnings in its year-end financial reports.  LJM2 participated in a wide variety of investments and convoluted transactions designed to deceive Enron investors and enrich Enron's CFO Andrew Fastow and LJM2's limited partner investors.

437.   Paul Cambridge, Ted Virtue, Charlie Kiley, and Bill Walsh participated in an initial meeting with Andy Fastow regarding Deutsche Bank's possible commitment to investing in LJM2.  Concerns were expressed internally about the potential conflicts of interest from investing in LJM2, yet Deutsche Bank ultimately committed to investing $10 million in LJM2 through BT Investment Partners.  In addition, a Deutsche Bank affiliate placed a designee on the LJM2 Advisory Committee, thereby permitting Deutsche Bank to regularly obtain information concerning Enron's transactions with LJM2, including the sale of turbines, Nigerian barges, and dark fiber, participation in Whitewing and Osprey debt certificates, prepay transactions such as Yosemite and Bob West Treasure, and participation in the four Raptor Transactions.

438.   Deutsche Bank aided Enron by participating in LJM2. Deutsche knew that LJM2's sham transactions and purportedly "independent" ownership of Enron-controlled SPEs would and did have the effect of falsifying Enron's reported financial condition.

#### (B)   Marlin, Osprey, Yosemite and Firefly

439.   One of the many new businesses Enron entered in the late 1990s was the distribution of water resources.  Enron's primary water-utility holdings were owned by an Enron

136

affiliate named Azurix, which itself had several subsidiaries and affiliates. The water-utility

business, as it turned out, was not profitable for Enron.

440.    In late 1998, Enron completed the acquisition of a publicly held British water-

utility company, Wessex Water Plc. Enron and its controlled subsidiaries incurred approximately

$1.9 billion of debt to finance the acquisition.

441.    Enron, with the aid of Deutsche Bank, created the Marlin Transaction for one

purpose: to remove Enron's water business – Azurix and its subsidiaries – from Enron's balance

sheet.

442.    Marlin Water Trust was set up as the SPE entity to hold Enron's water utility

assets.  The Marlin bonds were backed by a pledge of Enron stock to make up for any potential

shortfall in the value of Marlin's assets.  Investors in the Marlin bonds were promised that if

Enron's credit rating declined to a certain point, Enron would issue new shares of stock to Marlin

to pay back bondholders.  However, there was no way for investors in other Enron bonds and

stock to know about the details of this pledge, which threatened the value of their investments.

This material obligation was not disclosed.

443.    According to the sworn statement of Deutsche Bank banker Jakubik to the

Examiner:

> BT/Deutsche understood that Enron's objectives in developing the Marlin structure were
> to avoid having the rating agencies treat the structure as debt, avoid an adverse impact on
> its credit rating, have the debt treated as off-balance-sheet financing and avoid having to
> currently issue Enron stock.

444.    Deutsche Bank was a joint book-running manager with CSFB (then operating as

Donaldson, Lufkin & Jenrette) for both the Marlin I and Marlin II Transactions.

137

445.    The Marlin II Transaction was used to refinance the outstanding notes issued in the Marlin I offering.  The Marlin I offering consisted of approximately $1.024 billion in Marlin's 7.09% Senior Secured Notes due December 2001 (the debt component) and $125 million of certificates (the equity component).

446.    The share trust, with its poorly performing assets and debt of almost $2 billion, was not reported on Enron's consolidated financial reports. The purported reason that allowed deconsolidation was Marlin's "independence" from Enron.

447.    In fact, however, Marlin was totally controlled by Enron.

448.    Deutsche Bank and Enron structured Marlin such that Enron contributed 204,800 shares of preferred stock (convertible into 17.2 million shares of Enron common stock) to the Marlin Preferred Share Trust.  Enron also undertook the Share Trust obligations.  Recourse, accordingly, was to Enron.

449.    Because of Enron's control and Enron's assumption of risk through its stock contribution and assumption of share trust liabilities, Enron's deconsolidation of Marlin in its financial reports violated GAAP.

450.    In August 2001, the Marlin II Transaction was used to refinance the outstanding Marlin I notes.  The second Marlin offering closed on July 19, 2001, raising over $900 million to retire notes from the first Marlin offering.

451.    A May 2001 email from Deutsche Bank's George Tyson to Cambridge contained an attachment titled "Discussion of Refinancing Alternatives for Marlin Water Trust dated February 15, 2001."  The email confirms Deutsche Bank's knowledge that Enron's primary

objective was "keeping all of the Azurix and Marlin debt off-balance-sheet." Tyson's email also emphasized Enron's sensitivity to the ratings impact of refinancing Marlin.

452.    Despite knowing that Enron's off-balance-sheet treatment of Marlin had been improper from the start, Deutsche Bank helped to prepare, and was the joint primary underwriter for, the Marlin II offering.

453.    Deutsche Bank also underwrote Enron-related securities for the Osprey Trust. Like Marlin, the Osprey Trust was designed to remove non or poorly performing assets from Enron's balance sheet, and also contained a "stock trigger" feature which created billions in potential obligations for Enron. Deutsche Bank knew that Osprey was designed for Enron's balance-sheet manipulation. Paul Cambridge sent an email in November 2000, to Amsterdam-based Deutsche Bank banker Jur Holierhoek explaining, "The Osprey transaction was a highly tailored structured finance, designed to meet certain balance sheet and income statement goals of Enron."

454.    Despite Deutsche Bank's awareness of Enron's machinations with these "Trusts," for which Deutsche Bank provided substantial assistance, and Enron's potentially massive "stock trigger" obligations, Deutsche Bank failed to disclose this material information in any of the offering materials for the numerous Enron-related securities for which it served as underwriter, including the Zero Notes.

455.    Deutsche Bank was an underwriter in one of the Yosemite offerings. Yosemite invested in Enron prepay transactions, utilized to conceal vast amounts of debt. All the Yosemite underwriters understood the fraudulent nature and purpose of the Enron prepay transactions. Investors in Yosemite were misled as to the true purpose of the financing. The

Deutsche Bank employees who were involved in the Yosemite Offering include, but are not limited to: Craig Orchant, Ross Newman, Mike Jakubik, and Calli Hayes.

456.     In a March 2000 letter regarding "Structuring Future Yosemite Transactions" from Craig Orchant and Ross Newman of Deutsche Bank to Doug McDowell and Craig Clark of Enron Global Finance it states, "We appreciate that disclosure on the trust assets is a sensitive issue.  We do not believe that full disclosure on the underlying trust assets, such as the commercial terms of prepay transactions, would be needed."  Orchant and Newman clearly understood the inherently fraudulent character of the prepay transactions and the Yosemite offering; moreover, they gave advice to Enron on how to structure future Yosemite transactions.

457.     Deutsche Bank was a lender to the Firefly SPE Transaction.  As it did with the other SPE Transactions, Enron provided an undisclosed guarantee to the lenders through a "swap" arrangement.  This obligation was not disclosed to investors.  As a result of the "swap" arrangement, Firefly was not accounted for under or in accordance with GAAP; it should have been consolidated in the financial statements of Enron.  As a party to this transaction, Deutsche Bank directly participated in the scheme to misrepresent Enron's financial position.

### (iv)     Analyst Coverage

458.     Although it was well aware of, and had participated in, Enron's illicit practices, Deutsche Bank nonetheless published analyst reports and investment research reports that improperly touted Enron's financial strength and performance, and recommended that investors purchase Enron securities.  Silvercreek relied on the "buy" recommendations and the positive statements made by the analysts regarding Enron and its financial condition.

459.    The statements made by Deutsche Bank in its analyst reports were false and misleading as they contained information Deutsche Bank knew was incorrect.  In addition, Deutsche Bank failed to fully disclose the conflict of interest inherent in its status as an investor in LJM2, as well as the substantial fees Deutsche Bank earned from its transactions with Enron, including those that involved the creation and implementation of fraudulent tax schemes. Deutsche never issued a "sell" recommendation or otherwise disclosed its knowledge of Enron's precarious and risky financial condition.

460.    Misleading equity research reports issued by Deutsche Bank regarding Enron include, but are not limited to, reports dated: January 13, 1999; January 20, 1999; April 13, 1999; May 7, 1999; May 25, 1999; July 13, 1999; July 21, 1999; November 8, 1999; January 28, 2000; April 14, 2000; May 26, 2000; July 19, 2000; July 25, 2000; and September 15, 2000.

461.    Misleading fixed-income research reports issued by Deutsche Bank regarding Enron include, but are not limited to, reports dated: April 14, 2000; May 12, 2000; May 25, 2000; May 30, 2000; September 11, 2000; October 3, 2000; October 6, 2000; January 23, 2001; February 13, 2001; March 30, 2001; June 26, 2001; July 12, 2001; August 17, 2001; October 5, 2001; October 16, 2001; October 19, 2001; October 26, 2001; November 2, 2001; and November 9, 2001.

### (v)    Deutsche Bank's Knowledge of Enron's True Financial Position

462.    In its role as a Tier 1 Enron bank, Deutsche Bank had frequent and direct access to Enron's senior executives including Andy Fastow, Enron CFO.  As Paul Cambridge, Deutsche Bank's former Senior Relationship Manager for Enron, noted in his sworn statement, the access

141

that Deutsche Bank had to senior executives (and at least two Board members), enabled it to understand "the facts behind the numbers" with respect to Enron's financial reporting.

463.    As Marcus Tarkington, Deutsche Bank, noted in an e-mail to Jana Mills, Enron, Deutsche Bank recognized that Enron used off-balance-sheet financings and understood that the misleading disclosure of such transactions made it impossible to understand the total extent of Enron's obligations.  He indicated that Deutsche Bank would need to meet with Enron to get a better appreciation for Enron's increasing reliance on trading activities [prepay transactions]. Calli Hayes, Deutsche Bank, indicated in her sworn statement that Enron consistently reported off-balance-sheet obligations of $9 billion to $10 billion to Deutsche Bank during these meetings.

464.    Despite what external credit rating agencies were saying about Enron's credit, Deutsche Bank assigned its own internal measure to Enron's creditworthiness based on the private information it had about Enron's true financial condition.  Thus while external rating agencies, using publicly available information, gave Enron an investment grade credit rating, Deutsche Bank, because of its awareness of and participation in the fraudulent accounting scheme that it knew weakened Enron's credit significantly, internally rated Enron much lower, relegating its credit to junk bond status.

465.    Worse, while Deutsche Bank was recommending Enron securities to investors, and was underwriting new securities issues for Enron, including the Zero Notes, it was secretly reducing its own exposure to Enron.

466.    Internal email from Cambridge to Deutsche Bank banker Alexander Mason (April 2000), email from Cambridge to Hayes (November 2000), and email from Hayes to Cambridge

142

(March 2001), all demonstrate efforts to reduce Deutsche Bank's overall exposure to Enron. Similarly, in an email from Deutsche's William Archer to several other Deutsche Bank employees, Archer writes, "We continue to work with the company to get our exposure down."

467.    Enron at times requested additional funding from Deutsche Bank. After receiving a request for an incremental increase of exposure concerning Marlin, Calli Hayes, in a July 2001 email, stated flatly, "I cannot approve the below additional exposure."  An August 2001 email from Cambridge to fellow Deutsche Bank bankers reiterated the warning: "Don't lose sight of the fact that we [Deutsche Bank] are in a moratorium of any new Enron exposure."

468.    The May 2001 Minutes of Deutsche Bank's Underwriting Committee indicated that Deutsche Bank purchased $25 million of credit default protection relating to Enron in the derivative market.

469.    In November 2001, Calli Hayes wrote a post-mortem analysis that made certain admissions about early warning signs known privately to Deutsche Bank.  Among these signs, Deutsche Bank knew that Enron's financial disclosures were purposely vague and inadequate and that there was a growing problem with the use of increased off-balance-sheet transactions; this knowledge resulted in Deutsche Bank reducing credit exposure to Enron for the prior two years.

470.    Through its involvement in a myriad of deceptive transactions, underwritings and the Tax Transactions, Deutsche Bank had direct knowledge that Enron's financial statements were fraudulently misrepresented.  Deutsche Bank actively participated in and promoted transactions that were designed to conceal Enron's true financial position and buttress the fraud, and was willing to do so in exchange for lucrative fees.  Through its involvement in LJM2 and

the Tax Transactions, Deutsche Bank knew that Enron's revenue, earnings and cash flow from operations were artificially overstated, its debt obligations massively understated, and that Enron's financial statement disclosure was so opaque that it was impossible for anyone not involved with the fraudulent manipulation of the statements to have a true understanding of Enron's actual financial condition.

471.    As information about Enron's actual financial condition (that Deutsche Bank had helped Enron to conceal) was finally disseminated to the general public, the value of Enron securities dropped almost to zero.  Silvercreek lost substantially its entire investment in a matter of weeks.  Deutsche Bank played a significant role and is directly responsible for Silvercreek's losses as an aider and abettor of Enron's fraud.

472.    Given Deutsche Bank's extensive involvement in fraudulent transactions with Enron, transactions designed solely to manipulate Enron's financial statements and mislead the investing public, Deutsche Bank is directly responsible for the false information conveyed to the public and to Silvercreek.  In particular, as an underwriter of the Zero Notes, Deutsche Bank knowingly disseminated an offering memorandum and the related registration statement and prospectus that contained materially untrue and misleading information with respect to the financial conditions of Enron.

473.    Deutsche Bank knew that the offering memorandum, registration statement and prospectus for the Zero Notes were materially untrue, misleading and fraudulent.  Deutsche Bank also knew that its research reports were misleading.  Deutsche Bank substantially participated in Enron's illicit scheme to hide debt from its investors and generate phony profits.

144

474.     Silvercreek relied on Deutsche Bank's professional competence as an underwriter for the Zero Notes, believing that Deutsche Bank had conducted a proper due diligence and was not itself engaged in fraudulent transactions with Enron to help Enron manipulate its accounting books and records.  The registration statement and prospectus for the Zero Notes stated:

> We incorporate by reference in this prospectus the following documents filed by us with the SEC:
>
> –        Our Annual Report on Form 10-K for the year ended December 31, 2000;
>
> –        Our Quarterly Report on Form 10-Q for the quarter ended March 31, 2001;
>
> –        Our Current Reports on Form 8-K filed with the SEC on January 31, 2001 and February 28, 2001; and
>
> –        The description of our capital stock set forth in our Registration Statement on Form 8-B filed on July 2, 1997.

475.     The financial information contained in the offering memorandum, the S-3 registration statement and the prospectus for the Zero Notes, as well as the financial information incorporated by reference therein, was materially false, fraudulent and misleading due in significant part to the fact that Deutsche Bank assisted Enron in inflating its revenues and earnings and hiding debt by creating, developing, promoting and implementing a number of fraudulent transactions such as Marlin, Osprey and the Tax Transactions.

476.     Deutsche Bank's design of and participation in fraudulent transactions with Enron resulted in the dissemination of financial information to the investing public that was materially false and misleading.  This false information significantly inflated the values at which both the Zero Bonds and the 7% Notes were sold.  In addition, the false financial information which Deutsche Bank helped create was included in the prospectuses for both the Zero Notes and the 7% Notes and formed the basis upon which both securities were sold and purchased.

145

477.     In investing in Enron's debt via the 7% Notes and Zero Notes, Silvercreek relied

upon the accuracy of Enron's financials, as expressly incorporated in the offering documents

disseminated to Silvercreek, especially Enron's cash flow from operations and debt levels, which

Deutsche Bank materially assisted Enron in misstating.

### (vi)     Summary – Fastow Declaration

478.     Enron's former Chief Financial Officer, Andrew Fastow, confirmed, under oath,

the following facts:

> Deutsche was one of Enron's Tier-1 Banks that designed and engaged in a
> number of transactions between 1997 and 2001 that had the effect of increasing
> Enron's reported earnings and funds flows from operations. I believe, based on
> the level of sophistication of its bankers and my conversations with them, that
> Deutsche understood the transaction structures would materially impact Enron's
> financial statements. Deutsche's Paul Cambridge, the bank's relationship manager
> for Enron, responded to my concern that Deutsche's fees were excessive, saying
> that the fees were cheap considering all the earnings we're generating for you.

> Mike Jakubik, head of Deutsche's Finance Group, came to Enron from Bankers
> Trust. He worked at Enron for more than one year in the Global Finance Group.
> In that capacity, Mr. Jakubik attended finance meetings on a regular basis and
> discussed Enron's financial objectives. Before returning to BT/DB, he structured
> finance transactions that had a material impact upon Enron's reported financials
> and I discussed with him that Enron was not as healthy as the financial statements
> led investors to believe.

> **The Tax Transactions**

> Enron used certain Deutsche structured-tax transactions in order to increase its
> reported earnings.  I believe that these transactions were not business transactions
> that happened to have a tax benefit. Rather, it is my understanding that the tax
> transactions were done to create tax and accounting benefits.  I believe that Enron
> would not have done the transactions had it not been for the tax and accounting
> benefits that they created.  The benefits were twofold: First, the transactions
> reduced taxable income, which had the effect of increasing after-tax earnings-per-
> share. Second, the transactions were structured in a manner that allowed Enron to
> report future anticipated tax deductions as current-period, pre-tax income.

146

Deutsche sold certain tax structures to Enron, which were handled through Mr. Causey's Accounting group.  I recall the bank communicating to us that it only did these tax deals with a few companies and that it expected to get paid well for these structures because, to avoid attracting IRS attention, they could only do the transactions a few times.  Mr. Causey reported on these deals at some of the management-committee meetings that I attended.  I recall that there were several Tax Transactions, including some with Deutsche, that lowered our taxable income or that increased pre-tax earnings. The Accounting department was credited within Enron for increasing reported earnings for Enron.

I understood from Mr. Causey's presentations that the Deutsche tax structures required Enron to represent it was in certain businesses that it really was not in, including third-party real-estate management and investing in corporate bonds.

### Sutton Bridge

Sutton Bridge was a structured financing that involved transfers of shares in an English power plant from Enron to an SPE. I recall Mr. Skilling joking that Enron sold the Sutton Bridge power plant three times and booked profit all three times. Jeff McMahon and Deutsche designed the structure so that Deutsche would have little, if any, ownership risk.  I recall that we accounted for each of these transfers as a true sale, but that Mr. McMahon claimed the de minimis risk transfers as one of his largest accomplishments for the year.

### LJM2

As I've stated in this declaration, Enron used LJM2 to manage its balance sheet and earnings.  Deutsche was a member of the LJM2 Advisory Committee, which was created at the insistence of Andersen. The Auditors required that the Advisory Committee have certain significant powers to ensure that I did not fully control LJM2.  For instance, Andersen insisted that the Committee members have the power to remove me as General Partner without cause.  The Committee had to be informed 10 days in advance of transactions that LJM2 entered into with Enron.  With the exception of the initial investments, I believe that LJM2 provided members of the LJM2 Advisory Committee with the necessary information as required by Andersen. The members of the Committee were informed that Andersen had insisted on its creation.  I believe they understood their obligations.

### c.    **JPMorgan**

479.    Like the other financial institutions, JPMorgan had extensive business

relationships with Enron.  JPMorgan provided commercial and investment banking and advisory

147

services to Enron, assisted Enron in concealing almost $4 billion in debt that should have been disclosed on Enron's financial statements, and helped structure or finance several of Enron's off-balance-sheet partnerships or SPEs.  For example, the Mahonia transactions enabled Enron to understate its debt by $2.3 billion as of December 31, 2000, and to overstate its cash flow from operations by $546 million for the same year.  In return, JPMorgan received huge underwriting and consulting fees, interest payments, commitment fees and other payments. JPMorgan received approximately $86.3 million in "relationship revenues" from Enron from 1996 to 2000.

480.    JPMorgan functioned as a unified entity without an effective Chinese wall. Information obtained by JPMorgan's commercial and investment banking personnel was not quarantined from JPMorgan's research analysts.  On the contrary, JPMorgan used its research analysts as a marketing arm for its investment banking business.  Accordingly, for purposes of its business activities, knowledge possessed by any one sector of the company should be attributed to JPMorgan as a whole.

481.    In order to assist Enron in hiding debt and increasing reported cash flow from operations, JPMorgan worked with Enron on a series of transactions involving Mahonia, Ltd., a sham corporation secretly controlled by JPMorgan ("Mahonia Transactions").  The Mahonia Transactions purported to "structure" natural gas futures contracts or commodity trades, but were, in fact, loans from JPMorgan to Enron designed to boost Enron's apparent liquidity while concealing over $3.7 billion in debt that should have been reported on Enron's balance sheet.

482.    In addition to acting as an underwriter of the Zero Notes purchased by Silvercreek in 2001, JPMorgan underwrote several other Enron offerings between 1997 and 2001. JPMorgan also lent billions of dollars to Enron, JEDI, and various other illicit SPEs during this

148

period, including entities known as Sequoia, Choctaw, Cherokee and Cheyenne.  These entities were integral to Enron's scheme to conceal its true level of debt and to improperly generate revenue from non-arm's length transactions with the SPEs.  JPMorgan was instrumental in creating, structuring and financing LJM2, providing a substantial equity investment in LJM2 and a $65 million line of credit.

483.    JPMorgan executives also invested $25 million in LJM2.  Investors in LJM2 were promised, and were rewarded with, exorbitant returns.  JPMorgan was aware of the activities of LJM2, and knew that Enron controlled LJM2 but was not consolidating LJM2 with Enron's own financial statements, and instead was using it to hide billions of dollars of Enron debt and to create the appearance of profits, which were false.  JPMorgan had access to Enron's internal business and financial information, and worked closely with Enron's top executives.  Like the other banks, JPMorgan prefunded LJM2 to enable it to complete several illicit 11th hour transactions with Enron in December 1999 which were fraudulently reported by Enron on its year-end financial statements.

484.    In an appendix to the Third Report of the Examiner ("Role of JPMorgan Chase and its Affiliates," attached hereto as Exhibit G), a substantial volume of evidence with respect to JPMorgan's role in the Enron fraud was reviewed.  The Examiner concluded that:

> With respect to the Mahonia Transactions, the evidence would allow a fact-finder to conclude that:
>
> •    JPMorgan Chase designed and promoted the structure of the Mahonia Transactions, in part to help Enron satisfy its accounting objectives; and
>
> •    JPMorgan Chase funded and assisted Enron in completing twelve Mahonia Transactions, which totaled over $3.7 billion, even though JPMorgan Chase knew that Enron's accounting for these transactions, with no other meaningful related disclosure, would result in misleading

149

financial presentation.

485.    Based on JPMorgan's internal documents, the volume of its revenues from Enron-related business increased significantly from 1997 through to 2001.  Thus, it would appear that the level of revenues earned by JPMorgan was directly correlated to its participation in fraudulent transactions.  Revenues earned grew from $4.6 million in 1996 to $30.1 million in 1999 – an increase of over 650% in four years.

486.    In addition to its role in the Mahonia Transactions, JPMorgan also acted as an underwriter of Enron securities, including:

| Date | Security |
| --- | --- |
| October 1997 | $100 million 6 5/8% Enron notes |
| May 1998 | 35 million shares Enron common stock at $25 per share |
| July 1998 | $500 million 6.40% and 6.95% Enron notes |
| February 1999 | 27.6 million shares Enron common stock at $31.34 per share |
| February 2001 | $1.9 billion Enron zero coupon convertible notes |

487.    As one of Enron's lead lending banks, and based on the close relationship between top executives at JPMorgan and Enron's senior officers and employees, JPMorgan knew that Enron was providing false financial information in its public reports and disclosures, and that its true financial condition was far different from what it was reporting to the public. JPMorgan assisted Enron in this deception.  JPMorgan was one of Enron's primary, or "Tier 1," banking relationships.  Enron entered into at least twelve prepay transactions with JPMorgan between 1993 and September of 2001 which enabled Enron to report billions of dollars in fake revenue and cash from operations.

150

488.    JPMorgan's active participation in the Enron fraud may be summarized under three main categories:

      a.    Prepay Transactions;

      b.    Structured Transactions; and

      c.    Analyst coverage.

**(i)    Prepay Transactions**

489.    JPMorgan aided and directly participated in Enron's fraud by helping Enron to generate billions of dollars in revenues through phony prepay transactions.  Between 1997 and 2001 the prepay transactions that JPMorgan executed with Enron generated billions of dollars in fraudulent cash flow from operations, and helped to conceal billions of dollars of debt.

490.    With respect to the Mahonia Transactions, the Examiner concluded that they were, in fact, unsecured loans and were not accounted for in accordance with GAAP.  This fact was confirmed by Rick Walker, JPMorgan, in a December 1994 memo to file regarding Enron's prepay structures.  He noted that a prepay "represents a term loan embedded in a commodity swap.…"

491.    JPMorgan was clearly aware that deceiving investors was one of the primary motivations for the prepay structures.  In an e-mail from Rick Walker, JPMorgan, to Jeffrey Dellapina, JPMorgan, he noted that "the [Rating] agencies haven't figured out prepays." Similarly, in an e-mail from George Serice, JPMorgan, to Karen Simon, JPMorgan, he noted that "Enron loves these deals as they are able to **hide funded debt from their equity analysts** because they (at the very least) book it as deferred [revenue] or (better yet) bury it in their trading liabilities."

492.    The Examiner concluded that:

There is sufficient evidence for a fact-finder to conclude that JPMorgan Chase
knew these facts and that it considered the accounting treatment employed by
Enron to be a central benefit of the Mahonia Transaction structure:

•       Attractive accounting impact by converting funded debt to "deferred
        revenue", or long-term trade payable.

•       Attractive Accounting Treatment:  Obligation to deliver hydrocarbons in
        the future is classified as deferred revenue vs. funded debt.  Most users of
        the prepay structure believe the transaction to be 'rating agency friendly."

•       Funded debt ratios will likely improve as deferred revenue is not included
        in debt/capital ratios.

•       Treated as commercial obligations; balance sheet "friendly".

493.    The Examiner concluded that the JPMorgan Mahonia Transactions materially

impacted cash flow from operations as well as Enron's reported debt obligations – two critical

components to Plaintiffs' decision to purchase the Zero Notes and 7% Notes.  Considering the

Mahonia Transactions only (*i.e.*, excluding prepay transactions that Enron executed with other

counterparties) the Examiner found the impact to be as follows:

**Impact on Enron's Operating Cash Flows**

| For year ended | Reported Cash Flow from Operating Activities (millions) | Net Cash Flows from JPMorgan Prepays (millions) | Cash Flows From Operating Activities Without JPMorgan Prepays (millions) | Percentage Decrease |
|---|---|---|---|---|
| 1999 | $1,228 | $348 | $880 | 28% |
| 2000 | $4,779 | $981 | $3,798 | 21% |

**Impact on Enron's Debt**

| As of December 31 | Reported Debt (Does Not Include Prepay Transactions) (millions) | Amount Outstanding on JPMorgan Prepays (millions) | Debt Including Amount Outstanding on JPMorgan Prepays (millions) | Percentage Increase |
|---|---|---|---|---|
| 1999 | $8,152 | $1,392 | $9,481 | 16% |
| 2000 | $10,229 | $2,310 | $12,539 | 23% |

494.    Accounting for prepay transactions as cash flows from operations rather than loans (*i.e.*, cash flow from financing activities) materially understated Enron's debt obligations. It also gave investors a substantially flawed and overstated picture of the economics of Enron's business operations, and their ability to generate cash. In July 2002 testimony before a Senate Subcommittee, John C. Diaz, Managing Director of Moody Investor Services, Inc.'s Power & Energy Group, noted that:

> If such transactions had been accounted for as a loan, Enron's operating cash flow would have been reduced and its debt would have been greater. The disclosure of these transactions as loans would have exerted downward pressure on Enron's credit rating.

