IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SILVERCREEK MANAGEMENT INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | 02-cv-8881-JPO |
| CITIGROUP, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF SCOTT F. HESSELL
IN SUPPORT OF PLAINTIFFS' CONSOLIDATED MEMORANDUM
IN OPPOSITION TO BANK DEFENDANTS' MOTIONS TO DISMISS**

SCOTT F. HESSELL declares:

1.      I am admitted to practice *pro hac vice* in *Silvercreek Management Inc. et al.* v. *Citigroup, Inc., et al.,* No. 02-cv-08881 (the "Action"), and I am associated with Sperling & Slater, P.C., attorneys for plaintiffs Silvercreek Management Inc., Silvercreek Limited Partnership and Silvercreek II Limited (collectively, "Silvercreek") in the Action.  I make this declaration, based on personal knowledge and papers filed with this Court, in opposition to the individual and joint Motions to Dismiss the Third Amended Complaint filed by the defendants in this Action.

2.      Attached as **Exhibit 1** is a true and correct copy of the December 2005 Plea Agreement between the U.S. Department of Justice and Richard A. Causey filed in *U.S. v. Causey*, No. CR-H-04-25(S-2) (S.D. Tex.).

3.      Attached as **Exhibit 2** is a true and correct copy of the October 2004 Cooperation Agreement between the U.S. Department of Justice and Timothy Despain filed in *U.S. v. Despain*, No. CR-H-04-449 (S.D. Tex.).

4.      Attached as **Exhibit 3** are true and correct copies of press releases re Enron bankruptcy estate settlements with Credit Suisse, Deutsche Bank and Merrill Lynch.

5.      Attached as **Exhibit 4** is a true and correct copy of the April 19, 2007 Opinion and Order in *American National Insurance Co., et al. v. J.P. Morgan Chase*, No. G-02-0299 (S.D. Tex.).

6.      Attached as **Exhibit 5** is a true and correct copy of the January 19, 2010 Opinion and Order in *American National Insurance Co., et al. v. Citigroup*, *Inc., et al.*, No. G-02-723 (S.D. Tex.).

7.      Attached as **Group Exhibit 6** are true and correct copies of Supplement No. 1 to the Zero Coupon Notes Prospectus, filed by Enron with the SEC on August 3, 2001; Supplement No. 2 to the Zero Coupon Notes Prospectus, filed with the SEC on August 17, 2001; Supplement No. 3 to the Zero Coupon Notes Prospectus, filed with the SEC on September 26, 2001; Supplement No. 4 to the Zero Coupon Notes Prospectus, filed with the SEC on October 12, 2001.

Executed on October 6, 2016

/s/ Scott F. Hessell
Scott F. Hessell

# Exhibit 1

**UNITED STATES COURTS**
**SOUTHERN DISTRICT OF TEXAS**
**FILED**

DEC **2 8** 2005

**MICHAEL N. MILBY, CLERK OF COURT**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. CR-H-04-25(S-2) |
| | ) | |
| RICHARD A. CAUSEY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the United

States Department of Justice by the Enron Task Force ("the Department") and Richard A.

Causey ("Defendant") agree to the following: .

1.        Defendant will plead guilty to Count 19 of the Superseding Indictment, charging

him with securities fraud, in violation of Title 17, Code of Federal Regulations, Section 240.10b-

5, Title 15 United States Code, 78j(b) and 78ff.  Defendant agrees that he is pleading guilty

because he is guilty, and that the facts contained in Exhibit A (attached and incorporated herein)

are true and supply a factual basis for his plea.  At the time the offenses were committed by the

Defendant, the offense of securities fraud carried the following statutory penalty:

### Count 19 - Securities Fraud

a.      Maximum term of imprisonment: 10 years
        (17 C.F.R. § 240.10b-5, Title 15 U.S.C. 78j(b) and 78ff)

b.      Minimum term of imprisonment: 0 years
        (17 C.F.R. § 240.10b-5, Title 15 U.S.C. 78j(b) and 78ff)

c.      Maximum supervised release term: 3 years, to follow any term of
        imprisonment; if a condition of release is violated, Defendant may be

sentenced to up to two years without credit for pre-release imprisonment or time previously served on post-release supervision (18 U.S.C. §§ 3583 (b) & (e))

d.   Maximum fine: $1,000,000 or twice the gain/loss (18 U.S.C. § 3571(b)(3))

e.   Restitution: As determined by the Court pursuant to statute. (18 U.S.C. §§ 3663 and 3663A)

f.   Special Assessment: $100 (18 U.S.C. § 3013)

<u>Sentencing Guidelines</u>

2.   The defendant understands that, in imposing the sentence, the Court will be guided by the United States Sentencing Guidelines (the "Guidelines"). The defendant understands that the Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence. The Department and the Defendant agree that the applicable Sentencing Guideline range exceeds 84 months.

3.   Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the Defendant and the Department agree to ask the Court to impose an agreed-upon sentence of 84 months incarceration and to order forfeiture in the amount of $1,250,000.00. The Defendant and the Department agree that if the Court refuses to accept the plea agreement with this agreed-upon sentence, the agreement will be null and void. The Defendant agrees that he will not seek a sentence below 84 months incarceration, and Defendant understands that except under the circumstances described in paragraph 4 below, the Court will be required to impose a sentence of 84 months and to order the agreed-upon forfeiture amount, or the plea agreement will be null and void.

4.   If the Defendant provides truthful, complete, and accurate information to the

Department, then the Department in its sole and exclusive discretion may move the Court, pursuant to Sentencing Guideline Section 5K1.1 and 18 U.S.C. § 3553(e), to depart downward from the 84-month agreed-upon sentence set forth in paragraph 3. Defendant understands and agrees that under the terms of this Agreement and Rule 11(c)(1)(C) and regardless of any such motion that the Department may make, Defendant cannot and will not be sentenced to a period of incarceration of less than 60 months. Defendant further agrees that he will not move for a downward departure on any grounds and that no such grounds are applicable.

5.     The parties further agree that the Defendant's forfeiture of $1,250,000.00 in criminal proceeds and his agreement to relinquish any claim he may have to deferred compensation, as described in paragraphs 11 and 12 below, fully satisfies the forfeiture, fine, and restitution provisions of the sentencing laws and Guidelines.

<u>Waiver of Rights</u>

6.     If the Court accepts the plea agreement pursuant to Rule 11(c)(1)(C) and sentences Defendant to the agreed-upon sentence as set forth in paragraphs 3, 4, and 5, Defendant will not file an appeal or collaterally attack his conviction, guilty plea, or sentence.

7.     Defendant waives all defenses based on venue (but reserves the right to request a change of venue if his plea is vacated or plea withdrawn), speedy trial under the Constitution and Speedy Trial Act, and the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed, in the event that (a) Defendant's conviction is later vacated for any reason, (b) Defendant violates any provision of this Agreement, or (c) Defendant's plea is later withdrawn.

8.     Defendant understands that by pleading guilty he is waiving important rights

-3-

including: (a) the right to persist in his previously entered plea of not guilty; (b) the right to a jury trial with respect to guilt or sentencing; ( c) the right to be represented by counsel - and if necessary to have the court appoint counsel to represent him - at trial and at every other stage of the proceedings; (d) the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses; and (e) the right to additional discovery and disclosures from the Department. Defendant waives any right to additional disclosure from the Department in connection with his guilty plea.

### Defendant's Obligations

9.      Defendant agrees not to accept remuneration or compensation of any sort, directly or indirectly, for the dissemination through books, articles, speeches, interviews, or any other means, of information regarding his work at Enron or the investigation or prosecution of any civil or criminal cases against him.

### Forfeiture and Monetary Penalties

10.     Defendant agrees to pay the special assessment of $100.00 by check payable to the Clerk of the Court at or before sentencing. 18 U.S.C. § 3013(a)(2)(A); U.S.S.G. § 5E1.3.

11.     Defendant agrees to forfeit to the government $1,250,000.00, to be satisfied from funds located within Wachovia Securities Account 2005-0471, which contains sufficient funds for this purpose and which constitutes proceeds of the offense to which Defendant will plead guilty pursuant to this Agreement. Defendant warrants that he and his wife, Elizabeth A. Causey, are the sole owners of all property listed above, and they agree to hold the United States, its agents and employees harmless from any claims whatsoever in connection with the seizure or

forfeiture of property covered by this agreement. Defendant further agrees to waive all interest

in the amount listed above for forfeiture in any administrative or judicial forfeiture proceeding,

whether criminal or civil, state or federal. Defendant's wife, Elizabeth A. Causey, also agrees to

waive her right, title, and interest in the Wachovia Securities Account 2005-0471 up to and

including the forfeiture amount, and her execution of the attached Stipulation and Waiver is a

condition precedent of this Agreement. Defendant agrees to consent to the entry of orders of

forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure

32.2 and 43(a) regarding notice of forfeiture in the charging instrument, announcement of the

forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant

acknowledges that he understands that the forfeiture of assets is part of the sentence that may be

imposed in this case and waives any failure by the court to advise him of this, pursuant to Rule

11(b)(1)(J), at the time his guilty plea is accepted. Defendant further agrees to waive all

constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or

any other means) to any forfeiture carried out in accordance with this agreement on any grounds,

including that the forfeiture constitutes an excessive fine or punishment. Defendant agrees to

take all steps as requested by the United States to pass clear title to the forfeitable assets to the

United States, and to testify truthfully in any related judicial proceeding. Defendant agrees not

to seek a refund from the United States Treasury of the amount that he paid in taxes in

connection with the receipt of $1,250,000.00 in proceeds from the offense to which he will plead

guilty, and waives his right, title, and interest to the taxes paid on that amount.

      12.    Defendant further agrees to relinquish any claim he may have to deferred

compensation, severance, or any other form of payment related to his employment by Enron or

any related entity.

## The Department's Obligations

13.    The Department agrees that, except as provided for in this Agreement, no further criminal charges will be brought against Defendant for any act or offense in which he engaged in his capacity as an officer and/or employee of Enron Corporation, or arising out of such employment, and the Department will move after sentencing to dismiss the remaining counts of the Superseding Indictment against him with prejudice.

14.    The Department further agrees that no statements made by Defendant during any debriefing meetings with the Department will be used against him in any criminal proceedings instituted by the Department, except as provided in paragraphs 1, 3, 4, and 5.

## Hyde Amendment Waiver

15.    Defendant agrees that with respect to all charges contained in the Superseding Indictment in the above-captioned action, he is not a "prevailing party" within the meaning of the "Hyde Amendment," Section 617, PL 105-119 (Nov. 26, 1997), and will not file any claim under that law.

## Scope

16.    This Agreement does not bind any federal, state, or local prosecuting authority other than the Department, and does not prohibit the Department or any other department, agency, or commission of the United States from initiating or prosecuting any civil, administrative, or tax proceedings directly or indirectly involving Defendant.

## Complete Agreement

17.    No promises, agreements or conditions have been entered into by the parties other

than those set forth in this Agreement and none will be entered into unless memorialized in writing and signed by all parties. This Agreement supersedes any prior promises, agreements, or conditions between the parties, including any written proffer agreements. To become effective, this Agreement must be signed by all signatories listed below and in the addenda.

Dated: Houston, Texas
     December 28, 2005

                       SEAN BERKOWITZ
                       Director, Enron Task Force

By:      _Kathryn Ruemmler_

                       Kathryn Ruemmler
                       Deputy Director, Enron Task Force

Subscribed and sworn to before me on December 28, 2005.

Michael N Milby, Clerk
United States District Clerk

By: Darlene A Hansen
Deputy United States District Clerk

## ADDENDUM FOR DEFENDANT CAUSEY

I have consulted with my attorneys and fully understand all my rights with respect to the Superseding Indictment filed by the United States Department of Justice. I have consulted with my attorneys and fully understand all my rights with respect to the provisions of the U.S. Sentencing Commission's Guidelines Manual which, although not binding on the Court, may apply in my case. I have read this Agreement and carefully reviewed every part of it with my attorneys. No promises have been made to me by the Department except as set forth in this Agreement. I understand this Agreement and I voluntarily agree to it.

_Richard A. Causey_        _12-28-05_
Richard A. Causey            Date
Defendant

ADDENDUM FOR DEFENSE COUNSEL

I have fully explained to Defendant Richard A. Causey his rights with respect to the

Superseding Indictment, Cr. No. H-04-25 (S-2). I have reviewed the provisions of the U.S.

Sentencing Commission's Guidelines Manual and I have fully explained to Defendant the

provisions of those Guidelines which, although not binding on the Court, may apply in this case.

I have carefully reviewed every part of this Agreement with Defendant. To my knowledge,

Defendant's decision to enter into this Agreement is an informed and voluntary one.

Reid Weingarten, Esq.
Attorney for Defendant Causey

12/28/05
Date

Mark Hulkower, Esq.
Attorney for Defendant Causey

12/28/05
Date

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

DEC 2 8 2005

MICHAEL N. MILBY, CLERK OF COURT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Cr. No. H-04-25 (S-2) |
| | § | (Lake, J.) |
| RICHARD A. CAUSEY, | § | |
| | § | |
| Defendant. | § | |
| | § | |

Exhibit A to Plea Agreement

The following factual statement made by defendant Richard A. Causey is submitted to provide a factual basis for my plea of guilty to Count Nineteen (securities fraud) of the above captioned Superseding Indictment, charging me with securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

1.      I was the Chief Accounting Officer ("CAO") of Enron Corporation ("Enron") from 1998 through Enron's bankruptcy in December 2001. While CAO, I and other members of Enron's senior management fraudulently misled investors and others about the true financial position of Enron in order to inflate artificially the price of Enron's stock.

2       More specifically, I conspired with members of Enron's senior management to make false and misleading statements, in Enron's filings with the Securities and Exchange Commission ("SEC") and in analyst calls, about the financial condition of Enron, which did not fairly and accurately reflect Enron's actual financial condition and performance as I knew it.

3.      Certain of the conduct, for which I accept responsibility, is detailed below.

**False and Misleading Statements in SEC Filings**

4.      Along with others in senior management, I was responsible for the preparation and drafting of the financial statements that were included in Enron's annual reports filed with the SEC on Form 10-K and its quarterly reports on Form 10-Q. I, along with others in senior management, were responsible for ensuring that the financial statements contained in Enron's public filings fairly presented Enron's true financial condition. The financial statements were required to include a section entitled Management, Discussion and Analysis ("MD&A"), which required, among other things, that management disclose information necessary to an understanding of Enron's financial condition and results of operations. I reviewed drafts of Enron's quarterly and annual reports, and I signed these reports attesting to their accuracy. As set forth below, I participated along with others in Enron's senior management in efforts to use Enron's public filings and public statements to mislead the investing public about the true nature of Enron's financial performance by making false and misleading statements, and omitting facts

necessary to make certain statements not misleading.

5.     For example, in the first quarter of 2000, Enron recorded $85 million in earnings from a partnership interest it held in a vehicle named JEDI, which held Enron stock. I and others reported these earnings as recurring earnings from operations when, as I and others knew, the earnings in fact came from a dramatic increase in Enron's stock price resulting from positive investor reaction to Enron's January 20, 2000 analyst conference. I and others understood that it would have been material information to investors and analysts that a significant portion of Enron's reported earnings from its Assets and Investments business came solely from an increase in its own stock price. I and others misled investors by describing the earnings as coming from the strong performance of Enron's portfolio of energy related and other investments. I and others intentionally failed to disclose the true nature of the earnings and the fact that Enron management was taking large positions in Enron stock.

6.     Another example concerns disclosures in 2001 relating to Enron's retail business, Enron Energy Services ("EES"). During the first quarter of 2001, I became aware that EES had incurred hundreds of millions of dollars in losses resulting from California regulatory actions and the identification of significant valuation errors in EES contracts. These losses were in excess of EES's targeted earnings for the entire year of 2001. I understood that EES had been promoted by Enron management as a growth segment of the company that was a major contributor to Enron's stock price. I and others in senior management believed that had these losses been disclosed to Enron's shareholders and the analyst community, the reaction would have been severely negative and the stock price would have declined.

7.     I and others in senior management made a decision to move the risk management function of EES into another business unit, Enron Wholesale Services ("EWS"). This reorganization allowed us to avoid reporting the losses in EES's results so that I and others in senior management could continue to tout EES as a growing and successful business. I and others in management intentionally failed to disclose to the investing public any reference to EES's losses, which we knew was material information.

8.     On April 17, 2001, Enron issued its earnings release for its first quarter 2001 results, a copy of which I reviewed. I and others reported to Enron's shareholders and the investing public that EES had earned $40 million in recurring IBIT for the first quarter of 2001. We did not disclose that EES had in fact incurred hundreds of millions of dollars in losses during the first quarter of 2001 that through an accounting change we had concealed in EWS. By failing to disclose the true performance of EES, I and others intentionally misled Enron's shareholders and the investing public.

**10-Q for the First Quarter 2001**

9.     On or about May 15, 2001, Enron filed its Form 10-Q, which I reviewed and signed. While the 10-Q disclosed the transfer of risk management functions, the 10-Q did not disclose the losses that EES would otherwise have incurred, which was required in order to fairly

present to Enron's shareholders and the investing public Enron's true financial condition. This information was material and would have been important to a reasonable investor. I and others in senior management failed to include this information in Enron's 10-Q because we were concerned that disclosing such information would have a negative effect on Enron's stock price.

10. On or about May 15, 2001, within the Southern District of Texas, Enron filed via electronic transmission its Form 10-Q for the first quarter 2001, with the Securities and Exchange Commission. As set forth above, in connection with Enron's Form 10-Q for the first quarter 2001, a copy of which I signed, I and others in Enron senior management did willfully and unlawfully use and employ manipulative and deceptive devices and contrivances and directly and indirectly (i) employ devices, schemes and artifices to defraud; (ii) make untrue statements of material facts and omit to state facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engage in acts, practices, and courses of conduct which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of Enron securities.

11. I understood that my conduct and the conduct of those with whom I conspired would have a material effect on Enron's financial statements which Enron shareholders and potential shareholders relied upon in making investment decisions. Enron's stock was traded on the New York Stock Exchange. I also understood that interstate wire transmissions, including fax transmissions, email and telephone calls, would be used and were used in furtherance of the scheme. Specifically, I knew that Enron's annual and quarterly reports were filed with the SEC via interstate wire transmissions.

12. The preceding is a summary of facts that make me guilty, which I make for the purpose of providing the Court with a factual basis for my guilty plea to Count 19 of the Superseding Indictment. It does not include all of the facts known to me concerning criminal activity in which I and other members of Enron senior management engaged. I make this statement knowingly and voluntarily because I am in fact guilty of the crime charged.

Richard A. Causey
Defendant

December **28** , 2005

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

DEC 2 8 2005

MICHAEL N. MILBY, CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. CR-H-04-25(S-2) |
| | ) | |
| RICHARD A. CAUSEY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## STIPULATION AND WAIVER

1.       I, Elizabeth A. Causey, hereby agree to waive all right, title, and interest I have in

$1,250,000 of the assets in Wachovia Securities Account 2005-0471 ("Forfeited Assets") which

is held in the name of Richard and Elizabeth Causey.

2.       I warrant that I and/or my husband, Richard A. Causey, are the sole owners of all

of the Forfeited Assets, and agree to hold the United States, its agents and employees harmless

from any claims whatsoever in connection with the seizure or forfeiture of the Forfeited Assets.

3.       I acknowledge that, pursuant to paragraphs 5 and 11 of the plea agreement in

United States v. Causey, Cr.-H-04-25 (S-2), Richard Causey has acknowledged that the criminal

activities to which he is pleading guilty resulted in $1.25 million in criminal proceeds, which are

located within the Wachovia account referenced above.  The Wachovia account contains money

in excess of $1,250,000, and I understand that only $1,250,000 will be forfeited.  I agree to

relinquish any and all right, title, and interest I may have in the Forfeited Assets, and agree that

such right, title and interest can be forfeited to the United States, without further notice to me.  I

-6-

also agree to execute and record any and all documents necessary to transfer the Forfeited Assets to the United States as part of a forfeiture judgment.

4.    In addition, I agree to waive all right, title and interest I may have in any claim that my husband, Richard Causey, may have for deferred compensation, severance, or any other form of payment related to his employment at Enron or any related entity.  In understand that Richard Causey has waived any interest in such a claim as well pursuant to paragraph 12 of his Plea Agreement.

5.    I make this stipulation and waiver knowingly and voluntarily.


AGREED AND CONSENTED TO:

*Elizabeth Causey*
Elizabeth A. Causey

Dated: December 28, 2005

-7-

Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

OCT  5 2004

Michael N. Milby, Clerk of Court

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  No. CR-H- *04-449* |
| | ) |
| TIMOTHY DESPAIN, | ) |
| | ) |
| Defendant. | ) |

---

### COOPERATION AGREEMENT

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States

Department of Justice by the Enron Task Force ("the Department") and Timothy Despain

("Defendant") agree to the following (the "Agreement"):

1.    Defendant will waive indictment and plead guilty in the Southern District of

Texas to an information charging him with one count of conspiracy to commit securities fraud, in

violation of 18 U.S.C. § 371.  The charge carries the following statutory penalties:

    a.    Maximum term of imprisonment: 5 years
       (18 U.S.C. § 371)

    b.    Minimum term of imprisonment: 0 years
       (18 U.S.C. § 371)

    c.    Maximum supervised release term: 3 years, to follow any term of
       imprisonment; if a condition of release is violated, Defendant may be
       sentenced to up to two years without credit for pre-release imprisonment
       or time previously served on post-release supervision
       (18 U.S.C. §§ 3583 (b) & (e))

    d.    Maximum fine:  $250,000 or twice the gain/loss
       (18  U.S.C. § 3571(b)(3))



EXHIBIT 31052
WIT: *SAVAGE V4*
DATE: *1-21-05*
L. DURHAM

    e.      Restitution:  As determined by the Court pursuant to statute.
            (18 U.S.C. §§ 3663 and 3663A)

    f.      Special Assessment:  $100
            (18 U.S.C. § 3013)

<u>Sentencing Guidelines</u>

2.     The Defendant agrees that his sentence is governed by the United States Sentencing Guidelines (the "Guidelines").  Additionally, the defendant (a) waives any right to have facts that determine the offense level[1] under the Guidelines alleged in an indictment and found by a jury beyond a reasonable doubt, (b) agrees that the facts that determine the offense level will be found by the court at sentencing by a preponderance of the evidence, unless it is determined that this burden of proof cannot be waived, and that the court may consider any reliable evidence, including hearsay, and ( c) waives any constitutional challenge to the validity of the Guidelines.  The parties agree that Defendant's sentence is governed by the November 2000 Guidelines and that U.S.S.G. § 2F1.2 governs the determination of the applicable offense level and sentence, capped by the statutory maximum of 60 months.  The Department agrees, based on information known to it on the date of this Agreement, that (a) Defendant does not qualify for an aggravating role adjustment under U.S.S.G. § 3B1.1; and (b) the Department will not oppose a downward adjustment of three levels for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1.

3.     The Department will advise the Court and the Probation Office of information relevant to sentencing, including criminal activity engaged in by Defendant, and all such

---

[1]The term "offense level" includes the base offense level plus all specific offense characteristics, enhancements and adjustments.

information may be used by the Court in determining Defendant's sentence.  Defendant

understands that the parties' positions regarding the Sentencing Guidelines do not bind the Court

and that the sentence imposed is within the discretion of the sentencing judge.

<u>Waiver of Rights</u>

4.      Defendant will not appeal or collaterally attack his conviction or guilty plea.

Defendant does not waive his right to appeal or collaterally attack his sentence based upon the

law at the time of sentencing.

5.      Defendant waives all defenses based on venue (but reserves the right to request a

change of venue if his plea is vacated or plea withdrawn), speedy trial under the Constitution and

Speedy Trial Act, and the statute of limitations with respect to any prosecution that is not time-

barred on the date that this Agreement is signed, in the event that (a) Defendant's conviction is

later vacated for any reason, (b) Defendant violates any provision of this Agreement, or (c)

Defendant's plea is later withdrawn.  Defendant also waives his right to be charged by indictment

returned by a duly constituted grand jury in the Southern District of Texas and consents to be

charged by Information filed by the Acting United States Attorney.

6.      Defendant understands that by pleading guilty he is waiving important rights

including: (a) the right to persist in his previously entered plea of not guilty; (b) the right to a jury

trial with respect to guilt or sentencing; ( c) the right to be represented by counsel - and if

necessary to have the court appoint counsel to represent him - at trial and at every other stage of

the proceedings; (d) the right at trial to confront and cross-examine adverse witnesses, to be

protected from compelled self-incrimination, to testify and present evidence, and to compel the

attendance of witnesses; and (e) the right to additional discovery and disclosures from the

-3-

Department.  Defendant waives any right to additional disclosure from the Department in connection with his guilty plea.

<u>Defendant's Obligations</u>

7.    Defendant will provide truthful, complete, and accurate information to and will cooperate fully with the Department, both before and after he is sentenced.  This cooperation will include, but is not limited to, the following:

a.    Defendant agrees to make himself available at all meetings with the Department and to respond truthfully and completely to any and all questions put to him, whether in interviews, before a grand jury, or at any trial or other proceeding.

b.    Defendant waives all claims of attorney-client privilege related to communications with any counsel for Enron in his capacity as an officer and employee of Enron.

c.    Defendant agrees to provide any and all documents and other material that may be relevant to the investigation and that are in his possession or control.

d.    Except as required by law, Defendant agrees not to reveal any information derived from his cooperation to any third party (other than his counsel) without prior consent of the Department, and hereby instructs his attorneys to do the same.  Defendant agrees to inform the Department of any attempt by any third party to interview, depose, or communicate in any way with him regarding this case, his cooperation, or any other information related to Enron or transactions involving Enron.

e.    Defendant agrees to testify truthfully at any grand jury, court, or other proceeding as directed by the Department.

f.    Defendant consents to adjournments of his sentencing hearing as requested by the Department and agrees that his obligations under this Agreement continue until the Department informs him in writing that his cooperation is concluded.  Nothing in this paragraph pertains to the date that the Defendant may be required to report or surrender to the Bureau of Prisons or United States Marshal's Service in order begin the incarceratory portion of any sentence.

-4-

8.      The Department and Defendant agree that Defendant's counsel may be present at any meetings or debriefings between Defendant and the Department, and the Department will endeavor to provide reasonable notice of such meetings or debriefings, but counsel's presence is not required and, if necessary, Defendant agrees to be present and cooperate notwithstanding his counsel's unavailability.

9.      Defendant agrees not to accept remuneration or compensation of any sort, directly or indirectly, for the dissemination through books, articles, speeches, interviews, or any other means, of information regarding his work at Enron or Halliburton or the investigation or prosecution of any civil or criminal cases against him.

### The Department's Obligations

10.     The Department agrees that, except as provided in paragraphs 1, 5 and 13, no further criminal charges will be brought against Defendant for any heretofore disclosed participation in criminal activity in which he engaged in his capacity as an officer or employee of Enron and Halliburton.

11.     The Department further agrees that no statements made by Defendant during the course of his cooperation will be used against him in any criminal proceedings instituted by the Department, except as provided in paragraphs 1, 3, 5 and 13.

12.     If the Department determines, in its sole and exclusive discretion, that Defendant has cooperated fully, provided substantial assistance to law enforcement authorities, and otherwise complied with the terms of this Agreement, the Department will file a motion pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e), or pursuant to Federal Rule of Criminal Procedure 35(b), with the sentencing court setting forth the nature and extent of Defendant's cooperation.

In this connection, Defendant understands that a determination by the Department as to whether Defendant has cooperated fully, provided substantial assistance, and otherwise complied with this Agreement, as well as the Department's assessment of the value, truthfulness, completeness, and accuracy of the cooperation, is binding on him. Defendant agrees that, in making these determinations, the Department may consider facts learned by the Department both before and after the signing of this Agreement. The Department may or may not, in its sole and exclusive discretion, recommend to the Court a specific sentence to be imposed. Except as otherwise set forth in this Agreement, the Department will not make a promise or representation to Defendant as to what sentence will be recommended by the Department. The Department does not and cannot make any promise as to what sentence will be imposed by the Court.

Breach of Agreement

13. Defendant must at all times give complete, truthful, and accurate information and testimony, and must not commit, or attempt to commit, any further crimes, including but not limited to perjury, making false statements, and obstruction of justice. Should Defendant violate any provision of this Agreement, Defendant will not be released from his guilty pleas but the Department will be released from all its obligations under this Agreement, including its promise not to prosecute Defendant for any heretofore disclosed participation in criminal activity. Defendant agrees that, in any such prosecution, all statements and other information that he has provided at any time, including all statements he has made and all evidence he has produced during proffers, interviews, testimony, and otherwise, may be used against him, regardless of any constitutional provision, statute, rule, prior agreement, or other term of this Agreement to the contrary.

-6-

<u>Hyde Amendment Waiver</u>

14.     Defendant agrees that with respect to all charges contained in the Information in the above-captioned action, he is not a "prevailing party" within the meaning of the "Hyde Amendment," Section 617, PL 105-119 (Nov. 26, 1997), and will not file any claim under that law.

<u>Scope</u>

15.  This Agreement does not bind any federal, state, or local prosecuting authority other than the Department, and does not prohibit the Department or any other department, agency, or commission of the United States from initiating or prosecuting any civil, administrative, or tax proceedings directly or indirectly involving Defendant.

<u>Complete Agreement</u>

16.  Apart from the written proffer agreements originally dated July 2, 2004, no promises, agreements or conditions have been entered into by the parties other than those set forth in this Agreement and none will be entered into unless memorialized in writing and signed by all parties.  This Agreement supersedes all prior promises, agreements, or conditions between the parties, including the written proffer agreement.  To become effective, this Agreement must be signed by all signatories listed below and in the addenda.

Dated: Houston, Texas
       October 5, 2004

                                  ANDREW WEISSMANN
                                  Director, Enron Task Force

                          By:     _____

                                  Sean M. Berkowitz
                                  Assistant United States Attorney
                                  Enron Task Force

-7-

## ADDENDUM FOR DEFENDANT DESPAIN

I have consulted with my attorneys and fully understand all my rights with respect to the Information. I have consulted with my attorneys and fully understand all my rights with respect to the provisions of the U.S. Sentencing Commission's Guidelines Manual which may apply in my case. I have read this Agreement and carefully reviewed every part of it with my attorneys. No promises have been made to me by the Department except as set forth in this Agreement. I waive my right to be charged by indictment. I understand this Agreement and I voluntarily agree to it.

_____
Timothy Despain
Defendant

October 5, 2004
Date

-8-

## ADDENDUM FOR DEFENSE COUNSEL

I have fully explained to Defendant Despain his rights with respect to the Information.  I have reviewed the provisions of the U.S. Sentencing Commission's Guidelines Manual and I have fully explained to Defendant the provisions of those Guidelines which may apply in this case.  I have carefully reviewed every part of this Agreement with Defendant.  To my knowledge, Defendant's decision to waive indictment and enter into this Agreement is an informed and voluntary one.

_____
Leslie Ann Gerardo, Esq.
Attorney for Defendant Despain

10/5/04
_____
Date

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cr. No. H-04 |
| | ) | |
| TIMOTHY DESPAIN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## SENTENCE DATA SHEET

**DEFENDANT:** Timothy Despain

**CRIMINAL NO:**

**GUILTY PLEA:** Count 1 (Conspiracy to Commit Securities Fraud)

**SUBSTANCE OF
AGREEMENT:** Pursuant to Fed. R. Crim. P. 11(c)(1)(B), Defendant will plead guilty to
the Information, charging him with conspiracy to commit securities fraud.

**COUNT ONE:** Conspiracy (18 U.S.C. § 371)

**ELEMENTS:**
1) An agreement between two or more persons,
2) to commit a crime against the United States, and
3) an overt act committed by one of the conspirators in furtherance of the
agreement.

**PENALTY:** Imprisonment not to exceed 5 years and a fine not to exceed $250,000 or
twice gain/loss. 18 U.S.C. §§ 371 and 3571(b)(3). Supervised release
after imprisonment of not more than 3 years. 18 U.S.C. §§ 3559(a)(4) and
3583(b)(2).

**SENTENCING
GUIDELINES:** Applicable.
**SPECIAL**

-1-

ASSESSMENT:    $100.  18 U.S.C. § 3013(a)(2)(A).

ATTACHMENT:    Plea Agreement
DEFENDANT
WAIVED HIS
RIGHT TO
APPEAL:    Defendant will not appeal or collaterally attack his conviction or guilty plea.  Defendant does not waive his right to appeal or collaterally attack his sentence based upon the law at the time of sentencing.

## DESPAIN STATEMENT

I was an Assistant Treasurer of Enron Corporation from approximately January, 1999, until May, 2002. As an Assistant Treasurer at Enron, I coordinated interactions between Enron senior management and the national credit rating agencies who rated Enron's corporate debt. I also regularly communicated directly with the credit rating agencies. During my tenure, I reported directly to and was supervised directly by the people who served as Enron's Treasurer. From 1999 through the fall of 2001, in my capacity as an Assistant Treasurer, I was directed by my superiors to engage in, and I did engage in, conduct that I recognized was intended to manipulate fraudulently Enron's credit rating, which rating I knew was relied on by the holders and prospective purchasers of Enron's publicly traded stocks and bonds.

Enron's credit rating was important to Enron in a number of respects. As I and others knew, Enron's credit rating was directly related to the cost of capital Enron borrowed in the marketplace. In other words, the more favorable Enron's credit rating the less it cost Enron to borrow money. Moreover, I and others knew that maintaining an investment-grade credit rating for Enron debt was critical to Enron's ongoing business operations. An investment grade rating was essential to Enron's ability to enter into favorable or unsecured trading contracts with its counterparties. A decline in Enron's credit rating to below investment grade would also have triggered calls for significant amounts of cash to be posted under Enron's existing trading contracts and accelerated payments due under some of Enron's financing structures. Such a drop would also have severely impacted Enron's ability to continue accessing bank credit facilities and borrowing money in the public marketplace.

I understood that in rating Enron's debt, the credit rating agencies relied on, among other things, Enron's public filings, including its financial statements filed with the Securities and Exchange Commission. In addition, I and members of Enron's senior management spoke regularly with, and provided financial information to, representatives of the credit rating agencies. I and members of Enron's senior management who interacted with the credit rating agencies understood that two primary factors influencing Enron's credit rating were the total amount of Enron's debt and other debt-like obligations, as well as the cash and funds flow Enron generated from operations to satisfy those obligations (hereinafter collectively referred to as "cash flow").

In communicating with representatives of the rating agencies, I and others at Enron did not truthfully present the financial position and cash flow of the company and omitted to disclose facts necessary to make the disclosures and statements that were made to the rating agencies truthful and not misleading.

Among other things, I and others at Enron falsely represented to credit rating agencies that Enron's cash flows from its non-regulated businesses were stable and predictable. In fact, the annual cash flow targets that Enron set for itself and reported to the rating agencies were arbitrarily based on what I and others believed was necessary to maintain Enron's investment-

1

grade credit rating, rather than on the amount of cash flow Enron's non-regulated businesses were expected to achieve. Because of this difference between the actual cash flows from business operations and the cash flow targets arbitrarily set by senior management, Enron consistently struggled to achieve the cash flow targets it had set for itself. While I served as an Assistant Treasurer, Enron only achieved its cash flow target numbers by engaging in complex transactions designed primarily and at times exclusively to achieve specific cash flow results. In my view, because of the financial cost associated with engaging in them, various transactions actually were to Enron's financial detriment, apart from their use to achieve cash flow and other targets that could improve Enron's apparent performance. Often these transactions were completed in haste at or near the close of a financial reporting period.

By way of example, in late 1999, Enron was at least $500 million short of the cash flow target it had artificially set and then told the national rating agencies it intended to achieve for 1999. In order to make up this $500 million shortfall in Enron's targeted cash flow for 1999, Enron entered into a transaction referred to internally as Project Nahanni. The Project Nahanni transaction resulted in Enron reporting the sale of $500 million of Treasury securities as cash flow from operations. I and others knew that there was no business purpose to the Project Nahanni transaction, other than to achieve Enron's desired cash flow results. Moreover, the sale of Treasury securities should not have been characterized as a sale of a merchant asset and therefore should not have been included in the cash flow from operations figures presented to the rating agencies. In addition, in my view, the Nahanni transaction was actually to Enron's financial detriment, apart from its usefulness in misleadingly portraying Enron to the credit rating agencies, because the bank that structured the transaction charged Enron several million dollars to facilitate the transaction. This transaction occurred during a time in which Enron was actively pursuing a credit rating upgrade from one of the national credit rating agencies. I and others knew at the time of the Project Nahanni transaction that if the rating agencies understood at the time that $500 million of the reported cash flow from operations for 1999 was from the sale of Treasury securities, Enron's credit rating would have been negatively affected, and Enron would not likely have received the desired upgrade in its credit rating. Nevertheless, neither I nor others revealed the true nature of the transaction or its purpose to the credit rating agencies.

Another mechanism by which Enron achieved the artificial cash flow targets it set for itself was through transactions commonly referred to within the company as "prepays." The reporting of the cash received from these transactions was a means of demonstrating to the rating agencies Enron's ability to recognize cash from its mark-to-market trading book. Although the prepay transactions were accounted for as commodity transactions and reflected on Enron's books as a trading liability, the transactions in substance created debt-like obligations to the financial institutions that advanced funds to Enron through the transactions. I and others told the rating agencies that the cash generated from Enron's trading operations was from the sale or "monetization" of trading contracts or the future cash flow streams from those contracts. Fundamentally, the agencies were led to believe that Enron was generating cash by selling an asset, when in fact Enron was generating cash by incurring a future obligation that operated as debt. Over the course of my time as Assistant Treasurer, Enron's obligations under the "prepay"

transactions grew to approximately $5 billion. I was directed by Enron's Treasurers not to reveal to, or discuss with, the credit rating agencies, the nature and extent of the prepay transactions entered into by Enron, and I complied with this direction. I and the Treasurers recognized that if the rating agencies knew about the nature and extent of Enron's prepay transactions, such information would have had a materially negative effect on Enron's credit rating.

I and others at Enron also falsely represented to the rating agencies that Enron's communications with the rating agencies were direct and candid, and that there was a "no secrets policy" with the rating agencies. In fact, as I knew, Enron's communications with the rating agencies were not direct and candid. To the contrary, I and others intentionally withheld relevant information from the rating agencies about the true financial performance of Enron, and the way in which Enron achieved its cash flow numbers. I believed that if the rating agencies were aware of the true nature of Enron's cash flows, such information would likely have had a materially negative effect on Enron's credit rating.

As part of the charged conspiracy, I understood that the use of the interstate wires and mails – in the form of payments and filings with regulators, and calls with the credit rating agencies, among others - would be made. In furtherance of the charged conspiracy, I met with and spoke with national credit rating agencies from my office in Houston, Texas.

# Exhibit 3

 (http://www.prnewswire.com/)

 PRINT THIS

# Enron Reaches Settlement with CSFB in MegaClaims Litigation

May 09, 2006, 01:00 ET from Enron Corp. (http://www.prnewswire.com/news/enron+corp.)

HOUSTON, May 9 /PRNewswire/ -- Enron Corp. announced today that it has reached an agreement with Credit Suisse Securities (USA) LLC, formerly known as Credit Suisse First Boston LLC ("CSFB"), to settle MegaClaims litigation in the Enron bankruptcy case. Pursuant to the terms of the settlement, CSFB will pay Enron $90 million. The settlement further provides that approximately $337 million in claims against the Enron estate held by CSFB will be subordinated and receive no distribution from the Enron estate and approximately $92 million in CSFB claims will be allowed. The settlement reflects that CSFB was involved in fewer transactions with Enron than certain of the other MegaClaim defendants. CSFB did not admit liability or wrongdoing and both parties agreed to settle the litigation to avoid the costs and uncertainties of further proceedings.

"This settlement is further evidence of the proactive steps we continue to take to resolve the myriad of issues with respect to the Enron estate," said John J. Ray III, Enron's President and Chairman of the Board. "We are gratified with the progress we have made to date in the MegaClaims litigation and remain eager to reach resolution with the remaining financial institutions."

Remaining MegaClaim defendants include Citigroup Inc., Deutsche Bank AG, Barclays PLC, Fleet National Bank and Merrill Lynch & Co.

The settlement remains subject to the execution of definitive agreements and the approval of the United States Bankruptcy Court for the Southern District of New York.

Enron is represented in this matter by Susman Godfrey LLP; Togut, Segal & Segal; and Venable LLP.

Enron's Internet address is www.enron.com.

CAUTIONARY STATEMENT: Certain statements contained in this press release are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements include statements concerning plans, objectives, goals, strategies, future events or performance, and other statements that are other than statements of historical facts. Forward- looking statements are based on the opinions and estimates of management at the time the statements are made and are subject to certain risks and uncertainties that could cause actual results to differ materially from those anticipated in the forward-looking statements. Important factors that could cause actual results to differ materially from those in the forward-looking statements herein include, but are not limited to, political developments affecting federal and state regulatory agencies, and developments with respect to the bankruptcy of Enron. Except as required by law, Enron does not undertake any obligation to update any forward-looking statements.

SOURCE Enron Corp.

*Journalists and Bloggers*

**The news you need, when you need it.**

# Enron settles 'MegaClaims' litigation with Deutsche Bank

**JOHN PORRETTO | Posted: Tuesday, December 18, 2007 12:00 am**

AP Business Writer

Enron Creditors Recovery Corp. said Tuesday it has settled with Deutsche Bank AG on one of the final portions of a lawsuit filed against several banks accused of failing to prevent the energy company's collapse.

As part of the settlement, the German bank will pay Enron creditors $25 million in cash and give up claims to $416 million against the Enron estate.

Enron said Deutsche Bank entities also will receive about $35 million for their remaining interests in three complex transactions, allowing Enron to dissolve them and distribute the proceeds to creditors. Those proceeds are expected to top $100 million.

Deutsche Bank did not admit liability or wrongdoing, and both parties agreed to settle to avoid the costs and uncertainty of further proceedings. The bank had no comment on the settlement, which is subject to approval of the U.S. Bankruptcy Court for the Southern District of New York.

Enron, which filed for bankruptcy in 2001, has been liquidating its remaining operations and distributing assets to creditors. The company filed lawsuits in November 2003 to recover commercial paper payments from approximately 180 recipients so the funds can be shared by creditors.

It now has settled "MegaClaims" litigation with 10 of 11 defendants. Enron said a trial with Citigroup Inc., the remaining defendant, is set to begin in April.

"Our attention is now squarely focused on the multibillion-dollar suit against Citigroup, to which we've dedicated the necessary resources to ensure the causes of the Enron collapse are brought to light," John Ray III, president and chairman of the creditors group, said in a statement.

In a separate statement, Citicorp said, "We believe this suit is without merit and will defend against it vigorously."

To date, Enron has recovered roughly $2 billion in cash through the settlements, said Enron spokesman Harlan Loeb.

Enron, once the United States' seventh-largest company, entered bankruptcy after accounting tricks could no longer hide billions of dollars in debt. The collapse wiped out thousands of jobs, more than $60 billion in market value and more than $2 billion in pension plans.

Enron founder Kenneth Lay and former Chief Executive Jeffrey Skilling were convicted last year for their roles in the collapse. Skilling is serving a sentence of more than 24 years. Lay's convictions for

conspiracy, fraud and other charges were wiped out after his death last year from heart disease.





# CFO

**Next Generation Ownership**
Moving IR Beyond
Shareholder Identification
to…

Shipping Costs
How auditing transportation
costs and managing…

**Measures**
How to establish disclosure
controls for non-GAAP…



Know you have the insight to help
move your business forward.

PNC
INSTITUTIONAL
ASSET MANAGEMENT

Banking & Capital Markets

# Merrill Lynch Settles with Enron

The "MegaClaims" complaint involves claims that banks aided and abetted breaches of fiduciary duties by the ill-fated energy company.

**Stephen Taub**

July 6, 2006 | CFO.com | US

SHARE ▷   Share   G+ Share 0   Share 0   Tweet        ✉   🖨   -   +

**Newsletter Sign Up**

Your Email Address    SUBMIT

Merrill Lynch & Co. has agreed to pay $29.5 million to settle its portion of the claims litigation against a number of banks in the Enron bankruptcy case.

Under the deal, Merrill agreed not to seek $73.7 million in claims against the Enron Estate. However, the investment banking giant could receive about $10 million in other claims that were outside the settlement, according to the Associated Press.

**Recommended Stories:**

Lay, Skilling Guilty
Enron Settles with Vinson & Elkins
Enron's UK Bankers Closer to US
Trial

Enron noted in its announcement that the settlement reflects that Merrill Lynch was involved in fewer transactions with Enron than certain of the other defendants in the "MegaClaims" litigation. Under its arrangement, Merrill did not admit liability or wrongdoing.

The Enron MegaClaims complaint involves claims that the banks aided and abetted breaches of fiduciary duties; aided and abetted fraud; and engaged in civil conspiracy. The suit also includes bankruptcy-based claims linked to equitable subordination; preferential and/or fraudulent transfers and the re-characterization of certain transactions.

"We are gratified with the progress we have made to bring the MegaClaims litigation with Merrill Lynch to a close and remain optimistic that the remaining financial institutions will put their Enron issues to rest," said John J. Ray III, Enron's president and board chairman.

The banks accused of failing to prevent the energy company's collapse that still have active MegaClaims cases include Citigroup Inc., Deutsche Bank AG, Barclays PLC, and Fleet National Bank, Enron reported.

Last year, JPMorgan Chase & Co. agreed to pay Enron $350 million; Canadian Imperial Bank of Commerce agreed to pay $250 million; and Toronto Dominion Bank agreed to pay $70 million; according to the wire service. In May, Credit Suisse Securities LLC agreed to



Know you have
the insight to
help move your
business forward.

PNC
INSTITUTIONAL
ASSET MANAGEMENT

advertisement

**Popular Articles**

In Tech, Return Measures are Better than Margins

1. Partying Like It's 1999

2. Metric of the Month: The Cost of General Accounting

3. The Cash-Flow Clash

Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation | § | |
| Securities, Derivative & | § | MDL-1446 |
| "ERISA" Litigation | § | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | § | |
| MARK NEWBY, ET AL., | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-01-3624 |
| | § | CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | § | |
| | § | |
| Defendants | § | |
| AMERICAN NATIONAL INSURANCE | § | |
| COMPANY, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. G-02-0299 |
| VS. | § | |
| | § | |
| J.P. MORGAN CHASE & COMPANY, | § | |
| | § | |
| Defendant. | § | |

## OPINION AND ORDER OF RECONSIDERATION

The Second Amended Complaint (instrument #25) in the above referenced action, G-02-0299, grounded in Texas statutory and common law, asserts that Defendant JPMorgan Chase & Co. aided Enron in concealing Enron's deteriorating financial condition and "cooking its books" by means of fraudulent transactions, including the Mahonia Prepays, which disguised loans as commodity trades, and by repeatedly recommending the purchase of Enron securities to the investing public. Plaintiffs claim that they relied upon

-1-

Enron's financial statements and JPMorgan Chase analysts' recommendations in making investment decisions about Enron securities. The complaint asserts four causes of action: violation of article 581-33F of the Texas Securities Act, Tex. Rev. Civ. Stat.; violation of Section 27.01 of the Texas Business and Commerce Code; common law fraud; and conspiracy to commit fraud.

Pending before the Court is Plaintiffs National Western Life Insurance Company ("NWL"), Farm Family Casualty Insurance Company ("FFCIC"), and Farm Family Life Insurance Company's ("FFL's") motion for reconsideration under Federal Rules of Civil Procedure 52 or 59[1] or pursuant to the Court's inherent power or, in the alternative, motion to sever their claims (instrument #62) from the rest of the suit and for the Court to enter a final judgment on them under Rule 54(b). Specifically Plaintiffs ask the Court to reconsider, vacate or amend its opinion and order of March 17, 2007 (#61), granting Defendant JPMorgan Chase & Co.'s partial motion to dismiss the "holder" claims of Plaintiffs American National Insurance Company, American National Investment Accounts, Inc., SM&R Investments, Inc., American National Property and Casualty Company, Standard Life and Accident Insurance Company,

---

[1] Movants explain, "Although a judgment has not been entered, Federal Rules of Civil Procedure 52 and 59 are cited because the Order wholly dismisses the claims of certain Plaintiffs and a final judgment may have been entered prior to the time the instant motion is considered." #62 as 1 n.1. The Court has not entered a final judgment.

Farm Family Life Insurance Company, Farm Family Casualty Insurance Company, and National Western Life Insurance Company.  In that opinion and order, the Court found that Texas had not recognized "holder" claims,[2] and, in an "Erie guess,"[3] that Texas most likely

---

[2] In a "holder" claim, the plaintiff/securities holder alleges that the defendant wrongfully induced the plaintiff to continue holding his stock and seeks as damages the diminished value of the stock allegedly caused by the defendant's misrepresentation.  While not permissible in federal court, some state courts have allowed "holder" claims to be brought under common law fraud, although actual reliance is a required element.  Nevertheless, the majority have not recognized "holder" claims.  As summarized by Judge Davis in *WM High Yield Fund v. O'Hanlon*, No. Civ. A. 04-3423. 2005 WL 1017811, *13 (E.D. Pa. Apr. 29, 2005),

> In declining to permit "holder" actions, other courts have elucidated the policy problems therewith.  *See In re Worldcom, Inc, Sec. Litig.*, 336 F. Supp.2d 310, 318-23 (S.D.N.Y. 2004).  The Supreme Court, in reaching its decision that "holder" claims were not permissible in actions brought under Rule 10b-5, explained that holder claims are virtually impossible to verify because they are based on a plaintiff's representation that he would [] have purchased or sold the securities had he known about the misrepresentation.  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 742-43 . . . (1975).  The same rationale is applicable to a common law "holder" claim.  Other courts have rejected holder claims as being too speculative.  *See Chanoff v. United States Surgical Corp.*, 857 F. Supp. 1011 (D. Conn. 1994).  As the *Chanoff* court explained, "holder claims" violate "the established principle that a plaintiff cannot recover profits which might have been realized if he had not been deceived, unless there is evidence by which such profits can be estimated with reasonable certainty."  *Id.* at 1018.  Finally, it is notable that a plaintiff's damages in "holder" cases arise not from misrepresentations, but from the eventual disclosure of accurate information and its effect on the market.  As the court noted in *Arent Distribution Sciences, Inc.*, Plaintiffs were not harmed because they were unable to realize the true value of their stock–they were harmed because the true value of their stock was zero."  975 F.2d 1370, 1374 (8th Cir. 1999).

*See also In re Worldcom, Inc. Sec. Litig.*, 336 F. Supp.2d 310, 323 (S.D.N.Y. 2004)(stating, "Many other jurisdictions that have considered 'holder' claims based on their common law have rejected them because of the inherent difficulty in pleading and proving reliance, loss causation and/or damages.").

[3] The term, "Erie guess," developed from *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)("Except in matters governed by the

-3-

would not recognize such claims for policy reasons, but that if it did, it would only do so with the imposition of heightened pleading restrictions.

The three Movant Plaintiffs here argue that they, especially NWL, "do not present typical circumstances" in which holder claims would be precluded, and they submit new allegations and supporting evidence in an attempt to satisfy such enhanced pleading standards. They emphasize that JPMorgan Chase's second motion to dismiss was the first time JPMorgan Chase raised the issue of "holder" claims and that they had no opportunity to amend their complaint to meet any of the standards under which such claims might be cognizable, and thus they request leave to amend. Moreover, Movants ask the Court to reconsider its summary conclusion that Plaintiffs' claims are derivative rather than direct. They further contend that the Delaware Supreme Court in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), and the Fifth Circuit in *Smith v. Waste Management, Inc.*, 407 F.3d 381, 384 (5th Cir. 2005) applied the direct v. derivative test only to shareholders, not to owners of bonds and preferred

---

Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State."). Where the state's highest court has not ruled on the issue, as the Texas Supreme Court has not determined whether "holder" claims are cognizable under common law fraud or whether they are derivative or direct claims, the court "must make an *Erie* guess as to what the Texas Supreme Court would most likely decide." *Herrmann Holdings, Ltd. v. Lucent Technologies, Inc.*, 302 F.3d 552, 558 (5th Cir. 2002). *See also Hulin v. Fibreboard Corp.*, 178 F.3d 316, 318-19 (5th Cir. 1999).

stock, like Plaintiffs.  In addition, should the Court find that their claims are derivative, they argue that under any of the variants of the "clean hands" doctrine discussed in the underlying briefing, any derivative claims that generally would have to be brought by trustee of Enron's bankruptcy estate are precluded by Enron's complicity in the wrongdoing, and therefore Plaintiffs should be permitted to pursue their claims against JPMorgan Chase or they will have no remedy.  Alternatively, because the previous opinion and order dismisses all of Movants' claims, they ask for severance of their claims and a final judgment to issue based on the findings of fact and conclusions of law in the ruling.

## Standard of Review

Although the Federal Rules of Civil Procedure do not expressly recognize a motion for reconsideration, if such a motion challenges the prior judgment on the merits the Fifth Circuit will allow it to proceed as a motion "to alter or amend" under Rule 59(e) if it is served within ten days of entry of the judgment or as a motion for "relief from  judgment" under Rule 60(b) if served after that time.  *Lavespere v. Niagra Mach. & Tool Works, Inc.*, 910 F.2d 167, 173-74 (5th Cir. 1990), *cert. denied*, 510 U.S. 859 (1993) and *overruled on other grounds, Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994).  If the Movant "attaches additional materials to its motion that were not presented to the trial court for consideration at the time the court initially considered the

motion for summary judgment, the court may consider the new materials in its discretion. *Ford Motor Credit Co. v. Bright*, 34 F.3d 322, 324 (5th Cir. 1994), *citing Fields v. City of South Houston, Texas*, 922 F.2d 1183, 1188 (5th Cir. 1991)(*citing Lavespeare*, 910 F.2d at 172-75). Rule 59(e) "serve[s] the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Templet v. Hydrochem, Inc.*, 367 F.3d 473, 479 (5th Cir. 2004). "[T]he district court has considerable discretion in deciding whether to reopen a case in response to a motion for reconsideration arising under" Rule 59(e). *Lavespere*, 910 F.2d at 174. Factors for the court to consider include "the reasons for the moving party's default, the importance of the omitted evidence to the moving party's case, whether the evidence was available to the non-movant before she responded to the summary judgment motion, and the likelihood that the nonmoving party will suffer unfair prejudice if the case is reopened." *Id.*

There are some distinctive circumstances in this action that distinguish it from the typical suit in which a motion to reconsider is filed. Here, this Court's previous decision was made in response to a motion to dismiss, not a motion for summary judgment, and the Court did not review evidence.[4] Furthermore,

---

[4] Dismissal under Rule 12(b)(6), a disfavored remedy, should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would

this case, which was delayed in part to coordinate discovery schedules with the related *Newby* class action, is closer to the suit's inception than its end. *Templet*, 367 F.3d at 479 (*citing Lavespere*, 910 F.2d at 174)("two important judicial imperatives" relating to a motion for reconsideration are "1) the need to bring litigation to an end; and 2) the need to render just decisions on the basis of all the facts. . . . The task for the district court is to strike the proper balance between these two competing interests."). The Court finds the latter prong of more significance at this stage. Moreover, its ruling was in response to JPMorgan Chase's **second** motion to dismiss. Plaintiffs point out that JPMorgan Chase raised the issue of holder claims for the first time in the second motion, and that they had no opportunity to amend their complaint to meet the standards for holder claims set out by those states that have recognized them and recognized in the Court's previous order, nor was submission of evidence appropriate under a Rule 12(b)(6) review. Their motion for reconsideration offers allegations that would be included in an

---

entitle him to relief." *Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161, 164 (5th Cir. 1999), *quoting Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In reviewing a motion under Rule 12(b)(6), the court must accept all well pleaded facts as true and view them in a light most favorable to the plaintiff. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). The Court should not accept conclusory allegations or unwarranted deductions of fact as true, nor legal conclusions masquerading as factual allegations. *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994); *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993). The issue is not whether the plaintiff will prevail, but whether he is entitled to pursue his claims and offer evidence in support of them. *Doe v. Hillsboro I.S.D.*, 81 F,3d 1395, 1401 (5th Cir. 1996). The Court is limited to the pleadings in resolving the motion and may not look beyond them. *Baker v. Putnal*, 73 F.3d at 196).

amended complaint if the Court allows one, and has attached as exhibits supporting documentary evidence. If Movants are able to state holder claims, the Court finds that there would be minimal prejudice to JPMorgan Chase at this stage in allowing the claims to go forward.

The Court considers the evidence for purposes of the motion to reconsider and for determination of whether Plaintiffs might be able to satisfy the standard for pleading under Rule 9(b) in their as yet unpled amended complaint. As will be discussed in this opinion, the Court finds that reconsideration is advisable to clarify any manifest errors of law or fact or to prevent manifest injustice.

### Court's Previous Opinion and Order (#61)

In its previous opinion and order, the Court concluded that Texas probably would not recognize "holder" claims under common law fraud, but that if it did, it would do so only if heightened pleading standards were satisfied. Specifically, the Court looked at decisions from those courts that did permit such claims, including the vacated opinion in *Shirvanian I,*[5] *Small v. Fritz Cos., Inc.*, 65 P.3d 1255, 1256-57 (Cal. 2003)(holding that California permits a shareholder, who was wrongfully induced to

---

[5] *Shirvanian v. Defrates ("Shirvanian I")*, No. 14-02-00447, 2004 Tex. App. LEXIS 182 (Tex. App.–Houston [14th Dist.] 2004)(relying in part on California law), *op. withdrawn*, 161 S.W.3d 102 (Tex. App.–Houston [14th Dist.] 2004, pet. denied)(*"Shirvanian II"*).

hold a stock rather than sell it, to sue under common law fraud or negligent misrepresentation, but requires him to allege fraud with "specificity to show a bona fide claim of actual reliance"),[6] and *Rogers v. Cisco Sys., Inc.,* 268 F. Supp.2d 1305, 1311-12 & n.13 (N.D. Fla. 2003)(predicting that Florida common law would permit fraud "holding" claim, but not Florida securities statutes, but finding plaintiffs failed to plead reliance with sufficient particularity).[7]

In the only Texas case, the subsequently withdrawn opinion designated *Shirvanian I*, allowing the "holder" claims before it,

---

[6] In *Small v. Fritz Cos.*, 65 P.3d at 1265, the California Supreme Court wrote,

In a holder's action a plaintiff must allege specific reliance on the defendants' representations: for example, that if the plaintiff had read a truthful account of the corporation's financial status the plaintiff would have sold the stock, how many shares the plaintiff would have sold, and when the sale would have taken place. The plaintiff must allege actions, as distinguished from unspoken and unrecorded thoughts and decisions, that would indicate that the plaintiff actually relied on the misrepresentations. Plaintiffs who cannot plead with sufficient specificity to show a bona fide claim of actual reliance do not stand out from the mass of stock holders who rely on the market.

[7] In *Rogers* the Court found that the purpose of the heightened pleading requirements, especially relating to reliance, was to separate "plaintiffs who actually and justifiably relied upon the misrepresentations from the general public, who, though they did not so rely, suffered the loss due to the decline in share value." 268 F. Supp. 2d at 1314 n.18. Therefore it found "too vague" plaintiffs' allegations that they had read defendants' reports and financial statements, had "refrained from selling their stock" in reliance on that information, and that if they had known the actual financial condition of the company, they would have sold their shares before the stock price plummeted. *Id.* at 314. The court dismissed the "holder" claims brought under Florida law for a failure to allege how many shares the plaintiffs would have sold and when they would have sold them. *Id.*

the Texas Fourteenth Court of Appeals highlighted the fact that the case involved an "unusual" factual predicate of plaintiffs who had "direct dealings with the defendants" and who made the alleged misrepresentations directly to the defendants; that "critical feature" of personal contact made it more like an "ordinary case of deceit" than a misrepresentation in the vast public securities markets and the Fourteenth Court of Appeals expressly limited its holding to a "narrow setting." The appellate court emphasized that "[t]his type of holding claim will always have a very narrow pool of plaintiffs." 2004 Tex. App. LEXIS 182, at *55, 58. The court upheld such claims only where there were "direct, face-to-face or telephone misrepresentations" and where plaintiffs sufficiently asserted that "they had a specific plan to sell their shares at a date certain." *Id.* at 58-59. Moreover, the plaintiffs were not "'complete bystanders. The [plaintiffs] were the largest individual shareholders" of the defendant. *Id.* at 58.

In *Neal v. Smith Barney*, Judge Cote examined *Shirvanian I* and concluded that Texas would not recognize "holder" claims generally, and at most, would do so only where the "narrowly crafted circumstances" in that case were paralleled. *Neal v. Smith Barney & Co. Inc. (In re WorldCom, Inc. Sec. Litig.)*, Civ. No. 02-3288 (DLC), 2006 WL 752770, at *2-3 (S.D.N.Y. March 24, 2006)(dismissing "holder" claims because "[t]here is no basis to predict that the Texas Supreme Court would recognize a holder claim that would encompass [Plaintiff's] allegations"; "there is

-10-

general agreement that holder claims cannot be successfully pleaded under the common law. The principle deficiency to which courts point is the impediment to proof of damages."); *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 DLC, 04 Civ. 0232 DLC, 2006 WL 728518, *4 (S.D.N.Y. March 22, 2006)("The few jurisdictions that have allowed 'holder' claims to proceed have generally required allegations of specific reliance and/or direct communication between a plaintiff and defendant.").

JPMorgan Chase had argued that the facts pleaded in the Second Amended Complaint do not satisfy *Shirvanian I*'s test in that "Plaintiffs were 'ordinary' investors in Enron . . . who learned about Enron's financial condition through publicly available information"; they "did not plead any special 'direct' communications" with Enron or JPMorgan Chase; and they did not "allege that they had a specific plan to sell their shares at a date certain." #39 at 6.[8]

### New Allegations

Plaintiffs' motion to reconsider attempts to plead, with documentary evidence supporting its request for reconsideration, the kinds of facts that would meet "narrowly crafted circumstances" requirement of *Shirvanian I* or heightened standards

---

[8] Nor, this Court notes, were they by any stretch of the imagination the largest securities holders in Enron, although the Court sees no reason why this factor should be significant in determining whether a holder claim should be permitted to go forward under a common law fraud cause of action.

for pleading reliance and damages identified in other cases permitting such claims to go forward under state common law fraud. "A court's task 'in ruling on a Rule 12(b)(6) 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.''" *Official Committee of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003), *quoting Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998)(citations omitted)).

Plaintiffs represent that discovery has revealed that between 1997 and 2001, NWL's Assistant Portfolio Manager, Natalie Anderson ("Anderson"), who analyzed Enron bonds and made buy, sell or hold recommendations to NWL, spoke to Jim Gibbons ("Gibbons"), a fixed income analyst for JPMorgan Chase. Plaintiffs present excerpts of deposition testimony from Anderson (Ex. 1 to #62) in which she identified as her own certain handwritten notes relating to three separate occasions (*id.*, Exs. 2-4), when Anderson spoke directly to Gibbons or his assistant, Freda Lamb, between October 18, 2001 and November 9, 2001. Plaintiffs allege that during those conversations Gibbons gave his opinion to Anderson that NWL should hold onto its Enron investments. Furthermore, in the First Amended Complaint Plaintiffs have alleged that JPMorgan Chase conspired with Enron to help Enron grossly misstate its financial statements through numerous fraudulent transactions, and thus JPMorgan Chase knew Enron's financial statements were false and

-12-

deceptive. Moreover, claim Plaintiffs, although JPMorgan Chase knew that its analysts used and relied on these financial statements, JPMorgan Chase did not disclose to its analysts the truth of Enron's financial material falsehoods or JPMorgan Chase's role in creating these falsehoods, but simply allowed its analysts, including Gibbons, to give opinions based on false representations of Enron's financial status.

### Court's Decision

After reviewing the underlying briefing, its opinion and order, and the current motion, and in light of the new allegations, the Court grants the motion to reconsider to clarify the law and to correct any factual errors that exist or might be implied.

### A. Additional Relevant Law

(1) To prevail on a cause of action for common law fraud under Texas law, a plaintiff must prove "(1) that a material misrepresentation was made; (2) that it was false; (3) that, when the speaker made it, he knew it was false and or made it recklessly without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by the party; (5) that the party acted in reliance upon it; and (6) that he thereby suffered injury." *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983). *See also Oppenheimer v. Prudential Sec. Inc.*, 94 F.3d 189, 104 (5th Cir. 1996)("The elements that are necessary to state a claim of common law fraud

-13-

are basically identical [to those for statutory fraud]. The elements of a fraud are a material misrepresentation, which was false and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon and which caused injury."). Thus a "finding of recklessness is sufficient to establish a basis for misrepresentation of facts." *Trenholm*, 646 S.W.2d at 930.

Generally, even when the misrepresentations are of material fact, "[p]ure expressions of opinion are not actionable." *Id.* An exception to this rule is when the speaker has knowledge of the misrepresentation's falsity. *Id.* In addition an opinion based on past or present facts or opinion of a future event may be actionable where the speaker has special knowledge. *Id.* Because the question whether a statement is actionable as a statement of fact or is merely one of opinion depends on the circumstances in which the statement is made, factors to consider are "the statement's specificity and the comparative levels of the speaker's and the hearer's knowledge"; "[w]hen a speaker purports to have special knowledge of the facts, or does have superior knowledge of the facts--for example, when the facts underlying the opinion are not equally available to both parties--a party may maintain a fraud action." *Paull v. Capital Resource Management, Inc.*, 987 S.W.2d 214, 219 (Tex. App.-Austin 1999, writ denied), *citing Trenholm*, 646 S.W.2d at 930; *McCollum v. P/S Investments, Ltd.*, 764 S.W.2d 252, 254 (Tex. App.-Dallas 1988, writ denied)("[A]n exception to this rule [that pure expressions of

-14-

opinion cannot be fraudulent misrepresentations] exists when the person giving the opinion has knowledge superior to that of the person relying upon the opinion, as for example, when the facts underlying the opinion are not equally available to both parties."); *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995). "An opinion also may be treated as an actionable statement when the opinion is based on or buttressed with false facts." *Faircloth*, 898 S.W.2d at 277, citing *Trenholm*, 646 S.W.2d at 930-31 (where a developer induced homeowners to purchase a property next to a trailer park by falsely stating that the trailer park had been sold and the tenants given notice that their leases would not be renewed and where the developer opined that the park would be gone in a few months, the court held that the the misstatements of fact were so intertwined with the statement of opinion that the statement as a whole amounted to a false representation of material fact.). A false opinion of value may be actionable as a statement of fact if made by one who should know that another person is justifiably relying on the speaker's superior knowledge. *Faircloth*, 898 S.W.2d at 277, *citing Safety Cas. Co. v. McGee*, 133 Tex. 233, 127 S.W.2d 176, 178 (9139).

Federal Rule of Civil Procedure 9(b) requires a plaintiff to allege the "who, what, when, where, how" of the alleged fraud. *Williams v, Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005). In other words, it requires "the particulars of time, place and contents of the false representations as well as the identity of the person making the misrepresentation and what

-15-

[that] person obtained thereby." *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994).[9]

### B. Pleading Sufficiency of "Holder" Claims

Because the underlying motion is one to dismiss under Rule 12(b)(6), and because the Texas courts have not ruled on the question of permitting "holder" claims under common law fraud, the Court will allow "holder" claims satisfying the heightened pleading standards to go forward and examines Movants' newly submitted factual allegations to see if they satisfy those standards, as well as Rule 9(b)'s particularity requirements for pleading fraud. The Court reaffirms its determination that Texas would probably not recognize "holder" claims under common law fraud, but that if it did, it would do so only if heightened pleading standards were satisfied. Specifically, the Court identified as such enhanced pleading elements direct communications between plaintiff and defendant, actual reliance, acts reflecting reliance, and an indication of how many bonds or shares a plaintiff would have sold and when plaintiff would have sold them.

---

[9] As a point of contrast, the much more stringent standard for pleading scienter for a claim under § 10(b) of the Securities and Exchange Act of 1934 requires the pleading of specific facts demonstrating an intent to deceive, manipulate or defraud or severe recklessness ("Highly unreasonable omissions or misrepresentations demonstrating an extreme departure from standards of ordinary care"). *Financial Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006).

Plaintiff/Movants now attempt to alleged facts showing direct, personal communications between an officer of Plaintiff NWL, Natalie Anderson, and an analyst for JPMorgan Chase, Jim Gibbons, and/or his assistant Freda Lamb, who Plaintiffs claim recommended at critical times NWL's retention of its Enron securities. Plaintiffs state that communications occurred over a period of years, with three specific occasions (evidenced by Anderson's notes) in the last few weeks before Enron filed for bankruptcy; such circumstances imply reliance on the analyst's recommendations over a prolonged relationship since communication was not limited to an isolated instance. Moreover, allegations of Gibbons' position and NWL's repeated acts of consultation with him for advice suggest that Anderson (and NWL) viewed the analyst as having special knowledge. Specifically regarding the three communications in late 2001 purportedly memorialized in Anderson's notes, the motion states,

> While charged with JPMC's vast knowledge of various prepay transactions, Mr. Gibbons' assistant, Freda Lamb, spoke with Ms. Anderson on October 18, 2001, declaring that (1) the core business at Enron was stable, (2) Enron bonds will "stay wide" for a while (meaning that "spreads" on the bonds, or the way the bonds are priced, would stay high), and (3) no downgrade was expected . . . . During an October 30, 2001 JPMC conference call concerning Enron, Mr. Gibbons stated Enron had a current liquidity of about $1 billion and that $300 million due on September 15, 2001 was manageable. . . . On or about November 9, 2001, Mr. Gibbons informed Ms. Anderson that a merger between

-17-

> Enron and Dynegy was nearing completion, and
> that Enron securities will maintain
> investment grade with the Dynegy merger. . .
> . Each one of these direct communications
> containing falsehoods undeniably induced NWL
> to hold Enron securities. JPMC never told
> Plaintiffs that billions of dollars of prepay
> money was hidden debt that JPMC arranged for
> Enron through a sham creation it controlled
> named *Mahonia*.

Motion to Reconsider (#62) at 3 (citations to evidence exhibits omitted). Thus, given the circumstances suggesting special knowledge of Enron's financial condition, the Court finds that Plaintiffs have alleged that Gibbons' recommendations were based on purported misstatements of present facts and future predictions and of value and therefore may be construed as representation of facts possibly actionable as fraud under Texas law.

JPMorgan Chase argues that Plaintiffs must meet the standard for scienter under the PSLRA, which abolished the group pleading doctrine and which required that a plaintiff must plead facts demonstrating that the individual making the alleged fraudulent misrepresentation had the required state of mind for the misrepresentation to be imputed to the corporation. The Court disagrees and notes that Texas common law embraces principles of agency in making an employer vicariously liable for the torts of its servants without a showing of "scienter" by either. Plaintiffs have not alleged facts demonstrating that Gibson or Lamb knew about JPMorgan Chase's deceptive transactions with Enron to aid Enron in falsifying its financial statements, and they have

-18-

not sued Gibbons, but only JPMorgan Chase, apparently for vicarious liability. In Texas under agency law, a plaintiff may recover against a corporation for a tort committed by its agent where the wrongful act of that officer or agent was within the course or scope of his employment. *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 617-18 (Tex. 1999), *citing* Restatement (Second) Agency 219 (1958)[10]; *Wal-Mart Stores, Inc. v. Odem*, 929 S.W.2d 513, 530 (Tex. App.--San Antonio 1996, writ denied); *Crescendo Investments, Inc. v. Brice*, 61 S.W.3d 465 (Tex. App.--San Antonio 2001, pet. denied); *Rhodes, Inc. v. Duncan*, 623 S.W.2d 741, 743-44 (Tex. App.--Houston [1st Dist.] 1981, no writ). Even where a corporate employee intentionally commits a tort in fulfilling a duty entrusted to the employee, the corporation may also be vicariously liable. *GTE Southwest,* 998 S.W.2d at 617-18. *See also*

---

[10] Section 219 provides,

(1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.

(2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:

(a) the master intended the conduct or the consequences, or
(b) the master was negligent or reckless, or
(c) the conduct violated a non-delegable duty of the master, or
(d) the servant purported to act or speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

-19-

13 Tex. Jur. 3d Corporations § 413 (database updated Feb. 2007)("It is well settled that a corporation has the legal capacity to do wrong, that the rules applicable in determining the liability of a corporation for torts committed by its agents are the same as those that determine the liability of any other principal, and that, under such principles, a corporation is liable in tort for wrongful acts of directors, officers and other agents[11] where those acts are either: within the scope of employment of the officer or agent[;] authorized by the corporation[;] ratified or adopted by the corporation (footnotes omitted)[.]").[12]  From the facts alleged, one could infer that JPMorgan Chase knew or was at least severely reckless in allowing its analyst reports and recommendations, whether negligently or intentionally, to be disseminated to NWL, as well as other investors.[13]  These principles raise fact issues that cannot be

---

[11] It is not clear what the nature of Gibbons' position was.  "A corporation is not liable for acts of mere employees who are not officers or controlling agents representing the corporation it its corporate affairs unless it is shown that the corporation authorized or subsequently adopted or ratified their acts or was guilty of negligence in selecting and employing them."  Tex. Jur. 3d Corporations § 416.  Authorization may be express, implied or apparent.  *Id.*

[12] In *Wal-Mart* the court also noted, "But a corporation is not liable for the acts of mere employees who are not officers or controlling agents representing the corporation in its corporate affairs, unless it is shown that the corporation authorized or subsequently adopted or ratified their acts or was guilty of negligence in selecting and employing them."  929 S.W.2d at 530.  Such an analysis would require evidence not reviewable under Rule 12(b)(6).

[13] The motion to reconsider at 2 asserts,

As part of the conspiracy alleged by Plaintiffs, JPMorgan Chase ("JPMC") helped Enron grossly misstate its financial statements (and therefore knew Enron's financial

-20-

resolved on the pleadings.  In a Rule 12(b)(6) review, dismissal
should not be granted "unless it appears beyond doubt that the
plaintiff can prove no set of facts in support of his claim which
would entitle him to relief."  *Beanal v. Freeport-McMoran, Inc.*,
197 F.3d 161, 164 (5th Cir. 1999), *quoting Conley v. Gibson*, 355
U.S. 41, 45-46 (1957).  That standard has not been reached here
as to NWL.

Plaintiffs have not alleged that "they had a specific plan
to sell their shares on a date certain."  *Shirvanian I*, 2004 Tex.
App. LEXIS 182 at 58.  Not only the Fourteenth Court of Appeals
in *Shirvanian I*, but the other courts cited previously have
emphasized the importance of this element to be able to plead and
prove damages.  Nor have they pled reliance with particularity as
required by *Rogers*, 268 F. Supp.2d at 311-12, and *Small v. Fritz
Cos.*, 65 P.3d at 1265.

Thus Plaintiffs have satisfied only some of the criteria for
heightened pleading of the holder claims of NWL.  This Court
concludes that the new allegations are not sufficient to overcome
policy concerns which led to heightened standards for pleading
reliance and damages with respect to holder claims; there is no

---

statements were false and deceptive).  *See Plaintiffs' Second Amended Complaint* at
¶¶44-185.  Also knowing its analysts used and relied upon these financial statements,
JPMC (1) failed to disclose the truth of Enron's financial material falsehoods (and
its particular role in creating these falsehoods) to its analysts, and (2) silently stood
by and allowed its analyst-employees
--including Mr. Gibbons--to give opinions based upon the false representation of
Enron's financial status.

discernible way to distinguish Movants from any other investors ("bystanders") who did not rely on any particular analyst reports from JPMorgan Chase, but held onto their Enron securities and lost their purported value.

Moreover Movants have not alleged any facts that might meet such standards with respect to any Plaintiff other than NWL against JPMorgan Chase. They do assert, "Based on the conspiracy between [JPMorgan Chase] and Enron, FFL and FFCIC were also [JPMorgan Chase's] victims," but that conclusory statement is insufficient to plead a "holder" claim for FFL and FFCIC. Plaintiffs also charge that the Court did not consider Plaintiffs' reliance on Enron's misrepresentations in furtherance of the JPMC-Enron conspiracy. The Court finds that these claims about Enron's misrepresentations do not satisfy the heightened requirements for "holder" claims identified previously.

### C. Direct versus Derivative Claims

In its earlier opinion and order the Court did not find that the Second Amended Complaint adequately pleaded "holder" claims under the heightened standards, it did not focus on, but perhaps should have delved more deeply into (1) the question of direct versus indirect claims under Texas law and/or (2) even if Plaintiffs' claims were derivative, whether the debtor would be precluded from bringing them by some version of the doctrine of clean hands or *in pari delicto* doctrine ("in equal fault"). Since

-22-

these issues are raised not only in this suit, but in Plaintiff's related actions in this Enron litigation, it examines these questions now.

Plaintiffs have argued that bonds and preferred stock are debt instruments, and therefore Plaintiffs fall into the category of creditors to the debtor, to which they maintain the analysis of direct v. derivative claims does not apply, rather than into the category of shareholders (owners of the corporation), to which the analysis does apply. As noted in the earlier order, the Fifth Circuit, though without analysis, applied the derivative/direct claim analysis to bondholders, i.e., holders of debt instruments or creditors. *In re Kevco Inc.*, 113 Fed. Appx. 29, 31 (5th Cir. 2004)(*per curiam*)(affirming bankruptcy court's conclusion that bondholders' claims against defendants were property of the bankruptcy estate because the debtor could have brought the same claims at the commencement of the bankruptcy proceeding and because the injury complained of was derivative of the debtor's direct injury), *cert. denied sub nom. PAM Capital Funding L.P. v. National Gypsum Co.*, 544 U.S. 948 (2005). Furthermore Plaintiffs cite no authority expressly addressing their contention that the issue of direct and derivative claims applies only to owners of common stock and not to other types of securities holders, i.e., bonds (debt) or to preferred stock (which Plaintiffs claim are

-23-

more like bonds than equity[14]), and the Court has been unable to find any. Thus it follows the lead of the Fifth Circuit in *Kevco*.

In looking more closely at the nature of the claims asserted by Plaintiffs against JPMorgan Chase here in the context of Enron's bankruptcy, the Court examines key cases in the Fifth Circuit and a recent Texas case, *Highland Capital Management, L.P. v. Ryder Scott Company (In re Seven Seas Petroleum, Inc.)*, 212 S.W.3d 522 (Tex. App.--Houston [1st Dist.] 2006, no pet. hist.)(finding *inter alia* that purchasers of unsecured notes, who relied to their detriment on misrepresentations in reports of a reservoir-evaluation consulting firm, which were also incorporated into the financial reports of Seven Seas filed with the SEC before its bankruptcy, asserted claims of misrepresentation and fraud based on direct harm to the noteholders, and not a derivative harm to the debtor Seven Seas).

As a general rule a bankruptcy trustee lacks standing to sue third parties on behalf of creditors of the debtor's estate for claims personal to the creditors, but may only sue on claims that belong to the bankrupt corporation itself. *Caplin v. Marine*

---

[14] This question raises fact issues that cannot be resolved on the record here. The Court recognizes that preferred stock is a kind of "hybrid." Like common stock, preferred stock trades on the major exchanges. Like bonds, the dividends for preferred stock are established when the shares are issued and do not change over time. Furthermore, as with bonds, preferred stock is at risk from inflation and rising interest rates, and most preferred stock shares can be recalled by the company in five years at the price the shares were issued if the interest rates fall. If the company becomes bankrupt, preferred stock owners would stand in line behind the bondholders, but ahead of common stockholders, to try to collect on their claims.

*Midland Grace Trust*, 406 U.S. 416, 434 (1972); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991).[15]  "The bankruptcy estate succeeds only to the same rights the debtor had on the date the suit was commenced, plus recoveries from specific avoidance actions . . . ."  *In re Hunt*, 149 B.R. 96, 101 (Bankr. N.D. Tex. 1992).

Where the cause of action belongs to the debtor's estate, the trustee has the exclusive right to assert the claim.  *Educators Group*, 25 F.3d at 1284, *citing Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1152-53 (5th Cir. 1987)("observing that the 'general bankruptcy policy of ensuring that all similarly-situated creditors are treated fairly' requires that the trustee have the first opportunity to pursue estate actions without interference from individual creditors").  If a cause of action belongs solely to creditors of the debtor's estate, the trustee has no standing to bring them.  *Id.*, *citing Caplin*, 406 U.S. at 433-34.

In *Schertz-Cibolo-Universal City v. Wright (In re Educators Group Health Trust)*, 25 F.3d 1281, 1284 (5th Cir. 1994), the Fifth

---

[15] Under 11 U.S.C. §§ 323 and 541, the trustee succeeds to the debtor's rights as the estate's representative and may sue or be sued.  The estate is composed of all legal or equitable interests of the debtor in property as of the commencement of the bankruptcy proceedings.  11 U.S.C. § 541(a). The phrase "all legal or equitable interests" is broadly construed to include causes of action. *Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 245 (5th Cir, 1988); *Schertz-Cibolo-Universal City v. Wright (In re Educators Group Health Trust)*, 25 F.3d 1281, 1283-84 (5th Cir. 1994).  The trustee's duties are set out in 11 U.S.C. § 704. Bankruptcy Rule 6009 does not expand the rights that the Bankruptcy Code allots to the trustee.

Circuit established a test for determining under the applicable state law whether a creditor's claim was the property of the bankruptcy estate at the time the bankruptcy was commenced (a derivative claim) or whether it was a personal claim to the creditor that could not have been raised by the bankruptcy trustee:

> Whether a particular cause of action belongs to the estate depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case. . . . As part of this inquiry, we look at the nature of the injury for which relief is sought.[16] . . . If a cause of action alleges only indirect harm to a creditor (i.e., an injury that derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate. . . . Conversely, if the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case and thus is not property of the estate.

*Id.*  The panel commented, "[T]he fact that creditors in general are harmed does not determine whether a cause of action belongs to the bankruptcy estate; rather, general harm to creditors *necessarily follows* from the fact that the debtor has been injured.  *Id.* at 1285.

---

[16] *See E.F. Hutton Southwest Prop. II, Ltd.*, 103 B.R. 808, 812 (Bankr. N.D. Tex. 1989)(In determining whether a cause of action belongs to the bankruptcy estate, the court must "look to the injury for which relief is sought and consider whether it is peculiar and personal to the claimant or general and common to the corporation and creditors.").

In *Educators Group*, the Educators Group Health Trust ("EGHT") was created to provide health benefits to teachers in small school districts. 25 F.3d at 283. After EGHT filed for Chapter 7 bankruptcy, the school districts participating in EGHT's health benefits became creditors of the estate and in state court sued EGHT, the initial third-party administrator which collected the premiums from the teachers and marketed the benefits plan to the school districts, the administrator's principals, and the successor third-party administrator, for damages based on various causes of action, including mismanagement of EGHT and fraud. *Id.* The bankruptcy trustee intervened and claimed these causes of action belonged to the estate. *Id.*

The Fifth Circuit concluded that plaintiff school districts' claim that defendants negligently managed the corporation and caused it to become insolvent (and thus unable to pay the health benefit claims of employees of the districts) was a derivative claim that only indirectly harmed the creditors and that belonged exclusively to the debtor's estate and the trustee. *Id.* at 1284-85. Similarly it held that claims that defendants conspired to negligently manage EGHT, that defendants conspired to commit fraudulent transfers, that defendants conspired to make EGHT insolvent and to commit fraud on EGHT, that defendants breached their contracts withe EGHT, that defendants were unjustly enriched with funds of EGHT, and that the defendants breached their duties

of good faith and fair dealing and their fiduciary duties directly injured the debtor's estate and therefore belonged solely to the debtor's estate. *Id.* at 1285-86.

In contrast, the panel determined that the creditor school districts' claim that defendants "intentionally misrepresented *to them* [and not to a general audience] the financial situation of EGHT, and that they materially relied on such representations to their detriment," to the extent that it alleges direct injury specific to the school districts/plan participants, was a personal claim belonging to the school districts. *Id.* at 1285. The fact that the misrepresentations made to the school districts about EGHT's financial condition to induce them to become or remain health plan participants would not have harmed EGHT or its bankruptcy estate. To the extent that the complaint alleged a direct injury to plaintiff school districts, the Fifth Circuit held that the following causes of action also belonged to the plaintiff school districts: violations of the Texas Deceptive Trade Practices Act and conspiracy to commit the same; violations of the Texas Insurance Code; claims based on fraud and conspiracy to commit fraud to the extent that such claims are based on alleged false misrepresentations to the plaintiff school districts; claims based on negligence to the extent they alleged a breach of duty of care owed to the plaintiff school districts (e.g., plaintiffs alleged that defendants failed to use ordinary

-28-

care to inform the plaintiff school districts that EGHT was insolvent); and claims that the defendants negligently represented the financial status of EGHT to the school districts. *Id.* at 1286 & n.6.

In *In re Schimmelpennick*, 183 F.3d 347 (5th Cir. 1999), the Fifth Circuit added a further clarification to the direct/derivative analysis:

> It is axiomatic that a trustee has the right to bring actions that will benefit the estate. Such claims can either be founded on the rights of the debtor or on the rights of the debtor's creditors. If the right belongs to the debtor's creditors, the distinction between personal and general claims takes on significance: A trustee can assert the general claims of creditors, but is precluded from asserting those creditor claims that are personal. In other words, even if a claim "belongs to" the creditor, the trustee is the proper party to assert the claim, for the benefit of all creditors, provided the claim advances a generalized grievance.

*Id.* at 359. It summarized by holding that there are "three kinds of actions":

> 1) Actions by the estate that belong to the estate;
> 2) Actions by individual creditors asserting a generalized injury to the debtor's estate, which affects all creditors; and
> 3) Actions by individual creditors that affect only that creditor personally.
>
> The trustee is the proper party to advance the first two of these kinds of claims and the creditor is the proper party to advance the third. This construction ensures that the estate will not be wholly or partially consumed for the benefit of one creditor, or

-29-

> even a small number of creditors. Moreover,
> preservation of the estate for the advantage
> of all creditors will (1) prevent multi-
> jurisdictional rushes to judgment, (2) save
> judicial resources, and (3) further the
> equitable principles of bankruptcy.

*Id.* at 360.

As the sole Texas case addressing the issue, in *Highland Capital Management, L.P. v. Ryder Scott Co.*, 212 S.W.3d 522 (Tex. App.--Houston [1st Dist.] 2007, no pet. hist.),[17] in reviewing a summary judgment, the appellate court examined *inter alia* claims brought by purchasers of a subsequently bankrupt oil and gas company's (Seven Seas Petroleum, Inc.'s) unsecured subordinated notes against a reservoir-evaluation consulting firm in Texas state court. These noteholders alleged that the firm, Ryder Scott Company, had fraudulently or negligently misrepresented Seven Seas' proven-reserves estimates and that Seven Seas, with the complicity of its CEO, had knowingly incorporated information from Ryder Scott's inaccurate reports into Seven Seas' annual 10-K forms for from 1998-2002. *Id.* at 525. Plaintiffs claimed that they relied on these 10-K forms filed between 1999 and 2002 when they purchased their unsecured notes. *Id.* The terms of these unsecured notes expressly allowed Seven Seas to issue senior secured notes in the future. *Id.* In July 2001 Seven Seas issued

---

[17] This Court focuses on the claims against Ryder Scott, on which Plaintiffs have relied to argue that their claims against JPMorgan Chase are personal, and omits some of the facts regarding claims against other parties.

such secured notes in the amount of $45 million to fund the drilling of a well and to finance its business operations. *Id.* Purchasers of those secured notes included the Chairman and Chief Executive Officer of Seven Seas, Robert A. Hefner III ("Hefner"), who purchased half the notes along with a group of investors, and one of Seven Seas' lenders, Chesapeake Energy Corporation ("Chesapeake"), which purchased the other half of the notes. *Id.* Thus any claims by the purchasers of the secured notes were senior to those of purchasers of the unsecured notes. The Bankruptcy Court, which initially dealt with the issue, explained, "The Plaintiffs allege that Hefner and other directors of Seven Seas conspired with Ryder Scott to inflate Seven Seas' reserve report to avoid restrictions on the issuance of new debt senior to Plaintiffs' claims. The Collateral for the Secured Notes was virtually all of Seven Seas' assets." Memorandum Opinion, Findings and Conclusions in Support of Separate Orders denying remand, denying abstention, denying amendment of preliminary injunction, and dismissing Chesapeake Energy Corp., *Highlands Capital Mgmt. v. Chesapeake Energy Corp.* (In re Seven Seas Petroleum, Inc.), ch. 11 Case No. 02-45206-H2-11, Adv. Proceeding No. 04-3370, instrument #37 at 2 (S.D. Tex. Feb. 23, 2005).[18]

---

[18] The Bankruptcy Court further clarified,

> Plaintiffs do not assert that they had any direct contact or communication with Hefner, Chesapeake, or the other directors.

On August 14, 2002 when Ryder Scott revised its estimate of Seven Seas' proven reserves downward, Seven Seas could no longer meet its financial obligations and was forced into Chapter 7 bankruptcy by its creditors; the case was later converted into a Chapter 11 proceeding. *Id.* The bankruptcy court appointed a trustee to represent the interests of Seven Seas' creditors, equity holders, and other interest holders; the trustee then filed suit against Seven Seas' secured lenders, including Chesapeake, and its former officers and directors, including Hefner, for damages for breach of duties owed to Seven Seas and its creditors and to void the securities interests held by Chesapeake and Hefner. *Id.* at 525-26. Ultimately, as part of the plan of reorganization, the trustee settled with Chesapeake[19] and released

---

Plaintiffs['] allegations of harm are that Chesapeake, Hefner, and the other directors acted in concert to mislead investors in general about the value of Seven Seas' proven reserves by working in concert with Ryder Scott to publish inflated reserve reports.

*Id.*, instrument #37 at 3.

[19] The Bankruptcy Court stated that the settlement was an "agreement that required Chesapeake to give up some of its collateral for payment of priority claims and for the payment of a small portion of unsecured claims in the bankruptcy case (including Plaintiffs' claims) in exchange for a complete release of claims by the bankruptcy estate. The settlement agreement was the centerpiece of the plan of reorganization that was approved overwhelmingly by the creditors of the estate (including Plaintiffs). That plan was confirmed and has been consummated." *See* Memorandum Opinion, Findings and Conclusions in Support of Separate Orders denying remand, denying abstention, denying amendment of preliminary injunction, and dismissing Chesapeake Energy Corp., *Highlands Capital Mgmt. v. Chesapeake Energy Corp.* (In re Seven Seas Petroleum, Inc.), ch. 11 Case No. 02-45206-H2-11, Adv. Proceeding No. 04-3370, instrument #37 at 2 (S.D. Tex. Feb. 23, 2005).

all claims against it. *Id.* at 526. Neither the trustee nor the reorganized debtor sued Ryder Scott. *Id.* at 529 n.11.

Meanwhile, after Seven Seas was forced by creditors into involuntary bankruptcy, the noteholder plaintiffs filed suit in state court against Ryder Scott for negligent misrepresentation. *Id.* at 526. Pursuant to a motion from Ryder Scott, the case was transferred from Dallas County to Harris County, Texas. *Id.* After the reorganization plan had been confirmed by the Bankruptcy Court, the noteholder plaintiffs in the state court suit filed a second amended petition adding and suing Chesapeake and Hefner for conspiracy to defraud and aiding and abetting fraud,[20] conspiring with Ryder Scott to exaggerate Seven Seas' reservoir valuations, and additional claims against Ryder Scott for fraud, aiding fraud under the Texas Securities Act, and aiding and abetting fraud. *Id.* Chesapeake then removed the claims against itself only in the state court suit to the United States District Court for the Southern District of Texas, where the claims against Chesapeake were consolidated into the adversary proceeding involving it in the Bankruptcy Court. *Id.* at 527. Chesapeake then filed a motion to dismiss, arguing that the noteholders' claims against it had been released under the plan of reorganization previously

---

[20] The amended petition asserted that Chesapeake and Hefner conspired to inflate the reserve reports, thereby overstating the value of the company to allow the issuance of the secured notes, which injured the unsecured noteholder plaintiffs.

confirmed by the Bankruptcy Court; Chesapeake was dismissed as part of the final judgment. *Id.* at 527-28.

Unlike Chesapeake, Ryder Scott and Hefner did not remove the state-court claims against them. The bankruptcy trustee then obtained an injunction from the Bankruptcy Court enjoining the state court suit claims against Hefner, pending resolution of the trustee's claims against Hefner and others in the Bankruptcy Court, in essence based on the trustee's exclusive right to pursue the estate's claims before others, i.e., Plaintiffs here. *Id.* at 527.

The Bankruptcy Court opined about the nature of the claims against Hefner and Chesapeake as follows:

> In summary, whether a claim is property of the estate depends on the nature of the injury and whether the debtor could have raised the claim under state law as to the commencement of the case. If Chesapeake and Hefner conspired to create claims with collateral rights senior to other creditors, then the harm is generalized to all creditors. Not only "could have" the Debtor raised the claims against Chesapeake, and Hefner, the Debtor *did* raise those claims. Therefore the claims against Chesapeake and Hefner are property of the estate.
> Plaintiffs argue that they may pursue the claim because they have rights under state law that are independent of the Debtor's rights. That argument misperceives the test. In virtually all of the Fifth Circuit cases discussed above, both the debtor and a creditor had the ability to bring an action. The extensive discussion by the Fifth Circuit assumes that both have the right to bring the action. The decision that the [e]state is the proper party to bring the actions is made

-34-

> by a reference to bankruptcy principles,
> especially an avoidance of chaotic multiple
> actions in multiple jurisdictions and a race
> to judgment and execution on the judgment.
> Under the principles described above, the
> Debtor has the right to bring that action; it
> is the property of the estate. [footnotes
> omitted]

*Id.* at 528-29.

The state court action was not within the jurisdiction of the Bankruptcy Court, which had noted that its decision had no effect on any claim against the consulting firm that did not affect Chesapeake or Hefner. 212 S.W.3d at 529, 531. Nevertheless, on appeal of a summary judgment from the district court, the First Court of Appeals opined that the noteholders' misrepresentation and fraud claims against Ryder Scott were not "property of the estate" because Seven Seas could not have asserted these claims at the initiation of the bankruptcy. *Id.* at 531-32, *citing Educators Group*, 25 F.3d at 1284. It emphasized that the misrepresentation and fraud claims were based on intentional misrepresentations by Ryder Scott made directly to the noteholders and on the noteholders' "*reliance* on Ryder Scott's representations about Seven Seas' proved-reserve estimates and on [*the noteholders'*] *damages*." *Id.* at 532. The First Court of Appeals compared the claims of the noteholders against Ryder Scott to those of the plaintiff school districts in *Educators Group* that alleged "a direct injury to themselves, which is not derivative of any harm to the debtor" and quoted the Fifth Circuit: "[T]he

-35-

plaintiff school districts allege . . . in the complaint that defendants intentionally misrepresented *to them* the financial situation of EGHT, and that they materially relied on such misrepresentations to their detriment. To the extent that this cause of action and others allege a direct injury to the plaintiff school districts they belong to the plaintiff school districts and not the estate'." *Id., quoting Educators Group*, 25 F.3d at 1284.[21]

This Court concludes that although the First Court of Appeals claimed to have relied upon Fifth Circuit law, it misinterpreted *Educators Group*'s test for direct vs. derivative claims solely as it applied that test to claims against Ryder Scott because it did not look carefully at the nature of the injury, the first prong of the *Educators Group* test. As noted, the alleged misrepresentations made to the school districts in *Educators Group* were about the financial condition of their health benefits plan provider, EGHT, by its administrators and Chesapeake, who allegedly negligently mismanaged EGHT, caused it to become insolvent, and breached fiduciary duties by inserting themselves in front of the subordinated, unsecured noteholders by buying the secured notes. The misrepresentations were specific and directly

---

[21] The First Court of Appeals further concluded that the noteholders' claims under the Texas Securities Act similarly arose from *their purchase* of securities and thus Seven Seas could not pursue the same remedies under this Act. *Id.* This Court agrees here, but because the noteholders were not asserting "holder claims," which this Court has held are not permissible under the TSA, the ruling is inapplicable to the case before this Court.

made to the school districts to induce them to become or to
continue as health benefits participants. Such representations
to the school districts could not harm the corporation, which in
no way relied on them to its detriment. These claims were not
applicable to all EGHT's other creditors. In *Highland Capital*
in contrast, the alleged misrepresentations in Ryder Scott's
reservoir evaluation estimates, allegedly aided and abetted by
Hefner and Chesapeake, did harm the corporation by allowing Seven
Seas to take on more debt obligations than it could satisfy.
While the noteholders claim that they personally relied on Ryder
Scott's reports as presented in EGHT's 10-K forms, that
information was available to the marketplace for every other
investor in EGHT securities. There are no allegations of any
face-to-face or direct communications between the noteholders and
officials at Ryder Scott; or misrepresentations specifically
targeted to noteholders to establish personal reliance distinct
from that of any other investor or creditor relying on the SEC
filings; nor allegations demonstrating that the noteholders'
injury (loss of value in their investment) was any different from
that of all securities holders (other than the insider Defendants
who allegedly conspired to purchase the senior notes, be first in
line for repayment, and thereby make others less likely to receive
payment on their notes from the failing corporation). Moreover
the trustee could have brought claims of misrepresentation and

fraud against Ryder Scott at the commencement of the bankruptcy based on its false reports that caused generalized harm to creditors,[22] but chose not to. Just as the First Court of Appeals said about Chesapeake and Hefner, "If Chesapeake and Hefner conspired to create claims with collateral rights senior to other creditors, then the harm is generalized to all creditors," this Court concludes that the same is true about claims that Ryder Scott's conspiring with Hefner and other directors of Seven Seas to inflate the reserves of Seven Seas in reports that were incorporated into Seven Seas' SEC filings and relied on by investors and creditors. *Highland Capital*, 212 S.W.3d at 528-29. In both cases the fraud caused all securities holders to be pushed back in line for repayment of their obligations behind those insiders who purchased the secured notes. Thus for all these reasons, this Court concludes that the claims against Ryder Scott were derivative, not personal, and were the property of the debtor's estate. Thus it finds Plaintiffs' reliance on the case inapposite.

As for the impact of Rule 9(b), in the instant motion seeking reconsideration and leave to amend, Plaintiffs have alleged that NWL's representative spoke directly to Gibbons and Lamb an

---

[22] As will be discussed, the Fifth Circuit held that *in pari delicto* or complicity-in-the-wrongdoing is an affirmative defense that does not preclude the debtor from bringing the claim, but only "goes to the resolution of the claim, and not to the ability of the debtor to assert the claim." *Educators Group*, 25 F.3d at 1286.

undefined number of times between 1997 and 2001, and then at least three times, as evidenced by handwritten notes identified by Andersen as her own, in the crucial weeks for Enron between October 18, 2001 and November 9, 2001. Anderson and Gibbons thus purportedly had an established relationship in which Anderson sought advice about Enron for investment purposes from the JPMorgan analyst, possibly with superior knowledge or knowledge unavailable to Anderson. Plaintiffs claim that Anderson (and NWL) relied on Gibbons' recommendations that NWL continue to hold its Enron investments. As noted earlier, Gibbons' "opinions" as alleged might meet requirements to be actionable as fraud under Texas law to the extent that (1) they were based on past or present facts or predictive of future events and made by a speaker purportedly with special knowledge; (2) they were allegedly based on false facts; and (3) they were in part false opinions of value made by an analyst, who should know that Anderson and NWL might be (and allegedly were) justifiably relying on his superior knowledge. *Paull*, 987 S.W.2d at 219; *Trenholm*, 646 S.W.2d at 930; *Faircloth,* 898 S.W.2d at 277. None of these "opinions," however, is pled with particularity.

Moreover, the evidence submitted does not support the proposed allegations set out in motion to reconsider, at least not sufficiently to meet Rule 9(b)'s requirement that fraud be pled with particularity. Anderson's deposition testimony, apparently

-39-

taken on 8/16/05, demonstrates that her memory of conversations with Gibbons and JPMorgan Chase analyst reports from 1998-2001 was, at best, very foggy. Anderson testified that she could not remember the specific date of **any** communications with JPMorgan Chase about Enron, and that she "vaguely remembers" speaking to Jim Gibbons for his opinion on Enron between 1997 and 2001. #62, Ex. 1 at 167, l. 13-68, l19. When asked what his opinion during that four-year period was, she answered, "From what I recall, it was an opinion of hold," but she could not remember when that conversation took place and when he made that recommendation. #62, Ex. 1 at 168, l. 16. When the three separate handwritten notes, dated 10/18/01, 10/30/01, and 11/9/01 (Exs. 2-4 to #62), were presented to her as exhibits, she identified them as notes, in her handwriting, from conference calls with various Wall Street analysts, "one-on-one calls" to the best of her recollection," the first of which, dated 10/18/01, referenced Gibbons and Lamb. *Id.* at 192, ll.7-24. She testified that thought she remembered talking to Gibbons, but her notes indicated that she spoke to "Freda Lamb for Jim Gibbons." *Id.* at 194, ll. 4-6. She stated that she called Lamb on October 18, 2001 to update her file on Enron, but she could not remember if it was because of what happened on October 16, 2001. *Id.* at ll. 8-14. Later Anderson testified that it was her practice to take notes of a conversation, but that she did not "know whether or not these

-40-

notes are notes of a conversation, but it seems like it." #62, Ex.1, Dep. of Natalie Anderson at Vol. 2, p. 242, ll. 22-25. When asked, "How would you determine whether or not these were reflective of a telephone conversation with an analyst from a financial institution," she responded after an attorney objection, "I don't know." *Id.* at 243 ll. 1-5. Thus none of the communications between Gibbons and Anderson, even to determine whether they were sufficiently "direct" to qualify as personal claims, is not delineated with the necessary specificity to support fraud.

JPMorgan Chase argues that none of the three exhibits of Anderson's notes of conversations in late 2001 includes a statement that Gibbons recommended that NWL "hold" onto its Enron securities. Upon examination, straining to view the suggested allegations as true in a light most favorable to Movants, the Court finds a hint of such a recommendation in the first note, dated 10/18/01, reflecting Gibbons' view that Skilling's resignation was "good for start of cleaning house": "Don't buy now.[23] Wait for Ken Lay to show improvement. Bonds will stay wide for awhile. More writeoffs. . . . At this point not expecting a downgrade." #62, Ex. 2. Anderson testified that the clause, "bonds will stay wide for a while" means "that the spreads on the

_____

[23] Such a recommendation is not the same as a recommendation to sell or to not hold onto securities.

bonds--the way a bond is priced--were going to be higher
numerically for a while." #62, Ex. 1 at 194, ll. 19-21. She
further testified that even the possibility that Enron would
declare bankruptcy would not have affected NWL's decision to hold
onto its two Enron bonds because even if it did, 'we were still
of the opinion that . . . we would receive our--money back. . .
. [That opinion] was based on the information that we had from
the street analysts, the rating agencies and the--the reported
financials." *Id.* at 243-44.

JPMorgan Chase further argues that comments about Enron by
Gibbons recorded in the notes was not information targeted to
NWL's particular situation, but was information available in the
market place relating to and affecting all Enron securities
holders. After reviewing the notes, this Court agrees. Nowhere
are the particular bonds purchased by NWL referenced. The
comments attributed to Gibbons and/or Lamb are about Enron
generally and would be relevant to and affect all securities
holders and other creditors. Moreover they constitute information
that was widely available in the marketplace, financial
publications, and newspapers.

For these reasons the Court finds that the proposed holder
claims in the motion to reconsider are derivative in nature, not
direct and personal to NWL in particular or to the other
Plaintiffs.

### D. Clean Hands Doctrine

If the Court deems Movants' claims to be derivative and property of the corporation, Plaintiffs here have raised the "clean hands" doctrine, including the *Wagoner* rule[24] of the Second Circuit and the equitable *in pari delicto* doctrine,[25] to argue that the trustee cannot bring these claims because the debtor and JPMorgan Chase allegedly acted together in the conspiracy to defraud and therefore Plaintiffs should be allowed to assert their claims or they will be left without a remedy.

---

[24] In *Wagoner*, also recognizing a co-conspirator exception to a bankruptcy trustee's standing, the Second Circuit concluded that if the debtor has joined a third party in defrauding creditors, the trustee, who represents the debtor, does not have standing to sue the third party for damages to creditors. *Wagoner*, 944 F.2d at 113. "A claim against a third party for defrauding a corporation with the cooperation of management accrues to the creditors, not to the guilty corporation." *Id.* at 120.

[25] A common law defense, "*in pari delicto*" comes from the Latin phrase, "*in pari delicto potior est conditio defendedes*," which translates as "where the wrong of one party equals that of the other, the defendant is in the stronger position." *Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187 1196 & n.17 (5th Cir. 1995). *In pari delicto* may preclude private causes of action under the federal securities law and under Texas law. *Id.* at 1197, *citing Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 31-11 (1985)(holding that an action "may be barred on the grounds of the plaintiff's own culpability only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public."), and *Lewis v. Davis*, 145 Tex. 468, 199 S.W.2d 146 (1947). *See also Beer v. Landman*, 88 Tex. 450, 455, 31 S.W. 805, 807 (1895)("We understand the rule to be this: The plaintiff cannot recover when it is necessary for him to prove, as part of his cause of action, his own illegal contract or other illegal transaction; but if he can show a complete cause of action without being obliged to prove his own illegal act, although such illegal act may incidentally appear, and may be important even as explanatory of other facts in the case, he may recover. It is sufficient if his cause of action is not essentially founded upon something which is illegal. If it is, whatever may be the form of the action, he cannot recover.

In *Educators Group*, the Fifth Circuit observed that it could not find any authority "for the proposition that a defense on the merits of a claim brought by the debtor precludes the debtor from *bringing* the claim. That the defendant may have a valid defense goes to the resolution of the claim, and not to the ability of the debtor to assert the claim." *Id.* at 1286.

Furthermore, in Texas, application of the *in pari delicto* doctrine is a matter of public policy. *Lewis v. Davis*, 145 Tex. 468, 199 S.W.2d 146 (1947). In *Lewis v. Davis* the Texas Supreme Court noted,

> The rule is adopted, not for the benefit of either party and not to punish either of them, but for the benefit of the public. . . . In many cases relief is granted to the party who is not in pari delicto. . . . It has been said that even where the parties are in pari delicto relief will sometimes be granted if public policy demands it. . . . There is often involved, in reaching a decision as to granting or withholding relief, the question where the policy against assisting a wrongdoer outweighs the policy against permitting unjust enrichment of one party at the expense of the other. The solution of the question depends upon the peculiar facts and the equities of the case, and the answer usually given is that which it is thought will better serve public policy. [citations omitted]

*Id.* at 477. Thus under Texas law the impact of the doctrine would be uncertain.

### Request for Severance and Rule 54(b) Final Judgment

The Court agrees with JPMorgan Chase that severance of these claims and entry of a judgment under Rule 54(b) are not appropriate. The Rule provides,

> **Judgment Upon Multiple Claims or Involving
> Multiple Parties.** When more than one claim
> for relief is presented in an action, whether
> as a claim, counterclaim, cross-claim, or
> third-party claim, or when multiple parties
> are involved, the court may direct the entry
> of a final judgment as to one or more but
> fewer than all the claims or parties only
> upon an express determination that there is
> no just reason for delay and upon an express
> direction for entry of judgment.

The Rule strikes a balance between two adverse interests: the long established federal policy against piecemeal appeals and providing a means to avoid any injustice that might arise if judgment on the separate claim(s) was delayed until the entire case could be adjudicated. *Dole v. Phoenix Roofing, Inc.*, 922 F.2d 1202, 1207 (5th Cir. 1991), *citing Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 432 (1956), and 10 C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 2654 (2d ed. 1983). The Rule was adopted in response to "the potential scope and complexity of civil actions under the federal rules, given their extensive provisions for the liberal joinder of claims and parties." *In re Taxable Municipal Bod Securities Litig.*, Civ. A. MDL No. 863, 1996 WL 120844 (E.. La. Mar. 19, 1996). The policy behind the finality rule and Rule 54(b) is to prohibit "piecemeal" appeals except for certain narrow circumstances. *Id.* "A district court should grant [Rule 54(b)] certification only when there exists some danger of hardship or injustice through delay which would be alleviated by an immediate appeal; it should not be

-45-

entered routinely as a courtesy to counsel. *PYCA Industries, Inc. v. Harrison County Waste Management Dt.*, 81 F.3d 1412, 1421 (5th Cir. 1996).

Under Rule 54(b), the district court must first determine that "it is dealing with a 'final judgment," i.e., that the judgment is "'an ultimate disposition of an individual claim entered in the course of a multiple claims action." *Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 7 (1980)*, citing Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427 (1956). Second, it must expressly decide if there is any just reason for delay. *Id.,* 446 U.S. at 7. The district court has sound discretion to decide when each final decision in a multiple claims action is ready for appeal. *Id.* Moreover the district court must consider "administrative interests as well as the equities involved" in order to "assure that the application of the Rule effectively 'preserves the historic federal policy against piecemeal appeals.'" Id. at 8. The court may properly consider such factors as "whether the claims under review were separable from the others remaining to be adjudicated and whether the nature of the claim already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals." *Id.* In the second determination, the court should "weigh 'the inconvenience and cost of piecemeal review on the one hand and the danger of denying justice by delay

on the other.'" *Road Sprinkler Fitters Local Union, AFL-CIO v. Continental Sprinkler Co.*, 967 F.2d 145, 148 (5th Cir. 1991), *quoting Dickinson v. Petroleum Conversion Corp.*, 338 U.S. 507, 511 (1950).[26]

The Court finds no injustice here from requiring Plaintiffs to wait to pursue their appellate claims until a single final judgment has issued. Indeed, some Plaintiffs in this suit and their related suits assert both holder and non-holder claims, so there is a substantial risk that the Fifth Circuit would have to decide the same issues on multiple appeals. Moreover there are significant administrative and economic benefits to be had from one appeal per suit, rather than piecemeal appeals.

Accordingly, as indicated above, the Court

ORDERS that the motion for reconsideration (#62) is GRANTED and the Court's previous opinion and order is amended and/or clarified as stated herein. Nevertheless, from the allegations in the motion and its supporting evidence, the Court concludes that Plaintiffs have failed to demonstrate that they can state a claim if permitted to replead their holder claims. Thus the Court

---

[26] The Fifth Circuit does not "require the judge to mechanically recite the words, 'no just reason for delay.,'" but only that the judge's intent be "*unmistakable*" in the order or documents referenced in the order to enter a partial final judgment under Rule 54(b). *Briargrove Shopping Center Joint Venture v. Pilgrim Enterprises, Inc.*, 170 F.3d 536, 539 (5th Cir. 1999), *citing Kelly v. Lee's Old Fashioned Hamburgers, Inc.*, 908 F.2d 1218, 1220 (5th Cir. 1990)(en banc).

reaffirms its earlier dismissal of these claims, but for the reasons stated in this opinion. Finally, the Court

ORDERS that Plaintiffs' motion for the Court to sever these claims and enter a final judgment is DENIED.

SIGNED at Houston, Texas, this 19th day of April, 2007.


MELINDA HARMON
UNITED STATES DISTRICT JUDGE

Exhibit 5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation Securities, Derivative & "ERISA" Litigation | § § § § | MDL-1446 |
| MARK NEWBY, ET AL., | § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. H-01-3624 CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | § § | |
| Defendants | § | |
| AMERICAN NATIONAL INSURANCE COMPANY, et al., | § § § § | |
| Plaintiffs, | § | |
| VS. | § § | CIVIL ACTION NO. G-02-723 |
| CITIGROUP, INC., et al., | § § | |
| Defendants. | § | |

**OPINION AND ORDER**

Pending before the Court in the above referenced cause,
alleging securities fraud under Texas statutory and common law and
civil conspiracy to defraud, are the following motions: (1)
Schuyler M. Tilney's ("Tilney's")[1] motion to dismiss Plaintiffs'[2]

---

[1] Tilney was Managing Director of Global Energy and Power,
Global Marks & Investment Banking for Merrill Lynch & Company.
According to the controlling pleading, he was fired in September
2002 after he invoked his Fifth Amendment rights and refused to

1

Second Amended Complaint (instrument #78)[3]; (2) Defendant Merrill Lynch's[4] motion to dismiss Plaintiffs' Second Amended Complaint (#79); and (3) Plaintiffs'[5] motion for status conference (#91). Tilney adopts and incorporates for reference Defendant Merrill Lynch's motion to dismiss.

Against Tilney, in both his individual and his official capacities, Plaintiffs assert claims for aiding and abetting fraud under Tex. Bus. & Comm. Code § 27.01(d) and common-law civil conspiracy to commit fraud. In a footnote, #82 at 2, n.2, Plaintiffs state, "Based upon the Court's ruling that a common law 'duty to disclose' requirement is incorporated in section 27.01(d) of the Texas Business and Commerce Code, Plaintiffs withdraw their statutory fraud claims against Tilney." As will be discussed, the Court has reconsidered this statutory construction and thus reinstates and reviews this § 27.01(d) claim against Tilney.

---

testify in an investigation into Enron's collapse that was jointly conducted by the Securities and Exchange Commission ("SEC") and the United States Department of Justice ("DOJ"). #85, ¶¶ 10,

[2] Plaintiffs are American National Insurance Company, American National Investment Accounts, Inc., SM&R Investments, Inc., American National Property and Casualty Company, and Standard Life and Accident Insurance Company.

[3] The governing pleading is Plaintiffs' Second Amended Complaint, as Corrected (#85).

[4] Defendants are Merrill Lynch, Pierce, Fenner & Smith Incorporated and Merrill Lynch & Company, Inc. (collectively, "Merrill Lynch").

[5] In conjunction with Plaintiffs from H-04-4520 and H-03-1276.

Plaintiffs assert the same two claims plus a claim for common law fraud against Merrill Lynch.[6]

Seeking punitive damages on these claims, Plaintiffs complain that Merrill Lynch and Tilney, as Enron's co-conspirators, intentionally violated provisions of the Texas Penal Code, specifically section 32.46 (securing execution of a document by deception) and/or section 32.47 (fraudulent concealment of a writing), such that they are entitled to uncapped exemplary damages. These violations are among the enumerated felonies listed in Section 41.008(c) of the Texas Civil Practice & Remedies Code to which the cap on exemplary damages established in Section 41.008(b) does not apply.

### Standard of Review under Rules 12(b)(6) and 9(b)

When a district court reviews a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), it must construe the complaint in favor of the plaintiff and take all well-pleaded facts as true. *Kane Enterprises v. MacGregor (US), Inc.*, 322 F.3d 371, 374 (5th Cir. 2003), *citing Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir. 1986). In addition to the complaint, the court may review documents attached to the complaint and documents attached to the motion to dismiss to which the complaint refers and which

---

[6] The Court has previously rejected Plaintiffs' "holder" claims and claims under the Texas Securities Act (#75; also available as *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 490 F. Supp. 874 (S.D. Tex. 2007)).

are central to the plaintiff's claim(s). *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). If an exhibit attached to the complaint contradicts an allegation in the complaint, the exhibit controls. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004).

Generally, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-65 (2007)(citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555 and 1965, *citing* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216, pp. 235-236 (3d ed. 2004)("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action."). "*Twombly* jettisoned the minimum notice pleading requirement of *Conley v. Gibson*, 355 U.S. 41 . . . (1957)["a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"], and instead required that a complaint allege enough facts to state a claim

4

that is plausible on its face." *St. Germain v. Howard*, 556 F.3d
261, 263 n.2 (5th Cir. 2009), *citing In re Katrina Canal Breaches
Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)("To survive a Rule
12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts
to state a claim to relief that is plausible on its face.'"),
*citing Twombly*, 127 S. Ct. at [1974]. Furthermore, the plaintiff
must plead specific facts, not merely conclusory allegations, to
avoid dismissal. *Collins*, 224 F.3d at 498; *see also Alpert v.
Riley*, No. H-04-CV-3774, 2008 WL 304742, *11-12, 14 (S.D. Tex.
Jan. 31, 2008). "Dismissal is proper if the complaint lacks an
allegation regarding a required element necessary to obtain relief
. . . ." *Rios v. City of Del Rio, Texas*, 444 F.3d 417, 421 (5th
Cir. 2006), *cert. denied*, 549 U.S. 825 (2006).

Recently, in *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940
(2009)(5-4), the Supreme Court, applying the *Twombly* plausibility
standard to a *Bivens* claim of unconstitutional discrimination and
a defense of qualified immunity for government official, observed
that two principles inform the *Twombly* opinion: (1) "the tenet
that a court must accept as true all of the allegations contained
in a complaint is inapplicable to legal conclusions." . . . Rule
8 "does not unlock the doors of discovery for a plaintiff armed
with nothing more than conclusions."; and (2) "only a complaint
that states a plausible claim for relief survives a motion to
dismiss," a determination involving "a context-specific task that

5

requires the reviewing court to draw on its judicial experience and common sense."

Fraud claims must also satisfy the heightened pleading standard set out in Federal Rule of Civil Procedure 9(b)[7]: "In allegations alleging fraud . . ., a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." "What constitutes 'particularity' will necessarily' differ with the facts of each case . . . ." *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003)(*citing Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 19992)), *modified on other grounds*, 355 F.3d 356 (5th Cir. 2003).

The Fifth Circuit interprets Rule 9(b) at minimum to require "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation of why they were fraudulent." *Plotkin v. IP Axess, Inc.,* 407 F.3d 690, 696 (5th Cir. 2005).

Furthermore, although Rule 9(b) expressly states, "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally," the Fifth Circuit has ruled that while common-law fraud claims are not subject to the "strong inference" of

---

[7] Although Merrill Lynch did not file its motion under Rule 9(b), it applies as a matter of law.

scienter standard imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA")[8] on federal securities claims, Rule 9(b) "incorporates an element of scienter." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 213 (5th Cir. 2009), *citing Dorsey v. Portfolio Equities, Inc.*, 540 F. 3d 333, 341 (5th Cir. 2008). In order to plead adequately fraudulent

---

[8] Under the strict standard of the PSLRA, a plaintiff must "for each act or omission alleged" to be false or misleading, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In the context of federal securities fraud, scienter is "defined as 'an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Flaherty*, 565 F.3d at 207, *citing R2 Invs. LDC v. Phillips*, 401 F. 3d 638, 643 (5th Cir. 2005), and *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 697 (5th Cir. 2005)("[A] securities fraud plaintiff must prove that the defendant either consciously misbehaved . . . or was so severely reckless that it demonstrates that the defendant must have been aware of the danger of misleading the investing public."). "'Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from standards of ordinary care.'" *Flaherty*, 565 F.3d at 207, *quoting R2 Invs.*, 401 F. 3d 643. In *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499 (2007), when drafting a complaint under Rule 12(b)(6) to adequately plead scienter, the United States Supreme Court opined that "Congress required plaintiffs to plead with particularity facts that would give rise to a 'strong'--*i.e.*, a powerful or cogent--inference." *Tellabs*, 127 S. Ct. at 2509-10. Furthermore, "the inquiry is inherently comparative" and "a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter. The inference of scienter must ultimately be 'cogent and compelling,' not merely 'reasonable' or 'permissible.' A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S. Ct. at 2510.

intent in the context of a state-law securities fraud claim, a plaintiff must allege specific facts to support an inference of fraud. *Flaherty*, 565 F.3d at 213. "'Alleged facts are sufficient to support such an inference if they either (1) show a defendant's motive to commit securities fraud or (2) identify circumstances that indicate conscious behavior on the part of the defendant.'" *Id., quoting Herrmann Holdings, Ltd. v. Lucent Technologies, Inc.*, 302 F.3d 552, 565 (5th Cir. 2002).

The pleading standards of *Twombly* and Rule 9(b) apply to pleading a state-law claim of conspiracy to commit fraud. *U.S. ex rel. Grubbs v. Kanneganti*, ___ F.3d ___, No. 07-40963, 2009 WL 930071, *2, *9 (5th Cir. Apr. 8, 2009)("The *Twombly* standard replaces the lenient and longstanding rule that 'a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. The new reading raises a hurdle in front of what courts had previously seen as a plaintiff's nigh immediate access to discovery--modest in its demands but wide in its scope"; "a plaintiff alleging a conspiracy to commit fraud must 'plead with particularity the conspiracy as well as the overt acts . . . taken in furtherance of the conspiracy'"), *quoting FC Inv. Group LLC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1097 (D.C. Cir. 2008).

Rule 9(b) applies to statutory fraud cases arising under Tex.

8

Bus. & Com. Code § 27.01. *7-Eleven Inc. v. Puerto Rico-7 Inc.*, No. 3:08-CV-00140-B, 2008 WL 4951502, *2 (N.D. Tex. Nov. 19, 2008), *citing Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338-39 (5th Cir. 2008).

If Plaintiffs fail to state a claim for fraud underlying their civil conspiracy claim, the civil conspiracy claim must be dismissed, too. *Allstate Ins. Co. v. Receivable Finance, Inc.*, 501 F.3d 398, 414 (5th Cir. 2007); *American Tobacco Co., Inc. v. Grinnell*, 951 S.W. 2d 420, 438 (Tex. 1997)("Allegations of conspiracy are not actionable absent an underlying [tort]"); *Krames v. Bohannon Holman, LLC*, No. 3:06-CV-2370-0, 2009 WL 762205, *10 (N.D. Tex. Mar. 24, 2009)("Plaintiffs' failure to state a claim for fraud, which is the offense underlying their conspiracy claim, necessitates that Plaintiffs' conspiracy claim should similarly be dismissed.").

A dismissal for failure to plead with particularity as required by Rule 9(b) is treated the same as a Rule 12(b)(6) dismissal for failure to state a claim. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996).

**Relevant Law**

**1.  Common Law Fraud**

For common law fraud a plaintiff must prove that (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it

9

was false or made it recklessly without any knowledge of the truth
and as a positive assertion; (4) the representation was made with
the intention that it be acted upon by the other party; (5) the
party actually and justifiably acted in reliance upon the
representation; and (6) the party suffered injury. *Ernst Young,
LLP v. Pac. Mutual Life Ins. Co.*, 51 S.W. 3d 573, 577 (Tex. 2001);
*Johnson & Higgins of Tex., Inc. v. Kenneco Energy , Inc.*, 962 S.W.
2d 507, 524 (Tex. 1998).

Noting that "our fraud jurisprudence has traditionally
focused not on whether a misrepresentation is directly transmitted
to a known person alleged to be in privity with the fraudfeasor,
but on whether the misrepresentation was intended to reach a third
person and induce reliance" and that the Texas Supreme Court had
previously held "that a misrepresentation made through an
intermediary is actionable if it is intended to influence a third
person's conduct," the Texas Supreme Court ruled that "Texas
jurisprudence is entirely consistent with section 531's [of the
*Restatement (Second) Torts*] reason-to-expect standard, which
requires a degree of certainty that goes beyond mere
foreseeability." *Ernst & Young, L.L.P. v. Pacific Mutual Life
Insurance Co. (hereinafter, "Pacific Mutual")*, 51 S.W. 3d 573,
578-80 (Tex. 2001). *Restatement (Second) of Torts* § 531 (1977)
provides,

> One who makes a fraudulent misrepresentation is subject
> to liability to the persons or class of persons whom he

> **intends or has reason to expect** to act or to refrain
> from action in reliance upon the misrepresentation, for
> pecuniary loss suffered by them through their
> justifiable reliance in the type of transaction in
> which he intends or has reason to expect either conduct
> to be influenced.

Id. (emphasis added).

"Texas does not require that there be privity between the alleged target of the fraud and the fraudfeasor." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Company*, 313 F.3d 305, 323 (5th Cir. 2002). "[T]he alleged fraudfeasor must 'have information that would lead a reasonable man to conclude that there is *an especial likelihood* that it will reach those persons and *will influence their conduct*." *Pacific Mutual*, 51 S.W. 3d at 580, citing Restatement (Second) of Torts § 531 cmt. d (1977). Moreover the information must "reach" the third party and "influence its conduct." *Id.* Furthermore, "even an obvious risk that a third person will rely on a representation is not enough to impose liability. . . . General industry practice or knowledge may establish a basis for foreseeability to show negligence, but it is not probative of fraudulent intent." *Id.* at 581. Thus a plaintiff must demonstrate that the defendant *intended* that the plaintiff receive and rely upon the defendant's representation and that the plaintiff *actually received and relied* upon that representation. *Admiral Ins. Co. v. Heath Holdings USA, Inc.*, No. Civ. A. 3:03-CV-1634G, 2004 WL 1144062, *4 (N.D. Tex. May 21,

2004). Furthermore, "the plaintiff must have incurred pecuniary loss 'in the type of transaction in which [the maker of the representation] intends or has reason to expect [his or her] conduct to be influenced.'" *Pacific Mutual*, 51 S.W. 3d at 580, *quoting* Restatement (Second) of Torts § 531 (1977).

**2. Common-Law Fraudulent Concealment**

A subcategory of fraud is fraud by nondisclosure or fraudulent concealment. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W. 2d 171, 181 (Tex. 1997). For a fraudulent concealment claim, the plaintiff must plead and show (1) a deliberate failure to disclose material facts, (2) by one who had a duty to disclose such facts, (3) to another who is unaware of those facts and does not have an equal opportunity to discover them, (4) with the intent that the other party act or refrain from acting, and (5) with that other party relying on the nondisclosure to its detriment. *Bradford v. Vento*, 48 S.W. 3d 749, 754-55 (Tex. 2001); *7979 Airport Garage, L.L.C. v. Dollar Rent a Car Syst., Inc.*, 245 S.W. 3d 488, 507 n.27 (Tex. App.--Houston [14th Dist.] 2007, pet. denied). *See also Celanese Corp. v. Coastal Water* Authority, 475 F. Supp. 2d 623, 637 (S.D. Tex. 2007)("Elements of fraud by nondisclosure are: (1) the defendant failed to disclose facts to the plaintiff; (2) the defendant had a duty to disclose those facts; (3) the facts were material; (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have

an equal opportunity to discover the facts; (5) the defendant was deliberately silent when it had a duty to speak; (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting; (7) the plaintiff relied on the defendant's nondisclosure; (8) the defendant was injured as a result of acting without that knowledge."), *citing Bradford v. Veneto*, *Schlumberger Tech. Corp. v. Swanson*, 959 S.W. 2d 171 (Tex. 1997); *see also In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 490 F. Supp. 2d 784, 794 (S.D. Tex. 2007).

Under Texas law, an affirmative duty to disclose may arise under four circumstances: (1) where there is a fiduciary or confidential relationship between the parties; (2) where a person voluntarily discloses new information, he must disclose the whole truth; (3) when a person makes a representation and new information makes the earlier misrepresentation misleading or untrue; and (4) when a person makes a partial disclosure and conveys a false impression. *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 490 F. Supp. 2d 784, 794 (S.D. Tex. 2007)(and cases cited therein).

## 3. Statutory Fraud

Texas also has a cause of action for statutory fraud. Tex. Bus. & Comm. Code § 27.01, encompassing both a primary and a secondary violation. The Court quotes the statute in relevant

13

part as it relates to stock transactions:

§ 27.01 Fraud in Real Estate and Stock Transactions

(a)  Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a

(1) false representation of a past or existing material fact, when the false representation is

(A) made to a person for the purpose of inducing that person to enter into a contract; and

(B) relied on by that person in entering into that contract; . . . .

(b) a person who makes a false representation . . . commits the fraud described in Subsection (a) of this section and is liable to the person defrauded for actual damages.

(c) A person who makes a false representation or false promise with actual awareness of the falsity thereof commits the fraud described in Subsection (a) of this section and is liable to the person defrauded for exemplary damages.  Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

(d) A person who (1) has actual awareness of the falsity of a representation . . . made by another person and (2) fails to disclose the falsity of the representation . . . to the person defrauded, and (3) benefits from the false representation . . . commits the fraud described in Subsection (a) of this section and is liable to the person defrauded for exemplary damages.  Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

(e) Any person who violates the provisions of this section shall be liable to the person defrauded for reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, and costs of court.

Section 27.01(d) addresses secondary liability, here

14

allegedly incurred by Merrill Lynch and Tilney, for aiding and abetting the primary violation by Enron, under Section 27.01(a).

Section 27.01 and its predecessor, article 4004, V.T.C.S., are penal in nature and must be strictly construed by the courts. *Ratcliff v. Trenholm*, 596 S.W. 2d 645, 650 (Tex. Civ. App.–Tyler 1980, writ ref'd n.r.e.); *Bykowicz v. Pulte Home Corp.*, 950 F.2d 1046, 1050-51 (5th Cir. 1992), *cert. denied*, 506 U.S. 822 (1992).

Recent briefing has caused this Court to reconsider and examine again whether a secondary violator must have a duty to disclose under Section 27.01(d). There is sparse case law dealing with Section 27.01(d), and most of that merely quotes the statute, without applying it to the facts in the case. After careful review of the statute and case law examining a duty to disclose fraud generally, the Court concludes that it has wrongly imposed as pleading requirements the elements of common-law fraud by nondisclosure on Section 27.01(d), perhaps having been led to that result by the failure of other courts to distinguish the two in contemporaneously addressing Section 27.01 as a whole and common law fraudulent concealment.

Statutory construction questions are legal issues for the court. *Johnson v. City of Fort Worth*, 774 S.W. 2d 653, 656 (Tex. 1989). In construing a statute, the objective of the court is to determine and give effect to the Legislature's intent. *City of Rockwell v. Hughes*, 246 S.W. 3d 621, 625-26 (Tex. 2008); *National*

15

*Liab. & Fire Ins. v. Allen*, 15 S.W. 3d 525, 527 (Tex. 2000). The Court presumes that the Legislature intended the plain meaning of its words. *Allen*, 15 S.W. 3d at 570. To give effect to the legislature's intent, "we look first and foremost to the words of the statute." *Lexington Ins. Co. v. Strayhorn*, 209 S.W. 3d 83, 85 (Tex. 2006). The court should construe the statute's words according to their plain and common meaning unless a contrary intention is apparent from the context or unless such a construction leads to absurd results. *City of Rockwell v. Hughes*, 246 S.W. 3d 621, 625-26 (Tex. 2008); *see also Texas Dept. of Protective and Regulatory Services v. Mega Child Care, Inc.*, 145 S.W. 3d 170, 177 (Tex. 2004)(Where the text of a statute is unambiguous, the court must first examine and follow the clear, plain language and common meaning); *Allen*, 15 S.W. 3d at 527. Every word of a statute is presumed to have been used for a purpose, and every word excluded is presumed to have been excluded for a purpose. *City of Rockwell*, 246 S.W. 3d at 628.

Reading the plain and unambiguous language of Section 27.01(d), the Court observes that an alleged violation of the statute must be based on "the falsity of a representation or promise made by **another** person [emphasis added by the Court]," i.e., made by the alleged primary violator, in this case Enron. There is no mention of a duty to disclose. To be liable, under the clear language of the statute, the alleged aider and abettor,

16

Merrill Lynch and/or Tilney, need only "(1) [have] actual awareness of the falsity of a representation . . . made by another person and (2) fail[] to disclose the falsity of the representation . . . to the person defrauded, and (3) benefit[] from the false representation." Section 27.01(d). *See Dentler v. Perry*, No. 04-02-00034-CV, 2002 WL 31557302, *8 (Tex. App.--San Antonio 2002, no pet.); *Rodriguez v. Elizabeth Lusk*, No. 08-03-00385-CV, 2004 WL 2307443, *3 (Tex. App.--El Paso, Oct. 14, 2004)("The plaintiff must . . . prove that the defendant had actual awareness of the falsity of the representation if the plaintiff is seeking exemplary damages based on a misrepresentation made by someone other than the defendant."), *citing Woodlands Land Development Co. L.P. v. Jenkins*, 48 S.W. 3d 415, 426 n.4 (Tex. App.--Beaumont 2001).

**4. Civil Conspiracy to Defraud**

A civil conspiracy is composed of two or more persons combining to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Massey v. Armco Steel Co.*, 652 S.W. 2d 932, 934 (Tex. 1983). The elements of a cause of action for civil conspiracy in Texas are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Juhl v. Airington*, 936 W.W.2d 640, 644 (Tex. 1990); *Tri v. J.T.T.*, 162 S. W. 3d 552, 556

17

(Tex. 2005). To impose liability on a defendant for civil conspiracy to defraud, plaintiff must establish (1) that there was such a conspiracy and (2) that the particular defendant, here Merrill Lynch and/or Tilney, agreed with one or more of the conspirators about the claimed illegal object of the conspiracy and intended to have it brought about. *Ward v. Sinclair*, 804 S.W. 2d 929, 931 (Tex. App.--Dallas 1990), *citing Zervas v. Faulkner*, 861 F.2d 823, 836 (5th Cir. 1988).

The "meeting of the minds" element is "to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Transport Insurance Co. v. Faircloth*, 898 S.W. 2d 269, 278 (Tex. 1995). "[T]here must be a preconceived plan and unity of design and purpose." *Goldstein v. Mortenson*, 113 S.W. 3d 769, 779 (Tex. App.--Austin 2003)(A conspiracy to defraud on the part of two or more persons means a common purpose, supported by a concerted action to defraud, that each has the understanding that the other has that purpose."). "'There must be an agreement or understanding between the conspirators to inflict a wrong against, or injury on, another, a meeting of the minds on the object or course of action, and some mutual mental action coupled with an intent to commit the act which results in injury; in short, there must be a preconceived plan and unity of design and purpose, for the common design is of the essence of the conspiracy.'" *Id. See also Laxson v. Giddens,* 48 S.W. 3d 408, 410 (Tex. App.--Waco

18

2001)("*One without knowledge of a conspiratorial plan or scheme to injure another by the commission of a particular wrong cannot share the intent to injure such other.* [emphasis in original]").

"For a civil conspiracy to arise, the parties must be aware of the harm or the wrongful conduct at the beginning of the combination or agreement [or when the party joins the conspiracy]. . . . One cannot agree, expressly or tacitly, to commit a wrong about which he has no knowledge." *Firestone Steel Products Co. v. Barajas*, 927 S.W. 2d 608, 614 (Tex. 1996), *citing Triplex Communications, Inc. v. Riley*, 900 S.W. 2d 716, 719 (Tex. 1995)("[C]ivil conspiracy requires specific intent. For a civil conspiracy to arise, the parties must be aware of the harmful or wrongful conduct at the inception of the combination or agreement."); *Schlumberger*, 435 S.W. 2d at 857 ("[O]ne without knowledge of a conspiratorial plan or scheme to injure another by commission of a particular wrong cannot share the intent to injure the other.").

Nevertheless, "[t]he agreement need not be formal; rather, the understanding may be tacit; and it is not essential that each conspirator have knowledge of the details [of the conspiracy]; inferences of concerted action may be drawn from participation in the transactions." *J.T.T. v. Chon Tri*, 111 S.W. 3d 680, 684 (Tex. App.-Houston [1st Dist.] 2003)(*citing Bourland v. State*, 528 S.W. 2d 350, 354 (Tex. Civ. App.--Austin 1975, writ ref'd n.r.e.)),

19

*reversed on other grounds*, 162 S.W. 3d 552 (Tex. 2005).

On the other hand, "[t]he fact that a conspirator is not present at, or does not participate in, all of the conspiratorial activities does not, by itself, exonerate him." *United States v. Ashley*, 555 F.2d 462, 467 (5th Cir. 1977), *cert. denied sub nom Leveriette v. United States*, 434 U.S. 869 (1977); *see also United States v. Thomas*, 686 F. Supp. 1078, 1087-88 (M.D. Pa. 1988)(quoting *Ashley*). "[I]t is axiomatic that it is not necessary for each conspirator to have entered into the unlawful agreement at its inception." *Id.* at 468. A person may participate in a conspiracy without knowing the identities of all the other co-conspirators." *Id., citing United Stats v. Capo*, 791 F.2d 1054, 1066 (2d Cir. 1986). "[A] changing cast of characters does nothing to lessen the fact of one conspiracy. Once the existence of a common scheme of conspiracy is shown, 'slight evidence is all that is required to connect a particular defendant with the conspiracy.'" *Id.* at 467. The district court in *Ashley* opined, "Further, even if this case does present circumstances of changing and overlapping membership and activities, they were all directed toward a common goal. In such circumstances, 'most courts have found, as we do here, sufficient evidence to uphold a jury verdict reflecting a single conspiracy.'" 155 F.2d at 468, *citing United States v. Beasley*, 519 F.2d 233, 246 (5th Cir. 1975). In addition, "a co-conspirator is bound by the overt acts of other

conspirators taken in furtherance of the conspiracy, whether or not said co-conspirator was a member of the conspiracy at the time . . . ." *Thomas*, 686 F. Supp. at 1088.

Conspiracy is a derivative tort because recovery is not based on the conspiracy, i.e., the agreement, but on the injury from the underlying tort, here allegedly fraud. *Tilton v. Marshall*, 925 S.W. 2d 672, 681 (Tex. 1996). "The gist of a civil conspiracy is the damage resulting from commission of a wrong which injures another, and not the conspiracy itself"; in other words, it is the injury resulting from an act done pursuant to the conspiracy's common purpose that gives rise to the cause of action, not the existence of the conspiracy itself.[9] *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W. 2d 854, 856 (Tex. 1968); *see also Alford Chevrolet-Geo v. Jones*, 91 S.W. 3d 396, 403 (Tex. App.--Texarkana 2002, pet. denied)(It is not the agreement, but the injury to the plaintiff from an act done pursuant to the common purpose that gives rise to a cause of action for civil conspiracy), *citing Carroll v. Timmers Chevrolet*, 592 S.W. 2d 922, 925 (Tex. 1979). Therefore, under the allegations here, the wrong

---

[9] A key distinction between criminal and civil conspiracy is that unlike for a criminal conspiracy, for civil conspiracy the mere existence of a conspiracy is insufficient to constitute a claim; there must also be damages resulting from the commission of a wrong which injures another. *See, e.g., Belz v. Belz*, 667 S.W. 2d 240, 243 (Tex. App.–Dallas 1984), *citing Schlumberger*, 435 S.W. 2d at 856; *Starling v. Hill*, 121 S.W. 2d 648, 650 (Tex. Civ. App.–Waco, 1938, no writ).

21

which Merrill Lynch and Tilney allegedly conspired with Enron to accomplish, i.e., Enron's fraudulent financial reporting to mislead the investing public and the credit rating agencies, must be shown to have proximately caused Plaintiffs' damages. Thus to be liable for conspiracy, a defendant must also participate to some degree in the underlying fraud. *Id.*[10] Furthermore, to establish a conspiracy to defraud, the plaintiff must prove both a civil conspiracy and the underlying fraud. *Conger v. Danek Med., Inc.*, 27 F. Supp. 2d 717, 721-22 (N.D. Tex. 1998), *citing American Tobacco Co. V. Grinnell*, 951 S.W. 2d 420, 438 (Tex. 1997).

Proximate cause is composed of two elements, cause-in-fact and foreseeability. *City of Gladewater v Pike*, 727 S.W. 2d 514, 517 (Tex. 1987), *citing Williams v. Steves Industries, Inc.*, 699 S.W. 2d 570, 575 (Tex. 1985); *McClure v. Allied Stores of Texas, Inc.*, 608 S.W. 2d 901, 903 (Tex. 1980); and *Missouri Pac. R. Co. v. American Statesman*, 552 S.W. 2d 546, 549-50 (Tex. 1977).

"Cause in fact means that the omission or act involved was

---

[10] Furthermore, if a plaintiff cannot adequately allege with particularity or ultimately prove an element of the underlying fraud, the conspiracy claim also fails. *Hernandez v. Ciba-Geigy Corporation USA*, 200 F.R.D. 285, 292 (S.D. Tex. 2001); *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 380 (5th Cir. 2004). Under Rule 9(b), conspiracy to commit fraud must be pleaded with particularity as to time, place, and contents of false representations and the identity of the person making them and what he obtained thereby. *Castillo v. First City Bancorporation of Texas, Inc.*, 43 F.3d 953, 961 (5th Cir. 1994).

a substantial factor in bringing about the injury and without which no harm would have occurred." *Gladewater, 727 S.W. 2d at 517, citing McClure*, 608 S.W. 2d at 903. "The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called 'philosophic sense,' which includes every one of the great number of events without which any happening would not have occurred." *Union Pump Co. v. Allbritton*, 898 S.W. 2d 773, 776 (Tex. 1995).

"Even if the injury would not have happened but for the defendant's conduct, the connection between the defendant and the plaintiff's injuries may be too attenuated to constitute legal cause." *Hunt*, 1999 WL 1201689, at *3 *(citing Union Pump Co. v. Allbritton*, 898 S.W. 2d 773, 775 (Tex. 1995)("At some point in the causal chain the defendant's conduct may be too remotely connected with the plaintiff's injury to constitute legal causation," a determination that "'mandates weighing of policy considerations [citations omitted].'")), *abrogated on other grounds, Ford Motor Co. v. Ledesma*, 242 S.W. 3d 32 (Tex. 2007).

"Foreseeability requires that the actor, as a person of ordinary intelligence, would have anticipated the danger that his . . . act created for others." *City of Gladewater,* 727 S.W. 2d

at 517, *citing Nixon v. Mr. Property Management Co., Inc.*, 690 S.W. 2d 546, 549-50 (Tex. 1985). "Foreseeability does not require the actor to anticipate the manner in which injury will occur." *Univ. Preparatory School v. Huitt*, 941 S.W. 2d 177, 180 (Tex. App.--Corpus Christi 1996, writ denied). "All that is required is that the injury be of such a general character as might reasonably have been anticipated, and the injury should be so situated with relation to the wrongful act that the injury to him or to one similarly situated might reasonably have been foreseen." *Id.* "Proximate cause cannot be satisfied by mere conjecture, guess, or speculation." *IHS Cedars Treatment Center of DeSoto Texas, Inc. v. Mason*, 143 S.W. 3d 794, 798-99 (Tex. 2003); *Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W. 2d 472, 477 (Tex. 1995).

"There can be more than one proximate cause of an event." *Olson*, 980 S.W. 2d at 893; *see also Travis v. City of Mesquite*, 830 S.W. 2d 94, 98 (Tex. 1995). Under Texas law a plaintiff does not need direct evidence to satisfy causation. *Tomkins v. Cyr*, 202 F. 3d 770, 782 (5th Cir. 2000). "Circumstantial evidence and reasonable inferences therefrom are a sufficient basis for a finding of causation." *Id., citing Texas Dept. of Transportation v. Olson*, 980 S.W. 2d 890, 893 (Tex. App.--Fort Worth 1998), *citing Havner v. E-Z Mart Stores, Inc.*, 825 S.W. 2d 456, 459 (Tex. 1992). "Establishing causation requires facts sufficient for the

fact-finder reasonably to infer that the defendants' acts were a substantial factor in bringing about the injury." *Id., citing Purina Mills, Inc. v. Odell*, 948 S.W. 2d 927, 936 (Tex. App.--Texarkana 1997).

Whether something constitutes a proximate cause of an event is a question "of fact particularly within the province of a jury." *Olson*, 980 S.W. 2d at 893; *see also El Chico Corp. v. Poole*, 732 S.W. 2d 306, 314 (Tex. 1987); *Strakos v. Gehring*, 360 S.W. 2d 787, 792 (Tex. 1962). It can be a question of law for the court where there is no material dispute about the evidence and the circumstances are such that reasonable minds could not come to a different conclusion. *Hunt v. Killeen Imports, Inc.*, No. 03-99-00093-CV, 1999 WL 1201689, *3 (Tex. App.--Austin Dec. 16, 1999, pet. denied), *citing Missouri Pac. R.R. Co. v. American Statesman*, 552 S.W. 2d 99, 104 (Tex. 1977). It may also be a question of law for the court when the relationship between the defendant's acts or omissions and the plaintiff's injuries is attenuated or remote. *Id., citing Lear v. Siegler*, 819 S.W. 2d 470, 472 (Tex. 1991).

Typically a conspiracy is proved by circumstantial evidence. *Schlumberger*, 435 S.W. 2d at 858, *citing Jernigan v. Wainer*, 12 Tex. 189 (1854).[11] "Circumstantial evidence may be used to establish any material fact, but it must constitute more than mere

---

[11] Intent to defraud, however, must be established by "full, clear, satisfactory and convincing testimony." *RiqueIme Valdes v. Leisure Res. Group, Inc.*, 810 F. 2d 1345, 1351 (5th Cir. 1987).

25

suspicion." *Transport*, 898 S.W. 2d at 278*, citing Browning -
Ferris, Inc. v. Reyna*, 865 S.W. 2d 925, 927-28 (Tex. 1993)("some
suspicion linked to other suspicion produces only more suspicion,
which is not the same as evidence."); *Schlumberger*, 435 S.W. 2d
at 858 ("vital facts may not be proved by unreasonable inferences
from other facts and circumstances"; any vital fact must be proved
"by evidence amounting to something more than a mere scintilla").
Where the circumstantial evidence is meager, "if 'circumstances
are consistent with either of two facts and nothing shows that one
is more probable than the other, neither fact can be inferred.'"
*Transport Ins.*, 898 S.W. 2d at 278, *quoting $56,700 in U.S.
Currency v. State*, 730 S.W. 2d 659, 662 (Tex. 1987).
Circumstantial evidence can include acts by or statements of the
alleged conspirators. *International Bankers Life Ins. Co. v.
Holloway*, 368 S.W. 2d 567, 581-82 (Tex. 1963)("The general rule
is that conspiracy liability is sufficiently established by proof
showing concert of action or other facts and circumstances from
which the natural inference arises that the unlawful overt acts
were committed in furtherance of common design, intention, or
purpose of the alleged conspirators. . . . . It is not required
that each and every act of a conspirator be shown to have been in
concert with the others or that it be established by direct
evidence that all combined at a give time prior to each
transaction. Inferences of concerted action may be drawn from

26

joint participation in the transactions and from enjoyment of the fruits of the transactions.").

"Once a conspiracy is proven, each co-conspirator 'is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination.'" *Carroll v. Timmers Chevrolet*, 592 S.W. 2d 922, 926 (Tex. 1979)(*quoting State v. Standard Oil Co.*, 130 Tex. 313, 329, 107 S.W. 2d 550, 559 (1937)); *Akin v. Dahl*, 661 S.W. 2d 917, 926 (Tex. 1983). A finding of civil conspiracy imposes joint and several liability on all conspirators for actual damages resulting from acts in furtherance of the conspiracy. *Carroll*, 592 S.W. 2d at 925. "[C]ivil conspiracy 'came to be used to extend liability in tort . . . beyond the active wrongdoer to those who have merely planned, assisted, or encouraged his acts.' Once a conspiracy is proven, each co-conspirator 'is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination.'" *Id.* at 925-26, *quoting* W. Prosser, *Handbook of the Law of Torts* § 46 at 293 (1971), and *State v. Standard Oil Co.*, 130 Tex. 313, 107 S.W. 2d 550, 559 (1937).

Here Enron is alleged to be the "active wrongdoer"[12] in falsifying and filing the SEC reports and disseminating

---

[12] *Carroll*, 592 S.W. 2d at 925-26 ("[C]ivil conspiracy 'came to be used to extend liability in tort . . . beyond the active wrongdoer to those who have merely planned, assisted, or encouraged his acts.'").

information to other sources, while Merrill Lynch and Tilney assisted by planning and executing structured transactions (Nigerian Barge and Power Trades Transactions and LJM2 participation) with Enron, all overt acts in furtherance of the conspiracy that allowed Enron to do so.

### Factual Allegations

Plaintiffs assert that they purchased, and continued to hold until Enron filed for bankruptcy, Enron and Enron-related securities because they relied upon (1) Enron's false SEC-filed statements, which Defendants helped to falsify and (2) other misinformation that Defendants created and disseminated through various media outlets to Plaintiffs and other investors. Specifically American National Property and Casualty Company, American National Investment Accounts, Inc., SM&R Investments, Inc. and Accident Insurance Company purchased Enron common stock[13] from 1997-2000,[14] while American National Insurance Company

---

[13] Plaintiffs' statutory fraud claim applies only to losses from Plaintiffs' purchases of stock; Section 27.01 expressly limits its reach to"[f]raud in a transaction involving real estate or stock in a corporation or joint stock company." *Id.; see also, e.g., Dorsey v. Portfolio Equities, Inc.*, 540 F. 3d 333, 343 (5th Cir. 2008).

[14] Specifically, on September 24 and 25, 1997, allegedly relying on Enron's financial statements and ratios calculated using them, American National Property purchased 6,000 shares of Enron common stock; Standard Life and Accident Insurance Company purchased 4800 shares; American National Investment Accounts purchased 2600, 2300, and 1300 shares for the Growth Portfolio, Managed Portfolio, and Balanced Portfolio, respectively; and American National Accounts purchased 46,000, 49,000, and 4,000 for

28

purchased Enron commercial paper on September 25, 2001 and an Enron bond[15] on September 28, 2001. Plaintiffs allege that throughout they relied not only on the SEC-filed reports and Merrill Lynch analyst reports, but on numerous quoted or described upbeat public statements made by Enron officers about Enron's

---

the Growth Fund, Income Fund, and Triflex Fund, respectively. #85, ¶ 65.

On January 15, 1998, relying on "Enron's SEC-filed financial statements and various rational [*sic*--ratios?] derived from information on the financial statements" and on "'buy" recommendations, and in particular the absence of downgrades, in analyst reports," Plaintiffs purchased 400 shares of Enron common stock. *Id.*, ¶¶ 74-75.

On February 10, 2000, Plaintiffs purchased 2300 shares of Enron common stock based on Enron's published financial statements, upon analyst report "buy" recommendations, SEC-filed financial reports, and Merrill analyst reports that quoted statistics from the financial reports. *Id.*, ¶¶ 111-12.

On February 21, 2001, "[r]elying upon Enron's misrepresentations and analyst reports," they purchased 1600 shares of Enron common stock *Id.*, ¶ 138.

On February 27, 2001, "relying on Enron's misrepresentations, in particular the year end 2000 results, and also considering analyst reports," Plaintiffs purchased about 700 shares of common stock. *Id.*, ¶ 139.

On March 14, 2000, relying on "Enron's latest financial results," Plaintiffs purchased 1000 shares of Enron common stock. *Id.*, ¶¶ 142-43.

On August 29, 2001, relying "upon the most recent, fraudulent Enron financial statements," Plaintiffs purchased 500 shares of Enron common stock. *Id.*, ¶¶ 172-73.

Finally, on October 3, 2001, they bought another 1000 shares of Enron common stock, relying "upon the most recent, fraudulent Enron financial statements" and Merrill Lynch's analyst reports. *Id.*, ¶¶ 175-77.

In late September 2001, American National purchased Enron commercial paper and a $5 million Enron bond. *Id.*, ¶¶ 178-83, 793.

---

[15] For the bond purchase, Plaintiffs claim that American National relied upon "figures from the Enron financial statements" and the credit agencies' rating of Enron as "investment grade." #85, ¶ 178-180.

financial condition and business success.

The Second Amended Complaint alleges generally that after years of financing and underwriting Enron-related securities and providing Enron with advisory/consulting services, which allowed Merrill Lynch to acquire detailed knowledge of Enron's structure, management goals, and true financial condition and which led to an extremely close relationship between Tilney and Enron CFO Andrew Fastow, Enron sought help from Merrill Lynch Defendants to conceal its deteriorating financial condition from, and to perpetuate a fraud upon, the investing public in a giant Ponzi scheme.[16]  Motivated by pecuniary gain for itself, Merrill Lynch allegedly conspired with Enron to "cook" Enron's books by creating and participating in the Nigerian Barge Transaction and the Power

_____

[16] The complaint, #85 at ¶¶ 59-60, asserts,

59.  The serious divergence between what Enron said about itself and Enron's true financial condition began, at the latest, toward the end of 1996 or early 1997.  At that time, Enron was rapidly expanding into new areas of business.  Because Enron needed to borrow large amounts of money to finance both its new operations and planned expansions, Enron management became acutely sensitive to maintaining an "investment-grade" credit rating.

60.  Enron apparently made a decision in late 1996 or early 1997 to do whatever it takes--including cooking its books and making statements to the public about Enron that were untrue--to maintain its image of a financially sound, well-managed company with excellent growth prospects.  Such an image was intended to, and indeed for several years succeeded in, keeping Enron's stock price on the rise and keeping Enron's borrowing costs low by maintaining an "investment-grade" credit rating.

Trades Transactions at year-end 1999[17] and in transactions with Special Purpose Entity ("SPE") LJM2. These transactions allegedly enabled Enron to hide its actual financial condition from credit rating agencies and investors, including Plaintiffs, by employing accounting gimmickry and filing false financial statements[18] with the SEC. Despite Enron's increasing financial problems and deceptive financial engineering to conceal those difficulties, Merrill Lynch purportedly also repeatedly recommended to the investing public in upbeat analyst reports and other public pronouncements that they should purchase Enron securities when

---

[17] The complaint (#85, ¶ 56 at 12) points out that the SEC brought enforcement actions against Merrill Lynch and Tilney based on their conduct and participation in these two transactions. On February 20, 2003, the parties announced they had reached an agreement in principal to settlement terms. According to the complaint, Stephen M. Cutler, SEC Director, Division of Enforcement, in a speech published by the SEC on March 17, 2003, announced,

> As alleged in our complaint, at the end of 1999 Merrill Lynch and four of Merrill's senior executives aided and abetted the fraudulent manipulation of Enron's financial statements. They did so through two transactions designed to make Enron's performance look better than it actually was. Merrill Lynch has agreed to a settlement calling for the entry of a permanent anti-fraud injunction against the firm and a payment totaling $80 million--$37.50 million in disgorgement, $37.5 million in penalties, and $5 million in pre-judgment interest. The $37.5 million penalty is one of the largest ever imposed in a Commission action.

[18] The complaint explains that "when plaintiffs state they relied upon 'Enron's financial statements,' Plaintiffs mean they relied upon the actual statements and/or relied upon certain ratios that were calculated using financial statements." #85, ¶ 64.

Merrill Lynch knew Enron was fudging its books to hide financial troubles. *See, e.g.*, #85, ¶¶ 443-60.

In paragraph 419, Plaintiffs allege that in April 1998 Enron and Merrill Lynch had a "meeting of the minds" and entered into a conspiracy "to used deceptive analyst reports as a method for marketing Enron securities"; under this agreement "Merrill Lynch analysts would issue always-positive analyst reports concerning Enron" and, in exchange, "Enron would award Merrill Lynch lucrative investment banking deals that would generate substantial fees." "The sequence of events . . . creates a strong inference" that Enron and Merrill Lynch had a meeting of the minds." #85, ¶ 421. These include the actions against John Olson (managing director in Merrill Lynch's securities research division from September 1991 until August, 1998), internal Merrill Lynch memos, deposition testimony of Merrill Lynch employees, and the contrast between recommendations of Enron securities in analyst reports before and after the inception of the conspiracy. #85, ¶ 424-67.

Before the conspiracy began, Merrill Lynch analysts, especially John Olson, had issued reports rating Enron as "neutral" with regard to short term accumulation. #85, ¶ 420. The complaint discusses in detail the pressure placed by Enron on Merrill Lynch and its analysts (identifying analysts John Olson, Leo J. Kesler, and M. Shawn Foley) after the formation of the conspiracy, references their specific reports, and summarizes or

quotes part of their contents. #85, ¶¶ 422-67. Olson was fired in August 1998 and replaced by the deliberately chosen, more positive Donato Eassey. The complaint identifies the agreement between Merrill Lynch and Enron about the termination and substitution of analysts as evidence, along with its participation in the fraudulent transactions, of Merrill Lynch's knowledge that Enron was reporting false financial results and of a "meeting of the minds" for Plaintiffs' conspiracy claim. *See, e.g.,* #85, ¶¶ 113-14, 235, 419-22, 424-67.

In a sworn statement to the Enron Bankruptcy Examiner on June 3, 2002, Olson explained how, beginning in the summer of 1992, he had observed that Enron's SEC filings were increasingly difficult to analyze as Enron started using mark-to-market accounting, complex transactions, and SPEs. He testified about Enron,

> . . . as an analyst you were left hanging because you would go to the investor relations people, and they would say, "You really don't need to know this; it's too complicated for us to explain and just, you know, play it as it lays," . . . . . . . [*sic*] and people would give them the benefit of the doubt.

#85, ¶ 426. Olson testified that the actual state of Enron's trading operations was expertly hidden or perhaps not there at all: "You had no idea of--there were so many moving parts, you would just see a single line item saying earnings before interest and taxes . . . . . . You could not tell how good or bad any particular part of the business in trading was doing.'" #85, ¶ 427. When Olson's scepticism about the true value of Enron's

33

multifaceted new business approach was reflected in his analyst reports, Enron's executives were dismayed, including Ken Lay, who "exploded."[19] When Olson questioned Lay about Lay's statement that he expected to double Enron's earnings in five years, when the company's main pipeline business was only growing between 2-5% each year, meaning the rest of the company would have to grow at 30% each year to reach Lay's projection, Lay responded angrily, "you just don't get it; you don't understand; you don't get it, Olson." #85, ¶¶ 428-29. Olson told his boss, Andrew Melnick, that Enron "stock was trading at twice the multiples of price earnings ratios of other companies that I covered and that the others had better value." #85, ¶ 430. On July 17, 1997, Olson downgraded Enron's stock rating from accumulate to neutral, essentially from "buy" to "hold," and gave it a rating of "3-2," meaning a short-term hold and a long-term buy; Olson maintained that rating in his next four reports, issued on September 15, 1997, March 31, 1998, April 16, 1998, and July 16, 1998. #85, ¶

---

[19] The complaint asserts that in June 2001, Ken Lay wrote a note on top of an article about Enron, which quoted Olson as saying that Enron is "not very forthcoming about how [it] makes[s] [its] money, I don't know an analyst worth his salt who can seriously analyze Enron." Lay's note read, "John Olson has been wrong about Enron for 10 years and is still wrong. But he is consistant [sic]." #85, ¶ 440.

In an interview published in the *Houston Chronicle* on July 30, 2002, Olson again explained, "[Enron] stock was always expensive relative to the rest of the pack. . . I didn't understand what Enron was doing and was told, in no uncertain words, that 'I didn't get it.'" # 85, ¶ 441.

431.

Olson also described the gradual disintegration of the "Chinese Wall" from the time that he first started at Merrill Lynch, when Merrill Lynch assured that analysts' reports were based solely on their research and not on the desire to attract business,[20] to 1998, when using research analysts as a means of promoting business was the norm under the direction of Rick Gordon, who, Olson stated, "thought that an analyst should be a strong supporter of the investment banking department . . . by writing positive research reports about investment banking clients." #85, ¶¶ 452-53.[21]

_____

[20] Olson described the Chinese Wall as it appeared to him when he first started working at Merrill Lynch:

> I think the policy was that Merrill Lynch wanted to rely on the good faith and judgment of its analysts to keep them out of trouble and not doing garbage deals that investment bankers might be interested in doing so as to build up their year-end fee or bonus.

[21] The complaint traces the pressures that affected Olson in the late 1990's as rooted in the employees hired by Merrill Lynch at the beginning of the decade. In the early 1990's Merrill Lynch hired Gordon, Tilney, Olson and a number of others from First Boston's investment banking team. Olson recounts a couple of stories from that period reflecting what became standard practice with Enron and Merrill Lynch in the late 1990's. In one example, in 1990 Olson had an interview with _Forbes Magazine_ regarding how investors could benefit from price increases following the shutdown of oil from Iraq and Kuwait, a problem that did not involve Enron because it was a U.S.-based company with few foreign assets. Olson gave Forbes a list of companies, not including Enron, for the article. Ken Lay objected strenuously, dismayed that First Boston's analyst did not recommend Enron in the magazine, and reminded Gordon that Enron paid $5 million in yearly fees to First Boston. Ignoring the Chinese Wall policy, Gordon told Olson to put

Fastow admitted that Enron told Merrill Lynch that if it did not change its analyst coverage, Merrill Lynch would lose huge fees from Enron. Fastow testified during his deposition that he "told Mr. Tilney and Mr. Gordon [at Merrill Lynch] that it would be difficult, if not impossible, for Enron to give Merrill the business of leading an equity offering for Enron because their equity analyst was saying not to buy the stock." #85, ¶ 432. Two days after Olson issued his third neutral report on Enron on April 16, 1998, Merrill Lynch's Rick Gordon sent Merrill Lynch's president Herb Allison a memo asking him to telephone Ken Lay and Jeff Skilling in an effort to change Enron's decision to deny Merrill Lynch a manager or co-manger role in its upcoming $750 million common stock offering. #85, ¶ 433. On April 17, 1998, Fastow called Gordon and Tilney to tell them that Merrill Lynch would not be designated lead manager or even co-manager in the next equity offering because of Olson. Tilney and Gordon stated in a memorandum that "the decision was based solely on the research issue and was intended to send a strong message as to how 'viscerally' Enron's senior management feels about our research

---

a strong buy recommendation on Enron or Enron Oil & Gas or Olson's future at First Boston would be "very limited." Olson reminded Gordon that as a research analyst, Olson did not work for Gordon and told Gordon he would write reports based on his research. A couple of days later, after Gordon had phoned Olson's boss and asked the boss to threaten or discipline Olson, the boss told Olson. Olson's boss did not do what Gordon requested. #85, ¶¶ 454-55.

36

effort. . . . . (DLJ, whose top-ranked analyst has Enron's stock
on his recommended list, will lead the offering and all of the co-
managers have Buy ratings on Enron.)"  #85, ¶ 434.  In a
memorandum, Tilney and Gordon wrote that Olson "had not been a
real supporter of [Enron]," that Enron considered "his research
as flawed, particularly as it rates to a valuation of at least
certain of its businesses," and that he "makes snide and
potentially embarrassing remarks about the Company in meetings
with analysts while in the presence of Ken and Jeff."  *Id.*[22]

After Enron initially denied Merrill Lynch the lead manager
position in that public offering, Merrill Lynch's senior
management made a personal phone call to Lay and Skilling and
managed to get Merrill Lynch named as a co-manager on the

---

[22] After Olson was fired, on May 22, 1998 Olson sent Melnick
an email objecting to the reasons given for his termination:

> I was so stunned at your decision of Wednesday that I
> still feel bewildered at exactly where I have
> transgressed so badly in this Enron situation.  I have
> taken the liberty of asking Ken Lay . . . to call you for
> no other reason but to tell you that I have made no
> "snide" remarks about Enron and/or its management team--
> recently or ever.  Any reading of my last dozen reports
> on Enron will show you we have either been neutral or
> occasionally positive on the stock.  We were right.  ENE
> delivered a 15.5% average annual total return for the
> past five years.  The market delivered 20.8%: and our
> recommendations delivered 22% to 40% annually (e.g.
> Williams).  This has been an entirely professional
> relationship.  I do not know where you are getting the
> information to have made this judgement about me: but I
> can only regret it. . . .

#85, ¶ 438.

37

offering. #85, ¶ 435. Fastow testified that "[Tilney] called to tell me that [Merrill got a new equity analyst to cover Enron] and let me know that, you know, we should expect some good coverage of Enron." #85, ¶ 436. Olson, who had been aggressively recruited and had been given increasingly good reviews for his work from 1996-97, testified at his deposition that Andrew Melnick told Olson that Melnick had fired him because Olson had "blown a big investment banking deal," but that because Melnick had known Olson for a long time and thought Olson was a very good person, Merrill Lynch offered Olson the choice of being terminated outright or taking early retirement with a substantial severance package; of course Olson chose the latter. #85, ¶437. Tilney purportedly admitted that Enron influenced Merrill Lynch in its equity coverage and testified that he, Tilney, personally, believed Olson's coverage was competent and not flawed, but that Enron thought Olson's research was flawed. #85, ¶ 439. The complaint suggests that because Tilney was close to Fastow and acted as a "go between" for Enron's senior management and Merrill Lynch's senior management, Tilney participated indirectly in the firing of Olson. *Id.* Fastow testified that Tilney was involved in removing and replacing Olson. #85, ¶ 442.

After Donato Eassey was hired to replace Olson, Eassey upgraded Enron's equity rating on November 16, 1998. Transactions with, and fees from, Enron flowed in. #85, ¶¶ 443-44. Merrill

38

Lynch's January 18, 2000 analyst report materially misrepresented Enron's actual financial condition in stating that its earnings per share increased by 29% for the fourth quarter of 1999; the report failed to disclose that the fourth quarter 1999 financials understated outstanding debt by nearly $4 billion and overstated cash flows from operating activities by more than $200 million. It also failed to disclose Merrill Lynch's actual knowledge that at least $12 million of those earnings were fraudulently obtained from the Nigerian Barge Transaction, as Paul Regan explains in his expert report. #85, ¶ 445. In two publications, entitled "Bulletin" and "Comment" and dated January 22 and 23, 2001 respectively, Donato Eassey gave glowing false reports about revenue growth at Enron and a "buy" recommendation, quoting a current stock price of $70.88 despite a P/E of 48.2. #85, ¶¶ 446-47. Plaintiff SM&R received similar positive assessments of Enron and persistent "buy" recommendations on ENE by Eassey dated April 19, May 24, and May 25, 2001, before it purchased Enron securities. In the May 24th statement, Eassey wrote, "We believe recent weakness has made ENE more attractive. With no change in fundamentals, we reiterate our Buy opinions." #85, ¶448. Just two months before Enron filed for bankruptcy, in a "Flash Note" dated October 9, 2001, Eassey continued to recommend that investors "buy" Enron ENE securities: "While recognizing a more moderate EPS growth rate, we think ENE is nevertheless off to a

great start getting its financial health in order. Long term we think ENE will have put in motion the strategy to firmly reassert its earnings prowess in its hugely successful marketing business." #85, ¶¶ 448-49. In addition, addressing Enron's fixed income investments, Merrill Lynch's Leo J. Kesler in an "Enron Credit Conference Review" dated February 12, 2001 characterized Enron as a "premier energy company." #85, ¶ 450. SM&R also received an report from analyst M. Shawn Foley, dated August 15, 2001, just after CEO Skilling suddenly resigned; Foley wrote, "We believe the recent sell-off in ENE common has created an opportunity in the ENE 0% convertible due 2021 for yield oriented investors." #85, ¶ 451.

The complaint also asserts that in 2002, New York Attorney General Eliot Spitzer began investigating whether Merrill Lynch's investment advice was tainted by conflicts of interest. Olson testified in his deposition, "What used to be perceived as a conflict is now considered a synergy." Chief of New York's Investment Protection Bureau E.R. Dinallo's affidavit in support of Spitzer's investigation stated,

> Merrill Lynch failed to disclose to the public that Merrill Lynch's ratings were tarnished by an undisclosed conflict of interest: the research analysts were acting as quasi-investment bankers for the companies at issue, often initiating, continuing, and/or manipulating research coverage for the purpose of attracting and keeping investment banking clients, thereby producing misleading ratings that were neither objective nor independent, as they purported to be.

#85, ¶ 457. The complaint suggests that the practice of basing
compensation in part on the generation of the banking business by
employee research was widespread at Merrill Lynch. #85, ¶ 458.
It quotes Dinallo's affidavit, in turn quoting a Fall 2000 request
from then co-head of global equity research, Deepak Raj, to all
equity analysts, asking in response to a survey that the analysts
provide "complete details on their involvement" with investment
banking during the year and "in advisory work on mergers or
acquisitions, <u>especially where your coverage played a role in
securing the assignment</u>" and "<u>where your research was pivotal in
securing participation in high yield offering</u> [sic]." #85, ¶ 459.

After Spitzer investigated whether analysts were being
truthful and fair in public reviews of stocks of companies for
which Merrill Lynch did investment banking business, Merrill
Lynch was penalized with a $100 million fine. Merrill Lynch also
agreed to institute major reforms, including (1) severing links
between compensation for analysts and investment bankers; (2)
prohibiting banking input into analysts' compensation; (3)
creating a new investment review committee responsible for
approving research recommendations with strict standards and
independence from investment banking; (4) disclosure in Merrill's
research reports of whether it has received or is entitled to
receive any compensation from a covered company; and (5)
establishing a monitor, approved by the New York Attorney General,

to monitor compliance with the agreement.  #85, ¶¶ 456-60.

The complaint discusses in great detail the Nigerian Barge Transaction engineered by Enron (executives including Andrew Fastow) and Merrill Lynch (specifically discussing the roles of Robert Furst, Thomas Davis, Schuyler Tilney, James Brown, Jeffrey Kronthal, Dan Bayly, and William Fuhs) when Enron feared it would not meet analysts' expectations for year-end 1999.  #85, ¶¶ 253-91.  The gist of the transaction was that when Enron could not find a bona fide buyer for several power-generating barges off the coast of Nigeria, Enron arranged a sham sale, with no transfer of risk, of the barges to Merrill Lynch.  Specifically they arranged for a Merrill Lynch SPE, Ebarge, to purchase stock in an Enron subsidiary for $28 million, which would purportedly entitle Merrill Lynch to receive future revenue from sales of electricity to Nigeria under a power purchase agreement; Enron, however, according to the SEC, provided Ebarge with $21 million of the purchase price in the form of a loan that was non-recourse to Merrill Lynch, so that Merrill Lynch had only to provide $7 million for the purchase.

A December 22, 1999 Merrill Lynch interoffice memorandum states that the transaction would allow Enron to book $12 million in earnings for the end of the year.  Furthermore, according to the memorandum, which emphasized that there was no real risk for Merrill Lynch in this deal, Enron guaranteed Merrill Lynch that

Enron or one of its affiliates would buy back the barges within six months, with a 22.5% return for Merrill Lynch, while the transaction would allow Enron to record $28 million in cash flow.

The complaint alleges facts indicating that during negotiations directors of both Merrill Lynch and Enron were fully aware, indeed some quite fearful of the risk,[23] of the nature and deceptive purpose of the transaction. These assurances were memorialized in a document entitled "Appropriation Request," circulated with a December 21, 1998 memo from Furst to Schuyler Tilney and others at Merrill Lynch urging quick consideration and approval of the transaction because the transaction was important to Enron and Enron was an important client. On December 22, 1999 Merrill Lynch executives Davis, Bayly, Tilney, and Furst called Andrew Fastow and obtained verbal confirmation that Enron would relieve Merrill Lynch of the barges within six months and discussed their expectation of being rewarded with future Enron business.

---

[23] For example, Merrill Lynch's James Brown warned the deal could lead to "reputational risk, specifically aid[ing and]/abet[ing] Enron income manipulations." #85, ¶ 262. Brown informed Bankruptcy Examiner Neal Batson's investigators, #85, ¶ 263,

> Well, I raised the matter, you know, if Enron ever in the future fell apart from a credit--just like a credit meltdown or something, and we had been involved in this transaction, in light of the fact that I had these accounting concerns about the transaction, would that somehow create reputational risk for us? Would we have our names in the press?

The SEC and the DOJ discovered and subsequently asserted in a September 2003 SEC Complaint, "Contemporaneous notes of individuals at Merrill Lynch with knowledge of the transaction referred to it as the $7 million 'handshake' loan to Enron that would be repaid within six months." On December 23, 1999 Merrill Lynch drafted a letter agreement stating that its equity interest would "be subsequently sold to third party equity investors or purchased by Enron or an affiliate," that Merrill Lynch would receive "a yield of approximately 15.00% per annum" on its "investment," and that the risk of ownership would never pass from Enron to Merrill Lynch. The Nigerian Barge Transaction closed on December 29, 1999, just in time for Enron to reports its "profit" from the barge sale in its 1999 fourth quarter and annual financial reports, improperly recording about $12 million in earnings in the fourth quarter.

According to plan on June 29, 2000, because Enron could not find a third-party buyer for the barges, its executives arranged for LJM2 to purchase Merrill's interest in the barges for $7,525,000, $525,000 more than Merrill Lynch paid for it six months earlier, a 15% interest on its guaranteed $7 million "investment." Merrill Lynch also received a $250,000 "advisor fee",[24] bringing its total "take" to 22.14% on its six-month involvement in the Nigerian Barge Transaction.

---

[24] #85, ¶ 277.

44

The complaint also asserts that in the criminal trial
resulting in the convictions of four key Merrill Lynch employees
(James Brown, Dan Bayly, Robert Furst, and William Fuhs) for their
roles in the Nigerian Barge transaction, the jury found that the
Merrill Lynch employees knowingly and intentionally entered into
the Nigerian Barge Transaction to "cook" Enron's books so that
Enron could fraudulently report non-existent profits in its 1999
year-end financial statements. *See, e.g.*, #85, ¶¶ 278-82. The
complaint argues that although these convictions were overturned
by the Fifth Circuit, that reversal was based solely on the
government's "honest services" theory of liability and therefore
does not impact Plaintiffs' claims against Merrill Lynch. *United
States v. Brown*, 459 F.3d 509 (5th Cir. 2006), *cert. denied*, 550
U.S. 933 (2007).

The complaint also details the 1999 Power Trades Transaction,
for which Merrill Lynch was paid $17 million[25] to join and which
Enron hoped would allow it to artificially inflate its income for
that year by approximately $50 million of bogus income. #85 at
¶¶ 292-315. At the start, on December 8, 1999 Enron required
Merrill Lynch to enter into a Confidentiality Agreement precluding
Merrill Lynch from disclosing any information regarding the

---

[25] The complaint points out that the SEC complaint asserted,
"Enron was initially surprised regarding the size of the fee
because the transaction posed little risk to Merrill Lynch, but
ultimately agreed to pay a $17 million fee given the importance of
the transaction to its year-end earnings." #85 at ¶ 306.

proposed electricity trade. According to a memo written by Merrill Lynch's Dan Gordon with the aid of Furst and Tilney and circulated to Merrill Lynch's Special Transactions Review Committee, the transaction consisted of two contemporaneous back-to-back options (nearly identical in quantity, pricing, market locations, and term) that cancelled each other out, one in which Enron would sell Merrill Lynch a physically settled call option and the other in which Merrill Lynch would sell Enron a financially-settled option. Because the transactions were linked, there would be no exposure to commodity price risk. No energy was ever actually traded under these contracts. Another memo, dated December 29, 1999, states that the agreements "will 'cross-default' to one another. As such, in the event that one trade 'dissolves' the other trade will also 'dissolve.'" #85 at ¶ 298.

Allegedly Furst and Tilney pushed for and strongly recommended immediate approval of the two transactions as the two were accounting-driven to enable Enron, an important client, to achieve "off-balance sheet" treatment for certain assets that year. The Merrill Lynch Special Transactions Review Committee met twice on December 30, 1999 because of concerns about the propriety of Enron's intended accounting and the purpose of generating about $50 million of false income for Enron's financial statements. After the first meeting, Furst and Tilney asked Enron's Chief Accounting Officer Richard Causey for assurance that the proposed

accounting treatment was proper.  At the second meeting Tilney and Furst explained that the only purpose for the transaction was to achieve year-end-earnings, a cooking-of-the-books with no legitimate business purpose.  Thus the Committee knew that the Power Trades Transaction had no legitimate business purpose.  To avoid exposure, Merrill Lynch then requested that Enron and its auditor, Arthur Andersen, verify that the accounting treatment would be proper.  Causey objected to Merrill Lynch's speaking directly to Arthur Andersen, but confirmed to the Merrill Lynch Committee that Enron intended to report $50-60 million of earnings from the transaction, that the amount was material to Enron, and that it would affect senior management bonuses.  Merrill Lynch settled for a letter from Enron stating that Arthur Andersen had approved Enron's intended accounting.  Merrill Lynch's attorney drafted such a letter, which included language stating that Merrill Lynch had not provided any accounting advice and that "Enron had not relied upon Merrill Lynch in any way to determine the appropriate market value of the Transactions," for Enron to obtain Richard Causey's signature.  Once it was signed by Causey and returned to Merrill Lynch and placed in its internal files in case of need for a future legal defense, on December 31, 1999 Merrill Lynch and Enron closed the Power Trades Transaction, just in time for Enron to report bogus earnings in its 1999 annual financial reports.

The complaint states that Enron Bankruptcy Examiner Neal Batson concluded that Merrill Lynch "entered into two virtually offsetting electricity derivative transactions with Enron that Merrill Lynch knew Enron was using to achieve earnings targets at year-end 1999 and with respect to which Merrill Lynch believed Enron's accounting to be improper." He further found, "Merrill Lynch's conduct and participation in the Nigerian Barge and the 1999 electricity trade transactions allowed Enron to book improper gains of approximately $60 million for the fourth quarter of 1999."

In late May, 2000, Enron asked Merrill Lynch to unwind the deal early and without receiving its promised $17 million payments. Tilney, in an email dated May 30, 2000, wrote to Dan Gordon, "We were clearly helping them make earnings for the quarter and year-end (which had a great value in their stock price, not to mention personal compensation). What would you think was a fair number in the absence of relationship issues?" Without any energy having ever been traded and with Merrill Lynch receiving only half its originally agreed-upon fee, $8.5 million, on June 30, 2000 the Transaction was unwound.

Pursuant to a September 17, 2003 agreement between Merrill Lynch and the DOJ, paragraph 2,

> Merrill Lynch acknowledges that the Department has developed evidence during its investigation that one or more Merrill Lynch employees may have violated federal criminal law. Merrill Lynch accepts responsibility for

48

the conduct of its employees giving rise to any violation in connection with the Year-End 1999 Transactions.

Similarly in responding to requests for admission propounded in the *Newby* litigation, Merrill Lynch confirmed that it accepts responsibility for the conduct of its employees relating to the Year-End 1999 Transactions. The complaint asserts that although Merrill's agreement makes it liable for Tilney's actions with regard to the Nigerian Barge and Power Trades Transactions, the agreement does not absolve Tilney from liability to Plaintiffs in his personal capacity.

Merrill Lynch's third major involvement in Enron's Ponzi scheme was LJM2, created in late 1999 as a vehicle for hiding Enron's liabilities and enabling Enron to report strong earnings in year-end financial reports through a variety of investments. The complaint charges that Fastow admitted in his November 2006 deposition that he and others under his control "made an agreement with Merrill Lynch to do transactions that intentionally caused Enron's financial statements to be misleading" (¶¶ 332-33). LJM2, "probably the most well known-or infamous-SPE used by Enron to manipulate its balance sheet," was employed to deceive Enron investors and to enrich Fastow and LJM2's other limited partner investors. *See generally* #85, ¶¶ 331-418. Merrill Lynch and

49

Tilney helped Fastow set up LJM2,[26] and Merrill Lynch, for a fee of more than $3 million, served as the placement agent to prepare the private placement, to find limited partners, and to obtain capital commitments for the SPE. Almost 100 Merrill Lynch executives[27] and Tilney[28] were investors in LJM2, with Merrill Lynch bankers among the "most active" of all limited partners, according to Fastow's testimony. Merrill Lynch bankers, including Tilney, David Sullivan, and Gina Lee participated in drafting the offering documents. #85, ¶¶ 360-61. The resulting Private Placement Memorandum ("PPM") was distributed to LJM2 investors,

---

[26] During his November 2006 deposition, in response to the question, "was Merrill Lynch part of the development of what became LJM2 . . . with you as a general partner from the onset?," Fastow answered, "[G]enerally speaking, yes." #85 at ¶¶ 349. In structuring the SPE, Fastow testified that he explained to Merrill Lynch that "the purpose of LJM2 . . . was to help Enron manage its balance sheet and to help Enron manage its income statement," including "managing 'the timing of earnings, the actual creation of earnings, and changing the nature of earnings that Enron records,'" and that LJM2 "would act as a temporary 'warehouse' for Enron assets." *Id.*, ¶¶ 350-51, 353. Fastow relied on Merrill Lynch to tell him "what was necessary, in terms of structure and terms, in order to make the fund attractive to limited partners, especially institutional investors and private equity investors." *Id.* at ¶ 354.

[27] These executives committed to invest a total of approximately $16.6 million, although the actual amount invested was closer to $11 million according to an internal email dated November 29, 2001 from Merrill Lynch's Gerard Haugh to Curt Cariddi. #85, ¶ 342. The complaint also alleges that the subscription agreement dated December 20, 1999 shows Merrill Lynch's commitment to invest $5 million in LJM2. #85, ¶ 341.

[28] Tilney committed to $750,00, while Merrill's Senior Vice President, Private Client Group, committed to $1 million.

but not to the general public; it highlighted Fastow's position
as Enron's CEO,[29] emphasized the "'unusual opportunity'" to invest
in an Enron-generated business "'not otherwise available to
outside investors" arising from the partnership's connection to
Enron, and "'bragged that Fastow's access to Enron's information
pertaining to potential investments will contribute to superior
returns.'" *Id.*, ¶¶ 362-63. Moreover, limited partners were to
receive strikingly high rates of return, over 25%-30% annually.
*Id.* ¶ 365. Although he was Enron's CEO, Fastow, along with his
Enron subordinate Michael Kopper, controlled and owned LJM2
Capital Management, L.P., the entity created by Fastow to serve
as LJM2's general partner, charged with making LJM2's investment
decisions despite Fastow's conflicting obligations to protect
Enron's interests. #85, ¶¶ 368. Indeed, LJM2 even employed Enron
employees. *Id.*, ¶¶ 372, 374. Because Merrill Lynch and Tilney
helped structure LJM2, they knew that LJM2 was not independent
from Enron and thus not eligible for the off-balance sheet
treatment that was employed to hide its fraud. #85, ¶¶ 366-68;
*see also* ¶¶ 382-83.

---

[29] The complaint quotes the reaction to this investment
opportunity from Danny Bowers, chief investment officer of the
Houston Firefighters Relief and Retirement Fund, from an article
published by Bloomberg, as being "a pretty blatant conflict of
interest" with Fastow as CEO of Enron and decision maker for LJM2
and a "kind of a stinky deal." #85, ¶ 365.

In his Plea Agreement, Fastow explained that LJM2[30] was used to falsify Enron's reported financial results by (1) engineering improper earnings and funds flow; (2) enabling Enron to establish inflated "market" prices for assets; and (3) improperly keeping poorly performing and volatile assets off Enron's balance sheet. #85, ¶ 379. Fastow judicially admitted, "LJM transactions lacked economic substance for accounting purposes, in part because I and others secretly agreed that LJM would not lose money through participation in transactions." #85, ¶ 380. He also admitted, "LJM2, in my opinion, caused Enron's financial statements to be misleading and deceptive." *Id.* One example of LJM2's role related to the Nigerian Barge Transaction: Enron made LJM2 purchase the barges from Merrill Lynch to effect the "handshake" agreement that it would take them off Merrill's hands within six months; eventually LJM2 sold the barges at Enron's direction and, as guaranteed, LJM2 made a profit, supporting Fastow's admission. #85, ¶ 376-77. Thus Merrill Lynch benefitted twice: once when received a 22% profit for purchasing the barges from Enron and again as an LJM2 participant when LJM2 sold them. Tilney, of course, as another limited partner also enjoyed the engineered

---

[30] The complaint (¶ 413) asserts that "[i]nternal Merrill email from David Sullivan to Gary Dolan, dated June 15, 2000, describes how Merrill's status as a placement agent and investor in LJM2 provided Merrill with insider access to information about LJM2, including information regarding capital calls, distributions, valuations and updates summarizing the transactions in which LJM2 participated."

excessive distributions from LJM2's transactions.

As LJM2's most "active" limited partner investor, Merrill Lynch received reports and statements from LJM2 and therefore purportedly knew it was being used to doctor Enron's books. #85, ¶¶ 384, 413. According to the complaint, LJM2 engaged in a wide variety of transactions at years-end or quarters-end to help cook Enron's books, especially those with the four Raptor SPEs, which were allegedly owned and controlled by LJM2 (¶¶ 375, 390). Since LJM2, itself, was not actually "independent" from Enron, as Merrill Lynch knew, the Raptors should have appeared on Enron's consolidated financial statements, but the accounting for them, too, was improper (¶¶ 390-91).

In his Plea Agreement with the DOJ, Fastow explained that the structure of the first Raptor, Talon, was "used as a model for two of the remaining three Raptor entities." #85 at ¶ 402. He also testified that he "'recalled discussing [the Raptor I] concept with Mr. Tilney and David Sullivan,'" and that "in an LJM2 conference call for LJM2 limited partners, attended by Merrill bankers, Fastow discussed the ["extremely complex"] Raptor structure in significant detail." *Id*. at ¶¶ 393, 406.

Andrew Fastow's Plea Agreement with the DOJ recites,

I and others at Enron, including Enron's Chief Accounting Officer, had an unwritten agreement that LJM2 would be paid the return on its investment, plus a profit, prior to Talon engaging in any hedging, in exchange for my agreement to allow Enron to flexibly determine what assets would be hedged by Talon and the

values at which they were hedged.
#85, ¶ 402. He explained, "Enron exercised control over Talon and used it fraudulently to meet Wall Street expectations regarding Enron's financial performance." *Id.* at ¶ 403. Fastow confessed, "I understood Talon was set up as a way to conceal the poor performance of certain Enron assets, and that the hedging of these assets at values set by Enron misled investors by fraudulently improving the appearance of Enron's financial statements." *Id.*

The complaint charges that these SPEs had no legitimate business purpose, did not appear on Enron's consolidated financial statements, and were fraudulently accounted for as off-balance sheet entities (¶¶ 389, 392). In the Raptor transactions, moreover, the counterparties to derivative contracts were SPEs owned indirectly by LJM2 and Enron and should also have been consolidated with Enron under GAAP. Moreover, three of the four Raptors were hedged with Enron stock transferred to the SPEs at a discount price to offset losses; in essence, Enron was hedging against itself. This strategy was contrary to a basic accounting and financial rule that, except under limited circumstances, a business may not recognize gains on its income statement due to the increase in value of its capital stock. #85, ¶¶ 394-96. Just as an increase in the value of Enron stock would cause, improperly, a gain in the value of the Raptors' assets, a plummeting of the price of the stock, as ultimately happened,

creates a downward spiral in the value of the Raptors' assets.

LJM2 invested $30 million in each of the Raptors and promptly received back its original investment plus much more, with part of the profit flowing to Merrill Lynch and Tilney. In an October 2000 report to LJM's limited partners, Fastow stated that the internal rates of return on the four Raptors were 193%, 278%, 2500%, and a projected 125%.

> In his Plea Agreement with the DOJ, Fastow admitted,
>
> Among the improper Enron-LJM transactions were four special purpose entities (SPEs) known as the "Raptors." The Raptors purported to be independent, unconsolidated entities with which Enron would hedge the value of certain assets. I and others knew that the Raptors were not sufficiently independent from Enron and should not be been [sic] deconsolidated. As a result, Enron overstated its earnings. I and other members of Enron's senior management knew the impact of the Raptors on Enron's financial statements.
>
> The first Raptor vehicle, Talon, was created in April 2000 to protect Enron's balance sheet from decreases in the value of certain investments. Talon was capitalized mainly by Enron through a promissory note and Enron's own stock. The remainder of Talon's capitalization came from LJM2's payment of $30 million. The purpose of this $30 million payment was to provide Talon the "outside equity at risk" required for accounting purposes, to qualify Talon as an independent third party entity.

#85 at ¶ 402.

None of the Merrill Lynch Defendants disclosed to Enron investors their involvement in LJM2 or the excessively high rates of return reported by Fastow. #85 at ¶ 399. Despite the fact that its top executives were LJM2 investors, that it was kept

abreast of information about LJM2, and that it regularly reviewed Enron's SEC-filed information and substantial information pertaining to Enron, Merrill Lynch never provided any disclosures to Plaintiffs or other members of the investing public; its boilerplate disclosures did not change before and after the participation and funding of LJM2 in December 1999. #85, ¶¶ 413-15. Nor did Tilney speak the truth. *Id.* ¶ 418.

The complaint goes on to briefly summarize and/or list a number of improper transactions by the Raptors employing LJM2 as a dump for phony sales of undesirable assets to doctor Enron's books, with LJM2 and its investors (including Tilney and other Merrill Lynch executives and Merrill Lynch) always making a profit. The complaint asserts that those sample purchases described in the complaint demonstrate (1) the general awareness the LJM2 was available to purchase assets that Enron wanted to sell, but for which it could find no bona fide outside buyer; (2) that Enron would offer financial assistance necessary for LJM2 to effectuate the "sale"; and (3) that Enron protected LJM2 from losing money as a result of its transactions with Enron. #85, ¶ 407 Examples of such sales of bad assets include an interest in a Polish power plant called Nowa Sarznya, a natural gas company named MEGS LLC in the Gulf of Mexico, Enron's broadband services fiber optic cable network, Osprey Trust certificates, Rawhide Bob West Treasure, Blue Dog project, etc. #85, ¶¶ 408-11. The

56

complaint alleges that Merrill Lynch and Tilney conspired with Enron to aid Enron's fraud by such transactions when they structured, marketed, invested in, and participated in LJM2.

The complaint quotes in part Andrew Fastow's comments during his November 2006 deposition.

> Q.  Did LJ--LJM2 structure actually affect earnings as Enron?
>
> A.  Well I don't think the LJM2 structure itself affected earnings at Enron.  I think by having an LJM2, it allowed me and others to do transactions that affected the earnings of Enron.
>
> Q:  Did the transactions done through LJM2 allow or cause the financial statements at Enron to be manipulated?
>
> [Object to form]
>
> A.  My opinion is that many of the transactions that LJM2 did with Enron caused Enron's financials to be misleading and deceptive.
>
> Q.  And did Merrill bankers participate with your staff and others in drafting LJM2 documents?
>
> [Objection to form]
>
> A.  Yes, they did.

# 85, ¶ 417.

In addition to the "fraud-enabling" Nigerian Barge and Power Trades Transactions and promoting and participating in LJM2 (overt acts for Plaintiffs' conspiracy claim), the complaint describes various other transactions and means employed by Enron to manipulate its balance sheets and income statements, and explains how it got LJM2 out of the purchases.  These transactions are not

directly related to Merrill Lynch and Tilney, except as investors in LJM2, but may be relevant to Plaintiffs' conspiracy to defraud claim:  BT/Deutsche Tax Transactions named Teresa, Steele and Cochise[31]; prepays[32]; an entity named JEDI/Chewco[33]; and "minority

---

[31]  The complaint states that Teresa improperly allowed Enron to add approximately $52 million of phony "accounting income" to its net income in its year-end 1997 financial statements; Steele improperly allowed Enron to add $4 million to the net income in its year-end 1997 financial statements. #85, ¶ 66. *See also, id*. at ¶ 108 ("The BT/Deutsche Tax Transactions also significantly affected Enron's financial statements.  By means of several tax transactions, named Steele, Cochise and Teresa--Enron overstated its net income on the SEC filed financial reports by approximately $65,600,000.").

[32]  The complaint alleges that in the year-ending 1997 report, certain unnamed prepays "resulted in the non-reporting of over $300 million in debt, which should have been reported on financial statements." #85, ¶ 70.  It quotes from former Enron Assistant Treasurer Timothy Despain's October 4, 2004 Cooperation Agreement with the DOJ admitting to Enron's fraudulent accounting to fool credit rating agencies and ultimately investors that relied on them:

> Another mechanism by which Enron achieved the artificial cash flow targets it set for itself was through transactions commonly referred to within the company as "prepays."  The reporting of the cash received from these transactions was a means of demonstrating to the rating agencies Enron's ability to recognize cash from its mark-to-market trading book.  Although the prepays were accounted for as commodity transactions and reflected on Enron's books as a trading liability, the transactions in substance created debt-like obligations to the financial institutions that advanced funds to Enron through the transactions.  I and others told the rating agencies that the cash generated from Enron's trading operations was from the sale or "monetization" of trading contracts or the future cash flow streams from those contracts. Fundamentally, the agencies were led to believe that Enron was generating cash by incurring a future obligation that operated as debt.

interest" transactions, including one called Rawhide.[34]  Because
these and others are not the focus of the allegations against
Merrill Lynch and Tilney, the Court will not summarize the more
detailed discussions, including their impact on Enron's financial
reporting, in the complaint, but refers the parties to the
following:  for tax transactions to #85, ¶¶ 671-743;  for prepays
to ¶¶ 509-608;  for minority interest transactions to ¶¶ 744-74;
for share trust transactions to ¶¶ 609-55;  for FAS 140
transactions to ¶ 656-70;  and for non-economic hedges such as the
Raptors and LJM1 to ¶¶ 775-91.

The complaint states that Plaintiffs engaged accounting
expert D. Paul Regan, CPA, CFE, to examine Enron's financial
statements, along with Craig Shenkman CPA, who analyzed the effect
of tax transactions used by Enron to "cook" its books.  #85, ¶¶
41-42.  It asserts  that their experts were "in agreement with the

---

#85, ¶ 69.
The complaint charges that in Enron's year-end 1998
consolidated financial statement "because of prepay transactions
alone, approximately $1.2 billion of actual Enron debt was not
reflected in Enron's consolidated financial report."  #85, ¶ 87.

[33] The complaint simply states, "JEDI/Chewco was able to
conceal (that is, not report in its financial results") an
incredible $711,000,000 of debt.  JEDI impacted the second quarter
1997 Enron financial statements reviewed by Plaintiffs."  #85, ¶72.

[34] Through Rawhide, Enron allegedly concealed $727,500,000 of
debt that should have been recorded on its consolidated financial
reports.  #85, ¶ 83.  *See also id.*, ¶ 103 ("Another method of
cooking the books employed by Enron was an accounting device called
the 'minority interest' transaction.  This was the device used in
the 1998 Rawhide transaction.")

59

Enron Bankruptcy Examiner Neal Batson that Enron's SEC-filed financial statements were materially false and deceptive. Further, Plaintiffs' experts and Neal Batson agree that Merrill Lynch substantially aided Enron in the falsification of Enron's reported financial condition." #85, ¶ 43.

Key to the complaint is the summary in specific dollar amounts of Enron's material misrepresentations contrasted with the approximate actual amounts calculated by Plaintiffs' and Lead Plaintiff's experts, in agreement with Bankruptcy Examiner Batson, of (1) Enron's reported cash flow in its Form 10-Ks for December 31, 1997 ($211 million, as compared with Plaintiffs experts' no more than $89.0 million), December 31, 1998 ($1.640 billion, as compared with Plaintiffs' experts' less than $689.5 million), December 31, 1999 ($1.228 billion, as compared with Plaintiffs' experts' less than $160.2 million), and December 31, 2000 ($4.779 billion, as compared to Plaintiffs' experts' less than $3.679 billion), and in its Form 10-Q for the six months ending in the second quarter of 2001 ($1.337.0 billion, as compared with Plaintiffs' experts' no more than negative $2.107 billion); (2) Enron's interest expense[35] in its Form 10-Ks for December 31, 1997 ($401.0 million, as compared with Plaintiffs' experts' over $465.8 million), December 31, 1998 ($550.0 million, as compared with

---

[35] The complaint states that Enron typically reported interest expense in its Consolidated Income Statement of its financial statements filed with the SEC. #85, ¶ 486.

Plaintiffs' experts' over $739.8 million), December 31, 1999
($656.0 million, as compared with Plaintiffs' experts' over $995.8
million), and December 31, 2000 ($838.0 million, compared with
Plaintiffs' experts' over $1.265 billion) and its 10-Qs for the
first ($201.0 million, as compared with Plaintiffs' experts' over
$276.2 million) and second quarter ($416.0 million, as compared
with Plaintiffs' experts' over $589.5 million) of 2001; and (3)
Enron's reported total debt[36] in its Form 10-Ks for December 31,
1997, December 31, 1998, December 31, 1999, and December 31, 2000
and its 10-Qs for the first and second quarter of 2001.  #85, ¶¶
480-500.

The complaint explains that Plaintiffs looked to the ratio
of the amount of debt held by a company compared to its total
capital; if the debt figure is higher than the reported total
capital, the debt-to-capital ratio will increase.  The complaint
alleges that "Enron's huge debt misstatements created huge
miscalculations of debt ratios."  It compares the debt-to-capital
ratio calculated based on Enron's financial statements for year-
end 1998 (41.9%) with the ratio calculated by Plaintiffs' experts
(52.3%).  #85. ¶ 501.

The complaint also sets out the EBITDA (earnings before
interest, taxes, depreciation, and amortization), used to evaluate

---

[36] Enron reported its total debt in its Consolidated Balance
Sheet of its financial statements filed with the SEC.  #85, ¶ 494.

a company's profitability and to measure the cash earnings that may be applied to interest and debt retirement, calculated from Enron's Form-10K in December 31, 1997 ($946 million) with that calculated by Plaintiffs' experts on reviewing the transactions (no more than $911.9 million); calculated from Enron's Form-10K in December 31, 1998 ($2.167 billion) with that calculated by Plaintiffs' experts on reviewing the transactions (no more than $1.947 billion); calculated from Enron's Form-10K in December 31, 1999 ($2.361 billion with that calculated by Plaintiffs' experts on reviewing the transactions (no more than $2.020 billion); and calculated from Enron's Form-10K in December 31, 2000 ($2.894 billion) with that calculated by Plaintiffs' experts on reviewing the transactions (no more than $2.685 billion). Enron's EBITDA calculated from its Form 10-Q for the third quarter of 2001 was $1.363 billion, compared with the no more than $1.342 billion calculated from reviewed transactions by Plaintiffs' experts. #85, ¶¶ 503-08.

Also from review of the transactions by Plaintiffs' expert, the complaint asserts that Enron's year-end December 31, 1999 financial statements "understated Enron's debt by no less than $4,222,807,662, though the "actual understatement of debt" was much greater. The complaint adds, "Merrill and Tilney facilitated part of the understatement which was an objective of the agreement to misrepresent Enron's condition. Additionally, Merrill's

agreement with Enron and participation in fraudulent deals further let to an overstatement of Enron's income at year end 1999." #85, ¶ 107.

The complaint quotes from or summarizes sworn statements (judicial admissions) in plea agreements, cooperation agreements, and one deposition of former Enron officers (Richard Causey (December 28, 2005 Plea Agreement), Andrew Fastow (January 14, 2004 Plea Agreement; November 2006 deposition), Ben Glisan (September 10, 203 Plea Agreement), Mark Koenig (August 25, 2004 Cooperation Agreement), Kevin Hannon (August 31, 2004 Cooperation Agreement), Timothy Despain (October 5, 2004 Cooperation Agreement), and Michael Kopper (August 21, 2002 Cooperation Agreement)) admitting to manipulating figures in the SEC-filed reports to deceive the investing public and "unequivocally establish[ing] Enron's scheme to defraud the investing public and specify[ing] numerous acts in furtherance of the conspiracy to falsify Enron's reported financial results." #85, ¶¶ 190-214.

For example, the complaint quotes Causey, Enron's Chief Accounting Officer from 1998 until its bankruptcy in December 2001, pled guilty and *inter alia* judicially admitted,

> I, along with others in senior management, was responsible for ensuring that the financial statements contained in Enron's public filings fairly represented Enron's true financial condition. The financial statements were required to include a section entitled Management, Discussion and Analysis ("MD&A"), which required, among other things, that management disclose information necessary to an understanding of Enron's

> financial condition and results of operations. I
> reviewed drafts of Enron's quarterly and annual
> reports, and I signed these reports attesting to their
> accuracy. . . . I participated along with others in
> Enron's senior management in efforts to use Enron's
> public filings and public statements to mislead the
> investing public about the true nature of Enron's
> financial performance by making false and misleading
> statements, and omitting facts necessary to make
> certain statements not misleading.

#85, ¶¶ 191-92. His plea agreement admitted that Enron "willfully
and unlawfully" did "use and employ manipulative and deceptive
devices and contrivances directly and indirectly," specifically
that Enron (1) employed devices, schemes and artifices to defraud,
(2) made untrue statements of material facts and omitted to state
facts necessary in order to make the statements made, in light of
the circumstances under which they were made, not misleading; and
(3) engaged in acts, practices and courses of conduct which would
and did operate as a fraud and deceit upon members of the
investing public, in connection with purchases and sales of Enron
securities. *Id.*, ¶ 193.

Andrew Fastow in a January 14, 2004 sworn statement made as
part of a Plea Agreement with the DOJ, judicially admitted that
certain off-balance sheet entities and transactions, particularly
LJM Cayman, LJM2, and the Raptors, were used to manipulate Enron's
financial statements by (a) generating improper earnings and funds
flow, (b) enabling Enron to set inflated "market" prices for
assets, and (c) improperly protecting Enron's balance sheet from
poorly performing and volatile assets. #85, ¶195. He expressly

stated, "I understood that these schemes would have a material effect on Enron's financial statements (which Enron shareholders and potential shareholders relied upon in making investment decisions) or would have an otherwise deleterious impact on the company." #85, ¶197.

Former Enron Secretary Ben Glisan judicially admitted on September 10, 2003 as part of a Plea Agreement that he and others at Enron conspired to artificially manipulate Enron's financial statements and that the manipulated financial results "were publicly filed with the Securities and Exchange Commission and relied upon by the public." #85, ¶¶ 200-01. Furthermore at the trial of Ken Lay and Jeff Skilling, he listed approximately a dozen transactions back to 1997 that he thought were illegal, including the Nigerian Barge Transaction. #85, ¶ 202.

Enron's former Vice President and Director of Investor Relations Mark Koenig entered into a Cooperation Agreement with the DOJ on August 25 2004. In his sworn statement, incorporated into the Cooperation Agreement, Koenig judicially admitted,

> By early 2001, I was aware that the presentation to the
> public of Enron's finances and business success by
> Enron senior management, including myself,
> intentionally concealed the true state of Enron.
> Enron's publicly reported financial results and filings
> with the Securities and Exchange Commission, including
> its public descriptions of itself and statements made
> by myself and members of senior management, did not
> truthfully present Enron's financial positions, results
> from operations, and cash flow of the company and
> omitted facts necessary to make the disclosures and

65

statements that were made truthful and not misleading. #85, ¶ 203.  He further stated that he knew his public statements about Enron "were misleading and false and that a reasonable investor would have considered the information important in making a decision to invest and continue to invest in Enron."  *Id.*

Enron Broadband employee Kevin P. Hannon, in an August 31, 2004 sworn statement incorporated into a Cooperation Agreement with the DOJ, admitted that Enron's representations about its broadband business contained "misleading claims and omitted facts [that] would have been important in my view to a reasonable investment analyst's or investor's decision to invest in Enron stock."  #85, ¶ 205.

Enron's former assistant Treasurer Timothy Despain entered into a Cooperation Agreement on October 5, 2004, which judicially admitted that Despain '[a]mong other things . . . falsely represented to credit agencies that Enron's cash flows from its non-regulated business were stable and predictable."  He explained, "In fact, the annual cash flow targets that Enron set for itself and reported to the rating agencies were arbitrarily based on what I and others believed was necessary to maintain Enron's investment-grade credit rating, rather than on the amount of cash flow Enron's non-regulated businesses were expected to achieve."  #85, ¶¶ 210-11.  Moreover, as noted regarding fraudulent accounting for prepays to fool the credit rating

66

agencies and ultimately the investors that relied on them, he admitted,

> Another mechanism by which Enron achieved the artificial cash flow targets it set for itself through transactions commonly referred to within the company as "prepays." The reporting of the cash received from these transactions was a means of demonstrating to the rating agencies Enron's ability to recognize cash from its mark-to-market trading book. Although the prepays were accounted for as commodity transactions and reflected on Enron's books as a trading liability, the transactions in substance created debt-like obligations to the financial institutions that advanced funds to Enron through the transactions. I and others told the rating agencies that the cash generated from Enron's trading operations was from the sale or "monetization" of trading contracts or the future cash flow streams from those contracts. Fundamentally, the agencies were led to believe that Enron was generating cash by incurring a future obligation that operated as debt.

#85, ¶ 69.

**Merrill Lynch's Motion to Dismiss with Prejudice (#79)**

Because Tilney's motion adopts and incorporates parts of Merrill Lynch's motion, the Court addresses the latter first.

Moving to dismiss the three claims against it (statutory fraud, common-law fraud, and conspiracy to defraud), Merrill Lynch points out that this Court's order of June 6, 2007 (#75) identified a number of pleading deficiencies and gave Plaintiffs an opportunity to cure them. Merrill Lynch maintains Plaintiffs have failed to do so in the Second Amended Complaint.

First, Merrill Lynch argues that Plaintiffs have not adequately pleaded a material misrepresentation by Enron because they have not identified *where* in Enron's 1999 financial

statements Enron misrepresented its two transactions with Merrill Lynch.[37] Plaintiffs have instead added hundreds of "irrelevant" paragraphs alleging wrongdoing of a number of other financial institutions.[38] #80 at 1.

Second, although warned by the Court, they have still failed to plead adequately intent to induce reliance, an element of a primary violation, because they have not pleaded facts showing that Enron and Merrill Lynch had information that would make it "especially likely"[39] that their misrepresentations would reach Plaintiffs and influence their decision to purchase Enron

---

[37] They point out that in the June 6, 2007 order, the Court opined, "More than a 'general reference' to Enron's 1999 financial reports and SEC filings is needed; although Plaintiffs plead specific figures for sham earnings from the two transactions with Merrill Lynch, they fail to point to where in Enron's financial documents Enron (and its auditor) misrepresented these amounts.[citations omitted]" *Enron*, 490 F. Supp. 2d at 820. *See Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004)("Rule 9(b) requires the plaintiff to specify the statements contended to be fraudulent . . . [and] when and where the statements were made.").

[38] As noted earlier by the Court, these allegations may be relevant to Plaintiffs' conspiracy to defraud cause of action.

[39] *Pacific Mutual Life Ins. Co.*, 51 S.W. 3d at 579-80 (finding that Texas "jurisprudence, which focuses on the defendant's knowledge and intent to induce reliance, is consistent with" the *Restatement (Second) of Torts* § 531 (1977), which requires a degree of certainty that goes beyond mere foreseeability . . . . [T]he claimant's reliance must be 'especially likely' and justifiable . . . ."). Comment d to Section 531, discussing the need to limit liability, states, "The maker of the misrepresentation must have information that would lead a reasonable man to conclude there is an especial likelihood that it will reach those persons and will influence their conduct." Cited in *Pacific Mutual*, 51 S.W. 3d at 581.

68

securities.[40]  Instead they have added allegations of erroneously
reported versus actual figures for cash flow from operations,
interest expenses, debt, and EBITDA on specified SEC-filed reports
from 1997-2001.  Plaintiffs do not allege that Plaintiffs had some
"information" or "knowledge" that their alleged misstatements
would likely reach plaintiffs and that these misstatements would
influence their decisions to purchase Enron securities.

Nor have they pleaded with specificity the third element of
a primary violation of the statute and common-law fraud, their
actual reliance[41] on Enron's alleged misrepresentations, but only
conclusorily alleged that they did.  Plaintiffs are required to
identify with particularity who reviewed Enron's 1999 financial
statements, for which Plaintiff corporation he worked, and which
security purchases were impacted.

-----

[40] *See Pacific Mutual Life Ins. Co.*, 51 S.W. 3d at 577
(applying Restatement (Second) of Torts § 531:  "One who makes a
fraudulent misrepresentation is subject to liability to the persons
or class of persons whom he intends or has reason to expect to act
or to refrain from action in reliance upon the misrepresentation,
for pecuniary loss suffered by them through their justifiable
reliance in the type of transaction in which he intends or has
reason to expect their conduct to be influenced.")

[41] "Texas courts require a showing of actual reliance and do
not recognize a fraud-on-the-market theory of reliance for common
law claims."  *In re Enron Corp.*, 490 F. Supp. 2d at 814, *citing
Griffen v. GK Intelligent Sys., Inc.*, 87 F. Supp. 2d 684, 690 (S.D.
Tex. 1999), and *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 270
(N.D. Tex.1990).  *See also Rubalcaba v. Pacific/Atlantic Crop
Exchange, Inc.*, 952 S.W. 2d 552, 556 (Tex. App.--El Paso 1997, no
writ)(under Texas law "fraud is never presumed," but actual
reliance is required).

Merrill Lynch argues that the governing complaint expressly states that Plaintiffs "bring suit only for purchases made after Merrill Lynch and Tilney became involved in the fraud." Merrill Lynch maintains that the earliest allegation of their involvement was in May 1998 when Merrill, under pressure from Enron's Ken Lay, fired equity analyst John Olson after Olson issued a negative report about Enron and replaced him with an analyst who would issue more favorable evaluations. #85, ¶¶ 23, 77. Plaintiffs have not alleged that Merrill Lynch made a material misrepresentation or omission prior to that date, so there is nothing before it on which Plaintiffs can plead reliance and proximate causation. Nor can Merrill Lynch be liable for aiding and abetting statutory fraud for purchases of securities before May 1998 because Plaintiffs have not alleged that Merrill Lynch was "actually aware" of Enron's alleged misrepresentations before then. Nor do they allege that Merrill Lynch had a meeting of the minds with Enron before May 1998, so Merrill Lynch cannot be liable for conspiracy prior to that date.

Merrill also contends that all claims post-May 1998 purchases should be dismissed.

First, for their statutory fraud cause of action, Plaintiffs have inadequately alleged that Enron committed the requisite primary violation by issuing press releases and financial reports that misrepresented Enron's financial condition. Nor, insists

70

Merrill Lynch, have Plaintiffs adequately pleaded a secondary violation by Merrill Lynch. Merrill Lynch insists Plaintiffs must plead with specificity that each "actually relied" upon Defendant's silence in deciding to purchase the stock or property. Furthermore, since they have failed to plead with specificity the misrepresentations that Enron made in its 1999 financial statement about the two transactions with Merrill Lynch, they also cannot plead that Merrill Lynch was actually aware of them, failed to disclose them, and benefitted from them.

Second, Merrill Lynch maintains that Plaintiffs have not adequately pleaded each element of common-law fraud against Merrill Lynch. Plaintiffs have failed to explain why statements in Merrill Lynch's analyst reports are false. Furthermore Merrill Lynch insists many of the statements challenged by Plaintiffs are non-actionable opinions.[42] They have also failed to plead scienter. Plaintiffs have not alleged that the analyst who authored the reports himself acted with scienter, but instead assert that Merrill Lynch acted with scienter. *See In re Enron Corp.*, 465 F. Supp. 2d 687, 724 (S.D. Tex. 2006)[43]("to hold a

---

[42] See *Sergeant Oil & Gas Co. v. Nat'l Maint. & Repair, Inc.*, 861 F. Supp. 1351, 1358 (S.D. Tex. 1994)("To be actionable, a representation must be one of material fact, not opinion."); *Trenholm v. Ratcliff*, 646 S.W. 2d 927, 930 (Tex. 1983)("Pure expressions of opinion are not actionable.").

[43] The Court notes that this and other cases cited by Merrill Lynch for this proposition relate to federal claims under Section 10(b) and Rule 10b-5, in other words the Private Securities

corporate defendant liable for its analysts' statements . . . , a plaintiff must show that the analyst at issue had scienter (intent to deceive, manipulate, defraud or severe recklessness")); *Southland*, 365 F.3d at 366-67 (allegations of scienter based on the collective knowledge of the corporations's officers and employees do not satisfy Rule 9(b)). Nor have they pleaded actual reliance by Plaintiffs on the analyst reports. Indeed, they do not even claim that they reviewed them, no less relied upon them. Moreover, urges Merrill Lynch, Plaintiffs could not have actually relied on the analyst reports because most were issued after Plaintiffs purchased most of their Enron securities in 1997 and 1998. In addition, all the analyst reports in which Plaintiffs allege there are misleading statements are focused exclusively on Enron stock; thus Plaintiffs could not have relied on them when they purchased the Enron bond and Enron commercial paper in

---

Litigation Reform Act ("PSLRA") with its stringent requirements, buttressed by *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), and not under Texas common-law fraud.

As discussed earlier, the Fifth Circuit has ruled that while common-law fraud claims are not subject to the strong inference of scienter standard imposed by the PSLRA, Rule 9(b) "incorporates an element of scienter." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 213 (5th Cir. 2009), *citing Dorsey v. Portfolio Equities, Inc.*, 540 F. 3d 333, 341 (5th Cir. 2008). In order to plead adequately fraudulent intent in the context of a state-law securities fraud claim, a plaintiff must allege specific facts to support an inference of fraud. *Flaherty*, 565 F.3d at 213. "'Alleged facts are sufficient to support such an inference if they either (1) show a defendant's motive to commit securities fraud or (2) identify circumstances that indicate conscious behavior on the part of the defendant.'" *Id., quoting Herrmann Holdings, Ltd. v. Lucent Technologies, Inc.*, 302 F.3d 552, 565 (5th Cir. 2002).

September 2001, for example. Finally, because Plaintiffs are five separate corporate entities, Plaintiffs must specify who reviewed the analyst report for which entity and identify the false statement they relied on for each security purchased by them. Instead they only alleged that SM&R "received" three analyst reports in April and May 2001. *See In re Gen. Motors Corp. Anti-Lock Brake Prods. Liab. Litig.*, 966 F. Supp. 1525, 1535 (E.D. Mo. 1997)(dismissing claims because plaintiffs alleged reliance in a conclusory manner without specifying which of the eight plaintiffs relied on which alleged misrepresentation), *aff'd*, 172 F.3d 623 (8th Cir. 1999). Merrill Lynch also claims that Plaintiffs have failed to allege adequately that the analysts or Merrill Lynch had the intent to induce reliance through the analyst reports. *Pacific Mutual*, 51 S.W. 3d at 580-81 (pleading fraud requires a degree of certainty beyond mere foreseeability; "the maker of the misrepresentation must have information that would lead a reasonable man to conclude that there is an especial likelihood that it will reach those persons and will influence their conduct"). Plaintiffs have not met this standard, so their common-law fraud claim should be dismissed with prejudice.

Third, for the claim for conspiracy to defraud, which is a derivative tort, Merrill Lynch again contends that Plaintiffs have failed to adequately allege an underlying fraud claim against Enron for their conspiracy to defraud claim. Merrill Lynch

further argues that Plaintiffs have failed to allege a "meeting of the minds" or shown that it had knowledge of a conspiratorial plan or scheme, which Plaintiffs have broadly defined as "a giant Ponzi scheme whereby [Merrill Lynch and others] helped Enron raise increasing amounts of cash to make outstanding debt payments and maintain a facade of 'normal operations.'" #80 at 19, citing #85, ¶ 22. The scheme included having multiple financial institutions participate in dozens of improper transactions that enabled Enron to manipulate its publicly filed financial statements over a four-year period. *Id.*, *citing* #85, ¶¶ 509-791. For the "meeting of the minds" requirement, Plaintiffs allege the firing of Jon Olson and two year-end 1999 transactions (Nigerian Barge and Power Trades). #85, ¶¶ 23, 101, 419-21, 434. Merrill Lynch contends that Plaintiffs have not alleged any facts to support allegations that it knew of this far-reaching conspiracy and intended the injury that followed. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W. 2d 854, 857 (Tex. 1968)("One without knowledge of the object and purpose of a conspiracy cannot be a co-conspirator.").

Finally, Merrill Lynch contends that Plaintiffs have not alleged sufficient facts to circumvent Texas' statutory cap on exemplary damages, Tex. Civ. Practice & Rem. Code § 41.008(b), because they have not alleged against Merrill Lynch the elements of the felony violations of Texas Penal Code §§ 32.46 (securing

execution of a document by deception) and 32.47 (fraudulent concealment of a writing).[44]  To plead a violation of § 32.47, Plaintiffs must show that the document allegedly concealed is "a deed, mortgage, deed of trust, security instrument, security agreement or other writing for which the law provides public recording or filing."  Tex. Penal Code § 32.47(d)(2).  Merrill Lynch alleged only concealment of the terms of two contracts with Enron.  #85, ¶¶ 868-69.

In sum, Merrill Lynch urges the court to dismiss the Second Amended Complaint with prejudice.  Plaintiffs have already had the benefit of multiple rulings from the Court about the causes of action, of extensive factual discovery, and of multiple amendments.

**Schuyler M. Tilney's Motion to Dismiss with Prejudice (#78)**

---

[44] Plaintiffs have alleged,

325.  With knowledge, purpose and inten[t], Merrill and Tilney each fraudulently concealed documents that showed the true nature and terms of the Nigerian Barge Transaction and the Power Trades Transaction.

326.  Further, the underlying purpose of both the Nigerian Barge Transaction and the Power Trade Transaction was to secure the execution of a document by deception--that document being the execution and unqualified approval of Enron's cooked financial statements.

327. Merrill and Tilney, as Enron's co-conspirators, are thus vicariously liable for securing the execution of documents by deception.

#85, ¶¶ 325-27.

As noted, the claims against Tilney in his official and individual capacities are for aiding and abetting fraud under Texas Business & Commerce Code § 27.01(d) and for common-law conspiracy to commit fraud.[45]  Because of the Court's change of mind regarding a duty to disclose under that provision, the Court reinstates Plaintiffs' claim against Tilney as a secondary violator under § 27.01(d).

Like Merrill Lynch, Tilney moves to dismiss claims based on securities purchased before May 1998, when analyst John Olson was fired, identified as the beginning of the conspiracy between Enron and Merrill Lynch, because the complaint specifically limits the suit to "purchases made after Merrill and Tilney became involved in the fraud"  #85, ¶¶ 23, 38, 77.

Second, Tilney claims that Plaintiffs have failed to plead an alleged primary violation by Enron under section 27.01(a).  The

---

[45] Tilney complains that the complaint (#85 at ¶ 198) quoted from the October/November 2006 deposition testimony of Andrew Fastow to assert that through Tilney's close relationship with Fastow, Tilney and Merrill knew of Enron's and LJM2's fraudulent transactions and that Enron was making materially false and deceptive statements in publicly disseminated financial reports.  He points out that these are merely allegations taken as true for purposes of Rule 12(b)(6) review.  He argues that Plaintiffs have overstated what Fastow actually said and ignored other testimony showing limited revelations to Tilney and Merrill Lynch.  #78 at 3.  Plaintiffs respond with a motion to strike Tilney's motion to dismiss because the Court should only be looking at the face of the complaint.  #82 at 2.  The Court agrees and will ignore arguments about the weight and accuracy to be attributed to the deposition evidence and, for purposes of the motions to dismiss under Rule 12(b)(6), look solely at at the complaint's assertions as allegations of fact.

complaint fails to plead with particularity (1) misrepresentations made by Enron with respect to its transactions with Merrill Lynch; (2) facts demonstrating that Enron intended to induce reliance under the standard established in *Pacific Mutual Life Ins. Co.*, 51 S.W. 3d at 579-80 (applying *Restatement (Second) of Torts* § 531 (1977): "Texas jurisprudence is entirely consistent with section 531's reason-to-expect standard, which requires a degree of certainty that goes beyond mere foreseeability . . . . [T]he claimant's reliance must be 'especially likely' and justifiable . . . ."); and (3) facts showing Plaintiffs' actual reliance on Enron's alleged misstatements.

Third, Plaintiffs have failed to plead with particularity a secondary violation under Section 27.01(d) by Tilney. Because they have failed to plead a primary violation by Enron, they cannot plead that Tilney had actual awareness of such fraudulent representations or that Tilney failed to disclose such representations or that Tilney benefitted from such representations. Nor have they adequately pleaded that Plaintiffs actually relied on any nondisclosures by Tilney. Nor do they plead facts establishing that Tilney had a duty to disclose. They also fail to plead specifically how Tilney, individually, benefitted from Enron's false representations, but only quantify the benefit to Merrill Lynch and conclusorily assert that Tilney was "handsomely" compensated and that his "efforts for Enron" were

77

"a factor" in determining his compensation.

Furthermore, the complaint quotes facts supposedly "found" by the SEC, but Tilney argues that the statement is only an allegation, not a finding. Tilney notes that the SEC action against him was stayed and produced no judgment or final findings or factual determinations, and maintains that the allegations are therefor as a matter of law immaterial and subject to being stricken. *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003); *Lipsky v. Commonwealth United Corp.*, 551 F. 2d 887, 892-94 (2d Cir. 1976).

Last, of all, the complaint alleges that any benefits came from doing business with Enron, and not from Enron's false representations, as required by Section 27.01(d).[46] The Court earlier found that gaining "Enron's loyalty, trust or obligation to ensure future or ongoing business" was a sufficient benefit, but Tilney suggests that the express language of the statute requires that the benefit be "from the false representation." Plaintiffs do not allege that Tilney benefitted from any falsity in Enron's financial statements or from any sales to Plaintiffs of Enron securities that were induced by misrepresentations. His benefits were only secondary, i.e., compensation from Merrill

---

[46] Tilney offers no authority on how "direct" the benefit must be from the misrepresentation. Merrill Lynch's and Tilney's financial gains, in the larger picture, are from the intended misrepresentations and the fraud perpetrated on the investing public.

Lynch, and did not flow directly from Enron, the alleged maker of the misrepresentations.

As for the conspiracy claim, Tilney contends that Plaintiffs have failed to plead essential elements with particularity: Enron's underlying fraud, a meeting of the minds between Tilney and Enron and/or Tilney's knowledge of the object of the conspiracy, and Tilney's intent to injure others. He contends that Plaintiffs have not pleaded facts demonstrating that Tilney knowingly entered into Enron's alleged Ponzi scheme. Tilney emphasizes that he was not among those Merrill Lynch employees who were indicted and tried for the barge transactions.

Even if Plaintiffs had stated claims against him, Tilney, like Merrill Lynch, further insists that complaint fails to plead facts that would permit circumvention of Texas' statutory cap on exemplary damages in Texas Civil Practice & Remedies Code § 41.008(b).

### Plaintiffs' Response (#82)

Plaintiffs summarize the points made in Defendants' motions to dismiss regarding Plaintiffs' alleged failure to adequately allege (1) claims for securities purchased prior to May 1998; (2) the elements of statutory fraud; (3) the underlying fraud and "meeting of the minds" elements of conspiracy to defraud; (4) the misrepresentation, scienter, actual reliance, and "intent to induce reliance" elements of simple fraud; and (5) facts

supporting exemption to the statutory cap on exemplary damages. #82 at 3.

Objecting to both motions to dismiss, Plaintiffs begin by insisting they have adequately pleaded that Enron's representations, in its audited financial statements that were part of SEC-filed Form 10-Ks and 10-Qs, were false and that Enron deceived credit rating agencies to insure that the agencies also disseminated deceptive information about Enron to the investing public. Plaintiffs maintain that they relied upon Enron's deceptive financial statements and the reports from the credit rating agencies in making their investment decisions. The Second Amended Complaint identifies the Enron officers responsible for falsifying Enron's financial results and quotes from plea agreements and cooperation agreements of some former Enron officers to demonstrate Enron's specific intent to defraud investors. #85, ¶¶ 191-92 (former Enron Chief Accounting Officer Richard Causey); 200-01 (former Enron Treasurer Ben Glisan); 203-04 (former Enron Director of Investor Relations Mark Koenig); and 205-06 (former Enron Broadband officer Kevin P. Hannon). The Ponzi scheme allegations further demonstrate Enron's intent to defraud.

The complaint also identifies, through Plaintiffs' accounting expert Paul Regan, where Enron made false representations on which particular financial statements that were filed with the SEC and

explains why they were fraudulent:  specifically Regan points out Enron's falsification of cash flow, interest expense, debt, and earnings amounts reported in Enron's Form 10-Ks filed for periods ending December 31, 1999 and December 31, 2000 and in Enron's Form 10-Qs filed in 2001, and Regan provides near approximations of what each of those figures should have been.  #85, ¶¶ 476-508. Regan also points out the deceptively high figures reported in these SEC-filed documents based on EBITDA calculations.

In addition Plaintiffs have explained in great detail a number of "fraud-enabling transactions" utilized by Enron to doctor its books and have summarized methods used by Enron to conceal its true financial condition that were identified by Enron Bankruptcy Examiner Neal Batson, and, with Regan's expertise, their impact on Enron's reported financial results.  Regarding transactions in which Merrill Lynch and Tilney participated, Plaintiffs assert that the Nigerian Barge Transaction enabled Enron improperly to record approximately $12 million in funds in the fourth quarter of 1999 (#85, ¶¶ 272, 280), while the Power Trades Transaction allowed Enron to record approximately $50 million in income (#85, ¶ 313).  The 1999 year-end transactions with Merrill constituted the difference between meeting and failing to meet analyst expectations.  *Id.*, ¶¶ 249-51.

As for reliance, Plaintiffs plead facts demonstrating reliance on Enron's audited financial statements and utilization

81

of Bloomberg, an on-line subscription financial service, for access to those statements. #85, ¶ 796. In purchasing a $5.05 million bond for Plaintiff American National Insurance Company on September 28, 2001, Anne LeMire purportedly relied on various financial ratios reported on Bloomberg, including the Enron year-end 2000 financial statement representations reporting debt levels, interest coverage and cash flows. *Id.*, ¶ 798. Regan determined these figures were false and deceptive; he calculated that Enron understated its debt level by more that $5 billion, understated interest expenses by $427.0 million, and overstated its cash flows from operations by $1.1 billion on its year-end 2000 Form 10-K. *Id.* at ¶ 798, 498, 490, 484. LeMire also reviewed Enron's year-end 1999 results through Bloomberg. *Id.*, ¶ 798. The same figures were considered and relied on during the purchase of $2.1 million of Enron commercial paper on September 25, 2001. *Id.* at ¶ 798. For their stock purchases, Plaintiffs made their initial purchases based on computer models that used Enron's reported financial results, and thereafter monitored them, relying on them as part of the "total mix" of information. *Id.* at ¶¶ 792 (reviews of financial statements filed with the SEC, information from financial information services, such as Bloomberg, to which Plaintiffs subscribe), 794-96 (additionally, financial information services to which Plaintiffs subscribed provided information about analyst upgrades and downgrades issued

82

by major brokerage firms and recommendations in analyst reports, outlets like Yahoo! Finance), and 799 (financial statements).

Plaintiffs claim that in furtherance of its conspiracy with Defendants to defraud investors, Enron intended to deceive and did deceive investors by fooling the credit rating agencies into maintaining Enron's "investment grade" rating, which enabled Enron to continue defrauding investors. #85, ¶¶ 182-83, 207-14, 470-73, 518-25, 796-97. They contend that Enron's dissemination of false representations through the credit rating agencies is actionable under *Pacific Mutual*, 51 S.W. 3d at 578 (under Texas law, a misrepresentation made through an intermediary is actionable if it is intended to influence a third person's conduct). Enron's intent to defraud investors through the credit rating agencies and the facts that debt securities investors reasonably rely on credit rating agency evaluations are established by judicial admissions and other statements made by former Enron executives, including Mark Koenig, Kevin P. Hannon, Andrew Fastow, Michael Kopper, and Ben Glisan, showing they targeted debt securities purchasers who are especially likely to consider and rely on the agencies' ratings. #85 at ¶¶ 204-14.[47] Plaintiffs assert that they

_____

[47] For example, the Complaint asserts in relevant part,

207. In addition to falsification of its financial statements and misrepresentations to the public generally, Enron went to great lengths to convince the rating agencies that Enron was in sound financial condition. Enron executives were particularly fearful

83

"considered and relied [to their detriment] upon the credit rating agencies' rating of Enron Corporation as 'investment grade' and upon the absence of any negative recommendation or downgrade in Merrill analyst reports. A prerequisite to purchasing a debt instrument is: the debt must be investment grade." #85, ¶ 10;

---

that the rating agencies would at long last recognize Enron's financial predicament and downgrade Enron's debt to "junk" status.

208. Maintaining an "investment grade" credit rating could be seen as the driving force behind Enron's fraudulent accounting.

210. In a Cooperation Agreement with the DOJ entered into on October 5, 2004, Enron's former Assistant Treasurer Timothy Despain explained and judicially admitted that he "Among other things . . . falsely represented to credit agencies that Enron's cash flows from its non-regulated business were stable and predictable."

211. Despain explained, "In fact, the annual cash flow targets that Enron set for itself and reported to the rating agencies were arbitrarily based on what I and others believed was necessary to maintain Enron's investment-grade credit rating, rather than on the amount of cash flow Enron's non-regulated businesses were expected to achieve."

212. Enron was acutely aware of what kind of information was reviewed and considered by the rating agencies and "Wall Street" generally. Michael Kopper explained in his Cooperation Agreement with the DOJ entered into on August 21, 2002, because of the SPEs and manipulative off-balance sheet transactions, "Enron was able to present its financial results more attractively as measured by the criteria favored by Wall Street analysts and credit rating agencies."

213. At his deposition, Fastow also talked about the importance of keeping the credit rating agencies in the dark about Enron's true finances. Fastow made some presentations to rating agencies.

214. According to Fastow, a banker from Merrill Lynch once assisted Fastow in helping with the preparation for one of these "fool the rating agencies" presentations.

84

see also ¶¶ 796-97.

Plaintiffs object that neither Merrill Lynch nor Tilney has offered any legitimate basis for dismissal of the complaint.

Regarding Defendants' contention that all claims for securities purchased before May 1998 must be dismissed, Plaintiffs have expressly stated that their claims are not based on purchases before that date. But if they had, their conspiracy claim would have allowed them to do so. *Paschal v. Great Western Drilling, Ltd.*, 215 S.W. 3d 437, 456 (Tex. App.--Eastland 2006, pet. denied)("It is well-settled law that, upon joining a conspiracy, a defendant becomes a party to every act previously or subsequently committed by any of the conspirators in pursuit of their conspiracy."), *citing State v. Standard Oil Co.*, 130 Tex. 313. 107 S.W. 2d 550. 560 (Tex. 1937).

Furthermore, Plaintiffs maintain that they have adequately alleged that Merrill Lynch is liable as a secondary violator of Section 27.01. They have sufficiently pleaded a primary violation by Enron by specifically alleging the impact of the Nigerian Barge and Power Trades transactions in Enron's year-end 1999 Statements. #85 at ¶¶ 249, 255, 280, 291, 293, 317-18.

In addition Plaintiffs insist they are not required to show how the Barges and/or Power Trades impacted Enron's financial statements, but only that Enron made material misrepresentations. Plaintiffs maintain that numerous false statements are

85

specifically alleged in the complaint. As for intent to defraud, Plaintiffs insist that the rule in *Pacific Mutual* does not apply to determining whether Enron intended to defraud Plaintiffs, but "applies only to situations where misrepresentations are 'repeated to a third party.'" #82 at 15. Plaintiffs here allege direct reliance on misrepresentations made by Enron, not indirect misrepresentations made through Merrill or Tilney; for a primary violation Plaintiffs need only plead facts showing Enron's fraudulent intent to deceive them, as they have. #85, ¶¶ 200-14 (judicial admissions by Glisan, Koenig, Hannon, Despain, Kopper, and Fastow expressly stating Enron's fraudulent intent); ¶¶ 253-91 (intent to defraud by executing the Nigerian Barge Transaction); and ¶¶ 315-33 (intent to defraud by executing the Power Trades Transaction). They point out this Court's earlier ruling that Ponzi scheme allegations also reflect an intent to induce Plaintiffs and other investors into contracts to buy Enron securities. *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 540 F. Supp. 2d 759, 799 (S.D. Tex. 2007). They have alleged that when they first purchased Enron stock in 1997, they reviewed Enron's financial data (including price-to-earnings, price-to-book, and price-to-cash flows ratios and employed models that used, as inputs, data from Enron financial statements. #85 at ¶ 799. Thereafter they also regularly monitored Enron's performance via subscription financial news services such as Bloomberg. *Id.*,

¶¶ 792-95. Had Enron's true financial condition been revealed, Plaintiffs insist they would not have purchased Enron stock during 2000 and 2001. *Id.*, ¶¶ 476-508 (calculations showing that Enron's financial results would have been different if the truth had been told).

As for Merrill Lynch's and Tilney's alleged secondary violation under Section 27.01(d), Plaintiffs claim they have pleaded facts demonstrating that Merrill had actual awareness of the falsity of Enron's representations, especially in the financial statements filed with the SEC. #85, ¶¶ 229-49, 288, 449. *See also* ¶¶ 255-91 (Nigerian Barge Transaction); ¶¶ 293-315 (1999 Power Trades Transaction) "Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness." Tex. Bus. & Com. Code § 27.01(d). They have also, pursuant to the statute, pleaded Plaintiffs' reliance on the primary violator Enron's misrepresentations. Plaintiffs insist the statute requires only reliance on the primary violator's misrepresentation, not on the secondary violator's silence in light of a duty to disclose.

Thus Plaintiffs insist that they have adequately pleaded their statutory fraud claims against Merrill Lynch and Tilney. They maintain that they have adequately identified the misrepresentations in Enron's financial statements for the period ending December 31, 1999 regarding the Nigerian Barge and Power

87

Trades Transactions for the primary fraud violation. They contend that they have also shown Merrill Lynch and Tilney had actual awareness of the planned fraudulent accounting treatment of those two entities, as well as of the purpose of LJM2 to "manage" Enron's balance sheet and to act as a temporary "warehouse" for Enron's assets and the fraud-enabling aspects of the Raptor SPEs. #85, ¶¶ 293-98, 449, 353, 384, 404-06. The complaint has also provided details of Merrill's decision not to disclose Enron's misrepresentations or its own participation in fraud-enabling transactions (¶¶ 243-44), and Merrill Lynch's concealment of documents and other information about the Nigerian Barge and Power Trades Transaction deals that made Enron's accounting treatment deceptive (¶ 267-91, 295-98). The complaint alleges that by Merrill Lynch's silence regarding the fraudulent conduct and accounting, intended to assure more deals from Enron, Merrill Lynch benefitted from Enron's misrepresentations (¶¶ 37, 247 through high fees and continued business and fees on other Enron engagements; ¶ 277, Merrill Lynch's compensation for the Barge transaction; ¶ 299, promise of $17 million for participating in the Power Trades Transaction; and ¶ 334-44, benefits from placing and participating in LJM2).

Plaintiffs also maintain that they have adequately pleaded their conspiracy claims against Merrill and Tilney. As discussed, they have asserted underlying fraud claims against Enron,

including the filing of false SEC reports, and explained how they were false. # 85, ¶¶ 476-508 (misrepresentations in the financial statements); ¶¶ 191-214 (Enron knowingly and purposely made the misrepresentations with the intent to defraud Plaintiffs and to deceive the rating agencies and to induce investors, including Plaintiffs, to rely on them); ¶¶ 253-91 (intent to defraud by executing the Barge Transaction); ¶¶ 315-33 (intent to defraud by executing Power Trades Transaction); ¶¶ 26, 315-30 (intent to defraud by "cooking" year-end financial results).

They have also provided facts demonstrating Merrill Lynch's and Tilney's agreement ("meeting of the minds") to conspire with Enron. Civil conspiracy can be proven by circumstantial evidence and reasonable inference." *In re Performance Nutrition, Inc.*, 239 B.R. 93, 113 (Bankr. N.D. Tex. 1991). The agreement among conspirators may be informal and tacit, established by circumstantial evidence. *International Bankers Life Ins. Co. v. Holloway*, 368 S.W. 2d 567, 581-82 (Tex. 1963). The complaint discusses facts giving rise to a strong inference of a meeting of the minds between Merrill Lynch and Enron over the firing of analyst John Olson in May 1998, including Tilney's involvement. #85, ¶¶ 420-51, 439. Even more, the complaint discusses Defendants' conduct in the Nigerian Barge and Power Trades Transactions, raising a strong inference of their agreements with Enron that had, as the object of the conspiracy, the filing of

89

false and unlawful SEC reports to deceive the investing public
about Enron's actual financial condition. The alleged facts show
that Merrill Lynch and Tilney were fully aware of the fraudulent
accounting treatment that Enron planned for the Nigerian Barge
transactions (¶¶ 255-58, generally ¶¶ 253-330). They describe
Merrill Lynch's internal documentation referring to a "handshake
deal"[48] which concealed the accounting gimmickry (¶ 259).
Allegedly Defendants were warned by James Brown of Merrill Lynch
that participation in the Barge Transaction created "reputational
risk," #85, ¶ 262, causing Enron to create phoney "deal documents"
to conceal the true nature of the transaction (¶¶ 255-71). The
complaint describes agreements by Enron with Merrill and Tilney
that demonstrate the real nature of the Power Trades Transaction
and their concealment of it, which permitted Enron's engineered
accounting treatment (¶¶ 293-301). Allegations relating
specifically to Tilney are in ¶¶ 228-34 (the close relationship
of Tilney, serving as Merrill Lynch's senior Enron relationship
manager, with Enron's Jeff McMahon and Andrew Fastow, while
Tilney's wife was a senior vice president at Enron), 234 (a
Merrill Lynch attorney testified that Tilney exerted a lot of
undue pressure to get the deals closed), 260 (Merrill Lynch
managing directors James Brown and Jeffrey Kronthal testified that

---

[48] The complaint notes that Neal Batson also concluded that
nondisclosure of the "handshake deal" enabled the fraudulent
accounting treatment of the Barge Transaction. (¶ 289-90).

Tilney was a very strong supporter of the Nigerian Barge Transaction), 262-63 (Brown warned Enron and Tilney of "reputational risk" from participating in Barge Transaction), 247-48 (Tilney's compensation benefit for his agreement to the conspiracy). Furthermore, Tilney's refusal to answer questions about the Barge Transaction and his agreement to conspire with Enron on Fifth Amendment privilege grounds supports the inference that he agreed to conspire with Enron.[49] (¶ 328) Tilney's refusal to testify also demonstrates that Tilney is liable in his personal capacity since by agreement with the DOJ, dated September 7, 2003, Merrill Lynch accepted "responsibility for the conduct of its employees giving rise to any violation in connection with the Year-End 1999 Transactions," yet Tilney has not taken advantage of this shield provided by the agreement. (¶ 319-20) The complaint also accuses Tilney of involvement in, and of drafting

---

[49] The Court notes that the Fifth Circuit has long held that

"while a person may refuse to testify during civil proceedings on the ground that his testimony might incriminate him . . . his refusal to testify may be used against him in a civil proceeding." *Farace v. Indep. Fire Ins. Co.*, 699 F. 2d 204, 210 (5th Cir. 1983). Thus, although a jury in a criminal case is not permitted to draw adverse inferences based on a defendant's invocation of his Fifth Amendment rights, it is well-settled that "the Fifth Amendment does not forbid adverse inferences against parties to civil action when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318 . . . (1076).

*Hinojosa v. Butler*, 547 F. 3d 285, 291 (5th Cir. 2008).

91

documents for, the conflict-ridden, fraud-enabling LJM2, in which he personally invested. (¶¶ 343-44, 359-60) Fastow testified that Enron, at his direction, made "an agreement with Merrill Lynch to do transactions that intentionally caused Enron's financial statements to be misleading." (¶ 333).

While Defendants argue that Merrill and Tilney did not agree to enter into "a giant, multi-year scheme," Plaintiffs respond that they have alleged that Merrill and Tilney each "conspired with Enron and participated in various overt acts that aided in the conspiracy to allow Enron to illegally file false financial statements with the Securities and Exchange Commission." ¶ 22. The law is well established that "[i]t is not required that each and every act of a conspirator be shown to have been in concert with the others. . . ." *Holloway*, 368 S.W. 2d at 581-82. A defendant need only participate in one overt act in furtherance of the conspiracy to result in that defendant's liability for all acts by all co-conspirators. *Akin v. Dahl*, 661 S.W. 2d 917, 921-22 (Tex. 1962)("once a civil conspiracy is found, each co-conspirator is responsible for the action of any other co-conspirators which is in furtherance of the unlawful combination"); *Bunton v. Bentley*, 176 S.W. 3d 1, 15 (Tex. App.-Tyler 1999)("each element of the cause of action . . . is imputed to each co-conspirator), *remanded in part on other grounds*, 94 S.W. 3d 561 (Tex. 2002).

92

Plaintiffs insist they are stating direct simple fraud claims against Merrill Lynch, not claims based on misrepresentations repeated by a third party. Thus *Pacific Mutual* (defendant's audit representations were repeated by the company in the company's (not the auditor's) SEC filings)[50] and *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 323-24 (5th Cir. 2002)(plaintiff bondholders sued an analyst based upon representations that the analyst made to the company which issued the bonds, not directly to the plaintiffs) are not applicable. They rely on *Quaak v. Dexia, S.A.*, 445 F. Supp. 2d 130 (D. Mass. 2006)(holding analysts' employer liable for false analyst reports where the analysts were not alleged to be at fault, were not named as defendants, did not know about the falsities, but served "as an unwitting pawn in an overall chess game" when they worked from false data provided by the employer).

Plaintiffs have alleged that Merrill Lynch had actual knowledge of Enron's reported false and misleading financial results and intended to defraud investors by means of deceptive analyst reports. See ¶¶ 229-49 (Merrill Lynch's general knowledge of Enron's finances), 270-71, 288 (Merrill Lynch's actual knowledge of planned fraudulent accounting treatment of the Nigerian Barge Transaction), 293-98 (Merrill Lynch's actual

---

[50] Plaintiffs maintain that *Pacific Mutual*, 51 S.W. 3d at 578, addresses only misrepresentations made through an intermediary that are intended to influence a third person's conduct.

knowledge of the fraudulent accounting treatment of the Power Trades Transaction), 449 (Merrill Lynch's actual knowledge that LJM2's purpose was to "manage" Enron's balance sheet). The claim that Merrill Lynch's control of its securities analysts (as in firing of Jon Olson as its Enron-coverage securities analyst, under pressure from Enron and replacement of him with an analyst with more favorable reviews of Enron) and of the information they disseminated about Enron demonstrates Merrill's intent to defraud investors. Thus, as in *Quaak*, 445 F. Supp. 2d 130, the intent or scienter of the investment bank issuing the report, rather than the scienter of the individual analyst, is paramount. The statements of the analyst are imputed to his employer where the employer "used the analyst as a conduit by making false and misleading statements to the analyst with intent that the analyst publish it to the market." *In re Enron Corp.*, 465 F. Supp. 2d at 724. *See* #85, ¶¶ 419-51.

Plaintiffs also allege that they relied on actionable omissions in Merrill Lynch's analyst reports. They claim Merrill Lynch promulgated two types of deceptive statements where Merrill, rather that the analysts, would be responsible for the deceit: financial data about Enron that Merrill Lynch knew were false and "buy" recommendations in the reports that were not merely "opinions," but part of the alleged scheme to misrepresent Enron's

financial condition and deceive investors.[51]  *See, e.g.*, Merrill
Lynch's January 18, 2000 report, in which Merrill Lynch had the
analyst use information about Enron that only Merrill Lynch, from
its participation in the Nigerian Barge and Power Trades
Transactions, knew to be false.  Merrill Lynch said nothing while
its analysts issued reports containing false data and deceptive
recommendations.   Thus Plaintiffs argue that they sufficiently
allege Merrill Lynch's fraud.  *See Barrie v. Intervoice-Brite,
Inc.*, 397 F.3d 249, *modified and reh'g denied*, 409 F.3d 653 (5th
Cir. 2005)(where one defendant knew that the statement of another
defendant was false, but the first defendant remained silent
despite his knowledge of the others' misrepresentation, the first
defendant also was liable).   Plaintiffs explain that (1) Merrill
Lynch knew that the substance and recommendations of Merrill
Lynch's analysts were available and reported to Plaintiffs and
other investors[52]; and (2) plaintiffs relied upon those reports as
part of the "total mix" of information utilized for investment
decisions.  #85, ¶ 795.

---

[51] *Quaak*, 445 F. Supp. 2d at 140-43 (intentionally deceptive
recommendations are actionable misrepresentations).

[52] *See* ¶ 795 ("Defendants knew that the substance and
recommendations contained in their analyst reports were available
and reported to Plaintiffs and other investors both in subscriber
investment information services and on publicly disseminated
outlets such as Yahoo! Finance.  Merrill, accordingly, both [*sic*]
knew that their continuing portrayal of Enron as a growing, well-
managed and creditworthy company affected the market for Enron
securities.").

Finally Plaintiffs argue that a decision on the exemplary damages cap is premature since it does not affect whether the causes of action are viable and would serve no useful purpose.

### Tilney's Reply (#89)

Tilney points out that despite Plaintiffs' disclaimer, ¶ 65 of the complaint addresses purchases by Plaintiffs American National Property and Casualty Company and Standard Life Accident Insurance Company prior to May 1998. Given Plaintiffs' statement that they do not pursue claims prior to May 1998 and the fact that they have already submitted two amended complaints, the Court will hold them to their word by barring any potential claims by Plaintiffs against Merrill Lynch and Tilney before that date.

Tilney reiterates that Plaintiffs have failed to allege with particularity for their conspiracy claim an underlying fraud committed by Enron (actual reliance, facts sufficient to show where in Enron's financial statements Enron made misrepresentations, and facts sufficient to plead Enron's intent to induce reliance). They have also failed to allege a "meeting of the minds" between Tilney and Enron to enter into the massive Ponzi scheme conspiracy. The only conspiracy claims against Tilney relate to the barge and energy transactions at the end of 1999, Plaintiffs do not claim that Tilney conspired with other financial institutions or had any knowledge of any allegedly

fraudulent conduct involving them. Allegations about Tilney's personal relationships with Enron executives, especially Fastow, do not establish or even give rise to a reasonable inference that Tilney had knowledge of Enron's transactions with other financial institutions.

As for his assertion of the Fifth Amendment privilege at his deposition, "the prevailing rule [is] that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify *in response to probative evidence offered against them.*" *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)(emphasis added). Tilney argues that this case is not yet at the proof stage, so the rule does not apply. Moreover, he was only questioned about the barge transaction, so if applicable, it would only be with respect to that transaction. Furthermore, Merrill Lynch's agreement with the DOJ to accept responsibility for any wrongdoing by its employees does not give the employees immunity for their actions.

### Merrill Lynch's Supplemental Memorandum (#90)

Merrill Lynch's second memorandum is submitted in further support of its motion to dismiss the Second Amended Complaint.

It, too, reiterates its motion for dismissal of claims against it based on pre-May 1998 purchases.[53]

---

[53] Merrill Lynch additionally argues that two Plaintiffs, American National Property and Casualty Company and Standard Life Accident Insurance Company, who made purchases prior to May 1998,

Regarding the aiding and abetting claim against Merrill Lynch under Section 27.01(d), Merrill Lynch asserts that Plaintiffs fail to plead actual reliance on Enron's misrepresentations with particularity--who relied on a specified misrepresentation, which purchases of common stock such plaintiffs made on a specific misrepresentation, and how the representation was false. *In re General Motors Corp. Anti-Lock Brake Prods. Liab. Litig.*, 966 F. Supp. 1525, 1535 (E.D. Mo. 1997)(dismissing claims because plaintiffs alleged reliance in a conclusory manner without

---

did not make any post-May 1998 purchases and thus those two should be dismissed. #85 at ¶ 65.

While ¶ 65 refers only to 1997 purchases by these Plaintiffs and by American National Investment Accounts, it does not discuss any other years. In contrast, ¶ 799 reiterates the specific purchases of 1997 and further states,

Plaintiffs made various other purchases from time to time in Enron stock in order to adjust portfolio balances, to accommodate cash balances and for other various investment reasons. These other purchase dates included purchases of 400 shares on January 15, 1998; 2300 shares on February 10, 2000; 1600 shares on February 21, 2001; 700 shares on February 27, 2001; 1000 shares on March 14, 2001; 500 shares on August 29, 2001; and 1000 shares October 3, 2001. At each of these later purchase dates, Plaintiffs' investment decision-makers relied upon their historic position in Enron equities and the continued optimistic reported outlook for Enron.

See also ¶¶ 74, 111, 138, 139, 142, 172, 175. Because the complaint does not identify which Plaintiffs purchased stock when, the Court is unable to determine who bought what or to dismiss any party, based solely on the pleadings. The motion to dismiss Plaintiffs American National Property and Casualty Company and Standard Life Accident Insurance Company may be raised on summary judgment, when evidence can be presented.

specifying which of the eight plaintiffs relied on which alleged misrepresentation.), *aff'd sub nom. Biehl v. Gen. Motors Corp.*. 172 F.3d 623 (8th Cir. 1999). Instead they only allege that collectively they had "access" to Enron's financial reports through Bloomberg and considered it when purchasing common stock as part of the "total mix" of available information about the company.

Merrill Lynch asserts that "total mix" of public information is relevant only in a fraud-on-the-market context,[54] a presumption of reliance which this Court has rejected in connection with Texas state-law fraud claims. *In re Enron Corp.*, 284 F. Supp. 2d 511, 644 (S.D. Tex. 2003)("Texas law requires actual reliance."). Plaintiffs' only allegations of actual reliance relate not to their common stock purchases, but to the purchase of an Enron bond on September 28, 2001 by Ann LeMire, an employee of Plaintiff American National Insurance Company, who allegedly "relied upon

---

[54] Actually "total mix" is part of the test for materiality under the federal securities laws. *Basic v. Levinson*, 485 U.S. 224, 231 (1988)("[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"), *citing TC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). *See also Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 213-14 (5th Cir. 2004)("A *fact* is material 'if there is a substantial likelihood that a reasonable shareholder would consider it important' in making an investment decision. . . . For an *omission* to be material, 'there must be a *substantial* likelihood that the disclosure of the omitted fact would have been viewed by the *reasonable investor* as having *significantly* altered the 'total mix' of information made available.'")(emphasis in original).

various financial ratios reported in Bloomberg," including "Enron's year-end 2000 reported debt level, interest coverage, and cash flows." Since recovery under Section 27.01 is limited to losses on common stocks, this allegation of reliance for the purchase of the bond is irrelevant to the claim for aiding and abetting statutory fraud.

Another basis for dismissal of the statutory fraud claim is a failure to plead a misrepresentation by Enron, as instructed by the Court. Even now, with the addition of allegations regarding their expert, Paul Regan, they have only reiterated their earlier deficient allegations composed of general references to Enron's aggregate operating cash flow, interest expense, and total debt as reflected in Enron's 10-K reports for 1999 and 2000, and 10-Q reports for 2001. *In re Enron Corp.*, 490 F. Supp. 2d 784, 820-21 (S.D. Tex. 2007)("More than a 'general reference' to Enron's 1999 financial reports and SEC filings is needed; although Plaintiffs plead specific figures for sham 'earnings' from two transactions with Merrill Lynch, they fail to point to where in Enron's financial documents Enron (and its auditor) misrepresented these amounts. . . . Alternatively if Plaintiffs are alleging that the "true" numbers were omitted by Enron, Plaintiffs need to point to 'the place in which the omissions should have appeared and the way in which the omitted facts made the misrepresentations misleading.' [citations omitted]").

100

Nor, insists Merrill Lynch, have Plaintiffs adequately pleaded Enron's intent to induce reliance. It insists that *Pacific Mutual Life* is not limited to misrepresentation through an intermediary, as Plaintiffs urge; instead, the court held that to plead fraudulent intent properly, plaintiffs must show that the "maker of the misrepresentation" had "information that would lead a reasonable man to conclude that there is an especial likelihood that it will reach those persons and influence their conduct." 51 S.W. 3d at 581. Merrill Lynch contends that Plaintiffs' allegations of intent (#85, ¶¶ 201-06) are similar to those rejected by the Texas Supreme Court as deficient in *Pacific Mutual*, where the plaintiffs asserted (1) "Ernst & Young 'knew' that investors . . . would rely on the information in the audit report"; (2) "it was 'known and expected' by public accounting firms like Ernst & Young that documents like the prospectuses and proxy materials at issue [were] widely disseminated throughout the investment community and [that] investors rely upon information from these materials when evaluating investments in securities"; and (3) "investors like Pacific commonly rely on representations made in SEC-filed documents in evaluating securities backed by an entity . . . and that Ernst & Young's contention that it did not intend Pacific to rely on the audit report in buying the InterFirst notes was contrary to commonly accepted and firmly established practices in the investment community." *Id.* at 580-

101

81. The Texas Supreme Court explained, "General industry practice or knowledge may establish a basis for foreseeability to show negligence, but it is not probative of fraudulent intent." *Id.* Instead, "plaintiffs must allege and show more than that information was available in the investment community, pursuant to industry custom, and that it was foreseeable that it would reach them; Plaintiffs must show that Plaintiffs' reliance must be 'especially likely' and justifiable, and that the transaction sued upon must be the type the defendant contemplated." *Enron*, 490 F. Supp. 2d at 824, citing Pacific Mutual (internal quotations and citations omitted).

As for Plaintiffs' common law fraud claim against Merrill Lynch, which is based solely on alleged misrepresentations and omissions in Merrill Lynch's analyst reports, it should be dismissed because, among other things, (1) Plaintiffs fail to plead specific facts that demonstrate that their employees actually reviewed and relied upon Merrill Lynch's analyst reports; (2) Plaintiffs cannot allege that any Merrill Lynch analyst acted with scienter; and (3) Plaintiffs do not adequately allege that Merrill Lynch's analysts had an intent to induce Plaintiffs to purchase Enron securities. Merrill Lynch previously argued that Plaintiffs fail to allege specific misrepresentations or omissions in these analyst reports with particularity, that they do not explain why the statements are false, and that many of the

statements are nonactionable opinions.

Merrill Lynch also argues for dismissal of the common law fraud claim against it because (1) Plaintiffs have not met their burden to plead reliance with particularity, but only that the analyst reports were "part of the 'total mix' of information utilized for investment decisions," (2) they cannot allege that the analysts had scienter as required under *Southland Securities Corp. v. INSpire Insurance Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004)("appropriate to look as the state of mind of the individual corporate official or officials who make or issue the statement . . . rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.")[55]; and (3) they fail to allege that the analysts had an intent to induce reliance when they made misrepresentations in their research reports.

Merrill Lynch objects to Plaintiffs' reliance on *Quaak*, which

---

[55] The Court notes that *Southland* addressed claims brought under the PSLRA and § 10(b), not Texas law. As the Fifth Circuit stated in *Flaherty & Crumrine,* 565 F.3d at 213, common-law fraud claims are not subject to the strong inference of scienter standard imposed by the PSLRA, although Rule 9(b) "incorporates an element of scienter." *Id.*, *citing Dorsey v. Portfolio Equities, Inc.*, 540 F. 3d 333, 341 (5th Cir. 2008). In order to plead adequately fraudulent intent in the context of a state-law securities fraud claim, a plaintiff must allege specific facts to support an inference of fraud. *Flaherty & Crumrine*, 565 F.3d at 213. "'Alleged facts are sufficient to support such an inference if they either (1) show a defendant's motive to commit securities fraud or (2) identify circumstances that indicate conscious behavior on the part of the defendant.'" *Id., quoting Herrmann Holdings, Ltd. v. Lucent Technologies, Inc.*, 302 F.3d 552, 565 (5th Cir. 2002).

103

is a non-binding decision from the United States District Court for the District of Massachusetts and contrary to the Fifth Circuit's holding in *Southland*.

As for Plaintiffs' common-law conspiracy claim against Merrill Lynch, Merrill Lynch insists it should be dismissed for two reasons. First, Plaintiffs fail to allege with particularity (1) an underlying fraud claim for a primary violation by Enron, (2) actual reliance on Enron's misrepresentations, (3) facts showing where in Enron's financial statements Enron made misrepresentations about the Merrill Lynch transactions, and (4) facts showing Enron's intent to induce reliance.

Second, Merrill Lynch contends that Plaintiffs concede that the conspiracy they assert against Merrill Lynch is limited to the Nigerian Barge and Power Trades Transactions of December 1999 and to the harm resulting from only those two transactions, not from a larger "giant Ponzi scheme."[56] With regard to the latter,

---

[56] In their Response, Merrill Lynch maintains that Plaintiffs acknowledge that the complaint does not assert facts showing that Merrill Lynch had any knowledge of any other financial institutions' allegedly fraudulent conduct. Moreover after Merrill Lynch argued that Plaintiffs alleged a "giant, multi-year scheme," Plaintiffs declared that they "of course, made no such claims" and explained their use of the term, "Ponzi scheme," was intended to "merely describe[] a method of perpetuating a fraud. . . . [A] 'Ponzi scheme' describes a plan whereby increasing amounts of 'new' money is used to pay interest or dividends to investors, which in turn fools both current and potential investors into believing the company is doing well." #82 at 25 and 27. Merrill Lynch contends, "Although the law of conspiracy allows plaintiffs to hold a defendant jointly and severally liable for harm caused by its co-conspirator, that scope of liability is not so broad as to

Merrill Lynch maintains, Plaintiffs must plead specific facts demonstrating reliance for each security at issue purchased. Instead they address only American National Insurance Company and

---

encompass damages resulting from a co-conspirators acts committed in furtherance of an unrelated conspiracy about which the defendant knew nothing." #90 at 18-19.

The Court notes that in Plaintiffs' response, they point out that Defendants have not specified any allegations in the complaint that Merrill or Tilney conspired with "'multiple financial institutions.'" #82, p. 24. They have alleged that Merrill and each Defendant "agreed to a concert of action to commit the illegal act of falsifying Enron's publicly filed and disseminated financial results." *Id.* They also claim that "plaintiffs need not plead that Merrill or Tilney knew all aspects of Enron's conduct, such as dealings with 'other institutions.'" *Id.* at 24-25. As further explained later in the response, Plaintiffs state that they do not claim that Merrill and Tilney did not agree, as the object of the conspiracy, to enter into "a giant, multi-year scheme"; "rather, Plaintiffs allege that Merrill and Tilney each 'conspired with Enron and participated in various overt acts that aided in the conspiracy to allow Enron to illegally file false financial statements with the Securities and Exchange Commission. . . . The law is clear, 'It is not required that each and every act of a conspirator be shown to have been in concert with others . . . ' *Holloway*, 368 S.W. 2d at 581-82 ["The general rule is that conspiracy liability is sufficiently established by proof showing concert of action *or other facts and circumstances from which the natural inference arises that the unlawful overt acts were committed in furtherance of common design, intention, or purpose* of the alleged conspirators." [emphasis added by the Court]]; *Lesikar v. Rappeport*, 33 S.W. 3d 282, 302 (Tex. App.–Texarkana 2000, pet. denied)." #82 at 27. It appears to the Court that Plaintiffs have not abandoned claims to a larger conspiracy extending beyond the agreement between Enron and the Merrill Lynch Defendants to doctor Enron's financial reports to others sharing the common purpose. As discussed above, the co-conspirators need not meet together or know each other or know of and participate in all overt acts in furtherance of the conspiracy; they need only have a "meeting of the minds" with another conspirator and share the common object and purpose of the conspiracy, here the filing of false and unlawful SEC reports to deceive the investing public about Enron's actual financial condition to keep the Ponzi scheme afloat and enrich themselves in the process.

one employee, Ann LeMire, about one security, for the Enron bond purchased in 2001. There are no allegations about the other Plaintiffs or their common stock and paper purchases. Nor do they allege that LeMire actually relied on Enron's 1999 10-K when Plaintiff American National Insurance Company decided to purchase the bond in 2001; instead they assert that she "relied on various financial ratios as reported on Bloomberg, and that "among those that specifically influenced her decision that day was Enron's then 2000 annually reported debt level, interest coverage and cash flows." Because Plaintiffs do not allege that LeMire relied on Enron's misrepresentations about the Merrill Lynch transactions (which purportedly affected Enron's 1999 financial statements), but on the 2000 financial information, Plaintiffs cannot recover from Merrill Lynch for any losses resulting from LeMire's bond purchase. Plaintiffs have not responded to Merrill Lynch's argument that they failed to say who purchased the 2001 commercial paper or specifically what misrepresentation that unnamed employee relied upon. Instead they allege that it was their practice to review trends in operating cash flows, revenue and net income and that they reviewed a pre-approved list of commercial paper maintained by them. Enron appeared on that list as early as 1996, three years before the barge and energy trades transactions with Enron in December 1999. Merrill Lynch contends that Plaintiffs cannot claim they relied on misrepresentations made in 1999 when

106

they decided in 2001 to purchase the commercial paper off the pre-approved company list that had included Enron since 1996.  Nor did Plaintiffs allege reliance for their 2000 and 2001 common stock purchases.  They do not identify who relied on Enron's financial statements, for which plaintiff the person worked, and on which misrepresentation or omission the person relied.  They only conclusorily assert that Plaintiffs had access to Enron's financial information via an online news service, which falls far short of demonstrating actual reliance.

Relating to the conspiracy claim also, Plaintiffs must allege a misstatement; as noted, they fail to do so because they (1) rely on expert testimony that is not specific to the barge and energy trades transactions; and (2) repeats old allegations about the amounts Enron improperly recorded as earnings as a result of these transactions, which the Court has already rejected.  They also have failed to allege that Merrill Lynch and Enron had a "meeting of the minds" about the "giant Ponzi scheme" or facts showing that Merrill Lynch knew of or agreed to participate in any larger scheme involving other banks.  Moreover, Merrill Lynch objects that Plaintiffs cannot allege a meeting of the minds with the firing of Olson in May 1998, but then allege wrongdoing in the December 1999 barge and energy transactions.  It is black letter law that the parties "must be aware of the harm or wrongful conduct when they commence the combination or agreement, not years

after the conspiracy allegedly began. *In re Enron Corp.*, 284 F. Supp. 2d at 644. Olson's firing in an overt act, but Plaintiffs fail to identify the object of the conspiracy that this overt act was intended to further. "[M]erely proving a joint intent to engage in the conduct that resulted in the injury is not sufficient to establish a cause of action for civil conspiracy." *Juhl v. Arlington*, 936 S.W. 2d 640, 644 (Tex. 1996). Even if Merrill Lynch and Enron acted together to terminate Olson, such joint action would not establish that his termination was unlawful or that his termination furthered an unlawful purpose about which Merrill Lynch and Enron were in agreement.

Finally, regarding recovery of exemplary damages in excess of the statutory cap, Plaintiffs' objection that now is not the appropriate time to decide this issue lacks legal authority. Not only are costs a concern to all parties at all stages of litigation, but the legislative history for the cap demonstrated the Texas legislature imposed the limitation because of concern that "[m]any business [*sic*] are denied their day in court" because the "threat of large punitive damage awards is so great that many prudent business owners agree to settle a case that they would rather take to court." House Research Org., Bill Analysis, Tex. S.B. 25, 74th Leg., R.S. at 5 (1995)(available at http://www.hro. house.state.txs.us/PDF/ba74R/SB25.PDF. Moreover, since the presumption is in favor of limitation of exemplary damages, when

a plaintiff seeks to circumvent the cap, he must bear the burden of *pleading* and proving the elements of an exception. *Hall v. Diamond Shamrock Refining Co., L.P.*, 82 S.W. 3d 5, 22 (Tex. App.--San Antonio 2001)("If an intentional tort and/or malice is not pled and proven by the plaintiff, the cap automatically applies."), *rev'd on other grounds*, 168 S.W. 3d 164 (Tex. 2005); *Seminole Pipeline Co. v. Broad Leaf Partners, Inc.*, 979 S.W. 2d 730, 759 (Tex. App.--Houston [14th Dist.] 1995)("If an intentional tort and/or malice is not pled and proven by the plaintiff, the cap automatically applies."). Merrill Lynch urges that there is no reason to defer ruling on the issue of damages in excess of the statutory cap, especially when Plaintiffs acknowledge that neither of the exceptions on which they rely actually applies against Merrill Lynch.

### Court's Ruling

**A. Pre-May 1998 Claims**

Plaintiffs have clearly and unambiguously stated that they do not pursue any claims against Merrill Lynch or Tilney based on Enron securities purchases prior to May 1998. The Court will hold them to their word and accordingly finds the motion to dismiss such claims to be moot.

**B.   Common-Law Fraud Against Enron**

The Court finds that Plaintiffs have adequately alleged common law fraud against Enron, including material

109

misrepresentations or omissions, and/or fraudulent concealment by
Enron in specified SEC-filed Form 10Ks and Form 10Qs, as well as
intent to induce reliance and actual reliance by Plaintiffs (1)
to state a plausible separate claim against Merrill Lynch, (2) to
serve as the requisite primary violation under § 27.01(a) to
support the derivative aiding and abetting claim under Section
27.01(d) against Merrill Lynch and Tilney,[57] and (3) to constitute
the underlying violation for Plaintiffs' claim of civil conspiracy
to commit fraud against both Defendants.

*1. Fraud by Affirmative Misrepresentation*

As noted, Rule 9(b) requires that "a party must state with
particularity the circumstances constituting fraud or mistake.
Malice, intent, knowledge, and other conditions of a person's mind
may be alleged generally." Nevertheless, "[w]hat constitutes
'particularity' will necessarily differ with the facts of each
case . . . ." *Benchmark Electronics, Inc. v. J.M. Huber Corp.*,
343 F.3d 719, 724 (5th Cir. 2003)(*citing Guidry v. Bank of LaPlace*,

---

[57] Section 27.01 contains elements of common law fraud, in
particular the same elements of reliance and materiality with
common law fraud. *Bykowicz v. Pulte Home Corp.*, 950 F.2d 1046,
1050 (5th Cir. 1992)(citing *Haralson v. E.F. Hutton Group, Inc.*, 919
F.2d 1014, 1025 n.4 (5th Cir. 1990), *abrogated on other grounds*,
*Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001)), *cert. denied*,
506 U.S. 822 (1992). A "misrepresentation" is a falsehood or
untruth with the intent and purpose to deceive. *Vela v. Marywood*,
17 S.W. 3d 750, 760 (Tex. App.--Austin 2000, pet. denied). In the
context of fraud, a misrepresentation is the making of a false
statement of fact or a false expression of opinion by one claiming
or implying special knowledge. *Id.*, citing *Trenholm v. Ratcliff*,
646 S.W. 2d 927, 930 (Tex. 1983).

954 F.2d 278, 288 (5th Cir. 19992)), *modified on other grounds*, 355 F.3d 356 (5th Cir. 2003). *See also United States ex rel. Wilkins v. N. Am. Constr. Corp.*, 173 F. Supp. 2d 601, 613 (S.D. Tex. 2001)("[T]he particularity demanded by Rule 9(b) differs with the facts of each case[.]"). "[C]ourts have emphasized that Rule 9(b)'s ultimate meaning is context specific." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997). The Court finds that the detailed factual allegations in the complaint state against Enron a plausible claim for fraud, though of a distinctive type.

The crucial goal of Enron was concealment of its actual financial condition. The complaint's allegations describing the frustrations of John Olson, an experienced analyst, are significant and relevant on a larger scale:

> Olson testified in his sworn statement that the true status of Enron's trading operations was expertly hidden in its financial statements (if it was there at all), "You have no idea of--there were so many moving parts, you would just see a single line item saying earnings before interest and taxes . . . . You could not tell how good or bad any particular part of the business in trading was doing."

#85, ¶ 81.

The complaint targets what has been widely recognized as the core of the Enron scheme to defraud. As pleaded in the complaint, the heart and the engine of Enron's Ponzi scheme to defraud investors and credit rating agencies were Enron's manipulated accounting treatments by wrongful use of unconsolidated, off-

balance sheet SPEs and partnerships created by Enron to conceal Enron's debt and to inflate its cash flow, which in most cases was actually comprised of disguised loans, i.e., debt owed to its investor banks. The complaint here is not composed of what Rule 9(b) is intended to preclude, i.e., merely speculative or conclusory allegations; the complaint asserts the particular circumstances of the fraud, supporting facts demonstrating the time, place, and nature of the fraudulent conduct, and specifies who the perpetrators were, what they did, the Defendants' participation, and what should have been clearly reported on Enron's books and in specified SEC-filed documents. In other words it exposes in detail the fraud that was intentionally omitted from or concealed in the SEC-filed documents. The allegations in the complaint identify and explain that many of the key entities employed by Enron and alleged co-conspirators to effectuate their scheme were not independent of Enron and did not have the requisite outside 3% equity interest, with that equity at risk; in contrast, they were controlled by Enron so that they did not qualify and should not have been utilized for nonconsolidation and off-balance sheet treatment. It was precisely because these entities were improperly off-balance sheet that they were also not consolidated into Enron's public financial reports. Thus the misrepresentations in the SEC-filed reports were material omissions of liabilities, i.e., hidden, unreported

112

contingent guarantees or obligations of these off-balance sheet entities, or else they were manufactured cash flow and revenue figures created without basis to meet Wall Street expectations or derived from financially engineered transactions like sham "sales" of undesirable assets over which Enron actually retained control or from loans that it disguised as trades yielding income, as admitted by Enron's former officers. The judicial admissions of Kenneth Rice, Kevin Hannon, Richard Causey, Andrew Fastow, Ben Glisan, Mark Koenig, Timothy Despain, and Michael Kopper, discussed and quoted in the complaint, support Plaintiffs' Ponzi scheme allegations that Enron intended to deceive investors like Plaintiffs and falsified its SEC-filed financial statements with the knowledge that the investing public justifiably and reasonably relied upon these filings. *See, e.g.,* #85 at ¶¶ 69, 190-212.

The alleged misrepresentations are exposed by the complaint's contrast of material monetary discrepancies between (1) the representations of income and debt claimed by Enron that should have been clearly disclosed in particular SEC-filed documents, which Plaintiffs identify by date along with descriptions of the underlying transactions that helped falsify them and (2) the starkly contrasting approximate amounts calculated by Plaintiffs' experts after examining the evidence. *See, e.g.*, #85, ¶¶ 41-42, 445, 476-508, 798. The Court finds that both sets of figures are defined in approximate dollar values sufficient to meet Rule 9(b)

113

particularity standards. The Court notes that Merrill Lynch and
Tilney as of now have not challenged the competency, reliability
or relevancy of Plaintiffs' experts nor their calculations. The
Court finds it reasonable to infer that these experts will explain
in their reports and at trial what they found, where, and how they
reached their conclusions. Moreover Plaintiffs' reliance on
experts' analyses to support the factual allegations, to decipher
the complicated ways that the SEC-filed Form 10-Ks and 10-Qs were
false reports, and to put dollar values on concealed liabilities
and manipulated income from each detailed transaction is highly
appropriate in this case. Generally experts are necessary to
explain the intricacies of accounting and securities fraud. It
took years for financial experts to unravel the complex and
convoluted mechanisms used to conceal Enron's actual financial
status, not discernible from the face of Enron's SEC-filed
documents. Defendants will have a full opportunity to challenge
their credentials and conclusions at trial.

Defendants argue that Plaintiffs fail to plead intent to
induce reliance as defined under *Pacific Mutual,* 51 S.W. 3d 573,
578-80 (Tex. 2001) "Texas jurisprudence is entirely consistent
with section 531's [of the *Restatement (Second) of Torts*] reason-
to-expect standard, which requires a degree of certainty that goes
beyond mere foreseeability."). "[T]he alleged fraudfeasor must
'have information that would lead a reasonable man to conclude

114

that there is *an especial likelihood* that it will reach those
persons and *will influence their conduct*." *Pacific Mutual*, 51
S.W. 3d at 580, citing Restatement (Second) of Torts § 531 cmt.
d (1977). Furthermore, "even an obvious risk that a third person
will rely on a representation is not enough to impose liability.
. . . General industry practice or knowledge may establish a basis
for foreseeability to show negligence, but it is not probative of
fraudulent intent." *Id.* at 581.

However, direct evidence of fraudulent intent is unusual and
highly probative. Here the complaint demonstrates directly
Enron's intent to induce reliance on its financial reports by
credit rating agencies and by investors, including Plaintiffs, by
quoting passages from a number of former Enron officers'
Cooperation Agreements and Plea Agreements,[58] which describe their

---

[58] While a plea agreement or cooperation agreement offered for
the truth of the information contained in it is hearsay, the Ninth
Circuit has found such instruments admissible under Federal Rule of
Evidence 807: "A statement not specifically covered by Rule 803 or
804 but having equivalent circumstantial guarantees of
trustworthiness, is not excluded by the hearsay rule if the court
determines that (A) the statement is offered as evidence of a
material fact; (B) the statement is more probative on the point for
which it is offered than any other evidence which the proponent can
procure through reasonable efforts' and (C) the general purpose of
these rules and the interests of justice will best be served by
admission of the statement into evidence." *In re Slatkin*, 525 F.3d
805, 812 (9th Cir. 2008). The Ninth Circuit found that Slatkin's
plea agreement met these requirements: (A) it was offered as
evidence of a material fact, i.e., that he operated a Ponzi scheme
for fifteen years and his actual fraudulent intent in doing so; (B)
that as direct proof, it was more probative on these issues than
any other evidence the plaintiff bankruptcy trustee could obtain;
and (C) admission of the plea agreement furthers the general

115

knowing participation in a Ponzi scheme are more probative of
fraudulent intent than any circumstantial evidence. *See, e.g.*,
example Richard Causey, #85, ¶ 192 ("I participated along with
others in Enron's senior management in efforts to use Enron's
public filings and public statements to mislead the investing
public about the true nature of Enron's financial performance by
making false and misleading statements, and omitting facts
necessary to make certain statements not misleading.") and ¶ 193
(admitting that Enron "willfully and unlawfully" "engaged in acts,
practices and courses of conduct which would and did operate as
a fraud and deceit upon members of the investing public, in
connection with purchases and sales of Enron securities"); Mark
Koenig, #85, ¶ 204 (acknowledging his public statements about

---

purposes of the Rules of Evidence and "the interests of justice".
*Id.* The appellate court further noted that the plea agreement has
equivalent circumstantial guarantees of trustworthiness, including
that it was made under oath with the advice of counsel, it
subjected Slatkin to severe criminal penalties, it was made after
Slatkin was advised of his constitutional rights, and it was
accepted by the court in a criminal matter only after the court
determined that Slatkin's plea was knowing and voluntary. *Id.* *See
also In re AFI Holding, Inc.*, 525 F. 3d 700, 704 (9th Cir. 2008);
*Scholes v. Lehmann*, 56 F. 3d 750, 762 (7th Cir. 1995)(plea
agreement admissible as exception to hearsay rule under Fed. R.
Evid. 803(22); admissions in a guilty plea bind the party and "the
veracity safeguards surrounding a plea agreement that is accepted
as the basis for a guilty plea and resulting conviction actually
exceed those surrounding a deposition"); *Miller v. Holzmann*, 563 F.
Supp. 2d 54, 84-85 & n.24 (D.D.C. 2008); *Newby v. Enron Corp.*, 491
F. Supp. 2d 690, 703-04 (S.D. Tex. 2007); *In re Bayou Group, LLC*,
393 B.R. 810, 835 (S.D.N.Y. 2008)("Courts have consistently found
that criminal proceeding admissions of a fraudulent scheme to
defraud investors made in guilty pleas and plea allocutions are
admissible as evidence of 'actual intent' to defraud creditors.").

116

Enron "were misleading and false and that a reasonable investor would have considered the information important in making a decision to invest and continue to invest in Enron"); Kevin P. Hannon, #85, ¶ (admitting Enron's misrepresentations about its broadband business contained 'misleading claims and omitted facts [that] would have been important in my view to a reasonable investment analyst's or investor's decision whether to invest in Enron stock."); Timothy Despain, #85, ¶ 69 (" Although the prepays were accounted for as commodity transactions and reflected on Enron's books as a trading liability, the transactions in substance created debt-like obligations to the financial institutions that advanced funds to Enron through the transactions.  I and others told the rating agencies that the cash generated from Enron's trading operations was from the sale or 'monetization' of trading contracts or the future cash flow streams from those contracts.  Fundamentally, the agencies were led to believe that Enron was generating cash by incurring a future obligation that operated as debt.").[59]

Indeed, admissions like these support the complaint's scheme allegations; they demonstrate that Enron's misleading financial statements were deliberately targeted toward credit rating agencies and potential investors to feed Enron's complex Ponzi

_____

[59] "Ponzi scheme allegations adequately reflect an intent to induce Plaintiffs as well as other investors into contracts to buy Enron securities."  *In re Enron Corp.*, 540 F. Supp. 2d at 799.

scheme.  Moreover, the Court emphasizes that Comment 3 to the *Restatement (Second) of Torts* § 531 states,

> *Class of persons.*  The maker may have reason to expect that his misrepresentation will reach any of a class of persons, although he does not know the identity of the person whom it will reach or indeed of any individual in the class. . . . *The class may include a rather large group*, *such as potential* sellers, buyers *or investors*, or others who may be expected to enter into dealings in reliance upon the misrepresentation [emphasis added by the Court] .

As stated by the complaint, "Plaintiffs' reliance on Enron's fraudulent financial results was not just foreseeable and reasonable--it was the very goal of the conspiracy."  #85, ¶ 478. Those intentionally executing a Ponzi scheme operate expecting and knowing that there is an especial likelihood that SEC-filed financial statements, and financial reports and ratios drawn from them, analyst reports from preeminent financial institutions, as well as engineered credit rating agencies' evaluations, will reach and influence potential investors to purchase the company's stock, as innumerable current examples in recent years have so often proven true.  Such is especially true of company like Enron, which was widely touted on Wall Street and in the media as one of the very top, cutting edge, Fortune Five Hundred companies.  In addition, not only were Plaintiffs subscribers to financial information services, but four of the five Plaintiffs were already existing Enron shareholders, having purchased Enron stock on September 24th and 25th, 1997, claim they monitored their

investment via subscription financial news services such as Bloomberg and would have received such information from the company. #85, ¶ 799, 792, 794-96.

Reliance is an element of fraud regardless of whether it is fraud by affirmative misrepresentation or by non-disclosure. *Celanese Corp. v. Coastal Water Authority*, 475 F. Supp. 2d 623, 637-38 (S.D. Tex. 2007)(applying Texas law).

Reliance on the defrauding party's misrepresentations must be both actual and justifiable (reasonable). *Trenholm v. Ratcliff*, 646 S.W. 2d 927, 930 (Tex. 1982)(to prevail on a fraud claim, plaintiff must show *inter alia* that the plaintiff actually and justifiably relied upon the misrepresentation); see also *Clardy Mfg. Co. v. Marine Midland Bus. Loans, Inc.*, 88 F.3d 347, 358 (5th Cir. 1996)(applying Texas law), *cert. denied*, 519 U.S. 1078 (1997).

To determine whether reliance is justifiable, the court must ask, given the plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud, it is extremely unlikely that there was actual reliance by the plaintiff. *Clardy*, 88 F.3d at 358, *citing Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d at 1026.

Because one must determine whether particular circumstances impose a duty to disclose information and whether plaintiffs justifiably relied on a misrepresentation or a non-disclosure,

119

"[r]eliance is ordinarily a question of fact for the fact-finder"
and "is not a proper matter for dismissal on the pleadings." *Id.,*
*citing Jones v. Ray Ins. Agency,* 59 S.W. 3d 739, 754 (Tex. App.--
Corpus Christi 2001, pet. denied), and *1001 McKinney Lt. v. Credit*
*Suisse First Boston Mortgage Capital*, 192 S.W. 3d 20, 30 (Tex.
App.--Houston [14th Dist.] 2005, pet. denied). Nevertheless for
purposes of the motions to dismiss only, the Court finds that
Plaintiffs have adequately pleaded justifiable reliance. SEC-
filed reports are the major source of information about securities
for analysts as well as for investors and credit rating agencies.
Enron's allegedly false financial statements were reinforced by
the allegedly duped credit rating agencies.[60] According to Section
538 of the *Restatement (Second) of Torts* (1977) justifiable
reliance requires that the matter represented be "material"; "The
matter is material if . . . a reasonable man would attach
importance to its existence or nonexistence in determining his
choice of action in the transaction in question." SEC-filed
annual and quarterly reports easily satisfy this test. The
judicial admissions of some Enron officers indicate they thought
potential investors would have found the deceptive information
disseminated by Ernon material. Furthermore, the SEC-filed

---

[60] As noted earlier, the complaint explains that "when
plaintiffs state they relied upon 'Enron's financial statements,'
Plaintiffs mean they relied upon the actual statements and/or
relied upon certain ratios that were calculated using financial
statements." #85, ¶ 64.

reports on their face were not "preposterous"; indeed they fooled most of Wall Street, including market pundits, for years. While Plaintiffs, which are institutional investors, were not unsophisticated investors, they were also not market scholars. Even if they had been, it is clear that Enron's opaque accounting and financial engineering survived the scrutiny of highly sophisticated market participants and observers for years.

According to *Pacific Mutual*, the misrepresentation, must "reach" the third party and "influence its conduct." *Id.* Thus a plaintiff must demonstrate that the plaintiff actually received and relied upon the defendant's representation. While reliance upon the misrepresentation is an essential element, under Texas law a fraud victim's misrepresentation can be inferred from circumstantial evidence and there is no requirement that there be a direct relationship between the plaintiff and the defendant. *In re Mounce*, 390 B.R. 233, 248 (W.D. Tex. 2008), *citing Matis v. Golden*, 228 S.W. 3d 301, 311 (Tex. Civ. App.--Waco 2007, no pet. h.), and *Pacific Mutual*, 51 S.W. 3d at 577. Moreover the misrepresentation need not be the only inducer of the plaintiff's course of action, but it must have a material influence on the plaintiff's conduct and be a substantial factor in bringing about his action. *Id.* at 246-47, *citing* William L. Prosser, *Handbook of the Law of Torts* 714-15 (4th ed. West 1971); *Marburger v. Seminole Pipeline Co.*, 957 S.W. 2d 82, 86 (Tex. App.--Houston [14[th]

Dist.] 1997, no writ)(holding that reliance may be proven by showing that the victim was induced by several factors, including the defendant's misrepresentation).

For common-law fraud Rule 9(b) requires a party pleading fraud to state with particularity the circumstances constituting the fraud, which the Fifth Circuit interprets as specifying "time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir. 1997), *cert. denied*, 522 U.S. 966 (1997). Nevertheless "Rule 9(b) does not require Plaintiffs to plead reliance with particularity or state how they specifically relied on each statement." *Timberlake v. Synthes Spine Co.*, No. Civ. A. V-08-4, 2009 WL 926990, *6 (S.D. Tex. Mar. 31, 2009)(finding sufficient for claim of fraud by affirmative misrepresentation the allegation that named plaintiffs relied on Defendant's misrepresentations in their decision to have a particular kind of artificial disc implanted in their backs). The Fifth Circuit has opined that allegations of reliance are inherently conclusory. *Steiner v. Southmark*, 734 F. Supp. 269, 275 (N.D. Tex. 1990). *In accord In re Compaq Sec. Litig.*, 848 F. Supp. 1307, 1312 (S.D. Tex. 1992). Furthermore, "[r]eliance is ordinarily a question for the fact-finder." *Celanese Corp.*, 475 F. Supp. 2d at 638, *citing Jones v. Ray Ins. Agency*, 59 S.W. 3d

739, 754 (Tex. App.–Corpus Christi 2001, pet. denied), and *1001 Mckinney Ltd. v. Credit Suisse First Boston Mortgage Capital*, 192 S. W. 3d 20, 30 (Tex. App.--Houston [14[th] Dist.] 2005, pet. denied). "Thus, while reliance, or lack thereof, may be established as a matter of law based on the evidence of record on summary judgment, it is not proper matter for dismissal on the pleadings . . . ." *Id.*

For purposes of a Rule 12(b)(6) motion only, the Court finds that Plaintiffs adequately plead actual reliance by Plaintiffs' on Enron's misrepresentations. In purchasing their Enron securities and commercial paper, Plaintiffs allege that they relied on Enron's financial statements, SEC-filed documents, financial information services such as Bloomberg, to which they subscribed and which relied on the financial statements, Merrill Lynch analyst reports (which were described in the financial information services also), ratings of the credit rating agencies, and a list of approved commercial paper companies maintained and periodically updated by Plaintiffs, and on the credit rating agencies' buy recommendations, and they can testify to that reliance. *See, e.g.,* #85, ¶¶ 792-99. *See also Schwartz v. Pinnacle Communications*, 944 S.W. 2d 427, 435 (Tex. App.--Houston [14[th] Dist.] 1997)("appellant's actual reliance was established by Newton's testimony that he decided to make the investment on his daughter's behalf '[b]ased on the representations that Mr. Daniels

123

had made about the creditworthiness of TGI'"). They have also alleged that Ann LeMire, on behalf of American National Insurance Company, in purchasing the $5.05 million Enron bond on September 28, 2001, reviewed and relied on various financial ratios reported in Bloomberg and on Enron's 2000 audited financial numbers, and that the Bloomberg information also included a review of prior years financial numbers, too. #85, ¶ 798. Plaintiffs have also claimed that Plaintiff SM&R received positive assessments of Enron and persistent "buy" recommendations on ENE by Eassey dated April 19, May 24, and May 25, 2001, before it purchased Enron securities.[61] #85, ¶448. Moreover, four out of the five Plaintiffs purchased Enron stock before May of 1998, based on computer models using Enron's reported financial numbers, continued to monitor them and, as shareholders, must have received regular reports from Enron. #85, ¶799. In addition, as

---

[61] Even under the stricter pleading standards of the PSLRA, a number of courts have pointed out that analyst reports and recommendations may be material. *Quaak*, 445 F. Supp. 2d at 142, *citing Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 236-43 (D. Mass. 2004); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 299 (S.D.N.Y. 2003)( for a section 10(b) claim, it "comports with both common sense and probability" to apply a presumption of reliance on an analyst's recommendation); *DeMarco v. Robertson Stephens*, 318 F. Supp. 2d 110, 118 (S.D.N.Y. 2004)("it is entirely reasonable that investors would consider analyst recommendations as part of the 'total mix' of information available when making purchases"); *Havesi v. Citigroup, Inc.*, 366 F.3d 70, 79 n.6 (2d Cir. 2004)("On motions to dismiss, of course, courts are required to assume the truth of well-pleaded allegations, including allegations that an analyst's misrepresentations affected the market price of securities.").

124

institutional investors, Plaintiffs certainly sought out financial reports put out by a company before they would purchase its securities. Indeed they have alleged,

> In making determinations to purchase equity securities it was Plaintiffs['] investment decision makers' practice, among other things, to compare price to earning, price to book value, and price to cash flows. In particular, in 1997 until 2001, it was Plaintiffs['] practice that when purchasing stock in an entity for the first time, Plaintiffs['] decision makers would use two different investment disciplines which utilized published audited financial statements in order to compare companies. One discipline evaluated the historic use of cash flows and the other discipline reviewed a company's growth potential. . . . [They did so in buying Enron common stock on September 24 and 15, 1997.] Plaintiffs made various other purchases from time to time in Enron stock in order to adjust portfolio balances, to accommodate cash balances and for other various investment reasons. . . . At each of these later purchase dates, Plaintiffs' investment decision-makers relied upon their historic position in Enron equities and the continued optimistic reported outlook for Enron.

#85, ¶ 799. They also reiterated throughout the complaint that had they known the truth about Enron's financial condition they would not have purchased Enron stock, commercial paper or the bond. The Court, relying on its judicial experience and common sense, finds Plaintiffs have adequately pleaded facts demonstrating reliance on the alleged misrepresentations. *Iqbal*, 129 S. Ct. at 1940.

Furthermore, Plaintiffs have adequately alleged Enron's intention to induce and defraud Plaintiffs as third parties through evaluations of the credit rating agencies, duped by Enron,

125

and actionable under *Pacific Mutual* because, as discussed they have alleged facts, especially through judicial admissions by Enron's former officers, showing that Enron officers intended to, and did, influence Plaintiffs' conduct by misrepresentations in its financial reports and through the credit rating agencies. Plaintiffs have shown an intent to commit securities fraud by both these admissions and by pleadings facts demonstrating conscious behavior by Defendants directed toward that end. *Flaherty*, 565 F.3d at 213.

In sum the Court finds that Plaintiffs have adequately pleaded facts that satisfy the elements of common law fraud of affirmative misrepresentation and state a claim against Enron that is plausible on its face: they have alleged that Enron made material false misrepresentations in its financial statements and SEC-filed documents, that it ensured that the recommendations coming from its analysts regarding Enron were positive, that Enron knew these statements were false when it made them, that it made the representations with the intent to induce investors to purchase Enron securities so it could defraud them, that Plaintiffs bought Enron securities in reliance on those statements and on ratios and evaluations derived directly from and based on them, and deceived credit agencies to provide top ratings; and that as a result of these deceptive statements Plaintiffs suffered pecuniary loss. They have also stated repeatedly that had they

126

known the truth about Enron's financial condition they would not have purchased the securities.

b. *Fraud by Nondisclosure or Fraudulent Concealment*

"Fraudulent concealment or non-disclosure is a subcategory of fraud that occurs when a party with a duty to disclose a material fact fails to disclose that fact." *In re Enron Corp.*, 540 F. Supp. 2d at 771, *quoting GMAC Commercial Mortgage Corp. v. East Texas Holdings, Inc.*, 441 F. Supp. 2d 171, 181 (E.D. Tex. 2006)(*citing Schlumberger Technology Corp. v. Swanson*, 959 S.W. 2d 171, 181 (Tex. 1997).

The elements of fraud by non-disclosure are (1) a party conceals or fails to disclose a material fact within the knowledge of that party, (b) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, (c) the party intends to induce the other party to take some action by concealing or failing to disclose the fact, and (d) the other party suffers injury as a result of acting without knowledge of the undisclosed fact." *Bradford v. Vento*, 48 S.W. 3d 749, 754-55 (Tex. 2001). Allegations in the complaint indicate that Plaintiffs, and indeed most of the securities market, were ignorant of Enron's deceptive accounting and fraudulent transactions, that Enron knew that Plaintiffs did not know its true financial condition and did not have an equal opportunity to discover the truth, that Enron officers intended

127

to induce Plaintiffs to purchase Enron securities to feed its Ponzi scheme and enrich themselves, that Plaintiffs' relied on the absence of information from Enron exposing the fraud, and that Plaintiffs suffered pecuniary injury as a result.

As an essential element of a claim of fraud based on non-disclosure, the defendant must have a duty to disclose. An affirmative duty to disclose may arise in four circumstances: (1) where there is a fiduciary or confidential relationship between the parties; (2) where a person voluntarily discloses information, he must disclose the whole truth; (3) when a person make a representation and new information makes the earlier misrepresentation misleading or untrue; and (4) when a person makes a partial disclosure and conveys a false impression. *In re Enron* Corp., 540 F. Supp. 2d at 771, *citing Hoggett v. Brown*, 971 S.W. 2d 472, 487 (Tex. App.--Houston [14th Dist.] 1997, pet. denied). As an element of fraudulent concealment, under Rule 9(b) a plaintiff must allege with particularity facts showing that a defendant had such a duty to disclose.

In some of the related cases arising out of Enron's collapse, Defendants hare argued that under Texas law, a duty to disclose arises only from a confidential or fiduciary relationship, which everyone agrees Enron did not have with potential investors. They rely on *Bradford*, 48 S.W. 3d at 754-55, where the Texas Supreme Court observed that although several Texas courts of appeals have

128

recognized a general duty to disclose information may arise in an arm's length business transaction when a party makes a partial disclosure that, although true, conveys a false impression, Texas had not adopted the *Restatement (Second) of Torts* § 551 recognizing a general duty to disclose facts in a commercial setting.

The scope of the duty to disclose in Texas for a common law fraud claim currently is not crystal clear, but an examination of a strong trend in case law leads this Court to reaffirm its earlier reliance on an expanded interpretation of circumstances that may give rise to a duty to disclose, stated above.

In *United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 566 (5th Cir. 2005), Judge Carolyn King of the Fifth Circuit opined, "A reasonable jurist might well conclude, certainly after *Bradford*, that a duty to disclose exists in Texas *only* in the context of a confidential or fiduciary relationship." She also observed, "However, apart from *Coburn* [342 F.3d at 377-78(holding that a duty to disclose only arises in Texas when the parties are in a confidential or fiduciary relationship)], it would be fair to say that courts after *Bradford* (including this court) have not gotten the message but have instead continued to find that a duty to disclose can exist in Texas absent a confidential or fiduciary relationship." 414 F.3d at 566 (and cases cited therein, including two post-*Bradford,* post-*Coburn*

129

Fifth Circuit cases, *Rimade Ltd. v. Hubbard Enterprises, Inc.*, 388 F.3d 138, 143 (5th Cir, 2004)(in addition to a fiduciary or confidential relationship, a duty to disclose arises "to correct one's own prior false and misleading statements"), and *Lewis v. Bank of America*, 347 F.3d 587, 588 (5th Cir. 2003)(*citing Union Pacific Resources Group, Inc, v. Rhone*, 247 F.3d 574, 586 (5th Cir. 2001))(Agreeing that under Texas law, "[a] duty to speak arises by operation of law when (1) a confidential or fiduciary relationship exists between the parties; or (2) one party learns later that his previous statement was false and misleading; or (3) one party knows that the other party is relying on a concealed fact and does not have an equal opportunity to discover the truth; or (4) one party voluntarily discloses some but less that all material facts, so that he must disclose the whole truth, i.e., all material facts, lest his partial disclosure convey a false impression.").

Moreover, the *United Teacher* panel expressly chose not to resolve the question whether there is an expanded duty to disclose in Texas, but decided the case on other grounds. 414 F.3d at 568 ("We therefore need not reach the question of whether a duty to disclose can exist in Texas absent a confidential or fiduciary relationship."). Instead the panel alternatively opined that "even if we were to adopt such a general duty," the claim would be rejected in that case because there was no evidence of an

130

essential element of fraudulent intent.  414 F.3d at 566.

Some Texas appellate courts have reiterated *Bradford's* determination that Texas has not adopted § 551 of the *Restatement (Second) of Torts*, but have questioned whether the Texas Supreme Court in *Bradford* held that the duty to disclose was limited to confidential and fiduciary relationships; these courts have followed as common law the test established in *Hoggett,* 971 S.W. 2d at 487*,* and progeny, for determining when, as a matter of law, a duty to disclose exists (four situations in which a duty to disclose may arise:  (1) when there is a special or fiduciary relationship; (2) where one voluntarily discloses partial information, but fails to disclose the whole truth; (3) where one makes a misrepresentation and fails to disclose new information that makes the earlier representation misleading or untrue; and (4) where one makes a partial disclosure and conveys a false impression).  *See, e.g., Omni Metals, Inc. v. Poe & Brown of Texas, Inc.,* No. 14-00-01081-CV, 2002 WL 1331720, *3-4 (Tex. App.--Houston [14th Dist.] June 13, 2002); *Citizens Nat'l Bank v. Allen Rae Investments, Inc.*, 142 S.W. 3d 459, 477 (Tex. App.--Fort Worth 2004); *Cronus Offshore Inc. v. Kerr McGee Oil & Gas Corp.*, 369 F. Supp. 2d 848, 858 (E.D. Tex. 2004)(applying Texas law); and *Playboy Enterprises, Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W. 3d 250, 259-60 (Tex. App.--Corpus Christi, 2006, 2 pets. denied).  A number of courts continue to recognize an expansion

of the duty to disclose beyond a confidential or fiduciary relations. *See, e.g.,* two very recent decisions, citing others: *BP America Production Co. v. Marshall*, _____ S.W. 3d ___, No. 04-06000478-CV, 2008 WL 5169635, *8-9 (Tex. App.--San Antonio Dec. 10, 2008, Rule of Appellate Proc. 53.7(f) motion filed May 13, 2009)("In *Bradford*, the supreme court held that even if it recognized such a general duty to disclose in a commercial transaction, there was no evidence in that case to establish the defendant knew the plaintiff was ignorant of certain lease terms or did not have an equal opportunity to discover such terms. . . . *Bradford* does not hold . . . there is a duty to disclose only if a confidential or fiduciary relationship exists. . . . Moreover, the supreme court did not overrule those cases from the courts of appeal applying section 551 [citations omitted].")(and cases cited therein); *Suzlon Wind Energy Corp. v. Shippers Stevedoring Co.*, No. CIV. A. H-07-155), 2009 WL 197739, *15-16 (S.D. Tex. Jan. 27, 2009)(Rosenthal, J.)("Texas courts have held that a duty to disclose information may arise in an arm's length business transaction when a party makes a partial disclosure that, although true, conveys a false impression. . . . Courts have also held that voluntarily disclosing some information creates a duty to disclose the whole truth. . . . Whether a legal duty exists is a question of law. . . . In deciding whether a legal duty exists, courts consider 'whether one party generally had superior

132

knowledge of the risk in question,'" [citations omitted])(and cases cited therein).

Furthermore, in a very recent case, the Fifth Circuit, addressing Texas common-law fraud, wrote,

> To state a claim for common-law fraud based on nondisclosure, Texas law requires Dorsey to allege that Defendants concealed or failed to disclose a material fact that they knew Dorsey was ignorant of or did not have an opportunity to discover, that they intended him to take some action by concealing or failing to disclose the material fact, and that he suffered as a result of acting on the Defendants' nondisclosure. *Bradford v. Vento*, 48 S.W. 3d 749, 754-55 (Tex. 2001). However, "for there to be actionable nondisclosure fraud, there must be a duty to disclose." *Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.)*, 388 F. Supp. 2d 780, 788 (S.D. Tex. 2005)(citing Texas case law). A duty to disclose may arise "where one makes a representation and fails to disclose new information that makes the earlier representation misleading or untrue . . . ."

*Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 341 (5th Cir. 2008). In the *Newby* opinion referenced in *Dorsey*, this Court also recognized that a duty to disclose may also arise "where one voluntarily discloses partial information, but fails to disclose the whole truth" and where one makes "a partial disclosure and conveys a false impression." 388 F. Supp. 2d at 788.

In its summary of the complaint's facts, the Court finds Plaintiffs have stated a plausible claim for fraudulent concealment against Enron. They have alleged that (a) Enron concealed or failed to disclose material facts regarding its actual financial condition within its knowledge, (b) Enron knew

133

that Plaintiffs and other potential investors were ignorant of these facts and did not have an equal opportunity to discover the truth, (c) Enron intended to induce the Plaintiffs and other investors to purchase Enron securities to feed its Ponzi scheme, and (d) Plaintiffs suffered injury as a result of acting without knowledge of the undisclosed facts. *Bradford*, 48 S.W. 3d at 754-55. The complaint's allegations against Enron provide facts that would satisfy pleading that Enron had a duty to disclose based upon (1) partial voluntarily disclosure requiring disclosure of the whole truth, (2) making a representation after which new information makes the earlier misrepresentation misleading or untrue; and (3) making a disclosure that conveys a false impression.

## C. Analyst Statements and Merrill Lynch's Liability

Defendants have argued that Plaintiffs' pleadings regarding analysts are inadequate, so the common law fraud claim against Merrill Lynch should be dismissed. Defendants argue that the analyst statements were non-actionable opinions, that Plaintiffs have not shown why the statements were false, that Plaintiffs have not adequately alleged the analysts' scienter, and they have not shown either the analysts' or Merrill Lynch's intent to induce reliance (information that would lead a reasonable man to conclude that there is an especial likelihood that the analyst reports would reach plaintiffs), nor actual reliance on these reports by

134

Plaintiffs (identifying who received the report for each plaintiff and relied upon it).

Plaintiffs have responded that they are arguing that Merrill Lynch is liable because it controlled what these analysts could publish and used them as conduits to further Enron's Ponzi scheme. They point to their allegations about Olson and his termination and replacement by Eassey under pressure from Enron and Merrill Lynch to employ analysts who would provide positive evaluations of Enron's financial condition.

The conduit theory may be applied where a company gives false or misleading information to analysts "with the intent that the analysts communicate those statements to the market." I*n re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 743 (8th Cir. 2000). The analyst's statement is not imputed back to the company. "[T]he company itself has committed the fraud and is held primarily liability." *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997). In the context of federal securities laws, in particular even of the PSLRA, which has more stringent pleading requirements than common law-fraud, the Fifth Circuit has held that an exception to the general rule that securities issuers are not liable for statements or forecasts disseminated by securities analysts has been found when investors allege that

> defendants used the analysts as a conduit, making false and misleading statements to securities analysts with the intent that the analysts communicate those statements to the market. *Cooper v. Picket*, 137 F.3d

135

616, 624 (9th Cir. 1997); [*In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 743 (8th Cir. 2002), *op. vacated*, 2002 WL 1760770 (8th Cir. 2002)]. The plaintiff must plead with particularity how these exceptions apply, including who supplied the information to the analyst, how the analyst received the information, and how the defendant was entangled with or manipulated the information and the analyst. *Navarre*, 299 F.3d at 743; *Raab v. General Physics Corp.*, 4 F.3d 286, 288 (4th Cir. 1993).

*Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 373 (5th Cir. 2004). *In accord, Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 261-62 (5th Cir. 2005)("plaintiff must plead facts from which the court could infer that the defendant exercised the kind of control over the analysts' reports that would render the defendant liable for the statements made therein"), *modified on other grounds*, 409 F.3d 653 (5th Cir. 2005). *See also Freeland v. Iridium World Communications, Ltd.*, 545 F. Supp. 2d 59, 74-76 (D.D.C. 2008).

Plaintiffs have named names, identified dates, and alleged sufficient facts for a plausible claim that Merrill Lynch conspired with Enron and followed Enron's bidding in terminating Olson and hiring Eassey, and in ensuring that Merrill Lynch analysts issued positive reviews of Enron. Under the facts alleged, the analysts served as conduits of Merrill Lynch so that it may be responsible for their fraudulent misrepresentations.

136

**Statutory Fraud Claims Under 27.01(d) Against Merrill Lynch and Tilney**

*Underlying Fraud*

The Court has found *supra* that Plaintiffs have adequately alleged common-law fraud against Enron, which also constitutes the requisite primary violation of 27.01(a), for its aiding and abetting claims against Merrill Lynch and Tilney.

*Actual Awareness*

As for secondary violations by the two Defendants, the Court finds that Plaintiffs have adequately alleged a plausible claim that Merrill Lynch and Tilney had "actual awareness" of the falsity of representations by Enron and remained silent. "Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness." § 27.01(d). Two appellate courts have concluded that the Texas Supreme Court's definition of "actual awareness" in a DTPA case[62] "'would be similar, if not identical'" to that for section 27.01 of the Texas Business & Commerce clause:

> actual awareness 'does not mean merely that a person knows what he is doing; rather, it means that a person knows what he is doing is false, deceptive, or unfair. In other words, a person must think to himself at some point, "Yes, I know this is false, deceptive, or unfair to him, but I'm going to do it anyway.'"

*Woodlands Land Development Co. v. Jenkins*, 48 S.W. 3d 415, 426

---

[62] *St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.*, 973 S.W. 2d 51, 53-54 (Tex. 1998).

(Tex. App.--Beaumont 2001), and *Scott v. Sebree*, 986 S.W. 2d 364, 371 (Tex. App.--Austin 1999, pet. denied), *citing St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.,* 974 S.W. 2d 51, 53-54 (Tex. 1998).

Without repeating all the earlier factual allegations, to which the Court refers the parties, as some examples of alleged facts supporting Plaintiffs' contention that Merrill Lynch, Tilney, and other Merrill Lynch employees had "actual awareness" of Enron's fraud, the Court points out the blatantly obvious sham sale of the Nigerian barges, involving no transfer of risk and a guaranteed large profit for Merrill Lynch (which turned out to total 22.14% in six months), in order to allow Enron to book $12 million in earnings and $28 million in cash flow just in time for the end-year 1999 reports; specific allegations about identified Merrill Lynch employees' involvement, including Tilney's, in pushing the transaction through; and Merrill Lynch's real concern about the risk of participation in the deal, evidenced in the Appropriation Request, other identified documents, and the requested verbal communication from Fastow that Merrill Lynch would be relieved of the barges within six months. Moreover allegations regarding the Power Trades Transaction that support a finding of "actual awareness" include the Confidentiality Agreement, interoffice memoranda indicating that Merrill Lynch and its employees knew of the mirror image options that canceled each

138

other out, that they were to be used to achieve improper off-
balance sheet treatment to generate $50 million in bogus income
for Enron and cook its books at year-end 1999, and the great
concern about the impropriety of the accounting treatment and the
document required with Causey's signature in an effort to relieve
Merrill Lynch of any liability for the accounting before Merrill
Lynch would complete the transaction. As examples supporting
"actual awareness" relating to LJM2, Merrill Lynch and Tilney
helped to structure the improper SPE, knew it was not independent
of Enron with its lack of independent 3% equity and the patent
conflicts of interest in Fastow's and Kopper's roles at Enron and
LJM2 (and thus not eligible for off-balance sheet treatment), the
extraordinary rates of return for limited partners, including
Merrill Lynch and Tilney, the purchase of the barges to relieve
Merrill Lynch of them, and involvement in the Raptors. With
regard to the Raptors, Fastow testified he discussed with Merrill
Lynch employees Tilney and Dan Sullivan the structure of the first
one, Talon, which became the model for the others, while
extraordinary rates of return of the four Raptors were reported
in October 2000 to limited partners as 193%, 278%, 2500% and
projected 125%.

*Benefit*

Both Defendants benefitted financially from helping Enron
fraudulently cook its books and misrepresent its financial

139

condition in Enron's financial statements and SEC-filed documents; they would not have received these monies had accounting principles been properly followed and correct disclosures made. *Belton v. Dover Property Sales, Inc.*, Civ. A. No. 3-85-0557-H, 1985 WL 8797, *3 (N.D. Tex. 1986)(Under § 27.01(d) the "benefit from the false representation" obtained by an aider and abettor may include "customary fees of the closing itself" since the "fees would not have been received if the desired disclosure was made."). This Court has previously opined, "The language of the statute ('benefits from the false representation or promise') does not limit the benefit to the end result, i.e., the sale, as opposed to the whole transaction" resulting in a "successful" misrepresentation. *In re Enron Corp.*, 540 F. Supp. 2d at 773 n.14. The complaint asserts that Defendants knowingly accepted benefits for their complicity in Enron's deceit, providing Merrill Lynch's business financial reward and promises of future work, as well as returns for its LJM2 investment, and Tilney's increased value to the company's compensation (¶¶ 247-48 "The SEC's complaint states, 'Merrill Lynch earned $9.275 million in fees from the barge and energy trade transactions.' Further, 'Defendants' [including Merrill Lynch and Tilney] substantial participation in Enron's fraud resulted in continued business and fees for Merrill Lynch on other Enron engagements"; "the SEC found, 'Merrill Lynch handsomely compensated . . . Tilney and

140

[his] efforts for Enron were a factor in determining the amount of this compensation.'"), and returns on his investment in LJM2. *See, e.g., Glazener v. Jansing*, No. 03-02-00796-CV, 2003 WL 22207226, *6 (Tex. App.--Austin, Sept. 25, 2003). The complaint specifically alleges that in the Nigerian Barge Transaction and through Merrill Lynch's and Tilney's investment in LJM2, Merrill Lynch benefitted twice: once when received a 22% profit for purchasing the barges from Enron and again as an LJM2 participant when LJM2 sold them again. As another limited partner, Tilney also benefitted from investment in LJM2. The Power Trades Transaction similarly resulted in Merrill Lynch's receiving $8.5 million.

As for Defendants' contention that Plaintiffs have failed to allege Plaintiffs' reliance on nondisclosures by Merrill Lynch and Tilney for secondary statutory fraud, as this Court has pointed out, § 27.01(d) indicates Defendants must have actual awareness of "*another* person's," here of alleged primary violator Enron's, misrepresentations, on which Plaintiffs must have relied, not on the secondary violator's misrepresentation. All that these secondary violators Merrill Lynch and Tilney are required to do is have actual awareness of Enron's false representations, fail to disclose that falsity to Plaintiffs, and benefit from the false representations. A secondary violator has no duty to disclose, other than that implied by the statute and ignored by the

violator. *See* pp. 14-14 of this Opinion and Order. The Court finds that Plaintiffs have adequately alleged sufficient facts to state a facially plausible claim of secondary violations for exemplary damages under § 27.01 against Merrill Lynch and Tilney.

**Statutory Cap on Exemplary Damages**

The Court agrees with Merrill Lynch that Plaintiffs have not alleged sufficient facts to circumvent Texas' statutory cap on exemplary damages, Tex. Civ. Practice & Rem. Code § 41.008(b), because they have not alleged with any specificity against Merrill Lynch the elements of the felony violations of Texas Penal Code §§ 32.46 (securing execution of a document by deception) and 32.47 (fraudulent concealment of a writing). Accordingly the Court grants the motions to dismiss as to these Penal Code violation claims.

**Conspiracy Claims Against Merrill Lynch and Tilney**

*Underlying Fraud*

The Court has already found Plaintiffs have adequately alleged a common law fraud claim against Enron for the underlying tort of the conspiracy claim.

*Meeting of the minds, knowledge of the object or purpose, and the scope of the alleged far-reaching conspiracy*

Plaintiffs have adequately alleged facts showing that Merrill Lynch officials and Tilney conspired with Merrill Lynch to cook Enron's books so as to dupe the credit rating agencies and defraud

potential investors and the public to feed the Ponzi scheme and fill Enron and Merrill Lynch pockets. The allegations regarding analyst John Olson, his reports, termination and replacement are sufficient to show a meeting of the minds over what recommendations should be issued to paint a glowing picture of Enron's financial health, regardless of inaccuracy. That meeting of the minds is reaffirmed by factual allegations about the various transactions involving Enron, Merrill Lynch, and Tilney, which constitute overt acts in furtherance of the purpose of doctoring Enron's SEC-filed reports and promulgating information that would mislead credit rating agencies and the investing publicly generally.

While potential damages for the secondary statutory fraud claims against Merrill Lynch and Tilney are limited to those transactions about which these Defendants were "actually aware," the same in not true of the conspiracy claims as long as Merrill Lynch and Tilney were aware of the common purpose or goal of the scheme, to misrepresent Enron's financial condition in SEC-filed publications and other sources to lure potential investors into the giant Ponzi scheme and enrich the co-conspirators. They did not have to know about other co-conspirators and overt acts if those parties had a meeting of the minds with Enron and shared the same goal.

But the facts alleged imply they may have anyway. Merrill

143

Lynch and Tilney helped structure LJM2 and remained limited partners, receiving extraordinary profits in the patently improper SPE, along with a number of other major financial institutions well known to them and for whose transactions with Enron LJM2 was utilized in the conspiracy to cook Enron's books to lure in investors. There are sufficient facts here to raise a jury question about the scope of the conspiracy.

*Intended the injury that followed*

As noted earlier, Plaintiffs have alleged sufficient facts to demonstrate Enron, Merrill Lynch, and Tilney's intent to defraud investors of their money.

**ORDER**

In light of Plaintiffs' clear, unambiguous statement that they do not pursue any claims against Merrill Lynch or Tilney based on Enron securities purchases prior to May 1998, the Court

ORDERS that Defendants' motions to dismiss pre-May 1998 claims are MOOT. The Court further

ORDERS that Tilney's and Merrill Lynch's motions (#78 and 79) to dismiss are DENIED, except they are GRANTED as to Plaintiffs' inadequate pleading of felony violations of Texas Penal Code §§ 32.46 (securing execution of a document by deception) and 32.47 (fraudulent concealment of a writing), in Plaintiffs' effort to circumvent Texas' statutory cap on exemplary damages, Tex. Civ. Practice & Rem. Code § 41.008(b).

144

Finally Plaintiffs' motion for status conference (#91) is GRANTED as to this case only and a hearing will be established by separate order.

**SIGNED** at Houston, Texas, this 19th day of January, 2010.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE

145

Group Exhibit 6

Supplement No. 1 to the Zero Coupon Notes Prospectus, filed by Enron the SEC on August 3, 2001

# ENRON CORP/OR/

1400 SMITH ST
HOUSTON, TX 77002–7369
713. 853.6161

## 424B3

**ENRON CORP. – 424(B)(3)**
**Filed on 08/03/2001**
File Number 333–62168



**LIVEDGAR**[®] Information Provided by Thomson Reuters Accelus, ©2011. All Rights Reserved.
800.669.1154
www.gsionline.com

1

Filed pursuant to Rule 424(b)(3)
Registration No. 333-62168

ENRON CORP.
ZERO COUPON CONVERTIBLE SENIOR NOTES DUE 2021

PROSPECTUS SUPPLEMENT NO. 1

DATED AUGUST 3, 2001

TO PROSPECTUS DATED JULY 18, 2001
------------------

The selling securityholders table on page 43 of the prospectus is amended by this supplement no. 1 to include additional entities as selling securityholders and to list the current amounts of securities held by securityholders previously listed.

| NAME | PRINCIPAL AMOUNT AT MATURITY OF NOTES BENEFICIALLY OWNED THAT MAY BE SOLD HEREBY | PERCENTAGE OF NOTES OUTSTANDING | NUMBER OF SHARES OF COMMON STOCK THAT MAY BE SOLD HEREBY(1) | PERCENTAGE OF COMMON STOCK OUTSTANDING(2) | MATERIAL RELATIONSHIP |
|------|------|------|------|------|------|
| AIG SoundShore Opportunity Holding Fund Ltd.................... | $ 4,940,000 | 0.26% | 28,437.11 | *% | None |
| AIG SoundShore Holdings Ltd.............. | 8,687,000 | 0.46 | 50,006.72 | * | None |
| AIG SoundShore Strategic Holding Fund Ltd.................................. | 2,973,000 | 0.16 | 17,114.07 | * | None |
| Alpha U.S. Sub Fund VIII, LLC............ | 500,000 | 0.03 | 2,878.25 | * | None |
| BBT Fund, LP............................. | 65,000,000 | 3.41 | 374,172.50 | * | None |
| Credit Suisse First Boston............... | 23,000,000 | 1.21 | 132,399.50 | * | None |
| Deephaven Domestic Convertible Trading Ltd.................................. | 18,750,000 | 0.98 | 107,934.38 | * | None |
| Goldman Sachs & Company.................. | 52,255,000 | 2.74 | 300,805.91 | * | None |
| Innovest Finanzdienstleistungs.......... | 935,000 | 0.05 | 5,382.33 | * | None |
| JMG Convertible Investments LP........... | 7,500,000 | 0.39 | 43,173.75 | * | None |
| JMG Capital Partners LP.................. | 2,500,000 | 0.13 | 14,391.25 | * | None |
| JP Morgan Securities Inc................. | 54,040,000 | 2.83 | 311,081.26 | * | None |
| KBC Financial Products USA............... | 21,000,000 | 1.10 | 120,886.50 | * | None |
| Knight Securities LP..................... | 750,000 | 0.04 | 4,317.38 | * | None |
| Nicholas Applegate Investment Grade Convertible........................... | 30,000 | 0.01 | 172.70 | * | None |
| Royal Bank of Canada..................... | 30,000,000 | 1.57 | 172,695.00 | * | None |
| Victory Capital Management as Agent for the Key Trust Convertible Securities Fund................................. | 430,000 | 0.02 | 2,475.30 | * | None |
| Victory Capital Management as Agent for the EB Convertible Securities Fund..... | 2,440,000 | 0.13 | 14,045.86 | * | None |
| Victory Capital Management as Agent for the Charitable Convertible Securities Fund................................. | 2,270,000 | 0.12 | 13,067.26 | * | None |
| Victory Capital Management as Agent for the Field Foundation of Illinois...... | 110,000 | 0.01 | 633.22 | * | None |
| Victory Capital Management as Agent for the GenCorp Foundation................. | 100,000 | 0.01 | 575.65 | * | None |
| Victory Capital Management as Agent for the Parker Key/Convertible............ | 570,000 | 0.03 | 3,281.21 | * | None |
| Victory Capital Management as Investment Manager for Health Foundation of Greater Cincinnati.................... | 350,000 | 0.02 | 2,014.78 | * | None |
| Victory Capital Management as Investment Manager for Potlatch................... | 1,600,000 | 0.08 | 9,210.40 | * | None |
| Victory Capital Management as Agent for the Union Security Life Insurance Co... | 90,000 | 0.01 | 518.09 | * | None |
| Victory Capital Management as Agent for the Victory Invest Quality Bond Fund... | 230,000 | 0.01 | 1,324.00 | * | None |
| Victory Capital Management as Agent for the Key Trust Fixed Income Fund........ | 550,000 | 0.03 | 3,166.08 | * | None |
| Victory Capital Management as Agent for the Charitable Income Fund............. | 360,000 | 0.02 | 2,072.34 | * | None |

Supplement No. 2 to the Zero Coupon Notes Prospectus,

filed with the SEC on August 17, 2001

# ENRON CORP/OR/

1400 SMITH ST
HOUSTON, TX 77002–7369
713. 853.6161

# 424B3

**ENRON CORP. – 424(B)(3) SUPPLEMENT #2**
**Filed on 08/17/2001**
File Number 333–62168



**LIVEDGAR**® Information Provided by Thomson Reuters Accelus, ©2011. All Rights Reserved.
800.669.1154
www.gsionline.com

1

                                        Filed pursuant to Rule 424(b)(3)
                                           Registration No. 333-62168

ENRON CORP.
ZERO COUPON CONVERTIBLE SENIOR NOTES DUE 2021

PROSPECTUS SUPPLEMENT NO. 2

DATED AUGUST 15, 2001

TO PROSPECTUS DATED JULY 18, 2001
------------------

The selling securityholders table on page 43 of the prospectus, as
previously supplemented, is further amended by this supplement no. 2 to
include additional entities as selling securityholders and to update the
current amounts of securities held by certain securityholders previously listed.

| NAME | PRINCIPAL AMOUNT AT MATURITY OF NOTES BENEFICIALLY OWNED THAT MAY BE SOLD HEREBY | PERCENTAGE OF NOTES OUTSTANDING | NUMBER OF SHARES OF COMMON STOCK THAT MAY BE SOLD HEREBY(1) | PERCENTAGE OF COMMON STOCK OUTSTANDING(2) | MATERIAL RELATIONSHIP |
|------|------|------|------|------|------|
| Conseco Annuity Assurance - MultiBucket Annuity Convert. Bond Fund............. | $ 8,000,000 | 0.42% | 46,052.00 | * | None |
| Credit Lyonnais Securities (USA) Inc..... | 12,500,000 | 0.66 | 71,956.25 | * | None |
| First Union International Capital Markets, Inc........................... | 40,000,000 | 2.10 | 230,260.00 | * | None |
| Granville Capital Corporation............ | 4,500,000 | 0.24 | 25,904.25 | * | None |
| UBS AG London Branch..................... | 250,000,000 | 13.10 | 1,439,125.00 | * | None |
| UBS Wasburg LLC.......................... | 800,000 | 0.04 | 4,605.20 | * | None |

# Supplement No. 3 to the Zero Coupon Notes Prospectus, filed with the SEC on September 26, 2001

# ENRON CORP/OR/

1400 SMITH ST
HOUSTON, TX 77002–7369
713. 853.6161

# 424B3

**ENRON CORP. – 424(B)(3) SUPPLEMENT #3**
**Filed on 09/26/2001**
File Number 333–62168



**LIVEDGAR**[®] Information Provided by Thomson Reuters Accelus, ©2011. All Rights Reserved.
800.669.1154
www.gsionline.com

1

Filed pursuant to Rule 424(b)(3)
Registration No. 333-62168

ENRON CORP.
ZERO COUPON CONVERTIBLE SENIOR NOTES DUE 2021

PROSPECTUS SUPPLEMENT NO. 3

DATED SEPTEMBER 21, 2001

TO PROSPECTUS DATED JULY 18, 2001

------------------

The selling securityholders table on page 43 of the prospectus, as previously supplemented, is further amended by this supplement no. 3 to include additional entities as selling securityholders and to update the current amounts of securities held by certain securityholders previously listed.

| NAME | PRINCIPAL AMOUNT AT MATURITY OF NOTES BENEFICIALLY OWNED THAT MAY BE SOLD HEREBY | PERCENTAGE OF NOTES OUTSTANDING | NUMBER OF SHARES OF COMMON STOCK THAT MAY BE SOLD HEREBY(1) | PERCENTAGE OF COMMON STOCK OUTSTANDING(2) | MATERIAL RELATIONSHIP |
|---|---|---|---|---|---|
| AIG Soundshore Holdings Ltd. ............ | $ 19,087,000 | 1.00% | 109,874.32 | * | None |
| AIG Soundshore Opportunity Holding Fund Ltd. ............................ | 10,940,000 | 0.57 | 62,976.11 | * | None |
| AIG Soundshore Strategic Holding Fund Ltd. ........................... | 6,573,000 | 0.34 | 37,837.48 | * | None |
| Continental Casualty Company ............ | 55,500,000 | 2.91 | 319,485.75 | * | None |
| Goldman Sachs & Company ................ | 67,415,000 | 3.53 | 388,074.45 | * | None |
| Julius Bear Multibond Convertbond ....... | 1,000,000 | 0.05 | 5,756.50 | * | None |

Supplement No. 4 to the Zero Coupon Notes

Prospectus, filed with the SEC on October 12, 2001

# ENRON CORP/OR/

1400 SMITH ST
HOUSTON, TX 77002–7369
713. 853.6161

# 424B3

**ENRON CORP. – 424(B)(3) SUPPLEMENT #4**
**Filed on 10/12/2001**
File Number 333–62168



**LIVEDGAR**® Information Provided by Thomson Reuters Accelus, ©2011. All Rights Reserved.
800.669.1154
www.gsionline.com

Filed pursuant to Rule 424(b)(3)
Registration No. 333-62168

ENRON CORP.
ZERO COUPON CONVERTIBLE SENIOR NOTES DUE 2021

PROSPECTUS SUPPLEMENT NO. 4

DATED OCTOBER 11, 2001

TO PROSPECTUS DATED JULY 18, 2001
------------------

The selling securityholders table on page 43 of the prospectus, as previously supplemented, is further amended by this supplement no. 4 to include an additional entity as a selling securityholder.

| NAME | PRINCIPAL AMOUNT AT MATURITY OF NOTES BENEFICIALLY OWNED THAT MAY BE SOLD HEREBY | PERCENTAGE OF NOTES OUTSTANDING | NUMBER OF SHARES OF COMMON STOCK THAT MAY BE SOLD HEREBY(1) | PERCENTAGE OF COMMON STOCK OUTSTANDING(2) | MATERIAL RELATIONSHIP |
|------|------|------|------|------|------|
| CRT Capital Group LLC................... | $ 750,000 | 0.04% | 4,317.38 | * | None |