UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SILVERCREEK MANAGEMENT, INC., et al.,

Plaintiffs,

-v-

CITIGROUP, INC., et al.,

Defendants.

02-CV-8881 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiffs, a group of investment funds, brought this action against Defendants, a set of

financial institutions and individuals, for conduct relating to the issuance of debt securities by

Enron Corporation ("Enron").[1]  (*See* Dkt. No. 10-115 ("TAC").)  Plaintiffs assert claims under

state tort law and federal securities law.  Although filed in this Court in 2002, this action was

consolidated with numerous other Enron-related actions in an MDL proceeding in Texas for

several years, returning to this Court in 2016.  Defendants move to dismiss Plaintiffs' complaint

---

[1]        "Plaintiffs" refers to Silvercreek Management Inc., Pebble Limited Partnership, Silvercreek Limited Partnership, OIP Limited, and Silvercreek II Limited, and will be also be referred to collectively as "Silvercreek." (TAC ¶¶ 8-13.)  "Defendants" refers to Credit Suisse (Credit Suisse First Boston LLC n/k/a Credit Suisse Securities (USA) LLC, Credit Suisse First Boston (USA), Inc. n/k/a Credit Suisse (USA), Inc. and Pershing LLC), Deutsche Bank (Deutsche Bank Alex. Brown, Inc. n/k/a Deutsche Bank Securities Inc. and Deutsche Bank AG), Merrill Lynch (Merrill Lynch & Co.), and Jeffrey K. Skilling, who joins the financial institutions' motion to dismiss.  (Dkt. No. 27; Dkt. No. 55.)  The operative complaint in this action named several other institutional and individual defendants.  The additional institutional defendants—Barclays (Barclays PLC and Barclays Capital Inc.) and JPMorgan (JP Morgan Chase & Co. and JPMorgan Securities Inc.)—have since settled with Silvercreek.  (FAC ¶¶ 14-16, 21-23; Dkt. No. 27 at 2.)  All but one of the additional individual defendants—Andrew S. Fastow, Richard B. Buy, James V. Derrick, Jr., and the Estate of Kenneth Lay—have not filed a responsive pleading.  The last individual defendant—Richard A. Causey—filed an answer and has not joined in the motion to dismiss.  (Dkt. No. 27 at 2; Dkt. No. 10-122.)

for failure to state a claim.  For the reasons that follow, the motion is granted in part and denied in part.

## I.     Background

This action has been pending since 2002 and involves allegations of misconduct relating to the collapse of Enron.  In October of 2001, Plaintiffs invested over $100 million in 7% Exchangeable Notes (the "7% Notes") and Zero Coupon Exchangeable Notes (the "Zero Notes") issued by Enron.  (TAC ¶ 1.)  At the time, Enron was the world's largest energy trader and was engaged in a variety of other related and unrelated businesses.  (*Id.*)

In a story that is by now well known, Enron's success was not to last.  In late 2001, Enron was forced to restate its financial results for the previous four years.  (*Id.* ¶ 2.)  The restatements, which dramatically reduced Enron's reported income and increased its reported debt, stemmed from the company's use of unconsolidated special purpose entities ("SPEs") and off-balance-sheet transactions.[2]  (*Id.*)  In their complaint, Plaintiffs describe several specific SPE transactions in great detail.  (*Id.* ¶¶ 183-248.)  Enron also engaged in a variety of other transactions such as

_____

[2]        Enron used SPEs as financing vehicles through which assets were sold to an off-balance-sheet entity in exchange for cash or other assets, funded by debt issued by the entity.  (TAC ¶ 122.)  SPEs allowed Enron to hide debt and underperforming assets by "selling" assets to highly leveraged SPEs at above-market prices, creating apparent cash flow from what was, at bottom, debt financing.  (*Id.*)  The SPEs enabled Enron to show artificially increased revenue, earnings, and cash flow, and—because the SPEs' assets and liabilities were not consolidated on the firm's balance sheet—reduced debt.  (*Id.* ¶ 123.)

prepay contracts ("prepays"),[3] minority-interest transactions,[4] and tax-driven transactions.[5]  (*Id.* ¶¶ 249-262.)  Enron filed for bankruptcy shortly after its financial restatement, and its auditor, Arthur Andersen LLP ("Arthur Andersen"), was found guilty of obstruction of justice and ultimately folded.  (*Id.* ¶ 3.)

Plaintiffs claim that, in investing in Enron's debt securities, they relied upon information contained and incorporated in the securities' prospectuses and registration statements, public disclosures and representations made by Enron management, and research reports and commentary by investment research analysts.  (*Id.* ¶¶ 4, 106-111, 164.)  The heart of Plaintiffs' claim is that Enron, and the individuals and institutions serving Enron, engaged in financial engineering designed to mislead investors and the public about the financial health of the firm. In this action, Plaintiffs seek to hold responsible the banks and individuals they allege are responsible for their losses.  (*Id.* ¶ 5.)

This background section will first briefly introduce each of the Defendants[6] (their actions in relation to Enron will be described in greater detail below) and will then provide an overview of the history of this action, from its initiation in 2002 through the present motion.

---

[3]    A "prepay" is an arrangement to pay in advance for a service to be provided in the future.  (TAC ¶ 249.)  These transactions were treated by Enron as cash flow, but Plaintiffs claim that their true economic effect was closer to that of a loan.  (*Id.*)  Plaintiffs allege that Enron engaged in approximately $4 billion of prepays in 2000.  (*Id.* ¶ 251.)

[4]    In a minority-interest transaction, debt financing is reflected on the company's balance sheet as a minority interest in a subsidiary, that is, as an asset, rather than as debt.  (TAC ¶ 258.)  From 1997 to 2000, Enron raised $2.75 billion through minority interest financing.  (*Id.* ¶ 259.)

[5]    Plaintiffs allege that Enron wrongly reported one-time tax-saving strategies as profits, and that it engaged in tax transactions that violated both tax law and accounting rules, resulting in a material overstatement of Enron's income.  (TAC ¶¶ 260-262.)

[6]    This discussion focuses only on the Defendants relevant for the purposes of this motion to dismiss.

### A.    Current Defendants

Defendants at issue in this motion to dismiss are three financial institutions—Credit Suisse, Deutsche Bank, and Merrill Lynch—and one Enron executive—Skilling.

Plaintiffs allege that Defendant Credit Suisse was an underwriter of the Zero Notes offering and provided commercial and investment banking services to Enron, including by structuring Enron's prepay transactions and SPEs.  (*Id.* ¶¶ 28, 31.)  Credit Suisse also had a business relationship with Silvercreek, providing brokerage services, research reports, and investment advice.  (*Id.* ¶ 30.)

Plaintiffs allege that Defendant Deutsche Bank provided commercial and investment banking services to Enron.  (*Id.* ¶ 20.)  Plaintiffs allege that Deutsche Bank "had a close relationship with Enron" and "knew that Enron was falsifying its financial reports."  (*Id.* ¶ 341.)  In particular, Plaintiffs allege that Deutsche Bank helped Enron structure multiple tax-related transactions and set up and finance SPEs.  (*Id.* ¶ 20.)  These transactions included eleven SPE transactions from 1995 to 2001, and a variety of other allegedly fraudulent schemes.  (*Id.* ¶ 341.)

Plaintiffs allege that Defendant Merrill Lynch provided commercial and investment banking services to Enron.  (*Id.* ¶ 35.)  In particular, they allege that Merrill Lynch helped Enron structure and finance SPEs and participated in transactions designed to mischaracterize loans as purchase and/or sale transactions, another effort to cover up Enron's indebtedness.  (*Id.*)

Defendant Jeffrey Skilling served in a variety of executive leadership roles at Enron.  He was President from 1997 to August 2001, Chief Operating Officer from January 1997 to February 2001, a Director from 1997, and Chief Executive Officer from February to August 2011.  (*Id.* ¶ 39.)  Skilling was ultimately convicted of securities fraud, sentenced to 24 years in prison, and fined $45 million; his conviction was affirmed in part by the United States Supreme Court.  (*Id.* ¶ 40.)  *See Skilling v. United States*, 561 U.S. 358 (2010).  Plaintiffs allege that

4

Skilling was "directly involved in creating and overseeing the off-book entities and fraudulent financial transactions which were used to inflate Enron's reported earnings and underreport Enron's debt." (TAC ¶ 264.)

### B.     Procedural Background

This action arrives at this Court more than a decade after the incidents giving rise to its claims. The suit was initially filed in the Southern District of New York on November 7, 2002. (Dkt. No. 1.) The case was assigned to then-District Judge Gerard E. Lynch. (Dkt. No. 3.) Several months later, it was transferred for pretrial purposes to the Southern District of Texas by the Judicial Panel on Multidistrict Litigation, where it was consolidated as part of the Enron Multidistrict Litigation ("MDL"), Number 1446, for which the lead case was *Newby v. Enron Corp.*, No. H-011-3624 (S.D. Tex.). (Dkt. No. 5.) Discovery in this action was completed by 2006 (with some exceptions) in accordance with the case management plan governing the *Newby* action. (Dkt. No. 27 at 1-2.)

On July 5, 2006, the MDL Court certified a plaintiff class; the Silvercreek Plaintiffs opted out of the class. (*Id.* at 2.) This action, and the other opt-out actions, were then stayed pending resolution of the *Newby* class action. (*Id.*)

On June 25, 2010, after the conclusion of the *Newby* action, the Silvercreek Plaintiffs moved to lift the stay and for leave to file a third amended complaint. (*Id.*) The MDL Court lifted the stay and granted leave to amend. (Dkt. No. 10-120.) The Silvercreek Plaintiffs filed the operative Complaint (the "TAC") in August 2011. (*See* TAC.) As discussed above, the TAC names five Financial Institution Defendants—Barclays, Credit Suisse, Deutsche Bank, JPMorgan, and Merrill Lynch—and six Enron Director/Officer Defendants—Fastow, Skilling, Causey, Buy, Derrick, and the Estate of Kenneth Lay. (*Id.*)

The Financial Institution Defendants jointly moved to dismiss the TAC in the Texas Court in September of 2011.  (Dkt. Nos. 10-123, 10-124.)  Causey and Skilling filed answers, and Skilling also joined in the motion to dismiss.  (Dkt. Nos. 10-122, 10-130, 10-131.)  After the completion of briefing, Silvercreek settled with Barclays and JPMorgan.  (Dkt. Nos. 10-148, 10-161.)  Fastow, Buy, Derrick, and the Estate of Lay have, to date, not responded.  (Dkt. No. 27 at 2.)

