IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SILVERCREEK MANAGEMENT INC., et al.,<br><br>Plaintiffs,<br><br><br>v.<br><br>CITIGROUP, INC., et al.<br><br>Defendants. | 02-CV-8881 (JPO)<br><br><br>**Oral Argument Requested** |

**MEMORANDUM OF LAW IN SUPPORT OF DEUTSCHE BANK
ALEX. BROWN, INC. AND DEUTSCHE BANK AG'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Owen C. Pell
Scott E. Hershman
Joshua D. Weedman
Jacqueline L. Chung
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020-1095
(212) 819-8200

*Attorneys for Defendants Deutsche
Bank Alex. Brown, Inc. and Deutsche
Bank AG*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

UNDISPUTED FACTS ............................................................................................4

    A.    The Enron Fraud Was Directed By Insiders Who Controlled Who Knew of It......4

    B.    Deutsche Bank's Transactions With Enron Did Not Give Deutsche Bank Knowledge of Any Fraud..................................................................................6

    C.    Silvercreek Ignored Material Public Information and Followed Its Own Strategy When Purchasing the Zero and 7% Exchangeable Notes.......................13

    D.    Deutsche Bank's Due Diligence on the Zero Note Offering ................................15

ARGUMENT ........................................................................................................15

I.     DEUTSCHE BANK DID NOT AID AND ABET FRAUD ...............................................17

    A.    Deutsche Bank Had No Knowledge of Fraud.........................................................17

         1.    No One At Deutsche Bank Had Knowledge of Enron's Fraudulent Misrepresentation of Its Financial Statements ...........................................19

             a.    Michael Jakubik ..................................................................... 19

             b.    Paul Cambridge....................................................................... 20

             c.    Calli Hayes............................................................................. 21

             d.    Deutsche Bank's Analysts ....................................................... 22

             e.    Other Deutsche Bank Employees ............................................ 23

    B.    Deutsche Bank Did Not Substantially Assist the Fraud .......................................24

    C.    Deutsche Bank Did Not Cause Silvercreek's Harm .............................................25

II.    DEUTSCHE BANK DID NOT AID AND ABET ANY NEGLIGENT MISREPRESENTATIONS ABOUT ENRON....................................................................26

III.   DEUTSCHE BANK DID NOT CONSPIRE WITH ENRON ...........................................28

IV.   DEUTSCHE BANK WAS NOT AN UNDERWRITER FOR THE ZERO NOTES AND, IN ANY EVENT, EXERCISED REASONABLE DILIGENCE ..........................30

    A.    Silvercreek Cannot Establish That Deutsche Bank Was An Underwriter for the Zero Notes Offering ...............................................................................................30

B.     Deutsche Bank Conducted Adequate Due Diligence For the Zero Notes Offering ....................................................................................................... 32

    1.     Deutsche Bank Had No Reasonable Grounds to Believe, and Did Not Believe, That the Expertized Statements in the Offering Materials Were Untrue or Omitted a Material Fact ............................................................ 33

    2.     Deutsche Bank Had Reasonable Grounds to Believe, and Did Believe, That Enron's Non-Expertized Statements Were True and Contained No Material Omissions ................................................................................. 34

       a.     Deutsche Bank's Due Diligence Constituted a Reasonable Investigation of Enron ................................................................ 35

    3.     No Reasonable Investigation Would Have Uncovered the Misstatements or Omissions in Enron's Financial Statements ................. 37

V.     DEUTSCHE BANK DID NOT VIOLATE THE TEXAS SECURITIES ACT .............. 38

CONCLUSION ..................................................................................................................... 40

[Table of Authorities]

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

Abu Dhabi Commerce Bank v. Morgan Stanley & Co.,
    888 F. Supp. 2d 431 (S.D.N.Y. 2012)......................................................17

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986).....................................................................16

Appavoo v. Phillip Morris,
    1998 WL 440036 (N.Y. Sup. Ct. 1998)..................................................26

Babcock v. Citigroup Inc.,
    2005 WL 6465161 (N.Y. Sup. Ct. 2005)................................................27

Battino v. Cornelia Fifth Ave., LLC,
    861 F. Supp. 2d 392 (S.D.N.Y. 2012)....................................................16

Bloor v. Carro, Spanbock, Londin, Rodman & Fass,
    754 F. 2d 57 (2d Cir. 1985)..............................................................25

Boucher v. Sears,
    1997 WL 736532 (N.D.N.Y. Nov. 21, 1997)..........................................28

Buchwald v. Renco Group,
    399 B.R. 722 (S.D.N.Y. Bankr. 2009)...........................................29, 30

Chemtex, LLC v. St. Anthony Enters.,
    490 F. Supp. 2d 536 (S.D.N.Y. 2007)........................................17, 18, 24

CIMB Thai Bank PCL v. Stanley,
    2013 WL 5314330 (N.Y. Sup. Ct. 2013)................................................26

Cromer Fin. Ltd. v. Berger,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001)....................................................25

CRT Invs., Ltd. v. BDO Seidman, LLP,
    85 A.D.3d 470 (N.Y. App. Div. 2011) ..................................................24

De Sole v. Knoedler Gallery, LLC,
    139 F. Supp. 3d 618, 659 (S.D.N.Y. 2015).........................................28, 29

Dubai Islamic Bank v. Citibank, N.A.,
   256 F. Supp. 2d 158 (S.D.N.Y. 2003) .................................................................25

FDIC v. Great Am. Ins., Co.,
   607 F.3d 288 (2d Cir. 2010) ...............................................................................20

Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.,
   68 F. Supp. 3d 439, 467 (S.D.N.Y. 2014) ......................................................35, 36

Feit v. Leasco Data Processing Equip. Corp.,
   332 F. Supp. 544 (E.D.N.Y. 1971) .....................................................................36

Filler v. Hanvit Bank,
   2003 WL 22110773 (S.D.N.Y. 2003) .................................................................25

Filler v. Hanvit Bank,
   339 F. Supp. 2d 553 (S.D.N.Y. 2004) .................................................................18

Fundacion Museo De Arte Contemporaneo De Caracas-Sofia Imber v. Cbi-Tdb
   Union Bancaire Privee, 996 F. Supp. 277 (S.D.N.Y. 1998) ...............................17

Griffin v. PaineWebber, Inc.,
   84 F. Supp. 2d 508 (S.D.N.Y. 2000) ...................................................................33

Grubin v. Rattet (In re Food Mgmt. Grp., LLC),
   380 B.R. 677 (Bankr. S.D.N.Y. 2008) ................................................................28

Highland Capital Management, L.P. v. Ryder Scott Co.,
   402 S.W.3d 719 (Tex. App. 2012) .................................................................38, 39

In re Enron Corp. Sec., Derivative & ERISA Litig.,
   235 F. Supp. 2d 549 (S.D. Tex. 2002) ................................................................38

In re Health Mgmt. Sys., Inc. Sec. Litig.,
   1998 WL 283286 (S.D.N.Y. 1998) .....................................................................19

In re International Rectifier Sec. Litig.,
   1997 WL 529600 (C.D.Ca April 2, 1997) ..........................................................35

In re Livent Noteholders Sec. Litig.,
   151 F. Supp. 2d 371 (S.D.N.Y. 2001) .................................................................31

In re Parmalat Sec. Litig.,
   376 F. Supp. 2d. 472 (S.D.N.Y. 2005) ................................................................16

In re Refco,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007) .................................................................31

In re Refco Inc. Sec. Litig.,
   2013 WL 12191891 (S.D.N.Y. Mar. 11, 2013) ...................................................................18

In re Software Toolworks,
   50 F. 3d 615 (9th Cir. 1994) .............................................................................................33

In re WorldCom,
   346 F. Supp. 2d 628 (S.D.N.Y. 2004).....................................................................33, 34, 37

King Cty. v. IKB Deutsche Industriebank AG,
   863 F. Supp. 2d 288 (S.D.N.Y. 2012)................................................................................27

Krys v. Pigott,
   749 F.3d 117, 133 (2d Cir. 2014),
   affirming, 2012 WL 2136834 (S.D.N.Y. 2012)..................................................................16

Lefebvre v. N.Y. Life Ins. & Annuity Corp.,
   214 A.D.2d 911 (N.Y. App. Div. 1995) .............................................................................29

Marvel Characters, Inc. v. Kirby,
   726 F. 3d 119 (2d Cir. 2013)..............................................................................................16

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
   475 U.S. 574 (1986)...........................................................................................................15

Mazzaro De Abreu v. Bank of Am. Corp.,
   812 F. Supp. 2d 316 (S.D.N.Y. 2011)................................................................................17

McDaniel v. Bear Stearns & Co.,
   196 F. Supp. 2d 343 (S.D.N.Y. 2002)................................................................................24

Nathel v. Siegal,
   592 F. Supp. 2d 452 (S.D.N.Y. 2008)................................................................................18

Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.),
   511 F. Supp. 2d at 742, 802 (S.D.T.X. 2005) ...................................................................27

Portnoy v. Am. Tobacco Co.,
   1997 WL 638800 (N.Y. Sup. Ct. 1997)..............................................................................27

Psihoyos v. Pearson Educ. Inc.,
   855 F. Supp. 2d 103 (S.D.N.Y. 2012)...........................................................................15, 16

Ross v. Bolton,
   639 F. Supp. 323 (S.D.N.Y. 1986).....................................................................................24

Ryan v. Hunton & Williams,
   2000 WL 1375265 (E.D.N.Y. 2000)...................................................................................18

Silvercreek Mgmt., Inc. v. Citigroup Inc.,
    248 F. Supp. 3d 428 (S.D.N.Y. 2017)...............................................................26, 27, 28, 32

Silverman v. United Talmudical Acad. Torah Vyirah, Inc.
    (In re Allou Distribs., Inc.), 446 B.R. 32 (E.D.N.Y. Bankr. 2011)........................................30

Sterling Trust Co. v. Adderly,
    168 S.W. 3d 835 (Tex. 2005)..................................................................................................39

United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,
    44 F.3d 1082 (2d Cir. 1995)....................................................................................................20

WestRM-West Risk Mkts., Ltd. v. XL Reinsurance Am., Inc.,
    2006 WL 2034627 (S.D.N.Y. 2006).......................................................................................25

Wyo. State Treasurer v. Moody's Inv'rs Serv.
    (In re Lehman Bros. Mortg-Backed Sec. Litig.), 650 F.3d 167 (2d Cir. 2011)................30, 32

## STATUTES AND RULES

15 U.S.C. § 77b(a)(11)..........................................................................................................30

15 U.S.C. § 77k(a) ...........................................................................................................30, 33

15 U.S.C. § 77k(b)(3)(A).......................................................................................................35

15 U.S.C. § 77k(b)(3)(C).......................................................................................................33

17 C.F.R. § 229.508(a)...........................................................................................................31

17 C.F.R. § 230.176 ...............................................................................................................35

Fed. R. Evid. 602 ..............................................................................................................18, 20

Restatement (Second) of Torts § 876 (b)...............................................................................27

TSA Article 581-33F(2).........................................................................................................38

## EXPLANATION OF CITATION FORMS

The following citation forms are used in this Memorandum of Law:

- "SOF ¶ __" for references to Deutsche Bank's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1.

