IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SILVERCREEK MANAGEMENT INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITIGROUP, INC., et al. <br><br> Defendants. | 02-CV-8881 (JPO) |

**STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT
TO LOCAL RULE 56.1 SUBMITTED IN SUPPORT OF SUMMARY JUDGMENT BY
DEUTSCHE BANK ALEX. BROWN, INC. AND DEUTSCHE BANK AG**

Owen C. Pell
Scott E. Hershman
Joshua D. Weedman
Jacqueline L. Chung
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020-1095
(212) 819-8200

*Attorneys for Defendants Deutsche
Bank Alex. Brown, Inc. and Deutsche
Bank AG*

## TABLE OF CONTENTS

**Page**

| | | | |
|---|---|---|---|
| I. | Background | | 1 |
| | A. | Deutsche Bank Overview | 1 |
| | B. | Enron and its Advisors | 1 |
| | C. | Enron Officers | 2 |
| | D. | Enron Board of Directors | 3 |
| | E. | Arthur Andersen | 4 |
| | F. | Vinson & Elkins | 5 |
| II. | Enron Insiders controlled the Fraud and who knew of it | | 6 |
| | A. | The Enron Fraud | 6 |
| | B. | Deutsche Bank's Relationship with Enron | 8 |
| | | 1. Enron Exposure | 8 |
| | | 2. Deutsche Bank Employees | 10 |
| | C. | Andrew Fastow's Deposition Testimony | 13 |
| III. | Structured Tax Transactions | | 14 |
| | A. | Overview of the Structured Tax Transactions | 14 |
| | B. | Specific Structured Tax Transactions | 17 |
| | | 1. Teresa Transaction | 17 |
| | | 2. Steele Transaction | 18 |
| | | 3. Cochise Transaction | 20 |
| | | 4. Tomas Transaction | 22 |
| | C. | Role of Outside Advisors | 23 |
| | | 1. The Teresa Transaction Was Independently Expertized. | 24 |
| | | 2. The Steele Transaction Was Independently Expertized. | 25 |
| | | 3. The Cochise Transaction Was Independently Expertized. | 26 |
| | | 4. The Tomas Transaction Was Independently Expertized. | 28 |
| | D. | Arthur Andersen Concluded that Enron's Accounting for the Structured Tax Transactions Complied with GAAP and that Enron's Disclosures were Appropriate. | 29 |
| | E. | The Structured Tax Transactions had a Legitimate Non-Tax Business Purpose. | 34 |

F.     Ex Poste Treatment of the Structured Tax Transactions Confirms Their Validity. .................................................................................................35

IV.   There is no Evidence that Valhalla and Renegade "Tax Accommodation" Transactions were Fraudulent ...............................................................40

     A.    Valhalla ...................................................................................................40

     B.    Renegade ................................................................................................42

V.    There is no Evidence that the Osprey, Marlin, Yosemite, and Firefly Transactions were Fraudulent ...............................................................43

     A.    Marlin I and II .......................................................................................43

     B.    Osprey I and II ......................................................................................49

     C.    Yosemite ................................................................................................58

     D.    Firefly ....................................................................................................62

VI.   Deutsche Bank only had a Passive Role in LJM2 .....................................64

VII.  Deutsche Bank's Role in the Zero Note Offering.......................................67

     A.    Deutsche Bank Had A Limited Role In The Private Placement Offering for the Zero Notes..........................................................................67

     B.    Deutsche Bank Had A Limited Role in the Public Offering for the Zero Notes. ...............................................................................................68

     C.    Deutsche Bank's Due Diligence with the Zero Notes followed Applicable Custom, Practice, and Standards.........................................70

VIII. Silvercreek made its own Purchasing Decisions with regard to the Zero Notes and 7% Exchangeable Notes.............................................................72

     A.    Background on Silvercreek .....................................................................72

           1.    Plaintiff parties.........................................................................72

           2.    Silvercreek Witnesses ..............................................................73

           3.    Silvercreek's Investment Strategy and Sophistication..............73

     B.    Silvercreek Followed Its Own Trading Strategy When Trading the Zero Notes ..74

     C.    Silvercreek Followed Its Own Trading Strategy When Trading the 7% Exchangeable Notes..............................................................................81

## EXPLANATION OF CITATION FORMS

The following citation forms are used in this statement:

"Chung Decl. Ex. [__]" for references to the exhibits to the Declaration of Jacqueline L. Chung In Support of Deutsche Bank's Motion for Summary Judgment.  For consistency and brevity, citations to specific pages within those exhibits refer to the last three digits of the Bates number, if applicable, for the page(s) in question.

## **The Parties**

"Deutsche Bank":  Deutsche Bank Alex. Brown (n/k/a Deutsche Bank Securities Inc.) and Deutsche Bank AG.  Where appropriate, this statement distinguishes between Deutsche Bank and pre-merger Bankers Trust entities.

"Silvercreek" or "Plaintiffs":  Silvercreek Management, Inc., Silvercreek Limited Partnership, Silvercreek II Limited, OIP Limited and Pebble Limited Partnership.

## **Deposition Transcripts**[1]

### *Silvercreek Witnesses*

"Kittel Dep.":  Deposition of Robert Kittel, dated October 19 and 20, 2005 (Chung Decl. Ex. 231)

"Morwick Dep.":  Deposition of Louise Morwick, dated September 19 and 20, 2005 (Chung Decl. Ex. 228)

### *Deutsche Bank Witnesses*

"Cambridge Dep.":  Deposition of Paul Cambridge, dated November 3 and 4, 2004 (Chung Decl. Ex. D3)

"Hayes Dep.":  Deposition of Calli Hayes, dated October 17 and 18, 2005 (Chung Decl. Ex. D4)

"Hayes Bankr. Dep.":  Deposition of Calli Hayes, dated April 28 and May 14, 2003, taken in *In re: Enron Corp.*, No. 01-16034 (AJG) (S.D.N.Y. Bankr.) (Chung Decl. Ex. D46)

"Jakubik Dep.":  Deposition of Michael Jakubik, dated December 15, 2004 (Chung Decl. Ex. D47)

"Jakubik Bankr. Dep.":  Deposition of Michael Jakubik, dated May 1 and 19, 2003, taken in *In re: Enron Corp.*, No. 01-16034 (AJG) (S.D.N.Y. Bankr.) (Chung Decl. Ex. D5)

"McGuire Dep.":  Deposition of Brian McGuire, dated November 2, 2005 (Chung Decl. Ex. D107)

---

[1] Transcripts from multi-day depositions are combined (in excerpted form) into single exhibits.

"McGuire Bankr. Dep.": Deposition of Brian McGuire, dated May 2, 2003, taken in *In re: Enron Corp.*, No. 01-16034 (AJG) (S.D.N.Y. Bankr.) (Chung. Decl. Ex. D274)

"Mialkowski Dep.":  Deposition of Krystian Mialkowski, dated November 23, 2005 (Ex. D214)

"Tice Dep.":  Deposition of Paul Tice, dated November 17, 2005 (Chung Decl. Ex. D7)

"Tirello Dep.":  Deposition of Edward Tirello, dated November 15, 2005 (Chung Decl. Ex. D6)

"Walsh Dep.":  Deposition of William Walsh, dated April 7, 2005 (Chung Decl. Ex. D204)

### *Enron Witnesses*

"Fastow Dep.":  Deposition of Andrew Stuart Fastow, dated October 23 through 27 and October 30 through November 2, 2006 (Chung Decl. Ex. D31)

"Hermann Bankr. Dep.": Deposition of Robert Hermann, dated April 7, 2003, taken in *In re: Enron Corp.*, No. 01-16034 (AJG) (S.D.N.Y. Bankr.) (Chung Decl. Ex. D279)

"Maxey Bankr. Dep.": Deposition of R. Davis Maxey, dated December 11, 2002, taken in *In re: Enron Corp.*, No. 01-16034 (AJG) (S.D.N.Y. Bankr.) (Chung Decl. Ex. D97)

"Savage Dep.":  Deposition of Frank Savage, dated January 18 through 21, 2005 (Chung Decl. Ex. D24)

"Winokur Dep.":  Deposition of Herbert S. Winokur, Jr., dated April 27 through 29 and May 2 through 4, 2005 (Chung Decl. Ex. D206)

### *Arthur Andersen Witnesses*

"Cash Dep.":  Deposition of Debra Ann Cash, dated November 30 through December 3 and December 6 through 7, 2004 (Chung Decl. Ex. D25)

"Palmquist Bankr. Dep.":  Deposition of Robert Palmquist, dated May 13, 2003, taken in *In re: Enron Corp.*, No. 01-16034 (AJG) (S.D.N.Y. Bankr.) (Chung Decl. Ex. D95)

"Petersen Dep.":  Deposition of Richard Petersen, dated October 25 and 26, 2005 (Chung Decl. Ex. D59)

"Stewart Dep.":  Deposition of John E. Stewart, dated September 23 and September 27 through 29, 2005 (Chung Decl. Ex. D28)

### *Vinson & Elkins Witnesses*

"Baird Dep.":  Deposition of Robert Baird, dated July 18 and 19, 2005 (Chung Decl. Ex. D30)

"Osterberg Dep.":  Deposition of Edward Charles Osterberg, Jr., dated August 10 and 11, 2005 (Chung Decl. Ex. D197)

***King & Spalding Witnesses***

"McKee Dep.": Deposition of William McKee, dated October 20, 2005 (Chung Decl. Ex. D98)

## **Expert Reports and Depositions**

"Erickson Rpt.":  Expert Report of Merle Erickson, dated March 17, 2006 (Chung Decl. Ex. D58)

"Sundaresan Rpt.":  Expert Report of Suresh M. Sundaresan, dated July 17, 2006 (Chung Decl. Ex. D262)

"Myers Rpt.": Expert Report of Stewart Myers, dated March 17, 2006 (Chung Decl. Ex. D131).

"Matthews Dep.":  Deposition of Gilbert Matthews, dated October 24, 2006 (Chung Decl. Ex. D267)

"Haft Rpt.":  Expert Report of Robert Haft, dated March 17, 2006 (Chung Decl. Ex. 225).

**STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT
TO LOCAL RULE 56.1 SUBMITTED IN SUPPORT OF SUMMARY JUDGMENT BY
DEUTSCHE BANK ALEX. BROWN, INC. AND DEUTSCHE BANK AG**

Deutsche Bank submits this Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 in support of its Motion for Summary Judgment.

**I.   BACKGROUND**

**A.   Deutsche Bank Overview**

1.   On December 1, 1998 Deutsche Bank formally announced its planned acquisition of Bankers Trust Corporation.  Chung Decl. Ex. D1 (Edmund L. Andrews, Bank Giant: The Overview; Deutsche Gets Bankers Trust for $10 Billion, N.Y. TIMES, Dec. 1, 1998).  On June 5, 1999, Deutsche Bank completed the acquisition.  Chung Decl. Ex. D2 (Timothy L. O'Brien, International Business; Deutsche Bank Seals Bankers Trust Deal, N.Y. TIMES, June 5, 1999).

2.   Paul Cambridge was the Enron relationship partner at Deutsche Bank.  Chung Decl. Ex. D3 (Cambridge Dep. 40:9-41:13).

3.   Calli Hayes was a credit risk manager at Deutsche Bank.  Chung Decl. Ex. D4 (Hayes Dep. 33:9-34:2, 35:6-36:11).

4.   Michael Jakubik was a managing director at Bankers Trust from February 1997 through 1999 and Deutsche Bank beginning in July of 2000.  Chung Decl. Ex. D5 (Jakubik Bankr. Dep. 10:13-25, 18:4-9, 19:20-20:13).

5.   Edward Tirello was an equity analyst at Deutsche Bank who covered Enron from January 1999 to September 2000.  Chung Decl. Ex. D6 (Tirello Dep. 21:13-22:12, 28:21-30:13).

6.   Paul Tice was a fixed income analyst at Deutsche Bank who covered Enron from 2000 to 2001.  Chung Decl. Ex. D7 (Tice Dep. 15:8-11, 20:15-21:13, 26:16-27:7).

**B.   Enron and its Advisors**

7.     Enron's annual reports state that Enron's "management . . . is responsible for the[]

integrity and objectivity" of its financial statements:

> The . . . financial statements of Enron Corp. and subsidiaries
> collectively, Enron) were prepared by management, which is
> responsible for their integrity and objectivity.  The statements have
> been prepared in conformity with generally accepted accounting
> principles and necessarily include some amounts that are based on
> the best estimates and judgments of management.

Chung Decl. Exs. D8 (Enron Annual Report 1998 at 43); D9 (Enron Annual Report 1999 at 39);

D10 (Enron Annual Report 2000 at 29).

8.     Under Generally Accepted Auditing Standards, a company's "financial statements

are management's responsibility":

> The financial statements are management's responsibility. . . .
> Management is responsible for adopting sound accounting policies
> and for establishing and maintaining internal control that will,
> among other things, record, process, summarize, and report
> transactions (as well as events and conditions) consistent with
> management's assertions embodied in the financial statements. . . .
> [T]he fair presentation of financial statements in conformity with
> generally accepted accounting principles is an implicit and integral
> part of management's responsibility.

Chung Decl. Ex. D11 (Statements on Auditing Standards ("SAS"), Responsibilities and

Functions of the Independent Auditor (Jan. 1, 1997) at AU § 110.03).

**C.     Enron Officers**

9.     Kenneth Lay was Chairman and Chief Executive Officer of Enron from 1986 to

February 2001.  Chung Decl. Ex. D12 (Enron Sched. 14A (Mar. 27, 2001) at 5).

10.     Jeffrey Skilling was Chief Executive Officer of Enron from February 2001

through August 15, 2001.  Id. at 6.

11.     Andrew Fastow was Chief Financial Officer of Enron from March 1998 to October 2001.  Chung Decl. Exs. D13 (Enron 1998 Form 10-K (Mar. 31, 1999) at Item 1); D14 (Enron Press Release (Oct. 24, 2001)).

12.     Richard Causey was Chief Accounting Officer of Enron from January 1997 to the end of the relevant period.  Chung Decl. Ex. D15 (Enron 2000 Form 10-K (Apr. 2, 2001) at Item 1).

13.     Michael Kopper was a Managing Director at Enron Global Finance and a member of the Special Projects Group at Enron Corporation.  Chung Decl. Ex. D16 (Statement of Michael Kopper, Subcomm. on Oversight and Investigations of the Comm. on Energy and Commerce, 107 Cong. at 2, 7, 20, 37).

14.     Ben Glisan was the Treasurer of Enron Corporation from the spring of 2000 until October 2001.  Chung Decl. Ex. D17 (Ben Glisan Plea Agreement (Sept. 10, 2003) at 11).

15.     Timothy DeSpain was the Assistant Treasurer of Enron Corporation from January 1999 until May 2002.  Chung Decl. Ex. D18 (Timothy DeSpain Cooperation Agreement (Oct. 5, 2004) Statement at 2).

**D.      Enron Board of Directors**

16.     In May 1998, the Enron Board of Directors approved certain "Corporate Governance Guidelines".  Chung Decl. Ex. D19 (Enron's Bd. of Dirs. Meeting Minutes (May 4-5, 1998) at ENE 0000000497).

17.     These Guidelines identified "ensuring legal and ethical conduct by Enron and its officers and employees" and "providing general oversight of Enron's business" as among the "principal functions" of the Enron Board.  Id. at ENE 0000000523.  The Audit Committee of the Board, which was "comprised solely of independent Directors," "provide[d] reasonable

assurance" that the policies governing such conduct are observed and "serve[d] as the overseer of Enron's financial reporting process." Id. at ENE 0000000523, ENE 0000000528.

18.     The Audit Committee Charter states that a principle function of the Audit Committee was to "[s]erve as a channel of communication between the independent auditor and the Board of Directors and/or management and between the executive responsible for the audit functions provided internally or by contract and the Board of Directors and/or management of the Company." Chung Decl. Ex. D20 (Enron's Audit Comm. Meeting Minutes (May 6, 1997) at AB024600332).

19.     In 1998, Enron's Board of Directors had 15 members—13 of which were outside directors. Chung Decl. Ex. D21 (Enron Sched. 14A (Mar. 24, 1998) at 3-9).

20.     In 1999, Enron's Board of Directors had 16 members—14 of which were outside directors. Chung Decl. Ex. D22 (Enron Sched. 14A (Mar. 30, 1999) at 3-9).

21.     In 2000, Enron's Board of Directors had 18 members—16 of which were outside directors. Chung Decl. Ex. D23 (Enron Sched. 14A (Mar. 21, 2000) at 3-9).

22.     In 2001, Enron's Board of Directors had 14 members—12 of which were outside directors. Chung Decl. Ex. D12 (Enron Sched. 14A (Mar. 27, 2001) at 3-9)).

**E.     Arthur Andersen**

23.     Arthur Andersen LLP ("Arthur Andersen") was outside auditor to Enron. Chung Decl. Ex. D24 (Savage Dep. 824:23-25). Arthur Andersen also "provided . . . consulting services [to Enron] related to providing accounting advice on proposed structures and other matters, along with audit services." Chung Decl. Ex. D25 (Cash Dep. 1152:12-20).

24.     The Professional Standards Group ("PSG") at Arthur Andersen "maintain[ed] subject matter expertise" over "[a]ccounting principles and auditing procedures (including financial statement presentation/disclosures and auditors' reports." Chung Decl. Ex. D26

(William Swanson email re: "Research Manager" (Oct. 16, 2001) at AA145598.10).  Arthur Andersen engagement teams regularly consulted the PSG regarding accounting questions arising from Enron-related transactions.  Chung Decl. Ex. D27 (Lawrence Reiger memorandum re: "ENRON Consultation Process" (Feb. 12, 2001) at AA-EX00291260-3).  Enron was "the largest single largest user and client of the PSG".  Id. at AA-EX00291262.

25.     John Stewart was head of the Professional Standards Group.  Chung Decl. Ex. D28 (Stewart Dep. 14:12-15).  Stewart was a voting member of the Emerging Issues Task Force at the time that EITF 98-10 was developed and accepted and a member of the Derivatives Implementation Group, which is a task force that was created in 1998 concurrent with the issuance of SFAS 133 to provide guidance to companies interpreting SFAS 133.  Id. at 37:6-19, 809:14-18); Chung Decl. Ex. D29 (FASB article, FASB Statement 133 Implementation (Derivatives)).

26.     Arthur Andersen had "complete access to the [Enron] board of directors to bring to their attention any matters that are of concern to them that can in some way negatively impact the company or issues that they think [the board] should know about."  Chung Decl. Ex. D24 (Savage Dep. 828:14-18).

### F.     Vinson & Elkins

27.     Vinson & Elkins LLP ("Vinson & Elkins") was outside counsel to Enron.  Chung Decl. Ex. D30 (Baird Dep. 452:22-23).

28.     Among other things, Vinson & Elkins "counseled with Enron on disclosure issues" related to Enron's transactions and "specific regulatory requirements and issues."  Id. at 287:5-12.

## II.   ENRON INSIDERS CONTROLLED THE FRAUD AND WHO KNEW OF IT

### A.   The Enron Fraud

29.   The Enron fraud was controlled by senior Enron executives.  Enron's former Chief Financial Officer, Andrew Fastow admitted that Enron executives never fully "open[ed] up the kimono and show[ed]. . .the problems. . .at Enron" to others, but they did show a partial picture to select parties outside of their immediate circle.  Chung Decl. Ex. D31 (Fastow Dep. 1010:25-1011:15 (testifying that Enron did not reveal to its own employees the truth about the company's financials and business prospects)).  Fastow testified that Enron withheld information about certain transactions or "secrets or skeletons or ugly details" from financial institutions so that these institutions would not stop lending to Enron.  Id. at 1093:10-25.  Following the resignation of Enron's CEO, Jeffrey Skilling, in August 2001, Fastow suggested to Kenneth Lay that Enron retain Goldman Sachs, which was not a key lender to Enron, to assist with restructuring in part because "if any bank that was a key lender to [Enron] were to understand the true extent of Enron's problems, that that might cause them to stop lending, which could cause a [] knock-off effect within the bank market and effectively shut down Enron's credit."  Id. at 1276:11-17.  Fastow subsequently limited the information that he provided Goldman Sachs.  Id. at 1470:9-14.

30.   Fastow pled guilty to conspiracy to commit securities fraud and conspiracy to commit wire and securities fraud and admitted that he and other members of Enron's senior management "fraudulently manipulated Enron's publicly reported financial results" with a purpose to "mislead investors and others about the true financial position of Enron and, consequently, to inflate artificially the price of Enron's stock and maintain fraudulently Enron's credit rating."  Chung Decl. Ex. D32 (Andrew Fastow Plea Agreement (Jan. 14, 2004) at Exhibit A ¶ 1).

31.     Fastow admitted that he caused Enron and certain Special Purpose Entities ("SPE") under his control, known as the LJM entities, to enter into transactions that would "improve the appearance of Enron's financial statements" but which "lacked economic substance and were improper for accounting purposes, in part because [Fastow] and others secretly agreed that LJM would not lose money through participation in these transactions."  Id. at Exhibit A ¶ 4.

32.     Fastow also admitted he "misled Enron" by exploiting its relationship with the LJM entities for his own benefit.  Id. at Exhibit A ¶¶ 12, 15-16.  In his role as LJM general partner, Fastow entered into side deals with Richard Causey, the Chief Accounting Officer at Enron, to guarantee that LJM entities received a profit for engaging in various sales and repurchases of assets with Enron.  Chung Decl. Ex. D33 (Additional Agreement between Enron and LJM/A. Fastow (Sept. 2000) at MLNBY 0943675-677).

