UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SILVERCREEK MANAGEMENT, INC., *et al.*,

                      Plaintiffs,

      v.

CITIGROUP, INC., *et al.*,

                      Defendants.

Civil Action No.
02-cv-08881-JPO

**ECF CASE**

**ORAL ARGUMENT
REQUESTED**

# MEMORANDUM OF LAW OF DEFENDANT MERRILL LYNCH & CO., INC. IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**SHEARMAN & STERLING LLP**
Adam S. Hakki
Daniel Lewis
Mary C. Pennisi
599 Lexington Avenue
New York, NY 10022
212.848.4000

*Attorneys for Merrill Lynch & Co., Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT .......................................................................... 1

STATEMENT OF FACTS ................................................................................. 4

       A.     Enron's Strategies and Accounting Practices ............................... 5

       B.     Merrill Lynch Was a Tier 3 Bank, Outside of Enron's Inner Circle ........... 5

       C.     Merrill Lynch Analysts Lacked Insider Knowledge About Enron ............. 6

       D.     Enron's 1999 Year End Transactions with Merrill Lynch ........................ 7

              1.     The Barge Transaction .................................................. 7

              2.     Electricity Trades ........................................................ 9

       E.     LJM2 ......................................................................................... 10

       F.     Impact of the Barge Transaction and the Electricity Trades ................... 11

       G.     Enron Begins to Unravel in 2001 ............................................... 13

       H.     Plaintiffs' Investments in October of 2001 ................................. 14

               1.     The Exchangeables ...................................................... 14

               2.     The Zeroes ................................................................. 16

               3.     Plaintiffs Interactions with Merrill Lynch ..................... 17

       I.     Enron's Bankruptcy .................................................................. 18

ARGUMENT ................................................................................................. 18

     I.     PLAINTIFFS HAVE NOT ADDUCED SUFFICIENT EVIDENCE TO ESTABLISH PROXIMATE CAUSE FOR ANY OF THEIR CLAIMS ............. 19

       A.     Plaintiffs Failed to Develop Evidence to Attribute Losses to Merrill Lynch ....................................................................... 19

       B.     Plaintiffs Cannot Rely on So-Called "Scheme" Theories ........................ 22

II.     PLAINTIFFS HAVE NOT ADDUCED SUFFICIENT EVIDENCE TO
        ESTABLISH NEGLIGENT MISREPRESENTATION (COUNT 5)..................25

        A.      Merrill Lynch Did Not Owe Plaintiffs a Duty or Have a Special
                Relationship with Plaintiffs ........................................................................25

        B.      Merrill Lynch Did Not Negligently Misstate or Omit Information..........26

        C.      Plaintiffs Cannot Establish They Directly or Reasonably Relied on
                Any Purported Misstatements or Omissions by Merrill Lynch...............28

                1.      Plaintiffs Cannot Establish Direct Reliance.................................28

                2.      Plaintiffs Cannot Establish Reasonable Reliance .........................29

III.    PLAINTIFFS' AIDING AND ABETTING FRAUD CLAIM FAILS
        (COUNT 1)................................................................................................32

        A.      Plaintiffs Cannot Prove Reasonable Reliance on Enron's Financial
                Statements ................................................................................................32

        B.      Plaintiffs Have Not Adduced Sufficient Evidence to Show That
                Merrill Lynch Had Actual Knowledge of Enron's Fraud.........................32

        C.      Merrill Lynch Did Not Substantially Assist Enron's Fraud ....................35

IV.     PLAINTIFFS CANNOT PROVE THAT MERRILL LYNCH AIDED AND
        ABETTED ENRON'S ALLEGED NEGLIGENT MISREPRESENTATION
        (COUNT 3) ................................................................................................37

V.      PLAINTIFFS CANNOT PROVE MERRILL LYNCH'S LIABILITY FOR
        CONSPIRACY (COUNT 2)...................................................................39

CONCLUSION....................................................................................................40

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*2006 Frank Calandra, Jr. Irrevocable Tr. v. Signature Bank Corp.*,
    816 F. Supp. 2d 222 (S.D.N.Y. 2011) ....................................................................36

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
    404 F.3d 566 (2d Cir. 2005) .................................................................................39

*In re Agape Litig.*,
    773 F. Supp. 2d 298 (E.D.N.Y. 2011) ..................................................................36

*AHW Inv. P'ship v. Citigroup Inc.*,
    980 F. Supp. 2d 510 (S.D.N.Y. 2013), *aff'd*, 661 F. App'x 2 (2d Cir. 2016) .........38

*Allen v. Westpoint-Pepperell, Inc.*,
    11 F. Supp. 2d 277 (S.D.N.Y. 1997) ....................................................................32

*In re Allou Distribs., Inc.*,
    446 B.R. 32 (Bankr. E.D.N.Y. 2011) ....................................................................39

*Appavoo v. Phillip Morris Inc.*,
    1998 WL 440036 (N.Y. Sup. Ct. July 24, 1998) ...................................................37

*Ashland Inc. v. Morgan Stanley & Co.*,
    652 F.3d 333 (2d Cir. 2011) .................................................................................31

*Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*,
    969 F. Supp. 2d 339 (S.D.N.Y. 2013) ..................................................................19

*Barron Partners, LP v. LAB123, Inc.*,
    593 F. Supp. 2d 667 (S.D.N.Y. 2009) ..................................................................38

*Baxter v. A.R. Baron & Co.*,
    1995 WL 600720 (S.D.N.Y. Oct. 12, 1995) .........................................................23

*In re Bayou Hedge Funds Inv. Litig.*,
    472 F. Supp. 2d 528 (S.D.N.Y. 2007) ..............................................................37, 38

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
    851 F. Supp. 2d 746 (S.D.N.Y. 2012) ..................................................................28

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*,
    754 F.2d 57 (2d Cir. 1985) ............................................................................18, 22, 36

*Caldarola v. Calabrese*,
   298 F.3d 156 (2d Cir. 2002)..................................................................................18

*Chemtex*, 490 F. Supp. 2d at 545-46 ........................................................................40

*Congress Fin. Corp. v. John Morrell & Co.*,
   790 F. Supp. 459 (S.D.N.Y. 1992) .....................................................................26

*Cresser v. Am. Tobacco Co.*,
   174 Misc. 2d 1 (N.Y. Sup. Ct. July 31, 1997) ...................................................37

*Crigger v. Fahnestock & Co.*,
   2003 WL 22170607 (S.D.N.Y. Sept. 18, 2003)..................................................26

*DaSilva v. Am. Tobacco Co.*,
   175 Misc. 2d 424 (N.Y. Sup. Ct. Dec. 12, 1997)...............................................37

*de Abreu v. Bank of Am. Corp.*,
   812 F. Supp. 2d 316 (S.D.N.Y. 2011)...........................................................32, 35

*de Kwiatkowski v. Bear, Stearns & Co.*,
   306 F.3d 1293 (2d Cir. 2002)..............................................................................25

*Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*,
   602 F.2d 478 (2d Cir. 1979)...........................................................................33, 37

*In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*,
   2003 WL 23305555 (S.D. Tex. Dec. 11, 2003).............................................7, 33

*Epstein v. Haas Sec. Corp.*,
   731 F. Supp. 1166 (S.D.N.Y. 1990)....................................................................40

*Fidelity Funding of Cal., Inc. v. Reinhold*,
   79 F. Supp. 2d 110 (E.D.N.Y. 1997) ..................................................................40

*Filler v. Hanvitt Bank*,
   247 F. Supp. 2d 425 (S.D.N.Y. 2003), *vacated on other grounds*, 2003 WL
   21729978 (S.D.N.Y. July 25, 2003) ...................................................................18

*First Nationwide Bank v. Gelt Funding Corp.*,
   27 F.3d 763 (2d Cir. 1994)........................................................................ *passim*

*Glidden Co. v. Jandernoa*,
   5 F. Supp. 2d 541 (W.D. Mich. 1998) .................................................................36

*Glob. Mins. & Metals Corp. v. Holme*,
   35 A.D.3d 93 (1st Dep't 2006) ............................................................................29

*Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison,*
   955 F. Supp. 248 (S.D.N.Y. 1997) ...............................................................21

*Hydro Investors, Inc. v. Trafalgar Power Inc.,*
   227 F.3d 8 (2d Cir. 2000)..............................................................................31

*ITC Ltd. v. Punchgini, Inc.,*
   482 F.3d 135 (2d Cir. 2007)..........................................................................18

*JP Morgan Chase Bank v. Winnick,*
   350 F. Supp. 2d 393 (S.D.N.Y. 2004)...........................................................29

*In re JWP Inc. Sec. Litig.,*
   928 F. Supp. 1239 (S.D.N.Y. 1996), *as clarified* (S.D.N.Y. June 12, 1996)..........................25

*King v. Crossland Sav. Bank,*
   111 F.3d 251 (2d Cir. 1997)....................................................................28, 29

*Kolbeck v. LIT Am., Inc.,*
   939 F. Supp. 240 (S.D.N.Y. 1996) ..........................................................35, 36

*Laub v. Faessel,*
   297 A.D.2d 28 (1st Dep't 2002) ..............................................................18, 23

*Lawrence v. Sofamor, S.N.C.,*
   1999 WL 592689 (N.D.N.Y. Aug. 2, 1999) ...................................................29

*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC,*
   2017 WL 1194681 (S.D.N.Y. Mar. 30, 2017) ...............................................18

*In re Lehman Bros. Sec. & ERISA Litig.,*
   2015 WL 5294759 (S.D.N.Y. Sept. 10, 2015).................................................22

*Lentell v. Merrill Lynch & Co.,*
   396 F.3d 161 (2d Cir. 2005)..........................................................................24

*Lerner v. Fleet Bank, N.A.,*
   459 F.3d 273 (2d Cir. 2006)....................................................................32, 36

*Lindsay v. Lockwood,*
   163 Misc. 2d 228 (N.Y. Sup. Ct. 1994) ........................................................38

*In re Livent, Inc. Noteholders Sec. Litig.,*
   151 F. Supp. 2d 371 (S.D.N.Y. 2001)...........................................................32

*M & T Bank Corp. v. LaSalle Bank Nat'l Ass'n,*
   852 F. Supp. 2d 324 (W.D.N.Y. 2012) .........................................................31

*Matsumura v. Benihana Nat'l Corp.*,
    542 F. Supp. 2d 245 (S.D.N.Y. 2008)......................................................................29

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
    500 F.3d 171 (2d Cir. 2007)...................................................................................23

*Miele v. Am. Tobacco Co.*,
    2 A.D.3d 799 (2d Dep't 2003) ..........................................................................38, 39

*Miller v. Schweickart*,
    413 F. Supp. 1062 (S.D.N.Y. 1976).................................................................3, 23, 24

*In re Monahan Ford Corp.*,
    340 B.R. 1 (Bankr. E.D.N.Y. 2006).......................................................................40

*Morin v. Trupin*,
    711 F. Supp. 97 (S.D.N.Y. 1989) ..........................................................................37

*Multi Commc'n Media Inc. v. AT&T Corp.*,
    1997 WL 188938 (S.D.N.Y. Apr. 18, 1997)............................................................29

*Musalli Factory for Gold & Jewelry v. JPMorgan Chase Bank*,
    261 F.R.D. 13 (S.D.N.Y. 2009) ...........................................................................36

*Nat'l Westminster Bank USA v. Weksel*,
    124 A.D.2d 144 (1st Dep't 1987) .........................................................................36

*In re Omnicom Grp, Inc. Sec. Litig.*,
    541 F. Supp.2d 546 (S.D.N.Y. 2008)....................................................................21

*In re Parmalat Sec. Litig.*,
    501 F. Supp. 2d 560 (S.D.N.Y. 2007)...................................................................19

*Portnoy v. Am. Tobacco Co.*,
    1997 WL 638800 (N.Y. Sup. Ct. Sept. 26, 1997)...................................................37

*PPI Enters. (U.S.), Inc. v. Del Monte Foods Co.*,
    2003 WL 22118977 (S.D.N.Y. Sept. 11, 2003).......................................................31

*Prime Mover Capital Partners, L.P. v. Elixir Gaming Techs., Inc.*,
    793 F. Supp. 2d 651 (S.D.N.Y. 2011).....................................................................22

*In re Refco Inc. Sec. Litig.*,
    2012 WL 12941970 (S.D.N.Y. Feb. 10, 2012), *adopted in part, rejected in part,* 2012 WL 3126834 (S.D.N.Y. July 30, 2012), *aff'd sub nom. Krys v. Pigott*, 749 F.3d 117 (2d Cir. 2014).................................................................35, 36

*Ritchie Capital Mgmt., L.L.C. v. GE Corp.*,
    121 F. Supp. 3d 321 (S.D.N.Y. 2015)..............................................................20, 39

*Ryan v. Hunton & Williams*,
    2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ......................................................35

