UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SILVERCREEK MANAGEMENT, INC., *et al.*,

                                  Plaintiffs,

        v.

CITIGROUP, INC., *et al.*,

                                  Defendants.

Civil Action No.
02-cv-08881-JPO

**ECF CASE**

## DEFENDANT MERRILL LYNCH & CO., INC.'S
## RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN
## <u>SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Local Civil Rule 56.1, Defendant Merrill Lynch & Co., Inc. (now known as

Bank of America Corporation) ("Merrill Lynch"),[1] hereby respectfully submits this statement of

material facts, as to which there is no genuine issue of fact to be tried:

A.      **Background**

1.      Plaintiffs Silvercreek Limited Partnership, Silvercreek II Limited, OIP Limited,

and Pebble Limited Partnership ("Plaintiffs") are large, sophisticated funds.  Plaintiff Silvercreek

Management, Inc. ("SMI") is an Ontario-based investment manager that manages the

investments of the other plaintiffs.[2]  SMI was founded in or around March 2000 by Louise

Morwick, who was the company's President during the period relevant to this litigation.[3]

---

[1] Merrill Lynch is filing this motion for summary judgment based upon its knowledge before its acquisition by
Bank of America Corporation, and this submission applies only to Merrill Lynch & Co., Inc. and to no other Merrill
Lynch affiliate or subsidiary.  Moreover, this motion is filed without prejudice to or waiver of arguments that Merrill
Lynch & Co., Inc. is not the proper defendant in Plaintiffs' claims.  For purposes of rhetorical efficiency, this
Statement sometimes refers to "Merrill Lynch" without prejudice to arguments that the relevant entity is some entity
other than Merrill Lynch & Co., Inc. Merrill Lynch hereby incorporates the rule 56.1 statements of material facts
filed by the other defendants to the extent applicable.

[2] TAC ¶ 8.

[3] Lewis Decl. Ex. M12 [Deposition of Louise Morwick, Sept. 19-21, 2005 ("Morwick Dep.") 89:2-5, 113:1-5.]

2.      This case arises out of Plaintiffs' purchase of debt securities issued by Enron Corporation ("Enron"), including 7% Exchangeable Notes (the "Exchangeables") and Zero Coupon Exchangeable Notes (the "Zeroes") (collectively, the "Notes").[4] Plaintiffs' trading strategy focuses on distressed debt.  Plaintiffs purchased the Notes in October of 2001.[5]

3.      Plaintiffs purchased the Notes after Enron's announcements of a $1 billion charge to its third-quarter 2001 earnings, a $217 million loss in its broadband unit, and the SEC inquiry into Enron's accounting for related-party transactions, along with questions arising over Enron's future and profitability.[6]  Enron went into bankruptcy on December 2, 2001.[7]

4.      During the relevant time period, Merrill Lynch provided commercial and investment banking services and brokerage services to a variety of clients.[8]  Merrill Lynch Canada and Merrill Lynch Boston executed trades and maintained non-discretionary accounts for Plaintiffs in or around 2000 and 2001.[9]

5.      On April 25, 2001, Plaintiffs entered into a services agreement with Merrill Lynch under which Merrill Lynch agreed to be Plaintiffs' clearing broker, managing Plaintiffs' accounts on a non-discretionary basis.[10]

---

[4] TAC ¶ 1.

[5] TAC ¶ 1; Lewis Decl. Exs. M53, M55, & M58 [Silvercreek Plaintiffs Trading History – Enron 7% Exchangeable Notes Trades Prior To Oct. 24, 2001 (SlvC004890-901); Silvercreek Plaintiffs Trading History – Enron 7% Exchangeable Notes Trades After Oct. 23, 2001 (SlvC005046-55); Silvercreek Plaintiffs Trading History – Enron 0% Notes (SlvC005207-11).]

[6] RJN Ex. 47 [Sheila McNulty, John Labate, & Julie Earle, *Enron Faced With SEC Request*, FIN. TIMES, Oct. 23, 2001 (discussing inquiry into related-party transactions).]  Lewis Decl. Exs. M77 & M25 [Enron Earnings Release Details – 3rd Quarter 2001, (EC46649A0030192-240); Kevin M. Boone & Chris Voelker, *Enron Corp.: Picking up the Pieces*, Bear Stearns Oil and Gas - The Energy Group, 9 (Dana Gordon ed. Nov. 2, 2001) (AUSA 02592-605).]

[7] *In re Enron Corp.*, No. 1:01-bk-16034 (Bankr. S.D.N.Y. Dec. 2, 2001) (Enron Voluntary Petition).

[8] TAC ¶ 33.

[9] TAC ¶ 34; *see infra* note 240; *see also* Lewis Decl. Ex. M121 [Bloomberg Chat between Louise Morwick and Michael Nahill (Oct. 16, 2001) (SlvC013510).]

[10] Lewis Decl. Ex. M132 [Prime Brokerage Clearance Services Agreement between Silvercreek Management, Inc. and Merrill Lynch (Apr. 25, 2001) (SlvC011800-09).]

6.      Morwick's sister, Andrea Morwick, was an equity trader at Merrill Lynch

Canada.[11]  From time to time, Andrea Morwick executed trades on Morwick's behalf.[12]  They

communicated regularly through Bloomberg chats to discuss trades and market color.[13]

**B.      Enron's Rise**

7.      In 1985, Enron was formed by a merger between Houston Natural Gas Co. and

InterNorth Inc.  Kenneth Lay was its Chief Executive Officer.[14]

8.      Enron was built upon a promise of cutting-edge technology and innovation.  It

became one of the largest companies in the world, capitalizing on the deregulation of the energy

market and developing into an energy trader and supplier.[15]  By the mid-1990s, Enron was an

industry titan in the purchase, transportation, marketing and sale of energy sources, and related

---

[11] Lewis Decl. Ex. M14 [Morwick Dep. 778:2-20.]

[12] Lewis Decl. Exs. M89, M93, M94, & M122 [Bloomberg Chats between Louise Morwick and Andrea Morwick (Oct. 15, 2001) (SlvC013404-05); (Oct. 16, 2001) (SlvC013498-99); (Oct. 16, 2001) (SlvC013513); (Oct. 19, 2001) (SlvC013719).]

[13] *See* Lewis Decl. Ex. M102 [Excerpted Bloomberg Chats between Louise Morwick and Andrea Morwick (SlvC013390-4174).]

[14] RJN Ex. 70 [S.E.C. Tender Offer Statement (May 3, 1985)]; Lewis Decl. Ex. M101 [Press Release, Enron Corp., Dynegy and Enron Announce Merger Agreement (Nov. 9, 2001) (AUSA 003923-929).]

[15] Lewis Decl.  Exs. M30, M101, & M23 [Enron Corp., Enron Annual Report 2000 (2001) (MLBE 0002836-95); Press Release, Enron Corp., Dynegy and Enron Announce Merger Agreement (Nov. 9, 2001) (AUSA 003923-929); Enron Investor Relations, Enron Corp. Summary Investor Info. 11 (1997) (A.ZYLMAN 07028-39)];  RJN Exs. 52 & 8, [*The Amazing Disintegrating Firm*, THE ECONOMIST, Dec. 6, 2001, http://www.economist.com/node/896844;  Brian O'Reilly, *The Secrets of America's Most Admired Corporations: New Ideas New Products*, FORTUNE, Mar. 3, 1997];  Lewis Decl. Ex. M128 [Brian O'Reilly, *The Power Merchant, Once a Dull-As-Methane Utility, Enron Has Grown Rich Making Markets Where Markets Were Never Made Before*, FORTUNE, Apr. 17, 2000 (MLNBY 0302899-904).]  According to the 2001 Fortune 500 Rankings, *Fortune* magazine ranked Enron as the seventh largest corporation in the world, based upon revenues.  RJN Ex. 34 [*The 500 Largest U.S. Corporations*, FORTUNE, 2001.]  Competitors voted Enron the most innovative company in the United States in *Fortune's* poll of "America's Most Admired Corporations" between 1997 and 2000, ahead of high-flying companies such as Intel and Microsoft.  RJN Ex. 32, 18, & 7 [Geoffrey Colvin & Ahmad Diba, *America's Most Admired Companies*, FORTUNE, Feb. 21, 2000; Eryn Brown, *America's Most Admired Companies We tell you why the two new companies in the top three, Dell and Wal-Mart, are just alike—sort of*, FORTUNE, Mar. 1, 1999; Edward A. Robinson, *America's Most Admired Companies*, FORTUNE, Mar. 3, 1997.]  In 1999, Enron was recognized as "No. 1 in Quality of Management" and "No. 2 in Employee Talent" of all American companies and one of the 25 best companies to work for in America.  Lewis Decl. Ex. M133 [Enron Corp., Annual Report 1999 (2000) (CKIR04794 - CKIR04864).]

financial instruments, and in the development, construction, and operation of pipelines and power facilities.[16]

9.      Enron was at the forefront of broadband communications, renewable energy, and clean fuel.[17]  For example, on January 20, 2000, Enron announced a broadband Internet pact with Sun Microsystems.[18]

10.      By the 1990s, Enron expanded and had gas operations worldwide.  Enron launched projects in Africa, Asia, and South America.[19]  At the end of 1995, Enron developed a reputation as "an aggressive American gas company" when it signed an agreement with the Mozambique government to develop a field beneath the grasslands of southern Mozambique that contained a large reserve of natural gas.  The *New York Times* reported that Mozambique is the "poorest country in the world" and estimated that the pipeline could bring it "$100 million a year in hard currency."[20]  Later in 1998, Enron acquired an interest in Elektro Eletricidade e Servicos

---

[16] Lewis Decl. Exs. M23 & M30 [Enron Investor Relations, Enron Corp. Summary Investor Info., 1997 (A.ZYLMAN 07028-39); Enron Annual Report 2000 (2001) (MLBE 002836-95).]  *Fortune* magazine named Enron as the Most Innovative Company in America" for six consecutive years.  RJN Ex. 31 [Press Release, Enron Corp., Enron Named Most Innovative for Sixth Year (Feb. 6, 2001).]  In 1996, *Fortune* magazine called Enron one of "America's Most-Admired Corporations."  RJN Ex. 4 [Anne B. Fisher & Ani Hadjian, *Corporate* Reputations *Comebacks and Comeuppances What a Year It was: Coca-Cola Blossomed, Reaching the Top at Rubbermaid's Expense, Meanwhile, Beleaguered Kmart, Salomon, and Morrison Knudsen Fell Like Dead Leaves to the Bottom of the List*, FORTUNE, Mar. 4, 1996.]

[17] Lewis Decl. Ex. M23 [Enron Investor Relations, Enron Corp. Summary Investor Info., 1997 (A.ZYLMAN 07028-39)];  RJN Exs. 3 & 24 [James C. McKinley, Jr., *Enron Goes to Africa Seeking Gas and Customers*, N.Y. TIMES, Dec. 27, 1995, http://www.nytimes.com/1995/12/27/business/international-business-enron-goes-to-africa-seeking-gas-and-customers.html; *Enron Communications Inc. Announces Ten New ISP Partners in "ePowered Distribution Program*," PR NEWSWIRE, Oct. 26, 1999.]; RJN Ex. 27 [Press Release, Enron Corp., Enron Hosts Annual Analyst Conference (Jan. 20, 2000).]

[18] *See* RJN Exs. 27 & 28 [Press Release, Enron Corp., Enron Hosts Annual Analyst Conference (Jan. 20, 2000); Jennifer Jones, *Enron Inks deal with Sun to further broadband Net service*, CNN, Jan. 24, 2000, http://edition.cnn.com/2000/TECH/computing/01/24/enron.broadband.idg/index.html.]

[19] Lewis Decl. Ex. M23 [Enron Investor Relations, Enron Corp. Summary Investor Info., 1997 (A.ZYLMAN 07028-39)]; RJN Exs. 3 & 24 [James C. McKinley, Jr., *Enron Goes to Africa Seeking Gas and Customers*, N.Y. TIMES, Dec. 27, 1995, http://www.nytimes.com/1995/12/27/business/international-business-enron-goes-to-africa-seeking-gas-and-customers.html; *Enron Communications Inc. Announces Ten New ISP Partners in "ePowered Distribution Program*," PR NEWSWIRE, Oct. 26, 1999.]

[20] RJN Ex. 3 [James C. McKinley, Jr., *International Business: Enron Goes to Africa Seeking Gas and Customers*, N.Y. TIMES, Dec. 27, 1995, http://www.nytimes.com/1995/12/27/business/international-business-enron-goes-to-africa-seeking-gas-and-customers.html.]

S.A., an electricity distributor in Brazil that served approximately 1.5 million customers through 51,000 miles of distribution lines in São Paulo, and a number of other municipalities.[21]

11.     Enron had a constant need for cash to maintain its investment-grade credit rating.[22]  In 1990, then-President of Enron Jeffrey Skilling recruited Andrew Fastow, who became Chief Financial Officer in 1998.[23]

12.     Fastow developed Enron's most well-known and innovative business mechanisms for "off-balance-sheet" treatment of assets and liabilities.[24]

13.     By 2001, Enron ranked Number 7 on the Fortune 500, with annual revenues in excess of $100 billion.[25]

### C.     Enron's Strategies and Accounting Practices

14.     Press reports discussed Enron's accounting practices throughout the mid-1990s, including its practices of (i) monetizing future cash flows from projects, (ii) moving assets off of Enron's balance sheet, and (iii) mark-to-market accounting of energy trades.[26]

---

[21] RJN Ex. 20 [Enron Corp. Annual Report (Form 10-K) (Mar. 31, 1999).]

[22] Lewis Decl. Ex. M2 [Deposition of Andrew Stuart Fastow, Oct. 23-Nov. 2, 2006 ("Fastow Dep.") 54:14-55:23.]

[23] Lewis Decl. Ex. M2 [Fastow Dep. 19:19-22.]

[24] Lewis Decl. Ex. M123 [Russ Banham, *The Finest in Finance: Andrew S. Fastow*, CFO MAGAZINE, Oct. 1999 (MLBE 110972-73).]

