UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SILVERCREEK MANAGEMENT INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CITIGROUP, INC., *et al.*, <br><br> Defendants. | 02-cv-08881-JPO <br><br> ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF
CREDIT SUISSE'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

EXPLANATION OF CITATION FORMS .................................................................. vii

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ............................................................................................................3

      A.      Silvercreek. ..................................................................................................3

      B.      The Enron Notes. .......................................................................................4

      C.      Timing of Silvercreek's Purchases. ..........................................................6

ARGUMENT .................................................................................................................8

I.      SILVERCREEK DID NOT REASONABLY RELY ON ANY STATEMENTS
      BY CREDIT SUISSE. ........................................................................................8

      A.      Silvercreek Did Not Reasonably Rely on Credit Suisse's Alleged
              Statements. ................................................................................................9

      B.      There Was No Special Relationship Between Silvercreek and Credit
              Suisse. ......................................................................................................13

II.     SILVERCREEK DID NOT REASONABLY RELY ON ENRON'S FINANCIAL
      STATEMENTS ................................................................................................17

      A.      Plaintiffs' Aiding and Abetting and Conspiracy Claims Require Proof that
              Silvercreek Relied on Enron's Statements ...............................................17

      B.      Silvercreek Did Not Rely on Enron's Financial Statements in Making Its
              Decision To Purchase the Notes. .............................................................18

III.    CREDIT SUISSE DID NOT HAVE ACTUAL KNOWLEDGE OF THE
      ALLEGED ACCOUNTING FRAUD WITHIN ENRON ................................23

      A.      Plaintiffs' Secondary Liability Claims All Require Proof of Credit
              Suisse's Actual Knowledge. ....................................................................23

      B.      Credit Suisse Did Not Have Actual Knowledge of Enron's Alleged Fraud .........24

IV.    CREDIT SUISSE WAS NOT A STATUTORY UNDERWRITER. ................37

      A.      Silvercreek Admits that Credit Suisse Was Not an Underwriter. ...........37

B.      Credit Suisse Was Not "Essential" in the Distribution of the Zero Notes.............38

CONCLUSION..............................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
   No. 08 CIV. 7508 SAS, 2013 WL 837536 (S.D.N.Y. Mar. 6, 2013) ...............................15, 18

*AHW Inv. P'ship v. Citigroup Inc.*,
   980 F. Supp. 2d 510 (S.D.N.Y. 2013) ...................................................................................17

*Allen v. Westpoint-Pepperell, Inc.*,
   11 F. Supp. 2d 277 (S.D.N.Y. 1997) ...................................................................................9, 18

*Anderson v. City of New York*,
   657 F. Supp. 1571 (S.D.N.Y. 1987) ......................................................................................27

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ..............................................................................................................8

*AUSA Life Ins. Co. v. Dwyer*,
   928 F. Supp. 1239 (S.D.N.Y. 1996) ......................................................................................13

*Balk v. N.Y. Inst. of Tech.*,
   No. 11-CV-509 SAS, 2015 WL 5518709 (E.D.N.Y. Sept. 16, 2015) .....................................18

*Barron Partners, LP v. LAB123, Inc.*,
   593 F. Supp. 2d 667 (S.D.N.Y. 2009) ...............................................................................9, 17

*Bissell v. Merrill Lynch & Co.*,
   937 F. Supp. 237 (S.D.N.Y. 1996) ......................................................................................15

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ..............................................................................................................8

*Chemtex, LLC v. St. Anthony Enters.*,
   490 F. Supp. 2d 536 (S.D.N.Y. 2007) ..............................................................................17, 23

*Cong. Fin. Corp. v. John Morrell & Co.*,
   790 F. Supp. 459 (S.D.N.Y. 1992) ......................................................................................14

*In re Crazy Eddie Sec. Litig.*,
   802 F. Supp. 804 (E.D.N.Y. 1992) ...................................................................................18, 22

*Dallas Aero., Inc. v. CIS Air Corp.*,
   352 F.3d 775 (2d Cir. 2003) ..........................................................................................9, 13, 16

*de Abreu v. Bank of Am. Corp.*,
   812 F. Supp. 2d 316 (S.D.N.Y. 2011) ...............................................................................8, 23

*De Sole v. Knoedler Gallery, LLC*,
    139 F. Supp. 3d 618 (S.D.N.Y. 2015)..................................................................24

*Dorfman Org., Ltd. v. Greater N.Y. Mut. Ins. Co.*,
    279 A.D.2d 437 (N.Y. App. Div. 2001) ............................................................11

*Epstein v. Haas Sec. Corp.*,
    731 F. Supp. 1166 (S.D.N.Y. 1990)...................................................................17

*Fekety v. Gruntal & Co.*,
    191 A.D.2d 370 (N.Y. App. Div. 1993) ............................................................14

*Franco v. English*,
    210 A.D.2d 630 (N.Y. App. Div. 1994) ............................................................17

*Fridman v. City of New York*,
    183 F. Supp. 2d 642 (S.D.N.Y. 2002)...............................................................26

*Greentech Research LLC v. Wissman*,
    104 A.D.3d 540 (N.Y. App. Div. 2013) ............................................................16

*Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*,
    227 F.3d 8 (2d Cir. 2000) .................................................................................11

*J.P. Morgan Sec. Inc. v. Ader*,
    127 A.D.3d 506 (N.Y. App. Div. 2015) ............................................................15

*Kimmell v. Schaefer*,
    675 N.E.2d 450 (N.Y. 1996)..............................................................................14

*King v. Crossland Sav. Bank*,
    111 F.3d 251 (2d Cir. 1997)............................................................................9, 18

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    No. 11 MDL 2262 NRB, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015)................13

*In re Livent, Inc. Noteholders Sec. Litig.*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001)...............................................................22

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    No. 12-CV-3723 (RJS), 2016 WL 5719749 (S.D.N.Y. Sept. 29, 2016) ...............18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................................................8

*Neri v. R.J. Reynolds Tobacco Co.*,
    No. 98-CV-371, 2000 WL 33911224 (N.D.N.Y. Sept. 28, 2000)....................18, 22

*Newby v. Enron Corp. (In re Enron)*,
    491 F. Supp. 2d 690 (S.D. Tex. 2007) ..................................................................24

*Newby v. Enron Corp. (In re Enron)*,
    511 F. Supp. 2d 742 (S.D. Tex. 2005) ...........................................................17, 23

*Primavera Familienstifung v. Askin*,
    130 F. Supp. 2d 450 (S.D.N.Y. 2001) ...............................................................18

*In re Refco Inc. Sec. Litig.*,
    No. 07-MD-1902 (JSR), 2013 WL 12191891 (S.D.N.Y. Mar. 11, 2013) ..............27

*Shaffer v. Hirsch*,
    52 A.D.2d 785 (N.Y. App. Div. 1976) ...............................................................23

*Sheth v. N.Y. Life Ins. Co.*,
    273 A.D.2d 72 (N.Y. App. Div. 2000) ...............................................................11

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
    248 F. Supp. 3d 428 (S.D.N.Y. 2017).......................................................25, 38, 40

*Small v. Lorillard Tobacco Co.*,
    252 A.D.2d 1 (N.Y. App. Div. 1998) .................................................................17

*Snyder v. Puente De Brooklyn Realty Corp.*,
    297 A.D.2d 432 (N.Y. App. Div. 2002) .............................................................24

*Sterling Tr. Co. v. Adderley*,
    168 S.W.3d 835 (Tex. 2005)..............................................................................24

*Stuart Silver Assocs. v. Baco Dev. Corp.*,
    245 A.D.2d 96 (N.Y. App. Div. 1997) ...............................................................22

*Terra Sec. ASA Konkursbo v. Citigroup, Inc.*,
    820 F. Supp. 2d 541 (S.D.N.Y. 2011).................................................................9

*Terrydale Liquidating Tr. v. Barness*,
    611 F. Supp. 1006 (S.D.N.Y. 1984)...................................................................23

*United States v. Lloyds TSB Bank PLC*,
    639 F. Supp. 2d 326 (S.D.N.Y. 2009).................................................................33

*United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*,
    44 F.3d 1082 (2d Cir. 1995)..............................................................................26

*United States v. Howard*,
    No. 4:03-cr-00093 (S.D. Tex.)...........................................................................27

*Vanguard Mun. Bond Fund, Inc. v. Cantor, Fitzgerald L.P.*,
    40 F. Supp. 2d 183 (S.D.N.Y. 1999) ................................................................9, 16

*Welch v. TD Ameritrade Holding Corp.*,
    No. 07 CIV. 6904 (RJS), 2009 WL 2356131 (S.D.N.Y. July 27, 2009) ................................15

*White v. Melton*,
    757 F. Supp. 267 (S.D.N.Y. 1991) ................................................................30

**Statutes & Rules**

15 U.S.C. § 77k(a) ................................................................37

Fed. R. Civ. P. 56(c) ................................................................8

Fed. R. Evid. 602 ................................................................26, 27, 28

**Other Authorities**

*Black's Law Dictionary* 489, 955 (ed. 2014) ................................................................4

## EXPLANATION OF CITATION FORMS

The following citation forms are used in this memorandum:

- "Ex. __" for references to the exhibits to the Declaration of Richard W. Clary In Support of Credit Suisse's Motion for Summary Judgment.

- "Stmt. ¶ __" for references to Credit Suisse's Local Rule 56.1 Statement.

- "TAC ¶ __" for references to the Third Amended Complaint, dated August 11, 2011 (ECF 10-115).

**<u>The Parties</u>**

- "Credit Suisse":  Credit Suisse First Boston (USA), Inc. (n/k/a Credit Suisse (USA), Inc.), Credit Suisse First Boston LLC (n/k/a Credit Suisse Securities (USA) LLC) and Pershing LLC (f/k/a Donaldson, Lufkin & Jenrette Securities Corporation).  Where appropriate, this memorandum distinguishes between Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ") and the pre-merger Credit Suisse entities.

- "Silvercreek" or "Plaintiffs":  Silvercreek Management, Inc., Silvercreek Limited Partnership, Silvercreek II Limited, OIP Limited and Pebble Limited Partnership.

## PRELIMINARY STATEMENT

This case is about a distressed debt investor who tried to score a big return on falling bonds, got burned, and now wants its money back.  Plaintiffs bought Enron debt in October 2001, after the collapse of Enron had already begun.  Bad news about Enron was hitting the market almost every day.  But Plaintiffs ignored Enron's fundamentals and instead watched the "price" action of Enron's debt and equity, thinking that if they timed the market, they could hit a big payoff.  Plaintiffs were wrong.  Now they want Credit Suisse—which acted as a broker for Silvercreek for three of its purchases and which itself lost substantial money in Enron's collapse—to cover their losses, plus interest.

The Court has already dismissed any allegation that Credit Suisse defrauded Silvercreek.  Plaintiffs are left with theories of negligence, secondary liability and underwriter liability.  All but one of those claims (the underwriter claim) turn on two key issues:  reliance and knowledge.  Plaintiffs can prove neither.  And because Credit Suisse was not a statutory underwriter of the Zero Notes offering, Plaintiffs' Section 11 underwriter claim fails as well.

*First*, to prove their negligent misrepresentation claim, Plaintiffs must prove that they reasonably relied on statements of Credit Suisse.  To prove their common law aiding and abetting and conspiracy claims, Plaintiffs must prove that they reasonably relied on Enron's financial statements.  Plaintiffs can prove neither.  The evidence is clear that Silvercreek performed its own analysis and made decisions to purchase Enron bonds based solely on price— all in an effort to profit from the falling market for Enron's stocks and bonds.  Silvercreek did not rely on Enron's or Credit Suisse's statements in making these decisions—in fact, Silvercreek performed no additional work at that time beyond analyzing the pricing and terms of the bonds, even though the market was full of negative news concerning Enron.  (*See* Parts I-II.)

