UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| SILVERCREEK MANAGEMENT INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CITIGROUP, INC., *et al.*, <br><br> Defendants. | 02-cv-08881-JPO |

**CREDIT SUISSE'S LOCAL RULE 56.1 STATEMENT**

November 10, 2017

# TABLE OF CONTENTS

A.   Parties ........................................................................................................................1

   (a)   Silvercreek ........................................................................................................1

      (i)   Silvercreek Entities ............................................................................1

      (ii)   Silvercreek Witnesses .......................................................................2

   (b)   Credit Suisse ....................................................................................................3

      (i)   Credit Suisse-DLJ Merger .................................................................3

      (ii)   Credit Suisse Employees ...................................................................4

   (c)   Enron and Its Advisors .....................................................................................6

      (i)   Enron Officers ....................................................................................7

      (ii)   Enron Board of Directors ...................................................................8

   (d)   Arthur Andersen ............................................................................................10

   (e)   Vinson & Elkins .............................................................................................12

B.   Silvercreek ...............................................................................................................12

   (a)   Silvercreek's Business ....................................................................................12

      (i)   Convertible Bond Arbitrage .............................................................13

      (ii)   Silvercreek's Focus on Distressed Debt ..........................................14

      (iii)   Silvercreek's Returns ......................................................................15

      (iv)   Silvercreek's Investment Decisions ................................................15

      (v)   Silvercreek's Salespeople ................................................................17

   (b)   Silvercreek's Purchases in October 2001 .......................................................19

   (c)   Silvercreek's Zero Note Strategy ...................................................................22

   (d)   Silvercreek's 7% Note Strategy ......................................................................23

   (e)   Timing of Silvercreek's October 2001 Purchases ...........................................27

   (f)   Silvercreek's Analysis of Enron Notes in 2000 ..............................................32

   (g)   Silvercreek's Analysis of Enron Notes in 2001 ..............................................34

      (i)   The Zero Notes .................................................................................34

      (ii)   The 7% Notes ..................................................................................43

   (h)   Bankruptcy Risk ............................................................................................52

C.   Credit Suisse's Relevant Involvement with Enron .....................................................53

   (a)   Specific Transactions .....................................................................................54

      (i)   Share Trust Transactions ..................................................................54

         a)   Marlin .................................................................................54

         b)   Firefly .................................................................................61

| | | c) | Osprey | 64 |
| | (ii) | | LJM Transactions | 70 |
| | | a) | LJM1/Rhythms | 70 |
| | | b) | SAILS | 77 |
| | | c) | LJM2/Raptors | 79 |
| | (iii) | | Oil Swap | 85 |
| | (iv) | | FAS 125/140 Transactions | 91 |
| | | a) | Iguana | 91 |
| | | b) | Nile | 93 |
| | | c) | Nikita | 96 |
| | (v) | | Other Transactions | 99 |
| | | a) | NewPower | 99 |
| | | b) | Portland General Electric | 99 |
| | | c) | Sale of International Assets | 100 |
| (b) | | | Credit Suisse Communications Regarding Enron | 100 |
| | | a) | Alleged Reduction of Exposure to Enron | 100 |
| | | b) | Statements Regarding On- and Off-Balance Sheet Debt | 101 |
| | | c) | Yellen Email | 104 |
| | | d) | Alleged Pressure on Analysts | 105 |
| | | e) | Statements of Wade Suki | 105 |
| (c) | | | Investigative Reports and Other Out-of-Court Statements | 106 |
| | (i) | | February 28, 2002 *Financial Times* Article | 106 |
| | (ii) | | July 2002 Hearings of the U.S. Senate Permanent Subcommittee on Investigations | 109 |
| | (iii) | | September 2002 to November 2003 Bankruptcy Examiner's Reports | 109 |
| | (iv) | | September 25, 2006 Fastow Declaration | 111 |
| | (v) | | October 23 to November 2, 2006 Fastow Deposition | 113 |
| D. | | | Zero Notes Offering | 115 |
| (a) | | | Private Placement | 115 |
| (b) | | | Public Offering | 115 |

## EXPLANATION OF CITATION FORMS

The following citation forms are used in this statement:

- "Ex. __" for references to the exhibits to the Declaration of Richard W. Clary In Support of Credit Suisse's Motion for Summary Judgment.  For consistency and brevity, citations to specific pages within those exhibits refer to the last three digits of the Bates number, if applicable, for the page(s) in question.

- "TAC ¶ __" for references to the Third Amended Complaint, dated August 11, 2011 (ECF 10-115).

### The Parties

- "Credit Suisse" or "CSFB":  Credit Suisse First Boston (USA), Inc. (n/k/a Credit Suisse (USA), Inc.), Credit Suisse First Boston LLC (n/k/a Credit Suisse Securities (USA) LLC) and Pershing LLC (f/k/a Donaldson, Lufkin & Jenrette Securities Corporation).  Where appropriate, this statement distinguishes between Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ") and the pre-merger Credit Suisse entities.

- "Silvercreek" or "Plaintiffs":  Silvercreek Management, Inc., Silvercreek Limited Partnership, Silvercreek II Limited, OIP Limited and Pebble Limited Partnership.

### Deposition Transcripts[1]

#### *Silvercreek Witnesses*

- "Joynt Dep.":  Deposition of Bryn Joynt, dated November 10, 2005 (Ex. C50)

- "Kittel Dep.":  Deposition of Robert Kittel, dated October 19 and 20, 2005 (Ex. C49)

- "Morwick Dep.":  Deposition of Louise Morwick, dated September 19 and 20, 2005 and June 21, 2006 (Ex. C48)

#### *Credit Suisse Witnesses*

- "Abib Dep.":  Deposition of Osmar Abib Jr., dated June 16 and 17, 2004 (Ex. C5)

- "DeVries Dep.":  Deposition of Peter Andrew DeVries, dated May 25, 2005 (Ex. C27)

- "Haratunian Dep.":  Deposition of Stephen Haratunian, dated September 16, 2005 (Ex. C36)

- "Ivers Dep.":  Deposition of Richard H. Ivers, dated December 1 and 2, 2004 (Ex. C14)

---

[1] For ease of reference, transcripts from multi-day depositions are combined (in excerpted form) into single exhibits.

- "Jeffe Dep.":  Deposition of Robert A. Jeffe, dated October 6 and 7, 2004 (Ex. C11)

- "Launer Dep.":  Deposition of Curt N. Launer, dated May 10 through 12, 2005 (Ex. C25)

- "Maletta Dep.":  Deposition of David Maletta, dated June 16 and 17, 2005 (Ex. C28)

- "Mandanas Dep.":  Deposition of Mary Beth Mandanas, dated August 23 through 25, 2004 (Ex. C8)

- "Marino Dep.":  Deposition of Carmen J. Marino, dated October 20, 2005 (Ex. C42)

- "Moran Dep.":  Deposition of James Moran, dated July 21 and 22, 2004 (Ex. C7)

- "Nath Dep.":  Deposition of Laurence J. Nath, dated January 12 and 13, 2005 (Ex. C16)

- "Nath Bankr. Dep.":  Deposition of Larry Nath, dated May 13 and 14, 2003, taken in *In re: Enron Corp.*, No. 01-16034 (AJG) (S.D.N.Y. Bankr.) (Ex. C4)

- "O'Brien Dep.":  Deposition of Robert O'Brien, dated January 24, 2005 (Ex. C19)

- "Ogunlesi Dep.":  Deposition of Adebayo O. Ogunlesi, dated December 6 and 7, 2004 (Ex. C15)

- "Randell Dep.":  Deposition of Sara Randell, dated November 30, 2005 (Ex. C47)

- "Sakol Dep.":  Deposition of Jill Sakol, dated August 25 and 26, 2005 (Ex. C34)

- "Scott Dep.":  Deposition of D. Dwight Scott, dated October 27 through 29, 2004 (Ex. C12)

- "Yellen Dep.":  Deposition of Jonathan E. Yellen, dated August 18, 2005 (Ex. C33)

***Enron Witnesses***

- "Blake Dep.":  Deposition of Norman Perkins Blake, Jr., dated May 23 through 27, 2005 (Ex. C26)

- "Duncan Dep.":  Deposition of John House Duncan, Sr., dated February 7 through 10, 2005 (Ex. C21)

- "Fastow Dep.":  Deposition of Andrew Stuart Fastow, dated October 23 through 27 and October 30 through November 2, 2006 (Ex. C44)

- "Harrison Dep.":  Deposition of Kenny Lance Harrison, dated August 8 and 9, 2005 (Ex. C31)

- "Savage Dep.":  Deposition of Frank Savage, dated January 18 through 21, 2005 (Ex. C18)

- "Winokur Dep.":  Deposition of Herbert S. Winokur, Jr., dated April 27 through 29 and May 2 through 4, 2005 (Ex. C24)

*Arthur Andersen Witnesses*

- "Agnew Dep.":  Deposition of Kate D. Agnew, dated October 31 through November 3, 2005 (Ex. C45)

- "Cash Dep.":  Deposition of Debra Ann Cash, dated November 30 through December 3 and December 6 through 7, 2004 (Ex. C13)

- "Scardino Dep.":  Deposition of Kimberly R. Scardino, dated January 24 through 28 and January 31, 2005 (Ex. C20)

- "Stewart Dep.":  Deposition of John E. Stewart, dated September 23 and September 27 through 29, 2005 (Ex. C39)

*Vinson & Elkins Witnesses*

- "Astin Dep.":  Deposition of Ronald Taylor Astin, dated August 1 through 5 and August 8, 2005 (Ex. C30)

- "Baird Dep.":  Deposition of Robert Baird, dated October 5 and 6, 2004 and July 18 and 19, 2005 (Ex. C10)

- "Dilg Dep.":  Deposition of Joseph Carl Dilg, dated June 28 through July 1, 2005 (Ex. 29)

- "Osterberg Dep.":  Deposition of Edward Charles Osterberg, Jr., dated August 10 and 11, 2005 (Ex. C32)

- "Spradling Dep.":  Deposition of Mark Raymond Spradling, dated September 12 through 16 and September 19, 2005 (Ex. C35)

*Rating Agency Witnesses*

- "Barone Dep.":  Deposition of Ronald M. Barone, dated March 14 through 18, 2005 (Ex. C23)

- "Diaz Dep.":  Deposition of John Diaz, dated November 14 through 16, 2005 (Ex. C22)

- "Moore Dep.":  Deposition of Stephen Moore, dated February 14 through 18, 2005 (Ex. C46)

- "Shipman Dep.":  Deposition of Todd A. Shipman, dated September 20 through 22, 2005 (Ex. C38)

***Other Fact Witnesses***

- "Clemmens Dep.":  Deposition of Robert T. Clemmens, dated September 29 and 30, 2004 (Ex. C9)

- "Edsall Dep.":  Deposition of Michael T. Edsall, dated October 19 and 20, 2005 (Ex. C41)

- "McGahen Dep.":  Deposition of Graham McGahen, dated January 18, 2005 (Ex. C17)

- "Williams Dep.":  Deposition of Richard B. Williams, dated July 21 and 22, 2004 (Ex. C6)

***Silvercreek Experts***

- "Levitin Dep.":  Deposition of Moshe S. Levitin, CPA, MBA, DABFA, dated September 27 through 29, 2006 (Ex. C40)

- "Matthews Dep.":  Deposition of Gilbert Matthews, dated October 24 and 25, 2006 (Ex. C43)

- "Regan Dep.":  Deposition of D. Paul Regan, dated September 19 through 21, 2006 (Ex. C37)

## **Expert Reports**

***Credit Suisse Experts***

- "Cornell Rpt.":  Expert Report of Bradford Cornell, dated March 17, 2006 (Ex. C2)

- "Rock Rpt.":  Expert Report of Robert Rock, dated March 16, 2006 (Ex. C1)

***Silvercreek Experts***

- "Matthews Rpt.":  Report Prepared by Gilbert E. Matthews, dated  June 1, 2006 (Ex. C3)

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York, Credit Suisse contends that there is no genuine issue to be tried with respect to the following facts:

**A.      Parties**

      **(a)      Silvercreek**

            **(i)      Silvercreek Entities**

1.      Plaintiff Silvercreek Management Inc. is an Ontario corporation with its principal place of business in Toronto, Canada.  (TAC ¶ 8.)

2.      Pebble Limited Partnership is an Ontario limited partnership with its principal place of business in Toronto, Canada.  (TAC ¶ 9.)

3.      Silvercreek Limited Partnership is an Ontario limited partnership with its principal place of business in Toronto, Canada.  (TAC ¶ 10; Morwick Dep. 109:21-23 (Ex. C48).)

4.      OIP Limited was an Ontario corporation with its principal place of business in Toronto, Canada.  (TAC ¶ 11.)

5.      Silvercreek II Limited is a Cayman Islands corporation with its principal place of business in the Cayman Islands.  (TAC ¶ 12; Morwick Dep. 116:11-16 (Ex. C48).)

6.      Silvercreek Management Inc. is a "[r]egistered investment counselor and portfolio manager".  (Presentation re: Silvercreek Mgmt. Inc. (Jan. 2005), SlvC010404 at 406 (Ex. C209).)

7.      Silvercreek Management Inc. managed and had sole investment discretion over the investments of Silvercreek Limited Partnership, Silvercreek II Limited, OIP Limited and Pebble Limited Partnership.  (TAC ¶ 13; Morwick Dep. 115:8-19 (Ex. C48).)

### (ii)     Silvercreek Witnesses

8.      Louise Morwick was the portfolio manager, president, director and founder of Silvercreek.  (Resume of Louise Morwick, SlvC005463 (Ex. C202); Morwick Dep. 142:12-14 (Ex. C48); Sworn Decl. Louise Morwick (Aug. 11, 2005) at 3 (Ex. C294).)

9.      Ms. Morwick made the investment decisions for Silvercreek.  (Morwick Dep. 142:12-15 (Ex. C48); Kittel Dep. 321:4-5, 370:24-371:1 (Ex. C49); Joynt Dep. 162:15-18 (Ex. C50).)

10.     Ms. Morwick owned the majority of Silvercreek Management Inc. (Morwick Dep. 113:2-3 (Ex. C48).)

11.     Ms. Morwick was an investor in Silvercreek Limited Partnership and may have been an investor in Silvercreek II Limited.  (Morwick Dep. 112:6-7, 121:5-14 (Ex. C48).)

12.     Robert Kittel was Partner, Vice President and the research analyst for Silvercreek.  (Sworn Decl. Robert Kittel (Oct. 3, 2005) at 6 (Ex. C297); Morwick Dep. 142:11 (Ex. C48).)

13.     Mr. Kittel "provide[d] investment research and analysis of [Silvercreek's] investments."  (Morwick Dep. 142:8-16 (Ex. C48); Kittel Dep. 108:9-18 (Ex. C49).)

14.     Mr. Kittel "had an equity investment in the management company, Silvercreek Management Inc."  (Kittel Dep. 95:19-23 (Ex. C49).)

15.     Mr. Kittel was also an investor in Silvercreek Limited Partnership.  (Kittel Dep. 95:24-96:1 (Ex. C49).)

16.     Bryn Joynt was Vice President and Chief Financial Officer of Silvercreek. (Sworn Decl. Bryn Joynt (Oct. 13, 2005) at 3 (Ex. C299); Morwick Dep. 70:9-13 (Ex. C48).)

17.     Mr. Joynt was responsible for the operations, risk management, regulatory reporting, financial accounting and investor relations components of the Silvercreek business. (Joynt Dep. 154:9-13 (Ex. C50); Morwick Dep. 70:11-18 (Ex. C48).)

18.     Mr. Joynt did not participate in investment decisions for Silvercreek. (Joynt Dep. 159:24-160:17, 162:6-18 (Ex. C50); Morwick Dep. 70:10-21 (Ex. C48).)

19.     Mr. Joynt was an investor in Silvercreek at some point from "post the Enron loss" until March 2005.  (Joynt Dep. 90:20-91:18 (Ex. C50).)

**(b)     Credit Suisse**

20.     Credit Suisse is an investment bank that offers a wide variety of financial services, including such activities as sales and trading in equity and debt securities and derivatives, raising and investing capital, underwriting securities offerings and arranging private security placements, providing investment research, and providing financial advisory services. (Rock Rpt. ¶ 5 (Ex. C1).)

21.     Investment banks like Credit Suisse "do not provide auditing services, nor do they provide accounting advisory services -- including determining and/or providing advice regarding the appropriate accounting treatment for transactions in which they are involved." (Rock Rpt. ¶ 5 (Ex. C1).)

**(i)     Credit Suisse-DLJ Merger**

22.     On August 30, 2000 an affiliate of Credit Suisse First Boston (USA), Inc. (now known as Credit Suisse (USA), Inc.) announced that it would merge with the parent of Donaldson, Lufkin and Jenrette Securities Corporation ("DLJ").  (Press Release, Credit Suisse First Boston (USA), Inc., *Credit Suisse Group to acquire DLJ – a leading U.S. investment bank and financial services provider* (Aug. 30, 2000), https://www.credit-suisse.com/corporate/en/articles/media-releases/10601-200008.html (Ex. C226).)

3

23.     On November 3, 2000, Credit Suisse announced the completion of the merger with DLJ, with DLJ being renamed "Credit Suisse First Boston (USA), Inc." effective November 6, 2000.  (Press Release, Credit Suisse First Boston (USA), Inc., *Credit Suisse Group completes acquisition of Donaldson, Lufkin & Jenrette* (Nov. 3, 2000), https://www.credit-suisse.com/corporate/en/articles/media-releases/11462-200011.html (Ex. C231).)

24.     Prior to the merger, Credit Suisse and DLJ were separate and independent entities.  (*See* DLJ Form 14D-9 at 2 (Sept. 8, 2000) (Ex. C227) ("[T]here exists no material agreement, arrangement or understanding or any actual or potential conflict of interest between the Company or its affiliates and . . . Purchaser, [Credit Suisse Group] or their respective executive officers, directors or affiliates.").)

**(ii)     Credit Suisse Employees**

25.     Osmar Abib was a Managing Director in the Investment Banking Division's Energy Group at Credit Suisse.  (Sworn Decl. Osmar Abib (June 8, 2004) at 3 (Ex. C285); Abib Dep. 79:13-15 (Ex. C5).)

26.     Michael Colucci was a trader at Credit Suisse.  (Randell Dep. 17:10-13 (Ex. C47).)

27.     Andrew DeVries was an Equity Research Associate at Credit Suisse. (Sworn Decl. Peter Andrew DeVries (May 2005) at 3 (Ex. C292).)

28.     Charles Gassenheimer was a convertible research analyst at Credit Suisse. (Randell Dep. 50:6-8 (Ex. C47).)

29.     Richard Ivers was a Managing Director of Leveraged Finance at Credit Suisse.  (Sworn Decl. Richard H. Ivers (Nov. 23, 2004) at 3 (Ex. C289).)

30.     Robert Jeffe was a Managing Director and Co-Chairman of Global Energy/Power/Natural Resources (Investment Banking) at Credit Suisse.  (Sworn Decl. Robert Allan Jeffe (Sept. 30, 2004) at 3 (Ex. C287).)

31.     Curt Launer was an equities research analyst at Credit Suisse following the natural gas and power industries.  (Launer Dep. 22:21-24; 24:11-13 (Ex. C25).)

32.     David Maletta was Head of Corporate Counterparty Risk for North America at Credit Suisse.  (Sworn Decl. David Maletta (June 14, 2005) at 4 (Ex. C293); Maletta Dep. 51:11-21 (Ex. C28).)

33.     Mary Beth Mandanas was a Director in the Investment Banking Division at Credit Suisse.  (Mandanas Dep. 17:6-7, 22:7-13 (Ex. C8).)

34.     Carmen Marino was a Managing Director and Head of Monetizations Business at Credit Suisse.  (Sworn Decl. Carmen J. Marino (Oct. 3, 2005) at 6 (Ex. C298).)

35.     James Moran was a Director and lead of Managed Loan Transactions at Credit Suisse.  (Sworn Decl. James Moran (July 19, 2004) at 3 (Ex. C286).)

36.     Laurence Nath was Co-Head of Structured Products in the Investment Banking Division at DLJ and Credit Suisse.  (Sworn Decl. Laurence J. Nath (Jan. 11, 2005) at 5 (Ex. C291).)

37.     Robert O'Brien was a Managing Director and Chief Credit Officer at Credit Suisse.  (O'Brien Dep. 11:9-12 (Ex. C19).)

38.     Adebayo Ogunlesi was Head of the Global Energy Group at Credit Suisse. (Sworn Decl. Adebayo O. Ogunlesi (Nov. 30, 2004) at 3 (Ex. C290); Ogunlesi Dep. 17:11-15 (Ex. C15).)

39.     Sara Randell was a salesperson on the convertible trading desk at Credit Suisse.  (Randell Dep. 10:24-11:8 (Ex. C47).)

40.     Jill Sakol was a fixed income analyst at Credit Suisse.  (Sworn Decl. Jill Sakol (Aug. 23, 2005) at 3 (Ex. C296); Sakol Dep. 139:11-12 (Ex. C34).)

41.     Philip Salles was an equity research ssociate at Credit Suisse.  (Launer Dep. 60:14-61:21 (Ex. C25).)

42.     D. Dwight Scott was a Senior Vice President and Managing Director in Energy Investment Banking at DLJ.  (Sworn Decl. Donald Dwight Scott (Oct. 20, 2004) at 3 (Ex. C288); Scott Dep. 27:17-28:10 (Ex. C12).)

43.     Richard Vossler was a high-yield analyst at Credit Suisse.  (Sakol Dep. 367:22-25 (Ex. C34).)

44.     Jonathan Yellen was a Director in the Investment Banking Division's Energy Group at Credit Suisse.  (Sworn Decl. Jonathan Edward Yellen (Aug. 12, 2005) at 3 (Ex. C295); Yellen Dep. 21:21-22:6 (Ex. C33).)

**(c)     Enron and Its Advisors**

45.     Enron's annual reports state that Enron's "management . . . is responsible for the[] integrity and objectivity" of its financial statements:

> "The . . . financial statements of Enron Corp. and subsidiaries (collectively, Enron) were prepared by management, which is responsible for their integrity and objectivity.  The statements have been prepared in conformity with generally accepted accounting principles and necessarily include some amounts that are based on the best estimates and judgments of management."  (Enron 1998 Annual Rpt. at 43 (Ex. C214).)

(*See* Enron 1999 Annual Rpt. at 39 (Ex. C222); Enron 2000 Annual Rpt. at 29 (Ex. C231-1).)

46.    Under Generally Accepted Auditing Standards, a company's "financial

statements are management's responsibility":

> "The financial statements are management's responsibility. . . .
> Management is responsible for adopting sound accounting policies
> and for establishing and maintaining internal control that will,
> among other things, record, process, summarize, and report
> transactions (as well as events and conditions) consistent with
> management's assertions embodied in the financial statements. . . .
> [T]he fair presentation of financial statements in conformity with
> generally accepted accounting principles is an implicit and integral
> part of management's responsibility."  (AICPA, Codification of
> Statements on Auditing Standards, AU § 110.02 (1997)
> (Ex. C300).)

### (i)    Enron Officers

47.    Kenneth Lay was Chairman and Chief Executive Officer of Enron from

1986 to February 2001 and from August 2001 until after Enron's bankruptcy filing.  (Enron

Sched. 14A (Mar. 27, 2001) at 5 (Ex. C238); Press Release, Enron Corp., *Enron Announces*

*Skilling Resignation; Lay Assumes President and CEO Duties* (Aug. 14, 2001), EX. 000000557

(Ex. C249).)

48.    Jeffrey Skilling was Chief Executive Officer of Enron from February 2001

to August 2001.  (Enron Sched. 14A (Mar. 27, 2001) at 6 (Ex. C238); Press Release, Enron

Corp., *Enron Announces Skilling Resignation; Lay Assumes President and CEO Duties* (Aug. 14,

2001), EX. 000000557 (Ex. C249).)

49.    Andrew Fastow was Chief Financial Officer of Enron from March 1998 to

October 24, 2001.  (Fastow Dep. 638:2-5 (Ex. C44); Press Release, Enron Corp., Enron Names

Jeff McMahon Chief Financial Officer (Oct. 24, 2001), EX. 000000573 (Ex. C255).)

50.    Richard Causey was Chief Accounting Officer of Enron from

January 1997 until after Enron's bankruptcy filing.  (Enron 2000 Form 10-K (Apr. 2, 2001)

at Item 1, p.22 (Ex. C239).)

### (ii)     Enron Board of Directors

51.     In May 1998, the Enron Board of Directors approved certain "Corporate Governance Guidelines".  (Minutes, Mtg. of Bd. of Directors, Enron Corp. (May 4-5, 1998), ENE 0000000492 at 497 (Ex. C51).)

52.     The Corporate Governance Guidelines identified the "principal functions" of the Enron Board, including "ensuring legal and ethical conduct by Enron and its officers and employees" and "providing general oversight of Enron's business".  (Minutes, Mtg. of Bd. of Directors, Enron Corp. (May 4-5, 1998), ENE 0000000492 at 523 (Ex. C51).)

53.     Regarding the Board's function of ensuring legal and ethical conduct, the Corporate Governance Guidelines stated that the Audit Committee of the Board "provides reasonable assurance" that the policies governing such conduct are observed:

> "The Board approves the Enron Conduct of Business Affairs policy, which imposes on each officer and employee of Enron the duty of conducting the business affairs of Enron in accordance with all applicable laws and in a moral and honest manner.  The Audit and Compliance Committee provides reasonable assurance that the provisions of the Enron Conduct of Business Affairs policy are observed."  (Minutes, Mtg. of Bd. of Directors, Enron Corp. (May 4-5, 1998), ENE 0000000492 at 523 (Ex. C51).)

54.     The Corporate Governance Guidelines stated that the Audit Committee "serves as the overseer of Enron's financial reporting process" and is "comprised solely of independent Directors":

> "The Audit and Compliance Committee serves as the overseer of Enron's financial reporting process, system of internal controls, and corporate compliance process, and it provides reasonable assurance that Enron conducts its business in conformance with appropriate legal and regulatory standards and requirements.  Such Committee annually recommends independent auditors for appointment by the Board, reviews the services to be performed by the independent auditors, and exercises oversight of their duties. The Audit and Compliance Committee is comprised solely of

independent Directors."  (Minutes, Mtg. of Bd. of Directors, Enron Corp. (May 4-5, 1998), ENE 0000000492 at 528 (Ex. C51).)

55.     The Audit Committee Charter stated that a principle function of the Audit Committee is to "[s]erve as a channel of communication between the independent auditor and the Board of Directors and/or management and between the executive responsible for the audit functions provided internally or by contract and the Board of Directors and/or management of the Company."  Enron Corp. Audit Committee Mtg. (May 6, 1997), AB024600278 at 332 (Ex. C52).)

56.     In 1998, Enron's Board of Directors had 17 members—15 of whom were outside directors.  (Enron Sched. 14A (Mar. 24, 1998) at 4-9 (Ex. C211).)

57.     In 1999, Enron's Board of Directors had 16 members—14 of whom were outside directors.  (Enron Sched. 14A (Mar. 30, 1999) at 4-9 (Ex. C215).)

58.     In 2000, Enron's Board of Directors had 18 members—16 of whom were outside directors.  (Enron Sched. 14A (Mar. 21, 2000) at 4-9 (Ex. C223).)

59.     In 2001, Enron's Board of Directors had 14 members—12 of whom were outside directors.  (Enron Sched. 14A (Mar. 27, 2001) at 4-9 (Ex. C238).)

60.     Robert Belfer, Norman Blake, Ronnie Chan, John Duncan, Paulo Ferraz Pereira, Joe Foy, Wendy Gramm, Ken Harrison, Robert Jaedicke, Charles LeMaistre, John Mendelsohn, Jerome Meyer, Frank Savage, John Urquhart, Lord John Wakeham, Charles Walker, Bruce Willison and Herbert Winokur served as outside directors.  (Enron Sched. 14A (Mar. 24, 1998) at 4-9 (Ex. C211); Enron Sched. 14A (Mar. 30, 1999) at 4-9 (Ex. C215); Enron Sched. 14A (Mar. 21, 2000) at 4-9 (Ex. C223); Enron Sched. 14A (Mar. 27, 2001) at 4-9 (Ex. C238).)

61.     Ken Harrison did not receive compensation for his service on the Enron Board.  (Harrison Dep. 251:18-23 (Ex. C31).)  Mr. Harrison testified that he believed that Enron viewed him as an inside director, because he previously had been Chairman and CEO of Portland General Electric, which Enron had acquired.  (*Id.* at 69:4-71:13, 250:22-253:20 (Ex. C31).)

**(d)     Arthur Andersen**

62.     Arthur Andersen LLP ("Arthur Andersen") was outside auditor to Enron. (Savage Dep. 824:23-25 (Ex. C18).)

63.     Arthur Andersen also "provided . . . consulting services [to Enron] related to providing accounting advice on proposed structures and other matters, along with audit services."  (Cash Dep. 1152:10-20 (Ex. C13).)

64.     In an internal memorandum, Arthur Andersen characterized its consultation process with Enron as follows:

> "ENRON is a complex organization.  It deals with complex transaction structures, and in essence, uses the current accounting literature to engineer transactions to take advantage of that literature.  These transactions are complex, and there is no clear written literature with respect to these transactions.  In addition, ENRON is a very fast moving organization that continues to move faster and faster, the transactions are extremely fluid, and in many cases, one transaction builds on another. . . . They expect us to provide differentiation from our competition by (a) keeping up with them in near real-time mode; (b) bringing our best competencies to the table (c) letting them participate in the process of our technical debates; (d) making final decisions that can be counted on and used for the next round, often in very gray areas." (Mem. from L. Reiger re: "ENRON Consultation Process" (Feb. 12, 2001), AA-EX00291260 at 260 (Ex. C123).)

65.     The Professional Standards Group at Arthur Andersen "maintain[ed] subject matter expertise" over "[a]ccounting principles and auditing procedures (including financial statement presentation/disclosures and auditors' reports."  (Email from W. Swanson re: "Research Manager" (Oct. 16, 2001), AA145598.8 at 598.10 (Ex. C159).)

10

66.     Arthur Andersen engagement teams regularly consulted the Professional Standards Group regarding accounting questions arising from Enron-related transactions.  (Mem. from L. Reiger re: "ENRON Consultation Process" (Feb. 12, 2001), AA-EX00291260-3 (Ex. C123).)

67.     John Stewart was head of the Professional Standards Group.  (Stewart Dep. 14:10-15 (Ex. C39).)  Mr. Stewart was a voting member of the Emerging Issues Task Force at the time that EITF 98-10 was developed and accepted.  (*Id.* at 37:6-19.)  He also was a member of the Derivatives Implementation Group, which is a task force that was created in 1998 concurrent with the issuance of SFAS 133 to provide guidance to companies interpreting SFAS 133.  (*Id.* at 809:11-18; *see* FASB, Statement 133 Implementation (Derivatives), http://www.fasb.org/derivatives/ (Ex. C301).)

68.     With respect to Enron-related transactions, Arthur Andersen's process for consulting the Professional Standards Group ("PSG") worked as follows:

> "[I]n general terms, the engagement team will participate in discussions with the client about a transaction or series of transactions.  This discussion may take place formally or informally.  The engagement team then begins research on the proposed transaction to determine the accounting consequences, or to concur with the consequences the ENRON people have assumed.  If the engagement team finds that this a gray area, they will then confer with the PSG designee that John Stewart has identified for this particular type of transaction.  They will discuss options and alternatives with this PSG representative.  The engagement team will then discuss the consultation process with the client, and this can be an iterative process at this point.  At some point along the process, the PSG designee will discuss and report to John Stewart the consultations that have taken place.  If there are no firm conclusions reached at this point, John Stewart will be brought into the consultation process.  This can include John Stewart with members of the engagement team as well as John Stewart with client representatives.  At this point, generally, conclusions are reached, and the client will either restructure the transaction or the PSG will sign off.  After that the engagement

team is to document the results."  (Mem. from L. Reiger re: "ENRON Consultation Process" (Feb. 12, 2001), AA-EX00291260 at 260-61 (Ex. C123).)

69.  Enron was "the largest single largest user and client of the PSG".  (Mem. from L. Reiger re: "ENRON Consultation Process" (Feb. 12, 2001), AA-EX00291260 at 262 (Ex. C123).)

70.  Arthur Andersen had "complete access to the [Enron] board of directors to bring to their attention any matters that are of concern to them that can in some way negatively impact the company or issues that they think [the board] should know about."  (Savage Dep. 828:14-18 (Ex. C18).)

### (e)  Vinson & Elkins

71.  Vinson & Elkins LLP ("Vinson & Elkins") was outside counsel to Enron. (Baird Dep. 452:17-23 (Ex. C10).)

72.  Among other things, Vinson & Elkins "counseled with Enron on disclosure issues" related to Enron's transactions and "specific regulatory requirements and issues."  (Baird Dep. 287:5-12 (Ex. C10).)

## B.  Silvercreek

### (a)  Silvercreek's Business

73.  Silvercreek Management Inc. was founded in March 2000.  (Morwick Dep. 89:2-5 (Ex. C48).)

74.  Ms. Randell testified that Silvercreek was "a sophisticated hedge fund that employs convertible arbitrage and also some credit strategies to yield returns for their investors". (Randell Dep. 19:9-13 (Ex. C47).)

