IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SILVERCREEK MANAGEMENT INC., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 02-cv-8881-JPO |
| CITIGROUP, INC., et al., | ) ) | |
| Defendants. | ) ) | |

**SILVERCREEK'S MEMORANDUM IN OPPOSITION
TO CREDIT SUISSE'S MOTION FOR SUMMARY JUDGMENT**

Lyndon M. Tretter
Wollmuth Maher & Deutsch LLP
500 Fifth Avenue
New York, New York 10110
T: (212) 382-3300

Bruce S. Sperling (pro hac vice)
Eugene F. Frett (pro hac vice)
Scott F. Hessell (pro hac vice)
Sperling and Slater, P.C.
55 West Monroe, Suite 3200
Chicago, IL 60603
T: (312) 641-3200

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BRIEF FACTUAL BACKGROUND ................................................................................ 3

ARGUMENT ................................................................................................................... 7

I.  Legal Standards Governing Summary Judgment. ................................................ 7

II.  Disputes of Material Fact Preclude Summary Judgment on Credit Suisse's
Knowledge of  Enron's Fraud (Counts One, Two, Three and Nine). ................. 8

A.  Actual knowledge may be shown by circumstantial evidence. ................ 10

B.  The evidence of Credit Suisse's actual knowledge of Enron's fraud is
overwhelming; a jury must determine which version of the facts to credit. ........... 11

1.  Andrew Fastow's testimony alone is sufficient to create a dispute of
material fact regarding Credit Suisse's knowledge. ..................................... 11

2.  Credit Suisse admits knowledge of Enron's fraud. ........................... 14

3.  Credit Suisse's development of and participation in Enron's deceptive
transactions is sufficient to support an inference of actual knowledge. ......... 16

4.  Credit Suisse's remaining evidentiary objections lack merit. ......................... 18

III.  Silvercreek's Justifiable Reliance on Enron's and Credit Suisse's False Statements
is a  Matter for Trial. ....................................................................................... 19

A.  Material issues of disputed face preclude summary adjudication that Silvercreek
did not justifiably rely upon Enron's reported financial statements. ........................ 22

B.  Material issues of disputed fact preclude summary adjudication that Silvercreek
did not in fact rely upon representations made by Credit Suisse. ............................. 26

1.  Silvercreek's reliance on Ms. Randell's representations is disputed. ............. 26

2.  Silvercreek's reliance on Credit Suisse analyst reports is disputed. .............. 28

C.  Material issues of disputed face preclude summary adjudication
that Silvercreek's reliance on Credit Suisse was not justified. ................................. 29

1.  Credit Suisse's misrepresentations were not puffery. ..................................... 29

2.  Silvercreek's reliance on Credit Suisse's misstatements
was not unjustifiable as a matter of law. ......................................................... 30

IV.  The Existence of a Special Relationship between Credit Suisse and Silvercreek
Cannot  Be Decided as a Matter of Law (Count Five). ...................................... 30

V.  The Evidence Establishes That Credit Suisse was a Statutory Underwriter, and
Therefore Liable Under Section 11 of the Securities Act. ................................. 34

A.  Credit Suisse easily meets the definition of a statutory underwriter. ....................... 35

B.  Silvercreek never "admitted" Credit Suisse was not an underwriter. ....................... 37

i

C.   Section 11 does not require that Credit Suisse itself was "essential" to the distribution of the Zero Notes. ............................................................................ 38

CONCLUSION .................................................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*A&E Products Group, L.P. v. Mainetti U.S.A. Inc.*,
  2004 WL 345841 (S.D.N.Y. Feb. 25, 2004)...........................................................38

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
  2013 WL 837536 (S.D.N.Y. 2013)................................................................31, 34

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
  651 F. Supp. 2d 155 (S.D.N.Y. 2009)..................................................................19

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
  888 F. Supp. 2d 431 (S.D.N.Y. 2012)......................................................11, 12, 23

*Allen v. Coughlin*,
  64 F.3d 77 (2d Cir. 1995)........................................................................................7

*Amaker v. Foley*,
  274 F.3d 677 (2d Cir. 2001)....................................................................................8

*Amer. Nat. Ins. Co. v. J.P. Morgan Chase & Co.*,
  623 F Supp 2d 798 (S.D. Tex 2009)......................................................................19

*American Nat'l Ins. Co. v. Royal Bank of Canada*,
  2010 WL 9077875 (S.D. Tex. 2010)...............................................................26, 27

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................................................7

*Argent Classic Convertible Arbitrage Fund, L.P. v. Rite Aid Corp.*,
  315 F. Supp. 2d 666 (E.D. Pa. 2004)....................................................................21

*Assured Guaranty v. J.P. Morgan Investment Management, Inc.*,
  18 N.Y.3d 341 (2011)............................................................................................32

*Benson v. JPMorgan Chase Bank, N.A.*,
  2010 WL 1526394 (N.D. Cal. 2010)...............................................................10, 13

*Blake v. Race*,
  487 F. Supp. 2d 187 (S.D.N.Y. 2007)...................................................................13

*Brass v. American Film Tech., Inc.*,
  987 F.2d 142 (2d Cir. 1993)..................................................................................34

*Byrnes v. Faulkner, Dawkins and Sullivan,*
    550 F.2d 1303 (2d Cir. 1977)................................................................. 36

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ............................................................................ 19

*Cronin v. Aetna Life Ins. Co.,*
    46 F.3d 196 (2d Cir. 1995)..................................................................... 8

*Curry v. City of Syracuse,*
    316 F.3d 324 (2d Cir. 2003)................................................................... 8

*Dallas Aerospace, Inc. v. CIS Air Corp.,*
    352 F.3d 775 (2d Cir. 2003)................................................................. 30

*Days Inn Worldwide, Inc. v. Sonia Invs.,*
    2007 WL 1188028 (N.D. Tex. 2007)...................................................... 9

*De Sole v. Knoedler Gallery, LLC,*
    139 F. Supp. 3d 618 (S.D.N.Y. 2015).................................................. 20

*Dorfman Org., Ltd. V. Greater N.Y. Mut. Ins. Co.,*
    279 A.D.2d 437 (N.Y. App. Div. 2001) ............................................... 29

*Eichenholtz v. Brennan,*
    52 F.3d 478 (3d Cir. 1995)................................................................... 39

*Empire Elecs. Co. v. United States,*
    311 F.2d 175 (2d Cir. 1962)................................................................... 8

Enron. *See, e.g., P.T. Bank Cent. Asia v. ABN AMRO Bank N.V.,*
    301 A.D.2d 73 (N.Y. App. Div. 1st Dep't 2003)................................. 32

*Etheredge-Brown v. Am. Media, Inc.,*
    13 F. Supp. 3d 303 (S.D.N.Y 2014)....................................................... 8

*Fischl v. Armitage,*
    128 F.3d 50 (2d Cir. 1997)..................................................................... 9

*Freudenberg v. E\*Trade Fin. Corp.,*
    712 F. Supp. 2d 171 (S.D.N.Y. 2010).................................................. 29

*Globus v. Law Research Service, Inc.,*
    418 F.2d 1276 (2d Cir. 1969)............................................................... 35

*Halberstam v. Welch*,
    705 F.2d 472 (D.C Cir. 1983) ................................................................. 20

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983) ................................................................. 9, 40

*Heyman v. Commerce & Indus. Ins., Co.*,
    524 F.2d 1317 (2d Cir. 1975) ................................................................. 7

*Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*,
    227 F.3d 8 (2d Cir. 2000) ................................................................. 29, 31

*Hyosung Am., Inc. v. Sumagh Textile Co., Ltd.*,
    137 F.3d 75 (2d Cir. 1998) ................................................................. 7

*In re LIBOR-Based Fin. Instruments Antitrust*,
    *Litig.*, 2015 WL 6243526 (S.D.N.Y. 2015) ................................................................. 30

*In re Allou Distributors, Inc.*,
    446 B.R. 32 (Bankr. E.D.N.Y. 2011) ................................................................. 10

*In re Crazy Eddie Sec. Litig.*,
    802 F. Supp. 804 (E.D.N.Y. 1992) ................................................................. 23

*In re Enron Corp. Sec., Derivative &Litig.*,
    235 F. Supp. 2d 549, 707 (S.D. Tex. 2002) ................................................................. 35, 36

*In re Lehman Bros. Mortgage-Backed Sec. Litig.*,
    650 F.3d 167 (2d Cir. 2011) ................................................................. 38

*In re Livent, Inc. Noteholders Sec. Litig.*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001) ................................................................. 24, 26

*In re Nat'l Century Fin. Enters., Inc.*,
    846 F. Supp. 2d 828 (S.D. Ohio 2012) ................................................................. 8, 9, 18

*In re Refco Sec. Litig.*,
    759 F. Supp. 2d 301 (S.D.N.Y. 2010) ................................................................. 10, 13

*In re Refco, Inc. Sec. Litig.*,
    2008 WL 3843343 (S.D.N.Y. Aug. 14, 2008) ................................................................. 39

*In re Vivendi*, S.A. Sec. Litig.,
    838 F.3d 223 (2d Cir. 2016) ................................................................. 34

*Jeffreys v. City of New York*,
  426 F.3d 549 (2d Cir. 2005)....................................................................... 13

*Johnston v. Norton*,
  886 F. Supp. 403 (S.D.N.Y. 1995) ............................................................... 9

*JP Morgan Chase Bank v. Winnick*,
  350 F. Supp. 2d 393 (S.D.N.Y. 2004)........................................................ 20

*JP Morgan Chase Bank v. Winnick*,
  406 F. Supp. 2d 247 (S.D.N.Y. 2005)........................................................ 16

*Kimmell v. Schaefer*,
  89 N.Y.2d 257 (1996) ................................................................................. 31

*Koleinimport "Rotterdam" N.V. v. Foreston Coal Export Corp.*,
  283 F. Supp. 184 (S.D.N.Y. 1968) ............................................................ 16

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*,
  182 F.3d 157 (2d Cir. 1999)......................................................................... 7

*Neogenix Oncology, Inc., v. Gordon*,
  133 F.Supp.3d 539 (E.D.N.Y. 2015) ......................................................... 20

*Neri v. R.J. Reynolds Tobacco Co.*,
  2000 WL 33911224 (N.D.N.Y. Sept. 28, 2000) ........................................ 23

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)....................................................................... 29

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015)............................................................................... 35

*Oster v. Kirschner*,
  77 A.D.3d 51 (N.Y. App. 2010) ................................................................. 10

*Pension Comm. Of Univ. of Montreal Pension Plan v. Ban of Am. Sec., LLC*,
  652 F. Supp. 2d 495 (S.D.N.Y. 2009)........................................................ 10

*S.E.C. v. Lee*,
  720 F. Supp. 2d 305 (S.D.N.Y. 2010)........................................................ 34

*Salim v. Mitchell*,
  268 F. Supp. 3d 1132 (E.D. Wash. 2017) .................................................. 19

*SEC v. Kern*,
    425 F.3d 143 (2d Cir. 2005) .................................................................................. 36

*SEC v. Lybrand*,
    200 F. Supp. 2d 384 (S.D.N.Y. 2002) ............................................................. 36, 39

*SEC v. Universal Express, Inc.*,
    475 F. Supp. 2d 412 (S.D.N.Y. 2007) .................................................................. 38

*Sheth v. N.Y. Life Ins. Co.*,
    273 A.D.2d 72 (N.Y. App. Div. 2000) ................................................................. 29

*Silvercreek Mgmt. Inc. v. Citigroup, Inc.*,
    248 F. Supp. 3d 428 (S.D.N.Y. 2017) ............................................................ *passim*

*Silvercreek Mgmt., Inc. v. Salmon Smith Barney, Inc.*,
    2003 WL 23305555 (S.D. Tex. Dec. 11, 2003) ................................................ 25, 32

*Smith v. Ameriquest Mortg. Co.*,
    60 A.D.3d 1037 (N.Y. App. 2009) ....................................................................... 34

*Stuart Silver Assoc. v. Baco Dev. Corp.*,
    245 A.D.2d 96 (N.Y. App. Div. 1st Dep't 1997) .................................................. 24

*United States v. Owens*,
    699 F. Supp. 815 (C.D. Cal. 1988) ...................................................................... 14