495.    Not only was JPMorgan participating in fraudulent prepays with Enron, it was actively marketing the program to other clients. The Examiner found evidence of "Prepay Pitch Presentations" to other organizations, as well as evidence that JPMorgan knew the accounting for prepays as cash flow from operations was wrong. For example, when JPMorgan determined that another client was correctly accounting for prepays as a loan, Jeffrey Dellapina (JPMorgan), sent the following e-mail to Marcelo M de Estrada (JPMorgan):

> Did you see the email from [redacted entity name]? They call the prepay a "loan" in their financials. That is not helpful – I told [name redacted].

153

### (A)     JPMorgan was the architect for Enron's Mahonia Prepay Transactions.

496.     JPMorgan was not just an active participant in Enron's phony prepay transactions; it was, in fact, the architect of these transactions and secretly controlled the Mahonia structure. JPMorgan used Mahonia, Ltd., an offshore entity which it controlled, to enter into a series of sham transactions that took the form of commodity prepay forward contracts ("prepays") but which in reality were loans from JPMorgan to Enron. JPMorgan bankers Jeffrey Dellapina and Joe Deffner discussed ways "to make sure that Mahonia seem[ed] independent," while Mahonia Director Richard Jeune appointed JPMorgan as agent "for the purpose of arranging all our physical natural gas receipts and deliveries until further notice."

497.     JPMorgan devised the Mahonia structure to wrongfully conceal the true nature of the Enron prepay transactions; JPMorgan knew that the Mahonia prepays lacked any legitimate business purpose and were merely disguised loans.

498.     Three Mahonia entities, Mahonia Ltd., Mahonia Natural Gas Ltd, and Stoneville Aegean, Ltd., (collectively "Mahonia") were set up on the British Channel Island of Jersey. Most of Mahonia's business was with Enron and all of it was controlled by JPMorgan. Mahonia's trading with Enron typically involved quarter-end and year-end transactions that allowed Enron to manipulate its reported financial results.  The ostensible purpose of the off-shore Mahonia entities was oil and gas commodity trading with Enron.  The actual purpose, however, was not the delivery of oil or natural gas but, instead, the manipulation of Enron's accounting losses from one financial reporting period to another.

499.     JPMorgan created Mahonia as a proprietary product.  Mahonia was employed for the prepay transactions because, under GAAP, a prepay transaction cannot be booked as a trade

154

unless there are three independent parties to the trade. Enron, JPMorgan, and Mahonia were the purported independent parties.

500.    The prepay loans from JPMorgan to Enron were designed to appear as commodity trades and were designated "Forward Sales Contracts."  Under the terms of the Forward Sale Contracts, Enron agreed to provide Mahonia with specified amounts of crude oil or natural gas at a future point,  in exchange for Mahonia's "payment" of a  fixed, lump sum amount, all paid up front (*i.e.*, prepaid).  Each of the Forward Sale Contracts between Enron and Mahonia contained precise terms for deliveries and replacement deliveries that created the impression that the contracts contemplated and provided for the actual deliveries of crude oil and natural gas.

501.    Mahonia, however, was not independent of JPMorgan or Enron; rather, it was merely a shell acting at all times at JPMorgan's command.  From an accounting standpoint, Mahonia should have been consolidated with JPMorgan or Enron.  JPMorgan paid all of Mahonia's administrative fees, legal fees and expenses, and JPMorgan was Mahonia's attorney in fact.  Mahonia was made to appear independent only because JPMorgan and Enron created a paperwork maze that concealed Mahonia's lack of independence.  When specifically questioned by Enron's auditors, JPMorgan aided and abetted Enron's prepay accounting fraud by lying about Mahonia's "independence."

502.    Mahonia's total capitalization, paid by JPMorgan, was £10 (roughly $20). Mahonia was thus completely unsuitable for and financially incapable of engaging in the multi-million-dollar Enron prepay transactions without the backing of its owner, JPMorgan.

503.    JPMorgan's Managing Director of Risk Reporting Janet Caruso, in sworn deposition testimony in September 2005, acknowledged that J .P. Morgan did internal

accounting for Mahonia. JPMorgan's accounting role and its results, however, were kept secret from the public.

504.    Ian Colin James, the attorney of record, director of, and purported controlling person for Mahonia, was deposed in September 2005. At his deposition, James conceded that JPMorgan and Enron structured Mahonia with a total capitalization of less than $20 to engage in transactions involving billions of dollars. James, however, could not (or would not) explain how such an undercapitalized entity could legitimately engage in such large transactions. James admitted that he knew the prepays accelerated income for Enron from later periods to the date of the prepay and he admitted that JPMorgan also had this knowledge. He also admitted that: Mahonia was never audited, did not engage any external accountants, did not perform any due diligence in connection with the transactions, did not have any employees, did not have offices, and did not have any pipelines, tankers, or commodity-storage facilities.

505.    Ian James acted simultaneously, at various times for various deals, as the lawyer representing Enron, as the lawyer representing JPMorgan, and as the lawyer for Mahonia. Ian James knew and admitted that the Mahonia deals were specifically transacted for accounting purposes. James further admitted that reporting the transactions as cash flow from operations was improper. Janet Caruso, during her September 2005, deposition, explained that each Mahonia deal was an embedded loan or extension of credit which included an embedded interest rate for the loan.

506.    Thus, Mahonia had no substantive role in the prepay transactions; Mahonia was merely a shell under the control of JPMorgan created and used for the sole purpose of wrongfully evading accounting rules and fraudulently manipulating Enron's financial statements.

507.    The SEC determined, "Mahonia was controlled by [JPMorgan] and directed by [JPMorgan] to participate in the transactions ostensibly as a separate, independent, commodities-trading entity.  In fact, however, the [SPE] had no independent reason to participate in these transactions; [JPMorgan] knew Mahonia was included in the structure solely to effectuate Enron's accounting and financial reporting goals."

508.    New York's district attorney investigated Mahonia and determined Mahonia was not independent from JPMorgan.  The district attorney found that the "only outward sign of Mahonia's existence in Jersey is a sign plate hanging in the lobby of the offshore law firm that created it."  The New York District Attorney noted, "It has never had employees, office space, a commodities trading desk (much less any gas stations or tankers) or any facilities whatsoever for engaging in the business of commodities trading."  The district attorney also noted that after JPMorgan's wrongful conduct became public, "JPMorgan Chase . . . adopted new policies and new procedures to avoid the problems with the Mahonia Transactions."

509.    JPMorgan was involved in every aspect of establishing and operating Mahonia and even represented to the Texas Gas Transmission Corporation in 1995 that Chase was the agent "appointed" by Mahonia "for the purposes of arranging all our physical natural gas receipts and deliveries until further notice."  Dellapina, in an email to fellow JPMorgan banker Gary Wright, described Mahonia as "a special purpose company which works exclusively on Chase arranged transactions."  Mahonia received documents prepared, executed and annotated by JPMorgan, which required only Mahonia's signature for execution.

510.    JPMorgan implemented the prepays by providing Enron with the conduit needed to construct the deals.  A "call report" summarizing the substance of an October 1997 phone

conversation, states: "In speaking with Dinsa [Dinsa Mehta, JPMorgan Derivatives Trading Manager] earlier this week, he indicated that we are now doing all prepays in Chase's name and are no longer working with Mahonia."  JPMorgan, however, continued to use Mahonia as an SPE in Enron transactions through 2001 and acknowledged its central role in assisting and participating with Enron in implementing the prepays.

511.    The "commodities" contracts devised by JPMorgan, characterized as "Forward Sale Contracts" between Enron and Mahonia, hid the fact that the transactions were in substance loans and concealed Mahonia's status as a mere shell for JPMorgan.  In this connection, the "Security Agreement between Mahonia Limited and Chase Manhattan Bank" provided that JPMorgan maintained a "lien and security interest in, the whole of the Company's [Mahonia] undertaking and assets, present and future."

512.    Thus, unlike traditional agents who merely represent their principals in transactions, JPMorgan, by virtue of its security interest in the entirety of Mahonia's past and present assets, maintained control of Mahonia.  Indeed, the parties internally referred to the Mahonia Forward Sale Agreements under the rubric "the Chase Gas Agreement."

513.    JPMorgan, through Mahonia, falsely represented in the Forward Sale Contracts that it engaged in the business of re-selling crude oil and natural gas and that it intended to take delivery of crude oil and natural gas in the ordinary course of its business.  JPMorgan, through Mahonia, further misrepresented in the Forward Sale Contracts that it entered into such contracts in its capacity as a producer, processor, fabricator, refiner or merchandiser of natural gas, crude oil and/or petroleum products.  One of the Mahonia entities had been in business less than two weeks when it made this misrepresentation.

158

514.     Initially, in the early 1990s, the prepay transactions were small and apparently used for year-end tax-management purposes.  When Enron "delivered" the oil or gas, usually in regular installments of $10 million to $20 million, it was sold back to Enron through complex derivative transactions.  With each so-called "delivery," the losses began again to appear on Enron's ledger.

515.     The "deliveries," however, would resume the following year, allowing Enron to keep the losses in reserve to offset profits in future years.  At times, Enron would just roll the losses over to the next fiscal year by going back to JPMorgan's entity, Mahonia, and devising another natural gas or crude oil contract.

516.     By 1997, at the latest, fraudulent balance-sheet management became the sole purpose of the prepays, and the size of the prepay transactions increased substantially.  Enron's business with JPMorgan's Mahonia entity increased to include trades as large as $650 million. In 1997, Mahonia prepays totaled $300 million; in 1998, $500 million; in 1999, $500 million; in 2000, $980 million; and in 2001, $350 million.

517.      The Mahonia Transactions were typically closed at year-end or quarter-end for the purpose of concealing the true financial condition of Enron for that accounting reporting period.  The prepays had the effect of substantially and materially misstating Enron's financial position.

518.     Because JPMorgan knew the transactions were manipulative devices and knew that Enron's financial condition was perilous, JPMorgan insured the contracts to protect itself from loss.  Enron acted on JPMorgan's behalf to obtain the surety guarantees to assure

159

repayment on the Mahonia prepay loans.  Not only did Enron arrange the surety financial

guarantees, Enron paid the insurance premiums for the guarantees.

519.    After Enron filed for bankruptcy and JPMorgan filed claims with the insurance

carriers that had issued surety bonds for the trades between Enron and JPMorgan-controlled

entities, the carriers refused to pay on the grounds that the trades were fraudulent and were in

reality a series of loans from JPMorgan to Enron.

520.    In December 2002, in trial testimony during litigation with the sureties, JPMorgan

admitted that Mahonia, a special purpose vehicle, was not itself capable of performing its

obligations under the prepay contracts.

521.    In an Order and Opinion, entered March 5, 2002, the court hearing the surety

litigation concluded: (1) Mahonia agreed to pay Enron for gas at the same time Enron agreed to

pay Mahonia for the same quantity of gas; (2) the Mahonia entities were represented by the same

director, Ian James: (3) and that, "**taken together, these arrangements now appear to be**

**nothing but a disguised loan.**"

522.    The court determined:

> Unbeknownst to the Sureties at the time they issued the Bonds, the Contracts
> between Mahonia and Enron by plaintiff's predecessor, the Chase Manhattan
> Bank ("Chase"), were disguised as sales of assets.  . . . The net effect was simply
> a series of loans from Chase to Enron; but by disguising them as sales of assets,
> Enron could book them as revenue. . . .

> **(B)     JPMorgan knew the Mahonia transactions**
> **misrepresented Enron's debt level and served no**
> **legitimate business purpose.**

523.    JPMorgan knew the Mahonia Transactions were effectively debt.  JPMorgan's

Vice Chairman Donald H. Layton coined the phrase "disguised loans" to describe the prepays in

160

e-mails.  In an internal JPMorgan email string from May 1996, Layton wrote, "We are making disguised loans usually buried in commodities or equity derivatives . . ."

524.    In November 1998. Layton described a proposed prepay transaction in which JPMorgan would take delivery of pre-sold crude oil as follows: "This is as much a loan as a commodity transaction. . . . Is it now legal/okay for us to take physical in this way? In the past it was not. . . ."  In answer to Layton's email, he received an email in December 1998, explaining some of the JPMorgan/Enron prepay transactions.  In particular, the email advised that: (1) JPMorgan had been doing the prepay transactions since 1993, (2) prior to November of 1998, the prepay deals totaled $2 billion with 80% of the deals having been done with Enron, (3) Mahonia was used as the intermediary for convenience sake, (4) Enron's performance was previously guaranteed by letters of credit but was later guaranteed by surety bonds, and (5) even though the "transaction is priced as if a loan . . . the prepaids are not booked as loans."

525.    In May 1999, Layton again acknowledges his understanding that a prepaid oil swap was another example of "disguised loans" which show up in many units of Global Markets at JPMorgan and that the credit risk had "been laid off with insurance companies."

526.    Shortly thereafter, Layton initiated an email string beginning with an email where the subject line read: "DISGUISED LOANS."  Layton states, "We are making disguised loans, usually buried in commodities or equities derivatives (and I'm sure in other areas).  With few exceptions, they are understood to be disguised loans and approved as such.  But I am queasy about the process. . ."

527.    JPMorgan further understood that problems could arise if it referred to the financing component of these transactions as a "loan."  In a May 1999 email, Andy Holdings of

JPMorgan stated, "Legal have requested that the Financing Component of the transaction is not represented as a loan facility internally, given the remote risk that our internal records are subpoenaed by the Court in administration."

528.    Layton believed that JPMorgan should be treating transactions such as the Mahonia prepays as loans internally in order to better evaluate JPMorgan's risk and that such treatment outweighed the risk that third parties would become aware of the treatment and attack the integrity of the transactions.  In a May 1999 email, Layton responds:

> Legal says don't list it as a loan. Legal does not run the bank. They didn't want us to tape phone calls in the dealing room, either!!  Their obscure risk has to be weighed against the other factors as well and a wise judgment made.  In this case, I am not happy with the outcome.  I do not wish to have a piling up of disguised loans in trading account receivables that escape efforts at distribution, which is a central tenet of how the global bank runs ...  I have asked for a thorough review of disguised loans.  I know commodities, under the heading of "prepaid . . ." has a whole bunch.

529.    In a May 1999 email, Layton reports that he has requested a top-level review of JPMorgan's disguised loans, and the development of a policy that meets JPMorgan's needs including "ensuring consistent accounting treatment," "ensuring maximum effort at our traditional 'loans are made for distribution' strategy, despite the odd form of these loans," and "ensuring that we understand the subtle risks associated with some transactions, including 'document risk.'"

530.    JPMorgan's Dennis Oakley in a May 2001 email to Robert Traband (JPMorgan) explained about an upcoming Mahonia transaction, "since this is a prepaid forward contract the economics work just like a loan."

531.    In a taped September 2001 telephone conference, JPMorgan's Dellapina confirmed JPMorgan banker Ballentine's conclusion that the Mahonia Transactions represent

"amortizing debt" while JPMorgan banker Traband confirmed in the same conversation that the transaction is a "circular deal." In discussing Enron prepays: "They're not hedging. They're just they do the back-to-back swap…. Yeah. It's totally financing…. They've always had as a piece of their capital structure…."

532.   JPMorgan also made several judicial admissions during the course of its litigation with the sureties, which establish that the Mahonia prepays represented Enron debt. Layton, JPMorgan's Vice Chairman, testified at his deposition in October 2002 that the cash disbursements associated with the prepay transactions were "the equivalent of a loan type risk." JPMorgan Managing Director Ballentine characterized the Mahonia prepays, when deposed in August 2002, as an "extension of credit" and testified that the credit approval process for a prepay would have "some very similar aspects" to the credit approval process for a loan.

533.   JPMorgan's own Appropriateness Policy, as confirmed by Layton, characterized prepay transactions like the Mahonia prepays as the "economic equivalent of a loan."

534.   JPMorgan actively participated in the disguise of billions of dollars of debt through back and forth transactions in which Enron sold oil and gas contracts to Mahonia, but then secretly repurchased the contracts. Executives repeatedly noted that the prepays were actually loans; there was no actual or intended delivery of any commodity. In a November 1998 email from George Serice to Karen Simon and Jeffrey Dellapina regarding Enron's prepays and the use of surety bonds, Serice wrote: "Enron loves these deals as they are able to hide funded debt from their equity analysts because they (at the very least) booked it as deferred rev [(revenue)] or (better yet) bury it in their trading liabilities."

163

535.    JPMorgan participated with Enron to hide $3.7 billion in debt through Mahonia Transactions.  These transactions were frequently entered into at quarter and year ends, with JPMorgan charging higher than normal rates, knowing that Enron needed the transactions to meet its financial reporting targets.  JPMorgan knew that Enron's fraudulent accounting for the Mahonia Transactions would be detrimentally relied upon by investors and credit rating agencies.  JPMorgan knew and understood the complete lack of economic substance to the prepays, helped to structure them and create the means by which Enron disguised their true purpose.

536.    In an October 2001 e-mail exchange between Richard Walker, JPMorgan Investment Banker, and George Serice, JPMorgan Vice President of the Syndicated and Leverage Finance Group, Serice relayed a message to Walker commenting on Enron's finances, "$5B in prepays!!!!!!!!!!!!!!!!" and Walker responded, "shutup and delete this email[.]"

537.    Had this information been disclosed to the public, existing and prospective investors like Plaintiffs would not have been so glaringly deceived regarding Enron's financial position.  Silvercreek based its investment decisions on Enron financial information that was materially false and misleading.

### (C)    JPMorgan knowingly aided Enron's improper accounting for the Mahonia prepays.

538.    JPMorgan knew that Enron's accounting and disclosures for the Mahonia Transactions were materially false and failed to adequately disclose the effect of the Mahonia prepays on the debt and cash flow from operations components of Enron's financial statements.

539.    JPMorgan, fully aware that Enron did not classify the Mahonia prepays as debt, nevertheless internally accounted for those prepays as debt.  In a May 1999 letter from

164

JPMorgan's Walker and Traband, to Vice President of Enron Capital Management Bill Brown, Walker and Traband comment: "As you can see from the above areas of focus, an underlying theme is both the level and structure of consolidated and non-consolidated cash flows used to support the varying on and off-balance-sheet debt structures.  Attached is our understanding of how ENE's financial statement might be impacted by various project structures."  Attached to this letter was a copy of Enron's cash flow statement with indications of how prepays and other JPMorgan transactions were being accounted for.

540.    Enron's finance staff privately analyzed the Mahonia prepay transactions as if they were loans.  For example, the Enron internal report "Enron Capital: Status Report as of 9130197" (December 3, 1997) included prepay liabilities under the heading "Debt Classified as Non-Debt Obligations."  Enron's spreadsheet titled "Mahonia VI Natural Gas Forward Prepay Spreadsheet" contained columns showing the "payment amount," "interest," "principal" and "ending balance."

541.    Despite this understanding, Enron did not account for the Mahonia loans as line-item entries on consolidated balance sheets filed with the SEC. Instead, the transactions were deceptively referenced in footnotes, if at all.

542.    For example, in the Enron Form 10-K filed with the SEC for the year ending December 31, 1998, footnotes 1 and 2 of the consolidated financial statements state that Enron's price-risk-management activities include "forwards, swaps, options and other financial instruments with third parties [that] are reflected at market value, net of future physical delivery related costs…."  The Examiner noted that the footnotes "never described any of the Prepay Transactions specifically or disclosed the amount or nature of the obligations thereunder."

543.     JPMorgan's Dellapina admitted during deposition in the surety litigation that JPMorgan knew how Enron classified the Mahonia Transactions in its financial reports. JPMorgan's knowledge of Enron's accounting fraud is further evidenced in a 1999 letter from JPMorgan's Walker to Enron's Bill Brown and Phil Sisneros.  Ian James (Mahonia's "independent" director) at his September 2005, deposition also testified that he and JPMorgan both knew the accounting-driven nature of the transactions.

544.     JPMorgan not only knew how Enron accounted for the Mahonia Transactions, JPMorgan knew that the purpose of Enron's accounting was to hide the nature of the Mahonia Transactions from the investing public.  After meeting with Enron, one JPMorgan banker reported back that "Enron sponsors about $15BN in debt capital of which half is on balance sheet," and the banker listed the prepays in the off-balance-sheet section of a table summarizing Enron's debt capital.  The banker warned that "repackaging" Enron's "debt capital" could have a dangerous result – "some deals that are less know [sic] to the agencies [sic] may come to light … which could well cause some heartburn for Enron."

545.     In testifying before the SEC, JPMorgan's Serice conceded that JPMorgan knew Enron used the Mahonia Transactions "to effectively monetize the difference between their assets and liabilities from price risk management."

546.     The Mahonia Transactions resulted in substantial income for JPMorgan.  Because the nature of, and accounting for, the prepay transactions were improper, JPMorgan realized that Enron would pay a substantial premium to JPMorgan for devising and executing the disguised loans.

547.    JPMorgan's Traband, during his deposition in August 2002 in connection with the surety litigation, admitted that the rating agencies "indicated they wanted to see [Enron] get more cash generated through [their] trading book" and that "the prepays were an efficient means of doing so.…"  Numerous other internal communications among JPMorgan employees reveal JPMorgan's long-standing understanding of Enron's fraudulent accounting purposes for the Mahonia prepay transactions.

548.    Traband wrote to JPMorgan bankers Jim Biello and Gary Wright: "Enron utilizes the prepays to balance its book of Assets from Price Risk Management Activities versus Liabilities from Price Risk Management Activities...."  In an August 1999 Memorandum Ian James stated, "[f]or obvious reasons it is important that the [Mahonia] SPVs are controlled by Chase, but for accounting and other requirements, it is not desirable that they are wholly owned by Chase."

549.    JPMorgan remained willfully silent as Enron continued to fraudulently account for the Prepays as cash flow from operations, thereby deceiving the general public.  In a September 2001 email discussing Enron exposure, Traband wrote to Ballentine: "Attached is a revised exposure summary with the above lines highlighted....  Additionally, I have attached the credit stats including the prepays as debt."

550.    This policy of non-disclosure is nicely captured by a February 1996 memo from Richard Walker: "The syndication memo is admittedly very skimpy.  This is because **we have never let the market know anything about the underlying structure and the emphasis is totally on the letter of credit backed by the Enron Corp.**" s (emphasis added)  As long as

Enron provided JPMorgan with a continual stream of fees, JPMorgan was satisfied to keep clients, investors, and credit rating agencies in the dark.

551.   JPMorgan employee Sandra Aultman testified that her boss called the prepays "smoke and mirrors."  A recorded conversation with her boss in October 2001 confirms her testimony: "Yeah, it took 5 to 10 years to put all the smoke and mirrors up."

552.   JPMorgan knew that the Mahonia Transactions were loans and were not accounted for in accordance with GAAP.   In 1994 JPMorgan sent a letter to the Office of the Comptroller of the Currency seeking approval to enter into prepaid forward commodity contracts.  In his letter to the regulator, Garland Sims, Vice President and Senior Associate Counsel, JPMorgan, stated that:

> Chase would analyze credit risk resulting from the advance of funds under a pre-paid forward as it would if making a loan on a unsecured basis… In sum, we believe that the proposed pre-paid forward transactions are part of the business of banking because such transactions are the functional equivalent of extension of credit and delivery of the Eligible Commodity is incidental to that extension of credit.

553.   Early internal communications at JPMorgan further confirm its knowledge that the prepay transactions were loans.  In a June 1993 letter, Mark Webster, Director, JPMorgan Chase, to Ian James, Director, Mahonia, stated that "[t]he transactions described above are representative, in effect, of a fixed interest rate loan by [The Chase Manhattan Bank] to Enron."

554.   With respect to JPMorgan's knowledge as to how Enron was accounting for the prepay transactions, the Examiner noted:

There is evidence that JPMorgan knew:

(i)   Enron reported its obligations related to the Mahonia Transactions as "Price Risk Management Liabilities" instead of debt; and

(ii)    Enron reported the cash proceeds from the Mahonia Transactions as cash flow from operating activities instead of cash flow from financing activities.

555.    It is clear that JPMorgan understood that one of Enron's key motivations for the Mahonia Transactions was to mislead the credit rating agencies and investors.  According to Traband, Vice President, JPMorgan, "the rating agencies had also indicated they wanted to see them [Enron] get more cash out of their trading book …the prepays which resulted in cash coming in and a liability from price risk management, met these objectives."

556.    With respect to JPMorgan's knowledge as to how Enron was disclosing the prepay transactions in its financial statements, the Examiner noted:

(i)    There is evidence that JPMorgan Chase understood that creditors and other users of Enron's financial statements would not be able to discern the impact of the Mahonia Transactions.

(ii)    JPMorgan used prepays to generate massive fees from Enron and other banking customers.

557.    JPMorgan prepared documents, which Enron tendered to its auditors, improperly attesting to Mahonia's independence.  The purpose of these documents was to assist Enron in getting the auditors to sign off on "off-balance-sheet" treatment of the prepays (under GAAP, Mahonia and JPMorgan were supposed to be independent entities).

558.    In the fall of 2001, Arthur Andersen began to "push back" with respect to Enron's accounting for the Mahonia Transactions.  To continue off-balance-sheet treatment of the prepays, Arthur Andersen insisted on a new representation letter from JPMorgan stating that Mahonia was independent of JPMorgan.

169

559.     A taped telephone conference among JPMorgan's Dellapina, and Enron's Joseph Deffner, Lisa Bills and Michael Garberding establishes that JPMorgan agreed to accommodate Enron's request to provide written documentation that misrepresented Mahonia's supposed independence from JPMorgan.

560.     After the conference call, Dellapina and Enron employees exchanged several emails concerning the preparation of documentation to provide to Arthur Anderson.  Enron's Lisa Bills wrote, via email, to Dellapina in September 2001:

> [W]e have been requested by our auditors to include another representation.  It will state (in words not yet crafted, so any you want to propose are welcome) that Mahonia and Chase are unrelated entities which are not consolidated on a legal or accounting basis with each other.