On March 21, 2016, Silvercreek filed a motion before the Judicial Panel on Multidistrict Litigation for remand to this District, which was granted.  (Dkt. Nos. 9, 10-183.)  The case was assigned to this Court on June 15, 2016.  (Dkt. No. 11.)  In light of the intervening years and developments since the initial filing of the motion to dismiss, the parties sought leave from this Court to submit new briefing on the pending motion to dismiss.  (Dkt. No. 27.)  The Court granted that request.  (Dkt. No. 37.)  The Court now considers that motion.

The Court also notes that in ruling on these claims, it is not writing on a blank slate—far from it.  Much ink has been spilled, mostly by the MDL Court, but also by the Fifth Circuit, addressing claims arising from Enron's demise.  While those rulings do not have precedential effect in this action, and the Court relies on the particularities of the circumstances here (as described in Silvercreek's Complaint) in arriving at its decision, such rulings provide helpful guidance.

## II.    Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In considering a motion to dismiss, courts must

accept as true all "factual allegations contained in the complaint," *Twombly*, 550 U.S. at 572, and

must draw "all inferences in the light most favorable to the non-moving party," *In re NYSE*

*Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (Sotomayor, J.).

Under Federal Rule of Civil Procedure 9(b), a plaintiff alleging fraud must state its claim

"with particularity." Fed. R. Civ. P. 9(b). The Second Circuit has "held that Rule 9(b) requires

that a complaint '(1) specify the statements that the plaintiff contends were fraudulent, (2)

identify the speaker, (3) state where and when the statements were made, and (4) explain why the

statements were fraudulent.'" *DiMuro v. Clinique Labs.*, LLC, 572 Fed App'x 27, 30 (2d Cir.

2014) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

## III.   Discussion

The Court first addresses each of the individual claims challenged by the Financial

Institution Defendants, and concludes with an analysis of the issues relating to Skilling.

### A.   Common Law Fraud (Count Four)

In order to plead fraud under New York law, a plaintiff must allege[7] (a) a material

misrepresentation or omission of fact; (b) defendant's knowledge of the falsity of the statement;

(c) intent to defraud; (d) reasonable reliance by the plaintiff; and (e) damage to the plaintiff. *See*

*Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006). Because the claim is for fraud,

it must satisfy the heightened pleading requirements of Rule 9(b). This requires a plaintiff to

specify the fraudulent statements, identify the speaker, state when and where the statements were

made, and explain why the statements were fraudulent. *Eternity Glob. Master Fund Ltd. v.*

*Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004).

---

[7]        Count Four for Common Law Fraud is alleged only against Skilling, Credit
Suisse, and Merrill Lynch.

To support its claim of fraud, Silvercreek alleges that it had longstanding relationships with Merrill Lynch and Credit Suisse, that it regularly communicated with their representatives regarding potential investments, and that it paid them hundreds of thousands of dollars in brokerage-related fees.  (TAC ¶¶ 675, 792-94.)  Silvercreek argues that this close relationship led it to trust Credit Suisse and Merrill Lynch.  (*Id.*)

Silvercreek contends that, in October 2001, representatives of Credit Suisse and Merrill Lynch recommended Enron's Zero Notes and 7% Notes to Silvercreek as a good investment. (*Id.* ¶¶ 677-80, 794-98.)  Sara Randell, a Credit Suisse representative, approached Silvercreek in October 2001 with the "opportunity" to purchase the Zero Notes, representing them as an attractive investment.  (*Id.* ¶ 678.)  Silvercreek claims that it had numerous conversations with Randell, Credit Suisse's convertible bond desk, and the firm's research analysts (including Rick Vossler and Charles Guggenheim), and that it reviewed detailed forecasts, analyst reports (dated October 16, 19, 22, 23, 24, and 26; authored by Jill Sakol Curt Launder, Phillip Salles, Andy De Vries, Charles Guggeneim, and Rick Vossler, and others), and other business valuation materials provided by Credit Suisse.  (*Id.* ¶¶ 640, 679, 682.)  Silvercreek claims that Credit Suisse represented that the securities were an attractive investment opportunity, that Enron's accounting treatment was appropriate, and that its investment-grade credit rating was secure.  (*Id.* ¶¶ 678-82.)  Silvercreek purchased the Zero Notes and the 7% Notes from Credit Suisse in reliance, it alleges, on these representations.  (*Id.*)

Merrill Lynch also contacted Silvercreek in October 2001 about the opportunity to invest in the 7% Notes.  (*Id.* ¶¶ 794-97.)  Silvercreek claims that it had several conversations with Merrill Lynch brokers (including Haig Altoonian, Mike Nahill, and Terry O'Connor) and research analysts in connection with its decision to purchase the securities.  (*Id.*)  Merrill Lynch similarly provided Silvercreek with models and forecasts, analyst reports, and a proprietary

investment tool.  (*Id.*)  Silvercreek claims that it read and relied upon Merrill Lynch's October 24, 2001 research report, which deemed it "<u>unlikely</u>" that Enron's credit rating would fall below investment grade.  (*Id.* ¶ 796.)

Silvercreek alleges that, in providing their recommendations to buy the Enron securities, Credit Suisse and Merrill Lynch failed to disclose material information about Enron's financial health: namely, that its financial statements overstated earnings and cash flow and understated debt, and that they played a role in facilitating Enron's accounting schemes.  (*Id.* ¶¶ 681, 798, 853.)  Silvercreek further claims that Credit Suisse and Merrill Lynch *knew* that Enron's reporting was fraudulent and misleading, and that they had incentives to promote Enron's securities in spite of their underlying weakness.  (*Id.* ¶¶ 599-663, 798.)

Merill Lynch and Credit Suisse move to dismiss.  They argue that Silvercreek fails to identify misrepresentations with sufficient specificity to satisfy Rule 9(b), that Silvercreek fails to allege scienter, and that Silvercreek did not reasonably rely on the recommendations.

The Court first addresses the element of scienter.  Merrill Lynch and Credit Suisse argue that Silvercreek has not adequately alleged knowledge or intent on the part of any individual who encouraged them to purchase Enron securities or any author of any of the analyst reports in question.  (Dkt. No. 50 at 10, 14.)

To prove scienter, a plaintiff must ultimately show that a defendant had knowledge of the falsity of the statement and an intent to defraud.  *Crigger*, 443 F.3d at 234.  While knowledge and intent "may be alleged generally," under the pleading standard of Federal Rule of Civil Procedure 9(b), a court "must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).

In order to survive a motion to dismiss under Rule 12(b)(6), "Plaintiffs must state facts sufficient to 'give rise to a strong inference of fraudulent intent.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 176 (2d Cir. 2015) (quoting *Lerner*, 459 F.3d at 290). "An inference is 'strong' if it is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* at 176-77 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)). "A fraud plaintiff may establish a 'strong inference' of scienter, among other ways, 'by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Id.* at 177 (quoting *Lerner*, 459 F.3d at 290–91). In making this determination, the Court must "consider the complaint in its entirety and 'take into account plausible opposing inferences.'" *Stratte–McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) (quoting *Tellabs*, 551 U.S. at 323).

The Second Circuit stated the standard that applies to allegations of scienter against corporate defendants in *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190 (2d Cir. 2008):

> When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter. In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant. But it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant.

*Id.* at 195. The Second Circuit has further clarified that for a corporate defendant "it is possible to plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently

10

knowledgeable about the company to know' that those statements were misleading." *Loreley*, 797 F.3d at 177 (quoting *Teamsters Local*, 531 F.3d 195-96).

Silvercreek encourages the Court to adopt a broader approach to allegations of corporate scienter that disconnects the alleged misstatements at issue from the locus of knowledge of the misstatements' falsity, by imputing separate instances of specifically pleaded misstatements and knowledge to the corporation writ large.

While Silvercreek is correct that "there is no requirement 'that the *same individual* who made an alleged misstatement on behalf of a corporation personally possessed the required scienter,'" *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) (emphasis added) (quoting *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005)),[8] the facts alleged must nonetheless satisfy the requirement of *Teamsters Local* that "*someone* whose intent could be imputed to the corporation acted with the requisite scienter" or that the statements would have been approved by somebody with the requisite knowledge, *Teamsters Local*, 513 F.3d at 195. That is, under Second Circuit precedent, it is not enough to *separately* allege misstatements by some individuals and knowledge belonging to some others where there is no strong inference that, in fact, there was a connection between the two. The example cited in *Teamsters Local* describing a situation where a strong

---

[8]    Indeed, a fraud plaintiff "is not required to identify specifically the individuals at [the corporate entity] who acted with scienter in order to plead scienter with respect to [the corporation]." *Solow v. Citigroup, Inc.*, 827 F. Supp. 2d 280, 291 (S.D.N.Y. 2011); *see also Plumbers and Pipefitters Local Union No. 719 Pension Trust Fund v. Conseco Inc.*, No. 09 Civ. 6966, 2011 WL 1198712, at *23 (S.D.N.Y. Mar. 30, 2011) ("A finding that the Complaint fails to allege scienter with respect to any individual defendant does not necessarily, as a matter of law, preclude a finding that it adequately alleges scienter with respect to a corporate defendant."); *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005) ("To carry their burden of showing that a corporate defendant acted with scienter, plaintiffs in securities fraud cases need not prove that any one individual employee of a corporate defendant also acted with scienter.  Proof of a corporation's collective knowledge and intent is sufficient.").

inference of scienter could be alleged independent of any individual allegations supports this nexus requirement:

> [I]f General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero . . . [t]here would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

*Id.* at 195-96 (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)).  This example makes clear the requirement of some connection at the corporation between a misstatement and the requisite quantum of knowledge of its falsity (in the example, by requiring someone with the required knowledge to approve the misstatement).  This point is further underscored by the *Teamsters Local* court's insistence that any court finding a strong inference of corporate scienter from disconnected acts and knowledge is the *exception* rather than the rule.