- "TAC ¶ __" for references to the Third Amended Complaint, dated August 11, 2011 (ECF No. 10-115).

**The Parties**

- "Deutsche Bank":  Deutsche Bank Alex. Brown Inc. (n/k/a/ Deutsche Bank Securities Inc.) and Deutsche Bank AG.

- "Credit Suisse":  Credit Suisse First Boston (USA), Inc. (n/k/a Credit Suisse (USA), Inc.), Credit Suisse First Boston LLC (n/k/a Credit Suisse Securities (USA) LLC) and Pershing LLC (f/k/a Donaldson, Lufkin & Jenrette Securities Corporation).  Where appropriate, this memorandum distinguishes between Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ") and the pre-merger Credit Suisse entities.

- "Merrill Lynch":  Merrill Lynch & Co., Inc.

- "Silvercreek" or "Plaintiffs":  Silvercreek Management, Inc., Silvercreek Limited Partnership, Silvercreek II Limited, OIP Limited and Pebble Limited Partnership.

Defendant Deutsche Bank submits this Memorandum of Law in support of its motion for summary judgment against the TAC filed by the Silvercreek Plaintiffs.[1]

## PRELIMINARY STATEMENT

Silvercreek alleges that Deutsche Bank assisted Enron in defrauding Silvercreek. Specifically, Silvercreek asserts that Deutsche Bank knew that Enron was misrepresenting its financial results because Deutsche Bank engaged in transactions with Enron that either were wrongful or revealed that Enron was acting wrongfully.  The voluminous discovery in this action, however, establishes just the opposite.  The undisputed evidence reveals that the accounting fraud that destroyed Enron was carried out by senior Enron insiders who generally did not reveal Enron's violation of GAAP accounting and disclosure rules to others.  Indeed, Enron's disgraced former CFO, Andrew Fastow, has repeatedly admitted that Enron lied <u>both</u> to its own employees and its banks so as not "to open the kimono" on its violations of GAAP accounting and disclosure rules, for fear that doing otherwise would cut-off Enron's access to capital.  Consistent with this mindset of secrecy, the heart of the Enron fraud involved transactions that were <u>not</u> revealed publicly, were <u>not</u> subject to outside review, and <u>were</u> guided by senior Enron executives to whom "the kimono was open."  The Silvercreek Plaintiffs have no evidence that Deutsche Bank engaged in any transactions like this.

Silvercreek's claims against Deutsche Bank are largely premised on four structured tax transactions that Deutsche Bank did with Enron, which allowed Enron to lower its net effective tax rate.  Discovery established that there is no evidence that any party structured these transactions in violation of either financial accounting rules or the Tax Code.  The undisputed facts also show that the structured tax transactions were never hidden.  Before they were done

---

[1] Deutsche Bank hereby incorporates the arguments contained in the summary judgment motions filed by Credit Suisse and Merrill Lynch to the extent applicable.

they were vetted by Arthur Andersen, which approved both the transactions and Enron's accounting and disclosure for them, and all the transactions were vetted by national law firms which rendered favorable and conservative (i.e., "should" level) opinions on each transaction. Enron then disclosed in its financials _and_ in recorded analyst calls that it was doing transactions to reduce its effective tax rate and thereby generate net income. It also is undisputed that not only did Enron never restate any of the tax transactions, but Enron's post-bankruptcy management **defended** these transactions to the IRS, **and** allowed Deutsche Bank's claims in connection with these transactions in the Enron bankruptcy. In the end, the IRS never pursued any of these transactions as fraudulent.

Silvercreek also alleges that other Deutsche Bank transactions, including the so-called Marlin, Osprey, and Yosemite transactions, were fraudulent or improper such that Deutsche Bank would have known of Enron's abuse of GAAP accounting. But again, the undisputed facts show that these transactions were publicly-disclosed, were vetted and approved by Arthur Andersen and by Enron's Board, and were reviewed and rated by national credit-rating agencies. There also is no evidence that Deutsche Bank was—or could have been—aware of Enron's **subsequent** misuse of these transaction structures.

Finally, discovery revealed no evidence that Deutsche Bank's other lending or business relationships with Enron put Deutsche Bank on actual notice of Enron's abuse of GAAP accounting. Indeed, Enron's post-bankruptcy management **admitted** that Enron and Arthur Andersen were responsible for how Enron's accounting was done and there is no evidence that Deutsche Bank played any role in Enron's accounting processes. Consistent with Enron's admission, no Enron or Andersen witness testified that Deutsche Bank had any knowledge of Enron's "true" financial condition or accounting. Thus, after over 150 million pages of

documents and 1200 days of depositions, all that Silvercreek has to show for its claims is its reliance on Andrew Fastow, Enron's discredited CFO.  And even as to Fastow, it is undisputed that, having had no involvement whatsoever with most of Deutsche Bank's transactions, at his post-conviction deposition (given to assist the <u>Newby</u> class plaintiffs who prepared him for weeks), Fastow could not name a single transaction in which Deutsche Bank cooperated with Enron in any wrongdoing or in which Enron "opened the kimono" to Deutsche Bank.

By contrast, discovery did reveal undisputed facts showing that nothing Deutsche Bank did caused Silvercreek any injury.  Silvercreek saw itself as a highly sophisticated investor which relied on the investment decisions of its principal, Louise Morwick, whose strategy focused on companies performing badly.  It is undisputed that in October 2001, Silvercreek ignored the rapidly growing solvency risks relating to Enron, not even conducting an analysis of Enron's financials before investing in Enron debt securities.  Silvercreek ignored announcements relating to Fastow's limited partnerships and about the SEC beginning to examine those partnerships.  As important, Silvercreek chose to ignore the escalating prices on Enron credit default swaps, which showed an increasing risk of insolvency—the one factor Morwick claimed she cared about the most.  Silvercreek also cannot dispute that when Morwick finally did have someone analyze Enron's financials—<u>before</u> the fraud had been revealed—Silvercreek immediately began selling-off its positions.  As such, it is clear that Silvercreek made its own idiosyncratic and calculated bet.  That this bet against the market did not pay-off is something for which Silvercreek only has itself to blame—and nothing Deutsche Bank did caused Silvercreek any harm as a matter of law.

Given that Silvercreek has no material evidence that Deutsche Bank had actual knowledge of the Enron fraud or any intent or agreement to further it, there also is no evidence that Deutsche Bank knew any fact that would have led it to question either Enron's stated

internal processes and controls, or the expertized financials prepared by Arthur Andersen upon which Deutsche Bank relied.  There also is no evidence that reasonable diligence would have revealed what Fastow and other Enron executives were working actively to conceal. Accordingly, summary judgment should be granted because Silvercreek cannot establish that Deutsche Bank (i) aided and abetted fraud (Count I); (ii) aided and abetted negligent misrepresentation (Count III); (iii) engaged in civil conspiracy (Count II); (iv) to the extent it was a statutory underwriter (which it was not), violated Section 11 of the 1933 Securities Act (Count VI); or (5) violated the Texas Securities Act (Count IX).

## UNDISPUTED FACTS

The undisputed facts, detailed in Deutsche Bank's Rule 56.1 Statement of Undisputed Material Facts, mandate summary judgment.

### A.   The Enron Fraud Was Directed By Insiders Who Controlled Who Knew of It

It is undisputed that key senior Enron executives pled guilty to securities fraud for falsifying or causing others to falsify Enron's GAAP accounting and financial statement disclosures.  Outwardly, Enron represented that it maintained internal controls and processes that allowed it to comply with GAAP accounting rules.[2]  Moreover, Enron's post-bankruptcy management admitted that Enron and Arthur Andersen were responsible for how Enron's accounting was done,[3] and there is no evidence that Deutsche Bank played any role in Enron's accounting processes.  But what becomes clear from the admissions made in connection with the Enron guilty pleas is that the Enron accounting fraud was premised on secrecy, agreements among key Enron insiders, and transactions that were not public transactions, but were intra-

---

[2] SOF ¶¶ 7-8, 16-28, 33-31, 33-36.
[3] SOF ¶¶ 104-105.

Enron transactions in which Enron could conceal the absence of arms-length bargaining, which bargaining was a crucial component of the GAAP accounting for these transactions.

Richard Causey, Enron's Chief Accounting Officer, admitted that he and others responsible for Enron's SEC filings purposefully misreported earnings,[4] and violated accounting rules in hiding losses in Enron's wholesale trading business.[5]   Timothy Despain, Enron's Assistant Treasurer, admitted that Enron executives set arbitrary cash flow targets that were in no way connected to Enron's actual cash flow from operations, all with an eye to maintaining Enron's credit ratings, which were crucial to its access to cash to support its trading business.[6] Ben Glisan, Enron's Treasurer, explained that Enron used specific special-purpose entities ("SPEs") to falsify Enron's GAAP financial statements by moving poorly performing assets (and associated debt) off of Enron's books.[7]   Fastow, Causey and other Enron executives kept the true nature and function of these SPEs hidden from the rest of the company in order to personally benefit.[8]   Michael Kopper, who helped structure the RADR, Chewco, and Southhampton SPEs, admitted that these SPEs generated millions of dollars for a select few Enron executives and their families.[9]   Fastow admitted that he personally prospered by exploiting his role as general partner of the LJM SPEs.[10]   Fastow specifically used side deals with Causey that violated GAAP accounting rules to guarantee that his LJM SPEs profited at Enron's expense.[11]

Fastow confirmed that he and other Enron executives conceiving of and controlling the fraud never "open[ed] up the kimono and show[ed] . . . the problems . . . at Enron" to others,

---

[4] SOF ¶ 34.

[5] Id.

[6] SOF ¶ 36.

[7] SOF ¶ 33.

[8] SOF ¶¶ 29-36.

[9] SOF ¶ 35.

[10] SOF ¶ 32.

[11] Id.

including its own employees.[12]  Even the banks structuring various transactions and collectively loaning Enron billions of dollars did not know all of the "secrets or skeletons or ugly details behind the kimono" of the Enron fraud.[13]  Indeed, after Jeff Skilling's abrupt departure in August 2001, Fastow suggested to Kenneth Lay, Enron's then CEO, that Enron retain Goldman Sachs—not a key Enron lender—to assist with a restructuring in part because "if any bank that was a key lender to [Enron] were to understand the true extent of Enron's problems, that that might cause them to stop lending, which could cause a [] knock-off effect within the bank market and effectively shut down Enron's credit."[14]

### B.   Deutsche Bank's Transactions With Enron Did Not Give Deutsche Bank Knowledge of Any Fraud

#### 1.   The Structured Tax Transactions Did Not Reveal Any Fraud

The majority of Silvercreek's allegations against Deutsche Bank relate to four structured tax transactions that Deutsche Bank did with Enron between 1997 and 2000, known as Teresa, Steele, Cochise, and Tomas (collectively, the "Structured Tax Transactions").[15]  These transactions enabled Enron to realize net income from future contemplated tax deductions relating to real assets transferred in these transactions.[16]  Contrary to Silvercreek's assertions, undisputed facts show that Deutsche Bank had every reason to believe (indeed, to this day) that based on independent review, these transactions were GAAP–compliant, did not violate the tax laws, and were disclosed by Enron.[17]  The Structured Tax Transactions have the following undisputed facts in common:

---

[12] SOF ¶ 29.