33.     Ben Glisan pled guilty to conspiracy to commit wire and securities fraud and admitted that Enron executives created and used the LJM SPEs to "falsify [Enron's] financial picture" and "conceal the poor performance of certain Enron assets" to those outside of the fraud. Chung Decl. Ex. D17 (Ben Glisan Plea Agreement (Sept. 10, 2003) at 11).

34.     Richard Causey pled guilty to securities fraud and admitted that he "conspired with members of Enron's senior management to make false and misleading statements, in Enron's filings with the Securities and Exchange Commission ("SEC") and in analyst calls, about the financial condition of Enron[.]" Chung Decl. Ex. D34 (Richard Causey Plea Agreement (Dec. 28, 2005) at ¶ 2).  Causey admitted that he and other Enron senior executives were responsible for the preparation and drafting of Enron's financial reports, including annual Form 10-K filing and the quarterly Form 10-Q filing required by the SEC.  Id. at ¶ 4.

35.     Michael Kopper, who held various high-ranking positions at Enron and within the LJM entities, pled guilty to conspiracy to commit wire fraud and conspiracy to engage in monetary transactions in property derived from specified unlawful activity, and identified three transactions—RADR, Chewco, and Southhampton—that generated millions of dollars for the select few Enron executives and their families at the helm of these SPEs.  Chung Decl. Ex. D35 (Michael Kopper Cooperation Agreement (Aug. 21, 2002) at ¶ 14).

36.     Timothy DeSpain, the Assistant Treasurer of Enron Corporation, admitted in his cooperation agreement with the Department of Justice that Enron had  engaged in transactions "to manipulate fraudulently Enron's credit rating" by misrepresenting the company's financial position and the cash and funds flow that Enron generated from operations to satisfy debt and debt-like obligations.  Chung Decl. Ex. D18 (Timothy DeSpain Cooperation Agreement (Oct. 5, 2004) Statement at 1).  DeSpain further admitted "maintaining an investment-grade credit rating for Enron debt was <u>critical</u> to Enron's ongoing business operations" to ensure lower borrowing costs and to prevent any drop in the rating from triggering call options, which would have accelerated the payments due for significant amounts of cash.  <u>Id.</u> (emphasis added).

37.     Arthur Andersen provided audited financial statements for Enron for the years 1997 to 2001.  Chung Decl. Exs. D15 (Enron 2000 Form 10-K (Apr. 2, 2001) at 58-59); D36 (Enron 1999 Form 10-K (Mar. 30, 2000) at 63); D13 (Enron 1998 Form 10-K (Mar. 31, 1999) at 66-67); D37 (Enron 1997 Form 10-K (Mar. 31, 1998) at 66-67).

**B.     Deutsche Bank's Relationship with Enron**

**1.     Enron Exposure**

38.     Deutsche Bank had between $400 million to $800 million on loan to Enron between 1999 and 2001.  Chung Decl. Ex. D4 (Hayes Dep. 122:19-123:4, 126:2-23).

39.     Deutsche Bank's Underwriting Committee approved an additional $200 million in Enron exposure in November 2000.  Id. at 506:2-507:7; Chung Decl. Exs. D38 (Calli Hayes email to Paul Cambridge regarding "Enron electric generating program" (Nov. 28, 2000) at DBG 079615); D39 (Paul Cambridge email to Calli Hayes regarding "Enron electric generating program" (Nov. 29, 2000) at DBB 008664).

40.     On October 4, 2001, Paul Cambridge authored a memorandum to the Deutsche Bank Underwriting Committee regarding Deutsche Bank's credit exposure to Enron.  Chung Decl. Ex. D40 (Paul Cambridge memorandum to the Deutsche Bank Underwriting Committee regarding "Enron Exposure" (Oct. 4, 2001) at DBG 088493).  The purpose of the memorandum was to address the Underwriting Committee's concerns about exposure to Enron and to request approval for additional exposure associated with new business opportunities with Enron.  Id. Cambridge noted in the memorandum that Enron had represented that it was in sound financial health.  Enron had represented that notwithstanding the resignation of its CEO, Jeff Skilling, "[t]here are no hidden bombs" and that "Enron has reaffirmed its earnings and has publicly and privately stated there are not [sic] surprises in their books . . . ."  Id. at DBG 088494.  With regard to Enron's falling Margins, Cambridge noted that "Enron's energy businesses (still over 90% of its earnings) remain robust with strong growth" notwithstanding a declining margin in its trading business.  Id.  Cambridge further reported that with regard to cash flow, Enron "continues to enjoy access to the capital markets, and has publicly stated its goal of reaching an A-rating in the next 12-15 months."  Id.

41.     On November 8, 2001, Enron filed documents with the SEC restating its financial statements for the previous five financial years to account for $586 million in losses.  Chung Decl. Ex. D41 (Enron Press Release (Nov. 8, 2001)).  Enron also sent a letter to holders of Enron

securities stating that the financial statements incorporated into operative prospectuses could no longer be relied upon. Chung Decl. Ex. D42 (Enron letter to Zero Notes holders (Nov. 26, 2001) at JPMNBY200158440).

42.   On November 19, 2001, Enron restated its third quarter earnings for 2001 and disclosed that a $690 million debt was due to creditors on November 27.  Chung Decl. Exs. D43 (Enron Press Release (Nov. 19, 2001)); D44 (Enron Form 10-Q (Nov. 19, 2001)).

43.   On November 19, 2001, after a string of negative announcements, Enron held a meeting in New York with many financial institutions.  Chung Decl. Ex. D45 (Enron Bank Presentation (Nov. 19, 2001) at EC1632080162606).  Paul Cambridge, Calli Hayes, and Markus Tarkington attended the meeting on behalf of Deutsche Bank.  Chung Decl. Ex. D3 (Cambridge Dep. 544:22-545:8).  During the meeting, Enron revealed that its off-balance sheet debt position was significantly larger than what Cambridge and Hayes understood Enron's off-balance sheet debt to be.  Id. at 545:20-546:8; Chung Decl. Exs. D4 (Hayes Dep. 244:14-20); D45 (Enron Bank Presentation (Nov. 19, 2001) at EC1632080162647).   The Enron presentation also identified a number of factors responsible for the breakdown in investor and creditor confidence, including "related party transactions" that were "overused," and involved "conflicts of interest," and "possible control failure."  Chung Decl. Ex. D45 (Enron Bank Presentation (Nov. 19, 2001) at EC1632080162610).  Additionally, the presentation also acknowledged that Enron's "black box" nature and need to move toward "financial transparency."  Id. at EC1632080162675.

### 2.   Deutsche Bank Employees

44.   Paul Cambridge testified that Enron was selective about the disclosure of company information to Deutsche Bank.  Cambridge testified that "as a general rule, Enron was barely parsimonious with its information and frequently we did not necessarily . . . get the information that we wanted."  Chung Decl. Ex. D3 (Cambridge Dep. 466:14-25).  Cambridge

further testified that "Enron was an institution that operated in some cases like the CIA, on a need to know basis, and if you weren't involved in the transaction and they didn't feel it was appropriate to tell you, you wouldn't know." Id. at 484:23–485:20, 379:17-23, 393:9-13, 565:2-10); D40 (Paul Cambridge memorandum to the Deutsche Bank Underwriting Committee regarding "Enron Exposure" (Oct. 4, 2001) at DBG 088493).

45.    Calli Hayes assessed the credit quality of those that Deutsche Bank loaned money to or transacted with.  Chung Decl. Ex. D4 (Hayes Dep. 35:6-36:11, 239:23-240:11).  Between 1996 and 2001, Hayes assessed Enron's creditworthiness by looking at its financial statements, and speaking to both the company and the deal team who in turn had conversations with the company.  Id. at 60:17-25.  Hayes was sometimes at odds with Deutsche Bank's deal team because it was her job to "make sure that the bank d[id not] over expose itself", engage in too risky of a transaction, or transact with an entity that was not creditworthy.  Id. at 82:6-24.  However, any concern Hayes expressed about Deutsche Bank's exposure to Enron was only because the aggregate exposure was high—it was nothing specific to any proposed transaction and it was "regardless of the credit underneath."  Chung Decl. Ex. D46 (Hayes Bankr. Dep. 109:24-117:14).  Indeed, Hayes was "not any more or any less [concerned about Enron repaying Deutsche Bank] than [she was] with other clients."  Id. at 147:18-148:18.

46.    In between Michael Jakubik's positions at Bankers Trust and Deutsche Bank, from approximately February 1999 until July 2000, Jakubik worked at Enron.  Chung Decl. Ex. D47 (Jakubik Dep. 27:2-6).

47.    At Enron, Jakubik had very little interaction with Fastow.  Chung Decl. Ex. D5 (Jakubik Bankr. Dep. 258:16-21).  Jakubik only paid attention to the transactions he worked on while at Enron and did not focus on the company as a whole.  Id. at 312:10-313:4.  He never

learned or saw anything that suggested Enron's balance sheet was inaccurate.  Id. at 320:25-321:14.  It was Jakubik's belief that Enron's balance sheet was in "very sound" and "very strong shape" when he left the company in July 2000.  Id.

48.    Fastow's testimony demonstrates that, not only did he not hire Jakubik to work at Enron, but he did not work closely with him.  Chung Decl. Ex. D31 (Andrew Fastow Dep. 50:1-50:4, 864:1-864:4).  Fastow could not recall various aspects of Jakubik's work while he was employed at Enron including what his reporting level was or his involvement in certain transactions.  Id. at 412:6-412:11, 279:11, 279:22, 277:16-277:23.  Fastow could only recall vague discussions with Jakubik about Enron structured finance transactions but could not identify transactions on which Jakubik worked.  Id. at 277:16-23. He could not recall talking to Jakubik about transactions "filling the gap between actual and reported performance," and could only testify that Jakubik sometimes attended meetings where transactions were discussed.  Id. at 278:4-278:12.  Fastow and Jakubik's interactions were particularly limited after Jakubik moved to Enron North America in August 1999.  Chung Decl. Ex. D5 (Jakubik Bankr. Dep. 258:16-260:16).

49.    Edward Tirello was an equity analyst at Deutsche Bank who covered Enron.  He relied on public information about Enron as the basis for his analyst opinions regarding Enron stock.   Chung Decl. Ex. D6 (Tirello Dep. 52:7-15).   Tirello never issued a "strong buy" recommendation for Enron stock.  Chung Decl. Exs. D48 (Bankers Trust's Enron rating (Jan. 13, 1999) at DBG 098181); D49 (Deutsche Bank's Enron rating (Jan. 20, 1999) at DBG 098188); D50 (Deutsche Bank's Enron rating (Apr. 13, 1999) at DBG 086890); D51 (Deutsche Bank's Enron rating (May 25, 1999) at DBG 098191); D52 (Deutsche Bank's Enron rating (July 13, 1999) at DBG 086904); D53 (Deutsche Bank's Enron rating (Jan. 28, 2000) at DBG 098286);

D54 (Deutsche Bank's Enron rating (Apr. 17, 2000) at DBG 086893); D55 (Deutsche Bank's Enron rating (July 25, 2000) at DBN-253415); D56 (Deutsche Bank's Enron rating (Sept. 15, 2000) at DBG 008685).

50.      Paul Tice was a debt analyst at Deutsche Bank who covered Enron.  He also relied on public information about Enron as the basis for his analyst opinions regarding Enron credit.  Chung Decl. Ex. D7 (Tice Dep. 17:5-10).

### C.      Andrew Fastow's Deposition Testimony

51.      Andrew Fastow was deposed in the Newby action from October 23, 2006 to November 3, 2006.  At this time, Fastow had already been sentenced to a term of 72 months in prison, followed by two years of supervised release in connection with pleading guilty to conspiracy to commit wire fraud and conspiracy to commit wire and securities fraud.  Chung Decl. Ex. D31 (Fastow Dep. 501:24-502:1).

52.      Fastow met with plaintiff's counsel in the Newby action, Paul Howes, on multiple occasions in preparation for his deposition.  Id. at 1936:4-15, 1938:17-21.  During these meetings, Howes showed Fastow documents and inquired about his recollection or interpretation of them.  Id. at 1937:11-19, 13938:1-11; 1941:5-17.  On the days that Fastow sat for his deposition, Fastow continued to meet with Howe to review testimony and documents.  Id. at 1944:4-1945:2; 1945:23-1946:5, 1946:6-21, 1949:13-20.

53.      Fastow conceded that certain materials that Howes showed to him in preparation for his deposition were documents that he had not seen during his tenure at Enron.  Id. at 502:20-503:3.

54.      Fastow also testified that the declaration that he executed in the Newby action prior to his deposition was drafted by counsel in the Newby action.  Id. at 506:9-21.

55.     Fastow admitted that he did not work on the Structured Tax Transactions that Deutsche Bank did for Enron, as Richard Causey's department was responsible for handling these transactions.  Id. at 281:11-24.

56.     Fastow admitted that he had no personal knowledge of the Marlin, Osprey, and Yosemite transactions that Deutsche Bank did for Enron.  Id. at 1055:10-1056:16, 1062:6-13, 663:3-7.

## III.   STRUCTURED TAX TRANSACTIONS

### A.   Overview of the Structured Tax Transactions

57.     During the period from 1997 until 2001, Deutsche Bank did four tax transactions with Enron: the Teresa Transaction, the Steele Transaction, the Cochise Transaction, and the Tomas Transaction (hereinafter collectively, the "Structured Tax Transactions").  Chung Decl. Ex. D57 (Enron Accounting Summary (Oct. 2002) at ERN0083020 – 83043).

58.     The Structured Tax Transactions resulted in future tax benefits to Enron, largely in the form of deferred tax assets, which reduced Enron's income tax expense and led to a corresponding increase in Enron's net income.  Through the third quarter of 2001, as a result of these four transactions, Enron reported approximately $422.1 million of net income.  Chung Decl. Exs. D57 (Enron Accounting Summary (Oct. 2002) at ERN0083020-83043); D58 (Expert Report of Merle Erickson ("Erickson Report") dated Mar. 17, 2006 (hereinafter "Erickson Report) at 4, 34).

59.     Enron received "should" opinions from national, reputable law firms on each of the Structured Tax Transactions.  As such, these law firms were opining that Enron had at least a 70% chance of prevailing if the IRS decided to challenge Enron's tax treatment and the dispute was litigated.  Chung Decl. Ex. D58 (Erickson Report at 5, 10, 45-46).

60.    Arthur Andersen independently concurred with these "should" opinions.  Enron's accounting for the Structured Tax Transactions was reviewed by Arthur Andersen and Arthur Andersen's Professional Standards Group ("PSG").[2]   Arthur Andersen analyzed hypothetical versions of the Structured Tax Transactions and expressed its opinion about the GAAP accounting for each tax transaction in the form Statement on Auditing Standards ("SAS") 50 letters.[3]   Arthur Andersen also analyzed the GAAP accounting for each Structured Tax Transaction as actually completed as part of its financial statement audits of Enron.  As part of the latter work, Arthur Andersen determined that Enron's accounting for the Structured Tax Transactions complied with GAAP and that Enron's disclosures were appropriate.  Chung Decl. Ex. D58 (Erickson Report at 8, 11, 15).

61.    The accounting for deferred income taxes is specified by the Statement of Financial Accounting Standard No. 109 – Accounting for Income Taxes ("FAS 109").  FAS 109 addresses the recognition of deferred tax assets and was in effect during the period that Enron engaged in the Structured Tax Transactions.  FAS 109 generally requires firms to account for differences in the book and tax basis of its assets.  Specifically, firms record in their balance sheets a deferred tax asset for those assets that have a tax basis that is greater than their book basis.  FAS 109 provides no clearly defined threshold before a firm can recognize deferred tax assets.  Chung Decl. Exs. D58 (Erickson Report at 4, 21, 40); D61 (Financial Accounting

---

[2]Arthur Andersen's PSG was a group of individuals who, among other things: (i) consulted with engagement teams on GAAP issues; (ii) provided implementation guidance on accounting standards; (iii) represented Arthur Andersen before, and liaised with, standard-setting and regulatory bodies (e.g., the FASB, EITF, the SEC, etc.), (iv) authored accounting research materials for the firm's internal use; and v) reviewed training materials.  Chung Decl. Exs. D59 (Petersen Dep. 23:20-24:21); D144 (Stewart Dep. 17:6-18:9); D58 (Erickson Report at 8, n.4).

[3]A SAS 50 letter is a medium for obtaining from an accountant advice and/or the application of accounting principles to hypothetical transactions and/or to increase the knowledge of specific financial reporting issues.  Chung Decl. Exs. D58 (Erickson Report at 10, n. 6); D60 (SAS 50 – Reports on the Application of Accounting Principles).

Standards Board ("FASB"), FAS 109 – Accounting for Income Taxes, *available at* http://www.fasb.org/summary/stsum109.shtml).

62.     At the time of the Structured Tax Transactions, there existed diversity of practice on this issue.  Firms used at least three different confidence thresholds to evaluate the recognition of deferred tax assets.  Some firms recognized deferred tax assets based on a 33% probability of succeeding in court against the IRS, which is commonly referred to as a "substantial authority" threshold.  Others recognized deferred tax assets only when meeting at least a "more likely than not" threshold, which is considered to denote a probability of success of at least 50.1%.  Some required a "probable" threshold which denotes a probability of success of at least 70%.  Chung Decl. Exs. D58 (Erickson Report at 4-5, 43-44); D62 (James R. Browne, Financial Reporting for Uncertain Tax Positions, Tax Notes, Oct. 3, 2005 at 78).

63.     In July 2005, after all the Structured Tax Transactions were closed, the FASB proposed an interpretation of FAS No. 109 which would require that a tax position be "probable of being sustained on audit based solely on the technical merits of the position."  The FASB also noted that "probable" is generally synonymous with a "should" level opinion.  Chung Decl. Ex. D63 (FASB, Proposed Interpretation, Accounting for Uncertain Tax Positions, an interpretation of FASB Statement No. 109, July 14, 2005 at i and 16, ¶ B19, *available at* http://www.fasb.org/cs/ContentServer?site=FASB&c=Document_C&pagename=FASB%2FDocument_C%2FDocumentPage&cid=1176157305569 ("The Board believes that there is a common understanding on the part of financial statement preparers, auditors, and regulators about the confidence level expressed by probable and that a probable recognition threshold is not inconsistent with the perceived level of confidence of an unqualified *should prevail* tax opinion.")).

64.     In late 2005, the FASB modified its position in regard to the threshold necessary to recognize deferred tax assets.  It decided that a "more likely than not" threshold was necessary to recognize deferred tax assets.  Therefore, Enron exceeded the threshold necessary to recognize deferred tax assets subsequently specified by the FASB in 2005.  Chung Decl. Exs. D58 (Erikson Report at 5, 47-48); D64 (Minutes of Nov. 22, 2005 FASB meeting, *available at* http://fasb.org/jsp/FASB/Document_C/DocumentPage&cid=1218220116301).

65.     It is well known within the accounting and financial community, particularly for complex transactions, that there exists more than one reasonable method of accounting that is compliant with GAAP for a particular transaction.  This phenomenon is referred to as "diversity of practice," and is particularly relevant in these transactions because they involved the interpretation of ambiguous GAAP standards.  Chung Decl. Ex. D58 (Erickson Report at 8).  When there is no clear GAAP standard for a transaction, reasonable people can disagree about the appropriate GAAP accounting, and they can have equally defensible positions.  In sum, there exists diversity in practice for certain accounting issues with the diversity of accounting treatments all falling within the bounds of GAAP.   Chung Decl. Ex. D58 (Erickson Report at 39).

66.     The key GAAP accounting element in three of the structured tax transactions (the Teresa, Steele, and Cochise Transactions) related to the accounting for differences in the book and tax basis of the firm's assets by recording deferred tax assets.  The Steele and Cochise Transactions also involve another element: the accounting for purchases of assets.  Chung Decl. Ex. D58 (Erickson Report at 39).

## B.     Specific Structured Tax Transactions

### 1.     Teresa Transaction

67.     In the Teresa Transaction, which closed in March 1997, Enron contributed a leasehold interest in its headquarters (Enron North Building) to a partnership, Enron Leasing Partners L.P. ("ELP"), in which its partners were Potomac Capital Investment and a subsidiary of Bankers Trust.  The 98% limited partner in ELP was an Enron subsidiary, Organizational Partner, Inc. ("OPI").  OPI's tax basis in its interest in the partnership increased with the payment of dividends from ELP.  There was no corresponding increase in the book basis of the same investment.  Thus, the dividends caused the tax basis of the investment to exceed the book basis of the investment and as a result, Enron recorded a deferred tax asset.  Enron did so because the increased tax basis would yield future tax benefits.  Enron anticipated that at a future date, the Enron North Building would be distributed to Enron, and the tax basis of the building would thereby be increased to Enron's tax basis in the partnership.  Thus, the tax basis of the investment would be ascribed to the Enron North Building upon liquidation of the partnership. The income statement consequence of recording the deferred tax asset in the Teresa Transaction was to reduce Enron's income tax expense, which in turn increased Enron's reported net income. As a result of the Teresa Transaction, Enron reduced its income tax expense, and increased its net income, by approximately $228.7 million during the period from 1997-2001.  Chung Decl. Exs. D57 (Enron Accounting Summary (Oct. 2002) at ERN0083027-83029); D65 (Project Teresa Deal Basics, EC2 000037870); D 58 (Erickson Report at 40-41, 53-55); D66 (Limited Partnership Agreement of Enron Leasing Partners, L.P. by and among Enron Property Management Corp., Organizational Partner, Inc. and EN-BT Delaware, Inc, dated Mar. 27, 1997, ERN0035834-35992).