*Sheth v. New York Life Ins. Co.*,
    273 A.D.2d 72 (1st Dep't 2000) ............................................................................28

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
    248 F. Supp. 3d 428 (S.D.N.Y. 2017).....................................................25, 33, 38

*Sita v. Danek Med., Inc.*,
    43 F. Supp. 2d 245  (E.D.N.Y. 1999) ....................................................................29

*Small v. Lorilland Tobacco Co.*,
    252 A.D.2d 1 (1st Dep't 1998) ..............................................................................32

*SPV OSUS Ltd. v. AIA LLC*,
    2016 WL 3039192 (S.D.N.Y. May 26, 2016) .................................................19, 36

*St. Paul Fire & Marine Ins. Co. v. Heath Fielding Ins. Broking Ltd.*,
    976 F. Supp. 198 (S.D.N.Y. 1996) .......................................................................26

*Terrydale Liquidating Tr. v. Gramlich*,
    549 F. Supp. 529 (S.D.N.Y. 1982) .......................................................................37

*United States v. Brown*,
    459 F.3d 509 (5th Cir. 2006) ..........................................................................13, 21

*United States v. Village of Island Park*,
    888 F. Supp. 419 (E.D.N.Y. 1995) .......................................................................40

*Unterberg Harris Private Equity Partners, L.P. v. Xerox Corp.*,
    995 F. Supp. 437 (S.D.N.Y. 1998) .......................................................................20

*WM High Yield Fund v. O'Hanlon*,
    2013 WL 3230667 (E.D. Pa. June 27, 2013)............................................19, 23, 24

*In re WRT Energy Sec. Litig.*,
    1999 WL 178749 (S.D.N.Y. Mar. 31, 1999) ........................................................34

**Other Authorities**

Exchange Act of 1934, § 10(b).....................................................................................23

Fed. R. Civ. P. 56(a) ...................................................................................................18

Restatement (Second) of Torts § 876(b) ......................................................................38

Defendant Merrill Lynch & Co., Inc. ("Merrill Lynch")[1] respectfully submits this memorandum of law in support of its motion for summary judgment.

## PRELIMINARY STATEMENT

Plaintiffs Silvercreek Limited Partnership, Silvercreek II Limited, OIP Limited and Pebble Limited Partnership ("Plaintiffs") are large, sophisticated "vulture" funds. Their business is to seek out and acquire distressed debt of financially troubled issuers with the goal of obtaining high returns by purchasing risky debt at deep discounts. This case arises out of Plaintiffs' purchase of Enron debt securities, including 7% Exchangeable Notes (the "Exchangeables") and Zero Coupon Exchangeable Notes (the "Zeroes") (collectively, the "Notes"). *See* Third Amended Complaint, dated August 11, 2011 ("TAC") ¶ 1.

Consistent with their business model, Plaintiffs purchased the Notes in late October 2001, *after* Enron's senior executives had started to leave the company, *after* Enron announced a $1 billion charge to its third-quarter 2001 earnings, *after* Enron announced a $217 million loss in its broadband unit, *after* the SEC announced an inquiry into Enron's accounting for related-party transactions, and *after* the market had started to question whether Enron might go into meltdown. In fact, discovery confirmed that Plaintiffs made the purchases precisely because the bad news about Enron was depressing the price of Enron securities. Plaintiffs thought they knew better than the market, and they did no diligence before placing their bets, other than glancing at their Enron file. When Enron went into bankruptcy shortly thereafter, on December 2, 2001, and Plaintiffs' bets turned into losses, Plaintiffs sued a long list of defendants in an attempt to recover "damages" as an insurance policy on their failed strategy.

---

[1] Merrill Lynch is filing this motion for summary judgment based upon its knowledge before its acquisition by Bank of America Corporation. This submission applies only to Merrill Lynch & Co., Inc. and to no other Merrill Lynch affiliate or subsidiary. Moreover, this motion is filed without prejudice to or waiver of arguments that Merrill Lynch & Co., Inc. is not the proper defendant in Plaintiffs' claims. Merrill Lynch hereby incorporates the arguments contained in the summary judgment motions filed by the other defendants to the extent applicable.

Whatever can be made of Merrill Lynch's role in the Enron saga, there is no basis for these Plaintiffs to shift their losses to Merrill Lynch. There is not a single piece of evidence or testimony showing that Merrill Lynch had anything to do with Plaintiffs' purchases. Indeed, Merrill Lynch had one of the smallest relationships with Enron among all defendants, if not the smallest. Summary judgment on all claims as against Merrill Lynch should be granted for multiple, independent reasons.

*First*, Plaintiffs cannot establish that Merrill Lynch proximately caused Plaintiffs' losses. Though legally required, Plaintiffs' experts did not determine an amount of Plaintiffs' losses that could be attributed to Merrill Lynch. Merrill Lynch's chronologically remote transactions with Enron accounted for only five one-hundredths of one percent of the total debt allegedly concealed by Enron, less than 2% of the allegedly over-stated pre-tax income and 0% of the allegedly overstated cash flow. These transactions had no demonstrated impact on the prices of Enron's securities and, as a matter of undisputed fact, were no longer even reflected in Enron's financial statements by the time of Plaintiffs' investments in the Notes. Meanwhile, analyst reports by Merrill Lynch's equities research division lagged the market and contained no new or non-public information. For these and other reasons, Plaintiffs cannot demonstrate that the analyst reports themselves, as distinguished from Enron's public statements, affected the price of Enron securities.

Plaintiffs' theory is that Merrill Lynch's comparatively small, chronologically remote transactions somehow render Merrill Lynch liable for any and all damages flowing from Enron's collapse. Plaintiffs' position is economically irrational and legally indefensible. As Judge Edward Weinfeld vividly wrote in a case that similarly attempted to hold a defendant liable for conduct about two years before a plaintiff suffered losses, "[t]his is causation run riot . . .

somewhere a point will be reached when courts will agree that the link has become too tenuous. That point has been reached in this case." *Miller v. Schweickart*, 413 F. Supp. 1062, 1068 (S.D.N.Y. 1976).

*Second*, summary judgment on all claims against Merrill Lynch is warranted because Plaintiffs cannot demonstrate direct reliance on any representation by Merrill Lynch or, in any event, that any claimed reliance on Merrill Lynch or Enron was reasonable.  As noted, there is no record evidence that Merrill Lynch had anything to do with Plaintiffs' decision to buy the Notes. Moreover, Plaintiffs decided to invest in the Notes *because* of a perceived opportunity created by bad news about Enron, and yet discovery confirmed that Plaintiffs did little more than review by-then stale offering materials—that Merrill Lynch played no role in preparing—before plunking down over $100 million for Enron securities.  Under New York law, sophisticated investors are held to a higher standard when assessing claims of reasonable reliance, and the undisputed record shows Plaintiffs cannot meet that standard.

Plaintiffs' claims also fail for numerous other reasons, including:

  *__No special relationship between Plaintiffs and Merrill Lynch__*.  Plaintiffs cannot prove their relationship with Merrill Lynch was anything other than an ordinary "broker/customer" relationship.  The undisputed record has established beyond doubt that the relationship was not at all close.  As a result, Plaintiffs cannot prove they had a "special" relationship with Merrill Lynch as required to prove a negligent misrepresentation claim.

  *__No actual knowledge__*.  In order to prevail on their aiding and abetting claims, Plaintiffs must prove that Merrill Lynch had *actual* knowledge of Enron's alleged overall scheme of misrepresenting its financial position.  It is well-settled under New York law that constructive knowledge or red-flags is not enough.  The record confirms Plaintiffs cannot prove actual

knowledge, including because Enron's Chief Financial Officer himself acknowledged that

Merrill Lynch was not as "valuable" to Enron as other financial institutions and that he never

disclosed *any* information to Merrill Lynch about Enron other than the limited information

necessary for Enron's discrete transactions with Merrill Lynch.

***No substantial assistance***.  Plaintiffs' aiding and abetting claims also fail because it is

undisputed that Merrill Lynch played no role whatsoever in disseminating the financial

statements that Plaintiffs contend misled them, and also because Merrill Lynch's alleged

involvement with Enron was not proximate to Plaintiffs' investment almost two years later, as

legally required.  Any claim that Plaintiffs might never have invested "but/for" Merrill Lynch's

chronologically remote transactions is, as a matter of settled New York law, an entirely

insufficient basis to prove substantial assistance as required for aiding and abetting claims.

Each of these and other failures of proof requires summary judgment for Merrill Lynch.

In the end, this case is not about Enron's fraud; it is about whether there are legal grounds for

vulture investors to shift their investment losses to Merrill Lynch.  The answer is "no."

## STATEMENT OF FACTS

Enron had roots as a gas pipeline company formed by the 1985 merger of Houston

Natural Gas Co. and InterNorth Inc. before transforming into one of the largest, most innovative

companies in the world by capitalizing on the energy market deregulation.[2]  By the mid-1990s,

Enron was a titan in the purchase, transportation, and sale of energy and related financial

instruments, and in the development and operation of pipelines and power facilities.[3]  In 1990,

---

[2] 56.1 ¶¶ 7-8 [S.E.C. Tender Offer, 1985.]  Competitors voted Enron the most innovative company nationwide between 1997 and 2000, ahead of companies such as Intel and Microsoft. [FORTUNE, 1997-2000.]

[3] 56.1 ¶ 8 [Enron Corp. Investor Info., 1997; Enron Annual Report, 2000.]  Enron was recognized as the "Most Innovative Company" in America in the 1990s.  *See* 56.1 ¶¶ 7-10 (citing news coverage).

then-President of Enron Jeffrey Skilling recruited Andrew Fastow, who became CFO in 1998.[4]

Fastow developed methods for "off-balance sheet" treatment of assets and liabilities.[5] By 2001,

Enron ranked seventh on the *Fortune 500* with annual revenues over $100 billion.[6]

### A.    Enron's Strategies and Accounting Practices

Press reports discussed Enron's accounting techniques in the mid-1990s, including its

practices of (i) monetizing future cash flows, (ii) moving assets off balance sheet, and (iii) mark-

to-market accounting.[7] In 1992, Enron received approval from the SEC for "mark-to-market"

accounting, allowing it to record *projected* earnings from long-term contracts as current income.[8]

Enron, like many other companies, was known to use "special purpose entities" to access capital,

hedge risk, and increase leverage and return on assets without reporting debt.[9] Fastow relied on

Enron's accounting firm Arthur Andersen to help execute this financial engineering.[10]

### B.    Merrill Lynch Was a Tier 3 Bank, Outside of Enron's Inner Circle

Enron had billions of dollars in credit lines and loans outstanding at any given time.[11]

Because of the importance of credit to Enron's capital-intensive business, Enron "ranked" its

investment banks based on the amount of credit they made available.[12] To incentivize its banks,

Enron conditioned investment banking assignments on the provision of credit.[13] It was well-

known that approximately 30 banks were ranked Tier 1 or Tier 2.[14] Merrill Lynch, however,

---

[4] 56.1 ¶ 11 [Declaration of Andrew Fastow, Sept. 25, 2006 ("Fastow Decl.") 1; Deposition of Andrew Fastow, Oct. 23–Nov. 2, 2006 ("Fastow Dep.") 19:19-22.]

[5] 56.1 ¶ 12 [CFO, 1999.]

[6] 56.1 ¶ 13 [*Fortune 500 Database*, Enron Entry, 2001.]

[7] 56.1 ¶ 14 [CFO, 1999; INVES'T DEALERS, 1998; PR NEWS., 1997; FORBES, 1993; JP Morgan Report, 1999.]

[8] 56.1 ¶ 15 [SEC filings, 1997-1999; Jan. 30, 1992 Letter from Schuetze to Tompkins.]

[9] 56.1 ¶¶ 16-17 [Fastow Dep. 58:10-59:13; Enron 10-K, 2000; BUS. LAWYER, 1995.]

[10] 56.1 ¶¶ 18-19 [Fastow Dep. 50:5-7; Deposition of John Stewart, Sept. 23-29, 2005 ("Stewart Dep.") 18:10-20:8.]

[11] 56.1 ¶ 20 [Fastow Dep. 23:3-13, 54:14-55:23, 56:4-15; Enron Corp. Investor Info., 1997.]

[12] 56.1 ¶ 20 [Fastow Dep. 22:8-23:18.]