[25] RJN Ex. 54 [*Fortune 500 Database*, Enron Entry, FORTUNE (2001), http://archive.fortune.com/magazines/fortune/fortune500_archive/snapshots/2001/478.html.]

[26] Lewis Decl. Exs. M123 & M124 [Russ Banham, *The Finest in Finance: Andrew S. Fastow*, CFO, Oct. 1999 (MLBE 110972-73); *Enron Corporation's $1 Billion Shelf Rated Preliminary BBB+/BBB by S&P*, PR NEWSWIRE, Dec. 31, 1997 (ANARPT009243).] RJN Exs. 12 & 1 [Jeffrey Keegan, *Enron Goes to 144A Well to Fund New Water Business*, INVESTMENT DEALERS DIGEST, Dec. 14, 1998; Toni Mack, *Hidden Risks*, FORBES, May 24, 1993.]  For example, a June 9, 1999 research report described Enron Capital & Trade as "ha[ving] significant flexibility in structuring contracts and hence booking earnings.  It is primarily a financial business and hence uses 'mark-to-market' accounting.  As such, contracts can be structured to recognize the economic value of projects long before they are operational and cash is coming in the door."  Lewis Decl. Ex. M125 [JP Morgan, Company Report:  Enron Corp., 4 (June 9, 1999) (MLBE 0110981-1028).]  The report further noted "[a]s Enron accumulates risk, it sells that risk off to various counter-parties.  Securitization of this risk is another source of funds for Enron . . . in excess of $1.5 billion."  *Id.* at 20.

15.     In 1992, Enron sought and received approval from federal regulators for a mark-to-market accounting technique that allowed it to record projected earnings from long-term energy contracts as current income.[27]

16.     Enron was known to use "special-purpose entities" ("SPEs"), such as limited partnerships, to access capital, hedge risk, and increase leverage and return on assets without reporting debt on its balance sheet.[28]

17.     By the mid-1990s, the use of SPEs and structured finance was considered to be one of the most important developments in modern financial history because they enable companies throughout the world to raise more money more efficiently and provide investors a wide range of investment opportunities.[29]

18.     Fastow relied on Enron's accounting firm Arthur Andersen and accounting and legal professionals to help execute Enron's financing transactions.[30]  Arthur Andersen was responsible for certifying Enron's financial statements and was involved in Enron's complex transactions.[31]

19.     Arthur Andersen was considered one of the "Big Five" accounting firms and was applauded for its sophisticated work.  It was seen as capable, expert-like, and able to make

---

[27] Lewis Decl. Ex. M24 [Letter from Walter P. Schuetze, Chief Accountant, SEC, to Jack L. Tompkins, Senior Vice President and Chief Financial Officer, Enron Corp. (Jan. 30, 1992) (AB000516971-72).]  Enron disclosed its use of mark-to-market accounting practices in SEC filings.  *See*, *e.g.*, Lewis Decl. Exs. M88 & M87 [Enron Corp., Quarterly Report (Form 10-Q) (Aug. 14, 1997); Enron Corp., Annual Report (Form 10-K) (Mar. 31, 1998) (MLBE0062909-3089)];  RJN Exs. 10, 19, & 20 [Enron Corp., Quarterly Report (Form 10-Q) (Nov. 14, 1997) (CKIR04243-71); Enron Corp., Current Report (Form 8-K) (Mar. 18, 1999); Enron Corp., Annual Report (Form 10-K) (Mar. 31, 1999).]

[28] Lewis Decl. Ex. M2 [Fastow Dep. 58:10-59:13]; RJN Ex. 33 [Annual Report (Form 10-K) (Apr. 2, 2001).]

[29] RJN Ex. 66 [Report of the Comm. on Bankr. and Corporate Reorganization of the Ass'n of the Bar of the City of New York, *Structured Financing Techniques*, 50 BUS. LAW. 527, 530-32 (Feb. 1995).]  Structured finance was applied to a growing variety of assets by the late 1990s.  For instance, it was reported that David Bowie used structured finance transactions to sell future royalties to his music.  RJN Ex. 6 [Jay Mathews, *Securities Oddity:  The Bowie Bond; With Asset-Backed Debt, The Rock Star Plays A Financial Instrument*, WASH. POST, C01, Feb. 6, 1997.]

[30] Lewis Decl. Exs. M59 & M2 [Fastow Decl. ¶ 2; Fastow Dep. 50:5-10.]

[31] Lewis Decl. Ex. M2 & M136 [Fastow Dep. 50:5-7; Deposition of John Stewart, Sept. 23, 2005 ("Stewart Dep.") 18:10-20:8.]

judgments about billions of dollars of transactions in which Enron engaged each year with a multitude of counterparties.  It also had international operations and undertook projects in Asia, similar to Enron's global expansion at the time.[32]

### D.  Merrill Lynch Was a Tier 3 Bank, Outside of Enron's Inner Circle

20.     Enron had billions of dollars in credit lines and loans outstanding at any given time, arranged and funded in large part by Enron's primary bankers.[33]  Because of the importance of credit to Enron's capital-intensive business, Enron "ranked" its investment banks based on the amount of credit they made available to Enron.[34]  To incentivize its banks, Enron conditioned investment banking assignments on the provision of credit.[35]

21.     Enron maintained a list of Tier 1 and Tier 2 banks.[36]  Specifically, Fastow testified that there was "an internal designation in Enron, Tier 1, Tier 2, Tier 3."[37] Approximately 30 banks were ranked Tier 1 or Tier 2.[38]  Fastow explained that Tier 1 status meant that the bank was "being recognized as an institution that could do certain things and that

---

[32] RJN Exs. 11, 15, 23, 14, 16, 21, 62, 2, & 5 [Richard Roeper, *Big Five Accountants*, CHICAGO SUN-TIMES, Dec. 13, 1998; Elizabeth MacDonald, *Top U.S. Accounting Firms Post Record Revenue Gains,* WALL ST. J., Jan. 7, 1999; *Big Five Firms Thrive Despite Volatile Market Environment*, INTERNATIONAL ACCOUNTING BULLETIN, Oct. 19, 1999; *Top Accounting Firms In U.S. Post Record In Global Revenue,* THE ASIAN WALL STREET JOURNAL, Jan. 7, 1999; *The "Big Six" Battle the "Big Five" for Accounting* Dominance *in China,* CHINA ONLINE, Feb. 12, 1999; *Big Five Reap Record Fees*, WESTERN DAILY PRESS, June 24, 1999; *Enron Corp. Buyback – 3: Arthur Anderson* [sic] *Checks Trade Controls*, DOW JONES NEWS SERVICE, Dec. 22, 1995; *Arthur Anderson* [sic] *Appointed Advisor for $1000 Million Oman Project*, ECONOMIC TIMES, July 26, 1995; *Pakistan Gov't. Names Arthur Anderson* [sic] *as WAPDA Advisor,* DOW JONES TELERATE ENERGY SERVICE, Sept. 17, 1996.]

[33] Lewis Decl. Exs. M2 & M23 [Fastow Dep. 23:3-13, 54:14-55:23; 56:4-15; Enron Investor Relations, Enron Corp. Summary Investor Info., 1997, 10 (A.ZYLMAN 07028-39).]

[34] Lewis Decl. Ex. M2 [Fastow Dep. 22:8-23:18.]

[35] *Id.*

[36] Lewis Decl. Exs. M85, M2, & M4 [Mid-Year Debt Investor Relationship Review July 2000 (EC002781310; EC002761349, EC002781304-351); Fastow Dep. 22:8-24:19, 867:25-868:5.]

[37] Lewis Decl. Ex. M2 [Fastow Dep. 22:8-13.]

[38] Lewis Decl. Ex. M85 [Mid-Year Debt Investor Relationship Review July 2000 (EC002781310; EC002761349, EC002781304-351.]

did do certain things for Enron" and "it meant that Enron was going to try to find ways to get the type of business [ ] that each bank sought designated to them in the future."[39]

22.     Merrill Lynch was ranked Tier 3 because it was not a major commercial bank (this was years before its acquisition by Bank of America) and could not make large credit facilities available to Enron.[40]

23.     Fastow testified that although he valued Merrill Lynch personally, he acknowledged Merrill Lynch was not as "valuable" to Enron as other financial institutions due to its limited lending capacity.[41]  Consequently, Merrill Lynch received few investment banking assignments from Enron.  Of the █ merger and acquisition transactions entered into by Enron and Enron-related entities from 1997 through Enron's collapse, Merrill Lynch reported being Enron's advisor on only ██.[42]

24.     Merrill Lynch's minor relationship with Enron was reflected in the fees it received.  Merrill Lynch's share of business with Enron was relatively small and, particularly after 1999, declining.  In 2000, for example, Merrill Lynch earned approximately ████████ from Enron-related investment banking and financing business,[43] ████████████████ ████████████████████████████████████████████ ████████████████████████[44]

---

[39] Lewis Decl. Ex. M2 [Fastow Dep. 22:11-23:2.]

[40] Lewis Decl. Exs. M2, M3, & M4 [Fastow Dep. 27:25-28:9, 520:24-522:9, 842:10-844:20.]

[41] Lewis Decl. Ex. M2 & M3 [Fastow Dep. 27:25-28:9, 520:24-521:10.]

[42] Lewis Decl. Ex. M47 [Letter from James B. Weidner, on behalf of Merrill Lynch, to The Honorable W.J. "Billy" Tauzin, Chairman of House Energy and Commerce Committee (Apr. 11, 2002) (MLNBY 0307075-80); Ex. 1 referenced in Tauzin Letter (MLNBY 0307081-89).]

[43] *Id.*

[44] *Id.*

### E.   Merrill Lynch Analysts Lacked Any Insider Knowledge of Enron

25.     Enron's operations were known to be complex, opaque, and "impenetrable."[45] Merrill Lynch relied on information about Enron in the public domain.  In his deposition, Fastow acknowledged that Enron's true financial condition would not have been apparent to anyone simply based on its certified financial statements from 1997 through 2001.[46]  Fastow verified that Enron only shared information with Merrill Lynch that was limited to the discrete and few transactions involving Merrill Lynch.[47]  Fastow testified that "in some instances, [Tier 1 banks] had information that the investing public may not have had."[48]

26.     Fastow further testified that he did not want any single lending bank of Enron see the "full kimono" of its various transactions, including acknowledging that there were transactions that Fastow characterized as "improper" that were not shared with Enron's banks.[49]

27.     Plaintiffs' expert Matthews conceded that Merrill Lynch's analysts had no insider knowledge, but rather only had access to the same public information as Plaintiffs did to analyze Enron:

> Q:     And you have no basis to believe that the analysts, the Merrill Lynch analysts themselves, were in possession of information contrary to that expressed in their analyst reports?
>
> A:     Right.  They were dealing with the same—you know, the same information that Ms. Morwick was dealing with.  They were dealing with, as far as I could tell, with public information on which they relied.[50]

---

[45] In March of 2001, a *Fortune* story called Enron a company "largely impenetrable to outsiders" that is piling on debt while keeping Wall Street in the dark.  Lewis Decl. Ex. M129 [Bethany McLean, *Is Enron Overpriced?*, FORTUNE (Mar. 5, 2001) (SlvC000001 -  SlvC000004).]

[46] Lewis Decl. Exs. M2, M99, & M100 [Fastow Dep. 76:5-21, 1216:9-1217:22; 1861:22-1862:11.]

[47] Lewis Decl. Ex. M6 [Fastow Dep. 1366:10-1370:24.]

[48] Lewis Decl. Ex. M100 [Fastow Dep. 1861:22-1862:4.]

[49] Lewis Decl. Ex. M98 [Fastow Dep. 1010:25-1011:15; 1093:10-25.]

[50] Lewis Decl. Ex. M11 [Deposition of Gilbert E. Matthews, Oct. 25, 2006 ("Matthews Dep.") 374:7-14.]

28.     John Olson and Donato Eassey did not breach information barriers to learn details about Enron from walled-off internal sources in the bank.[51]  Both analysts testified that they were not influenced by Merrill Lynch investment bankers, that their research reflected their own opinions, and that they were never pressured to modify their analyses.[52]  Even Merrill Lynch's October 22, 2001 Analyst Report acknowledged that Merrill Lynch lacked details about the LJM partnership subject to investigation by the Securities and Exchange Commission ("SEC").[53]

29.     Plaintiffs allege that Olson was terminated because he was not sufficiently optimistic about Enron.[54]  However, even after Olson departed Merrill Lynch, Olson consistently rated Enron at the same (or higher) levels as his successor, Eassey.[55]  For example, Eassey's first report, published on November 6, 1998, rated Enron as "Accumulate," up from Olson's old "Neutral" rating.  However, when Olson joined Sanders Morris Mundy on October 19, 1998, his first rating of Enron was "Accumulate."  This rating was an upgrade from the "Neutral" rating he maintained on Enron while at Merrill Lynch.  Olson upgraded his rating because of improvements in Enron's situation.[56]

30.     On September 28, 2001, Olson changed his rating of Enron from "Buy" to a "Strong Buy."[57]  Olson purchased 10,000 shares of Enron stock on October 11, 2001 and

---

[51] Lewis Decl. Exs. M1 & M15 [Deposition of Donato Eassey, May 21, 2003, *In re Enron Corp.*, No. 01-16034 (Bankr. S.D.N.Y.) ("Eassey Bankruptcy Dep.") 113:23-123:24; 147:2-17; Deposition of John Olson, Dec. 7-8, 2004 ("Olson Dep"), 64:21-65:14; 69:13-76:25.]

[52] Lewis Decl. Exs. M16 & M1 [Olson Dep. 342:22-343:19; Eassey Bankruptcy Dep. 79:25-80:9.]

[53] Lewis Decl. Ex. M74 [Merrill Lynch Flash Note: Enron Corp. (Oct. 22, 2001) (MLNBY 0373995-96).]

[54] TAC ¶ 778.