*Second*, Plaintiffs cannot prove that Credit Suisse had actual knowledge of the alleged fraud inside Enron, which is an essential element of each of Plaintiffs' secondary liability allegations.  Plaintiffs filed the TAC with the benefit of over 150 million pages of documents and over 1200 days of depositions.  Yet their central allegations that Credit Suisse "knew" about the alleged fraud rely on hearsay and quotes by unnamed sources.  Many of these allegations are copied verbatim from an unsourced news article and from the reports of the Enron Bankruptcy Examiner, who had no personal knowledge of the facts.  These unproven allegations, which the Court was required to accept as true at the motion to dismiss stage, now fall out of the case.

Stripped of the unsupported hearsay, what remains are bare allegations that because Credit Suisse provided investment banking services or lending in connection with some of Enron's numerous transactions, Credit Suisse "knew" that Enron's accounting was fraudulent. But for the vast majority of the transactions that Plaintiffs cite, Plaintiffs' own experts do not challenge Enron's accounting.  In several instances Plaintiffs' allegations rely on "secret" assurances and structures that either were not secret or simply did not exist.  In the few instances in which Credit Suisse did encounter transactions that it thought might raise accounting concerns, the evidence is undisputed that Credit Suisse took affirmative steps to ensure that Enron's Board of Directors, its outside accountants and its outside counsel gave their informed approval.  Moreover, Andrew Fastow, Enron's CFO, admitted that Enron "did not make [Credit Suisse]" aware of certain Enron "transactions that were improper" because, if it did, Credit Suisse "would stop lending" to Enron.  (*See* Part III.)

*Third*, under Section 11 of the Securities Act, no reasonable jury could conclude that Credit Suisse, which was listed as one of dozens of holders with less than 1.5% of the outstanding notes—a group which included four lead plaintiff movants in the *Newby* action—

2

was an underwriter of the Zero Notes.  Silvercreek's own Rule 30(b)(6) witness admitted that

Silvercreek itself did not consider Credit Suisse to have been an underwriter.  (*See* Part IV.)

## BACKGROUND[1]

### A.      Silvercreek.

Silvercreek Management, Inc. is a Canadian hedge fund.  (Stmt. ¶¶ 1, 6-7, 74-76.)

Silvercreek functioned as the investment manager for four investment vehicles, Silvercreek

Limited Partnership, Silvercreek II Limited, OIP Limited and Pebble Limited Partnership.  (*Id.*

¶¶ 2-7.)  Louise Morwick is the founder and portfolio manager of Silvercreek (*id.* ¶ 8), Robert

Kittel was the analyst (*id.* ¶ 13) and Bryn Joynt was CFO (*id.* ¶ 16).  Ms. Morwick was the sole

investment decision maker for Silvercreek.  (*Id.* ¶ 9.)

To generate above-market returns for its clients, Silvercreek primarily engaged in

a strategy called convertible bond arbitrage (or variations on that strategy) and the purchase of

long positions in convertible bonds.  (Stmt. ¶¶ 74-78, 93-95.)  To engage in convertible bond

arbitrage, Silvercreek would buy convertible bonds, which are bonds that can be converted into

equity of the issuer at the bondholder's discretion.  (*Id.* ¶¶ 79-81.)  Simultaneously, Silvercreek

would sell short (*i.e.*, borrow a stock it did not own and sell that stock in the marketplace) the

stock into which it was convertible.  (*Id.* ¶ 81.)  As a result, Silvercreek's net cash outlay to

purchase the bond was the difference between the price it paid for the convertible bond and the

price it received for the stock it sold short (the conversion premium).  (*Id.* ¶ 82.)  Silvercreek's

expected return would then be the interest payments received from the bond, less the net cash

outlay and the costs associated with maintaining the short.  (*Id.* ¶ 83.)  Silvercreek also could

potentially profit from the short sale of the stock.  (*Id.* ¶ 84.)  Silvercreek would also have the

---

[1] Pertinent facts regarding Credit Suisse's involvement with Enron are described in connection with the relevant legal arguments (*see* Parts III-IV) and more fully in Credit Suisse's Local Rule 56.1 Statement.

assurance that, if it was no longer profitable to maintain the short, it could cover that short by converting the bond.  (*Id.* ¶ 85.)

Silvercreek is a distressed investor:  it deliberately purchases debt "issued by a company that is financially troubled and in danger of defaulting on the debt".  *See Black's Law Dictionary* 489, 955 (ed. 2014).  As Ms. Morwick testified, "if a company runs into difficulty even if it's credit difficulty, we usually do well in those positions."  (Stmt. ¶ 91; *see id.* ¶¶ 88-90.)  When a company performs poorly, Silvercreek can purchase its debt at deep discounts.  (*Id.* ¶ 92.)  A low debt price allows Silvercreek to take advantage of certain price differentials—for example, the difference between the bond purchase price and a short sale of the underlying equity, or the difference between the bond purchase price and a cash redemption.  (*Id.* ¶¶ 82, 226.)  Silvercreek also profits on its short sales when the companies in its portfolio perform poorly.  (*Id.* ¶ 85.)

Because Silvercreek's strategy depends on price, and bonds are traded over the counter (*i.e.*, through a network of brokers and dealers and are not listed on an exchange), Ms. Morwick was in constant contact with salespeople at numerous banks, including Credit Suisse.  (Stmt. ¶¶ 101-104.)  Silvercreek's sales contact on the Credit Suisse convertible bond desk during the relevant time period was Sara Randell.  (*Id.* ¶ 107.)  Ms. Randell provided pricing information to Ms. Morwick and Mr. Kittel and relayed Silvercreek's buy or sell orders to the Credit Suisse traders.  (*Id.* ¶¶ 113, 115.)  Salespeople at other banks provided the same services to Silvercreek.  (*Id.* ¶¶ 102-104, 116.)

### B.    The Enron Notes.

In October 2001, Silvercreek made purchases of two types of Enron debt:  Zero Notes and 7% Notes.  (Stmt. ¶¶ 118, 127)  Silvercreek made a series of purchases from October 18 through October 31, 2001.  (*Id.* ¶¶ 118-119, 127-128.)  Credit Suisse served as broker for only

3 of those purchases—on October 18 and 19 (Zero Notes) and October 25 (7% Notes).  (*Id.* ¶¶ 120-121, 129.)

On October 18, 19, 22 through 26, and 31, Silvercreek purchased Enron zero coupon bonds (the "Zero Notes").  (Stmt. ¶¶ 118-119.)  This was an outright purchase of convertible bonds; Silvercreek did not make a simultaneous short sale of Enron stock when it purchased the Zero Notes.  (*Id.* ¶¶ 87, 140.)  The Zero Notes were convertible into Enron stock at any time, but they did not pay any interest prior to maturity; instead, the holder would receive a lump sum at maturity in 2021.  (*Id.* ¶¶ 133-134, 136.)  Silvercreek planned to hold those bonds until February 2004, when they could be redeemed in cash for around 70 cents on the dollar.  (*Id.* ¶¶ 136, 138-139.)  Silvercreek purchased the Zero Notes at prices ranging from around 47 cents on the dollar to 58 cents on the dollar—a projected return of around 19% to 47%.  (*Id.* ¶ 119.)

From October 24 through 26, 2001, Silvercreek purchased Enron exchangeable 7% notes (the "7% Notes") and simultaneously sold short shares of Enron Oil & Gas Company ("EOG"), an entity that Enron had spun off.  (Stmt. ¶¶ 127-128, 145-147.)  The 7% Notes paid 7% interest quarterly and were exchangeable at maturity into EOG shares.  (*Id.* ¶¶ 144, 161-164.)  The maturity date was July 2002, nine months after these purchases.  (*Id.* ¶ 163.)  Silvercreek planned to hold the 7% Notes until maturity in order to profit from the 7% interest.  (*Id.* ¶ 145.)  As in the convertible bond arbitrage scenario described above, by purchasing the 7% Notes at a low price and simultaneously selling EOG short, Silvercreek's net cash outlay for the 7% Notes was very low, and it planned to cover its short using the EOG shares received at maturity.  (*Id.*)  In addition, if the price of EOG fell at maturity, noteholders could potentially receive more EOG shares.  (*Id.* ¶¶ 151-157.)

The 7% Notes had critical differences that prevented Silvercreek's purchases from

functioning like typical convertible bond arbitrage. *First*, the 7% Notes were not exchangeable prior to maturity, meaning that Silvercreek could not cover its short at any time by simply exchanging the 7% Notes. (Stmt. ¶¶ 162-164.) *Second*, the stock into which the bond was exchangeable was of a different company, EOG. (*Id.* ¶¶ 144, 147.) Because EOG was not the issuer of the 7% Notes, its stock price would not necessarily move with Enron's stock price, and in this case its price did not move down along with Enron's stock price decrease. (*Id.* ¶¶ 149-150.) Further, the EOG stock was not held in trust, meaning that if Enron filed for bankruptcy prior to maturity, there was no guarantee that the 7% noteholders would receive the EOG shares. (*Id.* ¶¶ 165-167.)

Silvercreek had previously purchased 7% Notes in October 2000. (Stmt. ¶ 199.) This position was closed out on October 23, 2001.[2] (*Id.* ¶ 201.) Ms. Morwick and Mr. Kittel had reviewed the terms for the 7% Notes in 2000, and Ms. Morwick testified that she also looked at several Enron financial statements at that time. (*Id.* ¶¶ 202-212.) But a year later, when Silvercreek again began purchasing Enron debt, Ms. Morwick reviewed only the terms of the Notes. (*Id.* ¶¶ 222, 227, 259-261.) Neither she nor Mr. Kittel conducted *any* analysis of Enron's financial health before making those later purchases. (*Id.* ¶¶ 227-231, 258-264.)

C.    **Timing of Silvercreek's Purchases.**

Silvercreek made its purchases at a time when bad news about Enron was being released to the market almost every day. On August 14, 2001, months prior to Silvercreek's first purchase, Enron's CEO Skilling resigned (Stmt. ¶ 168); on October 16, 2001 Enron reported a $1 billion after-tax charge to its third quarter 2001 earnings to recognize asset impairments, restructuring costs and losses for certain investments (*id.* ¶ 169); and also on October 16,

---

[2] Silvercreek earned in excess of 20 percent on those trades. (Stmt. ¶¶ 213-214.) Because Silvercreek suffered no damages on these trades, they cannot be the basis for any of its claims.

Moody's placed all the long term debt obligations of Enron on review for downgrade (*id.* ¶ 170). Silvercreek purchased Zero Notes two days later (*id.* ¶ 171) and continued doing so the following day (*id.* ¶ 172). Plaintiffs continued making purchases of Enron debt on October 22 through October 31. (*Id.* ¶¶ 174-175, 177-178, 183, 185-186, 189.) During that time, a further wave of negative events occurred. On October 22, Enron announced that the SEC had commenced an inquiry into its accounting for certain related-party transactions (*id.* ¶ 173); on October 24, Andrew Fastow, Enron's CFO, announced that he was taking a leave of absence from the company (*id.* ¶ 176); on October 25, Enron drew on committed lines of credit for cash liquidity in excess of $1 billion (*id.* ¶ 179), Fitch put Enron on negative credit watch (*id.* ¶ 180), and S&P changed Enron's outlook to "negative" (*id.* ¶ 181); on October 26 Egan-Jones downgraded Enron's credit below investment grade (*id.* ¶ 184); on October 29, Moody's downgraded Enron's long term debt (*id.* ¶ 187); and on October 31, the SEC's inquiry into Enron became a formal investigation (*id.* ¶ 188).

The bad news continued for Enron. S&P and Fitch both lowered Enron's ratings on November 1 and November 5, respectively. (Stmt. ¶ 190.) On November 8, Enron announced the restatement of its financials for 1997 through 2001. (*Id.* ¶ 192.) That same day, Enron confirmed discussions with Dynegy, another energy company, regarding a possible acquisition of Enron (*id.* ¶ 193), and the two companies announced a merger agreement a day later (*id.* ¶ 194). However, on November 28, S&P, Moody's and Fitch all downgraded Enron's debt to below investment grade (*id.* ¶ 195) and Dynegy terminated the merger agreement (*id.* ¶ 196). Enron filed for bankruptcy on December 2. (*Id.* ¶ 198.)