75.     Silvercreek "[s]pecialize[s] in convertible bond investments".  (Investor Presentation of Silvercreek Mgmt. Inc. for Silvercreek Ltd. P'ship (Jan. 2005), SlvC010404 at 406 (Ex. C209).)

76.     Silvercreek's core portfolio consists of "[h]edged convertible bond/preferred share positions", "[h]edged mandatory convertible/exchangeable positions" and "[o]utright [c]onvertible [b]ond [p]ositions".  (Investor Presentation of Silvercreek Mgmt. Inc. for Silvercreek Ltd. P'ship (Jan. 2005), SlvC010404 at 408 (Ex. C209).)

77.     Plaintiffs' expert, Gilbert Matthews, described hedged investments in convertible bonds as "[c]onvertible bond arbitrage".  (Matthews Rpt. at 2 (Ex. C3).)

78.     In October 2001, Silvercreek had approximately $350 million in assets under management.  (Morwick Dep. 121:21-122:16 (Ex. C48).)

### (i)     Convertible Bond Arbitrage

79.     Convertible bonds are debt securities that can be converted into equity securities of the issuer.  (Matthews Rpt. at 2 (Ex. C3).)

80.     Convertible bonds are generally convertible to equity of the issuer at the discretion of the bond holder.  (Matthews Rpt. at 2 (Ex. C3).)

81.     To engage in convertible bond arbitrage, an investor purchases a convertible bond and simultaneously sells short the stock into which the bond is convertible. (Matthews Rpt. at 2 (Ex. C3).)

82.     The net cash outlay of an investor engaging in convertible bond arbitrage is the difference between the price it receives for the stock it sold short and the price it paid for the convertible bond.  (Matthews Rpt. at 2 (Ex. C3).)

83.     The investor's returns would be the interest received on the convertible bond, less the net cash outlay and less the costs associated with maintaining the short position. (Matthews Rpt. at 2 (Ex. C3).)

84.     The investor in this type of investment also retains the possibility of profiting from the short sale.  (Matthews Rpt. at 2-3 (Ex. C3).)

85.     The investor also retains the ability to cover the short by converting the bond to equity if maintaining the short position becomes unprofitable.  (Matthews Rpt. at 2 (Ex. C3).)

86.     Ms. Morwick testified that "outright convertible bonds [and] hedged exchangeables . . . are . . . meant to be low risk, stable, conservative investments".  (Morwick Dep. 149: 12-15 (Ex. C48).)

87.     Ms. Morwick testified that the "Enron zero coupon bonds [we]re a good example of an outright convertible bond position."  (Morwick Dep. 186:17-21 (Ex. C48).)

**(ii)     Silvercreek's Focus on Distressed Debt**

88.     Ms. Morwick testified that Silvercreek's returns are better when the companies they invest in do poorly.  (Morwick Dep. 165:1-3 (Ex. C48) ("Q. . . . [B]ut for your business, you do better when the company does poorly?  A Yes.").)

89.     Ms. Morwick wrote a letter to Silvercreek investors stating that the fund had done well because the companies it had invested in were doing poorly.  (Ltr. from Louise Morwick to Silvercreek II Ltd. S'holders (July 2, 2001), SlvC012988 at 989 (Ex. C130) ("Positions that performed particularly well this month include Manugistics Group, Inc. . . . Manugistics announced results that were lower than expected and its stock price declined 36%.").)

14

90.     Silvercreek's marketing materials for investors in Silvercreek Limited Partnership state that it "delivers superior performance in weak equity markets".  (Investor Presentation of Silvercreek Mgmt. Inc. for Silvercreek Ltd. P'ship (Jan. 2005), SlvC010404 at 407 (Ex. C209).)

91.     Ms. Morwick testified that "[I]f a company runs into difficulty even if it's credit difficulty, we usually do well in those positions."  (Morwick Dep. 199:2-200:1 (Ex. 48).)

92.     Ms. Morwick testified that Silvercreek's "outright long convertible bond portfolio consists of convertible bonds that are trading close to their bond floor".  (Morwick Dep. 463:12-24 (Ex. C48).)

### (iii)     Silvercreek's Returns

93.     Silvercreek obtained average annual returns of 25.0% for Silvercreek Limited Partnership from March 2000 through December 2004.  (Investor Presentation of Silvercreek Mgmt. Inc. for Silvercreek Ltd. P'ship (Jan. 2005), SlvC010404 at 415 (Ex. C209).)

94.     Ms. Morwick testified that it would have been unlikely that she would have made "investments where the locked-in return [wa]s 10 percent".  (Morwick Dep. 308:7-10 (Ex. C48).)

95.     Ms. Morwick testified that "Enron a year ago [in 2000], we expected to earn a minimum of 21 percent.  In this particular case, it was 25 percent on the first trade, and then got better.  That's how we do make our investments in these businesses."  (Morwick Dep. 381:3-12 (Ex. C48).)

### (iv)     Silvercreek's Investment Decisions

96.     In making investment decisions, Ms. Morwick testified that Silvercreek "rel[ies] on [its] own work".  (Morwick Dep. 166:8-14 (Ex. C48).)

97.     Ms. Morwick also testified that in making investment decisions, Silvercreek looks "primarily at what [its] returns will be".  (Morwick Dep. 462:3-7 (Ex. C48).)

98.     Ms. Morwick testified that to analyze possible positions in outright convertible bonds, Silvercreek would build a model that "look[s] specifically at the economics of the bond", including:

> "What's the price of the bond? What interest does it pay? What's the return on that bond? So it's looking specifically at the mathematics of the particular investment. . . .  [S]o you can vary the price.  And if you vary the price, the return will be calculated for you."  (Morwick Dep. 144:8-21 (Ex. C48).)

99.     Ms. Morwick testified that Silvercreek maintained "investment-oriented file[s]":

> "So for every investment we make, a file is set up.  And that file contains, you know, a summary of the security review and the prospectus for the convertible bond.  . . . [A]dditional information may be added to that file over the course of the time.  So it includes the issuer information.  So there's a file for every company that we have an investment in."  (Morwick Dep. 81:1-13 (Ex. C48).)

100.     Ms. Morwick testified that Silvercreek also maintained "files dealing with trade records":

> "There are also separate files dealing with trade records, financials for the funds, you know, the operations of the business.  They wouldn't be joined together.  So if we were doing a trade in an Enron security that would result in a trade ticket, there would be a record of the trade.  Typically, we execute trades through Bloomberg.  So you'd have a record of the Bloomberg order and confirmation.  It would be ticketed.  So a trade ticket would be generated.  That will go to Treena because she coordinates the settlement process.  She will then collect a confirmation, typically through DTC, the Depository Trust, which is the central settlement body.  She'll get a confirmation, attach it to the ticket, and then the tickets will all be filed."  (Morwick Dep. 81:1-82:2 (Ex. C48).)

### (v)    Silvercreek's Salespeople

101.    Ms. Morwick testified that Silvercreek typically would execute its trades through Bloomberg.  (Morwick Dep. 81:17-20 (Ex. C48).)

102.    Silvercreek worked with salespeople at several different banks, including, among others, Banc of America; Bear, Stearns & Co.; Credit Suisse; D.E. Shaw; Deutsche Bank; First Union Securities Inc.; Jeffries & Co.; Merrill Lynch; and Salomon Smith Barney.  (*See e.g.*, Louise Morwick Bloomberg Messages (Oct. 30 – Nov. 1, 2001), SlvC014111 at 113-14 (Ex. C194); Silvercreek Mgmt. Inc., Trading History—Enron 7% Exchangeable Notes—trades after October 23, 2001 (Jan. 13, 2004), SlvC005046 at 048-49 (Ex. C208); Morwick Dep. 392:1-4, 20, 394:5-7 (Ex. C48).)

103.    Salespeople from various banks sent Ms. Morwick and Mr. Kittel pricing information.  (*E.g.*, Louise Morwick Bloomberg Messages (Oct. 15-16, 2001), SlvC013419 at 427-30 (Ex. C160); Robert Kittel Bloomberg Messages (Oct. 16-18, 2001), SlvC017556 at 556-59 (Ex. C162).)

104.    Salespeople from various banks executed trades for Ms. Morwick and Mr. Kittel.  (*E.g.*, Louise Morwick Bloomberg Messages (Oct. 15-16, 2001), SlvC013419 at 451, 453-54 (Ex. C160); Robert Kittel Bloomberg Messages (Oct. 16-18, 2001), SlvC017556 at 585, 594 (Ex. C162).)

105.    Ms. Morwick testified that "[i]t's typical for our salespeople to identify investment opportunities for us."  (Morwick Dep. 537:11-12 (Ex. C48).)

106.    Ms. Morwick referred to such identification by salespeople as a "pitch". (Morwick Dep. 548:16-18 (Ex. C48).)

107.    Ms. Randell was the salesperson assigned to Silvercreek on the Credit Suisse convertible trading desk.  (Randell Dep. 10:25-11:22 (Ex. C47).)

17

108.     Ms. Randell testified that Silvercreek was her client "[s]ince the time of their name change from Boulder Capital until the beginning of this year, until about January of this year [2005]"; thus Boulder Capital was Ms. Randell's client for she "guess[ed] a year". (Randell Dep. 11:23-12:10 (Ex. C47).)

109.     Ms. Morwick testified that Silvercreek II Limited had previously been known as Boulder II Limited.  (Morwick Dep. 131:11-132:6 (Ex. C48).)

110.     Documents reflect that Boulder II Limited's name was changed to Silvercreek II Limited on March 28, 2001.  (Ltr. from Silvercreek Mgmt. Inc. to To Whom It May Concern (Apr. 20, 2001), SlvC011812 (Ex. C124).)

111.     Ms. Morwick testified that "assets would have left Boulder Limited Partnership at the end of 2000 when Silvercreek Limited Partnership was established", and Ms. Morwick testified that "Silvercreek Limited Partnership that invested in the Enron notes was established December 31, 2000."  (Morwick Dep. 133:6-15, 134:1-135:18 (Ex. C48).)

112.     Ms. Morwick also testified that "[t]here was a change in manager prior to the name change [of Boulder II to Silvercreek II]", that the change in manager was from "Boulder to Silvercreek", and that Silvercreek Management was founded "in March, 2000". (Morwick Dep. 89:2-5, 131:11-132:6 (Ex. C48).)

113.     Ms. Randell testified that her role included relaying buy and sell order to the Credit Suisse traders and "sending [Ms. Morwick] Bloomberg messages about our asks, what we were buying or selling, or anything else she requested.  So if she requested our research, I would have sent that to her on Bloomberg."  (Randell Dep. 12:11-21, 28:2-29:8 (Ex. C47).)

114.     Ms. Morwick testified that in October 2001, "Sara [Randell] was communicating with me daily".  (*See* Morwick Dep. 536:22-537:8 (Ex. C48).)

115.    Ms. Randell sent Mr. Kittel and Ms. Morwick pricing information on various securities.  (*E.g.*, Robert Kittel Bloomberg Messages (Oct. 15, 2001), SlvC017478 at 478 (Ex. C158); Louise Morwick Bloomberg Messages (Oct. 15-16, 2001), SlvC013419 at 420-21 (Ex. C160).)

116.    Ms. Morwick testified that such messages were "typical type of message from one of [her] brokers".  (Morwick Dep. 750:1-16 (Ex. C48); Louise Morwick Bloomberg Messages (Oct. 15-16, 2001), SlvC013419 at 420-21 (Ex. C158).)

117.    Ms. Randell sent pricing to many Credit Suisse customers.  (*E.g.*, Sara Randell Bloomberg Messages (Oct. 18, 2001), CSFBLLC009881345 at 351-53 (Ex. C161).)

**(b)    Silvercreek's Purchases in October 2001**

118.    Silvercreek purchased Zero Notes on October 18, 19, 22, 23, 24, 25, 26 and 31, 2001.  (Silvercreek Mgmt. Inc., Trading History—Enron 0% Notes, SlvC005207 at 208-11 (Ex. C210).)

119.    Silvercreek paid 47.25 to 58.625 cents on the dollar for the Zero Notes during this time.

| Zero Notes | | | |
|---|---|---|---|
| Date | Price/$100 | Broker | Trade Tickets |
| October 18 | $58.625 | Credit Suisse | SlvC005297 at 300 (Ex. C165) |
| October 19 | $57.625 | Credit Suisse | SlvC005294 at 294 (Ex. C204) |
| October 19 | $57.25 | First Union | SlvC005297 at 297 (Ex. C165) |
| October 22 | $55.75 | Salomon Smith Barney | SlvC005290 at 290-91 (Ex. C166) |
| October 23 | $55.9375 | KBC Financial | SlvC005284 at 284 (Ex. C168) |
| October 23 | $55.83 | Salomon Smith Barney | SlvC005280 at 280 (Ex. C167) |
| October 24 | $53.60 | Salomon Smith Barney | SlvC005274 at 274 (Ex. C170) |
| October 24 | $52.90 | Morgan Stanley | SlvC005274 at 277 (Ex. C170) |
| October 24 | $52.00 | Banc of America | SlvC005271 at 271 (Ex. C169) |
| October 25 | $51.625 | Banc of America | SlvC005265 at 265 (Ex. C174) |
| October 25 | $51.625 | Salomon Smith Barney | SlvC005262 at 262 (Ex. C173) |
| October 26 | $51.625 | Banc of America | SlvC005268 at 268 (Ex. C188) |
| October 26 | $51.625 | First Union | SlvC005259 at 259 (Ex. C186) |
| October 31 | $47.25 | First Union | SlvC005257 at 257 (Ex. C192) |

120.    Credit Suisse acted as broker for a purchase on October 18, 2001. (Silvercreek Mgmt. Inc., Trading History—Enron 0% Notes, SlvC005207 at 208 (Ex. C210).)

121.    Credit Suisse acted as broker for a purchase on October 19, 2001. (Silvercreek Mgmt. Inc., Trading History—Enron 0% Notes, SlvC005207 at 208 (Ex. C210).)

122.    Ms. Morwick testified that the confirmations from the trades "would have" indicated whether the financial institution executing the trade was acting as agent or principal—that "you could check the confirms and you could have identified at that point in time that they were acting as principal and not an agent".  (Morwick Dep. 547:11-17 (Ex. C48).)

123.    Ms. Morwick testified that she "do[es]n't check the confirms, but certainly you could check the confirms and you could have identified at that point in time that they were acting as principal and not an agent."  (Morwick Dep. 547:11-17 (Ex. C48); *id.* 547:19-22 ("It's just not something that I do.  The settlements person matches the confirms.  And we don't check agent versus principal in the ordinary course of our business.").)

124.    Ms. Morwick testified that to the extent the purchases of Zero Notes or 7% Notes involved sales by financial institutions from their own positions, "[t]hat was disclosed in the confirms."  (Morwick Dep. 547:23-548:8 (Ex. C48).)

125.    The confirmation for the Zero Notes that Credit Suisse sold to Silvercreek on October 18, 2001 indicates that Credit Suisse was acting as an agent.  (Trade Ticket and Confirmation (Oct. 18, 2001), SlvC005297 at 300-02 (Ex. C165).)

126.    The confirmation for the Zero Notes that Credit Suisse sold to Silvercreek on October 19, 2001 indicates that Credit Suisse was acting as an agent.  (Trade Ticket and Confirmation (Oct. 19, 2001), SlvC005294 at 296 (Ex. C204).)

20

127.   Silvercreek purchased 7% Notes on October 24, 25 and 26, 2001.

(Silvercreek Mgmt. Inc., Trading History—Enron 7% Exchangeable Notes—trades after

October 23, 2001 (Jan. 13, 2004), SlvC005046 at 048, 050, 052, 054 (Ex. C208).)

128.   Silvercreek paid from 29.912 to 32.58 cents on the dollar for the 7% Notes

during this time.

| 7% Notes | | | |
|---|---|---|---|
| Date | Price/$100 | Broker | Trade Ticket |
| October 24 | $30.31 | Salomon Smith Barney | SlvC005431 at 431-33 (Ex. C171) |
| October 24 | $30.075 | Banc of America | SlvC005458 at 458 (Ex. C171-1) |
| October 24 | $29.912 | KBC Financial | SlvC005454 at 454-55 (Ex. C183) |
| October 24 | $30.333 | Jefferies | SlvC005450 at 450 (Ex. C182) |
| October 24 | $30.30 | Banc of America | SlvC005445 at 445-46 (Ex. C181) |
| October 24 | $30.30 | First Union | SlvC005441 at 441 (Ex. C180) |
| October 24 | $30.64 | First Union | SlvC005436 at 436-37 (Ex. C179) |
| October 25 | $31.48 | Jefferies | SlvC005405 at 405 (Ex. C191) |
| October 25 | $30.93 | Salomon Smith Barney | SlvC005410 at 410 (Ex. C175) |
| October 25 | $31.2425 | First Union | SlvC005414 at 414 (Ex. C176) |
| October 25 | $31.378 | KBC Financial | SlvC005414 at 419 (Ex. C176) |
| October 25 | $31.4443 | Credit Suisse | SlvC005423 at 423 (Ex. C177) |
| October 25 | $30.95 | Banc of America | SlvC005427 at 427-28 (Ex. C178) |
| October 26 | $32.58 | Banc of America | SlvC005389 at 389 (Ex. C193) |
| October 26 | $31.79 | First Union | SlvC005399 at 399 (Ex. C190) |
| October 26 | $32.39 | KBC Financial | SlvC005403 at 403-04 (Ex. C187) |

129.   Credit Suisse served as broker for a purchase on October 25, 2001.

(Silvercreek Mgmt. Inc., Trading History—Enron 7% Exchangeable Notes—trades after

October 23, 2001 (Jan. 13, 2004), SlvC005046 at 048-49 (Ex. C208).)

130.   The confirmation for the 7% Notes that Credit Suisse sold to Silvercreek

on October 25, 2001 indicates that Credit Suisse acted as an agent.  (Trade Ticket and

Confirmation (Oct. 25, 2001), SlvC005423 at 423-25 (Ex. C177).)

21

(c)      **Silvercreek's Zero Note Strategy**

131.     The Zero Notes were initially sold in a private placement in early 2001.

(*See* Prospectus, Enron Corp. Zero Coupon Convertible Senior Notes Due 2021 (July 18, 2001),

SlvC001165 at 176 (Ex. C247).)

132.     The prospectus for the Zero Notes is dated July 18, 2001.  (Prospectus,

Enron Corp. Zero Coupon Convertible Senior Notes Due 2021 (July 18, 2001), SlvC001165

at 166 (Ex. C247).)

133.     The Zero Notes were convertible at the holder's discretion into Enron

common stock.  (Prospectus, Enron Corp. Zero Coupon Convertible Senior Notes Due 2021

(July 18, 2001), SlvC001165 at 176 (Ex. C247).)

134.     The Zero Notes did not pay interest prior to maturity.  (Prospectus, Enron

Corp. Zero Coupon Convertible Senior Notes Due 2021 (July 18, 2001), SlvC001165 at 176

(Ex. C247).)

135.     The issue price of the Zero Notes was $655.24 per note.  (Prospectus,

Enron Corp. Zero Coupon Convertible Senior Notes Due 2021 (July 18, 2001), SlvC001165

at 176 (Ex. C247).)

136.     The Zero Notes would pay a lump sum of $1,000 at maturity.  (Prospectus,

Enron Corp. Zero Coupon Convertible Senior Notes Due 2021 (July 18, 2001), SlvC001165

at 176 (Ex. C247).)

137.     The date of maturity for the Zero Notes was February 7, 2021.

(Prospectus, Enron Corp. Zero Coupon Convertible Senior Notes Due 2021 (July 18, 2001),

SlvC001165 at 176 (Ex. C247).)

138.   The Zero Notes could be redeemed, at the holder's discretion, for $698.13 per note in lieu of stock on February 7, 2004.  (Prospectus, Enron Corp. Zero Coupon Convertible Senior Notes Due 2021 (July 18, 2001), SlvC001165 at 178-79 (Ex. C247).)

139.   Ms. Morwick testified that Silvercreek planned to hold its Zero Notes until February 2004, when there was a cash-only redemption.  (Morwick Dep. 462:15-24 (Ex. C48).)

140.   Silvercreek did not make a simultaneous short of Enron stock when it purchased the Zero Notes.  (*E.g.*, Trade Ticket (Oct. 24, 2001), SlvC005274 at 274  (Ex. C170).)

141.   The prospectus for the Zero Notes incorporated Enron's financial statements from 2000 and the first quarter of 2001.  (Prospectus, Enron Corp. Zero Coupon Convertible Senior Notes Due 2021 (July 18, 2001), SlvC001165 at 168 (Ex. C247).)

142.   The prospectus stated not to "assume the information contained in th[e] prospectus is accurate as of any date other than the date on the front of this prospectus". (Prospectus, Enron Corp. Zero Coupon Convertible Senior Notes Due 2021 (July 18, 2001), SlvC001165 at 167 (Ex. C247).)

**(d)     Silvercreek's 7% Note Strategy**

143.   The prospectus for the 7% Notes is dated August 10, 1999.  (Prospectus, Enron Corp. 7% Exchangeable Notes due July 31, 2002 (Aug. 10, 1999), SlvC000097 at 107 (Ex. C203).)

144.   The 7% Notes were Enron bonds that were exchangeable into common stock of Enron Oil & Gas Company ("EOG").  (Prospectus, Enron Corp. 7% Exchangeable Notes due July 31, 2002 (Aug. 10, 1999), SlvC000097 at 106 (Ex. C203).)

145.   Simultaneously with its purchase of 7% Notes, Silvercreek sold short the EOG common stock into which the 7% Notes were exchangeable; Silvercreek planned to hold the 7% Notes until maturity and cover the short with the EOG common stock it expected to

23

receive at maturity.  Silvercreek would then receive the interest payments on the 7% Notes, less its net cash outlay and the borrowing fees associated with maintaining the short.  (*See* Morwick Dep. 290:1-293:14, 340:10-24, 342:1-6; 359:18-22 (Ex. C48).)

146.    Ms. Morwick testified that this was "a highly leveraged strategy". (Morwick Dep. 641:23-642:4 (Ex. C48).)

147.    EOG was a former Enron entity that was spun off.  (Morwick Dep. 259:18-260:11 (Ex. C48).)

148.    Ms. Morwick testified that she knew that EOG "was a spin-out from Enron.  But as part of this transaction, it was no longer a key part of Enron's business." (Morwick Dep. 259:20-260:1 (Ex. C48).)

149.    Ms. Morwick testified that "at the time we were making the investment, the performance of EOG was not linked to Enron. . . .  Because they had sold all of their EOG shares."  (Morwick Dep. 260:12-20 (Ex. C48).)

150.    Ms. Morwick testified that the performance of EOG "would not correlate with the performance of Enron".  (Morwick Dep. 260:21-25 (Ex. C48).)

151.    The amount of common stock into which the 7% Notes were exchangeable depended on the price of EOG common stock at maturity of the 7% Notes. (Prospectus, Enron Corp. 7% Exchangeable Notes due July 31, 2002 (Aug. 10, 1999), SlvC000097 at 110 (Ex. C203).)

152.    The 7% Notes were exchangeable into a minimum of 0.8475 shares of EOG common stock per note.  (Prospectus, Enron Corp. 7% Exchangeable Notes due July 31, 2002 (Aug. 10, 1999), SlvC000097 at 106, 110 (Ex. C203).)

153.    The 7% Notes were exchangeable into 0.8475 shares of EOG common stock per note if the price of EOG common stock on the date of maturity was greater than $26.255.  (Prospectus, Enron Corp. 7% Exchangeable Notes due July 31, 2002 (Aug. 10, 1999), SlvC000097 at 110 (Ex. C203).)

154.    A holder of a 7% Note could receive more EOG common stock per note if the price of EOG common stock was lower on the date of maturity.  (Prospectus, Enron Corp. 7% Exchangeable Notes due July 31, 2002 (Aug. 10, 1999), SlvC000097 at 110 (Ex. C203).)

155.    If the EOG common stock price at maturity was between $22.250 and $26.255, the 7% Notes were exchangeable into "a fraction of a share of EOG common stock . . . equal to $22.250 divided by the EOG common stock market price at maturity".  (Prospectus, Enron Corp. 7% Exchangeable Notes due July 31, 2002 (Aug. 10, 1999), SlvC000097 at 110 (Ex. C203).)

156.    If the price of EOG common stock on the date of maturity was less than or equal to $22.250, the 7% Notes were exchangeable into one share of EOG common stock per note.  (Prospectus, Enron Corp. 7% Exchangeable Notes due July 31, 2002 (Aug. 10, 1999), SlvC000097 at 110 (Ex. C203).)

157.    Ms. Morwick testified that "one of the features of the convertible bond is that it converted into a minimum of 0.8475 EOG shares.  And if people had a negative view of EOG and thought it was going to go down, you would potentially get more shares".  (Morwick Dep. 372:15-21 (Ex. C48).)

158.    The prospectus for the 7% Notes incorporates certain Enron financial statements from 1998 through the first quarter of 1999.  (Prospectus, Enron Corp. 7% Exchangeable Notes Due July 31, 2002 (Aug. 10, 1999), SlvC000097 at 163 (Ex. C203).)

25

159.    The prospectus for the 7% Notes also contains selected information from Enron's financial statements from 1994 through 1998.  (Prospectus, Enron Corp. 7% Exchangeable Notes Due July 31, 2002 (Aug. 10, 1999), SlvC000097 at 126 (Ex. C203).)

160.    The prospectus states not to "assume the information contained in th[e] prospectus or in any other document incorporated by reference in this prospectus is accurate as of any date other than the date on the front of those documents".  (Prospectus, Enron Corp. 7% Exchangeable Notes Due July 31, 2002 (Aug. 10, 1999), SlvC000097 at 164 (Ex. C203).)

161.    The 7% Notes paid 7% annual interest quarterly.  (Prospectus, Enron Corp. 7% Exchangeable Notes Due July 31, 2002 (Aug. 10, 1999), SlvC000097 at 106 (Ex. C203).)

162.    The 7% Notes were mandatorily exchangeable at maturity.  (Prospectus, Enron Corp. 7% Exchangeable Notes Due July 31, 2002 (Aug. 10, 1999), SlvC000097 at 106 (Ex. C203).)

163.    Maturity for the 7% Notes was July 31, 2002.  (Prospectus, Enron Corp. 7% Exchangeable Notes Due July 31, 2002 (Aug. 10, 1999), SlvC000097 at 106 (Ex. C203).)

164.    The 7% Notes were not exchangeable prior to maturity.  (Prospectus, Enron Corp. 7% Exchangeable Notes Due July 31, 2002 (Aug. 10, 1999), SlvC000097 at 106 (Ex. C203).)

165.    The EOG shares into which the 7% Notes were exchangeable were not held in escrow for use at maturity of the 7% Notes.  (Prospectus, Enron Corp. 7% Exchangeable Notes due July 31, 2002 (Aug. 10, 1999), SlvC000097 at 137 (Ex. C203).)

166.    Because the EOG shares were not held in trust, if Enron went bankrupt prior to maturity, it was likely to be difficult for holders of 7% Notes to access the EOG shares.

(*See* Prospectus, Enron Corp. 7% Exchangeable Notes Due July 31, 2002 (Aug. 10, 1999),

SlvC000097 at 106 (Ex. C203); Morwick Dep. 127:20-128:21 (Ex. C48).)

167. Plaintiffs' damages expert, Gilbert Matthews, testified:

"Q. But certainly, the facts as they are, investors knew that in a
bankruptcy situation, they weren't getting the shares, because
Enron didn't even necessarily own them?

A. Right. Of course, yeah, if Enron was solvent, the fact that they
didn't necessarily own them would have—they would have been
obligated to buy them back. In effect, they would have been short
the shares and had to cover." (Matthews Dep. 181:12-24
(Ex. C43).)

**(e)     Timing of Silvercreek's October 2001 Purchases**

168. On August 14, 2001, Enron's CEO Skilling resigned. (Press Release,

Enron Corp., *Enron Announces Skilling Resignation; Lay Assumes President and CEO Duties*

(Aug. 14, 2001), Ex. 000000557 (Ex. C249).)

169. On October 16, 2001 Enron reported a $1 billion after-tax charge to its

third quarter 2001 earnings to recognize asset impairments, restructuring costs and losses for

certain investments. (Press Release, Enron Corp., *Enron Reports Recurring Third Quarter*

*Earnings of $0.43 Per Diluted Share; Reports Non-Recurring Charges of $1.01 Billion After-*

*Tax; Reaffirms Recurring Earnings Estimates of $1.80 for 2001 and $2.15 for 2002; and*

*Expands Financial Reporting* (Oct. 16, 2001), Ex. 000000568 (Ex. C253).)

170. Also on October 16, 2001, Moody's placed all of Enron's long term debt

obligations on review for downgrade. (Moody's Investors Services, *Moody's Places All Long*

*Term Debt Obligations of Enron Corp on Review for Downgrade; Senior Unsecured at Baa1*

*(Commercial Paper P-2 Confirmed, Not on Review*) (Oct. 16, 2001), ANARPT009057 at 107

(Ex. C236).)

171.    On October 18, 2001, Silvercreek purchased Zero Notes through Credit Suisse.  (Trade Ticket (Oct. 18, 2001), SlvC005297 at 300 (Ex. C165).)

172.    On October 19, 2001, Silvercreek purchased Zero Notes through Credit Suisse and through an entity other than Credit Suisse.  (Trade Ticket (Oct. 19, 2001), SlvC005294 at 294 (Ex. C204); Trade Ticket (Oct. 19, 2001), SlvC005297 at 297 (Ex. C165).)

173.    On October 22, 2001, Enron announced that the SEC had commenced an inquiry into Enron's accounting for certain related-party transactions.  (Press Release, Enron Corp., *Enron Announces SEC Request, Pledges Cooperation* (Oct. 22, 2001), Ex. 000000572 (Ex. C254).)

174.    Also on October 22, 2001, Silvercreek purchased Zero Notes through an entity other than Credit Suisse.  (Trade Ticket (Oct. 22, 2001), SlvC005290 at 290-91 (Ex. C166).)

175.    On October 23, 2001, Silvercreek purchased Zero Notes through entities other than Credit Suisse.  (Trade Ticket (Oct. 23, 2001), SlvC005284 at 284 (Ex. C168); Trade Ticket (Oct. 23, 2001), SlvC005280 at 280 (Ex. C167).)

176.    On October 24, 2001, Enron announced that Mr. Fastow was taking a leave of absence from Enron.  (Press Release, Enron Corp., *Enron Names Jeff McMahon Chief Financial Officer* (Oct. 24, 2001), Ex. 000000573 (Ex. C255).)

177.    Also on October 24, 2001, Silvercreek purchased Zero Notes through entities other than Credit Suisse.  (*E.g.*, Trade Ticket (Oct. 24, 2001), SlvC005274 at 274, 277 (Ex. C170).)

178.     Also on October 24, 2001, Silvercreek purchased 7% Notes through entities other than Credit Suisse.  (*E.g.*, Trade Ticket (Oct. 24, 2001), SlvC005431 at 431-33 (Ex. C171); Trade Ticket (Oct. 24, 2001), SlvC005458 at 458 (Ex. C171-1).)

179.     On October 25, 2001, Enron drew on committed lines of credit for cash liquidity in excess of $1 billion.  (Press Release, Enron Corp., *Enron Continues as Market-Maker of Choice, Says CEO Lay; Transaction Volume Shows Strength of Core Businesses; Company Draws Down Credit Facility To Address Investor Concerns* (Oct. 25, 2001), Ex. 000000574 (Ex. C256).)

180.     On October 25, 2001, Fitch placed Enron on negative credit watch.  (Fitch, Inc., *Fitch Puts Enron On Rating Watch Negative* (Oct. 25, 2001), ANARPT008855 at 899 (Ex. C234).)

181.     On October 25, 2001, Standard & Poor's downgraded Enron's outlook to negative.  (Standard & Poor's, *Ratings on Enron Corp. Affirmed.; Outlook to Negative* (Oct. 25, 2001), ANARPT009687 at 837 (Ex. C232).)

182.     On October 25, 2001, Silvercreek purchased Zero Notes through entities other than Credit Suisse.  (Trade Ticket (Oct. 25, 2001), SlvC005265 at 265 (Ex. C174); Trade Ticket (Oct. 25, 2001), SlvC005262 at 262 (Ex. C173).)

183.     On October 25, 2001, Silvercreek purchased 7% Notes through Credit Suisse and through entities other than Credit Suisse.  (Trade Ticket (Oct. 25, 2001), SlvC005423 at 423 (Ex. C177); *e.g.*, Trade Ticket (Oct. 25, 2001), SlvC005414 at 414 (Ex. C176).)

184.     On October 26, 2001, Egan-Jones lowered Enron's credit rating to below investment grade.  (Egan-Jones Ratings Co., *EJR Lowers Enron Corp: BBB- to BB- (S&P: BBB+)* (Oct. 26, 2001), SlvC002002 (Ex. C185).)

185.    On October 26, 2001, Silvercreek purchased Zero Notes through entities other than Credit Suisse.  (*E.g.*, Trade Ticket (Oct. 26, 2001), SlvC005268 at 268 (Ex. C188).)

186.    On October 26, 2001, Silvercreek purchased 7% Notes through entities other than Credit Suisse.  (*E.g.*, Trade Ticket (Oct. 26, 2001), SlvC005389 at 389 (Ex. C193).)