*United States v. Santoro*,
    302 F.3d 76 (2d Cir. 2002) .................................................................................. 34

*Villani v. National Marine Corp.*,
    No. 04-CV-00654JTC, 2008 WL 1995121 (W.D.N.Y. May 6, 2008) ..................... 9

*Wang v. Hearst Corp.*,
    203 F. Supp. 3d 344 (S.D.N.Y. 2016) ................................................................... 8

*Wantanabe Realty Corp. v. City of New York*,
    315 F. Supp. 2d 375 (S.D.N.Y. 2003) .................................................................. 13

*Wight v. BankAmerica Corp.*,
    219 F.3d 79 (2d Cir. 2000) ............................................................................. 11, 13

*Wilson v. Corelogic SafeRent, LLC*,
    No. 14-CV-2477 (JPO), 2017 WL 4357568 (S.D.N.Y. Sept. 29, 2017) ................... 7

**Statutes**

15 U.S.C. § 77b(a)(11).................................................................................................. 35, 39

15 U.S.C. § 77k(a) ........................................................................................................... 35

15 U.S.C. § 77k(a)(5) ...................................................................................................... 39

**Rules**

Fed. R. Civ. P. 56............................................................................................................... 7

Fed. R. Civ. P. 56(c)(2) ................................................................................................... 19

Fed. R. Evid. 602 ............................................................................................................. 14

Fed. R. Evid. 803(8) ........................................................................................................ 19

Federal Rules of Evidence 702 ........................................................................................ 19

**INTRODUCTION**

Credit Suisse asks the Court to deny Silvercreek a trial, requesting summary judgment on each of Silvercreek's claims against it: aiding and abetting fraud (Count I), conspiracy (Count II), aiding and abetting negligent misrepresentation (Count III), negligent misrepresentation (Count V), violation of Section 11 of the Securities Act of 1933 (Count VI), and violation of the Texas Securities Act (Count Nine). Because the record is replete with disputes of material fact, Credit Suisse's motion should be denied.

In 2001, Plaintiffs (together, "Silvercreek")[1] invested over $120 million in two convertible debt securities issued by Enron Corporation ("Enron"), then the seventh largest company in the U.S., with an equity cushion of $20 billion. Silvercreek made its investment (i) on the recommendation of defendant Credit Suisse (USA), Inc.[2] ("Credit Suisse"), which knew Silvercreek's convertible debt investment strategy and highlighted the Enron debt to Silvercreek as appropriate for that strategy; (ii) on the strength of Enron's reported financial statements and investment grade credit rating; and (iii) based on positive analyst coverage from Credit Suisse and others. In Silvercreek's eyes, having already earned a substantial return on an Enron debt instrument, this was an investment in senior debt; the only risk was bankruptcy. Based on Silvercreek's analysis of Enron's financial statements and its review of information provided by Credit Suisse, the major credit agencies and others, the risk of an Enron bankruptcy was near to zero, especially gives the short

---

[1] Plaintiff Silvercreek Management Inc. had discretionary investment authority for plaintiffs Pebble Limited Partnership, Silvercreek Limited Partnership, OIP Limited, and Silvercreek II Limited. *See* Plaintiffs' Response to Credit Suisse's Local Rule 56.1 Statement and Counterstatement of Disputed Facts ("PSOF") ¶ 7.  Per the Court's Individual Practices in Civil Cases, Silvercreek consolidated its Rule 56.1 Response with its counterstatement of disputed facts. PSOF ¶¶ 1-607 refers to Plaintiffs' responses to Credit Suisse's Local Rule 56.1 Statement; PSOF ¶¶ 608-1039 refers to Plaintiffs' counterstatement of disputed facts. The exhibits submitted with the PSOF are cited as "P-CS [#]."

[2] Formerly known as Credit Suisse First Boston (USA), Inc., and successor in interest to Donaldson, Lufkin and Jenrette Securities Corporation ("DLJ"). PSOF ¶¶ 22-23

time horizon for these investments, nine months and two years.

Silvercreek, however, did not know what Credit Suisse knew: Enron was hiding billions of dollars in debt through convoluted financing schemes, many of them Credit Suisse's handiwork. The extent of Enron's indebtedness – highly relevant to a convertible debt investor like Silvercreek – was not disclosed in the registration statements for the two Enron debt securities that Silvercreek purchased (the Zeros and the 7% Notes), the former underwritten by Credit Suisse; was not disclosed in the prospectuses; was not disclosed in Enron's financial statements and SEC filings; and was not disclosed by Credit Suisse's analysts who rated Enron securities "STRONG BUY" until days before Enron filed for bankruptcy.

Credit Suisse, though, acted on its knowledge that Enron had substantial undisclosed debt, substantially reducing its own credit exposure to Enron, including by selling Enron bonds directly to Silvercreek. The end result, unforeseeable to Silvercreek but a known risk to Credit Suisse, was bankruptcy, the materialization of which caused Silvercreek's injury.

Credit Suisse's one-sentence footnote – "[t]he legal standards for summary judgment are well-established" – is telling for what it does not say. (CS Br. at 8 n.3) Credit Suisse shoulders the heavy burden to show that there remains no material dispute of fact for a jury to resolve, but its submission doesn't come close. Even on Credit Suisse's cherry-picked record, summary judgment is not appropriate without asking the Court to do precisely what it cannot: resolve conflicts in testimony and documents; give Credit Suisse the benefit of the doubt in interpreting the evidence; and draw impermissible inferences from the evidence in Credit Suisse's favor.

Silvercreek, not Credit Suisse, is entitled to have the evidence viewed in the light most favorable to its claims; it is entitled to all reasonable inferences that flow from that evidence; and it is entitled to a trial unless no reasonable jury could find in its favor. These principles are indeed well-established, and they require Credit Suisse's motion to be denied.

## BRIEF FACTUAL BACKGROUND

Silvercreek sets forth a detailed recitation of the evidence in support of its claims in its contemporaneously-filed response to Credit Suisse's statement of facts and counterstatement of disputed facts. Therefore, it will only summarize certain key facts here.

**Silvercreek's investment strategy:** Silvercreek is not and never has been a distressed debt investor, nor was Silvercreek's investment in Enron debt securities a risky "convertible arbitrage" strategy. PSOF ¶¶ 88-92, 610-620. Prior to Enron, in over thirty years in the investment industry, including twenty-five in hedge funds, neither Ms. Morwick nor Silvercreek ever invested in a company that filed for bankruptcy. *Id.* ¶¶ 88, 620. They have no distressed debt expertise or training and were so inexperienced at dealing with distressed securities that when the Enron bankruptcy hit, they sought advice from a distressed investor colleague. *Id.* ¶¶ 88, 618, 620. Silvercreek's investment approach primarily involves lower-risk convertible debt securities, focusing on cash flow and fundamental valuation of companies. *Id.* ¶¶ 86, 610-616.

**Silvercreek's purchase of Enron debt securities in reliance on Credit Suisse:** Silvercreek's investment in Enron Zeros was triggered by a discussion with Credit Suisse, with whom Silvercreek had a longstanding business relationship and who was also an underwriter of the Zeros. PSOF ¶¶ 218-20, 233-37, 606-607, 681-687. Silvercreek's primary Credit Suisse contact, Sara Randell, spoke with Louise Morwick on the telephone on a daily basis. PSOF ¶¶ 107-08. Ms. Morwick recalls receiving telephone calls from Credit Suisse recommending the Zeros as an investment opportunity: "Strong company. You know, a bit of noise in the market currently, but you know, very strong credit." PSOF ¶¶ 218-20, 233-37, 248-51, 681-82. Ms. Randell highlighted Enron bonds as an investment that would make sense for Silvercreek's investment strategy; "a good yield for a good credit." *Id.* at ¶¶ 218, 233, 235-237. This recommendation was typical of Ms. Randell's interactions with Silvercreek: she would call Ms. Morwick with particular ideas about

investments relevant to Silvercreek's convertible debt strategy. *Id.* ¶ 681. In October 2001, Ms. Morwick had several phone conversations with Ms. Randell regarding Enron. *Id*. ¶¶ 276, 686.

In addition, Silvercreek reviewed and considered Credit Suisse analyst reports issued in and before October 2001, which repeatedly and unambiguously recommended investment in Enron securities, downplayed so-called negative "news," and dispelled any notion of impending bankruptcy. PSOF ¶¶ 168-179, 191-195, 205-206, 266, 704-707. In none of these conversations, analyst reports or the prospectus for the Zeros did Credit Suisse disclose that: (i) Credit Suisse had participated in transactions enabling Enron to manipulate its financial statements; (ii) Credit Suisse knew Enron's financial statements overstated Enron's earnings and cash flow from operations, and massively understated Enron's indebtedness; (iii) Credit Suisse's insider knowledge and concerns about Enron's hidden debt resulted in a decision by Credit Suisse to reduce its own exposure to Enron credit; or (iv) Credit Suisse discouraged its analysts from downgrading Enron, actively used its positive analyst reports to curry favor with Enron, and even allowed its investment bankers to edit analyst reports to more favorably depict Enron and the attractiveness of Enron securities. PSOF ¶¶ 524-529, 998-1031, 743-757.

**Enron's massive fraud is revealed, resulting in bankruptcy and loss to Silvercreek:** On November 8, 2001, Enron announced its intention to restate its annual financial statements for the years 1997, 1998, 1999, 2000 and for the first two quarters of 2001. PSOF ¶ 715. The announced restatement revealed: that Enron's net income was overstated (by over $500 million), its debt was understated (by over $2.5 billion), and its equity was overstated (by over 2.25 billion). *Id.* ¶ 716.  On December 2, 2001, Enron filed for bankruptcy protection. PSOF ¶ 546.

**Credit Suisse knowingly and substantially participated in Enron's fraud**: The extensive record of documents and testimony readily establishes that Credit Suisse structured and engaged in all manner of fraudulent disguised debt transactions at the heart of Enron's fraud. From

4

1999 onward, Credit Suisse was one of Enron's top "Tier One" Banks, earning more in fees than any other Tier One Bank in 1999, and earning the dubious label as Enron's "Best Bank" North America in 2001. PSOF ¶¶ 298-299, 744-746.

The depth and breadth of Credit Suisse's knowledge and involvement in Enron's finances cannot be overstated: underwriting 30 Enron-related debt transactions, participating in 54 revolving credit facilities, selling Enron assets, and most importantly financing, structuring, and advising on nearly a dozen deceptive transactions, including: (1) LJM related-party transactions, (2) $300 million in fake asset "sales," (3) two $150 million prepays, (4) $4.3 billion share trust transactions; and (5) a $750 million minority-interest deal. *Id.* PSOF ¶¶ 743, 747, 749-750 1032-1035, 1037-1039.

In the FAS 125/140 asset "sales," Credit Suisse-designed share trusts, and $750 million "Rawhide" minority-interest transactions, Credit Suisse worked with Enron to hide debt and inflate cash flow from operations through use of specific purpose entities ("SPE") controlled by Enron and not remotely independent. PSOF ¶¶ 846-893 (FAS 125/140);[3] 894-974 (share trusts); 975-997 (minority interest). The essence of each transaction, most of which were executed at or near Enron's quarter/year-end, involved agreeing to "sell" an asset to an SPE created by debt and "equity" financing supplied by Credit Suisse. In these transactions, Credit Suisse loaned money to Enron to "monetize" unsellable assets, which it knew would not be reported on Enron's balance sheet as

---

[3] In its Counterstatement, Silvercreek cites to and relies upon the opinions of Saul Solomon, an expert retained by the *Newby* class. PSOF ¶ 1034. Mr. Solomon issued a report (P-CS 11), an appendix to his report (P-CS 16), and a rebuttal report responding to the opinions of experts retained by the bank defendants (P-CS 15). Mr. Solomon was deposed for three days and was questioned by counsel for each of the Bank defendants remaining in this matter. Under these circumstances, Credit Suisse is not prejudiced by the Court's consideration of the Solomon reports. *Beyer v. Anchor Insulation Co.*, 2017 WL 784962, at *3-*4 (D. Conn. 2017) (declining to exclude testimony of expert designated by co-defendant where party could show no prejudice, having received expert's reports and deposed expert); *S.E.C. v. Koenig*, 557 F.3d 736, 743-44 (7th Cir. 2009) (district court did not err by permitting testimony of expert witness disclosed to opposing party; party was not prejudiced where counsel "had his report, had been at the deposition, and for all we know had a platoon of non-testimonial experts analyze everything [the expert] wrote and said").

debt, because Credit Suisse's loans included "purchasing" the equity in the SPEs dealing with the Enron assets. None of the entities were independent from Enron, the circuitous movement of Enron assets and lending served no legitimate business purpose, Enron continued to control those assets and guaranteed, through either structural features or oral assurances, repayment of Credit Suisse's equity, thereby violating GAAP's 3% "at risk" equity rule, necessary to avoid consolidation. PSOF ¶¶ 911-920 (Osprey non-consolidation improper); ¶¶ 951-959, 962-964 (Marlin I & II structure guaranteed repayment of Credit Suisse equity); ¶¶ 985-999 (Rawhide equity "100% Enron risk"). The Credit Suisse-designed share trust transactions where Enron avoided recording $4.3 billion in debt were particularly egregious since Credit Suisse bankers understood Osprey and Marlin were "vehicle[s] enabling Enron to raise disguised debt which appears as equity on Enron's balance sheet" and "serves the added purpose for Enron of being an off-balance sheet parking lot for certain [distressed] assets." PSOF ¶¶ 909-911.