561.     Ian James, Director, Mahonia, provided the requested letter to Arthur Andersen.  Mahonia, however, was not independent of JPMorgan.  Mahonia was established by JPMorgan for the sole purpose of assisting in the prepay transactions.  Phil Levy, JPMorgan, testified that Mahonia had no role in the structuring of the Mahonia Transactions (this was done by JPMorgan staff), and all funds required in the Mahonia Transactions were sourced by JPMorgan.

562.     With respect to the purported independence of Mahonia, the Examiner concluded that:

(i)     Notwithstanding the representation letter procured for Andersen, Mahonia was an SPE doing only the bidding of JPMorgan Chase; and

(ii)    JPMorgan Chase was aware of this fact at the time the requested representation letter was obtained.

563.     With respect to the Mahonia Transactions generally, the Examiner also concluded that JPMorgan Chase knew:

(i)     the Mahonia Transactions were loans in economic substance;

(ii)    Enron entered into the Mahonia Transactions for the purpose of reporting the proceeds of these financings as cash flow from operating activities and the obligation to repay these proceeds as price risk management liabilities; and

(iii)   the impact of the Mahonia Transactions on Enron's financial condition and results of operations would not be apparent to Enron's other creditors, analysts and other third-party users of Enron's financial statements.

> ### (D)   JPMorgan played an essential role in Enron's fraud involving the Mahonia Transactions in exchange for lucrative fees.

564.    As the Enron Ponzi scheme continued to grow, JPMorgan became integral to the Enron fraud.  JPMorgan knew that Enron was relying on the bank to facilitate Enron's quarter end and year end manipulations of its financial statements, and JPMorgan was only too happy to increase its participation given the lucrative fees that it was earning.

565.    The Examiner noted that:

JPMorgan Chase came to understand and expect that Enron would repeatedly rely on financial statement management techniques, such as those associated with the Mahonia Transactions, to satisfy its need for cash while simultaneously improving the reported results of its operations:

•     In October 1997, George Serice ("Serice") alerted others at JPMorgan Chase regarding Enron's desire to complete $150 to $300 million in Prepay Transactions by the end of the year, noting:  "These transactions are balance-sheet advantaged and are used as a year-end management tool. Enron is thus enticed to pay a premium for these transactions."

•     In October 1999, Traband wrote Walker and others at JPMorgan Chase (including Serice) regarding the possibility of another Prepay Transaction: "Spoke with Jung Suh [Enron] this morning as well.  He indicated that any prepay would still go throught [sic] Joe Deffner and that Joe did not think there would be another one this year."  Serice replied:  "I think we have heard that in each of the past 4 years."

•     An internal "call report" concerning Enron's desire to complete a Prepay Transaction in the fourth quarter of 2000 stated:  "Sounds like typical

171

Enron with year-end transactions.  Yes, we should focus on creative solutions – happy to help."

• In August 2001, when asked by Walker about assembling a group of JPMorgan Chase personnel for "listening to some of Enron's ideas and challenges regarding its interest in selling down some assets," Christopher Teague replied:  "Rick, as you will recall, we had some conceptual discussion on this about 6 weeks ago.  We had begun to focuss [sic] on it from the point of view of trying to free up capacity in the bank market.  Is that the goal here or is this another hide the debt structure?"

566.    JPMorgan continued to willingly participate in Enron's deception despite the fact that it knew that the Mahonia Transactions were not being appropriately disclosed, JPMorgan had misrepresented Mahonia's "independence" to Enron's auditors, and Enron's true debt levels were being hidden from credit rating agencies, creditors and investors.  JPMorgan benefited from the Mahonia prepay transactions, receiving both large fees and interest payments from Enron for aiding Enron's fraud.

567.    Indeed, in a kind of "blackmail," JPMorgan would price the prepaid transactions with reference to how important it thought the structure was to Enron.  In the transcript of a taped phone call amongst JPMorgan employees it was stated, "I think what we're trying to gauge is how, how aggressive they are to pay for this stuff now, which is discreetly get, you know, several hundred million dollars and have no market knowledge of what's going on…."

568.    JPMorgan also marketed the prepaid structure to other clients but noted that the "pickup with the rating agencies" was to some extent limited by the size of the client's existing trading book.  Basically, the fraudulent accounting for and disclosure of prepaid transactions would not go undetected by the credit rating agencies if the volume of the prepay deals was disproportionate to the legitimate trading book.

172

569.    The Examiner summarized the fraudulent disclosure of the prepay transactions by concluding that:

> There is evidence from which a fact-finder could conclude that the Mahonia Transactions were designed to achieve market invisibility, and that market invisibility was a feature of those transactions known to and promoted by JPMorgan Chase.

570.    Without funding from JPMorgan, Mahonia was incapable of financing the prepaid forward agreements between it and Enron.  The terms of Mahonia's agreements with JPMorgan were always for approximately the same monetary amount, same quantity, same underlying commodity, and used the same delivery points, as that stated in the forward sales contracts between Enron and Mahonia.  These sham transactions were included in Enron's financial records as trading obligations and the resulting borrowings wrongly included in "cash flow from operations."

### (ii)    Structured Transactions

571.    In addition to its participation in various underwritings and the Mahonia prepay transactions, JPMorgan was also actively involved in perpetuating the Enron Ponzi scheme through its participation in various deceptive SPE structures.  As listed by the Examiner, fraudulent SPE transactions in which JPMorgan was directly involved include the following:

> JPMorgan Chase participated in a number of Enron's other SPE Transactions that have been described in the Examiner's prior reports:
>
> - **JEDI II**:  In 1997, JPMorgan Chase provided $100 million of a $200 million short-term bridge loan to JEDI II.  In 1998, JPMorgan Chase acted as administrative agent for a $500 million syndicated revolving credit facility providing credit to JEDI II.
>
> - **Chewco**:  In 1997, JPMorgan Chase provided a short-term bridge loan of $188 million to Chewco, the purchaser of the interest in JEDI held by CalPERS.

173

- **Project Firefly**:  In 1998, JPMorgan Chase acted as administrative agent for a $400 million syndicated loan facility in connection with Project Firefly.  Later, in 1999, JPMorgan Chase acted as administrative agent for a $415 million senior secured lending facility related to Project Firefly.

- **Choctaw**:  In 1999, JPMorgan Chase advised Enron in connection with structuring and implementing the Choctaw Minority Interest Transaction, also acting as the agent bank for a $485 million syndicated loan made to Choctaw as part of the structure.

- **LJM2**:  In 1999, JPMorgan Chase acted as the agent bank in connection with a $65 million syndicated loan to LJM2.

- **Project Rawhide**:  In 1999, JPMorgan Chase participated in a $720 million syndicated loan arranged in connection with Project Rawhide.

- **Project Fishtail**:  In connection with Project Fishtail, which closed in 2000, JPMorgan Chase provided a $42 million credit facility to Annapurna, LLC, a member of a joint venture that held the economic interests in Enron's pulp and paper trading business.

- **Zephyrus**:  In 2000, JPMorgan Chase acted as agent bank for a $500 million syndicated loan to an SPE in connection with the Zephyrus Minority Interest Transaction.

- **Hawaii**:  In 2000, JPMorgan Chase participated in a $550 million syndicated loan in connection with the Hawaii FAS 140 Transaction.

- **Marlin**:  In 2001, JPMorgan Chase acted as one of five co-managers on a $475 million notes offering, to be used to redeem the outstanding debt of a prior Marlin Water Trust notes offering.

- **Slapshot**:  In 2001, JPMorgan Chase structured and acted as lender and agent bank in connection with a transaction designed to provide $375 million in off-balance-sheet financing for certain of Enron's forest product assets and to save Enron $100 to $150 million in Canadian income taxes.

572.    JPMorgan was also an underwriter in the Marlin offering.  Marlin Trust was utilized by Enron to off-load debt from its water business, and help conceal Enron's true financial position.  In addition, the Marlin structure was supported by Enron through various

174

"stock triggers," enormously risky undertakings that were not disclosed in Enron's financial statements or registration statements and prospectuses for its securities offerings.

573.    JPMorgan, along with Citigroup, administered the financial affairs of LJM2, about which they were fully knowledgeable.  As described earlier, LJM2 was a key vehicle employed by Enron to hide billions in debt and generate billions in false revenue, profits and cash flow from operations.

574.    JPMorgan designed the "tax technology" employed in the Enron Slapshot transaction described earlier.  JPMorgan also participated in the deceptive Fishtail transaction as described in the report from the Senate Subcommittee investigating the role of financial institutions in the collapse of Enron (see, Exhibit C).  JPMorgan provided an inflated valuation analysis for the assets "transferred" by Enron in the transaction, as well as a $42 million "commitment" referred to as an "unfunded capital investment."  This "commitment" was never intended to be used.  It was strictly a construct to create the appearance of an asset sale where no sale had actually occurred.  In return for pretending to finance the Fishtail transaction, JPMorgan received $500,000.

575.    Still further, JPMorgan provided $1.0 billion in minority interest financings; a technique by which Enron improperly hid $2.75 billion in debt.

**(iii)    Analyst Coverage**

576.    Although it was well aware of, and had participated in, Enron's improper accounting practices, JPMorgan nonetheless published analyst reports and investment research reports that misleadingly touted Enron's financial strength and performance, and recommended that investors purchase Enron securities. JPMorgan issued favorable reports and

175

recommendations on June 9, 1999; July 15, 1999; September 23, 1999; November 26, 1999, January 1, 2000; February 9, 2000; May 3, 2000; May 15, 2000; July 3, 2000; July 19, 2000; September 15, 2000; September 27, 2000; March 13, 2001; March 23, 2001; May 18, 2001; June 15, 2001; July 10, 2001; July 12, 2001; August 15, 2001; August 17, 2001; on October 9, 17, 20 and 23, 2001; and November 2, 2001.

577.    JPMorgan knew that Enron's debt level was much higher than reported, that Enron was not generating anywhere near the cash flow from operations that Enron claimed, that Enron was subject to undisclosed stock triggers which could undermine shareholder equity, endanger its investment-grade credit rating and limit its access to capital markets, and that as a consequence, JPMorgan was reducing its exposure to Enron at the same time it was recommending Enron securities to outside investors like Silvercreek.

578.    JPMorgan's head of equity research, Peter Haughton, sent a memo to the bank's equity analysts in March 2001 stating that the analysts were required to consult both the company concerned, and the JPMorgan investment banker responsible for the account, before publishing research that concerned one of JPMorgan's corporate clients.

579.    In promoting Enron securities to the investing public, JPMorgan never disclosed its conflicts of interest (*i.e.*, the need to "support" Enron in order to obtain investment banking business from Enron), or that it was involved in numerous transactions with Enron that were being fraudulently reported in Enron's financial statements, or that it was reducing its own exposure to Enron.

176

### (iv)  JPMorgan's Knowledge of Enron's True Financial Position

580.    From 1997 through the date Enron declared bankruptcy in 2001, JPMorgan

participated in over 70 different transactions with Enron – averaging over one a month.  Through

these transactions and its high-level relationships with Enron executives, JPMorgan gained

comprehensive knowledge of Enron's finances.  For example, an August 1994 internal document

prepared by JPMorgan titled "Enron Corporation Annual Review Package," shows that

JPMorgan had high-level access to Enron's confidential strategic plans.

581.    Internal JPMorgan emails from George Serice to Christopher Teague (April

1999), and from Richard Walker to James Lee and others (July 1999) demonstrate JPMorgan's

ability to seek and obtain (i) specially arranged private presentations regarding Enron's on- and

off-balance-sheet obligations; and (ii) early access to not-yet-public information about Enron.

582.    The Examiner noted that:

JPMorgan Chase's consistent achievement of Tier 1 status among Enron's banks,
and its steady flow of Enron's transactions, provided JPMorgan Chase with
multiple benefits, such as:

•      Particularized knowledge of at least some of Enron's off-balance-sheet
       financing;

•      Personal access to Enron's Chief Operating Officer, Skilling, and its
       Senior Vice President and Chief Financial Officer, Fastow;

•      Access to Enron's strategic plans;

•      The ability to seek and obtain specially arranged presentations regarding
       Enron's on- and off-balance-sheet obligations; and

•      Early access to not-yet-public information concerning organizational
       changes at Enron.

177

583.     Through its involvement in a myriad of deceptive SPE transactions, its underwritings of Enron-related securities, and the Mahonia Transactions, JPMorgan had direct knowledge that Enron's financial statements were replete with fraudulent and misleading entries. JPMorgan actively participated in transactions that were designed to further the fraud, made direct misrepresentations to the auditors to support the fraudulent accounting treatment, and was willing to do so in exchange for lucrative fees.  Through its involvement in LJM2 and the Mahonia Transactions, JPMorgan knew that Enron's cash flow from operations was artificially overstated, its debt obligations massively understated, and that Enron's financial statement disclosure was so opaque that it was impossible for anyone not involved with the fraudulent manipulation of the statements to have an understanding of Enron's true financial condition.

584.     Substantial evidence supporting Plaintiffs' allegations against JPMorgan has been uncovered in the years since Enron declared bankruptcy.  To date JPMorgan has agreed to:

- Pay $135 million in disgorgement, penalties, and interest to settle a civil action brought by the SEC;

- Pay upwards of $25 million to the state and city of New of York to settle a criminal action brought by the district attorney; and

- Pay $2.2 billion to settle the claims brought against it in the *Newby* class action case.

585.     As information about Enron's actual financial condition (that JPMorgan had helped Enron to conceal) finally became known to the general public, the value of Enron securities dropped almost to zero.  Plaintiffs lost substantially their entire investment in a matter of weeks.  JPMorgan played a significant role in and is directly responsible for Silvercreek's losses, as an aider and abetter of Enron's fraud.

178

586.    JPMorgan was an underwriter of the Zero Notes purchased by Plaintiffs.  As a result of its close relationship with Enron and its intimate involvement in Enron's deceptive SPEs and off-balance-sheet activities, JPMorgan knew that the offering memorandum, registration statement and prospectus for the Zero Notes were materially inaccurate and misleading.  Among other things, the existence and magnitude of Enron's off-balance-sheet obligations – and the hundreds of millions of dollars of understated debt and overstated cash flow from operations that JPMorgan helped Enron fabricate – were not disclosed.  JPMorgan also knew that its Enron research reports were materially inaccurate and misleading.

### (v)    Summary

587.    JPMorgan actively and substantially aided and abetted Enron's fraud in several ways.  First, JPMorgan devised a series of prepay transactions for Enron whose sole purpose was to conceal Enron's debt and misrepresent cash flow from financings as if the cash was generated from operations.  JPMorgan's internal documents, subsequently confirmed by the Examiner and others, establish that the Mahonia Transactions were deceptive transactions to disguise loans.  Even after it was clear to JPMorgan that the prepays were deceptively reported on Enron's publicly disseminated financial statements, JPMorgan continued to devise, promote, and fund additional prepay transactions.  Second, JPMorgan provided deceptive information to Arthur Andersen, Enron's accountant, concerning several JPMorgan-controlled Mahonia entities.  The Mahonia entities were used as the conduit in prepay transactions to make the transactions appear as commodity trades instead of loans.  The sole purpose of providing the misleading information to Arthur Andersen was to allow Enron to continue deceptively mischaracterizing the prepay loans in its financial statements. Third, JPMorgan knew that many of its deals with Enron could

not properly be treated as off-balance-sheet transactions, but would be required under GAAP to be reflected on Enron's consolidated financial statements.  Nevertheless, JPMorgan participated in these deals knowing that these transactions would be, and indeed were, used by Enron to falsify its financial reports.

### d.   CSFB

588.    Like the other Bank Defendants, CSFB had a long and close relationship with Enron, which made it privy to material facts about Enron's financial condition which Plaintiffs did not and could not know.  CSFB provided extensive commercial and investment-banking services, commercial loans and advisory services to Enron.  These advisory services, including those provided by Donaldson, Lufkin & Jenrette (both prior to and after DLJ's merger with CSFB), included the structuring of SPEs and devising ostensibly off-balance-sheet transactions. CSFB merged with DLJ in late November or early December 2000.

589.    CSFB functioned as a unified entity without an effective Chinese wall. Information obtained by CSFB's commercial and investment banking personnel was not quarantined from CSFB's research analysts.  On the contrary, CSFB used its research analysts as a marketing arm for its investment banking business.  Accordingly, for purposes of its business activities, knowledge possessed by any one sector of the company should be attributed to CSFB as a whole.

590.    CSFB acted as underwriter for numerous Enron securities, including the Zero Notes.  CSFB was the number one underwriter of Enron securities since 1985, having arranged $7.4 billion in offerings.

591.     As reported in a February 2002 Dow Jones News Service article that noted the "long gravy train of stock and bond offerings that Enron sent the Street's way over the past decade," CSFB obtained approximately 20% of Enron's underwriting work between 1990 and the company's collapse.  By CSFB's own count, it underwrote over 30 Enron-related transactions – 8 involving SPEs – just between 1997 and Enron's bankruptcy, earning at least $94.1 million in fees.

592.     Enron consistently viewed CSFB as a "Tier 1" bank, and CSFB in turn treated Enron as a firm-wide priority.  As early as 1998, Skilling noted to Fastow CSFB's willingness to "deliver the balance sheet strategically."  As noted by the Examiner, Enron ranked CSFB as its "Best Bank" in North America in its Debt Investor Relationship Review Highlights for January 2001.

593.     CSFB also advised Enron on mergers and acquisitions, was advisor to Enron on the $2 billion sale of Portland General Electric, and in 2001, helped Enron dispose of $5 billion to $7 billion in assets in Enron's international portfolio, some sold to SPEs at inflated values.

594.     CSFB was one of the principal commercial lending banks to Enron.  CSFB loaned or arranged to secure over $4 billion in financing.

595.     In addition to the stream of investment banking income that CSFB's participation in the Enron offerings provided, those offerings also supplied Enron with the cash to continue its Ponzi scheme, including funding its obligations to CSFB under the Enron-CSFB off-balance-sheet transactions.  By keeping silent about Enron's fraudulent accounting of CSFB loans as asset "sales" in the course of CSFB's underwriting efforts for Enron, CSFB self-servingly helped to ensure that Enron would have the funds to repay those debts.  Among the Enron-related

offerings CSFB underwrote to help maintain the Ponzi scheme and generate cash that could be used to service Enron indebtedness to CSFB:

| Date | Security Sold |
|------|---------------|
| 6/9/99 | 36.6 million shares of Azurix stock at $19 per share |
| 9/23/99 | $1,400,000,000 8.31% Osprey Trust, Osprey I, Inc. Senior Secured Notes due 03 |
| 2/11/00 | $440 million and £100 million Azurix 10.375% and 10.75% Senior Notes |
| 9/28/00 | $750,000,000 7.797% Osprey Trust, Osprey I, Inc. Senior Secured Notes due 2003; $315,000,000 6.375% Senior Secured Notes due 2003 |
| 10/00 | 27.6 million shares of New Power at $21per share |
| 7/12/01 | $475,000,000 6.31% Marlin Water Trust II, Marlin Water Capital Corp. II Senior Secured Notes due 03; $515,000,000 6.19% Senior Secured Notes due 03 |

596.     CSFB participated in Enron's fraudulent scheme to enable CSFB to garner profits via syndication and investment banking fees as well as interest payments.  The capital obtained from public investors at artificially inflated prices gave Enron the resources to pay off its commercial paper debt and loans from its banks, including CSFB.  CSFB also designed, structured and funded SPEs that were utilized by Enron to falsify its financial condition and misrepresent profits.  CSFB thereby helped keep the Ponzi scheme going and limited its own risk.

597.     In an appendix to the Final Report of the Examiner ("Role of CSFB and its Affiliates," attached hereto as Exhibit H), a substantial volume of evidence with respect to CSFB's role in the Enron fraud was reviewed.  According to the Examiner, the evidence would permit a fact-finder to conclude that CSFB:

- Participated with Fastow in the formation and funding of LJM1, knowing that Enron would use LJM1 to enter into non-economic hedging transactions;

- Structured and implemented a subsequent transaction by LJM1 that was improperly used to enrich Fastow;

- Assisted Enron in completing the CSFB Prepay, even though CSFB knew that Enron's accounting for transactions of this type, with no other meaningful related disclosure, would result in misleading financial presentation; and

- Obtained secret assurances from Enron in the Nile transaction that Enron would repay CSFB's "equity" interest in the SPE used in the Nile Transaction, knowing that the assurances precluded the accounting treatment Enron sought for such transactions and that Enron nonetheless intended to account for these transactions as if no assurances of repayment had been provided.

598.    CSFB's active participation in the Enron fraud may be summarized under three main categories:

    a.    Structured Transactions;

    b.    Prepay Transactions; and

    c.    Analyst coverage.

**(i)    Structured Transactions**

599.    CSFB was involved in a number of different FAS 140 transactions, including Iguana in December 1999 and Nikita and Nile in September 2001.  CSFB's participation in SPE structures almost always came at the end of a fiscal quarter as Enron sought to fraudulently "prop up" reported earnings through the use of deceptive financing transactions.

600.    For both the Nikita and Iguana transactions CSFB participated as the holder of the 3% supposedly independent "equity" component that could arguably qualify them for off-balance-sheet treatment.

183

601.    With respect to the Nile transaction, the Examiner concluded that CSFB knew that its participation in the scheme was a sham since, given Enron's secret undertaking to repurchase CSFB's "equity," CSFB had nothing at risk, and the transaction was a circular shuffle between related entities.  Nevertheless, with CSFB's aid and assistance, Enron was able to create the false appearance of revenues, and thereby record approximately $18.9 million in phantom revenues and conceal nearly $24 million in debt from Enron's balance sheet.

602.    Based on his review of internal documents and the sworn statement of James Moran, Director, CSFB, the Examiner concluded that:

> Although CSFB understood that its equity position in the Sphinx Trust "needed to be at risk" to satisfy the accounting treatment that Enron gave the overall transaction, the evidence indicates that Enron agreed to repurchase CSFB's 3% equity in Project Nile "at par."  An internal CSFB document describes the "credit risk" of the equity as being "100% Enron via put."

603.    The existence of a put that permitted CSFB to return its 3% equity back to Enron at par value fully removes any risk to the equity.  The only risk CSFB had on the structure was that Enron would not honor its obligation under the put; in other words, CSFB was exposed to credit risk on the debt that had been extended to Enron.  Although it was wrapped up in a sophisticated structure, CSFB knew that it was simply extending credit to Enron and it also understood Enron's motives for structuring simple debt as a sophisticated SPE structure – to deceive investors and credit agencies by overstating its revenues, overstating its cash flow from operations and understating its true debt obligations.

### (ii)      CSFB Prepay Transactions

604.    CSFB made multiple loans to Enron that were disguised as trades.  One example of such a disguised loan was a December 2000 $150 million transaction with Enron that was

characterized as a "swap" (prepay).  CSFB paid the $150 million up front, in exchange for which

Enron was to make payments to CSFB over a 2 year period.  Although papered as a swap, in

substance, it was a loan.  In fact, CSFB treated the transaction as a loan on its own books.  Enron

did not; instead it posted the money as "assets from price risk management" in order to hide the

obligation.  CSFB actively participated in and furthered Enron's fraudulent scheme by helping

Enron hide its true credit exposure.

605.     CSFB was aware of the deceptive nature of the prepay loans.  In September 2001,

Osman Abib, a CSFB banker, sent an e-mail to a colleague, James Moran, asking about the

prepay.  "Please remind me as to who at Enron originally asked for this deal and why we agreed

to do it (and most importantly what did CSFB get from it besides being nice guys again)."

606.     The prepay transaction which CSFB entered into with Enron in December 2000

was designed to help Enron manipulate its 2000 year-end financial reports ("CSFB Prepay").

The CSFB Prepay was nearly identical to the Mahonia Transactions in its general purpose and

structure – it enabled Enron to (i) conceal debt by not reporting the Prepay as a loan, and then

(ii) fraudulently book the loan proceeds as "cash flow from operating activities" on its financial

statements.

607.     CSFB was aware that the structure of the Prepay did not expose CSFB to any

commodity risk.  In James Moran's (Director, CSFB) sworn statement he notes that CSFB's

exposure to oil is netted out with the swaps and the net result operates as a loan between CSFB

and Enron.  In fact, no physical deliveries of the commodity were made, and none were intended.

608.     CSFB's awareness of the true nature of the CSFB Prepay transaction (and Enron's

intent to fraudulently report it) is further illustrated in a December 2000 e-mail from Ian Emmett,

185

CSFB, to Steven Wootton, Director, CSFB.  In the e-mail Emmett asks "Is it OK for us to be entering into such an 'obvious' loan transaction?"  Emmett sent another e-mail to Geoff Smailes, CSFB, on that same day noting that "I am being asked to quote on a structure for Enron that enables Enron to borrow USD that are treated as price risk management rather than debt on balance sheet."

609.    Also in December 2000, a CSFB employee, in-house lawyer Steve Wootton, raised concerns that the Enron "prepay" was an "accounting-driven transaction."   In the internal communications that followed, Mr. Wootton raised the issue of whether the transaction should be documented with "the Firm's standard representations for accounting driven transactions."

610.    Under CSFB's written guidelines, any transaction that is deemed to be "accounting driven" requires the approval of the "reputational risk" department.  After discussing the nature of the structure, CSFB decided that to mitigate any reputational risk, it would collect a series of representations from Enron.  The Examiner noted that these assurances included inter alia that:

- Enron had discussed the CSFB Prepay with its external auditors;

- Those auditors had confirmed that the accounting treatment was appropriate;

- Enron's senior management was aware of, familiar with and had approved the CSFB Prepay;

- The CSFB Prepay and Enron's accounting for it were consistent with applicable laws and regulations;

- Enron had not relied on CSFB "in respect of the accounting treatment [or] the overall suitability" of the CSFB Prepay; and

- The CSFB prepay, and its accounting and tax treatment, are consistent with regulatory requirements.

186

611.     The evidence documents a back and forth between Enron and CSFB – Enron doing its best to minimize the need for specific representations and CSFB reiterating the importance of such representations.  According to the sworn statement from CSFB Director Moran, Enron was not comfortable with CSFB's standard representation.

612.     A December 2000 e-mail from CSFB's Nicolas Tjandramaga to Marc Steglitz of CSFB's reputational risk group stated that it was "very important" for Enron that the prepay documents "DO NOT include any representations on accounting driven transactions." Thereafter, and despite CSFB's concerns regarding the prepay structure, it went ahead and funded the transaction.  In entering into the Prepay without its standard representations, CSFB actively helped Enron to fraudulently conceal the true nature of the transaction.

613.     CSFB clearly understood that the prepay transaction was a loan – when discussing the transaction with Enron employees, terms such as "quarterly interest payments" and "principal repayment" were used.  By this device, CSFB directly aided and assisted Enron in recording $150 million in phantom cash flow from operations and concealing $150 million in debt.