Considering the complaint in its entirety, the Court concludes that Silvercreek has not alleged circumstances that establish a strong inference of scienter on the part of Merrill Lynch or Credit Suisse.

Silvercreek has alleged that there were individuals in both firms who were likely aware of Enron's financially manipulative transactions and, separately, that there were individuals who recommended that Silvercreek purchase Enron's securities (including research analysts who provided positive reports of Enron's financials).  But, critically, Silvercreek has not alleged a connection between the recommendations and reports (the alleged misstatements) and the knowledge of their falsity sufficient to support a strong inference that the alleged misstatements themselves were made with an intent to defraud.

Specifically, as regards the individuals who recommended Enron's securities to Silvercreek—Randell from Credit Suisse, and Altoonian, Nahill, and O'Connor from Merrill Lynch—the Complaint does not specifically allege that they were involved in or even aware of the deceptive financing techniques and accounting-driven transactions that the banks were elsewhere helping Enron to engage in. As a result, none of these individuals could have acted with the requisite scienter to intentionally mislead Silvercreek into purchasing the securities through knowing misstatements about Enron's financial health.

Similarly, as regards the analyst reports, the Complaint nowhere alleges that any of the authors of those reports, or anybody directly responsible for approving their contents, was aware of Enron's financial manipulation so as to render the statements in the reports knowingly and intentionally false. Though Silvercreek alleges a scheme by which Defendants' analysts may have been pressured to positively report on Enron (TAC ¶¶ 777-80),[9] or that other portions of Defendants' organizations may have been aware of Enron's financial engineering (*id.* ¶¶ 640-43, 657-58),[10] these allegations do not give rise to a strong inference that the analysts authoring the reports or anybody directly approving them acted with the requisite scienter.

---

[9]      As regards Merrill Lynch, Silvercreek alleges a scheme by which Merrill Lynch analyst coverage of Enron was potentially overstated. Silvercreek notes in the complaint that the Enron Bankruptcy Examiner found evidence demonstrating Enron's influence over Merrill Lynch's analyst coverage, including a strong connection between "upbeat" analyst reports and Merrill Lynch participation in Enron financings. (TAC ¶ 777.) The complaint goes on to describe the pressure on Merrill Lynch analysts to maintain favorable coverage of Enron. On one occasion, an unfavorable analyst report led to the loss of underwriting business from Enron, which in turn led Merrill Lynch to fire the responsible analyst; a new analyst was hired, who positively covered Enron, and Enron's business returned. (*Id.* ¶ 780.) However, a general desire to attract Enron's business through positive coverage—a plausible inference from the pleaded facts—does not knowledge of fraud make.

[10]      As regards Credit Suisse, Silvercreek alleges that Credit Suisse was aware that Enron's financial statements did not reflect its underlying financial health as a result of its involvement in structuring Enron's transactions. (TAC ¶¶ 657-58), and that at the time Credit

In their brief in opposition, Silvercreek provides a list of individuals with "the requisite knowledge and intent." (Dkt. No. 63 at 19.) However, Silvercreek does not sufficiently connect any of these individuals to *both* knowledge of Enron's wrongdoing and the dissemination of the misstatements at issue. Some of the individuals they list—from Credit Suisse: Osmar Abib, Laurence Nath, "Credit Suisse senior executives," Wesley Jones, and Robert Jeffe; and from Merrill Lynch: "Senior Merrill Lynch executives," Schuler Tilney, and Rick Gordon—may have been aware of Enron's financial reality. While others—such as Jill Sakol from Credit Suisse— may have been involved in the publication of analyst reports or the issuance of recommendations. But absent a pleaded connection between these two discrete groups of employees, Silvercreek has not alleged a strong inference of scienter.

Silvercreek also argues for a "conduit" theory of corporate liability for the statements made in analyst reports. (Dkt. No. 63 at 21.) Under this theory, "[t]hat the Complaint does not allege scienter on the part of particular brokers or analysts is irrelevant; these individuals were allowed to communicate false recommendations regarding Enron on the basis of financial information that executives at the highest levels . . . knew to be false." (*Id.*) In support of this theory, Silvercreek cites a decision of the MDL Court applying a conduit theory to find corporate liability for the statements of research analysts. (*See* Dkt. No. 64 Ex. 5 at 136 (providing a copy of the opinion in *Am. Nat'l Ins. Co. v. Citigroup, Inc.*, No. H-01-3624 (S.D. Tex. Jan. 19, 2010).)

However, Plaintiffs fail to meet the requirements of alleging liability under this theory. The conduit theory functions to impute an employee's misstatements to a corporate defendant where the defendant "used the analysts as a conduit, making false and misleading statements to

---

Suisse was recommending Enron securities to Silvercreek it was reducing its own exposure to Enron while refusing to publicly downgrade Enron's debt securities (*id.* ¶¶ 640-63).

securities analysts with the intent that the analysts communicate those statements to the market." *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 373 (5th Cir. 2004). But in order to plead fraud under this theory, a plaintiff must: "(1) identify the specific forecasts and name the insider who adopted them; (2) point to specific interactions between the insider and the analyst which allegedly gave rise to the entanglement; and (3) state the dates on which the acts which allegedly gave rise to the entanglement occurred." *Id.* at 373-74 (citing *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987)).  While Silvercreek alleges at a high level the possibility that there was pressure exerted on analysts to positively cover Enron, Silvercreek's pleading does not describe the nature of that pressure, or any specific interactions between insiders and analysts with sufficient specificity to make out a claim under a theory of conduit liability.

In fact, the MDL Court dismissed similar claims against Deutsche Bank for failure to adequately allege scienter.[11]  *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 761 F. Supp. 2d 504, 575-77 (S.D. Tex. 2011).  That court dismissed claims relating to particular offering pamphlets, finding that the plaintiffs there "fail to allege facts showing that a particular Deutsche Bank representative knew these statements were misrepresentations . . . and with scienter created, drafted or directed the drafting of either of these pamphlets." *Id.* at 576.  And it further dismissed allegations of fraud relating to misstatements by specific employees, finding that "[f]or none of them do Plaintiffs adequately plead facts showing material misrepresentations or fraudulent intent (by either showing motive and opportunity to commit fraud or circumstances

---

[11]     The MDL Court here was considering common-law fraud claims under New York and Texas law, which it deemed to be "essentially the same." *In re Enron*, 761 F. Supp. 2d at 574 ("[C]ommon law claims for fraud and civil conspiracy are essentially the same under Texas and New York law, so there is no conflict and therefore no need to determine which governs.").

indicating conscious misrepresentation or behavior).” *Id.*  In particular, the MDL Court faulted

the plaintiffs there for failing to provide specific facts explaining how the employees in question

had knowledge of the falsity of their alleged misstatements.  *See id.* (“While the complaint states

that Stark claimed that Rubin failed to tell the truth about the assets purchased by Osprey, the

complaint nowhere provides specific facts showing that Rubin knew anything about such matters

as the nature of the assets to be purchased by Osprey or Citigroup's use of Osprey to offload $40

million of its risky exposure to Enron.”); *id.* at 577 (“The complaint conclusorily asserts that

Jakubik ‘knew the Osprey offerings were intended to create a vehicle for dumping [Enron's]

problem assets to avoid dramatic write-downs and receiv[e] cash well in excess of the fair

market value of these assets,’ while the Osprey Trust was ‘a mechanism for funding these

overpriced acquisitions with Plaintiffs' funds.’  It alleges no facts showing how, where, when or

from what he supposedly learned these things to support an inference of scienter.” (internal

citation omitted) (alterations in original)).

 Because Silvercreek has failed to adequately allege scienter, the fraud claim against

Merrill Lynch and Credit Suisse must be dismissed and the Court need not consider whether

Silvercreek has adequately pleaded the other elements of its fraud claim.

 **B.**  **Aiding and Abetting Fraud (Count One)**

 Silvercreek brings a claim of aiding and abetting fraud against all of the Financial

Institution Defendants.  (TAC ¶¶ 802-13.)

 A complaint states a claim for aiding and abetting fraud by alleging, consistent with the

heightened pleading standard of Rule 9(b): (1) a fraud; (2) the defendant's actual knowledge of

the fraud; and (3) the defendant's substantial assistance to the fraud.  *Krys v. Pigott*, 749 F.3d

117, 127 (2d Cir. 2014); *Oster v. Kirschner*, 77 A.D.3d 51, 55-56 (N.Y. App. Div. 1st Dep't

2010).  To plead substantial assistance, the complaint must allege that the aider “made a

substantial contribution to the perpetration of the fraud." *JPMorgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 257 (S.D.N.Y. 2005). Substantial assistance exists "where a defendant 'affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed.'" *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001) (quoting *Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.*, No. 98 Civ. 4960, 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999)). The MDL Court made clear that substantial assistance "can take many forms," such as "executing transactions" or helping a firm to present an "enhanced financial picture to others." *In re Enron Corp.*, 511 F. Supp. 2d 742, 806 (S.D. Tex. 2005).