[13] Id.

[14] SOF ¶ 29.

[15] TAC ¶¶ 360-432.

[16] SOF ¶ 58.

[17] SOF ¶¶ 80-110.

- All resulted in future tax benefits to Enron in the form of deferred tax assets or reduced tax liability.[18]

- The Structured Tax Transactions were based on real assets, and where assets were transferred, those transfers involved the passing of risk.[19]

- Each transaction was vetted by a national law firm, and each received a "should" level opinion.[20]   A "should" level opinion was a conservative tax opinion that meant that outside counsel believed that there was at least a 70% chance of success should the IRS challenge the transaction.[21]   These "should" opinions were based, in part, on Enron's representations about the business purpose of the transactions or pre-tax profit for the transactions and support the conclusion that such business purpose was valid and/or that pre-tax profit was not insignificant.[22]

- Arthur Andersen vetted and approved each Structured Tax Transaction, including as to Tax Code compliance, financial GAAP accounting, and Enron's disclosures.[23]

- Enron disclosed in its financial statements that it was using transactions to lower its effective tax rate (which generated net income).[24]   Enron also disclosed this on analyst calls.[25]

- Enron's post-bankruptcy management defended the transactions fully to the IRS,[26] and Deutsche Bank's claims in Enron's bankruptcy relating to these transactions were allowed.[27]

- The IRS never asserted that any of these transactions were fraudulent, nor did it ever accuse any of the tax counsel or Andersen accountants associated with the transactions of any wrongdoing.[28]

- Enron never restated any of these transactions, nor did Enron ever establish a reserve for these transactions based on any doubt as to the transactions.[29]

---

[18] SOF ¶¶ 58, 67, 70-71, 73-76, , 78-79.

[19] SOF ¶¶ 67, 69, 73, 76, 78-79.

[20] SOF ¶¶ 59, 80, 82-83, 87, 90, 94, 126-128.

[21] SOF ¶ 59, 62, 80.

[22] SOF ¶¶ 111-113.

[23] SOF ¶¶ 60, 81, 84-86, 88-89, 91-94, 95-109, 123-125.

[24] SOF ¶¶ 95-98.

[25] SOF ¶ 97.

[26] SOF ¶¶ 114-118.

[27] SOF ¶¶ 121-122.

[28] SOF ¶ 114-117, 119.

[29] SOF ¶¶ 100-103, 118.

Although Silvercreek alleged that 39 Deutsche Bank employees "knew that the tax transactions violated tax laws or GAAP,"[30] Silvercreek only chose to depose eight, and <u>none</u> testified that the Structured Tax Transactions (or any other Enron-related transaction) violated GAAP accounting or tax rules.  Moreover, the Arthur Andersen and law firm witnesses all stood by their analyses that the tax transactions were properly executed and accounted for.[31]

### 2.    Marlin, Osprey, Yosemite and Firefly Did Not Reveal Any Fraud

Silvercreek alleges that transactions in which Deutsche Bank participated as a member of an underwriting group—namely the Marlin, Osprey, and Yosemite transactions—were designed to violate GAAP by concealing Enron debt and investment losses by improperly transferring assets off of Enron's balance sheet.[32]    Silvercreek alleges that the Firefly transaction, where Deutsche Bank was part of a lending group, also was improperly excluded from Enron's financial statements.[33]  Once again, discovery revealed no facts to support these claims.

### a.    The Marlin and Osprey Structures Were Publicly-Disclosed and Independently Vetted

Marlin and Osprey were share trust transactions that allowed Enron to transfer assets to SPEs that would not be consolidated into Enron's financial statements.  These SPEs raised money to buy Enron assets by issuing investment grade debt to Qualified Institutional Buyers.  As additional security for the Marlin and Osprey debt, Enron issued and set aside preferred shares.[34]  The disclosure documents specified that certain events, including a decline in Enron's value or credit rating, would trigger the sale of the preferred shares for the benefit of the Marlin

---

[30] TAC ¶ 363.

[31] SOF ¶¶ 124-128.

[32] TAC ¶¶ 441, 446, 452-453, 455.

[33] TAC ¶ 457.

[34] SOF ¶¶ 148, 178.

and Osprey noteholders.[35]  With respect to these transactions, the following facts are undisputed:

- Marlin and Osprey were off-balance sheet transactions that were disclosed to the public.[36]

- The offering documents disclosed the events that could trigger the draw on Enron's preferred shares.[37]

- The offering documents disclosed that the SPEs were not independent of Enron, and highlighted that there were potential conflicts of interest between the SPEs and Enron.[38]

- With regard to the Osprey SPE, Enron disclosed that the assets to be purchased were from a "blind pool" that might not be priced as "unaffiliated third parties" might price them.[39]

- Marlin and Osprey were vetted by the rating agencies and received investment grade ratings, and both transactions were covered in the financial press.[40]

- Marlin and Osprey were vetted and cleared by Arthur Andersen, and by national law firms who opined on the structures and the disclosures regarding the transactions.  Both transactions were approved by Enron's Board.[41]

Thus, contrary to the TAC, the Marlin and Osprey structures were not hidden, nor did the independent outside entities that reviewed the transactions suggest that the transactions as designed were improper or deceptive under GAAP rules.

> **b.    The Yosemite Structure Was Publicly-Disclosed and Independently Vetted**

Yosemite was a credit-linked financing designed to use an SPE to raise funds to purchase certain unspecified Enron-related debt obligations and other high-credit quality financial

---

[35] SOF ¶¶ 148-50, 179.

[36] SOF ¶ 170, 191.

[37] SOF ¶¶ 148-50, 179.

[38] SOF ¶¶ 149, 161, 181-82, 197-98.

[39] SOF ¶¶ 182, 197.

[40] SOF ¶¶ 151-52, 157, 162-64, 184-86, 199-200.

[41] SOF ¶¶ 153-56, 165-69, 187-90, 199, 201, 203.

instruments.[42]  In Yosemite I, Enron and Citibank formed an SPE known as the Yosemite Trust

("YI Trust"), which raised $825,000,000 by issuing notes and certificates to Qualified

Institutional Buyers.[43]  The YI Trust used this money to buy certain undisclosed assets identified

in the Offering Memorandum as "Trust Investments" which consisted of both "Permitted

Investments" and "Enron Investments."[44]   The Offering Memo disclosed that Permitted

Investments included certain <u>unspecified</u> Enron payment obligations.[45]  It also is undisputed that:

- The Yosemite I Offering Memo disclosed that investors would not know which Enron investments were going into the SPE.  Thus, Enron disclosed that the assets to be purchased would not be specified in advance.[46]

- Standard & Poor's and Moody's reviewed the Yosemite structure and provided investment grade ratings.[47]

- Arthur Andersen and Vinson & Elkins reviewed and opined on the Yosemite accounting and disclosures.[48]

Thus, contrary to the TAC,[49] there is no evidence that Deutsche Bank knew the Yosemite I

structure would be used for any improper transactions, that any Deutsche Bank employee

(including those named in the TAC) had anything to do with or any knowledge of later prepay

transactions, or that any of those transactions violated GAAP accounting rules.[50]

### c.      Nothing About Firefly Revealed Any Fraud

Firefly was another share trust transaction that involved an SPE, known as Firefly, to

---

[42] SOF ¶ 205.

[43] SOF ¶¶ 205-07.

[44] SOF ¶¶ 208-10.

[45] SOF ¶ 210.

[46] SOF ¶¶ 208-10.

[47] SOF ¶¶ 212-13.

[48] SOF ¶¶ 215-16.

[49] TAC ¶ 455-56.

[50] In particular, TAC ¶ 456 adds nothing.  That paragraph relates to a Deutsche Bank document created <u>after</u> the Yosemite I transaction referring to <u>potential</u> future transactions.  Far from evidencing anything "inherently fraudulent," the document only states that there is no reason any future similar transaction cannot be modeled on Yosemite I, which expressly did not describe what assets would be purchased from Enron.  SOF ¶ 218.

borrow money from lenders to refinance a portion of the purchase price that Enron had paid for Elektro, a Brazilian power company in which Enron had an interest.[51]  Firefly raised a total of $465 million from a lending group that included Deutsche Bank.[52]  As with the other share trust transactions, Firefly was reviewed and cleared by Arthur Andersen and Vinson & Elkins.[53]  In addition, the transaction was approved by the Enron Board, and various aspects of the Elektro transaction were disclosed in Enron's SEC filings.[54]

Silvercreek devotes one paragraph in the TAC to Firefly and fails to explain why the transaction was fraudulent or deceptive.[55]  Silvercreek simply alleges that the transaction involved Enron's provision of an "undisclosed guarantee to lenders through a 'swap' arrangement," that this guarantee was "not disclosed to investors,"  and that as a result of the "swap," the Firefly transaction was not properly accounted for in Enron's financials.[56]  No evidence emerged in discovery to support the claim of an undisclosed guarantee, and no witness testified that such a thing existed—let alone that Deutsche Bank knew anything about it.

### 3.  Nothing About Valhalla and Renegade Revealed Any Fraud

Valhalla and Renegade were both lending transactions that were mutually beneficial to Enron and Deutsche Bank because they allowed Enron to obtain financing on favorable terms and let Deutsche Bank realize tax or accounting benefits.  Indeed, Silvercreek concedes that these transactions did not result in improper tax or accounting benefits to Enron.[57]  As with other

---

[51] SOF ¶ 219.

[52] SOF ¶¶ 220-21.

[53] SOF ¶¶ 224-26.

[54] SOF ¶¶ 223, 227-28.

[55] TAC ¶ 457.

[56] Id.

[57] TAC ¶ 433.

transactions, Valhalla was vetted and cleared by both Vinson & Elkins and Arthur Andersen, while Renegade was reviewed by Brown & Wood.[58]

Silvercreek's reference in the TAC to a single email that alluded to concerns about money laundering in connection with Valhalla is a red herring.[59]  Brian McGuire, the managing director of the Structured Transactions Group and Structured Capital Markets Group, testified that the money laundering concern stemmed from an accidental booking of the transaction in the wrong operational system. He further testified that his superiors at the time looked into the situation and determined the money-laundering concerns were a simple mistake.[60]  Silvercreek never developed any evidence to the contrary.