### 2.     Steele Transaction

68.     The Steele Transaction closed in October 1997.  Chung Decl. Ex. D57 (Enron Accounting Summary (Oct. 2002) at ERN0083029).

69.     The Steele Transaction involved the acquisition by an Enron subsidiary of $51.2 million of corporate bonds and $7.6 million of REMIC (Real Estate Mortgage Investment Conduit) Residuals in exchange for $46.8 million in cash, $4.5 million of debt, and $7.5 million of preferred stock.  Chung Decl. Exs. D57 (Enron Accounting Summary (October 2002) at ERN0083029 – 83032); D58 (Erickson Report at 56).

70.     When the Steele Transaction closed, the tax basis of the REMIC Residuals exceeded their book basis.  Due to the divergence in the book and tax basis of the REMIC Residuals, Enron recorded a deferred tax asset and a corresponding deferred credit in the same amount, which was required to make debits equal credits.  The deferred credit was a balance accounting item for which the book basis exceeds the tax basis.  Enron therefore recorded an additional deferred tax asset to reflect the difference in the book and tax basis of the deferred credit.  The final deferred tax asset recorded by Enron in the Steele Transaction was $121.8 million.  Enron also recorded a deferred credit in the same amount to ensure that debits continued to equal credits.  Chung Decl. Exs. D57 (Enron Accounting Summary (October 2002) at ERN0083029 – 83032); D58 (Erickson Report at 40, 56-58).

71.     After the close of the Steele Transaction, Enron amortized the deferred credit into pre-tax income.  It also recognized a deferred income tax expense in proportion to the pre-tax income recognized.  Enron amortized 87% of the deferred credit over the life of the corporate bonds, and amortized 13% of the deferred credit over the life of the REMIC Residuals.  The 87% vs. 13% split was based on the fair value of the bonds and REMICs at closing ($51.2 million of bonds vs. $7.6 million of REMICs).  As a result of amortizing the deferred credit, Enron recognized $94.2 million of pre-tax income and $61.2 million of after-tax net income during the

period from 1997-2001.  Chung Decl. Ex. D57 (Enron Accounting Summary (October 2002) at ERN0083029 – 83032); D58 (Erickson Report at 60).

### 3.    Cochise Transaction

72.    The Cochise Transaction, which closed in January 1999, was a REMIC transaction like Steele.  Chung Decl. Exs. D57 (Enron Accounting Summary (October 2002) at ERN0083034); D58 (Erickson Report at 66).

73.    In the Cochise Transaction, Enron acquired REMIC Regular Interests for $24.7 million and REMIC Residuals for $0.2 million.  It acquired the REMICs through a subsidiary that was organized as a Real Estate Investment Trust ("REIT").  Enron recorded the difference in the book and tax basis of the REMIC Residuals as a deferred tax asset, and it recorded a corresponding deferred credit to make debits equal credits.  As in the Steele Transaction, Enron considered the deferred credit to be an item that required the recordation of a deferred tax asset for the difference in the book basis and tax basis of the deferred credit.  It therefore increased the total deferred tax asset it recorded, and increased the deferred credit recorded by the same amount to ensure that debits continued to equal credits.  As part of the Cochise Transaction, Enron also acquired through one of its subsidiaries two airplanes purchased from Deutsche Bank that were under lease to United Airlines and Continental Airlines for approximately $46.8 million.  Chung Decl. Exs. D57 (Enron Accounting Summary (October 2002) at ERN0083020 – ERN0083043); D58 (Erickson Report at 40-41, 66-69).  In light of its recordation of a deferred credit, Enron reduced the book value of the airplanes to $0 (a $46.8 million reduction), and reduced its deferred credit by the same amount.  Chung Decl. Exs. D57 (Enron Accounting Summary (October 2002) at ERN0083020 – ERN0083043); D58 (Erickson Report at 68).

74.    After the close of the Steele Transaction, Enron amortized the deferred credit into pre-tax income.  During the 1999-2001 period, Enron recognized approximately $12.6 million of

pre-tax income from the amortization of the deferred credit, and after recording deferred income tax expense on this pre-tax income, Enron reported approximately $8 million of after-tax income.  Chung Decl. Exs. D57 (Enron Accounting Summary (October 2002) at ERN0083034 – 83037); D58 (Erickson Report at 69).

75.     Unlike in the Steele Transaction, the tax basis of the REMIC Residuals in the Cochise Transaction increased after the transaction closed due to "phantom income" earned by the REMICs.  This increase in tax basis was not accompanied by an increase in the book basis of the REMICs.  The increase in tax basis without a corresponding increase in book basis led to the recordation of deferred tax assets.   Over the period from 1999-2001, Enron recorded approximately $68.9 million of deferred tax assets as a result of the increase in the tax basis of the REMICs (it recorded a deferred tax asset of $27.4 million in 1999, $25.6 million in 2000, and $15.9 million in 2001).  These deferred tax assets resulted in the recognition of deferred income tax benefits of $68.9 million, which reduced Enron's income tax expense and increased its net income by the same amount. Chung Decl. Exs. D57 (Enron Accounting Summary (October 2002) at ERN0083034 – 83037); D58 (Erickson Report at 70-71).

76.     On June 28, 2000, the airplanes were sold to Deutsche Bank/BT for approximately $36.5 million.  The book value of the planes was $0 when they were sold by Enron.  Enron recorded a $36.5 million pre-tax gain when the planes were sold, which was computed as the difference in the sale proceeds ($36.5 million) and Enron's basis in the planes (which was $0).  Enron recorded an after-tax gain on the sale of the planes of about $24.5 million.  Deutsche Bank/BT held the planes until July 27, 2000 when it sold them to Oneida, a partnership formed by Enron and Deutsche Bank/BT as part of the Tomas Transaction. Deutsche Bank/BT was the managing partner of Oneida at the time of the sale.   Deutsche

Bank/BT paid fair market value for the planes, bore the risk of loss during its ownership of the planes, and had not entered into any agreement to sell the planes to Oneida. There was no agreement limiting the benefit to Deutsche Bank/BT if the Cochise Planes increased in value in the interim, or limiting the detriment to Deutsche Bank/BT if the Cochise Planes decreased in value. Chung Decl. Exs. D57 (Enron Accounting Summary (October 2002) at ERN0083034 – 83037); D58 (Erickson Report at 71, 73-75); Chung Decl. Ex. D107 (McGuire Dep. 190:12-191:14).

### 4.   Tomas Transaction

77.   The Tomas Transaction closed in September 1998. As part of its acquisition of Portland General Holdings, Inc. ("PGH"), Enron obtained a portfolio of leased assets -- airplanes, railcars, and other equipment -- previously held by PGH. The assets' fair market value exceeded their tax basis and would trigger, upon their sale, a taxable gain equal to the difference in their fair market value and tax basis. Enron wanted to dispose of these leased assets in a manner that would minimize the tax liability arising from the sale. The Tomas Transaction involved Enron's disposition of these leased assets. Chung Decl. Exs. D57 (Enron Accounting Summary (October 2002) at ERN0083032-83034); D58 (Erickson Report at 75).

78.   In the Tomas Transaction, Enron formed a partnership, Seneca Leasing Partners, in 1998 with two Deutsche Bank affiliates. Through a series of contributions and the use of an Enron subsidiary, Enron was able to increase the tax basis of the leased assets that were contributed to the partnership through its subsidiary, Oneida. This increase in the tax basis of the leased assets reduced the taxable gain, and consequent tax liability, arising from a sale of the leased assets. Chung Decl. Exs. D57 (Enron Accounting Summary at ERN0083032-83034); D58 (Erickson Report at 75-76).

79.     The Tomas Transaction resulted in a reduction in the tax cost of liquidating the leased assets portfolio.   The total tax benefits were approximately $43.6 million.   These tax benefits were included in the information provided in Enron's income tax footnotes.   Chung Decl. Exs. D57 (Enron Accounting Summary at ERN0083032-83034); D58 (Erickson Report at 75-76).

## C.     Role of Outside Advisors

80.     Enron received "should" opinions from national, reputable law firms on each of the Structured Tax Transactions.   Such opinions indicate that in the opinion of these law firms, Enron had at least a 70% chance of prevailing if the IRS decided to challenge Enron's tax treatment and the dispute was litigated.   Chung Decl. Ex. D58 (Erickson Report at 90-91).

81.     Arthur Andersen's tax accountants independently concurred with these "should" opinions.   Enron's accounting for the Structured Tax Transactions was reviewed by Arthur Andersen and Arthur Andersen's Professional Standards Group ("PSG").[4]   Arthur Andersen analyzed hypothetical versions of the structured tax transactions and expressed its opinion about the GAAP accounting for each tax transaction in the form Statement on Auditing Standards ("SAS") 50 letters.[5]   Arthur Andersen also analyzed the GAAP accounting for each tax transaction as actually completed as part of its financial statement audits of Enron.   In the late 1990s, Arthur Andersen was a highly reputable firm.   For example, in 1999, the CPA Journal noted that, "[f]or the 18th year straight, Arthur Andersen was rated the most highly regarded

---

[4] Arthur Andersen's PSG was a group of individuals who, among other things: (i) consulted with engagement teams on GAAP issues; (ii) provided implementation guidance on accounting standards; (iii) represented Arthur Andersen before, and liaised with, standard-setting and regulatory bodies (e.g., the FASB, EITF, the SEC, etc.), (iv) authored accounting research materials for the firm's internal use; and v) reviewed training materials.   Chung Decl. Exs.  D59 (Petersen Dep. 23:20-24:21); D144 (Stewart Dep. 17:6-18:9).

[5] A SAS 50 letter is a medium for obtaining from an accountant advice on the application of accounting principles to specified transactions, either completed or proposed, or advice on financial statements.   Chung Decl. Ex. D60 (SAS 50 – Reports on the Application of Accounting Principles).

accounting firm by accounting professors, according to a recent CPA Personnel Report survey."
Chung Decl. Exs. D277 (<u>Arthur Andersen Ranked No. 1 by Professors</u>, CPA Journal, Oct. 99,
Vol. 69); D278 (<u>Ernst Tops Novak Clint Survey in Photo-Finish</u>, Accounting Today, Aug. 11,
1997 v. 11 n. 14 p. 5(1)); D58 (Erickson Report at 90-91).

### 1.    The Teresa Transaction Was Independently Expertized.

82.    King & Spalding LLP ("King & Spalding") represented Enron in connection with
the Teresa Transaction.  Enron received a "should" tax opinion from King & Spalding with
respect to this transaction.  Chung Decl. Exs. D67 (King & Spalding tax opinion letter to R.
Davis Maxey dated May 14, 1997 by William S. McKee and Abraham Shashy, Jr., MN002908 –
MN002936); D68 (King & Spalding tax opinion letter to R. Davis Maxey dated July 29, 1997 by
Abraham N.M. Shashy, Jr. for himself and William S. McKee, EC2 000033769 – EC2
000033813).

83.    Prior to issuing its tax opinion, King & Spalding provided a memorandum to
Enron regarding the potential federal income tax consequences of the Teresa Transaction.
Chung Decl. Ex. D69 (King & Spalding Memorandum to R. Davis Maxey dated Feb. 20, 1997
from William S. McKee and Susan Jewett, EC2 000033661 – EC2 000033739).

84.    Arthur Andersen independently concurred with King & Spalding's "should"
opinion with respect to the Teresa Transaction.  Chung Decl. Ex. D70 ("Formation of Enron
Leasing Partners, L.P. (Partnership) and Treatment of Taxable Dividends" Memorandum to
Enron Corp. by David B. Duncan, Robert P. Palmquist, and Roger D. Willard dated Mar. 14,
1994, AA-EX00451597 – AA-EX00451602 at AA-EX00451598).

85.    In its memorandum dated March 14, 1997, Arthur Andersen supported the
recognition of a deferred tax asset on the increase in Enron's tax basis in the partnership that
occurred with each dividend.  Chung Decl. Ex. D71 ("Tax Accounting for Project Teresa"

Memorandum by David B. Duncan, Robert P. Palmquist, and Roger D. Willard dated Mar. 14, 1997, AASDTEX00475633 – AASDTEX00475638).

86.     Arthur Andersen also issued a SAS 50 letter to Bankers Trust regarding the proposed transaction.  Chung Decl. Exs. D72 (Accounting opinion letter from Arthur Andersen to Bankers Trust dated May 12, 1995, DBC 012919 – DBC 012924); D73 (Accounting opinion letter from Arthur Andersen to Bankers Trust dated July 26, 1995, AB0074 1235 – AB0074 1246).

### 2.     The Steele Transaction Was Independently Expertized.

87.     Enron's outside counsel for the Steele Transaction was Akin, Gump, Strauss, Hauer & Feld LLP ("Akin Gump").  In connection with the Steele Transaction, Akin Gump provided two tax opinion letters.  The transaction closed with Akin Gump giving a "should" level tax opinion to Enron.  Chung Decl. Exs. D74 (Federal tax opinion letter from Akin Gump to Maxey dated Dec. 16, 1997, EC2 000033867- EC2 000033904); D75 (Akin Gump tax opinion letter to Maxey dated Dec. 16, 1997, EC2 000033905 – EC2 000033916).

88.     In addition, Arthur Andersen issued a SAS 50 letter to Bankers Trust on the hypothetical version of the Steele Transaction.  In its SAS 50 letter, Arthur Andersen reached a determination that Enron should record a deferred tax asset for the deferred credit recognized in Steele.  Chung Decl. Ex. D76 (Accounting opinion letter from Arthur Andersen to Bankers Trust dated Aug. 11, 1997, DBC 017408 – DBC 017420).

89.     Arthur Andersen also prepared a memorandum regarding the accounting for the Steele Transaction in which it expressly advocated that a standard higher than "more likely than not" be applied to the transaction.  In the memorandum, Arthur Andersen stated:

> The preceding discussion is predicated on assumptions about certain provisions of the IRC, the regulations thereunder, and other relevant authorities promulgated by the Internal Revenue Service and the courts.  The recording of the financial

statement benefits of the transaction is dependent on the proper interpretation and implementation of such authorities.

In situations such as these, in which the ultimate relation of the economic and financial statement benefits is dependent upon certain positions that will be taken on current and future tax returns, we believe that the financial statement benefits should be recorded only if it is probable that the pertinent tax position will be sustained.  The term "probable," though discussed in SFAS No. 5 – Accounting for Contingencies, is not numerically defined therein or elsewhere in the authoritative accounting literature.  It is clear that it requires a higher degree of likelihood than the 50.1% threshold implied by the "more likely than not" standard discussed in SFAS No. 109.

This transaction has been reviewed by Bob Palmquist, Tax Partner and Mike Baldasaro, Tax Partner Director.  They have concluded, based upon review of the structure, discussions with Enron tax personnel and Enron's outside legal counsel that this transaction "should" be sustained under the IRC and relevant authoritative rules.  (Enron has also obtained a "should" opinion from a reputable outside law firm (Akin, Gump et al.).  We will accept a should tax conclusion as meeting the probability criteria described above.  This is consistent with the Firm's position on other transactions.

Chung Decl. Exs. D77 ("Acquisition of Interests in Real Estate Mortgage Investment Conducts (REMIC) (sic)" Memorandum to Enron Corp. Files by Roger D. Willard dated October 30, 1997, AASDTEX001068412 – AASDTEX001068418 at AASDTEX001068418); D278 ("Project Steele" memorandum to The Files by Robert P. Palmquist dated October 29, 1997, AASDTEX001068373).

### 3.    The Cochise Transaction Was Independently Expertized.

90.    William S. McKee and James D. Bridgeman of McKee Nelson, Ernst & Young LLP were the primary counsel for the development and implementation of the Cochise Transaction, with King & Spalding providing counsel on the issue of REIT status qualification for Maliseet.  In connection with the Cochise Transaction, McKee Nelson, Ernst & Young LLP provided a tax opinion letter that analyzed the tax implications of the transaction.  Chung Decl. Ex. D78 (McKee Nelson Ernst & Young tax opinion letter to R. Davis Maxey dated Mar. 21, 2001 by William S. McKee and James D. Bridgeman, EC2 000033988 – EC2 000034072).  In

addition, King & Spalding provided a tax opinion letter that analyzed the tax implications of the transaction and concluded that Maliseet "should" qualify as a REIT for Federal income tax purposes for its taxable year ended December 31, 1999, and that the organization and proposed method of operation of Maliseet "should" enable it to continue to satisfy the requirements for qualification and Federal income taxation as a REIT for its taxable year ended December 31, 2000 and subsequent tax years.  Chung Decl. Ex. D79 (King & Spalding tax opinion letter to Enron Corp. and Maliseet Properties, Inc. dated May 14, 2001, EC2 000033980 – EC2 000033983).

91.     Arthur Andersen provided a hypothetical accounting opinion – or SAS 50 – letter to Bankers Trust that analyzed the financial accounting treatment of a hypothetical transaction that was substantially identical to the Cochise Transaction.  Chung Decl. Ex. D80 (Accounting opinion letter from Arthur Andersen to Bankers Trust dated May 26, 1999, EC2 000037349 – EC2 000037367).

92.     Arthur Andersen also specifically reviewed the GAAP accounting for the sale of the planes in the Cochise Transaction and addressed this subject in a memorandum authored by Christopher Herbold dated July 19, 2000.  This memorandum concluded that Enron's accounting for the sale of the Cochise planes was appropriate.  Chung Decl. Ex. D81 ("Sale of Aircraft Interests" Memorandum by Christopher Herbold dated July 19, 2000, AASDTEX003221042 ("Based on our review of Project Cochise and of the Purchase Agreements the treatment is appropriate.")).

93.     In an earlier memorandum, Arthur Andersen concluded that Enron's accounting for the Cochise Transaction complied with GAAP.  It stated that:

> The significant accounting issues are 1) consolidation of Maliseet, 2) sustainability of tax positions, 3) proper calculation of deferred taxes and 4)

> proper calculation, method and period of amortization of the deferred credit. We have concluded that Enron has properly accounted for their issues to within immaterial differences. . . .
>
> This transaction has been reviewed by Bob Palmquist, Tax Partner. He has concluded, based upon review of the structure, discussions with Enron tax personnel, Enron's outside legal counsel and representations of Enron that this transaction "should" be sustained under IRC and relevant authoritative rules. We will accept a should tax conclusion as meeting the probability criteria described above. This is consistent with the Firm's position on other transactions. The transaction has also been discussed with Rick Peterson, PSG, who concurred with our conclusion above given the "should" opinion determination.

Chung Decl. Ex. D82 ("Project Cochise – Acquisitions of REMICs" memorandum to Enron

Corp. Files by Herman Manis and Christopher Herbold dated Mar. 31, 1999,

AASDTEX001068421 – AASDTEX001068427 at AASDTEX001068421,

AASDTEX001068427).

### 4.    The Tomas Transaction Was Independently Expertized.

94.    Akin Gump represented Enron in the closing of the Tomas Transaction and

provided a "should" opinion letter regarding the Federal tax issues in the Tomas Transaction.

Chung Decl. Ex. D83 (Akin Gump tax opinion letter to Enron Corp. dated November 23, 1998,

EC2 000033917 – EC2 000033979).   Arthur Andersen independently concurred with this

"should" level opinion:

> We have been informed by Bob Palmquist, engagement tax partner, (who has consulted with Mike Baldasaro, head of Corporate Transactions and Operations Tax Specialty Team[),] that they will be able to issue a "should" opinion with respect to the tax attributes associated with this transaction to support the "probable" assertion as described above.

Chung Decl. Ex. D275 ("Enron/Tax Efficient Lease monetization" memorandum to Enron Corp.

Files by David. B. Duncan, H Ronald Weissman, and Roger D. Willard dated July 4, 1998, AA-

EX00016779-90 at AA-EX00016790).

**D.    Arthur Andersen Concluded that Enron's Accounting for the Structured Tax Transactions Complied with GAAP and that Enron's Disclosures were Appropriate.**

95.    In each year from 1997 to 2000, Enron's financial statements included a disclosure about the company's accounting for deferred income taxes.  Chung Decl. Ex. D58 (Erickson Report at 14).

96.    Enron also reported the effects of the Structured Tax Transactions in several places in its financial statements, including its balance sheet, income statement, statement of cash flows, and related footnotes.  For example, in Enron's income statement, Enron's net income was higher as a result of these transactions.   Enron's balance sheets included deferred tax assets arising as a result of the transactions.   With respect to both Enron's income statement and balance sheet, Enron's statement of cash flows contained a specific line item for the non-cash component of net income that was attributable to deferred taxes.   Chung Decl. Exs. D58 (Erickson Report at 14); D57 (Enron Accounting Summary, ERN0083020 – ERN0083043 at ERN0083029, ERN0083036).