[13] *Id.*

[14] 56.1 ¶ 21[Mid-Year Debt Investor Relationship Review, July 2000.]

was ranked Tier 3 because it was not then a major commercial bank (this was years before its acquisition by Bank of America) and could not make large credit facilities available to Enron.[15] In fact, although Fastow valued Merrill Lynch personally, he acknowledged Merrill Lynch was not as "valuable" to Enron as other banks due to its limited lending capacity.[16]

Consequently, Merrill Lynch received few investment banking assignments from Enron. Of the █ merger and acquisition transactions entered into by Enron and Enron-related entities from 1997 through Enron's collapse, Merrill Lynch was Enron's advisor on only █.[17]  Merrill Lynch's minor relationship with Enron was reflected in the fees it received, which were relatively small and declining after 1999.[18]

### C.    Merrill Lynch Analysts Lacked Insider Knowledge About Enron

Plaintiffs allege that equity research reports published by Merrill Lynch were unduly optimistic and that the analysts had special knowledge about Enron (or access to special knowledge) that should have been disclosed.[19]  Enron's operations were known to be complex, opaque, and "impenetrable."[20]  Fastow acknowledged that Enron's true financial condition would not have been apparent to anyone based on its certified financial statements through 2001.[21]  Enron only shared information with Merrill Lynch that was limited to the discrete and few transactions involving Merrill Lynch.[22]  There is no evidence as to this or anything else that the analysts at Merrill Lynch during the period, John Olson and Donato Eassey, breached so-

---

[15] 56.1 ¶ 22 [Fastow Dep. 27:25-28:9, 520:24-522:9, 842:10-844:20.]

[16] 56.1 ¶ 23 [Fastow Dep. 27:25-28:9, 520:24-521:10.]

[17] 56.1 ¶ 23 [Letter to Hon. W.J. "Billy" Tauzin, Apr. 11, 2002 (the "Tauzin Letter").]

[18] In 2000, for example, Merrill Lynch earned approximately █ from Enron-related investment banking and financing business.  56.1 ¶ 24 [Tauzin Letter.]

[19] TAC ¶¶ 781-85.

[20] In March of 2001, *Fortune Magazine* called Enron a company "largely impenetrable to outsiders," keeping Wall Street in the dark.  Lewis Decl. Ex. M129 [FORTUNE, Mar. 5, 2001.]

[21] 56.1 ¶ 25 [Fastow Dep. 76:5-21, 1216:9-1217:22, 1861:22-1862:11.]

[22] 56.1 ¶ 25 [Fastow Dep. 1366:10-1370:24.]

called "Chinese walls" between them and investment bankers for details about Enron.[23]   In fact,

both analysts provided undisputed deposition testimony that they were not influenced or

informed by Merrill Lynch investment bankers, that their research reflected their own opinions,

and that they were never pressured to modify their analyses.[24]

### D.   Enron's 1999 Year End Transactions with Merrill Lynch

Plaintiffs allege that in December of 1999, Enron and Merrill Lynch entered into two

transactions designed by Enron to enable it to meet its fourth quarter and year-end 1999 earnings

forecasts.[25]   As follows, these were business transactions negotiated at arms-length with both

parties represented by counsel and involving real assets and real profit for Enron.  To the extent

that Plaintiffs claim the transactions resulted in misrepresentations, those claims are based on

how *Enron*, with Arthur Andersen, reported the transactions in *Enron's* financial statements.

### 1.   The Barge Transaction

On December 29, 1999, ML IBK Positions, Inc. ("MLIPI"), an affiliate of Merrill Lynch,

purchased a passive equity interest in Enron Nigeria Barge Ltd. ("ENB"), a company formed by

Enron Corporation's three electricity generating units mounted on barges anchored off the coast

of Nigeria, for $28 million.[26]   Before approaching MLIPI, Enron had been unable to complete a

negotiation to sell the interest to Marubeni, an Asian trading company. [27]   Enron thus sought to

---

[23] 56.1 ¶ 28 [Deposition of Donato Eassey, May 21, 2003 ("Eassey Bankruptcy Dep.") 113:23-123:24, 147:2-17; Deposition of John Olson, Dec. 7-8, 2004 ("Olson Dep.") 64:21-65:14, 69:13-76:25.]

[24] 56.1 ¶ 28 [Olson Dep. 342:22-343:19; Eassey Bankruptcy Dep. 79:25-80:9.]  Plaintiffs contend otherwise because Olson allegedly was terminated by Merrill Lynch because of pressure from Enron, who felt Olson's coverage was too negative.  TAC ¶ 778.  While Merrill Lynch disputes this, Plaintiffs' focus on Olson's termination is a red herring.  Even after Olson departed Merrill Lynch, Olson rated Enron at the same (or higher) levels as his successor, Eassey.  56.1 ¶¶ 29-30 [Merrill Lynch Report, Nov. 6, 1998; Sanders Morris Report, Oct. 19, 1998.]

[25] TAC ¶¶ 715, 726, 754.

[26] 56.1 ¶ 33 [Share Purchase Agreement, Dec. 29, 1999.]  ML IBK Positions, Inc. formed Ebarge, LLC.  56.1 ¶ 45 [Board Minutes, Dec. 29, 1999.]

[27] 56.1 ¶ 35 [Dec. 22, 1999 Email attaching Memorandum to the Debt Markets Commitment Committee.]

find a short-term investor until Marubeni or another third party invested in ENB. [28]

Employees of Merrill Lynch or its affiliates, with the help of the law firm Whitman Breed Abbott & Morgan LLP (later partly acquired by Winston & Strawn LLP), worked on the Barge Transaction.[29]   Plaintiffs allege that Enron made an oral promise to take Merrill Lynch out of the transaction at an agreed rate of return and that Enron therefore should have accounted for the transaction as a loan rather than a sale, as Enron ultimately did.[30]   While Merrill Lynch disputes this because the transaction posed real risks to it, including the risk that a subsequent investor might not have been found, Plaintiffs' allegations in this regard are taken as true for purposes of this motion.  What is undisputed is that Enron confirmed and Merrill Lynch understood that Enron's outside auditor, Arthur Andersen, had approved Enron's accounting of the transaction (although Merrill Lynch did not know what information about the transaction was shared with Arthur Andersen), and that, for various legitimate reasons, companies often seek to increase profits at year-end.[31]   This allowed Enron to book a before-tax, non-recurring gain of $12 million in the fourth quarter of 1999.[32]   This translated to a penny per share of earnings for the quarter.[33]

There is no evidence Merrill Lynch had any discussions with Arthur Andersen regarding the nature of the Barge Transaction or any role in determining Enron's accounting treatment because it did not.[34]   Fastow conceded that Merrill Lynch did not (and had no obligation to) investigate Enron's accounting treatment or its disclosures with respect to this or any other

---

[28] *Id.*

[29] 56.1 ¶ 36 [Share Purchase Agreement, Dec. 29, 1999; N.Y. TIMES, 2000.]

[30] TAC ¶¶ 729-733.  The record reflects that an explicit agreement to find a purchaser had been included in a prior draft version of the Letter Agreement, but it was subsequently removed.  Lewis Decl. Exs. M38, M32: Letter from Merrill Lynch to J. McMahon, Dec. 23, 1999; Letter from Merrill Lynch to A. Fastow, Dec. 29, 1999.]

[31] 56.1¶ 41 [Preliminary Information Memorandum, Dec. 1999.]

[32] 56.1 ¶ 41 [Expert Report of Saul Solomon, Jan. 17, 2006 ("Solomon Report") 136; Memorandum from Eric Boyt, Mar. 15, 2000; Expert Report of Frederick Dunbar, Jul. 17, 2006 ("Dunbar Report") 15.]

[33] 56.1 ¶ 41 [Dunbar Report 15.]

[34] 56.1 ¶ 43 [Fastow Dep. 1311:1-1314:10.]

transaction.[35]  Ultimately, on June 29, 2000, LJM2 E-Barge LLC, an SPE established by LJM2,

purchased MLIPI's equity interest for $28.53 million, and, in September 2000, the equity interest

in the barges was sold to a third party for $31.2 million, allowing Enron to book a profit.[36]

## 2.      Electricity Trades

Around the same time as the Barge Transaction, Merrill Lynch's Global Power Trading

Group was approached by Clifford Baxter, CEO of Enron North America, ███████████████

███████████████.[37]  On December 31, 1999, Merrill Lynch Capital Services, Inc.

("MLCS") and Enron entered into a swap arrangement related to the delivery of electricity from

certain Enron power plants.[38]  Enron sold physically settled electricity call options to MLCS for

a monthly premium, and MLCS sold financially settled electricity call options to Enron for a

monthly premium.[39]  Enron structured the options to trade for a period of four years, beginning

on September 1, 2000 and ending on August 31, 2004.[40]  Enron recorded a mark-to-market gain

of $49 million from the Electricity Trades in its 1999 fourth quarter financial statement, which,

pre-tax, translated to approximately one nickel per share of earnings.[41]  Ultimately, Enron

wanted to terminate the trade, and, on June 30, 2000, Enron paid Merrill Lynch $8.5 million to

terminate the transactions.[42]  The trades were unwound, and, as of June 30, 2000, the gain was

no longer on Enron's books.[43]

---

[35] 56.1 ¶ 43 [Fastow Dep. 1311:1-1314:10.]

[36] 56.1 ¶ 49 [Share Purchase Agreement, Jun. 29, 2000; Dunbar Report 15; Fastow Dep. 1321:6-1322:18.]

[37] 56.1 ¶ 50 [December 1999 email from Dan Gordon.]  Enron required that Merrill Lynch enter into a confidentiality agreement that precluded Merrill Lynch from disclosing any information regarding the proposed electricity trade transactions.  56.1 ¶ 53; [December 1999 Confidentiality Agreement.]

[38] 56.1 ¶ 64 [Kronthal SEC Tr. 232:7-9; Letter from Enron to Merrill Lynch GC with ISDA agreement attached, Jan. 4, 2000.]

[39] 56.1 ¶ 64 [Confirmation Letters from Enron to Merrill Lynch, Dec. 28, 1999.]

[40] 56.1 ¶ 65 [Letter from Enron to Merrill Lynch GC with ISDA agreement attached, Jan. 4, 2000.]

[41]  56.1 ¶ 66 [Dunbar Report 22.]

[42] 56.1 ¶ 67 [MLCS/EPMI Memorandum Agreement, June 30, 2000; May/June 2000 email exchange concerning the termination of the trades.]

[43] 56.1 ¶ 68 [MLCS/EPMI Memorandum Agreement, June 30, 2000.]

Merrill Lynch set aside $15.2 million in loss reserves.[44]  Merrill Lynch did not have any communications with Arthur Andersen and only confirmed through Enron that Arthur Andersen approved Enron's accounting treatment (although, again, Merrill Lynch did not know what information about the transaction was shared with Arthur Andersen).[45]

### E.    LJM2

LJM2 was a private limited partnership founded in late 1999 by Fastow and Enron employee Michael J. Kopper, with the assistance of Kirkland & Ellis LLP.[46]  The primary source of investment opportunities for LJM2 came from Enron's existing assets.[47]  Merrill Lynch was engaged as private placement agent for LJM2 in the fall of 1999 and helped with its structure.[48]  Merrill Lynch received a fee of approximately $5 million for acting as placement agent.[49]  ML IBK Positions, Inc., a Merrill Lynch affiliate, committed to invest $5 million in LJM2.[50]  Employees of Merrill Lynch invested in LJM2 through ML/LJM2 Co-Investment, L.P.[51]

Plaintiffs allege LJM2 engaged in transactions with Enron that resulted in misstatements by Enron in its financial statements.[52]  It is undisputed, however, that LJM2 was run by Fastow, who acknowledged that Merrill Lynch had no role in the daily operations of LJM2 or in the

---

[44] 56.1 ¶ 69 [Dec. 1999 Reserves Explanations; Emails regarding Enron - IBK Revenue Credit, (Jan. 3, 2000 - Feb. 9, 2000).]

[45] 56.1 ¶ 61 [Letter from Richard Causey to Merrill Lynch Capital Services, Inc., Dec. 30, 1999.]  This was consistent with Merrill Lynch's practice of confirming that accounting was proper in transactions.  [Deposition of Richard Gordon, Sept. 30, 2004 188:13-18.]

[46] 56.1 ¶ 70 [Merrill Lynch/LJM2 Engagement Letter; Memo from Tilney to B. Sullivan and M. McAndrews, Sept. 1999; Certificate of Limited Partnership of LJM2 Capital Management, L. P., October 20, 1999; Deposition of Michael Edsall, Oct. 19-20, 2005, 24:5-25:8, 146:7-19.]

[47] 56.1 ¶ 71 [Memo from Tilney to B. Sullivan and M. McAndrews, Sept. 1999.]

[48] 56.1 ¶ 71 [LJM2 Engagement Letter; Fastow Dep. 354:4-16.]

[49] 56.1 ¶ 72 [Email from Bill Riddle to David Sullivan and others, Apr. 6, 2000.]

[50] 56.1 ¶ 72 [Subscription Agreement, Dec. 1999; LJM2 Appropriation Request, Dec. 1999.]

[51] 56.1 ¶ 73 [Subscription Agreement, Apr. 2000.]  The amount invested by the ███ Merrill Lynch executives was ███████. [Id.; Email from Gerard Haugh to Curt Cariddi, Nov. 2001.]