[55] Lewis Decl. Exs. M71, M1, & M40 [Merrill Lynch Natural Gas Pipelines & Integrateds Analyst Report, Donato J. Eassey, Nov. 6, 1998 (MLNBY 0302227-29);  Eassey Bankruptcy Dep. 24:9-27:24; Sanders Morris Mundy Analyst Report by John E. Olson (Oct. 19, 1998).]

[56] Lewis Decl. Exs. M71, M1, & M40 [Merrill Lynch Natural Gas Pipelines & Integrateds Analyst Report, Donato J. Eassey, Nov. 6, 1998 (MLNBY 0302227-29); Eassey Bankruptcy Dep. 24:9-27:24; Sanders Morris Mundy Analyst Report by John E. Olson (Oct. 19, 1998).]

[57] Lewis Decl. Exs. M15 & M96 [Olson Dep., Dec. 7, 2004 Tr. 225:23-227:5; 245:20-246:5; Sanders Morris Mundy Analyst Report, John E. Olson, Sept. 28, 2001 (JO 000000019-42).]

purchased an additional 10,000 shares on October 22, 2001, after the disclosure of financial restatements on October 16, 2001.[58]  He did not sell his shares until November 21, 2001.[59]

31.     Merrill Lynch did not gain any special or non-public information about Enron from Elizabeth Tilney, the wife of Schuyler Tilney, who in 1999 was Senior Vice President in Advertising, Communications and Organizational Development in Enron Energy Services in 1999.[60]  She focused on marketing and communications, and had no role in finance or operations at Enron.[61]

### F.      Enron's 1999 Year-End Transactions with Merrill Lynch

32.     Plaintiffs allege that, in December of 1999, Enron and Merrill Lynch entered into two transactions designed by Enron to enable it to meet its fourth quarter and year-end 1999 earnings forecasts.[62]  Each of those transactions was negotiated at arms-length, with both parties represented by separate counsel.

### i.      The Barge Transaction

33.     On December 29, 1999, ML IBK Positions, Inc. ("MLIPI"), an affiliate of Merrill Lynch, purchased a passive equity interest in Enron Nigeria Barge Ltd. ("ENB"), a company formed by Enron Corporation to hold three electricity generating units mounted on barges anchored off the coast of Nigeria, for $28 million.[63]

---

[58] Lewis Decl. Ex. M16 [Olson Dep., Dec. 8, 2004 Tr. 320:9-321:12.]

[59] Lewis Decl. Ex. M16 [Olson Dep., Dec. 8, 2004 Tr. 323:21-23.]

[60] Lewis Decl. Exs. M20 & M6 [Tilney Dep. 36:10-38:20, 40:2-16; Fastow Dep. 1511:20-1512:19.]  RJN Ex. 64 [American Worker Project: Innovative Workplaces For The Future, Hearing Before the Subcomm. on Oversight and Investigations, 105th Cong. 6, 54 (May 20, 1998) (Statement of Elizabeth A. Tilney).]

[61] Lewis Decl. Exs. M20 & M6 [Tilney Dep. 36:10-38:20, 40:2-13; Fastow Dep. 1511:20-1512:19.]

[62] TAC ¶¶ 715, 726, 754.

[63] Lewis Decl. Ex. M46 [Share Purchase Agreement between Enron Nigeria Barge Holding and EBarge (Dec. 29, 1999) (MLNBY 0260809-832).]

34.     Enron represented that it was entering into a preliminary power purchase agreement ("PPA") with the Nigerian government on December 6, 1999.[64]

35.     Before approaching MLIPI, Enron had been negotiating a sale of the equity interest to Marubeni, an Asian trading company,[65] but had been unable to complete the transaction.[66]   Enron thus sought to find a short-term investor until Marubeni or another third party invested in ENB.[67]   Enron explained to Merrill Lynch that it would attempt either to reach a deal with Marubeni or market MLIPI's stake in ENB to another investor after the fourth quarter.[68]

36.     Employees of Merrill Lynch and/or its affiliates, with the help of the law firm Whitman Breed Abbott & Morgan (the New York office was later acquired by Winston & Strawn LLP),[69] worked on the Barge Transaction.[70]   Merrill Lynch vetted the proposed investment and relied upon Enron's certifications of its own compliance with its business and legal requirements.

---

[64] Lewis Decl. Exs. M72 & M46 [Power Purchase Agreement for Electricity Generating Facilities by and among Enron Nigeria Power Holding Ltd., Lagos State Government, Nigeria, National Electric Power Authority of Nigeria, and Federal Republic of Nigeria (Dec. 6, 1999) (ML 34203-358); Share Purchase Agreement between Enron Nigeria Barge Holding and EBarge (Dec. 29, 1999) (MLNBY 0260809-832).]

[65] Marubeni is a 150-year-old Japanese company that deals in importing and exporting goods as well as transactions involving, *inter alia*, "power projects and infrastructure, plants and industrial machinery."  RJN Exs. 60 & 61 [Marubeni, Company Profile, https://www.marubeni.com/company/profile/index.html; Corporate Chronology, https://www.marubeni.com/company/history/chronicle/.]

[66] Lewis Decl. Ex. M36 [Email from Brad Bynum to Mark Devito, James Brown and William Fuhs, regarding "DMCC for Enron Project" and attaching a draft interoffice Memorandum from James Brown, Mark Devito, Schuyler Tilney, Rob Furst and Brad Bynum, to Debt Market Commitment Committee (Dec. 22, 1999) (MLBE0152865-70).]

[67] *Id.*

[68] *Id.*

[69] RJN Ex. 59 [Kruti Trivedi, *Chicago Law Firm Makes New York Deal*, N.Y. TIMES, Aug. 1, 2000, http://www.nytimes.com/2000/08/01/business/chicago-law-firm-makes-new-york-deal.html.]

[70] Lewis Decl. Ex. M46 [Share Purchase Agreement between Enron Nigeria Barge Holdings Ltd. and Ebarge, LLC (Dec. 29, 1999) (MLNBY 0260809-32).]

37.     Specifically, Enron sent Merrill Lynch an Information Memorandum, dated

December 17, 1999, regarding the proposed transaction.[71]  Dan Bayly, a Senior Vice President of

Merrill Lynch and head of Investment Banking, expressed that Merrill Lynch's participation in

the Barge Transaction must be discussed by the appropriate committee and Executive Vice

President in charge of the firm's Corporate and Institutional Client Group and "███████████

██████."[72]

38.     James Brown was consulted as the head of the Project and Lease Finance Group

who was familiar with structured transactions.  Brown identified 10 risks for discussion related

to the possibility that Merrill Lynch would lose all or a significant portion of its $7 million

investment.  One of the risks identified by Brown was that there was "no repurchase oblig. from

Enron."  The last of the 10 risks identified for discussion was that Merrill Lynch could run a

reputational risk if the transaction was viewed to "aid/abet Enron income statement

manipulation."[73]

39.     The transaction was elevated to and reviewed by a committee that included

investment banking and legal personnel (the Debt Markets Commitment Committee

"DMCC").[74]  The DMCC reviewed Enron's proposal in a meeting on December 22, 1999.[75]

---

[71] Lewis Decl. Ex. M81 [Confidential Memorandum regarding Preferred Stock Representing a Set Duration 90% Economic Interest in Enron Nigeria Barge Ltd. ("Preliminary Information Memorandum")  (Dec. 21, 1999), at MLNBY 0226959-60 (MLNBY 0226938-61).]

[72] Lewis Decl. Ex. M69 [United States Securities & Exchange Commission, *In the Matter of Enron Corp.*, File No. HO-9350, Testimony of Daniel Bayly 81:15-25 ██████████████████████████████████████ ████████████████████████████████████ (MLNBY0303888-4045) (July 10, 2002).]

[73] Lewis Decl. Ex. M86 [Sworn Statement of James A. Brown, Apr. 28, 2003, *In re Enron Corp., et al.* No. 01-16034, (Bankr. S.D.N.Y.) ("Brown Statement") 76:21-77:23.]

[74] Lewis Decl. Exs. M86 & M78 [Brown Statement 80:11-18; Americas Credit Flash Report: Week ending 12/23/99) (MLBE 0016558-59).]

[75] Lewis Decl. Exs. M78 & M36 [Americas Credit Flash Report: Week ending Dec. 23, 1999) (MLBE 0016558-59); Email from Brad Bynum to Mark Devito, James Brown and William Fuhs, regarding "DMCC for Enron Project" and attaching a draft interoffice Memorandum from James Brown, Mark Devito, Schuyler Tilney, Rob Furst and Brad Bynum, to Debt Market Commitment Committee (Dec. 22, 1999) (MLBE0152865-70).]

40.     In reviewing the transaction, the DMCC considered, *inter alia*, that Enron, its accounting staff, and outside auditors, who had expertise in energy transactions, were aware of the transaction and were addressing the proper accounting and disclosure treatment for the transaction.[76]  The December 17, 1999 Information Memorandum from Enron stated "Following extensive review and discussion with Enron's accounting Staff and outside auditors, the following structure has been developed and approved to ensure the desired accounting treatment for the transaction.  Whereas the structure is more complex than desired and originally envisaged, it is necessary to meet all of the accounting objectives for the transaction."[77]  Merrill Lynch was not asked to advise on the accounting, structure, or disclosure treatment of the proposed transaction and was not involved in Enron's disclosure and accounting analysis.

41.     Enron confirmed to Merrill Lynch that Arthur Andersen had been consulted and signed off on Enron treating the transaction as a sale.[78]  This accounting treatment allowed Enron to book a before-tax, non-recurring gain of $12 million in the fourth quarter of 1999.[79]  This translated to a penny per share of earnings for the quarter.[80]

42.     Overall, Enron was monetizing part of the cost of acquiring specific assets by selling a portion of the net cash flows it expected those assets would generate in the future.[81]

---

[76] Lewis Decl. Exs. M36, M81, & M86 [Email from Brad Bynum to Mark Devito, James Brown and William Fuhs, regarding "DMCC for Enron Project" and attaching a draft interoffice Memorandum from James Brown, Mark Devito, Schuyler Tilney, Rob Furst and Brad Bynum, to Debt Market Commitment Committee (Dec. 22, 1999) (MLBE0152865-70); Preliminary Information Memorandum at MLNBY 0226959-60; Brown Statement 66:15-67:22.]

[77] Lewis Decl. Ex. M81 [Preliminary Information Memorandum at MLNBY 0226959.]

[78] Lewis Decl. Exs. M2 & M81 [Fastow Dep. 50:5-10; Preliminary Information Memorandum at MLNBY 0226959.]

[79] Lewis Decl. Exs. M79, M66, & M63 [Memorandum from Eric Boyt, Enron, to The Files, regarding Nigerian Barge Transaction-Accounting Issues (Mar. 15, 2000) (AB000227708-16); Solomon Report 136; Dunbar Report 15.]

[80] Lewis Decl. Ex. M63 [Dunbar Report 15.]

[81] Specifically, the shares sold to Ebarge would represent the right to obtain approximately 90% of certain net cash flows, and the owner of the shares would have the right to 1% of any additional cash flows.  Lewis Decl. Ex. M81 [Preliminary Information Memorandum at MLNBY0226945-47; 0226959-61.]  According to the Preliminary

43.     Enron designed and created the Barge Transaction and made its own disclosures regarding the transaction in its financial statements and public filings.  Merrill Lynch did not have any discussions with Arthur Andersen regarding the nature of the Barge Transaction, nor did it play any role in determining Enron's accounting treatment.[82]  Fastow conceded, during his deposition, that Merrill Lynch did not investigate Enron's accounting treatment or its disclosures with respect to this transaction.[83]  Fastow testified that it was not Merrill Lynch's obligation to provide any information to Enron's auditors" and also testified that he did not recall Merrill Lynch providing or requesting any information from Andersen.[84]

44.     At Merrill Lynch, after the DMCC reviewed the transaction, the transaction was approved by Tom Davis, then the Executive Vice President in charge of the Corporate and Institutional Client Group.[85]

45.     On December 29, 1999, MLIPI formed Ebarge, LLC ("Ebarge") for the transaction and authorized Ebarge to have a budget of $7 million to enter the Barge Transaction.[86]  Specifically, the Board of Directors of MLIPI, including Gary C. Dolan (Senior Counsel in the Investment Banking Group of Merrill Lynch, Pierce, Fenner & Smith Inc.), and Douglas P. Madden, an Assistant Secretary of the Corporation, along with Gary M. Carlin, Mark F. McAndrews, and Joseph S. Valenti (Controller of the Private Equity Group of Merrill Lynch, Pierce, Fenner & Smith Inc.), met and created Ebarge, LLC as a ███████████████

---

Information Memorandum, an Enron entity would provide power to Nigeria in three phases.  *Id.* at MLNBY 0226946-47.

[82] Lewis Decl. Ex. M6 [Fastow Dep. 1311:1-1314:10.]

[83] Lewis Decl. Ex. M6 [Fastow Dep. 1313:11-1314:10.]

[84] Lewis Decl. Ex. M6 [Fastow Dep. 1312:8-1314:10.]

[85] Lewis Decl. Exs. M78 & M42 [Americas Credit Flash Report: Week ending 12/23/99] (MLBE 0016558-59); Deposition of Tom Davis, Jul. 20, 2004 ("Davis Dep.") 11:20-23.]

[86] Lewis Decl. Exs. M37 & M63 [Minutes of Special Meeting of Board of ML IBK Positions, Inc. (Dec. 29, 1999) (MLBE0281216-17); Dunbar Report 14-15.]

██████████████████████████████████████████████████████

███████████████████[87]

46.    The Share Purchase Agreement for the Barge Transaction was signed on December 29, 1999 by Joseph S. Valenti on behalf of Ebarge.[88]

47.    Merrill Lynch recorded the investment and had a risk of losing the $7 million it invested.[89]

48.    After the transaction, Merrill Lynch continued to discuss the risk that it would lose its $7 million investment.  In February 2000, press reports emerged that the Nigerian government was considering repudiating the preliminary PPA.[90]  On June 13, Kira Toone, a Merrill Lynch staff accountant, asked Alan Hoffman (outside counsel to Merrill Lynch in connection with the Barge Transaction) ███████████████████████████████████

████████████████████████[91]

49.    Ultimately, on June 29, 2000, LJM2 E-Barge LLC, an SPE established by LJM2, purchased MLIPI's equity interest for $28.53 million, and, in September 2000, the equity interest in the barges was sold to a third party for $31.2 million, which is more than Merrill Lynch paid or received.[92]  The amount paid by the third party exceeded Merrill Lynch's equity investment.