## ARGUMENT

Silvercreek has failed to adduce sufficient evidence to defeat summary judgment for each of its remaining six claims against Credit Suisse.[3]  Plaintiffs' claim for negligent misrepresentation (Count Five) should be dismissed because Silvercreek did not rely on statements by Credit Suisse and because there was no special relationship between Silvercreek and Credit Suisse (*see* Part I).  Plaintiffs' claims for aiding and abetting fraud (Count One), conspiracy to commit fraud (Count Two) and aiding and abetting negligent misrepresentation (Count Three) should be dismissed because Silvercreek did not rely on Enron's financial statements (*see* Part II).  Each of those claims, as well as Plaintiffs' Texas Securities Act claim (Count Nine), should also be dismissed because Credit Suisse did not have knowledge of the underlying conduct by Enron (*see* Part III).  Finally, Plaintiffs' Section 11 claim (Count Six) should be dismissed because Credit Suisse was not a statutory underwriter (*see* Part IV).

## I.   SILVERCREEK DID NOT REASONABLY RELY ON ANY STATEMENTS BY CREDIT SUISSE.

Discovery has shown that Silvercreek did not reasonably rely on any statements made by Credit Suisse, and there was no special relationship between Silvercreek and Credit Suisse.  Either provides sufficient grounds for dismissal of Count Five.

Plaintiffs must adduce sufficient evidence from which a reasonable jury could find by clear and convincing evidence:  (1) "carelessness in imparting words"; (2) "upon which others were expected to rely"; (3) "and upon which they did act or failed to act"—*i.e.*, reliance; (4) "to their damage"; and (5) "the declarant must express the words directly, with knowledge or notice that they will be acted upon, to one to whom the declarant is bound by some relation or

---

[3] The legal standards for summary judgment are well-established.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *de Abreu v. Bank of Am. Corp.*, 812 F. Supp. 2d 316, 322 (S.D.N.Y. 2011).

duty of care." *Dallas Aero., Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003).  "[A]

plaintiff must prove reasonable reliance 'under New York law to recover for . . . negligent

misrepresentation.'" *King v. Crossland Sav. Bank*, 111 F.3d 251, 258 (2d Cir. 1997).

> "New York's high standard of 'clear and convincing' proof applies to actions for

negligent misrepresentation as well as actions for intentional fraud." *Allen v. Westpoint-

Pepperell, Inc.*, 11 F. Supp. 2d 277, 284-85 (S.D.N.Y. 1997), *aff'd on other grounds sub nom.

Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71 (2d Cir. 1998).  In addition, under New York

law, "[t]he heightened duty placed on sophisticated investors applies with equal force to the

reliance prong of negligent misrepresentation." *Terra Sec. ASA Konkursbo v. Citigroup, Inc.*,

820 F. Supp. 2d 541, 548 (S.D.N.Y. 2011).  Plaintiffs clearly are sophisticated investors.  (Stmt.

¶¶ 8, 12, 73-76.)

### A.    Silvercreek Did Not Reasonably Rely on Credit Suisse's Alleged Statements.

> Silvercreek alleges that Credit Suisse made negligent misrepresentations and

omissions in (a) "direct communications from Credit Suisse recommending and encouraging

Silvercreek to purchase the 7% and Zero Notes", and (b) "research reports and other information

published by CSFB".[4]  (TAC ¶¶ 164, 682, 870.)  The evidence contradicts these allegations.

### 1.    Silvercreek Did Not Rely on Statements by Ms. Randell.

> Plaintiffs allege that they had "numerous conversations with . . . Sara Rand[e]ll

. . . about Enron, and were told nothing but positive information."  (TAC ¶ 679.)  Specifically,

Plaintiffs allege that in October 2001, Ms. Randell contacted Ms. Morwick "with the specific

---

[4] Plaintiffs also allege that they relied on the offering documents for both Notes.  (TAC ¶ 161.)  Plaintiffs only allege that Credit Suisse was an underwriter for the Zero Notes (*see* TAC ¶ 881), which, like the 7% Notes, Credit Suisse sold to Plaintiffs only as agent, not principal (Stmt. ¶¶ 125-126, 130).  The only statements alleged to have been misleading in the offering documents were Enron's financial statements, which were not statements by Credit Suisse.  Plaintiffs cannot premise a negligent misrepresentation claim on these facts.  *See Barron Partners, LP v. LAB123, Inc.*, 593 F. Supp. 2d 667, 674 (S.D.N.Y. 2009) (no special relationship where plaintiff and defendant "were merely a buyer and seller of corporate stock"); *Vanguard Mun. Bond Fund, Inc. v. Cantor, Fitzgerald L.P.*, 40 F. Supp. 2d 183, 191 (S.D.N.Y. 1999).

'opportunity' for Plaintiffs to purchase the Zero Notes" and "[d]uring that call, Ms. Rand[e]ll represented to Ms. Morwick that CSFB viewed the Zero Notes as a good investment opportunity for Silvercreek based on the attractive yield, and the fact that the issuing company (Enron) had good credit.  Prior to Ms. Rand[e]ll's contact, Plaintiffs were not actively considering purchase of the Zero Notes."  (*Id.* ¶ 678.)  Plaintiffs also allege that Sara Randell "tout[ed] the 7% Notes" and that "[a]fter further dialogue with CSFB, Silvercreek purchased 7% Notes through CSFB".  (*Id.* ¶ 680.)  These allegations are unsupported by the evidence and applicable law.

*First*, contrary to Plaintiffs' allegation that Ms. Randell "tout[ed] the 7% Notes", none of Ms. Morwick, Mr. Kittel or Ms. Randell remembered any such conversation.  (Stmt. ¶¶ 256-257, 265.)  In fact, Ms. Morwick testified that she "d[id]n't think that's an investment opportunity that, you know, that they [Credit Suisse] had highlighted for us."  (*Id.* ¶¶ 256-257.)

*Second*, with respect to the Zero Notes, the evidence does not reflect "numerous conversations" in which Ms. Randell said "nothing but positive information" about Enron.  In fact, Bloomberg messages reflect that Ms. Randell sent Silvercreek *negative* information about Enron:  on October 26, Ms. Randell alerted Ms. Morwick and Mr. Kittel to the fact that an Egan-Jones credit report had come out lowering Enron's rating to below investment grade.  (Stmt. ¶¶ 272-275.)  Ms. Randell did not remember any phone calls with Ms. Morwick in October 2001 (*id.* ¶¶ 241-242), nor did Mr. Kittel recall any conversations with salespeople at that time (*id.* ¶ 232).

Ms. Morwick purported to recall only one conversation with Ms. Randell concerning the merits of Enron Notes.  She testified that this conversation occurred October 18, the same day as Silvercreek's first purchase of Zero Notes (Stmt. ¶¶ 233, 248-252).  Ms. Morwick testified that Ms. Randell "highlight[ed]" the Zero Notes and "identified th[em]

[a]s a very good investment opportunity.  Strong company.  You know, bit of noise in the markets currently, but, you know, very strong credit."  (*Id.* ¶¶ 233-234.)  Ms. Morwick also testified that she could not attribute statements to Ms. Randell from that conversation with any specificity.  (*Id.* ¶ 236.)  There is no supporting documentation for Ms. Morwick's vague recollection; Bloomberg messages reflect that on October 18, a general Bloomberg blast went out from Credit Suisse to various clients, including Silvercreek, indicating that there were Zero Notes offered at a certain price, and five minutes later, Ms. Morwick responded that she wanted to buy some (*id.* ¶ 222).  Ms. Morwick later testified that Ms. Randell had not "express[ed] her view [as to Enron's creditworthiness]" and had just "highlight[ed]" the Zero Notes because of Silvercreek's "investment strategy and the price."  (*Id.* ¶¶ 237-238.)  But even taking Ms. Morwick's initial testimony as accurate, the statements she attributes to Ms. Randell were mere puffery or statements "relating to future events that might never come to fruition"—*i.e.*, statements on which it was unreasonable to rely as a matter of law.[5]

 *Third*, it would have been unreasonable for Silvercreek—a sophisticated investment manager paid to analyze investments—to rely on the say-so of a Credit Suisse salesperson in deciding to make an investment.  Ms. Morwick herself referred to this type of purported recommendation as a "pitch".  (Stmt. ¶ 106.)  In reality, as discussed below (*see* Part II), Silvercreek had been following the Zero Notes as a potential investment for months, waiting for the price to fall to a point at which the investment became attractive.  Silvercreek's investment decision to gamble on Enron had nothing to do with any "pitch" by Ms. Randell.

---

[5] *See Sheth v. N.Y. Life Ins. Co.*, 273 A.D.2d 72, 74 (N.Y. App. Div. 2000) (holding "mere puffery [or] opinions of value or future expectations" inactionable); *Dorfman Org., Ltd. v. Greater N.Y. Mut. Ins. Co.*, 279 A.D.2d 437, 437 (N.Y. App. Div. 2001) (assertion that account "would be profitable and would double the brokers' account . . . was nonactionable opinion or mere puffery"); *Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20-21 (2d Cir. 2000) ("[M]ere promises . . . about future events . . . cannot support a claim for negligent misrepresentation.").

## 2.     Silvercreek Did Not Rely on Credit Suisse Analysts.

Plaintiffs further allege that they relied on "[i]nvestment research by [Credit Suisse]", and the "Buy" recommendations issued by Credit Suisse.  (TAC ¶ 164.)  Specifically, Plaintiffs claim that they relied on reports dated October 16, 19, 22 through 24 and 26 that "represented to Silvercreek . . . that [for example] Enron securities were a 'strong buy'".  (*Id.* ¶¶ 679, 682.)  Plaintiffs also allege that they had "numerous conversations with . . . the CSFB research analysts about Enron, and were told nothing but positive information" (*id.* ¶ 679), specifically naming the following analysts:  Jill Sakol, Curt Launer, Philip Salles, Andy DeVries, Charles Gassenheimer and Rich Vossler (*id.* ¶ 682).  These allegations are unsupported.

*First*, Plaintiffs cannot prove they relied on statements from Ms. Sakol, Mr. Gassenheimer or Mr. Vossler.  Neither Ms. Morwick nor Mr. Kittel testified to having had any conversation with or having read any reports by these analysts.  All three of these analysts were debt analysts (Stmt. ¶¶ 40, 28, 43), yet Ms. Morwick testified that Silvercreek did not review Enron credit research reports, only *equity* research reports.  (*Id.* ¶ 266.)  Moreover, Mr. Vossler was a *high-yield* analyst—in other words, an analyst for debt that is *below investment grade* (*id.* ¶ 43)—and Plaintiffs insist they considered their investments in Enron debt basically risk-free (*id.* ¶ 86), rendering his research irrelevant.  It is noteworthy that neither Mr. Vossler nor Mr. Gassenheimer was deposed in any Enron litigation by any party.

*Second*, there is no evidence that Silvercreek had any conversations with any of these Credit Suisse analysts at the time Silvercreek was purchasing the Notes, in October 2001.[6] Ms. Morwick specifically testified that Silvercreek "didn't speak with the [Credit Suisse equity] analysts.  We just read the research report."  (Stmt. ¶ 206.)  Mr. Kittel also testified that he did not recall conversations with Credit Suisse analysts at this time.  (*Id.* ¶¶ 232, 265.)

---

[6] Plaintiffs did not bother to ask any deposition questions of Mr. Launer, Ms. Sakol, Mr. Salles or Mr. DeVries.