187.    On October 29, 2001, Moody's downgraded Enron's long term debt. (Moody's Investors Services, *Moodys Downgrades Enron Corp Long Term Debt Ratings (Senior Unsecured to Baa2) and Keeps Them Under Review for Downgrade; Places Enron's P-2 Commercial Paper Rating on Review for Downgrade* (Oct. 29, 2001), ANARPT009057 at 117 (Ex. C236).)

188.    On October 31, 2001, the SEC's inquiry into Enron's accounting became a formal investigation.  (Press Release, Enron Corp., *Enron Corp. Elects William Powers, Jr. to Board of Directors and Establishes Special Committee To Examine Related Party Transactions; SEC Changes Inquiry to Formal Investigation* (Oct. 31, 2001) (Ex. C257).)

189.    On October 31, 2001, Silvercreek purchased more Zero Notes through an entity other than Credit Suisse.  (Trade Ticket (Oct. 31, 2001), SlvC005257 at 257 (Ex. C192).)

190.    On November 1, 2001, Standard & Poor's lowered Enron's ratings and placed Enron on CreditWatch negative.  (Standard & Poor's, *Enron Corp.'s Ratings Lowered, Placed on CreditWatch Negative* (Nov. 1, 2001), ANARPT009687 at 839 (Ex. C232).)

191.    On November 5, 2001, Fitch lowered Enron's ratings and maintained a negative watch.  (Fitch, Inc., *Fitch Downgrades Enron To 'BBB-'; Maintains Rating Watch Negative* (Nov. 5, 2001), ANARPT008855 at 901 (Ex. C234).)

192.    On November 8, 2001, Enron announced a restatement of its financials for 1997 through 2001.  (Press Release, Enron Corp., *Enron Provides Additional Information About*

*Related Party and Off-Balance Sheet Transactions; Company To Restate Earnings for 1997-2001* (Nov. 8, 2001) (Ex. C259).)

193.    On November 8, 2001, Enron confirmed discussions with Dynegy regarding a possible acquisition of Enron.  (Press Release, Enron Corp., *Enron Confirms Discussions with Dynegy* (Nov. 8, 2001) (Ex. C258).)

194.    On November 9, 2001, Enron and Dynegy announced a merger agreement whereby Dynegy would acquire Enron.  (Press Release, Enron Corp., *Dynegy and Enron Announce Merger Agreement* (Nov. 9, 2001) (Ex. C260).)

195.    On November 28, 2001, Standard & Poor's, Moody's and Fitch downgraded Enron's debt to below investment grade.  (Fitch, Inc., *Fitch Downgrades Enron To 'CC'* (Nov. 28, 2001), ANARPT008855 at 911 (Ex. C234); Moody's Investors Services, *Moody's Downgrades Enron Corp's Long-Term Debt Ratings (Senior Unsecured to B2); Commercial Paper Confirmed at Not-Prime; Ratings Remain Under Review for Downgrade* (Nov. 28, 2001), ANARPT009057 at 127 (Ex. C236); Standard & Poor's, *Enron's Rating Cut to 'B-'; Doubt Cast on Dynegy Merger* (Nov. 28, 2001), ANARPT009687 at 879 (Ex. C232).)

196.    On November 28, 2001, Dynegy terminated the merger agreement with Enron.  (Press Release, Enron Corp., *Enron Announces Notification by Dynegy of Merger Termination; Credit Rating Downgraded; Takes Action To Preserve Core Franchise* (Nov. 28, 2001) (Ex. C262).)

197.    On November 28, 2001, Ms. Morwick purchased Zero Notes for her personal account.  (Morwick Dep. 45:4-12 (Ex. C48).)

198.     On December 2, 2001, Enron filed for bankruptcy.  (Enron Corp., *Enron Files Voluntary Petitions for Chapter 11 Reorganization; Sues Dynegy for Breach of Contract, Seeking Damages of at Least $10 Billion* (Dec. 2, 2001) (Ex. C263).)

**(f)     Silvercreek's Analysis of Enron Notes in 2000**

199.     Silvercreek first purchased 7% Notes in October 2000.  (Morwick Dep. 237:24-238:3 (Ex. C48).)

200.     Silvercreek simultaneously sold short the number of EOG shares into which the 7% Notes it had purchased were exchangeable.  (*E.g.*, Silvercreek II Ltd.—Historical Position, SlvC004890 (Ex. C206).)

201.     Silvercreek's October 2000 purchase of 7% Notes and short of EOG were closed out on October 23, 2001.  (Morwick Dep. 340:5-9 (Ex. C48).)

202.     Ms. Morwick described the analysis Silvercreek did prior to its investment in the 7% Notes in October 2000:

> "Q Any recollection of the amount of time or amount of work that was put into the analysis of the potential position?
>
> A We would have reviewed financial statements for the company. And in terms of seriously considering the investment, you know, the convertible characteristics would have to have been there in terms of return opportunity, being able to buy the convertible bond, sell the underlying equity. But certainly we read the prospectus at that point in time. We would have reviewed the financial statements, the 10K going back at least one or two years."
> (Morwick Dep. 241:14-242:2 (Ex. C48).)

203.     Ms. Morwick testified that at that time she "looked at the 10K, and in terms of financial information, the prospectus contained information covering '94 to '99 timeframe".  (Morwick Dep. 243:5-23 (Ex. C48).)

204.    Ms. Morwick testified that she "read the 1999 10K . . . [a]nd the 10Qs as well.  I can't recall for sure whether I read the 1998 10K."  (Morwick Dep. 244:14-24 (Ex. C48).)

205.    Ms. Morwick testified that she "read the prospectus, [she] reviewed the financial statements and the annual report.  [She] looked at press releases, you know, analysts' reports, just reviewed the information that was in the public realm related to the company."  (Morwick Dep. 243:5-13 (Ex. C48).)

206.    Ms. Morwick testified that Silvercreek "didn't speak with the [Credit Suisse equity] analysts.  We just read the research report."  (Morwick Dep. 545:21-24 (Ex. C48).)

207.    Ms. Morwick testified that when Silvercreek made the investment in the 7% Notes in 2000, she did not take into account any analysis of potential off-balance-sheet transactions that Enron may have engaged in.  (Morwick Dep. 250:16-20 (Ex. C48).)

208.    Ms. Morwick testified that she did not recall doing any analysis related to EOG in fall of 2000 "other than to familiarize [her]self with what the company did".  (Morwick Dep. 259:18-21 (Ex. C48).)

209.    Ms. Morwick, regarding Mr. Kittel's work, stated that she "c[ould]n't definitively testify as to what he did other than [she] kn[e]w he read the prospectus".  (Morwick Dep. 242:22-23 (Ex. C48).)

210.    Mr. Kittel testified that he did not recall what analysis, if any, he may have performed prior to the October 2000 purchase of 7% Notes.  (Kittel Dep. 144:2-8 (Ex. C49).)

211.    Mr. Kittel testified that he recalled reviewing the prospectus for the 7% Notes, but he did not know when he had reviewed it.  (Kittel Dep. 144:18-21 (Ex. C49).)

33

212.   Mr. Kittel's written prospectus review does not include analysis of Enron's financials.  (Kittel Dep. 150:1-14 (Ex. C49); Silvercreek Mgmt. Inc., Prospectus Review—Mandatory/Exchangeable, SlvC000097 at 104-05 (Ex. C203).)

213.   Ms. Morwick testified that Silvercreek earned a return in excess of 20 percent on the 7% Notes it held between October 2000 and October 23, 2001.  (Morwick Dep. 327:5-328:18, 336:4-9 (Ex. C48); Silvercreek II Ltd.—Historical Position, SlvC004890 at 890 (Ex. C206).)

214.   Ms. Morwick testified that Silvercreek's October 2000 purchase and simultaneous short was "one of these positions that worked out much better than we could have expected because a stock that—because the stock fell, in addition.  Q. Right.  You made a lot of money here.  A. It was a good return."  (Morwick Dep. 326:19-25 (Ex. C48).)

**(g)   Silvercreek's Analysis of Enron Notes in 2001**

**(i)   The Zero Notes**

215.   Ms. Morwick testified that she "first looked at the 'zeroes' as a potential investment when they were issued", in "February '01."  (Morwick Dep. 85:12-14, 443:13-16 (Ex. C48).)

216.   Ms. Morwick testified that she did not purchase the Zero Notes at that time because the potential return "[wa]sn't good enough" then.  (Morwick Dep. 443:13-16, 448:4-8, 450:8-11 (Ex. C48).)

217.   Ms. Morwick testified that, in early 2001, Silvercreek would not have invested in the Zero Notes at that time because "it only had a 6 percent return."  (Morwick Dep. 443:13-16, 448:18-20 (Ex. C48).)

218.   Ms. Morwick testified that she "revisited [the possibility of purchasing the Zero Notes] in the summertime [of 2001], just in terms of tracking [the Zero Notes]."  (Morwick Dep. 450:12-15 (Ex. C48).)

219.   Ms. Morwick testified that the Zero Notes at that time were "an interesting potential long bond investment" because "[t]he common stock price went down" and she decided that she would "continue to watch it".  (Morwick Dep. 450:12-451:2 (Ex. C48).)

220.   Ms. Morwick testified that the decrease in the Enron common stock price at that time made "the price of the bond . . . more attractive in terms of the return you could earn on the investment".  (Morwick Dep. 451:3-11 (Ex. C48).)

221.   Ms. Morwick first purchased the Zero Notes on October 18, 2001. (Silvercreek Mgmt. Inc., Trading History—Enron 0% Notes, SlvC005207 at 208-11 (Ex. C210).)

222.   Bloomberg messages between Silvercreek and Ms. Randell on October 18, 2001, related to that purchase are as follows:

   a.  At 2:29PM, a Credit Suisse trader, Mr. Colucci, messaged Ms. Randell, saying that there were 10 million Zero Notes available at a certain price.  (Sara Randell Bloomberg Messages (Oct. 18, 2001), CSFBLLC009881345 at 481 (Ex. C161) ("ENE0 10MM AT 58.875").)

   b.  At 2:45PM, Ms. Randell sent this same message, "ENE0 10MM AT 58.875", to at least 25 of her customers, including Ms. Morwick.  (Sara Randell Bloomberg Messages (Oct. 18, 2001), CSFBLLC009881345 at 487-489 (Ex. C161).)

   c.  Ms. Randell testified that this message was "a general Bloomberg blast". (Randell Dep. 26:20-27:3 (Ex. C47).)

35

     d.   At 2:50PM, Ms. Morwick messaged Ms. Randell to say she "WOULD BUY 3MM THERE".  (Sara Randell Bloomberg Messages (Oct. 18, 2001), CSFBLLC009881345 at 490-91 (Ex. C161).)

     e.   Within the same minute, Ms. Morwick wrote to Ms. Randell that Ms. Randell "CAN MAKE IT 4MM ENE".  (Sara Randell Bloomberg Messages (Oct. 18, 2001), CSFBLLC009881345 at 491 (Ex. C161).)

     f.   At 2:53PM, Ms. Randell tells Ms. Morwick that she  "BO[UGH]T 4000M AT 58 5/8".  (Sara Randell Bloomberg Messages (Oct. 18, 2001), CSFBLLC009881345 at 491 (Ex. C161).)

     g.   At 3:21PM, Ms. Morwick writes to Ms. Randell, "THANKS SARA – TO SETTLE WITH RBC DS".  (Sara Randell Bloomberg Messages (Oct. 18, 2001), CSFBLLC009881345 at 494 (Ex. C161).)

223.    Ms. Morwick testified that the Zero Notes "became a better investment" on October 18, 2001, because "Enron declined in value."  (Morwick Dep. 461:2-17 (Ex. C48).)

224.    Ms. Morwick testified that without the drop in Enron stock price in October 2001, she would not have made the Zero Notes purchases at that time.  (Morwick Dep. 467:3-6 (Ex. C48) ("Q. Without the drop in the stock price over this period, you wouldn't have made this investment at the time?  A. No, it's unlikely.").)

225.    When asked if her "decision in terms of the timing to invest in the Enron convertible bond was based on, in looking at the price, monitoring the price?", Ms. Morwick testified that her decision was based on "[m]onitoring the price."  (Morwick Dep. 463:12-24 (Ex. C48).)

226.    Ms. Morwick testified that her analysis of the Zero Notes focused on the bond price relative to the expected cash redemption in 2004.  (Morwick Dep. 462:25-463:3 (Ex. C48) ("Q.  So the analysis for you was pretty straightforward.  The bond price is X.  The cash redemption in 2004 is going to be Y?"  A. That's correct.").)

227.    Ms. Morwick testified that at the time Silvercreek purchased the Zero Notes in October 2001, she assessed whether the price of the Zero Notes was "right" and "where the bonds were trading" but she did "[n]ot [do] a lot" else before making the decision to invest "because . . . [she]'d done a fair bit of work in the past and was comfortable with the Enron credit."  (Morwick Dep. 460:19-24 (Ex. C48).)

228.    At a later deposition, Ms. Morwick testified:

"Q Okay.  The only written work product that you've produced in the litigation that reflects work that you've done is the prospectus summaries.  So on [October] 18th[, 2001] when you buy—I mean, I understand what you're saying, that you're drawing upon work that you've done over time?

A That's correct.

Q But what do you actually do that day?

A In terms of that day, primarily looked at the return on the investment.

Q So which is essentially a mathematical formula of plugging in the price and doing the cash flow analysis?

A That's right.  And I looked at current news.  . . . Is anything going on with the company?  Where is the common equity price trading?  What's going on with the company today?  Is anything happening with it? And then in terms of actually analyzing the potential return on that investment, I would have been looking at the price and measuring what the expected return was.

Q. Anything else you recall doing that day?

37

A I think that pretty much covers it.  Just going through the news."
(Morwick Dep. 771:9-772:8 (Ex. C48).)

229.	Ms. Morwick testified that when she said "going through the news", she

meant "through the Bloomberg information system.  So you call up the name, and you can look

at all of the press releases and news related to the company."  (Morwick Dep. 772:9-15

(Ex. C48).)

230.	Ms. Morwick testified that she was "confident that [she] would have done

that [on October 18, 2001]" because "[t]hat's my practice."  (Morwick Dep. 772:16-23

(Ex. C48).)

231.	Mr. Kittel testified that he did not recall doing "any work" in connection

with Silvercreek's purchase of the Zero Notes:

"Q Okay. Did you do any work in connection with the purchases
of the zeros?

A Not that I recall.

Q Did you read the prospectus of the zeros prior to October 26th?

A Not that I recall.

Q Do you recall having any discussions with Ms. Morwick about
the zeros?

A I do not recall.

Q Do you recall having any discussion with Enron about the zeros?

A I don't recall."  (Kittel Dep. 235:4-19 (Ex. C49).)

232.	Mr. Kittel testified that he did not recall having any discussions with

traders, salespersons or analysts at any investment banks regarding the Zero Notes.  (Kittel Dep.

235:4-19 (Ex. C49) ("Q Do you recall having any discussion with any investment banks about

the zeros, either traders, salespersons, analysts?  A I don't recall.").)

233.    Ms. Morwick testified that on October 18, 2001, Ms. Randell "highlight[ed] the Enron zero coupon bonds as an investment opportunity".  (Morwick Dep. 398:18-399:15 (Ex. C48).)

234.    Ms. Morwick testified that Ms. Randell was one of several analysts who "identified this is a very good investment opportunity.  Strong company.  You know, bit of noise in the markets currently, but, you know, very strong credit."  (*See* Morwick Dep. 392:1-11, 400:7-24 (Ex. C48).)

235.    Ms. Morwick testified that she "understood[]" that Ms. Randell said that the Zero Notes were "an attractive yield upon good credit" but "d[id]n't recall the specific . . . words".  (Morwick Dep. 457:16-458:8 (Ex. C48).)

236.    Ms. Morwick further testified that she could not "[w]ith certainty attribut[e] a detailed statement to [Ms. Randell]".  (Morwick Dep. 400:14-24 (Ex. C48).)

237.    At a later deposition, Ms. Morwick testified that, on the call she testified about from October 18, 2001, Ms. Randell "wasn't expressing her view [as to Enron's creditworthiness], no.  She was highlighting [the Zero Notes] as an investment opportunity that would make sense for us.  . . . Based on our investment strategy and the price."  (Morwick Dep. 776:2-9 (Ex. C48).)

238.    Ms. Morwick testified that

"Q . . . Do you have any basis for belief that Ms. Randell was trading on non-public information with you during this period on Enron?

A I don't know what Sara[] personally knew or didn't know.  I think she believed that Enron was a solid credit.

Q Do you have any reason to think that that belief was not genuine on her part?

39

A I don't have a reason to believe that.  Certainly, First Boston was recommending this investment as a good investment.  I don't know specifically what they—what the analysts or what Sara[] knew or didn't know at that point in time.  They were communicating to us that it was a good investment.  Now, it was a buy, certainly, in terms of the equity and not a company that was going to go bankrupt.  So I would expect that she believed that.  I was going to say it's certainly clear that individuals at First Boston did know more about the company.

Q . . . [B]ut you have no basis for belief that Sarah Randell had access to information that those individuals had access to?

A That's correct."  (Morwick 869:12-870:11 (Ex. C48).)

239.    Ms. Morwick testified that aside from what she testified to remembering as a conversation on October 18, 2001 where Ms. Randell "highlight[ed] the Enron zero coupon bonds as an investment opportunity", Ms. Morwick did not recall having any conversations about the Zero Notes with Ms. Randell from October 18 through October 31, 2001.  (Morwick Dep. 398:18-399:15, 543:22-544:5 (Ex. C48).)

240.    Ms. Morwick testified that, "through October 31st", she "didn't speak with anyone else from CSFB".  (Morwick Dep. 544:9-15 (Ex. C48).)

241.    Ms. Randell testified that she did not "recall any communications other than communications over Bloomberg with Louise [Morwick] about Enron during October 2001."  (Randell Dep. 30:3-6 (Ex. C47).)

242.    Ms. Randell testified that it was "[r]arely" her "practice to speak with [Ms. Morwick] by telephone".  (Randell Dep. 30:7-9 (Ex. C47).)

243.    Ms. Randell testified that generally she "would forward whatever [pricing and availability] the traders sent me to whatever customers I covered".  (Randell Dep. 32:25-33:5 (Ex. C47).)

40

244.     Ms. Morwick testified that Ms. Randell "may have brought other securities [than Enron] to [Silvercreek's] attention" and that "[i]t's typical for a salesperson to bring ideas to [customers]".  (Morwick Dep. 541:6-14 (Ex. C48).)

245.     Ms. Morwick testified that salespeople "bring [Silvercreek] ideas, and we do our own work and assess the opportunities."  (Morwick Dep. 674:1-5 (Ex. C48).)

246.     On October 19, 2001, Ms. Morwick again purchased Zero Notes through Ms. Randell.  (Sara Randell Bloomberg Messages (Oct. 19-22, 2001), CSFBLLC009881515 at 640-41, 657-58 (Ex. C164).)

247.     Bloomberg messages between Silvercreek and Ms. Randell on October 19, 2001 related to Silvercreek's Zero Notes purchases on that date are as follows:

a.  At 8:24AM, Ms. Randell sent Ms. Morwick and Mr. Kittel pricing for various bonds, including the Zero Notes (ENE0).  (Sara Randell Bloomberg Messages (Oct. 19-22, 2001), CSFBLLC009881515 at 532, 536 (Ex. C164).)

b.  At 12:39PM, Ms. Morwick asked Ms. Randell if she "HA[D] LEVELS FOR GLW 0, ENE 0 AND HOT 0 (BOTH)".  (Sara Randell Bloomberg Messages (Oct. 19-22, 2001), CSFBLLC009881515 at 640-41 (Ex. C164).)

c.  At 12:41PM, Ms. Randell responded to Ms. Morwick:  "GLW 50 1/2 – 51 1/2. ENE 57 1/8 – 5/8".  (Sara Randell Bloomberg Messages (Oct. 19-22, 2001), CSFBLLC009881515 at 641 (Ex. C164).)

d.  At 1:11PM, Ms. Morwick wrote to Ms. Randell, "WOULD BUY 4MM ENE 0 UP TO 57.625 – OUTRIGHT".  (Sara Randell Bloomberg Messages (Oct. 19-22, 2001), CSFBLLC009881515 at 657 (Ex. C164).)

41

e.  Within the same minute, Ms. Randell responded to Ms. Morwick saying,
"THAT'S DONE.  THANK YOU."  (Sara Randell Bloomberg Messages
(Oct. 19-22, 2001), CSFBLLC009881515 at 657 (Ex. C164).)

f.  At 1:12PM, Ms. Morwick responded saying, "THANKS SARA – TO SETTLE
WITH RBC DS".  (Sara Randell Bloomberg Messages (Oct. 19-22, 2001),
CSFBLLC009881515 at 657-58 (Ex. C164).)

248.   At a later deposition, when asked whether she called "any telephone
conversation that you had with Ms. Randell about [the October 19, 2001] purchase", Ms.
Morwick testified that she "d[id]n't recall specifics of the conversation.  I tended to talk to Sara[]
daily. . . .  It's likely that I talked to her about it, but I don't recall specifics of the conversation."
(Morwick Dep. 861:7-14 (Ex. C48).)

249.   When asked if she would "have been talking to [Ms. Randell] about Enron
daily during this period", Ms. Morwick testified "[n]ot necessarily, no."  (Morwick Dep. 861:15-
17 (Ex. C48).)

250.   Ms. Morwick testified that she did not recall any telephone conversation
about Enron with Ms. Randell on October 19, 2001.  (Morwick 860:10-15 (Ex. C48).)

251.   At a later deposition, Ms. Morwick testified that she "believe[d] [she]
talked to Sara[] [Randell]" on October 22, 2001, by phone, about Enron.  (Morwick Dep. 788:24-
789:9 (Ex. C48).)

252.   When Ms. Morwick was pointed to a Bloomberg message she sent
Ms. Randell on October 22, 2001, and to which no response was reflected in the Bloomberg
messages, she testified that "[i]t [wa]s possible" that Ms. Randell had responded to
Ms. Morwick's request by phone, but that she "d[id]n't recall specifically that there was a phone

42

conversation"—she testified that "it [wa]s likely, but [she] c[ould]n't say that there was."
(Morwick Dep. 863:1-25 (Ex. C48).)

253.    Ms. Morwick testified that on October 22, 2001, "[w]e continued to follow the news with regard to the company [Enron]."  (Morwick Dep. 781:17-21 (Ex. C48).)

254.    Ms. Morwick testified that she continued to buy Enron debt throughout this period because "the decline in the equity price . . . was . . . creating the investment opportunity."  (Morwick Dep. 464:21-465:1 (Ex. C48).)

**(ii)     The 7% Notes**

255.    On October 24, 2001, Silvercreek began buying 7% Notes and shorting EOG common stock.  (*See* Morwick Dep. 340:10-24, 342:1-6; 359:18-22 (Ex. C48).)

256.    Ms. Morwick testified that she "d[id]n't recall talking about the exchangeable notes as an investment [with Credit Suisse].  [She] d[id]n't think that's an investment opportunity that, you know, that they had highlighted for [Silvercreek]."  (Morwick Dep. 398:18-399:15 (Ex. C48).)

257.    Ms. Morwick also testified that she "d[id]n't recall specifically talking to Sara [Randell] about the Enron 7 percent notes."  (Morwick Dep. 546:5-8 (Ex. C48).)

258.    Ms. Morwick testified that she began reestablishing that position because the spread had decreased significantly:

> "Q.  Is it fair to say that without doing the math, that the next day when the spread, the conversion premium goes from 70 cents to 50 cents, your projected returns will increase?
>
> A.  It's much higher.  Correct.
>
> Q.  Okay.  Now, you made these trades because the spread decreased so much; correct?
>
> A.  That's correct.

43

Q.  Okay.  And on October 23rd you were selling because the spread, and October 24th you were buying because the spread had essentially been cut in half?

A. That's correct.

Q. That's why you bought when you bought?

A. Because the return—we sold because the return for the nine-month investment was not attractive on October 23rd, but you could make the purchase on October 24th and 25th at a return that was much more attractive."  (Morwick Dep. 359:10-360:3 (Ex. C48).)

259.    With respect to the 7% Notes, Ms. Morwick testified that maybe "an hour, an hour and half" passed between the time the 7% Notes came to her attention and the time she made her first purchase of them on October 24, 2001.  (Morwick Dep. 402:5-11 (Ex. C48) ("Q. Okay. Once it was brought to your attention in connection with ultimately deciding—First of all, do you know how much time past in a day when it first came to your attention to when you made your first purchase?  A. It may have been an hour, an hour and a half.").)

260.    Ms. Morwick testified that during that time, she "went and pulled or had the file pulled to just revisit some of the terms.  We just sort of reviewed the prospectus, so we reviewed the prospectus that morning just to make sure that it was fresh in our mind".  (Morwick Dep. 402:22-25 (Ex. C48).)

261.    Ms. Morwick testified that she did not conduct "detailed work" on EOG stock in October 2001 when she sold EOG short.  (Morwick Dep. 435:6-14 (Ex. C48) ("[Q.] Did you do any analysis of EOG stock at that time in order to form a view as to whether your short position was a good position to be in or not? A. Not detailed work, no.  I was probably more fundamentally positive on the company in general, but we just don't want to take the risk.").)

262.    Mr. Kittel did not "recall performing any analysis of Enron's financial statements "prior to . . . October 24, 2001".  (Kittel Dep. 64:17-22 (Ex. C49).)

263.     Mr. Kittel did not "recall performing any written analysis of Enron's financial statements" "[p]rior to October 26, 2001".  (Kittel Dep. 66:25-67:3 (Ex. C49).

264.     Mr. Kittel did not recall performing "any written analysis whatsoever related to Silvercreek's Enron investments" from "the day [he] started [at Silvercreek] through October 26, 2001", other than "the prospectus review" and a "recovery-type analysis" he prepared "post-October 26th".  (Kittel Dep. 67:17-69:2 (Ex. C49).

265.     Mr. Kittel testified that he did not remember any communications with sales persons or traders or analysts about buying and/or selling Enron securities.  (Kittel Dep. 316:23-317:1 (Ex. C49) ("Q. Okay. Do you remember any communications with sales persons or traders or analysts about buying and/or selling Enron securities? A. I do not recall.").)

266.     Ms. Morwick testified the following regarding debt analyst reports:

"Q. What did the debt analysts say about buying fixed-income instruments in this time period?

A. We looked primarily at the equity research reports.

Q. You were buying debt; right?

A. We were buying debt. We are looking at the company as a whole. We were buying a triple B plus credit, a stable rating by S&P, highly recommended by all the analysts in the street.

Q. I understand that.

A. If the equity has value, our debt is not at risk.

Q. If you are buying debt, why don't you read debt analyst reports?

A. We do our own analysis."  (Morwick Dep. 376:5-19 (Ex. C48).)

267.     On October 25, 2001, Silvercreek purchased 7% Notes (EXG) through Credit Suisse.  Bloomberg communications related to that purchase are as follows:

a. At 9:49 a.m., Mr. Colucci, a trader at Credit Suisse, messaged Ms. Randell, "EXG PFD WE HAVE 80K AT +.05 ON A FULL".  (Sara Randell Bloomberg Messages (Oct. 25, 2001), CSFBLLC009882350 at 2240 (Ex. C172).)

b. At 9:52 a.m., Ms. Randell sent this same message, "EXG PFD WE HAVE 80K AT +.05 ON A FULL", to 15 customers, including Silvercreek.  (Sara Randell Bloomberg Messages (Oct. 25, 2001), CSFBLLC009882350 at 2241-2243 (Ex. C172).)

c. At 10:18 a.m., Mr. Kittel asked Ms. Randell, "WHERE ARE YOU ON EXG?".  (Sara Randell Bloomberg Messages (Oct. 25, 2001), CSFBLLC009882350 at 2250 (Ex. C172).)

d. At 10:20 a.m., Ms. Randell wrote to Ms. Morwick and Mr. Kittel, writing "EXG PFD WE HAVE 80K AT +.05 ON A FULL".  (Sara Randell Bloomberg Messages (Oct. 25, 2001), CSFBLLC009882350 at 2250 (Ex. C172).)

e. At 10:41 a.m., Ms. Randell told Ms. Morwick and Mr. Kittel that "THE EXG TRADED AT +50".  (Sara Randell Bloomberg Messages (Oct. 25, 2001), CSFBLLC009882350 at 2257 (Ex. C172).)

f. At 11:00 a.m., Ms. Morwick wrote to Ms. Randell, "WOULD BUY 200K EXG AT .50".  (Sara Randell Bloomberg Messages (Oct. 25, 2001), CSFBLLC009882350 at 2261 (Ex. C172).)

g. At 11:07 a.m., Ms. Randell responded to Ms. Morwick that she "HAD A SELLER OF 80K AND TRADED ALL OF IT", and asked Ms. Morwick if she could "WORK AN ORDER".  (Sara Randell Bloomberg Messages (Oct. 25, 2001), CSFBLLC009882350 at 2261 (Ex. C172).)

46

h.   At 11:21 a.m., Ms. Morwick answered "SURE" to Ms. Randell.  (Sara Randell
     Bloomberg Messages (Oct. 25, 2001), CSFBLLC009882350 at 2264 (Ex. C172).)

i.   At 11:23 a.m., Mr. Colucci wrote to Ms. Randell, "EXG PRFD WE TRADED
     160K AT +0.5 WE CAN PAY IT FOR 200K".  (Sara Randell Bloomberg
     Messages (Oct. 25, 2001), CSFBLLC009882350 at 2266 (Ex. C172).)

j.   At 11:25 a.m., Ms. Randell wrote the same message, "EXG PRFD WE TRADED
     160K AT +0.5 WE CAN PAY IT FOR 200K" to various customers.  (Sara
     Randell Bloomberg Messages (Oct. 25, 2001), CSFBLLC009882350 at 2267-69
     (Ex. C172).)

k.   At 11:30 a.m., Ms. Randell told Ms. Morwick that "THERE [WA]S NOW A +57
     BID FOR EXG ON THE FLOOR".  (Sara Randell Bloomberg Messages (Oct. 25,
     2001), CSFBLLC009882350 at 2270 (Ex. C172).)

l.   At 1:08 p.m., Ms. Randell wrote to Ms. Morwick and Mr. Kittel that "EXG
     TRADING +55 CENTS NOW".  (Sara Randell Bloomberg Messages (Oct. 25,
     2001), CSFBLLC009882350 at 2307-2308 (Ex. C172).)

m.   At 2:04 p.m, Ms. Randell told Ms. Morwick and Mr. Kittel that Silvercreek had
     "BO[UGH]T 50,000 EXG AT 31.48 AND SS 42.400 COMMON AT 36.55
     THANK YOU . . . STILL WORKING 150K TO BUY FOR YOU."  (Sara
     Randell Bloomberg Messages (Oct. 25, 2001), CSFBLLC009882350 at 2326
     (Ex. C172).)

n.   At 2:38 p.m., Ms. Randell told Ms. Morwick and Mr. Kittel that Silvercreek had
     "BO[UGH]T 175,000 EXG AT 31.4443 AND SS 148.300 AT 36.5143 ... LVS

25K PFD TO BUY FOR YOU.  THANK YOU."  (Sara Randell Bloomberg

Messages (Oct. 25, 2001), CSFBLLC009882350 at 2332 (Ex. C172).)

o.   At 4:04 p.m., Ms. Randell told Ms. Morwick and Mr. Kittel the "FINAL

REPORT ON EXG" was that Silvercreek had "BO[UGH]T 175,000 EXG AT

31.4443 AND SS 148.300 COMMON AT 36.5143.  THANK YOU!"  (Sara

Randell Bloomberg Messages (Oct. 25, 2001), CSFBLLC009882350 at 2349

(Ex. C172).)

p.   At 4:05 p.m., Ms. Morwick responded to Ms. Randell, "THANK SARA—TO

SETTLE WITH RBC DS".  (Sara Randell Bloomberg Messages (Oct. 25, 2001),

CSFBLLC009882350 at 2349 (Ex. C172).)

268.    At her later deposition, Ms. Morwick testified that on October 25, 2001

"[w]e were assessing all of the historical financial information and all of the news coming out

related to the company.  And we were assessing what was going on in the market."  (Morwick

Dep. 828:13-18 (Ex. C48).)

269.    Ms. Morwick testified that she did not look at prices of other Enron bonds,

the prices of Enron credit default swaps or Enron's EDF (expected default frequency) score.

(Morwick Dep. 805:15-18, 830:3-23 (Ex. C48).)

> "Q Okay.  If you had known that the EDF score of the company
> had increased threefold over the period leading up to October 24th
> and that the EDF score was now equivalent to a company trading
> at junk status, I mean, would that be information that would have
> been relevant to your investment decisions?
>
> A I'm not familiar with the EDF score.  We base our information
> on the financial position of the company.
>
> Q The historical financial position of the company?
>
> A And the current information related to the company.  They had

just come out with their third-quarter results.  So their third-quarter results reflected a very strong business.  They expressed confidence that they were going to earn $1.80 in earnings per share for that year.  I think even higher than that for 2002.  So the base financial information that was released only, what, a couple of weeks, a week or so prior, was very positive related to this company."  (Morwick Dep. 830:3-23 (Ex. C48).)