In the two oil prepays, Credit Suisse itself created the false appearance of a $150 million commodity trade by running the loan through Credit Suisse's oil trading desk (over their objection) even though it did not involve any commodities risk at all. Credit Suisse executives repeatedly acknowledged "its really a loan to Enron," admitted the transactions, as designed, eliminated commodities risk, and that Enron was going to hide the loans in "price risk management liabilities" instead of debt. PSOF ¶¶ 433-458, 782-828. For example, Credit Suisse traders questioned whether it was "ok" to be "entering into such an 'obvious loan' transaction?" since "I am being asked to quote on a structure for Enron that enables Enron to borrow USD that are treated as price risk management rather than debt on balance sheet." *Id.* ¶¶ 433, 817; *see also id.* ¶¶ 814-819 (collecting documents and evidence Credit Suisse knew prepays were loans).

As one of two limited partners in LJM1, Credit Suisse structured and capitalized a sham

entity to establish a fake hedge against a position in a volatile Internet stock (Rhythms Netconnections), which was used by Enron to avoid a $135.5 million writedown. PSOF ¶¶ 758-767. Even Credit Suisse's purported "investment" in LJM1 was a fiction—Enron guaranteed repayment of Credit Suisse's "at risk" equity, and followed through on its commitment. *Id.* ¶¶ 376, 771. After Fastow helped Credit Suisse monetize its $7.5 million LJM investment into a 300% return, Credit Suisse agreed to Fastow's "quid for the pro quo" of extending $30 million of additional credit to allow LJM2 (yet another "unconsolidated" entity) to engage in sham asset "sales," even though it prompted one Credit Suisse banker to lament, "I think I need to go take a shower and go to confession soon." PSOF ¶¶ 793-797 & P-CS 83.

## ARGUMENT

### I.   Legal Standards Governing Summary Judgment.

Summary judgment can only be granted if "there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Courts act with caution in deciding whether to grant summary judgment, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986), because summary judgment is a "drastic device" that "cuts off a party's right to present his case to the jury," *Heyman v. Commerce & Indus. Ins., Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975). Thus, summary judgment is proper only if "no reasonable trier of fact could find in favor of the non-moving party." *Wilson v. Corelogic SafeRent, LLC*, No. 14-CV-2477 (JPO), 2017 WL 4357568, at *2 (S.D.N.Y. Sept. 29, 2017) (citing *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995)).

As the movant, Credit Suisse bears the heavy burden of showing the absence of a genuine issue of any material fact for trial. *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999) (citation omitted); *Hyosung Am., Inc. v. Sumagh Textile Co., Ltd.*, 137 F.3d 75, 77 (2d Cir. 1998). Only if the moving party meets its burden of production to show the

absence of a genuine issue regarding any material fact does the burden shift to the party opposing summary judgment to introduce additional evidentiary matter. *Amaker v. Foley*, 274 F.3d 677, 680-81 (2d Cir. 2001) (Sotomayor, J.).

In reviewing the summary judgment record, "the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995); *Etheredge-Brown v. Am. Media, Inc.*, 13 F. Supp. 3d 303, 305 (S.D.N.Y 2014) (same). This is especially true when the inferences the party seeks to draw deal with questions of "motive, intent, and subjective feelings and reactions." *Empire Elecs. Co. v. United States*, 311 F.2d 175, 180 (2d Cir. 1962). In this regard, "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *Wang v. Hearst Corp.*, 203 F. Supp. 3d 344, 349 (S.D.N.Y. 2016) (citing *Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003)).

Silvercreek respectfully submits that there are genuine disputes as to the material facts which require denial of Credit Suisse's motion.

## II. Disputes of Material Fact Preclude Summary Judgment as to Credit Suisse's Knowledge of Enron's Fraud (Counts One, Two, Three and Nine).

Credit Suisse asserts that it lacked knowledge of Enron's fraud: Credit Suisse's involvement in Enron's manipulations was "limited"; Credit Suisse sought representations from fraudfeasor Enron that its accounting treatment passed muster; and Credit Suisse's contemporaneous written admissions should be interpreted with the help of self-serving *post hoc* testimony. (CS Br. at 23-37.) At most, Credit Suisse's submission "takes small chips out of the mountain of evidence" presented by Silvercreek. *In re Nat'l Century Fin. Enters., Inc.*, 846 F. Supp. 2d 828, 871 (S.D. Ohio 2012) (applying New York law, denying Credit Suisse's motion for summary judgment on

claim that it aided and abetted its client's fraud).[4] Although Credit Suisse will have the opportunity to present its interpretation of the evidence to the jury, it cannot ask this Court to credit it here. To do so would require impermissible credibility determinations and weighing of the evidence.[5]

The record discloses triable issues of fact with respect to each set of allegations previously identified by the Court as sufficient to allege Credit Suisse's knowledge (*see Silvercreek Mgmt. Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 443 (S.D.N.Y. 2017)):

- Credit Suisse had a long and close relationship with Enron, which made it privy to material facts about Enron's financial condition not known to the investing public (PSOF ¶¶ 743-752);

- Credit Suisse bankers knew Enron had billions in additional, disguised debt and, in fact, knew before recommending Enron debt securities to Silvercreek the total amount of Enron's debt was closer to $36 billion (PSOF ¶¶ 506, 512, 515, 753-754);

- Credit Suisse participated in, helped structure, invested in, and lent to transactions in which Enron hid underperforming assets and debt, including transactions in which Credit Suisse purchased phantom "equity" in SPEs that were actually loans to Enron (PSOF ¶¶ 846-893 (Nile and Nikita phony asset sale transactions); 894-974 (Osprey, Marlin and Firefly "share trust" deals); 975-997 (Rawhide "minority interest" transaction));

- Credit Suisse participated in prepay transactions to help Enron manipulate its fi-

---

[4] In *National Century*, Credit Suisse, who was the offending company's lender and underwriter on certain notes, raised identical summary judgment attacks on aiding and abetting and conspiracy claims for its involvement in a Ponzi scheme perpetrated by the company's executives. The Court canvased and analyzed applicable New York law and rejected Credit Suisse's effort to try the case on motion for summary judgment rather than face a jury on disputed facts such as its knowledge. Though not binding on this Court, it presents a thorough analysis of New York law on the same issues presented by Credit Suisse's motion.

[5] Credit Suisse makes much of Silvercreek's burden of persuasion for fraud claims under New York law, *i.e.*, "clear and convincing evidence." Once it is determined that a material issue of fact remains for trial, it will be for the jury, not this Court, to weigh the evidence and determine whether Silvercreek has met its burden. *See Villani v. National Marine Corp.*, 2008 WL 1995121, at *4-*5 (W.D.N.Y. 2008) (having determined genuine issue of material fact existed, court declined to weigh evidence to determine as matter of law that evidence was not "clear and convincing"; to do so would "usurp the jury function of assessing the weight of the evidence") (citing *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). Furthermore, Plaintiffs' claims for negligent misrepresentation, aiding and abetting negligent misrepresentation, violation of the Securities Act of 1933 and violation of the Texas Securities Act all require proof by a preponderance of the evidence. *Johnston v. Norton*, 886 F. Supp. 403, 404 (S.D.N.Y. 1995) (negligent misrepresentation); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 379 n.7 & 388-391 (1983) (claims under the securities laws); *Days Inn Worldwide, Inc. v. Sonia Invs.*, 2007 WL 1188028, at *3 (N.D. Tex. 2007) (Texas Securities Act).

nancial reports by providing cash to Enron upfront to be paid later—again, the functional equivalent of a loan (PSOF ¶¶ 798-845);

- Credit Suisse helped Enron design a structure to allow Enron to engage in hedging transactions on non-arm's length terms, with awareness of the true nature of the transaction and Enron's intent to fraudulently report it (PSOF ¶¶ 761-764, 766, 776-777, 779-780);

- Internal Credit Suisse emails support the inference of knowledge. ("Is it OK for us to be entering into such an 'obvious' loan transaction?"); (describing Enron as a "house of cards").) (PSOF ¶¶ 817; 519-523; *see also* § II.B.2 *infra*); and

- Credit Suisse realized outsized profits from its relationship with Enron (PSOF ¶¶ 744, 746, 966).

This evidence alone is more than sufficient to submit the question of Credit Suisse's "actual knowledge" to the jury.

## A.    Actual knowledge may be shown by circumstantial evidence.

"Actual knowledge" can be proven by admissions, direct testimony, or circumstantial evidence. An admission of knowledge is not required (although the record contains several such admissions); actual knowledge is subject to proof by circumstantial evidence. *Oster v. Kirschner*, 77 A.D.3d 51, 56 (N.Y. App. 2010); *see also Pension Comm. Of Univ. of Montreal Pension Plan v. Ban of Am. Sec., LLC*, 652 F. Supp. 2d 495, 503-04 (S.D.N.Y. 2009) (denying summary judgment; denials of actual knowledge are "subject to an assessment of credibility," sufficient circumstantial evidence of actual knowledge). For example, proof of substantial involvement in transactions assisting the primary violator's fraud is evidence of actual knowledge. *In re Refco Sec. Litig.*, 759 F. Supp. 2d 301, 334-35 (S.D.N.Y. 2010) (law firm's knowledge of fraud "more than plausible" given extensive involvement with and knowledge of defendant's business); *In re Allou Distributors, Inc.*, 446 B.R. 32, 55-56 (Bankr. E.D.N.Y. 2011) (participating in allegedly fraudulent transactions sufficient to support inference of actual knowledge, precluding summary judgment); *Benson v. JPMorgan Chase Bank, N.A.*, 2010 WL 1526394, at *4 (N.D. Cal. 2010) (bank's close business relationship with fraudfeasor supported inference of actual knowledge of Ponzi scheme).

Likewise, proof of motive and opportunity supports an inference of actual knowledge. *In re Refco*, 759 F. Supp. at 335; *see also Wight v. BankAmerica Corp.*, 219 F.3d 79, 92 (2d Cir. 2000) ("clear opportunity and a strong financial motive" supported inference of knowledge of underlying fraud). Actual knowledge is also proven by evidence defendant's assistance was provided "despite misgivings," or the defendant's conscious avoidance of facts showing the existence of fraud. *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 431, 477-78 (S.D.N.Y. 2012) (denying summary judgment; defendant's assistance to fraudfeasor despite misgivings regarding appropriateness of underlying transaction sufficient to create issue of fact as to defendant's actual knowledge).

**B.      There is substantial evidence of Credit Suisse's actual knowledge of Enron's fraud.**

Credit Suisse's contention that discovery has "disproven" its actual knowledge is based, almost entirely, upon facts subject to genuine dispute, which precludes summary judgment.