614.     Through its participation in the prepay structures, its knowledge of the "accounting driven" nature of these transactions, and its knowledge of how Enron would account for such structures, CSFB was an active participant in Enron's fraudulent overstatement of earnings and understatement of debt.  Despite its knowledge of these transactions, CSFB did not disclose the existence of the off-balance-sheet obligations (i) in its research reports; (ii) in the prospectuses for those offerings for which it served as an underwriter, including the Zero Notes, or (iii) through its brokers, like Sara Randall, who aggressively marketed Enron securities to investors like Plaintiffs.  Despite its legal obligation to ensure that the information included in

187

securities offering documents was accurate, and to make complete disclosure when recommending Enron securities, CSFB failed to meet its obligations and actively participated with Enron in fraudulently deceiving investors.

615.    CSFB made large profits from disguised loans to Enron.

616.    CSFB, through a group of ten bankers hired by DLJ from Citigroup/Salomon and headed by Laurence Nath, a managing director at CSFB, helped to create several illicit SPEs, including Marlin, Firefly, Mariner, Osprey, Whitewing, and the Raptors.  CSFB helped Enron sell assets at inflated prices to these entities despite the fact that Enron could never have sold the assets at such prices in arm's length transactions, thereby creating sham revenue and profits and concealing massive debt.

617.    CSFB would send Laurence Nath to the Enron corporate office for a few weeks to meet with Enron's treasury and global finance departments, including Jeff McMahon and Ben Glisan, to create a quick-fix solution for Enron's books.  The buzz word to describe such transactions was "monetising," which meant that Enron needed to sell an asset to an SPE in order to remove that asset from Enron's books.  Such transactions artificially inflated revenue, earnings and cash flow from operations and concealed debt.

618.    For example, in July 1998, Enron formed a new company called Azurix Corp. to penetrate the global water business.  Enron acquired Wessex Water plc for $2.6 billion as Azurix' centerpiece.  To keep Azurix' debt off Enron's balance sheet, Enron tapped Lawrence Nath at CSFB to design an artificial structure that would ostensibly maintain it as an unconsolidated entity.  This was achieved by the Marlin Water Trust ("Marlin") which was set up in 1998 to move water assets and debt off Enron's balance sheet.  The Marlin debt was

backed by Enron stock. Enron's obligations to Marlin (which precluded off-balance-sheet treatment) were not disclosed to Enron's investors. CSFB also underwrote the Azurix IPO, selling 38.5 million shares of Azurix stock at $19 per share. Enron received $370 million of new capital by selling 19.5 million shares in the offering.

619.   CSFB acted as lead underwriter in the October 2000 New Power IPO selling 27.6 million shares at $21. This offer enabled Enron to create large – and false – profits for the 2000 fiscal year. Enron took New Power public to create a trading market in New Power stock, which would allow it to recognize a profit through a sham sale of New Power stock to an SPE (Hawaii 125-0). Subsequently, Enron "hedged" its New Power investment through the infamous Raptor vehicles (described above). CSFB made a sham loan to the SPE to fund its "purchase" of Enron's New Power shares. This loan was secretly guaranteed by Enron through a total return swap and led to Enron's recording of $370 million in manufactured profit. By entering into the secret total return swap with Enron, CSFB knew that its loan was being used as a deceptive device.

### (A)   LJM1/Rhythms Hedging Transaction

620.   CSFB designed the concept of Enron using its own stock to backstop obligations. This concept formed the basis for Enron's share trust structures (such as Marlin and Osprey) as well as several "hedging" transactions, including the Rhythms Transaction and the Raptors. CSFB created LJM1 and engineered the Rhythms Transaction. The Rhythms Transaction, in turn, formed the template for the Raptors.

621.   Enron created the SPE LJM1 for the purpose of hedging Enron's market risk on its equity position in Rhythms NetConnections stock (the "Rhythms Transaction"). Enron

engaged in the Rhythms Transaction for the sole purpose of managing financial reporting results.

The transaction had little economic substance but it did enrich Enron insiders and the limited

partners of LJM1, including CSFB.

622.    The Examiner concluded in his Second Interim Report that LJM1 was created and

existed primarily to execute hedging transactions with Enron on non-arm's length terms that a

truly independent third party would never accept.  With respect to the LJM1/Rhythms Hedging

Transaction, the Examiner concluded that:

> CSFB knew that LJM1 would enter into the LJM1/Rhythms Hedging Transaction
> with Enron and CSFB was in possession of all the facts necessary to conclude that
> the LJM1/Rhythms Hedging Transaction was a non-economic hedge.  CSFB was
> also in possession of all the facts necessary to conclude that Enron paid
> significant value in a transaction in which it had no possibility of obtaining an
> economic return and that the transaction was designed to give Enron only a
> potential financial statement benefit.

### (B)    LJM2 and the Raptors

623.    The Raptor Transactions were developed using the Rhythms Transaction structure

created by CSFB.  Similar to the Rhythms Transaction, the Raptor Transactions were designed to

reduce the reported earnings volatility on a number of Enron's investments.  Another SPE,

LJM2, served as the purported "outside investor" for the Raptors.  CSFB was a limited partner in

LJM2, having invested $15 million in equity, and contributed $30 million to LJM2's $120

million credit facility.

624.    With respect to the Raptors Transactions, the Examiner concluded that, "The

hedging transactions, designed ostensibly to manage Enron's investment risk, were not real

economic hedges, but were merely accounting hedges – apparently designed to generate

favorable financial statement results without serving any commercial purpose."  Enron retained

the economic exposure in all the Raptors, and the transactions were not accounted for properly. However, in order to pursue this "financial statement management," Enron paid LJM2 $69.9 million, thereby enriching the LJM2 investors, including CSFB.

625.    CSFB was fully aware of the importance of the Raptor Transactions to Enron and was equally aware of how lucrative its participation in the Raptor Transactions via LJM2 could be.  In the presentation handout for the "LJM Investments – Annual Partnership Meeting" dated October 26, 2000, CSFB is identified as a partner in LJM2 as well as a "Meeting Attendee."  As part of the presentation package, the Raptor I Transaction is reviewed as a sample investment:

> Sample Investments: Raptor I
>
> - Raptor is a structured finance vehicle, capitalized with an Enron stock derivative and LJM equity, that will enter into derivative transactions with Enron related to investments in Enron's merchant investment portfolio.
>
> - Raptor helps Enron manage the impact of the price volatility of its merchant investment portfolio on its income statement.
>
> - Major risk to LJM is that Enron stock price drops below $48.00 per share (43% decline) six months after closing.
>
> - LJM's return is projected to be 84%.
>
> - LJM used for speed, flexibility, complexity of transaction, and confidentiality.

The final page of this document highlights that LJM2 is of "Strategic importance to Enron."

626.    The offering memorandum for the LJM2 partnership stressed the "unusually attractive investment opportunity" resulting from LJM2's connection to Enron.  It explained that "[t]he Partnership expects that Enron will be the Partnership's primary source of investment opportunities" and that it "expects to benefit from having the opportunity to invest in Enron-

generated investment opportunities that would not be available otherwise to outside investors."
The offering memorandum specifically noted that Fastow's "access to Enron's information
pertaining to potential investments will contribute to superior returns." Finally, investors were
told about similar Fastow controlled partnerships that had done deals with Enron similar to those
contemplated by LJM2, and that those investors had tripled their money in 2 years.

627.   The presentation document also outlined the investment profits for the Raptor
Transactions and provided the internal rate of return ("IRR") for each investment:

| Investment Name | Total Profits | IRR |
| --- | --- | --- |
| Raptor | $40,366,667 | 193% |
| Raptor I-A | $2,542,969 | 12% |
| Raptor II | $41,050,000 | 278% |
| Raptor II-A | $450,621 | 12% |
| Raptor III | $39,550,000 | 2503% |
| Raptor IV | $41,050,000 | 125% |

628.   CSFB was given a private invitation to invest and did invest in LJM2. Some of
CSFB's senior executives invested $22.5 million in equity money through DLJ Fund Investing
Trust Partners and Merchant Capital, and CSFB itself contributed to a $120 million credit line
for LJM2. CSFB was "promised," and, indeed, received extraordinary returns on its investment
in LJM2. CSFB helped structure and finance LJM2. CSFB injected money near the end of 1999
to fund some SPE transactions so that Enron could create false revenue and earnings and
misrepresent that it had met its profit forecasts for 1999. CSFB repeatedly loaned money to
LJM2 to enable it to engage in transactions with SPEs and Enron. These were transactions that
involved blatant conflicts of interest.

192

629.     By investing in LJM2, CSFB was able to: (i) continue to develop its relationship with Enron; and (ii) achieve exceptional returns – returns ultimately funded through a series of fraudulent Enron securities offerings – with substantially no risk.  CSFB was fully aware of how Enron was using the Raptor Transactions to inflate its accounting earnings and was also aware that Enron was not providing any meaningful disclosure with respect to the Raptor Transactions in its financial reporting.  As such, it knowingly participated in a scheme, the object and effect of which was to appropriate Enron income from Enron investors and divert that income to investors in LJM2, including CSFB.

### (C)     Stock Triggers

630.     In July 1999, Lawrence Nath and his CSFB team designed an off-balance-sheet deal called Osprey Trust.  It held debt and assets such as natural gas pipelines and power plants.  Osprey's primary purpose was to raise $1.07 billion for Whitewing LP (described earlier), another ostensibly off-balance-sheet entity.  Osprey was also linked to LJM2.  Like Marlin, and the Raptors, Osprey also issued debt that was supported by Enron stock.  If Enron's stock price fell below certain defined levels (the "stock triggers") Enron was required to contribute more stock to the structure to support the debt.  These "stock triggers" were a CSFB signature.

631.     The CSFB crafted "stock triggers" would play an integral role in Enron's financial statement manipulation, its (actual) increasingly precarious financial position, and ultimately, its downfall.  The "stock triggers" required Enron to inject more shares if the price of Enron stock declined below specified levels.  In addition, there could be a forced liquidation if Enron's credit was downgraded, in which event the SPE's debt would become recourse to Enron.  Were its credit rating to fall, Enron's ability to raise new capital (and continue the Ponzi scheme,

as well as pay lucrative underwriting fees to the banks) would be compromised.  The upshot of these arrangements was a CSFB-designed house of cards, built on a succession of offerings that concealed Enron's mounting off-balance-sheet debt.

632.    The "stock triggers" created a time bomb.  An Enron insider was quoted in the March 2002 Financial Times stating: "There's no question that senior people at CSFB knew what was going on and that it was a house of cards."

> They [the CSFB bankers] said: "If this thing hits $20, you better run for the hills."  There was no question that they knew exactly what lay inside the structures when the triggers went off – everything.  You could almost say they knew more about the company than people in Enron did.

633.    The quote from the Financial Times article is corroborated by internal correspondence from CSFB.  For example, in October 2001, Jonathan Yellen, a banker in CSFB's Energy and Power Investment Banking Group, sent an email to CSFB's primary Enron coverage manager Osmar Abib referring to a "warning" made by Abib two years prior about Enron being a "house of cards."

634.    The only way for CSFB to defuse the time bomb was to continue to offer unduly optimistic analyst reports, continue to underwrite offerings, and continue to conceal from the investors to whom it pitched Enron securities – including Silvercreek – the massive amount of material nonpublic information CSFB possessed concerning Enron's false financial statements and mounting debt.

635.    CSFB bankers knew the nature and extent of Enron's off-balance-sheet exposure as evidenced by incredulous statements they made to Enron employees in response to the employees' public claims that Enron stock was undervalued.  Despite this knowledge, CSFB continued to participate in Enron's schemes and to publicly recommend Enron securities.

194

636.    CSFB bankers, in particular, knew that the decline in Enron's share price was creating an extraordinary risk that the Raptors would be unwound and Enron's debt pledges would come due.  Two CSFB managers expressed their amazement at Enron's continued failure to own up to the dire circumstances the undisclosed triggers presented, asking, "How can you guys keep doing this?"  The CSFB managers specifically noted that Enron was at a "critical point" where further declines in Enron's stock price would cause the Raptors Transaction to be unwound and the massive credit support Enron had been providing to become due.  CSFB bankers knew that Enron had at least eight to twelve billion dollars of off-balance-sheet debt.  The CSFB bankers secretly warned Enron employees that if Enron's stock price reached $20 per share "you guys [Enron] are gonna be fucked." Despite this knowledge, CSFB, as late as August 2001 publicly issued a "Strong Buy" with a price target of $84.

### (D)    Other Transactions

637.    Another SPE, Firefly, also created by CSFB, was used to acquire the Elektro utility in Brazil.  JPMorgan loaned approximately $1.25 billion to Enron for this purchase.  The transaction was structured so that Enron could keep $435 million in debt off its balance sheet.

638.    CSFB provided the pretend "equity" financing for the September 2001 Nikita Transaction described earlier.  As a direct participant, CSFB knew that the transaction was not a true asset sale and was solely a construct to generate revenue and earnings and hide debt.  Again, CSFB acted as the front man in this transaction for Enron.

639.    In the SAILS Transaction (developed by CSFB to hedge its interest in the Enron stock held by LJM1, and to protect the gain it stood to realize - described more fully in Appendix F to the Final Report of the Examiner), CSFB enabled Enron's CFO, Andy Fastow, to receive

195

fees derived from the value of LJM1's Enron stock, in violation of Fastow's representations to the Enron Board in connection with its approval of LJM1, and contrary to the related terms of the Amended Partnership Agreement. This transaction also provided a significant return to CSFB.

### (iii)   Analyst Coverage

640.    Although it was well aware of, had directly participated in and initiated some of Enron's improper transactions and relating accounting practices, CSFB nonetheless published analyst reports and investment research reports that misleadingly touted Enron's financial strength and performance, and recommended that investors purchase Enron securities. CSFB issued favorable reports and recommendations on July 6, 1999; July 13, 1999; September 2, 1999; September 22, 1999; October 12, 1999; November 30, 1999; January 18, 2000; January 21, 2000; February 28, 2000; April 13, 2000; October 18, 2000; February 20, 2001; April 17, 2001; August 14, 2001; August 17, 2001; October 19, 2001; and October 23, 2001.

641.    CSFB knew that Enron's debt level was much higher than reported, that Enron was not generating anywhere near the cash flow from operations that Enron claimed, that Enron was subject to undisclosed stock triggers which could undermine shareholder equity, endanger its investment-grade credit rating and limit its access to capital markets, and that as a consequence, CSFB was reducing its exposure to Enron at the same time it was recommending Enron securities to outside investors like Silvercreek.

642.    An October 2001 research report refers to a "scenario of issuance of $2 billion in new stock" to support its off-balance-sheet debt. This is clearly misleading in light of the fact that CSFB knew that Enron had at least "8-12 billion" in hidden debt, not just the $1.2 billion that was the subject of Enron's "one-time" adjustment.

643.    The Examiner reviewed a significant quantity of documents with respect to analyst coverage of Enron that CSFB made available to its clients, and expressed significant concerns that the analyst at CSFB maintained his "strong buy" recommendation on Enron stock for longer than all but one other Wall Street analyst that covered Enron.  The Examiner's greater concern, however, was the analyst coverage that was not made available to CSFB's clients.

644.    Curt Launer, the CSFB analyst whose research was circulated to CSFB's external clients, including Silvercreek, continued to rate Enron a "strong buy" until November 23, 2001 when Enron's stock price had dropped to $4.71.  CSFB made sure that Enron was aware of Laurner's views in comparison to those of other analysts.  Enron declared bankruptcy just over a week later.

645.    Particularly damning was the way CSFB muzzled one of its debt security analysts, Jill Sakol, who wanted to issue a report downgrading Enron's "attractive" credit rating.  The Examiner found that Ms. Sakol's coverage was not made available to CSFB's external clients while her information regarding a possible downgrade of Enron's rating was made available to CSFB's internal trading desks.

646.    In her sworn statement, analyst Sakol noted that by the fall of 2001 she believed that Enron's debt should be downgraded.  She further reported that she was, in the words of the Examiner:

> Discouraged from publishing her candid assessment of Enron even though she contemporaneously communicated this assessment to CSFB bond traders in London and New York, at least one of whom thereafter used that information successfully to divest CSFB of its holdings of the Marlin share trust notes.

647.    CSFB had a complete disregard for the concept of "Chinese walls" and the need for equity analysts to be independent of other business units within the firm.  The Examiner

197

found evidence that shows that Sakol's research was being edited by CSFB's investment bankers in an effort to put a more positive spin on transactions CSFB's investment banking department was working on.  In an October 2001 e-mail from Michael Davis, CSFB, to Jill Sakol, he noted, "added two paragraphs … that may help accounts in both US and Europe get more comfortable with the share trust deals."

648.    Sakol also testified that although she had a negative view of Enron debt, she was concerned about expressing her views publicly to investors because she was concerned about how others at CSFB may react given the importance of Enron as a client to CSFB.  Specifically, she testified that William Battey, Head of CSFB's analyst department, as summarized by the Examiner:

> Called her to his office where he quizzed her about Enron, praised her for getting timely information to CSFB's bond traders, and reminded her of the importance of the Enron relationship to CSFB.

649.    During her August 2005 deposition, Sakol described a culture at CSFB where analysts were discouraged from issuing analyst reports critical of important clients of CSFB. She explained that it was a political issue, "Because I knew that Enron was a very large client of the firm" there "would be sensitivities to putting out something that was critical of the company."  Sakol was frustrated but concluded that her report was not published because "investment banking could be upset because they were concerned that Enron would be upset."

650.    A memo prepared by Abib, Managing Director, CSFB, for Tony James, CSFB's co-head of investment banking, makes it clear that CSFB was attempting to leverage a "Strong Buy" rating on Enron stock, all the while seeking ways to reduce its exposure to Enron credit.  In advance of a meeting that James was scheduled to have with Fastow, Abib noted that CSFB's

equity analyst has maintained a "Strong Buy" on Enron stock. In the same memo, Abib details that "CSFB currently has net credit exposure of $625 million to Enron and CSFB's internal credit team has determined that this net exposure position needs to be reduced to $500 million by the end of October."

651. Later in an e-mail from Abib to Greg Whalley, Enron, Abib touts CSFB's equity analyst as a way CSFB "can be of value to Enron … [Launer] was the most visible and supportive equity research analyst on Enron."

652. The Examiner discovered a number of different internal documents and e-mails that further supports the allegation that CSFB was aware of significant problems with Enron, choosing to act on the negative information for its internal benefit while at the same time touting Enron securities to outside investors – including Silvercreek. For example, in a February 2002 e-mail from Wade Suki, Associate Analyst, JPMorgan Chase, to Andy DeVries, Equity Research Associate, CSFB, Suki writes:

> I'm sure Curt [Launer's] testimony will NOT include the fact that you guys knew about this crap in august (at the latest) but still didn't write about it or bring it to the attention of investors … shall I forward your emails to the justice department??? The ones warning me to stay away from ENE – these date waaaaaay back … now if you were telling me and everyone on your sales force (as you claim) to stay away, don't you think Congress would like to know about this???

653. With respect to CSFB's analyst coverage of Enron, the Examiner concludes:

> [A] fact-finder could conclude that CSFB sought to support its relationship with Enron and Enron's stock price through the publication of positive equity analyst reports while simultaneously acting internally on more negative analyst reports in making its own investment decisions.

654. In promoting Enron securities to the investing public, CSFB never disclosed its conflicts of interest (*i.e.*, the need to "support" Enron in order to obtain investment banking

199

business from Enron), or that it was involved in numerous transactions with Enron that were being fraudulently reported in Enron's financial statements, or that it was reducing its own exposure to Enron.

655.    CSFB's corrupt research analyst practices were the subject of an SEC enforcement action filed in April 2003.  In its Complaint the SEC alleged, *inter alia*, that CSFB, from at least July 1998 through December 2001 (i) created and fostered an environment replete with conflicts of interest which it imposed on in its research analysts; (ii) used its research analysts to curry favor with (and business from) investment banking clients; and (iii) undermined the independence and objectivity of its research analysts, resulting in the publication of false or misleading research.

656.    To settle the SEC action, CSFB consented to the entry of a final judgment which permanently enjoined CSFB from committing specified securities law violations, and required CSFB to implement a number of structural changes to its operations so as to sever the links between research and investment banking.  In addition CSFB agreed to pay $200,000,000 in disgorgement and penalties.

### (iv)    CSFB's Knowledge of Enron's True Financial Position

657.    CSFB had enjoyed a very long relationship with Enron and had close and direct relationships with Enron executives.  These relationships provided CSFB with an ability to gain considerable intelligence with respect to Enron's true financial position.  Indeed the Examiner concluded that:

> CSFB possessed detailed knowledge of Enron's operations through its many contacts with the company and the due diligence that it completed in connection with its over thirty underwritings of Enron securities.  Through its involvement in Enron's many failed asset sales, CSFB had first-hand knowledge that many of

Enron's assets could not be sold at prices that would avoid requiring Enron to record a loss. Through its investments in LJM1 and LJM2, CSFB was aware of Enron's use of non-economic hedges.…

658.    CSFB was also heavily involved in Enron's off-balance-sheet financings and thus knew that Enron had significant (and hidden) off-balance-sheet obligations. CSFB also understood that Enron's off-balance-sheet structures were complex and could not be deciphered by looking at Enron's financial statements and related note disclosures. In fact, in July 1999, Carmen Marino, Managing Director at CSFB, sent out an e-mail to another Managing Director at CSFB noting that "running a pipeline business can't take much time – Enron seems to spend all its available man hours on various, convoluted financing schemes."

659.    In September 1999, Wesley Jones, VP, CSFB Global Energy and Project Finance, sent an e-mail to Jonathan Yellen, VP, CSFB Investment Banking, describing Osprey as "a vehicle enabling Enron to raise disguised debt which appears as equity on Enron's balance sheet…Osprey serves the added purpose for Enron of being an off-balance-sheet parking lot for certain assets."

660.    More evidence that CSFB knew Enron's true financial condition and knew that Enron's accounting and financial statement representations were fraudulent was the dramatic reduction in CSFB's exposure to Enron credit that occurred during the year immediately preceding Enron's bankruptcy filing.

661.    A June 2001, internal CSFB memorandum summarized CSFB's exposure to Enron. It listed total net exposure of about $800.5 million. By the time Enron filed for bankruptcy protection less than six months later, CSFB had been able to dramatically reduce its Enron exposure by "monetizing" certain assets (*i.e.*, transferring the risk of an Enron default to

the investing public), by purchasing default protection, and by allowing certain transactions to

unwind instead of renewing the obligations.

662.     Summarizing a call that CSFB executives had with Fastow and Glisan in August

2001, Robert Jeffe, Managing Director, CSFB, noted in his report that Fastow disclosed to the

group that Enron's total on and off-balance-sheet debt was $36 billion.  Thereafter, as the

Examiner observed:

> CSFB accelerated the process of reducing its exposure to Enron.  For example,
> CSFB: (i) decided to reduce its "Enron exposure" to $500 million and then to
> $300 million (and in fact reduced it to $167 million), in October and November;
> (ii) completed the Nile Transaction and renewed the CSFB Prepay without
> incurring additional credit exposure to Enron; and (iii) reduced its holdings of
> Enron debt.

663.     Thus during a short period prior to Enron's bankruptcy, CSFB was able to reduce

its exposure to the risk of an Enron default from about $800 million to between $100-200

million.

664.     As information about Enron's actual financial condition (that CSFB had helped

Enron to conceal) was finally disseminated to the general public, the value of Enron securities

dropped almost to zero.  Silvercreek lost substantially its entire investment in a matter of weeks.

CSFB played a significant role in and is directly responsible for Silvercreek's losses, both as an

aider and abettor of Enron's fraud, and by reason of its fraudulent inducement of Silvercreek's

purchases of Enron securities.

665.     CSFB was an underwriter on the Zero Notes.  CSFB knew that the registration

statement and prospectus for which it was responsible as an underwriter were materially

inaccurate and misleading.  CSFB also published research reports which were grossly inaccurate

and misleading, and knowingly assisted Enron in its illicit scheme to hide the true level of Enron's debt and artificially inflate its earnings.

666.    CSFB acquired the Zero Notes in the stage one private placement for the purpose of reselling them to the public in stage two.  The registration statement for the Zero Notes provided, inter alia, that resellers such as CSFB would be required to be named as a selling securityholder in the related prospectus and "may be deemed to be underwriters within the meaning of the Securities Act."

667.    CSFB also had the right to participate in the preparation of the registration statement and prospectus, to review Enron's books and records, and to make inquiries of Enron representatives, all to conduct the reasonable investigation required by Section 11 of the Securities Act.

668.    The registration statement for the Zero Notes further stated:

We incorporate by reference in this Prospectus the following documents filed by us with the SEC:

-       Our Annual Report on Form 10-K for the year ended December 31, 2000;

-       Our Quarterly Report on Form 10-Q of the quarter ended March 31, 2001;

-       Our Current Reports on Form 8-K filed with the SEC on January 31, 2001 and February 28, 2001; and

-       The description of our capital stock set forth in our Registration Statement on Form 8-B filed on July 2, 1997."

669.    Annex A of the January 31, 2001 Offering Memorandum for the stage one private placement, "Form of Selling Securityholder Notice and Questionnaire" (the "Questionnaire") provided that each

[B]eneficial owner of Registrable Securities generally will be required to be

203

named as a selling securityholder in the related Prospectus, deliver a Prospectus to purchasers of Registrable Securities and be bound by those provisions of the Registration Rights Agreement applicable to such beneficial owner (including certain indemnification provisions.…)

670.    Question 5 of the Questionnaire relates to "Relationship with the Company" and asks Selling Securityholders to detail their relationship with the Company.  In particular:

Except as set forth below, neither the undersigned nor any of its affiliates, directors or principal equity holders (5% or more) has held any position or office or has had any other material relationship with the Company (or its predecessor or affiliates) during the past three years.

671.    The Zero Notes prospectus that was filed with the SEC as part of the registration statement (Registration No. 333-62168) dated July 18, 2001 lists Credit Suisse First Boston as a Selling Securityholder, indicating that CSFB completed and signed the Questionnaire.  **Under the column titled "Material Relationship," the prospectus indicates "None" for CSFB.  This statement was materially false and misleading.**  It omitted to disclose the extensive relationship between CSFB and Enron, including but not limited to CSFB's investment in LJM2, CSFB's role in the establishment and funding of LJM1, and CSFB's involvement in various SPE structures, and CSFB's involvement in the prepay transactions.

672.    The Zero Notes prospectus failed to disclose the massive credit support Enron received from its sham hedging transactions with the CSFB-designed SPEs, as well as the ticking time bomb presented by the stock triggers.  CSFB executives also knew, but in underwriting and selling the Zero Notes failed to disclose, the massive amount of Enron's off-balance-sheet debt – hidden debt that CSFB estimated to be between $8 and $12 billion.