## 1.      Underlying Fraud by Enron

As a threshold matter, Silvercreek meets the first prong by adequately alleging an underlying fraud by Enron. The Complaint describes in detail numerous transactions engaged in by Enron designed to misstate income and debt—and these misstatements, Silvercreek represents, were relied upon in its decision to purchase Enron securities. Specifically, as discussed above, these transactions include over-reporting income and under-reporting debt in connection with SPE transactions, prepays, minority-interest transactions, and tax transactions, as described in detail above. (TAC ¶¶ 171, 185, 191, 211-12, 218, 235, 239-62.) The Complaint also shows the financial impact of Enron's misstatements by describing and providing dollar amounts for the restatements of Enron's financials, detailing how these restatements draw into question statements made in the registration statements and prospectuses for the 7% Notes and the Zero Notes. (TAC ¶¶ 118-19.) The Complaint even makes clear that several senior officers of Enron admitted to engaging in accounting fraud. (*E.g.* TAC ¶¶ 224-25.)

These descriptions are adequate to allege a predicate fraud to support Silvercreek's aiding and abetting claim. To that end, both the MDL Court and the Fifth Circuit have upheld allegations of underlying fraud by Enron so as to support an aiding and abetting claim against

bank defendants.  *See Regents of Univ. of Calif. v. Credit Suisse First Boston (USA), Inc.*, 482

F.3d 372, 386 (5th Cir. 2007) ("Presuming plaintiffs' allegations to be true, Enron committed

fraud by misstating its accounts, but the banks only aided an[d] abetted that fraud by engaging in

transactions to make it more plausible . . . .").

### 2. Actual Knowledge and Substantial Assistance

In addition to alleging the existence of an underlying fraud, Silvercreek must plead that

Defendants had actual knowledge of the fraud and provided substantial assistance to it.  *See*

*Oster*, 77 A.D.3d at 55-56.

Silvercreek provides allegations that support an inference of knowledge for each of the

Financial Institution Defendants.

Regarding Credit Suisse, the Complaint alleges that Credit Suisse had a "long and close

relationship to Enron, which made it privy to material facts about Enron's financial condition."

(TAC ¶ 588.)  Credit Suisse bankers "knew that Enron had at least '8-12 billion' in hidden debt"

and, in fact, knew that the actual amount was closer to $36 billion.  (*Id.* ¶¶ 642, 662.)  The

Complaint also alleges that Credit Suisse participated in, helped structure, invested in, and lent to

transactions in which Enron hid underperforming assets and debt.  (*Id.* ¶¶ 588-639.)  Among

these transactions were ones in which Credit Suisse helped create false revenue and hide debt by

holding "equity" in SPEs, which qualified them for off-balance-sheet treatment, even though the

equity was to be repaid at par and the risk to the equity was Enron's credit risk—in other words,

a loan.  (*Id.* ¶¶ 599-603.)  Similarly, Credit Suisse participated in prepay transactions to help

Enron manipulate its financial reports by providing cash to Enron upfront to be paid later—

again, the functional equivalent of a loan.  (*Id.* ¶¶ 604-06.)  Credit Suisse also helped Enron

design a structure to allow it to engage in hedging transactions on non-arm's-length terms.  (*Id.*

¶ 622.)  Silvercreek alleges throughout the complaint that Credit Suisse had "awareness of the

true nature of the . . . transaction (and Enron's intent to fraudulently report it)," and marshals emails from within Credit Suisse that support the allegation of knowledge.  (*Id.* ¶ 608 ("Is it OK for us to be entering into such an 'obvious' loan transaction?"); *see also id.* ¶ 633 (describing Enron as a "house of cards").)  Silvercreek also quotes a March 2002 report from an Enron insider quoted in the Financial Times stating that: "There's no question that senior people at CSFB knew what was going on and that it was a house of cards."  (*Id.* ¶ 632.)  Silvercreek further alleges that Credit Suisse profited handsomely from its relationship with Enron.  (*Id.* ¶ 629.)

Regarding Deutsche Bank, the Complaint alleges that Deutsche Bank engineered and implemented numerous transactions designed to overstate income and understate debt, transactions that an internal Deutsche Bank memo described as "unique and lucrative."  (*Id.* ¶ 347.)  As with Credit Suisse, the Complaint alleges that Deutsche Bank "had a close relationship with Enron," and that "Deutsche Bank's top officials had frequent communications with Enron's executives," and that "Deutsche Bank knew that Enron was falsifying its financial reports."  (*Id.* ¶ 341.)  Indeed, Deutsche Bank's October 2001 Underwriting Committee Amended Minutes note that "Enron has considerable off-balance-sheet liabilities [and] lacks transparency with respect to its hedging activities."  (*Id.* ¶ 355.)  The Complaint alleges that Deutsche Bank crafted a number of tax transactions for Enron that allowed Enron to inflate profit and revenue by creating tenuous future tax deductions; these transactions are alleged to have lacked any business purpose and to have caused Enron to materially misstate its financial condition in its financial statements in violation of GAAP and tax laws.  (*Id.* ¶¶ 360-432.)  The Complaint identifies each Deutsche Bank employee who was involved in the transactions, along with the specifics of four of the transactions themselves, which resulted in an over $400 million impact on Enron's net income.  (*Id.* ¶¶ 363, 366.)  The Complaint further alleges Deutsche

Bank's involvement in various additional tax-accommodation transactions and SPE transactions. (*Id.* ¶¶ 433-57.)  The Complaint makes clear allegations of Deutsche Bank's knowledge of the true nature of these transactions, contending that "Deutsche Bank recognized that Enron used off-balance-sheet financings and understood that the misleading disclosure of such transactions made it impossible to understand the total extent of Enron's obligations," and had an internal view of Enron's creditworthiness that was much less optimistic than that of external credit rating agencies.  (*Id.* ¶¶ 463-64.)

Finally, regarding Merrill Lynch, the Complaint alleges involvement in many transactions similar to those engaged in by Credit Suisse and Deutsche Bank.  (*Id.* ¶¶ 684-801.) As with Credit Suisse and Deutsche Bank, Merrill Lynch had a close relationship with Enron— in fact the head of Merrill Lynch's Energy Investment Banking operations was married to a Senior Vice President at Enron—and profited from the relationship.  (*Id.* ¶ 684.)  The Complaint alleges that Merrill Lynch "knew that Enron was providing false financial information in its public reports and disclosures, and that its true financial condition was far different from what it was reporting to the public."  (*Id.* ¶ 688.)  The Complaint focuses on certain of Merrill Lynch's transactions, the "Year-End 1999 Transactions" (also called the Nigerian Barge Transaction[12] and Electricity Trades Transaction), which were used to overstate Enron's income.  (*Id.* ¶¶ 699, 726-53.)  The Complaint describes how Merrill Lynch agreed with Enron to engage in these transactions, knowing that if the nature of their agreement were disclosed, Enron would not be

---

[12]     The Nigerian Barge Transaction, for example, involved Enron's selling an ownership interest in three floating power plants to a Merrill Lynch-created SPE, which "paid" for the barges using $7 million in cash from Merrill Lynch and a loan from an Enron affiliate; the Merrill Lynch SPE would "purchase" stock in an Enron subsidiary, but would be repaid for its "investment" within six months, at a 15 percent rate of return.  (*Id.* ¶ 727-31.)  Enron booked the transaction as a sale, but only as a result of keeping its guarantee to repay Merrill Lynch a secret. (*Id.* ¶¶ 732-34.)  The Complaint clearly alleges that "[b]oth Enron and Merrill Lynch were aware that the structure of the transaction would be flouting basic accounting rules."  (*Id.* ¶ 732.)

able to report the transactions as income.  (*Id.* ¶ 714.)  And the Complaint describes emails

evincing Merrill Lynch's concern for "reputational risk" around its involvement in Enron's

"income statement manipulation" (*id.* ¶ 745), as well as the United States Department of

Justice's determination that Merrill Lynch violated federal criminal law in connection with the

Year End 1999 Transactions (*id.* ¶ 699), and Merrill Lynch's settlement with the SEC (in a

settlement including $80 million in disgorgement and penalties) for allegations relating to the

same transactions (*id.* ¶ 703).  The Government also pressed criminal charges against several

Merrill Lynch employees for conspiring with and aiding Enron to knowingly commit fraud.  (*Id.*

¶ 704.)  According to the Complaint, Merrill Lynch was also involved in, and its executives

invested in, the LJM2 transaction—a vehicle that allowed Enron to engage in self-dealing

transactions to inflate earnings and hide debt while earning returns for investors—and in energy

call contracts, through which Enron booked additional unearned profit.  (*Id.* ¶¶ 718-25, 754-776.)

Thus, as with Deutsche Bank and Credit Suisse, Silvercreek clearly alleges Merrill Lynch's

knowledge of Enron's true financial position and its role in assisting Enron to falsely report its

financial condition.  (*Id.* ¶¶ 786-791.)

The allegations in the Complaint are both specific and wide-ranging, and adequately

allege the knowledge of the Financial Institution Defendants.  *See Krys*, 749 F.3d at 130

(requiring that allegations be more that "conclusory").

The allegations also adequately plead substantial assistance by Defendants.  While "[t]he

mere fact that participants in a fraudulent scheme use accounts at [a financial institution] to

perpetrate it, without more, does not in and of itself rise to the level of substantial assistance,"

*Berman v. Morgan Keegan & Co.*, 455 F. App'x 92, 96 (2d Cir. 2012) (quoting *S.E.C. v. Lee*,

720 F. Supp. 2d 305, 330 (S.D.N.Y. 2010)), the alleged level of involvement here, including

participation in "atypical financial transactions," rises well beyond "mere participation" to the

point of knowing, substantial assistance, *In re Gas Reclamation, Inc. Sec. Litig.*, 659 F. Supp. 493, 504 (S.D.N.Y. 1987) .