### 4.    Deutsche Bank Did Not Participate in Any LJM2 Transactions

LJM2 was an SPE set up by Fastow to purchase assets from Enron.[61]  Silvercreek alleges that Deutsche Bank "knew that LJM2's sham transactions and purportedly 'independent' ownership of Enron-controlled SPEs would and did have the effect of falsifying Enron's reported financial condition."[62]  A Deutsche Bank-related entity committed up to $10 million and became one of over fifty LJM2 limited partners (which included major state pension funds and prominent U.S. companies) who committed up to $391 million (i.e., Deutsche Bank's commitment was less than 3% of the limited partnership).[63]  It is undisputed that:

- Deutsche Bank received written materials from LJM2 which stated that Enron's Board had taken steps to ensure that no conflicts of interest would occur in the sale of assets by Enron to Fastow's LJM entities.[64]

---

[58] SOF ¶ 133-34, 140.
[59] TAC ¶ 434.
[60] SOF ¶ 136.
[61] SOF ¶ 230.
[62] TAC ¶ 438
[63] SOF ¶ 231.
[64] SOF ¶¶ 233-234.

- Deutsche Bank sought and received independent confirmation from an Enron outside director that the Enron Finance Committee was reviewing LJM transactions and that Arthur Andersen vetted 90% of the LJM transactions.[65]

- LJM2's governance did not give any limited partner any say in LJM2's investment strategy or the right or ability to review transactions by Fastow, as the General Partner.[66]

- Deutsche Bank never approved any LJM2 transactions.[67]

- Deutsche Bank did not attend any meetings of LJM2's limited partners.[68]

### C. Silvercreek Ignored Material Public Information and Followed Its Own Strategy When Purchasing the Zero and 7% Exchangeable Notes

Silvercreek was a highly sophisticated investor whose investment decisions were guided by its principal, Louise Morwick.[69]  Silvercreek began buying the Zero Notes on October 18, 2001 and continued to buy them through October 31, 2001.[70]  Although Silvercreek had sold off its initial position of 7% Exchangeable Notes by October 23, 2001, it made new purchases from October 24-26, 2001, and resumed selling on October 26, 2001.[71]  At no time did Silvercreek look to Deutsche Bank as a market maker on the Zero Notes, only using the bank to sell some of the Notes after Enron's bankruptcy.[72]

By October 2001, when Silvercreek began buying Zero Notes and re-purchasing  7% Exchangeable Notes, there had been significant negative news about Enron and its stock price had fallen—something that actually made Enron highly attractive to Morwick, who looked for

---

[65] SOF ¶ 235.

[66] SOF ¶ 236.

[67] SOF ¶ 237-238.

[68] SOF ¶ 239.

[69] SOF ¶¶ 263, 265, 268.

[70] SOF ¶¶ 274, 282, 284, 285, 287, 290, 293, 299.

[71] SOF ¶¶ 325–332.

[72] SOF ¶ 275.

poorly performing companies to invest in.[73]  On October 16, 2001, Enron had taken a substantial charge against equity which related specifically to limited partnerships run by Fastow.[74]  Then in rapid succession, on October 22, Enron announced that the SEC had begun to inquire about certain Fastow partnerships; on October 24, Enron replaced Fastow as CFO; on October 25, Enron drew down on committed lines of credit for cash liquidity in excess of $1 billion; and on October 31, the SEC launched a formal inquiry.[75]  Credit rating agencies put Enron on negative credit watch starting on October 25, and then downgraded Enron on October 26 and 29.[76] Starting on October 26, there were also rumors that Enron insiders were selling their shares.[77]

Although Morwick testified that she "was comfortable with the Enron credit,"[78] it is undisputed that Silvercreek chose to ignore the escalating prices on Enron credit default swaps— a significant indicator of the market's perception that a company has an increased risk of insolvency.[79]  In fact, during the time Silvercreek was buying, the price of Enron credit default swaps increased threefold—and Silvercreek knew this, having received this data.[80]  Remarkably, it also is undisputed that Morwick did not have anyone analyze Enron's financial strength before launching her trading strategy.  No one from Silvercreek analyzed Enron or spoke to the company until October 26, 2017, after at least one broker had started warning Silvercreek that Enron could reach a "meltdown stage."[81]  Tellingly, as soon as that analysis occurred Silvercreek

---

[73] SOF ¶¶ 267, 279-280, 327.

[74] SOF ¶ 280.

[75] SOF ¶ 283, 286, 288, 298.

[76] SOF ¶ 289, 291, 297.

[77] SOF ¶ 292.

[78] SOF ¶ 277.

[79] SOF ¶ 310.

[80] Id.

[81] SOF ¶¶ 294, 295, 330.

began selling its position—i.e., <u>before</u> Enron's GAAP accounting violations were revealed later in November 2001.[82]

### D.   Deutsche Bank's Due Diligence on the Zero Note Offering

Deutsche Bank played a limited role in the Rule 144A private offering of the Zero Notes and played no underwriting role in the public offering, but rather, was identified only as one of 48 "selling security holders."[83]   In connection with the Rule 144A private offering, Deutsche Bank relied on Enron's publicly disclosed internal audit and review processes, and on Arthur Andersen's unqualified audit opinions of the earlier Enron financial statements and disclosures incorporated into the Zero Notes Offering Memorandum.[84]   Deutsche Bank also conducted due diligence as to the non-expertized information in the Offering Memorandum that included input from groups within the bank as well as a review of prior diligence from earlier transactions.[85] That diligence revealed no issues as to Enron's GAAP accounting—nor could it have—given what was later revealed about the centralized nature of the Enron fraud and Enron's efforts to conceal the truth about Enron's GAAP accounting violations.

### ARGUMENT

The undisputed facts show that none of the transactions cited in the TAC bear any indicia of GAAP accounting fraud or wrongful conduct—indeed, to the contrary.   As such, Silvercreek must offer material facts to overcome these undisputed facts.   The legal standards for summary judgment are clear.   <u>Matsushita Elec. Indus. Co.</u> v. <u>Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986); <u>Psihoyos</u> v. <u>Pearson Educ. Inc.</u>, 855 F. Supp. 2d 103, 112 (S.D.N.Y. 2012) (Oetken, J.). "'The mere existence of a scintilla of evidence in support of the [non-movant's] position will be

---

[82] SOF ¶¶ 294-300.

[83] SOF ¶ 248.

[84] SOF ¶¶ 7, 8, 37, 99, 246 n.7, 256.

[85] SOF ¶¶ 253-256.

insufficient; there must be evidence on which the jury could reasonably find for the [non-movant].'"  Marvel Characters, Inc. v. Kirby, 726 F. 3d 119, 143 (2d Cir. 2013) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)); see also Psihoyos, 855 F. Supp. at 117 (same).  With respect to the transactions delineated in the TAC, Silvercreek "must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." Psihoyos, 855 F. Supp. at 117 (citing Anderson, 477 U.S. at 256-57)); see also Battino v. Cornelia Fifth Ave., LLC, 861 F. Supp. 2d 392, 400 (S.D.N.Y. 2012) (Oetken, J.) (same).

Specifically, Silvercreek may not rely on amorphous claims that certain transactions failed to reveal Enron's "true" financial condition.  It is, for example, beyond dispute that GAAP accounting allowed transactions in which assets (and their associated liabilities) could be moved off a company's balance sheet to an SPE, or that companies could validly do transactions that created deferred tax assets which would lower their net effective tax rate.[86]  As such, nothing about these types of GAAP-compliant transactions is inherently fraudulent or misleading.  See Krys v. Pigott, 749 F.3d 117, 133 (2d Cir. 2014) (back-to-back loan transactions not inherently fraudulent), affirming, 2012 WL 2136834, at *2 (S.D.N.Y. 2012) (Rakoff, J.); In re Parmalat Sec. Litig., 376 F. Supp. 2d. 472, 505 n.162 (S.D.N.Y. 2005) ("[A] bank's use of special purpose corporate entities in connection with financing and other investment arrangements is neither unusual nor deceptive in and of itself.").  That transactions like these might make it harder to analyze a company is not fraud.  As such, the Enron fraud was not about the use of proper GAAP or tax accounting to conceal Enron's "true" financial condition.  Rather, as the Enron criminal pleas show, the fraud was Enron violating GAAP accounting and disclosure rules with respect to material transactions so as to thereby conceal Enron's GAAP financial condition.  Silvercreek

---

[86] SOF ¶¶ 60, 157.

must offer material facts to show that Deutsche Bank knew that Enron was doing this—and that is something Silvercreek cannot do.

## I.   DEUTSCHE BANK DID NOT AID AND ABET FRAUD

To prove aiding and abetting fraud, Silvercreek must show (1) "a violation by a primary wrongdoer"; (2) "knowledge of the violation by the aider and abettor"; and (3) "proof that the aider and abettor substantially assisted the primary wrongdoer." Chemtex, LLC v. St. Anthony Enters., 490 F. Supp. 2d 536, 545-46 (S.D.N.Y. 2007) (internal citations omitted).  "A claim for aiding and abetting fraud must be proven by clear and convincing evidence." Mazzaro De Abreu v. Bank of Am. Corp., 812 F. Supp. 2d 316, 322 (S.D.N.Y. 2011); see also Abu Dhabi Commerce Bank v. Morgan Stanley & Co., 888 F. Supp. 2d 431, 444 (S.D.N.Y. 2012).  Based on the undisputed facts, Silvercreek cannot meet this standard because there is no clear and convincing evidence that Deutsche Bank either knew of or substantially assisted any fraud.

### A.   Deutsche Bank Had No Knowledge of Fraud

Silvercreek must establish that Deutsche Bank had actual knowledge of a fraud.  See Chemtex, 490 F. 2d at 546 ("New York law requires that the alleged aider and abetter have "actual," as opposed to merely constructive knowledge, knowledge of the primary wrong"); Fundacion Museo De Arte Contemporaneo De Caracas-Sofia Imber v. Cbi-Tdb Union Bancaire Privee, 996 F. Supp. 277, 293 (S.D.N.Y. 1998)(same).

The level of knowledge required for an aiding and abetting claim is higher than that necessary to satisfy the scienter element in a fraud claim.  Abu Dhabi Commerce Bank, 888 F. Supp. 2d at 445 ("[W]hile a strong inference of scienter can be satisfied by a showing of 'facts that constitute strong circumstantial evidence of . . . recklessness,' aiding and abetting requires a reasonable inference of actual knowledge") (quoting J.P. Morgan Chase Bank v. Winnick, 406 F. Supp. 2d 247, 253 n.4 (S.D.N.Y. 2005)).  Specifically, constructive knowledge is not enough.

Filler v. Hanvit Bank, 339 F. Supp. 2d 553, 557 (S.D.N.Y. 2004) ("Constructive knowledge of the primary fraud—the possession of information which would cause a person exercising reasonable care and diligence to become aware of the fraud—is not sufficient to support an aiding abetting claim."); Chemtex, 490 F. Supp. 2d at 546 (rejecting plaintiffs' allegations of constructive knowledge).  As such, suspicion of fraud or the existence of "red flags" is not actual knowledge of an underlying wrong.  See Nathel v. Siegal, 592 F. Supp. 2d 452, 469 (S.D.N.Y. 2008) (allegations that defendant ignored warning signs of fraud or red flags do not prove actual knowledge); Ryan v. Hunton & Williams, 2000 WL 1375265 at *8-9 (E.D.N.Y. 2000) (suspicion of fraud is not actual knowledge).