97.    Enron's income tax footnote likewise contained information about the effects of the Structured Tax Transactions.  Specifically, the tax rate reconciliation in Enron's tax footnote included a line item "Basis and Stock sale differences."   Included in that line item were the effects on Enron's income tax expense of the Teresa, Tomas, and Cochise Transactions. Reductions in income tax expense result in a corresponding increase in net income.  With respect to the disclosure of "Basis and Stock sale differences" in Enron's financial statements, Wall Street analysts explicitly inquired about this line item during conference calls.   Enron's management discussed the fact that its tax rate was lower than the statutory rate, and that management expected its tax rate to remain below the statutory rate.  Enron's management also discussed the major factors that reduced Enron's tax rate, including asset and stock sale

differences – a factor that reflected the effects of the Teresa, Tomas, and Cochise Transactions. Chung Decl. Exs. D58 (Erickson Report at 14-15, 135-136); D57 (Enron Accounting Summary, ERN0083020 (October 2002) at ERN0083028, ERN0083036); D283 ("2000 Enron Corp Statutory to Effective Rate Reconciliation" Memorandum by Robert P. Plamquist, Michael D. Jones, Allen T. Pearl, and Christopher J. Herbold dated Jan. 20, 2001, AASDTEX000414443-414445); D282 (Transcript of Enron 1999 Second Quarter Results and Outlook Analyst Conference Call held on July 13, 1999); D85 (Enron Response to RFA No. 100).

98.     In addition, Enron's tax rate reconciliation contained in each year's 10-K reflected the effects of the Structured Tax Transactions.  Chung Decl. Ex. D58 (Erickson Report at 14). For example, Enron's 2000 10-K states in its "Summary of Significant Accounting Policies" section:

> Income Taxes.  Enron accounts for income taxes using an asset and liability approach under which deferred assets and liabilities are recognized based on anticipated future tax consequences attributable to differences between financial statement carrying amounts of assets and liabilities and their respective tax bases.

Chung Decl. Ex. D58 (Erickson Report at 35).

99.     Arthur Andersen's and Enron's management were responsible for Enron's financial statements and the disclosures therein.  As part of its financial statement audits of Enron, Arthur Andersen concluded that Enron's disclosures were appropriate.  Chung Decl. Exs. D58 (Erickson Report at 15); D273 ("Enron Corp - Income Tax Risk Assessment" Memorandum by Robert P. Palmquist, Allen T. Pearl, David B. Duncan, and Stanley W. Farmer, dated May 1999, AASDTEX000441995-441960).

100.     Enron did not record tax reserves post-closing in connection with the Teresa, Steele, Cochise, and Tomas Transactions.  Chung Decl. Exs. D58 (Erickson Report at 77, 79, 83).

101.    Under the guidance provided in SFAS No. 5 – <u>Accounting for Contingencies</u>, a tax reserve should be recorded when it is "probable" that the tax position will be disallowed and where the quantity of the tax reserve can be estimated with precision.  Chung Decl. Ex. D58 (Erickson Report at 78-79, 83).  Specifically, SFAS No. 5 states:

> 8. An estimated loss from a loss contingency (as defined in paragraph 1) shall be accrued by a charge to income if *both* of the following conditions are met:
> a. Information available prior to issuance of the financial statements indicates that it is <u>probable that an asset had been impaired</u> or a liability had been incurred at the date of the financial statements.  It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
> b. The amount of the loss can be <u>reasonably estimated</u>.

Chung Decl. Exs. D84 (SFAS No. 5 – <u>Accounting for Contingencies</u>, *available at* http://www.fasb.org/jsp/FASB/Document_C/DocumentPage?cid=1218220126761&acceptedDisclaimer=true (underlined emphasis added; italics in original)); D58 (Erickson Report at 79).

102.    Enron would have recorded such tax reserves if it believed that it was probable that it would not realize some or all of the contemplated tax savings due to disallowance of those benefits by the IRS.  Chung Decl. Ex. D58 (Erickson Report at 78).

103.    Responsibility for decisions about the necessity and quantity of a tax reserve rests with a firm's management and auditor – not with its investment bankers.  Chung Decl. Exs. D58 (Erickson Report at 9, 77, 86-89); D274 (McGuire Bankr. Dep. 146:12-25).  Arthur Andersen reached the conclusion that Enron's tax reserves were appropriate.  Chung Decl. Ex. D58 (Erickson Report at 83); D271 ("Enron Corp - Income Tax Risk Assessment" Memorandum by David B. Duncan, Robert P. Palmquist, Michael D. Jones, Chris Herbold, dated July 22, 2000, AASDTEX000414409); D272 ("2000 Audit - Tax Contingency Meeting" Memorandum by Michael D. Jones, Robert P. Palmquist, Allen T. Pearl, and Christopher J. Herbold, dated Jan. 16, 2001, AASDTEX000414414-414415).

104.    Enron's post-bankruptcy management admitted that no Deutsche Bank entity was responsible for auditing or preparing Enron's financial statements.  Enron also admitted that no employee or representative of DB ever audited or approved Enron's financial statements prior to their publication.  Chung Decl. Exs. D85 (Enron Plaintiffs' Answers to Deutsche Bank Entities' First Set of Requests for Admission, Dec. 15, 2005, Enron Corp. v. Citigroup Inc., 03-09266 (Bankr. S.D.N.Y.) (hereinafter "Enron Responses to RFA(s)") Nos. 63-66).

105.    Enron understood that it was responsible for preparing its financial statements and it accordingly vested Arthur Andersen with responsibility for auditing its financial statements. Chung Decl. Exs. D85 (Enron Responses to RFAs Nos. 67-68).

106.    As a result, in addition to providing *ex ante* advice on the Structured Tax Transactions, Arthur Andersen reviewed Enron's tax and accounting treatment of the Structured Tax Transactions as part of its financial statement audits after the transactions closed.  Arthur Andersen was engaged to issue an opinion on Enron's year-end financial statements for the fiscal years ending December 31, 1997, December 31, 1998, December 31, 1999, and December 31, 2000.  Arthur Andersen admitted that it performed audits of Enron's year-end financial statements for those years.  Chung Decl. Ex. D86 (Arthur Andersen's Responses and Objections to Deutsche Bank's First Set of Requests for Admission, Response to Request for Admission No. 17 dated December 14, 2005).

107.    Arthur Andersen determined that Enron's deferred tax accounting for the Structured Tax Transactions was done "properly" and that Enron's disclosures were "adequate." Chung Decl. Ex. D58 (Erickson Report at 49-50).  For example, it stated with respect to the fiscal year ending December 31, 1999:

> As a result of our procedures, we concluded that the current and deferred income tax provisions and the deferred income tax liabilities as of and for the year ended

December 31, 1999, are adequate but not excessive and have been <u>properly classified and disclosed</u> in the 1999 financial statements in all material respects.

Chung Decl. Exs. D87 ("Enron Corp – Income Tax Risk Assessment and Audit Plan" Memorandum by Robert P. Palmquist, Allen T. Pearl, David B. Duncan, and Christopher J. Herbold dated Feb. 26, 2000, AASDTEX000441962 (emphasis added)); D88 ("Income Tax Conclusion" Memorandum by Robert P. Palmquist and Allen T. Pearl dated December 31, 1999, AASDTEX000357118 (emphasis added)).

108.   With respect to the fiscal year ending December 31, 2000, Arthur Andersen found:

> As a result of our procedures, we concluded that the current and deferred income tax provision and the deferred income tax liabilities as of and for the year ended December 31, 2000 are <u>adequate</u> but not excessive and have been <u>properly classified and disclosed</u> in the 2000 financial statements in all material respects.

Chung Decl. Ex. D89 ("Enron Corp – Income Tax Risk Assessment and Audit Plan Conclusion" Memorandum by David B. Duncan, Robert P. Palmquist, Michael D. Jones, and Chris Herbold dated Feb. 18, 2001, AASDTEX000414412) (emphasis added).

109.   When Arthur Andersen audited Enron's accounting for the Teresa Transaction, it concluded that it was appropriate for Enron to recognize deferred tax assets on the dividends from the partnership.  Arthur Andersen explicitly concluded in 2000 that changes in the tax law had not invalidated its original "should" opinion about the Teresa Transaction.  As of 2000, Arthur Andersen believed that it was probable that Enron would realize the tax benefits contemplated in the transaction and therefore did not believe that it was probable that the tax position would be disallowed.   Chung Decl. Ex. D90 ("Project Teresa dividends and redemptions" Memorandum by Robert P. Palmquist, Michael D. Jones, Allen T. Pearl, and Chris Herbold dated December 31, 2000, AASDTEX000414477 – AASDTEX000414479 at AASDTEX000414477).

110.    Neither the SEC nor to DOJ has asserted that the Structured Tax Transactions were not properly disclosed.  Chung Decl. Ex. D58 (Erickson Report at 14).

   **E.    The Structured Tax Transactions had a Legitimate Non-Tax Business Purpose.**

111.    The Structured Tax Transactions had legitimate non-tax business purposes in addition to the attainment of financial accounting benefits, including generation of investment profits and risk shifting.  It was reasonable to believe that the Structured Tax Transactions had sufficient non-tax business purposes to withstand challenge from the IRS.  Chung Decl. Ex. D58 (Erickson Report at 12).

112.    At the time of the Structured Tax Transactions, there existed a difference of opinion and practice with respect to whether the pursuit of accounting benefits constituted a valid business purpose under the tax law.  Enron's prior experience with the IRS was consistent with financial accounting benefits being treated as a valid business purpose.  Enron issued a security known as MIPS (monthly income preferred securities) in 1993.  The IRS challenged the use of these securities, but Enron ultimately prevailed.  The IRS noted that the accounting benefits of transaction were a "business reason for entering into the transaction" and concluded that the transaction possessed "economic substance."  Based on its previous experiences with the IRS, it was reasonable for Enron to believe that financial accounting benefits could be a legitimate business purpose and that the Structured Tax Transactions could withstand scrutiny from the IRS on such grounds.  Chung Decl. Ex. D58 (Erickson Report at 12).

113.    Statements by Enron's post-bankruptcy management support the conclusion that the Structured Tax Transactions had legitimate non-tax business purposes.  The IRS audited the Tomas Transaction in part on the basis of the legitimacy of its non-tax business purpose.  In 2003, Enron's post-bankruptcy management protested the IRS's proposed treatment of the

Tomas Transaction, asserting that Enron had "strong business reasons, apart from tax planning reasons" for the transaction.   Chung Decl. Ex. D58 (Erickson Report at 13, 101);   D280 ("Portland General Holdings, Capital Gain Income -- Primary Position (Project Tomas)", ECggg000682047-682066 at Ecggg000682047, Ecggg000682065).   After the closing of the Tomas Transaction, Akin Gump noted that PGH had undertaken the transaction for a variety of business reasons.   Chung Decl. Ex. D83 (Akin Gump tax opinion letter to Enron Corp. dated November 23, 1998, EC2 000033917 – EC2 000033979 at EC2 000033923).  With respect to the Teresa Transaction, King & Spalding's tax opinion noted that there were additional purposes for the transaction other than generating income for financial accounting purposes.  Chung Decl. Exs. D58 (Erickson Report at 104-05);   D67 (King & Spalding tax opinion letter to R. Davis Maxey dated May 14, 1997 by William S. McKee and Abraham Shashy, Jr., MN002908 – MN002936 at MN002912).   In the Steele and Cochise Transactions, the should-level opinions from Akin Gump and McKee Nelson, respectively, included similar statements.  Chung Decl. Exs. D74 (Federal tax opinion letter from Akin Gump to Maxey dated December 16, 1997, EC2 000033867- EC2 000033904 at EC2 000033872); D78 (McKee Nelson Ernst & Young tax opinion letter to R. Davis Maxey dated Mar. 21, 2001 by William S. McKee and James D. Bridgeman, EC2 000033988 – EC2 000034072 at EC2 000033999-34000).

     **F.**    **Ex Poste Treatment of the Structured Tax Transactions Confirms Their Validity.**

114.    The IRS did not disallow any of the tax deductions or tax bases claimed by Enron in connection with the Teresa, Cochise, and Steele Transactions.  Chung Decl. Exs. D85 (Enron Responses to RFAs Nos. 130, 132, 134); D58 (Erickson Report at 13, 90, 130).

115.    With respect to the Teresa Transaction, Enron paid over $100 million of federal income taxes prior to its bankruptcy.  Post-bankruptcy, Enron received a refund from the U.S.

Treasury for these previously paid income taxes. That refund had to be approved by the Congressional and Joint Committee on Taxation ("JCT"). Chung Exs. D91 (IRS Refund Documentation, OPI, JCT Approval of Refunds for Organizational Partners, ECggg00727799-804); D58 (Erickson Report at 11, 90, 97).

116.   The IRS did not impose penalties on Enron relating to the Teresa, Cochise, or Steele Transactions. Chung Decl. Exs. D85 (Enron Responses to RFA Nos. 131, 133, 135); D58 (Erickson Report at 11, 90, 98).

117.   During its audit of Enron, the IRS asserted penalties for the Tomas Transaction. Enron ultimately agreed to pay about $8 million in penalties on Tomas but made no admission of wrongdoing. Chung Decl. Exs. D92 (E-mail from Ed Coats, ECggg000727678); D93 (Final Settlement Materials and Form 870-AD, ECggg000727677).

118.   Enron's post-bankruptcy management admitted that it did not restate its financial statements to reverse the effects of the Tomas Transaction and asserted to the IRS in 2003 that the as reported tax treatment of the Tomas Transaction was "correct" and that Enron acted in good faith in reporting the effects of the Tomas Transaction on its returns. Chung Decl. Exs. D85 (Enron Response to RFA No. 149); D281 ("Enron Corp. -- Substantial Underpayment Penalty (Project Tomas)" Memorandum, ECggg000682194-ECggg000682203 at ECggg000682194, ECggg000682202); D58 (Erickson Report at 9, 13, 76, 90, 101-102). Enron also never restated its financial statements on account of the Teresa, Steele, and Cochise Transactions. Chung Decl. Ex. D85 (Enron Responses to RFAs Nos. 146, 147, 148).

119.   As in the Teresa Transaction, Enron filed for an income tax refund on the Tomas Transaction, and received $13 million from the IRS. Chung Decl. Ex. D58 (Erickson Report at 90, 97).

120.    Neither the SEC nor DOJ asserted that the accounting for the Structured Tax Transactions did not comply with GAAP.  Chung Decl. Ex. D58 (Erickson Report at 9).

121.    Claims of $257,255,850 were allowed as Deutsche Bank's direct and subordinated claims for the Steele Transaction in a bankruptcy settlement that was approved by the Enron bankruptcy court.  Chung Decl. Ex. D94 (Bankruptcy Settlement).

122.    Claims of $267,500,000 were allowed as Deutsche Bank's direct and subordinated claims for the Cochise transaction in a bankruptcy settlement that was approved by the Enron bankruptcy court.  Chung Decl. Ex. D94 (Bankruptcy Settlement).

123.    Arthur Andersen personnel who were responsible for providing the SAS 50 letters on the hypothetical transactions and who were directly responsible for auditing the Structured Tax Transactions as completed did not have their CPA licenses revoked and were not subject to disciplinary action by their State Boards of Accountancy.  Chung Decl. Ex. D58(Erickson Report at 10, 48).

124.    In fact, the Arthur Andersen personnel did not retreat from the positions they took with respect to the Structured Tax Transactions after the fact.  Robert Palmquist, the Arthur Andersen partner in charge of auditing Enron's income tax accounting, testified that Enron did not record reserves on the Structured Tax Transactions because he believed that Enron would prevail in court even if those transactions were disputed by the IRS.

> Q. I don't recall seeing a document in connection with the transactions that we reviewed earlier, including, in particular, Project Teresa, Project Steele, Project Cochise, and Project Tomas, that you made any similar recommendation that Enron consider a reserve for some portion of the tax benefit in those structures.
>
> My question is: Did you make such a recommendation with respect to those four structures? . . .
>
> A. In my role as tax partner with the Enron engagement, in connection with the accrual review at the end of the year, we discussed the amount of tax reserves available for

> contingencies and determined, each and every year, that they were adequate but not excessive.  The transactions that you refer to, in my opinion, <u>did not warrant specific reserves or a general reserve</u> – not general, specific, or consideration at year end because <u>I believed at that time that Enron would win those particular issues.</u>

Chung Decl. Ex. D95 (Palmquist Bankr. Dep. 163:20-164:16 (emphasis added)).

125.    Palmquist continued by stating that "With respect to the other transactions [Teresa, Cochise, Steele, Tomas], I came to the conclusion that I did not believe they would be challenged [by the IRS]."  Chung Decl. Ex. D95 (Palmquist Bankr. Dep. 165:9-12).

126.    Enron's senior in-house tax director, Robert Hermann, who ultimately played an important role in approving Enron's use of the Structured Tax Transactions, testified that he believed that the transactions complied with the then-existing tax law and that he still believed that after the transactions had closed.  Chung Decl. Ex. D96 (Hermann Bankr. Dep. 79:12-18); __ (Erickson Report at 99).   Hermann also testified that having two independent sets of professionals reaching the same "should" opinion with respect to the transactions "made me feel more strongly that they worked."  Hermann stated that:

> A. . . . I don't think we ever used a law firm that I did not believe was one of the top firms in the country.  And their professionalism and honesty was never in question. . . .
>
> Q. Just following up on that, did it worry you that the designer of the transaction – and they usually designed it for a promoter, for a Bankers Trust, Deutsche Bank.  Did it worry you that the fact that they were involved in designing the transaction may have affected their . . . independence?
>
> A. No.  Because the deals were not just turning just on one person's opinion that they worked.  In every transaction, you had a minimum of two separate independent entities opining that it's a should.  You had the person or firm give you a tax opinion that's a should, and then you had Arthur Andersen independently forming their own opinion that it should.
>
> So, no, it didn't occur to me that there was a whole bunch of collusion here and lack of independence on anybody's part.  The fact that there were independent people coming to that conclusion that were basically adverse to each other made me feel more strongly that they worked.

Chung Decl. Ex. D96 (Hermann Bankr. Dep. 84:2-85:10).

127.    Davis Maxey, the employee who led Enron's Corporate Tax Planning Group, also

testified about the compliance of the transactions with the tax law.  For example, with respect to

the Teresa Transaction, he stated:

> A.  I think we took some comfort in the fact that the – this transaction was pretty widely [vetted].  It was certainly discussed internally within the Enron tax department.  There are some very capable technical people there, and they were comfortable with the transaction.  Outside advisors were comfortable; in addition to King & Spalding, Arthur Andersen and probably several other firms, where the transaction was discussed on an informal basis.  And there was a general agreement among everybody that the proper opinion level here was at a should level, and that parties were generally comfortable with the mechanics of the transaction.

> Q.  But I guess you recognize that, let's say, seven or eight years down the road you're claiming a billion dollars of depreciation on a building with a billion dollars in basis, and you paid a whole lot less than that for the building, and its just been kind of doing things in your group that you recognize that the IRS might contest that big step-up?

> A.  Well, certainly.  I mean, if there were no – you can actually – as you well know, you can get a will-level opinion, and that is when a transaction is so certain that they're unlikely to contest it.

> But here the general view was – among all of those parties and all of those advisors who were consulting on this, was that the company – that the position the company was taking was within the four corners of the tax laws everybody was analyzing.  And everyone was comfortable with the analysis on that transaction [Teresa].  No one was willing to issue a will-level opinion, but they were comfortable at a should level. . . .

> And in fact, they were – Mr. Coates [sic] and his department had been – had looked at this transaction and all of the others and were – expressed general comfort with it.

Chung Decl. Ex. D97 (Maxey Bankr. Dep. 74:21-76:22) (emphasis added).

128.    William McKee likewise testified that he stands behind the tax opinions he

rendered in the Teresa and Cochise Transactions:

> If the transaction[s] [were] a fraud, I wouldn't have given the tax opinion, the transactions were real, they are – they passed muster under all the applicable tax rules as I'm sure you know Project Cochise was audited by the Internal Revenue

> Service and they passed it along all right, said it was fine, I don't – certainly nothing – the transactions are bona fide transactions, they produced the tax consequences that [I] said [they] do and I'm comfortable with my tax opinions.

Chung Decl. Ex. D98 (McKee Dep. 363:16-25).

## IV.   THERE IS NO EVIDENCE THAT VALHALLA AND RENEGADE "TAX ACCOMMODATION" TRANSACTIONS WERE FRAUDULENT

### A.   Valhalla

129.   In the Valhalla transaction, Enron obtained a $50 million net borrowing from Deutsche Bank and its affiliates while Deutsche Bank was able to take advance of preferential tax savings related to the treatment of debt and equity under U.S. and German tax laws.  Chung Decl. Exs. D99 (Email from Steven Herrup to Calli Hayes et al. attaching Memorandum regarding "Project Valhalla" (Feb. 29, 2000) at DBF-044204 ("Project Valhalla Memo")); D100 (Email from Davis Maxey to Richard Causey attaching presentation entitled "Structured Transactions Group Business Review" (Oct. 2001) at EC2000038363 ("Project Valhalla Business Review")).

130.   Two subsidiaries of Enron entered into an Agreement on Participation Rights with Deutsche Bank, AG through which Deutsche Bank paid $2 billion for the participation rights issued by one of the Enron subsidiaries. The participation rights entitled Deutsche Bank to a 7.7% annual minimum distribution for the first five years of the agreement to the extent of available distributable profits. Chung Decl. Ex. D101 (Agreement on Participation Rights between Rheingold GmbH Eschborn, Valhalla GmbH and Deutsche Bank AG (May 2, 2000) at Clause 3, Section 3.3).

131.   Enron and Deutsche Bank, New York entered into a structured note, through which Enron loaned Deutsche Bank $1.95 billion. Chung Decl. Ex. D102 (Promissory Note by Deutsche Bank AG in favor of Enron Corp. (May 2, 2000) at DBC-008807).