[52] TAC ¶¶ 200-01.

selection or approval of its transactions or investments.[53]  Nor did Merrill Lynch have an ability

to veto transactions, and, except for the Barge Transaction, Merrill Lynch was never a counter-

party to or involved with any of LJM2's transactions even though many other investment banks

were.[54]  Moreover, Merrill Lynch had no communications with Arthur Andersen or anyone else

about how Enron accounted for its transactions with LJM2.[55]  In this regard, Fastow

acknowledged that it was Enron's obligation, not Merrill Lynch's obligation, to provide Arthur

Andersen with the information to properly record transactions between Enron and LJM2.[56]

## F.    Impact of the Barge Transaction and the Electricity Trades

The impact of the Barge Transaction and the Electricity Trades on Enron's debt, pre-tax

income and cash flow was marginal.[57]  As follows, only $7 million dollars out of Enron's total

$12.87 billion of debt were attributable to Merrill Lynch's transactions.[58]  Of Enron's $3.28

billion in pre-tax income, Merrill Lynch's transactions contributed only $62 million.[59]

---

[53] 56.1 ¶ 74 [Fastow Dep. 1071:7-17, 1340:11-20, 1352:17-25, 1358:20-23; Deposition of David Sullivan, Mar. 2, 2005 30:18-25.]  Fastow was the general partner of LJM2.  56.1 ¶ 74 [Fastow Decl. 14.]

[54] 56.1 ¶ 76 [Fastow Dep. 1336:07-1338:14, 1339:10-1341:1, 1351:16-1359:20, 1364:12-1366:9, 1370:15-1371:03.]

[55] 56.1 ¶ 78 [Fastow Dep. 1336:10-25; Stewart Dep. 1202:13-1204:9.]

[56] 56.1 ¶ 78 [Fastow Dep. 1336:10-1337:19.]

[57] Lewis Decl. Exs. M66, M63 [Solomon Report 133; Dunbar Report 21-24.]

[58] The report of the *Newby* Plaintiffs' expert Saul Solomon furnished the data concerning the number of transactions and the cumulative figures contained in the chart.  Lewis Decl. Exs. M67, M66, M63 [Feb. 22, 2006 Supplement to Solomon Report, Schedules 3-6; Solomon Report 133; Dunbar Report 21-24.]  Plaintiffs' expert Anthony Saunders relied on Solomon's report for adjusted estimates of Enron's debt.  Lewis Decl. Ex. M65 [Report of Anthony Saunders on Insolvency, Jun. 1, 2006 6, 11, 12, 16.]

[59] *Id.*



It is undisputed that Enron realized all profits from the final sale of the barges to a third-party prior to its third quarter 2000 earnings announcement on October 17, 2000, long before the first alleged corrective financial disclosure at the end of October 2001 and Plaintiffs' investment in October 2001.[60]  It is also undisputed that the Electricity Trades were terminated after six months and that any recorded gains were completely reversed from Enron's financial statements by the third quarter of 2000, *i.e.*, more than one year before Plaintiffs' investments.[61]

Merrill Lynch was deeply scrutinized for the Barge Transaction and the Electricity Trades.  Merrill Lynch entered into a settlement with the SEC in 2003 in connection with the transactions in which it agreed to pay $37.5 million in disgorgement, $5 million in interest, and $37.5 million in civil penalties.[62]  In addition, although some former Merrill Lynch employees were convicted in criminal trials based on their participation in the Barge Transaction, those

---

[60] 56.1 ¶ 83 [Dunbar Report 3, 18-22.]
[61] 56.1 ¶ 84 [Dunbar Report 22-27.]
[62] 56.1 ¶ 85 [SEC Press Release, Mar. 17, 2003.]

convictions were vacated by the Fifth Circuit and are to no effect.[63]  Judge Werlein, who

presided over the sentencing before the convictions were vacated, described the Barge

Transaction—which occurred nearly *two years* before Plaintiffs' purchases—as "one discrete

fraud" that "would appear to have been one of the smaller and more benign frauds" at Enron.[64]

### G.    Enron Begins to Unravel in 2001

Plaintiffs themselves allege there were scores of transactions totaling billions of dollars

after Merrill Lynch's involvement with Enron.[65]  By the summer of 2001, rumors began to swirl

about Enron and questions started to emerge regarding Enron's accounting.[66]  These rumors

gained momentum when Skilling resigned on August 14, 2001.[67]  Also in August, Enron's

broadband division reported a $217 million loss, and Enron's share price significantly dropped.[68]

In the late summer and fall of 2001, there were a series of additional negative financial

disclosures about or by Enron.  For example, newspapers published articles challenging Enron

profits.[69]  In an earnings release on October 16, 2001, Enron announced that it was taking "after-

tax non-recurring charges of $1.01 billion" that resulted in a net loss for the quarter of $618

million.[70]  Enron also recorded a $1.2 billion reduction in shareholders' equity as of the end of

the third quarter.[71]  Moody's placed Enron's credit rating on downgrade watch.[72]  Moody's

announcement indicated that there was "a risk of default greater than the one reflected in"

---

[63] 56.1 ¶ 86; *United States v. Brown*, 459 F.3d 509, 531 (5th Cir. 2006).

[64] 56.1 ¶ 87 [*United States v. Bayly*, Revised Sentencing Tr. at 62-63 (S.D. Tex. 2005) ("*Bayly* Tr.").]  The only conviction that was not reversed related to an obstruction of justice and perjury charge, not to any transactions.  *Id.*

[65] TAC ¶¶ 218-19, 242, 245, 247, 254, 259, 261, 421, 571, 604-606, 619, 638.

[66] 56.1 ¶ 90 [citing various news articles from Spring-Fall 2001.]

[67] 56.1 ¶ 90 [citing August 2001 news coverage discussing Skilling's resignation.]

[68] 56.1 ¶ 91 [Enron Earnings Release, 3d Q. 2001; Bear Stearns Oil and Gas Energy Group, Nov. 2001.]

[69] 56.1 ¶ 94 [N.Y. Times, Sept. 9, 2001.]

[70] 56.1 ¶ 95 [Enron Corp. Press Release, Oct. 16, 2001.]

[71] 56.1 ¶ 96 [Enron Corporation Third Quarter Earnings Release Conference Call, Oct. 16 2001.]

[72] 56.1 ¶ 96 [Moody's Release, Oct. 16, 2001.]

13

Enron's rating.[73]  On October 22, 2001, Enron confirmed that the SEC had commenced an

informal inquiry into its accounting for related party transactions.[74]  On October 24, 2001, Enron

announced Fastow was taking a leave of absence.[75]

### H.    Plaintiffs' Investments in October of 2001

During and following this stream of negative, bordering on scandalous news, Plaintiffs

decided to purchase "over $100 million" of Exchangeables and Zeroes.[76]  Plaintiffs' purchases

were consistent with their sophisticated "vulture fund" strategy of pursuing distressed assets.[77]

Thinking that the only risk was an Enron bankruptcy and that this risk was remote, Plaintiffs

invested in the Notes to take advantage of the continuing price decline of Enron securities.[78]

There is *no evidence* that suggests that anyone from Merrill Lynch communicated with Plaintiffs

about these purchases.  Merrill Lynch was not among the financial institutions identified as

having communicated with Plaintiffs about the Notes at the time of the purchases at issue.[79]

### 1.    The Exchangeables

Plaintiffs first purchased Exchangeables in October 2000.[80]  Merrill Lynch was not

---

[73]  Lewis Decl. Ex. M62 [Expert Report of Tsvetan Beloreshki, Jul. 17, 2006 ("Beloreshki Report") ¶ 49.]

[74]  56.1 ¶ 97 [N.Y. TIMES, Nov. 1, 2001.]

[75]  56.1 ¶ 99 [Enron Corp. Press Release, Oct. 24, 2001; Deposition of Louise Morwick, Sept. 19-20, 2005, Jun. 21, 2006 ("Morwick Dep.") 365:16-366:2.]

[76]  56.1 ¶ 101 [Silvercreek Trading History; Beloreshki Report, 2, 10-11.]  SMI managed investments for SLP, S2L, Pebble and OIP, whose total assets at that time were valued at approximately $350 million.  56.1 ¶ 102 [Morwick Dep. 89:2-90:2, 121:21-122:3.]  SMI invests primarily in convertible securities, including outright long convertible bonds and fully hedged convertible bonds.  56.1 ¶ 102 [Declaration of Louise Morwick, Apr. 17, 2002 ("Morwick Decl.") ¶ 2; Morwick Dep. 149:9-149:21.]

[77]  56.1 ¶ 102 [Deposition of Eric Hage, Nov. 15, 2005, 104:4-105:8, 118:22-121:7.]

[78]  56.1 ¶ 103 [Morwick Dep. 324:19-22, 664:25-665:23, 680:22-23, 883:22-884:1; Expert Report of Suresh Sundaresan, Jul. 17, 2006, 8-11.]

[79]  56.1 ¶¶ 110-12, 127 [Morwick Dep. 391:2-394:2; 395:5-398:5, 455:3-8, 459:18-460:2.]

[80]  The Exchangeables were exchangeable into common stock shares of EOG Resources, Inc. at maturity on July 31, 2002.  They were issued as general senior unsecured obligations of Enron on August 10, 1999.  The prospectus contained Enron's financial information from 1994 through March 31, 1999, and included the audit opinion for Enron's 1998 annual financial statements.  56.1 ¶ 105 [Silvercreek Trading History; Prospectus for the Exchangeables, Ex. 23.01.]

involved in the underwriting or sale of the securities.[81]   The offering materials did not include

any financial statement reflecting Merrill Lynch's transactions with Enron at the end of 1999 or

early 2000.[82]   Plaintiffs began selling this position on August 20, 2001, following Skilling's

resignation.[83]   While Plaintiffs expected a 21% investment return if they held through maturity,

they obtained a 38% return in half the expected time.[84]

Plaintiffs continued to sell the Exchangeables through September and October as the bad

news about Enron continued, and, on October 23, 2001, Plaintiffs sold the remainder of their

position.[85]   However, the next day Louise Morwick, President of Silvercreek Management, Inc.

("SMI"), had a change of heart "and pulled . . . the [Enron] file . . . to just revisit some of the

terms" and "sort of reviewed the prospectus . . . just to make sure that it was fresh in our mind"

because the price had dropped such that she was considering additional purchases.[86]

Morwick testified that she believed the sole risk associated with the investment was an

Enron bankruptcy,[87] but she failed to analyze any market indicators of bankruptcy risk in

October 2001.[88]   Plaintiffs continued to purchase the Exchangeables on October 25.[89]   Around

10 a.m., Robert Kittel, who worked with Morwick, received a message from a broker at First

Union asking to discuss the Exchangeables because people were "nervous" and it "could be a

confusing situation if this gets to meltdown stage."[90]   This talk of a possible Enron meltdown did

---

[81] 56.1 ¶ 106 [Bloomberg Terminal Descriptions.]

[82] 56.1 ¶ 106 [TAC ¶¶ 134-36.]

[83] 56.1 ¶ 107 [Morwick Dep. 314:22-25, 318:5-18; Silvercreek Trading History.]

[84] 56.1 ¶ 107 [Morwick Dep. 322:13-22.]

[85] 56.1 ¶¶ 108-9 [Silvercreek Trading History; Morwick Dep. 323:3-325:1, 333:2-25, 334:5-25.]

[86] 56.1 ¶ 113 [Morwick Dep. 402:22-403:2; 397:21-398:5 ("I recall [] hearing people use those words. 'This
company is too big to fail.'").]

[87] 56.1 ¶ 114 [Morwick Dep. 884:22-886:2; Morwick Decl. ¶ 34.]

[88] 56.1 ¶ 114 [Morwick Dep. 804:17-810:10.]

[89] 56.1 ¶ 116 [Silvercreek Trading History.]

[90] 56.1 ¶ 116 [Bloomberg Chat between Robert Kittel and Broker, Oct. 25, 2001.]

not dissuade Morwick, who made additional purchases on October 26.[91]  By that afternoon,

Morwick started to sell.[92]  When asked about the change, Morwick explained:

> It was a combination of information.  It was what was happening in the market,
> which, you know, did not make sense.  Clearly somebody thought there was a
> problem.  The people were just selling in they . . . if you look at the financials of
> the company, someone was selling in a fashion that was irrational.  So just it
> makes you nervous that somebody knows something that you potentially don't
> know.
>
> *       *       *
>
> Come [October 26], the market is continuing to go down.  I mean, it's not
> rational.  The market is telling you something might be going on—going wrong.[93]

Morwick did not, however, employ any hedges to mitigate losses besides selling the

Exchangeables, and Plaintiffs did not liquidate their entire position until November 2003.[94]

## 2.      The Zeroes

Plaintiffs' other investment in Enron debt securities was in the Zeroes, which were due to

mature on February 7, 2021, and provided the noteholder with an option to convert the note into

Enron common stock.[95]  The Zeroes had been issued in a private placement.[96]  A public

exchange offering of the Zeroes occurred in July 2001, well after any financial impact of the

Barge Transaction and the Electricity Trades had been eliminated from Enron's financial

statements.[97]  Merrill Lynch was not involved in the private placement or exchange.