---

[87] Lewis Decl. Ex. M37 [Minutes of Special Meeting of Board of ML IBK Positions, Inc. (Dec. 29, 1999) (MLBE0281216-17).]

[88] Lewis Decl. Ex. M46 [Share Purchase Agreement between Enron Nigeria Barge Holding Ltd. and EBarge, LLC (Dec. 29, 1999) (MLNBY 0260809-832).]

[89] Lewis Decl. Exs. M46, M70, & M86 [Share Purchase Agreement between Enron Nigeria Barge Holding Ltd. and EBarge, LLC (Dec. 29, 1999) (MLNBY 0260809-832); E-Barge, LLC Dec. 31, 1999 statement (K. TOONEMEERTENS 00007-11); Brown Statement 57:9-20]

[90] RJN Exs. 30 & 29 [*Nigerian Gov't To Review Enron Electricity Deal*, AFX EUROPEAN FOCUS, Feb. 4, 2000; *Nigerian IPP Faces Problems*, FINANCIAL TIMES ENERGY NEWSLETTERS, Feb. 1, 2000.]

[91] Lewis Decl. Ex. M82 [Email from K. Toone, Merrill to A. Hoffman, Whitman, Breed, Abbott & Morgan (copied to J. Valenti, G. Haugh), "Subject:  Ebarge LLC" (June 13, 2000) (MLNBY 0311648).]

[92] Lewis Decl. Exs. M39, M63, & M6 [Share Purchase Agreement between Ebarge and LJM2 (June 29, 2000) (MLBE 0295112-34); Dunbar Report 15; Fastow Dep. 1321:6-1322:18.]

Enron ultimately profited from the transaction by an amount greater than the profit it booked at the end of 1999.[93]

### ii.       Electricity Trades

50.       Merrill Lynch's Global Power Trading Group was approached by Clifford Baxter, CEO of Enron North America, ███████████████████████████████████████████████████████

███ ███ [94]

51.       At the time, Enron was considered to be among the most knowledgeable experts in these types of derivative transactions, and was credited with introducing many complex financial products to the energy market.[95]

52.       ███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████.[96] Merrill Lynch understood that part of Enron's purpose was to capture value from ███████████████████████████████████

███████████████████████████████████████.[97]



[93] Lewis Decl. Ex. M6 [Fastow Dep. 1320:24-1322:18.]

[94] Lewis Decl. Ex. M83 [Email from Dan Gordon, Subject: "STRC MEMO-GLOBAL POWER TRADING GROUP TRANSACTION" attaching the Global Power Trading Group Enron Trade Memorandum (Dec. 29, 1999) (MLNBY 0345863-70).]

[95] For example, Enron was a leader in what was known in the industry as "weather protection," a market in which firms entered into derivatives contracts to ensure that they had a ready source of power at a favorable price whenever temperatures go above, or below, a certain threshold. *See, e.g.*, RJN Ex. 63 [Ross McIntyre, *Perfect Weather*, POWER ECONOMICS, Mar. 5, 2001.]

[96] Lewis Decl. Exs. M107 & M83 [Deposition of Jeffrey Kronthal, June 16-17, 2004 ("Kronthal Dep.") 62:15-17; 129:8-17; Email from Dan Gordon, Subject: "STRC MEMO-GLOBAL POWER TRADING GROUP TRANSACTION" attaching the Global Power Trading Group Enron Trade Memorandum (Dec. 29, 1999) (MLNBY 0345863-70).]

[97] Lewis Decl. Exs. M107 & M83 [Kronthal Dep. 224:13-225:15; Email from Dan Gordon, Subject: "STRC MEMO-GLOBAL POWER TRADING GROUP TRANSACTION" attaching the Global Power Trading Group Enron Trade Memorandum (Dec. 29, 1999) (MLNBY 0345863-70).]

53.     Enron required that Merrill Lynch enter into a confidentiality agreement at the outset of negotiations that precluded Merrill Lynch from disclosing any information regarding the proposed transactions.[98]

54.     Under the first transaction, Enron proposed that it would purchase from Merrill Lynch a call option that provided Enron the right to obtain from Merrill Lynch the difference in dollars between the market price of energy in the future as reflected in a designated index and a strike price set forth in the agreement (a financially settled call operation).  Under the second transaction, Merrill Lynch would buy from Enron a call option that provided Merrill Lynch with the right to obtain the delivery of power from Enron at a contractually specified price (physically settled).[99]

55.     The call option that Merrill Lynch purchased from Enron (the physically settled call option) had a strike price based upon the "Chicago Citygate" natural-gas indices along with three other applicable indices (Inside F.E.R.C. ANR Louisiana, NGI (Bidweek) Michigan Consolidated, and Inside F.E.R.C. Tenn. Gas Pipeline Co.).  The call option that Enron purchased from Merrill Lynch (the financially settled call option) had a strike price based on Louisiana "Henry Hub" and ANR indices.[100]  In the winter, extreme cold in Chicago could cause natural-gas prices to rise significantly more than in the milder Gulf Coast region where the Louisiana indices were determined.  A change in natural-gas prices in Chicago would create a corresponding change in the Chicago Citygate index relative to the Henry Hub index.  As the

---

[98] Lewis Decl. Ex. M43 [Confidentiality Agreement between Enron North America Corp. and Merrill Lynch Capital Markets (Dec. 8, 1999) (MLNBY 0244540-4).]

[99] Lewis Decl. Exs. M28 & M26 [Confirmation Letter (Daily Call Option) from Enron Power Marketing, Inc. to Merrill Lynch Capital Services, Inc. (Dec. 28, 1999) (MLNBY 0244499-507); Confirmation (Daily Call Option)—Physical dated Dec. 28, 1999 (MLNBY 0244528-39).]

[100] Lewis Decl. Exs. M26 & M28 [Confirmation (Daily Call Option)—Physical dated Dec. 28, 1999 (MLNBY0244528-39); Confirmation Letter (Daily Call Option)—Financial from Enron to Merrill Lynch dated Dec. 28, 1999, (MLNBY0244499-507).]

two options were based upon these indices, variations in them could cause variations in the options' respective values.[101]

     56.   

     57.    Enron was a competitor of Merrill Lynch in the energy trading market.[104]  As such, Enron was unlikely to reveal its strategy to Merrill Lynch or reveal the existence of other transactions or counterparties Enron may have engaged to manage its risk position.

     58.   ███████████████████████████████████████ ███████████████████████████████████████[105]  They believed that Merrill Lynch's Special Transaction Review Committee should review the proposed transactions and also ███████████████████████████████████████ ███[106]  Generally, the STRC primarily focused on reputational and client risks posed by certain transactions.[107]

     59.   ███████████████████████████████████ ███████████████████████████████████████

---

[101] Lewis Decl. Ex. M109 [Deposition of David J. Lund, Feb. 16, 2005 ("Lund Dep.") 205:12-18.]

[102] Lewis Decl. Exs. M107 & M110 [Kronthal Dep. 191:21-23; Deposition of Locke R. McMurray, Oct. 31, 2005 ("McMurray Dep.") 83:14-85:20.]

[103] Lewis Decl. Ex. M107 [Kronthal Dep. 190:7-191:13.]

[104] Lewis Decl. Ex. M107 [Kronthal Dep. 109:4-19.]

[105] Lewis Decl. Ex. M111 [Testimony of Jeffrey W. Kronthal before the United States Securities and Exchange Commission, dated July 9, 2002 ("Kronthal SEC Tr.") 51:16-20]

[106] Lewis Decl. Ex. M111 [Kronthal SEC Tr., 110:20-24.]

[107] Lewis Decl. Exs. M109 & M112 [Lund Dep. 172:9-174:3; Deposition of Robert J. McCann, Sept. 22, 2005 ("McCann Dep.") 52:13-53:7.]



[108]

60.

[109]

61.

[110]

[111]

Merrill Lynch did not have any communications with Arthur Andersen and only confirmed

through Enron that Arthur Andersen had approved Enron's accounting treatment of the

transaction (although, again, Merrill Lynch did not know what information about the transaction

---

[108] Lewis Decl. Exs. M83 & M107 [Email from Dan Gordon, Subject: "STRC MEMO-GLOBAL POWER TRADING GROUP TRANSACTION" attaching the Global Power Trading Group Enron Trade Memorandum (Dec. 29, 1999) (MLNBY 0345863-70); Kronthal Dep 182:20-183:9; 213:18-214:2.]

[109] Lewis Decl. Exs. M111, M26, & M28 [Kronthal SEC Tr.  50:1-51:20, 65:8-66:1 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Confirmation (Daily Call Option)—Physical dated Dec. 28, 1999 (MLNBY0244528-39); Confirmation Letter (Daily Call Option)—Financial from Enron to Merrill Lynch dated Dec. 28, 1999, (MLNBY0244499-507).]

[110] Lewis Decl. Ex. M108 [Kronthal Dep. 328:20-25, 334:23-335:2.] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 110:10-13, 117:12-22.

[111] Lewis Decl. Ex. M107 [Kronthal Dep. 245:10-246:12.] ▮▮▮▮▮ Lewis Decl. Ex. M111 [Kronthol SEC Tr. 76:12-23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) *Id.* at 96:6-13).]

was shared with Arthur Andersen).[112]  This was consistent with Merrill Lynch's standard practice of confirming the accounting was proper in the transactions.

62.



.[113]

63.    Causey's letter stated that "Enron has reviewed the Transactions with its outside auditors Arthur Andersen," and "Arthur Andersen concurs with Enron's proposed accounting for the Transactions."[114]

64.    On December 31, 1999, Merrill Lynch Capital Services, Inc. ("MLCS") and Enron entered into the swap arrangement.[115]  Enron sold physically settled electricity call options to MLCS for a monthly premium, and MLCS sold financially settled electricity call options to Enron for a monthly premium.[116]

---

[112] Lewis Decl. Ex. M41 [Letter from Richard Causey, Enron, to Merrill Lynch Capital Services, Inc. (Dec. 30, 1999) (MLBE 370582) (confirming Arthur Andersen's approval of the Electricity Trade Transactions signed by Richard Causey); This was consistent with Merrill Lynch's practice of confirming that accounting was proper in transactions. Lewis Decl. Ex. M104 [Deposition of Richard Gordon, dated Sept. 30, 2004 188:13-18.]

[113] Lewis Decl. Ex. M111 [Kronthal SEC Tr. at 136:21-137:23, 138:1-5

[114] Lewis Decl. Ex. M41 [Letter from Richard Causey, Enron, to Merrill Lynch Capital Services, Inc. (Dec. 30, 1999) (MLBE 370582).]

[115] Lewis Decl. Exs. M111 & M27 [Kronthal SEC Tr. 232:7-9; Letter to Merrill Lynch's General Counsel (Jan. 4, 2000), attaching ISDA Agreement (dated as of Dec. 28, 1999) (EC000883457-569).]

[116] Lewis Decl. Exs. M28 & M26 [Confirmation Letter (Daily Call Option) from Enron Power Marketing, Inc. to Merrill Lynch Capital Services, Inc. (Dec. 28, 1999) (MLNBY 0244499-507); Confirmation (Daily Call Option)—Physical dated Dec. 28, 1999 (MLNBY 0244528-39).]

65.     Enron structured the options to trade for a period of four years, beginning on September 1, 2000, roughly nine months after the party executed the transactions, and ending on August 31, 2004.[117]

66.     Enron recorded a mark-to-market gain of $49 million from the Electricity Trades in its 1999 fourth quarter financial statement, which, pre-tax, translated to approximately one nickel per share of earnings.[118]

67.     Ultimately, Enron wanted to terminate the trade, and, on June 30, 2000, Enron paid Merrill Lynch $8.5 million to terminate the transactions.[119]

68.     The trades were unwound, and, as of June 30, 2000, the mark-to-market gain was no longer reflected on Enron's books.[120]

69.     Merrill Lynch set aside $15.2 million in loss reserves for the duration of the transactions, reflecting the real risks it perceived from them.[121]

**G.     LJM2**

70.     LJM2 was a private investment limited partnership founded in late 1999 by Fastow and Enron employee Michael J. Kopper, with the help of Kirkland & Ellis LLP, to invest in energy and communication-related businesses and assets.[122]

---

[117] Lewis Decl. Ex. M27 [Letter to Merrill Lynch's General Counsel (Jan. 4, 2000), attaching ISDA Agreement (Dec. 28, 1999) (EC000883457-569).]

[118] Lewis Decl. Ex. M63 [Dunbar Report 22.]

[119] Lewis Decl. Ex. M29 [MLCS/EPMI Memorandum Agreement, 1 (June 30, 2000) (L.MCMURRAY 02069-70).]  The termination resulted from negotiations between Clifford Baxter and Gordon.  In February of 2000, Baxter first contacted Gordon to terminate the transactions, but Gordon would only do so if Enron immediately paid approximately $17 million net present value of the options premium differential.  Baxter declined and the parties were unable to reach an agreement on a "termination fee."  Lewis Decl. Exs. M135 & M84 [Deposition of Schuyler Tilney, Aug. 17-18, 2006 ("Tilney Dep.") 453:21-457:10; Email exchange involving Enron and Merrill Lynch, Subject: "Merrill Lynch Offer- termination of Midwest Peaking Trade (May 31-June 1, 2000) (ECTe004369121-23).]  They finally reached an agreement in June of 2000.  Lewis Decl. Ex. M29 [MLCS/EPMI Memorandum Agreement, 1 (June 30, 2000) (L.CMurray 02069-70).]

[120] Lewis Decl. Ex. M29 [MLCS/EPMI Memorandum Agreement (June 30, 2000) (L.MCMURRAY 02069-70).]