*Third*, Plaintiffs have not adduced evidence that, prior to their purchases in October 2001, Ms. Morwick or Mr. Kittel even read the analyst reports that Plaintiffs list in their Complaint.  Ms. Morwick testified that, with respect to the Zero Notes, she assessed whether the price of the Zero Notes was "right", "where the bonds were trading".  (Stmt. ¶ 227.)  With respect to the 7% Notes, she testified that she reviewed the terms and the prospectus.  (*Id.* ¶ 259.)  Neither Ms. Morwick nor Mr. Kittel recalled reading any Credit Suisse analyst reports in particular, let alone the specific reports listed in the Complaint.  (*Id.* ¶¶ 205, 206, 266, 288.)

Even if Plaintiffs had read the reports, it would be unreasonable as a matter of law for Silvercreek—a sophisticated hedge fund whose business was to analyze investments—to rely on generalized research analyst reports in making its investment decisions.  *See Dallas*, 352 F.3d at 789 ("[Plaintiff] cannot claim it relied on [defendant]'s special expertise because it is clear that [plaintiff] itself had the relevant expertise at issue".); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 6243526, at *60 (S.D.N.Y. Oct. 20, 2015) ("[P]laintiffs' allegations also fail the reasonable reliance prong, as it would have been patently unreasonable for traders to treat an analyst's views as a guarantee").  As discussed below (*see* Part II), Silvercreek's investment strategy did not call for it even to review Enron's financials— let alone analyst reports on Enron—in deciding to invest in Enron debt.

Because Plaintiffs cannot prove that they reasonably relied on statements made by Credit Suisse, their negligent misrepresentation claim must be dismissed.

## B.   There Was No Special Relationship Between Silvercreek and Credit Suisse.

To maintain a claim for negligent misrepresentation, Plaintiffs must also show that there was a special relationship between Silvercreek and Credit Suisse.  *E.g.*, *AUSA Life Ins. Co. v. Dwyer*, 928 F. Supp. 1239, 1253 (S.D.N.Y. 1996).  "The relationship between the parties . . . must be sufficiently close that it approaches privity."  *Id.*  To determine whether a special

relationship existed, courts look to three factors: "(1) whether the person making the representation held or appeared to hold unique or special expertise; (2) whether a special relationship of trust or confidence existed between the parties; and (3) whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Kimmell v. Schaefer*, 675 N.E.2d 450, 455 (N.Y. 1996). There is no duty to disclose in an arm's-length transaction. *See Cong. Fin. Corp. v. John Morrell & Co.*, 790 F. Supp. 459, 475 (S.D.N.Y. 1992). Plaintiffs have not shown that there was a special relationship between Silvercreek and either Ms. Randell or the Credit Suisse analysts.

### 1.  Silvercreek Had No Special Relationship with Ms. Randell.

Plaintiffs allege that they "were in privity with CSFB, who from time to time communicated investment suggestions and recommendations to Plaintiffs, and sold 7% Notes and Zero Notes to Plaintiffs." (TAC ¶ 871.) Plaintiffs further allege they "had a close and long-standing relationship with CSFB" and "communicated daily with CSFB's convertible bond desk". (*Id.* ¶ 675.) Plaintiffs also allege—erroneously—that Credit Suisse sold Zero Notes and 7% Notes "to Silvercreek as principal (not as broker), thereby reducing its own exposure". (*Id.* ¶¶ 678, 680.)

Stripped of the rhetoric, these allegations describe ordinary brokerage services. New York law is clear that, as a general matter, there is no special relationship between a broker and a purchaser of securities. *See Fekety v. Gruntal & Co.*, 191 A.D.2d 370, 371 (N.Y. App. Div. 1993) ("[A] broker does not, in the ordinary course of business, owe a fiduciary duty to a purchaser of securities"). Applying the undisputed evidence to the three *Kimmel* factors, it is clear that all three weigh against finding a special relationship here.

*First*, Plaintiffs have not alleged, nor have they adduced evidence that

14

Ms. Randell had "unique or special expertise".

  *Second*, nothing in this relationship remotely suggests it was "special"; Ms. Randell was simply an intermediary between Silvercreek and the Credit Suisse traders, who themselves were functioning as market intermediaries.  The most the evidence shows is that Ms. Randell had covered Silvercreek on the convertible bond desk for about a year and a half (Stmt. ¶¶ 108-112), which is insufficient.  *See J.P. Morgan Sec. Inc. v. Ader*, 127 A.D.3d 506, 507 (N.Y. App. Div. 2015) (no special relationship between broker-dealer and asset management firm though broker-dealer had worked for the firm's predecessor in interest for years).

  Moreover, contrary to the allegations of the Complaint, the evidence shows that Credit Suisse was acting as an agent in the three sales it made to Silvercreek in October 2001—it was *not* selling those Notes as principal.  (Stmt. ¶¶ 125-126, 130.)  Ms. Randell merely provided Ms. Morwick and Mr. Kittel with pricing information (*id.* ¶¶ 115-116), as Ms. Randell did with many other clients (*id.* ¶ 117).  Ms. Morwick and Mr. Kittel received these same types of communications from many other brokers.  (*Id.* ¶ 103.)  These were routine communications to obtain pricing and execute trades.  (*Id.* ¶ 116.)  There was nothing "special" about them.  *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, No. 08 CIV. 7508 SAS, 2013 WL 837536, at *6-7 (S.D.N.Y. Mar. 6, 2013) ("[If] generic communications regarding potential investment . . . could give rise to a [special relationship] then any Placement Agent would be liable.").  And, of course, Ms. Randell had no discretion over any Silvercreek investment decision.[7]

  *Third*, Plaintiffs have not shown that Ms. Randell was aware or intended that Silvercreek would rely on information she purportedly provided.  Since Ms. Morwick could not

---

  [7] *See Bissell v. Merrill Lynch & Co.*, 937 F. Supp. 237, 246 (S.D.N.Y. 1996) ("In the absence of discretionary trading authority delegated by the customer to the broker . . . a broker does not owe a general fiduciary duty to his client."), *aff'd*, 157 F.3d 138 (2d Cir. 1998); *Welch v. TD Ameritrade Holding Corp.*, No. 07 CIV. 6904 (RJS), 2009 WL 2356131, at *45 (S.D.N.Y. July 27, 2009).

have reasonably relied on the general positive statements that she purportedly heard from

Ms. Randell (*see* Part I.A), it likewise would be unreasonable to infer that Ms. Randell was

aware or intended that Silvercreek would rely on such information.

> ### 2.      Silvercreek Had No Special Relationship with Credit Suisse Analysts.

Plaintiffs allege they "were in privity with CSFB" and that "it was reasonably

foreseeable that . . . Plaintiffs would rely upon and act upon" information from Credit Suisse

analysts "in deciding whether to invest in Enron securities".  (TAC ¶ 875.)  But all three special

relationship factors again weigh against Silvercreek.

With respect to the first factor, although the analysts may have had expertise

analyzing and researching companies, this is *the same* expertise Silvercreek possessed.  This

weighs against finding a special relationship.  *See Greentech Research LLC v. Wissman*, 104

A.D.3d 540, 541 (N.Y. App. Div. 2013) (no "unique or specialized expertise" where plaintiff "is

an experienced financial analyst and money manager").  Plaintiffs cannot establish the second

factor—a relationship of trust and confidence—because the analyst reports were available to the

public and not specific to Silvercreek in any way.  *See Dallas*, 352 F.3d at 788; *Vanguard*, 40

F. Supp. 2d at 191 ("[F]ederal courts have typically dismissed negligent misrepresentation claims

brought by members of the general investing public.").  Plaintiffs have not adduced evidence of

any direct communications between Credit Suisse analysts and Silvercreek during the relevant

time period.  With respect to the third factor, it was not reasonably foreseeable that Silvercreek, a

sophisticated hedge fund that makes money from analyzing investments and developing its own

investment strategy, would rely on a public research analyst report in making its investment

decisions, rather than engaging in its own analysis—analysis Silvercreek's clients paid it, and not

Credit Suisse, to perform.

In short, the facts do not demonstrate a special relationship between Silvercreek and either Ms. Randell, the analysts or Credit Suisse, causing Count Five to fail.

## II.   SILVERCREEK DID NOT REASONABLY RELY ON ENRON'S FINANCIAL STATEMENTS.

Plaintiffs' claims for aiding and abetting fraud (Count One), conspiracy to commit fraud (Count Two) and aiding and abetting negligent misrepresentation (Count Three) all should be dismissed because Plaintiffs have not adduced sufficient evidence from which a reasonable jury could conclude, by clear and convincing evidence, that Silvercreek actually and reasonably relied on Enron's financial statements.

### A.   Plaintiffs' Aiding and Abetting and Conspiracy Claims Require Proof that Silvercreek Relied on Enron's Statements.

Plaintiffs' claims for aiding and abetting and conspiracy all require proof of the underlying violation—*i.e.*, fraud or (for Count Three) negligent misrepresentation *by Enron*.  *See Chemtex, LLC v. St. Anthony Enters.*, 490 F. Supp. 2d 536, 545-46 (S.D.N.Y. 2007) (requiring proof of "violation by the primary wrongdoer" for aiding and abetting fraud (citing *Franco v. English*, 210 A.D.2d 630, 633 (N.Y. App. Div. 1994)); *Epstein v. Haas Sec. Corp.*, 731 F. Supp. 1166, 1187 (S.D.N.Y. 1990) ("[C]ivil conspiracy to commit fraud, standing alone, is not actionable"); *Newby v. Enron Corp. (In re Enron)*, 511 F. Supp. 2d 742, 801-02 (S.D. Tex. 2005) (requiring proof that "the party whom the defendant aids . . . perform a wrongful act" for aiding and abetting negligent misrepresentation).

To demonstrate the underlying fraud or negligent misrepresentation, Plaintiffs must also prove that they reasonably relied on Enron's statements.[8]  *See Small v. Lorillard*

---

[8] Plaintiffs' aiding and abetting negligent misrepresentation claim fails for the additional reason that no special relationship existed between Silvercreek and Enron.  *See AHW Inv. P'ship v. Citigroup Inc.*, 980 F. Supp. 2d 510, 524-25 (S.D.N.Y. 2013) ("[A]n issuer of shares to public investors . . . [is] not in a special privity-like relationship with the investing public, or with actual purchasers".), *aff'd*, 661 F. App'x 2 (2d Cir. 2016); *Barron*, 593 F. Supp. 2d at 674 (no special relationship where plaintiff and defendant "were merely a buyer and seller of corporate stock").

*Tobacco Co.*, 252 A.D.2d 1, 8 (N.Y. App. Div. 1998) ("[I]ndividualized proof of reliance is

essential to [a] cause[ ] of action . . . for common-law fraud."), *aff'd*, 94 N.Y.2d 43 (1999); *King*,

111 F.3d at 258 ("[A] plaintiff must prove reasonable reliance 'under New York law to recover

for . . . negligent misrepresentation.'").   These facts must be proved by *clear and convincing*

*evidence*.  *See Abu Dhabi*, 888 F. Supp. 2d at 444; *Balk v. N.Y. Inst. of Tech.*, No. 11-CV-509

SAS, 2015 WL 5518709, at *7 (E.D.N.Y. Sept. 16, 2015), *aff'd*, 683 F. App'x 89 (2d Cir. 2017);

*Allen*, 11 F. Supp. 2d at 284-85; *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 488

(S.D.N.Y. 2001).   For the reasons discussed in Part II.B below, Plaintiffs cannot meet their

burden.[9]

### B.    Silvercreek Did Not Rely on Enron's Financial Statements in Making Its Decision To Purchase the Notes.

Plaintiffs allege that they "relied on the accuracy and completeness of Enron's

historical financial information from 1994 to 2001 for their purchases of the Enron Notes".

(TAC ¶¶ 4, 106, 110, 164.)[10]   Discovery has shown that, in reality, Plaintiffs purchased Zero

Notes and 7% Notes in October 2001 based solely on price and the return they hoped to generate

by taking advantage of perceived price differentials.