270.    Ms. Morwick testified that on October 16, 2001, she had "looked at the earnings announcement and the news related to [Enron].  But [she] wasn't looking at the Enron zeros as an investment opportunity on that day."  (Morwick Dep. 753:4-21 (Ex. C48).)

271.    Ms. Morwick also testified that she "d[id]n't know if [she] looked at [the Altman Z score (a measure of bankruptcy risk)] for Enron [before opening the 7% Notes position on October 24, 2001]".  (Morwick Dep. 803:7-22 (Ex. C48).)

272.    On October 26, 2001, Charles Gassenheimer told Ms. Randell that "EGAN JONES LOWERS ENRON BELOW INVESTMENT GRADE . . . CITES LACK OF DISCLOSURE ON ENE'S PARTNERSHIPS.  ALSO BELIEVES ENE WILL NEED $3 TO $4 BILLION IN CAPITAL, EXCLUDING THE REPLACEMENT OF ITS $2 BILLION COMMERCIAL PAPER FACILITY."  (Sara Randell Bloomberg Messages (Oct. 26, 2001), CSFBLLC009882502, at 502 (Ex. C184).)

273.    On October 26, 2001, Ms. Randell sent Ms. Morwick and Mr. Kittel a Bloomberg message that "EGAN JONES HAS A CREDIT REPORT OUT ON ENE TODAY"; Mr. Kittel asked for a copy, and she responded "OK . . . CHARLES SENDING IT".  (Sara Randell Bloomberg Messages (Oct. 26, 2001), CSFBLLC009882502, at 506-507 (Ex. C184).)

274.    Silvercreek received a fax from Credit Suisse on October 26, 2001 of the Egan Jones report.  (Egan-Jones Ratings Company, *EJR Lowers Enron Corp:  BBB- to BB+ (S&P:  BBB+)* (Oct. 26, 2001), SlvC002002 (Ex. C185).)

275.    Also on October 26, 2001, Ms. Morwick responded to Ms. Randell, also asking for a copy of the Egan-Jones report; Ms. Randell responded "SENT IT TO ROB". (Louise Morwick, Bloomberg Messages (Oct. 26, 2001), SlvC013909 at 947-48 (Ex. C189).)

276.    When asked whether she recalled that there was an Egan Jones report on October 26th, Ms. Morwick testified that "We were dialoguing with Sara[] [Randell] over the course of these days about Enron. She certainly knew that we were interested in the company. So she was clearly highlighting information for us." (Morwick Dep. 868:7-13 (Ex. C48).)

277.    Mr. Kittel testified that Ms. Morwick had asked him to do some additional analysis of Enron on October 26, 2001. (Kittel Dep. 296:1-3, 413:10-17 (Ex. C49).)

278.    Ms. Morwick testified that on October 26, 2001, she asked Mr. Kittel to do "[a]dditional work on the credit of Enron and break-up value and asset value of the business". (Morwick Dep. 848:3-5 (Ex. C48).)

279.    Ms. Morwick testified that she "wanted Rob [Kittel] to take a look at the asset value of the business and the breakout value of the business and go through with a fine-tooth comb and see if he could come across anything that changed our view, make sure we weren't missing something, just go back and double check everything". (Morwick Dep. 840:12-21 (Ex. C48).)

280.    Mr. Kittel testified that he did not recall having "ever investigated Enron's [debt] in this detail" prior to October 26, 2001. (Kittel Dep. 296:1-7 (Ex. C49).)

281.    On October 26, 2001, Mr. Kittel received an email at 4:32 p.m. from Eric Kalamares at Bank of America, with the subject "Ene debt.xls" (Production of Robert Kittel's Documents (Oct. 19, 2005), RKITTEL0002 at '0041-0042 (Ex. C207).)

282.    Ms. Morwick testified that, in the afternoon on October 26, 2001, Silvercreek sold some 7% Notes.  (Morwick Dep. 405:8-15 (Ex. C48).)

283.    Mr. Kittel performed some analysis of Enron over the weekend of October 27 and 28, 2001.  (Kittel Dep. 306:20-23 (Ex. C49); Enron Corp. Balance Sheet Breakdown, SlvC001991 (Ex. C129).)

284.    Mr. Kittel testified the following with respect to sources of information for his analysis that weekend:

"Q. What was the source of your information or sources?

A. As I indicated, I don't recall definitively what the sources, but it looks to me like financial statements of Enron as at June 30th, 2001. I would have -- I believe there -- the debt information, part of the debt information would have come from the e-mail that I received the day before.

Q. M'hmm.

A. And part of it would have come from a review of the 10K, which is where a number of the asset list information came from, as well."  (Kittel Dep. 307:19-308:5 (Ex. C49).)

285.    Mr. Kittel could not recall performing a similar analysis prior to October 27, 2001.  (Kittel Dep. 308:9-12 (Ex. C49) ("Q. . . . Have you ever done—had you ever done an analysis similar to this prior to October 27th, 2001 with respect to Enron?  A. Not that I recall.").)

286.    Mr. Kittel testified that he did not recall making an inquiry to anyone concerning a level of Enron's off balance sheet debt prior to October 27, 2001.  (Kittel Dep. 309:4-7 (Ex. C49).)

287.    On October 28, 2001, Mr. Kittel listened to an Enron conference call from October 23, 2001.  (Handwritten Notes (Oct. 28, 2001), SlvC001986 (Ex. C205); Kittel Dep. 305:6-16 (Ex. C49).)

288.     Mr. Kittel testified that, also on October 28, 2001, he recalled "reviewing the prospectus for the sevens, again, in reviewing the notes, the prospectus for the zeros and looking at financial statements and other information, other public information and analyst reports regarding the company [Enron]."  (Kittel Dep. 153:23-154:6, 305:6-16 (Ex. C49).)

289.     Mr. Kittel had no specific recollection of which financial statements he reviewed at that time.  (Kittel Dep. 305:6-16 (Ex. C49) ("Q. Do you have any specific recollection of which financial statements you reviewed?  A. No, I do not.").)

290.     Ms. Morwick testified that Silvercreek sold Zero Notes on October 31, 2001.  (Morwick Dep. 467:9-468:3 (Ex. C48).)

### (h)    Bankruptcy Risk

291.     Ms. Morwick testified that "[a]ny outright long convertible bond investment is exposed to bankruptcy risk."  (Morwick Dep. 137:12-13 (Ex. C48).)

292.     Ms. Morwick testified that "The sole risk, the only risk in that Enron 7 percent investment, was a bankruptcy of the $25 billion company in less than nine months." (Morwick Dep. 129:8-10 (Ex. C48).)

293.     Ms. Morwick testified that "Based on the public information of the company, I viewed that [bankruptcy] risk as an impossibility if the financial information was correct."  (Morwick Dep. 129:11-16 (Ex. C48).)

294.     Ms. Morwick testified that Silvercreek "didn't hedge [that bankruptcy risk]".  (Morwick Dep. 129:17-22 (Ex. C48).)

295.     Mr. Matthews testified that the 7% Notes were "exchangeable into the stock—into the stock of a different issuer" which "add[ed] one additional risk factor, which [wa]s bankruptcy. . . .  Because in the event of bankruptcy, there's no reason to assume that the bankruptcy of the issue that you were—of the issuer, you know, would have any impact on the

stock into which it's exchangeable.  As in this case, the bankruptcy of Enron did not affect Enron Oil & Gas."  (Matthews Dep. 117:2-12 (Ex. C43).)

296.    Ms. Morwick testified that, with respect to the 7% Notes, Silvercreek had been "long in Enron senior bond, short underlying shares of EOG.  EOG, the price stayed flat. The bonds went to zero.  . . . The bankruptcy of Enron meant that we could not get these EOG shares that we expected to get upon maturity of the bond.  We would not be able to cover our short.  So we covered our short.  That gave rise to a small loss or gain.  We're left with bonds that were now worth 5 cents on the dollar."  (Morwick Dep. 680:19-681:6 (Ex. C48).)

297.    Ms. Morwick testified that "Since sustaining the Enron loss, we don't do positions where you can be exposed to a bankruptcy and have a loss of that magnitude. . . .  You don't invest in a bond like the Enron bond that exchanges into shares of a different company where you can't get those shares for sure."  (Morwick Dep. 127:20-128:2 (Ex. C48).)

**C.    Credit Suisse's Relevant Involvement with Enron**

298.    Credit Suisse was one of many investment banks that provided investment banking services to Enron.  (Rock Rpt. ¶ 24 (Ex. C1).)

299.    Credit Suisse was "not adviser[] of [Enron] for accounting related matters."  (Haratunian Dep. 76:6-7 (Ex. C36).)

300.    Credit Suisse did not provide any accounting advisory or audit services to Enron, and had no role in determining Enron's accounting methodologies or treatments.  (Rock Rpt. ¶ 24 (Ex. C1).)

301.    Credit Suisse was not responsible for Enron's financial reporting or disclosure.  (Rock Rpt. ¶ 24 (Ex. C1).)

302.    Andrew Fastow testified that he "did not make CSFB" or "any lending bank of Enron" aware of certain Enron "transactions that were improper" because, if he did, Credit Suisse and those banks "would stop lending":

> "Q.  . . . You talked about the kimono; someone mentioned that, right?
>
> A.  Uh-huh.
>
> Q.  Right?
>
> A.  I used that phrase.
>
> Q.  There was -- there was secrets or skeletons or ugly details behind the kimono that, as a significant lender to Enron, you did not want CSFB to see?
>
> A.  There certainly were transactions that were improper, in which I participated, that I did not make CSFB aware of.
>
> Q.  And, in fact, you didn't want any lending bank of Enron to see the full kimono, including CSFB, because they would stop lending to you if they did, right?
>
> A.  I think that's a fair characterization."  (Fastow Dep. 1093:10-25 (Ex. C44).)

**(a)     Specific Transactions**

**(i)     Share Trust Transactions**

**a)     Marlin**

303.    In October 1998, Enron acquired Wessex Water Plc for approximately $2.4 billion (the "Wessex Acquisition").  (Presentation to Moody's Investors Service re: Marlin Water Trust & Marlin Water Trust II (May 2001), MDY 007390 at 394 (Ex. C126).)

304.    In December 1998, Enron created the Marlin structure.  Through the Marlin structure, Enron funded Atlantic Water Trust, a special purpose vehicle that repaid a portion of the financing for the Wessex Acquisition.  (Marlin Water Trust Offering Mem. (Dec. 8, 1998), CSFBLLC 005710245 at 245 (Ex. C213).)

54

305.    Marlin was funded through two offerings.  The first offering closed on December 17, 1998, raising $1.024 billion of debt and $125 million of equity ("Marlin I"). (Marlin Water Trust Offering Mem. (Dec. 8, 1998), CSFBLLC 005710245 at 257, 350 (Ex. C213); Indenture (Dec. 17, 1998), CSFBLLC 005710498 at 502 (Ex. C59); Marlin Water Trust Am. & Restated Cert. Purchase Agmt. (Dec. 17, 1998), CSFBLLC 005711004 at 005 (Ex. C60).)  The second offering closed on July 19, 2001, raising $475 million and €515 million to repay the remaining Marlin I notes ("Marlin II").  (Marlin Water Trust II Offering Mem. (July 12, 2001), CSFBLLC 000033573 at 573 (Ex. C242); Suppl. Indenture (July 19, 2001), CSFBLLC 005712569 at 573 (Ex. C136).]

306.    DLJ was a joint bookrunning manager of Marlin I and an initial purchaser of Marlin I notes.  (Marlin Water Trust Offering Mem. (Dec. 8, 1998), CSFBLLC 005710245 at 245, 406 (Ex. C213).)

307.    Credit Suisse was a joint bookrunning manager of Marlin II and an initial purchaser of Marlin II notes.  (Marlin Water Trust II Offering Mem. (July 12, 2001), CSFBLLC 000033573 at 573, 689 (Ex. C242).)

308.    On October 12, 1998, the details of the Wessex Acquisition and the Marlin I offering were presented to Standard & Poor's.  (Presentation to Moody's Investors Service re: Project Marlin (Oct. 12, 1998), MDY 002451 at 459 (Ex. C55).)

309.    The presentation to Standard & Poor's described certain "trigger" events. (Presentation to Moody's Investors Service re: Project Marlin (Oct. 12, 1998), MDY 002451 at 470 (Ex. C55).)  The presentation stated that "Note Trigger Events will require issuance by [the] Voting Trust" (controlled by Enron) of "Enron Mandatorily Convertible Preferred Stock" if there is "a downgrading of Enron senior debt to below investment grade" and "a decline in

Enron's common stock price by 30%". (*Id.*) The presentation further stated that "[u]pon a Note Trigger Event, Marlin will cause the voting trustee to liquidate the Enron Mandatorily Convertible Preferred Stock". (*Id.*)

310. Ronald Barone, the "primary analyst . . . on the Marlin rating evaluation" at Standard & Poor's, attended Enron's representation regarding the Marlin I offering. (Barone Dep. 790:15-21 (Ex. C23).)

311. Following the presentation, Mr. Barone requested from Enron the "offering memorandum" and "term sheet" for the Marlin I offering. (Barone Dep. 795:22-24 (Ex. C23).) Mr. Barone testified that Standard & Poor's practice was to review those materials "[t]o make sure the transaction accurately reflected what was disclosed to us in a presentation meeting". (*Id.* at 797:6-21.)

312. On October 12, 1998, the details of the Wessex Acquisition and the Marlin I offering were presented to Moody's. (Presentation to Moody's Investors Service re: Project Marlin (Oct. 12, 1998), ECv001275132 at 132 (Ex. C54).) The presentation described the "trigger" events. (*Id.* at 148.)

313. Stephen Moore, a lead analyst covering Enron at Moody's, testified that in rating the Marlin I bonds he "reviewed the documents that were part of the transaction", "had discussions with Enron", "had discussions with their investment bankers, DLJ" and reviewed "whatever other sources of information were pertinent to the analysis". (Moore Dep. 442:25-443:13, 454:7-8 (Ex. C46).) Mr. Moore testified that, "to the extent that [he] had a comment that [he] thought needed to be communicated to Enron or to the investment bankers involved, [he] communicated that comment". (*Id.* at 444:13-19.)

314.   John Diaz, a Managing Director at Moody's responsible for the energy sector, testified that he "knew about the . . . Marlin triggers back when those transactions were entered into because Moody's had rated them".  (Diaz Dep. 12:18-22, 260:25-261:7 (Ex. C22).)

315.   On October 20, 1998, Enron and the Marlin Trust acknowledged to DLJ that DLJ cannot "advise on accounting, legal, tax or regulatory matters affecting Enron or the [Marlin Trust] and agree[d] that they will engage and rely upon their own advisers in that regard."  (Ltr. from DLJ (Oct. 20, 1998), CSFBLLC 000030687 at 688 (Ex. C56).)

316.   In a memorandum dated October 30, 1998, Arthur Andersen analyzed the Wessex Acquisition, Marlin structure and Marlin I offering and concluded that, based on the applicable accounting standards, "Enron would not consolidate Marlin" and related entities. (Mem. from C. Bass, et al. re: "Enron Corp. - Wessex Acquisition-Joint Venture Structure" (Oct. 30, 1998), AASDTEX005421354 at 357-60 (Ex. C57).)

317.   On December 1, 1998, Standard & Poor's issued its rating for the Marlin I offering.  (Standard & Poor's, "Marlin Water Trust & Marlin Water Capital Rtd By S&P" (Dec. 1, 1998), ANARPT009281 (Ex. C212).)

318.   Moody's also rated the Marlin I notes.  (Moody's, "Marlin Water Trust" (Mar. 2, 2001), MDY 010719-21 (Ex. C237).)

319.   On December 8, 1998, the Enron Board of Directors approved the Marlin I offering.  (Minutes, Mtg. of Bd. of Directors, Enron Corp. (Dec. 8, 1998), ECLX000005785 at 789-95 (Ex. C58).)

320.   On December 8, 1998, Arthur Andersen provided to DLJ a comfort letter regarding the Marlin I offering.  (Ltr. from Arthur Andersen to DLJ and BT Alex. Brown Inc. (Dec. 8, 1998), CSFBLLC 000021850-4 (Ex. C199).)

321.    On December 17, 1998, Vinson & Elkins provided to DLJ a legal opinion regarding the Marlin I offering, concluding that Enron's disclosures "provide a fair summary" of the transaction documents and "are accurate in all material respects".  (Ltr. from Vinson & Elkins to DLJ and BT Alex. Brown Inc. (Dec. 17, 1998), EVE 1718279 at 780 (Ex. C62).)

322.    On March 31, 1999, Enron disclosed the structure of the Wessex Acquisition in its Form 10-K, including that the acquisition would be "accounted for using the equity method", and that "Wessex is held through Azurix Corp.", an "unconsolidated affiliate", along with the existence of the trigger mechanisms:

> "During 1998, Enron, through wholly-owned subsidiaries, acquired . . . Wessex Water Plc (Wessex) . . . . These acquisitions are being accounted for using the equity method . . . .
>
> 9. UNCONSOLIDATED AFFILIATES. . . .  In October 1998, Enron, through a wholly-owned subsidiary, acquired Wessex, which provides water supply and wastewater services in southern England, for approximately $2.4 billion.  Wessex is held through Azurix Corp. . . . .  In December 1998, Enron completed financial restructuring of Enron's ownership interest in Wessex, reducing its interest to 50%. . . .  In connection with the financings, Enron committed to cause the sale of its convertible preferred stock, with the number of common shares issuable upon conversion determined based on future common stock prices, if certain debt obligations of the related entities acquiring such interests are defaulted upon, or in certain events, including, among other things, Enron's credit ratings falling below specified levels."  (Enron 1998 Form 10-K (Mar. 31, 1999), Item 14 at Notes 2, 9 (Ex. C216).)

323.    In May 2001, the details of the Marlin II offering were presented to Moody's.  (Presentation to Moody's Investors Service re: Marlin Water Trust and Marlin Water Trust II (May 2001), MDY 007390 at 390-91 (Ex. C126).)  The presentation again disclosed the note triggers.  (*Id.* at 407.)

324.    In May 2001, the details of the Marlin II offering were presented to Standard & Poor's.  (Presentation to Standard & Poor's Investor Service re: Marlin Water

Trust & Marlin Water Trust II (May 2001), CSFBLLC 000030604 at 604-05 (Ex. C125).)  The

presentation described the "trigger" events.  (*Id.* at 628.)

      325.    Todd Shipman, who was the "primary analyst" covering Enron at

Standard & Poor's at the time of the Marlin II offering, testified that he was "aware of [the

Marlin II triggers] at the time that [he was] doing [his] credit analyses for Enron".  (Shipman

Dep. 292:11-14, 464:25-465:11 (Ex. C38).)

      326.    On June 13, 2001, the Enron Board of Directors approved the Marlin II

offering.  (Minutes, Special Mtg. of Bd. of Directors, Enron Corp. (June 13, 2001), ENE

0000001584 at 599-605 (Ex. C128).)

      327.    In a memorandum dated July 2001, Arthur Andersen analyzed the Marlin

structure and Marlin II offering and concluded that it "believe[s] that Enron's position is

reasonable and would not require consolidation" of the Atlantic Water Trust in the event that the

Voting Trust guarantee is increased by no more than $360 million.  (Mem. from D. Duncan, et

al. re: "Marlin Water Trust – Refinancing" (July 2001), AASDTEX002232756 at 760

(Ex. C131).)

      328.    On July 9, 2001, Standard & Poor's issued its rating for the Marlin II

offering.  (Standard & Poor's, "Marlin Water Trust II's Senior Secured Notes Rated 'BBB'"

(July 9, 2001), SP 076138 (Ex. C241).)

      329.    On July 11, 2001, Enron and Marlin Water Trust II acknowledged to

Credit Suisse that Credit Suisse cannot "advise on accounting, legal, tax or regulatory matters

affecting Enron or [Marlin Water Trust II] and agree[d] that they will engage and rely upon their

own advisers in that regard."  (Ltr. from Enron (July 11, 2001), CSFBLLC 000030694 at 694

(Ex. C132).)

330.    On July 12 and 19, 2001 Arthur Andersen provided comfort letters to Credit Suisse regarding the Marlin II offering.  (Ltr. from Arthur Andersen to Credit Suisse, et al. (July 12, 2001), CSFBLLC 005712214 at 214 (Ex. C133); Ltr. from Arthur Andersen to Credit Suisse, et al. (July 19, 2001), CSFBLLC 005713039 at 039 (Ex. C137).)

331.    On July 12, 2001, Moody's issued its rating for the Marlin II offering. (Moody's, "Moody's Assigns Baa1 Rating to Marlin Water Trust II and Marlin Water Capital Corp. II" (July 12, 2001), MDY 18399 at 399 (Ex. C243).)

332.    On July 18, 2001, Fitch issued its rating for the Marlin II offering.  (Fitch, "Fitch Rts Marlin Water Trust II Sr Secured Notes Due 2003, 'BBB'" (July 18, 2001), ANARPT008872 at 872 (Ex. C245).)

333.    Fitch also rated the Marlin II offering.  (Fitch Ratings, "Fitch Downgrades Marlin Water Trust II and Osprey Trust I" (Nov. 12, 2001), ANARPT008905 (Ex. C261).)

334.    On July 19, 2001, Vinson & Elkins provided a legal opinion to Credit Suisse regarding the Marlin II offering, concluding that Enron's disclosures "provide a fair summary" of the transaction documents and "are accurate in all material respects.  (Ltr. from Vinson & Elkins to Credit Suisse, et al. (July 19, 2001), EVE 1737000 at 001, 003 (Ex. C135).)

335.    Kimberly Scardino, an Enron audit manager at Arthur Andersen who assisted on the Marlin transactions, testified that it was her "belief at the time [that] Enron's accounting for Marlin I or the Marlin Trust was appropriate", that her "understanding was . . . that the accounting for Marlin Water Trust II was appropriate" and that she does not believe that "there [is] anything that [she] know[s] today . . . would lead [her] to change either of those two conclusions".  (Scardino Dep. 18:1-22, 948:8-16, 1095:17-1096:15 (Ex. C20).)

60

336.    Arthur Andersen did not identify Marlin as one of the 39 transactions for which it contended it was "the victim of fraud, deceit, misrepresentations, or concealment . . . with respect to [its] rendering of professional services".  (Arthur Andersen LLP's Resp. & Objs. to Lead Pl.'s Second Set of Interrogs. (Dec. 9, 2005), Resp. No. 4 (Ex. C276).)

337.    Mark Spradling, a partner at Vinson & Elkins who was a lead attorney representing Enron on the Marlin transactions, testified, "I never identified an issue that I thought was . . . illegal or fraudulent in the Marlin transactions".  (Spradling Dep. 546:1-11, 550:20-23 (Ex. C35).)

338.    Plaintiffs' accounting expert, Moshe Levitin, testified that he has "no opinion that -- that Enron accounted for the Marlin transaction improperly".  (Levitin Dep. 383:5-8 (Ex. C40).)

339.    Plaintiffs' accounting expert, D. Paul Regan, testified that he has "no opinion that the Marlin transactions were improperly accounted".  (Regan Dep. 148:14-17 (Ex. C37).)

### b)    Firefly

340.    In July 1998, Enron acquired a controlling interest in Elektro Eletricidade e Servicos S.A. ("Elektro") for approximately $1.3 billion (the "Elektro Acquisition").  (Firefly Trust Conf. Info. Mem. (Feb. 2, 1999), CSFBLLC 005531808 at 821 (Ex. C66).)

341.    In December 1998, Enron created the Firefly structure, issuing $415 million of bank debt and $60 million of equity.  (Flow of Funds Mem. (Dec. 30, 1998), CSFBLLC 006016374 at 374 (Ex. C64).)  Through the Firefly structure, Enron funded the Firefly Trust, a special purpose vehicle that repaid a portion of the financing for the Elektro

Acquisition.  (*Id.*; Firefly Trust Conf. Info. Mem. (Feb. 2, 1999), CSFBLLC 005531808 at 821

(Ex. C66).)

        342.    DLJ, along with Chase Securities and BT Alex. Brown, provided the bank

debt for Firefly.  (Firefly Cap. Commitment Ltr. (Dec. 17, 1998), CSFBLLC 006015926 at 926

(Ex. C61).)  DLJ also was a co-arranger, co-underwriter and documentation agent.  (*Id.*; Senior

Loan Agmt. (Dec. 30, 1998), CSFBLLC 006015492 at 492 (Ex. C63).)

        343.    In a memorandum dated July 16, 1998, Arthur Andersen analyzed Firefly

and concluded that the transaction "would meet the requirements . . . to qualify for

non-consolidation at the date of acquisition."  (Mem. from C. Bass, et al. re: "Temporary

Control-Elektra Acquisition" (July 16, 1998), AA-EX00447367 at 371 (Ex. C53).)

        344.    On December 8, 1998, the Enron Board of Directors approved Firefly and

the Elektro Acquisition.  (Minutes, Mtg. of Bd. of Directors, Enron Corp. (Dec. 8, 1998),

ECLX000005785 at 795-802 (Ex. C58).)

        345.    In a memorandum dated January 19, 1999, Arthur Andersen again

analyzed Firefly and again concluded that Firefly did not need to be consolidated, because

"Enron is not issuing equity with a guaranteed return" and "Enron is guaranteeing the Firefly's

debt, but that only occurs in the event of certain contingencies occuring."  (Mem. from C. Bass,

et al. re: "Enron International. - Elektro Acquisition - Subsequent Joint Venture Structure"

(Jan. 19, 1999), AA-EX00220756 at 764 (Ex. C65).)

        346.    On March 31, 1999, Enron disclosed the Elektro Acquisition in its

Form 10-K, including that the acquisition would be "accounted for using the equity method" and

that "Enron's interest in Elektro" would be held by "Jacare Electrical Distribution Trust", an

"unconsolidated affiliate":

> "During 1998, Enron, through wholly-owned subsidiaries,
> acquired Elektro-Eletricidades e Servicos S.A. (Elektro) . . . .
> These acquisitions are being accounted for using the equity method
> . . . .
>
> 9. UNCONSOLIDATED AFFILIATES . . . . In August 1998,
> Enron, through a wholly-owned subsidiary, completed the
> acquisition of a controlling interest in Elektro, Brazil's sixth largest
> electricity distributor, for approximately $1.3 billion. . . . Enron's
> interest in Elektro is held by Jacare Electrical Distribution Trust."
> (Enron 1998 Form 10-K (Mar. 31, 1999), Item 14 at Notes 2, 9
> (Ex. C216).)

Enron also disclosed that the debt was subject to "trigger" events that would "cause the sale of

[Enron's] convertible preferred stock" if "among other things, Enron's credit ratings [fell] below

specified levels":

> "In connection with the financings, Enron committed to cause the
> sale of its convertible preferred stock, with the number of common
> shares issuable upon conversion determined based on future
> common stock prices, if certain debt obligations of the related
> entities acquiring such interests are defaulted upon, or in certain
> events, including, among other things, Enron's credit ratings
> falling below specified levels."  (*Id.* at Note 9.)

347.     On March 30, 2000, Enron disclosed in its Form 10-K that it had

"consolidated Jacare effective January 1, 1999":

> "In December 1998, Enron financially closed the Elektro financial
> restructuring, reducing its interest in Jacare to 51%.  Following the
> decision by Enron to acquire additional interests in Elektro, Enron
> consolidated Jacare effective January 1, 1999. . . . As a result of the
> consolidation, as of January 1, 1999, Enron's investment in
> unconsolidated affiliates decreased by approximately $450 million
> and minority interests increased by approximately $890 million."
> (Enron 1999 Form 10-K (Mar. 30, 2000), Item 14 at Note 2
> (Ex. C224).)

348.     Edward Osterberg, a tax partner at Vinson & Elkins who assigned a

Vinson & Elkins attorney to lead Firefly, testified that he "do[es]n't recall thinking there was

anything improper about Project Firefly" and "do[es]n't have any recollection of anyone at

63

Vinson & Elkins telling [him] there was anything improper about Firefly".  (Osterberg Dep. 26:6-14, 194:18-195:18, 196:3-5 (Ex. C32).)

349.    Arthur Andersen did not identify Firefly as one of the 39 transactions for which it contended it was "the victim of fraud, deceit, misrepresentations, or concealment . . . with respect to [its] rendering of professional services".  (Arthur Andersen LLP's Resp. & Objs. to Lead Pl.'s Second Set of Interrogs. (Dec. 9, 2005), Resp. No. 4 (Ex. C276).)

350.    Plaintiffs' accounting expert, Moshe Levitin, testified that he has "no opinion that the Firefly transaction was accounted for improperly".  (Levitin Dep. 384:2-5 (Ex. C40).)

### c)    Osprey

351.    In September 1999, Enron created the Osprey structure.  Through the Osprey structure, Enron funded Whitewing, a special purpose vehicle that purchased assets from Enron.  (Osprey Trust Am. & Restated Trust Agmt. (Sept. 24, 1999), CSFBLLC 005705486 at 489-90) (Ex. C90).)

352.    Osprey was financed through three offerings.  The first Osprey offering closed on September 24, 1999, raising $1.4 billion of debt and $100 million of equity ("Osprey I").  (Osprey Trust Offering Mem. (Sept. 16, 1999), CITINEWBY 00251701 at 710 (Ex. C218).)  The second Osprey offering closed on July 12, 2000, raising $70 million of additional equity ("Osprey II").  (Am. No. 1 to Participation Agmt., 7/10/00, E 195890 at 896 (Ex. C111).)  The third Osprey offering closed on October 5, 2000, raising $750 million and €315 million of additional debt and $50 million of additional equity ("Osprey III").  (Osprey Offering Mem. (Sept. 28, 2000), CSFBLLC 000025828 at 840, 842 (Ex. C228).)

353.    DLJ was a joint bookrunning manager of Osprey I and Osprey III. (Osprey Trust Offering Mem. (Sept. 16, 1999), CITINEWBY 00251701 at 701 (Ex. C218); 2000 Osprey Offering Mem. (Sept. 28, 2000), CSFBLLC 000025828 at 828 (Ex. C228).)

354.    DLJ was a co-placement agent for the equity in Osprey I, Osprey II and Osprey III.  (Engagement Ltr. (Sept. 16, 1999), CSFBLLC 005707601 at 601 (Ex. C87) (Osprey I); Fees Ltr. (July 14, 2000), CSFBLLC 005707622 (Ex. C112) (Osprey II); Engagement Ltr. (Sept. 28, 2000), CSFBLLC 000036851 at 851 (Ex. C115) (Osprey III).)

355.    Credit Suisse co-managed Osprey III.  (Osprey Offering Mem. (Sept. 28, 2000), CSFBLLC 000025828 at 828 (Ex. C228).)

356.    On September 16, 1999, Enron and the Osprey Trust acknowledged to DLJ that DLJ cannot "advise on accounting, legal, tax or regulatory matters affecting Enron or the [Osprey Trust] and agree[d] that they will engage and rely upon their own advisers in that regard."  (Engagement Ltr. (Sept. 16, 1999), CSFBLLC 005707601 at 602 (Ex. C87).)  On September 28, 2000, Enron and the Osprey Trust repeated that acknowledgment.  (Engagement Ltr. (Sept. 28, 2000), CSFBLLC 000036851 at 851 (Ex. C115).)

357.    On August 20, 1999, the details of the Osprey structure and the Osprey I offering were presented to Standard & Poor's.  (Presentation to Standard and Poor's, Project Condor (Aug. 20, 1999), SP019097 at 120-21 (Ex. C86).)

358.    The presentation to Standard & Poor's included discussion of the "trigger" events.  (Presentation to Standard and Poor's, Project Condor (Aug. 20, 1999), SP019097 at 120-21 (Ex. C86).)  The presentation stated that "Note Trigger Events will cause a remarketing of the Mandatorily Convertible Preferred Stock" if there is "a downgrading of Enron

senior debt to below Baa3 by Moody's or below BBB- by Standard & Poor's" and "a decline in Enron's common stock price to below $22 for three consecutive trading days".  (*Id.*)

359.    Todd Shipman, who "in the beginning of 2000" became the "primary analyst" covering Enron at Standard & Poor's, testified that he was "aware" of the Osprey note triggers "before October 2001".  (Shipman Dep. 28:3-6, 464:16-18 (Ex. C38).)

360.    On September 16, 1999, Standard & Poor's issued its rating for the Osprey I offering.  (Standard & Poor's, "Osprey Trust's $1.4 Billion Notes 'BBB'" (Sept. 16, 1999), SP 055878 at 878 (Ex. C219).)

361.    Fitch also rated the Osprey I offering.  (Fitch Ratings, "Fitch Downgrades Marlin Water Trust II and Osprey I" (Nov. 12, 2001), ANARPT008905 at 905 (Ex. C261).)

362.    John Diaz, a Managing Director at Moody's responsible for the energy sector, testified that he "knew about the Osprey . . . triggers back when those transactions were entered into because Moody's had rated them".  (Diaz Dep. 12:18-22, 260:25-261:7 (Ex. C22).)