**1.      Andrew Fastow's testimony creates a disputed issue of material fact regarding Credit Suisse's knowledge.**

Andrew Fastow was the Chief Financial Officer of Enron from March 1998 to October 2001. PSOF ¶ 49. In deposition testimony, Mr. Fastow testified that based on what Credit Suisse's bankers said to him, Credit Suisse had a "very good understanding" of Enron's assets. *Id.* ¶ 734. For example, when he shared with Credit Suisse's Jaffe that he believed Enron's assets were over-valued, Jaffe agreed. *Id.*; *see also* PSOF ¶¶ 573-582.

Credit Suisse was one of Enron's "Tier One" banks, because Credit Suisse had the ability to structure deals to help Fastow and Enron meet its financial reporting objectives. PSOF ¶¶ 727-40). Credit Suisse bankers constantly "trolled the halls" of Enron looking for deals; Enron employees even joked that Credit Suisse's Furst "was at Enron more than some of the finance people who worked at Enron." PSOF ¶¶ 735, 536, 573.

11

Credit Suisse's Laurence Nath was the architect of many of the "structured finance" deals sold to Enron, including the share trust and LJM/Rhythms transactions, which Mr. Nath said would help Enron keep debt off its balance sheet. PSOF ¶¶ 573-580; 730-731; 738-739. Indeed, it was this "off-balance-sheet" feature that allowed Credit Suisse to charge Enron a fee premium over what it would have cost to raise on balance sheet debt which of course would have to be reported in its SEC filings. *Id.* ¶¶ 728-733. Fastow told Credit Suisse that Enron needed to report more cash flow from operations. *Id.* ¶¶ 736-737. Credit Suisse responded by bringing convoluted financing transactions to Enron for its consideration, such as share trusts, prepays, and the FAS 125/140 deals. *Id.* ¶¶ 736-738.

Part of garnering Enron's business meant Credit Suisse had to understand Enron's accounting methods in order to structure deals to meet its needs, in particular with respect to financial reporting. Along these lines, Fastow testified that, based on his conversations with its bankers, Credit Suisse understood the purpose and effect of the prepay transactions (*i.e.*, to hide debt and to create fictitious cash flow from operations). PSOF ¶ 737. It was Credit Suisse's ability to structure transactions to meet Enron's financial reporting objectives in a way that would pass muster with accountants, lawyers and ratings agencies that most impressed Fastow. He recalled Mr. Nath explaining the accounting impact of the transactions, the rating impact of the transactions, and the legal opinions that could be obtained to legitimize the transactions. PSOF ¶ 731, 738. In presenting these schemes to Enron, Nath emphasized that the structure of the transactions was proprietary to Credit Suisse, and Credit Suisse often required Enron to enter into confidentiality agreements before Nath would disclose the details. *Id.*

From this testimony alone, a reasonable jury could conclude Credit Suisse had actual knowledge of Enron's fraud. Credit Suisse was one of Enron's Tier One banks, and knew its business and its financial reporting needs. Credit Suisse knew Enron needed to take debt off of its

12

balance sheet and to increase its cash flow from operations, and then presented and implemented deceptive transactions to effectuate those goals. *See In re Refco*, 759 F. Supp. 2d at 334-35 (law firm's knowledge of fraud "more than plausible" given extensive involvement with and knowledge of defendant's business); *Benson*, 2010 WL 1526394, at *4. Fastow's testimony is also sufficient to show knowledge through Credit Suisse's motive and opportunity: through its "proprietary" structures Credit Suisse captured a fee premium over what it could earn from ordinary balance sheet financing. *In re Refco*, 759 F. Supp. at 335; *Wight*, 219 F.3d at 92.

Because Mr. Fastow's testimony undermines Credit Suisse's ability to meet its burden to show the absence of a material issue for trial, Credit Suisse asks the Court to ignore it. (CS Br. at 27-28). Credit Suisse dismisses Mr. Fastow's 2,000 page deposition and detailed declaration as "testimony," and calls it a "product" – in Credit Suisse's view a bargained-for exchange between Fastow and class counsel. *Id.* These are nothing more than attacks on Mr. Fastow's credibility— grounds for denying summary judgment, not for granting it. *See Wantanabe Realty Corp. v. City of New York*, 315 F. Supp. 2d 375, 393 n.110 (S.D.N.Y. 2003) (disbelief of opposing party's witness does not meet burden on summary judgment; "specific bases for possible impeachment" are credibility issues for trier of fact). Credit Suisse has no authority to support its request to just disregard Fastow's testimony. The limited circumstances where a Court may weigh the credibility of witness testimony on summary judgment are not present here. *Cf. Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (affirming summary judgment where the only evidence supporting plaintiff's claim was the plaintiff's own "contradictory and incomplete testimony"); *see Blake v. Race*, 487 F. Supp. 2d 187, 202-03 (S.D.N.Y. 2007) (*Jeffreys* rule cannot be relied upon to disregard testimony of non-party witness on credibility grounds).

Credit Suisse also asks the Court to conclude that Mr. Fastow lacked personal knowledge, insisting his testimony was "manufactured," "written by class counsel" and included "assertions

of defendants' state of mind that Mr. Fastow could not possibly know." (CS Br. at 28). To the contrary, Mr. Fastow's testimony is more than sufficient to establish his personal knowledge—Mr. Fastow's observations were based upon what he said to Credit Suisse bankers and what they said to him, bringing his testimony well within Rule 602's requirements for testimony based on personal perception. *E.g.*, P-CS 6 at 345:5-9; 1796:7-11; PSOF ¶¶ 573-82; *see* Fed. R. Evid. 602 advisory committee's note to 1972 amendment ("[P]ersonal knowledge is not an absolute but may consist of what the witness thinks he knows from personal perception."). This Court may disregard Mr. Fastow's testimony only if *no reasonable juror* could conclude Fastow had personal knowledge regarding the substance of his testimony. *United States v. Owens*, 699 F. Supp. 815, 817-18 (C.D. Cal. 1988) (Fed. R. Evid. 602 permits exclusion by judge only where no reasonable juror could find personal knowledge). Given Mr. Fastow's testimony, and viewing it in the light most favorable to Plaintiffs, summary judgment must be denied as to Credit Suisse's knowledge of Enron's fraud.

### 2. Credit Suisse admits knowledge of Enron's fraud.

The record contains a number of Credit Suisse admissions that a reasonable jury could conclude are sufficient to show its knowing participation in Enron's fraud. A few examples, any of which are sufficient to defeat summary judgement include:

- In June 1999, Credit Suisse assisted Enron in developing LJM1, a structure that Credit Suisse's Jeffe admitted "at the time and even today the idea of somebody selling something to themselves representing both sides was something I had never seen." PSOF ¶¶ 383, 763.

- Credit Suisse knew the LJM RhythmsNet put was a sham, because Credit Suisse "would not purchase this entire put at any price" and Enron "would have to take a significant discount" to sell it on the open market. PSOF ¶¶ 760, 770.

- In July 1999, Credit Suisse's Marino observed that Enron "seems to spend all of its available man hours on various convoluted financing schemes." PSOF ¶ 776; PSOF ¶ 398 (disputing meaning of email).

- An internal DLJ email in September 1999 circulated among several Credit Suisse bankers was candid about what was going on in the share-trust transactions: "As

you probably know, Osprey is a vehicle enabling Enron to raise disguised debt which appears as equity on Enron's balance sheet. ... Osprey serves the added purpose for Enron of being an off-balance-sheet parking lot for certain assets." PSOF ¶¶ 909, 363.

- In August 2000, Credit Suisse's Abib, when told Fastow would persuade Enron to lift the restrictions on Enron stock contributed to LJM1, and thereby pay Credit Suisse $5mm profit on its 5-month $7.5 mm "investment" in LJM1, stated "Why am I surprised by Andy's message – I think that I need to go take a shower and go to confession soon." PSOF ¶ 796.

- Credit Suisse analysts repeatedly told the market Enron was a "STRONG BUY" with aggressive stock targets and, as early as October 2000, were telling friends and family to steer clear. PSOF ¶¶ 1005-1010. Even worse, Credit Suisse muzzled one of its analysts who wanted to downgrade Enron from Attractive to Hold but allowed her to communicate her real rating to Credit Suisse's London trading desk to avoid further Enron losses on Credit Suisse's part. PSOF ¶¶ 1011-1017.

- On November 26, 2000, Credit Suisse analyst Salles nonetheless wrote to Credit Suisse Enron analyst Curt Launer, describing Enron's financial reporting of a structured finance deal as "clear as mud…" PSOF ¶ 1008.

- Credit Suisse knew the oil swap prepays were simply a "$150mm oil-linked loan to Enron" that Credit Suisse investment bankers "instructed us to execute on their behalf." PSOF ¶ 810. Credit Suisse's oil desk "didn't want to do" the deal, and required a guarantee from investment banking. *Id*. ¶ 823.

- Credit Suisse's Emmett asked about the 2000 prepay, "Is it OK for us to be entering into such an 'obvious' loan transaction" PSOF ¶ 678. Credit Suisse's Emmett observed that "Enron basically wants to move a loan that is on-balance sheet, off-balance sheet …." PSOF ¶¶ 817, 811.

- Credit Suisse's Moran, Director of Credit Products, knew Enron wanted "to have [the prepay] appear as a swap, and have it accounted for in their price risk management book," even though "it really is a loan to [Enron]" PSOF ¶ 815. Credit Suisse's Emmett admitted the net effect of the 2000 prepay was Credit Suisse to "lend" $150 million to Enron through a "circular transaction." *Id*. ¶ 818.

- Despite Credit Suisse's knowledge of the purpose for the 2000 prepay (*i.e.*, to raise off-balance sheet debt), Credit Suisse knew Enron wanted the prepay documentation to be "as standard as possible and DO NOT include any representations on accounting driven transactions." PSOF ¶¶ 829-837.

- In September 2001, Credit Suisse renewed the December 2000 Prepay, noting on the credit memo "but it is really a loan to ENE." PSOF ¶ 816.

- On October 19, 2001, Credit Suisse's Yellen emailed Credit Suisse's Abib, stating, "[E]very time i read about enron's latest travails i think about your ominous warnings 2 years ago that the 'house of cards' may some day collapse. i certainly never believed it then. hopefully we're still making good money on that account anyway. it seems like we are." On October 21, Abib responded to Yellen: "We are still making $$$ at ENE but look out!" PSOF ¶¶ 519-523 (disputing meaning of email); P-

CS 125.

- On October 22, 2001, Credit Suisse's DeVries emailed a friend "I hope you listened to me on ENE . . .," Enron was "all smoke [and] mirrors accounting," but Credit Suisse "made a bundle" on the LJM Partnerships. PSOF ¶ 1010.

- Credit Suisse learned from Fastow in late August 2001 that Enron had $36 billion in combined on/off balance sheet debt, while reported financials reflected only $12 billion in debt, prompting Credit Suisse to rapidly reduce its own credit exposure to Enron from $950 million in July to $125 million right before Enron's bankruptcy. PSOF ¶¶ 754-757; 506-513.

Credit Suisse challenges a few of these examples in its brief and statement, arguing the author's deposition testimony shows the "innocent" explanation for (i) Mr. Abib's "house of cards" comment, (ii) for Credit Suisse's knowledge of Enron's true debt picture, and (iii) for Mr. DeVries' warnings to friends and family to stay away from Enron stock. (CS Br. at 36-37.) No doubt Credit Suisse will offer additional "innocent" explanations for those documents not addressed in its brief. But this is just arguing what the evidence means and how much weight it should be given, decisions for the jury, not for the Court on summary judgment. Credit Suisse is the movant, and is not entitled to have documents and testimony read in its favor. *See, e.g., JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 254 (S.D.N.Y. 2005) (defendant's interpretation of email does not preclude inference of actual knowledge); *Koleinimport "Rotterdam" N.V. v. Foreston Coal Export Corp.*, 283 F. Supp. 184, 187-88 (S.D.N.Y. 1968) (denying summary judgment where "the parties disagree about the relevancy of some of the documents; and there is a genuine issue as to the meaning and significance of almost all of them"). A reasonable jury could believe, from these admissions alone, that Credit Suisse had actual knowledge of Enron's fraud. *Winnick*, 406 F. Supp. 2d at 255 n.5 (receipt of emails discussing allegedly fraudulent transactions sufficient to support inference of knowledge of fraudulent scheme).