673.    Through its involvement in securities underwritings, asset sales, SPE structuring, and prepay transactions, and its investment in the illicit LJM partnerships, CSFB was fully aware

that Enron's financial reporting was fraudulent and misleading.  CSFB actively participated in

perpetuating the fraud by directly assisting Enron in creating a false appearance of revenues and

earnings, overstating cash flow from operations and understating massive amounts of debt.

Despite its knowledge of the considerable misstatements in Enron's financial statements, it

continued to act as an underwriter for Enron securities and continued to incorporate financial

statements and SEC filings that it knew were materially false and misleading, in the offering

documents of such securities – including the Zero Notes that Silvercreek purchased.  Finally,

when the demise of the Enron Ponzi scheme was near and the declaration of bankruptcy

inevitable – CSFB continued to promote Enron securities to investors like Silvercreek all the

while using its detailed knowledge of Enron's finances to substantially reduce its own exposure

to Enron.

674.    CSFB is, therefore, liable for its participation in the stage two public sale of Zero

Notes on and after July 18, 2001, including but not limited to the sales of Zero Notes it made to

Silvercreek, and is also liable for the sales of 7% Notes it made to Silvercreek.

### (v)    CSFB's Direct Dealings with Plaintiffs

675.    Silvercreek had a close and long-standing relationship with CSFB.  It

communicated daily with CSFB's convertible bond desk, which includes sales, research and

trading.  Silvercreek relied on CSFB's research and its professional competence as an

underwriter of securities, including Enron securities.  In 2001, the year of Enron's collapse,

Silvercreek paid CSFB over US$1 million in brokerage revenue.

676.    In August 2001, with the resignation of Jeff Skilling, Silvercreek spent a lot of

time discussing Enron with brokers, including, in particular, CSFB, and reviewing the analyst

research and public information.  The resignation of Mr. Skilling was attributed to a personal issue, specifically, the death or illness of a friend which ostensibly served as a "life wake-up call."  Research analysts, including those at CSFB, as well as Enron executives assured the investing public, including Silvercreek, that the resignation was unrelated to Enron's business or financial condition.

677.    CSFB brought the "opportunity" to invest in Zero Notes to Silvercreek's attention, touted the investment, and actually sold Zero Notes to Silvercreek as principal (not as broker), thereby reducing its own exposure, all without disclosing CSFB's knowledge of the fraud and the precarious condition of Enron and its finances, much less that CSFB as an institution had decided, based on information available only to it, to divest itself of credit exposure to Enron because of concerns about Enron's substantial off-balance-sheet transactions.

678.    In particular, in October 2001, Sara Randall of CSFB contacted Louise Morwick, President of Plaintiff SMI, with the specific "opportunity" for Plaintiffs to purchase the Zero Notes.  During that call, Ms. Randall represented to Ms. Morwick that CSFB viewed the Zero Notes as a good investment opportunity for Silvercreek based on the attractive yield, and the fact that the issuing company (Enron) had good credit.  Prior to Ms. Randall's contact, Plaintiffs were not actively considering purchase of the Zero Notes.

679.    Silvercreek had numerous conversations with CSFB's convertible sales desk, its coverage person, Sara Randall, and the CSFB research analysts about Enron, and were told nothing but positive information.  Silvercreek reviewed detailed forecasts and business valuations in several conversations with the analysts from CSFB.  Silvercreek also had discussions about Enron with other CSFB analysts, Rick Vossler and Charles Gugenheim.

680.     After selling its Zero Notes to Silvercreek, CSFB, through Sara Randall, again approached Silvercreek, this time touting the 7% Notes.  After further dialogue with CSFB, Silvercreek purchased 7% Notes through CSFB.  On information and belief, CSFB sold the 7% Notes to Silvercreek as principal, thereby further reducing CSFB's own credit exposure to Enron.

681.     CSFB intentionally concealed from Silvercreek CSFB's knowledge that Enron's financial reporting was fraudulent and misleading, and that CSFB had assisted Enron in (i) creating a false appearance of revenues and earnings, and (ii) overstating cash flow from operations and understating massive amounts of debt.  CSFB also failed to disclose that it was then accelerating the process of reducing its exposure to Enron.  As a result, CSFB's statements to Plaintiffs that the Zero Notes and the 7% Notes were a good investment opportunity were false, misleading and failed to disclose material facts in CSFB's possession.

682.     In making their decision to purchase the Zero Notes, Silvercreek relied, in significant part, on (a) conversations and communications with CSFB, including Ms. Randall; (b) CSFB's standing as an underwriter; and (c) CSFB analyst research reports and recommendations (from among others Jill Sokol, Curt Lautner, Phillip Salles, Andy DeVries, Charles Guggenheim and Rich Vosslov), which CSFB published and disseminated to Silvercreek, including reports and recommendations dated 10/16/2001, 10/19/2001, 10/22/2001, 10/23/2001, 10/24/2001, and 10/26/2001, which represented to Silvercreek, *inter alia*, that (i) Enron securities were a "strong buy"; (ii) Enron's accounting treatment was appropriate; (iii) Enron's investment grade credit rating was unlikely to worsen; and (iv) there was no apparent risk of accounting restatements.  Silvercreek likewise relied, in significant part, on CSFB's

material misrepresentations and omissions in making their investment decisions regarding the

7% Notes, and in purchasing 7% Notes through CSFB's brokerage services.

### (vi)   Summary – Fastow Declaration

683.    Enron's former Chief Financial Officer, Andrew Fastow, confirmed, under oath,

the following facts:

> CSFB was a Tier-1 Bank for Enron, as was DLJ before their merger, because of
> its deal structuring, as well as other capabilities. I primarily dealt with CSFB
> executives, including Robert Furst, the primary banking relationship manager for
> CSFB before Osmar Abib took over; Bayo Ogunlesi; and Bob Jeffe.  These CSFB
> executives aggressively solicited Enron's business when I was CFO.  CSFB often
> advised Enron on purchases and sales of assets, as well as on structuring
> transactions, sometimes using these assets. Because the amount and type of
> business CSFB did for Enron, and based upon my conversations with Mr. Jeffe, it
> was my impression that CSFB was one of the banks most familiar with Enron's
> assets. I had conversations with senior CSFB executives regarding my belief that
> the market value of certain Enron assets was less than the book value of those
> assets.

> **Share Trusts**

> Mr. Nath was the co-head of CSFB's Structured Products Group. I attended
> several meetings in which Mr. Nath presented transaction structures to Enron.  In
> my opinion, Mr. Nath's presentations were exemplary because they contained
> four elements: ( 1) an articulation of how the transaction would contribute to
> Enron meeting its financial reporting objectives; (2) an explanation that Mr. Nath
> had shown his structure to outside counsel and that the counsel had indicated the
> type of opinion it would render ("would," "could," "should"); (3) a description of
> the accounting for the transaction, based upon his discussions with his
> accountants; and (4) a description of how much "credit" that the rating agencies
> would give to the effect of the transaction when they evaluated Enron's financial
> statements.  I viewed Larry Nath as the person most responsible for developing
> and executing the following transaction structures: Marlin, Whitewing, Osprey,
> and Firefly.

> The primary purpose that Enron entered into the share-trust structures was to
> lower its reported debt and, in some cases to increase reported funds flow from
> operations.  In the aggregate, these transactions lowered Enron's reported debt by
> billions of dollars and increased reported funds flow from operations by billions
> of dollars.

Enron paid significant fees to CSFB related to these transactions.  Based on my conversations with CSFB executives, both Enron and CSFB understood that: (a) these vehicles were a way to finance assets and were not true operating companies; (b) Enron effectively controlled the vehicles; and (c) the book value of the assets in the vehicle was, in some instances, in excess of the market value of the assets.

## LJM1

CSFB and RBS were Limited Partners in LJM1.  I explained to CSFB and RBS bankers that their investment, in my opinion, did not have equity risk.  Rather, we discussed that it had credit risk analogous to that of a Reg-U loan.

Mr. Ivers, a CSFB banker, helped structure the transaction so that it would be over-collateralized; this helped to reduce the equity risk for the Limited Partners.

I discussed with CSFB and RBS bankers that SwapSub, a subsidiary of LJM1, would likely have a material impact upon Enron's reported earnings.  Based on my interactions with their bankers, I believe that CSFB and RBS understood that I was running LJM Cayman and that its primary purpose was to create the SwapSub subsidiary in order to hedge the Rhythms stock held by Enron.

### e.    **Merrill Lynch**

684.    Merrill Lynch is a large financial services firm that had an extensive and close relationship with Enron.  It provided investment banking services to Enron, helped structure and finance one or more of Enron's SPEs, and after mid-1998 (when Merrill Lynch, at Enron's behest, fired the analyst who had been covering Enron and giving the company a negative rating),  issued a steady stream of positive research reports on the business and financial strength of Enron.  For these services Merrill Lynch earned enormous fees.  Furthermore, Elizabeth Tilney, the wife of Schuyler Tilney (head of Merrill Lynch's Energy Investment banking operations) was a Senior Vice President involved in Enron's EES operations.  The Tilneys and Enron's CFO, Defendant Fastow, and his wife were friends and socialized together.

209

685.     This relationship provided Tilney with access to information hidden from the investing public about the serious problems affecting the EES operations, discussed below. Merrill Lynch participated in Enron's conduct and business by helping to raise billions of dollars from investors through the sale of new securities based on misleading financial information, as well as aiding in structuring and financing some of Enron's SPEs and partnerships.

686.     Enron and its banks – including Merrill Lynch – told investors that an area of tremendous growth for Enron was its retail energy services business ("EES") – whereby Enron purportedly undertook to manage the energy needs of corporate consumers for multi-year periods in return for fees to be paid over a number of years.  Enron and its banks presented this business as achieving tremendous success by constantly signing new multi-million or even billion dollar contracts which allowed EES to exceed internal forecasts.  This division purportedly turned profitable at the end of 1999 and achieved substantial gains in its profitability thereafter.

687.     However, EES was actually losing hundreds of millions of dollars.  In order to induce large enterprises to sign long-term energy management contracts and "jumpstart" this business so it could appear to be obtaining huge contract volumes, Enron was entering into EES contracts which it knew would likely result in losses.  However, by utilizing mark-to-market accounting, Enron grossly overstated the ultimate value of these contracts and created greatly inflated current period revenues and profits from transactions which generated little, if any, current period cash, and which would likely result in long-term losses.  As contained in an August 2001 letter written to Enron's Board by an EES manager just after Skilling "resigned":

> One can only surmise that the removal of Jeff Skilling was an action taken by the board to correct the wrongdoings of the various management teams at Enron …
> (*i.e.*, EES's management's … hiding losses/SEC violations)

\*   \*   \*

[I]t became obvious that EES had been doing deals for 2 years and was losing money on almost all the deals they had booked.

\*   \*   \*

It will add up to over $500 mm that EES is losing and trying to hide in Wholesale. Rumor on the 7th floor is that it is closer to $1 billion … [t]hey decided … to hide the $500 MM in losses that EES was experiencing … EES has knowingly misrepresented EES['s] earnings.  This is common knowledge among all the EES employees, and is actually joked about.  But it should be taken seriously."

688.    As one of Enron's leading investment banks, and based on the close relationship between top executives at Merrill Lynch and Enron's senior officers, Merrill Lynch knew that Enron was providing false financial information in its public reports and disclosures, and that its true financial condition was far different from what it was reporting to the public.  Merrill Lynch assisted Enron in this deception.

689.    Merrill Lynch also gained intimate knowledge of Enron's finances as a result of due diligence investigations in connection with Merrill Lynch's underwriting of many Enron equity and debt offerings and Merrill Lynch's involvement in various other Enron-related transactions.

690.    Merrill Lynch was willing to engage and participate in the Enron Ponzi scheme because such participation created enormous profits for its executives and for the company as a whole.  Among other things, 97 senior Merrill Lynch executives committed to invest $16.6 million in ML/LJM2 Co-Investment LLP, an LJM2 investor, hoping to benefit from the conflicts of interest presented by Mr. Fastow's dual roles at Enron and LJM2.  Through its affiliate's investment in LJM2, Merrill Lynch knew or was willfully closing its eyes to the following fraudulent Enron transactions: Raptor, Condor/Whitewing, Chewco, Cuiaba, EES, ETOL II,

ETOL II, JEDI, JEDI II, Osprey Trusts, ENA Collateralized Loan Obligation Trust, MEGS, Backbone, Bob West Treasure, New Power IPO, New Power, Yosemite Crude Oil Swap ("Nixon"), Yosemite I, Yosemite II, Yosemite III, Yosemite IV, Rawhide Minority Interest financing, Rawhide, Rhythms, Sarlux Power Project, Cortez Energy, Margaux, LAB Trust, Avici, Talon, Bobcat, Porcupine, Timberwolf, Project Backbone, Project Condor, and the Fishtail Transaction. As reflected in Merrill Lynch's LJM2 Private Placement Memorandum, Merrill Lynch officers received material nonpublic information about Enron by reason of their involvement in LJM2, including but not limited to the fact that although Enron listed $34 billion in assets on its balance sheet, it actually owned or managed over $51 billion in assets through hidden control of unconsolidated affiliates – the private placement memo noted that the $17 billion difference represented off-balance-sheet transactions.

691. The fraudulent character of the LJM2 enterprise was confirmed at an October 2000 partnership meeting, during which the investors were shown a chart depicting a stark contrast between Enron's assets as represented to the public and Enron's assets when its unconsolidated affiliates were included (as they should have been), as well as a summary of several LJM2 Transactions. Promising a 69% rate of return, the presentation showed Enron to be the counterparty to almost all of LJM2's transactions. Among the Merrill Lynch officers who invested in LJM2 were Jim Brown (head of Merrill Lynch's Strategic Asset and Lease Group), Daniel Bayly (head of Merrill Lynch's Global Investment Banking division) and Robert Furst (a Daniel Bayly subordinate), all of whom were directly involved in the Nigerian barges asset parking scheme alleged more fully below.

212

692.    Merrill Lynch also managed sales of Enron bonds.  Enron promised to give bond underwriting business to Merrill Lynch in return for Merrill Lynch investments in some of the off-balance-sheet partnerships set up by Fastow.

693.    Merrill Lynch was aware of and directly involved in Enron transactions designed to mislead the public about Enron's financial state.  In late 1999, as it was helping to falsify Enron's results via the LJM2 contrivance, Merrill Lynch also assisted Enron in cooking its books by pretending to purchase Enron assets when it was really engaged in loans and wash trades.

694.    Although it was well aware of, participated in, and substantially assisted Enron's wrongful practices, Merrill Lynch nonetheless published analyst reports and investment research reports that, far from disclosing Enron's phony accounting, touted Enron's supposed financial strength and performance, and recommended that investors purchase Enron securities.

695.    Worse, Merrill Lynch utilized misleading positive research on Enron to win lucrative investment banking business from Enron.  Investors relied on these misleading research reports, which nowhere disclosed the quid pro quo with Enron.

696.    Merrill Lynch's knowledge of, and involvement in, Enron's deception was demonstrated in an internal Merrill Lynch document which stated that Enron executives had "informed Merrill Lynch that it is at a distinct disadvantage because of Merrill Lynch's reluctance to use its balance sheet to support Enron's business activities" and that Merrill Lynch had thereafter invested in Enron ventures in order to "improve its relationship" with Enron.

697.    Merrill Lynch attorney Locke R. McMurray testified that Merrill Lynch executive Tilney would put on a lot of pressure to get deals closed – no matter what the legal issues or barriers.

698.    Merrill Lynch functioned as a unified entity without an effective Chinese wall. Information obtained by Merrill Lynch's commercial and investment banking personnel was not quarantined from Merrill Lynch's research analysts.  On the contrary, Merrill Lynch used its research analysts as a marketing arm for its investment banking business.  Accordingly, for purposes of its business activities, knowledge possessed by any one sector of the company should be attributed to Merrill Lynch as a whole.

### (i)      Merrill Lynch's Agreement with the US Department of Justice

699.    The Enron Task Force of the U.S. Department of Justice conducted a criminal investigation into Merrill Lynch's conduct relating to the collapse of Enron.  As a result of its inquiry, the Justice Department determined Merrill Lynch had violated federal criminal law in connection with certain transactions referred to as "Year-End 1999 Transactions," and also known as the Nigerian Barge Transaction and Electricity Trades Transaction.

700.    In accordance with an agreement between Merrill Lynch and the U.S. Department of Justice dated September 17, 2003 ("Merrill DOJ Agreement"):

> Merrill Lynch acknowledges that the Department has developed evidence during its investigation that one or more Merrill Lynch employees may have violated federal criminal law. Merrill Lynch accepts responsibility for the conduct of its employees giving rise to any violation in connection with the Year-End 1999 Transactions. . . .

Merrill DOJ Agreement at 2, ¶2. Additionally, in responding to requests for admission propounded in the *Newby* litigation, Merrill Lynch confirmed that it accepts responsibility for the conduct of its employees in connection with the Year-End 1999 Transactions.

701.    In its agreement with the U.S. Department of Justice:

> Merrill Lynch further agrees that it will not, through its attorneys, board of directors, agents, officers or employees make any public statement, in litigation or

214

> otherwise, contradicting Merrill Lynch's acceptance of responsibility set forth
> above. Any such contradictory statement by Merrill Lynch, its attorneys, board of
> directors, agents, officers or employees shall constitute a breach of this Agreement.

Merrill DOJ Agreement at 3, ¶7.

702.　　Merrill Lynch has admitted and agreed that Merrill Lynch is liable for all its

employees' misconduct concerning the Nigerian Barge Transaction and Electricity Trades

Transaction, and in particular for conspiring with and aiding and abetting Enron in committing

accounting fraud.

### (ii)　　Merrill Lynch's Consent Decree with the SEC

703.　　In March 2003, the Securities and Exchange Commission filed a complaint

against Merrill Lynch and certain of its employees arising from the Nigerian Barge Transaction

and the Electricity Trades Transaction.  The SEC alleged that Merrill Lynch and its executives

help Enron to commit securities fraud, and entered into these two sham transactions knowing

that they were designed to fraudulently overstate Enron's income and understate its debt.  Merrill

Lynch settled with the SEC by agreeing to entry of a permanent anti-fraud injunction against the

firm and the payment of $80 million in disgorgement and penalties.

### (iii)　　Criminal Case against Merrill Lynch's Employees

704.　　Several Merrill Lynch employees were tried and convicted of conspiring with and

aiding Enron to knowingly commit fraud on the investing public in connection with the Nigerian

Barge Transaction.

705.　　In August 2006, the Fifth Circuit Court of Appeals reversed the trial court's

judgment.  *United States v. Brown*, 459 F.3d 509 (5th Cir. 2006).  This reversal, however, does

not in any way impact Plaintiffs' claims against Merrill Lynch.  On the contrary, the reversal

215

concerned one theory pursued by the prosecutors – the "honest services" theory – that is unrelated to Plaintiffs' causes of action against Merrill Lynch.  Reversal was required only because it was a general verdict, and the Court could not determine if the defective "honest services" theory had played a role in the jury's decision.  As the Fifth Circuit emphasized, "This opinion should not be read to suggest that no dishonest, fraudulent, wrongful, or criminal act has occurred.  We only hold that the alleged conduct is not a federal crime under the honest-services theory of fraud specifically." 459 F.3d at 523 (emphasis in the original).  Moreover, the Fifth Circuit affirmed the perjury and obstruction charges against Merrill Lynch employee Brown.

706.    Thereafter Merrill Lynch employees Brown, Furst and Bayly were re-indicted, and the Fifth Circuit, in an interlocutory appeal, sustained the right of the government to proceed to a retrial of the criminal charges.  *United States v. Brown*, 571 F.3d 492 (5th Cir. 2009).  Mr. Bayly has since settled the SEC's complaint against him by agreeing to an injunction that (i) permanently enjoins him from violating federal anti-fraud provisions and from aiding and abetting accounting fraud; and (ii) also enjoins him for five years from serving as an officer or director of any public company.  In addition, he is required to pay $300,000 (consisting of disgorgement and penalties); at the same time, the criminal charges against him were dropped.  Messrs. Brown and Furst are awaiting retrial.

### (iv)    Merrill Lynch's Settlement with the NY Attorney General

707.    In 2002, New York Attorney General Eliot Spitzer launched an investigation to determine if Merrill Lynch's investment advice was tainted by conflicts of interest.

708.    The Chief of New York's Investment Protection Bureau, Eric R. Dinallo, stated in his affidavit in support of Spitzer's action,

216

> Merrill Lynch failed to disclose to the public that Merrill Lynch's ratings were
> tarnished by an undisclosed conflict of interest: the research analysts were acting
> as quasi-investment bankers for the companies at issue, often initiating,
> continuing, and/or manipulating research coverage for the purpose of attracting
> and keeping investment banking clients, thereby producing misleading ratings that
> were neither objective nor independent, as they purported to be.

The core issue of the New York Attorney General's investigation was whether analysts were

being truthful and candid in their public pronouncements on stocks of companies with whom

Merrill Lynch did investment banking business.

709. Spitzer's investigation focused on the Internet group at Merrill Lynch and detailed

how their compensation was impacted based on banking business generated by their reporting.

Olson, a former Merrill Lynch analyst, revealed to the Examiner that the practice was not limited

to the Internet group at Merrill Lynch:

> The general understanding was that investment banking was paying up to 50
> percent on the research budget, and I think that the climate of opinion was such that
> it was good to be accommodating to investment banking.

710. Internal communications at Merrill Lynch following Olson's termination confirm

that analyst research reports became a tool for the investment bankers to use as a selling point for

investment banking clients. Dinallo's affidavit, provided during the Spitzer investigation, points

to a Fall 2000 request from Merrill Lynch's then- co-head of global equity research, Deepak Raj,

to all equity analysts. Raj stated:

> We are once again surveying your contributions to investment banking during the
> year .... Please provide complete details on your involvement in the transaction,
> paying particular attention to the degree that your research coverage played a role
> in origination, execution and follow-up. Please note, as well, your involvement in
> advisory work on mergers or acquisitions, especially where your coverage played a
> role in securing the assignment and your follow-up marketing to clients. Please
> indicate where your research coverage was pivotal in securing participation in high
> yield offering [sic].

The result of Merrill Lynch's having fostered a conflict-rich environment for its equity analysts is clearly stated in Dinallo's affidavit: "Misleading information was widely disseminated."

711.    As a result of Spitzer's investigation, Merrill Lynch agreed to undertake a number of major reforms, including (a) severing links between compensation for analysts and investment bankers; (b) prohibiting investment banking input into analysts' compensation; (c) creation of a new investment review committee responsible for approving research recommendations with strict standards and independence from investment banking; (d) disclosure in Merrill Lynch's research reports whether it has received or is entitled to receive any compensation from a covered company; and (e) establishing a monitor, approved by the New York Attorney General, to monitor compliance with the agreement. Merrill Lynch also agreed to pay a $100 million penalty.

### (v)    Merrill Lynch's Underwriting Activities

712.    Aside from aiding and abetting Enron's fraudulent accounting of Merrill Lynch loans and wash trades as asset "sales" (and keeping silent about them), Merrill Lynch also fraudulently underwrote a series of offerings to ensure that Enron would continue to have a stream of cash to repay those debts and maintain the Ponzi scheme.  Merrill Lynch received hefty fees from underwriting the following Enron offerings:

218

| Date | Security |
|------|----------|
| 11/96 | 8 million shares 8.3% Enron Capital Trust I preferred securities at $25 per share |
| 1/97 | 6 million shares 8-1/8% Enron Capital Trust II preferred securities at $25 per share |
| 11/97 | $200 million Enron reset notes |
| 9/98 | $250 million Enron floating rate notes |
| 2/99 | 27.6 shares of Enron common stock at $31.34 per share |
| 6/99 | 36.6 million shares Azurix stock at $19 per share |
| 10/99 | $100 million Enron "weather" bonds |
| 2/00 | $440 million and £100 million Azurix 10.375% and 10.75% Senior Notes |

All told, Merrill Lynch worked on approximately 23 Enron debt and equity offerings between 1997 and 2001, serving as co-manager for two.

713.    Among these offerings, Merrill Lynch helped Enron structure Azurix, Enron's purported worldwide water company. Merrill Lynch knew that Enron had grossly overpaid for Azurix, that Azurix had been undertaken without a proper and detailed feasibility study, and without a thorough and well-thought-out business plan. Merrill Lynch acted as lead underwriter for the Azurix IPO, which raised $370 million in badly needed capital for Enron and later as lead underwriter of over $650 million in Azurix senior notes reaping millions of dollars for Azurix.

### (vi)    Merrill Lynch's Active Role in the Enron Fraud

714.    In an appendix to the Examiner's Third Interim Report ("Role of Merrill Lynch and its Affiliates," attached hereto as Exhibit I), a substantial volume of evidence with respect to

219

Merrill Lynch's role in the Enron fraud was reviewed.  The Examiner concluded that the evidence would permit a fact-finder to conclude that:

> Merrill Lynch's conduct and participation in the Nigerian Barge and the 1999 electricity trade transactions allowed Enron to book improper gains of approximately $60 million for the fourth quarter of 1999.  These gains increased Enron's earnings per share for 1999 from $1.09 to $1.17, and allowed Enron to meet its earning targets for the year.  These transactions thus had a material impact on Enron's reported financial performance for 1999.

> The evidence would allow a fact-finder to conclude that Merrill Lynch:

> - entered into an oral agreement with Enron whereby Enron promised to take Merrill Lynch out of the Nigerian Barge transaction within six months at a specified rate of return, knowing that if such an agreement were disclosed to Enron's auditors, Enron could not have accounted for the transaction as a sale; and

> - entered into two virtually offsetting electricity derivative transactions with Enron that Merrill Lynch knew Enron was using to achieve earnings targets at year-end 1999 and with respect to which Merrill Lynch believed Enron's accounting to be improper.

715.    The fraudulent 1999 year-end transactions materially and substantially affected Enron's fourth-quarter and annual financials. These transactions resulted in Enron's recognition of approximately $60 million in income for the fourth quarter of 1999, improving net income from $199 million to $259 million—a 30% increase.

716.    Merrill Lynch knowingly issued false and misleading statements in the registration statements and prospectuses for the offerings it underwrote and in its research reports.  It knowingly participated with Enron in the manipulative devices Enron employed to artificially inflate its revenues and earnings and keep billions of dollars of debt hidden.  Merrill Lynch had access to Enron's internal business and financial information as one of Enron's main underwriters and financial advisors, and from its frequent interactions with Enron executives.

220

717.    Merrill Lynch's active participation in the Enron fraud may be summarized under four main categories:

a.      LJM2;

b.      Nigerian Barge Transaction;

c.      1999 Electricity Trades Transaction; and

d.      Analyst coverage.