In arguing that the claims levied against them are insufficient to state a claim, Defendants point to an opinion by the MDL Court that dismissed a claim against Deutsche Bank for aiding and abetting fraud under New York law for failure to plead actual knowledge.  *See In re Enron*, 761 F. Supp. 2d at 540 ("Plaintiffs . . . do not plead facts that establish that anyone at Deutsche Bank knew at the time of entering into the transactions how Enron would disclose them, that they were improper, or that Enron was entering into them to commit fraud.  Absent such details, the aiding and abetting claim must be dismissed for failure to plead actual knowledge of the underlying fraud.").  However, in an earlier opinion, the MDL Court allowed just such a claim, brought under Texas law[13] against Merrill Lynch, to survive a motion to dismiss.  *See In re Enron Corp. Sec., Derivative & ""ERISA" Litig.*, 490 F. Supp. 2d 784, 821 (S.D. Tex. 2007) ("The complaint . . .  demonstrates that Merrill Lynch gave substantial assistance to Enron in cooking its books and its SEC-filed reports . . . .  The complaint states facts that suggest Merrill Lynch acted with intent to deceive investors like Plaintiffs or acted with reckless disregard regarding Enron's alleged untruthful or illegal activity.")  This comparison makes clear the highly context-specific and pleading-dependent nature of the Court's inquiry here.  The fact that the MDL Court found that the complaint against Deutsche Bank in the earlier action failed to state a claim (and found that the complaint against Merrill Lynch did state a claim) has no

---

[13]       "To state a claim for aider and abettor liability under the [Texas Securities Act], a plaintiff must allege that (1) there was a primary violation of the securities laws, here allegedly by Enron, (2) the aider and abettor had a general awareness of his role in the violation, (3) the aider and abettor gave substantial assistance in the violation, and (4) the aider and abettor intended to deceive the plaintiff or acted with reckless disregard for the truth of the primary violator's misrepresentations."  *In re Enron*, 490 F. Supp. 2d at 790.

bearing on whether the Plaintiffs in this action, with this Complaint, have done so.  As discussed above, Silvercreek provides ample detail about who at Deutsche Bank knew about the nature of the transactions and their fraudulent underlying purpose, and does so with sufficient specificity to allege Defendants' actual knowledge and substantial assistance.

As a final matter, Defendants contend that Silvercreek fails to allege that Enron's fraud (and Defendants' participation in it) was the proximate cause of Silvercreek's losses.  (Dkt. No. 50 at 22-23; Dkt. No. 51 at 8-11.)  But Silvercreek alleges with particularity how the Financial Institution Defendants knowingly helped Enron engage in fraudulent transactions, which, when revealed, directly caused Silvercreek's loss.  *See Winnick*, 406 F. Supp. 2d at 256.  At this stage, the Court need not disaggregate the numerous revelations that led to Enron's demise; it is sufficient to conclude that Silvercreek has clearly alleged that Defendants' conduct reasonably foreseeably led to its injuries.  *See Cromer*, 137 F. Supp. 2d at 470.

Accordingly, the claim for aiding and abetting fraud survives the motion to dismiss.

### C.      Common Law Conspiracy (Count Two)

Silvercreek brings a claim of conspiracy to commit fraud against all of the Financial Institution Defendants.  (TAC ¶¶ 814-29.)

"To adequately plead claims for conspiracy to commit fraud under New York law, in addition to pleading the underlying fraud, the [plaintiff] must allege the following with the required specificity as to each defendant: '(1) an agreement among two or more parties, (2) a common objective, (3) acts in furtherance of the objective, and (4) knowledge.'" *Winnick*, 406 F. Supp. 2d at 259 (quoting *Filler v. Hanvit Bank*, No. 01 Civ. 9510, 2003 WL 22110773, at *2 (S.D.N.Y. Sept. 12, 2003)).  A claim for conspiracy to commit fraud is also subject to Rule 9(b)'s heightened pleading standard.  See *Fezzani v. Bear, Stearns & Co.*, 592 F. Supp. 2d 410, 428-29 (S.D.N.Y. 2008).

Defendants argue that because Silvercreek fails to plead an underlying fraud against Enron, the claim for conspiracy to commit fraud must necessarily fail.  (Dkt. No. 50 at 24.)  *See Sedona Corp. v. Ladenburg Thalmann & Co.*, No. 03 Civ. 3120, 2005 WL 1902780, at *17 (S.D.N.Y. Aug. 9, 2005).  However, because the Court has found that Silvercreek has adequately alleged Enron's underlying fraud—namely, the knowing and intentional misstatement of its financial statements to the detriment of its investors—the claim for conspiracy does not fail on this account.

Defendants also argue that the conspiracy claim itself must fail because Silvercreek's allegations have not been pleaded with sufficient particularity to satisfy the heightened requirements of Rule 9(b).  (Dkt. No. 50 at 25.)  Defendants claim that Silvercreek fails to allege that Defendants entered into an agreement with Enron to effectuate the alleged scheme of transactions by which Enron misaccounted its financials.  (*Id.*)

The Complaint, however, tells a different story.  Silvercreek alleges that Defendants knowingly agreed to participate in allegedly fraudulent transactions to help Enron mis-report its income and debt and committed acts in furtherance of this common scheme.  (*See, e.g.*, TAC ¶¶ 341-58, 478 (Deutsche Bank); *id.* ¶¶ 595-98 (Credit Suisse); *id.* ¶¶ 684-90 (Merrill Lynch)).  These allegations—though they do not plead a formal, back-room agreement among all Defendants and Enron—are nonetheless sufficient to state a conspiracy claim.  *See Sedona Corp.*, 2005 WL 1902780, at *17 ("[D]isconnected acts, when taken together, may satisfactorily establish a conspiracy.").  Accordingly, Silvercreek's conspiracy claim survives Defendants' motion to dismiss.

Notably, the MDL Court refused to dismiss allegations of conspiracy against Merrill Lynch and other financial institution defendants based upon a similar set of allegations to those adduced in the Complaint here.  *See In re Enron*, 490 F. Supp. 2d at 826 ("Plaintiffs have pled

24

facts suggesting a meeting of the minds of Enron and Merrill Lynch officials, a concert of action, and overt acts in furtherance of the conspiracy to allow Enron to 'cook its books,' file false and unlawful SEC reports, and deceive the investing public, including Plaintiffs, about Enron's financial condition."); *see also In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. MDL-1446, 2010 WL 9077875, at *49 (S.D. Tex. Jan. 19, 2010) ("Plaintiffs have adequately stated a plausible claim of conspiracy to defraud against RBC and Enron. . . . [T]hey have alleged the underlying fraud against Enron aided by RBC, both affirmative misrepresentations and fraudulent concealment, in great detail, and Plaintiffs' reliance on the misrepresentations and omissions."); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 540 F. Supp. 2d 759, 799 (S.D. Tex. 2007) ("The Court agrees with Plaintiffs that they have alleged facts and circumstances implying a meeting of the minds in a conspiracy to deceive the market about Enron's actual financial condition and concerted action to accomplish that end.").

### D.   Section 11 Claim (Count Six)

Silvercreek also asserts claims for violations of Section 11 of the Securities Act against Deutsche Bank, Credit Suisse, and the Officer Defendants.  (TAC ¶¶ 879-900.)  Defendants argue that Silvercreek's Section 11 claims should be dismissed because they fail to satisfy the heightened pleading requirement of Rule 9(b).  (Dkt. No. 50 at 26.)  Deutsche Bank and Credit Suisse, moreover, argue that Silvercreek has failed to adequately allege that they were underwriters of the securities in question, which is a requirement for their liability under Section 11.  (Dkt. No. 51 at 12-15; Dkt. No. 53 at 2-6.)

The parties first dispute whether the heightened pleading requirement of Rule 9(b) applies to Silvercreek's Section 11 claim.  In the Second Circuit, Section 11 claims, which do not require an allegation of scienter, *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1323 (2015), are required to satisfy Rule 9(b) only where they

"rely upon averments of fraud," *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).  Where a

complaint states a Section 11 claim based on negligence, it does not need to satisfy Rule 9(b).

*Id.* at 171-72.  Where a plaintiff expressly disclaims allegations of fraud and affirmatively alleges

negligence, this is generally sufficient to relieve the plaintiff of Rule 9(b)'s requirements.  *See In*

*re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 757 F.

Supp. 2d 260, 322 (S.D.N.Y. 2010).

Here, Silvercreek has pleaded enough to exempt its Section 11 claim from Rule 9(b).

Silvercreek expressly disclaims allegations of fraud and recklessness in connection with the

claim.  (TAC ¶ 879-80.)  Silvercreek also affirmatively alleges negligence in connection with

this claim.  (*Id.* ¶ 887 (alleging that Defendants failed to "ma[k]e a reasonable investigation and

none of them possessed reasonable grounds for believing that the statements contained in the

registration statement were true, did not omit any material fact, and were not materially

misleading").)  The mere presence of fraud allegations elsewhere in the complaint does not

poison the well.

The MDL Court, considering similar allegations, reached a similar conclusion, finding

that, because "[t]he amended pleading expressly states that Plaintiffs' section 11 claims . . .

against all three Underwriter Defendants do 'not sound in fraud,' . . . Rule 9(b)'s requirement . . .

does not apply."  *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. MDL-1446,

2003 WL 23305555, at *13 (S.D. Tex. Dec. 11, 2003).

Turning to the potential liability of Defendants here under Section 11, the provision

"allows purchasers of a registered security to sue certain enumerated parties [including

underwriters] in a registered offering when false or misleading information is included in a

registration statement."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983) (citing

15 U.S.C. § 77k(a)).  The Securities Act further defines an underwriter as "any person who has

purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking." 15 U.S.C. § 77b(a)(11).  Determining whether a party is an underwriter for the purposes of liability under Section 11 is an objective and fact-specific inquiry.  *See SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 432 (S.D.N.Y. 2007).  It is enough, for example, where "associates arranged to have their stock included in one of the . . . registration statements and were identified as putative underwriters in the . . . prospectus," transforming defendants into "participants in the . . . distribution and accordingly . . . underwriters."  *Byrnes v. Faulkner, Dawkins & Sullivan*, 550 F.2d 1303, 1311-12 (2d Cir. 1977).