Silvercreek baldly alleges in the TAC that Deutsche Bank "knew that Enron was falsifying its financial reports," and that it was complicit in the fraud because it engaged in certain transactions that "helped Enron to falsify its actual financial condition, liquidity, and creditworthiness."[87]  But the undisputed facts belie this conclusory allegation.  As to each transaction in the TAC, no document or outside accounting or legal opinion raised an issue of a GAAP accounting violation.  Moreover, that the Structured Tax Transactions, Marlin, Osprey and Yosemite were all publicly disclosed is wholly inconsistent with the central premise of the Enron fraud, which was secrecy and non-disclosure.  That post-bankruptcy Enron management and the IRS ultimately stood by various Deutsche Bank transactions also belies the idea that these transactions provided Deutsche Bank with actual knowledge of fraud or wrongdoing.[88] Similarly, in LJM2, Deutsche Bank had no reason not to rely on Enron's statements (and one of

---

[87] TAC ¶¶ 341-42.

[88] Furthermore, Silvercreek's allegations regarding Deutsche Bank's supposed "knowledge" of the Enron fraud rely on statements made by persons without personal knowledge, including the Enron Bankruptcy Examiner.  See, e.g., TAC ¶¶ 358, 382, 385, 398, 399, 413, 430, 431.  These statements should be disregarded because they are inadmissible and bankruptcy examiners reports are routinely excluded on these grounds.  Fed. R. Evid. 602; see also In re Refco Inc. Sec. Litig., 2013 WL 12191891, at *11 (S.D.N.Y. Mar. 11, 2013) ("[A] Bankruptcy Examiner's report is hearsay when offered, as here, to prove the truth of facts and conclusions propounded in it.").

Enron's outside directors who the bank contacted independently) that LJM2 would be managed in a manner consistent with GAAP accounting rules, and no Deutsche Bank witness testified that the bank's involvement as a passive limited partner in LJM2 and as a member of the Advisory Committee enabled it to gain insight into how Fastow and Causey were using LJM2 to violate GAAP rules.  See In re Health Mgmt. Sys., Inc. Sec. Litig., 1998 WL 283286, at *6 (S.D.N.Y. 1998) (allegations based solely on board membership do not establish actual knowledge).

### 1.    No One At Deutsche Bank Had Knowledge of Enron's Fraudulent Misrepresentation of Its Financial Statements

#### a.    Michael Jakubik

Silvercreek alleges that Michael Jakubik—a Deutsche Bank employee who worked at Enron—gave Deutsche Bank inside knowledge of Enron's efforts to fraudulently manipulate its financial statements.[89]  However, there is no evidentiary support for this assertion, and in particular, Andrew Fastow's testimony creates no material issues of fact as to Jakubik's or Deutsche Bank's actual knowledge of fraud.

First, Fastow admits that he did not hire Jakubik, and nothing in the deposition shows that Fastow ever took much interest in him.[90]  Moreover, Jakubik and Fastow had very little interaction during Jakubik's time at Enron, especially after Jakubik moved to Enron North America in August 1999.[91]  Second, it was clear even from Fastow's deposition in support of the Newby plaintiffs that Jakubik was not among the circle of Enron executives who had knowledge of Enron's efforts to violate GAAP accounting rules.  Specifically,

- Fastow could not remember Jakubik's reporting level.[92]

- Fastow could not name a transaction on which Jakubik worked.[93]

---

[89] TAC ¶ 478.

[90] SOF ¶ 48.

[91] Id.

[92] Id.

- When asked whether he discussed with Jakubik that "Enron structured finance transactions deceived investors," Fastow did not say yes. Instead he hedged, saying only "I did not talk in—in those terms about it, but we did talk in terms of what the impact of the transactions would be on Enron's reported financials."[94]

- Fastow could not recall telling Jakubik anything about transactions "filling the gap between actual and reported performance."[95] The best he could do was to say that Jakubik attended staff meetings and where transactions were sometimes discussed.[96]

Under these circumstances, it is not even clear why any of these answers (all of which were objected to) would be admissible under FRE 602 as they lack any foundation.[97] Nor do any of these answers move beyond the realm of "conclusory allegations or unsubstantiated speculation," which will not defeat summary judgment. FDIC v. Great Am. Ins., Co., 607 F.3d 288, 292 (2d Cir. 2010).

In any event, none of these answers suggest that Jakubik knew of any actual fraud. Indeed, Jakubik testified that when he left Enron in July 2000, he was under the impression that Enron's balance sheet was in sound financial shape.[98]

### b.   Paul Cambridge

Paul Cambridge was the Enron-relationship partner at Deutsche Bank, which involved maintaining the bank's relationship with Enron and sometimes being involved in transactions

---

[93] Id.

[94] Id.

[95] Id.

[96] Id.

[97] To the extent that Fastow's testimony is based on a lack of personal knowledge it is inadmissible. See Fed. R. Evid. 602; United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc., 44 F.3d 1082, 1084 (2d Cir. 1995) (statement "not based upon personal knowledge . . . did not suffice to create an issue of fact precluding summary judgment"). It is undisputed that in preparing for his deposition, Fastow spent "tens of hours" reviewing materials prepared by Newby class counsel and in meetings with class counsel. SOF ¶ 52. Certain materials presented to him were ones he had not seen before. SOF ¶ 53. Moreover, the declaration executed by Fastow in advance of his testimony, and cited in the TAC (see TAC ¶ 478), was prepared by Newby class counsel, and Fastow subsequently admitted that many of the statements in the declaration were based on his "understanding" from what others told him, not his own personal knowledge. SOF ¶ 54. Notably, Fastow also admitted that he was not involved in the Structured Tax Transactions, and had no ability to discuss whether they were GAAP or tax compliant. SOF ¶ 55. He also admitted that he had no personal knowledge of Marlin, Osprey, or Firefly. SOF ¶ 56.

[98] SOF ¶ 47.

that the bank was doing with Enron.[99]  What is wholly absent from the record is any evidence that anyone at Enron ever disclosed to Cambridge that Enron was doing transactions that violated GAAP accounting or disclosure rules.  Again, that Cambridge attended meetings with Fastow or other Enron executives does not, without more, prove anything because Fastow and other Enron executives have admitted to hiding the fraud from those outside the company.

Indeed, the record contradicts Silvercreek's assertion that Cambridge knew about the Enron fraud or had special access or insight into the company.[100]  Cambridge testified that "as a general rule, Enron was barely parsimonious with its information and frequently we did not necessarily . . . get the information that we wanted."[101]   Additionally, "Enron was an institution that operated in some cases like the CIA, on a need to know basis, and if you weren't involved in the transaction and they didn't feel it was appropriate to tell you, you wouldn't know."[102]  As late as October 2001, less than two months before Enron's bankruptcy, Cambridge wrote to Deutsche Bank's Underwriting Committee of his understanding, based on representations from Enron, that "[t]here are no hidden bombs.  Enron has reaffirmed its earnings and has publicly and privately stated that there are no surprises in their books."[103]

### c.    Calli Hayes

Callie Hayes was a Managing Director in the Deutsche Bank Credit Risk Department.[104] Her duties included assessing the risks associated with Deutsche Bank's overall exposure to Enron.[105]  Between 1999 to 2001, Deutsche Bank had between $400 million and $800 million on

---

[99] SOF ¶ 2.
[100] See e.g., TAC ¶¶ 350-53, 363.
[101] SOF ¶ 44.
[102] Id.
[103] SOF ¶ 40.
[104] SOF ¶ 3.
[105] SOF ¶ 45.

loan to Enron based on a range of transactions.[106]   Although Hayes expressed concerns about Deutsche Bank's exposure to Enron, there is no evidence that this concern went beyond the normal commercial concerns that any banker would have when monitoring a sizeable loan investment to a borrower with less than an "AAA" credit rating and which openly engaged in GAAP-allowed off-balance sheet transactions.[107]

There is no support for Silvercreek's conclusory allegation that Hayes knew about the fraud.[108]   Rather, the factual record shows that Hayes only had access to Enron's publicly filed financials, and to direct and indirect communications with Enron representatives which honed to those publicly-filed documents.[109]   The fact that, as a credit risk officer, she sometimes spoke against a transaction did not mean she knew of a fraud, rather it meant that she could see reasons why a company with Enron's credit rating and structure might not be worth the risk of additional credit from Deutsche Bank.[110]   Nothing in the record indicates otherwise.

### d.      Deutsche Bank's Analysts

Silvercreek asserts that Deutsche Bank aided and abetted the Enron fraud by publishing analyst reports that recommended Enron securities despite being "well aware of" and "participating" in "Enron's illicit practices."[111]   Silvercreek further asserts that "the statements made by Deutsche Bank in its analyst reports were false misleading as they contained information Deutsche Bank knew was incorrect."[112]   The TAC offers no facts to support these conclusory allegations, and discovery revealed none.   Both Edward Tirello, the equity analyst

---

[106] SOF ¶ 38.

[107] SOF ¶ 45.

[108] See, e.g., TAC ¶¶ 350, 352, 363.

[109] SOF ¶ 45.

[110] Id.

[111] TAC ¶ 458.

[112] TAC ¶ 459.

covering Enron from January 1999 to September 2000 and Paul Tice, the fixed-income analyst

covering Enron from April 2000 to November 2001, testified that they relied solely on publicly

available information in forming opinions about Enron.  For example, Tirello testified:

> I mean, the earnings are the earnings.  You can't change that.  The
> revenue is the revenue.  You can't change that.  What we did was
> we took the data, plus all the – what my associates did is took the
> data, plus other publically available information, and sat down and
> analyzed it and tried to project how they would do in the future.
> That's what we did.[113]

Paul Tice testified similarly:

> [I] would work off the publically available information.  So I was
> on the same side as all the bondholders were, and public investors.
> So that was the information I was working off of.  A big piece of
> that was their publically filed financials with the SEC, their press
> releases, whenever they set conference calls.  And from that I
> would analyze the credit, understand it.  And then position that
> credit relative to the market and talk about relative value.[114]

No Enron or other witnesses, and no documents, undermine this testimony.

### e.      Other Deutsche Bank Employees

Silvercreek's allegations regarding other Deutsche Bank employees are similarly

unsupported.  As noted, none of the eight witnesses Silvercreek chose to depose on the

Structured Tax Transactions offered any evidence to support Silvercreek's allegation that

Deutsche Bank "knew" that those transactions "violated tax laws or GAAP."[115]   Also, no

Deutsche Bank (or other) witness testified to receiving an undisclosed guarantee from Enron or

that any transaction with Enron was improperly accounted for, nor did any Enron or Arthur

Andersen witness (including Fastow) ever call any Deutsche Bank testimony into question.

In sum, extensive discovery shows no evidence, let alone clear and convincing evidence,

---

[113] SOF ¶ 49.