132.    The net result of Project Valhalla left Enron with a five year net borrowing of $50 million. Deutsche Bank achieved tax benefits, through deduction of the interest it paid on the structured note and exemption from payments it received under its participation rights.  Chung Decl. Exs. D103 (Project Valhalla Tax Overview (July 2002) at ERN0036817); D104 (Project Valhalla Presentation (Dec. 14, 1999) at ERN0037129).

133.    Project Valhalla was reviewed by Vinson & Elkins for Enron, which issued a tax opinion on the treatment of the underlying transactions and concluded that the transactions should be treated as a loan for U.S. federal income tax purposes.  Chung Decl. Ex. D105 (Letter from Vinson & Elkins regarding "Project Valhalla Financing Transaction" (Sept. 12, 2000) at ERN0036828).

134.    Arthur Andersen advised as to the accounting treatment of Project Valhalla and stated that the debt treatment of the transactions was acceptable. Chung Decl. Ex. D106 (Letter from Arthur Andersen to Deutsche Bank (Sept. 22, 1999) at ERN0103665).

135.    A claim for $102,304,668.35 from Project Valhalla was allowed as a Deutsche Bank direct claim in a bankruptcy settlement which was approved by the Enron bankruptcy court.  Chung Decl. Ex. D94 (Settlement Agreement between Enron Creditors Recovery Corp. and Deutsche Bank (Dec. 17, 2005) at 12.

136.    The Valhalla transaction was mistakenly booked within Deutsche Bank in the wrong internal operational system, which triggered a concern among some Deutsche Bank personnel that the transaction might violate German anti-money laundering laws. However, senior employees at Deutsche Bank looked into the potential issue and discovered the operational mistake such that there was no money laundering issue.  Chung Decl. Ex. D107 (McGuire Dep. 322:6-325:6).

### B.     Renegade

137.    In December 1998 Enron and Bankers Trust (London) closed Project Renegade which allowed Enron to obtain reduced rates of financing while enabling Bankers Trust to use tax savings related to the treatment of financial asset securitization trusts ("FASITs").  Chung Decl. Exs. D108 (Meeting Minutes of the Executive Committee of the Board of Directors of Enron Corp. (Dec. 8, 1998) at EC002557987); D100 (Email from Davis Maxey to Richard Causey attaching presentation entitled "Structured Transactions Group Business Review" (Oct. 2001) at EC2000038337 (Project Renegade Business Review)).

138.    Through the Renegade transactions, an Enron subsidiary, ECT Equity Corp. ("ECT Equity"), borrowed $320 million from Bankers Trust (London) ("BT London"). Chung Decl. Ex. D109 (Promissory Note between ECT Equity and BT London (Dec. 23, 1998) at AB000145298). BT London sold the promissory note evidencing the loan to a newly created company, Wiltshire Financial Asset Company LLC ("Wiltshire"), which elected to be treated as a FASIT for federal income tax purposes.  Chung Decl. Exs. D110 (Agreement of Sale Between BT London and Wiltshire (Dec. 29, 1998) at AB000145427); D111 (Wiltshire LLC Agreement (Dec. 29, 1998) at AB000145346).

139.    ECT Equity loaned the proceeds to Enron Financial Holdings Corp. ("EFH"). Chung Decl. Exs. D112 (Deposit Agreement between ECT Equity and BT London (Dec. 23, 1998) at AB000145282); D113 (Deposit Agreement between EFH and BT London (Dec. 23, 1998) at AB000145289). EFH then used those proceeds to purchase $312 million of certificates in Wiltshire. Bankers Trust International PLC ("BT International") also purchased $8 million worth of certificates in Wiltshire. Chung Decl. D284 (Agreement of Sale between EFH, BT International, and Wiltshire (Dec. 29, 1998) at AB000145431).

140.    Project Renegade was reviewed by the law firm Brown & Wood for Wiltshire which issued a tax opinion stating that Wiltshire would validly be treated as a FASIT under the tax code.  Chung Decl. Ex. D114 (Letter from Brown & Wood regarding "Wiltshire Financial Asset Company, LLC," (Dec. 29, 1998) at DBC 008444).

141.    Enron received a $1.3 million fee for participating in Project Renegade. Chung Decl. Ex. D100 (Email from Davis Maxey to Richard Causey attaching presentation entitled "Structured Transactions Group Business Review" (Oct. 2001) at EC2000038337 (Project Renegade Business Review)).

142.    Enron's creditors and Deutsche Bank released each other from any claims, liabilities, or obligations in connection with Project Renegade in a court-approved Enron bankruptcy settlement.  Chung Decl. Ex. D94 (Settlement Agreement between Enron Creditors Recovery Corp. and Deutsche Bank (Dec. 17, 2005) at 12.

## V.    THERE IS NO EVIDENCE THAT THE OSPREY, MARLIN, YOSEMITE, AND FIREFLY TRANSACTIONS WERE FRAUDULENT

### A.    Marlin I and II

143.    In late 1998, Enron acquired the publicly held British water-utility company, Wessex Water plc ("Wessex") through its wholly owned indirect subsidiary, Azurix, for approximately $2.4 billion. The Marlin transactions served to refinance this debt.  Chung Decl. Ex. D115 (Marlin I Offering Memorandum ("OM") (Dec. 8, 1998) at 1.

144.    The Marlin transactions involved two offerings. The first offering, Marlin I, was completed in December 1998 and raised $1.024 billion of notes and $125 million of certificates. Id. at i. The second offering, Marlin II, was completed in July 2001 and raised approximately $915,000,000 through the issuance of notes denominated in both dollars and euros.  Chung Decl. Ex. D116 (Marlin II OM (July 12, 2001) at i, 1).

145.    BT Alex. Brown (a predecessor entity to Deutsche Bank Alex. Brown) acted as joint bookrunning manager with Donaldson, Lufkin & Jenrette. Affiliates of BT Alex. Brown also acted as the indenture trustee and Luxembourg paying agent and transfer agent.   Chung Decl. Ex. __ (Marlin I OM at i, 112, AASDTEX002438370).

146.    The OM disclosed that Enron contributed various assets to Atlantic in exchange for a beneficial interest in Atlantic. Specifically, Enron contributed:  1) ownership of Azurix and related entities, including Wessex; 2) Enron's rights to repayment under a £73 million debt obligation ("the Azurix Europe Note"); and 3) $200 million in the form of a release of indebtedness owed to Enron by Enron Water L.L.C. Id. at 1, 5.

147.    The OM disclosed that Atlantic used $900 million of the funds contributed by Marlin to repay a portion of the indebtedness incurred to acquire Wessex. Atlantic contributed the remaining $249 million in cash, as well as the Azurix Europe Note, to Bristol Water Trust ("Bristol") as the reserve fund to support repayment of the Marlin securities. Id. at 5.

148.    The OM disclosed that Enron contributed 204,800 shares of its preferred stock to the Preferred Share Trust. Id. at 5, 6, 127. The OM further disclosed that upon the occurrence of certain defined trigger events, Enron was required to issue additional amounts of shares to repay the Marlin I Notes. Id. at 20.

149.    The OM disclosed risk factors relating to the issuance of the notes. The OM stated there could be no assurance that the sale of the Enron preferred stock would be sufficient to repay the notes in the event of the occurrence of certain defined trigger events. Id. at 19. The OM also expressly disclosed the relationship between Enron, Atlantic, and Azurix and the resulting potential conflicts of interest. Id. at 25.

150.    The Marlin trigger events included an event of default under the Marlin I indenture; a failure to deposit an amount equal to the repayment amount at least 120 days before the notes became due; and a downgrading of Enron senior debt to below investment grade, among other triggers.  Id. at 8-9.

151.    Enron sought to have the notes rated. The presentations on Marlin I that Enron made to the ratings agencies expressly described the trigger events that could result in the issuance of Enron stock. Enron specifically described the anticipated sources of repayment on the notes, which included a future IPO of Azurix as well as the requirement of Enron to issue Enron mandatorily convertible preferred stock if no IPO occurred prior to maturity.  Chung Decl. Exs. D117 (Presentation to Moody's Investors Service Regarding Project Marlin (Oct. 12, 1998) at 8, 17); D118 (Presentation to Standard & Poor's Regarding Project Marlin (Oct. 2, 1998) at 8, 17).

152.    The Marlin I notes were rated Baa2 by Moody's, BBB by Standard and Poor's, and BBB by Duff & Phelps Credit Rating Co ("DCR").  Chung Decl. Exs. D115 (Marlin I OM at 7); D119 (Moody's Marlin I Rating Letter (Dec. 15, 1998) at DBK-0193301); D120 (Standard and Poor's Marlin I Rating Letter (Nov. 23, 1998) at DBK-0193303); D121 (DCR Marlin I Rating Letter (Dec. 3, 1998) at DBK-0193292).

153.    The Marlin I offering was reviewed and approved by Enron's board of directors. Chung Decl. Ex. D122 (Enron Board of Directors Meeting Minutes (Dec. 8, 1998) at 5-11.

154.    Vinson & Elkins reviewed the Marlin I transaction documents and stated the summary descriptions provided a fair summary of the transaction documents and further stated that the federal income and ERISA tax consequences were accurately described.  Chung Decl.

Ex. D123 (Letter from Vinson & Elkins to BT Alex Brown Inc. and Donaldson, Lufkin & Jenrette Securities Corp. (Dec. 17, 1998) at DBK-0193143).

155.    Vinson & Elkins also reviewed several other aspects of the transaction. Chung Decl. Exs. D 124 (Letter from Vinson & Elkins to BT Alex Brown Inc. and Donaldson, Lufkin & Jenrette Securities Corp. (Dec. 17, 1998) at DBK-0193147 (stating no consolidation of entities involved in Marlin I would occur in bankruptcy proceedings)); D125 (Letter from Vinson & Elkins to BT Alex Brown Inc. and Donaldson, Lufkin & Jenrette Securities Corp. (Dec. 17, 1998) at DBK-0193185 (certain corporate matters)); D126 (Letter from Vinson & Elkins to BT Alex Brown Inc. and Donaldson, Lufkin & Jenrette Securities Corp. (Dec. 17, 1998) at DBK-0193219 (English law)); D127 (Letter from Vinson & Elkins to BT Alex Brown Inc. and Donaldson, Lufkin & Jenrette Securities Corp. (Dec. 17, 1998) at DBK-0193230 (tax)).

156.    The Marlin structure was reviewed and approved by the accounting firm Arthur Andersen which issued a comfort letter dated December 8, 1998 in connection with the Marlin I OM. The letter stated that selected Enron financial statements included in the OM were accurate. Chung Decl. Ex. D128 (Letter from Arthur Andersen to BT Alex. Brown Incorporated (Dec. 8, 1998) at DBK-0191422.

157.    In addition to the public disclosures and rating agency review, the Marlin I transactions were also covered publicly by financial industry reporters.  Chung Decl. Exs. D129 (Standard & Poor's, "Research: Marlin Water Trust & Marlin Water Capital Rtd By S&P," (Dec. 1, 1998) at DBM 004415; D129 (Moody's, "Marlin Water Trust" (Mar. 2, 2001) at DBM 004418); D130 (Investment Dealers' Digest, "Enron goes to 144A well to fund new water business," (Dec. 14, 1998) at 1); D131 (Expert Report of Stewart Myers (Mar. 17, 2006) at ¶ 11 (noting that "'off-balance-sheet' does not mean that large project-financing transactions are

secret, hidden or undisclosed.") and ¶ 50 (noting that both Marlin and Osprey transactions were disclosed to the public)).

158.    In July 2001, Enron used Marlin Water Trust II ("Marlin II") to refinance the outstanding Marlin I notes. The Marlin II OM disclosed that Marlin II and Marlin Water Capital Corp. II issued senior secured notes for a total U.S. value of approximately $915,000,000. Chung Decl. D116 (Marlin II OM (July 12, 2001) at ANTS000000001, 1).

159.    Deutsche Bank AG London acted as joint bookrunning agent with Credit Suisse First Boston for the Marlin II transactions.  Id. at ANTS000000001. Deutsche Bank Luxembourg S.A. acted as the Luxembourg listing, paying, and transfer agent, while Deutsche Bank AG London acted as the Euro paying agent. Id. at ANTS000000174.

160.    The OM disclosed that Marlin II would use the proceeds from the issuance to acquire a beneficial interest in Atlantic Water Trust. The funds would also be used to redeem Marlin I's outstanding indebtedness and pay the accrued and unpaid yield on the Marlin trust certificates.  Id. at 1.

161.    The Marlin II OM disclosed several risk factors relating to the issuance of the notes. The OM stated there could be no assurance that the sale of the Enron preferred stock would be sufficient to repay the notes in the event of a trigger event. The OM also disclosed the relationship between Enron, Atlantic, and Azurix and the resulting potential conflicts of interest. Id. at 14, 17.

162.    As with the Marlin I offering, Enron sought to have the securities rated and presented the details of the Marlin II offerings to ratings agencies, including a description of the trigger events that could activate Enron's obligation to issue more shares.  Enron specifically described the anticipated sources of repayment on the notes, which included asset sales proceeds

as well as Enron's obligation to remarket the existing mandatorily convertible preferred shares. Chung Decl. Ex. D132 (Presentation to Moody's Investors Service Regarding Marlin Water Trust and Marlin Water Trust II (May 2001) at 12.

163.     The Marlin II securities were rated Baa1 by Moody's, BBB by Standard and Poor's, and BBB by Fitch.  Chung Decl. Exs. D116 (Marlin II OM at 6); D133 (Moody's Rating Letter (July 12, 2001) at DBK-0180762); D134 (Standard & Poor's Rating Letter (July 19, 2001) at DBK-0180766); D135 (Fitch's Rating Letter (July 17, 2001) at DBK-0180758.

164.     Marlin II was covered by the public financial press.  Chung Decl. Ex. D136 (Moody's, "Moody's Assigns Baa1 Rating to Marlin Water Trust II and Marlin Water Capital Corp. II" (July 12, 2001) at DBM 023414); D137 (Fitch, "Fitch Rts Marlin Water Trust II Sr Secured Notes Due 2003, 'BBB'" (July 18, 2001) at AB025202126).

165.     Enron's board of directors also reviewed and approved the Marlin II transactions. Chung Decl. Ex. D138 (Minutes, Special Meeting of the Board of Directors, Enron Corp. (June 13, 2001) at 15-21).

166.     The Marlin structure was reviewed and approved by the accounting firm Arthur Andersen which issued a comfort letter dated July 12, 2001 in connection with the Marlin I OM. The letter stated that selected Enron financial statements included in the OM were accurate. Chung Decl. Ex. D139 (Letter from Arthur Andersen to Credit Suisse First Boston ("CSFB") (July 12, 2001) at DBK-0178917).

167.     Vinson & Elkins reviewed the Marlin II transaction documents and stated the summary descriptions provided a fair summary of the transaction documents and further stated that the federal income and ERISA tax consequences were accurately described.  Chung Decl. Ex. D140 (Letter from Vinson & Elkins to CSFB (July 19, 2001) at EVE 1737000).

168. Vinson & Elkins also reviewed several other aspects of the transaction. Chung Decl. Ex. D141 (Letter from Vinson & Elkins to CSFB (July 19, 2001) at DBK-0180620 (stating no consolidation of entities involved in Marlin II would occur in bankruptcy proceedings)); D142 ( Letter from Vinson & Elkins to CSFB (July 19, 2001) at DBK-0180694 (English law)); D143 (Letter from Vinson & Elkins to CSFB (July 19, 2001) at DBK-0180716 (tax)).

169. The Marlin structure was reviewed and approved by Arthur Andersen who stated that Enron did not have to consolidate either Atlantic or Marlin into its financial statements. Chung Decl. Ex. D144 (Memorandum from Arthur Andersen to The Files regarding "Enron Corp. - Wessex Acquisition- Joint Venture Structure" (Oct. 30, 1998) at 6-7).

170. Enron disclosed the structure of the Wessex acquisition in its Form 10-K dated March 31, 1999. The 10-K disclosed that the acquisition would be "accounted for using the equity method" and that "Wessex is held through Azurix Corp" which was described as an "unconsolidated affiliate." The 10-K also specifically disclosed the Marlin trigger events.  Chung Decl. Ex. D13 (Enron 1998 Form 10-K (Mar. 31, 1999) at Note 9, Unconsolidated Affiliates).

171. Enron's creditors and Deutsche Bank released each other from any claims, liabilities, or obligations in connection with Marlin I and II in the Enron court-approved bankruptcy settlement.  Chung Decl. Ex. D94 (Settlement Agreement between Enron Creditors Recovery Corp. and Deutsche Bank (Dec. 17, 2005) at 17,18).

**B.    Osprey I and II**

172. Enron created the Osprey structure in September 1999, with the purpose to redeem an equity interest of an unaffiliated equity investor in Whitewing LP and to purchase certain assets owned by Enron.  Chung Decl. Exs. D145 (Osprey I OM (Sept. 16, 1999) at i); D146 (Osprey II OM (Sept. 28, 2000) at i).

173.     Osprey I closed in September 1999 and consisted of both an issuance of debt and equity certificates which were sold to Qualified Institutional Buyers and non-U.S. investors pursuant to Rule 144A and Regulation S of the 1933 Securities Act.  The Osprey I OM disclosed that Osprey I would raise $1.5 billion through the sale of $1.4 billion in Senior Secured Notes (the "Osprey I Notes") and $100 million through the sale of trust certificates (the "Osprey Certificates").  Chung Decl. Ex. D145 (Osprey I OM at i, 9).

174.     Deutsche Banc Alex. Brown, together with Donaldson, Lufkin & Jenrette served as joint book-running manager for the Osprey I transactions, with Deutsche Bank Securities Inc. serving as an initial purchaser. Bankers Trust Luxembourg S.A. served as the Luxembourg paying and transfer agent.  Id. at i, DBB007111.

175.     The Osprey I OM disclosed that Osprey Trust ("Osprey") and Osprey I, Inc. co-issued the Osprey I Notes and Osprey Certificates. Osprey was a statutory business trust formed as of September 15, 1999 under the laws of Delaware. Osprey I, Inc. was a wholly owned special purpose subsidiary of Osprey, also incorporated under the laws of Delaware on September 15, 1999. Id. at 24, 25.

176.     The Osprey I OM disclosed that Osprey invested substantially all of the $1.5 billion in cash proceeds in Whitewing Associates in exchange for a limited partner interest. The OM disclosed that Whitewing Associates used $578 million of the proceeds to redeem the interest of an existing equity investor in Whitewing LP. The OM disclosed that Whitewing Associates contributed $115.7 million in cash to the Condor Share Trust ("Condor Trust") for the reserve fund, which was invested in Enron notes or other permitted securities, and retained $807 million to be used for unspecified investments. Id. at 1, 4.

177.    The OM disclosed that Whitewing Associates became the 100% beneficial owner of the Condor Trust, which held assets designated to support repayment of the notes and certificates. Id. at 31.

178.    The OM disclosed that Enron contributed 250,000 shares of Enron preferred stock and $139 million of Enron notes to Whitewing Associates.  Whitewing Associates contributed the Enron shares and notes to the Condor Trust to support repayment of the notes and certificates. Id. at 4, 18, 55.

179.    The OM disclosed that upon the occurrence of certain defined trigger events, Enron was required to issue additional amounts of shares to repay the Osprey I notes and, if there was still a shortfall on the notes, to pay an amount equal to any remaining deficiency. The Osprey trigger events included an event of default under the Osprey I indenture; a failure to deposit an amount equal to the repayment amount at least 120 days before the notes became due; and a downgrading of Enron senior debt to below investment grade, among other triggers.  Id. at 1-2, 5, 7, 12-13, 66.

180.    The OM disclosed that the Osprey I Notes were supported by the assets in Whitewing Associates, which included: 1) the Enron shares held by the Condor Trust; 2) Enron's obligation to issue additional equity as necessary to raise proceeds of a required amount at least equal to $1.4 billion; 3) the Whitewing Assets and 4) additional unspecified permitted investments. Id. at 1.

181.    The OM disclosed that the Whitewing Assets consisted of Designated Assets, which were assets that Enron invested in and developed in its ordinary course of business. The Designated Assets were described as follows:

> In the implementation of several of Enron's core business strategies, Enron has frequent opportunities to invest in debt and equity interests of its customers and in

projects it is developing, or originating through its wholesale operations and services, retail energy services and related financing activities (the "Designated Assets"). Enron periodically seeks to sell Designated Assets as a means to create liquidity for its business. . . . Whitewing LP will utilize a portion of the proceeds of Osprey's investment to acquire Designated Assets."

Id. at 1.

182.    The Osprey I OM disclosed Whitewing Associates' asset acquisition process.  In the section entitled "*Blind Pool,*" the Osprey I OM disclosed that Whitewing Associates held no Whitewing Assets prior to the Osprey I closing. The OM expressly disclosed that investors would not know what assets would be acquired by Whitewing Associates at the time of their investment. The Osprey I OM disclosed that "there can be no assurance as to any such acquisition or the terms thereof." The OM further disclosed that any future Whitewing Asset purchases were to "be at a price and on other terms determined by internal Enron negotiations conducted on an arms length basis, and the holders of the Osprey Trust Certificates (the "Certificateholders") will have certain consent rights to such acquisitions, but there can be no assurance that such prices and other terms will reflect those that would be agreed by unaffiliated third parties."  Id. at 13.