Plaintiffs first evaluated but passed on the Zeroes prior to October 2001.  Although

Plaintiffs knew the decline in the price of Enron stock was attributable to, *inter alia*, the negative

company-specific news in October 2001, Plaintiffs did no additional diligence before starting to

---

[91] 56.1 ¶ 117 [Silvercreek Trading History.]
[92] 56.1 ¶ 118 [Morwick Dep. 407:6-18, 421:25-422:17.]
[93] 56.1 ¶ 118 [Morwick Dep. 407:6-408:24.]
[94] 56.1 ¶¶ 118, 121 [Silvercreek Trading History; Morwick Dep. 141:5-12, 407:6-18, 421:25-422:17.]
[95] 56.1 ¶ 123 [Prospectus for Zeros.]
[96] 56.1 ¶ 123 [TAC ¶ 143.]
[97] 56.1 ¶ 124 [TAC ¶ 150; Dunbar Report 18-22.]

buy the Zeroes again.[98]  Plaintiffs continued to purchase the Zeroes through October 31, 2001.[99]

In other words, Plaintiffs continued to purchase the Zeroes even *after* deciding to stop

purchasing the Exchangeables because the market was making Morwick "nervous" that

something "might be going on—going wrong."  *See supra* H.1.  On the afternoon of October 31,

Plaintiffs began selling the Zeroes and liquidated their position by January 2002.[100]

### 3.  Plaintiffs Interactions with Merrill Lynch

While Merrill Lynch performed occasional brokerage services for Plaintiffs at Plaintiffs'

sole discretion,[101] there is no evidence that Merrill Lynch made any recommendations to

Plaintiffs to invest in the Notes in October 2001 or later, or that Plaintiffs considered any specific

advice from Merrill Lynch in connection with those investments.  Moreover, although Plaintiffs

claim that Merrill Lynch provided Plaintiffs with Enron "models," no evidence indicates *when,*

*how, or who* at Merrill Lynch provided Plaintiffs with a model.  Nor have Plaintiffs produced

copies of the model.  And while Kittel testified that he conducted a valuation after Plaintiffs had

started selling the Exchangeables again and recalled speaking with someone at Enron around that

time and looking at information from another financial institution, he could "not recall" whether

he used information from Merrill Lynch and acknowledged having other information

available.[102]

---

[98] 56.1 ¶ 132 [Morwick Dep. 465:4-25; Beloreshki Report 11-18.]

[99] 56.1 ¶ 133 [Silvercreek Trading History.]

[100] 56.1 ¶¶ 134, 136 [*Id.*]

[101] 56.1 ¶ 137 [Plaintiffs' Responses and Objections to Bank Defendants' Joint First Set of Interrogatories, 47, Dec. 22, 2004; Merrill Lynch Trade Confirmations, Nov. 30, 2001 and Jul. 31, 2002; Prime Brokerage Clearance Services Agreement, Apr. 25, 2001.]

[102] 56.1 ¶ 141 [Deposition of Robert Kittel, Oct. 20, 2005 ("Kittel Dep.") 295:6-296:7, 304:3-306:12, 307:19-308:21, 344:7-25.]  Even assuming for argument's sake that Plaintiffs based their valuation on Merrill Lynch's models, however, Kittel prepared his valuation over the weekend of Oct. 27, 2001, days after Plaintiffs completed purchasing the Exchangeables, *i.e.*, when the market was already telling Plaintiffs something was "going on—going wrong," and only a few days before Plaintiffs stopped purchasing the Zeroes.  *Id.* [Kittel Dep. 306:8-12.]

## I.      Enron's Bankruptcy

On November 8, 2001, Enron announced its intention to restate its financial statements

for 1997 through 2000 and the first and second quarters of 2001 to reduce previously reported

net income by an aggregate of $586 million.[103]   On November 19, 2001, senior Enron executives

met with certain of Enron's bankers to restore creditor confidence, relieve its liquidity crisis, and

discuss a proposed merger with Dynegy, Inc.[104]   Enron informed its bankers that Enron's actual

"debt" was multiples of its reported debt of $12.978 billion.[105]   The Barge Transaction was not

disclosed until April 9, 2002, when Enron was already in bankruptcy and its stock was trading at

$0.29 per share.[106]   The Electricity Trades were not disclosed until August 9, 2002, when

Enron's stock was trading at $0.16 per share.[107]

## ARGUMENT

"Summary judgment is appropriate when 'there is no genuine dispute as to any material

fact and [that] the movant is entitled to judgment as a matter of law.'"   *LBBW Luxemburg S.A. v.*

*Wells Fargo Sec. LLC*, 2017 WL 1194681, at *6 (S.D.N.Y. Mar. 30, 2017) (Oetken, J.) (quoting

Fed. R. Civ. P. 56(a)).   Once the movant has demonstrated there is no genuine issue as to a

material fact, the opposing party "must do more than simply show that there is some

metaphysical doubt as to the material facts . . . .   [T]he nonmoving party must come forward with

specific facts showing that there is a *genuine issue for trial*."   *Caldarola v. Calabrese*, 298 F.3d

156, 160 (2d Cir. 2002) (citation and quotation marks omitted).   "[C]onclusory statements,

conjecture, and inadmissible evidence are insufficient to defeat summary judgment."   *ITC Ltd. v.*

*Punchgini, Inc.*, 482 F.3d 135, 151 (2d Cir. 2007).

---

[103] 56.1 ¶ 154 [Enron Corp. Press Release, Nov. 8, 2001.]
[104] 56.1 ¶ 155 [Enron Corp. Bank Presentation, Nov. 19, 2001.]
[105] 56.1 ¶ 155 [*Id.*]
[106] 56.1 ¶ 157 [WALL ST. J., Apr. 9, 2002; Dunbar Report 22.]
[107] 56.1 ¶ 158 [Dunbar Report 27.]

I.    **PLAINTIFFS HAVE NOT ADDUCED SUFFICIENT EVIDENCE TO ESTABLISH PROXIMATE CAUSE FOR ANY OF THEIR CLAIMS**

Every claim Plaintiffs assert requires them to prove that Merrill Lynch proximately caused their alleged losses.  *See Laub v. Faessel*, 297 A.D.2d 28, 30-31 (1st Dep't 2002) (negligent misrepresentation); *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir. 1985) (aiding and abetting); *Filler v. Hanvitt Bank*, 247 F. Supp. 2d 425, 431 (S.D.N.Y. 2003) (conspiracy), *vacated on other grounds*, 2003 WL 21729978 (S.D.N.Y. July 25, 2003); *In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 578 (S.D.N.Y. 2007) (same).

The purpose of the proximate cause requirement is "'to fix a legal limit on a person's responsibility, even for wrongful acts.'"  *SPV OSUS Ltd. v. AIA LLC*, 2016 WL 3039192, at *7 (S.D.N.Y. May 26, 2016) (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994)).  "[C]entral to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were a substantial factor in the sequence of responsible causation."  *Id*. (citation and internal quotation marks omitted).  Plaintiffs must therefore prove both the fact and amount of damages caused by each defendant's alleged wrongdoing.  *WM High Yield Fund v. O'Hanlon*, 2013 WL 3230667 (E.D. Pa. June 27, 2013) (summary judgment granted because plaintiffs failed to submit causation evidence for specific defendant); *see also Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 345 (S.D.N.Y. 2013) (summary judgment granted because plaintiffs unable to prove amount of damages traceable to disclosure of allegedly withheld information).

A.    **Plaintiffs Failed to Develop Evidence to Attribute Losses to Merrill Lynch**

Plaintiffs proffer two experts at least nominally addressing the issue of causation. Plaintiffs' damages expert, Gilbert E. Matthews, conceded he is not offering any opinion on

which portion of Plaintiffs' claimed losses was caused by a particular defendant, including

Merrill Lynch, or on the cause of Enron's bankruptcy.[108]  Meanwhile, Plaintiffs' expert Anthony

Saunders, conceded he was not parsing what alleged losses were caused by Merrill Lynch.[109]

There is an obvious explanation for Plaintiffs' failure to have its experts focus on losses

proximately caused by Merrill Lynch's alleged conduct:  they could not prove proximate

causation against Merrill Lynch.  But it is Plaintiffs' burden and that ends their speculative case.

*First*, as discussed above, it is undisputed that there is a nearly two year gap between

Plaintiffs' investment in the Notes and the Barge Transaction, the Electricity Trades and Merrill

Lynch's involvement in LJM2 in any capacity other than as a passive investor.  *See supra*

Sections D & H.  It is also undisputed that any effect the Barge Transaction and the Electricity

Trades had was eliminated entirely from Enron's financial statements no later than one year

before Plaintiffs' investments in the Notes.  *See supra* Section F.  This undisputed temporal gap

by itself defeats any attempt to prove that Merrill Lynch's transactions with Enron were a

proximate cause of any of Plaintiffs' losses.  *See, e.g.*, *Ritchie Capital Mgmt., L.L.C. v. GE

Corp.*, 121 F. Supp. 3d 321, 339 (S.D.N.Y. 2015) (proximate causation not alleged given gap

between defendants' actions that allegedly aided and abetted fraud and plaintiffs' decision to

invest more than eight years later).

The undisputed nearly two year temporal gap also defeats any attempt to prove proximate

cause as to Merrill Lynch to the extent Plaintiffs seek to argue their losses were caused by

Enron's collapse.  This is because there were myriad, intervening transactions by Enron,

including many in 2000 and 2001, that Plaintiffs themselves concede were a substantial factor in

---

[108] Lewis Decl. Ex. M10 [Deposition of Gilbert Matthews, Oct. 24-25, 2006 ("Matthews Dep.") 103:2-105:25, 249:17-251:16], Ex. M11 [Matthews Dep. 372:12-374:16.]

[109] Lewis Decl. Ex. M18 [Deposition of Anthony Saunders, Sept. 20, 2006, 289:3-7, 307:22-309:21.]

the sequence of causation.[110]  *See, e.g., First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d

763, 769 (2d Cir. 1994) ("[W]hen factors other than the defendant's fraud are an intervening

direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of

the defendant's actions."); *Unterberg Harris Private Equity Partners, L.P. v. Xerox Corp.*, 995

F. Supp. 437, 441 (S.D.N.Y. 1998) ("[L]oss causation cannot be found if an intervening cause

was responsible for the plaintiff's economic loss . . . ."); *Hayden v. Paul, Weiss, Rifkind,*

*Wharton & Garrison*, 955 F. Supp. 248, 258 (S.D.N.Y. 1997) ("no rational jury could conclude

that [defendant's] alleged misrepresentation proximately caused the damage suffered by

plaintiffs").  Indeed, the Fifth Circuit's opinion vacating the convictions of former Merrill Lynch

employees observed that there is "no substantiated support" for a "causal connection" between

the Barge Transaction and "Enron's unraveling."  *Brown*, 459 F.3d at 520 n.8.  Any other

attempted "theory of harm that connects the ultimate demise of Enron to" Merrill Lynch here

would be equally "unprincipled."  *Id*. at 535 (DeMoss, J., concurring).

   *Second*, there is no evidence that Enron's security prices were affected at all by the

earnings announcement at the end of the fourth quarter of 1999 that included the Barge

Transaction and the Electricity Trades.  *See supra* Section F.  Nor is there evidence that analyst

reports from Merrill Lynch rather than information from Enron or other analysts or sources

published at the same time affected the price for Enron securities.  *See supra* Section C.  Indeed,

it is undisputed that Merrill Lynch's dissemination of equity analyst reports typically lagged

other banks' coverage of Enron.  *Id.*  In the absence of such evidence, Plaintiffs cannot sustain

their burden of proof with respect to proximate cause as to Merrill Lynch.  *In re Omnicom Grp.,*

*Inc. Sec. Litig.*, 541 F. Supp.2d 546, 554 (S.D.N.Y. 2008) (granting summary judgment on issue

---

[110] TAC ¶¶ 218-19, 242, 245, 247, 254, 259, 261, 421, 571, 604-06, 619, 638 (detailing billions of dollars'
worth of complex transactions); Lewis Decl. Ex. M64 [Expert Report of Anthony Saunders on Role of Banks, Jun.
1, 2006, 24-28, 35-37, 47-48, 56-63 (same).]

of causation where plaintiff failed to isolate impact of defendant's alleged misstatements).