[121] Lewis Decl. Ex. M48 [Dec. 1999 Reserves Explanations (MLNBY 0924434); Internal Merrill Lynch email chain regarding "Enron—IBK Revenue Credit" (Jan. 3, 2000 -Feb. 9, 2000) (MLNBY0924444-47).]

71.    Merrill Lynch was engaged as private placement agent for LJM2 in the fall of 1999 and helped with its structure.[123]  The primary source of investment opportunities for LJM2 came from Enron's existing assets.[124]

72.    In connection with raising funds for LJM2 from investors through April 2000, Merrill Lynch received a fee of approximately $5 million.[125]  ML IBK Positions, Inc., an affiliate of Merrill Lynch, committed to invest $5 million in LJM2.[126]

73.    Employees of Merrill Lynch and/or its affiliates invested personally in LJM2 through a limited partnership known as ML/LJM2 Co-Investment, L.P.[127]  The actual amount invested by the ▮ employees was ▮ million.[128]

74.    Merrill Lynch had no role in the daily operations of LJM2 or in the selection or approval of its transactions or any of its investments.[129]  LJM2 was run by Fastow, who served as the general partner of LJM2.[130]  Fastow testified that "[i]n August 1999, [he] prepared a sales

---

[122] Lewis Decl. Exs. M34, M33, M17, & M22 [Engagement Agreement Letter among Merrill Lynch, LJM2 Co-Investment, L.P. and LJM2 Capital Management, L.P. (Sept. 16, 1999) (the "Merrill Lynch LJM2 Engagement Letter") (MLNBY 0226208-17); Memorandum from Schuyler Tilney and Ben Sullivan, Merrill Lynch, to Mark McAndrews, Merrill Lynch (Sept. 29, 1999) (MLNBY 0226044-45); Certificate of Limited Partnership of LJM2 Capital Management, L. P. (Oct. 20, 1999) (MLNBY 0254330-31); Deposition of Michael Edsall, Oct. 19-20, 2005, ("Edsall Dep.") 24:5-25:8, 146:7-19.]

[123] Lewis Decl. Exs. M34 & M3 [Merrill Lynch LJM2 Engagement Letter; Fastow Dep. 354:4-16.]

[124] Lewis Decl. Ex. M33 [Memorandum from Schuyler Tilney and Ben Sullivan, Merrill Lynch, to Mark McAndrews, Merrill Lynch (Sept. 29, 1999) (MLNBY 0226044-45).]

[125] Lewis Decl. Exs. M49 & M34 [Email from Bill Riddle to David Sullivan and Benjamin Sullivan re: Final Closing for LJM2 (Apr. 6, 2000) (MLNBY 0050806); Merrill Lynch LJM2 Engagement Letter.]

[126] Lewis Decl. Exs. M44 & M45 [Subscription Agreement between ML IBK Positions, Inc., and LJM2 Co-Investment, L.P., (Dec. 20, 1999) (MLNBY 0254404-26); Merrill Lynch LJM2 Appropriation Request (Dec. 21, 1999) 1 (MLNBY 0257141-2).]

[127] Lewis Decl. Ex. M35 [Subscription Agreement between ML1LJM2 Co-Investment, L.P. and LJM2 Co-Investment, L.P. (Apr. 5, 2000) MLBE 0115470 (MLBE 0115464-83).]

[128] Lewis Decl. Exs. M35 & M31 [Subscription Agreement between ML1LJM2 Co-Investment, L.P. and LJM2 Co-Investment, L.P. (Apr. 5, 2000) MLBE 0115470 (MLBE 0115464-83); Email from Gerard Haugh, Merrill Lynch, to Curt Cariddi, Merrill Lynch (Nov. 29, 2001) (MLBE 0016262).]

[129] Lewis Decl. Exs. M98, M6, & M19 [Fastow Dep. 1071:7-17, 1340:11-20, 1352:17-25, 1358:20-23; Deposition of David Sullivan, Mar. 2, 2005 ("Sullivan Dep.") 30:18-25.]

[130] Lewis Decl. Ex. M59 [Fastow Decl. at 14.]

presentation, which [he] gave to Merrill, CSFB, Deutsche, and other banks who might invest in LJM2."[131]

75.    The Board of Directors of Enron approved LJM2 as a potential transactional partner for Enron and ratified, under its Code of Conduct, that Fastow's ownership and management of LJM2 would not adversely affect Enron's interest.[132]

76.    Merrill Lynch had no ability to veto transactions, and, except for the Barge Transaction, Merrill Lynch was never a counterparty to or involved with any of LJM2's transactions.[133]  Fastow testified that Merrill Lynch did not serve as a financial advisor to any party in connection with any of the LJM2 transactions apart from the Barge Transaction.[134]

77.    Fastow did not recall informing any of the limited partners about his decision to backdate documents in connection with LJM2's investments.[135]

78.    Merrill Lynch had no communications with Arthur Andersen or anyone else about how Enron accounted for its transactions with LJM2.[136]  Fastow acknowledged that it was Enron's obligation to provide Arthur Andersen with the information to properly record transactions between Enron and LJM2.[137]

79.    Tilney testified that it was "not the intention" to have LJM2 "buy the asset from Enron and then sell it back to Enron at a later date."  He did not know what LJM2 did with the

---

[131] Lewis Decl. Ex. M59 [Fastow Decl. at 14.]
[132] Lewis Decl. Exs. M115 & M80 [Yaroshefsky Report, 16; Minutes of Enron Board Meeting (Oct. 11, 1999) (AB000002320-47).]
[133] Lewis Decl. Ex. M6 [Fastow Dep. 1336:07-1338:14; 1339:10-1341:1; 1351:16-1359:20; 1364:12-1366:9; 1370:15-1371:03.]
[134] Lewis Decl. Ex. M6 [Fastow Dep. 1359:9-20.]
[135] Lewis Decl. Ex. M6 [Fastow Dep. 1364:12-22.]
[136] Lewis Decl. Exs. M6 & M114 [Fastow Dep. 1336:10-1336:25; Deposition of John Stewart, Sept. 23-29, 2005, 1202:13-1204:9.]
[137] Lewis Decl. Ex. M6 [Fastow Dep. 1336:10-1337:19.]

assets and that, as a "limited partner," he "had no control over what was going on in the investment" and "paid relatively little attention."[138]

### H.    Impact of the Barge Transaction and the Electricity Trades

80.    Only $7 million dollars out of Enron's total $12.87 billion of debt were attributable to the Barge Transaction and the Electricity Trades.[139]

81.    Of Enron's $3.28 billion in pre-tax income, Merrill Lynch's transactions contributed only $62 million.[140]

82.    By the end of October 2001, Enron's financial statements would not have been affected by the Barge Transactions or the Electricity Trades.[141]

83.    Enron realized legitimate profits from the Barge Transaction prior to its third-quarter 2000 earnings announcement on October 17, 2000.[142]

84.    The Electricity Trades were terminated after six months, and any recorded gains were completely reversed from Enron's financial statements by the third quarter of 2000.[143]

85.    In 2003, Merrill Lynch entered into a settlement with the SEC in connection with its transactions with Enron and agreed to pay $37.5 million in disgorgement, $5 million in interest, and $37.5 million in civil penalties.[144]

---

[138] Lewis Decl. Ex. M20 [Tilney Dep. 336:2-339:1.]

[139] The report of the *Newby* Plaintiffs' expert Saul Solomon furnished the data concerning the number of transactions and the cumulative figures contained in the chart.  Lewis Decl. Exs. M67, M66, M63 [Feb. 22, 2006 Supplement to Jan. 17, 2006 Expert Report of Saul Solomon, Schedules 3-6; Solomon Report 133; Dunbar Report 21-24.] Plaintiffs' expert Anthony Saunders relied on Solomon's report for adjusted estimates of Enron's debt. Lewis Decl. Ex. M65 [Report of Anthony Saunders on Insolvency, Jun. 1, 2006 6, 11, 12, 16.]

[140] *Id.*

[141] Lewis Decl. Ex. M63 [Dunbar Report 18-27.]

[142] Lewis Decl. Ex. M63 [Dunbar Report 3, 18-22.]

[143] Lewis Decl. Ex. M63 [Dunbar Report 22-27.]

[144] RJN Ex. 65 [Press Release, SEC, SEC Charges Merrill Lynch, Four Merrill Lynch Executives with Aiding and Abetting Enron Accounting Fraud (Mar. 17, 2003).]

86.     In addition, although some of Merrill Lynch's former employees were convicted in criminal trials based on their participation in the Barge Transaction, those convictions were vacated by the Fifth Circuit.[145]

87.     Judge Werlein, who presided over the sentencing before the convictions were vacated, described the Barge Transaction—which occurred nearly *two years* before Plaintiffs' purchases of the Notes—as "one discrete fraud" that "would appear to have been one of the smaller and more benign frauds" at Enron.[146]

**I.     Enron Begins to Unravel in 2001**

88.     There were scores of transactions after Merrill Lynch's allegedly active involvement with Enron.[147]

89.     In the spring of 2001, questions were raised about Enron's records and profitability.  For instance, on April 17, 2001, during a conference call with financial analysts, when Richard Grubman questioned Enron's accounting records, stating:  "You know, you are the only financial institution that can't produce a balance sheet or cash flow statement with their earnings."  Skilling replied, "Thank you very much, we appreciate that . . . asshole."[148]

90.     By the summer of 2001, rumors began to swirl about Enron's financial condition, and questions started to emerge regarding Enron's aggressive accounting.[149]  These rumors

---

[145] *United* States *v. Brown*, 459 F.3d 509, 531 (5th Cir. 2006).

[146] Lewis Decl. Ex. M21 [Revised Sentencing Transcript, *United States v. Bayly*, H-CR-03-363, at 62-63 (S.D. Tex. Apr. 21, 2005).]  The only conviction that was not reversed related to an obstruction of justice and perjury charge, not to any transactions.  *Id.*

[147] TAC ¶¶ 218, 219, 242, 245, 247, 254, 259, 261, 421, 571, 604-606, 619, 638.

[148] RJN Ex. 35 [*Enron CEO Uses Vulgarity in Attack on Fund Manager*, Fox News, Apr. 18, 2001, http://www.foxnews.com/story/2001/04/18/enron-ceo-uses-vulgarity-in-attack-on-fund-manager.html.]

[149] RJN Exs. 37, 35, & 44 [Jonathan Friedland, *Enron's CEO, Skilling, Quits Two Top Posts*, Wall St. J., Aug. 15, 2001 at A3; *Enron CEO Uses Vulgarity in Attack on Fund Manager*, Fox News, Apr. 18, 2001, http://www.foxnews.com/story/2001/04/18/enron-ceo-uses-vulgarity-in-attack-on-fund-manager.html; Alex Berenson, *A Self-Inflicted Wound Aggravates Angst Over Enron*, N.Y. Times, Sept. 9, 2001 at 1]; Lewis Decl. Exs. M129 & M38 [*Is Enron Overpriced*, Fortune, Mar. 5, 2001; Rebecca Smith & John Emshwiller, *Enron Prepares to Become Easier to Read*, Wall St. J., Aug. 28, 2001 at C1.]

gained momentum when Skilling resigned on August 14, 2001.[150]  Kenneth Lay assumed

Skilling's position as CEO, even though he had planned to step down from Enron.[151]

91.     Also in August of 2001, Enron's broadband division reported a $217 million loss,

and Enron's share price dropped significantly.[152]  While the company's stock price hit $90 per

share in the prior year, by the end of August, it traded around $37.76.[153]

92.     In the late summer and fall of 2001, there were a series of additional negative

financial disclosures about or made by Enron.  On August 28, 2001, the *Wall Street Journal*

reported that Enron was "prepar[ing] to become easier to read," and acknowledged that Enron's

accounting was "bedevilingly complicated" and that Lay sought to "restore [] credibility" on

Wall Street by making "fuller disclosures."[154]  The article explained that "Lay acknowledges that

Enron, which grew into a colossus over the past decade with a hard-charging, in-your-face

management style, has 'lost some credibility' with the investment community."[155]  The article

posited that Enron's "stock slide has multiple causes, including uncertainty about trading profits

due to the slower economy and a drop in energy prices as well as mounting concerns about the

difficulty that investors face in figuring out how the company's extremely complex operations

---

[150] RJN Exs. 37, 40, 39, & 41 [Jonathan Friedland, *Enron's CEO, Skilling, Quits Two Top Posts*, WALL ST. J., Aug. 15, 2001 at A3; John R. Emshwiller, *Enron's Skilling Cites Stock-Price Plunge as Main reason for Leaving CEO Post*, WALL ST. J., Aug. 16, 2001 at A2; Richard A. Oppel, Jr. & Alex Berenson, *Enron's Chief Executive Quits After Only 6 Months in* Job, N.Y. TIMES, Aug. 15, 2001 at 1, Paul Krugman, *Reckonings; Enron Goes Overboard*, N.Y. TIMES, Aug. 17, 2001 at 19.]

[151] RJN Ex. 42 [*Enron Replaces President*, CNN Money, Aug. 28, 2001, http://money.cnn.com/2001/08/28/companies/enron/).]

[152] Lewis Decl. Ex. M77 & M25 [Enron Earnings Release details – 3rd Quarter 2001, EC46649A0030240, EC46649A0030192-240; Kevin M. Boone & Chris Voelker, Bear Stearns Oil and Gas: The Energy Group, 9 (Dana Gordon ed., Nov. 2, 2001) (AUSA 002592-605).]

[153] RJN Exs. 9 & 25 [Enron Stock Price on Aug. 23, 2000 and Aug. 27, 2001, Bloomberg Finance L.P.]

[154] Lewis Decl. Ex. M130 [Rebecca Smith & John Emshwiller, *Enron Prepares to Become Easier to Read*, WALL ST. J., Aug. 28, 2001 (MLNBY 0374048-50).]