Silvercreek first purchased 7% Notes in October 2000.   (Stmt. ¶ 199.)   However,

by October 23, 2001, Silvercreek had unwound that position (*id.* ¶ 201), because it was not

sufficiently profitable (*id.* ¶ 258).   On October 24, Silvercreek began buying 7% Notes again.

---

[9] Where "aiding and abetting claims overlap with . . . conspiracy claims, New York courts have allowed the aiding and abetting claims to proceed, but have dismissed as duplicative the conspiracy claims." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, No. 12-CV-3723 (RJS), 2016 WL 5719749, at *8 (S.D.N.Y. Sept. 29, 2016).  Here, the conspiracy claim should be dismissed as duplicative because the same facts form the basis of Plaintiffs' aiding and abetting fraud claim and their conspiracy claim.   (*Compare* TAC ¶¶ 802-13, *with* TAC ¶¶ 814-29.).

[10] Plaintiffs also allege they "relied upon publicly available information", but Plaintiffs have not specified which "publicly available information" they claim to have relied on, beyond Enron's financial statements.   Such information cannot provide evidence of reliance.  *See Neri v. R.J. Reynolds Tobacco Co.*, No. 98-CV-371, 2000 WL 33911224, at *6 (N.D.N.Y. Sept. 28, 2000); *In re Crazy Eddie Sec. Litig.*, 802 F. Supp. 804, 812 (E.D.N.Y. 1992).

(*Id.* ¶ 255.)  Prices had fallen, the conversion premium had decreased significantly, and

Silvercreek thought it could make money.  (*Id.* ¶ 258.)  As Ms. Morwick testified:

> "Q. Okay.  Now, you made these trades because the spread
> decreased so much; correct?
>
> A. That's correct.
>
> Q.  Okay.  And on October 23rd you were selling because the spread, and October
> 24th you were buying because the spread had essentially been cut in half?
>
> A. That's correct.
>
> Q. That's why you bought when you bought?
>
> A. Because the return—we sold because the return for the nine-
> month investment was not attractive on October 23rd, but you
> could make the purchase on October 24th and 25th at a return that
> was much more attractive."  (*Id.* ¶ 258.)

Purchasing on October 24 or 25, 2001 was more attractive to Plaintiffs because

the conversion premium (*i.e.*, the difference between the bond price and EOG stock price) had

decreased.  Because Silvercreek was simultaneously shorting EOG stock with each 7% Note

purchase it made, Silvercreek's return would be the interest paid on the bond, minus the

conversion premium and costs associated with maintaining its short of EOG.  (Stmt. ¶ 145.)

Accordingly, the smaller the conversion premium, the more money Silvercreek believed it could

make.  In addition, because the 7% Notes were exchangeable for more shares of EOG stock if

the EOG stock price decreased, as Ms. Morwick testified, "if people had a negative view of EOG

and thought it was going to go down, you would potentially get more shares" of EOG at

exchange and further augment returns.  (*Id.* ¶ 157.)

Similarly, Silvercreek had been aware of the Zero Notes since February 2001

(Stmt. ¶¶ 215-220), but declined to invest in them until October 18, 2001 because they "only had

a 6 percent return" which "[wa]sn't good enough".  (*Id.* ¶¶ 216-217.)  On October 18,

19

Silvercreek decided to purchase because "it became a better investment" when "Enron declined in value." (*Id.* ¶ 223; *see also id.* ¶ 224 ("Q. Without the drop in the stock price over this period, you wouldn't have made this investment at the time?  A. No, it's unlikely.").)  Ms. Morwick testified that Silvercreek planned to hold these bonds until February 2004, when there was a cash-only redemption of around 70 cents on the dollar.  (*Id.* ¶ 138-139.)  Silvercreek purchased the Zero Notes at prices ranging from around 47 cents on the dollar to 58 cents on the dollar—a return of around 19% to 47%.  (*Id.* ¶ 119.)  That difference between redemption value and purchase price is what drove Silvercreek's analysis:  "Q.  So the analysis for you was pretty straightforward.  The bond price is X.  The cash redemption in 2004 is going to be Y?  A.  That's correct."  (*Id.* ¶ 226.)  Ms. Morwick testified that she continued to buy throughout this period because "the decline in the equity price . . . was . . . creating the investment opportunity." (*Id.* ¶ 254.)

The timing of Plaintiffs' purchases highlights their focus on price.  Plaintiffs waited to buy until October, when bad news about Enron emerged and the price fell, and *continued to buy* as more negative information about Enron came to the market and prices fell further.  Silvercreek made its first purchase after Enron reported a $1 billion write-down and Moody's had placed all long term debt obligations of Enron on review for downgrade.  (Stmt. ¶¶ 169-170.)  It continued buying after Enron announced an SEC inquiry into its accounting (*id.* ¶¶ 173, 175).  It continued buying after Fastow announced that he was taking an unexplained leave of absence from the company.  (*Id.* ¶¶ 176, 182.)  It continued buying when Fitch and S&P changed Enron's outlook to negative (*id.* ¶¶ 180-183, 185-186) and when Egan-Jones downgraded Enron's debt to below investment grade (*id.* ¶¶ 184-186).  It made its final purchase two days *after* Moody's downgraded Enron's long term debt and the same day Enron announced

20

the SEC's inquiry had become a formal investigation.  (*Id.* ¶¶ 187-189.)  Ms. Morwick even made a personal investment in the Zero Notes on November 28, on the eve of the bankruptcy filing.  (*Id.* ¶¶ 195-197.)

               Despite being sophisticated money managers, Plaintiffs conducted *no* analysis of the financial health of Enron before making its purchases in October 2001.  They simply analyzed the price and the mechanics of the bonds.  Ms. Morwick testified that to analyze possible positions in outright convertible bonds, Silvercreek would build a model that "look[s] specifically at the economics of the bond. . . .  What's the price of the bond?  What interest does it pay?  What's the return on that bond? So it's looking specifically at the mathematics of the particular investment. . . .  [S]o you can vary the price.  And if you vary the price, the return will be calculated for you."  (Stmt. ¶ 98.)  This model did not consider the solvency or insolvency of Enron, or its cash flow, or assets available to be sold, or amount of debt.  That is because Plaintiffs' investment decisions focused "primarily at what our returns will be".  (*Id.* ¶ 97.) Ms. Morwick testified that she assessed whether the price of the Zero Notes was "right" and "where the bonds were trading", but she did "[n]ot [do] a lot" else before making the decision to invest.  (*Id.* ¶ 227.)  Mr. Kittel did not recall doing any work on the purchases of the Zero Notes. (*Id.* ¶ 231.)  With respect to her decision to purchase the 7% Notes, Mr. Morwick testified that "an hour, an hour and a half" passed between the time the 7% Notes came to her attention and the time she purchased them (*Id.* ¶ 259) and that she "went and pulled or had the file pulled to just revisit some of the terms".  (*Id.* ¶ 260.)  Mr. Kittel did not recall conducting any analysis with respect to the 7% Notes until after Silvercreek purchased them.  (*Id.* ¶¶ 262-264.) Mr. Kittel first conducted any analysis of Enron's financials on October 26—*after* Silvercreek's purchases of 7% Notes and after all but one of Silvercreek's purchases of the Zero Notes.  (*Id.*

¶¶ 266-280.)

Although Ms. Morwick and Mr. Kittel conclusorily testified that they "read" certain of Enron's regulatory filings in October 2000 (Stmt. ¶¶ 202-205, 209-212)—a full year before the investments at issue here—there is no evidence that they or anyone at Silvercreek performed any analysis of Enron's financials at that time, much less in October 2001. Ms. Morwick testified that she felt comfortable investing in 2001 "because . . . [she]'d done a fair bit of work [on Enron] in the past". (*Id.* ¶ 227.) But even if she had relied on financial statements "in the past", such reliance would have been unreasonable.[11] The prospectus for the 7% Notes, the Notes Ms. Morwick first purchased in October 2000, is dated August 10, 1999 (*id.* ¶ 143) and included financial information from 1994 through Q1 1999 (*id.* ¶¶ 158-159). Plaintiffs made its first purchase of the Notes that are at issue here on October 18, 2001—in other words, more than two years after the financials included in the 7% Notes prospectus. The prospectuses for both the Zero Notes and the 7% Notes explicitly warned investors not to "assume the information contained in th[e] prospectus is accurate as of any date other than the date on the front of this prospectus [or those documents]." (*See id.* ¶¶ 142, 160.)

Moreover, evidence of having read certain documents is not proof of having *relied* on those documents. *See Neri*, 2000 WL 33911224, at *5; *Crazy Eddie*, 802 F. Supp. at 812-13. As Ms. Morwick testified, Silvercreek "rel[ies] on our own work" (Stmt. ¶¶ 96, 245.). Here, that work was analysis of the terms of the bonds and the potential returns based on pricing in the market. This was pure arbitrage. It had nothing to do with any purported reliance on Enron's stale financial statements. Plaintiffs therefore cannot prove reliance by clear and

---

[11] *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 440 (S.D.N.Y. 2001); *Stuart Silver Assocs. v. Baco Dev. Corp.*, 245 A.D.2d 96, 99 (N.Y. App. Div. 1997).

convincing evidence.  *See Shaffer v. Hirsch*, 52 A.D.2d 785, 785 (N.Y. App. Div. 1976)

(dismissing where "the plaintiff . . . rel[ied] on . . . his own independent inquiry").

## III.  CREDIT SUISSE DID NOT HAVE ACTUAL KNOWLEDGE OF THE ALLEGED ACCOUNTING FRAUD WITHIN ENRON.

Plaintiffs' secondary liability claims—*i.e.*, for aiding and abetting fraud (Count

One), conspiracy to commit fraud (Count Two), aiding and abetting negligent misrepresentation

(Count Three), and aiding and abetting under the Texas Securities Act ("TSA") (Count Nine)—

all must be dismissed because Plaintiffs cannot prove that Credit Suisse had actual knowledge of

the alleged underlying primary violations by Enron.

### A.  Plaintiffs' Secondary Liability Claims All Require Proof of Credit Suisse's Actual Knowledge.

Plaintiffs' secondary liability claims all require proof that Credit Suisse had

*actual knowledge* of Enron's alleged misconduct.  With respect to the common law aiding and

abetting claims, Plaintiffs must prove by clear and convincing evidence that Credit Suisse had

"actual knowledge of the violation" allegedly committed by Enron—*i.e.*, fraud or negligent

misrepresentation.  *Chemtex*, 490 F. Supp. 2d at 546-47; *see Newby*, 511 F. Supp. 2d at 801-02

(requiring proof that defendant "knowingly and substantially assist[ed] the principal violation").

"Actual knowledge of a breach of duty is required; mere suspicion or even recklessness as to the

existence of a breach is insufficient."  *Terrydale Liquidating Tr. v. Barness*, 611 F. Supp. 1006,

1027 (S.D.N.Y. 1984).  "Even if a fact finder were to conclude that [the defendant had]

knowledge of . . . 'red flags' that [the primary violator] was engaging in fraudulent activity, such

notice would not be sufficient to support an allegation of actual knowledge".  *de Abreu*, 812 F.

Supp. 2d at 325.  "The burden of demonstrating actual knowledge" is "a heavy one."  *Chemtex*,

490 F. Supp. 2d at 546.

Similarly, a claim for conspiracy to commit fraud requires proof by clear and

convincing evidence that Credit Suisse "*knowingly* agreed to cooperate in a fraudulent scheme". *Snyder v. Puente De Brooklyn Realty Corp.*, 297 A.D.2d 432, 435 (N.Y. App. Div. 2002) (emphasis added).  Plaintiffs must also prove that Credit Suisse "intentional[ly] participat[ed] in the furtherance of a common purpose or plan".  *De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 659 (S.D.N.Y. 2015).