363.    On September 16, 1999, Jonathan Yellen (a Credit Suisse employee) forwarded to a number of other Credit Suisse employees a Dow Jones news article regarding Standard & Poor's rating of Osprey I.  Wesley Jones (a Credit Suisse employee) responded directly to Mr. Yellen, stating that "Osprey is a vehicle enabling Enron to raise disguised debt which appears as equity on Enron's balance sheet" and that "Osprey serves the added purpose for Enron of being an off-balance-sheet parking lot for certain assets".  (Email from J. Yellen re: "enron osprey" (Sept. 17, 1999), CSFBCO 005107202 (Ex. C88).)  At the time these emails were written in 1999, DLJ and Credit Suisse were separate and independent entities, and Credit Suisse did not work on Osprey I.  (*See* Press Release, Credit Suisse, Credit Suisse Group to acquire DLJ – a leading U.S. investment bank and financial services provider (Aug. 30, 2000),

66

https://www.credit-suisse.com/corporate/en/articles/media-releases/10601-200008.html

(Ex. C226); Osprey Trust Offering Mem. (Sept. 16, 1999), CITINEWBY 00251701 at 701

(Ex. C218).)

364.   On September 17, 1999, the Enron Board of Directors approved the

Osprey structure.  (Minutes, Special Mtg. of Bd. of Directors, Enron Corp., (Sept. 17, 1999),

ENE 0000001024 at 026-033 (Ex. C89).)

365.   On September 24, 1999, Vinson & Elkins provided a legal opinion

regarding the Osprey I offering, concluding that Enron's disclosures "provide a fair summary" of

the transaction documents and "are accurate in all material respects".  (Ltr. from Vinson &

Elkins to DLJ (Sept. 24, 1999), EVE 54093 at 094 (Ex. C91).)  DLJ was an addressee.  (*Id.*

at 093.)

366.   Ronald Astin, the Vinson & Elkins partner with "primary responsibility

for assuring that the [Osprey] transaction was documented appropriately", testified that he "did

not know of any violation of any law, that [he] was aware, that applied, that was implicated in

the Osprey transaction."  (Astin Dep. 1005:17-18, 1067:9-11, 1068:1-3 (Ex. C30).)

367.   On November 15, 1999, Enron disclosed in its Form 10-Q the Osprey I

offering and Whitewing structure—including that Whitewing was "no longer consolidated by

Enron":

> "In March 1999, an Enron controlled joint venture, Whitewing
> Associates, L.P. (Whitewing), that held 250,000 shares of Enron
> Series A Junior Convertible Preferred Stock (Series A Preferred
> Stock) was amended to allow, among other things, control to be
> shared equally between Enron and the third party investor.
> Consequently, Whitewing's financial statements are no longer
> consolidated by Enron, resulting in an increase in Enron's
> investment in unconsolidated affiliates of approximately $500
> million, an increase in preferred stock of $1,000 million and a
> decrease in minority interests of $500 million.  In September 1999,

> Enron entered into a series of transactions that resulted in the
> exchange of all outstanding shares of Enron Series A Preferred
> Stock held by Whitewing for 250,000 shares of Enron Mandatorily
> Convertible Junior Preferred Stock, Series B (Series B Preferred
> Stock) with a liquidation value of $1,000 million." (Enron Form-
> 10-Q (Nov. 15, 1999) at Part I, Item 1 Note 5 (Ex. C220).)

368. In a memorandum dated March 10, 2000, Arthur Andersen analyzed the

Osprey and Whitewing structures and concluded that "Whitewing LP initially qualifies as an

unconsolidated joint venture". (Mem. from D. Duncan, et al. re: "Creations and Subsequent

Activities of Whitewing LP" (Mar. 10, 2000), a0015273 at 276 (Ex. C106).)

369. On March 30, 2000, Enron disclosed in its Form 10-K the existence and

consequences of certain "trigger" events, specifically that "Enron could be obligated, under

certain circumstances, to deliver additional shares of common stock or Series B Preferred Stock

to Whitewing":

> "In September 1999, Enron entered into a series of transactions
> that resulted in the restructuring of Whitewing, including the
> exchange of all outstanding shares of Series A Preferred Stock held
> by Whitewing for 250,000 shares of Enron Mandatorily
> Convertible Junior Preferred Stock, Series B (Series B Preferred
> Stock) . . . . In, addition, Enron entered into a Share Settlement
> Agreement under which Enron could be obligated, under certain
> circumstances, to deliver additional shares of common stock or
> Series B Preferred Stock to Whitewing for the amount that the
> market price of the converted Enron common shares is less than
> $28 per share." (Enron 1999 Form 10-K (March 30, 2000),
> Item 14 at Note 9 (Ex. C224).)

370. In May 2000, a detailed summary of the Osprey and Whitewing structures

was presented to Fitch. (Presentation to Fitch IBCA: Project Condor (May 2000), CSFBLLC

005707623 at 623, 629-31 (Ex. C109).)

371. On October 2, 2000, Moody's updated its rating of the Osprey offerings.

(Moody's, "Opinion Update, Osprey Trust" (Oct. 2, 2000), MDY 26150 at 150 (Ex. C229).) The

Moody's update described the stock trigger mechanisms and stated that "[i]n the event of a

severe downturn in Enron's fortunes leading to a trigger of the notes, the value of the merchant assets, should the converts and Enron equity not be sufficient to pay the now $2.14 billion in notes, is expected to decline as well due to high correlation to Enron's markets." (*Id.*)  The update further stated that "[t]he recent issuance of Osprey II moved the stock price trigger to $59.78 to equalize the trigger of the new issuance with the original issuance which share security." (*Id.*)

372.    In a memorandum dated November 7, 2001, Arthur Andersen, "in connection with [Enron's] analysis of potential restatement items", "reconsidered whether Whitewing should be consolidated", and concluded that it "believe[s] it to be appropriate for Enron to not consolidate Whitewing."  (Mem. from D. Duncan re: "Whitewing Analysis" (Nov. 7, 2001), AASDTEX001041134 at 135 (Ex. C195).)  Debra Cash, a partner on Arthur Andersen's Enron audit engagement team and co-author of the memorandum, testified that she "agreed with that conclusion at the time" and is "not aware of any reason" "to believe that that conclusion would not be correct today".  (*Id.*; Cash Dep. 23:3-14, 873:25-874:10 (Ex. C13).)

373.    Kate Agnew, a staff auditor at Arthur Andersen who was resident in Enron's offices, testified that she never "form[ed] the belief that . . . Whitewing, Condor or Osprey were being used by Enron for illegal, fraudulent or improper purposes", nor did she recall "ever hear[ing] anybody express any concerns or reservations about whether Enron was using Whitewing or Condor for illegal, fraudulent or improper purposes" nor is she "aware of any facts relating to Whitewing/Condor that [she] believe[s] would lead Andersen to change any of the accounting conclusions that it reached concerning Whitewing/Condor".  (Agnew Dep. 35:3-6, 459:12-21, 460:4-9 (Ex. C45).)

374.    Plaintiffs' accounting expert, Moshe Levitin, testified that he has "[n]o opinion that that -- the Osprey transactions were accounted for improperly".  (Levitin Dep. 383:12-15 (Ex. C40).)

375.    Plaintiffs' accounting expert, D. Paul Regan, testified that he has no "opinion that [the Osprey] transactions were improperly accounted for by Enron".  (Regan Dep. 146:7-12 (Ex. C37).)  Mr. Regan further testified that he "do[es]n't have the opinion that any transaction involving Whitewing was improperly accounted for by Enron".  (*Id.* at 146:14-17.)

### (ii)    LJM Transactions

### a)    LJM1/Rhythms

376.    In June 1999, Andrew Fastow met with Credit Suisse employees to discuss a proposal to invest in a limited partnership, which would enter into a transaction to hedge the Rhythms stock held by Enron using put options.  (Call Rpt. by R. Jeffe (June 8, 1999), CSFBLLC 005725132 at 132 (Ex. C69); Mem. from R. Jeffe, et al. (June 22, 1999), CSFBLLC 000005024 (Ex. C73).)

377.    On or around June 21, 1999, Mr. Fastow formed LJM1 (also known as LJM Cayman), a limited partnership, to execute the Rhythms hedge transaction with Enron. (LJM Cayman, L.P., Stmt. by General Partner (June 21, 1999), CSFBLLC 000010814 at 815, 817 (Ex. C70).)

378.    The general partner of LJM1 was controlled and managed by Mr. Fastow. The general partner of LJM1 was LJM Partners, L.P.  (LJM Cayman, L.P., Stmt. by Gen. Partner (June 21, 1999), CSFBLLC 000010814 at 815 (Ex. C70).)  The general partner of LJM Partners, L.P. was LJM Partners, LLC.  (LJM Partners, L.P., Stmt. by General Partner (June 21, 1999), CSFBLLC 000010825 at 826 (Ex. C71).)  Mr. Fastow was the sole managing member of LJM Partners, LLC and sole limited partner of LJM Partners, L.P. until mid-2001, when he sold his

partnership interest to Michael Kopper.  (Ltd. Liab. Co. Agmt. of LJM Partners, LLC (June 25, 1999), CSFBLLC 000010900 at 900 (Ex. C74); Ltr. Agmt. between LJM Partners, LLC & A. Fastow (June 21, 1999), CSFBLLC 000010827-8 (Ex. C72); Mem. from A. Ogunlesi, et al. (July 19, 2001), CSFBLLC 005718492 (Ex. C138).)

379.    ERNB Ltd. ("ERNB"), an affiliate of Credit Suisse, was one of the two limited partners of LJM1.  (Am. & Restated Agmt. of Ltd. P'ship of LJM Cayman, L.P. (June 30, 1999), CSFBLLC 000010950 at 989 (Ex. C76).)  ERNB invested $7.5 million of capital into LJM1.  (*Id.*; Mem. from R. Furst (July 8, 1999), CSFBLLC 000010778 at 778 (Ex. C81).)

380.    As a limited partner of LJM1, ERNB could "not participate in the conduct of the business of" LJM1, nor could it "participate in the management, direction or operation of the affairs of" LJM1.  (Am. & Restated Agmt. of Ltd. P'ship of LJM Cayman, L.P. (June 30, 1999), CSFBLLC 000010950 at 974 (Ex. C76).)

381.    On or around June 30, 1999, Enron entered into a derivative transaction with LJM1 through LJM1's subsidiary, LJM Swap Sub, L.P. ("Swap Sub"), to purchase put options on 5,393,258 shares of Rhythms stock (the "Rhythms Hedge").  As part of the transaction, Enron transferred to LJM1 6,755,394 restricted shares of Enron common stock. (LJM1 Subsidiary Consolidation, AA-EX00269245 at 245 (Ex. C67).)  In return, Enron received a $64 million promissory note from LJM1 and put options on 5,393,258 shares of Rhythms stock from Swap Sub.  (Am. & Restated Ltd. Recourse Promissory Note (June 30, 1999), CSFBLLC 000011095 at 095 (Ex. C78) ($50 million note); Am. & Restated Ltd. Recourse Promissory Note (June 30, 1999), CSFBLLC 000011099-101 (Ex. C79) ($14 million note); Confirmation (June 30, 1999), CSFBLLC 000011129 at 130 (Ex. C80).)

382.     As a limited partner of LJM1, ERNB was a counterparty to Enron in the Rhythms Hedge.  (Confirmation (June 30, 1999), CSFBLLC 000011129 at 133 (Ex. C80).)

383.     Robert Jeffe testified that, before ERNB invested in LJM1, he "had a pretty full discussion" with Mr. Fastow regarding the "conflict issues" raised by his control over LJM1.  (Jeffe Dep. 126:18-23 (Ex. C11).)  Mr. Jeffe asked Mr. Fastow whether there would be "adequate controls in place", whether "the board [was] aware of it", whether "the outside auditors, had . . . looked at the transaction" and "how . . . Vinson & Elkins fe[lt] about it".  (*Id.* at 126:21-24, 127:4-8.)  Mr. Fastow informed him that the Board of Directors, Arthur Andersen and Vinson & Elkins all signed off on the deal.  (*Id.* at 244:16-24.)

384.     Adebayo Ogunlesi testified that he asked Jeffrey Skilling "to confirm that Enron's management was aware of the [Rhythms] transaction, that the board was aware of the transaction, that their outside advisors were aware of the transaction" and "of the fact that Fastow was going to be the general partner of the [LJM1] partnership".  (Ogunlesi Dep. 127:19-128:2, 129:17-19 (Ex. C15).)  Mr. Skilling "confirm[ed] he was aware . . . [and] that Mr. Lay was aware, that the board was aware, and that Enron's outside advisors were also aware, had signed off on it, had gotten comfortable and signed off on the transactions".  (*Id.* at 129:16-130:3; *see* Mem. from R. Jeffe, et al. (June 22, 1999), CSFBLLC 000005024 (Ex. C73).)

385.     Richard Ivers testified that he "met with Mr. Skilling" in June 1999 and informed Mr. Skilling that "as a condition of the [LJM1] deal [Credit Suisse] expected to have some kind of an authorization from the board" of Enron.  (Ivers Dep. 439:18-440:20 (Ex. C14).)  Mr. Ivers "asked [Mr. Skilling] if the board was fully informed and approved of the transaction" and informed him that Credit Suisse "will need evidence of the board approval as a condition of the transaction".  (*Id.* at 441:18-25.)  Mr. Skilling "assured [Mr. Ivers] that -- you know, that

either was happening or would happen prior to the scheduled close of the transaction."  (*Id.* at 440:20-23.)

386.    In a call report dated June 8, 1999, Robert Jeffe stated that the proposed Rhythms Hedge and accompanying "financial and accounting issues" had "been carefully reviewed with outside counsel and Enron's outside auditors."  (Call Rpt. by R. Jeffe (June 8, 1999), CSFBLLC 005725132 (Ex. C69).)

387.    Norman Blake, one of Enron's outside directors, testified that the Rhythms Hedge was "fully disclosed to the board", including that "Enron's stock was the majority of the value in LJM1", that "the ability of LJM1 to provide an effective hedge depended in part on the value of the Enron stock", and that Enron's senior management, Arthur Andersen, and Vinson & Elkins had all approved the structure:

> "Q.    And before the board approved LJM1, the structure of the Rhythms hedge was fully disclosed to the board, correct?
>
> A.    To the best of my knowledge, that's correct.
>
> Q.    And you understood that Enron's stock was the majority of the value in LJM1, correct?
>
> A.    Yes.
>
> Q.    And you understood that, consequently, the ability of LJM1 to provide an effective hedge depended in part on the value of the Enron stock, correct?
>
> A.    Correct.
>
> Q.    Now, Enron's senior management signed off on LJM1, correct?
>
> A.    Correct.
>
> Q.    Mr. Lay signed off on LJM1, correct?
>
> A.    Yes, sir.
>
> Q.    Mr. Skilling signed off on LJM1, correct?

> A.   Yes, sir.
>
> Q.   Mr. Buy signed off on LJM1, correct?
>
> A.   I -- I don't know for a fact, but I assume so.  But I don't know for sure.
>
> Q.   Mr. Causey signed off on LJM1, correct?
>
> A.   Yes.
>
> Q.   Andersen signed off on LJM1, correct?
>
> A.   Yes.
>
> Q.   In fact, Andersen worked closely with Enron management to structure the transaction, correct?
>
> A.   Yes, sir.
>
> Q.   Vinson & Elkins signed off on LJM1, correct?
>
> A.   It is my understanding that is the case."  (Blake Dep. 352:16-354:10 (Ex. C26).)

Other outside directors testified similarly.  (*See* Duncan Dep. 227:6-228:11 (Ex. C21) ("You understood that LJM was capitalized with Enron stock; is that correct? A. Yes. Q. And you understood that the Enron stock provided the credit capacity for the hedge? A. Yes."); Winokur Dep. 1003:15-1004:4 (Ex. C24) ("And you understood that the hedge on Enron's Rhythms investment involved the use of forward contracts on Enron's stock? A. Yes. . . . Q. And you understood that the Enron securities provided the bulk of the credit capacity for the hedge; is that right? A. Yes.").)

388.   A Credit Suisse memorandum dated June 22, 1999, stated that the LJM1 structure and the Rhythms Hedge had been "approved by Enron's Board and [had] the full support of Ken Lay, Chairman and CEO and Jeff Skilling, President and COO."  (Mem. from R. Jeffe, et al. (June 22, 1999), CSFBLLC 000005024 at 024 (Ex. C73).)

389.    On July 14, 1999, Goldman Sachs issued an analyst report stating that

Enron's "shares of Rhythms Net" had been "fully hedged":

> "Energy Assets and Investments earnings increased to $325
> million from $258 million primarily as a result of a gain on
> Enron's investment in Rhythms NetConnections. Enron owns 5
> million shares of Rhythms Net and fully hedged its position during
> the quarter, locking in substantial (yet not quantified by the
> company) gains."  (Goldman, Sachs & Co. Inv. Research, "Enron
> Corp. Excellent 2Q; Raising '00 Est; Firing on All Cylinders"
> (July 14, 1999), ANARPT003555 at 555 (Ex. C217).)

390.    Enron engaged PricewaterhouseCoopers ("PwC") "to render an opinion to

the board of directors and management and/or a special committee of [Enron] as to the fairness

from a financial point of view of the consideration to be received by [Enron] in the proposed

transaction between [Enron] and LJM Partners LLP"—i.e., the Rhythms Hedge.  (PwC Ltr. to

Special Comm. of Bd. of Directors (July 14, 1999), EC06519B0170368 (Ex. C82).)

391.    On August 17, 1999, PwC issued an opinion that "the consideration

received by" Enron in the Rhythms Hedge "is fair from a financial point of view."  (PwC Ltr. to

B. Gilsan (Aug. 17, 1999), AB000468680 at 683 (Ex. C85).)

392.    In August 1999, Arthur Andersen documented its review of the LJM1

structure and a proposed "hedging transaction"—i.e., the Rhythms Hedge—concluding that it

"concurred with Enron's conclusion to give [third party] accounting recognition to the . . .

transaction."  (Mem. from D. Duncan, et al. re: "LJM1 Partnership Structure and Project Martin"

(Aug. 1999), AASDTEX000361304 at 304, 307 (Ex. C84).)

393.    Vinson & Elkins advised Enron on the Rhythms Hedge, also referred to as

"Project Martin".  (Dilg Dep. 676:19-677:9 (Ex. C29).)

394.    Joseph Dilg, a member of the management committee at Vinson & Elkins

and eventual Managing Partner, testified that he "do[es]n't recall anyone at Vinson & Elkins

expressing to [him] a concern about the propriety or purpose of Project Martin as [Vinson & Elkins] worked on it", nor did he "recall anybody at Vinson & Elkins  expressing to [him] . . . a concern about the propriety  or . . . permissibility of the purpose or structure of the LJM partnership" generally.  (Dilg Dep. 14:17-16:9, 688:8-689:1 (Ex. C29).)

395.    Michael Edsall, a partner at Kirkland & Ellis LLP who was counsel to LJM1, testified that he does not "have any impression that the limited partners in [LJM1] had any role in structuring th[e] Rhythms hedge".  (Edsall Dep. 15:10-12, 37:9-10, 103:12-15 (Ex. C41).)

396.    On March 30, 2000, Enron disclosed in its Form 10-K its transactions with LJM1—including that "[a] senior officer of Enron is the managing member of LJM's general partner", that LJM1 was capitalized with "6.8 million shares of [restricted] Enron common stock" and that LJM1 had provided Enron with "financial instruments hedging an investment held by Enron":

> "In June 1999, Enron entered into a series of transactions involving a third party and LJM Cayman, L.P. (LJM).  LJM is a private investment company which engages in acquiring or investing in primarily energy-related investments.  A senior officer of Enron is the managing member of LJM's general partner.  The effect of the transactions was (i) Enron and the third-party amended certain forward contracts to purchase shares of Enron common stock, resulting in Enron having forward contracts to purchase Enron common shares at the market price on that day, (ii) LJM received 6.8 million shares of Enron common stock subject to certain restrictions and (iii) Enron received a note receivable and certain financial instruments hedging an investment held by Enron.  Enron recorded the assets received and equity issued at estimated fair value.  In connection with the transactions, LJM agreed that the Enron officer would have no pecuniary interest in such Enron common shares and would be restricted from voting on matters related to such shares.  LJM repaid the note receivable in December 1999."  (Enron 1999 Form 10-K (Mar. 30, 2000) Item 14, Note 16 (Ex. C224).)

76

In its proxy statement dated March 21, 2000, Enron disclosed that the senior officer was Andrew Fastow: "Andrew S. Fastow, Executive Vice President and Chief Financial Officer of Enron, is the managing member of LJM1's general partner."  (Enron Sched. 14A (Mar. 21, 2000) at 28 (Ex. C223).)

397.    On May 15, 2000, Enron disclosed in its Form 10-Q the details of the termination of the Rhythms Hedge:

> "The agreement [between Enron and LJM] resulted in (i) the termination of certain financial instruments hedging an investment held by Enron, (ii) the payment, by Enron, of approximately $26.8 million to LJM, (iii) the transfer to Enron of approximately 3.1 million shares of Enron common stock held by LJM and (iv) the termination of a put option held by LJM.  The put option, which was originally entered into in the first quarter of 2000, gave LJM the right to sell shares of Enron common stock to Enron at a strike price of $71.31 per share.  The agreement closed in April 2000. Additionally, in the first quarter of 2000, Enron advanced to LJM $10 million, at a market rate of interest, which was repaid in April 2000."  (Enron Form 10-Q (May 15, 2000) at Item 1, Note 7 (Ex. C225).)

398.    Carmen Marino testified that his statement in an email that "Enron seems to spend all its available man hours on various convoluted financing schemes" was "written tongue in cheek" and it "[e]xaggerated for humorous effect."  (Email from C. Marino re: "LJM Partners: What Enron is Getting for All this Stock" (July 28, 1999), CSFBLLC 006359810 (Ex. C83); Marino Dep. 191:7-192:8 (Ex. C42).)  Mr. Marino testified that he was not "trying to communicate a truth" in that statement.  (Marino Dep. 192:18-24 (Ex. C42).)

### b)    SAILS

399.    In December 1999, ERNB and another Credit Suisse affiliate, Credit Suisse Financial Products, executed a SAILS transaction.  (SAILS Mandatorily Equity-Linked Sec. Contract (Dec. 9, 1999), CSFBLLC 000008587 at 590 (Ex. C99).)  The SAILS transaction

had the effect of monetizing certain restricted stock held by LJM1.  (*Id.* at 594-600; Cornell Rpt. ¶ 105 (Ex. C2).)

400.    Enron was not a party to the SAILS transaction.  (SAILS Mandatorily Equity-Linked Sec. Contract (Dec. 9, 1999), CSFBLLC 000008587 at 587, 609-11 (Ex. C99).)

401.    When LJM1 was formed, transfer and hedging restrictions were placed on the Enron stock contributed to LJM1.  (Ltr. Agmt. between LJM Cayman, L.P. & LJM Swap Sub, L.P. (June 30, 1999), CSFBLLC 000011081 at 081-82 (Ex. C77).)

402.    Prior to executing the SAILS transaction, Credit Suisse contacted Enron to "ensure that" the transfer and hedging restrictions had been waived or that such waiver "was not required for the contemplated transaction".  (Ivers Dep. 172:6-11 (Ex. C14).)

403.    On June 28, 1999, the Enron Board of Directors resolved that "proper officers of the Company [are] authorized, empowered, and directed (any one of them acting alone) to take any and all such further action, to amend, execute, and deliver all such further instruments and documents, for and in the name and on behalf of the Company . . . as in their discretion appear to be necessary, proper, or advisable to carry into effect the purposes and intentions" of the resolutions regarding the formation of LJM1.  (Minutes, Special Mtg. of Bd. of Directors, Enron Corp. (June 28, 1999), ENE 0000000955 at 963 (Ex. C75).)

404.    On November 29, 1999, Richard Causey, Enron's Chief Accounting Officer, consented in writing to the SAILS transaction on behalf of Enron.  (Acknowledgment & Agmt. (Nov. 29, 1999), CSFBLLC 000008676 at 678 (Ex. C98).)

405.    The SAILS transaction did not affect Enron's reported profits or other operating results.  (Cornell Rpt. ¶ 112 (Ex. C2).)

406.    Plaintiffs' accounting expert, Moshe Levitin, testified that he "ha[s] no opinion that the SAILS transaction was accounted for improperly by Enron or anyone else". (Levitin Dep. 384:17-20 (Ex. C40).)

### c)    LJM2/Raptors

407.    In October 1999, Andrew Fastow created LJM2 Co-Investment, L.P. ("LJM2").  (Ltd. Liab. Co. Agmt. of LJM2 Cap. Mgmt., LLC (Oct. 21, 1999), ERN0051652 at 652 (Ex. C97).)

408.    Mr. Fastow was general partner of LJM2 until mid-2001, when he sold his partnership interest to Michael Kopper.  (Ltd. Liab. Co. Agmt. of LJM2 Cap. Mgmt., LLC (Oct. 21, 1999), ERN0051652 (Ex. C97); Mem. from A. Ogunlesi et al. (July 19/23, 2001), CSFBLLC 005718492 (Ex. C138); Kopper Ltr. to LJM2 Limited Partners (Aug. 24, 2001), CSFBLLC 000015916 at 919 (Ex. C140).)

409.    The terms of LJM2 were presented to the Enron Board.  (Presentation (ca. Sept. 30, 1999), AB024505476 at 479 (Ex. C93).)  The Board reviewed and approved LJM2, including Mr. Fastow's role therein.  (Minutes, Mtg. of Bd. of Directors, Enron Corp. (Oct. 11-12, 1999), AB000194645 at 662-64 (Ex. C95).)

410.    Arthur Andersen reviewed and provided accounting advice on LJM2, concluding that it "concurred with Enron that the necessary capitalization and control features have been met for nonconsolidation of LJMII and that recognition could be given to transactions with LJMII as a third party."  (Mem. from D. Duncan, et al. re: LJMII P'ship Structure (Dec. 31, 1999), AASDTEX000370508 at 510 (Ex. C104); *see also* Mem. from D. Duncan, et al. re LJMII P'ship Structure (Dec. 13, 1999), AA0035257 at 258 (Ex. C100) (stating that Arthur Andersen "agrees with the accounting for LJM2 as an SPE, and that the necessary control requirements have been met.").)

411.     Robert Baird, a partner in the corporate finance and securities section at Vinson & Elkins, reviewed the private placement memorandum for LJM2.  (Baird Dep. 19:1-22, 455:9-10 (Ex. C10).)  On October 4, 1999, Mr. Baird provided legal advice to Enron regarding LJM2.  (Email from B. Baird re: "LJM2" (Oct. 4, 1999), EVE 780670.01 at 0.01-.02 (Ex. C94); Baird Dep. 462:8-463:17 (Ex. C10).)

412.     Merchant Capital, Inc., an affiliate of Credit Suisse, and DLJ Fund Investment Partners III, L.P., an affiliate of DLJ, were limited partners of LJM2.  (LJM2 Co-Investment, L.P., Limited Partners, CI000267057 at 058-59 (Ex. C201).)

413.     LJM2 had a total of 53 limited partners.  (LJM2 Co-Investment, L.P., Limited Partners, CI000267057 at 057-60 (Ex. C201); Cornell Rpt. ¶ 137 (Ex. C2).)

414.     Merchant Capital, Inc. committed to invest $10 million in LJM2, representing 2.6% of the total commitments to LJM2.  (LJM2 Co-Investment, L.P., Limited Partners, CI000267057 at 064-66 (Ex. C201); Cornell Rpt. ¶ 137 (Ex. C2).)

415.     DLJ Fund Investment Partners III, L.P. committed to invest $5 million in LJM2, representing 1.3% of the total commitments to LJM2.  (LJM2 Co-Investment, L.P., Limited Partners, CI000267057 at 064-66 (Ex. C201); Cornell Rpt. 137 (Ex. C2).)

416.     Papyrus I Funding Trust committed to invest $45 million in LJM2.  (LJM2 Co-Investment, L.P., Limited Partners, CI000267057 at 065 (Ex. C201).)

417.     The Arkansas Teacher Retirement System committed to invest $30 million in LJM2.  (LJM2 Co-Investment, L.P., Limited Partners, CI000267057 at 065 (Ex. C201).)

418.     The MacArthur Foundation committed to invest $15 million in LJM2. (LJM2 Co-Investment, L.P., Limited Partners, CI000267057 at 065 (Ex. C201).)

419.    Sun America insurance company committed to invest $10 million in LJM2.  (LJM2 Co-Investment, L.P., Limited Partners, CI000267057 at 065 (Ex. C201).)

420.    The Institute for Advanced Studies at Princeton committed to invest $5 million in LJM2.  (LJM2 Co-Investment, L.P., Limited Partners, CI000267057 at 065 (Ex. C201).)

421.    Limited partners of LJM2 were not permitted to "participate in the control of the business of " LJM2 or "to participate in the management, direction or operation of the affairs of" LJM2.  (LJM2 Co-Investment, L.P., Limited Partners, CI000267057 at 097 (Ex. C201).)

422.    Neither Merchant Capital, Inc. nor DLJ Fund Investment Partners III, L.P. served as placement agent for LJM2.  (Ltr. from C. Froeb re LJM2 Co-Investment, L.P. Private Placement Mem. (Oct. 20, 1999), CSFBLLC 000019209 at 213 (Ex. C96); LJM2 Co-Investment L.P. Supp. Num. One to Private Placement Mem. (Dec. 15, 1999), CSFBLLC 000007574-81 (Ex. C101).)

423.    Neither Merchant Capital, Inc. nor DLJ Fund Investment Partners III, L.P. served on the LJM2 Advisory Committee.  (LJM2 Monthly Newsletter (Apr. 7, 2000), CSFBLLC 000007494 (Ex. C107); *see* LJM2 Co-Investment, L.P. Third Am. & Restated Ltd. P'ship Agmt. (Apr. 5, 2000), CSFBLLC 000019140 at 180-81 (Ex. C108) (provisions governing Advisory Committee).)

424.    On March 30, 2000, Enron disclosed in its Form 10-K the formation of LJM2 and its acquisitions:

> "LJM2 Co-Investment, L.P. (LJM) was formed in December 1999 as a private investment company which engages in acquiring or investing in primarily energy-related or communications-related businesses.  In the fourth quarter of 1999, LJM2, which has the

81

same general partner as LJM, acquired, directly or indirectly, approximately $360 million of merchant assets and investments from Enron, on which Enron recognized pre-tax gains of approximately $16 million.  In December 1999, LJM2 entered into an agreement to acquire Enron's interests in an unconsolidated equity affiliate for approximately $34 million.  Additionally, LJM acquired other assets from Enron for $11 million."  (Enron 1999 Form 10-K (Mar. 30, 2000) at Note 16 (Ex. C224).)

425.    In its May 2, 2000 proxy statement (filed March 21, 2000), Enron

disclosed that "Mr. Fastow is the managing member of LJM2's general partner" and "is entitled

to receive a percentage of the profits of LJM2", on which it provided additional detail:

"In the second half of 1999, Enron entered into eight transactions with LJM1 and LJM2 Co-Investment, L.P. ("LJM2"). LJM2 is a private investment company that primarily engages in acquiring or investing in energy and communications related investments. Mr. Fastow is the managing member of LJM2's general partner. The general partner of LJM2 is entitled to receive a percentage of the profits of LJM2 in excess of the general partner's proportion of the total capital contributed to LJM2, depending upon the performance of the investments made by LJM2.  In six of these transactions, LJM1 and/or LJM2 acquired various debt and equity securities of certain Enron subsidiaries and affiliates that were directly or indirectly engaged in the domestic and/or international energy business.  The aggregate consideration agreed to be paid to Enron pursuant to these six transactions was approximately $119.3 million.  In the seventh transaction, LJM2 paid $12.9 million for an equity interest in an Enron securitization vehicle (that owned approximately $300 million of merchant assets) and loaned $19.6 million to such vehicle.  In the eighth transaction, LJM2 borrowed $38.5 million from an Enron affiliate, which loan was outstanding at year end.  These transactions occurred in the ordinary course of Enron's business and were negotiated on an arm's length basis with senior officers of Enron other than Mr. Fastow.  Management believes that the terms of the transactions were reasonable and no less favorable than the terms of similar arrangements with unrelated third parties."  (Enron Sched. 14A (Mar. 21, 2000) at 25 (Ex. C223).)

426.    In July 2000, Credit Suisse agreed to contribute $10 million to a

$65 million, 364-day revolving credit facility for LJM2, which was arranged by Chase Bank of

Texas.  (Assignment Agmt. between Chase Bank of Texas, N.A. and Credit Suisse First Boston

(July 26, 2000), CSFBLLC000010116 at 116, 122 (Ex. C113).)  In November 2000, that facility

was replaced by a $120 million revolving credit facility led by Dresdner Bank AG, to which

Credit Suisse committed $30 million.  (LJM2 Revolving Credit Agmt. (Nov. 13, 2000),

CSFBLLC 000010265 at 269, 349, 353 (Ex. C117).)

 427. Credit Suisse was not involved in structuring any transaction between

Enron and LJM2, including the Raptors.  (Cornell Rpt. ¶ 143 (Ex. C2).)

 428. Michael Edsall, a partner at Kirkland & Ellis LLP who was counsel to the

general partner of LJM2, testified that he is "not aware that CSFB [or DLJ] was involved at all in

developing the Raptor structure".  (Edsall Dep. 15:10-12, 146:4-6, 229:21-230:10 (Ex. C41).)