### 3. Credit Suisse's development of and participation in several of Enron's deceptive transactions is sufficient to support an inference of actual knowledge.

A reasonable juror could also conclude that Credit Suisse actually knew of Enron's fraud

16

from its participation in and development of structures designed to hide Enron's debt and inflate

its earnings. The factual record regarding these transactions – the LJM structures, the prepays, the

share trust, minority interest, and FAS 125/140 transactions – is sufficient to submit the matter of

Credit Suisse's knowledge of Enron's fraud to the jury and is also disputed so as to preclude sum-

mary judgment. *See* PSOF ¶¶ 758-797, 376-432 (LJM1/2); 798-846, 433-457 (prepays); 847-894,

458-493 (FAS 125/140); 895-975, 303-375 (share trust); and 976-998 (minority interest). As Sil-

vercreek's expert Purcell explained, given Credit Suisse's involvement in complex financing trans-

actions, given its access to senior management, given its due diligence responsibilities, and given

its in-house expertise, it would be "almost inconceivable" that Credit Suisse did not "understand

almost everything about Enron's finances and financial structure, including a full appreciation of

its business operations." PSOF ¶ 752. Examiner Batson likewise concluded that Credit Suisse had

"detailed knowledge" of Enron's operations, including the overvaluation of its assets, and knew

that Enron's balance sheet did not reflect billions of dollars in debt as a result of its participation

in structured finance transactions. PSOF ¶ 1039.[6]

In response, Credit Suisse makes two principal arguments. First, Credit Suisse says, they

were not Enron's auditors or accountants, and did not decide how Enron would report transactions

on its financial statements. This argument rings hollow when faced with evidence Credit Suisse

bankers brought transactions to Enron pre-packaged to evade the demands of Enron's auditors and

to receive the blessing of lawyers and ratings agencies.  *E.g.*, PSOF 731, 738-739. So too does the

claim Credit Suisse was misled. Even if Credit Suisse did not know *everything* Enron was doing

---

[6] These expert opinions are squarely admissible under Fed R. Evid. 702.  S*ee Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F. Supp. 1314, 1372-73 (S.D.N.Y. 1982) (finding expert testimony appropriate in aiding and abetting case against accountants regarding "ordinary practices of a profession or trade to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry.") (citations omitted).

to manipulate its financial statements, it knew *enough* based on involvement in structures designed to raise debt capital but avoid disclosing the same. *See National Century*, 846 F. Supp. 2d at 872 ("Credit Suisse may not have known all of the intricacies … but substantial evidence exists to support a conclusion that Credit Suisse had sufficient knowledge to appreciate that its representations to investors were untrue.").

Credit Suisse argues, along the same lines, Enron's auditor Arthur Andersen supported Enron's accounting treatment of these transactions, and continued to do so during litigation. In passing on the legitimacy of the oil swap structure, however, Andersen did not know Credit Suisse believed the prepay was a loan with no commodity risk, which information would have been relevant to its conclusions regarding accounting treatment. PSOF ¶¶ 451, 873-874. Nor did Andersen know Credit Suisse and Enron agreed Credit Suisse's contributed "equity" in the share trust, FAS 140 and minority interest transactions was not really at risk because Enron guaranteed repayment on loan-like terms, together with paying Credit Suisse extraordinary fees. *Id*. ¶¶ 873-877. In all events, Andersen's agreement with Enron's accounting treatment only creates an issue of fact for the jury to decide; it does not definitively resolve it. *See National Century*, 846 F. Supp. 2d at 872 (denying summary judgment; third party assurances not conclusive of lack of actual knowledge; "a jury should decide whether to credit this interpretation of the evidence").

### 4.    Credit Suisse's remaining evidentiary objections lack merit.

Lastly, Credit Suisse challenges three categories of evidence: statements contained in a February 28, 2002 *Financial Times* article; the report of the Enron bankruptcy examiner, Neal Batson; and Congressional materials. These objections should be overruled or ignored as premature. First, Silvercreek does not rely upon statements in the Financial Times article in opposing Credit Suisse's motion. Second, Silvercreek agrees the Court should consider evidence relied upon by Examiner Batson in his report only if otherwise admissible—or if it can be presented at trial in

admissible form. *See* Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (party need not produce evidence in a form that would be admissible at trial to avoid summary judgment). Mr. Batson's opinions and conclusions, however, are another matter, and may properly be considered as expert opinion under Federal Rules of Evidence 702.[7] Mr. Batson is a highly respected professional whose qualifications to opine on the exceptionally complicated morass of Enron disguised debt transactions cannot seriously be questioned. As the Enron MDL Court concluded, in determining that Mr. Batson's opinions and conclusions were properly considered in denying Chase's summary judgment motion: "The Court concludes that his opinions are admissible; indeed his much praised multi-volume report is part of the record in *Newby* and has been relied upon by numerous parties and the Court." *Amer. Nat. Ins. Co. v. J.P. Morgan Chase & Co.*, 623 F Supp. 2d 798, 823 n.21 (S.D. Tex 2009) (detailing Mr. Batson's credentials).

The Court (and jury) may also properly consider the findings by Congressional committees and regulatory agencies regarding the Enron fraud as findings arising from a legally authorized government investigation. Fed. R. Evid. 803(8); *see Salim v. Mitchell*, 268 F. Supp. 3d 1132, 1158-60 (E.D. Wash. 2017) (congressional report admissible on summary judgment).

## III.   Silvercreek's Justifiable Reliance on Enron's and Credit Suisse's False Statements is a Fact Issue for Trial.

The purpose of the reliance requirement is not to blame the victim, but to identify the plaintiff who has acted so foolishly or with such willful blindness that it is legally responsible for its loss. *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 172 (S.D.N.Y. 2009) (plaintiff must show "that its reliance on the alleged misrepresentation was not so utterly

---

[7] Silvercreek disclosed its intention to rely upon Mr. Batson's opinions and conclusions by letter to all counsel of record dated September 5, 2017. Credit Suisse has not objected to that disclosure.

unreasonable, foolish or knowingly blind as to compel the conclusion that whatever injury it suffered was its own responsibility.").

This question of "justifiable" reliance is a uniquely fact intensive inquiry, and is "normally reserved for the finder of fact. . . ." *De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 647 (S.D.N.Y. 2015). Indeed, the reliance inquiry is "always nettlesome because it is so fact intensive." *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 407 (S.D.N.Y. 2004). Consequently, the question of justifiable reliance "is not usually amenable to summary judgment." *De Sole,* 139 F. Supp. 3d at 647 (denying defendants' summary judgment motion asserting lack of justifiable reliance).[8]

And, as discussed at greater length in Silvercreek's memorandum in opposition to Merrill Lynch's motion for summary judgment (at pp. 8-10, incorporated here by reference), Ms. Morwick, Silvercreek's investment decisionmaker, testified Silvercreek was looking to invest in an investment grade Enron that had the wherewithal to pay the principal (and interest) on the convertible debt securities Silvercreek was considering. To become comfortable with its decision, Silvercreek relied upon Enron's reported financial statements. Ms. Morwick's testimony also establishes Silvercreek's reliance upon Credit Suisse's representation that the Enron Zeros were a "good yield on a good credit," as well as Silvercreek's reliance upon Credit Suisse analyst reports to confirm its own analysis of Enron's public disclosures: that Enron was a solid company, and the only risk

---

[8] In a perfunctory footnoted argument, Credit Suisse suggests that the Court dismiss Silvercreek's conspiracy claim as duplicative of its aiding and abetting fraud claim. (CS Br. at 18 n.9) However, to be subject to New York's duplication rule the two claims must be "entirely duplicative." *Neogenix Oncology, Inc., v. Gordon*, 133 F.Supp.3d 539, 553 (E.D.N.Y. 2015).  And, as discussed in greater length in Silvercreek's memorandum in opposition to Merrill Lynch's motion for summary judgment (at pp. 34-35, incorporated herein by reference), the two claims are not identical: liability for conspiracy "may be based on a more attenuated relation with the principal violation . . . than in aiding and abetting."  *Halberstam v. Welch*, 705 F.2d 472, 485 (D.C Cir. 1983).  Accordingly, Credit Suisse's motion to dismiss the conspiracy claim should be denied.

to Silvercreek's investment – bankruptcy – was nowhere on the horizon. All of these sources of information were tainted by Enron and Credit Suisse's manipulative transactions. Enron's financial statements, in the words of Ms. Morwick, "were just complete garbage. They were completely wrong. They weren't even close to reality." (P-CS1 (Morwick Dep.) 374:15-25; 381:12-15.)

Credit Suisse quarrels with this evidence. It says Silvercreek's investment decisions were pure high risk bets, typical of an investor in "distressed" securities (contrary to Silvercreek's testimony); it says Silvercreek didn't care what Enron's financial statements disclosed (contrary to Silvercreek's testimony); and it says Silvercreek didn't rely on anything said by Credit Suisse's broker or analysts (again, contrary to Silvercreek's testimony). Credit Suisse goes further, suggesting that, as a matter of law, it was unreasonable for Silvercreek to rely on anything Enron or Credit Suisse said, because certain selected reports about Enron contained storm warnings that a sophisticated investor like Silvercreek should have heeded. This, too, is contradicted by Ms. Morwick, who explained why this "noise" did not affect Silvercreek's decision to invest in what it believed – and what Enron and Credit Suisse both confirmed – was a fundamentally strong company, with a $20 billion equity cushion, and an investment grade credit rating. PSOF ¶¶ 617-620, 639-649, 657-658, 665, 689-692.[9]

In other words, Credit Suisse is raising a quintessential fact dispute. Silvercreek's testimony, as well as expert opinion, supports the reasonableness of Silvercreek's reliance, and, at a minimum, raise disputed issues of fact. The jury will decide whom to believe, based on live testi-

---

[9] That Silvercreek entered into a short position with respect to the shares of EOG into which the 7% Notes were exchangeable, is not relevant to the question of Silvercreek's reliance on Enron's financial statements. As courts have recognized, short positions designed to hedge the equity component of convertible debt securities do not demonstrate a lack of reliance. *Argent Classic Convertible Arbitrage Fund, L.P. v. Rite Aid Corp.*, 315 F. Supp. 2d 666, 676 (E.D. Pa. 2004); *see* PSOF ¶ 634 (Silvercreek pre-sold EOG shares to remove market risk on the value of EOG stock).

mony, in evaluating whether Silvercreek's reliance was justified. The issue cannot be decided summarily based on isolated, out of context snippets from multiple days of deposition.

> **A.   Material issues of disputed face preclude summary adjudication of Silvercreek's reliance on Enron's financial statements.**

To argue Silvercreek did not rely on Enron's publicly-reported financial statements, Credit Suisse proposes an alternate history of Silvercreek's investment decisions that revolves exclusively around price. Silvercreek, Credit Suisse contends, was watching the movement of the equity prices that affected the conversion premium for the 7% Notes and the pricing of the Zeros; both securities provide a greater return if purchased at a lower price.

So far so good but entirely unremarkable. Silvercreek does not dispute that it paid attention to prices in deciding when to buy, as do all market participants. But Silvercreek *does* dispute that it would have bought Enron securities at any price if it knew that Enron's financial statements were fiction. As Ms. Morwick testified:

> Q.   The bottom line is you made a bet against the market, right?
>
> A.   No. We looked at the fundamentals of this business. We were investing in Enron…I think the market cap, you know, certainly the combined total cap is 20, 25 billion dollars. It's an investment based on the financials of this company and the business strength of this company. And the financials that we were basing our investment decision on were just complete garbage. They were completely wrong. They weren't even close to reality.

P-CS 1 (Morwick Dep.) at 374:15-25, 381:12-15. Ms. Morwick further testified:

> It was our belief in the historical financial information (1994 to 2000) that primarily resulted in our buying the Enron 7% notes starting October 24th and the Enron Zeros starting October 18th. We believed in the history and core strength of Enron. Hence, we believed that the October 2001 negative news about Enron represented "financial noise", was not core to the Enron business, and was not going to be material to the long term viability of the company. The one-time charge to third quarter 2001 earnings announced on October 16, 2001 was largely non-cash and represented a small percentage of Enron's total equity. This was a BBB+ rated company, with a multi-billion dollar equity market capitalization, the 7th largest company in the United States, ahead of IBM.