**(A)    LJM2**

718.    Merrill Lynch was engaged to serve as the private placement agent for LJM2. Part of Merrill Lynch's role was to raise capital for LJM2 so it could participate in the illicit transactions that Defendant Fastow, Enron CFO, and Merrill Lynch would orchestrate.  Of the approximately $390 million in commitments for the LJM2 partnership, a significant amount was provided by Merrill Lynch and its executives (upwards of $20 million).

719.    With respect to Merrill Lynch's participation in LJM2 the Examiner notes that:

> In the private placement memorandum for LJM2, Merrill Lynch described how Enron had $34 billion in assets, but had $51 billion in assets under management, noting that the $17 billion difference was created by assets that Enron had financed off-balance-sheet.  Thus, Merrill Lynch appears to have had knowledge regarding Enron's substantial use of off-balance-sheet vehicles during this period.

720.    Merrill Lynch was a principal architect in the structure and financing of LJM2. Hired to act as private placement agent in September 1999, Merrill Lynch helped market LJM2 to a select group of favored executives and banks who were provided an opportunity to invest in LJM2 in order to reap the huge rewards which would flow from the fact that Enron, through Fastow, was effectively controlling LJM2.  An excerpt from the type of marketing material used to promote LJM2 is attached hereto as Exhibit D.

721.    Merrill Lynch knew that LJM2 was not independent of Enron and that the partnership would be used for non-arm's length transactions to boost Enron's reported profits while improperly keeping vast amounts of debt off its balance sheet.  Merrill Lynch also provided more than $120 million in credit to LJM2 so that it could engage in transactions with bogus SPEs, permitting Enron to engage in even more financial fraud.

722.    The LJM2 marketing document was not made public.  This document stated that LJM2 would benefit from investment opportunities that "would not be available otherwise to outside investors" and thus was an "unusually attractive investment opportunity" because Fastow's "access to Enron's information pertaining to potential investments will continue to contribute to superior returns."  Merrill Lynch told potential investors in LJM2 of the enormous returns previously generated by similar entities run by Fastow.  In fact, some "investments" generated returns as high as 2500%.

723.    Almost 100 Merrill Lynch executives invested upwards of $16 million in LJM2, including Vice Chairman Thomas Davis, Bayly, and Tilney – who, along with Davis, later refused on Fifth Amendment grounds to testify before the United States Congress.  Merrill Lynch also sold $349 million worth of shares in LJM2 in a private offering.  Merrill Lynch knew that LJM2 would be engaged in self-dealing transactions with Enron that would enable Enron to inflate its revenue and earnings and hide its debts while earning extraordinarily high, virtually guaranteed returns for investors.

724.    As described earlier, Merrill Lynch was one of the banks that pre-funded LJM2 in December 1999 to enable it to complete several 11th hour transactions to generate millions in illusory revenue and profits for Enron and to conceal debt.  Merrill Lynch put up the money to

pre-fund LJM2 in December 1999 because it knew that these transactions were required to generate sufficient fabricated revenue and profits for Enron to meet its earnings targets (and avoid a decline in its stock price). These vital year end deals included the sale of (i) collateralized loan obligations (CLOs); (ii) an interest in the Nowa Sarzyna power plant; (iii) an interest in MEGS LLC; and (iv) Yosemite certificates. Merrill Lynch's participation in creating LJM2 was an essential component of these off-the-books schemes. Merrill Lynch was aware that Enron officials would be operating on both sides of the transactions, virtually ensuring enormous profits for the investing partners.

725.    Enron also asked Merrill Lynch to extend a line of credit to LJM2. An internal Merrill Lynch document advocating the credit request states, "committing to this LJM2 facility will build ML's relationship with Andy Fastow, and assist ML in securing future investment banking opportunities with Enron." Other Merrill Lynch e-mails warned against it, citing the lack of a rating and the nature of the credit risk. Nevertheless, two Merrill Lynch executives requested an exception to bank policy for the loan for the following reasons: "Enron is an excellent client. $40MM in revenue in 1999[;] $20MM in revenue for 2000 year to date[;] Andy Fastow is in an influential position to direct business to Merrill Lynch." In the end, the prospect of more lucrative business from Enron trumped those at Merrill Lynch who urged caution.

### (B)    Nigerian Barge Transaction

726.    The Nigerian Barge Transaction was an accounting sham involving the sale of an interest in three Nigerian barges with floating power generating plants. Enron wanted to sell these barges before the end of calendar year 1999, so it could report the sales income as earnings

and cash flow in its 1999 financial statements.  However, Enron was unable to find a legitimate, arms-length buyer willing to complete the sale before the end of the year.

727.    In December 1999, Enron asked Merrill Lynch, as a favor, to set up its own special purpose vehicle (Ebarge) to temporarily assume an ownership interest in the three power-generating barges then held by Enron's Asia/Pacific/Africa/China ("APACHI") energy division. The ostensible purchase price was to be $28 million, including a $7 million cash payment from Merrill Lynch and an interest-free loan of $21 million from Enron Nigeria Power Holding Ltd. (an Enron affiliate) to Ebarge.  In the transaction, the Merrill Lynch SPE would "purchase" stock in an Enron subsidiary.  Ownership of the stock purportedly would entitle Merrill Lynch to receive certain future revenue from sales of electricity to Nigeria under a power-purchase agreement.  A December 1999 Merrill Lynch interoffice memorandum states that Enron viewed the transaction "as a bridge to permanent equity."  The memo also spells out the terms of the deal: Enron would book "$10MM of earnings", Merrill Lynch's "hold will be for less than six months" and the "investment would have a 22.5 % return" for Merrill Lynch.

728.    Merrill Lynch otherwise took no part in the development, operation or maintenance of the barges.  Moreover, Merrill Lynch did absolutely no due diligence prior to executing the transaction and did not negotiate at all with respect to the "price" for the barges. Merrill Lynch closed the transaction with Enron less than two weeks after Enron approached it with the concept even though the barges were not even operational at the time of the closing. This transaction had no other purpose than to allow Enron's APACHI division to book sales income of $12.5 million.

729.    To close the deal, Merrill Lynch's Debt Markets Committee had to approve the transaction.  A December 1999 memorandum was prepared by Furst and sent to Tilney and others at Merrill Lynch seeking quick consideration and approval of the transaction.  The memorandum emphasized that the transaction posed absolutely no risk for Merrill Lynch because of assurances from Enron that Merrill Lynch would be taken out of the deal within six months.  The memorandum also noted that the transaction would permit Enron to record $28 million in cash flow.  Furst strongly recommended that Merrill Lynch take part in the transaction because the transaction was important to Enron and Enron was an important client.

730.    A document entitled "Appropriation Request" was circulated with the Furst memo.  The Appropriation Request explained that Merrill Lynch would be assuming no risk because Enron had "assured us that we will be taken out of our investment within six months" and that Enron would "facilitate" Merrill Lynch's exit from the transaction with third-party investors.  According to the SEC Complaint, "Contemporaneous notes of individuals at Merrill Lynch with knowledge of the transaction referred to it as a $7 million 'handshake' loan to Enron that would be repaid within six months."

731.    Merrill Lynch agreed to participate in this sham sale, but only after receiving Enron's commitment that it would find a buyer for Merrill Lynch's interest in the barges within 6 months or repurchase the barges itself.  Merrill Lynch also received assurances of a 15 percent return on its $7 million "loan" plus an immediate payment of $250,000.  This so-called sale arrangement violated fundamental accounting rules which allow a seller to book sales income only for a transaction that is a true sale.  Enron's guarantee to Merrill Lynch functioned as an ongoing obligation that kept Merrill Lynch from assuming the risks accompanying ownership.

225

In a real sale, the risks and rewards of the asset are completely transferred from the seller.  The entire transaction was nothing more than an asset parking scheme; Merrill Lynch never truly assumed the risk of any investment, nor did it intend to.  It served no economic purpose other than to facilitate Enron's accounting fraud.

732.    Both Enron and Merrill Lynch were aware that the structure of the transaction would be flouting basic accounting rules.  In order to facilitate Enron booking the transaction as a sale, Merrill Lynch had to keep Enron's oral guarantee a secret, omitting it from the documentation and leaving it as an oral understanding.  An internal Merrill Lynch document refers to a "conference call with senior management of Enron confirming this commitment to guaranty the ML takeout within six months."

733.    With respect to the evidence of an oral agreement between Merrill Lynch and Enron, the Examiner concluded, from the Merrill Lynch side:

> There is substantial evidence to support the existence of such an agreement, including:
>
>> •    Appropriation Request regarding the Nigerian Barge Transaction dated Dec. 23, 1999 stating:  "Enron is viewing this as a bridge to permanent equity and they have assured us that we will be taken out of our investment within six months … Dan Bayly will have a conference call with senior management of Enron confirming this commitment to guaranty the ML takeout within six months."  The Appropriation Request also indicated a "[t]akeout by 6/30/00."
>>
>> •    Merrill Lynch Credit Flash Report for week ending December 23, 1999 describing Nigerian Barge Transaction as a "relationship loan" and stating:  "IBK [investment banking] was supportive based on Enron relationship (approx. $40mm in annual revenues) and assurances from Enron management that we will be taken out of our $7mm investment within the next 3-6 months."
>>
>> •    March 2, 2001 email from Brown referencing oral assurances in Nigerian Barge Transaction:  "We had a similar precedent with

226

Enron last year, and we had Fastow get on the phone with Bayly and lawyers and promise to pay us back no matter what.  Deal was approved and all went well."

- June 13, 2000 email from Kira Toone to Alan Hoffman, counsel for Merrill Lynch in the Nigerian Barge Transaction:  "As we approach June 30, 2000 I am getting questions concerning Ebarge, LLC.  It was our understanding that Merrill Lynch IBK Positions would be repaid its equity investment as well as a return on its equity by this date.  Is this on schedule to occur?"

- Joseph Valenti, the controller in charge of the Merrill Lynch entity that funded the $7 million in the Nigerian Barge Transaction, testified that he understood, at the time the transaction was executed, that Merrill Lynch was to receive a return of 15% on its investment."

- January 18, 2002 email in which a Merrill Lynch executive described the Nigerian Barge Transaction as follows:  "The funding was considered by Enron as a bridge to permanent equity and the arrangement called for them to pay interest of 15% per annum on such investment.  The equity bridge was taken out on 6/29/00 for $7.525M ($525K interest @ 15% for six months)."

- Merrill Lynch accountants determined that Merrill Lynch was not required to consolidate Ebarge, the SPE formed by Merrill Lynch and through which it made its $7 million investment in the Nigerian Barge Transaction, under FAS 94 because of the temporary nature of the investment – the "hold" being for less than six months.

734.    Likewise, the Examiner found evidence from Enron's internal documents and e-mails that Enron too recognized the existence of the oral contract to take Merrill Lynch out of the Nigerian Barge Transaction within six months.  In particular, the Examiner noted:

Further, internal communications at Enron from the same period demonstrate Enron's understanding of its agreement to take Merrill Lynch out of the transaction within six months at an agreed rate of return:

- Internal Enron email from Dan Boyle regarding the Nigerian Barge Transaction:  "The deal with ML was to get them a total annualized return of roughly 20%.  ML is expecting to receive a minimum of $7.525 million

when they sell there [sic] equity on June 30, 2000 (15% annualized return on this portion). In addition, we paid ML a $250,000 advisory fee at closing, which, combined with the ML take out on June 30, results in a return of approximately 20%."

•     Internal Enron DASH report regarding the Nigerian Barge Transaction, noting that: "Enron will have to 'un-wind' the Merrill Lynch transaction by 2nd quarter 2000."

•     Dan Boyle, in a document highlighting his accomplishments for the year 2000, made specific reference to the Nigerian Barge Transaction and his role in effecting the promised takeout of Merrill Lynch, noting that: "ML stated intention (with ENE commitment) is to sell the equity position by 6/30/00 but business unit not in a position to market ML equity to third party investor by deadline. Negotiated and executed sale of the ML equity to LJM, fulfilling obligation to ML."

735. However, not all Merrill Lynch employees were strong supporters of the deal, and concerns were raised about the propriety of the deal.

736. One of those concerned that Enron could not properly book the deal as a sale was Merrill Lynch's Brown. Indeed, after reviewing the Furst memorandum, Brown concluded that Merrill Lynch's participation in the deal could lead to reputational risk, specifically for aiding and abetting Enron income manipulation.

737. Brown told the Examiner's investigators:

Well, I raised the matter, you know, if Enron ever in the future fell apart from a credit - just like a credit meltdown or something, and we had been involved in this transaction, in light of the fact that I had these accounting concerns about the transaction, would that somehow create reputational risk for us? Would we have our names in the press?

738. The Debt Markets Commitment Committee met on or about December 22, 1999, to discuss the transaction. Because of Furst's strong recommendation of the deal and Brown's reluctance, the Committee required that Enron guarantee that Merrill Lynch's involvement would not exceed six months as a condition of entering into the transaction.

739.    The Committee also recommended that Enron be made aware that, as a condition of doing the deal, Merrill Lynch expected future Enron business.

740.    The Appropriation Request lays out the gist of Merrill Lynch's motivation to engage in the Nigerian Barge deal, namely: "Enron has strongly requested ML to enter into this transaction," "Enron will facilitate our exit from the transaction with third party investors. Dan Bayly will have a conference call with senior management of Enron confirming this commitment to guaranty the ML takeout within six months," and "Enron has paid ML approximately $40 million in fees in 1999 and is expected to do so again in 2000."

741.    On or about December 22, 1999, Merrill Lynch executives Davis, Bayly, Tilney, and Furst called Fastow, received oral confirmation that Enron would indeed take Merrill Lynch out of the deal within six months, and told Fastow of Merrill Lynch's expectation of being rewarded with future Enron business.

742.    On or about December 23, 1999, Merrill Lynch drafted a letter agreement regarding its role as "exclusive advisor" for the transaction.  Although the draft agreement could not spell out all of the terms of the agreement between Merrill Lynch and Enron, it did specifically recite that Merrill Lynch's equity interest would "be subsequently sold to third-party equity investors or purchased by Enron or an Enron affiliate."  The draft agreement further stated that Merrill Lynch was to receive "a yield of approximately 15.00% per annum" on its "investment."  Thus, Merrill Lynch knew that the risk of ownership of the barges never passed from Enron and therefore also knew that Enron could not account for the transaction as a sale under GAAP rules.

229

743.    Enron and Merrill Lynch were aware of this accounting problem and, in order to facilitate Enron booking the transaction as a sale, it had to keep Enron's oral guarantee a secret, omitting it from the documentation and leaving it as an oral understanding. An internal Merrill Lynch document refers to a "conference call with senior management of Enron confirming this commitment to guarantee the ML take out within 6 months."

744.    The Nigerian Barge Transaction was closed on December 29, 1999, less than two weeks after Merrill Lynch was first approached about the transaction and just in time for Enron to report its "profit" from the barge sale in its 1999 fourth-quarter and annual financial reports. Enron improperly recorded approximately $12 million in additional earnings in the fourth quarter of 1999.

745.    That Merrill Lynch understood that it was aiding Enron in committing accounting fraud is crystal clear.  For example, in a May 2000 e-mail from Furst (who had responsibility for the Enron relationship) to Merrill Lynch investment bankers David Sullivan, Benjamin Sullivan, Tilney, Jack Weingart, Bowen Diehl and Alexander Moomjy, Mr. Furst wrote, "Off-balance-sheet debt – not a primary driver because Enron believes they can structure anything to be off-balance-sheet."  Others within Merrill Lynch were concerned as well.  Consulted by Mr. Furst, Katherine Zrike, Merrill Lynch's chief counsel for Global Investment Banking, expressed concerns with the unusual nature of the transaction, its timing (year-end) and the absence of due diligence.  Brown also sent Mr. Furst an e-mail expressing his concern about Merrill Lynch's "reputational risk" were it found to have aided and abetted "Enron income statement manipulation."  Thus, Merrill Lynch understood that Enron was using the transaction in order to deceive the public about its financial statements – yet it still went forward with the deal.

746.    Merrill Lynch's purpose in participating in the Nigerian barge asset parking scheme had nothing to do with customary and prudent investment banking considerations, but as described in a December 1999 memo Mr. Furst authored:

> Enron is a top client to Merrill Lynch.  Enron views the ability to participate in transactions like this as a way to differentiate ML from the pack and add significant value.

In other words, Merrill Lynch was again making an accommodation aimed at preserving its lucrative stream of Enron investment banking business.

747.    On June 29, 2000, one day before the 6-month deadline, LJM2, the Enron-affiliated investment vehicle run by Fastow, stepped in and took over the interest in the barges from Merrill Lynch at the previously agreed-upon terms.  It paid Merrill Lynch the $7.525 million that had been assured to Merrill Lynch by Enron at the beginning of the transaction – the $7 million principal and 15% interest over 6 months – and assumed the $21 million note that Ebarge had given to Enron.  Ebarge never paid any interest on the note, notwithstanding loan documents that required it to do so.  Among the factors that demonstrate that this was not a real sale:

- Through an unwritten side agreement, Enron provided a guarantee to take Merrill Lynch out of the deal within 6 months.

- Merrill Lynch was guaranteed and received a specified 15% return on its $7 million payment.

- Merrill Lynch never received the periodic cash flow payments from the operation of the barges as promised under the agreement and never complained about it to Enron.

- Ebarge, the Merrill Lynch special purpose vehicle, didn't pay any interest on the $21 million loan advanced by Enron.

231

- Enron paid all of the costs associated with the formation, operation and management of Ebarge.

- The risks of owning Ebarge weren't transferred to Merrill Lynch.

748.    Internal Merrill Lynch documents called the payment it had made a "relationship loan" made in order to gain favor with Enron so that Merrill Lynch would receive future investment banking deals.

749.    Without any negotiation between Merrill Lynch and LJM2 as to the price, Enron executives caused LJM2 to purchase Merrill Lynch's $7 million equity interest for $7,525,000. This purchase was presented to the LJM2 limited partners as early as March of 2000.  Thus, Bayly, Furst, Brown, Tilney, and other Merrill Lynch employees who were also limited partners in LJM2 knew or had reason to know that Enron was proposing to have LJM2 purchase the barges from Merrill Lynch. Further, these Merrill Lynch employees/LJM2 investors knew that the purpose of the Nigerian Barge Transaction was to manipulate Enron's 1999 financial statements.

750.    The $525,000 premium that Merrill Lynch took on the transaction (an annualized 15.00% interest rate) coupled with the $250,000 "advisor" fee paid by Enron, amounted to an annual rate of return of 22.14% on its six-month, guaranteed, $7 million dollar "investment" in the Nigerian Barge Transaction.

751.    Arthur Andersen accountant Debra Cash testified that Arthur Andersen was misled about the nature of the transaction by the failure of Enron and Merrill Lynch to disclose the oral side-agreement.

752.    The Nigerian Barge Transaction (and the sham Electricity Trades Transaction alleged more fully below) were both done at the same time that Merrill Lynch was soliciting investors for LJM2.

753.    In its September 17, 2003 agreement with the  U.S. Department of Justice, Merrill Lynch accepted responsibility for its employees' conduct in connection with the Nigerian Barge Transaction, and agreed not to contradict that acceptance of responsibility in this litigation.

### (C)    Electricity Trades Transaction

754.    Merrill Lynch also entered into a pair of offsetting energy call contracts with Enron in December 1999, as a result of which Enron booked $60 million in phony profits.  This crucial deception permitted Enron to meet earnings expectations - thereby propping up the price of its securities and perpetuating the fraudulent scheme.  As reported in August 2002, in The New York Times:

> Desperate to meet a year-end profit target, the Enron Corp. struck a sham energy deal with Merrill Lynch that let Enron book a $60 million profit in the final days of December 1999, according to former Enron executives involved in the transaction.

> The executives said that the energy deal, a complex set of gas and power trades, was intended to inflate Enron's profits and drive up its stock price.  Enron and Merrill Lynch, they said, agreed that the deal would be canceled after Enron booked the profits; it later was.

> *    *    *

> "This was absolutely a sham transaction, and it was an 11th hour deal," said one former Enron executive who was briefed on the deal.  "We did this deal to get 1999 earnings."  This account was confirmed by five other former executives who either worked on the deal or were briefed on it.

> *    *    *

> Merrill Lynch executives were so concerned about Enron's accounting for the deal that they obtained a letter signed by Richard A. Causey, Enron's chief accounting officer, stating that Enron did not rely on Merrill Lynch for accounting advice, former executives said….

755.     The energy trades were the handiwork of Tilney.  Among other incomplete power plant projects in the Midwest, Enron owned a peaker generating plant called Midwest Continental.  Enron asked Merrill Lynch to purchase contracts for future delivery of electricity from that plant in exchange for a promise that Merrill Lynch would receive a profit from a subsequent cancellation or repurchase of those contracts.  The structure of the transaction was to include the sale of a physically settled electricity call option from Enron to Merrill Lynch, accompanied by the sale of a mirror image financially settled electricity call option from Merrill Lynch to Enron.  As a condition to participating in the transactions, Merrill Lynch insisted that the swaps be cancelled as soon as Enron reported its earnings for 1999.  In other words, neither party intended to engage in a bona fide commodity sale.

756.     The energy contracts were cancelled in April 2000 – after Enron reported its Q4 1999 results, and before the Midwest Continental plant was even completed.  No energy was ever exchanged pursuant to the 1999 Merrill Lynch – Enron trades, nor did Merrill Lynch ever exercise any rights under those agreements.

757.     A December 1999 Global Power Trading Group memo stated, "The proposed transaction is 'back-to-back' and is therefore delta-neutral."  "The quantities, pricing points, market locations and term are 'mirror' image," the memo admitted.  In other words, the sham energy trades had all of the earmarks of "wash trades" – pre-arranged, offsetting transactions of an equivalent amount of electricity or natural gas with no net change in ownership and no economic risk to either party – the two options essentially cancel each other out.  They are

234

independently illegal under the Commodity Exchange Act, and in the wake of the 2000-2001 energy crisis, FERC enacted regulations specifically outlawing them as well.

758.    Like the Nigerian Barge Transaction, the Midwest Continental deal was the product of Merrill Lynch's quest for additional investment banking business from Enron.  For $40 million in revenues from Enron in 1999, and an additional $20 million in the first half of 2000, Merrill Lynch was all too happy not only to remain silent about its extensive knowledge concerning Enron's sham transactions, but to actively participate in them as well.

759.    With respect to Merrill Lynch's participation in the 1999 Electricity Trade Transaction, the Examiner concluded that:

> Merrill Lynch knew that Enron intended to book earnings of approximately $50-60 million from the 1999 electricity trade transactions.  Merrill Lynch also knew that this gain would allow Enron to achieve year-end earnings targets, and that this gain could impact Enron's stock price and the compensation of Enron senior management, as indicated in an email from Tilney to Dan Gordon: "we were clearly helping them make earnings for the quarter and year (which had a great value in their stock price, not to mention personal compensation)."

760.    In addition to retaining its place as a favored Enron investment banker, Merrill Lynch had independent reasons for taking part in Enron's deceptive scheme.  Merrill Lynch's business included selling "credit default puts" – essentially, guarantees of Enron notes.  Were Enron to default, Merrill Lynch would be liable for losses on those Enron notes it had essentially guaranteed. Thus, Merrill Lynch's motive in deceiving the market was in part to insulate itself from liability under those puts.

761.    Moreover, were Enron's credit rating to fall, it would be required to issue additional shares, which would dilute its share value and jeopardize Merrill Lynch's future stream of underwriting income.  Through the deceptive year-end 1999 Electricity Trades

Transaction, Merrill Lynch deceived the credit rating agencies, the market, and ultimately, every investor, including Silvercreek, who relied on Enron financials in making investment decisions.

762.   Because of the accounting gimmickry Enron planned on accomplishing through the Electricity Trades Transaction, Enron required Merrill Lynch to enter into a confidentiality agreement at the onset of negotiations to preclude Merrill Lynch from disclosing any information regarding the proposed transaction.

763.   Merrill Lynch knew that there was no commodity price risk. Additionally, Merrill Lynch knew that the underlying option transactions were linked.  In the December 1999 memo regarding the transactions, it is noted that "the documentation provides for the netting of the payments due under the physically settled and financially-settled call options."  Further, it states that the governing agreements "will 'cross-default' to one another.  As such, in the event that one trade 'dissolves the other trade will also 'dissolve.'"

764.   The memo further outlined that Merrill Lynch would receive a $17 million fee based partly on "the benefits enjoyed by Enron as a result of the transaction."

765.   Furst and Tilney pushed for and strongly recommended immediate approval of the transaction, emphasizing that the transaction was one of Enron's highest priorities, that it was accounting-driven and that it would enable Enron to achieve off-balance-sheet treatment for certain assets.  The transaction was also recommended for approval because Enron was an important client and because of the magnitude of the financial benefits available to both Enron and Merrill Lynch.

766.   The Special Transactions Review Committee ("STRC") met twice on December 30, 1999.  During the first meeting some members expressed concern about the propriety of

Enron's intended accounting for the transaction and the effect that the transaction could have on the compensation of Enron's management. At that time, the STRC took at least some pause when realizing that the sole purpose of the transaction was to generate about $50-60 million in artificial income for Enron and declined to approve the deal. Following that meeting, however, Furst and Tilney contacted Richard Causey to get assurances regarding the propriety of Enron's proposed accounting treatment.

767.   Later that day, the STRC met again and was made aware, by Furst and Tilney, that Enron's only purpose for the transaction was to achieve year-end earnings. Merrill Lynch management, accordingly, knew that the Electricity Trades Transaction had no legitimate business purpose.

768.   Merrill Lynch then asked that Enron and its auditor, Arthur Andersen, verify that the accounting treatment had actually been approved. Causey confirmed to the STRC that Enron intended to report $50-60 million of earnings on the transaction, that that amount was material to Enron and that the amount would affect senior management bonuses. Causey objected to Merrill Lynch speaking directly with Arthur Andersen about the deal and Merrill Lynch instead settled for a letter from Enron stating that Arthur Andersen had approved Enron's intended accounting.

769.   Merrill Lynch's in-house counsel then prepared a letter for Causey's signature declaring that "Enron has reviewed the Transactions with its outside auditors, Arthur Andersen, and Arthur Andersen concurs with Enron's proposed accounting for the Transactions."  The letter further confirmed that Merrill Lynch had not provided any accounting advice to Enron and that "Enron had not relied upon Merrill Lynch in any way to determine the appropriate market value of the Transactions."

237

770.   After Causey signed the letter and returned it to Merrill Lynch, on December 31, 1999, Merrill Lynch closed the Electricity Trades Transaction knowing that Enron's accounting of the transaction was intended to manipulate its year-end earnings.  As a result, and for future window-dressing, the self-serving Causey letter was placed in Merrill Lynch's internal files stating, "Merrill Lynch did Not Design or Contribute to the Accounting Components of the Proposed Transaction."