Here, Silvercreek has more than met that threshold by alleging that both Deutsche Bank and Credit Suisse participated in the underwriting of the Zero Notes by purchasing them with a view to their distribution.  *See* 15 U.S.C. § 77b(a)(11).  Silvercreek has alleged, *inter alia*, that Deutsche Bank assisted in the preparation and dissemination of the initial offering memorandum and was featured on its front page (TAC ¶¶ 146-48); that Deutsche Bank and Credit Suisse owned the Zero Notes when they became registered and promptly sold them (*id.* ¶ 149); that the registration statement provided that Deutsche Bank and Credit Suisse "intend to distribute the notes" (Dkt. No. 63 at 47 (quoting Dkt. No. 52-1 Ex. 1 at 44-46).); and that the registration statement for the Zero Notes expressly stated that Defendants "may be deemed to be 'underwriters' within the meaning of the Securities Act" (TAC ¶ 153). Such actions are sufficient to plead that Defendants were underwriters for the purpose of surviving a motion to dismiss.

Deutsche Bank and Credit Suisse make several unsuccessful arguments for why they should not be considered underwriters.

First, Deutsche Bank argues that it cannot be an underwriter because it purchased the securities in an earlier private offering, and the mere existence of a later public offering is insufficient to transform it into an underwriter.  (Dkt. No. 51 at 12-15.)  It is true that the Zero Coupon notes were offered in two separate transactions (first as a private placement and then, subsequently, pursuant to a registration statement (TAC ¶¶ 143, 150)), and that Section 11 does not apply to private offerings, *see, e.g.*, *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 430 (S.D.N.Y. 2001).  But the parties disagree as to whether these two transactions—the earlier private offering and the later public offering—should be merged so as to treat them as a single public offering.

Courts in this District generally refuse to merge the two-step transaction (a so-called "Exxon Capital exchange") and avoid treating purchasers in the first step as purchasers pursuant to a public offering for the purposes of liability under the Securities Act.  *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 627-28 (S.D.N.Y. 2007); *In re Livent*, 151 F. Supp. 2d at 432; *cf. In re Safety-Kleen Corp. Bondholders Litig.*, 2002 WL 32349819, at *1 (D.S.C. 2002).  But Silvercreek argues that the Exxon Capital exchange exception is a narrow exception to a broader rule that transactions "should be viewed through an 'integrated' analysis" where "the evidence support[s] a finding that the [two transactions] constituted a single transaction, both in the minds of the parties and in terms of the effect on the investing public."  *S.E.C. v. Lybrand*, 200 F. Supp. 2d 384, 395 (S.D.N.Y. 2002), *aff'd sub nom. S.E.C. v. Kern*, 425 F.3d 143 (2d Cir. 2005).  Further, Silvercreek argues that the Exxon Capital exchange exception does not apply where a putative underwriter later sells the registered security, *see, e.g.*, *In re Livent, Inc. Noteholders Sec. Litig.*, 174 F. Supp. 2d 144, 157 (S.D.N.Y. 2001), even if it initially purchased the security in an exempt private placement.

Based on the pleadings, and with all inferences drawn in Silvercreek's favor, Defendants' two-step objection is unavailing.  Specifically, Silvercreek alleges that "Deutsche Bank . . . solicited, offered and sold the Zero Notes to the investing public pursuant to the registration statement"  (TAC ¶ 884), and describes how "[i]n the initial stage one of the private placement . . . Enron sold $1.9 billion in Zero Notes, . . . to the initial underwriters, including . . . Deutsche Bank . . . . (TAC ¶ 149).   "The initial underwriters then resold some of the Notes to institutional purchasers . . . and resold the balance in the stage two public offering, once the registration statement for these Notes had become effective."  (TAC ¶ 149.)  Though Deutsche Bank argues that it did not, in fact, sell the securities pursuant to the registration statements, its objections only raise questions of fact and are thus not sufficient to prevail at the motion-to-dismiss stage. *See In re Livent*, 174 F. Supp. 2d at 157 (rejecting a defendant's "assertions that it did not act as an underwriter and did not sell registered Notes," where "the Noteholders' contrary claims squarely raise issues of fact").

Credit Suisse argues that Silvercreek has not alleged that Credit Suisse purchased the Zero Notes "from an issuer," namely Enron, as is required to be deemed an underwriter.  *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 177 (2d Cir. 2011); *see also* 15 U.S.C. § 77b(a)(11).  (*See* Dkt. No. 53 at 2-3.)  However, direct purchase from an issuer is only one path to underwriter status.  Here, Silvercreek alleges a different path: that Credit Suisse "acquired the Zero Notes in the stage one private placement for the purpose of reselling them to the public in stage two"  (TAC ¶ 666), and "indirectly participated in the purchase of the Zero Notes from Enron with a view to the distribution of the Notes" (*id.* ¶ 881).  This intermediary role is sufficient for underwriter status because it is "essential in the actual distribution of securities." *In re Lehman Bros.*, 650 F.3d at 178.

Finally, Credit Suisse argues that Silvercreek has not alleged that Credit Suisse actually participated in the preparation of the Registration Statement for the Zero Notes or performed any underwriting activities with respect to the Zero Notes offering.  (Dkt. No. 53 at 3-6; *see also* Dkt. No. 51 at 13 n.6.)  However, actual participation in the preparation of a registration statement is not required, *see, e.g.*, *McFarland v. Memorex Corp.*, 493 F. Supp. 631, 646 (N.D. Cal. 1980), and Silvercreek meets the requirement by pleading that Credit Suisse had control over the registration statement's contents (TAC ¶ 146).

Accordingly, the Section 11 claim survives.

### E.    Section 12(a)(2) Claim (Count Eight)

Silvercreek alleges violations of Section 12(a)(2) of the Securities Act against only Credit Suisse.  (TAC ¶¶ 901-12.)  Credit Suisse argues that the claim should be dismissed because it is barred by the statute of repose and because it fails to state a claim.  (Dkt. No. 53 ¶¶ 6-10.)

Regarding the statute of repose, there is an apparent conflict between Section 13 of the Securities Act, which establishes a three-year statute of repose for claims under Section 12(a)(2), and the relation-back principle of Federal Rule of Civil Procedure 15(c), which would allow a Section 12(a)(2) claim to be timely beyond the statute of repose if it related back to an earlier complaint.  *See* 15 U.S.C. § 77m ("In no event shall any such action be brought to enforce a liability created . . . under section [12(a)(2)] of this title more than three years after the sale.");  Fed. R. Civ. P. 15(c).  If the Section 13 statute of repose dominates, Silvercreek's Section 12(a)(2) claim is untimely; if Rule 15(c) dominates, it is timely.[14]

---

[14]    Silvercreek disclaims reliance on the theory that the limitation period can be tolled by the pendency of the *Newby* class action, pursuant to *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), as this theory has been foreclosed by the Second Circuit's decision in *Police & Fire Retirement Sys. v. IndyMac MBS, Inc.*, 721 F.3d 95, 109 (2d Cir. 2013). Silvercreek, however, reserves the right to revisit this theory if the Supreme Court resolves a circuit split on this issue against current Second Circuit precedent.  *Compare IndyMac*, 721 F.3d

While the Second Circuit has not decided whether Rule 15(c) trumps the Section 13 statute of repose, *see IndyMac*, 721 F.3d at 110 n.18 ("[W]e need not address . . . whether Rule 15(c) allows 'relation back' of claims otherwise barred by a statute of repose."), it has made clear that "the statute of repose in Section 13 creates a *substantive* right, extinguishing claims after a three-year period" such that permitting claims after the repose period would "violate" the Rules Enabling Act, *see id.* at 109; *see also* 4 Wright & Miller, Fed. Prac. & Proc. § 1056 (4th ed. 2017) ("[A] repose period is fixed and its expiration will not be delayed by estoppel or tolling."). And the language of Section 13's statute of repose itself provides strong support for the interpretation that the statute of repose permits no exceptions, as it provides that "[*i*]*n no event* shall any such action be brought." 15 U.S.C. § 77m (emphasis added). To that end, multiple district courts in this Circuit considering precisely this issue have concluded that the statute of repose cannot be circumvented by the relation-back doctrine. *See Bensinger v. Denbury Res. Inc.*, 31 F. Supp. 3d 503, 510 (E.D.N.Y. 2014); *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 310 (S.D.N.Y. 2011); *In re IndyMac Mortg.-Backed Sec. Litig.*, 793 F. Supp. 2d 637, 643 (S.D.N.Y. 2011), *aff'd in part sub nom. IndyMac*, 721 F.3d 95.

The Court agrees with the other courts in this District and the guidance provided by the Second Circuit and Section 13. Accordingly, Silvercreek's Section 12(a)(2) claim is barred by the statute of repose.

Silvercreek would have the Court narrow this rule of no relation back in the face of a statute of repose to apply only to *new* parties seeking to intervene in an action. That is, because Silvercreek is "seeking to relate back to *its own* prior complaint," it contends, relation back raises no issue. (Dkt. No. 63 at 61.) However, this is a distinction without a difference, as the statute

---

95, *with Joseph v. Wiles*, 223 F.3d 1155 (10th Cir. 2000), *and Bright v. United States*, 603 F.3d 1273 (Fed. Cir. 2010).

of repose creates a "substantive right" for a putative defendant to be free from suit for particular conduct after a certain period of time, whether the suit is brought by a new party or by a party with a lawsuit already pending. *See IndyMac*, 721 F.3d at 109. Liability for suit under an entirely novel cause of action a full seven years after the expiration of the statute of repose amounts to a more than incidental impact on the parties' substantive rights and, as the Second Circuit made clear in *IndyMac*, risks running afoul of the Rules Enabling Act. *Cf. Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 5 (1987) ("The cardinal purpose of Congress in authorizing the development of a uniform and consistent system of rules governing federal practice and procedure suggests that Rules which incidentally affect litigants' substantive rights do not violate [the Rules Enabling Act] if reasonably necessary to maintain the integrity of that system of rules."); *United States ex rel. Carter v. Halliburton Co.*, 315 F.R.D. 56, 65 (E.D. Va. 2016) ("The effect on Defendants' substantive rights appear incidental here . . . and the substantive right of repose is . . . minimal in this case.").