[114] SOF ¶ 50.

[115] TAC ¶ 363.

that Deutsche Bank had actual knowledge of the Enron fraud, and this element of Silvercreek's claims cannot be satisfied.

**B.**        **Deutsche Bank Did Not Substantially Assist the Fraud**

Silvercreek also cannot establish that Deutsche Bank substantially assisted a fraud.  An alleged aider and abettor "substantially assists" where it "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the fraud] to proceed."  Chemtex, 490 F. Supp. 2d at 547 (quoting Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 284 (2d Cir. 1991)).  Providing routine business services does not amount to substantial assistance.  CRT Invs., Ltd. v. BDO Seidman, LLP, 85 A.D.3d 470, 471 (N.Y. App. Div. 2011).  Moreover, "[m]ere inaction is insufficient to sustain a claim for aiding and abetting fraud unless the defendant has an independent duty to plaintiff."  Chemtex, 490 F. Supp. 2d at 547.  Substantial assistance also requires clear and convincing evidence of scienter.  "Indeed, 'the scienter requirement scales upward,' and plaintiffs have the additional burden of showing that the assistance rendered is 'both substantial and knowing;' in other words, there must be 'something close to an actual intent to aid in fraud' or 'scienter of the conscious intent variety.'"  McDaniel v. Bear Stearns & Co., 196 F. Supp. 2d 343, 352 (S.D.N.Y. 2002) (quoting Ross v. Bolton, 639 F. Supp. 323, 327 (S.D.N.Y. 1986) (internal citation omitted)).

As shown above, there is no evidence that any Deutsche Bank transactions were designed or implemented to affirmatively assist Enron in violating GAAP accounting or disclosure rules.  Indeed, as discussed above, most of Deutsche Bank's transactions were publicly disclosed by Enron and involved substantial vetting and approval by parties outside of Enron.  There also is no evidence that Deutsche Bank had the requisite scienter to substantially assist Enron in committing fraud, nor could there be, given that there is no evidence that Deutsche Bank was ever brought into the fraud by the senior Enron executives who ran it.  See supra I.A.

### C.     Deutsche Bank Did Not Cause Silvercreek's Harm

There also can be no "substantial assistance" unless Silvercreek can show that "the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated."  Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001); see also Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F. 2d 57, 62-63 (2d Cir. 1985) (affirming dismissal where plaintiff failed to prove proximate cause).  The injury must be "a direct or reasonably foreseeable result of the defendant's conduct."  Filler v. Hanvit Bank, 2003 WL 22110773, at *2 (S.D.N.Y. 2003); see also Dubai Islamic Bank v. Citibank, N.A., 256 F. Supp. 2d 158, 167 (S.D.N.Y. 2003) ("Substantial assistance requires a defendant's participation to be the proximate cause of plaintiff's injury.") (interpreting NY law).  Thus, Silvercreek must proffer material facts showing that Deutsche Bank's actions (or inaction) proximately caused Silvercreek's trading losses.  See WestRM-West Risk Mkts., Ltd. v. XL Reinsurance Am., Inc., 2006 WL 2034627, at *32 (S.D.N.Y. 2006) (granting summary judgment where plaintiffs proffered no evidence of causation).

Here, the reasonable and foreseeable cause of Silvercreek's injuries was Silvercreek.  Silvercreek purchased the Zero Notes during a thirteen-day period from October 18-31, 2001, and a new position in the 7% Exchangeable Notes during a two-day period from October 24-25.[116]  It is undisputed that Silvercreek did this even though Enron's disclosures had raised warnings both about the company's financial position and its GAAP accounting for partnerships used in off-balance sheet transactions.  This included Enron's $638 million third-quarter 2001 loss and a $1.2 billion reduction in shareholder equity on October 16, 2001, the announcement of SEC scrutiny into Fastow partnerships on October 22, followed by Fastow's removal on October

---

[116] SOF ¶¶ 274, 326-332.

24, and the announcement that Enron was drawing down on its credit lines on October 25.[117]

Moreover, ratings agencies had started downgrading Enron on October 26, and there were

reports that day that Enron insiders were starting to sell their shares.[118]  It also is undisputed that

Silvercreek received notice of and ignored Enron's Credit Default Swap rates, even though those

rates more than tripled, showing a dramatic increase in the risk of an Enron insolvency.[119]

But most damning is that Silvercreek chose not to have its analysts assess Enron's

financial condition before embarking on its buying spree.  Tellingly, when Silvercreek finally did

the analysis—which occurred <u>before</u> the fraud was revealed and <u>before</u> Enron disclaimed further

reliance on its financials—Silvercreek immediately began selling-off its position.[120]  Thus, as a

sophisticated investor, Silvercreek was wholly capable of assessing Enron risk and acting on that

risk <u>before</u> the fraud was disclosed.  That Silvercreek chose not to do this analysis first makes

Silvercreek primarily responsible for its trading losses.

## II.   DEUTSCHE BANK DID NOT AID AND ABET ANY NEGLIGENT MISREPRESENTATIONS ABOUT ENRON

Silvercreek has not alleged negligent misrepresentation against Deutsche Bank, but has

asserted a claim for aiding and abetting misrepresentation.  Although the standard for aiding and

abetting negligent misrepresentation in New York remains unclear,[121] this Court, in finding that

---

[117] SOF ¶¶ 270, 283, 286, 288.

[118] SOF ¶¶ 289, 291, 292, 297.

[119] SOF ¶ 311.

[120] SOF ¶¶ 294-300.

[121]  This Court held in its March 31, 2017 Opinion that "absent any indication in New York law to the contrary, the tort of aiding and abetting negligent misrepresentation exists."  Silvercreek Mgmt., Inc. v. Citigroup Inc., 248 F. Supp. 3d 428, 455 (S.D.N.Y. 2017).  Deutsche Bank respectfully submits that the Court should revisit this finding because New York case law calls into question the existence of aiding and abetting claims for unintentional torts such as negligent misrepresentation.  <u>See</u> <u>CIMB Thai Bank PCL</u> v. <u>Stanley</u>, 2013 WL 5314330, at *10 (N.Y. Sup. Ct. 2013) ("Under New York law, aiding and abetting claims only apply to intentional torts."); <u>Appavoo</u> v. <u>Phillip Morris</u>, 1998 WL 440036, at *6 (N.Y. Sup. Ct. 1998) ("As these three theories of collective liability may only be asserted with respect to intentional torts, plaintiffs' conspiracy, concerted action and aiding and abetting claims apply only to plaintiffs' fraud claims."); <u>Babcock</u> v. <u>Citigroup Inc.</u>, 2005 WL 6465161, at *3 (N.Y. Sup. Ct. 2005) ("[A] defendant cannot conspire to commit a non-intentional tort like negligent misrepresentation."); <u>Portnoy</u> v. <u>Am.</u>

such a cause of action exists in New York law, has relied in part on New York authority that looks to the Restatement (Second) of Torts § 876 (b).  Silvercreek, 248 F. Supp. 3d at 454.  The Restatement provides that a defendant can be liable if he or she "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."  Restatement (Second) § 876 (b).[122]  These requirements align with the general requirements for aiding and abetting under New York law.  King Cty. v. IKB Deutsche Industriebank AG, 863 F. Supp. 2d 288, 299-300 (S.D.N.Y. 2012) ("When proceeding under an aiding and abetting theory of liability under New York law, a plaintiff must show '(1) the existence of a . . . violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation.'").

Silvercreek's claim for aiding and abetting negligent misrepresentation cannot withstand summary judgment for the same reasons that its aiding and abetting fraud claim must fail.  The undisputed facts show that Deutsche Bank did not (i) know of the underlying violation—i.e., Enron's violations of GAAP accounting—as they were taking place, nor (ii) substantially assist Enron's negligent misrepresentations.  Also, "[a]iding and abetting liability is based on proof of scienter—the defendants must know that the conduct they are aiding and abetting is a tort."  Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.), 511 F. Supp. 2d at 742, 802 (S.D.T.X. 2005) (citation omitted).  Thus, Silvercreek also must show that Deutsche

---

Tobacco Co., 1997 WL 638800, at *7 (N.Y. Sup. Ct. 1997) ("[T]he court holds that to the extent plaintiffs' conspiracy, concerted action and aiding and abetting claims are being asserted against the Corporate Parents, they should be dismissed for the reason that those theories of collective liability only apply to intentional torts.").

[122] As further explained in the comments to section 876(b), "advice or encouragement to act operates as moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the advisor as participation or physical assistance."  Restatement (Second) § 876 (b) Comment on Clause B.  Moreover, "if the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act."  Id.

Bank knew about Enron's negligent acts and intentionally assisted in the furtherance of these acts  (notwithstanding that a negligent actor is not required to have intent).  This standard would require Deutsche Bank to have a greater level of knowledge about the misstatements in Enron's financial statements and other disclosures than Enron itself.  See Silvercreek, 248 F. Supp. 3d at 455 ("For example, if Enron negligently breached its duty to disclose certain information on its securities prospectuses, and Defendants knew and substantially assisted Enron in doing so, they should not be able to escape liability [for aiding and abetting negligent misrepresentation]").

As shown above, there is no evidence that Deutsche Bank possessed this state of mind— indeed, the evidence is to the contrary.  Absent knowledge of Enron's violation of GAAP accounting and disclosure rules, Deutsche Bank could not have realized that Enron acted negligently toward investors and could not have engaged in intentional acts to further that negligence.  Accordingly, Silvercreek's aiding and abetting negligent misrepresentation claim fails.

## III.   DEUTSCHE BANK DID NOT CONSPIRE WITH ENRON

In addition to proof of the underlying tort, Silvercreek's claim of civil conspiracy requires proof of (i) an agreement between two or more parties; (ii) an overt act in furtherance of the agreement; (iii) the parties' intentional participation in furtherance of a common purpose or plan; and (iv) resulting damage or injury.  De Sole v. Knoedler Gallery, LLC, 139 F. Supp. 3d 618, 659 (S.D.N.Y. 2015).  Scienter again is a key aspect of a civil conspiracy claim.  Grubin v. Rattet (In re Food Mgmt. Grp., LLC), 380 B.R. 677, 704 (Bankr. S.D.N.Y. 2008) ("Under New York law, malice and intent both to participate in the alleged conspiracy and to injure the plaintiff are essential elements in civil conspiracy actions.").  Silvercreek also must establish these elements by clear and convincing evidence.  See Boucher v. Sears, 1997 WL 736532, at *12 (N.D.N.Y. Nov. 21, 1997) (plaintiffs "failed to produce any evidence, let alone clear and convincing

evidence, that the Bank conspired with any of the other defendants").