183.    In the section entitled "*Uncertainty of Ability to Realize on Any Liquidation of the Whitewing Assets*," the OM disclosed to investors that "[t]here may be no established market for the Whitewing Assets and there may be contractual or other limitations relating" to the sale of any of the Whitewing Assets.  The OM also disclosed that "a sale of such assets may be difficult and there can be no assurance as to the proceeds thereof."  Id. at 13.

184.    Enron sought to have the Osprey securities rated and gave presentations to rating agency analysts from Standard & Poor's and Moody's. These presentations set forth the general terms of the Osprey transaction and included disclosure of the trigger events, including Enron's commitment to issue additional shares in the event that liquidation of the mandatorily convertible

preferred stock did not generate sufficient funds to pay back the debt holders.  Chung Decl. Ex. D147 (Presentation to Standard & Poor's, Project Condor (Aug. 20, 1999) at 13, 18-19); D148 (Presentation to Moody's, Project Condor (Aug. 19, 1999) at 11, 17-18).

185.   Each of the rating agencies rated the Osprey I Notes investment grade.   The Osprey I notes were given credit ratings of "BBB" by Standard & Poor's, "Baa3" by Moody's, and "BBB" by Duff & Phelps.  Chung Decl. Exs. D149 (Standard & Poor's Rating Letter (Sept. 15, 1999) at E 147719); D150 (Moody's Rating Letter (Sept. 27, 1999) at E 147717); D 151 (Duff and Phelps' Rating Letter (Sept. 23, 1999) at E 147715).

186.   Other public sources described the Osprey I transactions, including Enron's share commitment to support the notes.  Chung Decl. Ex. D152 (Bloomberg News, Enron Sells $1.4 Bln of Notes Via Trust to Reduce Interest Cost, (Sept. 27, 1999) at EC46649A0032180-81 ("'What you are buying when you buy into these notes, when you really force the issue, is Enron credit' . . . [s]till, 'it doesn't throw debt onto their consolidated balance sheet.'" (quoting Bear Stearns analyst)); D153 (Duff & Phelps ratings report (Sept. 16, 1999) at EC46649A0032183 ("The company's rationale behind the sale of the notes and the purchase of the merchant assets is to allow ENE an efficient vehicle to monetize its merchant portfolio.")).

187.   Enron's board of directors reviewed and approved the Osprey I offering and structure. Chung Decl. Ex. D154 (Minutes, Special Mtg. of the Board of Directors, Enron Corp., (Sept. 17, 1999) at ENE 0000001026-033).

188.   The Osprey I transactions were reviewed by Vinson & Elkins, which issued opinions on several aspects of the offering.  Chung Decl. Exs. D155 (Letter from Vinson & Elkins to Deutsche Bank Securities Inc. (Sept. 24, 1999) at E 147614 (10b-5 due diligence opinion)); D156 (Letter from Vinson & Elkins to Deutsche Bank Securities Inc. (Sept. 24, 1999)

at  E 147618 (stating no consolidation of entities involved in Osprey I would occur in bankruptcy proceedings)); D157 (Letter from Vinson & Elkins to Deutsche Bank Securities Inc. (Sept. 24, 1999) at E 147656 (certain corporate matters)); D158 (Letter from Vinson & Elkins to Deutsche Bank Securities Inc. (Sept. 24, 1999) at E 147670 (tax matters)).

189.   The Osprey structure was reviewed and approved by the accounting firm Arthur Andersen which issued a comfort letter dated September 16, 1999 in connection with the Osprey I OM. The letter stated that selected Enron financial statements included in the OM were accurate.  Chung Decl. Ex. D159 (Letter from Arthur Andersen to Deutsche Bank Securities Inc. Sept. 16, 1999) at E 146241.

190.   Arthur Andersen stated in multiple memoranda dated March 10, 2000 that Enron did not have to consolidate Whitewing into its financial statements.  Chung Decl. Exs. D160 (Memorandum from Arthur Andersen to The Files regarding "Creations of Whitewing LP" (Mar. 10, 2000) at AASDTEX000400244); D161 (Memorandum from Arthur Andersen to The Files regarding "Subsequent Activities of Whitewing LP" (Mar. 10, 2000) at AASDTEX000400251).

191.   Enron disclosed the Osprey trigger events in its Form 10-K dated March 30, 2000. which stated that "Enron could be obligated, under certain circumstances, to deliver additional shares of common stock or Series B Preferred Stock to Whitewing." Enron also disclosed the deconsolidation of Whitewing which resulted in "an increase in Enron's investment in unconsolidated equity affiliates of approximately $500 million, an increase in preferred stock of $1.0 billion and a decrease in minority interest of $500 million."  Chung Decl. Ex. D36 (Enron 1999 Form 10-K (Mar. 30, 2000) at Note 9, Unconsolidated Equity Affiliates.

192.   In July 2000, additional Osprey certificates were sold for $70 million, the proceeds of which were invested in the Whitewing structure.  Chung Decl. Exs. D162 (Osprey

Trust Certificate Purchase Agreement (July 10, 2000) at AB000053144); D163 (Amendment No. 1 to Amended and Restated Trust Agreement of Osprey Trust (July 12, 2000) at AB000053164).

193.   The Osprey II transaction was a subsequent offering to Osprey I in September 2000 and utilized the same structure established in Osprey I.   The Osprey II Notes and Certificates were sold pursuant to 144A/Regulation S to Qualified Institutional buyers, and non-U.S. investors.  Chung Decl. Ex. D146 (Osprey II OM (Sept. 28, 2000) at i, 4).

194.   Deutsche Banc Alex. Brown, together with Donaldson, Lufkin & Jenrette ("DLJ"), served as the joint bookrunning manager for the Osprey II transactions. Deutsche Bank Securities Inc. acted as an initial purchaser, Deutsche Bank Luxembourg S.A. acted as the Luxembourg listing, paying, and transfer agent, and Deutsche Bank AG London served as the Euro paying agent.  Id. at i, CSFBLLC005523075.

195.   Osprey and Osprey, Inc. issued an additional $1.027 billion of Osprey Notes and $50 million of Osprey Certificates (the "Osprey II offering", or "Osprey II").   The Osprey II Note issuance amount consisted of $750 million in U.S. dollar-denominated notes, and €315 million in Euro-denominated notes.  Id. at i, 18.

196.   The Osprey II OM disclosed that the $1.08 billion in proceeds from the sale of the notes and certificates were contributed by Osprey to Whitewing Associates in exchange for an increase in Osprey's limited partnership interest in Whitewing Associates.  The Osprey II OM further disclosed that Whitewing Associates contributed $171 million of this amount to the Condor Trust to increase the assets held to support repayment of the Osprey I & II notes.  The remainder was available to Whitewing Associates for investment in certain Designated Assets as defined in the Osprey II OM.  Id. at 1.

197.    The Osprey II OM disclosed Whitewing Associates' asset acquisition process. Like the Osprey I OM, the Osprey II OM disclosed that any additional Whitewing Asset purchases were to "be at a price and on other terms determined by internal Enron negotiations conducted on an arms length basis, and the holders of the Osprey Trust Certificates (the "Certificateholders") will have certain consent rights with respect to such acquisitions, but there can be no assurance that such prices and other terms will reflect those that would be agreed by unaffiliated third parties." Id. at 15.

198.    Additionally, just as in the Osprey I OM, the Osprey II OM also contained a section entitled "*Uncertainty of Ability to Realize on Any Liquidation of the Whitewing Assets*" which disclosed that "[t]here may be no established markets for the Whitewing Assets and there may be contractual or other limitations relating" to the sale of any of the Whitewing Assets. This section further disclosed that "a sale of such assets may be difficult and there can be no assurance as to the proceeds thereof." Id. at 15.

199.    Enron sought to have the Osprey II securities rated and each of these rating agencies rated the Osprey II notes as investment grade. The Osprey II Notes were given credit ratings of "BBB" by Standard & Poor's, "Baa2" by Moody's, and "BBB" by Fitch IBCA, Duff & Phelps ("Fitch").  Chung Decl. Exs. D146 (Osprey II OM at 82); D164 (Standard & Poor's Rating Letter (Sept. 15, 2000) at E 28316); D165 (Moody's Rating Letter (Sept. 29, 2000) at E 28315); D166 (Fitch's Rating Letter (Sept. 26, 2000) at E 28314).

200.    Moody's issued a credit research opinion update on October 2, 2000, which described the support underlying the securities as well as the Osprey trigger events.  Chung Decl. Ex. D167 (Moody's Opinion Update (Oct. 2, 2000) at MDY 26150).

201.    The Osprey II transactions were reviewed by Vinson & Elkins which issued opinions on several aspects of the offering.  Chung Decl. Exs. D168 (Letter from Vinson & Elkins to Deutsche Bank Securities Inc. (Oct. 5, 2000) at E 28216 (10-b 5 due diligence opinion)); D169 (Letter from Vinson & Elkins to Deutsche Bank Securities Inc. (Oct. 5, 2000) at E 28221 (stating no consolidation of entities involved in Osprey II would occur in bankruptcy proceedings)); D170 (Letter from Vinson & Elkins to Deutsche Bank Securities Inc. (Oct. 5, 2000) at E 28260 (certain corporate matters)); D171 (Letter from Vinson & Elkins to Deutsche Bank Securities Inc. (Oct. 5, 2000) at E 28272 (validity under English law)); D172 (Letter from Vinson & Elkins to Deutsche Bank Securities Inc. (Oct. 5, 2000) at E 28278 (tax matters)).

202.    The Osprey certificate holders had certain approval rights, which granted the holders approval authority over Osprey's initial asset purchases and any subsequent investments over $40 million.  Chung Decl. Ex. D173 (Amended and Restated Limited Liability Company Agreement of Whitewing Management LLC (Sept. 24, 1999) at 6.06(b) and (c)).

203.    The Osprey structure was reviewed and approved by the accounting firm Arthur Andersen which issued a comfort letter dated September 28, 2000 in connection with the Osprey II OM. The letter stated that selected Enron financial statements included in the OM were accurate.  Chung Decl. Ex. D174 (Letter from Arthur Andersen to Deutsche Bank Securities Inc. (Sept. 28, 2000) at E 26792. Arthur Andersen reiterated its previous conclusion that Whitewing did not need to be consolidated in a memo dated Nov. 7, 2001. Chung Decl. Ex. D175 (Mem. by D. Duncan re: "Whitewing Analysis" (Nov. 7, 2001) at AASDTEX001041135).

204.    Enron's creditors and Deutsche Bank released each other from any claims, liabilities, or obligations in connection with Marlin I and II in the Enron court-approved

bankruptcy settlement.  Chung Decl. Ex. D94 (Settlement Agreement between Enron Creditors Recovery Corp. and Deutsche Bank (Dec. 17, 2005) at 17, 18).

### C.  Yosemite

205.    The Yosemite I transaction was an Enron credit-linked note financing designed to use a special-purpose entity to raise funds to purchase certain unspecified Enron-related debt obligations and high credit quality investments. Chung Decl. Ex. D176 (Yosemite I OM (Nov. 4, 1999) at i, 1). The Yosemite I OM outlined the terms of issuance for $750 million of Series 1999-A Linked Enron Obligations ("LEOs" or "Yosemite I notes") to be sold pursuant to Rule 144A and Regulation S to Qualified Institutional Buyers, and non-U.S. investors.  Id. at CITINEWBY 00006980, 3.

206.    Deutsche Bank Securities Inc. acted as an initial purchaser of the Yosemite I notes, while Bankers Trust Luxembourg S.A. served as the Luxembourg paying and transfer agent.  Id. at CITINEWBY 00007068. Deutsche Bank was allocated and sold approximately 11% of the Yosemite I Notes.  Chung Decl. Ex. D177 (Yosemite I Note Purchase Agreement (Nov. 4, 1999) at Schedule A).

207.    The Yosemite I OM disclosed that the Yosemite I notes were issued by Yosemite I Trust ("YI Trust" or "Trust"), an entity established in October 1999.  Chung Decl. Ex. D176 (Yosemite I OM at 21).  In addition to the Yosemite I notes, the YI Trust issued $75 million in certificates. Id. at 40.  The Yosemite I financing closed on November 18, 1999. Id. at A-4.

208.    The Yosemite I OM disclosed that the Trust would use the proceeds of the issuance to invest in unspecified Enron-related obligations and in certain high credit quality investments. Id. at 1.

209.    The Yosemite I OM disclosed that the YI Trust was not required to disclose to holders of the Yosemite I notes any information relating to the specific YI Trust investments absent a default.  Id. at 4.

210.    The Yosemite I OM further disclosed that the YI Trust would invest the proceeds in "Permitted Investments" that were defined as certain unspecified high credit quality (such as triple A and U.S.) investments and unspecified payment obligations supported by Enron (the "Enron Investments").   The principal of the Yosemite I notes and certificates was payable through amounts received by the YI Trust investments from Citibank.  Id. at 4, 5.

211.    The Yosemite I OM disclosed that the Yosemite I financing included two swap transactions between Citibank and the YI Trust.  Id. at 5-7.  Under one swap, in the absence of an Enron credit default, Citibank agreed to pay amounts equal to the interest payments due on the Yosemite I notes and certificates.   In return, Citibank was entitled to the actual yield generated by the Trust investments.  Id. The other swap was disclosed as a credit-default swap which required Citibank to either financially or physically settle the swap in the event of an Enron bankruptcy or other specified events.  Id. at 5-7.  Upon an election to physically settle the swap, Citibank was required to deliver to the YI Trust certain defined unsecured obligations of Enron. See id.  The Yosemite I OM disclosed both swaps.  Id. at 5-7, 42-57.

212.    Enron sought to have the securities rated and, after performing their credit review of the Yosemite I Offering, Standard & Poor's rated the Yosemite I notes "BBB+" and Moody's rated the Yosemite I notes "Baa2".  Chung Decl. Exs. D178 (Standard & Poor's Rating Letter (Nov. 18, 1999) at EVE38799; D179 (Moody's Rating Letter (Nov. 18, 1999) at EVE38801).

213.    The ratings letter from Moody's disclosed the connection between the Yosemite I securities and Enron's credit ratings.  Id. ("The rating reflects the credit quality of the Enron

corporation ("Enron")), as well as the effectiveness of the documentation and of the structure in conveying this credit quality to investors. In addition, the rating incorporates the financial strength and additional risk presented by the swap arrangement with Citibank, N.A. ("Citibank"). The rating of the Linked Enron Obligations will change with the ratings of the Enron and Citibank.").

214.    Yosemite I was covered by the public financial press, which also discussed the link to Enron's credit. Chung Decl. Ex. D180 (Investment Dealers' Digest, "Citi's LEOs spin bank debt into synthetic bonds" (Dec. 6, 1999) at 1-2 ("[T]he 8.25% five year LEOs . . . resemble Enron's plain vanilla debt. . . . In fact, the structure is so effective in separating the structural and credit risk that neither the deal's investors nor the rating agencies ever know exactly what assets are in the trust. From their perspective it doesn't matter – the securities they are analyzing carry only Enron credit risk.")).

215.    Vinson & Elkins reviewed the Yosemite I transaction documents and stated the summary descriptions provided a fair summary of the transaction documents and further stated that the federal income and ERISA tax consequences were accurately described.  Chung Decl. Exs. D181 (Letter from Vinson & Elkins to Deutsche Bank Securities Inc. (Nov. 18, 1999) at EVE 38739 (10-b 5 due diligence opinion)); D182 (Letter from Vinson & Elkins to United States Trust Company of New York (Nov. 18, 1999) at EVE 38592 (enforceability of certain provisions pertaining to closing agreement));  D183 (Letter from Vinson & Elkins to Deutsche Bank Alex. Brown (Nov. 18, 1999) at EVE 38584 (enforceability of closing agreement)); D184 (Letter from Vinson & Elkins to Citibank (Nov. 18, 1999) at EVE 38600 (enforceability of Enron agreement and fee letters)); D185 (Letter from Vinson & Elkins to Yosemite I (Nov. 18, 1999) at EVE 38606 (tax indemnification agreement)); D186 (Letter from Vinson & Elkins to United States

Trust Company of New York (Nov. 18, 1999) at EVE 38742 (Enron debt security)). Vinson & Elkins also issued an opinion stating that, in the event of a bankruptcy, the Yosemite I trust and Enron should not be consolidated. Chung Decl. Ex. D187 (Letter from Vinson & Elkins to Deutsche Bank Alex. Brown (Nov. 18, 1999) at EVE 38613).

216.     The Yosemite offering was reviewed and approved by the accounting firm Arthur Andersen which issued a comfort letter dated November 4, 1999 in connection with the Yosemite I OM. The letter stated that selected Enron financial statements included in the OM were accurate. Chung Decl. Ex. D188 (Letter from Arthur Andersen to Deutsche Bank Alex. Brown (Nov. 4, 1999) at DBK-0253642.

217.     Enron's creditors and Deutsche Bank released each other from any claims, liabilities, or obligations in connection with Yosemite in the Enron court-approved bankruptcy settlement. Chung Decl. Ex. D94 (Settlement Agreement between Enron Creditors Recovery Corp. and Deutsche Bank (Dec. 17, 2005) at 17, 18).

218.     Deutsche Bank sought to become involved in future Yosemite offerings stating in a letter to Enron that "[w]e believe that Deutsche Bank is very well-placed to contribute to future Yosemite financings. . ." Deutsche Bank's letter outlined what Deutsche Bank understood as Enron's objectives and suggested ideas for improving future Yosemite offerings. Deutsche Bank recommended increasing the transparency of the transaction because "the absence of a description of assets expected to be included in the trust, compelled investors to assume the worst, even though we understand from you that the Yosemite I and II assets are essentially direct, unsubordinated Enron payment obligations." Chung Decl. Ex. D189 (Letter from Deutsche Bank to Enron regarding "Structuring Future Yosemite Transactions" (Mar. 30, 2000) at 1-2).

### D.     Firefly

219.    In July 1998, Enron purchased a 90% voting and approximately 46.6% economic stake in Elektro Eletricidade e Servicos S.A. ("Elektro"), a power distribution company in Brazil for $1.3 billion. Project Firefly served to refinance a portion of the purchase price of the Elektro acquisition.   Chung Decl. Ex. D190 (Presentation to Investors regarding "Up to $60,000,000 Certificates of Beneficial Ownership in Firefly Trust" (Dec. 1998) at 5, 6) ("Presentation to Investors").

220.    On December 30, 1998, BT Alex. Brown Incorporated served as the syndication agent and Bankers Trust Company served as a senior lender for Project Firefly.  Chung Decl. Ex. D191 (Senior Loan Agreement (Dec. 30, 1998) at DBK-0103847).

221.    Project Firefly involved the issuance of $415 million of debt to a syndicate of lenders and a $60 million certificates of beneficial ownership.  Chung Decl. Ex. D191 (Senior Loan Agreement, Recitals; D192 (Firefly Trust Certificate Purchase Agreement (Dec. 30, 1998) at Section 1.1.).

222.    The Presentation to Investors disclosed that principal on the debt could be repaid from an Enron obligation to remarket existing Enron mandatorily convertible preferred shares and from proceeds from a purchase agreement with Enron. Chung Decl. Ex. D190 (Presentation to Investors at 9).

223.    The Firefly transactions were reviewed and approved by Enron's board.  Chung Decl. Ex. D122 (Minutes, Meeting of the Board of Directors, Enron Corp. (Dec. 8, 1998) at 11-18).

224.    Arthur Andersen reviewed the Firefly transactions and concluded that the transactions "would meet the requirements . . . to qualify for non-consolidation at the date of acquisition."  Chung Decl. Ex. D193 (Mem. by C. Bass, et al. re: "Temporary Control-Elektro

Acquisition" (July 16, 1998) at 5. Arthur Andersen reiterated this conclusion in a subsequent memo and confirmed that Firefly did not need to be consolidated. Chung Decl. Ex. D194 (Mem. from Carl. Bass, Michael Jones re: "Enron International – Elektro Acquisition – Subsequent Joint Venture Structure" (Jan. 19, 1999) at 7, 8).

225.   Vinson & Elkins reviewed the Firefly transaction documents and issued two opinions regarding the validity of the transaction documents and confirming certain tax aspects of the transaction. Chung Decl. Exs. D195 (Letter from Vinson & Elkins to BT Alex. Brown Incorporated, (Dec. 30, 1998) at 2 (tax matters)); D196 (Letter from Vinson & Elkins to BT Alex. Brown Incorporated (Dec. 30, 1998) at 3 (certain corporate matters)).

226.   Edward Osterberg, a tax partner at Vinson & Elkins who supervised the lead attorney on Firefly, testified that he didn't recall "anything improper about Project Firefly" and further said that he had didn't have "any recollection of anyone at Vinson & Elkins telling [him] there was anything improper about Firefly". Chung Decl. Ex. D197 (Osterberg Dep. 26:6-14, 194:16-196:1).

227.   Enron disclosed the Elektro acquisition in its Form 10-K dated March 31, 1999. The 10-K stated that Enron's interest in Elektro would be held by "Jacaré Electrical Distribution Trust" which was an "unconsolidated affiliate." Enron disclosed that the Firefly securities were subject to trigger events that could cause the sale of Enron's convertible preferred stock. The 10-K described some of the trigger events, which included any default upon certain debt obligations of related entities or if, among other events, Enron's credit ratings fell below certain levels. Chung Decl. Ex. D13 (Enron 1998 Form 10-K (Mar. 31, 1999) at Note 2 (Business Acquisitions), Note 9 (Unconsolidated Affiliates).