*Third*, it is undisputed that Enron's collapse *preceded* disclosure of the Barge Transaction and the Electricity Trades.  *See supra* Section I.  Plaintiffs therefore cannot prove proximate cause as to Merrill Lynch because, as a matter of basic misrepresentation law, a corrective disclosure must *precede* a stock drop in order for proximate cause to be found.  *Prime Mover Capital Partners, L.P. v. Elixir Gaming Techs., Inc.*, 793 F. Supp. 2d 651, 664 (S.D.N.Y. 2011) (proximate cause not shown when "the truth allegedly concealed by those misrepresentations did not become public until after . . . share price had already dropped to the lowest level alleged in the complaint").  Judge Werlein, who presided over the criminal trial, for this reason and others, found that no investor losses could be attributed to the Barge Transaction because it was not revealed until after Enron's stock had completely collapsed "*due to other disclosures and events.*"[111]  That reasoning applies equally to the other limited aspects of Merrill Lynch's involvement with Enron, which were not disclosed until after Enron's bankruptcy, *see supra* Section I.

### B.     Plaintiffs Cannot Rely on So-Called "Scheme" Theories

Plaintiffs' gambit in not developing any evidence to identify losses attributable to Merrill Lynch's conduct appears to be based on their mistaken belief that they can hold Merrill Lynch liable for all consequences flowing from Enron's demise based solely on transactions that occurred years before Enron's collapse.  Courts reject attempts to prove proximate cause based on theories that "but for" a defendant's conduct, the alleged fraud would have stopped or a plaintiff never would have invested.  *See In re Lehman Bros. Sec. & ERISA Litig.*, 2015 WL 5294759, at *4 (S.D.N.Y. Sept. 10, 2015) (framing one's case in terms of fraudulent inducement impermissibly conflates loss causation with transaction causation) (quotation marks omitted).

---

[111] Lewis Decl. Ex. M21 [*Bayly* Tr. 16:14-17:1 (emphasis added).]

Courts also hold that loss causation must be traced to each defendant's conduct, even in the context of allegedly broad, multi-defendant schemes. *See, e.g.*, *Bloor*, 754 F.2d at 61 ("Even where a 10(b) claim is based not on specific misrepresentations or omissions, but rather on a 'comprehensive scheme to defraud,' the plaintiff must still demonstrate causation in fact by showing that defendant's allegedly fraudulent activities were actually responsible for plaintiff's injuries."); *Baxter v. A.R. Baron & Co.*, 1995 WL 600720, at *6 (S.D.N.Y. Oct. 12, 1995).[112]

Two prime examples are *Miller v. Schweickart*, 413 F. Supp. 1062 (S.D.N.Y. 1976) and *WM High Yield Fund v. O'Hanlon*, 2013 WL 3230667 (E.D. Pa. June 27, 2013). In *Miller*, the limited partners of a broker-dealer (Schweickart) brought suit against Skelly Oil based on Skelly Oil's "parking" transactions with that broker-dealer in 1971 and 1972. The broker-dealer had participated in similar "parking" transactions with other entities in 1973 and 1974 and ultimately collapsed in July 1974, after the market moved against the firm's position arising from the subsequent transactions. Granting summary judgment to Skelly Oil, Judge Weinfeld held that, even where the defendant allegedly helped a company illegally "park" securities and thereby participated in a scheme that concealed that the company was overextended, it could not be liable for losses incurred when the company collapsed two years later as a result of subsequent "parks" with others:

> Even if it be assumed that Skelly knowingly aided and abetted the fraudulent conduct of the Schweickart general partners during the period of their transactions in 1971 through early 1972, such participation, as a matter of law, was not a proximate cause of Schweickart's collapse in July 1974.
>
> \*      \*      \*
>
> To accept plaintiffs' theory would extend liability for fraud beyond the immediate

---

[112] Although these decisions address "loss causation" in the context of claims asserted under Section 10(b) of the Exchange Act of 1934, courts have held repeatedly that they are analogous to the common law claims asserted in this case. *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007) (explaining that loss causation is "closely related to the common law doctrine of proximate cause"); *Laub*, 297 A.D.2d at 31 ("'Loss causation is the fundamental core of the common-law concept of proximate cause . . . .'").

and foreseeable consequences of one's wrongdoing and in effect make Skelly the permanent accomplice of the Schweickart general partners in all their subsequent parking transactions with others; it would subject Skelly to strict liability for any future depredations by those general partners long after Skelly had ceased to have any dealings with Schweickart, even for deeds done with others years later, of which Skelly had no knowledge. ***This is causation run riot***. As Judge Friendly observed in a different context, "(s)omewhere a point will be reached when courts will agree that the link has become too tenuous." That point has been reached in this case.

*Miller*, 413 F. Supp. at 1067-68 (citation omitted) (emphasis added).

In *WM High Yield Fund*, investors sued accounting firm Deloitte & Touche for losses from their investment in debt securities after a company went bankrupt for which Deloitte had certified its financials. The court granted summary judgment in favor of Deloitte because "it [could not] be shown what portion of the [debt's] price decline might be related or unrelated to the fraud allegedly committed by numerous Defendants other than Deloitte." 2013 WL 3230667, at *12; *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173-75 (2d Cir. 2005).

Drawing on these very concepts, Judge Werlein, who presided over the later-vacated sentencing of former Merrill Lynch employees, observed that the "federal securities laws and the common law of fraud" require proof of specific losses that can be attributed to a particular defendant.[113] Criticizing the government for submitting a report from Saunders, the same expert Plaintiffs rely on here, that instead attempted to attribute all losses following Enron's quarterly results at the end of 1999 to Merrill Lynch, Judge Werlein held that the government had failed to submit the required evidence regarding losses attributable to Merrill Lynch or evidence of what other misrepresentations by Enron also would have affected the prices of Enron securities and by how much, and that this left him with a record from which it was impossible to make a "reasonable estimate of the loss" attributable to Merrill Lynch.[114] The record here is equally

---

[113] *See* Lewis Decl. Ex. M21 [*Bayly* Tr. 16:2-17:3.]
[114] *Id.* [*Bayly* Tr. 20:9-20.]

deficient and requires summary judgment.

## II.     PLAINTIFFS HAVE NOT ADDUCED SUFFICIENT EVIDENCE TO ESTABLISH NEGLIGENT MISREPRESENTATION (COUNT 5)

For their negligent misrepresentation claim, Plaintiffs must prove (1) a special or privity-like relationship imposing a duty on Merrill Lynch to impart correct information to Plaintiffs, *i.e.*, the so-called "special relationship" requirement, (2) that the information conveyed by Merrill Lynch was incorrect, and (3) actual and reasonable reliance.  *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 452 (S.D.N.Y. 2017) ("2017 Order").  The undisputed discovery record establishes that Plaintiffs cannot prevail on these claims.

### A.     Merrill Lynch Did Not Owe Plaintiffs a Duty or Have a Special Relationship with Plaintiffs

In denying the motion to dismiss, this Court held the existence of a special relationship posed a factual issue because Plaintiffs had alleged a "long standing relationship" such that Merrill Lynch might have been aware that information it was providing would be relied on by Plaintiffs.  *Silvercreek*, 248 F. Supp. 3d at 453-54.

Discovery has confirmed, however, that there is no support for Plaintiffs' claim of a long-standing relationship with Merrill Lynch.[115]  At most, the record shows a "nondiscretionary broker-customer relationship."  *See supra* Section H.3.  Indeed, Plaintiffs in their interrogatory responses identify themselves only as a "client" of Merrill Lynch without providing any detail to substantiate their allegation of a "long standing relationship."[116]  As a matter of controlling Second Circuit law, this sort of "client" relationship with Merrill Lynch, even if long-standing, does not create the type of relationship required for a negligent misrepresentation claim.  *See de*

---

[115] As a matter of settled law, Merrill Lynch's publication of analyst reports alone, disseminated to a wide audience, is insufficient to create a special relationship between Merrill Lynch and Plaintiffs.  *See In re JWP Inc. Sec. Litig.*, 928 F. Supp. 1239, 1254 (S.D.N.Y. 1996), *as clarified* (S.D.N.Y. June 12, 1996).

[116]  *See* Lewis Decl. Ex. M61 [Plaintiffs' Responses and Objections to Bank Defendants' Joint First Set of Interrogatories, 47 (Dec. 22, 2004)]; TAC ¶ 792.

*Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1302 (2d Cir. 2002) ("[A] broker ordinarily has no duty to monitor a nondiscretionary account, or to give advice to such a customer on an ongoing basis.  The broker's duties ordinarily end after each transaction is done, and thus do not include a duty to offer unsolicited information, advice, or warnings concerning the customer's investments. . . .  The client may enjoy the broker's advice and recommendations with respect to a given trade, but has no legal claim on the broker's ongoing attention.").

Because there is no basis in the record to allege a "special relationship," summary judgment on Plaintiffs' negligent misrepresentation claim is proper.  *Crigger v. Fahnestock & Co.*, 2003 WL 22170607, at *10 (S.D.N.Y. Sept. 18, 2003); *St. Paul Fire & Marine Ins. Co. v. Heath Fielding Ins. Broking Ltd.*, 976 F. Supp. 198, 204 (S.D.N.Y. 1996) (summary judgment granted "where no triable issue of fact as to the 'special relationship' element exists"); *Congress Fin. Corp. v. John Morrell & Co.*, 790 F. Supp. 459, 475 (S.D.N.Y. 1992) (same).

### B.     Merrill Lynch Did Not Negligently Misstate or Omit Information

The negligent misrepresentation claim also fails because there is no evidence Merrill Lynch acted negligently in connection with recommendations to buy Enron securities.

*First*, as discussed above, no evidence indicates that Merrill Lynch brokers made any recommendations or affirmative statements at all with respect to Plaintiffs' decision to purchase the Notes in October 2001.  *See supra* Section C.  To the extent Merrill Lynch had obligations to Plaintiffs in connection with previous transactions, those obligations ended when those transactions were completed, and there accordingly was no information that Merrill Lynch provided in connection with the Notes purchases as to which it could have been negligent.

*Second*, Plaintiffs have adduced no evidence that the individuals at Merrill Lynch who allegedly had some sort of relationship with Plaintiffs and might have made recommendations with respect to Enron securities would have been in any position to know Enron's allegedly true

financial condition and as a result could have been negligent when providing information to

Plaintiffs.  For example, although Plaintiffs' expert Matthews opined in a general way that

information regarding Enron's off-balance sheet debt financing was "known or knowable" to

investment banks, he failed to explain how an analyst or broker at an investment bank would

have been in a position to know that information, particularly one at Merrill Lynch, a Tier 3 bank

with limited and declining business with Enron, *see supra* Section B.[117]  In fact, Matthews

conceded during his deposition that analysts at Merrill Lynch had no such knowledge:

> Q:  And you have no basis to believe that the analysts, the Merrill Lynch analysts
> themselves, were in possession of information contrary to that expressed in their
> analyst reports?
>
> A:  Right.  They were dealing with the same—you know, the same information
> that Ms. Morwick was dealing with.  They were dealing with, as far as I could
> tell, with public information on which they relied.[118]

Moreover, to the extent Plaintiffs' negligent misrepresentation claim is predicated on a

theory that analyst reports published by Merrill Lynch aided and abetted Enron's fraud, the

contention that these analysts had actual knowledge of Enron's fraud because Merrill Lynch

"functioned as a unified entity without an effective Chinese wall," TAC ¶ 698, is unsupported by

the record.  Nothing indicates that Merrill Lynch analysts or employees breached information

barriers to gain knowledge of Enron's true financial state from walled-off internal sources.

Instead, the undisputed testimony of both Merrill Lynch analysts is that they carefully analyzed

Enron and came to their own independent conclusions.  *See supra* Section C.

*Third*, nothing in the record indicates that the opinions published by analysts—or the

unspecified recommendations by brokers, assuming there were any, but *see supra* Section H.3—

were incomplete statements of the opinions or that the individuals making them did not

---

[117] Lewis Decl. Ex. M76 [Expert Report of Gilbert Matthews, Jun. 1, 2006, 5.]

[118] Lewis Decl. Ex. M11 [Matthews Dep. 374:7-14.]

genuinely believe they were accurate.  In the absence of such evidence, the analyst reports

amount to genuinely held statements of opinion that are not actionable as negligent

misrepresentations.  *See, e.g.*, *Sheth v. New York Life Ins. Co.,* 273 A.D.2d 72, 74 (1st Dep't

2000) ("The purported misrepresentations relied upon by plaintiffs may not form the basis of a

claim for fraudulent and/or negligent misrepresentation since they are conclusory and/or

constitute mere puffery, opinions of value or future expectations."); *In re Bear Stearns Mortg.*

*Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 770-71 (S.D.N.Y. 2012) (ratings

actionable if speaker does not believe statements or knowingly omits facts that "seriously . . .

undermine the accuracy of the statement").

### C.     Plaintiffs Cannot Establish They Directly or Reasonably Relied on Any Purported Misstatements or Omissions by Merrill Lynch

Plaintiffs' negligent misrepresentation claim also fails because Plaintiffs cannot prove

direct or reasonable reliance on an alleged misstatement or omission by Merrill Lynch.