[155] *Id.*

make money."[156]  It further noted that Howard Weil, an energy investment boutique that

provides research and investment banking services, referred to Enron's accounting methods as a

"black box."[157]  Lay promised to address the long-time analyst and investor complaint that

"Enron doesn't provide enough information about its extremely complex operations."[158]  Lay

indicated that Enron would release more detailed information on individual business segments

and "give a better idea of the profitability of various businesses."[159]  It further noted that, as of

July 31, Fastow had ended his ownership ties with certain limited partnerships.[160]

93.     On August 29, 2001, the *New York Times* reported that Lay acknowledged that,

although Enron was trying to address concerns expressed by analysts, "they'll probably never get

all the information they want."[161]  He said that the company would probably not provide profit

and loss numbers for natural gas and electricity, the biggest products it trades.[162]  The article

noted that "Enron's financial statements include other complex transactions," including a

statement in a recent 10-K issued by Enron, stating that it might be required to issue new shares

of common stock if the price falls below certain levels because of "certain financial contracts."[163]

94.     Anxiety in the investment community continued to mount as Enron's stock

further slid to $31.57.[164]  Shortly before September 11, the *New York Times* proclaimed

---

[156] Lewis Decl. Ex. M130 [Rebecca Smith & John Emshwiller, *Enron Prepares to Become Easier to Read*, THE WALL STREET J., Aug. 28, 2001 (MLNBY 0374048-50) (emphasis added).]

[157] *Id.*

[158] *Id.*

[159] *Id.*

[160] *Id.*

[161] RJN Ex. 43 [Richard A. Oppel, Two *Are Promoted as Enron Seeks Executive Stability*, N.Y. TIMES, Aug. 29, 2001.]

[162] *Id.*

[163] RJN Exs. 43 & 33 [Richard A. Oppel, *Two Are Promoted as Enron Seeks Executive Stability*, N.Y. TIMES, Aug. 29, 2001; Enron Corp., Annual Report (Form 10-k) (Apr. 2, 2001)].

[164] RJN Ex. 9 [Enron Stock Price on Sept. 7, 2001, Bloomberg Finance, L.P.]

"SOMETHING is rotten with the state of Enron.  Or so Wall Street suspects."[165]  James Chanos,

president of Kynikos Associates, a hedge fund in New York, posited that the stock traded under a

cloud, and he believed the shares were overvalued.[166]  After the resignation of Skilling, the

article stated:  "Unfortunately, Enron's books offer investors little succor.  The complexity of the

company's businesses and the way it reports its results make understanding Enron's financial

statements essentially impossible."[167]  The *New York Times* noted that answers were critical to

determining whether Enron's "[b]ig profits" were coming from "big risky trades" with "big,

unexpected write-offs," and questioned its use of "'related-party' transactions."[168]  According to

Enron's spokesperson at the time, Enron understood that it had "credibility issues on the street,

no question," and Enron was "looking at a lot of ways to give our investors more

information."[169]

95.     On October 16, 2001, in an earnings release, Enron announced that it was taking

"after-tax non-recurring charges of $1.01 billion" in the third quarter, which resulted in a net loss

for the third quarter of $618 million.[170]

96.     Enron also disclosed that it would record a $1.2 billion reduction in shareholders'

equity as of the end of the third quarter.[171]  On October 16, 2001, Moody's placed Enron's credit

rating on a downgrade watch.[172]  Moody's announcement indicated a "substantial probability of

---

[165] RJN Ex. 44 [Alex Berenson, *A Self Inflicted Wound Aggravates Angst Over Enron*, N.Y. TIMES, Sept. 9, 2001.]

[166] *Id.*

[167] *Id.*

[168] *Id.*

[169] *Id.*

[170] Lewis Decl. Ex. M90 [Press Release, Enron Corp., *Enron Reports Recurring Third Quarter Earnings of $0.43 Per Diluted Share* (Oct. 16, 2001) (MLBE 338336-44).]

[171] Lewis Decl. Ex. M113 [Enron Corporation Third Quarter Earnings Release Conference Call at 8, Oct. 16, 2001 (ERN0078436-462).]

[172] RJN Ex. 46 [*Moody's Places All* Long *Term Debt Obligations of Enron Corp on Review for Downgrade; Senior Unsecured at Baa1 (Commercial Paper P-2 Confirmed, Not on Review)*, Oct. 16, 2001,

a downgrade within a reasonably short period of time" and "a risk of default greater than the one reflected in a BBB credit rating."[173]

97.     On October 22, 2001, Enron confirmed that the SEC had commenced an informal inquiry into its accounting for related-party transactions.[174]

98.     The same day, Enron's share price fell to approximately $20.65.[175]

99.     On October 24, 2001, Enron announced that Fastow was taking a leave of absence as CFO.[176] A flood of negative news reports about Enron subsequently followed, questioning the accuracy of its financial disclosures and health.[177]

100.     On October 28, 2001, the *Wall Street Journal* published a report challenging Enron's profits as a result of its accounting techniques.[178]

### J.     Plaintiffs' Investments in October of 2001

101.     During and following this stream of negative, bordering on scandalous news about Enron, Plaintiffs decided to purchase "over $100 million" of Enron Notes.[179] Specifically,

---

https://www.moodys.com/research/CORRECTION-TO-TEXT-MOODYS-PLACES-ALL-LONG-TERM-DEBT-OBLIGATIONS--PRM_20011017103914.]

[173] Lewis Decl. Ex. M62 [Beloreshki Report ¶ 49.]

[174] RJN Ex. 51 [Alex Berenson, *S.E.C. Opens Investigation Into Enron*, N.Y. TIMES, Nov. 1, 2001, http://www.nytimes.com/2001/11/01/business/sec-opens-investigation-into-enron.html.]

[175] RJN Ex. 9 [Enron Stock Price on Oct. 22, 2001, Bloomberg Finance, L.P.]

[176] Lewis Decl. Exs. M91 & M13 [Press Release, Enron Corp., Enron Names Jeff McMahon Chief Financial Officer (Oct. 24, 2001) (CKIR02362); Morwick Dep. 365:16-366:2.]

[177] RJN Ex. 50 [Richard A. Oppel, Jr., *Enron Seeks Additional Financing*, N.Y. TIMES, Oct. 29, 2001 ("The Enron Corporation, still struggling to reassure investors it can weather a financial crisis over complicated transactions involving its former chief financial officer, is seeking $1 billion to $2 billion in additional financing from banks, an industry official said today.  Last week, Enron . . . used about $3 billion in available credit lines and spent about $2 billion to pay off commercial paper.)]; Lewis Decl. Exs. M127 & M126 [Floyd Norris, *Plumbing Mystery of Deals by Enron*, N.Y. TIMES, Oct. 28, 2001 (SlvC000074-75) (questioning Enron's adherence to accounting laws and stating "Enron's limited disclosures make it impossible to say for sure [whether its activities and losses were legal under the accounting rules.]  Enron may have discovered ways to use the accounting rules to enable it to keep losses off income statements, while leaving profits on them.  That may become clearer when the Securities and Exchange Commission, which has begun preliminary inquiries, completes its work."); Alex Berenson & Richard A. Oppel, *Once-Mighty Enron Strains Under Scrutiny*, N.Y. TIMES, Oct. 28, 2001 (SlvC000068-73)]; RJN Exs. 48 & 49 [Floyd Norris, *Enron Ousts Finance Chief As S.E.C. Looks at Dealings*, N.Y. TIMES, Oct. 25, 2001; Rebecca Smith & John R. Emshwiller, *Enron Replaces Fastow As Finance Chief—McMahon Takes Over Post; Move Follows Concerns Over Partnership Deals*, WALL. ST. J., Oct. 25, 2001.]

[178] Lewis Decl. Ex. M131 [*Most Analysts Remain Plugged In to Enron*, WALL. ST. J., Oct. 26, 2001 (AASDTEX001182117).]

Plaintiffs purchased two types of Enron debt securities—the Exchangeables and Zeroes—in mid-to late-October 2001.[180]

102.    Plaintiffs' purchases were consistent with their distressed asset investment strategy.[181]   In 2000 and 2001, SMI managed investments for SLP, S2L, Pebble, and OIP, whose total assets at that time were valued at approximately $350 million.[182]  SMI invested primarily in convertible securities, including outright long convertible bonds and fully hedged convertible bonds.[183]  With respect to the latter, SMI used a strategy, "valu[ing] businesses and develop[ing] a directional view . . . a fairly straightforward cash flow-oriented investment" (as compared to a strategy referred to as "delta hedging arbitrage," a "strategy driven by a . . . theoretical valuation of the convertible bond relative to the underlying equity" where a percentage of the underlying security is sold short).[184]

103.    Thinking that the only risk associated with their investment was Enron's bankruptcy, and that such a risk was remote, Plaintiffs invested in the Notes in order to take advantage of the continuing price decline of Enron securities.[185]

104.    No Merrill Lynch broker or employee communicated with Plaintiffs about these purchases.

---

[179] TAC ¶¶ 88, 100; Lewis Decl. Exs. M55, M58, & M62 [Silvercreek Plaintiffs Trading History – Enron 7% Exchangeable Notes Trades After Oct. 23, 2001 (SlvC005046-55); Silvercreek Plaintiffs Trading History – Enron 0% Notes (SlvC005207-11); Tsvetan Beloreshki Report, dated July 17, 2006 ("Beloreshki Report"), 2, 10-11.]

[180] Lewis Decl. Exs. M55, M58, & M60 [Silvercreek Plaintiffs Trading History – Enron 7% Exchangeable Notes Trades After Oct. 23, 2001 SlvC005048-54 (SlvC005046-55);  Silvercreek Plaintiffs Trading History – Enron 0% Notes SlvC005208-11 (SlvC005207-11); Declaration of Louise Morwick in Opposition to Motions to Dismiss by Defendants Salomon Smith Barney, Goldman Sachs & Co., and Banc of America Securities, filed Apr. 17, 2002 in *Silvercreek Management, Inc. v. Salomon Smith Barney, Inc.* ("Morwick Decl.") ¶ 3.]

[181] Lewis Decl. Ex. M7 [Deposition of Eric Hage, Nov. 15, 2005 ("Hage Dep.") 104:4-105:8, 118:22-121:7.]

[182] Lewis Decl. Ex. M12 [Morwick Dep. 89:2-90:2, 121:21-122:3.]

[183] Lewis Decl. Exs. M60 & M12 [Morwick Decl. ¶ 2; Morwick Dep. 149:9-21.]

[184] Lewis Decl. Exs. M60 & M12 [Morwick Decl. ¶ 2; Morwick Dep. 207:13-208:19.]

[185] Lewis Decl. Exs. M13, M14, & M68 [Morwick Dep. 324:19-324:22, 664:25-665:23, 680:22-23, 883:22-884:1; Suresh Sundaresan Report, July 17, 2006 ("Sundaresan Report"), 8-11.]

i.     **The Exchangeables**

105.    Plaintiffs first purchased the Exchangeables in October 2000.[186]  The

Exchangeables were exchangeable into common stock shares of EOG Resources, Inc. at maturity

on July 31, 2002.  Originally, these securities had been issued as general senior unsecured

obligations of Enron on August 10, 1999.  The offering was made pursuant to a prospectus and a

registration statement that were filed on July 23, 1999 and amended on August 2 and August 10,

1999.[187]  The prospectus contained Enron's financial information for the period of 1994 through

March 31, 1999 and included, with Arthur Andersen's written consent, the audit opinion for

Enron's 1998 annual financial statements.[188]

106.    The offering materials did not include any financial statement reflecting Merrill

Lynch's transactions with Enron at the end of 1999 and in early 2000.[189]  Merrill Lynch was not

involved in the underwriting or sale of the Exchangeables.[190]

107.    Plaintiffs began selling this position on August 20, 2001.[191]  While Plaintiffs had

originally anticipated a 21% investment return (assuming that they would hold the

Exchangeables through maturity), Plaintiffs received a 38% return in what was essentially half

the expected time.[192]

---

[186] Lewis Decl. Ex. M53 [Silvercreek Plaintiffs Trading History – Enron 7% Exchangeable Notes trades prior to Oct. 24, 2001 SlvC004892-901 (SlvC004890-901).]

[187] RJN Exs. 71 & 38 [Form S-3 Registration Statement and Prospectus for the 7% Exchangeable Notes due July 31, 2002 (Jul. 23, 1999); Enron Corp. Amendment No. 1 to Form S-3 Registration Statement (Aug. 2, 1999).] Lewis Decl. Ex. M51 [Prospectus for the 7% Exchangeable Notes due July 31, 2002 (Aug. 10, 1999) (SlvC 000106-269).]

[188] Lewis Decl. Ex. M51 [Prospectus for the 7% Exchangeable Notes due July 31, 2002 (Aug. 10, 1999), Ex. 23.01 SlvC000268 (SlvC 000106-269).]

[189] TAC ¶¶ 134-36.

[190] RJN Exs. 67, 68, & 69 [Bloomberg Terminal Description for the Exchangeables, at 8 (listing Lead Manager and Co-Managers not including Merrill Lynch); Bloomberg Terminal Description for the Zeros (Private Placement), at 8 (same); Bloomberg Terminal Description for the Zeros (Public Offering), at 8 (same).]

[191] Lewis Decl. Exs. M13 & M53 [Morwick Dep. 314:22-25, 318:5-18; Silvercreek Plaintiffs Trading History – Enron 7% Exchangeable Notes trades prior to Oct. 24, 2001 SlvC004892 (SlvC004890-901).]

[192] Lewis Decl. Ex. M13 [Morwick Dep. 322:13-22.]

108.    Plaintiffs continued to sell the Exchangeables through September and October, and did even "better" on their return.[193]

109.    On October 23, 2001, Plaintiffs sold the remainder of their position and determined that the investment return was no longer attractive going forward.[194]  By this point, Plaintiffs made $674,459.17 in profits as a result of their investment.[195]  As of the close of business on October 23, 2001, Plaintiffs did not intend to make any additional purchases of the Exchangeables.[196]  This decision was based on the determination that there were better investment opportunities elsewhere.[197]

110.    Plaintiffs changed their minds on October 24, 2001.[198]  No broker or employee at Merrill Lynch spoke with Morwick or encouraged Morwick's purchase of the Exchangeables. Merrill Lynch was not among the financial institutions Morwick identified as having communicated with about the Exchangeables at the time of this purchase.[199]

111.    She considered that the conversion spread had compacted dramatically from earlier in October 2001—falling by almost two-thirds.[200]  Due to the lower conversion spread, Plaintiffs "could make the purchase on October 24th and 25th at a return that was much more attractive" than it had been on October 23, 2001.[201]

112.    Morwick had no conversations with anyone at Merrill Lynch that influenced the decisions to purchase the Exchangeables in October 2001.