Finally, to prove an aiding and abetting claim under the TSA, Plaintiffs must demonstrate that Credit Suisse "either intended to deceive plaintiff or acted with reckless disregard of the truth of the representations made by the primary violator".  *Newby v. Enron Corp. (In re Enron)*, 491 F. Supp. 2d 690, 691 n.2 (S.D. Tex. 2007).  This "reckless disregard" standard requires "subjective awareness" of the primary violator's misconduct.  *Sterling Tr. Co. v. Adderley*, 168 S.W.3d 835, 841-42 (Tex. 2005).  A "mere failure to investigate" is insufficient; instead, "an aider must be aware of the primary violator's improper activities before it may be held liable for assisting in the securities violation."  *Id.*

## B.     Credit Suisse Did Not Have Actual Knowledge of Enron's Alleged Fraud.

Plaintiffs have failed to adduce evidence from which a reasonable jury could find that Credit Suisse had actual knowledge of the alleged accounting fraud within Enron or any alleged Enron misrepresentations.  It is undisputed that Credit Suisse played no role in Enron's accounting or in the disclosures Enron made in its financial statements.  Credit Suisse was never asked to review or help prepare Enron's financial statements, and Credit Suisse never gave advice—much less accounting advice—to Enron in connection with its financial statements.  To the extent Enron's disclosures were misleading or inadequate, Credit Suisse also was misled.  As Enron's CFO testified (while cooperating with the *Newby* plaintiffs in order to get his sentence reduced), Enron "did not make CSFB" or "any lending bank of Enron" aware of certain Enron "transactions that were improper" because, if it did, Credit Suisse and those other banks "would

24

stop lending" to Enron.  (Stmt. ¶ 302.)  When Enron filed for bankruptcy, Credit Suisse sustained

large losses on its financings of Enron and its Enron-related investments.  (*Id.* ¶¶ 504-05.)

Plaintiffs nonetheless contend that Credit Suisse had actual knowledge of Enron's

alleged accounting fraud (1) based on statements purportedly made about Credit Suisse

according to inadmissible or otherwise unsupported sources; (2) because Credit Suisse was

involved in certain Enron transactions; and (3) based on certain Credit Suisse emails.[12]

Discovery has disproven each of those theories.

### 1.    Plaintiffs' Key Allegations of Knowledge Rely on Inadmissible Evidence or Otherwise Lack Evidentiary Support.

Plaintiffs' case relies heavily on alleged statements attributed to unnamed Credit

Suisse employees and statements by third parties about Credit Suisse employees.  None provides

admissible evidence of actual knowledge.

*First*, there is no evidence (much less admissible evidence) that the following

statements were ever made:

- unnamed "CSFB managers" asked unnamed Enron personnel, "How can you guys keep doing this?" (TAC ¶ 636);

- unnamed "CSFB managers" stated that Enron was at a "critical point" (*id.*); and

- unnamed "CSFB bankers" warned unnamed Enron employees that they were "gonna be fucked" (*id.*).

These untrue and unsubstantiated statements may now be disregarded.

---

[12] The Court has already held that Plaintiffs' allegations that Credit Suisse employees "muzzled" a research analyst (TAC ¶ 645) are insufficient to prove knowledge.  *See Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 441-42 (S.D.N.Y. 2017) ("[W]hile Silvercreek alleges at a high level the possibility that there was pressure exerted on analysts to positively cover Enron, Silvercreek's pleading does not describe the nature of that pressure, or any specific interactions between insiders and analysts with sufficient specificity to make out a claim").  Moreover, the undisputed facts show, at most, that there was "sensitivity" within Credit Suisse regarding "clients that were important to the firm" (like Enron) and that analysts believed that the investment banking and capital markets functions within Credit Suisse "didn't want to offend their clients."  (Stmt. ¶¶ 524-27.)  As the Court observed, "a general desire to attract Enron's business through positive coverage . . . does not knowledge of fraud make."  *Silvercreek*, 248 F. Supp. 3d at 440 n.9.

*Second*, numerous of Plaintiffs' key allegations regarding Credit Suisse's supposed "knowledge" are lifted verbatim from an unsourced February 28, 2002 *Financial Times* article, including allegations that:

- an unnamed "Enron insider" stated that unnamed "senior people" at Credit Suisse "knew what was going on and that it was a house of cards" (Stmt. ¶ 539; *see* TAC ¶ 632);

- unnamed "CSFB bankers . . . knew more about the company than people in Enron did" (Stmt. ¶ 540; *see* TAC ¶ 632);

- "[t]here was no question that [unnamed 'CSFB bankers'] knew exactly what lay inside the structures when the triggers went off" (Stmt. ¶ 540; *see* TAC ¶ 632);

- unnamed "CSFB bankers" said, "If this thing hits $20, you better run for the hills" (Stmt. ¶ 540; *see* TAC ¶ 632); and

- Laurence Nath spent "weeks" at Enron corporate office "to create a quick-fix solution for Enron's books" (Stmt. ¶¶ 535-37; *see* TAC ¶ 617).

There is *no* evidence to support the allegations made by the unnamed sources. The article itself is inadmissible hearsay and must be disregarded at summary judgment. *See Fridman v. City of New York*, 183 F. Supp. 2d 642 at 646 n.2 (S.D.N.Y. 2002) (news article "inadmissible on a motion for summary judgment"). Lead Plaintiffs in the *Newby* class action similarly included these *Financial Times* allegations in their complaint, and ultimately were forced to concede in discovery that they had no source for them other than the unsourced news article. (Stmt. ¶ 541.)

*Third*, Plaintiffs' allegations regarding Credit Suisse's supposed "knowledge" rely heavily on statements by persons without personal knowledge, including the reports of the Enron Bankruptcy Examiner. These statements are inadmissible and must be disregarded. Fed. R. Evid. 602; *see, e.g.*, *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir. 1995) (statement "not based upon personal knowledge . . . d[oes] not suffice to create an issue of fact precluding summary judgment").

26

Bankruptcy examiners' reports are routinely excluded because the examiner lacks personal knowledge and because the report itself is not a business record or public record. *See* Fed. R. Evid. 602; *In re Refco Inc. Sec. Litig.*, No. 07-MD-1902 (JSR), 2013 WL 12191891, at \*11 (S.D.N.Y. Mar. 11, 2013) ("[C]ourts routinely find that there is no hearsay exception that would permit a Bankruptcy Examiner's report to be admitted into evidence."). Here, Plaintiffs repeatedly cite the allegations of the Enron Bankruptcy Examiner, Neal Batson, regarding Credit Suisse's supposed "knowledge" of the alleged fraud, going so far as to attach the examiner's reports to their complaint.[13] (*See, e.g.*, TAC ¶¶ 133, 597, 601, 657.) Mr. Batson, however, was an Alston & Bird partner with no personal knowledge of Enron's business—and certainly no personal knowledge of Credit Suisse's state of mind. (Stmt. ¶¶ 547-54.) Moreover, his assignment from the Bankruptcy Court was to investigate whether the Enron Trustee might be able to *allege* claims against various entities (essentially, a motion to dismiss standard), not to make fact findings. (*Id.* ¶ 548.) His reports were never subject to cross-examination; discovery of the Examiner was not allowed. *See United States v. Howard*, No. 4:03-cr-00093 (S.D. Tex.), ECF 206 (Ex. C284 at 45) (quashing subpoena directed to Mr. Batson). Mr. Batson's reports therefore are inadmissible and must be disregarded at summary judgment. *See In re Refco Inc. Sec. Litig.*, 2013 WL 12191891 at \*11.

The "testimony" of Andrew Fastow that is not based on his personal knowledge is likewise inadmissible. Mr. Fastow's testimony was the product of an exchange with the lead plaintiff counsel in *Newby* for Mr. Fastow's dismissal from the class action and for the lead plaintiff counsel's support for Mr. Fastow at his sentencing hearing. (Stmt. ¶¶ 555-72.) In the

---

[13] Plaintiffs also cite and attach to their complaint certain Congressional materials. (*See* TAC ¶ 133.) These materials likewise are inadmissible because they are "not based on . . . personal knowledge" and otherwise "lack[] the ordinary indicia[] of reliability". *Anderson v. City of New York*, 657 F. Supp. 1571, 1579-80 (S.D.N.Y. 1987). Moreover, these materials are not cited specifically with regard to Credit Suisse.

weeks leading up his sentencing, Mr. Fastow spent "tens of hours" reviewing document binders prepared by class counsel—which included documents Mr. Fastow had never seen before—and meeting with class counsel.  (*Id.* ¶¶ 556-59.)  Based on those binders and discussions, counsel prepared a draft of "Mr. Fastow's" declaration.  (*Id.* ¶ 560.)  The day before his sentencing hearing, Mr. Fastow signed the declaration.  (*Id.* ¶¶ 561, 564.)  At the sentencing hearing, class counsel promised the sentencing judge that Mr. Fastow would testify in *Newby* to "tell the banks' role that is so essential for the investors to have any chance of getting their money back".  (*Id.* ¶¶ 562, 564-65.)  Mr. Fastow was given a reduced sentence, and the lead plaintiff promptly dismissed all claims against him.  (*Id.* ¶¶ 566, 568.)  Less than two weeks later, at his deposition, Mr. Fastow admitted that many of the allegations in his declaration were based on his "understanding" from what he had been told by others—not personal knowledge.  (*Id.* ¶¶ 573-82.)  Mr. Fastow admitted that he had no personal knowledge regarding Marlin, Firefly or Osprey (*Id.* ¶¶ 573-78.)—*i.e.*, the very structures upon which he based his assertion that Credit Suisse "understood" the alleged Enron fraud (*see* TAC ¶ 683).  Mr. Fastow also admitted on cross-examination that he deliberately kept Credit Suisse (and other banks) from knowing of improper Enron transactions.  (Stmt. ¶ 302.)  Mr. Fastow's manufactured "testimony", written by class counsel using documents Mr. Fastow had never seen before, about transactions of which Mr. Fastow had no knowledge, and including assertions of defendants' state of mind that Mr. Fastow could not possibly know, must be disregarded.  *See* Fed. R. Evid. 602.

### 2. Credit Suisse's Limited Involvement in Certain Enron Transactions Does Not Support a Finding of Actual Knowledge.

Plaintiffs contend that Credit Suisse had "actual knowledge" of the alleged fraud within Enron by way of its involvement with Enron's (i) "share trust" transactions; (ii) FAS 125/140 transactions; (iii) transactions involving LJM entities; and (iv) one "prepaid" oil swap

transaction with Credit Suisse.[14]  Discovery has proven each of these contentions to be baseless.

### a.    Share Trust Transactions.

DLJ, before it merged with Credit Suisse, provided investment banking services to Enron on three "share trust" transactions—Marlin, Firefly and Osprey.  (Stmt. ¶¶ 306-07, 315, 329, 342, 353-56.)  Each was approved by Enron's Board of Directors, Enron's accountants at Arthur Andersen, and Enron's outside counsel at Vinson & Elkins.  (Id. ¶¶ 316, 319-21, 326-27, 330, 334, 337, 343-45, 348, 364-66, 368.)  Arthur Andersen and its witnesses have continued to stand by the accounting for these transactions, even knowing what they knew following Enron's collapse.  (Id. ¶¶ 335-36, 349, 372-73.)  In fact, none of Plaintiffs' accounting experts opines that there was anything wrong with Enron's accounting for these transactions.  (Id. ¶¶ 338-39, 350, 374-75.)  To argue that DLJ—which provided no accounting advice to Enron (Id. ¶¶ 299-301)—had "actual knowledge" of an accounting fraud in connection with these transactions is untenable.