 429. In an August 2000 internal email regarding "Raptor Hedging

Transactions", Enron in-house counsel Scott Sefton informed Michael Kopper (who was a

member of the LJM2 "team" at Enron) that Enron "wants to hedge a number of positions it holds

in public companies and has expressed a desire that the identity of these companies not be

disclosed to LJM's partners", as "LJM" had previously done in connection with a hedge of

Enron Broadband Services.  Mr. Sefton asked Mr. Kopper to "confirm that this procedure will

work for these [Enron] investments as well"—*i.e.*, the Raptor hedging transactions:

> "ENA wants to hedge a number of positions it holds in public
> companies and has expressed a desire that the identity of these
> companies not be disclosed to LJM's partners.  (This is important
> from a securities law perspective).  I understand that in the initial
> [Enron Broadband Services] hedge (that involved the public
> company) LJM confirmed that the identity of that company would
> not be disclosed to its partners.  Instead LJM agreed that it would
> describe the position as a swap involving a communications
> company.  Please confirm that this procedure will work for these
> ENA investments as well."  (Email from S. Sefton re: "Raptor
> Hedging Transactions" (Aug. 22, 2000), ECTe 011553954 at 955
> (Ex. C114).)

(*See* Presentation re: "LJM2 Co-Investment LP" (Sept. 27, 1999), E 233779 at 790 (Ex. C148);

Edsall Dep. 57:23-58:10 (Ex. C41).)  Mr. Kopper responded, "It should.  Just confirm with Mike

Edsall.  Commercially I'm ok with it."  (Email from S. Sefton re: "Raptor Hedging Transactions"

(Aug. 22, 2000), ECTe011553954 at 954 (Ex. C114).)  Mr. Sefton then forwarded the email

string to Michael Edsall at Kirkland & Ellis LLP, asking Mr. Edsall to "confirm that this

procedure will work for the Raptor hedging transactions."  (*Id.*)  Mr. Edsall testified that he does

not recall responding to Mr. Sefton's request.  (Edsall Dep. 566:25-567:5 (Ex. C41).)

      430.    Mary Beth Mandanas, "one of the relationship person[s] on the LJM2

account" for Credit Suisse, testified that there were no "guaranteed returns on equity investments

within LJM2".  (Mandanas Dep. 279:17-18, 316:19-21 (Ex. C8).)  Ms. Mandanas explained that

a reference to "guaranteed minimum returns" in a memorandum she prepared was based on the

assumption that "the structure doesn't go underwater" and the fact that the structure "typically"

held "investment grade debt":

> "Many of LJM2's investments were in structured financings.
> Typically structured financings provide coupons, similar to a bond,
> so you could have a preferred stock investment that provides a
> coupon.  So assuming that, of course as we assumed here, that the
> structure doesn't go underwater, then you're expected to get a
> minimum return based on that coupon payment.  So just as you
> receive coupons off a bond, these preferred stock investments
> expected to receive coupon payments.  And the reference to the
> principal guaranteed by investment grade credits is the fact that the
> structures that they invested in, the debt, was typically investment
> grade.  So that's where the principal guaranteed by investment
> grade credits concept comes from."  (*Id.* at 316:4-8, 316:23-
> 317:15.)

(*See* Mem. from M.B. Mandanas, et al. re: "LJM Financing" (July 18, 2001),

CSFBCO000545978 at 982 (Ex. C134).)

      431.    James Moran testified that he did not "have an understanding that any of

the investments LJM2 made had guaranteed returns".  (Moran Dep. 558:25-559:4 (Ex. C7).)

432.     David Maletta, who approved on behalf of Credit Risk Management the

$30 million contribution to the LJM2 revolving credit facility, testified that he did not "think

there was even an indirect obligation by Enron to back up the $30 million loan", explaining, "I

didn't have any illusion that I could knock on their door and say give me back my $30 million".

(Maletta Dep. 241:3-5, 295:7-12, 301:13-16 (Ex. C28).)

### (iii)     Oil Swap

433.     In December 2000 and January 2001, three independent commodity swaps

were executed between three independent counterparties:  Enron North America, Morgan

Stanley Capital Group and an affiliate of Credit Suisse.  (Swap Confirmation between Credit

Suisse First Boston Int'l & Enron N. Am. Corp. (Dec. 15, 2000), CSFBCO 005293162 at 162-

163 (Ex. C118); Swap Confirmation between Enron N. Am. Corp. and Morgan Stanley Capital

Group, Inc. (Dec. 18, 2000), CSFBCO 000047424 at 424-427 (Ex. C120); Swap Confirmation

between Credit Suisse First Boston Int'l & Morgan Stanley Capital Grp., Inc. (Jan. 9, 2001),

CSFBCO 000128279 at 279-282 (Ex. C122).)

434.     The swap between Enron and Credit Suisse called for Credit Suisse to

make a $150 million payment to Enron on December 19, 2000.  (Swap Confirmation between

Credit Suisse First Boston Int'l & Enron N. Am. Corp. (Dec. 15, 2000), CSFBCO 005293162

at 162-163 (Ex. C118).)  In return, Enron was obligated to pay Credit Suisse the value of 97,955

barrels of oil on March 19, 2001 and June 19, 2001.  (Email from N. Tjandramaga to G. Smailes

re: "ENRON PREPAID SWAP transaction details" (Dec. 18, 2000), CSFBCO000199997

(Ex. C121).)  At maturity of the swap agreement, Enron would pay Credit Suisse the value of

5,701,243 barrels of oil.  (*Id.* at 162.)

435.     The swap between Morgan Stanley and Credit Suisse called for Credit

Suisse to pay Morgan Stanley the value of 97,955 barrels of oil on March 19, 2001 and June 19,

2001, and the value of 5,701,243 barrels of oil at maturity.  (Swap Confirmation between Credit

Suisse First Boston Int'l & Morgan Stanley Capital Group, Inc. (Jan. 9, 2001), CSFBCO

000128279 at 282 (Ex. C122).)  Morgan Stanley was to pay Credit Suisse $26.77 per barrel for

5,897,153 barrels on the closing day of the swap.  (*Id.* at 280.)

       436.    The swap between Enron and Morgan Stanley called for Morgan Stanley

to pay Enron the value of 97,955 barrels of oil on March 19, 2001 and June 19, 2001, and the

value of 5,701,243 barrels of oil at maturity.  (Swap Confirmation between Enron N. Am.

Corp. & Morgan Stanley Capital Group, Inc. (Dec. 18, 2000), CSFBCO 000047424 at 425, 427

(Ex. C120).)  Enron was to pay Morgan Stanley $26.795 per barrel for 97,955 barrels on

March 19, 2001 and June 19, 2001.  (*Id.*)  Enron paid Morgan Stanley the same price per barrel

for 5,701,243 barrels at maturity.  (*Id.*)

       437.    James Moran testified as follows regarding the three independent swaps:

"First was a swap between Enron and CSFB.  The second is a swap between CSFB and Morgan

Stanley.  The third swap is a swap between Morgan Stanley and Enron. . . . Each one of those

swaps is independent, the success or failure of one does not affect the success or failure of the

other."  (Moran Dep. 373:8-15 (Ex. C7); *see* Cornell Report ¶ 156 (Ex. C2) ("It is important to

note that these three oil swaps were independent of each other and each had its own executed

swap confirmation.").)

       438.    Mr. Moran testified that, with respect to the swaps, Credit Suisse "cared"

about "what direction the price of oil went" because "if oil went in a certain direction and [Credit

Suisse] needed to unwind the swap, or if a bad thing happened and oil went real high, the

[payment] obligation that we had to Morgan Stanley . . . could have been larger [and] then the

claim that [Credit Suisse] would have had towards Morgan Stanley would have been greater."

(Moran Dep. 221:3-16 (Ex. C7).)  Credit Suisse was only "protected" by the "other leg of the

transaction" if "everybody did what they were supposed to"—*i.e.*, "[a]s long as everybody

performs."  (*Id.* at 221:17-222:12.)

439.    Mr. Moran testified that Credit Suisse first became aware of the oil swaps

when Kelly Boots, Enron's director of bank relationships, contacted Credit Suisse "to look at an

opportunity" to provide "$150 million financing".  (Moran Dep. 29:21-25, 207:10-208:3

(Ex. C7).)

440.    Mr. Moran testified that Ms. Boots "generally outlined the deal",

including that "Enron wanted to do $150 million prepaid oil swap financing" which "[w]ould be

about nine months in duration."  (Moran Dep. 208:7-14 (Ex. C7).)

441.    Mr. Moran testified that "[t]he opportunity came about because . . . TD

[Toronto-Dominion] whiffed on the request" and Enron "wanted [Credit Suisse] to take a look

at" participating.  (Moran Dep. 209:7-10 (Ex. C7).)

442.    Mr. Moran testified:

> "The transaction was presented to credit risk management, and in
> the discussions we had with credit risk management, we discussed
> that Enron was doing this to achieve a certain accounting
> requirement.  Based on that, David Maletta concluded that the
> transaction would be reviewed—would need to be reviewed by
> reputational risk so that CSFB would not be faced with
> reputational risk if we decided to do the deal."  (Moran Dep.
> 223:8-18 (Ex. C7).)

443.    On or about December 14, 2002, Credit Suisse sought representations

from Enron that (a) Enron "has discussed the Transaction, and the accounting treatment . . . with

its independent external auditors"; (b) Enron's "independent external auditors have confirmed to

it that such accounting treatment is appropriate and consistent with the relevant accounting

principles in the jurisdiction"; (c) Enron's "senior management is aware of the terms of the

Transaction, is familiar with its purpose, and has approved the Transaction"; (d) "[t]he purpose and effect of the Transaction and the manner in which the counterparty intends to account for the Transaction, are permissible and appropriate as a matter of local law, custom and practice in the applicable jurisdiction"; (e) Enron "is solely responsible for deciding to enter the Transaction and has not relied on CSFB in respect of the accounting treatment to the Transaction"; and (f) "[t]he Transaction, including the accounting and tax treatment to be accorded the Transaction, are consistent with all regulatory requirements arising from or applicable to the Transaction and [Enron] has taken all steps necessary to ensure that the Transaction complies with such requirements".  (Email from J. Moran to M. Steglitz re: "URGENT / decision required- status on Eneron oil linked loan" (Dec. 15, 2000), DPOEX000000419 at 421 (Ex. C119).)

444.    Mr. Moran personally discussed the six representations with Enron, and Enron agreed to each representation.  (Moran Dep. 230:2-233:21 (Ex. C7).)

445.    Mr. Moran testified that the six representations were not included in the swap confirmations because "Enron indicated that they wanted to have their trade confirms as standard as possible.  The inclusion of these items, whilst they didn't have a problem with them, would make the confirm look nonstandard, and they didn't want that."  (Moran Dep. 233:24-234:5 (Ex. C7).)  Mr. Moran explained that "Enron does a lot of swaps, they wanted to make the documentation as standard as possible on all their transactions"—*i.e.*, all swaps.  (*Id.* at 234:8-14.)  Enron was the "original scribe" of the oil swap confirmations; Credit Suisse provided edits.  (*Id.* at 234:23-235:3.)

446.    Mr. Moran testified that the oil swap was "not a loan", because, among other things, "it's documented with ISDA and a trade confirm."  (Moran Dep. 248:8-10 (Ex. C7).)

447.    Mr. Moran testified that Enron "describe[d] to [him] the accounting treatment that they intended for the transaction", specifically "[t]hat the two swaps that Enron entered into, the position would be accounted for in their trading book."  (Moran Dep. 231:8-16 (Ex. C7).)  Enron informed Mr. Moran that the transaction would appear in Enron's "short-term liability book".  (*Id.* at 216:10-11.)

448.    Enron informed Mr. Moran that Enron "had conversations with Arthur Andersen, and Arthur Andersen had approved the [oil swaps] transaction."  (Moran Dep. 231:20-232:8 (Ex. C7).)

449.    Debra Cash, a partner on Arthur Andersen's Enron audit engagement team, testified that she "provided accounting advice" to Enron "with respect to the generic prepay [oil swap] structure."  (Cash Dep. 23:3-14, 249:14-15 (Ex. C13).)

450.    In June 1999 and June 2001, Ms. Cash co-authored memoranda summarizing the accounting considerations for "prepay transactions" like the $150 million oil swap.  (*See* Mem. from D. Cash, et al. re: "Prepay Transaction, Amended for FAS 133" (June 1999), AA 029708-11 (Ex. C68); Mem. from D. Cash, et al. re: "Updated Prepay Transaction" (June 2001), AA-EX00395542-45 (Ex. C127).)

451.    John Stewart, a lead partner in Arthur Andersen's Professional Standards Group, testified that, with respect to the $150 million oil swap, Enron's "belief was that you can get price risk management accounting rather than debt or some other classification on the balance sheet with only two parties"; however, "Arthur Andersen's view was that that was not acceptable" to structure the swap with only two parties.  (Stewart Dep. 14:6-15, 769:5-18 (Ex. C39).)  Arthur Andersen instead concluded that "we needed three parties so that each contract . . . had price risk", which was "fully consistent with the way traders ran their—their

books". (*Id.* at 769:19-770:3.) Arthur Andersen "thought two parties was too debt-like" but "the three parties [structure] was certainly consistent with Generally Accepted Accounting Principles." (*Id.* at 770:9-12.) Mr. Stewart testified that such accounting "was the view" that Arthur Andersen had when he "arrived [there] in 1998" and he "d[id]n't believe that [he] had changed [his] mind or the firm had changed its mind by 2001, December 2001." (*Id.* at 860:17-25.)

452.    In September 2001, the three independent commodity swaps executed in December 2000 and January 2001 were renewed by three independent counterparties:  Enron North America, Barclays Bank PLC and an affiliate of Credit Suisse.  (Swap Confirmation between Credit Suisse First Boston Cayman Island Branch & Enron N. Am. Corp. (Sept. 27, 2001), CSFBLLC 000047317-28 (Ex. C146); Swap Confirmation between Barclays Bank PLC & Enron N. Am. Corp. (Sept. 27, 2001), BARC 000005117-21 (Ex. C144); Swap Confirmation between Credit Suisse First Boston Cayman Island Branch & Barclays Bank PLC (Sept. 27, 2001), CSFBLLC 000047246 at 246-257 (Ex. C145).)

453.    Barclays replaced Morgan Stanley in the two swaps in which it was a counterparty.  (Swap Confirmation between Barclays Bank PLC & Enron N. Am. Corp. (Sept. 27, 2001), BARC 000005117 at 117-121 (Ex. C144); Swap Confirmation between Credit Suisse First Boston Cayman Island Branch & Barclays Bank PLC (Sept. 27, 2001), CSFBLLC 000047246 at 246-257 (Ex. C145).)  The independent structure of each swap remained the same. (*Id.*)

454.    Credit Suisse performed its obligation under the renewed oil swap, but Enron did not, resulting in an approximately $140 million loss to Credit Suisse.  (Proof of Claim Against Enron N. Am. Corp., *In re Enron Corp.*, No. 01-16035 (S.D.N.Y. Bankr. Oct. 2002)

at 2-3 (Ex. C269).)  Credit Suisse filed a proof of claim in the Enron bankruptcy to recover that

loss.  (*Id.*)

456.    Addressing whether a commodity swap executed between Enron and

JP Morgan Chase should be treated as an independent obligation or on a "composite basis" with

other swaps, Justice Cooke of the High Court of London ruled:

> "A faithful representation of those contracts required them to be
> treated as the contracts they were and not on some composite basis,
> as if they constituted a single loan, simply because of the economic
> effect of them, if they and [the other swaps] were fully performed,
> was similar or identical to that of a loan.  They contained
> provisions which made them swap contracts with margin
> obligations and obligations to make payments which depended on
> the market movement of gas prices.  There was price risk in each
> both on a performance basis and on a default basis."  (*Mahonia
> Ltd. v. West LB AG*, Case No. 2001/1400, [2004] EWHC 1938
> (Comm.) (Q.B. 2004) at 115-16 (Ex. C275).)

456.    Plaintiffs' accounting expert, Moshe Levitin, testified that he has no

"opinion that the CSFB Oil Swap was accounted for improperly by Enron".  (Levitin Dep.

383:20-23 (Ex. C40).)

457.    Plaintiffs' accounting expert, D. Paul Regan, testified that he "do[es]n't

intend to offer an opinion on the CSFB prepaid oil swap".  (Regan Dep. 145:14-16 (Ex. C37).)

### (iv)    FAS 125/140 Transactions

#### a)    Iguana

458.    On December 20, 1999, DLJ and Enron closed a transaction designed to

monetize Enron's participation interests in Mariner Energy LLC, Mariner Energy, Inc. and East

Coast Power L.L.C. (the "Iguana" transaction).  (Mem. from S. Douglas to J. Mintz (Dec. 21,

1999), ECTe005535882 at 882-83 (Ex. C103).)

459.    DLJ contributed the debt ($202 million) and equity ($6.4 million) for Iguana.  (Offering Mem. (Dec. 14, 1999), CSFBLLC 000032335 at 372 (Ex. C221); Mem. from B. Jukes to B. Spiro (June 14, 2000), CSFBLLC 000025029 (Ex. C110).)

460.    DLJ and Enron entered into a total return swap relating to the Iguana debt. (Offering Mem. (Dec. 14, 1999), CSFBLLC 000032335 at 343, 359-60, 372 (Ex. C221).)

461.    The agreements governing the Iguana transaction state that the Iguana equity was subject to a put option at "fair market value".  (Put Option Agmt. (Dec. 20, 1999), CSFBLLC 000024199 at 200 (Ex. C102).)

462.    In a memorandum dated February 21, 2000, Arthur Andersen analyzed Iguana and concluded that "the [Iguana] transaction meets all conditions" for the application of FAS 125 "and that the sale accounting is appropriate."  (Mem. from C. Carlin, et al. re: "Project Iguana" (Feb. 21, 2000), AAO071470 at 471 (Ex. C105).)

463.    Arthur Andersen did not identify Iguana as one of the 39 transactions for which it contended it was "the victim of fraud, deceit, misrepresentations, or concealment . . . with respect to [its] rendering of professional services".  (Arthur Andersen LLP's Am. Resp. & Objs. to Lead Pl.'s Second Set of Interrogs. (Dec. 9, 2005), Resp. No. 4 (Ex. C276).)

464.    Plaintiffs' accounting expert, Moshe Levitin, testified that he has no "opinion that the Iguana transaction was improperly accounted for by Enron".  (Levitin Dep. 382:19-22 (Ex. C40).)

465.    Plaintiffs' accounting expert, D. Paul Regan, testified that he "do[es]n't have an opinion that the Iguana transaction was improperly accounted for by Enron".  (Regan Dep. 147:13-16 (Ex. C37).)

92

### b)      Nile

466.    On September 28, 2001, Credit Suisse and Enron Energy Services ("EES") closed the Nile transaction, which was designed to monetize a portion of EES's stock in a subsidiary called ServiceCo Holdings Inc. for $25 million.  (Am. & Restated Ltd. Liab. Co. Agmt. of Pyramid I Asset, L.L.C. (Sept. 28, 2001), CSFBLLC 006052296 at 296 (Ex. C154); Enron Mem. (Sept. 30, 2001), EC 000037657 (Ex. C155).)

467.    Credit Suisse provided the debt ($23,991,207) and equity ($1,008,793) for the Nile transaction.  (Asset Notice (Sept. 28, 2001), CSFBLLC 006052270 (Ex. C151); Receipt of Trust (Sept. 28, 2001), CSFBLLC 006052371 (Ex. C153); Enron Mem. (Sept. 30, 2001), EC 000037657 (Ex. C155).)

468.    Credit Suisse and Enron entered into a total return swap on the debt, which was guaranteed by Enron.  (Total Return Swap Confirmation Relating to Sphinx Trust Series A, (Sept. 28, 2001), CSFBLLC 006052247 at 247-258 (Ex. C149); Enron Guaranty (Sept. 28, 2001), CSFBLLC 006052260 at 260-268 (Ex. C150).)

469.    The agreements governing the Nile transaction state that the equity tranche was subject to a put option at "fair market value".  (Am. & Restated Ltd. Liab. Co. Agmt. of Pyramid I Asset, L.L.C. (Sept. 28, 2001), CSFBLLC 006052296 at 311-12 (Ex. C154).)  Under those agreements, Credit Suisse had a limited right to cause Enron to purchase the equity tranche at the fair market value, as initially determined by the "Series Certificate Holder"—*i.e.*, Credit Suisse.  (*Id.* at 312.)  If Enron disputed Credit Suisse's determination, both parties could "negotiate in good faith" the fair market value or either party could refer the matter to mediation and arbitration.  (*Id.* at 312, 324-26.)

470.    A Credit Suisse memorandum dated September 19, 2001 mistakenly states that "the Tranche B debt" of the Nile transaction would be "supported by an Enron put which

requires Enron to purchase at 'par' the principal and interest of Tranche B".  (Mem. from

J. Moran, et al. re: "Enron Corp." (Sept. 19, 2001), CSFBCO 005292624 at 627 (Ex. C143).)

471.    James Moran testified that, on September 19, 2001, he met with Robert

O'Brien, David Maletta, and others at Credit Suisse to discuss the parameters of the Nile

transaction.  (Moran Dep. 144:5-146:12 (Ex. C7).)  Mr. Moran testified that the attendees

discussed the financing of the transaction, including that "[t]he financing is made up of a 97

percent debt component, that debt component carries through a total return swap Enron credit

risk" and that "[t]here is a 3 percent equity tranche, which carries a fair market value put from

Enron."  (Moran Dep. 146:17-22 (Ex. C7).)  Mr. Moran testified that no one "at the meeting

[made] reference the fact that in at least two places, the [September 19, 2001] memo refers to a

par value put as opposed to a fair market value put".  (*Id.* at 147:21-147:25.)  Mr. Moran

explained that the meeting was an "open forum" to "discuss the concept" and that he was "not

surprised that anybody didn't say hey, what you're saying on the deal is different than what is

being presented . . . in the paperwork."  (*Id.* at 146:17-148:13.)

472.    Mr. Moran testified that the Nile credit memorandum did not "set forth the

accurate terms of the Nile transaction ", explaining that the equity tranche "[wa]s not supported

by an Enron put that requires the purchase at par, that's not accurate."  (Moran Dep. 159:21-

160:9 (Ex. C7).)

473.    David Maletta testified that he "recollect[ed] that myself and Bob O'Brien

believed that [the Nile Transaction] was improperly structured as outlined in the submitted

memo" from September 2001—specifically that "there was a statement that Enron was going to

pay us back at par, which would not qualify it for equity treatment, and that we were troubled by

that."  (Maletta Dep. 352:17-353:3 (Ex. C28).)  Mr. Maletta testified that he and Mr. O'Brien:

"sat down with James [Moran] and went through I believe it was the draft documentation or some of the draft language that basically said that, yes, while Enron would pay the firm back, it would be based at fair market value at the time, which could be zero.  Therefore, they were not guaranteeing our par position but merely the payment back of whatever the value at the time of that tranche was worth."  (*Id.* at 353:7-20.)

474.    Robert O'Brien testified:  "I know there was confusion in looking at this Project Nile as to what was really being said in the description of the transaction.  And I know either I or someone else asked clarification from James Moran as to what the nature of that risk actually was."  (O'Brien Dep. 131:8-13 (Ex. C19).)  Mr. O'Brien testified that "Mr. Moran basically described the risk on tranche B as a risk that was tied into a valuation of the equity of this Enron investment."  (*Id.* at 132:7-10.)

475.    James Moran testified that "[t]here were no side arrangements between Enron and CSFB" and that there were "[n]ever ever" "any side arrangements discussed about" the Nile transaction.  (Moran Dep. 144:10-12, 148:22-149:5 (Ex. C7).)

476.    On August 23, 2001, Enron asked Arthur Andersen to review the Nile transaction as a "one-off [FAS] 140 transaction" and provide comments.  (Email from K. Scardino re: "Project Nile – Initial Drafts of Transaction Documents (marked in Word)" (Aug. 23, 2001), AASDTEX000758653, at 653 (Ex. C139).)

477.    In a memorandum dated September 30, 2001, Enron's internal accountants concluded that "CSFB as equity provider is not protected by the [Total Return Swap applicable to the debt] and is therefore fully exposed to the risk of [the equity] valuation with no guaranty of return on or of capital."  (Enron Mem. (Sept. 30, 2001), EC 000037657 (Ex. C155).)  Enron's accountants further concluded that "[t]he [Nile] transaction qualified as a sale of a financial asset under SFAS 140".  (*Id.*)

478.     Arthur Andersen did not identify Nile as one of the 39 transactions for
which it contended it was "the victim of fraud, deceit, misrepresentations, or concealment . . .
with respect to [its] rendering of professional services". (Arthur Andersen LLP's Am. Resp. &
Objs. to Lead Pl.'s Second Set of Interrogs. (Dec. 9, 2005), Resp. No. 4 (Ex. C276).)

479.     Plaintiffs' accounting expert, Moshe Levitin, testified that he "do[es]n't
have the opinion that the accounting for the Nile transaction was improper or incorrect".
(Levitin Dep. 382:10-14 (Ex. C40).)

480.     Plaintiffs' accounting expert, D. Paul Regan, testified that he "do[es]n't
intend to offer an opinion about the Nile transaction if [he were] called at trial". (Regan Dep.
148:2-5 (Ex. C37).)

### c)      Nikita

481.     On September 28, 2001, Credit Suisse participated in the Nikita
transaction, which monetized a portion of Enron's interest in its subsidiary EOTT Energy
Partners, L.P. ("EOTT"), a publicly owned limited partnership. (Enron Mem. re: "Project Nikita
Memo" (Oct. 1, 2001), EC 000037584 at 584-589 (Ex. C157).)

482.     Barclays initially provided the debt ($71,865,000) and CSFB provided the
equity ($8,135,000) for the Nikita transaction. (Receipt of Trust (Sept. 28, 2001), CSFBLLC
006055542-3 (Ex. C152).)

483.     The agreements governing the Nikita transaction state that the equity in
the Nikita transaction was subject to a put option at "fair market value". (Am, & Restated Ltd.
Liab. Co. Agmt. of Timber I, L.L.C. (Sept. 27, 2001), CSFBLLC 006055479 at 495 (Ex. C147).)

484.     In a memorandum dated October 1, 2001, Arthur Andersen analyzed
Nikita and concluded, "[W]e agree that the transfer of EOTT Shares"—*i.e.*, the Nikita

transaction—"is properly accounted for as a sale under FAS 140."  (Mem. from T. Bauer, et al. re: "EOTT 140 Sale- Project Nikita" (Oct. 1, 2001), AASDTEX003252588 at 594 (Ex. C156).)

485.    James Moran testified that the Nikita transaction was originally intended to be structured such that Barclays held both the debt and equity.  (Moran Dep. 171:21-172:15 (Ex. C7).)  However, because the deal required "a U.S. person to buy the equity" and Barclays "didn't have one", Enron asked Credit Suisse to become the equity holder.  (*Id.* at 172:11-25; 173:7-10.)

486.    Mr. Moran testified that when Enron asked Credit Suisse to purchase the equity in the Nikita transaction, the deal was "twelve hours" away from closing.  (Moran Dep. 173:16-25 (Ex. C7).)  He testified that Credit Suisse informed Enron that "[t]hat's just too much freight to move within, you know, twelve hours.  We can't do that."  (*Id.*)

487.    After "discussions with Enron", it was determined that Barclays would enter a "total return swap" with Credit Suisse.  (Moran Dep. 174:3-10 (Ex. C7); *see* Telefax from K. McNally to J. Moran (Dec. 6, 2001), CSFBLLC 006052805-9 (Ex. C198).)  The total return swap worked such that "any payments [Credit Suisse] received from the [Nikita] transaction, CSFB would pass that money over to Barclays, and in return Barclays would provide [Credit Suisse] with a LIBOR coupon plus an $8.135 million repayment."  (Moran Dep. 454:2-6 (Ex. C7).)

488.    Mr. Moran testified:

"Q.    Did you ever discuss with anyone from Barclays or from Enron whether there were any side arrangements involved in the Nikita deal?

A.    No.

Q.    Did you ever discuss with anyone at CSFB, Enron or from Barclays, whether there were any protections that Enron provided to the equity tranche in the Nikita deal?

97

A.     No."  (Moran Dep. 175:22-176:7 (Ex. C7).)

489.    Richard Williams, a Director of Investment Banking at Barclays, testified that he did not "convey to anyone at CSFB that Barclays had received any verbal assurances from Enron" regarding the Nikita transaction, nor did "anyone else at Barclays convey" such information to Credit Suisse, nor did Mr. Williams "have any reason to believe that anyone at CSFB knew about any verbal assurances that Barclays received from Enron" regarding the Nikita transaction.  (Williams Dep. 12:6-13:9, 500:2-501:2 (Ex. C6).)

490.    Robert Clemmens, Head of Risk for the Americas at Barclays, testified that he has "no knowledge" that "anyone at CSFB knew about any verbal assurances that Barclays received from Enron" regarding the Nikita transaction, and he has "no knowledge of any communication between CSFB and Enron" regarding "whether CSFB itself received any verbal assurances from Enron on the [Nikita] transaction".  (Clemmens Dep. 13:21-14:3, 399:21-400:22 (Ex. C9).)

491.    Graham McGahen, a Managing Director in Credit Risk Management at Barclays testified that he "do[es]n't recall ever having a conversation with anyone from CSFB relating to Enron" and is not "aware of whether anyone else at Barclays ever conveyed to anyone from CSFB that Barclays had received verbal assurances from Enron regarding the" Nikita transaction.  (McGahen Dep. 11:14-12:6, 177:5-19 (Ex. C17).)

492.    Robert O'Brien testified that he was "not aware" of "whether Barclays had any oral agreement with Enron concerning its investment in Nikita".  (O'Brien Dep. 123:13-20 (Ex. C19).)

493.     Plaintiffs' accounting expert, D. Paul Regan, testified that he "do[es] not intend to offer an opinion about the Nikita transaction if [he were] called at trial".  (Regan Dep. 146:22-55 (Ex. C37).)

### (v)     Other Transactions

#### a)     NewPower

494.     In October 2000, an Enron subsidiary, NewPower, conducted an initial public offering ("IPO") that raised over $500 million.  (Prospectus, NewPower (Oct. 4, 2000), CSFBLLC006723454 at 454 (Ex. C230).)

495.     Credit Suisse and DLJ were the co-lead managing underwriters of the NewPower IPO, and Chase H&Q, CIBC World Markets, Paine Webber Inc., Salomon Smith Barney and DLJdirect Inc. were co-managing underwriters of the IPO.  (Prospectus, NewPower, 24,000,000 Shares of Common Stock (Oct. 4, 2000), CSFBLLC006723454 at 454 (Ex. C230).)

496.     Neither Credit Suisse nor DLJ made any loan to Hawaii 125-0.  (*Cf.* Application for Corporate Credit (Sept. 29, 2000), CI000591633 at 647 (Ex. C116) (CIBC credit application regarding Hawaii 125-0).)

497.     In opposition to Credit Suisse's motion for summary judgment in *Newby*, the lead plaintiff admitted that it "made no . . . specific allegation" that "CSFB and DLJ made a loan to Hawaii 125-0" and disclaimed any such contention at summary judgment.  (Pl.'s Opp. to CSFB Defs.' Mot. & Mem. Law Supp. Mot. Summ. J. at 13, No. H-01-3624 (S.D. Tex. Nov. 13, 2006), ECF 5197 (Ex. C283).)

#### b)     Portland General Electric

498.     Silvercreek alleges that "CSFB . . . was advisor to Enron on the $2 billion sale of Portland General Electric".  (TAC ¶ 593.)

499. The February 28, 2002 Financial Times article asserts, "CSFB was tapped to lead Enron's Dollars 1.8bn divestiture of Portland General, announced in August". (Joshua Chaffin & Stephen Fidler, "Enron's Alchemy Turns To Lead For Bankers", *Financial Times* (Feb. 28, 2002) at 2 (Ex. C264).) The article did not assert anything improper about the transaction, merely that Credit Suisse had been hired. (*Id.*)

### c) Sale of International Assets

500. Silvercreek alleges that, "in 2001, [Credit Suisse] helped Enron dispose of $5 billion to $7 billion in assets in Enron's international portfolio, some sold to SPEs at inflated values." (TAC ¶ 593.)

501. The February 28, 2002 Financial Times article asserts, "[Credit Suisse] was awarded the mandate to liquidate Enron's troubled international asset portfolio with a value estimated at Dollars 4bn to Dollars 7bn and the potential to generate millions of dollars in fees." (Joshua Chaffin & Stephen Fidler, "Enron's Alchemy Turns To Lead For Bankers", *Financial Times* (Feb. 28, 2002) at 2 (Ex. C264).) The article did not assert anything improper about the transaction, merely that Credit Suisse had been hired. (*Id.*)

### (b) Credit Suisse Communications Regarding Enron

### a) Alleged Reduction of Exposure to Enron

502. Robert Jeffe testified that, in November 2000, "CSFB was trying to get out of the lending business". (Jeffe Dep. 135:5-9, 140:7-8 (Ex. C11).) The "right" amount of debt held by Credit Suisse, "from [Credit Suisse's leadership in] Switzerland's perspective, was zero, and we had in place an ongoing effort to try to keep reducing these exposures and to deal with optimizing for returns with CSFB and lending was not a high return business." (*Id.* at 140:7-14.)