22

P-CS 2 (Morwick Decl.) ¶ 6. Accepting Credit Suisse's version of events necessarily requires the Court to disbelieve Ms. Morwick, which cannot be done on summary judgment, as Credit Suisse's own authority attests. *Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*, 888 F. Supp. 2d 431, 464 (S.D.N.Y. 2012) (denying summary judgment on reasonable reliance grounds: "while a jury may find … [defendants'] evidence persuasive if it is admissible and presented … at trial, I cannot give it more weight than the testimony offered by" plaintiff.").[10]

Credit Suisse argues the timing of Silvercreek's purchases shows it didn't care about Enron's financial statements, and indeed, attempted to bet against a declining market. This theory, too, runs squarely into disputed facts. Ms. Morwick testified Silvercreek viewed these disclosures as "noise" unrelated to Enron's fundamental strength. *See* PSOF ¶¶ 168-170, 173, 176, 179. Still further, each piece of negative information was followed by positive analyst coverage from Credit Suisse: Enron's $1 billion writedown; Moody's placement of Enron on review for a possible one notch downgrade (still investment grade); the announcement of an SEC inquiry; and Andrew Fastow's leave of absence. *Id.*[11]

Credit Suisse also contends Silvercreek "conducted *no* analysis of the financial health of Enron" (CS Br. at 21), simply ignoring Silvercreek's testimony of the work it did in connection

---

[10]  None of Credit Suisse's other authority supports the proposition that affirmative testimony of reliance can be disregarded to grant summary judgment.  In *Neri v. R.J. Reynolds Tobacco Co.*, 2000 WL 33911224 (N.D.N.Y. Sept. 28, 2000) the court granted the defendant's motion for summary judgment only as to those plaintiffs who had not seen the allegedly false advertisements, while denying the motion as to those plaintiffs who had seen the ads.  In *In re Crazy Eddie Sec. Litig.*, 802 F. Supp. 804, 812-13 (E.D.N.Y. 1992), the court entered summary judgment for defendants where "[n]ot one plaintiff identified a document he or she relied upon."

[11]  Credit Suisse's contention that Silvercreek continued to buy Enron securities after Egan-Jones downgraded Enron's debt to below investment grade is mistaken. PSOF ¶ 274. Silvercreek's alleged October 31, 2001 "purchase" of Zeros was merely a month-end rebalancing cross-trade between plaintiff OIP Limited and plaintiff Silvercreek Limited Partnership – not an additional investment. PSOF ¶¶ 118, 189.

with its Enron investments (including that Silvercreek was already very familiar with Enron, having made an investment in the 7% Notes in 2000). Among other things, Silvercreek (i) reviewed Enron's 10-Ks for 1999 and 2000, (ii) reviewed registration statements and the prospectuses for the 7% and Zeros (the later prospectus issued only 3 months earlier), reviewed Enron press releases and participated in Enron investor calls, (iii) reviewed Enron's 2001 3Q earnings report, (iv) confirmed Enron's investment grade credit rating with the major credit rating agencies; and (v) reviewed several current Enron analyst reports from major investment banks. PSOF ¶¶ 637-659, 683-684. Credit Suisse has no authority for its assertion that Silvercreek's due diligence was insufficient. The cases it cites are really distinguishable, given their completely inapposite facts. *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 440 (S.D.N.Y. 2001), (prior to plaintiff's investment, company publicly announced that there were "serious irregularities in the Company's financial records," and "it seems virtually certain that the company's financial results … will need to be restated.); *Stuart Silver Assoc. v. Baco Dev. Corp.*, 245 A.D.2d 96, 99 (N.Y. App. 1997) (Plaintiff invested without reading prospectus or conducting any other investigation).

Silvercreek considered and evaluated publicly available information, explaining why at the time certain "negative" news appeared to be financial noise, and did not indicate Enron was misrepresenting its financials, much less was insolvent and might file for bankruptcy in five weeks. PSOF ¶¶ 693-703. As Silvercreek's expert observed, Credit Suisse's argument is pure hindsight; although a couple of indicators may have suggested a weakening of Enron's credit, there were many other indicators that Enron's credit and core businesses remained solid, including repeated assurances in Credit Suisse analyst reports. P-CS 4 at 5.

More to the point, as Silvercreek testified in addressing the "negative" news, personnel move at large companies happen all the time. In Silvercreek's view, the departures of Skilling and Fastow were offset by the return of Ken Lay, who was supposedly the engineer of Enron's success.

PSOF ¶¶ 168, 176. The October 16, 2001 write-down was a non-recurring charge relating to non-core sectors of the company, and did not suggest that Enron's historic and current financials were no longer reliable and would have to be restated. *Id*. ¶ 169. Moreover, the core business showed a strong third quarter performance and a substantial increase in earnings over the prior year, with earnings expected to continue to increase in the ensuing 15 months. Most analysts, including Credit Suisse, reported favorably on the 3Q results. Although Moody placed Enron on credit watch, there was no suggestion of a drop below investment grade. *Id.* ¶¶ 269, 702. Meanwhile, Fitch and S&P reaffirmed their respective investment grade ratings. *Id*. ¶ 702. Finally, an SEC inquiry is not an investigation (Enron did not become the subject of an SEC investigation until October 31, 2001 at which point Silvercreek was already reducing its Enron holdings), and most inquiries do not result in a formal investigation. *Id.* ¶¶ 173, 698.

In short, Silvercreek's investment decision-making process was completely justifiable. PSOF ¶ 1037. The bits and pieces of evidence Credit Suisse presents do not trump all contrary evidence supporting Silvercreek's reliance; they only highlight the issue for trial. The evidence comports with the Enron MDL court's prior ruling, on a motion to dismiss, that there are fact issues regarding Silvercreek's reliance properly left to the trier of fact. *Silvercreek Mgmt., Inc. v. Salmon Smith Barney, Inc.*, 2003 WL 23305555, at **11-12 (S.D. Tex. Dec. 11, 2003) (finding justifiable reliance on "the offering memoranda and prospectuses of the two notes," the "glowing recommendations of Enron securities" by professional analysts; also noting, "the significance of historic financial information" and that "a company's annual and quarterly financial statements are standardly used by the market to . . . gauge Enron's long-term financial stability, the critical factor in evaluating the risk for debt securities.").[12]

---

[12] As for Credit Suisse's contention that further investigation by Silvercreek would have made a difference in ferreting out Enron's actual financial condition, the Enron MDL court observed that sophisticated Enron

For all of the reasons discussed above, Silvercreek's reliance raises disputed questions of fact that are not resolvable on summary judgment. Just because there was some negative information about Enron does not mean it was irrational to rely on Enron's financials, investment grade credit ratings, and the consensus of professional analysts that Enron was a good investment. As stated by the court in *Winnick*, even outright "hints of falsehood" (which were quite pronounced there) do not negate, as a matter of law, reliance on a company's financials. 350 F. Supp. 2d at 413 (characterizing the negative news as "background noise"). Rather, given the information in the market, "whether reliance was reasonable or justifiable is a factual question inappropriate for summary adjudication. The motion for summary judgment must therefore be denied." *Id.* at 413.

### B. Material issues of disputed fact preclude summary adjudication regarding Silvercreek's reliance on Credit Suisse's representations.

Relying on snippets of Ms. Morwick's deposition testimony, Credit Suisse contends that, as a matter of law, Silvercreek did not rely upon statements made by Credit Suisse's convertible bond desk (Sara Randell) or on statements made by Credit Suisse analysts, who touted Enron securities as a "STRONG BUY" at the same time Credit Suisse sought to shed its own exposure to Enron credit because it knew, unlike Silvercreek, that Enron was hiding billions of dollars in off-balance-sheet debt. In essence, Credit Suisse mounts nothing more than a credibility attack on Ms. Morwick's testimony, which should be left for the jury, and cannot be considered on summary judgment.

#### 1. Silvercreek's reliance on Ms. Randell's representations is disputed.

On October 18, 2001, Credit Suisse sold Silvercreek $4,000,000 in Zeros "[a]s principal for our own account" and then, the next day – October 19, sold Silvercreek an additional

---

investors were not "market scholars. Even if they had been, it is clear that Enron's opaque accounting and financial engineering survived the scrutiny of highly sophisticated market participants and observers for years." *Amer. Nat. Ins. Co. v. Royal Bank of Canada*, 2010 WL 9077875, at *44 (S.D. Tex. 2010).

$4,000,000 in Zeros, also from its own account. PSOF ¶¶ 126-27, 171-72. The opportunity to invest in the Zeros in October 2001 was brought to Silvercreek by Credit Suisse; although the Zeros had recently re-emerged as an investment possibility, Silvercreek was not actively considering the Zeros until Credit Suisse called. PSOF ¶¶ 218, 681; P-CS 18 ¶ 8. At the time, Ms. Morwick was speaking to Randell on a daily basis. PSOF ¶¶ 114, 686. Fully aware of Silvercreek's convertible debt portfolio, Credit Suisse's Randell recommended the Zeros to Silvercreek because they offered a "good yield for a good credit." PSOF ¶¶ 233-234 (Randell was one of several brokers who identified the Zeros as "a very good investment opportunity. Strong company. You know, bit of noise in the markets currently, but, you know, very strong credit."); *see also* P-CS 1 at 457:16-458:8 (Ms. Randell told Ms. Morwick that the Zeros were "attractive yield upon good credit").)[13] Silvercreek continued to discuss Enron with Credit Suisse after purchasing the Zeros. PSOF ¶¶ 256, 686. On October 22, 2001, Ms. Randell spoke with Ms. Morwick about Enron. *Id.* Just like the several other brokers with whom Ms. Morwick spoke none "raised any negative points with respect to Enron. They all viewed this company as a strong, successful business that—you know, bankruptcy wasn't on people's radar screens. It just would have been absurd to think about this company being a bankruptcy candidate." *Id.* ¶¶ 251, 686. On October 25, 2001, Credit Suisse also sold Silvercreek $2,755,751.25 in Enron 7% Notes. *Id.* ¶ 267.

Credit Suisse's own submission highlights disputes of material fact regarding Ms. Morwick's testimony, including its assertions that the testimony lacks "supporting documentation;" that Ms. Randell didn't have a regular practice of talking to Silvercreek by phone; and that Ms.

---

[13] Credit Suisse contends that Ms. Randell provided Silvercreek the opportunity to invest in the Enron Zeros through a Bloomberg "blast" to approximately 25 customers.  (PSOF 222.)  Silvercreek disputes that this "blast" was the only communication it received from Ms. Randell, and Ms. Morwick testified to representations made by Ms. Randell regarding the Zeros that are not contained in that "blast" (which only states a quantity and a price).  (*Id.*)

Randell never recommended Enron's creditworthiness. (CS Br. at 10-11) To resolve these disputes requires the Court to pick one party's version of events over another party's, which it cannot do on summary judgment.

### 2. Credit Suisse's challenge to Silvercreeks's reliance on Credit Suisse analyst reports is disputed.

In addition to Ms. Randell's recommendation of the Zeros, Silvercreek read and relied upon Credit Suisse analyst reports that uniformly and repeatedly rated Enron a "Strong Buy" with high stock price targets. PSOF ¶¶ 202, 205. In particular, these analyst reports reiterated strong support for Enron securities: (i) after the resignation of Jeffrey Skilling in August 2001 (*id.* ¶ 168 (stating "Our analysis and information indicates there are no changes or disclosure items inherent in the departure."); (ii) after Enron's reporting of a $1 billion after tax charge to earnings on October 16, 2001 (*id.* ¶ 169); (iii) by rebutting allegations relating to the LJM partnerships on October 19, 2001 (*id.* ¶ 170); (iv) after the SEC announced an inquiry with respect to related party transactions on October 19, 2001 (*id.* ¶ 173 (stating: "It is important to note that this is not an investigation at this point … There is no mention of the nature of the information requested and no apparent risk of required actions or accounting restatements."); (v) after Andrew Fastow was replaced as Chief Financial Officer on October 24, 2001 (*id.* ¶ 176 (maintaining investment grade (Baa1/BBB+) "Attractive ratings" and downplaying credit issues and liquidity concerns regarding off-balance partnerships); and (vi) after Enron drew on committed lines of credit on October 25, 2001 (*id.* ¶ 179) (stating that the move, among other things, was a "demonstration to trading markets that ENE will remain an active well capitalized participant").