771.   The STRC also knew that the fee Merrill Lynch would be receiving from Enron bore no relationship to any work or risk undertaken by Merrill Lynch. Indeed, the SEC Complaint alleges that "Enron was initially surprised regarding the size of the fee because the transaction posed little risk to Merrill Lynch, but ultimately agreed to pay a $17 million fee given the importance of the transaction to its year-end earnings."

772.   If the Electricity Trades were actual trades driven by market forces, the large discrepancy in option premiums (Enron was obligated to pay $17 million in excess of what it was scheduled to receive from Merrill Lynch) would not exist.  The only reason for this discrepancy was to create a way for Enron to compensate Merrill Lynch for participating in the transaction.  This was well understood by Merrill Lynch as explained in the December 1999 memo for the STRC meeting, "The Global Power Trading Group has decided to charge Enron a present value fee of $17 million. Enron is aware of the fee and agreed to it."

773.   The deal was closed on December 31, 1999—just in time for Enron to report the artificial earnings in its 1999 annual financial reports.

774.   In late May 2000, Enron asked Merrill Lynch to unwind the deal early without receiving the $17 million dollar payment. In response to this request, Tilney wrote to Dan

Gordon in an email, "[we] were clearly helping them make earnings for the quarter and year (which had a great value in their stock price, not to mention personal compensation). What would you think was a fair number in the absence of relationship issues?"

775. On June 30, 2000, the Electricity Trades Transaction was unwound with no energy ever having changed hands and with a payment of $8.5 million to Merrill Lynch, half of its originally agreed-upon fee.

776. In its September 17, 2003 agreement with the U.S. Department of Justice, Merrill Lynch accepted responsibility for its employees' conduct in connection with the Electricity Trades Transaction, and agreed not to contradict that acceptance of responsibility in this litigation.

### (D)    Analyst Research

777. The Enron Bankruptcy Examiner uncovered evidence that demonstrates the extraordinary influence Enron had over Merrill Lynch regarding analyst coverage. In particular, the Examiner found evidence of a strong connection between 'upbeat' analyst reports and Merrill Lynch's participation in various Enron financings.

778. Merrill Lynch ceded to Enron's pressure to provide positive analyst ratings. In July of 1997, John Olson, a Merrill Lynch analyst, lowered Enron's rating to "neutral." In April 1998, Mr. Fastow informed Merrill Lynch that Enron would not be including Merrill Lynch in an upcoming $750 million stock offering because of Merrill Lynch's equity coverage of Enron's stock. Shortly thereafter Tilney  and Rick Gordon wrote Merrill Lynch president Herbert Allison a memo complaining that Merrill Lynch had lost the Enron deal because of Enron executives' anger at Merrill Lynch equity analyst John Olson's negative analysis of Enron stock. In the

memo, the Merrill Lynch executives complained "our research relationship with Enron has been strained for a long period of time," and that Olson "has not been a real supporter of the Company, even though it is the largest, most successful company in the industry."  Finally, Messrs. Tilney and Gordon informed Mr. Allison that Mr. Olson's negative reports had led Enron to exclude Merrill Lynch from underwriting an upcoming $750 million Enron offering – Merrill Lynch had lost Enron business "based solely on the research issue."  Despite Mr. Olson's 35 years of experience as an energy analyst, Merrill Lynch removed Mr. Olson as its Enron analyst, and later fired him.

779.    The Examiner found that:

Olson's firing appears to have been directly related to his equity coverage on Enron and the criticisms of Tilney and Gordon.  When asked whether he believed that Merrill Lynch had fired him because of his coverage of Enron, Olson testified: "100 percent."

780.    After Olson was replaced with Donato Eassey, Merrill Lynch quickly upgraded Enron stock to a "buy."  In May 1998, Enron made Merrill Lynch co-manager of one of its offerings.  Another memo was written to Allison stating that Enron's anger had "dissipated" and "to that end" Merrill Lynch had won business from Enron which would generate $45 million in fees.

781.    Merrill Lynch cemented its quid quo pro relationship with Enron by issuing favorable analyst reports, bulletins and comments, on, among other dates, January 20, 1999; March 31, 1999; April 13, 1999; April 15, 1999; July 14, 1999; October 2, 1999; January 18, 2000; January 21, 2000; January 24, 2000; April 12, 2000; April 13, 2000; July 24, 2000; July 25, 2000; October 17, 2000; January 22, 2001; January 23, 2001; April 18, 2001; May 24, 2001; October 9, 2001; and October 17, 2001.

782.     For example, in publications dated January 22 and January 23, 2001, (one titled "Bulletin," the other titled "Comment"), Merrill Lynch's analyst Donato Eassey provides glowing reports about Enron:

> ENE's diverse energy earnings mix provides the base from which to exploit their huge wholesale trading platform - Globally. While the asset based businesses posted a 61 % increase in revenues and a modest 0.5 % increase in 4Q IBIT, the Wholesale businesses revenues climbed nearly 300% with IBIT up 195%.

Eassey did not disclose or even try to account for how much of the "revenue growth" was a result of sham transactions, especially those in which Merrill Lynch aided Enron in inflating its revenue; nor did he disclose that Merrill Lynch had a massive conflict of interest in giving investment advice regarding Enron.

783.     Comments and bulletins with similar upbeat assessments of Enron and recommendations to purchase Enron securities were continually published by Merrill Lynch. The recommendation was always the same: buy. In a May 24, 2001 comment, after the value of Enron stock had substantially declined, Eassey wrote: "We believe recent weakness has made ENE more attractive.  With no change in fundamentals, we reiterate our Buy opinions."

784.     Just two months prior to Enron's bankruptcy filing, Eassey recommended Enron securities as a "buy" in a "Flash Note" dated October 9, 2001.  According to Eassey:

> While recognizing a more moderate EPS growth rate, we think ENE is nevertheless off to a great start getting its financial health in order.

> Longer term, we think ENE will have put in motion the strategy to firmly reassert its earnings prowess in its hugely successful marketing businesses….

785.     The analyst reports published by Merrill Lynch always promoted Enron securities – even after Merrill Lynch knew that Enron was technically insolvent.  There was no disclosure of Enron's manipulation of its financial statements, no disclosure of Merrill Lynch's role in that

manipulation, no disclosure of Merrill Lynch's blatant conflict of interest in promoting Enron –

just effusive boosterism fraudulently dressed as independent research.

### (vii)   Merrill Lynch's Knowledge of Enron's True Financial Position

786.    Merrill Lynch had enjoyed a long relationship with Enron and had close and

direct relationships with Enron executives.  These relationships provided Merrill Lynch with an

ability to gain considerable intelligence with respect to Enron's true financial position.

787.    The Examiner noted that:

> Merrill Lynch was involved in approximately thirty-five transactions with Enron
> and Enron-related entities from 1997 through the Petition Date.  These
> transactions included underwritings, private placements of debt and equity,
> structured finance transactions, derivative transactions and participation as a
> syndicate member in several credit facilities.

788.    Enron's internal documents indicate that Merrill Lynch was a top fee earner for

Enron in 1999 when it earned $40 million.  Of the fees earned by Merrill Lynch in 1999, over

20% of the fees related to the Nigerian Barge Transaction and the 1999 Electricity Trades

Transaction – both of which were consummated in December of 1999.

789.    Through its involvement in a myriad of deceptive transactions, underwritings and

asset sales, Merrill Lynch had direct knowledge that Enron's financial statements were

fraudulently misrepresented.  Merrill Lynch actively participated in transactions that were

designed to further the fraud and was willing to do so in exchange for lucrative fees.  Through its

involvement in LJM2, Merrill Lynch knew that Enron's debt obligations were massively

understated and that Enron's financial statement disclosure was so opaque that it was impossible

for anyone not involved with the fraudulent manipulation of the statements to have an

understanding of Enron's true financial condition.

242

790.   As information about Enron's actual financial condition (that Merrill Lynch had helped Enron to conceal) was finally disseminated to the general public, the value of Enron securities dropped almost to zero.  Silvercreek lost substantially its entire investment in a matter of weeks.  Merrill Lynch played a significant role in and is directly responsible for Silvercreek's losses, both as an aider and abettor of Enron's fraud, and by reason of its fraudulent inducement of Silvercreek's purchases of Enron securities.

791.   Silvercreek relied in substantial part on Merrill Lynch's material misrepresentations and non-disclosures in making their investment decisions regarding Enron securities.

### (viii)   Silvercreek's Direct Dealings with Merrill Lynch

792.   Silvercreek had a long standing relationship with Merrill Lynch.  It maintained brokerage accounts with Merrill Lynch, frequently traded securities through Merrill Lynch's brokerage division, and paid several hundreds of thousands of dollars in commissions to Merrill Lynch in 2001 alone.

793.   Over the course of this relationship, Silvercreek developed a trust in Merrill Lynch and read and relied upon much of its research and recommendations, including specifically some key recommendations on the debt securities of Enron.

794.   Silvercreek also received communications from Merrill Lynch brokers, both orally and via Bloomberg messages, recommending securities to Silvercreek, including Enron securities.  Among the Merrill Lynch brokers who communicated with Silvercreek were Haig Altooninan, Mike Nahill and Terry O'Connor.

243

795.    Specifically, Silvercreek read and relied upon an August 15, 2001 Merrill Lynch research report describing "an opportunity in the ENE 0% convertible due 2021 [the Zero Notes] for yield oriented investors."  This analysis and a subsequent one stating that "the [Zero Notes] with an OAS of 450 bps over the 2 year Treasury is a compelling alternative to their straight debt" were key considerations in Silvercreek's decision to purchase the Zero Notes.

796.    Throughout the period of its purchases, Silvercreek communicated regularly with Merrill Lynch and read and relied upon its Enron research, including a comment on October 24, 2001 that "cash is still king and ENE's cash flow from operations should exceed $3 billion next year… This, along with announced/potential asset sales should insulate ENE's credit ratings and give us confidence that it is unlikely that ENE would fall below investment grade," and again on October 25, 2001 "we think it is unlikely ENE will not be able to maintain investment grade credit rating."  And on October 31, 2001, "our NAV est. stands in the $16-$24 area" [per common share]."  An "NAV" or net asset value represents value in excess of any debt or liabilities of the company.  Silvercreek invested only in senior debt of Enron.  As at October 31, 2001, an NAV of $24 per share implied equity value for Enron of over $17 billion.

797.    In reviewing and analyzing the Enron investments, Silvercreek had numerous conversations with Haig Altoonian and Terry O'Connor as well as Merrill Lynch's research analysts.  Mr. Altooninan contacted Silvercreek and encouraged Silvercreek to buy Enron's 7% Notes.  Silvercreek was also provided with a copy of Merrill Lynch's Enron "model" and "forecasts" – none of which hinted at the dire financial situation at the company.  Silvercreek prepared a detailed break-up value (net asset value) based on discussions with Merrill Lynch and a "Merrill Estimate," which Merrill Lynch provided to Silvercreek.  Again, this analysis

244

supported substantial equity value for Enron and ample coverage for the senior debt investments held by Silvercreek.  However, Merrill Lynch withheld material information and the analysis was misleading as vast quantities of Enron debt were concealed.

798.    In none of its communications with Silvercreek did Merrill Lynch disclose to Silvercreek that (i) Merrill Lynch knew Enron's financial reporting was fraudulent and misleading; (ii) Merrill Lynch had assisted Enron in creating phony revenues and earnings, and in overstating  its cash flow from operations and understating massive amounts of debt; and (iii) Merrill Lynch had a glaring conflict of interest in promoting Enron securities – both to attract more business from Enron, and to insulate itself from liability under its credit default "guarantees" on Enron securities, including the Zero and 7% Notes.

799.    In 2002, when Silvercreek tried to revisit Merrill Lynch's web site to review its Enron research, all the research that had been provided to Silvercreek had been removed.

800.    Merrill Lynch's statements to Plaintiffs recommending Enron securities were false, misleading and failed to disclose material facts in Merrill Lynch's possession.   Plaintiffs relied, in substantial part, on these conversations and communications with Merrill Lynch in making their decision to purchase Enron securities.

### (ix)    Summary – Fastow Declaration

801.    Enron's former Chief Financial Officer, Andrew Fastow, has confirmed, under oath, the following facts:

> At year end 1999, Merrill Lynch engaged in several transactions that had the effect of allowing Enron to report higher income at year-end than it would otherwise have been able to report: the Nigerian Barges Transaction, the power trades transaction, and certain LJM2 Transactions.

### Nigerian Barges

245

In December 1999, Enron could not find a buyer at an acceptable price for its interest in the Nigerian Barges, so Enron requested that Merrill Lynch purchase them temporarily so that Enron could report the transaction in 1999.

I had at least one private conversation with Schuyler Tilney in December 1999 about Merrill Lynch buying the barges. In response to his query, I discussed with Mr. Tilney why Enron was asking Merrill Lynch, rather than LJM2, to purchase the Barges at that time, and I told him of the assurance Skilling had given to me with respect to the barges. After the terms of the transaction had been agreed upon, Mr. McMahon asked me, as Enron CFO, to call the head of Merrill Lynch's investment-banking group to give him certain assurances. On December 23, 1999, I participated in a conference call, during which I assured Merrill Lynch's Daniel Bayly that the bank's investment would be repaid within six months and that the bank would receive its pre-determined rate of return.  I testified about this conversation in the Lay/Skilling trial and my testimony was truthful and accurate.

I believe that Merrill Lynch agreed to purchase the Nigerian Barges from Enron on a temporary basis only because I gave assurances that I intended as a guarantee that Merrill Lynch would receive three things: return of its investment, return on its investment, and an exit from ownership within six months. I understood from Mr. McMahon and Mr. Tilney that Merrill Lynch required each of these things. In my opinion, the guarantee from me reduced the risk to Merrill Lynch in a manner sufficient so that Arthur Andersen, had it known of the guarantee, would not have treated the transaction as a true sale.  As a result of the true sale treatment, Enron recorded higher income and funds flow at year-end than it otherwise would have. Based upon my discussions with senior Merrill Lynch executives, I believe that Merrill Lynch understood the impact this transaction would have on Enron's financial statements,  that the guarantee provided by me would likely change the accounting treatment of the transaction, and that the only reason for the transaction was to receive the desired accounting and financial-reporting treatment.

As discussed on the conference call, I arranged for LJM2 to purchase the barges from Merrill Lynch in June 2000. Merrill Lynch received the pre-arranged compensation.

246

### 1999 Power Trades

At year-end 1999, I understood that Enron entered into electricity-commodity contracts with Merrill Lynch that had the effect of increasing Enron's reported income by $40 million or more and contributed to causing Enron to report higher income at year end than it would otherwise have been able to report.  Based on my conversations with senior Enron and Merrill Lynch executives, I understood that, at the time the transaction closed in December 1999, there was a verbal agreement between Mr. Baxter and Mr. Tilney to unwind the transactions in 2000 in exchange for a predetermined fee to be paid by Enron to Merrill Lynch. Before the transaction closed I assured Mr. Tilney that Mr. Baxter's verbal agreement would be honored by Enron. I do not believe Merrill Lynch would have entered into these transactions absent the agreement to unwind the transactions and to pay the predetermined fee.

In December 1999 Cliff Baxter came to my office. He told me he had negotiated a set of power trades with Merrill Lynch that would generate about $40 million in earnings at year-end 1999, but which would be unwound and reversed in 2000. Mr. Baxter told me he had dealt with Mr. Tilney (and perhaps others) on this transaction.

Also in December 1999, Mr. Tilney called me.  The transaction had not yet closed. Mr. Tilney asked whether he could trust Mr. Baxter to honor the oral agreement to unwind the power -trade deal and to pay Merrill Lynch the prearranged compensation. I assured Mr. Tilney that the verbal agreement to reverse the transaction would be honored and that he could trust Mr. Baxter in that regard because he represented Enron. It was my impression from the conversations with Mr. Tilney and Mr. Baxter that Merrill Lynch would not close the deal without this oral assurance to unwind the deal and to pay Merrill Lynch the fee.

In the first half of 2000 Mr. Tilney called me again about this transaction and told me that Mr. Baxter was trying to "re-trade" (*i.e.*, renege on) the oral agreement by cutting Merrill Lynch's fee.  He asked if I knew anything about it and if I could do anything. I told Mr. Tilney that I would talk to Mr. Skilling about it.

I talked to Mr. Skilling and told him that I understood from Merrill Lynch that Mr. Baxter was trying to renege on the deal. I voiced a general concern that reneging on deals would not be well received by the bank market and that we needed to honor our agreements with the banks. Mr. Skilling said he would take care of it.

### 1999 LJM2 Transactions

LJM2 was a private equity fund in which I was the general partner. Merrill Lynch, I and others structured LJM2, and Merrill Lynch and a number of its executives invested in the fund. Based on my conversations with its executives, Merrill Lynch understood that LJM2 would be used to manage Enron's earnings and balance sheet, and that the transactions undertaken by LJM2 with Enron in December 1999 resulted in Enron reporting higher earnings than it would have otherwise absent those transactions with LJM2.

In August 1999, I prepared a sales presentation which I gave to Merrill Lynch, CSFB, Deutsche, and other banks who might invest in LJM2. This presentation described the "Opportunity" this way:

> Companies sell assets with superior return potential to:

- Manage balance sheet

- Manage income statement

"Managing" was understood to mean making the numbers what Enron desired them to be.  Managing its earnings and balance sheet allowed Enron to create the false appearance of earnings and funds flow, and lower debt, thereby obfuscating the true underlying economic performance and health of the company.

The first closing of LJM2 took place on December 20, 1999. Before closing, each investor received a Supplement to the PPM, which described the year-end transactions with Enron: The Nowa Sarzyna power plant in Poland; investment in both equity and debt of ENA CLO I Trust also known as Project Merlin; purchase of an interest in an Enron SPV known as MEGS, LLC; and an investment in an Enron SPV known as Bob West Treasure LLC.

Merrill Lynch understood that in connection with some of the transactions, LJM2 received certain assurances from Enron management or structural features attendant to the transactions that caused the equity holders-LJM2-to have less risk in their investment than a true arms-length third party would have had.  These transactions helped Enron to meet its year-end financial reporting objectives. Not all of these assurances and structural features were disclosed in Enron's financial statements. As a result, I do not believe that investors reading Enron's financial disclosures would have understood the true effect of those transactions and would have tended to be deceived about them.

Six year-end LJM2 deals were disclosed to the banks in the PPM Supplement. I discussed this with many Limited Partners.

I discussed the Raptor I concept and structure with Merrill Lynch. I explained to Merrill Lynch how the Raptor vehicle would be used by Enron to increase its current period earnings, and the fact that LJM2 would receive the return of and on its investment before any hedging would begin. LJM2 also provided a written description of the Raptor vehicle to these investors prior to the date on which they were to fund the transaction by responding to capital calls. As I stated in my plea agreement, I and others knew that the Raptors were not sufficiently independent from Enron and should not have been deconsolidated.  As a result of the Raptor vehicles, Enron overstated its earnings.

## IX.

## CAUSES OF ACTION

## COUNT ONE

## AGAINST ALL BANK DEFENDANTS, FOR AIDING AND ABETTING FRAUD

802.     Plaintiffs repeat and reallege all allegations set forth in paragraphs 1 – 799 above.

803.     As alleged more fully above, Enron perpetrated a massive fraud on the investing public, including Silvercreek.

804.     The Bank Defendants, and each of them, aided and abetted, encouraged and rendered substantial assistance to Enron (including the Officer Defendants, individually, and in their capacities as representatives of Enron), in defrauding Plaintiffs.  In taking action, as particularized herein, to aid, abet and substantially assist the commission of Enron's wrongful acts complained of, each of the Bank Defendants acted with an awareness of its own wrongdoing and realized that its conduct would substantially assist the accomplishment of Enron's fraudulent scheme.

805.     The Bank Defendants, by their active participation in the numerous schemes, artifices, and manipulations detailed above, each knowingly and intentionally aided and abetted the fraudulent misrepresentations and omissions of Enron and the Officer Defendants concerning

249

the financial condition of Enron, including its operations, performance, profitability, liquidity, cash flow from operations, debt structure, indebtedness, and debt and borrowing capacity, as misleadingly set forth in financial statements, 10-K, 10-Q, and other SEC filings, press releases, and other publicly disseminated reports and disclosures.

806. The assistance of the Bank Defendants was substantial; it was vital to Enron's ability to (i) implement and further its underhanded business objectives; (ii) continue the Ponzi scheme; (iii) make false and misleading statements; (iv) misrepresent and conceal its actual financial condition; (v) encourage entities, including Plaintiffs, to do business with Enron and purchase Enron-related securities; and (vi) otherwise deceive the business community and investing public, including Plaintiffs, all as detailed above.

807. It was reasonably foreseeable to Bank Defendants, and each of them, that parties such as Plaintiffs would rely upon and act upon the foregoing material misrepresentations and omissions of Enron and its Officer Defendants, aided and abetted by the Bank Defendants, in making decisions to do business with Enron and purchase Enron-related securities.

808. The Bank Defendants, and each of them, substantially benefited from their participation in the Enron Ponzi scheme, having received massive fees and profits as a consequence thereof.

809. Plaintiffs reasonably and justifiably relied upon the foregoing material misrepresentations and omissions of Enron and its Officer Defendants, aided and abetted by the Bank Defendants, in purchasing the Enron 7% and Zero Notes.

810. Upon the complete public disclosure of the true and material facts which had been misrepresented and concealed, the 7% and Zero Notes became essentially worthless.

250

811.    Plaintiffs have suffered substantial damages as a result of Enron's fraudulent scheme, and the Bank Defendants' material support and assistance to that scheme.

812.    The Bank Defendants' misconduct was willful and wanton, and demonstrated a conscious disregard for the interests of Enron's existing and prospective investors, including Silvercreek.

813.    Plaintiffs are entitled to recover actual and punitive damages from each Bank Defendant.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT TWO

### AGAINST ALL BANK DEFENDANTS, FOR CONSPIRACY TO COMMIT FRAUD

814.    Plaintiffs repeat and reallege all allegations set forth in paragraphs 1 – 811 above.

815.    As alleged more fully above, Enron perpetrated a massive fraud on the investing public, including Silvercreek.

816.    All Bank Defendants, and each of them, are liable to Plaintiffs because each Bank Defendant conspired with Enron to commit fraud.

817.    All Bank Defendants, and each of them, pursued a conspiracy, common enterprise, and common course of conduct to accomplish the wrongs complained of herein.  The purpose and effect of the conspiracy was, inter alia, to financially benefit Bank Defendants at the expense of Plaintiffs by participating in and facilitating Enron's fraudulent activities.  The Bank Defendants accomplished the conspiracy by assisting Enron and the Officer Defendants in misrepresenting and concealing material information regarding the financial status and

251

operations of Enron; and by taking steps and making their own misleading statements in furtherance of the wrongdoing as alleged above.

818.    Each Bank Defendant was a direct, necessary and substantial participant in the conspiracy and was aware of its own contributions in furtherance thereof.  The Bank Defendants' wrongful acts include, inter alia, all of the acts that each of them is alleged above to have committed in participating with and aiding Enron in furtherance of the conspiracy.

819.    The Bank Defendants and Enron sought to accomplish an unlawful purpose by unlawful means.  Each Bank Defendant engaged with Enron in a scheme to mislead the investing public about Enron's true financial condition.

820.    The object that the Bank Defendants and Enron sought to accomplish-- defrauding existing and prospective Enron securities investors like Plaintiffs, by filing and distributing false and misleading financial reports, registration statements, prospectuses and other information for the purpose of misrepresenting Enron's financial condition and keeping the Ponzi scheme going-- allowed the Bank Defendants, and each of them, to benefit financially from Enron's business.  The object of this conspiracy is unlawful under both state and federal law, and was accomplished through unlawful means.

821.    In perpetrating the fraud, each Bank Defendant and Enron had a meeting of the minds.  They constructed and participated in transactions that allowed Enron to disseminate false and misleading financial information in SEC filings and elsewhere, thereby deceiving credit rating agencies and the investing public generally.

822.    The Bank Defendants and Enron each committed numerous unlawful, overt acts in furtherance of the conspiracy.  The facts of Enron's fraudulent conduct in furtherance of the

conspiracy to defraud, which is imputed to each conspiracy participant, cannot be disputed. They have been conclusively established through a series of sworn statements, guilty pleas and criminal convictions.

823.   The Bank Defendants knew that Enron's purpose for entering into numerous, convoluted and deceptive transactions was the manipulation of its reported financial position. Nevertheless, as alleged above, and in furtherance of the conspiracy, the Bank Defendants, and each of them, participated with Enron in many such transactions.

824.   The Bank Defendants thereby engaged in overt, unlawful acts to aid Enron in falsifying its books and records and in reporting fraudulent financial results.  Further, the Bank Defendants' continuously disseminated positive and misleading statements and recommendations concerning Enron in analyst reports and elsewhere, which were also overt acts in furtherance of the conspiracy.

825.   The conspiracy between the Bank Defendants and Enron lasted for several years, to devastating effect.  Plaintiffs relied upon the material misrepresentations and omissions disseminated by Enron, as aided and assisted by the Bank Defendants, in purchasing Enron securities.

826.   Upon the complete public disclosure of the true and material facts concerning Enron's financial performance and condition, which had been misrepresented and concealed by the Bank Defendants, the 7% and Zero Notes became essentially worthless.

827.   Plaintiffs suffered substantial damages proximately caused by the conspiracy, and each Bank Defendant's role in it.

828.   The Bank Defendants' misconduct was willful and wanton, and demonstrated a conscious disregard for the interests of Enron's existing and prospective investors, including Silvercreek.

829.   Plaintiffs are entitled to recover actual and punitive damages from each Bank Defendant.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT THREE

### AGAINST ALL BANK DEFENDANTS, FOR AIDING AND ABETTING NEGLIGENT MISREPRESENTATION

830.   Plaintiffs repeat and reallege all allegations set forth in paragraphs 1 – 827 above, except for those relating to Enron's scienter or fraudulent intent.

831.   As alleged more fully above, Enron disseminated false and misleading information concerning its historic financial performance and current financial condition, including its cash flow from operations and debt level.

832.   Enron had a duty to existing and prospective investors like Silvercreek, to exercise due care in disseminating financial information to the investing public, and investors were expected to and had a right to rely on the integrity and veracity of such financial information.

833.   Enron breached its duty and failed to exercise reasonable care in communicating false and misleading information to Plaintiffs and others.

834.   The Bank Defendants, and each of them, aided and abetted, encouraged and rendered substantial assistance to Enron in making material misrepresentations and omissions to Plaintiffs, as alleged more fully above.  In taking action, as particularized herein, to aid, abet and

254

substantially assist the commission of the wrongful acts complained of, each of the Bank Defendants acted with an awareness of its own wrongdoing and realized that its conduct would substantially assist the dissemination of material misrepresentations and omissions by Enron and its Officer Defendants.