Because Silvercreek's Section 12(a)(2) claim fails due to the expiration of the statute of repose, the Court need not address whether Silvercreek states a claim.

### F.    Negligent Misrepresentation (Count Five)

"To state a claim for negligent misrepresentation under New York law, a plaintiff must allege that (1) the parties stood in some special relationship imposing a duty of care on the defendant to render accurate information, (2) the defendant negligently provided incorrect information, and (3) the plaintiff reasonably relied upon the information given." *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 525 (S.D.N.Y. 2014) (quoting *Saltz v. First Frontier, LP,* 782 F. Supp. 2d 61, 82 (S.D.N.Y.2010), *aff'd,* 485 Fed App'x 461 (2d Cir. 2012)). "Liability for negligent misrepresentation may be imposed 'only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and

trust with the injured party such that reliance on the negligent misrepresentation is justified.'" *Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 778 (S.D.N.Y. 2011) (quoting *Kimmell v. Schaefer,* 89 N.Y.2d 257, 263 (1996)).  The existence of a special relationship is a "fact-intensive, case-by-case inquiry," *In re Vivendi Universal, S.A.,* 2004 WL 876050, at *13 (S.D.N.Y. Apr. 22, 2004) (citation omitted); however, this has not precluded courts from dismissing claims due to a failure to adequately plead this element, *Amusement Indus.*, 786 F. Supp. 2d at 778.

The parties first dispute whether the claim for negligent misrepresentation should be subjected to Rule 9(b)'s heightened pleading requirement or whether the plain-statement rule of 8(a) applies.  (Dkt. No. 50 at 29; Dkt. No. 63 at 37-38.)

As a threshold matter, contrary to Defendants' claim, the Second Circuit has not spoken clearly to this question.  Defendants rely on *Aetna Casualty and Surety Co. v. Aniero Concrete Co.*, 404 F.3d 566, 583 (2d Cir. 2005) (per curiam), to argue that "[c]ontrolling Second Circuit authority makes clear that a claim for 'negligent misrepresentation . . . under New York law . . . must be pled in accordance with the specificity criteria of Rule 9(b),'" (Dkt. No. 69 at 18 (quoting *Aetna*, 404 F.3d at 583)).  However, Defendants' quotation from *Aetna* comes not from the opinion of the Second Circuit itself, but rather from a district court decision on a motion to dismiss attached to the Second Circuit opinion as Appendix A.  *See Aetna*, 404 F.3d at 568.  The Second Circuit in *Aetna* did not affirm that decision, but rather affirmed a later opinion for summary judgment (attached as Appendix C), "[f]or substantially the reasons stated" in the *summary judgment* opinion.  *Id.*  Given that Defendants' quoted language comes neither from the

opinion of the Second Circuit nor even from the district court opinion that the Second Circuit was affirming, the Court is reluctant to rely on it.[15]

Given the absence of an answer from the Second Circuit in *Aetna*, the question whether Rule 9(b) applies to claims of negligent misrepresentation is less than crystal clear. *See Eternity Glob. Master Fund Ltd*, 375 F.3d at 188 ("Rule 9(b) may or may not apply to a state law claim for negligent misrepresentation. District court decisions in this Circuit have held that the Rule is applicable to such claims, but this Court has not adopted that view . . . ." (citation omitted)). Some courts in this Circuit have applied Rule 9(b) to claims of negligent misrepresentation, *see, e.g.*, *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 495 (S.D.N.Y. 2006), while others have opted to apply Rule 9(b) only where the specific claim of negligent misrepresentation at issue sounded in fraud, stressing that Rule 9(b) should apply only where "the negligent misrepresentation claim is based on the same set of facts as those upon which a fraud claim is grounded," *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 254-55 (S.D.N.Y. 2011). This case-by-case approach, looking at whether a plaintiff's claim "rel[ies] on a showing of fraud or mistake," has also counseled against the application of Rule 9(b). *See, e.g.*, *Amos v. Biogen Idec Inc.*, 28 F. Supp. 3d 164, 171–72 (W.D.N.Y. 2014).

The case-by-case approach is consistent with the approach adopted by the MDL Court, *In re Enron Corp. Sec., Derivative & ERISA Litig.*, Nos. H–01–3624, H–03–2345, 2011 WL 3516292, at *6 (S.D. Tex. Aug. 11, 2011), and appropriately reflects the diversity of claims for negligent misrepresentation. This Court adopts the case-by-case approach as well.

---

[15]     That said, other courts in this Circuit apparently have relied on this same language. *See Schwartzco Enterprises LLC v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 350 (E.D.N.Y. 2014) ("[I]t is clear that *Aetna* now controls, and, for that reason, the Court will subject the Plaintiffs' negligent misrepresentation claim under New York law to Rule 9(b) scrutiny.")

Applying the case-by-case framework to the instant case, Silvercreek expressly disclaims "any allegation of scienter or recklessness" in its theory of negligent misrepresentation. (TAC ¶ 861.) Silvercreek purports to rely on a different theory of liability, and, indeed, it is possible that Defendants could be liable for negligent misrepresentation independent of their liability for fraud. (*Id.* ¶¶ 862-78.) As such, given the possibility of a stand-alone claim sounding in negligence, it would be illogical to require a plaintiff to satisfy a heightened pleading requirement merely because she also, separately, alleges claims sounding in fraud that are entirely unrelated. As such, Silvercreek's negligent misrepresentation claim should not be required to satisfy the requirements of Rule 9(b).

Considering the merits of the claim itself, Silvercreek is required to allege a special relationship, negligent provision of incorrect information, and reasonable reliance. *LBBW Luxemburg*, 10 F. Supp. 3d at 525.

Defendants first argue that Silvercreek has failed to allege the existence of a special relationship. They argue that Credit Suisse and Merrill Lynch provided only occasional brokerage services to Silvercreek, which is insufficient to create liability for negligent misrepresentation. (Dkt. No. 50 at 29-30.) But Silvercreek's allegations about the relationship paint a different picture: a "long-standing relationship" that included the banks' providing Silvercreek with information that they knew would be used by Silvercreek in making its investment decisions. (Dkt. No. 63 at 39 (citing TAC ¶¶ 675-79, 792-97).)

Given that the "determination of whether a special relationship exists is essentially a factual inquiry," *Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 104 (2d Cir. 2001), these allegations are sufficient to survive the motion to dismiss. *See Houlihan/Lawrence, Inc. v. Duval*, 228 A.D.2d 560, 561 (N.Y. App. Div. 2d Dep't 1996) ("[T]here may be liability for negligent misrepresentation where there is a relationship between the parties such that there is

an awareness that the information provided is to be relied upon for a particular purpose by a

known party in furtherance of that purpose, and some conduct by the declarant linking it to the

relying party and evincing the declarant's understanding of their reliance." (citations omitted)).

Indeed, the MDL Court determined that a similar claim for negligent misrepresentation on could

survive (though it ultimately dismissed the claim on other grounds). *See In re Enron*, 2003 WL

23305555, at *12.

      In addition to adequately alleging the existence of a special relationship, Silvercreek also

satisfies the other requirements for pleading negligent misrepresentation—that is, negligent

provision of incorrect information and reasonable reliance—for reasons substantially discussed

above.  Though Silvercreek's allegations were insufficient to establish Defendants' scienter for

the purposes of allegations of fraud, they are sufficient to plausibly allege negligence on

Defendants' part in breaching their duty to provide full and accurate information about the nature

of the securities they were recommending.  As such, the claim for negligent misrepresentation

survives this motion to dismiss.

### G.  Aiding and Abetting Negligent  Misrepresentation (Count Three)

      Silvercreek also alleges aiding and abetting of negligent misrepresentation.  (TAC

¶¶ 830-42.)

      The parties, however, dispute whether aiding and abetting of negligent misrepresentation

is a tort that exists under New York law.  (Dkt. No. 50 at 31; Dkt. No. 63 at 40.)

      While there is precedent in this District for the proposition that "[t]here is no cause of

action for aiding and abetting negligence or negligent misrepresentation in New York," *King

Cty., Wash. v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288, 315 (S.D.N.Y. 2012)),

there also appear to be some contrary indications that draw into question this apparently

unequivocal position.  First, this statement rejecting the cause of action was supported not by any

citation to New York law but rather by a single citation to an opinion by another court in this District. *See id.* (citing *In re Bayou Hedge Funds Inv. Litig.*, 472 F. Supp. 2d 528, 532 (S.D.N.Y. 2007)). That opinion, in turn, simply stated—without supporting citation of any sort—that "[f]ew states recognize aiding and abetting liability predicated on a third party's negligence, and this court is aware of no New York or Connecticut case that has done so." *In re Bayou*, 472 F. Supp. 2d at 532.

However, the New York Court of Appeals has recognized criminal liability for aiding and abetting a negligent act. *See People v. Flayhart*, 72 N.Y.2d 737, 741 (1988) (finding "no logical or conceptual difficulty" with liability for aiding and abetting criminally negligent homicide); *cf. S.E.C. v. DiBella*, 587 F.3d 553, 569 (2d Cir. 2009) (permitting liability for aiding and abetting a negligent violation of the federal Investment Advisers Act of 1940). *But see In re Herald*, 730 F.3d 112, 117 n.4 (2d Cir. 2013) ("Neither the district court nor we reach the issue of how one can be said to have 'aided and abetted' negligence and gross negligence."). Moreover, the Restatement (Second) of Torts permits aiding and abetting liability "both when the act done is [intentional] and when it is merely a negligent act." Restatement (Second) of Torts § 876(b) cmt. d. And this provision has been cited favorably by New York courts in finding liability for aiding and abetting negligent conduct. *See, e.g.*, *Miele v. Am. Tobacco Co.*, 2 A.D.3d 799, 805 (N.Y. App. Div. 2d Dep't 2003) ("The concerted action theory of liability for injury to a third party will attach when one knows that another's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other . . ."); *Raney v. Seldon Stokoe & Sons, Inc.*, 42 A.D.3d 617, 619-20 (N.Y. App. Div. 3d Dep't 2007) (granting leave to amend to allege concerted action where the underlying conduct was negligent).