Just as there is no evidence to support the aiding and abetting claims, there is no evidence by which Silvercreek can demonstrate (i) the existence of an agreement between Deutsche Bank and Enron to mislead the public about Enron's financial condition; or (ii) that Deutsche Bank participated intentionally (i.e., with the requisite scienter) in furtherance of a common illegal plan with Enron.  As demonstrated above, the undisputed facts undercut any claim that Deutsche Bank participated in transactions with Enron under a shared understanding that these transactions violated GAAP accounting and disclosure rules so as to "misrepresent[] and conceal[] material information regarding the financial status and operations of Enron."  TAC ¶ 817.  To the same effect, the undisputed facts offer no support for the idea that Deutsche Bank had any understanding with Enron to "construct[] and participate[] in transactions that allowed Enron to disseminate false and misleading financial information in SEC filings as elsewhere."  TAC ¶ 817.  Accordingly, the conspiracy claim must fail.  See De Sole, 139 F. Supp. 3d at 659 (granting summary judgment after finding that "Plaintiffs have not proffered evidence sufficient to demonstrate that [defendants] agreed with someone else to commit fraud.").  Finally, nowhere does the record reveal that Deutsche Bank had an underlying motivation to mislead Enron's investors as to Enron's financial condition.   Absent evidence of scienter, Silvercreek's conspiracy claim cannot proceed.  Lefebvre v. N.Y. Life Ins. & Annuity Corp., 214 A.D.2d 911, 913 (N.Y. App. Div. 1995) ("[w]hen scienter is lacking, the mere fact that a defendant's otherwise lawful activities may have assisted another in pursuit of guileful objectives is not a sufficient basis for a finding that he or she conspired to defraud.").[123]

---

[123]  Additionally, Silvercreek's conspiracy claim should be dismissed as duplicative of the underlying aiding and abetting claim to which the conspiracy claim is connected.  New York law does not recognize an independent tort of civil conspiracy, but does permit a claim of civil conspiracy to "connect the actions of separate defendants with an otherwise actionable tort."  Buchwald v. Renco Group, 399 B.R. 722, 774-75 (S.D.N.Y. Bankr. 2009) (internal

## IV.    DEUTSCHE BANK WAS NOT AN UNDERWRITER FOR THE ZERO NOTES AND, IN ANY EVENT, EXERCISED REASONABLE DILIGENCE

Section 11 of the 1933 Securities Act imposes liability with regard to public offerings where "any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading" to the extent that Deutsche Bank (i) was an underwriter for the public offering of the Zero Notes; and (ii) cannot satisfy the requirements for the "due diligence" defense.  15 U.S.C. § 77k(a).

### A.    Silvercreek Cannot Establish That Deutsche Bank Was An Underwriter for the Zero Notes Offering

There is no support for Silvercreek's assertion that Deutsche Bank was an underwriter for the Zero Notes.  Section 2 of the Securities Act defines an underwriter as:

> any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking.

15 U.S.C. § 77b(a)(11).  "Distribution" must be in connection with a registered public offering.  Wyo. State Treasurer v. Moody's Inv'rs Serv. (In re Lehman Bros. Mortg-Backed Sec. Litig.), 650 F.3d 167, 177 (2d Cir. 2011) ("Distribution" . . . encompasses "the entire 'process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public.'") (quoting S.E.C. v. Kern, 425 F.3d 143, 152 (2d Cir. 2005)); see also In re Lehman Bros., 650 F.3d at 181 (Section 11 "was designed to impose its exacting standards regarding the provision of accurate and complete information only on people

---

citation omitted).  Consequently, "[w]hile there is no cognizable action for a civil conspiracy, a plaintiff may plead conspiracy … with an actionable underlying tort and establish that those acts flow from a common scheme or plan."  Id.  "Several courts have held that under New York law, where the conduct put forth in support of a claim of conspiracy is the same conduct that supports the underlying actionable torts, the conspiracy claim should be dismissed as duplicative" Id.; see also Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs., Inc.), 446 B.R. 32, 60-61 (E.D.N.Y. Bankr. 2011) (dismissing conspiracy claims on summary judgment as duplicative of aiding and abetting claims).

(or entities) responsible for distributing securities to the public, that is, those engaged in the public offering.").

It is undisputed that the February 2001 Rule 144A offering in which Deutsche Bank participated with Enron cannot render Deutsche Bank an underwriter for Section 11 purposes because this offering was independent from any registered public offering by Enron.  See In re Refco, 503 F. Supp. 2d 611, 628 (S.D.N.Y. 2007) (Section 11 applies by its terms to registered offerings only, and rejecting argument that a Rule 144A private placement and registered offering should be treated as one transaction); In re Livent Noteholders Sec. Litig., 151 F. Supp. 2d 371, 430-432 (S.D.N.Y. 2001) (dismissing Section 11 claims against banks whose only role related to an earlier private offering and who did not solicit or sell to plaintiffs under the registration statement).  In any event, it also is undisputed that Deutsche Bank's role in the February 2001 private offering for the Zero Notes was limited to that of an Initial Purchaser of 8% of the $1.9 billion in Zero Notes which Enron placed with a group of Qualified Institutional Buyers.[124]  Deutsche Bank also was not a lead manager.  That role went to Salomon Smith Barney, the lead bookrunner.[125]  There is no evidence that Deutsche Bank assisted in drafting the Offering Memorandum or marketing the Zero Notes.  In fact, all inquiries about the Zero Notes were to be referred to Salomon Smith Barney.[126]

In the later public offering of the Zero Notes (in June 2001), Deutsche Bank played an even more limited role and was <u>not</u> even listed as an underwriter,[127] but only as one of 48

---

[124] SOF ¶¶ 240-241.

[125] SOF ¶ 242.

[126] Id.  Indeed, had Deutsche Bank been a principal underwriter of the offering, Enron would have been required to identify it as such in the registration statement and state the amount underwritten by Deutsche Bank and the nature of its obligation to take the securities.  17 C.F.R. § 229.508(a).  Nothing stopped Enron from identifying Deutsche Bank as a principal underwriter if it had fulfilled that role, and Enron would have been required to do so if that had been the case.  But Enron did not do this.

[127] The only other references to Deutsche Bank are as an Initial Purchaser in the Rule 144A offering.  SOF ¶ 246.

"selling securityholders"—that is, entities understood to be holding investments in the Zero Notes at the time of the public offering and who may "offer and sell, from time to time, any or all of their notes or common stock issued upon conversion of their notes."[128]  This description does not suggest that a selling security holder had underwriting responsibilities.

Finally, regardless of how it was identified, there is no evidence that Deutsche Bank played any kind of essential underwriting role as to the Zero Notes.  There is no evidence that Deutsche Bank drafted or provided comments on any aspect of the Registration Statement. Moreover, it is undisputed that Deutsche Bank never sold Zero Notes to Silvercreek or communicated with Silvercreek about potential purchases of Zero Notes.[129]  Additionally, there is no evidence that the Bank received any underwriting fees or bonuses in connection with the public offering.  Thus, nothing about Deutsche Bank's participation in the Zero Notes would support a finding that Deutsche Bank was "essential in the actual distribution of" the Zero Notes such that they can be liable under Section 11.  See Silvercreek, 248 F. Supp. 3d at 450 (quoting In re Lehman Bros., 650 F.3d at 178.

### B.    Deutsche Bank Conducted Adequate Due Diligence For the Zero Notes Offering

Even if Deutsche Bank was a statutory underwriter (which it is not), it is not liable here to

---

[128] SOF ¶¶ 246-248.  The Registration statement also cautions that "[t]he selling securityholders listed in the above table *may have sold or transferred, in transactions exempt from the registration requirements of the Securities Act, some or all of their notes or shares of our common stock* since the date on which the information in the above table was provided to us."  SOF ¶ 246.  This disclaimer nowhere suggests that the selling securityholders were going to facilitate distribution of the Notes to the public.

[129] SOF ¶ 275.  As a Qualified Institutional Buyer, Silvercreek was eligible to purchase Zero Notes during the February 2001 Rule 144A private placement and in fact considered doing so, but declined because the potential returns on the Zero Notes were not yet favorable enough.  SOF ¶ 270.  Had Silvercreek purchased in February 2001, it would not have been able to plead Section 11 claims because Section 11 does not apply to the distribution of unregistered securities in a Rule 144A private placement.   In re Lehman Bros. Mortgage-Backed Sec. Litig., 650 F.3d at 181 n. 20.  The only reason Silvercreek pleads this claim now is because, based on the deterioration in Enron's share price, it chose to buy after the registered offering.  There is nothing in the policies behind Section 11 that contemplates hinging a Section 11 claim on the investment whims of a Qualified Institutional Buyer that could have purchased these Notes at any time.

the extent it was entitled to rely on expertized financial statements and otherwise conducted sufficient due diligence in connection with non-expertized statements, such that it satisfied the customary requirements of "due diligence" under Section 11.

> **1.     Deutsche Bank Had No Reasonable Grounds to Believe, and Did Not Believe, That the Expertized Statements in the Offering Materials Were Untrue or Omitted a Material Fact**

Underwriters are not liable under Section 11 for "any part of the registration statement purporting to be made on the authority of an expert," if they "had no reasonable ground to believe and did not believe, at the time such part of the registration statement became effective, that the statements therein were untrue or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(b)(3)(C).  Arthur Andersen was an expert, and its audited financial statements of Enron are considered expertized.  See § 77k(a)(4); In re WorldCom, 346 F. Supp. 2d 628, 664-666 (S.D.N.Y. 2004).

Underwriters have no duty to investigate the "expertized" portions of offering materials, but instead may reasonably rely on them.  WorldCom, 346 F. Supp. 2d at 671-72; Griffin v. PaineWebber, Inc., 84 F. Supp. 2d 508, 512-13 (S.D.N.Y. 2000); In re Software Toolworks, 50 F.3d 615, 624-25 (9th Cir. 1994) (affirming summary judgment for underwriters where the "'expert decisions, which underl[ay] the plaintiffs' attacks on the financial statements, represent[ed] precisely the type of 'certified' information on which section permits non-experts to rely'") (citations omitted).  Indeed, not only is it "almost by definition . . . reasonable to rely on financial statement certified by public accountants," but it is also "essential to the proper functioning of securities marketing, to the trading in securities, to the lending of money by banks and financial institutions, and to the reliance by stockholders on the reports of their corporations."  WorldCom, 346 F. Supp. 2d at 671-72 (citing to John Nuveen & Co. v. Sanders,

450 U.S. 1005, 1010 n. 4 (1981) (Justice Powell dissent from denial of certiorari)). Thus, "where breaches by accountants occur, it is the accountants themselves—not those who rely in good faith on their professional expertise—who are at fault and who should be held responsible." Id.

Silvercreek's Section 11 claim is primarily focused on alleged misstatements in Enron's audited financial statements for the years ending December 31, 1999 and 2000, which were incorporated by reference into the Zero Notes Registration Statement.[130] Arthur Andersen had confirmed that these audited financials "present fairly, in all material respects, the financial position of Enron Corporation and subsidiaries of December 31, 2000 and 1999, and the results of their operations, cash flows and changes in shareholders' equity for each of the three years in the period ending December 31, 2000, in conformity with accounting principles generally accepted in the United States."[131] As shown above, the undisputed facts show that Deutsche Bank had no basis for challenging Arthur Andersen's expertise as Enron's longtime auditor, and Deutsche Bank was allowed to reasonably rely on Arthur Andersen's preparation of and opinion on Enron's audited financial statements.