228.     Enron disclosed the consolidation of Jacaré in the 10-K dated March 30, 2000. The 10-K specifically disclosed that as a result of the consolidation, "Enron's investment in unconsolidated affiliates decreased by approximately $450 million and minority interests increased by approximately $890 million."  Chung Decl. Ex. D36 (Enron 1999 Form 10-K (Mar. 30, 2000) at Note 2, Business Acquisitions and Dispositions).

229.     Enron's creditors and Deutsche Bank released each other from any claims, liabilities, or obligations in connection with Firefly in the Enron court-approved bankruptcy settlement.  Chung Decl. Ex. D94 (Settlement Agreement between Enron Creditors Recovery Corp. and Deutsche Bank (Dec. 17, 2005) at 17, 18).

## VI.     DEUTSCHE BANK ONLY HAD A PASSIVE ROLE IN LJM2

230.     LJM2 Co-Investment L.P. ("LJM2") was an investment fund designed and organized in late 1999 by Andrew Fastow.  Chung Decl. Ex. D198 (LJM2 Co-Investment, L.P. Private Placement Memorandum at DBA 01744).   LJM2 was a Delaware limited partnership managed by LJM2 Capital Management, L.P., as General Partner.  Chung Decl. Ex. D199 (LJM2 Co-Investment, L.P. Closing Documents for Initial Closing (Dec. 20, 1999) at DBA 067, DBA 114).  Enron officers Andrew Fastow and Michael Kopper were the Principals of LJM2. Id. at DBA 00209.  LJM2 Capital Management, L.P. was owned by LJM2's Principals.  Chung Decl. Ex. D198 (LJM2 Co-Investment, L.P. Private Placement Memorandum at DBA 017761).

231.     On December 20, 1999, Bankers Trust Investment Partners, Inc. ("BTIP") agreed to commit $10 million to become a limited partner of LJM2.   Chung Decl. Ex. D200 (LJM2 letter to BTIP (Dec. 20, 1999) at DB 002048).  LJM2 ultimately raised $391 million in capital commitments from its over fifty limited partner investors.  Chung Decl. Ex. D201 (LJM2 Co-Investment, L.P. Limited Partners, Capital Commitments (Apr. 5, 2000) at CI000267064).

232. Over the course of LJM2's existence, BTIP satisfied capital calls for approximately $7.3 million. Chung Decl. Ex. D202 (Deutsche Bank AG's Amended Objections and Responses to the February 3, 2003, Rule 30(b)(6) Letter Requests (June 23, 2003) at 16-17).

233. Andrew Fastow provided Deutsche Bank with an introductory presentation on LJM2. Chung Decl. Exs. D203 (Andrew Fastow letter to BTIP (Sept. 27, 1999) at AB000550122); D204 (Walsh Dep. 26:6-27:13). One of the presentation slides, titled "Governance," stated that the Enron Board of Directors had waived the Enron "Code of Conduct" for Andrew Fastow's activities relative to LJM2. Chung Decl. Ex. D205 (LJM2 Co-Investment L.P. Presentation (Sept. 27, 1999) at DBD 004777).

234. An LJM2 Private Placement Memorandum ("PPM") presented to investors contained a section titled "Conflicts of Interest" and indicated that the LJM2 Principals' dual roles in managing LJM2 while remaining employed as senior officers at Enron raised certain conflicts of interest. Chung Decl. Ex. D198 (LJM2 Co-Investment, L.P. Private Placement Memorandum at DBA 01775). Potential investors in LJM2 were told that the Enron board had established procedures to address these potential conflicts of interest on transactions between Enron and LJM2. Chung Decl. Ex. D204 (Walsh Dep. 33:6-34:3). Some of these procedures involved a process by which each transaction between Enron and LJM2 would be reviewed by Enron's Board of Directors, together with Arthur Andersen as Enron's outside auditor, and Kirkland & Ellis as Enron's outside counsel, to ensure that each transaction was negotiated at arms-length before granting final approval on the transaction. Chung Decl. Ex. D204 (Walsh Dep. 33:6-35:19).

235. Herbert "Pug" Winokur, an outside Enron director, confirmed to Deutsche Bank that, at a minimum, the Finance Committee of the Enron Board reviewed all Enron-related LJM

transactions, and that the full board was frequently present during those reviews.  Chung Decl. Exs. D206 (Winokur Dep. 161:21-164:3); D207 (Paul Cambridge email to Deutsche Bank (Apr. 18, 2001) at DBB008673).  Winokur added that when an LJM transaction was related to Enron, Andrew Fastow would either recuse himself from the approval process or leave the negotiation and investment decisions to LJM's people.  Chung Decl. Ex. D207 (Paul Cambridge email to Deutsche Bank (Apr. 18, 2001) at DBB008673).  Winokur also stated that Arthur Andersen vetted 90% of the proposed transactions at the Enron level before LJM became involved. Id.

236.    As a limited partner, BTIP was a passive investor in the LJM2 partnership. Chung Decl. Ex. 198 (LJM2 Co-Investment, L.P. Private Placement Memorandum at DBA 01773). The LJM2 PPM, in a section titled, "Passive Investment in Interests," states that the limited partners will not be permitted to engage in the active management of LJM2.  Id.  The PPM also states that the LJM2 limited partners would be "relying entirely" on the General Partner to conduct and manage the affairs of LJM2.  Id.  This section further provides that "the Limited Partners must rely on the ability of the General Partner to make appropriate Investments for the Partnership and to dispose of such Investments and of the Manager to manage such Investments." Id.

237.    In April 2000, BTIP was appointed a member of the LJM2 "Advisory Committee."   Chung Decl. Ex. 208 (LJM2 letter to BTIP (Apr. 14, 2000) at LJM056504). Section 8.1 of the LJM2 Partnership Agreement states that "the General Partner shall retain ultimate responsibility for investment strategy and for making all decisions relating to the operation and management of the Partnership." Chung Decl. Ex. 209 (Third Amended and Restated Limited Partnership Agreement (Apr. 5, 2000) at DB 002246).  BTIP and the other Advisory Committee members had no authority over the operation of the investment fund.  Id.

238.    Neither BTIP nor Deutsche Bank executed Acknowledgement Letters regarding any of LJM2's proposed investments.  Chung Decl. Ex. D204 (Walsh Dep. 74:18-75:16).

239.    In October 2000, LJM2 held a Partnership Meeting for all LJM2 limited partners. Chung Decl. Ex. D210 (LJM Investments Annual Partnership Meeting (Oct. 26, 2000) at AB000209291)).  No representative from either BTIP or Deutsche Bank attended this meeting. Id. at AB000209294; D204 (Walsh Dep. 59:21-59:24).

## VII.   DEUTSCHE BANK'S ROLE IN THE ZERO NOTE OFFERING

### A.    Deutsche Bank Had A Limited Role In The Private Placement Offering for the Zero Notes.

240.    On January 31, 2001, Enron issued the Offering Memorandum for the issuance of $1,907,698,000 in Zero Notes.  Chung Decl. Ex. D211 (Zero Coupon Convertible Senior Notes Offering Memorandum ("Zero Notes OM") (Jan. 31, 2001) at CITYNEWBY 01859945).  The Offering Memorandum stated that Enron was offering the Zero Notes at an issue price of $655.24 per note and would pay noteholders $1000 per note at maturity on February 7, 2021.  Id. Thus, although no interest would be paid on the notes, the yield to maturity (i.e., the implicit interest rate) would be 2.2125%.  Id.  The Zero Notes were convertible at the holder's discretion in to Enron common stock.  Id.  The Zero Notes could be exchanged, at the holder's discretion, for $698.13 per note in lieu of stock on February 7, 2004.  Id.[6]

241.    The Offering Memorandum identified Salomon Smith Barney, Deutsche Bank Alex. Brown, JP Morgan, Banc of America Securities LLC, and Barclays Capital as Initial Purchasers.  Id.  Sales of the notes by Initial Purchasers were limited to Qualified Institutional Buyers ("QIBs") pursuant to Rule 144a and to non-US entities pursuant to Regulation S.  Chung

---

[6] The Offering Memorandum for the Zero Notes private placement incorporated by reference Enron's 10-K filing for the year ended December 31, 1999, which included audited financial statements for the years ended December 31, 1999 and December 31, 1998.  Id. at CITYNEWBY 01859948; Chung Decl. Ex. D36 (Enron 1999 Form 10-K (Mar. 30, 2000) at Item 14).

Decl. Ex. D211 (Zero Notes OM (Jan. 31, 2001) at CITYNEWBY at 01859945); see also Chung Decl. Ex. D212 (Zero Notes Purchase Agreement (Jan. 31, 2001) at ¶ 3(a)).   As an Initial Purchaser, Deutsche Bank agreed to underwrite 8% of the notes.   Chung Decl. Ex. D213 (Deutsche Bank memorandum to Commitment Comm. (Jan. 30, 2001) at DBN-297949).

242.   Salomon Smith Barney was the lead bookrunner for the Zero Notes private offering and held 80% of the Notes.   Id.   As the sole book runner, Salomon Smith Barney was primarily in charge of the private placement offering. Chung Decl. Ex. D214 (Mialkowski Dep. 15:23-24, 37:9-38:23).   Deutsche Bank directed all inquiries regarding the Zero Notes to Salomon Smith Barney.   Id. at 15:20-24.

243.   On February 7, 2001, Enron and the Initial Purchases entered into a Registration Rights Agreement concerning the Zero Notes.   Chung Decl. Ex. D215 (Registration Rights Agreement (Feb. 7, 2001) at SlvC003755).

244.   On February 7, 2001, the Zero Notes were issued.   Chung Decl. Ex. D216 (Zero Notes Prospectus (July 18, 2001) at SlvC001165).

245.   Deutsche Bank earned $1,958,336.01 in fees in connection with its participation in the Zero Notes private placement.   Chung Decl. Ex. 217 (Check from Salomon Smith Barney to Deutsche Bank for underwriting the Zero Notes (May 8, 2001) at DBF 000599).

**B.   Deutsche Bank Had A Limited Role in the Public Offering for the Zero Notes.**

246.   On June 1, 2001, Enron filed an S-3 Registration Statement for the Zero Notes notifying the SEC of its intention to distribute the Zero Notes in a public offering.   Chung Decl. Ex. D218 (Enron Form S-3 Registration Statement (June 1, 2001)).   The June, 1, 2001 Registration Statement identified Deutsche Bank as one of 32 "selling securityholders."   Id. at 40.   The only other references to Deutsche Bank are as an Initial Purchaser in the Rule 144A

offering. Id. ("[Enron] issued and sold the notes in a private placement to Salomon Smith Barney Inc., Deutsche Bank Alex. Brown In., J.P. Morgan Securities Inc., Banc of America Securities LLC and Barclays Capital Inc., and the notes were simultaneously sold by Salomon Smith Barney Inc., Deutsche Bank Alex. Brown Inf., J.P. Morgan Securities Inc., Banc of America Securities LLC and Barclays Capital Inc. to the selling security holders in transactions exempt from registration under the Securities Act."). The Registration statement also cautions that the "selling securityholders listed in the above table may have sold or transferred, in transactions exempt from the registration requirements of the Securities Act, some or all of their notes or shares of our common stock since the date on which the information in the above table was provided to us." Id. at 41 (emphasis added). This disclaimer nowhere suggests that the selling securityholders were going to facilitate distribution of the Notes to the public.[7] The Registration Statement incorporated by reference Enron's audited financial statements for the year ended December 31 2000. Id. at 44.

247.   On July 13, 2001, Enron filed its first amendment to the registration statement for the Zero Notes. Chung Decl. Ex. D219 (Enron Amendment No. 1 to Form S-3 Registration Statement (July 13, 2001)). The July 13, 2001 Registration Statement identified Deutsche Bank as one of 43 "selling securityholders." Id. at 45-46.

248.   The prospectus issued in connection with the public offering became effective on July 18, 2001. Chung Decl. Ex. D216 (Zero Notes Prospectus (July 18, 2001) at SlvC001165).

---

[7] The Registration Statement also incorporated Enron's financial statements for the years ended December 31, 1999 and 2000. Arthur Andersen had confirmed that these audited financials "present fairly, in all material respects, the financial position of Enron Corporation and subsidiaries of December 31, 2000 and 1999, and the results of their operations, cash flows and changes in shareholders' equity for each of the three years in the period ended December 31, 2000, in conformity with accounting principles generally accepted in the United States. Chung Decl. Ex. D15 (Enron 2000 Form 10-K (Apr. 2, 2001) at 59).

The prospectus identified Deutsche Bank as one of 48 "selling securityholders."   Id. at SlvC001249-50.

249.   On August 3, 2001, Enron filed Prospectus Supplement No. 1 "to include additional entities as selling securityholders and to list the current amounts of securities held by securityholders previously listed."  Chung Decl. Ex. D220 (Zero Notes Prospectus Supplement No. 1 (Aug. 3, 2001) at 1).  Deutsche Bank was not identified as a "selling securityholder" in Prospectus Supplement No. 1. Id.

250.   On August 15, 2001, Enron filed Prospectus Supplement No. 2, again amending the original prospectus, as modified by Supplement No. 1, "to include additional entities as selling securityholders and to list the current amounts held by securityholders previously listed." Chung Decl. Ex. D221 (Zero Notes Due Prospectus Supplement No. 2 (Aug. 15, 2001) at 1). Deutsche Bank was not identified as a "selling securityholder" in Prospectus Supplement No. 2. Id.

251.   Two other supplements followed: Prospectus Supplement No. 3 on September 21, 2001 and Prospectus Supplement No. 4 on October 11, 2001.  Chung Decl. Exs. D222 (Zero Notes Prospectus Supplement No. 3 (Sept. 21, 2001)) D223 (Zero Notes Prospectus Supplement No. 4 (Oct. 11, 2001)).  Deutsche Bank was not identified as a "selling securityholder" in Prospectus Supplement Nos. 3 and 4.  See Chung Decl. Exs. D222 at 1, D223 at 1.

252.   The financial statements incorporated into the Zero Note offering memorandum, registration statement, and prospectus were prepared by Enron and audited by Arthur Andersen. Chung Decl. Ex. D224 (Arthur Andersen letter to SSB, et al. (Jan. 31, 2001) at AASDTEX000455993).

      **C.**     **Deutsche Bank's Due Diligence with the Zero Notes followed Applicable Custom, Practice, and Standards.**

253.     Deutsche Bank conducted due diligence on the Zero Note offering before the February 2001 private placement that was consistent with all customary practices and procedures.   Chung Decl. Exs. D214 (Mialkowski Dep. 85:11-18); D225 (Expert Report of Robert Haft (Mar. 17, 2006) at 11-20).   Deutsche Bank's investment banking, convertible origination, and credit groups participated in the diligence process.   Chung Decl. Ex. D214 (Mialkowski Dep. 16:4-9, 85:19-86:12).   The diligence log included a record of all diligence performed in connection with Deutsche Bank's prior transactions with Enron.   Id. at 183:21-184:8. The investment banking group reviewed publically available information (including financial statements and press releases) and sales notes regarding the company and used this information to update its ongoing due diligence logs.   Id. at 18:16-20:9; 71:15-72:22.     The credit group also reviewed financial statements and other publically available information on Enron to assess the bank's exposure levels with the company.   Id. at 31:7-21.   The convertible origination group reviewed the structure of the proposed convertible notes transactions.   Id. at 29:11-20.

254.     Deutsche Bank participated in a due diligence call with Enron on January 29, 2001, during which Enron answered questions posed by the lead underwriter, Salomon Smith Barney.   Chung Decl. Exs. D213 (Deutsche Bank memorandum to Commitment Comm. (Jan. 30, 2001) at DBN-297948); D226 (Rick Pearson email to Krystian Mialkowski and Raymond Mak, with attached "Zero Convertible Due Diligence" presentation (Jan. 30, 2001) at DBN-297786-89).

255.     The due diligence log relating to the Zero Notes showed that Enron had released fourth quarter 2000 and full year 2000 results in a press release on January 22.   The log also stated that "the Company feels that there are no material developments which would impact the

syndicate or investors since this announcement." Chung Decl. Ex D213 (Deutsche Bank memorandum to Commitment Comm. (Jan. 30, 2001) at DBN-297951).

256.     Arthur Andersen issued a letter on January 31, 2001, in which it stated that based on its audit of the financial statements incorporated in Enron's 1999 10-K filing, its review of other available Enron financial statements from the 1999 and 2000 time period in a non-audit capacity, and its review of meeting minutes relating to certain Enron director and shareholder meetings:

> Nothing came to our attention as a result of the foregoing procedures . . . that caused us to believe that:
>
> a.  Any material modifications should be made to the unaudited consolidated financial statements described [herein], incorporated by reference in the Offering Memorandum, for them to be in conformity with accounting principles generally accepted in the United States. . . .

Chung Decl. Ex. D227 (Arthur Andersen letter to Salomon Smith Barney, et al. (Jan. 31, 2001), at AASDTEX000455995).  Arthur Andersen issued a supplement to its original letter on February 7, 2001, in which it re-affirmed the conclusions stated its original letter after the review of additional materials that had not been available on January 31.  Chung Decl. Ex. D228 (Arthur Andersen's amendment to its Jan. 31, 2001 letter to Salomon Smith Barney, et al. (Feb. 7, 2001), at AASDTEX000456098).

## VIII.   SILVERCREEK MADE ITS OWN PURCHASING DECISIONS WITH REGARD TO THE ZERO NOTES AND 7% EXCHANGEABLE NOTES

### A.     Background on Silvercreek

#### 1.     Plaintiff parties

257.     Plaintiff Silvercreek Management Inc. is an Ontario corporation with its principal place of business in Toronto, Canada.  (Compl. ¶ 8).

258.    Pebble Limited Partnership is an Ontario limited partnership with its principal place of business in Toronto, Canada.  (Compl. ¶ 9).

259.    Silvercreek Limited Partnership is an Ontario limited partnership with its principal place of business in Toronto, Canada.  (Compl. ¶ 10).

260.    OIP Limited was an Ontario corporation with its principal place of business in Toronto, Canada.  (Compl. ¶ 11).

261.    Silvercreek II Limited is a Cayman Islands corporation with its principal place of business in the Cayman Islands.  (Compl. ¶ 12).

262.    Silvercreek Management Inc. managed and had sole investment discretion over the investments of Silvercreek Limited Partnership, Silvercreek II Limited, OIP Limited and Pebble Limited Partnership.  Chung Decl. Exs. D229 (Morwick Dep. 115:8-116:16).

### 2.    Silvercreek Witnesses

263.    Louise Morwick was the portfolio manager, president, director and founder of Silvercreek. Id. at 142:14; Chung Decl. Exs. D229 (Resume of Louise Morwick at SlvC005463); D230 (Sworn Declaration of Louise Morwick (Sept. 12, 2005) at 6).  Morwick made the investment decisions for Silvercreek.  Chung Decl. Exs. D228 (Morwick Dep. 142:14-15); D231 (Kittel Dep. 321:4-5, 370:24-371:1).  Morwick owned the majority of Silvercreek Management Inc.  Chung Decl. Ex. D228 (Morwick Dep. 113:2-3).

264.    Robert Kittel was Partner, Vice President and the research analyst for Silvercreek. Chung Decl. Ex. D232 (Sworn Declaration of Robert Kittel (Oct. 6, 2005) at 6); D228 (Morwick Dep. 142:11).  Kittel "provide[d] investment research and analysis of [Silvercreek's] investments."  Chung Decl. Exs. D228 (Morwick Dep. 142:8-16); D231 (Kittel Dep. 108:9-18).

### 3.    Silvercreek's Investment Strategy and Sophistication

265.    Silvercreek and each of its funds ("Plaintiffs") qualifies as a Qualified Institutional Buyer under Rule 144A of the Securities laws.  Chung Decl. Ex. D228 (Morwick Dep.  141:13-15, 142:1-3).

266.    During the 2000 to 2001 period, Silvercreek had approximately $350 million assets under management.  Id. at 121:21-122:3.

267.    Morwick testified that Silvercreek's returns are better when the companies they invest in do poorly.  Id. at 165:1-3 ("Q. . . . [B]ut for your business, you do better when the company does poorly?   A Yes.").   She further testified that that "[I]f a company runs into difficulty even if it's credit difficulty, we usually do well in those positions."  Id. at 199:2-200:1.  Silvercreek's marketing materials for investors in Silvercreek Limited Partnership state that it "delivers superior performance in weak equity markets."  Chung Decl. Ex. D233 (Presentation regarding "Silvercreek Management Inc." (Jan. 2005) at SlvC010407).

268.    In making investment decisions, Morwick testified that Silvercreek "rel[ies] on our own work" Chung Decl. Ex. D228 (Morwick Dep. 166:8-14).   Morwick also testified that in making investment decisions, Silvercreek looks "primarily at what our returns will be."  Id. at 462:3-7.  Additionally, Morwick testified that Silvercreek "will read whatever we can find and come across related to the company.  So we will read whatever information we find in the public realm, form our opinions.  And it factors into primarily our analysis of the financial statements."  Id. at 166:10-16.

**B.    Silvercreek Followed Its Own Trading Strategy When Trading the Zero Notes**

269.    As the portfolio manager for Silvercreek, Morwick made the investment decisions to buy and sell the Zero Notes.  Id. at 142:14-15.