#### 1.     Plaintiffs Cannot Establish Direct Reliance

"[U]nder New York law a cause of action for negligent misrepresentation can be

maintained only when the plaintiff *himself or herself* relies on statements made by the

*defendant*."  *King v. Crossland Sav. Bank*, 111 F.3d 251, 258 (2d Cir. 1997).

Here, as noted, Plaintiffs failed to adduce evidence showing that they directly relied on

any statement or representation attributable to Merrill Lynch.  As discussed above, Merrill Lynch

was not among the institutions that Morwick, the person responsible for the decision to buy the

Notes, testified that she communicated with prior to purchasing the Notes, and that she at most

pulled out the prospectus and read it quickly before starting to invest.  *See supra* Section H.1.

Moreover, over multiple days of testimony, Plaintiffs' employee witnesses failed to mention

reading, let alone relying on, a broker recommendation or analyst report provided by Merrill

Lynch.  No document produced in this litigation reflects that Plaintiffs considered any statements

attributable to Merrill Lynch before investing in the Notes.  *See supra* Section H.3.

Accordingly, there is no evidence that Plaintiffs directly relied on information from

Merrill Lynch.  *See King*, 111 F.3d at 259 ("Negligent misrepresentation requires that the

plaintiff rely on a statement made by the defendant, and . . . this simply did not occur."); *Sita v.

Danek Med., Inc.*, 43 F. Supp. 2d 245, 260 (E.D.N.Y. 1999) (granting summary judgment

because plaintiff could not prove reliance on alleged misrepresentation); *Multi Commc'n Media

Inc. v. AT&T Corp.*, 1997 WL 188938, at *10 (S.D.N.Y. Apr. 18, 1997); *Lawrence v. Sofamor,

S.N.C.*, 1999 WL 592689, at *5 (N.D.N.Y. Aug. 2, 1999).

## 2.   Plaintiffs Cannot Establish Reasonable Reliance

Even assuming that Plaintiffs could establish that they actually relied on a statement

attributable to Merrill Lynch, summary judgment is still appropriate because Plaintiffs cannot

demonstrate that any such reliance would have been reasonable.  In assessing whether reliance is

reasonable, New York courts consider "the entire context of the transaction . . . including factors

such as its complexity and magnitude" and "sophistication of the parties."  *Matsumura v.

Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 257 (S.D.N.Y. 2008) (quotation marks omitted).

"Sophisticated business entities are held to a higher standard" and have a duty to protect

themselves from alleged misrepresentations by investigating the details of their transactions.  *JP

Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004); *Glob. Mins. &

Metals Corp. v. Holme*, 35 A.D.3d 93, 100 (1st Dep't 2006).

Plaintiffs are sophisticated "vulture funds" that invest in distressed debt and had the

means of assessing debt securities such as the Notes.  *See supra* Section H.  A cursory review of

the timeline surrounding Plaintiffs' investment demonstrates that they conducted essentially no

investigation while ignoring numerous red-flags.



 Even Plaintiffs' expert conceded that the negative information released into the market prior to

Plaintiffs' investment "certainly mean[t] that [Plaintiffs] should do additional research and due

diligence and find out what other people are thinking" about Enron, and that it would have been

unreasonable to rely on old analyst reports.[119]   And Plaintiffs' expert agreed at least that pricing

on credit default swaps was relevant to evaluating Enron's risk of default and that the tripling of

the price during the period Plaintiffs purchased the Notes "raise[d] questions."[120]

        Meanwhile, the analyst reports published by Merrill Lynch in the period immediately

leading up to and then through the period of Plaintiffs' purchases contained multiple caveats and

limitations, including in particular, noting "uncertainties" regarding Enron's balance sheet and

the lack of access to non-public information about LJM (an entity different from LJM2 and in

---

[119] Lewis Decl. Ex. M10 [Matthews Dep. 238:24-239:18.]
[120] Lewis Decl. Ex. M10 [Matthews Dep. 210:3-6.]

which Merrill Lynch had no involvement).[121]   Another later report also noted Enron's high

number of "off-balance [sheet]" financing transactions and indicated this made it "more

difficult" to evaluate the company.[122]   The warning signs and the caveats in the analyst reports

by themselves negate any claim of reasonable reliance.   *See M & T Bank Corp. v. LaSalle Bank*

*Nat'l Ass'n,* 852 F. Supp. 2d 324, 339 (W.D.N.Y. 2012) ("Where a plaintiff is notified that the

information it possesses is incomplete, or is subject to information contained elsewhere, the

plaintiff may truly be said to have willingly assumed the business risk that the facts may not be

as represented.") (citation and internal quotation marks omitted).

      Plaintiffs also cannot prove reasonable reliance because, prior to purchasing the Notes,

Morwick conducted no diligence, failing to implement even the advice of Plaintiffs' own

litigation expert.   *See supra* Section H.1.   And while Morwick acknowledged believing the "sole

risk" associated with the investment in the Exchangeables was the risk of Enron's bankruptcy,

Plaintiffs failed to hedge against that risk in any way.   *See supra* Section H.1.[123]   Plaintiffs as

sophisticated investors cannot claim reasonable reliance when they purchased Enron securities at

deep discounts knowing of—indeed, precisely because of—Enron's unstable financial condition

without undertaking any additional diligence.   *See PPI Enters. (U.S.), Inc. v. Del Monte Foods*

*Co.*, 2003 WL 22118977, at *27 (S.D.N.Y. Sept. 11, 2003) (citing *Hydro Investors, Inc. v.*

*Trafalgar Power Inc.,* 227 F.3d 8, 21 (2d Cir. 2000) (affirming summary judgment where

plaintiff could not establish reasonable reliance); *Ashland Inc. v. Morgan Stanley & Co.*, 652

F.3d 333, 339 (2d Cir. 2011) (same on motion to dismiss).

---

[121] Lewis Decl. Exs. M73 & M74 [Merrill Lynch Comment, Oct. 9, 2001; Merrill Lynch Flash Note, Oct. 22, 2001.]

[122] Lewis Decl. Ex. M75 [Merrill Lynch Analyst Report, Oct. 24, 2001.]

[123] Lewis Decl. Exs. M11, M10, M14, & M60 [Matthews Dep. 350:22; Matthews Dep. 179:14-22 (confirming that Plaintiffs' investment "was not hedged for a bankruptcy risk."); Morwick Dep. 884:22-886:2; Morwick Decl. ¶ 34.]

## III.    PLAINTIFFS' AIDING AND ABETTING FRAUD CLAIM FAILS (COUNT 1)

### A.    Plaintiffs Cannot Prove Reasonable Reliance on Enron's Financial Statements

Plaintiffs' claim that Merrill Lynch aided and abetted Enron's fraud fails because

Plaintiffs cannot prove a fraud by Enron on which they reasonably relied.  Plaintiffs' claim for

aiding and abetting fraud also fails because Plaintiffs cannot prove by clear and convincing

evidence that they relied on Enron's statements.[124]  *Small v. Lorilland Tobacco Co.*, 252 A.D.2d

1, 8 (1st Dep't 1998) ("[I]ndividualized proof of reliance is essential to [a] cause[ ] of action . . .

for common-law fraud.").  Plaintiffs' investments were based solely on Enron's stock and bond

prices.[125]  Although Morwick and Kittel testified that they "read" Enron's regulatory filings in

October 2000, no evidence reflects they analyzed Enron's financials in October 2001.  *See supra*

Section H.  And even if Plaintiffs invested in the Notes based upon Morwick's "work in the

past," any reliance upon prior work and stale statements was unreasonable.  *In re Livent, Inc.*

*Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 436, 440 (S.D.N.Y. 2001) (reliance on previous

statements was unreasonable given intervening negative disclosures).

### B.    Plaintiffs Have Not Adduced Sufficient Evidence to Show That Merrill Lynch Had Actual Knowledge of Enron's Fraud

Plaintiffs also cannot demonstrate that Merrill Lynch had the "'actual knowledge []

required to impose liability on an aider and abettor under New York law.'"  *Lerner v. Fleet Bank,*

*N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (citation omitted).  To satisfy this requirement, Plaintiffs

must prove Merrill Lynch had "*actual* knowledge of the alleged fraud"; constructive knowledge

is not enough.  *de Abreu v. Bank of Am. Corp.*, 812 F. Supp. 2d 316, 322-23 (S.D.N.Y. 2011)

(emphasis in the original).  Moreover, actual knowledge of one aspect or period of an alleged

---

[124] New York's "standard of 'clear and convincing' proof applies to actions for negligent misrepresentation as well as actions for . . . fraud."  *Allen v. Westpoint-Pepperell, Inc.*, 11 F. Supp. 2d 277, 284-85 (S.D.N.Y. 1997).

[125] Lewis Decl. Ex. M13 [Morwick Dep. 359:10-360:3, 372:15-21, 450:12-451:19, 461:2-17, 463:12-24, 467:3-8.]

fraud is not enough.  Plaintiffs must prove that Merrill Lynch had actual knowledge of Enron's overall scheme to manipulate its financial statements.  *See generally Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*, 602 F.2d 478, 484 (2d Cir. 1979) ("A remote party must not only be aware of his role, but he should also know when and to what degree he is furthering the fraud.") (citation and internal quotation marks omitted).

On the motion to dismiss, this Court held that Plaintiffs' plausibly alleged Merrill Lynch actually knew Enron was falsifying financial information in its public disclosures because (i) Merrill Lynch had an allegedly "close" relationship with Enron, including because Schuyler Tilney, a Merrill Lynch investment banker, was married to a Senior Vice President at Enron, and (ii) Merrill Lynch participated in the Nigerian Barge Transaction and the Electricity Trades and was a placement agent and passive investor in LJM2.  *Silvercreek*, 248 F. Supp. 3d at 444-45.

Discovery confirmed that Plaintiffs' complaint grossly overstates the nature of Enron and Merrill Lynch's relationship, which was not, in fact, close.  This most clearly was confirmed by Fastow, who testified that Merrill Lynch was a Tier 3 bank that was not as "valuable" to Enron as other financial institutions.  *See supra* Section B.  And, as noted, Fastow did not recall telling anyone at Merrill Lynch anything about transactions that did not involve Merrill Lynch.  *See supra* Section C; *see also In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 2003 WL 23305555, at *11 (S.D. Tex. Dec. 11, 2003) (allegation of involvement in transactions with Enron and in structuring and then as passive investor in LJM2 is not a basis to show defendant knew about the alleged fraud and that the financial statements and offering memoranda and prospectus were false when issued).

Equally baseless is Plaintiffs' contention that Tilney, the head of Merrill Lynch's Energy Investment banking operations, somehow had access to information about Enron's true financial

condition because he was married to a Senior Vice President at Enron, invested in LJM2, and was a friend of Fastow.  TAC ¶¶ 684-85.  This contention is baseless as a threshold legal matter because any knowledge Tilney (or anyone else) had as a result of personal relationships or investments in LJM2 cannot be imputed to Merrill Lynch because it would not have been developed in the course of employment at Merrill Lynch.  *See In re WRT Energy Sec. Litig.*, 1999 WL 178749, at *11 (S.D.N.Y. Mar. 31, 1999) ("An employee's knowledge may be imputed to a corporation only if such knowledge was acquired by the employee while acting within the scope of his employment, and for the employer's benefit, and if such knowledge relates to a matter to which the employee's authority extends.").

Even assuming such knowledge could be imputed, however, there is, as a factual matter, nothing to impute.  Tilney's undisputed testimony confirmed that no one at Merrill Lynch called on his wife to develop business with Enron, and Tilney could not recall even a single conversation between anyone at Merrill Lynch and his wife.[126]  Moreover, nothing indicates that Tilney's wife, who was on the "marketing side" of Enron, had access to information about its financial condition.[127]  Likewise, Fastow "did not recall specifically talking [to Tilney] about [Enron's] $5 to $7 billion" losses.[128]  And when Tilney was asked for his understanding "as to what Enron was getting out of the LJM2 deal," he testified that he did not "know what [LJM2 did] with the . . . assets," and that, as a "limited partner," he "had no control over what was going on in the investment" and "paid relatively little attention."[129]

Given Merrill Lynch's extremely small role with Enron, confined both by size and time, it at most had been presented with red-flags about Enron's overall scheme with respect to its

---

[126] 56.1 ¶ 31 [Deposition of Schuyler Tilney, Aug. 17, 2006 ("Tilney Dep.") 40:2-16.]
[127] 56.1 ¶ 31 [*Id.*]
[128] Lewis Declaration Ex. M6 [Fastow Dep. 1516:3-9.]
[129] Lewis Declaration Ex. M20 [Tilney Dep. 334:12-339:1.]

financial statements.  That is not enough to prove actual knowledge.  *Ryan v. Hunton &*
*Williams,* 2000 WL 1375265, at \*9 (E.D.N.Y. Sept. 20, 2000) (holding that allegations of actual
knowledge of fraudulent scheme in one year do not support conclusion of knowledge in next
year); *de Abreu,* 812 F. Supp. 2d at 324-26 (granting summary judgment because knowledge of
allegedly illegal activity with respect to certain banking activities was insufficient to prove actual
knowledge of overall scheme).