---

[193] Lewis Decl. Exs. M13 & M53 [Morwick Dep. 323:3-325:1, 333:2-25; Silvercreek Plaintiffs Trading History – Enron 7% Exchangeable Notes trades prior to Oct. 24, 2001 SlvC004892-901 (SlvC004890-901).]

[194] Lewis Decl. Exs. M13 & M53 [Morwick Dep. 334:5-25; Silvercreek Plaintiffs Trading History – Enron 7% Exchangeable Notes trades prior to Oct. 24, 2001 (SlvC004892-901).]

[195] Lewis Decl. Ex. M134 [Silvercreek Plaintiffs Historical Position (SlvC 020753-56).]

[196] Lewis Decl. Ex. M13 [Morwick Dep. 383:19-384:3.]

[197] *Id.* at 336:2-337:12.

[198] *Id.* at 391:2-394:2, 397:21-398:5.

[199] *Id.* at 395:5-398:5, 391:2-394:2; 395:11-397:20, 455:3-8, 459:18-460:2.

[200] *Id.* at 370:10-23, 401:2-23.

[201] *Id.* at 359:10-360:3.

113.    In the hour or so before Morwick made her decision to re-purchase the Exchangeables because of the price declines, Morwick "pulled . . . the [Enron] file . . . to just revisit some of the terms" and "just sort of reviewed the prospectus . . . just to make sure that it was fresh in our mind."[202]

114.    Morwick testified that she believed the sole risk associated with the investment in the Exchangeables was the risk of Enron's bankruptcy.[203]  Morwick did not, however, analyze the various market indicators of bankruptcy or default risk for Enron, such as the Altman Z-score, KMV model, EDF score, price of Enron credit default swaps, or price of other Enron bonds.[204]  Indeed, in deciding to repurchase any of the Notes in October 2001, Morwick admitted that she failed to analyze any market indicators of bankruptcy or default risk.[205]  She believed "it was impossible that Enron would go bankrupt within nine months of October 25, 2001."[206]

115.    The price of credit default swaps on Enron tripled between October 18, 2001 and October 24, 2001.[207]  The negative information released into the market prior to Plaintiffs' investment "raise[d] questions" and "certainly mean[t] that [Plaintiffs] should do additional research and due diligence and find out what other people are thinking."[208]

116.    Plaintiffs continued to purchase the Exchangeables on October 25, 2001.[209] Around 10 a.m. that same morning, Robert Kittel, who worked with Morwick, received a message via Bloomberg from a broker at First Union asking him to call her to discuss the Exchangeables, because, according to the broker, people were "nervous" about the fact that the

---

[202] *Id.* at 402:22-403:2.

[203] Lewis Decl. Exs. M14 & M60 [Morwick Dep. 884:22-886:2; Morwick Decl. ¶ 34.]

[204] Lewis Decl. Ex. M14 [Morwick Dep. 804:17-810:10.]

[205] *Id.*

[206] *Id.* at 885:24-886:2.

[207] Lewis Decl. Ex. M10 [Matthews Dep. 207:9-24.]

[208] *Id.* at 239:11-18, 209:11-210:6, 212:8-216:19.

[209] Lewis Decl. Ex. M55 [Silvercreek Plaintiffs Trading History – Enron 7% Exchangeable Notes trades after Oct. 23, 2001, SlvC005048-52 (SlvC005046-55).]

EOG shares were not held by Enron in trust, and it "could be a confusing situation if this gets to meltdown stage."[210]  Kittel testified that he "[did not] recall reading this e-mail" and that he could not recall but did not "believe [he] told Mrs. Morwick about this concern."[211]

117.    Plaintiffs made additional purchases on October 25, 2001 (purchasing over $42 million in Exchangeables and $1.5 million in Zeroes) and October 26, 2001 (purchasing $11.3 million in Exchangeables and $1.5 million in Zeroes).[212]

118.    By the afternoon of October 26, 2001, however, Morwick started to sell the Exchangeables, but did not employ any hedges to mitigate losses.[213]  When asked about the change in strategy, Morwick explained:

> It was a combination of information.  It was what was happening in the market, which, you know, did not make sense.  Clearly somebody thought there was a problem.  The people were just selling in they . . . if you look at the financials of the company, someone was selling in a fashion that was irrational.  So just it makes you nervous that somebody knows something that you potentially don't know.
>
> *     *     *
>
> Come [October 26], the market is continuing to go down.  I mean, it's not rational.  The market is telling you something might be going on—going wrong.[214]

119.    On the same days Plaintiffs re-purchased the Exchangeables, Plaintiffs sold short the number of shares for which the Exchangeables were exchangeable.[215]  The short sales were part of Plaintiffs' proprietary strategy that aimed to hedge the investment.

---

[210] Lewis Decl. Ex. M9 [Bloomberg Chat Between Robert Kittel and Broker (Oct. 25, 2001) (SLVC017745).]

[211] Lewis Decl. Ex. M8 [Deposition of Robert Kittel, Oct. 20, 2005 ("Kittel Dep.") 408:3-409:12.]

[212] Lewis Decl. Ex. M55 [Silvercreek Plaintiffs Trading History – Enron 7% Exchangeable Notes Trades After Oct. 23, 2001 SlvC005050, SlvC005048-54 (SlvC005046-55).]

[213] Lewis Decl. Exs. M12 & M13 [Morwick Dep. 141:5-12, 407:6-18, 421:25-422:17.]

[214] Lewis Decl. Ex. M13 [Morwick Dep. 407:6-408:24.]

[215] Lewis Decl. Ex. M55 & M13 [Silvercreek Plaintiffs Trading History – Enron 7% Exchangeable Notes Trades After Oct. 23, 2001 (SlvC005046-55); Morwick Dep. 342:1-12, 343:2-11, 347:4-10, 352:20-353:9.]

120.    On October 26, 2001, Plaintiffs began buying back EOG common stock as they began selling the Exchangeables.[216]  The decision to buy back the EOG shares was not the result of a "detailed" analysis of EOG or the price of EOG stock, but the perceived need to "contain" any risk that the short sales could cause greater losses to Plaintiffs.[217]

121.    Plaintiffs did not liquidate their entire position in the Exchangeables until November 2003.[218]

122.    Plaintiffs entirely closed out of their EOG position in January 2002.[219]

### ii.        The Zeroes

123.    Plaintiffs' other investment in Enron debt securities at issue in the action was in the Zeroes, which were due to mature on February 7, 2021 and provided the noteholder with an option to convert the note into Enron common stock.[220]  The Zeroes had been issued in a private placement.[221]  This private placement did not involve Merrill Lynch.[222]

124.    A public exchange offering of the Zeroes occurred in July 2001, well after any financial impact of the Barge Transaction and the Electricity Trades had been eliminated from Enron's financial statements.[223]

125.    The prospectus for the Zeroes was filed on June 1, 2001.  It was updated periodically through October 12, 2001 and included, with Arthur Andersen's written consent, the

---

[216] *Id.*

[217] Lewis Decl. Ex. M13 [Morwick Dep. 435:6-436:5.]

[218] Lewis Decl. Ex. M55 [Silvercreek Plaintiffs Trading History – Enron 7% Exchangeable Notes Trades After Oct. 23, 2001 SlvC005048-54 (SlvC005046-55).]

[219] Lewis Decl. Ex. M55 [Silvercreek Plaintiffs Trading History – Enron 7% Exchangeable Notes Trades After Oct. 23, 2001 SlvC005049-51 (SlvC005046-55).]

[220] Lewis Decl. Ex. M52 [Prospectus for Zero Coupon Notes Due 2021 (SlvC 001165-255).]

[221] TAC ¶ 143.

[222] RJN Ex. 68 [Bloomberg Terminal Description for the Zeros (Private Placement) at 8.]

[223] Lewis Decl. Ex. M63 [Dunbar Report 18-22]; TAC ¶ 150.

audit opinion for Enron's 2000 financial statements.[224]  Merrill Lynch had no involvement with drafting, issuing, or disseminating the prospectus for the Zeroes.

126.    Plaintiffs first evaluated the Zeroes but passed on the investment opportunity prior to October 2001.  According to Plaintiffs, the Zeroes "w[ere] still going to move in price to a significant degree with the underlying equity price," and the return was too small to justify the investment.[225]

127.    Merrill Lynch was not among the financial institutions Morwick identified as having communicated with about the Zeroes at the time of Plaintiffs' purchases at issue.[226]

128.    Indeed, Morwick did not cite any conversations with Merrill Lynch.  Salespeople affiliated with Merrill Lynch did not speak about the Zeroes with Plaintiffs at this juncture.

129.    At the time, Plaintiffs did not have a favorable view of the trajectory of Enron's common stock, but as the stock price declined, the "price of the bond [became] more attractive in terms of the return you could earn on the investment."[227]

130.    Because the price of Enron stock had declined so significantly, the call option component of the Zeroes had, at that point, also declined and caused the price of the bond to decrease further towards the "bond floor."[228]  As a result, the bond traded more like a "straight senior bond investment as opposed to a convertible bond that has a fair bit of equity sensitivity."[229]  Morwick explained that the "decline in the equity price . . . was [what] . . .

---

[224] Lewis Decl. Ex. M52 [Prospectus for Zero Coupon Notes Due 2021 (SlvC 001165-255).].  RJN Ex. 45 [Prospectus for Zero Coupon Notes Due 2021, Ex. 23.01; Prospectus Supplement No. 4 for Zero Coupon Notes Due 2021, Oct. 11, 2011.]
[225] Lewis Decl. Ex. M13 [Morwick Dep. 447:6-13.]
[226] *Id.* at 455:3-455:8, 459:18-460:2.
[227] *Id.* at 451:7-11.
[228] *Id.* at 461:6-24.
[229] *Id.* at 461:6-16.

creat[ed] the investment opportunity"[230] and that, but for that decline in the price of Enron stock,

they would not have made the investment in the Zeroes in the first place.[231]

131.    Plaintiffs attributed the decline in the price of Enron stock to, among other things,

the negative company-specific news that had been released throughout October 2001.[232]

Plaintiffs were thus aware of the negative news related to Enron at the time.

132.    Although Plaintiffs knew the decline in the price of Enron stock was attributable

to, among other things, the negative company-specific news in October 2001, they did no

additional diligence before starting to buy.[233]

133.    Plaintiffs continued to purchase the Zeroes through October 31, 2001.[234]

Specifically, Plaintiffs purchased an additional $0.9 million in Zeroes for the final time.[235]

134.    Later on October 31, Plaintiffs began selling the Zeroes.[236]

135.    Also on October 31, Morwick considered purchasing an Enron put and had a

conversation with her sister, Andrea Morwick, about prices, but no such puts were available.[237]

136.    Plaintiffs liquidated their position by January 2002.[238]

### iii.    Plaintiffs Interactions with Merrill Lynch

137.    Merrill Lynch Canada and Merrill Lynch Boston executed trades and maintained

a brokerage account for Plaintiffs at Plaintiffs' sole discretion.[239]  Merrill Lynch did not retain or

exercise any discretion over Plaintiffs' accounts.[240]

---

[230] *Id.* at 464:21-465:1.

[231] *Id.* at 467:3-8.

[232] *Id.* at 465:4-15.

[233] Lewis Decl. Exs. M13 & M62 [Morwick Dep. 465:4-25; Beloreshki Report 11-18.]

[234] Lewis Decl. Ex. M58 [Silvercreek Plaintiffs Trading History – Enron 0% Notes SlvC005210 (SlvC005207-11).]

[235] *Id.*

[236] *Id.*

[237] Lewis Decl. Exs. M14 & M95 [Morwick Dep Tr. at 848:19-850:7; Bloomberg Chat between L. Morwick and A. Morwick (Oct. 31, 2001) (SlvC014122).]

[238] Lewis Decl. Ex. M58 [Silvercreek Plaintiffs Trading History – Enron 0% Notes (SlvC005207-11).]

138.    Merrill Lynch made no recommendations to Plaintiffs directly to invest in the Notes in October 2001 or later.[241]

139.    All purchases and sales of the Notes were executed by financial institutions (other than Merrill Lynch).[242]

140.    While Merrill Lynch did not execute any transactions involving the Notes, Merrill Lynch Canada did execute purchases of EOG stock on November 29, 2001, November 30, 2001, December 3, 2001, December 5, 2001, December 13, 2001, December 17, 2001, December 20, 2001, January 2, 2002, January 3, 2002, January 4, 2002, and January 5, 2002.[243]

---

[239] Lewis Decl. Exs. M57 & 132 [Merrill Lynch Trade Record and Confirmations to SMI (Nov. 30, 2001) (SlvC005189-92); Prime Brokerage Clearance Services Agreement, as of Apr. 25, 2001 (SlvC011800-09).]