Plaintiffs nonetheless contend that the existence of "stock triggers" in the share trust debt meant that the debt was "backed by Enron stock", thereby "preclud[ing] off-balance-sheet treatment".[15]  (TAC ¶¶ 442, 618, 630.)  Putting aside the novelty of this accounting theory—which Plaintiffs' own experts do not appear to support—the undisputed facts demonstrate that these "stock triggers" were disclosed to ratings agencies and in Enron's SEC

---

[14] The complaint also references transactions involving NewPower, Portland General Electric and a sale of "assets in Enron's international portfolio".  (TAC ¶¶ 593, 619.)  The allegations regarding Portland General Electric and the sale of international assets merely parrot statements from the inadmissible February 28, 2002 *Financial Times* article, and there is no evidence that Credit Suisse "actually knew" of any fraud in connection with those matters.  (Stmt. ¶¶ 498-99.)  The allegations regarding NewPower repeat a baseless claim about a supposed "sham loan"—a claim that the *Newby* lead plaintiff was forced to abandon at summary judgment for lack of evidence.  (Id. ¶¶ 500-01.)

[15] Plaintiffs also cite a September 16, 1999 email among Credit Suisse employees describing Osprey as an "off-balance-sheet parking lot for certain assets".  (TAC ¶ 659.)  At the time that email was sent, DLJ and Credit Suisse were separate and competing entities, and, before the November 2000 merger, only DLJ provided services regarding Osprey.  (Stmt. ¶¶ 22-24, 363.)  The email cannot support "actual knowledge", because no Credit Suisse employee had anything to do with the Osprey I transaction.  (Id. ¶¶ 353-55, 363.)

filings, as was the fact that the share trust structures were not consolidated on Enron's balance sheet.[16]  (Stmt. ¶¶ 308-14, 322-25, 346-47, 357-62, 367, 369-71.)  Neither Credit Suisse nor DLJ can have "actual knowledge" of a concealed fraud when the allegedly fraudulent devices were in fact disclosed.  *See White v. Melton*, 757 F. Supp. 267, 272 (S.D.N.Y. 1991) (no fraud where "allegedly omitted or misrepresented information was in fact appropriately disclosed").

### b.    FAS 125/140 Transactions.

Plaintiffs also make allegations regarding certain transactions accounted under FAS 125/140—Iguana, Nile and Nikita—for which Credit Suisse and DLJ provided ordinary investment banking services.  (Stmt. ¶¶ 459, 467, 482, 485-87; *see* TAC ¶¶ 597, 600-02, 638.)  Like the share trust transactions, Plaintiffs' own experts do not opine that there was anything wrong with the accounting for these transactions.  (Stmt. ¶¶ 464-65, 479-80, 493.)  Indeed, with respect to the Iguana transaction, Plaintiffs plead no facts that Enron's accounting was fraudulent in any way, much less that Credit Suisse or DLJ had actual knowledge of any fraud.  (*See* TAC ¶ 600.)

With respect to the Nile and Nikita transactions, Plaintiffs contend that Credit Suisse knew that the equity in those structures was not "at risk", thus precluding off-balance-sheet treatment under FAS 125/140.  (TAC ¶¶ 597, 600, 638.)  These contentions are based on a theory that Enron was obligated to repurchase the equity from Credit Suisse, either via a put option "at par" or via some "secret undertaking".  (*Id.*)  Discovery has disproven both versions of this theory.  There is no dispute that the final, binding transaction documents for both Nile and Nikita provide for a put option at "fair market value", not at par.  (Stmt. ¶¶ 469, 483.)  And discovery has uncovered no evidence of any "secret undertaking" to repurchase the equity.  (*Id.*

---

[16] Plaintiffs do not make specific allegations regarding stock triggers in Firefly.  As with Marlin and Osprey, the stock triggers in Firefly were disclosed by Enron.  (Stmt. ¶ 346.)

¶¶ 470-75, 488, 492.)  Moreover, with respect to the Nikita transaction, numerous witnesses from

the third counterparty (Barclays) testified that Credit Suisse had no knowledge of any alleged

oral side agreement between Barclays and Enron, and no one from Enron or Credit Suisse

testified otherwise.  (*Id.* ¶¶ 488-92.)  There is also no evidence that Credit Suisse itself was party

to any such oral agreement.  (*Id.*)  In short, there is simply no evidence that Credit Suisse had

actual knowledge of an accounting fraud within Enron regarding the FAS 125/140 transactions,

assuming there even was such a fraud.

### c.    LJM Transactions.

Plaintiffs allege that by virtue of its limited partner interests in the LJM entities,

Credit Suisse somehow acquired "actual knowledge" of the alleged accounting fraud within

Enron.  These allegations find no support in the record.[17]

The LJM entities were created and controlled by Andrew Fastow.  (Stmt. ¶¶ 377-

78, 407-08.)  Affiliates of Credit Suisse were limited partners.  (*Id.* ¶¶ 379, 412.)  Under the

relevant partnership agreements, Credit Suisse was a passive investor with no right to participate

in the management or conduct of the LJM businesses, which were controlled solely by

Mr. Fastow.  (*Id.* ¶¶ 380, 421.)  Mr. Fastow's control over the LJM entities—including any

potential conflicts of interest—were disclosed in Enron's SEC filings.  (*Id.* ¶¶ 396, 424-25.)

In June 1999, Enron entered into a derivative transaction with LJM1 to purchase a

put option on approximately $5 million shares of Rhythms Net stock (the "Rhythms Hedge").

(Stmt. ¶ 381.)  Since its affiliate was a limited partner of LJM1, Credit Suisse was a counterparty

to the transaction but had no ability to dictate its terms.  (*Id.* ¶¶ 379-80.)  Plaintiffs nonetheless

---

[17] The complaint also makes passing reference to a SAILS transaction executed between two Credit Suisse entities, which had the effect of monetizing certain restricted stock held by LJM1.  (Stmt. ¶¶ 399-404; *see* TAC ¶ 639.)  However, it is undisputed that the SAILS transaction had no effect on Enron's reported profits or other operating results (Stmt. ¶ 405), and Plaintiffs' own experts do not challenge any of the accounting in connection with the transaction (*id.* ¶ 406).

contend that because Credit Suisse "knew" that the subsidiary of LJM1 that held the put option in the Rhythms Hedge was primarily capitalized with Enron stock, Credit Suisse also "knew" that Enron's accounting for the transaction was fraudulent.  (TAC ¶¶ 209, 622.)  These allegations are unsupported by the evidence.

The evidence instead shows Enron and its advisors were fully informed regarding these allegedly concealed facts and that Credit Suisse employees spoke at length with Enron's management to ensure that Enron's Board of Directors, outside accountants and outside counsel had all given their informed approval.  Specifically, the Enron Board, which at the time included as many as 14 outside directors, was apprised that "Enron's stock was the majority of the value in LJM1" and that "the ability of LJM1 to provide an effective hedge depended in part on the value of the Enron stock" and approved the transaction.  (Stmt. ¶¶ 57, 387.)  Enron's accountants and outside counsel likewise gave their informed approval, including a separate fairness review by PricewaterhouseCoopers.  (*Id.* ¶¶ 390-95.)  In addition, Enron disclosed in its SEC filings that LJM1 was capitalized with "6.8 million shares of [restricted] Enron common stock" and had provided Enron with "financial instruments hedging an investment held by Enron".  (*Id.* ¶ 396.)  A Goldman Sachs analyst issued a report stating that Enron's holdings of Rhythms Net stock were "fully hedged".  (*Id.* ¶ 389.)  In light of these disclosures and the fully informed approvals by Enron's Board and outside advisers, there is no credible evidence from which a reasonable jury could conclude that Credit Suisse had "actual knowledge" of an ongoing accounting fraud at Enron in connection with the Rhythms Hedge.  Instead, Credit Suisse took steps to ensure that those responsible for Enron's accounting—Enron's management, its board and its advisers— understood and approved the transaction.  (*Id.* ¶¶ 383-88.)  These actions are flatly inconsistent with "actual knowledge" of fraud.  They are also inconsistent with any "conspiracy".  Actual co-

conspirators do not ask one another to discuss their frauds with their boards and outside advisers. *See United States v. Lloyds TSB Bank PLC*, 639 F. Supp. 2d 326, 342 (S.D.N.Y. 2009).

In October 1999, Andrew Fastow created LJM2.  (Stmt. ¶ 407.)  Affiliates of Credit Suisse were two of over 50 limited partners, among which were institutional investors such as the Arkansas Teacher Retirement System, the MacArthur Foundation, Sun America Insurance Company and the Institute for Advanced Studies at Princeton.  (*Id.* ¶¶ 412-20.)  Credit Suisse also contributed to revolving credit facilities organized by Chase Bank of Texas and Dresdner Bank.  (*Id.* ¶ 426.)  However, Credit Suisse did not serve on the Advisory Committee, or otherwise participate in the management of LJM2 or in the structuring of any transaction between Enron and LJM2.  (*Id.* ¶¶ 421-23, 427.)  In particular, it is undisputed that Credit Suisse was not involved at all in LJM2's Raptor structures.  (*Id.* ¶¶ 428-29.)

Plaintiffs nonetheless contend that Credit Suisse knew about Enron's alleged accounting fraud because Enron supposedly "guaranteed" Credit Suisse's returns on its investment in LJM2.  (TAC ¶¶ 230, 628.)  But the undisputed evidence shows that Credit Suisse did not understand its returns to have been "guaranteed".  Instead, Credit Suisse merely understood, as any sophisticated investor would, that its investments were structured "similar[ly] to a bond" and paid a coupon.  (Stmt. ¶¶ 430-32.)  Thus, like any bond, so long as the underlying structure did not "go underwater", Credit Suisse could expect a predictable income.  (*Id.* ¶ 430.)  These unremarkable facts do not come close to demonstrating actual knowledge of fraud at Enron.

### d.   Oil Swap.

In December 2000 and January 2001, three commodity swaps were executed between three independent counterparties—Enron, Morgan Stanley Capital Group and an affiliate of Credit Suisse—based on the market prices of oil on certain dates.  (Stmt. ¶¶ 433-36.)

Each of the oil swaps was independent:  the success or failure of one swap did not depend on the success or failure of the others.  (*Id.* ¶¶ 437-38.)  Based on the three-swap structure, Arthur Andersen approved Enron's accounting for the swaps as a "price risk management" activity.  (*Id.* ¶¶ 449-51.)  Arthur Andersen stood by that accounting throughout the Enron litigation.  (*Id.* ¶ 451.)  John Stewart, head of the Professional Standards Group at Arthur Andersen and co-creator of EITF 98-10 and SFAS 133—two key accounting principles applicable to the oil swaps—testified that "the three parties" structure employed by Enron "was certainly consistent with Generally Accepted Accounting Principles".  (*Id.* ¶¶ 67-68, 451.)  The High Court of London reached a similar conclusion regarding another multi-party swap transaction involving Enron.  (*Id.* ¶ 455.)  It is no surprise, then, that Plaintiffs' own accounting experts do not opine that there was anything wrong with Enron's accounting for the oil swaps.  (*Id.* ¶¶ 456-57.)

Plaintiffs nonetheless contend that Credit Suisse "knew" that Enron's accounting was somehow fraudulent, because certain representations that Credit Suisse sought and obtained from Enron regarding the swaps and their accounting were not included in the standard-form swap confirmations.  (TAC ¶ 612.)  But, even if true, such facts would not support a finding that Credit Suisse had "actual knowledge" of fraud.  There is no dispute that Credit Suisse carefully reviewed the transaction, recognized that it could create accounting-related concerns, and took steps to ensure that Enron had obtained the informed approval of Arthur Andersen and that Enron had not relied on Credit Suisse with respect to the accounting treatment.  Specifically, in late 2000, Enron approached Credit Suisse about participating in the oil swaps, which Enron had already structured.  (Stmt. ¶¶ 439-41.)  Credit Suisse reviewed the opportunity with its Credit Risk Management group and concluded that it appeared that Enron had structured the transactions "to achieve a certain accounting requirement", so Credit Suisse would seek further

review by its Reputational Risk group.  (*Id.* ¶ 442.)  Following that review, Credit Suisse sought

and obtained representations from Enron that:

- Enron "has discussed the Transaction, and the accounting treatment . . . with its independent external auditors";

- Enron's "independent external auditors have confirmed to it that such accounting treatment is appropriate";

- Enron's "senior management is aware of the terms of the Transaction, is familiar with its purpose, and has approved the Transaction";

- "[t]he purpose and effect of the Transaction and the manner in which the counterparty intends to account for the Transaction, are permissible and appropriate as a matter of local law, custom and practice";

- Enron "is solely responsible for deciding to enter the Transaction and has not relied on CSFB in respect of the accounting treatment to the Transaction"; and

- "[t]he Transaction, including the accounting and tax treatment to be accorded the Transaction, are consistent with all regulatory requirements . . . and [Enron] has taken all steps necessary to ensure that the Transaction complies with such requirements".  (*Id.* ¶ 443.)