503. David Maletta testified that in the "mid fall of 2001 we were increasingly concerned because of the noise in the newspaper surrounding Enron [and] were going to start to

reduce our exposure." (Maletta Dep. 430:11-14 (Ex. C28).) Mr. Maletta testified that, at that time, he and Robert O'Brien "collectively decided we wanted to reduce the guideline of credit exposure that we had to Enron" to approximately $300 million. (*Id.* at 432:25-433:12.) Mr. Maletta testified that he does not recall a "specific date" when such reduction efforts began. (*Id.* at 430:19-431:2.)

504. Robert O'Brien testified that, when Enron entered bankruptcy, Credit Suisse's "total write-offs" from its credit exposure to Enron was "between 150 and 200 million" dollars. (O'Brien Dep. 60:5-15 (Ex. C19).)

505. On or around December 5, 2001, at the request of Robert O'Brien, James Moran created a "whiteboard liquidation analysis" "that showed what [Credit Suisse's] overall exposure was to Enron" following Enron's bankruptcy. (Moran Dep. 296:10-297:16 (Ex. C7); Email from J. Moran to P. Staddon (Dec. 5, 2001), DPOEX00000307 at 308 (Ex. C197).) The analysis showed that, taking into account Credit Suisse's credit derivatives on Enron, Credit Suisse's "net" credit exposure to Enron was $156.5 million. (Moran Dep. 305:3-11 (Ex. C7); Email from J. Moran to P. Staddon (Dec. 5, 2001), DPOEX00000307 at 308 (Ex. C197).) Taking into account Credit Suisse's potential estimated recovery in the bankruptcy, Credit Suisse's expected net credit exposure to Enron dropped to $120.1 million. (Moran Dep. 305:12-21 (Ex. C7); Email from J. Moran to P. Staddon (Dec. 5, 2001), DPOEX00000307 at 308 (Ex. C197).)

b) **Statements Regarding On- and Off-Balance Sheet Debt**

506. Robert Jeffe testified that, at a meeting he attended with Andrew Fastow on August 27, 2001, he learned that Enron "had more than $36 billion in on and off-balance sheet indebtedness". (Jeffe Dep. 146:15-23 (Ex. C11); *see* Email re: "Spider Call Report by Jeffe, Robert for Enron Corporation (Sept. 10, 2001), CSFBCO000549742 (Ex. C141); Email re:

"Spider Call Report by Jeffe, Robert for Enron Corporation (Sept. 18, 2001),

CSFBCO000549746 (Ex. C142).)

> 507.    Mr. Jeffe testified that, prior to that August 2001 meeting, he thought that

Enron's on and off-balance sheet debt was "a lot lower" and "more in the 16 or 17 billion area."

(Jeffe Dep. 146:24-147:7 (Ex. C11).)

> 508.    Mr. Jeffe testified that he did not "understand what the [$36 billion]

number meant" because "[y]ou have to look at the whole financial picture".  (Jeffe Dep. 416:17-

417:11 (Ex. C11).)

> 509.    Mr. Jeffe testified that he "wanted more information" from Enron

regarding the $36 billion figure and asked Mr. Fastow for the "additional information".  (Jeffe

Dep. 418:6-22 (Ex. C11).)  However, he and Credit Suisse "never got it".  (*Id.* at 419:8-9.)

> 510.    Mr. Jeffe testified that Mr. Fastow informed him that Timothy DeSpain,

who worked in Enron's financial department, "was the one responsible . . . to provide [Credit

Suisse] with the projections and the consolidated financial statements" to explain the $36 billion

figure.  (Jeffe Dep. 307:20-308:3 (Ex. C11); Abib Dep. 147:21-22 (Ex. C5).)  Mr. Jeffe testified

that "[o]thers on the team" were responsible for reaching out to Mr. DeSpain.  (Jeffe Dep. 308:4-

7 (Ex. C11).)

> 511.    Mr. Jeffe testified that he discussed the $36 billion figure with Osmar

Abib, and they "felt it was appropriate to have a discussion with Bayo Ogunlesi."  (Jeffe Dep.

150:10-19 (Ex. C11).)

> 512.    Adebayo Ogunlesi testified that he did not recall that the "number was . . .

reported by Mr. Jeffe" to have been $36 billion; instead, "30 billion is a number that somehow

stuck in [his] mind."  (Ogunlesi Dep. 222:24-223:5 (Ex. C15).)

513.     Mr. Ogunlesi testified that, prior to learning of the $36 billion figure, he had "[n]o clue" what "Enron's on and off-balance sheet liabilities were".  (Ogunlesi Dep. 223:17-21 (Ex. C15).)

514.     Mr. Ogunlesi testified that Credit Suisse did not "attempt to decrease its Enron credit exposure . . . as a result of this specific piece of information"; instead, Mr. Ogunlesi thought that the "credit folks" at Credit Suisse, Robert O'Brien and David Maletta, "had actually much earlier on in the year had decided that they wanted to reduce the amount of aggregate exposure that we had to the merchant generation sector, which included Enron".  (Ogunlesi Dep. 224:12-225:6 (Ex. C15).)

515.     Osmar Abib testified that he did not "recall a $36 billion number, specifically", but "remember[ed] it was a number that was north of $30 billion".  (Abib Dep. 228:23-229:3 (Ex. C5).)

516.     Mr. Abib testified he attempted to speak with Mr. DeSpain on August 20, 2001, regarding the $36 billion figure:  "[W]e were trying to get some details about the number and the information that Mr. Fastow had mentioned to us in the earlier meeting, because we didn't have that information and so we were trying to get it."  (Abib Dep. 238:4-8 (Ex. C5).)

517.     Mr. Abib testified that he "followed up with" Mr. DeSpain  regarding the $36 billion figure, but Mr. DeSpain "did not give us the information."  (Abib Dep. 238:15-239:3 (Ex. C5).)

518.     In October 2004, Mr. DeSpain pleaded guilty to conspiracy to commit securities fraud.  (Press Release, *Former Enron Assistant Treasurer Timothy Despain Pleads Guilty to Fraud and Agrees to Cooperate* (Oct. 5, 2004),

https://archives.fbi.gov/archives/news/pressrel/press-releases/former-enron-assistant-treasurer-timothy-despain-pleads-guilty-to-fraud-and-agrees-to-cooperate (Ex. C266).)

### c)      Yellen Email

519.     On October 19, 2001, Jonathan Yellen sent Osmar Abib an email stating, "[E]very time i read about enron's latest travails i think about your ominous warnings 2 years ago that the 'house of cards' may some day collapse.  i certainly never believed it then. hopefully we're still making good money on that account anyway.  it seems like we are."  (Email from J. Yellen to O. Abib re: "Hello stranger!" (Oct. 19, 2001) CSFBLLC 006360752 (Ex. C163).)

520.     Mr. Abib testified that, when he made the statements to which Mr. Yellen referred in his October 19, 2001 email, he was "brand new in the coverage position" of Enron, which was not "long enough to have sufficient knowledge of any issues that might have been a real problem" with Enron's financial condition.  (Abib Dep. 408:23-409:14 (Ex. C5).)

521.     Mr. Abib testified that he specifically was referring to the relationship between Credit Suisse and Enron, which at the time was "in pretty good shape", but he "just had concern from an internal perspective at CSFB if there was anything we might do or not—that would cause a problem with the relationship."  (Abib Dep. 405:22-406:12 (Ex. C5).)

522.     Mr. Yellen testified that he understood Mr. Abib's "concerns" to have reflected "the fee potential for [Enron] over the long term."  (Yellen Dep. 213:21-214:19 (Ex. C33).)

523.     Mr. Yellen testified that, when he wrote the October 19, 2001 email, he did not "believe that Enron was a house of cards" but instead "believed Enron was a very strong company."  (Yellen Dep. 230:15-18 (Ex. C33).)

### d)  Alleged Pressure on Analysts

524.  Jill Sakol testified that she did not "try to spin the [analyst] report[s] in the most favorable light to the client", nor did she "fe[el] pressure to do that".  (Sakol Dep. 449:15-450:13 (Ex. C34).)

525.  Ms. Sakol testified that she "[d]isagree[d]" with the statement of plaintiffs' counsel that "CSFB published positive assessments of Enron by one of its analysts . . . while discouraging the public release of negative internal Enron analysis by you, and used such negative information internally to its benefit."  (Sakol Dep. 454:20-455:10 (Ex. C34).)

526.  Ms. Sakol testified that she "d[id]n't agree with" the statement of plaintiffs' counsel that her "Enron research was edited by a CSFB investment banker to present to the investing public a more positive picture of the debt associated with the Marlin and Osprey share trust transactions".  (Sakol Dep. 456:20-457:1 (Ex. C34).)

527.  Ms. Sakol testified that there was "sensitivity" within Credit Suisse regarding "clients that were important to the firm" and that analysts believed that the investment banking and capital markets functions within Credit Suisse "didn't want to offend their clients." (Sakol Dep. 162:1-7, 450:3-5 (Ex. C34).)

### e)  Statements of Wade Suki

528.  On February 26, 2002, Wade Suki, an associate at JPMorgan Chase, emailed Andy DeVries, a junior research analyst at Credit Suisse, stating "[S]hall I forward your emails to the justice department???  the ones warning me to stay away from ENE – these date waaaaaay back".  (Email from A. DeVries to W. Suki re "do I step into some DO? . . ." (Feb. 26, 2002) CSFBLLC 006362852 (Ex. C200); DeVries Dep. 232:5-17 (Ex. C27).)

529.  Mr. DeVries testified that, when he made prior statements to Mr. Suki regarding Enron, he "was trying to give [Mr. Suki] the impression that [he] knew what was going

on . . . but [he] didn't really know what was going [on], and [he] wanted [Mr. Suki] to think that [he] did know what was going on."  (DeVries Dep. 426:17-22 (Ex. C27).)

530.    Mr. DeVries testified that he was not actually "in the know about why Enron['s stock price] went down from $30" to its lower price on November 28, 2001.  (DeVries Dep. 426:23-427:2 (Ex. C27).)

531.    Mr. DeVries testified that he never "conveyed" to his boss, Curt Launer, any "sentiment" that "investors should hold off on ENE".  (DeVries Dep. 386:25-387:13, 406:15-21 (Ex. C27).)

532.    Mr. DeVries testified that he was not "consult[ed]" on, did not "write" and did not make "substantive contributions at all" to Credit Suisse's research reports regarding Enron.  (DeVries Dep. 391:1-392:5 (Ex. C27).)

### (c)    Investigative Reports and Other Out-of-Court Statements

#### (i)    February 28, 2002 *Financial Times* Article

533.    On February 28, 2002, the *Financial Times* published an article titled, "Enron's Alchemy Turns To Lead For Bankers" (the "*Financial Times* Article").  (Joshua Chaffin & Stephen Fidler, "Enron's Alchemy Turns To Lead For Bankers", *Financial Times* (Feb. 28, 2002) (Ex. C264).)

534.    The *Financial Times* Article asserts that an unnamed "former Enron employee" stated that "the real brains behind (the partnerships) was from CSFB and DLJ." (*Financial Times* Art. at 1 (Ex. C264).)

535.    The *Financial Times* Article asserts that according to an unnamed source Laurence Nath spent "weeks" at Enron corporate office "to create a quick-fix solution for Enron's books".  (*Financial Times* Art. at 2 (Ex. C264).)

536.    Mr. Nath testified before the Bankruptcy Examiner that he "did not spend weeks at a time in Houston" at Enron's offices and that the allegation in the *Financial Times* article that he had done so was "inaccurate":

> "Q.  Can you recall today for me what specific article or topic that you read about yourself in the newspaper and said this is not accurate?
>
> A.  There was a rather large article in the FT [Financial Times] written in probably the March time frame that I thought was not completely accurate or not accurate.
>
> Q.  I don't want to interrupt your train.  With respect to that particular article, with anything they said about you, what did you find that was not accurate?
>
> A.  I would have to look—I have to look at the articles specifically to go point by point, but my recollection was that there—there were—it was a significant amount of innuendo.  There were— well, I guess one was easy.  They said I spent weeks of time at Houston, which my wife was interested to hear.  She was curious where she was at that time.
>
> MS. NORTH:  By that, I take it to mean that you did not spend weeks at a time in Houston?
>
> THE WITNESS:  I did not spend weeks at a time in Houston.
>
> A. There were allegations about spending, I think, time locked up in conference rooms with Mr. Fastow.  I think there was an allegation about that which was inaccurate.  I think there was a tone to the article that was highly inaccurate."  (Nath Bankr. Dep. 381:21-383:5 (Ex. C4).)

537.    Mr. Nath testified here that, at the time he reviewed the transcripts of his testimony before the Bankruptcy Examiner, he found those transcripts to be "truthful and accurate" and he did not know of "anything that [he] would like to change in that testimony in the intervening eighteen months" since he gave it.  (Nath Dep. 51:8-53:16 (Ex. C16).)  Plaintiffs' counsel did not ask Mr. Nath about his testimony before the Bankruptcy Examiner regarding the allegations in the *Financial Times* article, or about those allegations generally.  (*Id.*)

538.    The *Financial Times* Article asserts that according to an unnamed source an unnamed "banker" stated, "When the Marlin and Osprey deals first came to light, they were known as a DLJ product.  They dominated the market for them".  (*Financial Times* Art. at 3 (Ex. C264).)

539.    The *Financial Times* Article asserts that according to an unnamed source an unnamed "Enron insider" stated that unnamed "senior people" at Credit Suisse "knew what was going on and that it was a house of cards".  (*Financial Times* Art. at 3 (Ex. C264).)

540.    The *Financial Times* Article asserts that according to an unnamed source unnamed "CSFB bankers" had said, "'If this thing hits Dollars 20, you better run for the hills.' There was no question that they knew exactly what lay inside the structures, when the triggers went off - everything.  You could almost say they knew more about the company than people in Enron did."  (*Financial Times* Art. at 3 (Ex. C264).)

541.    The *Newby* lead plaintiffs admitted that the *Financial Times* Article was their only "evidence" to support their allegations that:  (1) "Larry Nath would come down to Houston for a week or two and sit down with the ... accountants and come up with something"; (2) an "Enron insider" stated, "There's no question that senior people at CSFB knew what was going on and that it was a house of cards"; and (3) "one who was present" at an alleged July 2000 meeting stated, "They (the CSFB bankers) said 'If this thing hits the $20s, you better run for the hills.'"  (Pls.' Resps. to Def. Credit Suisse First Boston LLC's First Set of lnterrogs. (Apr. 30, 2004), Resp. to Interrog. Nos. 2, 8, 12 (Ex. C274).)  The alleged unnamed sources in the *Financial Times* article have never been publicly identified.

### (ii)    July 2002 Hearings of the U.S. Senate Permanent Subcommittee on Investigations

542.    On July 23 and 30, 2002, the United States Senate Permanent Subcommittee on Investigations held hearings regarding "The Role of the Financial Institutions in Enron's Collapse".  (Sen. Hr'g 107-618 (vol. 1) (2002) (Ex. C265).)

543.    The testimony of Robert Roach before the Permanent Subcommittee is purportedly summarized in a document titled, "Testimony of Robert Roach, Chief Investigator, Permanent Subcommittee on Investigations, The Role of the Financial Institutions in Enron's Collapse".  (Sen. Hr'g 107-618 (vol. 1) (2002) (Ex. C265) at 33; *see* TAC ¶ 133, Ex. B.)

544.    Mr. Roach was an investigator for the Subcommittee and had no involvement with or personal knowledge about the events described in his report and testimony. (Sen. Hr'g 107-618 (vol. 1) at 33 (Ex. C265).)

545.    Mr. Roach was never deposed in any Enron-related litigation.

### (iii)    September 2002 to November 2003 Bankruptcy Examiner's Reports

546.    On December 2, 2001, and on certain dates thereafter, Enron and certain of its affiliates filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code with the United States Bankruptcy Court for the Southern District of New York. (Final Rpt. of Neal Batson, Court-Appointed Examiner at 1 (Ex. C272).)

547.    On May 22, 2002, the United States Trustee appointed Neal Batson, of Alston & Bird LLP, as examiner.  (Final Rpt. of Neal Batson, Court-Appointed Examiner at 1, 137 (Ex. C272).)  On May 24, 2002, the bankruptcy court approved the appointment.  (*Id.*)

548.    From September 2002 through November 2003, Mr. Batson issued a series of reports regarding his opinion whether, with respect to various entities, "there are sufficient facts to support a claim", which the bankruptcy estate could assert against those entities:

"The Examiner is not the ultimate decision maker on these matters. The Examiner has analyzed the evidence he has gathered to date against the legal standards applicable to the issues identified in this Report.  The Examiner has considered direct evidence and the reasonable inferences that can be drawn therefrom.  If there are sufficient facts to support a claim, even though there is evidence to the contrary, then a court would submit that claim to a fact-finder.  Where the Examiner reaches the conclusion that there is sufficient evidence for a fact-finder to conclude that a claim exists, the Examiner has determined that in a legal proceeding regarding such matter, the proposition would be submitted to the fact-finder for decision."  (Final Rpt. of Neal Batson, Court-Appointed Examiner at 13-14 (emphasis omitted) (Ex. C272).)

549.     On September 21, 2002, Mr. Batson issued a report titled, "First Interim Report of Neil Batson, Court-Appointed Examiner".  (First Interim Rpt. of Neal Batson, Court-Appointed Examiner (Ex. C268).)

550.     On January 21, 2003, Mr. Batson issued a report titled, "Second Interim Report of Neil Batson, Court-Appointed Examiner".  (Second Interim Rpt. of Neal Batson, Court-Appointed Examiner (Ex. C270).)

551.     On June 30, 2003, Mr. Batson issued a report titled, "Third Interim Report of Neil Batson, Court-Appointed Examiner".  (Third Interim Rpt. of Neal Batson, Court-Appointed Examiner (Ex. C271).)

552.     November 4, 2003, Mr. Batson issued a report titled, "Final Report of Neil Batson, Court-Appointed Examiner".  (Final Rpt. of Neal Batson, Court-Appointed Examiner (Ex. C272).)  Among the "financial institutions discussed in [that] Report" and the corresponding appendices is "Credit Suisse First Boston, Inc. and its affiliates and predecessors".  (*Id.* at 12 n.22 (Ex. C272).)

553.     Mr. Batson had no involvement with or personal knowledge about the events described in his report and testimony.  (Final Rpt. of Neal Batson, Court-Appointed Examiner at 1-2 (Ex. C272).)

554.   Mr. Batson was never deposed in any Enron-related litigation.

**(iv)     September 25, 2006 Fastow Declaration**

555.   On January 14, 2004, Mr. Fastow pleaded guilty to conspiracy to commit wire fraud and securities fraud.  (*United States v. Fastow*, No. 02-cr-0665 (S.D. Tex.), ECF 129, EX. 000000634 (Ex. C273).)

556.   In August and September 2006, Mr. Fastow spent "tens of hours" in meetings with attorneys representing the plaintiff class in *Newby*.  (Fastow Dep. 503:16-505:2 (Ex. C44).)  Approximately "[t]en" such meetings were held in September 2006 alone, many lasting "four to six hours".  (*Id.* at 505:3-11.)

557.   Mr. Fastow spent approximately "three or four weeks" meeting with class counsel.  (Fastow Dep. 1023:25-1024:6 (Ex. C44).)

558.   Mr. Fastow's meetings with class counsel were "held almost up to the day [Mr. Fastow was] sentenced".  (Fastow Dep. 504:20-22 (Ex. C44).)

559.   During those meetings, Mr. Fastow was shown "documents in preparation for [his] testimony" that were "in many cases, new documents, to [him]."  (Fastow Dep. 502:20-503:3 (Ex. C44).)

560.   In connection with Mr. Fastow's meetings with class counsel, class counsel prepared a declaration regarding what class counsel "understood [Mr. Fastow] to be saying" in response to class counsel's "questions regarding events at Enron, with a particular focus . . . on some of the defendants in this lawsuit".  (Fastow Dep. 506:10-17 (Ex. C44).)

561.   On September 25, 2006, Mr. Fastow signed the declaration.  (Fastow Dep. 505:12-20 (Ex. C44).)

562.   On September 25, 2006, Paul Howes, counsel for the *Newby* class, wrote a letter to Judge Kenneth Hoyt, who presided over Mr. Fastow's criminal case and sentencing.

(Letter from P. Howes to Hon. Kenneth M. Hoyt (Sept. 25, 2006) (Ex. C277).)  In that letter, Mr. Howes wrote that Mr. Fastow's "testimony [in the Enron civil actions] will mean justice for investors—the recovery of billions from Enron's banks."  (*Id.* at 1.)

563.    On September 26, 2006, class counsel filed Mr. Fastow's declaration in the *Newby* action.  (*Newby v. Enron Corp.*, No. 01-cv-3624 (S.D. Tex. Sept. 26, 2006, ECF 5048 (Ex. C280).)

564.    On September 26, 2006, Mr. Fastow's sentencing hearing was held. (*United States v. Fastow*, No. CR-H-2-665 (S.D. Tex. Sept. 26, 2006), ECF 197 (Ex. C279).)

565.    Mr. Howes spoke on behalf of Mr. Fastow at his sentencing hearing. Mr. Howes asserted that Mr. Fastow "is prepared . . . to tell the banks' role that is so essential for the investors to have any chance of getting their money back".  (Tr. of Sentencing at 10:8-11, *United States v. Fastow*, No. CR-H-02-665 (S.D. Tex. Sept. 26, 2006) (Ex. C278); Fastow Dep. 502:5-6 (Ex. C44).)

566.    Mr. Fastow "expect[ed] to receive" a sentence of "[t]en years".  (Fastow Dep. 502:2-4 (Ex. C44).)  He was in fact sentenced to 72 months.  (*United States v. Fastow*, No. CR-H-2-665 (S.D. Tex.), ECF 197 (Ex. C279).)

567.    Following his sentencing, Mr. Fastow was remanded to a Federal Detention Center in Houston, Texas.  (Fastow Dep. 508:19-509:1 (Ex. C44).)

568.    On October 12, 2006, the lead plaintiff in *Newby* moved to dismiss all claims against Mr. Fastow in that case.  (Agreed Mot. for Voluntary Dismissal of Andrew Fastow, *Newby v. Enron Corp.*, No. 01-cv-3624 (S.D. Tex. Oct. 12, 2006), ECF 5099 (Ex. C281).)  On October 31, 2006, the court granted the lead plaintiff's motion.  (*Id.*; Revised

Order Granting Agreed Mot. for Voluntary Dismissal of Andrew Fastow, *Newby v. Enron Corp.*, No. H-01-3624 (S.D. Tex. 2006), ECF 5151 (Ex. C282).)

### (v)      October 23 to November 2, 2006 Fastow Deposition

569.     Mr. Fastow testified that as "[a]n outcome of [his] meetings" with class counsel "was [his] agreement to make [him]self available for the deposition" in *Newby*.  (Fastow Dep. 503:24-504:3 (Ex. C44).)

570.     Mr. Fastow understood that "[his] lawyer's time [was] being paid for", either by class counsel or the lead plaintiff.  (Fastow Dep. 504:7-11 (Ex. C44).)

571.     To prepare specifically for his deposition, Mr. Fastow spent several days meeting with class counsel and others at an office in Houston.  (Fastow Dep. 509:14-510:-24 (Ex. C44).)  He was accompanied "at all times" by "United States Marshalls".  (*Id.* at 509:18-9.)

572.     "[T]hree or four" of Mr. Fastow's meetings with class counsel were held at the Federal Detention Center in Houston.  (Fastow Dep. 1936:4-8; 1936:16-1937:12 (Ex. C44).)

573.     At his deposition, Mr. Fastow testified that he "do[es]n't know from firsthand knowledge" "who designed the share trusts that [Enron] did with CSFB".  (Fastow Dep. 239:12-18 (Ex. C44).)

574.     Mr. Fastow testified, "[M]y understanding, from what I was told when I was at Enron, was that Mr. Nath was the primary architect of the share-trust structures."  (Fastow Dep. 1056:21-23 (Ex. C44).)

575.     Mr. Fastow testified, "People who worked for me at Enron led me to believe that Mr. Nath was primarily responsible for the minority interest structure, Nighthawk, Condor, Whitewing, Osprey, Marlin, and . . . Firefly. . . .   That's my recollection.  They gave him credit for that."  (Fastow Dep. 1056:23-1057:4 (Ex. C44).)

576.     Mr. Fastow testified, "I will say that I do not have firsthand knowledge, because I do—do not recall attending the Osprey meetings . . . but . . . I have secondhand knowledge based upon what Enron employees who reported to me told me about who they gave credit to for the creation of that structure."  (Fastow Dep. 1057:19-24 (Ex. C44).)

577.     Mr. Fastow testified that he was "not a primary person involved in executing [the Marlin] deal".  (Fastow Dep. 1062:6-11 (Ex. C44).)

578.     Mr. Fastow testified that he has no "firsthand knowledge" concerning Firefly.  (Fastow Dep. 1067:3-10 (Ex. C44).).

579.     Mr. Fastow testified that he has no "firsthand knowledge" regarding the Nile and Nikita transactions.  (Fastow Dep. 1031:12-1032:2 (Ex. C44).)

580.     Mr. Fastow testified that he has no "firsthand knowledge" of "any oral side deal on the 3 percent equity that was given to CSFB or DLJ" concerning the Nile, Nikita or Iguana transactions.  (Fastow Dep. 1035:8-17 (Ex. C44).)

581.     Mr. Fastow testified that, with respect to the "CSFB prepay" that closed in December 2000, he "w[as] not at the so-called deal execution level, the day-to-day level of getting the deal done".  (Fastow Dep. 1022:14-24, 1029:5-12 (Ex. C44).)  Mr. Fastow testified that he did not "have firsthand knowledge of the deal execution level, of how Enron interfaced with CSFB on that transaction or what was said between CSFB and Enron".  (*Id.* at 1029:13-19 (Ex. C44).)

582.     Mr. Fastow testified that he did not recall having "any personal knowledge of CSFB being involved in the accounting decisions that Enron made with respect to the Rhythms hedge" nor "any personal knowledge of CSFB being involved in the decisions that

Enron made about how to disclose the Rhythms hedge on Enron's financial statements".
(Fastow Dep. 1087:11-20 (Ex. C44).)

### D.   Zero Notes Offering

#### (a)   Private Placement

583.   On January 31, 2001, Enron issued an Offering Memorandum identifying
Salomon Smith Barney Inc., J.P. Morgan Securities Inc., Deutsche Banc Alex. Brown Inc., Banc
of America Securities LLC and Barclays Capital Inc. as "Initial Purchasers" of certain Zero
Coupon Convertible Senior Notes (the "Zero Notes") in a private placement pursuant to S.E.C.
Rule 144A and Regulation S.  (Offering Mem., ENE-STARO-01095 at 139, 141 (Ex. C233).)

584.   The Initial Purchasers were permitted to resell or otherwise transfer the
Zero Notes to third parties under S.E.C. Rule 144A and Regulation S.  (Offering Mem., ENE-
STARO-01095 at 141-42 (Ex. C233).)

585.   On February 7, 2001, Enron and the Initial Purchasers entered a
Registration Rights Agreement concerning the Zero Notes.  (Reg. Rights Agmt., SlvC003753
at 755 (Ex. C235).)

586.   Credit Suisse did not participate in the private placement of the Zero
Notes.  (*See generally* Offering Mem., ENE-STARO-01095 (Ex. C233); Reg. Rights Agmt.,
SlvC003753 (Ex. C235).)

587.   Subsequent to the private placement, Credit Suisse acquired certain of the
Zero Notes.  (Enron Reg. Stmt. (July 13, 2001) at 44-45 (Ex. C244).)

#### (b)   Public Offering

588.   In June 2001, Enron filed a Form S-3 Registration Statement concerning
the Zero Notes dated June 1, 2001 (the "June 1 Registration Statement").  (Enron Reg. Stmt.
(June 1, 2001) (Ex. C240).)

589.   The June 1 Registration Statement identified the following "selling securityholders":

| Name | Principal amount at maturity of notes beneficially owned that may be sold hereby | Percentage of notes outstanding | Number of shares of common stock that may be sold hereby(1) | Percentage of common stock outstanding(2) | Material relationship |
|------|------|------|------|------|------|
| <S> | <C> | <C> | <C> | <C> | <C> |
| Allstate Life Insurance Company . . . . . | $ 2,050,000 | 0.11% | 11,800.83 | *% | None |
| Allstate Insurance Company. . . . . . . . | 2,450,000 | 0.13 | 14,103.43 | * | None |
| Alta Partners Holdings, LDC. . . . . . . | 15,000,000 | 0.79 | 86,347.50 | * | None |
| Argent Convertible Arbitrage Fund Ltd. . | 10,000,000 | 0.52 | 57,565.00 | * | None |
| Argent Classic Convertible Arbitrage Fund (Bermuda) Ltd. . . . . . . . | 10,000,000 | 0.52 | 57,565.00 | * | None |
| Bear, Stearns & Co. Inc. . . . . . . . . | 55,000,000 | 2.88 | 316,607.50 | * | None |
| Black Diamond Offshore, Ltd. . . . . . . | 1,748,000 | 0.09 | 10,062.36 | * | None |
| CIBC World Markets. . . . . . . . . . . . | 5,000,000 | 0.26 | 28,782.50 | * | None |
| CFFX, LLC. . . . . . . . . . . . . . . . | 19,250,000 | 1.01 | 110,812.63 | * | None |
| Deutsche Banc Alex Brown Inc. . . . . . . | 169,100,000 | 8.86 | 973,424.15 | * | None |
| Double Black Diamond Offshore, LDC. . . . | 7,869,000 | 0.41 | 45,297.90 | * | None |
| GLG Market Neutral Fund. . . . . . . . . | 500,000 | 0.03 | 2,878.25 | * | None |
| Goldman Sachs & Company. . . . . . . . . | 8,500,000 | 0.45 | 48,930.25 | * | None |
| Granville Capital Corporation. . . . . . | 42,000,000 | 2.20 | 241,773.00 | * | None |
| SAM Investments LDC. . . . . . . . . . . | 100,000,000 | 5.24 | 575,650.00 | * | None |
| RAM Trading Ltd. . . . . . . . . . . . . | 25,000,000 | 1.31 | 143,912.50 | * | None |
| HBK Master Fund L.P. . . . . . . . . . . | 129,000,000 | 6.77 | 742,588.50 | * | None |
| HighBridge International LLC. . . . . . . | 205,000,000 | 10.75 | 1,180,082.50 | * | None |
| JMG Capital Partners, LP. . . . . . . . . | 25,000,000 | 1.31 | 143,912.50 | * | None |
| JMG Triton Offshore Fund, Ltd. . . . . . | 54,000,000 | 2.83 | 310,851.00 | * | None |
| McMahan Securities Co. L.P. . . . . . . | 2,500,000 | 0.13 | 14,391.25 | * | None |
| Nomura Securities International, Inc. . . | 30,000,000 | 1.57 | 172,695.00 | * | None |
| Shelby County Trust Bank as Custodian for Citizens Security Life Insurance Company. . . . . . . . . . | 300,000 | 0.02 | 1,726.95 | * | None |
| Salomon Smith Barney Inc. . . . . . . . | 369,638,000 | 19.38 | 2,127,821.15 | * | None |
| TD Securities (USA) Inc.- Formerly Toronto Dominion (New York), Inc. . . . . . . . . . | 45,000,000 | 2.36 | 259,042.50 | * | None |
| TQA Master Plus Fund, LTD. . . . . . . . | 2,500,000 | 0.13 | 14,391.25 | * | None |
| TQA Master Fund, LTD. . . . . . . . . . | 15,000,000 | 0.79 | 86,347.50 | * | None |
| TRIBECA Investments LLC. . . . . . . . . | 70,000,000 | 3.67 | 402,955.00 | * | None |
| UBS O'Connor LLC F/B/O O'Connor Global Convertible Portfolio. . . . | 1,000,000 | 0.05 | 5,756.50 | * | None |
| UBS O'Connor LLC F/B/O  UBS Global Equity Arbitrage Master Ltd. . . . . | 10,000,000 | 0.52 | 57,565.00 | * | None |
| White River Securities L.L.C. . . . . . | 55,000,000 | 2.88 | 316,607.50 | * | None |
| Worldwide Transactions, Ltd. . . . . . . | 383,000 | 0.02 | 2,204.74 | * | None |
| Any other holder of notes or future transferee, pledgee, donee, or successor of any such holder(3) . . . . . . . . . . . . . | 419,910,000 | 22.01 | 2,417,211.92 | * | None |

```
</TABLE>
   * Less than 1%.
```

(Enron Reg. Stmt. (June 1, 2001) at 40 (Ex. C240).)

590.   In July 2001, Enron filed Amendment No. 1 to the Zero Notes Registration Statement, dated July 13, 2001 (the "July 13 Registration Statement").  (Enron Reg. Stmt. Amend. No. 1 (July 13, 2001) (Ex. C244).)