Credit Suisse's apparently biased analyst reports were part of the total mix of information Silvercreek relied upon in making its decision to invest in Enron securities. PSOF ¶¶ 641, 660, 665, 704-706, PCS-18 ¶¶ 8, 12.

C.    **Material issues of disputed fact preclude summary adjudication of Silver-creek's justified reliance on Credit Suisse.**

Having itself developed the record showing a dispute of material fact as to Silvercreek's actual reliance upon Credit Suisse, the Bank changes course to contend that, as a matter of law, it was not reasonable for Silvercreek to rely upon the statements of Ms. Randell or the statements of Credit Suisse analysts. The Court, in denying Credit Suisse's motion to dismiss, previously rejected these same arguments.

### 1.    Credit Suisse's misrepresentations were not puffery.

Credit Suisse urges the Court to disregard Ms. Randell's "good credit" representation and Zeros recommendation as "mere puffery." However, Silvercreek does not contend that Ms. Randell (or Credit Suisse analysts) made faulty predictions; rather they misrepresented existing facts. *E.g.*, *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (reversing dismissal where complaint alleged statements of fact and defendant's knowledge that the contrary was true); *see also Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 190 (S.D.N.Y. 2010) (even statements characterized as puffery are actionable where "belied by conditions internally known by defendants").[14] Here, a representation that Enron was a "good yield for a good credit" and unqualified recommendation of the Zeros cannot be squared with Credit Suisse's actual knowledge Enron had billions of dollars of debt hidden off-balance-sheet, and its total debt burden was more than twice what was reported. Moreover, as shown below (at pp. 34-35), Credit Suisse's representations regarding Enron are actionable not only for what they communicated to Silvercreek, but for what they withheld. At a minimum, having chosen to tout Enron's credit, Credit Suisse had a duty to disclose what it

---

[14] *Sheth v. N.Y. Life Ins. Co.*, 273 A.D.2d 72, 74 (N.Y. App. 2000), cited by Credit Suisse, is of little value, because the court does not identify the statements found to be inactionable. *Dorfman Org., Ltd. V. Greater N.Y. Mut. Ins. Co.*, 279 A.D.2d 437, 437 (N.Y. App. 2001) and *Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20-21 (2d Cir. 2000) have no application to the alleged representations here, which are representations of existing fact rather than a prediction of future performance.

actually knew. Had it done so, Credit Suisse's recommendations would have carried little weight.

### 2. Silvercreek's reliance on Credit Suisse's misstatements was not unjustifiable as a matter of law.

Finally, Credit Suisse contends that, as a sophisticated investor, Silvercreek could not justifiably rely upon anything Credit Suisse said, particularly when it could be characterized as a sales "pitch." This is a straw man. Silvercreek does not contend that it relied solely on Ms. Randell's recommendation, or Credit Suisse's glowing analyst reports.[15] Rather, Silvercreek contends that Credit Suisse's recommendation and research contributed materially to the mix of information that Silvercreek considered in deciding whether to invest. Had Silvercreek known that Credit Suisse's analyst reports were tasked with boosting the securities of its investment banking clients, and if Silvercreek knew Credit Suisse was aware of Enron's machinations to hide debt and inflate reported income, we would not be here. But Silvercreek did not have that knowledge, while Credit Suisse did. Nor did Silvercreek have any reason to doubt Ms. Randell's representation that Enron was a good credit; this representation was consistent with Silvercreek's own analysis from publicly available information.

### IV. The Existence of a Special Relationship between Credit Suisse and Silvercreek Cannot Be Decided as a Matter of Law (Count Five).

A claim for negligent misrepresentation under New York law requires (1) that the parties stood in a special relationship imposing a duty of care on the defendant to render accurate infor-

---

[15] Silvercreek did not view Credit Suisse analyst reports as some sort of "guarantee," unlike the claim in *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6243526, at *60 (S.D.N.Y. 2015), cited by Credit Suisse. As explained above, analyst reports were data points confirming Silvercreek's own analysis of Enron's reported financial statements.  And, although Silvercreek is a sophisticated investor, it had no crystal ball allowing it to see Credit Suisse's involvement in Enron's accounting machinations or the true amount of Enron's debt. For this reason, Credit Suisse's reliance upon *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 789 (2d Cir. 2003), which involved the purchase of a used jet engine by a corporation "in the business of buying, selling, and leasing aircraft and aircraft engines" is well off the mark. *Id.* at 778.

mation, (2) the defendant negligently provided incorrect information, and (3) the plaintiff reasonably relied upon the information given. *Silvercreek*, 248 F. Supp. 3d at 452. The existence of a special relationship sufficient to support a claim for negligent misrepresentation is a "fact-intensive, case-by-case inquiry." *Id.* at 33. The "highly fact-specific" nature of this inquiry means that it "is not generally amenable to summary disposition." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 2013 WL 837536, at *3 (S.D.N.Y. 2013).[16] As correctly noted by this Court in denying defendants' motions to dismiss, the existence of a "'long-standing relationship' that included the banks' providing Silvercreek with information that they knew would be used by Silvercreek in making its investment decisions" is sufficient to show the "special relationship" required by New York law. *Silvercreek*, 248 F. Supp. 3d at 453. As discussed below, the record contains substantial facts supporting the existence of a special relationship between Credit Suisse and Silvercreek, precluding summary judgment.

Although Credit Suisse focuses on the test identified by the New York Court of Appeals in *Kimmell v. Schaefer*, 89 N.Y.2d 257 (1996) for determining whether a duty arises from "near privity," the inquiry is much simpler: because Credit Suisse sold Enron securities to Silvercreek for its own account, it was in privity with Silvercreek and had a duty not to misrepresent the facts or to omit facts necessary to make its recommendation of Enron securities not misleading. For this reason, the principle that, ordinarily, a broker owes no special duty to its nondiscretionary customer does not apply. (CS Br. at 14) Unlike a typical one-off brokerage transaction, a reasonable jury

---

[16] Buried in a footnote, Credit Suisse also contends that Silvercreek has failed to show a special relationship with Enron to support its claim for aiding and abetting negligent misrepresentation (count three). (CS Br. 17 n.8.) This is erroneous. As discussed at greater length in Silvercreek's opposition to Merrill Lynch's motion (at p. 33, incorporated herein by reference), Enron, as a publicly traded company, had a statutorily imposed duty of care in preparing and disseminating its financial statements, which alone satisfies the special relationship requirement. What's more, having chosen to speak to prospective investors, Enron had a duty to speak truthfully, which likewise supports the existence of a special relationship.

could instead conclude that Credit Suisse's solicitation of Silvercreek's Enron investment for its own account,[17] established the relationship necessary to impose upon Credit Suisse a duty of care – *i.e.*, a duty to give honest and complete information when recommending a purchase or sale. *Silvercreek*, 2003 WL 23305555, at *12 (denying motion to dismiss negligent misrepresentation claim for lack of special relationship; failure to "give complete and accurate information while providing brokerage services relating to Plaintiffs' purchases of the Enron notes during a brief period in October 2001 are sufficient to state a claim for negligent misrepresentation").[18]

Nor is Silvercreek suing Sara Randell, Silvercreek's regular contact at Credit Suisse's convertible bond desk, or Credit Suisse analysts. The relationship that forms the basis of Silvercreek's claim, to be sure, relies in part upon the acts of both Ms. Randell and the analysts touting Enron securities. But Silvercreek need not prove, for example, that Ms. Randell or Credit Suisse analysts had "unique or special expertise" (CS Br. at 15), because Silvercreek alleges (and has produced supporting evidence) that Credit Suisse had unique and special expertise – its "superior knowledge of essential facts" – created by its extensive entanglement with Enron. *See, e.g.*, *P.T. Bank Cent. Asia v. ABN AMRO Bank N.V.*, 301 A.D.2d 73, 378 (N.Y. App. Div. 1st Dep't 2003). Credit Suisse's insider status as a Tier One, Enron-favored bank, and its participation in several deceptive transactions enabling Enron's accounting fraud, gave Credit Suisse access to non-public, material information – and superior knowledge – that was not generally known or available to Silvercreek or

---

[17] Credit Suisse incorrectly asserts that there is no dispute of fact with respect to its assertion that it acted solely as agent in its Enron trades with Silvercreek. (CS Br. at 15.) Although one of the DTC confirmations reference the word "agent," hard copy trade confirmations sent to Silvercreek by Credit Suisse disclose that Credit Suisse sold the Enron Zeros "[a]s principal and for our own account." PSOF ¶ 123. This evidence raises a genuine dispute as to whether Credit Suisse was acting as principal—and thereby transferring its own Enron debt exposure to the unsuspecting Silvercreek.

[18] The Enron MDL court concluded that Silvercreek's negligent misrepresentation claim was nevertheless barred by the Martin Act, a conclusion that has since been superseded by the Court of Appeals decision in *Assured Guaranty v. J.P. Morgan Investment Management, Inc*., 18 N.Y.3d 341 (2011).

other members of the investing public.

Nonetheless, even focusing solely on Ms. Randell's ongoing relationship with Silvercreek, there remain disputed fact questions that must be resolved by a jury. Ms. Randell was assigned to service Silvercreek. PSOF ¶ 108. Ms. Randell worked with Ms. Morwick for at least two years. *Id.*; *see also* PCS-18 (Morwick Suppl. Decl.) ¶ 9. In that role, Ms. Randell communicated with Ms. Morwick on a daily basis, including by telephone. *Id.* ¶ 114, 248; P-CS 1 at 861:7-14. Ms. Randell understood Silvercreek's investment strategy, and recommended securities to Ms. Morwick based on that strategy. PSOF ¶ 74, 681. This relationship resulted in the completion of over 1,000 trades and over $1 million in commissions paid by Silvercreek to Credit Suisse in 2001 alone. P-CS 18 ¶ 10.

Silvercreek's decision to invest in Enron debt was triggered by a recommendation from Ms. Randell. PSOF ¶ 218, 681; P-CS 1 at 857:2-6. Ms. Randell told Ms. Morwick that Enron's Zeros fit Silvercreek's investment strategy, namely offering "a good yield for a good credit." *Id.* Ms. Morwick recalls receiving calls from Credit Suisse selling Enron debt as an investment opportunity: "Strong company. You know, a bit of noise in the market currently, but you know, very strong credit." PSOF ¶ 234 Ms. Randell highlighted Enron bonds as an investment that would make sense for Silvercreek's investment strategy. *Id.* ¶ 237. This recommendation was typical of Ms. Randell's interactions with Silvercreek: she would call Ms. Morwick with particular ideas about investments that were relevant to Silvercreek. *Id.* ¶ 681; P-CS 1 at 856:19-857:1.

This testimony creates a dispute of material fact regarding the nature of the relationship between Credit Suisse and Silvercreek. The reason brokers do not ordinarily have a special relationship with their customers is that "their responsibilities are, in most cases, limited to completing a single transaction." *S.E.C. v. Lee*, 720 F. Supp. 2d 305, 329 (S.D.N.Y. 2010) (denying summary judgment on negligent misrepresentation claim). The protection provided by this general rule is

lost, however, where the "broker affirmatively establishes a trust relationship by recommending a stock to his clients." *Id.* Thus, for example, a broker must disclose "excessive commissions" received from the sale of a recommended stock, even absent discretionary investment authority, because it is the broker, not the customer, selecting the securities to recommend to its client. *United States v. Santoro*, 302 F.3d 76, 81 (2d Cir. 2002);[19] *see also Abu Dhabi Commercial Bank¸* 2013 WL 837536, at *6 (denying summary judgment where broker "affirmatively solicited [plaintiffs'] investment");[20] *Smith v. Ameriquest Mortg. Co.*, 60 A.D.3d 1037, 1039-40 (N.Y. App. 2009) (personal solicitation of mortgage refinancing, including provision of information to prospective customer, created triable issue of fact as to the existence of duty of care).