835.    The Bank Defendants, by their active participation in the numerous schemes, artifices, and manipulations detailed above, knowingly and intentionally aided and abetted misrepresentations and omissions of Enron and the Officer Defendants concerning the financial condition of Enron, including its operations, performance, profitability, liquidity, cash flow from operations, debt structure, indebtedness, and debt and borrowing capacity, as misleadingly set forth in financial statements, 10-K, 10-Q, and other SEC filings, press releases, and other publicly disseminated reports and disclosures.

836.    The assistance of the Bank Defendants was substantial; it was vital to Enron's ability to (i) make false and misleading statements; (ii) misrepresent and conceal its actual financial condition; (iii) encourage entities, including Plaintiffs, to do business with Enron and purchase Enron-related securities; and (iv) otherwise deceive the business community and investing public, including Plaintiffs, all as detailed above.

837.    It was reasonably foreseeable to Bank Defendants, and each of them, that parties such as Plaintiffs would rely upon and act upon the foregoing material misrepresentations and omissions of Enron and its Officer Defendants, aided and abetted by the Bank Defendants, in making decisions to do business with Enron and purchase Enron-related securities.

838.    The Bank Defendants, and each of them, substantially benefited from their participation in Enron's publication and dissemination of false and misleading financial information, having received massive fees and profits as a consequence thereof.

839.    Plaintiffs reasonably and justifiably relied upon the foregoing material misrepresentations and omissions of Enron, aided and abetted by the Bank Defendants, in purchasing the Enron 7% and Zero Notes.

840.    Upon the complete public disclosure of the true and material facts concerning Enron's financial performance and condition, which had been misrepresented and concealed by the Bank Defendants, the 7% and Zero Notes became essentially worthless.

841.    Plaintiffs have suffered substantial damages as a result of Enron's publication and dissemination of false and misleading financial information, and the Bank Defendants material support and assistance to that wrongdoing.

842.    Plaintiffs are entitled to recover their actual damages from each Bank Defendant.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT FOUR

### FRAUD AND DECEIT AGAINST OFFICER DEFENDANTS, MERRILL LYNCH AND CSFB

843.    Plaintiffs repeat and reallege all allegations set forth in paragraphs 1– 840 above.

### A.      Officer Defendants

844.     The Officer Defendants made material representations and omissions to Plaintiffs which were false and misleading.  These material misrepresentations and omissions are contained in, among other things, (i) Enron's registration statements and prospectuses for the Zero Notes and 7% Notes, and the financial statements incorporated therein; (ii) the rating agency and research analyst reports which the Officer Defendants deliberately sought to manipulate; and (iii) public pronouncements by the Officer Defendants, including in press releases and investor conference calls, all as more fully alleged above.

845.     The conduct of the Officer Defendants constituted a fraud against Plaintiffs.  The Officer Defendants made material misrepresentations and omissions with the intent to defraud the investing public in general, and Plaintiffs in particular.

846.     The Officer Defendants, and each of them, knew, or recklessly disregarded the falsity and misleading nature of their misrepresentations and omissions.  The Officer Defendants intended to defraud and deceive Plaintiffs, and intended to fraudulently induce Plaintiffs and others to purchase the Zero Notes and 7% Notes.

847.     The Officer Defendants possessed superior knowledge, not readily available to Plaintiffs who, unlike the Officer Defendants, did not have access to the corporate books and records of Enron.  The Officer Defendants knew, or recklessly disregarded that (i) Plaintiffs were induced to purchase Enron debt securities on the basis of material misstatements and omissions; and (ii) the prospectuses for the 7% and Zero Notes were false and misleading, and incorporated by reference false and misleading financial statements of Enron.

848.     Plaintiffs relied upon the material misrepresentations and omissions by the Officer Defendants, and each of them, in purchasing the Zero Notes and 7% Notes.  Plaintiffs were ignorant of the falsity of the Officer Defendants' representations and were ignorant of the full and true facts suppressed by the Officer Defendants.  Such reliance was justified, and to the detriment of Plaintiffs.

849.     As a result of the Officer Defendants' wrongful conduct, Plaintiffs have suffered substantial economic losses and other general and specific damages, all in an amount to be determined according to proof.

850.     The aforementioned acts of the Officer Defendants, and each of them, were done willfully and wantonly with intent to defraud, and demonstrated a conscious disregard for the interests of Enron's existing and prospective investors, including Silvercreek.

851.     Plaintiffs are entitled to recover actual and punitive damages from each Officer Defendant.

### B.     *Merrill Lynch and CSFB*

852.     Merrill Lynch and CSFB each made material representations and omissions to Plaintiffs which were false and misleading.  These material misrepresentations and omissions are contained in research reports and other information published by CSFB and Merrill Lynch and disseminated directly to Silvercreek, as well as direct communications recommending and encouraging Silvercreek to purchase the 7% and Zero Notes, all as alleged more fully above.

853.     In recommending Enron securities to Silvercreek, and encouraging Silvercreek to invest in the 7% and Zero Notes, CSFB and Merrill Lynch knew that Enron was fraudulently manipulating its accounting books and records, and that its cash flow from operations and debt

levels were materially misrepresented on its financial statements.  CSFB and Merrill Lynch also knew that the veracity of this type of information was especially important to Silvercreek, as a debt investor.  CSFB and Merrill Lynch also failed to disclose that they were both attempting to reduce their credit exposure to Enron, out of concern for Enron's actual financial condition, and had severe conflicts of interest in promoting Enron securities as a means to obtain investment banking business from Enron.

854.    The conduct of Merrill Lynch and CSFB, and each of them, constituted a fraud against Plaintiffs.  Merrill Lynch and CSFB made material misrepresentations and omissions with the intent to defraud the investing public in general, and Plaintiffs in particular.

855.    Merrill Lynch and CSFB knew, or recklessly disregarded the falsity and misleading nature of their misrepresentations and omissions.  Merrill Lynch and CSFB intended to defraud and deceive Plaintiffs, and intended to fraudulently induce Plaintiffs to purchase Enron debt securities.

856.    Merrill Lynch and CSFB had superior access, as compared to Plaintiffs, to Enron and information about Enron's actual financial condition.  Among other things, both served as underwriters for multiple Enron securities offerings, were partners with Enron in illicit off-balance-sheet entities, and had the opportunity to conduct due diligence of Enron and its finances on several occasions.

857.    Plaintiffs relied upon the material misrepresentations and omissions by CSFB and Merrill Lynch, and each of them, in purchasing Enron debt securities.  Plaintiffs were ignorant of the falsity of Merrill Lynch's and CSFB's representations and were ignorant of the full and true

facts suppressed by Merrill Lynch and CSFB.  Such reliance was justified, and to the detriment of Plaintiffs.

858.    As a result of Merrill Lynch's and CSFB's wrongful conduct, Plaintiffs have suffered substantial economic losses and other general and specific damages, all in an amount to be determined according to proof.

859.    The aforementioned acts of Merrill Lynch and CSFB, and each of them, were done willfully and wantonly with intent to defraud, and demonstrated a conscious disregard for the interests of Enron's existing and prospective investors, including Silvercreek.

860.    Plaintiffs are entitled to recover actual and punitive damages from each of Merrill Lynch and CSFB.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### COUNT FIVE

### AGAINST OFFICER DEFENDANTS, MERRILL LYNCH AND CSFB FOR NEGLIGENT MISREPRESENTATION

861.    Plaintiffs repeat and reallege all allegations set forth in paragraphs 1 – 858 above, except for those relating to scienter or fraudulent intent.  This claim does not sound in fraud, and neither fraud, recklessness nor scienter is an element of this claim.  For purposes of this claim, Plaintiffs disclaim any allegation of scienter or recklessness.

*A.*    *Officer Defendants*

862.    The Officer Defendants made material misrepresentations and omissions to Plaintiffs in, among other things (i) Enron's registration statements and prospectuses for the Zero Notes and 7% Notes, and the financial statements incorporated therein; and (ii) public

pronouncements by the Officer Defendants, including in press releases and investor conference calls, all as more fully alleged above.

863.    The Officer Defendants intended the registration statements, prospectuses, financial statements and public pronouncements to be disseminated to existing and prospective investors, including Plaintiffs, and intended that Plaintiffs and other investors would rely upon them and be induced to purchase Enron debt securities.

864.    In making the material misrepresentations and omissions, as alleged above, the Officer Defendants acted carelessly, and without any reasonable grounds for believing their representations were true.  The Officer Defendants intended by their misrepresentations and omissions to induce Plaintiffs to purchase Enron debt securities.

865.    The Officer Defendants breached their duty to existing and prospective investors, including Plaintiffs, to exercise due care in publishing and disseminating financial information about Enron and its operations.

866.    Plaintiffs relied upon the Officer Defendants' material misrepresentations and omissions in purchasing the Zero and 7% Notes.  The Officer Defendants knew or should have known that Plaintiffs would so rely.  Plaintiffs were ignorant of the falsity of the Officer Defendants' misrepresentations and were ignorant of the full and true facts omitted by Officer Defendants.  Such reliance was justified, and to the detriment of Plaintiffs.

867.    The Officer Defendants possessed superior knowledge, not readily available to Plaintiffs who, unlike the Officer Defendants, did not have access to the corporate books and records of Enron.  The Officer Defendants knew, or should have known that (i) Plaintiffs were induced to purchase Enron debt securities on the basis of mistaken information; and (ii) the

prospectuses for the 7% and Zero Notes were false and misleading, and incorporated by reference false and misleading financial statements of Enron.

868.     As a result of the Officer Defendants' wrongful conduct, Plaintiffs have suffered substantial economic losses and other general and specific damages, all in an amount to be determined according to proof.

869.     Plaintiffs are entitled to recover their actual damages from each Officer Defendant.

### B.     *Merrill Lynch and CSFB*

870.     Merrill Lynch and CSFB each made material misrepresentations and omissions to Plaintiffs in, among other things (i) research reports and other information published by CSFB and Merrill Lynch and disseminated directly to Silvercreek; and (ii) direct communications recommending and encouraging Silvercreek to purchase the 7% and Zero Notes, all as alleged more fully above.

871.     Plaintiffs were in privity with CSFB, who from time to time communicated investment suggestions and recommendations to Plaintiffs, and sold 7% Notes and Zero Notes to Plaintiffs.  CSFB, as an underwriter for the Zero Notes, knew or should have known that Plaintiffs and other investors would rely upon the registration statement, prospectus and financial statements incorporated therein and be induced to purchase the Zero Notes.

872.     Plaintiffs were in privity with Merrill Lynch, who maintained brokerage accounts on behalf of Plaintiffs for investment purposes, and from time to time communicated investment suggestions and recommendations to Plaintiffs.

873.    CSFB and Merrill Lynch owed Silvercreek a duty of care in disseminating information about Enron and its financial condition to Silvercreek.  CSFB and Merrill Lynch also knew or should have known that the integrity and veracity of Enron's financial information, especially its cash flow from operations and debt level, were important to Plaintiffs.

874.    CSFB and Merrill Lynch breached their respective duties to Plaintiffs by making material misrepresentations and omissions about Enron and its financial condition and failing to exercise reasonable care or competence in obtaining and communicating that information. Merrill Lynch and CSFB, as serial underwriters for Enron, clearly had superior access, as compared to Plaintiffs, to information about Enron and its finances.

875.    It was reasonably foreseeable to Merrill Lynch and CSFB that parties such as Plaintiffs would rely upon and act upon the foregoing material misrepresentations and omissions in deciding whether to invest in Enron securities.

876.    Plaintiffs relied upon the material misrepresentations and omissions by CSFB and Merrill Lynch, and each of them, in purchasing Enron debt securities.  Plaintiffs were ignorant of the falsity of Merrill Lynch's and CSFB's representations and were ignorant of the full and true facts omitted by Merrill Lynch and CSFB.  Such reliance was justified, and to the detriment of Plaintiffs.

877.    As a result of Merrill Lynch's and CSFB's wrongful conduct, Plaintiffs have suffered substantial economic losses and other general and specific damages, all in an amount to be determined according to proof.

878.    Plaintiffs are entitled to recover their actual damages from each of Merrill Lynch and CSFB.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT SIX

### AGAINST JPMORGAN, DEUTSCHE BANK, BARCLAYS AND CSFB
### FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT

879.    Plaintiffs repeat and reallege all allegations set forth in paragraphs 1 – 875 above, except for those relating to scienter or fraudulent intent.

880.    This claim is brought pursuant to Section 11 of the Securities Act, against Defendants JPMorgan, Deutsche Bank, Barclays and CSFB.  This claim does not sound in fraud, and neither fraud, recklessness nor scienter is an element of this claim.  For purposes of this claim, Plaintiffs disclaim any allegation of scienter or recklessness.

881.    These Defendants served as underwriters of the Zero Notes offering within the meaning of the definition of "underwriter" contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11).  They each directly (or in the case of CSFB indirectly) participated in the purchase of the Zero Notes from Enron with a view to the distribution of the Notes.

882.    Moreover, JPMorgan, Deutsche Bank and Barclays each received an underwriter's discount and commission from Enron in connection with the initial stage one offering of the Zero Notes, and were prominently featured as underwriters in the offering memorandum.

883.    JPMorgan, Deutsche Bank and Barclays solicited, offered and sold the Zero Notes in the stage one private placement pursuant to Enron's agreement to register the Notes within 180 days of the initial offering.  As a result, the Notes fetched a much better price than if the Zeros offering had been solely a private placement.

264

884.    JPMorgan, Deutsche Bank, and CSFB solicited, offered and sold the Zero Notes to the investing public pursuant to the registration statement for the stage two public offering.

885.    Plaintiffs purchased or acquired the Zero Notes pursuant to, or traceable to, the registration statement for those Notes.

886.    As alleged more fully above, the registration statement, at the time it was issued and became effective, was inaccurate and misleading, contained untrue statements of material fact and/or omitted to state material facts necessary to make the statements made therein not misleading.  The matters detailed above would have been material to a reasonable person reviewing the registration statement and the financial statements incorporated therein.

887.    Due to their role as underwriters of the Zero Notes, these Defendants were responsible for the contents and dissemination of the registration statement for those Notes and are liable under Section 11 of the Securities Act for any material misrepresentations or omissions contained therein. None of them made a reasonable investigation and none of them possessed reasonable grounds for believing that the statements contained in the registration statement were true, did not omit any material fact, and were not materially misleading.

888.    Plaintiffs did not know or in the exercise of reasonable diligence could not have known of the misstatements and omissions of material fact contained in the registration statement.

889.    Plaintiffs have sustained damages as a result of the misstatements and omissions of material fact contained in the registration statement for which they are entitled to compensation.

890.    To the extent that any of the parent Bank Defendants acted through a subsidiary or affiliate in connection with the Zero Notes offering, the parent is equally liable with the subsidiary or affiliate  pursuant to Section 15 of the Securities Act, 15 U.S.C.§ 77o.

891.    Less than one year passed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this count is based and the date of the filing of the initial complaint in this action.  Likewise, less than three years elapsed from the time that the securities upon which this count is brought were offered to the public and the date of the filing of the initial complaint in this action.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT SEVEN

### AGAINST THE OFFICER DEFENDANTS FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT

892.    Plaintiffs repeat and reallege all allegations set forth in paragraphs 1 – 888 above, except for those relating to scienter or fraudulent intent.

893.    This claim is brought against the Officer Defendants Lay, Fastow, Skilling and Causey pursuant to Section 11 of the Securities Act.  This claim does not sound in fraud, and neither fraud, recklessness nor scienter is an element of this claim. For purposes of this claim, Plaintiffs expressly disclaim any allegation of scienter or recklessness.

894.    Plaintiffs purchased or acquired the 7% Notes and the Zero Notes pursuant to, or traceable to, the respective registration statements for those Notes.

895.    As alleged more fully above, the respective registration statements for the 7% Notes and the Zero Notes, at the time each was issued and became effective, were inaccurate and misleading, contained untrue statements of material fact and/or omitted to state material facts

266

Case 1:02-cv-08881-JPO   Document 19-11   Filed 08/24/16   Page 273 of 282

necessary to make the statements made therein not misleading.  The matters detailed above would have been material to a reasonable person reviewing the registration statements and the financial statements incorporated therein.

896.    Due to their roles as officers and directors of Enron, who each signed the S-3 registration statements for the 7% Notes and the Zero Notes respectively, these Officer Defendants were responsible for the contents and dissemination of the registration statements and are liable under Section 11 of the Securities Act for any material misrepresentations or omissions contained therein.  These Officer Defendants did not make a reasonable investigation and did not possess reasonable grounds for believing that the statements contained in the registration statements were true, did not omit any material fact, and were not materially misleading.

897.    Plaintiffs did not know or in the exercise of reasonable diligence could not have known of the misstatements and omissions of material fact contained in the registration statements.

898.    Plaintiffs have sustained damages as a result of the misstatements and omissions of material fact contained in the registration statements for which they are entitled to compensation.

899.    These Officer Defendants are control persons of Enron pursuant to Section 15 of the Securities Act, 15 U.S.C.§ 77o, in that they had actual power and/or influence over Enron and/or said Defendants induced and/or participated in Enron's violations of Section 11 of the Securities Act.  As a consequence, the Officer Defendants are liable as issuers to the same extent as Enron.

900.    Less than one year passed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this count is based and the date of the filing of the initial complaint in this action.  Likewise, less than three years elapsed from the time that the securities upon which this count is brought were offered to the public and the date of the filing of the initial complaint in this action or the class action complaint in *Newby v. Enron Corp.*, No. H-01-3624 (S.D. Tex.).

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT EIGHT

## AGAINST CSFB FOR VIOLATIONS OF SECTION 12(a)(2) OF THE SECURITIES ACT

901.    Plaintiffs repeat and reallege all allegations set forth in paragraphs 1 – 898 above, except for those relating to Enron's scienter or fraudulent intent.

902.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2) against Defendant CSFB.  This claim does not sound in fraud, and neither fraud, recklessness nor scienter is an element of this claim.  For purposes of this claim, Plaintiffs disclaim any allegation of scienter or recklessness.

903.    CSFB was an underwriter of the Zero Notes.  CSFB sold Zero Notes to Silvercreek as principal, and was a seller within the meaning of Section 12(a)(2) of the Securities Act.

904.    As alleged previously, the prospectus for the Zero Notes offering was amended several times, the last amendment coming just a week before CSFB sold the Zero Notes to Silvercreek.

268

905.     Silvercreek purchased the Zero Notes from CSFB in the initial public offering or under circumstances requiring delivery of a prospectus.

906.     As alleged more fully above, the prospectus for the Zero Notes, and oral communications by CSFB, included untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

907.     The untruths and omissions detailed above would have been material to a reasonable person reviewing the prospectus and the financial statements incorporated therein.

908.     Due to its role as an underwriter of the Zero Notes, CSFB was responsible for the contents and dissemination of the registration statement for those Notes, including the prospectus.  CSFB did not make a reasonable investigation of Enron, its financial statements, or its true financial condition.

909.     Plaintiffs did not know of the untruths and omissions detailed above.  By contrast, CSFB knew, or in the exercise of reasonable care should have known of those untruths and omissions.

910.     Plaintiffs have sustained damages as a result of the untruths and omissions of material fact contained in the prospectus and oral communications by CSFB, for which Plaintiffs are entitled to compensation.

911.     To the extent that CSFB acted through a subsidiary or affiliate in connection with the sale of Zero Notes to Silvercreek, CSFB is equally liable with the subsidiary or affiliate pursuant to Section 15 of the Securities Act, 15 U.S.C.§ 77o.

912.    Less than one year passed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this count is based and the date of the filing of the initial complaint in this action.  Likewise, less than three years elapsed from the time that the securities upon which this count is brought were sold to Silvercreek and the date of the filing of the initial complaint in this action.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**COUNT NINE**

**VIOLATIONS OF ARTICLE 581-1 ET SEQ. OF THE TEXAS SECURITIES ACT AGAINST ALL DEFENDANTS (EXCEPT MERRILL LYNCH)**

913.    Plaintiffs repeat and reallege all allegations set forth in paragraphs 1 – 910 above, except for those relating to Enron's scienter or fraudulent intent.

914.    This claim is brought against all Defendants except Merrill Lynch for violations of Article 581-33 of the Texas Securities Act in connection with their role in the sale of the Zero Notes.

915.    Enron issued the Zero Notes to the initial underwriters in the stage one private placement subject to the express obligation that Enron cause the Zero Notes to be registered for the subsequent stage two sale of the Zero Notes in the public market.

916.    Enron complied with its registration obligation and caused the Zero Notes to be registered for sale by the owners thereof.

917.    However, as alleged more fully above, the prospectus for the Zero Notes, and the financial statements and SEC reports incorporated therein, contained numerous untrue statements of material facts and/or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

918.    As a consequence, Enron is liable under Article 581-33C for all damages sustained by Silvercreek in connection with their purchases of the Zero Notes.

919.    The Officer Defendants participated in the Zero Notes offering, as alleged more fully above, by preparing and reviewing the registration statement for the Zero Notes, including the prospectus contained therein, and signing the registration statement.

920.    The Officer Defendants are liable as aiders and abettors under Article 581-33F(2) of the Texas Securities Act in that they directly and/or indirectly with intent to deceive, defraud, and/or with reckless disregard for the truth or the law materially aided Enron in its violation of Article 581-33C in connection with the second stage public offering of the Zero Notes.

921.    The Officer Defendants are also control persons under Article 581-33F(1) in that they had actual power and/or influence over Enron and/or said Defendants induced and/or participated in Enron's violation of Article 581-33C.  As a consequence, the Officer Defendants are liable as an issuer to the same extent as Enron.

922.    Defendants JPMorgan, Deutsche Bank and CSFB, and each of them, sold Zero Notes in the stage two public offering, and Defendant Barclays sold Zero Notes in the stage one private placement knowing that the Zeros were about to be registered for resale in the stage two public offering, thereby obtaining a much better price than if the offering was solely a private placement.  These Bank Defendants did so (i) having had the right and opportunity to participate in the preparation of the prospectus and otherwise to make a reasonable investigation of Enron and its finances; and (ii) knowing, or recklessly disregarding that the prospectus and the financial statements and SEC reports incorporated therein, contained numerous untrue statements of

271

material facts and/or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

923.    Defendants JPMorgan, Deutsche Bank, Barclays and CSFB are liable as aiders and abettors under Article 581-33F(2) of the Texas Securities Act in that they directly and/or indirectly with intent to deceive, defraud, and/or with reckless disregard for the truth or the law materially aided Enron in its violation of Article 581-33C in connection with the second stage public offering of the Zero Notes.

924.    Pursuant to Article 581-33(D)(3) of the Texas Securities Act, Plaintiffs are entitled to damages based upon the consideration Plaintiffs paid for the Zero Notes (which is less than the price at which the Zero Notes were first offered to the public), plus interest at the legal rate from the time of their purchases less the value of the Notes at the time Plaintiffs sold them. Plaintiffs are also entitled to recover their reasonable attorney's fees under Article 581-33D (7) as such recovery is equitable under the circumstances of Defendants' wrongdoing.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT TEN

### VIOLATIONS OF 10(b) OF THE SECURITIES EXCHANGE ACT AND RULE 10(b)(5) AGAINST OFFICER DEFENDANTS

925.    Plaintiffs repeat and reallege all allegations set forth in paragraphs 1 – 922 above.

926.    As alleged more fully above, each of the Officer Defendants directly participated in Enron's Ponzi scheme, the implementation of numerous manipulative devices to further that scheme, and the preparation and review of registration statements, prospectuses, annual and quarterly financial statements, and other public disclosures that were misleading, in that they contained material misrepresentations and failed to disclose material facts necessary in order to

272

make the statements made, in light of the circumstances under which they were made, not misleading. Each of the Officer Defendants knew that these materials and disclosures were misleading, or recklessly disregarded whether they were misleading,

927.    The Officer Defendants violated Section 10(b) of the Securities Exchange Act, and Rule 10b-5 thereunder, by employing devices, schemes, and artifices to defraud; making untrue statements of material fact or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or by engaging in acts, practices, and courses of business that operated as a fraud or deceit upon Plaintiffs in connection with their purchases of the 7% and Zero Notes.

928.    The Officer Defendants acted knowingly and/or in reckless disregard of the truth, for the purpose and effect of (i) concealing Enron's true financial results, operating condition and prospects, (ii) artificially inflating the market prices of Enron's securities, including the 7% and Zero Notes; and (iii) enhancing their own compensation based on Enron's fraudulent accounting.

929.    In purchasing the 7% and Zero Notes, Plaintiffs relied not only upon the false and misleading registration statements, financial statements and analyst reports concerning Enron, but also on the integrity of the market in Enron securities. Plaintiffs purchased Enron Notes at prices artificially inflated by the Officer Defendants' misconduct.

930.    Plaintiffs, and each of them, suffered substantial damages by reason of the Officer Defendants fraudulent conduct.  They were induced to acquire hundreds of millions of dollars of debt securities that were essentially worthless because Enron was effectively insolvent, but hid this condition from Silvercreek and the rest of the marketplace.  Plaintiffs would never have purchased the 7% and Zero Notes at the price they paid – or at any price – had they been aware

273

that Enron, by and through the Officer Defendants, was misleadingly concealing its true debt level, unprofitability and lack of cash flow from operations.

931.  The Officer Defendants were also controlling persons of Enron pursuant to Section 20(a) of the Securities Exchange Act, 15 U.S.C.§ 78t(a), in that they had actual power and/or influence over Enron and/or said Defendants induced and/or participated in Enron's violations of Section 10(b) of the Securities Exchange Act, and Rule 10b-5 thereunder.  As a consequence, the Officer Defendants are liable under Section 10(b) of the Securities Exchange Act, and Rule 10b-5 thereunder, to the same extent as Enron.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## XI.

## PRAYER FOR RELIEF

1.  Compensatory and general damages according to proof;

2.  Special damages according to proof;

3.  Prejudgment interest at the maximum legal rate;

4.  Punitive and exemplary damages according to proof;

5.  Costs of the proceedings herein;

6.  Reasonable attorneys' fees; and

7.  All such other and further relief as the Court deems just.

274

## XII.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all issues to triable.


DATED:  August 11, 2011                    SPERLING & SLATER, P.C.


                                           By:  /s/ Scott F. Hessell
                                                SCOTT F. HESSELL
                                                Admitted pro hac vice

                                                BRUCE S. SPERLING (pro hac vice)
                                                EUGENE J. FRETT (pro hac vice)
                                                SCOTT F. HESSELL (pro hac vice)
                                                55 West Monroe, Suite 3200
                                                Chicago, IL  60603
                                                (312) 641-3200

                                                Attorneys for Plaintiffs

CERTIFICATION

I certify that on August 11, 2011, a copy of the foregoing **THIRD AMENDED**

**COMPLAINT** was served on all counsel of record by sending a copy through

www.serve@esl3624.com website and to all registered users through the Court's ECF/CM

filing system.

By  /s/ Scott F. Hessell
Attorneys for Plaintiffs