Particularly relevant here, the MDL Court similarly held that liability for aiding and abetting negligent misrepresentation existed under Connecticut law. *See In re Enron*, 511 F.

Supp. 2d at 801.  (There, as here, there was no Connecticut case either supporting or refuting the position and the MDL Court reasoned from section 876(b) of the Restatement (Second) of Torts and from Connecticut cases suggesting the availability of aiding and abetting liability for negligent torts.  *Id.* at 801-04.)

 The Court agrees with the MDL Court and concludes that, absent any indication in New York law to the contrary, the tort of aiding and abetting negligent misrepresentation exists.  Here, for example, if Enron negligently breached its duty to disclose certain information in its securities prospectuses, and Defendants knew and substantially assisted Enron in doing so, they should not be able to escape liability.

Defendants also argue that even assuming the tort exists, Silvercreek has failed to state a claim given their failure to allege an underlying primary tort.  (Dkt. No. 50 at 31.)  *See Abu Dhabi Commercial Bank*, 651 F. Supp. 2d at 186.  However, for the reasons discussed above in the context of the aiding and abetting fraud claim, Silvercreek has adequately stated a claim for aiding and abetting negligent misrepresentation.

### H.   Texas Securities Act Claim (Count Nine)

Plaintiffs also bring a claim under the Texas Securities Act ("TSA") against all Defendants except Merrill Lynch, for aiding and abetting liability in connection with the issuance of the Zero Notes.  (TAC ¶¶ 913-24.)

Defendants argue that the TSA claim should be dismissed because it is precluded by New York law and because it fails to state a claim.  (Dkt. No. 50 at 32.)

It is well settled that New York's Martin Act does not create a private cause of action for securities fraud, *see Kerusa Co. LLC v. W10Z/515 Real Estate Ltd. P'ship*, 12 N.Y.3d 236, 244 (2009), while the Texas Securities Act does.  However, there is no blanket prohibition on the applicability of multiple state securities law to a single transaction.  *See* 69A Am. Jur. 2d

Securities Regulations – State § 18 ("In the area of securities transactions, no conflict-of-laws analysis ordinarily applies, and all of the blue sky laws of all of the jurisdictions apply to the transactions that are within the bounds of the statute.").  Courts in this District, considering this question, have found that, "because New York has no interest in precluding claims like those brought by the plaintiff" (even in the absence of its own cause of action), New York impliedly permits the application of the securities laws of other states.  *See Fed. Hous. Fin. Agency v. Deutsche Bank AG*, 903 F. Supp. 2d 285, 291 (S.D.N.Y. 2012); *see also Chrysler Capital Corp. v. Century Power Corp.*, No. 91 Civ. 1937, 1992 WL 163006, at *2 (S.D.N.Y. June 24, 1992) ("[B]ecause application of multiple state securities laws to a single securities transaction does not present a conflict of laws issue, [the] argument that only New York law," and its lack of a private cause of action, "may apply to the transaction at issue is rejected.").  And the New York Court of Appeals has held that the Martin Act does not preempt non-fraud tort claims—suggesting a permissive approach to the applicability of other sources of law, notwithstanding the Martin Act's failure to provide a private right of action.  *See Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, 962 N.E.2d 765, 770 n.2 (N.Y. 2011).

The cases cited by Defendants to the contrary, including an opinion by the MDL Court, do not stand for the opposite proposition; rather, they are better viewed as presenting situations where Texas lacked sufficient connection to the transaction at issue to justify application of its securities laws.  *See Pinnacle Oil Co. v. Triumph Oklahoma, L.P.*, No. 93 Civ. 3434, 1997 WL 362224, at *2 (S.D.N.Y. June 27, 1997) ("The Texas contacts, however, are minimal in comparison to the New York contacts, and New York has a much greater interest in this litigation than does Texas."); *In re Enron*, 761 F. Supp. 2d at 574-75 ("While Plaintiffs conclusorily assert that [the trust] is a mere shell for Enron, they fail to allege any facts to

support that claim or the argument that therefore misrepresentations purportedly made by it or Deutsche Bank on its behalf emanated from Texas.").

But here, bringing a claim under the TSA is appropriate.  The TSA is a "broad remedial statute intended not only to protect Texas residents but also 'non-Texas residents from fraudulent securities practices emanating from Texas.'"  *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 691-92 (S.D. Tex. 2002) (quoting *Baron v. Strassner*, 7 F. Supp. 2d 871, 875 (S.D. Tex. 1998)).  As such, the MDL Court has permitted similar claims brought under the TSA by non-Texas residents, even where other claims in the action were governed by non-Texas law.  *See id.* at 692.  Here, Enron resided in Texas and was the issuer of the securities at issue, and the prospectus containing the alleged misstatements was prepared in Texas; moreover, Enron officers and directors are Defendants in this action.  (Dkt. No. 63 at 70.)  Defendants would have the Court limit the applicability of the TSA to situations where the Texas issuer itself is also a named *defendant* in the action—which is not the case here, as Enron is not a Defendant, even though several of its officers are—but this crabbed reading of the Texas statute is unsupported by precedent and would limit Texas's ability to pursue its interest in policing securities fraud perpetrated within its borders with effects that extend beyond them.  *See In re Enron*, 761 F. Supp. 2d at 544.

Given that the Court concludes that the TSA applies, the question is whether Silvercreek has stated a claim under the TSA.  Defendants argue that Silvercreek fails to state a claim under the TSA for substantially the same reasons that it fails to state a claim for aiding and abetting Enron's fraud.  (Dkt. No. 50 at 33-34.)

To establish liability for aiding and abetting under Article 581-33F(2) of the TSA, a plaintiff must allege: "(1) the existence of a primary violation of the securities laws, (2) that the aider has a general awareness of its role in the violation, (3) that the aider gave substantial

assistance in the violation, and (4) that the aider intended to deceive the plaintiff or acted with reckless disregard for the truth of the representations made by the primary violator." *In re Enron*, 235 F. Supp. 2d at 568; *see* Tex. Rev. Civ. Stat. Ann. art. 581-33.

As explained above, Silvercreek has adequately alleged a primary fraud with regard to Enron, and that Defendants substantially assisted in this fraud with knowledge and intent to do so. This is sufficient to state a claim under the TSA.

## I.     Skilling

Finally, the Court addresses the claims against Skilling. Before this action was remanded to this Court, Skilling both answered the complaint (Dkt. No. 10-130), and joined in the Financial Institution Defendants' motion to dismiss (Dkt. No. 10-131).[16]  Upon renewed briefing, Skilling again joins in the motion to dismiss, albeit in a cursory fashion, joining and relying upon his co-Defendants' filings, authorities, evidence, and "all prior papers." (Dkt. No. 55 at 2.)  Skilling nowhere makes arguments applicable to his particular situation, which is distinct from that of the Financial Institution Defendants, as he was an officer of Enron.

To resolve this difficulty, the Court divides the claims against Skilling into three groups. First, there are the causes of action against Skilling that are not alleged against the Financial Institution Defendants. Into this group falls only Count 10 for violations of Section 10(b) of the Exchange Act and Rule 10(b)(5). (TAC ¶¶ 925-31.)  The motion to dismiss this claim is denied due to the lack of any argument or explanation supporting its dismissal.

---

[16]     Because Skilling has answered in this action (Dkt. No. 10-130), his Rule 12(b)(6) motion to dismiss is properly considered as a Rule 12(c) motion for judgment on the pleadings. *See* Fed. R. Civ. P. 12.  However, this distinction does not substantively impact the Court's analysis. *See Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).

In the second group are claims against Skilling that are not dismissed as against the Financial Institution Defendants—namely, negligent misrepresentation, violations of Section 11, and violations of the TSA.  Silvercreek's theory of liability against Skilling on these claims is even more direct than those against the Financial Institution Defendants, and its allegations are well-pleaded throughout the complaint.  (*See, e.g.*, TAC ¶¶ 264-266.)  As such, the claims that the Court does not dismiss as against the Financial Institution Defendants also survive as against Skilling.

Finally, we are left with the single claim against Skilling—fraud—that the Court here dismisses as against the Financial Institution Defendants.  However, this claim was dismissed due to the Financial Institution Defendants' lack of scienter resulting from a disconnect between the source of alleged misstatements and the locus of the knowledge of their falsity.  No such infirmity exists as regards the fraud claim against Skilling.  The Complaint alleges that Skilling was "directly involved in creating and overseeing the off-book entities and sham financial transactions which were used to inflate Enron's reported earnings and underreport Enron's debt" (TAC ¶ 264), and that he did so "knowingly" (*id.* ¶ 265).  It further alleges that these misrepresentations were contained in, *inter alia*, the registration statements and prospectuses for the Zero Notes and 7% Notes, and that Silvercreek relied on these misrepresentations in purchasing the Notes to their detriment.  (*Id.* ¶¶ 844-849.)  These allegations are described with sufficient specificity to state a claim for fraud against Skilling.  *See Crigger*, 443 F.3d at 234; Fed. R. Civ. P. 9(b).  Given that Skilling has not rebutted Silvercreek's well-pleaded theory of liability against him (a different and more direct theory than that pleaded against the financial-institution Defendants), the claim of fraud as against him is not dismissed.

**IV.     Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART and

DENIED IN PART.  Defendants are directed to file answers to Plaintiffs' remaining claims

within 21 days of this Opinion and Order.

The Clerk of Court is directed to close the motion at Docket Number 49.

SO ORDERED.

Dated: March 31, 2017
       New York, New York

_____
                    J. PAUL OETKEN
              United States District Judge