> ### 2. Deutsche Bank Had Reasonable Grounds to Believe, and Did Believe, That Enron's Non-Expertized Statements Were True and Contained No Material Omissions

Deutsche Bank participated in the due diligence surrounding the non-expertized portions of the Zero Notes offering materials. The due diligence performed by Deutsche Bank complied with customary standards and procedures.[132] Notwithstanding a reasonable investigation, Deutsche Bank could not uncover the material GAAP misrepresentations in Enron's financial statements or divine that Enron was facing insolvency.

---

[130] SOF ¶ 246 n.7. The Offering Memorandum for the Zero Notes private placement incorporated by reference Enron's 10-K filing for the year ended December 31, 1999, which included audited financial statements for the years ended December 31, 1999 and December 31, 1998. SOF ¶ 240 n.6.

[131] Id.

[132] SOF ¶ 253.

a.      **Deutsche Bank's Due Diligence Constituted a Reasonable Investigation of Enron**

An underwriter is not liable for the non-expertized portions of a registration statement if it had, "after a reasonable investigation, reasonable ground[s] to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(b)(3)(A); Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc., 68 F. Supp. 3d 439, 467 (S.D.N.Y. 2014).  Although "what constitutes reasonable investigation and reasonable ground for belief depends on the circumstances of each registration," SEC Release 33-6383, at *35, the court must, ultimately, "[w]ithout the benefit of hindsight . . . determine whether 'the overall investigation . . . was reasonable under the circumstances at the time of the investigation."  In re International Rectifier Sec. Litig., 1997 WL 529600, at *7 (C.D.Ca April 2, 1997).  Moreover, "the diligence conducted must be reasonable, not perfect."  Id. at *17.

Thus, in contrast to the strict liability imposed on issuers, underwriters who use the "[care] required of a prudent man in the management of his own property" when conducting due diligence are protected from liability under Section 11.  Nomura, 68 F. Supp. 3d 439 at 467–68.  Whether an underwriter meets this standard depends on a variety of factors, including those listed in SEC Rule 176: "(a) The type of issuer; (b) The type of security; (c) The type of person; . . . (f) Reasonable reliance on officers, employees, and others whose duties should have given them knowledge of the particular facts (in light of the functions and responsibilities of the particular person with respect to the issuer and the filing); (g) When the person is an underwriter, the type of underwriting arrangement, the role of the particular person as an underwriter and the availability of information with respect to the registrant[.]"  17 C.F.R. § 230.176; Nomura, 68 F.

Supp. 3d 439 at 468.  Courts applying these factors use a sliding scale, assessing reasonableness as a function of an underwriter's (i) degree of involvement, (ii) expertise, and (iii) access to the relevant information."  <u>Nomura</u>, 68 F. Supp. 3d 439 at 468–69 (citing In re <u>WorldCom, Inc. Sec. Litig.</u>, No. 02-cv-3288, 2005 WL 638268, at *9; <u>Feit</u> v. <u>Leasco Data Processing Equip. Corp.</u>, 332 F. Supp. 544, 577–78 (E.D.N.Y. 1971).

In connection with the Rule 144A offering of the Zero Notes, Deutsche Bank had Enron's public statements regarding the internal processes and controls that it had put in place to ensure its compliance with GAAP.  Deutsche Bank then used its investment banking, credit, and convertible origination groups to participate in diligence.[133]  These groups reviewed Enron's financial statements, press releases, and other publicly available information, reviewed Deutsche Bank's credit position as to Enron, and the structure of the Zero Notes offering—a review that included reference to Deutsche Bank's prior due diligence in connection with the Marlin, Osprey and Yosemite Rule 144A offerings.[134]  Deutsche Bank also participated in a due diligence call with Enron and other underwriting syndicate members, during which questions posed by the lead underwriter, Salomon Smith Barney, were answered.[135]  Deutsche Bank and other syndicate members also requested and received a letter from Arthur Anderson specific to the Zero Notes Rule 144A offering, in which Arthur Anderson confirmed, based on its audit of Enron's financials and its review of Enron's unaudited financials, that no material modifications needed to be made to Enron's unaudited financial statements in order satisfy GAAP.  Given that Deutsche Bank had seen no information from its prior transactions with Enron that raised issues

---

[133] SOF ¶ 253.

[134] <u>Id.</u>  The SEC has expressly contemplated that banks may employ "anticipatory continuous due diligence techniques" based on prior transactions that allow for a reasonable investigation for a new offering in an "orderly efficient manner."  SEC Release 33-6499, at *6-7 (expressing SEC's view that "evolving continuous due diligence practices . . . enhanc[e] the ability of underwriters to conduct due diligence investigations of widely followed registrants").

[135] SOF ¶ 254.

of fraud as to Enron's GAAP accounting or disclosures, and given the expertized and supplemental information from Arthur Andersen, the undisputed facts show that the due diligence investigation conducted by Deutsche Bank for the Zero Notes was reasonable.

### 3.   No Reasonable Investigation Would Have Uncovered the Misstatements or Omissions in Enron's Financial Statements

Plaintiffs do not identify any "red flags" in the expertized and non-expertized portions of the Zero Notes Registration Statement that Deutsche Bank should have investigated, and which would have revealed the material misstatements in Enron's financials.  "Red flags" consist of "facts or circumstances that 'would suggest to an investor of ordinary intelligence the probability that she has been defrauded'" or "facts which come to a defendant's attention that would place a reasonable party in defendant's position 'on notice that the audited company was engaged in 'wrongdoing' to the detriment of its investors.'"  In re WorldCom, 346 F. Supp. 2d at 672-73 (citation omitted).  Indeed, no reasonable investigation by Deutsche Bank would have enabled it to uncover the "fraud" or "wrongdoing" that Enron was deliberately concealing.

Enron has admitted that it and Arthur Andersen were responsible for preparing and presenting Enron's GAAP financials and disclosures.[136]  Deutsche Bank had no involvement in those processes or disclosures.  Arthur Andersen had issued unqualified audit opinions for Enron, and had not stated that there were problems with Enron's financials.[137]  There was nothing in Enron's disclosures relating to the performance of its underlying business units that pointed to Enron violating GAAP accounting and disclosure rules.  Indeed, as highlighted by Andrew Fastow in his deposition testimony, even when Enron was in dire straits and Goldman Sachs was retained to assess strategic alternatives to save the company, he did not reveal the

---

[136] SOF ¶¶ 7-8,105.
[137] SOF ¶¶ 37, 246 n.7.

truth of Enron's financial condition to Goldman Sachs.[138]  Given how much of the fraud centered on Fastow's internal dealings at Enron, this admission highlights how deeply concealed the GAAP accounting fraud was.   Accordingly, there is no evidence that any reasonable investigation would have revealed the fraud because Fastow and others who controlled Enron's internal accounting and disclosure processes were committed to concealing the truth from outsiders, and, and as such, Deutsche Bank cannot be liable under Section 11.

## V.  DEUTSCHE BANK DID NOT VIOLATE THE TEXAS SECURITIES ACT

Silvercreek alleges that Deutsche Bank is secondarily liable under the Texas Securities Act because it participated in the sale of Zero Notes in the public offering while knowing that the prospectus and financial statements incorporated therein contained false and misleading information.[139]   The Texas Securities Act imposes primary liability on a person who sells securities "by means of an untrue statement of a material fact or an omission to state a material fact," and secondary liability on anyone who "materially aids a seller, buyer, or issuer of a security" if that person acts with "intent to deceive or defraud or with reckless disregard for the truth or the law."  TSA Article 581-33F(2).  To establish secondary liability, Silvercreek must show (i) the existence of a primary violation of the securities law; (ii) that the aider has a general awareness of its role in the violations; (iii) that the aider gave substantial assistance in the violation; and (iv) that the aider intended to deceive the plaintiff or acted with reckless disregard for the truth of the representations made by the primary violator.  In re Enron Corp. Sec., Derivative & ERISA Litig., 235 F. Supp. 2d 549, 568 (S.D. Tex. 2002); Highland Capital Management, L.P. v. Ryder Scott Co., 402 S.W.3d 719 (Tex. App. 2012).  Silvercreek's claim must fail because the undisputed facts establish that Silvercreek cannot prove substantial

---

[138] SOF ¶ 29.
[139] TAC ¶¶ 922; 923.

assistance, "general awareness," or intent.

As shown above, Deutsche Bank did not "substantially assist" Enron in making false or misleading statements with respect to the Zero Notes.  See supra I.B.  Enron and its auditors were responsible for the information in the Zero Notes Registration Statement.[140]   Although Silvercreek alleges that it relied on equity analyst reports on Enron in connection with its investment decision, no equity analyst at Deutsche Bank was covering Enron during the time that the Zero Notes were available to the public.[141]   It is also undisputed that Deutsche Bank did not sell any Zero Notes to Silvercreek, nor can Silvercreek show that it was looking to Deutsche Bank for information on the Zero Notes.[142]

To the same extent, as demonstrated above, Deutsche Bank was not "generally aware" that by its conduct, it was aiding Enron in the commission of a securities violation.  As also shown above, there is no evidence that Deutsche Bank had an intent to deceive investors or that it acted with "reckless disregard for the truth of the representations" made by Enron, principally because there is no evidence that Deutsche Bank had any reason to believe that the Enron financial statements incorporated in the Zero Notes Registration Statement—as expertized by Arthur Andersen—were false or misleading (including because due diligence was reasonable under the circumstances).[143]   See supra IV.B.  Finally, as shown above, there also is no evidence to support a finding that Deutsche Bank acted with scienter, as required under the TSA.  See supra I.A.; Highland, 402 S.W.3d at 738-39 ("[S]howing that a defendant acted negligently in failing to discover the improper activity creating primary liability or showing that it 'should have known' does not satisfy the scienter requirement for aider liability under Section 33(F) of the

---

[140] SOF ¶ 105.
[141] SOF ¶ 276.
[142] SOF ¶ 275.
[143] SOF ¶ 253.

[Texas Securities Act]") (citing <u>Sterling Trust Co.</u> v. <u>Adderly</u>, 168 S.W. 3d 835, 842 (Tex. 2005)).  For these reasons, Silvercreek's claim under the Texas Securities Act must fail.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Deutsche Bank respectfully requests that summary judgment be granted on all remaining claims against it.

Dated: November 10, 2017

Respectfully Submitted,

By: */s/ Owen C. Pell*
 Owen C. Pell
 Scott E. Hershman
 Joshua D. Weedman
 Jacqueline L. Chung
 WHITE & CASE LLP
 1221 Avenue of the Americas
 New York, NY 10020-1095
 (212) 819-8200
 opell@whitecase.com
 scott.hershman@whitecase.com
 jweedman@whitecase.com
 jacqueline.chung@whitecase.com

 *Attorneys for Defendants Deutsche Bank Alex. Brown, Inc. and Deutsche Bank AG*