270.    Morwick first looked at the possibility of investing in the Zero Notes at the time of their issuance in February 2001 in the Rule 144A private offering, but decided not to purchase them because the return on the notes at the time was not sufficient. Id. at 85:12-14, 448:4-8, 448:18-20, 450:8-10.

271.    Morwick revisited the possibility of purchasing the Zero Notes in the summer of 2001.  Id. at. 450:12-451:2.

272.    Morwick testified that the Zero Notes at that time were "an interesting potential long bond investment" because "[t]he common stock price went down" and decided that she would "continue to watch it."  Id.

273.    Morwick testified that the decrease in the Enron common stock price at that time made "the price of the bond . . . more attractive in terms of the return you could earn on the investment."  Id. at 451:4-11.

274.    Silvercreek purchased the Zero Notes through a series of trades executed between October 18, 2001 to October 31, 2001.  Chung Decl. Ex. D234 (Silvercreek Zero Notes Trading Summary at SlvC005208).

275.    Plaintiffs did not purchase any notes from Deutsche Bank or through Deutsche Bank as a broker-dealer.  Id.; Chung Decl. Ex. D228 (Morwick Dep. 563:14-17).   Additionally, Plaintiffs did not speak with any Deutsche Bank representatives in connection with the purchase of Zero Notes.  Chung Decl. Ex. D228 (Morwick Dep. 557:2-7).

276.    Deutsche Bank did not have an equity analyst covering Enron during the time that Silvercreek purchased the Zero Notes.  Chung Decl. Exs. D214 (Mialkowski Dep. 198:2-7); D6 (Tirello Dep. 57:2-6).

277.    Morwick testified that at that time, she assessed whether the price of the Zero Notes was "right" and "where the bonds were trading" but she did "[n]ot [do] a lot" else before making the decision to invest "because . . . [she]'d done a fair bit of work in the past and was comfortable with the Enron credit."  Chung Decl. Ex. D228 (Morwick Dep. 460:19-24.)

278.    Kittel testified that he did not recall doing any work in connection with Silvercreek's purchase of the Zero Notes.  Chung Decl. Ex. D231 (Kittel Dep. 235:4-19).  Kittel also testified that he did not recall having any discussions with traders, salespersons or analysts from any investment banks regarding the Zero Notes.  Id.

279.    Silvercreek's purchases of the Zero Notes took place after the August 14, 2001 resignation of Jeffrey Skilling as Chief Executive Office of Enron.  Chung Decl. Exs. D235 (Enron Press Release (Aug. 14, 2001)); D234 (Silvercreek Zero Notes Trading Summary at SlvC0052087-11).

280.    Silvercreek's purchases of the Zero Notes took place after Enron's October 16, 2001 announcement of a $1 billion after-tax charge to its third quarter 2001 earnings to recognize asset impairments, restructuring costs and losses for certain investments.  Chung Decl. Ex. D236 (Enron Press Release (Oct. 16, 2001) at SlvC000082).  Plaintiffs were aware of the October 16 announcement.  Chung Decl. Ex. D228 (Morwick Dep. 800:4-23).

281.    Additionally on October 16, 2001, Moody's placed all of the long term debt obligations of Enron on review for downgrade.  Chung Decl. Ex. D237 (Report by Moody's (Oct. 16, 2001) at ANARPT009107).

282.    On October 18, 2011, Silvercreek purchased Zero Notes and continued doing so the following day.  Chung Decl. Ex. D234 (Silvercreek Zero Notes Trading Summary at SlvC0052088-11).

283.   On October 22, 2001, the SEC announced that it was inquiring into a possible conflict of interest related to Enron's dealings with partnerships maintained by Enron's CFO Andrew Fastow.   Chung Decl. Ex. D238 (Enron Press Releases (Oct. 22, 2001) at DBG 101964).

284.   Also on October 22, 2001, Plaintiffs continued to purchase Zero Notes.  Chung Decl. Ex. D228 (Morwick Dep. 781:14-16).

285.   On October 23, 2001, Enron hosted a conference call to discuss the SEC inquiry. Chung Decl. Ex. D238 (Enron Press Releases (Oct. 22, 2001) at DBG 101968).  Silvercreek did not listen to that call at that time and continued to purchase Zero Notes that day.  Chung Decl. Ex. D239 (Notes regarding "Enron Corporation" (Oct. 28, 2001) at SlvC001986); D228 (Morwick Dep. 385:12-386:18).  Plaintiffs did not listen to a recording of the Enron call until October 28, 2001.  Id.

286.   On October 24, 2001 Enron announced that its CFO, Andrew Fastow, was taking a leave of absence from the company.  Chung Decl. Ex. D14 (Enron Press Release (Oct. 24, 2001)).

287.   Plaintiffs purchased additional Zero Notes on October 24, 2001.

288.   On October 25, 2001 Enron drew down on committed lines of credit for cash liquidity in excess of $1 billion.  Chung Decl. Exs. D240 (Enron Press Release (Oct. 25, 2001)); D241 (Enron Press Release (Oct. 25, 2001) at SlvC000067).

289.   Also on October 25, 2001, Fitch put Enron on negative credit watch.  Chung Decl. Ex. D242 (Fitch Press Release (Oct. 25, 2001) at ANARPT008899).   Additionally, Standard & Poor's put Enron's outlook to negative.   Chung Decl. Ex. D243 (Standard & Poor's Press Release (Oct. 25, 2001) at ANARPT009837).

290.     Plaintiffs purchased additional Zero Notes on October 25, 2001. Chung Decl. Ex. D234 (Silvercreek Zero Notes Trading Summary at SlvC005207-11).

291.     On October 26, 2001, Egan Jones lowered Enron's credit rating to below investment grade.  Chung Decl. Ex. D244 (Egan Jones report (Oct. 26, 2001) at SlvC002002).

292.     Additionally, on October 26, 2001, there were reports that Enron insiders were selling shares while the stock price was dropping.  Chung Decl. Ex. D245 (Wall Street Journal article (Oct. 26, 2001) at SlvC000061).

293.     Plaintiffs continued to purchase Zero Notes on October 26, 2001.  Chung Decl. Ex. D234 (Silvercreek Zero Notes Trading Summary at SlvC005210).

294.     On October 26, 2001, Morwick asked Robert Kittel, her analyst, to perform a more detailed analysis of Enron's credit situation.  Over the course of the weekend on October 27-28, 2001, Kittel reviewed the prospectus for the Zero Notes, Enron's 10-K statements, and compiled an analysis of Enron's balance sheet.  Chung Decl. Exs. D231 (Kittel Dep. 201:20-202:9, 306:20-308:5); D246 (Enron Corporation Balance Sheet Breakdown (June 30, 2001) at SlvC001991).  This analysis included further review of Enron's debt levels.  Chung Decl. Ex. D231 (Kittel Dep. 295:6-296:3).  He continued to analyze Enron until late November and to pursue additional information regarding Enron's debt levels.  Chung Decl. Exs. D247 (Notes regarding "Enron Corporation" (Oct. 30, 2001) at SlvC001359-60); D248 (Rob Kittel memorandum to Silvercreek (Mar. 19, 2002) at 1-3); D249 (Notes at SlvC001379-80); D250 (Notes regarding "Enron Corporation" at SlvC001383-84).   Kittel had not performed any analysis of Enron's financial statements prior to October 26-28, 2001 time period.  Chung Decl. Ex. D231 (Kittel Dep. 203:2, 308:9-12).

295.    On October 27, 2001, Kittel had a telephone conversation with Tim DeSpain at Enron to discuss the financial status of the company.  They discussed Enron's assets, including its investments in unconsolidated affiliates, and its outstanding debts.  Id. at 344:10-14; Chung Decl. Ex. D249 (Notes at SlvC001379-80).

296.    Kittel testified that he did not recall making an inquiry to anyone concerning the level of Enron's off-balance sheet debt prior to October 27, 2001.  Chung Decl. Ex. D231 (Kittel Dep. 309:4-7).

297.    On October 29, 2001, Moody's downgraded Enron's long term debt.  Chung Decl. Ex. D251 (Moody's Report (Oct. 29, 2001) at ANARPT009117).

298.    On October 31, 2001, the SEC announced a formal investigation into Enron's financial accounting practices.  Chung Decl. Ex. D252 (Wall Street Journal article (Oct. 31, 2001) at SlvC000090).   On or around the time of this announcement, Robert Kittel had a telephone conversation with David Lebor at Enron Corporation.   Chung Decl. Ex. D247 (Notes regarding "Enron Corporation" (Oct. 30, 2001) at SlvC001359-60).  They discussed the status of the SEC investigation and Enron's current financial status.  Id.; Chung Decl. Ex. D231 (Kittel Dep. 315:13-316:16).

299.    On October 31, 2001, Silvercreek made its final purchase of Zero Notes. Chung Decl. Ex. D234 (Silvercreek Zero Notes Trading Summary at SlvC005210).

300.    On October 31, 2001, Silvercreek began to sell off its position in the Zero Notes. Id. at SlvC005209.

301.    Morwick looked briefly into the possibility of purchasing an Enron put in late October 2001, to offset any potential losses in Silvercreek's convertible bond investments, but

none were available. Chung Decl. Ex. D228 (Morwick Dep 848:19-851:23); D253 (Silvercreek messaging thread (Oct. 31, 2001) at SlvC014111).

302.   On November 1, Standard & Poor's lowered Enron's ratings and placed Enron on CreditWatch negative.  Chung Decl. Ex. D254 (Standard & Poor's Press Release (Nov. 1, 2001) at ANARPT009839).

303.   On November 5, Fitch lowered Enron's ratings and maintained a negative watch. Chung Decl. Ex. D255 (Fitch Press Release (Nov. 5, 2001) at ANARPT008901).

304.   On November 8, Enron announced the restatement of its financials for 1997-2000. Chung Decl. Ex. D238 (Enron Press Releases (Oct. 22, 2001) at DBG 101956).

305.   Also on November 8, Enron confirmed discussions with Dynegy regarding a possible acquisition of Enron.  Chung Decl. Ex. D256 (Enron Press Release (Nov. 8, 2001).

306.   On November 10, Enron and Dynegy announced a merger agreement where Dynegy would buy Enron.  Chung Decl. Ex. D257 (Enron Press Release (Nov. 9, 2001).

307.   On November 28, S&P, Moody's and Fitch downgraded Enron's debt to below investment grade.   Chung Decl. Exs. D258 (Fitch Press Release (Nov. 28, 2001) at ANARPT008911); D259 (Moody's Press Release (Nov. 28, 2001) at ANARPT009127); D260 (Standard & Poor's Press Release (Nov. 28, 2001) at ANARPT009879).

308.   On November 28, 2001, Morwick purchased $150,000 of Zero Notes for her own portfolio.  Chung Decl. Ex. D228 (Morwick Dep. 45:8-16).

309.   Also on November 28, Dynegy terminated the merger agreement with Enron. Chung Decl. Ex. D238 (Enron Press Releases (Oct. 22, 2001) at DBG 101946).

310.   On December 2, Enron filed for bankruptcy.  Chung Decl. Ex. D261 (Enron Press Release (Dec. 2, 2001)).

311.    Thus, during the time that Silvercreek purchased Enron debt securities, it did not review the prices of Enron credit default swaps.  Chung Decl. Ex. __ (Morwick Dep. 806:23-808:12, 810:4-10).   An increase in the price of a credit default swap reflects the market's assessment of an increased risk of default.   Chung Decl. Ex. D228 (Morwick Dep. 807:11-808:5).  The credit default swap spreads for Enron debt obligations increased dramatically during the October 18-26 window during which Silvercreek was purchasing the Zero Notes. Institutions selling protection on Enron debt obligations were demanding nearly three times more from buyers of default protection during time that Silvercreek sought to increase its position on the Zero Notes.  Chung Decl. Exs. D262 (Expert Report of Suresh M. Sundaresan (July 17, 2006) at ¶¶ 22-23).  Silvercreek had received information about the escalating market levels for Enron five-year credit default swaps.  Chung Decl. Exs. D263 (Expert Report of Tsvetan N. Beloreshki (July 17, 2006) at ¶¶ 11, 55-56; D264 (CSFB message to Robert Kittel (Oct. 15, 2001) at SlvC017488); D265 (CSFB message to Louise Morwick (Oct. 17, 2001) at SlvC013538); D266 (CSFB message to Louise Morwick (Oct. 25, 2001) at SlvC013879).

312.    Plaintiff's expert conceded that the negative information released into the market prior to Plaintiffs' investment "raise[d] questions" and "certainly mean[t] that [Plaintiffs] should do additional research and due diligence and find out what other people are thinking."  Chung Decl. Ex. D267 (Matthews Dep. 239:11-18, 209:11-210:6, 212:8-216:19).

313.    Deutsche Bank assisted Silvercreek in five separate sales of the Zero Notes that took place between December 3, 2001 and January 22, 2002.   Chung Decl. Ex. D234 (Silvercreek Zero Notes Trading Summary at SlvC005208, SlvC005210).

**C.    Silvercreek Followed Its Own Trading Strategy When Trading the 7% Exchangeable Notes**

314.    There is no allegation that Deutsche Bank underwrote the offering for the 7% Exchangeable Notes (hereinafter "7% Notes") or that Plaintiffs executed any trades for the 7% Notes through Deutsche Bank.  Chung Decl. Exs. D268 (Silvercreek 7% Notes trading history pre-Oct. 24, 2001 (Mar. 28, 2002) at SlvC004892); D269 (Silvercreek 7% Notes trading history post-Oct. 23, 2001 (Jan. 13, 2002) at SlvC005046); D228 (Morwick Dep. 560:21-562:13).

315.    The 7% Notes were exchangeable for shares of common stock of Enron Oil & Gas Company ("EOG") on their maturity date of July 31, 2002.  The 7% Notes paid quarterly interest payments equal to 7% per year and were mandatorily exchangeable on the maturity date. These notes were originally issued on August 10, 1999 as general senior unsecured obligations of Enron.  The offering was made pursuant to a prospectus. Chung Decl. Ex. D270 (7% Notes Prospectus (Aug. 10, 1999) at SlvC000106-110).

316.    The prospectus presented Enron's year-end financial data for the following five years: 1994, 1995, 1996, 1997, and 1998.  The data included were derived from Enron's audited financial statements for those years.  Id. at SlvC000126-128.

317.    Appendix A of the prospectus (hereinafter "Appendix A") likewise included EOG's year-end financial data for 1996, 1997, and 1998.  Such data were also derived from audited financial statements.  Id. at SlvC000177-180.

318.    The prospectus incorporated by reference the consolidated financial statements included in Enron's [Current Report on] Form 8-K dated March 18, 1999 and consolidated financial statements and schedules included in Enron's [Annual Report on] Form 10-K for the year ended December 31, 1998.  These consolidated financial statements were audited by Arthur Andersen, as indicated in their reports with respect thereto, and were incorporated into the

prospectus in reliance upon the authority of said firm as experts in giving said reports.  Id. at SlvC000165.

319.    Arthur Andersen also consented to the incorporation by reference in Appendix A of its report on the consolidated financial statements of EOG and subsidiaries dated March 5, 1999, included in EOG's Form 10-K, as amended, for the year ended December 31, 1999.  Id. at SlvC000268.

320.    The prospectus contained the following disclaimer:

> YOU SHOULD NOT ASSUME THAT THE INFORMATION IN THIS PROSPECTUS OR IN ANY OTHER DOCUMENT INCORPORATED BY REFERENCE IN THIS PROSPECTUS IS ACCURATE AS OF ANY DATE OTHER THAN THE DATE ON THE FRONT OF THOSE DOCUMENTS.

> Id. at SlvC000164.

321.    Deutsche Bank was not an underwriter of the 7% Notes.  Id. at SlvC000107, SlvC000166.

322.    Plaintiffs first purchased the 7% Notes in October 2000.  Chung Decl. Ex. D268 (Silvercreek 7% Notes trading history pre-Oct. 24, 2001 (Mar. 28, 2002) at SlvC004890).

323.    Plaintiffs began to sell the 7% Notes on August 20, 2001.  Their decision to unwind this position was based on what they could sell the position for at that point in time. When Plaintiffs made the investment in the 7% Notes, they anticipated a minimum return of approximately 21% assuming that they held the notes until the maturity date of July 31, 2002. When they sold a portion of the 7% Notes on August 20, 2001, they received a return of nearly 38% after holding the notes for essentially half of the period of time that they expected.  Id.; Chung Decl. Ex. D228 (Morwick Dep. 314:22-25, 318:10-18, 322:13-22).

324.    Plaintiffs continued to sell their position throughout September and October 2001, receiving an even "better" return and doing "very well on this investment." Chung Decl. Exs.

D228 (Morwick Dep. 323:3-327:4, 333:2-22); D268 (Silvercreek 7% Notes trading history pre-Oct. 24, 2001 (Mar. 28, 2002) at SlvC004891-895, SlvC004897-898, SlvC0048900-901).

325.    On October 23, 2001, Plaintiffs sold the remainder of the 7% Notes and closed out their position.  Plaintiffs had determined that the return on the investment from that day forward was not sufficiently attractive to hold their position.  They believed that they could make better investments elsewhere.    Chung Decl. Ex. D228 (Morwick Dep. 334:1-337:8, 340:3-9); D268 (Silvercreek 7% Notes trading history pre-Oct. 24, 2001 (Mar. 28, 2002) at SlvC004891-895, SlvC004897-898, SlvC0048900-901).

326.    One day later, on October 24, 2001, Plaintiffs reversed course and began repurchasing the 7% Notes.  Morwick did not consult with anyone at BT or Deutsche Bank regarding the 7% Notes.  Chung Decl. Ex. D228 (Morwick Dep. 381:16-21, 383:4-384:13).

327.    In the hour to an hour-and-a-half before Plaintiffs made their first purchase, Morwick "went and pulled or had the [Enron] file pulled just to revisit some of the terms." Plaintiffs reviewed the prospectus to make sure that it was fresh in their mind and then made a decision to re-establish the position.  They also looked at the news from the four or five days that preceded their decision to re-invest.  Id. at 402:2-403:10.

328.    At this juncture, Plaintiffs knew of information concerning Enron that had been coming into the market the week prior to their purchase.  They were also aware that Jeff Skilling, Enron's CEO, had resigned in mid-August.  Id. at 397:12-15, 318:5-9.

329.    Morwick believed that the sole risk associated with the decision to repurchase the 7% Notes was the risk of Enron's bankruptcy.  Id. at 884:18-885:3, 886:3-11. Plaintiffs did not, however, review any market indicators of bankruptcy with respect to Enron, such as the Altman Z score, the KMV model, and the EDF score.    Id. at 805:5-806:22.  Plaintiffs also did not

analyze indicators of Enron's risk of default, such as the prices of Enron credit default swaps.  Id. at 806:12-807:2, 808:6-12.  In addition, they also did not look at the pricing of other Enron bonds.  Id. at 808:15-17.

330.    Plaintiffs continued to purchase the 7% Notes on October 25, 2001.  Around 10:00 a.m. that day, one of Morwick's colleagues, Robert Kittel, received a message sent over Bloomberg from a broker at First Union.  The broker asked Kittel to call her about the 7% Notes. She stated that people were "nervous" because the EOG stock was not held in trust and because it "could be a confusing situation" if it reached a "meltdown stage."  Chung Decl. Ex. D285 (messaging thread to Robert Kittel (Oct. 25, 2001) at SlvC017745).  Kittel testified that he did not recall reading this message and did not believe that he alerted Morwick to the broker's concerns.  Chung Decl. Ex. D231 (Kittel Dep. 408:3-12).

331.    Plaintiffs made additional purchases of 7% Notes on October 25, 2001 and October 26, 2001.  Chung Decl. Ex. D269 (Silvercreek 7% Notes trading history post-Oct. 23, 2001 (Jan. 13, 2002) at SlvC005046-055).

332.    By the afternoon of October 26, 2001, Plaintiffs again changed course and began to sell the 7% Notes.  The change in strategy was precipitated by "a combination of information" including "what was happening in the market, which . . . did not make sense."  Morwick elaborated that "[t]he people were just selling" and that, while people had also sold a lot over the previous two days, "the price continued to go down."  Chung Decl. Ex. D228 (Morwick Dep. 407:6-408:5).

333.    On the same days that Plaintiffs repurchased the 7% Notes, they engaged in short sales of the shares for which the 7% Notes were exchangeable.  On October 26, 2001, Plaintiffs began buying back EOG common stock as they began selling the 7% Notes.  Chung Decl. Ex.

D269 (Silvercreek 7% Notes trading history post-Oct. 23, 2001 (Jan. 13, 2002) at SlvC005046-055).

334.    Plaintiffs did not undertake a detailed analysis of EOG stock to determine whether their short position was advantageous.  They did not want to "take the risk of a naked short, and potentially making our loss even bigger" so they engaged in this strategy to "contain" the risk. Chung Decl. Ex. D228 (Morwick Dep. 435:6-436:5).

335.    Plaintiffs closed out of their EOG position in January 2002 and liquidated their entire position in the 7% Notes in November 2003.  Chung Decl. Ex. D269 (Silvercreek 7% Notes trading history post-Oct. 23, 2001 (Jan. 13, 2002) at SlvC005046-055).

Dated:  November 10, 2017

Respectfully Submitted,

By:  */s/ Owen C. Pell*
Owen C. Pell
Scott E. Hershman
Joshua D. Weedman
Jacqueline L. Chung
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020-1095
(212) 819-8200
opell@whitecase.com
scott.hershman@whitecase.com
jweedman@whitecase.com
jacqueline.chung@whitecase.com