### C.    Merrill Lynch Did Not Substantially Assist Enron's Fraud

Plaintiffs also must prove that Merrill Lynch substantially assisted an action by Enron
that proximately caused the harm on which primary liability is predicated.  *Kolbeck v. LIT Am.,*
*Inc.,* 939 F. Supp. 240, 249 (S.D.N.Y. 1996).  They cannot.

As set forth above, Merrill Lynch's limited activities with Enron, which pre-dated
Plaintiffs' investment by almost two years, did not proximately cause Plaintiffs' alleged losses.
The contention that Merrill Lynch nevertheless should be held liable as an aider and abettor
"where the financial statement was issued in [early 2000] and not relied upon until years later—
and where [Merrill Lynch] had nothing to do with the preparation and dissemination of that
financial statement—stretches the concept of substantial assistance well beyond the breaking
point."  *In re Refco Inc. Sec. Litig.*, 2012 WL 12941970, at \*11 (S.D.N.Y. Feb. 10, 2012), *report*
*and recommendation adopted in part, rejected in part,* 2012 WL 3126834 (S.D.N.Y. July 30,
2012) (Rakoff, J.), *aff'd sub nom. Krys v. Pigott*, 749 F.3d 117 (2d Cir. 2014).

Plaintiffs' theory must be that earlier disclosure of the Barge Transaction and Electricity
Trades or a decision not to get involved with LJM2 would have stopped them from investing in
the Notes two years later.  However, it is well-settled that proving "but-for" causation is not
enough to prove substantial assistance.  *Kolbeck*, 939 F. Supp. 2d at 249.  Moreover, that two
year "chain of causation…is far too long to constitute proximate cause" of the sort necessary to

prove substantial assistance. *Id.*; *see also Bloor*, 754 F.2d at 62 ("The injury…must proceed directly from the wrong alleged and must not be attributable to some supervening cause.") (internal quotation marks omitted); *In re Agape Litig.,* 773 F. Supp. 2d 298, 325 (E.D.N.Y. 2011) (dismissing claims because plaintiffs failed to demonstrate defendants' actions proximately caused their harm).

Plaintiffs' claim of substantial assistance also fails because there is no evidence that Merrill Lynch affirmatively assisted Enron in misstating its transactions in Enron's financial statements.[130]   In analyzing this issue, the relevant consideration is not whether Merrill Lynch undertook substantial activities in connection with its transactions with Enron.  Rather, "[u]nder New York law, substantial assistance of a financial statement fraud will, as a general rule, only be found if the defendant has actually participated in preparing or disseminating the financial statements." *In re Refco*, 2012 WL 12941970, at *10.  Inaction by Merrill Lynch if and when Enron was not being candid in its disclosures is not enough. *Glidden Co. v. Jandernoa*, 5 F. Supp. 2d 541, 556 (W.D. Mich. 1998) (applying New York law); *see also Nat'l Westminster Bank USA v. Weksel*, 124 A.D.2d 144, 148 (1st Dep't 1987) (even assuming law firm knew client was misrepresenting leasing arrangements as sales, it still would not have substantially assisted client because at most it allegedly did nothing in response).

Summary judgment is therefore warranted as to Merrill Lynch on the issue of substantial assistance because it is undisputed that Merrill Lynch played no role in the distribution of the materials for the Notes offerings, no role in the preparation of any of Enron's financial statements, and no role in the management or operations of LJM2. *Glidden*, 5 F. Supp. 2d at

---

[130] Where the alleged aiding and abetting fraud turns on omissions or failures to disclose the fraud, the plaintiffs must demonstrate that the defendants had a fiduciary duty directly to the plaintiff, which, as explained in section II.A *supra*, does not exist here. *SPV OSUS Ltd.,* 2016 WL 3039192, *8; *Lerner*, 459 F.3d at 295; *Musalli Factory for Gold & Jewelry v. JPMorgan Chase Bank,* 261 F.R.D. 13, 25 (S.D.N.Y. 2009); *2006 Frank Calandra, Jr. Irrevocable Tr. v. Signature Bank Corp.*, 816 F. Supp. 2d 222, 237 (S.D.N.Y. 2011).

557; *see also Morin v. Trupin*, 711 F. Supp. 97, 113 (S.D.N.Y. 1989) (finding "no . . . substantial

assistance can be alleged, since plaintiffs acknowledge that the . . . defendants had no

involvement in the preparation or dissemination of the offending documents"); *Terrydale*

*Liquidating Tr. v. Gramlich*, 549 F. Supp. 529, 531 (S.D.N.Y. 1982) (same).

      The Second Circuit's discussion of this issue in *Edwards & Hanly v. Wells Fargo Sec.*

*Clearance Corp.*, 602 F.2d 478 (2d Cir. 1979), is instructive.  In that case, the plaintiffs alleged

an employee at a securities clearing firm aided and abetted a primary violator by taking steps to

conceal a primary violator's trading activity by, among other things, generating and accepting

false trade documentation.  *Id.* at 482-83.  The Second Circuit observed that the relevant primary

violation was not the concealed trading activity itself, but the primary violator's failure to

disclose it.  *Id.* at 484.  Even though the clearing firm employee played an integral and active

role in the misrepresented transactions, there could not be a finding of substantial assistance on

his part because he played no role in the primary violator's omissions to the plaintiff.  *Id.*

**IV.**    **PLAINTIFFS CANNOT PROVE THAT MERRILL LYNCH AIDED AND**
       **ABETTED ENRON'S ALLEGED NEGLIGENT MISREPRESENTATION**
       **(COUNT 3)**

      To support its claim that Merrill Lynch aided and abetted negligent misrepresentation, to

the extent such a claim exists under New York law,[131] Plaintiffs must prove a negligent

misrepresentation by Enron that Merrill Lynch had actual knowledge of and substantially

assisted.  *In re Bayou Hedge Funds Inv. Litig.*, 472 F. Supp. 2d 528, 532 (S.D.N.Y. 2007).  This

claim fails for the same reasons the aiding and abetting fraud claim fails, including because

Plaintiffs cannot prove a misrepresentation that they reasonably relied on as to which Merrill

---

[131] *See Portnoy v. Am. Tobacco Co.*, 1997 WL 638800, at *7 (N.Y. Sup. Ct. Sept. 26, 1997) ("[T]heories of
collective liability only apply to intentional torts."); *DaSilva v. Am. Tobacco Co.*, 175 Misc. 2d 424, 431 (N.Y. Sup.
Ct. Dec. 12, 1997) (same); *Appavoo v. Phillip Morris Inc.*, 1998 WL 440036, at *6 (N.Y. Sup. Ct. July 24, 1998)
(same); *Cresser v. Am. Tobacco Co.*, 174 Misc. 2d 1, 6-7 (N.Y. Sup. Ct. July 31, 1997) (same).

Lynch had actual knowledge or provided substantial assistance. *Id.* at 532-33. The aiding and abetting negligent misrepresentation claim also fails for multiple independent reasons.

*First*, as held by the Court, Plaintiffs' aiding and abetting negligent misrepresentation claim is predicated on the contention that Enron "negligently breached its duty to disclose certain information in its securities prospectuses." *Silvercreek*, 248 F. Supp. 3d at 455. However, no evidence exists to sustain Plaintiffs' allegation of a negligent misrepresentation by Enron because Plaintiffs only relationship with Enron was as arms-length investors in Enron securities, and there is therefore no special relationship of the sort needed to state a negligent misrepresentation claim. *Barron Partners, LP v. LAB123, Inc.*, 593 F. Supp. 2d 667, 674 (S.D.N.Y. 2009) (dismissing negligent misrepresentation claim where plaintiff and defendant "were merely a buyer and seller of corporate stock"); *AHW Inv. P'ship v. Citigroup Inc.*, 980 F. Supp. 2d 510, 524-25 (S.D.N.Y. 2013), *aff'd*, 661 F. App'x 2 (2d Cir. 2016).

*Second*, in addition to failing to prove knowing and substantial assistance, Plaintiffs' claim fails because, as set forth in the RESTATEMENT (SECOND) OF TORTS § 876(b)—the provision previously relied on by the Court, *Silvercreek*, 248 F. Supp. 3d at 454-55—aiding and abetting liability for another's negligence is available only where two parties each also commit negligent acts, only one of which causes injury. Section 876(b) comment (d) offers as an illustration:

> A and B are members of a hunting party. Each of them in the presence of the other shoots across a public road at an animal, which is negligent toward persons on the road. A hits the animal. B's bullet strikes, C, a traveler on the road. A is subject to liability to C.

*See also Lindsay v. Lockwood*, 163 Misc. 2d 228, 232 (N.Y. Sup. Ct. 1994).

A case involving negligent claims against tobacco companies is illustrative, where defendants were allegedly knowingly negligent in manufacturing cigarettes. *Miele v. Am.*

*Tobacco Co.*, 2 A.D.3d 799, 805 (2d Dep't 2003).  The court held defendants could be held

liable for aiding and abetting negligence of other tobacco companies who knowingly engaged in

the same or similar conduct even if the defendant had not manufactured the cigarettes that caused

the injury.  *Id.*  Here, Plaintiffs offer no evidence or theory to explain how Merrill Lynch

knowingly provided substantial assistance to Enron, much less that it somehow was

independently negligent in its transactions with Enron.  Summary judgment is warranted for this

additional reason.

## V.   PLAINTIFFS CANNOT PROVE MERRILL LYNCH'S LIABILITY FOR CONSPIRACY (COUNT 2)

To establish a claim of civil conspiracy, plaintiff must demonstrate the underlying tort

plus (1) an agreement between two or more parties, (2) an overt act in furtherance of the

agreement, (3) the parties' intentional participation in the furtherance of a common purpose or

plan, and, (4) resulting damage or injury.  *Ritchie Capital Mgmt., L.L.C. v. GE. Capital Corp.*,

121 F. Supp. 3d 321, 339 (S.D.N.Y. 2015), *aff'd,* 821 F.3d 349 (2d Cir. 2016).

"It is a well-settled and often repeated principle of New York law that no cause of action

lies for civil conspiracy."  *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 591 (2d

Cir. 2005).  Although a conspiracy may be alleged to connect a defendant to an otherwise

actionable tort, it is not a vehicle for re-alleging a tort asserted elsewhere "in the guise of a

separate conspiracy claim."  *Id*.  Plaintiffs' conspiracy claim is duplicative of their aiding and

abetting claims and must be dismissed because it is predicated on the same allegations of "active

participation in the Enron fraud," *i.e.*, the Barge Transaction, Electricity Trades, LJM2, and

analyst coverage (*see, e.g.*, TAC ¶ 717).  *Aetna Cas.*, 404 F.3d at 591; *In re Allou Distribs., Inc.*,

446 B.R. 32, 60-61 (Bankr. E.D.N.Y. 2011) (dismissing conspiracy claims as duplicative).

Summary judgment is also appropriate to the extent Plaintiffs seek to hold Merrill Lynch

liable for a single, multi-year scheme by Enron based on something other than those transactions and analyst coverage.  No evidence suggests that Merrill Lynch had knowledge of a conspiracy "extending beyond its own individual acts."  *Fidelity Funding of Cal., Inc. v. Reinhold*, 79 F. Supp. 2d 110, 123 (E.D.N.Y. 1997).  At most, Merrill Lynch participated in a rimless hub-and-spoke conspiracy, as a spoke without knowledge of any broader conspiracy of Enron at the hub. *Id.* at 124 ("[O]nly those at the hub of the conspiracy are necessarily aware of the scope of the fraud occurring throughout the entire wheel"); *In re Monahan Ford Corp.*, 340 B.R. 1, 36 (Bankr. E.D.N.Y. 2006); *United States v. Village of Island Park*, 888 F. Supp. 419, 455 (E.D.N.Y. 1995).  Moreover, the conspiracy claim fails because Plaintiffs have failed to prove the elements needed to demonstrate a reasonably relied upon primary violation by Enron.  *See Chemtex*, 490 F. Supp. 2d at 545-46; *Epstein v. Haas Sec. Corp.*, 731 F. Supp. 1166, 1187 (S.D.N.Y. 1990).

## CONCLUSION

For the foregoing reasons, Merrill Lynch respectfully requests summary judgment in its favor on all claims.

Dated:  New York, New York
November 10, 2017

Respectfully submitted,

SHEARMAN & STERLING, LLP

By: _____
     Adam S. Hakki
     Daniel Lewis
     Mary C. Pennisi
     599 Lexington Avenue
     New York, New York 10022
     Telephone:  212-848-4000
     Facsimile:  212-848-7179

*Attorneys for Merrill Lynch & Co., Inc.*

NYDOCS04/610725.25