[240] Lewis Decl. Exs. M61, M56, M57 [Plaintiff Silvercreek's Responses and Objections to Bank Defendants' Joint First Set of Interrogatories, at 47; Merrill Lynch Trade Confirmation to SMI (July 31, 2002) (SlvC005094); Merrill Lynch Trade Record and Confirmations to SMI (Nov. 30, 2001) (SlvC005189-92).]  Merrill Lynch regularly sent Morwick lists of securities and prices via Bloomberg without recommendations.  *See*, *e.g.*, Lewis Decl. Ex. M118 & M119 [Bloomberg Chat Between Michael Nahill and Louise Morwick (Oct. 18, 2001) (listing pricing information for various securities, but not conveying investment advice or recommendations) (SlvC013610); Bloomberg Chat Between Haig Altoonian and Louise Morwick (Oct. 25, 2001) (SlvC013851-52) (same).]  Occasionally, Merrill Lynch traders reached out to Plaintiffs regarding securities available for sale.  Lewis Decl. Ex. M120 [Bloomberg Chat Between Haig Altoonian and Robert Kittel (Oct. 25, 2001) (describing security for sale and asking if Kittel "currently [has] an interest?")  (SlvC017751).]  Plaintiffs instructed Merrill Lynch to make trades on their behalf via Bloomberg.  Lewis Decl. Ex. M121 & M122 [Bloomberg Chat Between Louise Morwick and Michael Nahill (Oct. 16, 2001) (Morwick instructing Nahill to "work 2M PFGC – use 28.7 low.") (SlvC013510); Bloomberg Chat Between Louise Morwick and Andrea Morwick (Oct. 19, 2001) (Louise Morwick directing Andrea Morwick to "please try to sell short 20K KSS common – use 54.70 low.") (SlvC013719).]

[241] *Cf.* Lewis Decl. Exs. M102 & M103 [Excerpted Bloomberg Chats Between Louise Morwick and Merrill Lynch employees (SlvC013390-4174); Excerpted Bloomberg Chats Between Robert Kittel and Merrill Lynch employees (SlvC017478-923).]

[242] Lewis Decl. Ex. M61 [Plaintiffs' Responses and Objections to Bank Defendants' Joint First Set of Interrogatories (Dec. 22, 2004) 9-10, 49 ("Pl.'s Resp. and Objections").]  Trading history charts produced by Plaintiffs indicate the amounts and dates of purchases and sales of the Zeroes and the Exchangeables, as well as broker information for each transaction.  Merrill Lynch does not appear to have been involved as a broker in the Silvercreek Plaintiffs' purchases or sales of the Exchangeables.  Lewis Decl. Exs. M53 & M55 [Silvercreek Plaintiffs Trading History – Enron 7% Exchangeable Notes trades prior to Oct. 24, 2001 (SlvC004890-901); Silvercreek Plaintiffs Trading History – Enron 7% Exchangeable Notes trades after Oct. 23, 2001 (SlvC005046-55).]  Nor was Merrill Lynch involved as a broker in the Silvercreek Plaintiffs' purchases or sales of the Zeroes. Lewis Decl. Ex. M58 [Silvercreek Plaintiffs Trading History – Enron 0% Notes (SlvC005207-11).]

[243] Lewis Decl. Ex. M116 [Plaintiffs' Supplemental Responses and Objections to Merrill Lynch & Co., Inc's First Set of Interrogatories and Document Requests, July 14, 2006, 37.]  The only Merrill Lynch entity that appears in the broker column in the Silvercreek Plaintiffs' trading history is "MLC," or Merrill Lynch Canada, and only related to purchases of EOG shares.  Lewis Decl. Ex. M55 [Silvercreek Plaintiffs Trading History – Enron 7% Exchangeable Notes Trades After Oct. 23, 2001 SlvC005049-55 (SlvC005046-55).]

141.    On October 26, 2001, Morwick asked Kittel to do "[a]dditional work on the credit

of Enron and break-up value and asset value of the business."[244]  Morwick wanted Kittel to "take

a look at the asset value of the business and the breakout value of the business and go through

with a fine-tooth comb and see if he could come across anything that changed our view, make

sure we weren't missing something, just go back and double check everything."[245]  Kittel

prepared a valuation of Enron to "try [ ] to understand [Enron's] credit" over the weekend of

October 27, 2001[246] after Plaintiffs had started selling the Exchangeables again and just before

Plaintiffs last purchase of Zeroes.[247]  Kittel did not recall previously "investigat[ing] Enron's

[debt] in this detail."[248]  Kittel recalled no conversations or interactions with Merrill Lynch about

the valuation.[249]  He also could not "recall definitively" the sources of the information he used in

his analysis.[250]  Kittel's valuation also included handwritten notes about Enron's "off balance

sheet assets" and "off b/s debt."[251]

142.    No evidence indicates that Merrill Lynch attempted to communicate with

Plaintiffs directly to induce their investment, met with them personally, or sent correspondence

to assure Plaintiffs of the safety of the investment.  There is one document that was produced by

Plaintiffs reflecting an isolated conversation between Merrill Lynch and Plaintiffs—handwritten

notes of Robert Kittel, dated November 8, 2001, reflecting a phone call with Donato Eassey from

---

[244] Lewis Decl. Ex. M14 [Morwick Dep. 848:3-5.]

[245] *Id.* at 840:12-21.

[246] Lewis Decl. Ex. M8 [Kittel Dep. 306:8-12.]

[247] *Id.* at 304:3-306:12.

[248] *Id.* at 296:1-7, 308:6-12.

[249] *Id.* at 308:13-21.

[250] On Oct. 26, 2001, Kittel received an email from an employee of Bank of America with the subject "ENE debt," which he likely requested as part of "compil[ing] additional information on Enron" on the same day.  Lewis Decl. Ex. M8 [Kittel Dep. 295:6-296:7.]  Kittel testified that he "believe[d] . . . part of the debt information [used in his analysis] would have come from the e-mail," but he did not "recall definitively what . . . sources" he used.  Lewis Decl. Ex. M8 [Kittel Dep. 307:19-308:5.]  Kittel also recalled speaking with someone at Enron around that time.  Lewis Decl. Ex. M8 [Kittel Dep. 344:7-25.]

[251] Lewis Decl. Exs. M8 & M97 [Kittel Dep. 308:13-310:10, Ex. 17 (SlvC001991).]

Merrill Lynch to discuss the potential Enron-Dynegy merger,[252] which was contemplated in November of 2001.[253]  Later, under oath, Kittel was unable to recall this phone call or who Eassey was.[254]  He could not recall any other interactions with Merrill Lynch.[255]

143.    There are no internal business records or memoranda indicating that Plaintiffs considered or factored any information from Merrill Lynch into their decisions to purchase the Notes.

### K.    Merrill Lynch Analyst Coverage

144.    The analyst reports published by Merrill Lynch reflected genuinely held statements of opinion about Enron that analyzed public information.  As explained above, analysts affiliated with Merrill Lynch offered opinions that were based upon their own views, uninfluenced by other divisions of the bank or outsiders.[256]  These analysts carefully analyzed Enron, came to their own independent conclusions, and were never pressured to modify their analysis.[257]

145.    Analyst reports published by Merrill Lynch typically lagged the market and contained no new information about Enron.[258]

146.    The analyst reports published by Merrill Lynch did not affect the prices of Enron's securities.[259]

---

[252] Lewis Decl. Ex. M117 [Kittel Dep. Ex. 43, SlvC001363 (SlvC001361-64).]

[253] Lewis Decl. Ex. M50 [Enron Corp. PowerPoint Bank Presentation, Waldorf Astoria, New York, N.Y. (Nov. 19, 2001) (the "Bank Presentation") (R.Gordon 00002-71).]

[254] Lewis Decl. Ex. M8 [Kittel Dep. 324:2-325:5.]

[255] Id. at 308:13-21, 324:2-325:5.

[256] Lewis Decl. Exs. M1 & M15 [Eassey Bankruptcy Dep. 113:23-123:24; 147:2-17; Olson Dep. 64:21-65:14; 69:13-76:25.]

[257] Lewis Decl. Exs. M16 & M1 [Olson Dep. 342:22-343:19; Eassey Bankruptcy Dep. 79:25-80:9.]

[258] Lewis Decl. Ex. M63 [Dunbar Report 11-12.]

[259] Id. at 6-11.

147.    No evidence indicates that Plaintiffs actually reviewed, read, or relied upon analyst reports published by Merrill Lynch.

148.    The analyst reports published by Merrill Lynch in the period immediately leading up to and then through the period of Plaintiffs' purchases contained multiple caveats and limitations, including, in particular, noting "uncertainties" regarding Enron's balance sheet and the lack of access to non-public information about LJM (an entity different from LJM2 and in which Merrill Lynch had no involvement).[260]   Another later report also noted Enron's high number of "off-balance [sheet]" financing transactions and indicated this made it "more difficult" to evaluate the company.[261]   Following Skilling's resignation, Eassey, the analyst at Merrill Lynch covering Enron at the time, was the first on Wall Street to question Enron's profits and downgrade his rating from "Buy" to "Neutral," the lowest rating at the time among all analysts.[262]

149.    The analysts affiliated with Merrill Lynch did not have non-public information about Enron.[263]

150.    The analysts affiliated with Merrill Lynch did not have access to non-public information about Enron in October of 2001.[264]

151.    Ratings and opinions about Enron's stock expressed in the reports were informed by public disclosures.  For instance, an October 24, 2001 comment noted that, while Enron's "cash flow from operations [was] strong," the issue of the SEC inquiry "will continue to

---

[260] Lewis Decl. Exs. M73 & M74 [Oct. 9, 2001 Merrill Lynch Comment, MLBE 0175418 (MLBE 0175416-19); Oct. 22, 2001 Merrill Lynch Flash Note, MLNBY0373995 (MLNBY0373995-96).]

[261] Lewis Decl. Ex. M75 [Merrill Lynch Analyst Report (Oct. 24, 2001) (MLBE 0213572-73).]

[262] Lewis Decl. Ex. M63 [Dunbar Report 5.]

[263] Lewis Decl. Exs. M15 & M1 [Olson Dep. 157:12-16; Eassey Bankruptcy Dep. 122:8-11.]

[264] *Id.*; Lewis Decl. Ex. M105 [Merrill Lynch Comment (Oct. 24, 2001) (MLBE 0190389-90).]

overhang the stock for some time," predicting that Enron's "stock will struggle until the SEC clarifies its concerns."[265]

152.    On October 24, 2001, another analyst report stated that "the various off-balance financing vehicles that [Enron] has employed in the past, as well as the inherent volatile nature of its core energy trading business, means that [Enron] remains a far more difficult company to analyze than most of its peers."[266]

153.    On November 1, 2001, the SEC turned the inquiry into a formal investigation, and Merrill Lynch issued a flash notice lowering its opinion of Enron's stock to "Neutral" based upon the uncertainty of the SEC investigation.[267]

### L.    Enron's Bankruptcy

154.    On November 8, 2001, Enron announced its intention to restate its financial statements for 1997 through 2000 and the first and second quarters of 2001 to reduce previously reported net income by an aggregate of $586 million.[268]  Enron acknowledged that it had been inflating its income since 1997.[269]  Enron attributed the restatement to the retroactive consolidation of three entities:  Chewco Investments, L.P. ("Chewco"), a limited partnership run by Kopper; Joint Energy Development Investments Limited Partnership ("JEDI"), an investment partnership between Chewco and Enron; and LJMl, an investment partnership that had two institutional investors as limited partners, and whose general partner was a limited partnership wholly owned by Fastow.[270]

---

[265] Lewis Decl. Ex. M105 [Merrill Lynch Comment (Oct. 24, 2001) (MLBE 0190389-90).]
[266] *Id.*
[267] Lewis Decl. Exs. M1 & M106 [Eassey Bankruptcy Dep. 78:5-15; Merrill Lynch Flash Note, Enron Corp – Noise Outweighing Fundamentals (Nov. 1, 2001) (MLNBY0266348-51).]
[268] Lewis Decl. Ex. M92 [Press Release, Enron Corp., Enron Provides Additional Information About Related Party and Off-balance Sheet Transactions (Nov. 8, 2001) (AUSUA 002661-63).]
[269] *Id.*
[270] *Id.*

155.    On November 19, 2001, senior Enron executives met with certain of Enron's bankers to restore creditor confidence, relieve its liquidity crisis, and discuss its proposed merger with Dynegy, Inc. ("Dynegy").[271]  During this meeting, Enron informed its bankers that, while the debt reflected on its third-quarter 2001 balance sheet under GAAP was $12.978 billion, Enron's "debt" (as described in the presentation) was actually multiples of that reported figure.[272]  Thus, Enron noted that billions of debt was "off balance sheet" or, in some cases, reflected on the balance sheet but classified as something other than debt.[273]  And much of this additional "debt" was incurred through structured finance transactions involving the use of SPEs.[274]

156.    Enron filed its third-quarter Form 10-Q, including interim financial statements, on November 19, 2001.[275]  These financial statements gave effect to the previously announced "non-recurring charges" and restatement of prior financial statements.  In addition, in its third-quarter 2001 balance sheet, Enron reported total debt under generally accepted accounting principles of $12.978 billion.[276]

157.    The Barge Transaction was not disclosed until April 9, 2002, when Enron was already in bankruptcy and its stock was trading at $0.29 per share.[277]

158.    The Electricity Trades were not disclosed until August 9, 2002, when Enron's stock was trading at $0.16 per share.[278]

---

[271] Lewis Decl. Ex. M50 [Bank Presentation at 2.]

[272] *Id.* at 43-68.

[273] *Id.*

[274] *Id.*

[275] RJN Ex. 58 [Enron Corp. Quarterly Report (Form 10-Q) (Nov. 19, 2001).]

[276] RJN Ex. 58 [Enron Corp. Quarterly Report (Form 10-Q) (Nov. 19, 2001).]  The debt consisted of $6.434 billion of short-term debt and $6.544 billion of long-term debt.  *Id.*

[277] RJN Ex. 56 [Anita Raghavan, *Enron's McMahon: Hero or Collaborator? Current Company President Took Part in a Sale That Helped Give Profits an Artificial Boost*, WALL ST. J., Apr. 9, 2002, at C1]; Lewis Decl. Ex. M63 [Dunbar Report 22.]

---

[278] Lewis Decl. Ex. M63 [Dunbar Report 27.]

Dated:  New York, New York
November 10, 2017

Respectfully submitted,

SHEARMAN & STERLING, LLP

By: _____
Adam S. Hakki
Daniel Lewis
Mary C. Pennisi
599 Lexington Avenue
New York, New York 10022
Telephone:  212-848-4000
Facsimile:  212-848-7179

*Attorneys for Merrill Lynch & Co., Inc.*