Credit Suisse discussed each representation with Enron, and Enron agreed to each.  (*Id.* ¶¶ 444,

447-48.)  The representations were not documented in the swap confirmations, however, because

Enron "wanted to make the documentation as standard as possible" across all of its swaps (not

just its commodity swaps).  (*Id.* ¶ 445.)  This was not surprising, since the swaps were traded

pursuant to ISDA master agreements, which are standard across the industry.  (*Id.* ¶ 446.)  The

fact that Enron's representations to Credit Suisse did not appear in the swap confirmations is not

proof of fraud.  Instead, it is undisputed that Credit Suisse specifically sought and obtained

representations that the accounting had been vetted and approved, thereby assuring itself that the

accounting was appropriate.  This is the exact opposite of actual knowledge of fraud, and no

reasonable jury could find otherwise.

### 3.    Assorted Emails Misleadingly Cited in the Complaint Do Not Support a Finding of Actual Knowledge.

Plaintiffs also cite a handful of Credit Suisse emails, none of which supports a finding of "actual knowledge".  (*See* TAC ¶¶ 657-63.)  For example, discovery has confirmed that an August 2001 memorandum by Robert Jeffe in which he allegedly "noted in his report that Fastow disclosed to the group that Enron's total on and off-balance-sheet debt was $36 billion" (*Id.* ¶ 662) cannot support an inference that Credit Suisse "actually knew" that Enron's accounting was fraudulent.  At his deposition, Mr. Jeffe explained that he did not "understand what the number meant" because "[y]ou have to look at the whole financial picture".  (Stmt. ¶¶ 506-08.)  To investigate the matter further, Credit Suisse sought "more information" from Enron—first from Mr. Fastow himself and then (at Mr. Fastow's direction) from Tim DeSpain. (*Id.* ¶¶ 509-10, 516-17.)  Despite multiple attempts—including by the Head of the Global Energy Group at Credit Suisse—to follow up with Mr. DeSpain, no one at Enron ever provided Credit Suisse the information it sought.  (*Id.* ¶¶ 516-17.)  Soon thereafter, Enron entered bankruptcy, and Mr. Fastow and Mr. DeSpain later pled guilty to fraud.  (*Id.* ¶¶ 198, 518.)  The undisputed evidence thus shows that Credit Suisse took reasonable steps to obtain information about Enron's debt but was stonewalled by Enron.  Such facts are entirely at odds with "actual knowledge" of fraud.[18]

Plaintiffs' reliance on a reference in an October 2001 email to Osmar Abib having made "ominous warnings 2 years ago that the [Enron] 'house of cards' may some day collapse" (TAC ¶ 633) is similarly misplaced.  Mr. Abib testified that when he made that comment he

---

[18] Similarly, Plaintiffs' allegation that "CSFB accelerated the process of reducing its exposure to Enron"—which relies entirely on the assertions of the Examiner (TAC ¶¶ 662-63)—is unsupported by the admissible evidence. Instead, the evidence is clear that Credit Suisse reduced its Enron exposure both as part of a firm-wide effort to "get out of the lending business" altogether (Stmt. ¶ 502) and as a specific reaction to "the noise in the newspaper surrounding Enron" in "fall 2001" (*id.* ¶ 503).  It had nothing to do with the alleged fraud.  If in fact Credit Suisse had actual knowledge of Enron's alleged fraud, it makes no sense that its Enron exposure (its losses when Enron went bankrupt) were on the order of $150 million.  (*Id.* ¶¶ 504-05.)

specifically was referring to the relationship between Credit Suisse and Enron—not the financial condition of Enron.  (Stmt. ¶¶ 519-21.)  He further explained that at that time he was "brand new in the coverage position" of Enron and had not been in that position "long enough to have sufficient knowledge of any issues that might have been a real problem" with Enron's financial condition.  (*Id.* ¶ 520.)  As such, Mr. Abib could not plausibly have been referring to the alleged fraud.

Finally, discovery has shown that a February 2002 email from Wade Suki, a JPMorgan Chase employee, to Andy DeVries, a junior research analyst at Credit Suisse, regarding prior "warning[s] to stay away from [Enron]" (TAC ¶ 652) was simply a bluff. Mr. DeVries admitted at his deposition that, in his communications with Mr. Suki, he "was trying to give [Mr. Suki] the impression that [he] knew what was going on . . . but [he] didn't really know what was going [on], and [he] wanted [Mr. Suki] to think that [he] did know what was going on."  (Stmt. ¶¶ 528-32.)  As such, like the other emails that Plaintiffs misleadingly cite, the email from Mr. DeVries cannot support a finding of "actual knowledge" by Credit Suisse.

Because Plaintiffs have failed to adduce evidence from which a reasonable jury could find by clear and convincing evidence that Credit Suisse had "actual knowledge" of the alleged accounting fraud within Enron, Plaintiffs' secondary liability claims must be dismissed.

## IV.  CREDIT SUISSE WAS NOT A STATUTORY UNDERWRITER.

Plaintiffs' Section 11 claim must be dismissed because no reasonable jury could conclude that Credit Suisse was a statutory underwriter of the Zero Notes.  15 U.S.C. § 77k(a).

### A.  Silvercreek Admits that Credit Suisse Was Not an Underwriter.

At deposition, Silvercreek admitted that it does not consider Credit Suisse to have been a "member[] of the underwriting group" for the Zero Notes.  (Stmt. ¶¶ 605-07.)

37

Silvercreek's President and Rule 30(b)(6) designee, Louise Morwick, testified that one of "the underwriters of the [Zero Notes] bond" contacted Silvercreek in "February '01" and "encouraged" Silvercreek "to look at it as an investment". (*Id.* ¶ 607.) A "member[] of the underwriting group" provided Ms. Morwick a copy of the Offering Memorandum, which identified Salomon Smith Barney Inc., J.P. Morgan Securities Inc., Deutsche Banc Alex. Brown Inc., Banc of America Securities LLC and Barclays Capital Inc. as the initial purchasers in the private placement. (*Id.* ¶¶ 583, 605.) Credit Suisse, by contrast, did not contact Silvercreek regarding the Zero Notes until "probably October 18", 2001. (*Id.* ¶ 606.) Ms. Morwick distinguished the first contact by the "underwriters" in February 2001 from the later contact from "First Boston" in October 2001. (*Id.* ¶ 607.) As such, Silvercreek itself does not believe that Credit Suisse was an underwriter of the Zero Notes.

> ### B.   Credit Suisse Was Not "Essential" in the Distribution of the Zero Notes.

No reasonable jury could conclude that Credit Suisse's role as one of many "selling securityholders" who participated in the public offering was "essential in the actual distribution of" the Zero Notes. *See Silvercreek*, 248 F. Supp. 3d at 450. Instead, the evidence is clear that Credit Suisse was situated similarly to various institutional holders—including several lead plaintiff movants from the *Newby* action.

It is undisputed that five "initial purchasers"—Salomon Smith Barney, J.P. Morgan, Deutsche Bank, Banc of America and Barclays—acquired the Zero Notes from Enron in early 2001 in a private placement. (Stmt. ¶ 583.) Following the private placement, Credit Suisse and numerous other banks and institutional investors acquired the Zero Notes on the secondary market. (*Id.* ¶¶ 584, 588-601.)

On June 1, 2001, Enron filed an initial Registration Statement, pursuant to which holders of the Zero Notes could convert the notes to registered securities for sale to the public.

Such holders were identified in the Registration Statement as "selling securityholders".  (Stmt. ¶¶ 588-89.)  A total of 32 "selling securityholders" are listed on the initial Registration Statement.  (*Id.* ¶ 589.)  Credit Suisse is not one of them.  (*Id.*)  In fact, Credit Suisse does not appear on any of the offering materials until about six weeks later, in an amendment filed July 13, 2001.  (*Id.* ¶ 591.)  Sellers continued to be added, via the prospectus and prospectus supplements, until mid-October 2001—around the same time that Silvercreek made its purchases.  (*Id.* ¶¶ 592-601.)  Ultimately, a total of 78 "selling securityholders" were listed in the offering materials.  (*Id.* ¶ 602.)

More than 40% of the outstanding notes were held by three sellers in the offering: Salomon Smith Barney, UBS AG London and HighBridge International.  (Stmt. ¶ 602.)  Credit Suisse, by contrast, held 1.21% of the outstanding notes.  (*Id.* ¶¶ 595, 602.)  A total of 58 sellers had holdings of 1.5% or less, most of which were institutional investors.  (*Id.* ¶ 602.)  In fact, four institutional investors listed as "selling secuirityholders"—JMG Capital Partners LP, JMG Triton Offshore Fund Ltd, TQA Master Fund Ltd and TQA Master Plus Fund Ltd—moved to be appointed lead *plaintiffs* of a "debt securities class" in the consolidated *Newby* action, a class which would have included the Zero Notes.  (*Id.* ¶¶ 602, 604.)  One of them, JMG Triton Offshore Fund, listed more than twice as many notes as Credit Suisse.  (*Id.* ¶¶ 593, 602.)

Thus, far from being "essential" to the distribution of the notes, Credit Suisse was situated no differently from institutional investors like Silvercreek's own potential co-plaintiffs.  The initial purchasers in the private placement continued to hold a substantial portion of the outstanding notes, and Credit Suisse was merely one of 58 sellers with holdings less than 1.5%.  (Stmt. ¶ 602.)  As the offering materials make clear, Credit Suisse made no promises to sell in the public offering "at all".  (*Id.* ¶ 603.)

Silvercreek attempts to conflate the private placement with the public offering based on an "integrated analysis" wherein the private placement and public offering may be merged if "the evidence support[s] a finding that the [two transactions] constituted a single transaction, both in the minds of the parties and in terms of the effect on the investing public." *See Silvercreek*, 248 F. Supp. 3d at 449.  But no reasonable investor could have expected that the myriad institutional and other investors listed in the offering materials were underwriters of a single, unified transaction.  Silvercreek's own President and portfolio manager did *not* view Credit Suisse as an underwriter.  (*See* Part IV.A.)  Nor is there any evidence that the hedge funds and other institutional investors listed in the offering materials considered themselves to have been underwriters.  Surely, the putative lead plaintiffs for the "debt securities class" in *Newby* did not consider themselves to have been underwriters.

Without evidence that Credit Suisse was "essential" to the distribution of the Zero Notes to the public, Silvercreek's Section 11 claim against Credit Suisse must fail.

## CONCLUSION

For the foregoing reasons, Credit Suisse respectfully requests that the Court grant its motion for summary judgment in its entirety.

New York, New York

November 10, 2017

CRAVATH, SWAINE & MOORE LLP,

by
_____
Richard W. Clary
Member of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
rclary@cravath.com

*Attorney for Defendants Credit Suisse First Boston
(USA), Inc. (n/k/a Credit Suisse (USA), Inc.), Credit
Suisse First Boston LLC (n/k/a Credit Suisse Securities
(USA) LLC) and Pershing LLC (f/k/a Donaldson,
Lufkin & Jenrette Securities Corp.)*

41