116

591.    The July 13 Registration Statement identified the following "selling securityholders":

| NAME | PRINCIPAL AMOUNT AT MATURITY OF NOTES BENEFICIALLY OWNED THAT MAY BE SOLD HEREBY | PERCENTAGE OF NOTES OUTSTANDING | NUMBER OF SHARES OF COMMON STOCK THAT MAY BE SOLD HEREBY(1) | PERCENTAGE OF COMMON STOCK OUTSTANDING(2) | MATERIAL RELATIONSHIP |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| Allstate Life Insurance Company................... | $  2,050,000 | 0.11% | 11,800.83 | *% | None |
| Allstate Insurance Company... | 2,450,000 | 0.13 | 14,103.43 | * | None |
| Alta Partners Holdings, LDC...................... | 15,000,000 | 0.79 | 86,347.50 | * | None |
| Amaranth Securities LLC ..... | 9,000,000 | 0.47 | 51,808.50 | * | None |
| Argent Convertible Arbitrage Fund Ltd.................. | 10,000,000 | 0.52 | 57,565.00 | * | None |
| Argent Classic Convertible Arbitrage Fund (Bermuda) Ltd...................... | 10,000,000 | 0.52 | 57,565.00 | * | None |
| Banc of America Securities LLC...................... | 18,500,000 | 0.97 | 106,495.25 | * | None |
| Bear, Stearns & Co. Inc. .... | 55,000,000 | 2.88 | 316,607.50 | * | None |
| Black Diamond Capital I, Ltd. ..................... | 4,000,000 | 0.21 | 23,026.00 | * | None |
| Black Diamond Offshore, Ltd...................... | 2,468,000 | 0.13 | 14,207.04 | * | None |
| Double Black Diamond Offshore LDC...................... | 10,989,000 | 0.58 | 63,258.18 | * | None |
| CIBC World Markets........... | 5,000,000 | 0.26 | 28,782.50 | * | None |
| CFFX, LLC.................... | 19,250,000 | 1.01 | 110,812.63 | * | None |
| Credit Suisse First Boston... | 105,100,000 | 5.51 | 605,008.15 | * | None |
| Deutsche Banc Alex. Brown Inc. ..................... | 169,100,000 | 8.86 | 973,424.15 | * | None |
| First Union International Capital Markets, Inc. ..... | 30,000,000 | 1.57 | 172,695.00 | * | None |
| First Union National Bank.... | 15,000,000 | 0.79 | 86,347.50 | * | None |
| GLG Market Neutral Fund...... | 500,000 | 0.03 | 2,878.25 | * | None |
| Goldman Sachs & Company...... | 46,735,000 | 2.45 | 269,030.03 | * | None |
| Granville Capital Corporation............... | 42,000,000 | 2.20 | 241,773.00 | * | None |
| SAM Investments LDC.......... | 100,000,000 | 5.24 | 575,650.00 | * | None |
| RAM Trading Ltd.............. | 25,000,000 | 1.31 | 143,912.50 | * | None |
| HBK Master Fund L.P.......... | 129,000,000 | 6.77 | 742,588.50 | * | None |
| HighBridge International LLC...................... | 205,000,000 | 10.75 | 1,180,082.50 | * | None |
| JMG Capital Partners, LP..... | 25,000,000 | 1.31 | 143,912.50 | * | None |
| JMG Triton Offshore Fund, Ltd...................... | 54,000,000 | 2.83 | 310,851.00 | * | None |
| KBC Financial Products USA... | 34,540 | 0.01 | 198.83 | * | None |
| Liberty View Global Volatility Fund L.P. ...... | 10,000,000 | 0.52 | 57,565.00 | * | None |
| McMahan Securities Co. L.P. ..................... | 2,500,000 | 0.13 | 14,391.25 | * | None |
| </TABLE> | | | | | |

| NAME | PRINCIPAL AMOUNT AT MATURITY OF NOTES BENEFICIALLY OWNED THAT MAY BE SOLD HEREBY | PERCENTAGE OF NOTES OUTSTANDING | NUMBER OF SHARES OF COMMON STOCK THAT MAY BE SOLD HEREBY(1) | PERCENTAGE OF COMMON STOCK OUTSTANDING(2) | MATERIAL RELATIONSHIP |
|------|------|------|------|------|------|
| <S> | <C> | <C> | <C> | <C> | <C> |
| Nomura Securities International, Inc. ....... | 30,000,000 | 1.57 | 172,695.00 | * | None |
| Paloma Securities LLC ....... | 9,000,000 | 0.47 | 51,808.50 | * | None |
| R(2) Investments, LDC........ | 57,500,000 | 3.01 | 330,998.75 | * | None |
| Shelby County Trust Bank as Custodian for Citizens Security Life Insurance Company................... | 300,000 | 0.02 | 1,726.95 | * | None |
| Salomon Smith Barney Inc. ... | 369,638,000 | 19.38 | 2,127,821.15 | * | None |
| Spear, Leeds & Kellogg, L.P. ....................... | 4,000,000 | 0.21 | 23,026.00 | * | None |
| TD Securities (USA) Inc. -- Formerly Toronto Dominion (New York), Inc. ........ | 45,000,000 | 2.36 | 259,042.50 | * | None |
| TQA Master Plus Fund, LTD.... | 2,500,000 | 0.13 | 14,391.25 | * | None |
| TQA Master Fund, LTD......... | 15,000,000 | 0.79 | 86,347.50 | * | None |
| TRIBECA Investments LLC...... | 70,000,000 | 3.67 | 402,955.00 | * | None |
| UBS O'Connor LLC F/B/O O'Connor Global Convertible Portfolio.................. | 1,000,000 | 0.05 | 5,756.50 | * | None |
| UBS O'Connor LLC F/B/O UBS Global Equity Arbitrage Master Ltd................. | 10,000,000 | 0.52 | 57,565.00 | * | None |
| White River Securities L.L.C. ..................... | 55,000,000 | 2.88 | 316,607.50 | * | None |
| Worldwide Transactions, Ltd........................ | 543,000 | 0.03 | 3,125.78 | * | None |
| Any other holder of notes or future transferee, pledgee, donee, or successor of any such holder(3)............. | 115,540,460 | 6.05 | 665,109.00 | | None |
| </TABLE> | | | | | |

(Enron Reg. Stmt. (July 13, 2001) at 44-45 (Ex. C244).)

       592.    In July 2001, Enron filed a Prospectus relating to the Zero offering, dated July 18, 2001 (the "July 18 Prospectus").  (Enron Prospectus (July 18, 2001) (Ex. C246).)

593.   The July 18 Prospectus identified the following "selling securityholders":

| NAME | PRINCIPAL AMOUNT AT MATURITY OF NOTES BENEFICIALLY OWNED THAT MAY BE SOLD HEREBY | PERCENTAGE OF NOTES OUTSTANDING | NUMBER OF SHARES OF COMMON STOCK THAT MAY BE SOLD HEREBY(1) | PERCENTAGE OF COMMON STOCK OUTSTANDING(2) | MATERIAL RELATIONSHIP |
|------|------|------|------|------|------|
| <S> | <C> | <C> | <C> | <C> | <C> |
| Allstate Life Insurance Company................... | $ 2,050,000 | 0.11% | 11,800.83 | *% | None |
| Allstate Insurance Company... | 2,450,000 | 0.13 | 14,103.43 | * | None |
| Alta Partners Holdings, LDC...................... | 15,000,000 | 0.79 | 86,347.50 | * | None |
| Amaranth Securities LLC ..... | 9,000,000 | 0.47 | 51,808.50 | * | None |
| Argent Convertible Arbitrage Fund Ltd.................. | 10,000,000 | 0.52 | 57,565.00 | * | None |
| Argent Classic Convertible Arbitrage Fund (Bermuda) Ltd...................... | 10,000,000 | 0.52 | 57,565.00 | * | None |
| Banc of America Securities LLC...................... | 18,500,000 | 0.97 | 106,495.25 | * | None |
| BBT Fund, L.P............... | 40,000,000 | 2.10 | 230,260.00 | * | None |
| Bear, Stearns & Co. Inc. .... | 55,000,000 | 2.88 | 316,607.50 | * | None |
| Black Diamond Capital I, Ltd. ..................... | 4,000,000 | 0.21 | 23,026.00 | * | None |
| Black Diamond Offshore, Ltd...................... | 2,468,000 | 0.13 | 14,207.04 | * | None |
| Double Black Diamond Offshore LDC...................... | 10,989,000 | 0.58 | 63,258.18 | * | None |
| CIBC World Markets........... | 5,000,000 | 0.26 | 28,782.50 | * | None |
| CFFX, LLC................... | 19,250,000 | 1.01 | 110,812.63 | * | None |
| Credit Suisse First Boston... | 105,100,000 | 5.51 | 605,008.15 | * | None |
| Deutsche Banc Alex. Brown Inc. ..................... | 169,100,000 | 8.86 | 973,424.15 | * | None |
| First Union International Capital Markets, Inc. ..... | 10,000,000 | 0.52 | 57,565.00 | * | None |
| First Union National Bank.... | 15,000,000 | 0.79 | 86,347.50 | * | None |
| GLG Market Neutral Fund...... | 500,000 | 0.03 | 2,878.25 | * | None |
| Goldman Sachs & Company...... | 46,735,000 | 2.45 | 269,030.03 | * | None |
| Granville Capital Corporation................ | 14,500,000 | 0.76 | 83,469.25 | * | None |
| SAM Investments LDC.......... | 100,000,000 | 5.24 | 575,650.00 | * | None |
| RAM Trading Ltd.............. | 25,000,000 | 1.31 | 143,912.50 | * | None |
| HBK Master Fund L.P.......... | 129,000,000 | 6.77 | 742,588.50 | * | None |
| HighBridge International LLC...................... | 205,000,000 | 10.75 | 1,180,082.50 | * | None |
| HSBC Trustee, Zola Managed Trust...................... | 1,600,000 | 0.08 | 9,210.40 | * | None |
| JMG Capital Partners, LP..... | 25,000,000 | 1.31 | 143,912.50 | * | None |
| JMG Triton Offshore Fund, Ltd...................... | 54,000,000 | 2.83 | 310,851.00 | * | None |
| KBC Financial Products USA... | 6,000,000 | 0.32 | 34,539.00 | * | None |
| Liberty View Global Volatility Fund L.P. ...... | 10,000,000 | 0.52 | 57,565.00 | * | None |
| Lyxor Master Fund........... | 1,400,000 | 0.07 | 8,059.10 | * | None |
| McMahan Securities Co. L.P. ..................... | 2,500,000 | 0.13 | 14,391.25 | * | None |
| Morgan Stanley & Co. ........ | 100,000,000 | 5.24 | 575,650.00 | * | None |
| </TABLE> | | | | | |

```
                        PRINCIPAL AMOUNT AT
                        MATURITY OF NOTES
                        BENEFICIALLY OWNED     NUMBER OF SHARES
                        THAT MAY BE       PERCENTAGE OF   OF COMMON STOCK    PERCENTAGE OF
                        SOLD HEREBY         NOTES         THAT MAY BE        COMMON STOCK     MATERIAL
  NAME                                    OUTSTANDING     SOLD HEREBY(1)    OUTSTANDING(2)   RELATIONSHIP
  ----                  ------------------  -----------   ---------------   --------------   ------------
  <S>                   <C>                 <C>           <C>               <C>              <C>
  Nomura Securities
    International, Inc. ....... 30,000,000   1.57          172,695.00          *             None
  Paloma Securities LLC .......  9,000,000   0.47           51,808.50          *             None
  R(2) Investments, LDC........ 57,500,000   3.01          330,998.75          *             None
  Shelby County Trust Bank as
    Custodian for Citizens
    Security Life Insurance
    Company...................     300,000   0.02            1,726.95          *             None
  Salomon Smith Barney Inc. ... 369,638,000 19.38        2,127,821.15         *             None
  Spear, Leeds & Kellogg,
    L.P. .....................   4,000,000   0.21           23,026.00          *             None
  TD Securities (USA) Inc. --
    Formerly Toronto Dominion
      (New York), Inc. ....... 45,000,000   2.36          259,042.50          *             None
  TQA Master Plus Fund, LTD....  2,500,000   0.13           14,391.25          *             None
  TQA Master Fund, LTD......... 15,000,000   0.79           86,347.50          *             None
  TRIBECA Investments LLC...... 70,000,000   3.67          402,955.00          *             None
  UBS O'Connor LLC F/B/O
    O'Connor Global Convertible
    Portfolio..................  1,000,000   0.05            5,756.50          *             None
  UBS O'Connor LLC F/B/O UBS
    Global Equity Arbitrage
    Master Ltd................. 10,000,000   0.52           57,565.00          *             None
  White River Securities
    L.L.C. ................... 55,000,000   2.88          316,607.50          *             None
  Worldwide Transactions,
    Ltd.......................     543,000   0.03            3,125.78          *             None
  Zola Partners, L.P. .........  3,000,000   0.16           17,269.50          *             None
  Any other holder of notes or
    future transferee, pledgee,
    donee, or successor of any
    such holder(3)............ 11,075,000   0.58           63,753.00          *             None
  </TABLE>
```

(Enron Prospectus (July 18, 2001) at 44-45 (Ex. C246).)

594.   In August 2001, Enron filed Prospectus Supplement No. 1 relating to the

Zero Notes offering, dated August 3, 2001 (the "August 3 Prospectus Supplement").  (Enron

Prospectus Supp. No. 1 (Aug. 3, 2001) (Ex. C248).)

595.    The August 3 Prospectus Supplement amended the July 18 Prospectus "to

include additional entities as selling securityholders and to list the current amounts of securities

held by securityholders previously listed".  (Enron Prospectus Supp. No. 1 (Aug. 3, 2001)

(Ex. C248).)  That disclosure stated:

| NAME | PRINCIPAL AMOUNT AT MATURITY OF NOTES BENEFICIALLY OWNED THAT MAY BE SOLD HEREBY | PERCENTAGE OF NOTES OUTSTANDING | NUMBER OF SHARES OF COMMON STOCK THAT MAY BE SOLD HEREBY(1) | PERCENTAGE OF COMMON STOCK OUTSTANDING(2) | MATERIAL RELATIONSHIP |
|---|---|---|---|---|---|
| AIG SoundShore Opportunity Holding Fund Ltd........................... | $ 4,940,000 | 0.26% | 28,437.11 | *% | None |
| AIG SoundShore Holdings Ltd.............. | 8,687,000 | 0.46 | 50,006.72 | * | None |
| AIG SoundShore Strategic Holding Fund Ltd............................... | 2,973,000 | 0.16 | 17,114.07 | * | None |
| Alpha U.S. Sub Fund VIII, LLC........... | 500,000 | 0.03 | 2,878.25 | * | None |
| BBT Fund, LP........................... | 65,000,000 | 3.41 | 374,172.50 | * | None |
| Credit Suisse First Boston............. | 23,000,000 | 1.21 | 132,399.50 | * | None |
| Deephaven Domestic Convertible Trading Ltd................................. | 18,750,000 | 0.98 | 107,934.38 | * | None |
| Goldman Sachs & Company................. | 52,255,000 | 2.74 | 300,805.91 | * | None |
| Innovest Finanzdienstleistungs......... | 935,000 | 0.05 | 5,382.33 | * | None |
| JMG Convertible Investments LP.......... | 7,500,000 | 0.39 | 43,173.75 | * | None |
| JMG Capital Partners LP................. | 2,500,000 | 0.13 | 14,391.25 | * | None |
| JP Morgan Securities Inc................ | 54,040,000 | 2.83 | 311,081.26 | * | None |
| KBC Financial Products USA.............. | 21,000,000 | 1.10 | 120,886.50 | * | None |
| Knight Securities LP................... | 750,000 | 0.04 | 4,317.38 | * | None |
| Nicholas Applegate Investment Grade Convertible........................... | 30,000 | 0.01 | 172.70 | * | None |
| Royal Bank of Canada.................... | 30,000,000 | 1.57 | 172,695.00 | * | None |
| Victory Capital Management as Agent for the Key Trust Convertible Securities Fund................................. | 430,000 | 0.02 | 2,475.30 | * | None |
| Victory Capital Management as Agent for the EB Convertible Securities Fund..... | 2,440,000 | 0.13 | 14,045.86 | * | None |
| Victory Capital Management as Agent for the Charitable Convertible Securities Fund................................. | 2,270,000 | 0.12 | 13,067.26 | * | None |
| Victory Capital Management as Agent for the Field Foundation of Illinois....... | 110,000 | 0.01 | 633.22 | * | None |
| Victory Capital Management as Agent for the GenCorp Foundation................. | 100,000 | 0.01 | 575.65 | * | None |
| Victory Capital Management as Agent for the Parker Key/Convertible............. | 570,000 | 0.03 | 3,281.21 | * | None |
| Victory Capital Management as Investment Manager for Health Foundation of Greater Cincinnati..................... | 350,000 | 0.02 | 2,014.78 | * | None |
| Victory Capital Management as Investment Manager for Potlatch.................... | 1,600,000 | 0.08 | 9,210.40 | * | None |
| Victory Capital Management as Agent for the Union Security Life Insurance Co... | 90,000 | 0.01 | 518.09 | * | None |
| Victory Capital Management as Agent for the Victory Invest Quality Bond Fund... | 230,000 | 0.01 | 1,324.00 | * | None |
| Victory Capital Management as Agent for the Key Trust Fixed Income Fund........ | 550,000 | 0.03 | 3,166.08 | * | None |
| Victory Capital Management as Agent for the Charitable Income Fund............. | 360,000 | 0.02 | 2,072.34 | * | None |

(*Id.*)

596.    In August 2001, Enron filed Prospectus Supplement No. 2 relating to the

Zero Notes offering, dated August 15, 2001 (the "August 15 Prospectus Supplement").  (Enron

Prospectus Supp. No. 2 (Aug. 15, 2001) (Ex. C250).)

597.    The August 15 Prospectus Supplement amended the July 18 Prospectus, as previously supplemented, "to include additional entities as selling securityholders and to list the current amounts of securities held by securityholders previously listed".  (Enron Prospectus Supp. No. 2 (Aug. 15, 2001) (Ex. C250).)  That disclosure stated:

| NAME | PRINCIPAL AMOUNT AT MATURITY OF NOTES BENEFICIALLY OWNED THAT MAY BE SOLD HEREBY | PERCENTAGE OF NOTES OUTSTANDING | NUMBER OF SHARES OF COMMON STOCK THAT MAY BE SOLD HEREBY(1) | PERCENTAGE OF COMMON STOCK OUTSTANDING(2) | MATERIAL RELATIONSHIP |
|------|------|------|------|------|------|
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` |
| Conseco Annuity Assurance - MultiBucket Annuity Convert. Bond Fund............. | $ 8,000,000 | 0.42% | 46,052.00 | * | None |
| Credit Lyonnais Securities (USA) Inc..... | 12,500,000 | 0.66 | 71,956.25 | * | None |
| First Union International Capital Markets, Inc...................... | 40,000,000 | 2.10 | 230,260.00 | * | None |
| Granville Capital Corporation............ | 4,500,000 | 0.24 | 25,904.25 | * | None |
| UBS AG London Branch..................... | 250,000,000 | 13.10 | 1,439,125.00 | * | None |
| UBS Wasburg LLC.......................... | 800,000 | 0.04 | 4,605.20 | * | None |

(*Id.*)

598.    In September 2001, Enron filed Prospectus Supplement No. 3 relating to the Zero Notes offering, dated September 21, 2001 (the "September 21 Prospectus Supplement").  (Enron Prospectus Supp. No. 3 (Sept. 21, 2001) (Ex. C251).)

599.    The September 21 Prospectus Supplement amended the July 18 Prospectus, as previously supplemented, "to include additional entities as selling securityholders and to list the current amounts of securities held by securityholders previously listed".  (Enron Prospectus Supp. No. 3 (Sept. 21, 2001) (Ex. C251).)  That disclosure stated:

| NAME | PRINCIPAL AMOUNT AT MATURITY OF NOTES BENEFICIALLY OWNED THAT MAY BE SOLD HEREBY | PERCENTAGE OF NOTES OUTSTANDING | NUMBER OF SHARES OF COMMON STOCK THAT MAY BE SOLD HEREBY(1) | PERCENTAGE OF COMMON STOCK OUTSTANDING(2) | MATERIAL RELATIONSHIP |
|------|------|------|------|------|------|
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` |
| AIG Soundshore Holdings Ltd. ............ | $ 19,087,000 | 1.00% | 109,874.32 | * | None |
| AIG Soundshore Opportunity Holding Fund Ltd.  ........................ | 10,940,000 | 0.57 | 62,976.11 | * | None |
| AIG Soundshore Strategic Holding Fund Ltd.  ........................ | 6,573,000 | 0.34 | 37,837.48 | * | None |
| Continental Casualty Company ............ | 55,500,000 | 2.91 | 319,485.75 | * | None |
| Goldman Sachs & Company ................ | 67,415,000 | 3.53 | 388,074.45 | * | None |
| Julius Bear Multibond Convertbond ....... | 1,000,000 | 0.05 | 5,756.50 | * | None |

(*Id.*)

600.    In October 2001, Enron filed Prospectus Supplement No. 4 relating to the Zero Notes offering, dated October 11, 2001 (the "October 11 Prospectus Supplement").  (Enron Prospectus Supp. No. 4 (Oct. 11, 2001) (Ex. C252).)

601.    The October 11 Prospectus Supplement amended the July 18 Prospectus, as previously supplemented, "to include additional entities as selling securityholders and to list the current amounts of securities held by securityholders previously listed".  (Enron Prospectus Supp. No. 4 (Oct. 11, 2001) (Ex. C252).)  That disclosure stated:

| NAME | PRINCIPAL AMOUNT AT MATURITY OF NOTES BENEFICIALLY OWNED THAT MAY BE SOLD HEREBY | PERCENTAGE OF NOTES OUTSTANDING | NUMBER OF SHARES OF COMMON STOCK THAT MAY BE SOLD HEREBY(1) | PERCENTAGE OF COMMON STOCK OUTSTANDING(2) | MATERIAL RELATIONSHIP |
|---|---|---|---|---|---|
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` |
| CRT Capital Group LLC.................... | $    750,000 | 0.04% | 4,317.38 | * | None |
| `</Table>` | | | | | |

(*Id.*)

602.    Selecting the most recent disclosure for each entity listed as a selling securityholder in the June 1 Registration Statement, the July 13 Registration Statement, the July 18 Prospectus, the August 3 Prospectus Supplement, the August 15 Prospectus Supplement, the September 21 Prospectus Supplement and the October 11 Prospectus Supplement, and listing each such entity in descending order according to the "Principal Amount at Maturity of Notes Beneficially Owned That May Be Sold Hereby", yields the following:

| No. | Name | Principal Amount at Maturity of Notes That May Be Sold | Percentage of Notes Outstanding |
|---|---|---|---|
| 1 | Salomon Smith Barney Inc. | $369,638,000 | 19.38% |
| 2 | UBS AG London Branch | $250,000,000 | 13.10% |
| 3 | HighBridge International LLC | $205,000,000 | 10.75% |
| 4 | Deutsche Banc Alex. Brown Inc. | $169,100,000 | 8.86% |
| 5 | HBK Master Fund L.P. | $129,000,000 | 6.77% |
| 6 | Morgan Stanley & Co. | $100,000,000 | 5.24% |
| 6 | SAM Investments LDC. | $100,000,000 | 5.24% |
| 8 | TRIBECA Investments LLC. | $70,000,000 | 3.67% |

| No. | Name | Principal Amount at Maturity of Notes That May Be Sold | Percentage of Notes Outstanding |
|---|---|---|---|
| 9 | Goldman Sachs & Company | $67,415,000 | 3.53% |
| 10 | BBT Fund, LP | $65,000,000 | 3.41% |
| 11 | R(2) Investments, LDC | $57,500,000 | 3.01% |
| 12 | Continental Casualty Company | $55,500,000 | 2.91% |
| 13 | Bear, Stearns & Co. Inc. | $55,000,000 | 2.88% |
| 13 | White River Securities L.L.C. | $55,000,000 | 2.88% |
| 15 | JP Morgan Securities Inc. | $54,040,000 | 2.83% |
| 16 | JMG Triton Offshore Fund, Ltd. | $54,000,000 | 2.83% |
| 17 | TD Securities (USA) Inc. -- Formerly Toronto Dominion (New York), Inc. | $45,000,000 | 2.36% |
| 18 | First Union International Capital Markets, Inc. | $40,000,000 | 2.10% |
| 19 | Nomura Securities International, Inc. | $30,000,000 | 1.57% |
| 19 | Royal Bank of Canada | $30,000,000 | 1.57% |
| 21 | RAM Trading Ltd. | $25,000,000 | 1.31% |
| 22 | Credit Suisse First Boston | $23,000,000 | 1.21% |
| 23 | KBC Financial Products USA | $21,000,000 | 1.10% |
| 24 | CFFX, LLC | $19,250,000 | 1.01% |
| 25 | AIG Soundshore Holdings Ltd. | $19,087,000 | 1.00% |
| 26 | Deephaven Domestic Convertible Trading Ltd. | $18,750,000 | 0.98% |
| 27 | Banc of America Securities LLC | $18,500,000 | 0.97% |
| 28 | Alta Partners Holdings, LDC | $15,000,000 | 0.79% |
| 28 | First Union National Bank | $15,000,000 | 0.79% |
| 28 | TQA Master Fund, LTD. | $15,000,000 | 0.79% |
| 31 | Credit Lyonnais Securities (USA) Inc. | $12,500,000 | 0.66% |
| 32 | Double Black Diamond Offshore, LDC. | $10,989,000 | 0.58% |
| 33 | AIG Soundshore Opportunity Holding Fund Ltd. | $10,940,000 | 0.57% |
| 34 | Argent Classic Convertible Arbitrage Fund (Bermuda) Ltd. | $10,000,000 | 0.52% |
| 34 | Argent Convertible Arbitrage Fund Ltd. | $10,000,000 | 0.52% |
| 34 | Liberty View Global Volatility Fund L.P. | $10,000,000 | 0.52% |
| 34 | UBS O'Connor LLC F/B/O UBS Global Equity Arbitrage Master Ltd. | $10,000,000 | 0.52% |
| 38 | Amaranth Securities LLC | $9,000,000 | 0.47% |
| 38 | Paloma Securities LLC | $9,000,000 | 0.47% |
| 40 | Conseco Annuity Assurance - MultiBucket Annuity Convert. Bond Fund | $8,000,000 | 0.42% |
| 41 | JMG Convertible Investments LP | $7,500,000 | 0.39% |
| 42 | AIG Soundshore Strategic Holding Fund Ltd. | $6,573,000 | 0.34% |
| 43 | CIBC World Markets | $5,000,000 | 0.26% |
| 44 | Granville Capital Corporation | $4,500,000 | 0.24% |
| 45 | Black Diamond Capital I, Ltd. | $4,000,000 | 0.21% |

| No. | Name | Principal Amount at Maturity of Notes That May Be Sold | Percentage of Notes Outstanding |
|---|---|---|---|
| 45 | Spear, Leeds & Kellogg, L.P. | $4,000,000 | 0.21% |
| 47 | Zola Partners, L.P. | $3,000,000 | 0.16% |
| 48 | McMahan Securities Co. L.P. | $2,500,000 | 0.13% |
| 48 | TQA Master Plus Fund, LTD. | $2,500,000 | 0.13% |
| 48 | JMG Capital Partners, LP | $2,500,000 | 0.13% |
| 51 | Black Diamond Offshore, Ltd. | $2,468,000 | 0.13% |
| 52 | Allstate Insurance Company | $2,450,000 | 0.13% |
| 53 | Victory Capital Management as Agent for the EB Convertible Securities Fund | $2,440,000 | 0.13% |
| 54 | Victory Capital Management as Agent for the Charitable Convertible Securities Fund | $2,270,000 | 0.12% |
| 55 | Allstate Life Insurance Company | $2,050,000 | 0.11% |
| 56 | HSBC Trustee, Zola Managed Trust | $1,600,000 | 0.08% |
| 56 | Victory Capital Management as Investment Manager for Potlatch | $1,600,000 | 0.08% |
| 58 | Lyxor Master Fund | $1,400,000 | 0.07% |
| 59 | UBS O'Connor LLC F/B/O O'Connor Global Convertible Portfolio | $1,000,000 | 0.05% |
| 59 | Julius Bear Multibond Convertbond | $1,000,000 | 0.05% |
| 61 | Innovest Finanzdienstleistungs | $935,000 | 0.05% |
| 62 | UBS Wasburg LLC | $800,000 | 0.04% |
| 63 | Knight Securities LP | $750,000 | 0.04% |
| 63 | CRT Capital Group LLC | $750,000 | 0.04% |
| 65 | Victory Capital Management as Agent for the Parker Key/Convertible | $570,000 | 0.03% |
| 66 | Victory Capital Management as Agent for the Key Trust Fixed Income Fund | $550,000 | 0.03% |
| 67 | Worldwide Transactions, Ltd. | $543,000 | 0.03% |
| 68 | GLG Market Neutral Fund | $500,000 | 0.03% |
| 68 | Alpha U.S. Sub Fund VIII, LLC | $500,000 | 0.03% |
| 70 | Victory Capital Management as Agent for the Key Trust Convertible Securities Fund | $430,000 | 0.02% |
| 71 | Victory Capital Management as Agent for the Charitable Income Fund | $360,000 | 0.02% |
| 72 | Victory Capital Management as Investment Manager for Health Foundation of Greater Cincinnati | $350,000 | 0.02% |
| 73 | Shelby County Trust Bank as Custodian for Citizens Security Life Insurance Company | $300,000 | 0.02% |
| 74 | Victory Capital Management as Agent for the Victory Invest Quality Bond Fund | $230,000 | 0.01% |

| No. | Name | Principal Amount at Maturity of Notes That May Be Sold | Percentage of Notes Outstanding |
|-----|------|-------------------------------------------------------|--------------------------------|
| 75 | Victory Capital Management as Agent for the Field Foundation of Illinois | $110,000 | 0.01% |
| 76 | Victory Capital Management as Agent for the GenCorp Foundation | $100,000 | 0.01% |
| 77 | Victory Capital Management as Agent for the Union Security Life Insurance Co. | $90,000 | 0.01% |
| 78 | Nicholas Applegate Investment Grade Convertible | $30,000 | 0.01% |

603.    The June 1 Registration Statement, July 13 Registration Statement and July 18 Prospectus state, "The selling securityholders intend to distribute the notes and the shares of our common stock issuable upon conversion of the notes from time to time only as follows (if at all)".  (Enron Reg. Stmt. (June 1, 2001) at 42 (Ex. C240); Enron Reg. Stmt. Amend. No. 1 (July 13, 2001) at 45 (Ex. C244); Enron Prospectus (July 18, 2001), at 46 (Ex. C246).)

604.    On December 21, 2001, JMG Capital Partners, L.P., JMG Triton Offshore Fund, Ltd., TQA Master Fund, Ltd. and TQA Master Plus Fund, Ltd moved to be appointed lead plaintiffs of a "debt securities class" in *Newby*, based on *inter alia* their purchases of "over $1 billion of [Enron] zero coupon convertible senior notes."  (*Newby v. Enron Corp.*, No. H-01-3624 (S.D. Tex. Dec. 21, 2001), ECF 63 at 1-2 (Ex. C267).)

605.    Louise Morwick, Silvercreek's President and Rule 30(b)(6) designee, testified that the "members of the underwriting group" for the Zero Notes "contacted [Silvercreek] and suggested we looked at it."  (Morwick Dep. 443:13-444:6 (Ex. C48); Sworn Decl. Louise Morwick at 3 (Ex. C294).)  "One [member] of the underwriting group" provided Silvercreek "the offering memorandum" for the Zero Notes.  (*Id.* at 444:9-10.)  Mr. Morwick, however, could not recall which "member[] of the underwriting group" made the contact.  (*Id.* at 444:11-12.)

126

606.    Ms. Morwick testified that "CSFB contacted us" on "probably October 18", 2001, regarding the Zero Notes.  (Morwick Dep. 455:3-8 (Ex. C48).)

607.    Ms. Morwick testified that "the underwriters of the bond" contacted Silvercreek in "February '01" regarding the Zero Notes, months "before" Silvercreek was contacted by "First Boston" on October 18, 2001:

> "Q. . . . I think you testified to Mr. Levi that October 18th or around there was the date on which you had a conversation with Ms. Sara Randell from CSFB?
>
> A.  Yeah, I recall First Boston contacting us with respect to having Enron zero coupon bonds for sale.
>
> Q. . . . You said that this conversation was when this opportunity was first flagged to you; right?
>
> A.  Yes.  They -- in terms of actually initiating a position, they were the ones that brought it to our attention.
>
> . . .
>
> Q.  What exactly did you mean by first flagged?
>
> . . .
>
> THE DEPONENT:  I don't recall if I specifically used those words in terms of them contacting us with respect to having Enron bonds for sale and suggesting that we buy them.  You know, first flagged -- we looked at the Enron zero coupon bonds before.  I mean, we were contacted in February '01 by the underwriters of the bond and, you know, encouraged to look at it as an investment in February.  So I'd certainly looked at it then, and I looked at it again at some point in the summer, and was, you know, considering an investment.
>
> Q.  So October 18th, 2001, wasn't the first time you were made aware of zero coupon notes; right?
>
> A.  That's correct. . . .  I'd already read the offering memorandum. I'd looked at the prospectus and looked at it at some point in the summer."  (Morwick Dep. 535:5-536:19 (Ex. C48).)

Dated:  November 10, 2017

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP,

by

_____
Richard W. Clary
Member of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
rclary@cravath.com

*Attorney for Defendants Credit Suisse First Boston
(USA), Inc. (n/k/a Credit Suisse (USA), Inc.), Credit
Suisse First Boston LLC (n/k/a Credit Suisse Securities
(USA) LLC) and Pershing LLC (f/k/a Donaldson,
Lufkin & Jenrette Securities Corp.)*

128