Moreover, it is well established "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016); *see also Brass v. American Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (same). Thus, Credit Suisse's representation to Silvercreek that Enron was a good credit at a good yield imposed a duty to disclose what Credit Suisse actually knew about Enron's indebtedness, which alone satisfies the special relationship requirement. In sum, whether a relationship existed between Credit Suisse and Silvercreek sufficient to impose a duty of care raises material issues of disputed fact for the jury to resolve. Summary judgment on Count Five should therefore be denied.

## V.   The Evidence Establishes That Credit Suisse was a Statutory Underwriter, and Therefore Liable Under Section 11 of the Securities Act.

---

[19] Like the "excessive commissions" in *Santoro*, Credit Suisse was obligated to disclose that it was trading for its own account, in addition to disclosing known financial information regarding Enron that would be material to Silvercreek's decision to invest – *i.e.*, information tending to show that Enron was not a "good credit."

[20] Although citing the *Abu Dhabi Commercial Bank* decision for the proposition that "generic communications" regarding an investment do not create a special relationship (CS Br. at 15), Credit Suisse neglects to mention that the *Abu Dhabi* court denied summary judgment on special relationship grounds with respect to those plaintiffs who, like Silvercreek, were personally solicited to invest.  2013 WL 837536, at *6.

In Count Six of its Complaint, Silvercreek states a claim under Section 11 of the Securities Act of 1933 against Credit Suisse, *i.e.*, that (i) it was an underwriter of the Zeros, and (ii) the registration statement for the Zeros contained material misrepresentations or omissions. PSOF ¶¶ 879-891.[21] Pursuant to Section 11, underwriters like Credit Suisse are liable for material misrepresentations or omissions in a registration statement. 15 U.S.C. § 77k(a). Underwriter liability is a critical part of the Congressional objective to ensure full disclosure to investors. *Omnicare*, *Inc. v. Laborers Dist. Council Constr. Industry*, 135 S. Ct. 1318, 1331 (2015) ("Congress adopted § 11 to ensure that issuers tell the whole truth to investors.") (internal quotation marks and brackets omitted); *Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1288 (2d Cir. 1969) ("[S]ection 11 … was designed … to promote enforcement of the Act and to deter negligence by providing a penalty for those who fail in their duties. And Congress intended to impose a high standard of trusteeship on underwriters.") (internal quotation marks omitted).

## A.    Credit Suisse easily meets the definition of a statutory underwriter.

The Enron MDL court previously found Credit Suisse to be an underwriter of the Zeros. *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 235 F. Supp. 2d 549, 707 (S.D. Tex. 2002) ("*Regents I")*. And with good reason. An "underwriter" is "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking." 15 U.S.C. § 77b(a)(11). The definition of "underwriter" is to be construed broadly, "in order to include as underwriters all persons who might operate as conduits for securities being placed into

---

[21] Section 11 has no *scienter* requirement; even innocent material misrepresentations or omissions are actionable. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1323 (2015). Thus, Credit Suisse's assertion (disputed elsewhere) that it had no knowledge of Enron's misconduct is  irrelevant to Count Six.

the hands of the investing public." *SEC v. Lybrand*, 200 F. Supp. 2d 384, 393 (S.D.N.Y. 2002).

Credit Suisse operated as just such a conduit. It acquired the Zeros in the stage one private placement for the purpose of reselling them to the public in stage two. PSOF ¶¶ 590-591, 712. The Zeros registration statement specifically contemplated the role of resellers like Credit Suisse, providing that they "would be required to be named as a selling shareholder in the related prospectus and 'may be deemed to be underwriters within the meaning of the Securities Act.'" C240 at 41; C244 at 48. Credit Suisse thereby "engaged in steps necessary to the distribution of" the Zeros. *SEC v. Kern*, 425 F.3d 143, 152 (2d Cir. 2005).[22]

Moreover, Credit Suisse: (i) had the benefit of Enron's registration commitment, as set forth in the Registration Rights Agreement (C235), (ii) had the right to participate in the preparation of the registration statement and the prospectus (C235 at SlvC003769);[23] (iii) was given access to Enron's books, records, and personnel to conduct due diligence (*id.*); (iv) was included in the scope of the registration statement's requirement that it be listed as a selling securityholder in the prospectus (C244 at 44); (vi) was included in the scope of the registration statement's provision that it "may be deemed to be [an] 'underwriter' within the meaning of the Securities Act (C244 at 48);[24] and (vii) was expressly and specifically described by the registration statement as "intend[ing] to distribute the notes" (C244 at 47).

In its motion, Credit Suisse does not, and cannot, dispute any of these facts. Instead, it relies on an invented "admission" by Silvercreek, and a nonexistent legal requirement that an entity

---

[22] In light of its access to non-public information and its favorable recommendation of the Zeros, it is certainly appropriate to hold Credit Suisse responsible as an underwriter. *Regents I*, 235 F. Supp. 2d at 612.

[23] This Court has already held that such control over the registration statement's contents is alone sufficient to make it a statutory underwriter. *Silvercreek*, 248 F. Supp. 3d at 450.

[24] This fact alone has been held to be sufficient to establish underwriter status. *Byrnes v. Faulkner, Dawkins and Sullivan*, 550 F.2d 1303, 1311-12 (2d Cir. 1977).

sell a minimum quantity of securities in order to qualify as a statutory underwriter; the latter limitation is purportedly based on this Court's own opinion denying Credit Suisse's motion to dismiss Silvercreek's Section 11 claim. In so arguing, Credit Suisse misrepresents both the relevant deposition testimony and this Court's opinion.

**B.    Silvercreek never "admitted" Credit Suisse was not an underwriter.**

Credit Suisse claims that Silvercreek's corporate representative Louise Morwick, "admitted that it does not consider Credit Suisse to have been a 'member[] of the underwriting group' for the Zero Notes." (CS Br. at 37). This is a gross distortion of Ms. Morwick's testimony. She was not asked, and did not testify, whether she or Silvercreek considered Credit Suisse to be an underwriter. Rather, Ms. Morwick testified "one of the [members] of the underwriting group" contacted Silvercreek in February 2001 regarding the Zeros, but Silvercreek decided that they did not fit its strategy at that time. PSOF ¶¶ 605, 607. She later testified that Credit Suisse (then known as First Boston) solicited Silvercreek to buy Zeros in October 2001, and that this was not the first Silvercreek had heard of the Zeros because, as she previously testified, a member of the underwriting group approached Silvercreek in February. *Id*. ¶ 607, 678.

Credit Suisse's attempt to craft an "admission" from this testimony is ludicrous. According to Credit Suisse, Ms. Morwick's inability to recall which underwriter contacted her in February somehow distinguishes Credit Suisse from *all* of the underwriters, thereby "admitting" Credit Suisse was not an underwriter. But it is plain from the context Ms. Morwick was simply distinguishing between the solicitation by Credit Suisse (which she was asked about by name: "you had a conversation with Ms. Sara Randell from [Credit Suisse]?") and the earlier solicitation, which she had already attributed to one of the underwriters, whose identity she had forgotten (and therefore referred to as "the underwriters"). Credit Suisse's tortured reading of Ms. Morwick's testimony, to gin up a non-existent "admission" is hopelessly flawed, and cannot support summary

judgment.[25]

Nor would Ms. Morwick's opinion regarding Credit Suisse's status as an underwriter even matter for purposes of Section 11. The question of whether a defendant is a statutory underwriter is determined objectively; a defendant can be an underwriter regardless of its *own* subjective intent, much less that of another party. *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 432 (S.D.N.Y. 2007) ("[T]he underwriter inquiry is objective and markedly does not incorporate consideration of the actor's subjective understandings.").

### C.   Section 11 liability does not require that Credit Suisse have been "essential" to the distribution of the Zeros, only that it played a role in that distribution.

Credit Suisse next misconstrues the Court's opinion denying Credit Suisse's motion to dismiss the Section 11 claim by arguing that it can only be a statutory underwriter if it was "essential in the actual distribution of securities." (CS Br. at 38, quoting *Silvercreek*, 248 F. Supp. 3d at 450). Credit Suisse then insists that, because its holdings of Zeros were relatively small, it was not "essential" to their distribution.

This argument is refuted in the very sentence of the Court's opinion that Credit Suisse cites, but in the portion it pointedly omitted from its quotation. This Court, citing *In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F.3d 167, 178 (2d Cir. 2011), said that Credit Suisse's "***intermediary role*** is sufficient for underwriter status because it is 'essential in the actual distribution of securities.'" *Silvercreek*, 248 F. Supp. 3d at 450 (emphasis added). Thus, it is the *role* of intermediary that must be essential, not that each underwriter has to be essential for liability to attach. *See*

---

[25] Even were the Court to consider Ms. Morwick's testimony an "admission," which it is not, it certainly is not a judicial admission that binds Silvercreek, but rather an evidentiary admission subject to explanation or contradiction. *See A&E Products Group, L.P. v. Mainetti U.S.A. Inc.*, 2004 WL 345841, at *7 (S.D.N.Y. Feb. 25, 2004) (Rule 30(b)(6) testimony does not constitute judicial admission).

*also Lehman*, 650 F.3d at 178 ("[P]ersons playing **roles** essential in the actual distribution of securities qualify as underwriters.") (emphasis added). Credit Suisse does not (and cannot) point to undisputed facts showing it did not perform an intermediary role with respect to the distribution of the Zeros.

Other than its misleading quote of this Court's opinion, Credit Suisse offers no authority construing the definition of "underwriter" to contain a *de minimus* threshold requirement (not that Credit Suisse's holdings of the Zeros at the outset of the public offering – some 5.59% – would even qualify as "*de minimus*"). Such a rule would fly in the face of the statutory definition, which expressly applies to "any person" who engages in underwriting activity. 15 U.S.C. § 77b(a)(11); *see also In re Refco, Inc. Sec. Litig.*, 2008 WL 3843343, at *4 (S.D.N.Y. Aug. 14, 2008) ("[T]he breadth of the definition of 'underwriter' is intended to sweep up **all** … those who **play a role** in the distribution of the securities.") (emphasis added); *Lybrand*, 200 F. Supp. 2d at 393 ("**all persons** who might operate as conduits for securities being placed into the hands of the investing public" are "underwriters") (emphasis added).

Likewise, Section 11 itself expressly applies to "**every** underwriter with respect to such security." 15 U.S.C. § 77k(a)(5) (emphasis added). Consistent with the statutory language, in the construing the public policy bar against indemnification of underwriters, the Third Circuit has specifically rejected the contention that indemnification should be available to underwriters who "played a '*de minimis*' role in the public offering at issue" as inconsistent with Congressional intent and the policies underlying the securities laws. *Eichenholtz v. Brennan*, 52 F.3d 478, 484 (3d Cir. 1995).

The incompatibility of Credit Suisse's asserted rule with the language and policy of Section 11 is clear. By its approach, if an issuer simply engaged enough underwriters, *all of them* would be exempt from liability under Section 11, since each one arguably would not itself be "essential"

39

to the distribution. Needless to say, interpretations of the securities laws that create such technical and expansive loopholes are rejected by the courts. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 386-87 (1983) ("[W]e have repeatedly recognized that securities laws combating fraud should be construed not technically and restrictively, but flexibly to effectuate their remedial purposes.") (internal quotations and brackets omitted). Credit Suisse's Section 11 liability is clear, and it has presented no facts that would warrant a judgment in its favor, much less undisputed facts. Accordingly, its motion for summary judgment directed to the Section 11 claim should be denied.

## <u>CONCLUSION</u>

For the reasons stated above, Silvercreek respectfully requests that Credit Suisse's motion for summary judgment be denied in its entirety.

DATED:  March 9, 2018                            Respectfully submitted,

By:   /s/ Scott F. Hessell
_____

BRUCE S. SPERLING (pro hac vice)
EUGENE J. FRETT (pro hac vice)
SCOTT F. HESSELL (pro hac vice)
55 West Monroe, Suite 3200
Chicago, IL  60603
(312) 641-3200
Attorneys for Plaintiffs

## __CERTIFICATION__

I certify that on March 9, 2018, a true and correct copy of the foregoing was served to all registered users through the Court's ECF/CM filing system.

By: /s/ Scott F. Hessell
Scott F. Hessell