IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

SILVERCREEK MANAGEMENT INC., *et al.*,

Plaintiffs,

v.

CITIGROUP, INC., *et al.*

Defendants.

02-CV-8881 (JPO)

**SILVERCREEK'S RESPONSE TO
DEUTSCHE BANK'S RULE 56.1 STATEMENT
&
<u>COUNTERSTATEMENT OF DISPUTED FACTS</u>**

Dated: March 15, 2018

Bruce S. Sperling
Eugene J. Frett
Scott F. Hessell
SPERLING & SLATER, P.C.
55 West Monroe, Suite 3200
Chicago, IL 60603
(312) 641-3200
gfrett@sperling-law.com
shessell@sperling-law.com
*Attorneys for Plaintiffs Silvercreek
Management Inc., Pebble Limited
Partnership, Silvercreek Limited
Partnership, OIP Limited, and
Silvercreek II Limited*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

**SILVERCREEK'S RESPONSE TO DEUTSCHE BANK'S RULE 56.1 STATEMENT**.......1

I.     BACKGROUND ................................................................................................1

    A.     Deutsche Bank Overview. ..................................................................1

    B.     Enron and its Advisors.......................................................................2

    C.     Enron Officers.....................................................................................3

    D.     Enron Board of Directors....................................................................5

    E.     Arthur Andersen..................................................................................6

    F.     Vinson & Elkins..................................................................................8

II.    ENRON INSIDERS CONTROLLED THE FRAUD AND WHO KNEW OF IT............9

    A.     The Enron Fraud. ................................................................................9

    B.     Deutsche Bank's Relationship with Enron. .....................................12

        1.     Enron Exposure......................................................................12

        2.     Deutsche Bank Employees. ...................................................14

    C.     Andrew Fastow's Deposition Testimony...........................................18

III.   STRUCTURED TAX TRANSACTIONS.............................................................20

    A.     Overview of the Structured Tax Transactions. .................................20

    B.     Specific Structured Tax Transactions. ..............................................24

        1.     Teresa Transaction. ...............................................................24

        2.     Steele Transaction..................................................................25

        3.     Cochise Transaction...............................................................26

        4.     Tomas Transaction..................................................................28

    C.     Role of Outside Advisors..................................................................29

        1.     The Teresa Transaction Was Indendently Expertized. ...........31

        2.     The Steele Transaction Was Independently Expertized. .........33

        3.     The Cochise Transaction Was Independently Expertized. ......36

        4.     The Tomas Transaction Was Independently Expertized. .........40

    D.     Arthur Andersen Concluded that Enron's Accounting for the Structured Tax Transactions Complied with GAAP and that Enron's Disclosures were Appropriate. ...............................................................................41

E. The Structured Tax Transactions had a Legitimate Non-Tax Business Purpose.................................................................................47

F. Ex Poste Treatment of the Structured Tax Transactions Confirms Their Validity. .............................................................................54

IV. THERE IS NO EVIDENCE THAT VALHALLA AND RENEGADE "TAX ACCOMMODATION" TRANSACTIONS WERE FRAUDULENT ............................72

A. Valhalla. ...............................................................................72

B. Renegade. .............................................................................74

V. THERE IS NO EVIDENCE THAT THE OSPREY, MARLIN, YOSEMITE, AND FIREFLY TRANSACTIONS WERE FRAUDULENT ...............................75

A. Marlin I and II. .......................................................................75

B. Osprey I and II. ......................................................................85

C. Yosemite. ..............................................................................94

D. Firefly.................................................................................98

VI. DEUTSCHE BANK ONLY HAD A PASSIVE ROLE IN LJM2 ..............................101

VII. DEUTSCHE BANK'S ROLE IN THE ZERO NOTE OFFERING...........................107

A. Deutsche Bank Had A Limited Role In The Private Placement Offering for the Zero Notes. .....................................................107

B. Deutsche Bank Had A Limited Role in the Public Offering for the Zero Notes.........................................................................108

C. Deutsche Bank's Due Diligence with the Zero Notes followed Applicable Custom, Practice, and Standards. ..............................111

VIII. SILVERCREEK MADE ITS OWN PURCHASING DECISIONS WITH REGARD TO THE ZERO NOTES AND 7% EXCHANGEABLE NOTES ................114

A. Background on Silvercreek..................................................114

1. Plaintiff Parties.....................................................114

2. Silvercreek Witnesses. ...........................................114

3. Silvercreek's Investment Strategy and Sophistication............................................................115

B. Silvercreek Followed Its Own Trading Strategy When Trading the Zero Notes.........................................................................117

C. Silvercreek Followed Its Own Trading Strategy When Trading the 7% Exchangeable Notes. .................................................132

**SILVERCREEK'S STATEMENT OF FACTS IN OPPOSITION TO DEUTSCHE BANK'S MOTION FOR SUMMARY JUDGMENT** ...................................139

IX.    SUMMARY .........................................................................................139

X.     ENRON FRAUD AND COLLAPSE ..................................................142

    A.    Financial Statements 1997–2001. ...........................................142

    B.    Enron's Financial Restatements.................................................144

    C.    Public Statements by Deutsche about Enron in 2001. ............147

    D.    Enron's Financial Collapse. .....................................................149

        1.    The Collapse of the Merger with Dynegy.................................149

        2.    Enron's Chapter 11 Filing..........................................................150

XI.    ENRON TRANSACTIONS. ..................................................................151

    A.    Failure to Consolidate Special Purpose Entities in Violation of GAAP..............151

    B.    The Raptors. ...............................................................................152

    C.    Tax Transactions Briefly............................................................155

XII.   DEUTSCHE BANK'S INVOLVEMENT ............................................157

    A.    Deutsche Bank and Enron shared a close Relationship, assisted each other in tax benefits, and shared information........................157

        1.    Deutsche Bank was a Tier 1 Enron bank—and received huge fees for its role in helping Enron perpetuate its fraud..............157

        2.    Deutsche maintained a close relationship with Enron. ............159

        3.    Deutsche knew non-public information about Enron's true financial condition ...............................................................162

    B.    Deutsche Bank actively sought to reduce its exposure to Enron while its analysts continued to issue "buy" recommendations. ...................165

    C.    Deutsche Bank participated in several Enron schemes........................172

        1.    Tax Transactions. .......................................................................174

            a.    Teresa Transaction. ...................................................... 185

            b.    Steele Transaction. ....................................................... 192

            c.    Cochise Transaction...................................................... 201

            d.    Tomas Transaction. ....................................................... 207

    D.    Deutsche Bank knew "expertized" documents defied reality and stepped well beyond the bounds of allowing accountant and lawyer independence. .......214

        1.    Deutsche's manner of developing the Tax Transactions did not allow Andersen to act with professional objectivity or independence. .............214

2.      Reliance on SAS 50 letters is unjustified as they are based on hypothetical versions of transactions. .................................................216

3.      Deutsche knew the "should" opinions required and contained unsupportable representations. ...............................................................218

E.      Deutsche was the center of the hub connecting all the other participants and objectivity was lost. .......................................................225

F.      The absence of IRS challenge is not approval. ....................................229

G.      Tax Accommodation Transactions. ......................................................230

H.      Structured Transactions With Disguised Enron Affiliates...................231

1.      LJM2. ..........................................................................................231

a.      Deutsche had direct input on the role of the LJM2 Advisory Committee. ...................................................... 232

b.      Deutsche had direct participation in the LJM2 Advisory Committee. ...................................................... 233

2.      Marlin I and II, Osprey I and II, and Yosemite. ......................235

I.      Plaintiffs' Expert Anthony Saunders. ..................................................240

XIII.   POST-BANKRUPTCY MANAGEMENT ....................................................244

XIV.   AS AN UNDERWRITER IN THE ZERO NOTE OFFERING, DEUTSCHE BANK IS LIABLE FOR THE FALSITY OF THE ZERO NOTES REGISTRATION sSTATEMENT. ...........................................................................248

A.      Deutsche Bank was an underwriter of the Zero Notes. ........................248

B.      Deutsche Bank did not perform a good faith, meaningful "due diligence" investigation regarding the Zero Notes registration statement. ..........................249

1.      Deutsche Bank knew that Enron's financial statements were false.........249

2.      Deutsche Bank knew of "red flags" that it did not investigate. ..............250

3.      Deutsche Bank did not endeavor to verify Enron's representations in connection with the Zero Notes registration statement. .....................251

XV.    PLAINTIFFS PURCHASE ENRON DEBT SECURITIES FROM CREDIT SUISSE AND OTHERS. ..........................................................................................261

## EXPLANATION OF CITATION FORMS

The following citation forms are used in this statement:

P-DB[#] references to the exhibits attached to the Declaration of Scott F. Hessell In Opposition to Deutsche Bank's Motion for Summary Judgment.

PSOF ¶¶ 1-335 refer to Plaintiffs' Responses to Deutsche Bank's Local Rule 56.1 Statement; PSOF ¶¶ 336-828 refer to Plaintiffs' Counterstatement of Disputed Facts in Opposition to Summary Judgment.

D[#] refers to the exhibits to the Declaration of J. Chung in Support of Deutsche Bank's Motion for Summary Judgment.

### <u>The Parties</u>

"Deutsche Bank" or "Deutsche" refers to defendants Deutsche Bank Alex. Brown (n/k/a Deutsche Bank Securities Inc.) and Deutsche Bank AG.

"Silvercreek" references plaintiffs Silvercreek Management, Inc., Silvercreek Limited Partnership, Silvercreek II Limited, OIP Limited and Pebble Limited Partnership.

Attached to the Scott F. Hessell Declaration is an index of all P-DB Exhibits cited with a more complete description of the Exhibits cited here.

## SILVERCREEK'S RESPONSE TO
## DEUTSCHE BANK'S RULE 56.1 STATEMENT

Plaintiffs Silvercreek Management Inc., Pebble Limited Partnership, Silvercreek Limited Partnership, OIP Limited, and Silvercreek II Limited, respond to Deutsche Bank's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 in support of its Motion for Summary Judgment.

## I.   BACKGROUND

### A.   Deutsche Bank Overview.

1.     On December 1, 1998 Deutsche Bank formally announced its planned acquisition of Bankers Trust Corporation. Chung Decl. Ex. D1 (Edmund L. Andrews, Bank Giant: The Overview; Deutsche Gets Bankers Trust for $10 Billion, N.Y. TIMES, Dec. 1, 1998). On June 5, 1999, Deutsche Bank completed the acquisition. Chung Decl. Ex. D2 (Timothy L. O'Brien, International Business; Deutsche Bank Seals Bankers Trust Deal, N.Y. TIMES, June 5, 1999).

**RESPONSE**:  **Undisputed** that the newspaper articles reference Deutsche Bank's acquisition of Banker's Trust; however, **disputed** that the cited newspapers stories establish any fact for purposes of this litigation; further D2 reports Deutsche Bank A.G. completed its acquisition of Bankers Trust Corporation on June 4, 1999, not June 5, 1999, but **immaterial** in all events.

2.     Paul Cambridge was the Enron relationship partner at Deutsche Bank. Chung Decl. Ex. D3 (Cambridge Dep. 40:9-41:13).

**RESPONSE**:  **Disputed**, as omitting the full description of Paul Cambridge's work with respect to Enron. Paul Cambridge described himself as Deutsche Bank's senior relationship manager for Enron, meaning he was the person "known through the organization" and people would go to him "if they had a particular product or an idea they wanted to market to the client," he was also "responsible for talking to the client, understanding what their financial objectives were, figuring out a strategy to deliver the bank's products into that strategy – or set of objectives." D3 at 40:24-41:13.

3.     Calli Hayes was a credit risk manager at Deutsche Bank. Chung Decl. Ex. D4 (Hayes Dep. 33:9-34:2, 35:6-36:11).

**RESPONSE**:  **Disputed**, as omitting Calli Hayes' complete role at Deutsche Bank[1] and Bankers Trust. From 1992 until 1996, Calli Hayes worked at BT Alex Brown "looking after the bank's risk in positioning in securities," from 1996 on she was on the lending side of the bank (Ex. D4 34:12–17) and from 1999 on she worked at Deutsche Bank (Ex. D4 34:18-25).  Calli Hayes testified that her "job is to assess the credit quality of people that the bank is either lending or entering into transactions where we would be taking direct credit exposure to that particular entity…." D4 at 35:2-5, 13-19.

4.     Michael Jakubik was a managing director at Bankers Trust from February 1997 through 1999 and Deutsche Bank beginning in July of 2000. Chung Decl. Ex. D5 (Jakubik Bankr. Dep. 10:13-25, 18:4-9, 19:20-20:13).

**RESPONSE**:  **Disputed** as omitting Michael Jakubik's complete role. Michael Jakubik had a starting job title at Bankers Trust as managing director and head of project finance (Ex. D5 10:14-25) and began working for Deutsche Bank sometime in the end of July 2000 (*id*. at 18:4-9) when he was a managing director (D5 at 19:20-22).

5.     Edward Tirello was an equity analyst at Deutsche Bank who covered Enron from January 1999 to September 2000. Chung Decl. Ex. D6 (Tirello Dep. 21:13-22:12, 28:21-30:13).

**RESPONSE**:  **Disputed**. Edward Tirello was a senior utility analyst at BT Alex Brown and at Deutsche Bank until October 2000 (D6 at 21:18-22:12) and he covered Enron from the end of 1998 or beginning of 1999 through October of 2000 (*id*. at 32:9-24, 57:2-6).

6.     Paul Tice was a fixed income analyst at Deutsche Bank who covered Enron from 2000 to 2001. Chung Decl. Ex. D7 (Tice Dep. 15:8-11, 20:15-21:13, 26:16-27:7).

---

[1] Defendants Deutsche Bank.Alex Brown, Inc. and Deutsche Bank, AG are collectively referred to herein as "Deutsche Bank" or "Deutsche." As Deutsche Bank acts through its many subsidiaries, all of whom are consolidated for accounting and legal reporting purposes, references to "Deutsche" or "Deutsche Bank" also include, collectively, the bank's subsidiaries.

**RESPONSE**:  **Disputed** to the extent that Paul Tice described his role as a fixed income research analyst; he advised investors to buy Enron bonds, including with respect to deceptive transactions Osprey, Marlin and Yosemite notes. Ex. D7 at 11:24-13:3, 15:8-11.

**B.     Enron and its Advisors**.

7.      Enron's annual Reports state that Enron's "management . . . is responsible for the[] integrity and objectivity" of its financial statements:

> The . . . financial statements of Enron Corp. and subsidiaries collectively, Enron) were prepared by management, which is responsible for their integrity and objectivity. The statements have been prepared in conformity with generally accepted accounting principles and necessarily include some amounts that are based on the best estimates and judgments of management.

Chung Decl. Exs. D8 (Enron Annual Rpt. 1998 at 43); D9 (Enron Annual Rpt. 1999 at 39); D10 (Enron Annual Rpt. 2000 at 29).

**RESPONSE**:  **Undisputed**.

8.      Under Generally Accepted Auditing Standards, a company's "financial statements are management's responsibility":

> The financial statements are management's responsibility. . . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. . . . [T]he fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

Chung Decl. Ex. D11 (Statements on Auditing Standards ("SAS"), Responsibilities and Functions of the Independent Auditor (Jan. 1, 1997) at AU § 110.03).

**RESPONSE**:  **Undisputed** that certain auditing standards state in part that "the financial statements are management's responsibility" while the "auditor's responsibility is to express an opinion on the financial statements." Ex. D11 at § 110.03.

### C.   Enron Officers.

9.   Kenneth Lay was Chairman and Chief Executive Officer of Enron from 1986 to February 2001. Chung Decl. Ex. D12 (Enron Sched. 14A (Mar. 27, 2001) at 5).

**RESPONSE**:  **Disputed** as incomplete. Kenneth Lay was Chairman and Chief Executive Officer of Enron from 1986 to February 2001. Jeffrey Skilling served as Chief Executive Officer of Enron for 6 months, and left in August of 2001 (D16 at 91) and Kenneth Lay served as Chief Executive Officer again after Skilling left from August 2001 until bankruptcy.

10.   Jeffrey Skilling was Chief Executive Officer of Enron from February 2001 through August 15, 2001. Id. at 6.

**RESPONSE**:  **Undisputed**.

11.   Andrew Fastow was Chief Financial Officer of Enron from March 1998 to October 2001. Chung Decl. Exs. D13 (Enron 1998 Form 10-K (Mar. 31, 1999) at Item 1); D14 (Enron Press Release (Oct. 24, 2001)).

**RESPONSE**:  **Undisputed**.

12.   Richard Causey was Chief Accounting Officer of Enron from January 1997 to the end of the relevant period. Chung Decl. Ex. D15 (Enron 2000 Form 10-K (Apr. 2, 2001) at Item 1).

**RESPONSE**:  **Disputed**. "Relevant period" is an undefined term. Richard Causey was Executive Vice President and Chief Accounting Officer of Enron since July 1999 and Senior Vice President and Chief Accounting and Information Officer of Enron since January 1997 until July 1999. D15 at 24, 25.

13.   Michael Kopper was a Managing Director at Enron Global Finance and a member of the Special Projects Group at Enron Corporation. Chung Decl. Ex. D16 (Statement of Michael Kopper, Subcomm. on Oversight and Investigations of the Comm. on Energy and Commerce, 107 Cong. at 2, 7, 20, 37).

**RESPONSE**:  **Undisputed** as to positions stated, **disputed** as to the extent of Michael Copper's role.  Michael Kopper served as Andrew Fastow's chief lieutenant, became the general partner of Chewco, and served as a general manager of both LJM partnerships. Ex. D16 at 3.

14.     Ben Glisan was the Treasurer of Enron Corporation from the spring of 2000 until October 2001. Chung Decl. Ex. D17 (Ben Glisan Plea Agreement (Sept. 10, 2003) at 11).

**RESPONSE**:  **Undisputed**.

15.     Timothy DeSpain was the Assistant Treasurer of Enron Corporation from January 1999 until May 2002. Chung Decl. Ex. D18 (Timothy DeSpain Cooperation Agreement (Oct. 5, 2004) Statement at 2).

**RESPONSE**:  **Undisputed**.

**D.     Enron Board of Directors**.

16.     In May 1998, the Enron Board of Directors approved certain "Corporate Governance Guidelines." Chung Decl. Ex. D19 (Enron's Bd. of Dirs. Meeting Minutes (May 4-5, 1998) at ENE 0000000497).

**RESPONSE**:     **Disputed**, as the title of the documents approved were "Corporate Governance Guidelines of the Board of Directors" and "Charters for the Audit, Compensation, Finance, and Nominating Committees of the Board of Directors" and these documents were attached to the May 1998 minutes as Exhibit B.  *See* P-DB1 (May 4-5, 1998 Enron's Bd. of Dirs. Meeting Minutes) at AB000189397-AB000189450.

17.     These Guidelines identified "ensuring legal and ethical conduct by Enron and its officers and employees" and "providing general oversight of Enron's business" as among the "principal functions" of the Enron Board. Id. at ENE 0000000523. The Audit Committee of the Board, which was "comprised solely of independent Directors," "provide[d] reasonable assurance" that the policies governing such conduct are observed and "serve[d] as the overseer of Enron's financial reporting process." Id. at ENE 0000000523, ENE 0000000528.

**RESPONSE**:     **Disputed**. D19 does not include the referenced pages, and therefore paragraph 17 is not supported by admissible evidence.

18.     The Audit Committee Charter states that a principle function of the Audit Committee was to "[s]erve as a channel of communication between the independent auditor and the Board of Directors and/or management and between the executive responsible for the audit functions provided internally or by contract and the Board of Directors and/or management of the Company." Chung Decl. Ex. D20 (Enron's Audit Comm. Meeting Minutes (May 6, 1997) at AB024600332).

**RESPONSE**:  **Disputed**, mischaracterizes evidence. D19 indicates the audit committee charter was not approved until May 1998, while Ex. D20 purports to include pages from a meeting in May 1997. The charter is not properly authenticated, and is not the charter referenced in D19. Paragraph 18 is therefore not supported by admissible evidence.

19.     In 1998, Enron's Board of Directors had 15 members—13 of which were outside directors. Chung Decl. Ex. D21 (Enron Sched. 14A (Mar. 24, 1998) at 3-9).

**RESPONSE**:  **Undisputed**.

20.     In 1999, Enron's Board of Directors had 16 members—14 of which were outside directors. Chung Decl. Ex. D22 (Enron Sched. 14A (Mar. 30, 1999) at 3-9).

**RESPONSE**:  **Undisputed**.

21.     In 2000, Enron's Board of Directors had 18 members—16 of which were outside directors. Chung Decl. Ex. D23 (Enron Sched. 14A (Mar. 21, 2000) at 3-9).

**RESPONSE**:  **Undisputed**.

22.     In 2001, Enron's Board of Directors had 14 members—12 of which were outside directors. Chung Decl. Ex. D12 (Enron Sched. 14A (Mar. 27, 2001) at 3-9)).

**RESPONSE**:  **Undisputed**.

**E.    Arthur Andersen**.

23.     Arthur Andersen LLP ("Arthur Andersen") was outside auditor to Enron. Chung Decl. Ex. D24 (Savage Dep. 824:23-25). Arthur Andersen also "provided . . . consulting services [to Enron] related to providing accounting advice on proposed structures and other matters, along with audit services." Chung Decl. Ex. D25 (Cash Dep. 1152:12-20).

**RESPONSE**:  **Undisputed**.

24.     The Professional Standards Group ("PSG") at Arthur Andersen "maintain[ed] subject matter expertise" over "[a]ccounting principles and auditing procedures (including financial statement presentation/disclosures and auditors' Reports." Chung Decl. Ex. D26 (William Swanson email re: "Research Manager" (Oct. 16, 2001) at AA145598.10). Arthur Andersen engagement teams regularly consulted the PSG regarding accounting questions arising from Enron-related transactions. Chung Decl. Ex. D27 (Lawrence Reiger memorandum re: "ENRON Consultation Process" (Feb. 12, 2001) at AA-EX00291260-3). Enron was "the largest single largest user and client of the PSG." Id. at AA-EX00291262.

**RESPONSE**:  **Disputed**, mischaracterizes evidence and omits evidence.  The referenced document states that, for subject matter consultation (which is performed to assure the engagement team has an understanding of the relevant rules, regulations and policies, as opposed to practice application which is performed to assure the relevant rules, regulations and policies are appropriately applied to a specific situation) the principal sources for such consultation are subject matter experts, which for the referenced area the "firmwide experts" are the Professional Standards Group ("PSG") National Committees on Professional Standards (and designated country experts). Also, "in general terms, the engagement team will participate in discussions with [Enron] about a transaction" and may confer with the PSG designee. D27 at 1-2.  In February 2001 Arthur Anderson's ("AA") engagement team had serious concerns about its process for vetting Enron transactions, including that the AA engagement partner John Stewart did not have the "bandwidth, or that there are not more John Stewarts in the PSG to handle all the issues…" *Id*. at 2-3.

The memorandum stated: "ENRON is a complex organization. It deals with complex transaction structures, and in essence, **uses the current accounting literature to engineer transactions to take advantage of that literature**. These transactions are complex, and there is no clear written literature with respect to these transactions." *Id*. at 1 (emphasis added). Deutsche helped to engineer transactions for Enron, and "understood the transaction structures would materially impact Enron's financial statements." P-DB2 (Fastow Decl.) at ¶ 57; *see also* P-DB3 (McKee Dep.) at 360:21–361:4 (testifying he knew the deals "were being structured by Deutsche Bank").

25.    John Stewart was head of the Professional Standards Group. Chung Decl. Ex. D28 (Stewart Dep. 14:12-15). Stewart was a voting member of the Emerging Issues Task Force at the time that EITF 98-10 was developed and accepted and a member of the Derivatives Implementation Group, which is a task force that was created in 1998 concurrent with the issuance of SFAS 133 to provide guidance to companies interpreting SFAS 133. Id. at 37:6-19, 809:14-18); Chung Decl. Ex. D29 (FASB article, FASB Statement 133 Implementation (Derivatives)).

**RESPONSE**: **Disputed**, mischaracterizes testimony. John Stewart was the "senior technical partner" of the PSG and the "final decision maker with respect to accounting issues for [Enron]" at least in February 2001. D27 at 3. He testified he was a partner in the PSG and head of the accounting practice group of the PSG. D28 at 14:6-15. When asked about prepay transactions, which involve certain accounting concepts, including whether they are part of a "trading activity," he referenced ITF 98-10 and testified he served on the Emerging Issues Task Force in 1998 and voted on that matter. *Id*. at 36:11-37:19. He was a member of the Derivatives Implementation Group (*id*. at 809:14-16) which, prior to April 2001, helped prepare FASB Statement 133 Implementation Issues and assisted in providing guidance on questions companies would face when they began implementing Statement 133. D29 at 1-2.

26.     Arthur Andersen had "complete access to the [Enron] board of directors to bring to their attention any matters that are of concern to them that can in some way negatively impact the company or issues that they think [the board] should know about." Chung Decl. Ex. D24 (Savage Dep. 828:14-18).

**RESPONSE**:  **Disputed**, mischaracterizes testimony.

**F.     Vinson & Elkins**.

27.     Vinson & Elkins LLP ("Vinson & Elkins") was outside counsel to Enron. Chung Decl. Ex. D30 (Baird Dep. 452:22-23).

**RESPONSE**:  **Disputed**, as D30 does not provide support for the statements in paragraph 27.

28.     Among other things, Vinson & Elkins "counseled with Enron on disclosure issues" related to Enron's transactions and "specific regulatory requirements and issues." Id. at 287:5-12.

**RESPONSE**:  **Disputed**, as D30 does not support the statements in paragraph 28.

## II.   **ENRON INSIDERS CONTROLLED THE FRAUD AND WHO KNEW OF IT**

### A.   *The Enron Fraud*.

29.     The Enron fraud was controlled by senior Enron executives. Enron's former Chief Financial Officer, Andrew Fastow admitted that Enron executives never fully "open[ed] up the kimono and show[ed]. . .the problems. . .at Enron" to others, but they did show a partial picture to select parties outside of their immediate circle. Chung Decl. Ex. D31 (Fastow Dep. 1010:25-1011:15 (testifying that Enron did not reveal to its own employees the truth about the company's financials and business prospects)). Fastow testified that Enron withheld information about certain transactions or "secrets or skeletons or ugly details" from financial institutions so that these institutions would not stop lending to Enron. Id. at 1093:10-25. Following the resignation of Enron's CEO, Jeffrey Skilling, in August 2001, Fastow suggested to Kenneth Lay that Enron retain Goldman Sachs, which was not a key lender to Enron, to assist with restructuring in part because "if any bank that was a key lender to [Enron] were to understand the true extent of Enron's problems, that that might cause them to stop lending, which could cause a knock-off effect within the bank market and effectively shut down Enron's credit." Id. at 1276:11-17. Fastow subsequently limited the information that he provided Goldman Sachs. Id. at 1470:9-14.

**RESPONSE**:  **Disputed**, mischaracterizes testimony, and the cited testimony does not support paragraph 29. Fastow testified "open the kimono" means "show everything," and that Enron's employees were not shown everything about Enron's business prospects or financial results that he was aware of while he was still an employee of Enron.  D31 at 1010:25-1011:23. He also testified that he did not tell CSFB of "some of" his conduct that was "not proper," either at LJM or Enron, and that it was a "fair characterization" that he did not want any Enron lender to see the "full kimono" for fear they would stop lending. Id. at 1093:10-25. Fastow suggested Goldman Sachs as opposed to some other bank for two reasons, the first of which was that it had the best contacts for chairman-level discussions among companies that might be interested in a merger or acquisition of Enron, and second was he told Mr. Lay that Enron's situation was very bad, and if a key lender understood the true extent of Enron's problems they may stop lending. Id. at 1275:25-1276:17. He testified he did not "open" the kimono to Goldman Sachs before he left Enron and did not recall if the people working for him at Enron had given Goldman Sachs all of the information they needed by the time he left. Id. at 1470:9-17. Fastow, in his sworn declaration,

stated that Deutsche "designed and engaged in a number of transactions between 1997 and 2001 that had the effect of increasing Enron's reported earnings and funds flows from operations" and that he "believe[s], based on the level of sophistication of its bankers and my conversations with them, that Deutsche understood the transaction structures would materially impact Enron's financial statements." P-DB2 (Fastow Decl.) at ¶ 57. He further stated that he discussed with Mike Jakubik, head of Deutsche's Finance Group, "that Enron was not as healthy as the financial statements led investors to believe." *Id*. at ¶ 58.

30.     Fastow pled guilty to conspiracy to commit securities fraud and conspiracy to commit wire and securities fraud and admitted that he and other members of Enron's senior management "fraudulently manipulated Enron's publicly reported financial results" with a purpose to "mislead investors and others about the true financial position of Enron and, consequently, to inflate artificially the price of Enron's stock and maintain fraudulently Enron's credit rating." Chung Decl. Ex. D32 (Andrew Fastow Plea Agreement (Jan. 14, 2004) at Exhibit A ¶ 1).

**RESPONSE**:  **Undisputed** as to the referenced portions of Fastow's plea agreement, but disputed as incomplete. Fastow also swore that he "and others worked together, intentionally and knowingly, to engage in transactions that would affect Enron's financial statements." P-DB2 (Fastow Decl.) at ¶ 7. He testified that this meant someone looking at Enron's financial statements would have a false impression of the company and that "others" included Deutsche Bank. P-DB70 (Fastow Dep.) at 944:11-945:1, 945:17-22. Fastow believed, "based on conversations with certain bankers, that they knew the prepays and some of the share-trust transactions created the false appearance of funds flow," including Deutsche Bank. *Id*. at 942:14-943:1, 943:23-944:2.

31.     Fastow admitted that he caused Enron and certain Special Purpose Entities ("SPE") under his control, known as the LJM entities, to enter into transactions that would "improve the appearance of Enron's financial statements" but which "lacked economic substance and were improper for accounting purposes, in part because [Fastow] and others secretly agreed that LJM would not lose money through participation in these transactions." Id. at Exhibit A ¶ 4.

**RESPONSE**:  **Undisputed** as to the cited portions, **disputed** as incomplete. Fastow testified that banks received oral assurances from Enron that Deutsche Bank would receive a return

10

of their investment capital.  P-DB2 (Fastow Decl.) at ¶¶12-13. Fastow testified that, when he

declared that he believed that, "based on conversations with certain bankers, that they knew that

the prepays and some of the share-trust transactions created the false appearance of funds flow,"

including Deutsche Bank. P-DB70 (Fastow Dep.) at 942:14-944:2.

32.     Fastow also admitted he "misled Enron" by exploiting its relationship with the LJM
entities for his own benefit. Id. at Exhibit A ¶¶ 12, 15-16. In his role as LJM general partner,
Fastow entered into side deals with Richard Causey, the Chief Accounting Officer at Enron, to
guarantee that LJM entities received a profit for engaging in various sales and repurchases of assets
with Enron. Chung Decl. Ex. D33 (Additional Agreement between Enron and LJM/A. Fastow
(Sept. 2000) at MLNBY 0943675-677).

**RESPONSE**:  **Disputed**, mischaracterizes evidence. With respect to Swap Sub, Fastow

admitted that he mislead Enron so that Swap Sub would improperly obtain $19 million and that

money was to be distributed to those who were not entitled to it, including Enron employees and

LJM. D32 at Ex. A ¶¶ 12, 15-16.

33.     Ben Glisan pled guilty to conspiracy to commit wire and securities fraud and
admitted that Enron executives created and used the LJM SPEs to "falsify [Enron's] financial
picture" and "conceal the poor performance of certain Enron assets" to those outside of the fraud.
Chung Decl. Ex. D17 (Ben Glisan Plea Agreement (Sept. 10, 2003) at 11).

**RESPONSE**:  **Disputed in part** mischaracterizes evidence. D17 does not assert that LJM

SPEs were used to "conceal the poor performance of certain Enron assets." However, **undisputed**

that Glisan pled guilty to conspiracy to commit wire and securities fraud, and admitted "LJM

enabled Enron to falsify its financial picture" and used SPE Talon to engage in illegal transactions.

D17 at 11.

34.     Richard Causey pled guilty to securities fraud and admitted that he "conspired with
members of Enron's senior management to make false and misleading statements, in Enron's
filings with the Securities and Exchange Commission ("SEC") and in analyst calls, about the
financial condition of Enron[.]" Chung Decl. Ex. D34 (Richard Causey Plea Agreement (Dec. 28,
2005) at ¶ 2). Causey admitted that he and other Enron senior executives were responsible for the
preparation and drafting of Enron's financial Reports, including annual Form 10-K filing and the
quarterly Form 10-Q filing required by the SEC. Id. at ¶ 4.

**RESPONSE**:  **Undisputed**.

35.     Michael Kopper, who held various high-ranking positions at Enron and within the LJM entities, pled guilty to conspiracy to commit wire fraud and conspiracy to engage in monetary transactions in property derived from specified unlawful activity, and identified three transactions—RADR, Chewco, and Southhampton—that generated millions of dollars for the select few Enron executives and their families at the helm of these SPEs. Chung Decl. Ex. D35 (Michael Kopper Cooperation Agreement (Aug. 21, 2002) at ¶ 14).

**RESPONSE**:  **Undisputed**.

36.     Timothy DeSpain, the Assistant Treasurer of Enron Corporation, admitted in his cooperation agreement with the Department of Justice that Enron had engaged in transactions "to manipulate fraudulently Enron's credit rating" by misrepresenting the company's financial position and the cash and funds flow that Enron generated from operations to satisfy debt and debt-like obligations. Chung Decl. Ex. D18 (Timothy DeSpain Cooperation Agreement (Oct. 5, 2004) Statement at 1). DeSpain further admitted "maintaining an investment-grade credit rating for Enron debt was <u>critical</u> to Enron's ongoing business operations" to ensure lower borrowing costs and to prevent any drop in the rating from triggering call options, which would have accelerated the payments due for significant amounts of cash. <u>Id.</u> (emphasis added).

**RESPONSE**:  **Undisputed**.

37.     Arthur Andersen provided audited financial statements for Enron for the years 1997 to 2001. Chung Decl. Exs. D15 (Enron 2000 Form 10-K (Apr. 2, 2001) at 58-59); D36 (Enron 1999 Form 10-K (Mar. 30, 2000) at 63); D13 (Enron 1998 Form 10-K (Mar. 31, 1999) at 66-67); D37 (Enron 1997 Form 10-K (Mar. 31, 1998) at 66-67).

**RESPONSE**:  **Undisputed**.

**B.      Deutsche Bank's Relationship with Enron**.

       **1.      Enron Exposure**.

38.     Deutsche Bank had between $400 million to $800 million on loan to Enron between 1999 and 2001. Chung Decl. Ex. D4 (Hayes Dep. 122:19-123:4, 126:2-23).

**RESPONSE**:  **Disputed**, mischaracterizes testimony. Ms. Hayes testified that in 1999

Deutsche Bank had $800 million in debt exposure to Enron and in 2000 and 2001 that exposure

was reduced into the "600 plus level." D4 at 122:19-123:4, 126:2-23.

39.     Deutsche Bank's Underwriting Committee approved an additional $200 million in Enron exposure in November 2000. <u>Id.</u> at 506:2-507:7; Chung Decl. Exs. D38 (Calli Hayes email to Paul Cambridge regarding "Enron electric generating program" (Nov. 28, 2000) at DBG

079615); D39 (Paul Cambridge email to Calli Hayes regarding "Enron electric generating program" (Nov. 29, 2000) at DBB 008664).

**RESPONSE**: **Undisputed**.

40.     On October 4, 2001, Paul Cambridge authored a memorandum to the Deutsche Bank Underwriting Committee regarding Deutsche Bank's credit exposure to Enron. Chung Decl. Ex. D40 (Paul Cambridge memorandum to the Deutsche Bank Underwriting Committee regarding "Enron Exposure" (Oct. 4, 2001) at DBG 088493). The purpose of the memorandum was to address the Underwriting Committee's concerns about exposure to Enron and to request approval for additional exposure associated with new business opportunities with Enron. Id. Cambridge noted in the memorandum that Enron had represented that it was in sound financial health. Enron had represented that notwithstanding the resignation of its CEO, Jeff Skilling, "[t]here are no hidden bombs" and that "Enron has reaffirmed its earnings and has publicly and privately stated there are not [sic] surprises in their books . . . ." Id. at DBG 088494. With regard to Enron's falling Margins, Cambridge noted that "Enron's energy businesses (still over 90% of its earnings) remain robust with strong growth" notwithstanding a declining margin in its trading business. Id. Cambridge further reported that with regard to cash flow, Enron "continues to enjoy access to the capital markets, and has publicly stated its goal of reaching an A-rating in the next 12-15 months." Id.

**RESPONSE**: **Disputed**, mischaracterizes evidence. The memorandum states "[t]here are no hidden bombs" but does not attribute that as a statement from a specific person or entity, other than from Deutsche Bank's Paul Cambridge. D40 at DBG088494. Silvercreek does not dispute as to first and last two sentences of paragraph 40. The cited memorandum does not, as the third sentence states, note that Enron represented it was in sound financial health. Other contemporaneous internal Deutsche Bank documents (including one from the Underwriting Committee two days later) suggest considerable concern about Enron's undisclosed, off-balance sheet liabilities and general creditworthiness. *See* PSOF ¶¶ 409-411.

41.     On November 8, 2001, Enron filed documents with the SEC restating its financial statements for the previous five financial years to account for $586 million in losses. Chung Decl. Ex. D41 (Enron Press Release (Nov. 8, 2001)). Enron also sent a letter to holders of Enron securities stating that the financial statements incorporated into operative prospectuses could no longer be relied upon. Chung Decl. Ex. D42 (Enron letter to Zero Notes holders (Nov. 26, 2001) at JPMNBY200158440).

**RESPONSE**:  **Disputed**, as the press release cited by Deutsche Bank does not state that there were $586 million in losses.  *See* D41.  Otherwise, **undisputed** that Enron and later Deutsche Bank admit that based on the November 8, 2001 restatement, the financial statements incorporated into the Zero Notes prospectuses were false, including with respect to LJM1/LJM2 consolidation, to which Deutsche Bank was specifically aware but failed to disclose as part of its Zero Notes "due diligence." *See* PSOF ¶¶ 639-48.

42.    On November 19, 2001, Enron restated its third quarter earnings for 2001 and disclosed that a $690 million debt was due to creditors on November 27. Chung Decl. Exs. D43 (Enron Press Release (Nov. 19, 2001)); D44 (Enron Form 10-Q (Nov. 19, 2001)).

**RESPONSE**:  **Undisputed**.

43.    On November 19, 2001, after a string of negative announcements, Enron held a meeting in New York with many financial institutions. Chung Decl. Ex. D45 (Enron Bank Presentation (Nov. 19, 2001) at EC1632080162606). Paul Cambridge, Calli Hayes, and Markus Tarkington attended the meeting on behalf of Deutsche Bank. Chung Decl. Ex. D3 (Cambridge Dep. 544:22-545:8). During the meeting, Enron revealed that its off-balance sheet debt position was significantly larger than what Cambridge and Hayes understood Enron's off-balance sheet debt to be. Id. at 545:20-546:8; Chung Decl. Exs. D4 (Hayes Dep. 244:14-20); D45 (Enron Bank Presentation (Nov. 19, 2001) at EC1632080162647). The Enron presentation also identified a number of factors responsible for the breakdown in investor and creditor confidence, including "related party transactions" that were "overused," and involved "conflicts of interest," and "possible control failure." Chung Decl. Ex. D45 (Enron Bank Presentation (Nov. 19, 2001) at EC1632080162610). Additionally, the presentation also acknowledged that Enron's "black box" nature and need to move toward "financial transparency." Id. at EC1632080162675.

**RESPONSE**:  **Undisputed** as to the first two sentences and last two sentences of paragraph 43. The third sentence is **disputed**, except do not dispute that Mr. Cambridge testified he was aware of off-balance-sheet debt held by Enron but was not aware of the number disclosed at the meeting (D3 at 544:11-19) and that Ms. Hayes testified the disclosed debt numbers at the meeting were larger than what "we" knew about beforehand. P-DB6 (Hayes Dep.) at 244:14-20. *See* PSOF ¶ 404.

    2.    **Deutsche Bank Employees**..

14

44.     Paul Cambridge testified that Enron was selective about the disclosure of company information to Deutsche Bank. Cambridge testified that "as a general rule, Enron was barely parsimonious with its information and frequently we did not necessarily . . . get the information that we wanted." Chung Decl. Ex. D3 (Cambridge Dep. 466:14-25). Cambridge further testified that "Enron was an institution that operated in some cases like the CIA, on a need to know basis, and if you weren't involved in the transaction and they didn't feel it was appropriate to tell you, you wouldn't know." Id. at 484:23–485:20, 379:17-23, 393:9-13, 565:2-10); D40 (Paul Cambridge memorandum to the Deutsche Bank Underwriting Committee regarding "Enron Exposure" (Oct. 4, 2001) at DBG 088493).

**RESPONSE**:  **Disputed**, mischaracterizes testimony. Cambridge testified that, to keep current with Enron's financial state, he would stay current with their financings and with any significant publicly available analyses to look for "anything inconsistent or information I didn't know." D3 at 465:8-21. As Deutsche Bank was a lender to Enron, he testified that Deutsche attended Enron credit conferences and "held individual meetings with them where we had questions with regard to their financial statements." *Id*. He further testified that he during the course of his "week to week dialogue" with Enron, if he saw or read something that needed further explanation, he "could call the company and ask for that." *Id*. When asked whether he had periodic meetings with Enron to get the facts behind the numbers, Cambridge testified that he had periodic meetings with Enron where "we would have questions regarding their financial statements and that we would be seeking clarification." *Id*. at 465:22–466:6. He further testified that Deutsche was "trying to get an explanation for the numbers or ensure that our interpretation of the numbers was accurate. *Id*. at 466:11–13. He also testified that "it is possible" Deutsche "could have received information that might not have been publicly available" in those meetings. *Id*. at 466:19–21. Fastow also swore that he believed, "based on the level of sophistication of its bankers and my conversations with them, that Deutsche understood the transaction structures would materially impact Enron's financial statements." P-DB2 (Fastow Decl.) at ¶¶ 57–58.

45.     Calli Hayes assessed the credit quality of those that Deutsche Bank loaned money to or transacted with. Chung Decl. Ex. D4 (Hayes Dep. 35:6-36:11, 239:23-240:11). Between 1996

15

and 2001, Hayes assessed Enron's creditworthiness by looking at its financial statements, and speaking to both the company and the deal team who in turn had conversations with the company. Id. at 60:17-25. Hayes was sometimes at odds with Deutsche Bank's deal team because it was her job to "make sure that the bank d[id not] over expose itself," engage in too risky of a transaction, or transact with an entity that was not creditworthy. Id. at 82:6-24. However, any concern Hayes expressed about Deutsche Bank's exposure to Enron was only because the aggregate exposure was high—it was nothing specific to any proposed transaction and it was "regardless of the credit underneath." Chung Decl. Ex. D46 (Hayes Bankr. Dep. 109:24-117:14). Indeed, Hayes was "not any more or any less [concerned about Enron repaying Deutsche Bank] than [she was] with other clients." Id. at 147:18-148:18.

**RESPONSE**:  **Disputed** as incomplete and mischaracterizes testimony. Ms. Hayes also testified that by Halloween of 2001 she was concerned about Enron's creditworthiness, and well before that time, in November of 2000. P-DB6 (Hayes Dep.) at 225:9-13; P-DB7 (November 28, 2000 Email) at DBG079615-DBG079616 (expressing concerns exposure was too high and stating with respect to Enron's electric generating program "it is yet another deal, structured and lead by someone else, and we are being asked to just step in and save the day.").

46.    In between Michael Jakubik's positions at Bankers Trust and Deutsche Bank, from approximately February 1999 until July 2000, Jakubik worked at Enron. Chung Decl. Ex. D47 (Jakubik Dep. 27:2-6).

**RESPONSE**:  **Undisputed**.

47.    At Enron, Jakubik had very little interaction with Fastow. Chung Decl. Ex. D5 (Jakubik Bankr. Dep. 258:16-21). Jakubik only paid attention to the transactions he worked on while at Enron and did not focus on the company as a whole. Id. at 312:10-313:4. He never learned or saw anything that suggested Enron's balance sheet was inaccurate. Id. at 320:25-321:14. It was Jakubik's belief that Enron's balance sheet was in "very sound" and "very strong shape" when he left the company in July 2000. Id.

**RESPONSE**:  **Disputed**, mischaracterizes testimony and incomplete. Jakubik stated in his sworn statement to the Bankruptcy Examiner that he was very angry at Fastow when he arrived at Enron, so he did not seek out meetings with him. D5 at 258:16-21. He stated that as his time with Enron "wore on," his "interest in Enron decreased rapidly" and he was "not really focused much on the organization." Id. at 312:21-313:4. He stated that he believed that "the Enron balance sheet

when I left Enron was in very sound shape." *Id*. at 321:6-14. Fastow, however, swore that *before* returning to Deutsche Bank, Jakubik "structured finance transactions that had a material impact upon Enron's reported financials and [he] discussed with [Jakubik] that Enron was not as healthy as the financial statements led investors to believe." P-DB2 (Fastow Decl.) at ¶ 58. Fastow also testified that he believed Mr. Cambridge and Mr. Jakubik were "sophisticated financial executives." D31 at 279:4-10.

48.     Fastow's testimony demonstrates that, not only did he not hire Jakubik to work at Enron, but he did not work closely with him. Chung Decl. Ex. D31 (Andrew Fastow Dep. 50:1-50:4, 864:1-864:4). Fastow could not recall various aspects of Jakubik's work while he was employed at Enron including what his reporting level was or his involvement in certain transactions. Id. at 412:6-412:11, 279:11, 279:22, 277:16-277:23. Fastow could only recall vague discussions with Jakubik about Enron structured finance transactions but could not identify transactions on which Jakubik worked. Id. at 277:16-23. He could not recall talking to Jakubik about transactions "filling the gap between actual and reported performance," and could only testify that Jakubik sometimes attended meetings where transactions were discussed. Id. at 278:4-278:12. Fastow and Jakubik's interactions were particularly limited after Jakubik moved to Enron North America in August 1999. Chung Decl. Ex. D5 (Jakubik Bankr. Dep. 258:16-260:16).

**RESPONSE**:  **Disputed**, mischaracterizes testimony and incomplete. Fastow testified Jeff McMahon recruited Jakubik to work at Enron and Jakubik dual-reported to Fastow's group and, at a certain time, to Enron North America. D31 at 50:1-4, 864:1-4. He testified that for the entire time Jakubik was at Enron, he either reported to Fastow or his treasurer or dual-reported to Fastow. *Id*. at 412:6-11. According to Fastow, Jakubik was responsible for structuring some transactions that impacted Enron's financial statements while he was at Enron, and that Fastow talked with Jakubik "in terms of what the impact of the transactions would be on Enron's reported financials" and which "impact" was that "the transactions tended to make Enron look better to the outside world than it looked inside." *Id*. at 277:10-278:3. While Fastow did not recall using the phrase "filling the gap" with Jakubik in a specific conversation, he did recall using that phrase frequently at his finance staff meetings, of which Jakubik attended many. *Id*. at 278:4-12. Jakubik testified

that he was offered a job at Enron North America as a way to get some "real responsibility and away from Andy Fastow." D5 at 260:2-8.

49.     Edward Tirello was an equity analyst at Deutsche Bank who covered Enron. He relied on public information about Enron as the basis for his analyst opinions regarding Enron stock. Chung Decl. Ex. D6 (Tirello Dep. 52:7-15). Tirello never issued a "strong buy" recommendation for Enron stock. Chung Decl. Exs. D48 (Bankers Trust's Enron rating (Jan. 13, 1999) at DBG 098181); D49 (Deutsche Bank's Enron rating (Jan. 20, 1999) at DBG 098188); D50 (Deutsche Bank's Enron rating (Apr. 13, 1999) at DBG 086890); D51 (Deutsche Bank's Enron rating (May 25, 1999) at DBG 098191); D52 (Deutsche Bank's Enron rating (July 13, 1999) at DBG 086904); D53 (Deutsche Bank's Enron rating (Jan. 28, 2000) at DBG 098286); D54 (Deutsche Bank's Enron rating (Apr. 17, 2000) at DBG 086893); D55 (Deutsche Bank's Enron rating (July 25, 2000) at DBN-253415); D56 (Deutsche Bank's Enron rating (Sept. 15, 2000) at DBG 008685).

**RESPONSE**:  **Disputed**, mischaracterizes testimony, as Tirello generally that Deutsche Bank's clients "would expect" that analyst reports would offer insights into the company, "provide them with more facts" than they could get from other sources. D6 at 51:10-22. Tirello was an equity analyst at Deutsche Bank who covered Enron. Tirello testified his "associates" "took the data, plus other publicly available information and sat down and analyzed it and tried to project how [Enron] would do in the future." D6 at 52:10-15. Tirello's cited Reports contain "buy" recommendations; it is **undisputed** that they do not contain "strong buy" recommendations.

50.     Paul Tice was a debt analyst at Deutsche Bank who covered Enron. He also relied on public information about Enron as the basis for his analyst opinions regarding Enron credit. Chung Decl. Ex. D7 (Tice Dep. 17:5-10).

**RESPONSE**:  **Disputed**, mischaracterizes testimony. Tice was a fixed income research analyst at Deutsche who covered Enron (D7 at 15:4-11). It is undisputed that he testified to using publicly available information when analyzing Enron credit. *Id*. at 17:3-24.

### C.     **Andrew Fastow's Deposition Testimony**.

51.     Andrew Fastow was Deposed in the Newby action from October 23, 2006 to November 3, 2006. At this time, Fastow had already been sentenced to a term of 72 months in prison, followed by two years of supervised release in connection with pleading guilty to conspiracy to commit wire fraud and conspiracy to commit wire and securities fraud. Chung Decl. Ex. D31 (Fastow Dep. 501:24-502:1).

**RESPONSE**:  **Undisputed**.

52.     Fastow met with plaintiff's counsel in the <u>Newby</u> action, Paul Howes, on multiple occasions in preparation for his Deposition. <u>Id.</u> at 1936:4-15, 1938:17-21. During these meetings, Howes showed Fastow documents and inquired about his recollection or interpretation of them. <u>Id.</u> at 1937:11-19, 13938:1-11; 1941:5-17. On the days that Fastow sat for his Deposition, Fastow continued to meet with Howe to review testimony and documents. <u>Id.</u> at 1944:4-1945:2; 1945:23-1946:5, 1946:6-21, 1949:13-20.

**RESPONSE**:  **Undisputed**.

53.     Fastow conceded that certain materials that Howes showed to him in preparation for his Deposition were documents that he had not seen during his tenure at Enron. <u>Id.</u> at 502:20-503:3.

**RESPONSE**:  **Undisputed** Fastow testified the documents he saw in preparation for testimony "seem to be, in many – in many cases, new documents, to me." D31 at 502:20-503:3.

54.     Fastow also testified that the declaration that he executed in the Newby action prior to his Deposition was drafted by counsel in the Newby action. <u>Id.</u> at 506:9-21.

**RESPONSE**:  **Disputed**, mischaracterizes testimony. Fastow testified, with respect to his declaration that, "[t]his is all in my words. I signed it. So it's now my words." D31 at 505:21-24. He described the process of drafting the declaration as one that involved a number of conversations with attorneys over "many hours" where Fastow answered questions about events at Enron, and then attorneys prepared a first draft of the declaration based upon those conversations. *Id*. at 506:7-17.

55.     Fastow admitted that he did not work on the Structured Tax Transactions that Deutsche Bank did for Enron, as Richard Causey's Department was responsible for handling these transactions. <u>Id.</u> at 281:11-24.

**RESPONSE**:  **Disputed**, mischaracterizes testimony and incomplete. Fastow testified he understood Enron's intent with respect to the Deutsche Bank Tax Transactions was that they "had the effect of increasing Enron's after-tax reported earnings per share" and that knew that in part, based on participating in some meetings where the deals were discussed. D31 at 281:11-24.

19

56.    Fastow admitted that he had no personal knowledge of the Marlin, Osprey, and Yosemite transactions that Deutsche Bank did for Enron. Id. at 1055:10-1056:16, 1062:6-13, 663:3-7.

**RESPONSE**:  **Disputed**, mischaracterizes testimony. Fastow testified he did not recall being in meetings in April and May 1999 where Osprey was discussed. D31 at 1055:3-16. And that he was not the primary person responsible at Enron for executing Marlin. Id. at 1062:8-13. But Fastow continued he was "at meetings where the [share trust] structure was discussed and explained." P-DB70 at 1062-63; see also P-DB2 (Fastow Decl.) ¶¶ 57-58.

## III.    STRUCTURED TAX TRANSACTIONS

### A.    Overview of the Structured Tax Transactions.

57.    During the period from 1997 until 2001, Deutsche Bank did four tax transactions with Enron: the Teresa Transaction, the Steele Transaction, the Cochise Transaction, and the Tomas Transaction (hereinafter collectively, the "Structured Tax Transactions"). Chung Decl. Ex. D57 (Enron Accounting Summary (Oct. 2002) at ERN0083020 – 83043).

**RESPONSE**:  **Undisputed** as to the fact of the transactions but disputed in that D57 is an unverified and unauthenticated document created after the events at issue, which is inadmissible hearsay.

58.    The Structured Tax Transactions resulted in future tax benefits to Enron, largely in the form of deferred tax assets, which reduced Enron's income tax expense and led to a corresponding increase in Enron's net income. Through the third quarter of 2001, as a result of these four transactions, Enron reported approximately $422.1 million of net income. Chung Decl. Exs. D57 (Enron Accounting Summary (Oct. 2002) at ERN0083020-83043); D58 (Expert Report of Merle Erickson ("Erickson Report") dated Mar. 17, 2006 (hereinafter "Erickson Report") at 4, 34).

**RESPONSE**:  **Disputed**. There were no tax benefits to Enron from Deutsche Bank's Structured Tax Transactions. For example, in reviewing the Cochise transaction at the request of Bill McKee, Stanford Law Professor David Mills concluded "there are no significant tax benefits being sought or obtained here." "[T]ax benefits are not an issue." P-DB8 (Mills letter to McKee) at OUTREB0000699. Rather, the tax transactions were done to create $438.8 million in phantom

income on Enron's financial statements between 1997 and 2001. P-DB9 (Regan Expert Rpt.) at

233.  **Further disputed** because D57 is an unverified and unauthenticated document created after

the events at issue, which is inadmissible hearsay.

59.     Enron received "should" opinions from national, reputable law firms on each of the
Structured Tax Transactions. As such, these law firms were opining that Enron had at least a 70%
chance of prevailing if the IRS decided to challenge Enron's tax treatment and the dispute was
litigated. Chung Decl. Ex. D58 (Erickson Rpt. at 5, 10, 45-46).

**RESPONSE**:   **Undisputed** that Enron received a should opinion letter from William

McKee on the Teresa transaction; received a should opinion from Akin Gump on the Steele

transaction when William McKee refused to issue the letter, received a should opinion from King

& Spalding on the Cochise transaction; and received a should opinion from Akin Gump on the

Tomas transaction. P-DB10 (July 29, 1997 King & Spalding Teresa Tax Opinion) at

AB000151584-AB000151628;   P-DB11   (December   16,   1997   Steele   Tax   Opinion)   at

EC2000033867-EC2000033904; P-DB3 (McKee Dep.) at 203:25-204:3; P-DB13 (November 23,

1998 Akin Gump Tomas Tax Opinion) at AB000151727-AB000151789.  **Disputed** in that none

of the letters opined on the legitimacy of Enron's use of the Deutsche Bank Tax transaction to

manufacture pre-tax income on its financial statements, nor the inappropriateness of Enron's

disclosures. Further, the opinion letters were based, in part, on representation letters that were

false, as was known by the law firms and Deutsche Bank.  *See* PSOF ¶ 594.

60.     Arthur Andersen independently concurred with these "should" opinions. Enron's
accounting for the Structured Tax Transactions was reviewed by Arthur Andersen and Arthur
Andersen's Professional Standards Group ("PSG").[2] Arthur Andersen analyzed hypothetical
versions of the Structured Tax Transactions and expressed its opinion about the GAAP accounting

---

[2] Arthur Andersen's PSG was a group of individuals who, among other things: (i) consulted with
engagement teams on GAAP issues; (ii) provided implementation guidance on accounting standards;
(iii) represented Arthur Andersen before, and liaised with, standard-setting and regulatory bodies (*e.g.*, the
FASB, EITF, the SEC, etc.), (iv) authored accounting research materials for the firm's internal use; and v)
reviewed training materials. D59 (Petersen Dep.) at 23:20-24:21; D144 (Stewart Dep.) at 17:6-18:9; D58
(Erickson Rpt.) at 8, n.4.

for each tax transaction in the form Statement on Auditing Standards ("SAS") 50 letters.[3] Arthur Andersen also analyzed the GAAP accounting for each Structured Tax Transaction as actually completed as part of its financial statement audits of Enron. As part of the latter work, Arthur Andersen determined that Enron's accounting for the Structured Tax Transactions complied with GAAP and that Enron's disclosures were appropriate. Chung Decl. Ex. D58 (Erickson Rpt. at 8, 11, 15).

**RESPONSE**: **Disputed**.  Arthur Andersen's review of the tax transactions for Enron was not independent. Andersen was employed by Deutsche Bank to assist in developing the Tax Transactions prior to presenting them to Enron. Deutsche Bank, the transaction's promoter with a vested financial stake in Enron to purchase them, was also involved in the creation of the SAS 50 letters Andersen later provided to Enron. P-DB14 (Finley Dep.) at 69:17-72:2; 74:24-75:22; 80:19-82:15; 93:9-22; P-DB15 (Finley Bankr. Dep.) at 18:1-19:6. Numerous Deutsche Bank structured finance personnel involved in developing the Tax Transactions worked at Andersen, including Thomas Finley, Christine Levinson, William Boyle, Brian McGuire, John Tsai, and Forest Gilman. P-DB14 (Finley Dep.) at 94:24-97:23. Deutsche Bank knew at the time of obtaining the SAS 50 letters from Andersen, that they would provide them to clients to support accounting results. P-DB228 (McGuire Bankr. Dep.) at 139:4–141:4. Andersen was suggested to Enron because of their supposed expertise in tax transaction accounting details and participated in marketing the transactions to Enron. *See* PSOF ¶ 577. In order to effectively target potential customers, Deutsche Bank later decided to limit marketing to companies that shared Andersen, King & Spalding or Akin Gump as clients. P-DB18 (August 14, 1997 DB marketing email describing agreement between Finley, Kozak and Bijawat) at DBG027038 ¶ 1. Although its conviction for evidence

---

[3] A SAS 50 letter is a medium for obtaining from an accountant advice and/or the application of accounting principles to hypothetical transactions and/or to increase the knowledge of specific financial reporting issues. D58 (Erickson Rpt.) at 10, n.6; D60 (SAS 50 – *Reports on the Application of Accounting Principles*).

tampering was overturned, Arthur Andersen was criminally prosecuted and no longer exists as a result of its involvement in Enron. *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005).

61.     The accounting for deferred income taxes is specified by the Statement of Financial Accounting Standard No. 109 – Accounting for Income Taxes ("FAS 109"). FAS 109 addresses the recognition of deferred tax assets and was in effect during the period that Enron engaged in the Structured Tax Transactions. FAS 109 generally requires firms to account for differences in the book and tax basis of its assets. Specifically, firms record in their balance sheets a deferred tax asset for those assets that have a tax basis that is greater than their book basis. FAS 109 provides no clearly defined threshold before a firm can recognize deferred tax assets. Chung Decl. Exs. D58 (Erickson Rpt. at 4, 21, 40); D61 (Financial Accounting Standards Board ("FASB") FAS 109 – Accounting for Income Taxes, *available at* http://www.fasb.org/summary/stsum109.shtml).

**RESPONSE**:  **Disputed.**  Silvercreek's accounting expert opines that FAS 109 financial accounting standards were not properly applied to the Deutsche Bank Tax Transactions. P-DB9 (Regan Expert Rpt.) at 74, 264, 268-271. The financial accounting standards of FAS 109 speak for themselves and are generally not disputed.

62.     At the time of the Structured Tax Transactions, there existed diversity of practice on this issue. Firms used at least three different confidence thresholds to evaluate the recognition of deferred tax assets. Some firms recognized deferred tax assets based on a 33% probability of succeeding in court against the IRS, which is commonly referred to as a "substantial authority" threshold. Others recognized deferred tax assets only when meeting at least a "more likely than not" threshold, which is considered to denote a probability of success of at least 50.1%. Some required a "probable" threshold which denotes a probability of success of at least 70%. Chung Decl. Exs. D58 (Erickson Rpt. at 4-5, 43-44); D62 (James R. Browne, Financial Reporting for Uncertain Tax Positions, Tax Notes, Oct. 3, 2005 at 78).

**RESPONSE**:  **Disputed**.  Silvercreek's expert opines that the financial accounting standards of FAS 109 were properly applied to the Deutsche Bank Tax Transactions. P-DB9 (Regan Expert Rpt.) at 74, 264, 268-271.

63.     In July 2005, after all the Structured Tax Transactions were closed, the FASB proposed an interpretation of FAS No. 109 which would require that a tax position be "probable of being sustained on audit based solely on the technical merits of the position." The FASB also noted that "probable" is generally synonymous with a "should" level opinion. Chung Decl. Ex. D63 (FASB, Proposed Interpretation, Accounting for Uncertain Tax Positions, an interpretation of FASB Statement No. 109, July 14, 2005 at i and 16, ¶ B19, *available at* http://www.fasb.org/cs/ContentServer?site=FASB&c=Document_C&pagename=FASB%2FDoc ument_C%2FDocumentPage&cid=1176157305569 ("The Board believes that there is a common

understanding on the part of financial statement preparers, auditors, and regulators about the confidence level expressed by probable and that a probable recognition threshold is not inconsistent with the perceived level of confidence of an unqualified *should prevail* tax opinion.")).

**RESPONSE**:   **Disputed**.  The purported change in FAS 109 standards of a should or

probable opinion standard is not relevant to any issue in this litigation and therefore **immaterial**.

Further, Silvercreek's accounting expert opines that financial accounting standards of FAS 109

were not properly applied to the Deutsche Bank Tax Transactions. P-DB9 (Regan Expert Rpt.) at

74, 264, 268-271.

64.     In late 2005, the FASB modified its position in regard to the threshold necessary to recognize deferred tax assets. It decided that a "more likely than not" threshold was necessary to recognize deferred tax assets. Therefore, Enron exceeded the threshold necessary to recognize deferred tax assets subsequently specified by the FASB in 2005. Chung Decl. Exs. D58 (Erikson Rpt. at 5, 47-48); D64 (Minutes of Nov. 22, 2005 FASB meeting, *available at* http://fasb.org/jsp/FASB/Document_C/DocumentPage&cid=1218220116301).

**RESPONSE**:   This purported fact is **immaterial**.   Although, the financial accounting

standards of FAS 109 speak for themselves and are generally not disputed, whether those financial

accounting standards were properly applied to the Deutsche Bank Tax Transactions is **disputed**.

P-DB9 (Regan Expert Rpt.) at 74, 264, 268-271.

65.     It is well known within the accounting and financial community, particularly for complex transactions, that there exists more than one reasonable method of accounting that is compliant with GAAP for a particular transaction. This phenomenon is referred to as "diversity of practice," and is particularly relevant in these transactions because they involved the interpretation of ambiguous GAAP standards. Chung Decl. Ex. D58 (Erickson Rpt. at 8). When there is no clear GAAP standard for a transaction, reasonable people can disagree about the appropriate GAAP accounting, and they can have equally defensible positions. In sum, there exists diversity in practice for certain accounting issues with the diversity of accounting treatments all falling within the bounds of GAAP. Chung Decl. Ex. D58 (Erickson Rpt. at 39).

**RESPONSE**:   **Disputed**.  Financial accounting and GAAP standards were not properly

applied to the STDs and Silvercreek **disputes** that Deutsche Bank and Enron have defensible

GAAP accounting positions related to the Deutsche Bank Tax Transactions, particularly to the

lack of any disclosures with respect to the transactions in Enron's financial statements and

impropriety of converting future (and dubious) tax benefits into pre-tax income. P-DB9 (Regan Expert Rpt.) at 74, 264, 268-271.

66.     The key GAAP accounting element in three of the structured tax transactions (the Teresa, Steele, and Cochise Transactions) related to the accounting for differences in the book and tax basis of the firm's assets by recording deferred tax assets. The Steele and Cochise Transactions also involve another element: the accounting for purchases of assets. Chung Decl. Ex. D58 (Erickson Rpt. at 39).

**RESPONSE**:   **Disputed**.   Silvercreek disputes that purchase accounting rules were properly applied to the Deutsche Bank Tax Transactions. P-DB9 (Regan Expert Rpt.) at 74, 264, 268-271.

### B.     Specific Structured Tax Transactions.

#### 1.     Teresa Transaction.

67.     In the Teresa Transaction, which closed in March 1997, Enron contributed a leasehold interest in its headquarters (Enron North Building) to a partnership, Enron Leasing Partners L.P. ("ELP") in which its partners were Potomac Capital Investment and a subsidiary of Bankers Trust. The 98% limited partner in ELP was an Enron subsidiary, Organizational Partner, Inc. ("OPI"). OPI's tax basis in its interest in the partnership increased with the payment of dividends from ELP. There was no corresponding increase in the book basis of the same investment. Thus, the dividends caused the tax basis of the investment to exceed the book basis of the investment and as a result, Enron recorded a deferred tax asset. Enron did so because the increased tax basis would yield future tax benefits. Enron anticipated that at a future date, the Enron North Building would be distributed to Enron, and the tax basis of the building would thereby be increased to Enron's tax basis in the partnership. Thus, the tax basis of the investment would be ascribed to the Enron North Building upon liquidation of the partnership. The income statement consequence of recording the deferred tax asset in the Teresa Transaction was to reduce Enron's income tax expense, which in turn increased Enron's reported net income. As a result of the Teresa Transaction, Enron reduced its income tax expense, and increased its net income, by approximately $228.7 million during the period from 1997-2001. Chung Decl. Exs. D57 (Enron Accounting Summary (Oct. 2002) at ERN0083027-83029); D65 (Project Teresa Deal Basics, EC2 000037870); D 58 (Erickson Rpt. at 40-41, 53-55); D66 (Limited Partnership Agreement of Enron Leasing Partners, L.P. by and among Enron Property Management Corp., Organizational Partner, Inc. and EN-BT Delaware, Inc, dated Mar. 27, 1997, ERN0035834-35992).

**RESPONSE**:   The transaction details are generally **undisputed**; however, it is **disputed** that the tax transactions complied with GAAP. P-DB9 (Regan Expert Rpt.) at 226-227, 240-243, 258-260, including among other things that future tax benefits not occur or be needed, that deferred

credits are not appropriately recognized as present income, and that IRC sec. 269 and partnership

rules were not appropriately applied. *See* PSOF ¶¶ 405, 430, 476, 504, 507, 511, 522, 530, 539-

40, 544, 552, 599, 630, 633.  **Further disputed** because D57 is an unverified and unauthenticated

document created after the events at issue, which is inadmissible hearsay.

### 2. Steele Transaction.

68.     The Steele Transaction closed in October 1997. Chung Decl. Ex. D57 (Enron Accounting Summary (Oct. 2002) at ERN0083029).

**RESPONSE**:  **Undisputed**.

69.     The Steele Transaction involved the acquisition by an Enron subsidiary of $51.2 million of corporate bonds and $7.6 million of REMIC (Real Estate Mortgage Investment Conduit) Residuals in exchange for $46.8 million in cash, $4.5 million of debt, and $7.5 million of preferred stock. Chung Decl. Exs. D57 (Enron Accounting Summary (October 2002) at ERN0083029 – 83032); D58 (Erickson Rpt. at 56).

**RESPONSE**:  **Disputed**.  The value of preferred stock contributed by Enron is **disputed**.

P-DB9 (Regan Expert Rpt.) at 228-232, 240-243.  **Further disputed** because D57 is an unverified

and unauthenticated document created after the events at issue, which is inadmissible hearsay.

70.     When the Steele Transaction closed, the tax basis of the REMIC Residuals exceeded their book basis. Due to the divergence in the book and tax basis of the REMIC Residuals, Enron recorded a deferred tax asset and a corresponding deferred credit in the same amount, which was required to make debits equal credits. The deferred credit was a balance accounting item for which the book basis exceeds the tax basis. Enron therefore recorded an additional deferred tax asset to reflect the difference in the book and tax basis of the deferred credit. The final deferred tax asset recorded by Enron in the Steele Transaction was $121.8 million. Enron also recorded a deferred credit in the same amount to ensure that debits continued to equal credits. Chung Decl. Exs. D57 (Enron Accounting Summary (October 2002) at ERN0083029 – 83032); D58 (Erickson Rpt. at 40, 56-58).

**RESPONSE**:  The transaction details and accompanying paperwork speak for themselves

and are generally **undisputed**.  However, **disputed** in that D57 is an unverified and

unauthenticated document created after the events at issue, which is inadmissible hearsay.

**Further disputed** whether the accounting for the transaction complied with GAAP. P-DB9

(Regan Expert Rpt.) at 226-227, 228-232, 240-243.

71.     After the close of the Steele Transaction, Enron amortized the deferred credit into pre-tax income. It also recognized a deferred income tax expense in proportion to the pre-tax income recognized. Enron amortized 87% of the deferred credit over the life of the corporate bonds, and amortized 13% of the deferred credit over the life of the REMIC Residuals. The 87% vs. 13% split was based on the fair value of the bonds and REMICs at closing ($51.2 million of bonds vs. $7.6 million of REMICs). As a result of amortizing the deferred credit, Enron recognized $94.2 million of pre-tax income and $61.2 million of after-tax net income during the period from 1997-2001. Chung Decl. Ex. D57 (Enron Accounting Summary (October 2002) at ERN0083029 – 83032); D58 (Erickson Rpt. at 60).

**RESPONSE**:  The transaction details and accompanying paperwork speak for themselves and are generally **undisputed** but it is **disputed** whether the accounting for the transaction complied with GAAP. P-DB9 (Regan Expert Rpt.) at 226-227, 228-232, 240-243.  **Further disputed** because D57 is an unverified and unauthenticated document created after the events at issue, which is inadmissible hearsay.

### 3.     Cochise Transaction.

72.     The Cochise Transaction, which closed in January 1999, was a REMIC transaction like Steele. Chung Decl. Exs. D57 (Enron Accounting Summary (October 2002) at ERN0083034); D58 (Erickson Rpt. at 66).

**RESPONSE**:  **Undisputed** as to date of the Cochise Transaction but **disputed** because D57 is an unverified and unauthenticated document created after the events at issue, which is inadmissible hearsay.

73.     In the Cochise Transaction, Enron acquired REMIC Regular Interests for $24.7 million and REMIC Residuals for $0.2 million. It acquired the REMICs through a subsidiary that was organized as a Real Estate Investment Trust ("REIT"). Enron recorded the difference in the book and tax basis of the REMIC Residuals as a deferred tax asset, and it recorded a corresponding deferred credit to make debits equal credits. As in the Steele Transaction, Enron considered the deferred credit to be an item that required the recordation of a deferred tax asset for the difference in the book basis and tax basis of the deferred credit. It therefore increased the total deferred tax asset it recorded, and increased the deferred credit recorded by the same amount to ensure that debits continued to equal credits. As part of the Cochise Transaction, Enron also acquired through one of its subsidiaries two airplanes purchased from Deutsche Bank that were under lease to United Airlines and Continental Airlines for approximately $46.8 million. Chung Decl. Exs. D57 (Enron Accounting Summary (October 2002) at ERN0083020 – ERN0083043); D58 (Erickson Rpt. at 40-41, 66-69). In light of its recordation of a deferred credit, Enron reduced the book value of the airplanes to $0 (a $46.8 million reduction) and reduced its deferred credit by the same amount.

Chung Decl. Exs. D57 (Enron Accounting Summary (October 2002) at ERN0083020 – ERN0083043); D58 (Erickson Rpt. at 68).

**RESPONSE**:  The transaction details and accompanying paperwork speak for themselves and are generally **undisputed**.  However, it is **disputed** whether the accounting for the transaction complied with GAAP. P-DB9 (Regan Expert Rpt.) at 226-227, 233-239, 240-243.  **Further disputed** because D57 is an unverified and unauthenticated document created after the events at issue, which is inadmissible hearsay.

74.    After the close of the Steele Transaction, Enron amortized the deferred credit into pre-tax income. During the 1999-2001 period, Enron recognized approximately $12.6 million of pre-tax income from the amortization of the deferred credit, and after recording deferred income tax expense on this pre-tax income, Enron reported approximately $8 million of after-tax income. Chung Decl. Exs. D57 (Enron Accounting Summary (October 2002) at ERN0083034 – 83037); D58 (Erickson Rpt. at 69).

**RESPONSE**:  **Disputed**, as the assertions in the foregoing paragraph are not supported by the cited materials. **Further disputed** because D57 is an unverified and unauthenticated document created after the events at issue, which is inadmissible hearsay.

75.    Unlike in the Steele Transaction, the tax basis of the REMIC Residuals in the Cochise Transaction increased after the transaction closed due to "phantom income" earned by the REMICs. This increase in tax basis was not accompanied by an increase in the book basis of the REMICs. The increase in tax basis without a corresponding increase in book basis led to the recordation of deferred tax assets. Over the period from 1999-2001, Enron recorded approximately $68.9 million of deferred tax assets as a result of the increase in the tax basis of the REMICs (it recorded a deferred tax asset of $27.4 million in 1999, $25.6 million in 2000, and $15.9 million in 2001). These deferred tax assets resulted in the recognition of deferred income tax benefits of $68.9 million, which reduced Enron's income tax expense and increased its net income by the same amount. Chung Decl. Exs. D57 (Enron Accounting Summary (October 2002) at ERN0083034 – 83037); D58 (Erickson Rpt. at 70-71).

**RESPONSE**:  The transaction details and accompanying paperwork speak for themselves and are generally **undisputed** but **disputed** whether the accounting for the transaction complied with GAAP. P-DB9 (Regan Expert Rpt.) at 226-227, 233-243. **Further disputed** because D57 is

an unverified and unauthenticated document created after the events at issue, which is inadmissible hearsay.

76.     On June 28, 2000, the airplanes were sold to Deutsche Bank/BT for approximately $36.5 million. The book value of the planes was $0 when they were sold by Enron. Enron recorded a $36.5 million pre-tax gain when the planes were sold, which was computed as the difference in the sale proceeds ($36.5 million) and Enron's basis in the planes (which was $0). Enron recorded an after-tax gain on the sale of the planes of about $24.5 million. Deutsche Bank/BT held the planes until July 27, 2000 when it sold them to Oneida, a partnership formed by Enron and Deutsche Bank/BT as part of the Tomas Transaction. Deutsche Bank/BT was the managing partner of Oneida at the time of the sale. Deutsche Bank/BT paid fair market value for the planes, bore the risk of loss during its ownership of the planes, and had not entered into any agreement to sell the planes to Oneida. There was no agreement limiting the benefit to Deutsche Bank/BT if the Cochise Planes increased in value in the interim, or limiting the detriment to Deutsche Bank/BT if the Cochise Planes decreased in value. Chung Decl. Exs. D57 (Enron Accounting Summary (October 2002) at ERN0083034 – 83037); D58 (Erickson Rpt. at 71, 73-75); Chung Decl. Ex. D107 (McGuire Dep. 190:12-191:14).

**RESPONSE**:  The transaction details, convoluted and contrived as they may be, and accompanying paperwork speak for themselves and are generally **undisputed**. However, **disputed** that the accounting for the contrived 30 day "sale" transaction complied with GAAP. P-DB9 (Regan Expert Rpt.) at 226-227, 233-243. Among other things, Deutsche Bank and Enron agreed upon expectation to resell the planes to Oneida prior to the sale to Deutsche Bank and then to Oneida was plainly a violation of GAAP because a transaction cannot be considered a bona fide sale if there is an understanding that the asset be repurchased. P-DB19 (Appx. G (Role of BT/Deutsche Bank and its Affiliates) to 3d Interim Rpt. Of Neal Batson Court-Appointed Examiner ("Batson DB Rpt.")) at 54; P-DB21 (email among Akin Gump attorneys) at AGS35929 (transfer of planes to Oneida did not "achieve Enron's goals from an accounting perspective" of recording a book gain on the sale); P-DB22 (DB internal email re Project Tomas JV) DBF002636-DBF002637 (describing round tripping of planes, noting "I would not expect material gain or loss to result to BT Leasing in any event."); P-DB186 (Enron Resps. to Deutsche Bank RFA Nos. 167-

68) at 46-47.  **Further disputed** because D57 is an unverified and unauthenticated document created after the events at issue, which is inadmissible hearsay.

### 4.   **Tomas Transaction**.

77.   The Tomas Transaction closed in September 1998. As part of its acquisition of Portland General Holdings, Inc. ("PGH") Enron obtained a portfolio of leased assets -- airplanes, railcars, and other equipment -- previously held by PGH. The assets' fair market value exceeded their tax basis and would trigger, upon their sale, a taxable gain equal to the difference in their fair market value and tax basis. Enron wanted to dispose of these leased assets in a manner that would minimize the tax liability arising from the sale. The Tomas Transaction involved Enron's disposition of these leased assets. Chung Decl. Exs. D57 (Enron Accounting Summary (October 2002) at ERN0083032-83034); D58 (Erickson Rpt. at 75).

**RESPONSE**:  The transaction details and accompanying paperwork speak for themselves and are generally **undisputed**; however, it is **disputed** whether the accounting for the transaction complied with GAAP. P-DB9 (Regan Expert Rpt.) at 226-227, 261-268; *see also* P-DB19 (Batson DB Rpt.) at 73 (no bona fide intent to engage in leasing activity with Deutsche Bank). **Further disputed** because D57 is an unverified and unauthenticated document created after the events at issue, which is inadmissible hearsay.

78.   In the Tomas Transaction, Enron formed a partnership, Seneca Leasing Partners, in 1998 with two Deutsche Bank affiliates. Through a series of contributions and the use of an Enron subsidiary, Enron was able to increase the tax basis of the leased assets that were contributed to the partnership through its subsidiary, Oneida. This increase in the tax basis of the leased assets reduced the taxable gain, and consequent tax liability, arising from a sale of the leased assets. Chung Decl. Exs. D57 (Enron Accounting Summary at ERN0083032-83034); D58 (Erickson Rpt. at 75-76).

**RESPONSE**:  The transaction details and accompanying paperwork speak for themselves and are generally **undisputed**; however, it is **disputed** whether the accounting for the transaction complied with GAAP. P-DB9 (Regan Expert Rpt.) at 226-227, 261-268; *see also* P-DB19 (Batson DB Rpt.) at 73 (no bona fide intent to engage in leasing activity with Deutsche Bank). **Further disputed** because D57 is an unverified and unauthenticated document created after the events at issue, which is inadmissible hearsay.

79.     The Tomas Transaction resulted in a reduction in the tax cost of liquidating the leased assets portfolio. The total tax benefits were approximately $43.6 million. These tax benefits were included in the information provided in Enron's income tax footnotes. Chung Decl. Exs. D57 (Enron Accounting Summary at ERN0083032-83034); D58 (Erickson Rpt. at 75-76).

**RESPONSE**:  The transaction details and accompanying paperwork speak for themselves and are generally not **disputed**; however, it is **disputed** whether the accounting for the transaction complied with GAAP. P-DB9 (Regan Expert Rpt.) at 261-268.  Further the assertion that the tax benefits were disclosed in Enron's footnotes is also **disputed**. P-DB9 (Regan Expert Rpt.) at 271.

**Further disputed** because D57 is an unverified and unauthenticated document created after the events at issue, which is inadmissible hearsay.

### C.     Role of Outside Advisors.

80.     Enron received "should" opinions from national, reputable law firms on each of the Structured Tax Transactions. Such opinions indicate that in the opinion of these law firms, Enron had at least a 70% chance of prevailing if the IRS decided to challenge Enron's tax treatment and the dispute was litigated. Chung Decl. Ex. D58 (Erickson Rpt. at 90-91).

**RESPONSE**:  Silvercreek **disputes** everything other than that Enron received a should opinion letter from William McKee on the Teresa transaction, received a should opinion from Akin Gump on the Steele transaction when King & Spalding refused to issue the letter, received a should opinion from William McKee on the Cochise transaction, and received a should opinion from Akin Gump on the Tomas transaction. P-DB10 (July 29, 1997 King & Spalding Teresa Tax Opinion) at AB000151584-AB000151628; P-DB11 (December 16, 1997 Steele Tax Opinion) at EC2000033867-EC2000033904; P-DB12 (March 21, 2001 McKee Nelson Cochise Tax Opinion) at AB000151794-AB000151878; P-DB13 (November 23, 1998 Akin Gump Tomas Tax Opinion) at AB000151727-AB000151789. Each of these letters were based on certain representations, the truth of which are **disputed**. *See infra* PSOF ¶ 594. **Further disputed** because D57 is an unverified and unauthenticated document created after the events at issue, which is inadmissible hearsay.

81.     Arthur Andersen's tax accountants independently concurred with these "should" opinions. Enron's accounting for the Structured Tax Transactions was reviewed by Arthur Andersen and Arthur Andersen's Professional Standards Group ("PSG").[4] Arthur Andersen analyzed hypothetical versions of the structured tax transactions and expressed its opinion about the GAAP accounting for each tax transaction in the form Statement on Auditing Standards ("SAS") 50 letters.[5] Arthur Andersen also analyzed the GAAP accounting for each tax transaction as actually completed as part of its financial statement audits of Enron. In the late 1990s, Arthur Andersen was a highly reputable firm. For example, in 1999, the CPA Journal noted that, "[f]or the 18th year straight, Arthur Andersen was rated the most highly regarded accounting firm by accounting professors, according to a recent CPA Personnel Report survey." Chung Decl. Exs. D277 (Arthur Andersen Ranked No. 1 by Professors, CPA Journal, Oct. 99, Vol. 69); D278 (Ernst Tops Novak Clint Survey in Photo-Finish, Accounting Today, Aug. 11, 1997 v. 11 n. 14 p. 5(1)); D58 (Erickson Rpt. at 90-91).

**RESPONSE**:  **Disputed**. Arthur Andersen was not remotely independent, and Deutsche

Bank knew, Andersen's advice was compromised. Andersen was employed by Deutsche Bank in

development of the Deutsche Bank Tax Transactions prior to presenting them to Enron and

Deutsche Bank was involved in the creation of the SAS 50 letters. P-DB14 (Finley Dep.) at 69:17-

72:2, 74:24-75:22, 80:19-82:15, 93:9-22. P-DB15 (Finley Bankr. Dep.) at 18:1-19:6. Whether

Deutsche Bank deferred to the accounting development of Andersen is **disputed** as numerous

Deutsche Bank people involved in developing the Deutsche Bank Tax Transactions worked at

Andersen, including Thomas Finley, Christine Levinson, William Boyle, Brian McGuire, John

Tsai, and Forest Gilman. P-DB14 (Finley Dep.) at 94:24-97:23. Deutsche Bank knew at the time

of obtaining the SAS 50 letters from Andersen, that they would provide them to clients to support

accounting results. P-DB228 (McGuire Bankr. Dep.) at 126:13-20. Andersen was suggested to

---

[4] Arthur Andersen's PSG was a group of individuals who, among other things: (i) consulted with engagement teams on GAAP issues; (ii) provided implementation guidance on accounting standards; (iii) represented Arthur Andersen before, and liaised with, standard-setting and regulatory bodies (*e.g.*, the FASB, EITF, the SEC, etc.), (iv) authored accounting research materials for the firm's internal use; and (v) reviewed training materials. Chung Decl. Exs. D59 (Petersen Dep.) at 23:20-24:21; D144 (Stewart Dep.) 17:6-18:9.

[5] A SAS 50 letter is a medium for obtaining from an accountant advice on the application of accounting principles to specified transactions, either completed or proposed, or advice on financial statements. Chung Decl. Ex. D60 (SAS 50 – *Reports on the Application of Accounting Principles*).

Enron as knowing the tax transaction accounting details and participated in marketing the

transactions to Enron. *See infra* PSOF ¶ 577. In fact, to increase the potential acceptability of the

transactions by taxpayer companies, Deutsche Bank decided to limit marketing to companies that

shared Andersen, King & Spalding or Akin Gump as clients. P-DB18 (DB marketing email

describing agreement between Finley, Kozak and Bijawat) at DBG027038 ¶ 1.

### 1.   The Teresa Transaction Was Independently Expertized.

82.     King & Spalding LLP ("King & Spalding") represented Enron in connection with
the Teresa Transaction. Enron received a "should" tax opinion from King & Spalding with respect
to this transaction. Chung Decl. Exs. D67 (King & Spalding tax opinion letter to R. Davis Maxey
dated May 14, 1997 by William S. McKee and Abraham Shashy, Jr., MN002908 – MN002936);
D68 (King & Spalding tax opinion letter to R. Davis Maxey dated July 29, 1997 by Abraham N.M.
Shashy, Jr. for himself and William S. McKee, EC2 000033769 – EC2 000033813).

**RESPONSE**: **Disputed**.  Silvercreek disputes that the Enron should opinion letters from

William McKee on the Teresa transaction support the transaction because the letters were based

on certain representations, the truth of which are **disputed**. P-DB10 (King & Spalding Teresa Tax

Opinion) at AB000151584-AB000151628; *see infra* PSOF ¶ 594.

83.     Prior to issuing its tax opinion, King & Spalding provided a memorandum to Enron
regarding the potential federal income tax consequences of the Teresa Transaction. Chung Decl.
Ex. D69 (King & Spalding Memorandum to R. Davis Maxey dated Feb. 20, 1997 from William
S. McKee and Susan Jewett, EC2 000033661 – EC2 000033739).

**RESPONSE**: **Undisputed**.

84.     Arthur Andersen independently concurred with King & Spalding's "should"
opinion with respect to the Teresa Transaction. Chung Decl. Ex. D70 ("Formation of Enron
Leasing Partners, L.P. (Partnership) and Treatment of Taxable Dividends" Memorandum to Enron
Corp. by David B. Duncan, Robert P. Palmquist, and Roger D. Willard dated Mar. 14, 1994, AA-
EX00451597 – AA-EX00451602 at AA-EX00451598).

**RESPONSE**: **Disputed.** Arthur Andersen's review of the transactions for Enron was not

independent. Andersen was employed by Deutsche Bank in development of the Deutsche Bank

Tax Transactions prior to presenting them to Enron and Deutsche Bank was involved in the

creation of the SAS 50 letters. P-DB14 (Finley Dep.) at 69:17-72:2, 74:24-75:22, 80:19-82:15,

93:9-22; P-DB15 (Finley Bankr. Dep.) at 18:1-19:6. Whether Deutsche Bank deferred to the accounting development of Andersen is **disputed** as numerous Deutsche Bank people involved in developing the Deutsche Bank Tax Transactions worked at Andersen, including Thomas Finley, Christine Levinson, William Boyle, Brian McGuire, John Tsai, and Forest Gilman. P-DB14 (Finley Dep.) at 94:24-97:23. Deutsche Bank knew at the time of obtaining the SAS 50 letters from Andersen, that they would provide them to clients to support accounting results. P-DB228 (McGuire Bankr. Dep.) at 139:4-141:4. Andersen was suggested to Enron as knowing the tax transaction accounting details and participated in marketing the transactions to Enron. *See infra,* PSOF ¶ 577. In fact, to increase the potential acceptability of the transactions by companies, Deutsche Bank decided to limit marketing to companies that shared Andersen, King & Spalding or Akin Gump as clients. P-DB18 (August 14, 1997 DB marketing email describing agreement between Finley, Kozak and Bijawat) at DBG027038 ¶ 1.  Additionally, the letters were based on certain representations and assumptions, the accuracy of which is **disputed**. *See* PSOF ¶¶ 586-92, *infra*.

85.    In its memorandum dated March 14, 1997, Arthur Andersen supported the recognition of a deferred tax asset on the increase in Enron's tax basis in the partnership that occurred with each dividend. Chung Decl. Ex. D71 ("Tax Accounting for Project Teresa" Memorandum by David B. Duncan, Robert P. Palmquist, and Roger D. Willard dated Mar. 14, 1997, AASDTEX00475633 – AASDTEX00475638).

**RESPONSE**:  **Disputed**.  This document as inadmissible hearsay and no other support is proffered for the assertion in paragraph 85.  Given that Deutsche Bank never would have seen the document, it could not have been relied upon and is therefore, **immaterial**.  Andersen's memorandum rests on a false and therefore **disputed** premise that "accounting income is a good business purpose"; yet, Andersen's October 25, 1997 internal memorandum from Richard Petersen to Roger Willard unambiguously states "the impact of a transaction on financial reporting" is not

a valid business purpose. P-DB23 at PSI00021882 (disputing Enron's claimed business purpose

from purchase of REMICs as contrary to "the requirements of the tax law").

> 86.     Arthur Andersen also issued a SAS 50 letter to Bankers Trust regarding the
> proposed transaction. Chung Decl. Exs. D72 (Accounting opinion letter from Arthur Andersen to
> Bankers Trust dated May 12, 1995, DBC 012919 – DBC 012924); D73 (Accounting opinion letter
> from Arthur Andersen to Bankers Trust dated July 26, 1995, AB0074 1235 – AB0074 1246).

**RESPONSE**:  **Undisputed**.  Also **undisputed** that Deutsche Bank's retention of Andersen

with respect to the development of the STDs and with respect to Deutsche Bank's promotion of

the transactions after the fact compromised Andersen's independence.

**2.     The Steele Transaction Was Independently Expertized**.

> 87.     Enron's outside counsel for the Steele Transaction was Akin, Gump, Strauss, Hauer
> & Feld LLP ("Akin Gump"). In connection with the Steele Transaction, Akin Gump provided two
> tax opinion letters. The transaction closed with Akin Gump giving a "should" level tax opinion to
> Enron. Chung Decl. Exs. D74 (Federal tax opinion letter from Akin Gump to Maxey dated Dec.
> 16, 1997, EC2 000033867- EC2 000033904); D75 (Akin Gump tax opinion letter to Maxey dated
> Dec. 16, 1997, EC2 000033905 – EC2 000033916).

**RESPONSE**:  **Disputed**.  The Steele should opinion letters are not independent and

assume facts, which are **disputed**.  First, William McKee, who represented Deutsche Bank on the

Steele transaction, considered and refused to give the tax opinion to Enron on the Steele transaction

because he thought IRC section 269 could apply to void it. P-DB3 (McKee Dep.) at 29:18-32:1;

P-DB24 (Hermann Bankr. Dep.) at 86:21-88:1. According to Bob Hermann, Deutsche Bank was

probably in the room when McKee said he was not preparing the Steele should opinion. P-DB24

(Hermann Bankr. Dep.) at 86:21-88:1. Mr. John Buser, who advised Enron on the Steele

transaction stated, "If the tax benefits were not substantially deferred, our tax opinion would

become inapplicable because we – [sic] we were opining on a certain set of facts.  If those weren't

the facts, our opinion would no longer be relevant." P-DB25 (Buser Dep.) at 57:12-58:18. Buser's

lawyer told the Enron Bankruptcy examiner that his Steele tax opinion was premised upon certain

factual assumptions represented to him and that, if those assumptions were not true, his opinion

letter could not be relied upon. Buser's opinion letter relied upon the assumption that Enron would

defer recognition of the tax deductions from Steele for many years such that Enron would not

enjoy any present value benefit of the tax deductions (in excess of the transaction costs). P-DB10

(King & Spalding Teresa Tax Opinion) at AB000151584-AB000151628.   Enron told the

Congressional Joint Committee on Taxation that it did not substantially defer the tax benefits from

Steele for many years, as Mr. Buser assumed. P-DB26 (Jan. 2003 Enron Letter to JCT) at

AB000525602 ¶ 4.

88.   In addition, Arthur Andersen issued a SAS 50 letter to Bankers Trust on the
hypothetical version of the Steele Transaction. In its SAS 50 letter, Arthur Andersen reached a
determination that Enron should record a deferred tax asset for the deferred credit recognized in
Steele. Chung Decl. Ex. D76 (Accounting opinion letter from Arthur Andersen to Bankers Trust
dated Aug. 11, 1997, DBC 017408 – DBC 017420).

**RESPONSE**: **Disputed**.  Andersen's SAS 50 letters are predicated on a hypothetical version

of Steele. P-DB14 (Finley Dep.) at 510. SAS 50 letters were based on hypothetical facts, and were

not an audit, approval or opinion of actual transaction facts. *Id*. at 518:1-11, 520:5-521:17. In

reference to the SAS 50 letters, Bob Hermann testified "the deals always changed, so the letters

didn't make any difference anyway." P-DB24 (Hermann Bankr. Dep.) at 47:8-24 Because they

were issued well before the tax transactions were actually done, the Andersen SAS 50 letters could

not take into consideration whether the client had the required ability and intent to utilize the

purported tax deductions and losses derived from them. P-DB14 (Finley Dep.) at 521:18-524:15.

Andersen *assumed* that Enron had both "the ability and intent" to utilize the tax deductions and

losses made available by the tax transactions and made the assumption based on the representations

made by Deutsche. *Id*. at 515:17-527:16.  Thomas Finley testified, that Andersen's SAS 50 letters

were premised upon the assumption that the counterparties in the Tax Transactions had both the

"ability and intent" to utilize the tax deductions and losses and that the accounting treatment relied

on this premise. *Id*. at 521:18-524:15. Accounting firms no longer provide SAS 50 letter, and it makes sense to Finley based on the timing that accounting firms stopped the practice after Enron. *Id*. at 516:19-517:25. Enron had millions of dollars in net operating losses, so the tax savings that were created from the tax transactions were unusable. P-DB28 (JCT Report) at 10. Simply put, Enron did not do any tax transactions for tax deduction, because they had plenty and "didn't need deductions;" to Enron the accounting income was the "critical" key. P-DB24 (Hermann Bankr. Dep.) at 46:6-18. To support the necessary SAS 50 requirements for the eventual closing of Steele, Enron falsely told Andersen, "the acceleration of the financial statement benefits in advance of the tax benefits is not the sole reason for doing this transaction." P-DB29 (Oct. 1997 Letter from Enron to Andersen) at AA 000006608-AA 000006609.   Deutsche Bank knew this representation was false, since it told Enron's tax counsel in development, "the principal purpose of [the company] in entering the transaction was to achieve the accelerated accounting benefits resulting therefrom." P-DB30 (June 1997 Letter Deutsche to Enron) at DBC009410-DBC009418.

89.     Arthur Andersen also prepared a memorandum regarding the accounting for the Steele Transaction in which it expressly advocated that a standard higher than "more likely than not" be applied to the transaction. In the memorandum, Arthur Andersen stated:

> The preceding discussion is predicated on assumptions about certain provisions of the IRC, the regulations thereunder, and other relevant authorities promulgated by the Internal Revenue Service and the courts. The recording of the financial statement benefits of the transaction is dependent on the proper interpretation and implementation of such authorities.

> In situations such as these, in which the ultimate relation of the economic and financial statement benefits is dependent upon certain positions that will be taken on current and future tax returns, we believe that the financial statement benefits should be recorded only if it is probable that the pertinent tax position will be sustained. The term "probable," though discussed in SFAS No. 5 – Accounting for Contingencies, is not numerically defined therein or elsewhere in the authoritative accounting literature. It is clear that it requires a higher degree of likelihood than the 50.1% threshold implied by the "more likely than not" standard discussed in SFAS No. 109.

This transaction has been reviewed by Bob Palmquist, Tax Partner and Mike Baldasaro, Tax Partner Director. They have concluded, based upon review of the structure, discussions with Enron tax personnel and Enron's outside legal counsel that this transaction "should" be sustained under the IRC and relevant authoritative rules. (Enron has also obtained a "should" opinion from a reputable outside law firm (Akin, Gump et al.). We will accept a should tax conclusion as meeting the probability criteria described above. This is consistent with the Firm's position on other transactions.

Chung Decl. Exs. D77 ("Acquisition of Interests in Real Estate Mortgage Investment Conducts (REMIC) (sic)" Memorandum to Enron Corp. Files by Roger D. Willard dated October 30, 1997, AASDTEX001068412 – AASDTEX001068418 at AASDTEX001068418); D278 ("Project Steele" memorandum to The Files by Robert P. Palmquist dated October 29, 1997, AASDTEX001068373).

**RESPONSE**:  **Disputed**.  D278 offers no support for the proposed facts.  Silvercreek **disputes** this document as inadmissible hearsay and no other support is proffered for the assertion in paragraph 89.  Further, since Deutsche Bank never saw the document, it could not have been relied upon and is therefore, **immaterial**.  Silvercreek **disputes** that APB 16 applied to the Steele transaction in the absence of a "business combination," and the above document applies APB 16 "business combination" accounting by analogy.  P-DB9 (Regan Rpt.) at 231, 241.

### 3.   The Cochise Transaction Was Independently Expertized.

90.   William S. McKee and James D. Bridgeman of McKee Nelson, Ernst & Young LLP  were the primary counsel for the development and implementation of the Cochise Transaction, with King & Spalding providing counsel on the issue of REIT status qualification for Maliseet. In connection with the Cochise Transaction, McKee Nelson, Ernst & Young LLP provided a tax opinion letter that analyzed the tax implications of the transaction. Chung Decl. Ex. D78 (McKee Nelson Ernst & Young tax opinion letter to R. Davis Maxey dated Mar. 21, 2001 by William S. McKee and James D. Bridgeman, EC2 000033988 – EC2 000034072). In addition, King & Spalding provided a tax opinion letter that analyzed the tax implications of the transaction and concluded that Maliseet "should" qualify as a REIT for Federal income tax purposes for its taxable year ended December 31, 1999, and that the organization and proposed method of operation of Maliseet "should" enable it to continue to satisfy the requirements for qualification and Federal income taxation as a REIT for its taxable year ended December 31, 2000 and subsequent tax years. Chung Decl. Ex. D79 (King & Spalding tax opinion letter to Enron Corp. and Maliseet Properties, Inc. dated May 14, 2001, EC2 000033980 – EC2 000033983).

**RESPONSE**:  **Disputed**.  Silvercreek does not dispute that the subject letters were written, but does **dispute** that the "should" opinion is based on the true facts of the transaction. For

example, Deutsche employee McGuire, who was directly involved in discussing the Cochise transaction with Enron, stated the carryover (pretax) benefits were a "significant" and principal purpose of the Cochise transaction. P-DB228 (McGuire Bankr. Dep.) at 35:6-21, 453:17-24, 456:4-457:12. If this representation is untrue, then the transaction falls under IRC § 269 and would fail. *Id*. at 193:3-10. Additionally, Deutsche Bank clearly, though inadvertently, admitted the much greater importance on pre-tax (carryover) versus post-tax (purchase) benefits in its development letter to William McKee outlining transactions that would become the Steele and Cochise transaction. P-DB31 (1997 Letter from Boyle to McKee) at AB000187758-AB000187776. The letter was co-written by William Boyle, Thomas Finley, Brian McGuire of Deutsche Bank Structured Transaction Group, with input from Arthur Andersen, P-DB32 (Boyle Dep.) at 93:19-98:10, and stated,

> "The distinction between Above-the-Line and Below-the-Line is critically important in a number of respects. Most significantly, stock analysts and valuation specialists utilize this concept when analyzing a particular corporate business entity and determining the appropriate value and stock price for the corporation. Commonly, such analysis relies heavily on Earnings Before Interest, Taxes, Depreciation and Amortization."
>
> . . .
>
> "Thus, **stock analysts and valuation specialists generally ignore the tax expense line** of an income statement . . . in determining a corporation's true market or trading value. Accordingly, since the compensation of a business entity's executive offices is often tied to the market or trading value of the entity, **such executives place much greater priority on increasing Pre-Tax Income** and are generally less concerned about the entity's [post-tax income].

P-DB31 at AB0000187758 (emphasis added). This same letter further concludes, "In summary, it should be apparent from the above discussion that **the Transaction is a deal driven by the [pre-tax] accounting benefits. If a client were interested in the tax benefits, other less expensive alternatives exist** . . . ." *Id*. at AB0000187776 (emphasis added). Bankruptcy Examiner, Neal Batson, agreed that there is "significant factual uncertainty whether Enron's representation that the

Carryover Benefit was more important to it that the Purchase Benefit was accurate when made. P-DB33 (Batson Tax Transactions Rpt.) at 33.

Deutsche Bank's internal memos on what would become the Steele and Cochise transactions further demonstrate Deutsche's understanding that clients, like Enron, would be most interested in the transaction for the "generation of pre-tax income." P-DB34 (1997 Memo re New Product Initiative for REMIC Subco) at DBF044288-DBF044297 ("The principal purpose of the Transaction for the Client will be to generate significant amounts of pre-tax accounting and investment income."); *see also*, P-DB9 (Regan Expert Rpt.) at 243-251.

Finally, the validity of the King & Spalding letter Deutsche Bank cites is clearly in question, because by its terms it is entirely based on the veracity of the facts stated in Bill McKee's letter which are shown by the above statements from Deutsche Bank management and their tax expert to be unsupportable. D79 at 3 (". . . we have relied and assumed the accuracy of, the opinion of McKee, Nelson, Ernst & Young, LLP, dated as of March 21, 2001 . . . .").

91.    Arthur Andersen provided a hypothetical accounting opinion – or SAS 50 – letter to Bankers Trust that analyzed the financial accounting treatment of a hypothetical transaction that was substantially identical to the Cochise Transaction. Chung Decl. Ex. D80 (Accounting opinion letter from Arthur Andersen to Bankers Trust dated May 26, 1999, EC2 000037349 – EC2 000037367).

**RESPONSE**:  **Disputed**.  Silvercreek disputes the characterization of the citation stating that the hypothetical is "substantially identical" to the Cochise transaction. Chung Decl. Ex. D80; P-DB14 (Finley Dep.) at 509:15-510:16. Silvercreek does not dispute that Arthur Andersen issued the above SAS 50 letter on a hypothetical transaction.

92.    Arthur Andersen also specifically reviewed the GAAP accounting for the sale of the planes in the Cochise Transaction and addressed this subject in a memorandum authored by Christopher Herbold dated July 19, 2000. This memorandum concluded that Enron's accounting for the sale of the Cochise planes was appropriate. Chung Decl. Ex. D81 ("Sale of Aircraft Interests" Memorandum by Christopher Herbold dated July 19, 2000, AASDTEX003221042

("Based on our review of Project Cochise and of the Purchase Agreements the treatment is appropriate.")).

**RESPONSE**:  **Disputed**.  Silvercreek disputes this document as inadmissible hearsay and no other support is proffered for the assertion in paragraph 92.  The referenced document is apparently a memo to a "file."  There is no testimony supporting in what context it was created, reviewed, modified withdrawn, or otherwise revoked.

93.     In an earlier memorandum, Arthur Andersen concluded that Enron's accounting for the Cochise Transaction complied with GAAP. It stated that:

> The significant accounting issues are 1) consolidation of Maliseet, 2) sustainability of tax positions, 3) proper calculation of deferred taxes and 4) proper calculation, method and period of amortization of the deferred credit. We have concluded that Enron has properly accounted for their issues to within immaterial differences. . . .

> This transaction has been reviewed by Bob Palmquist, Tax Partner. He has concluded, based upon review of the structure, discussions with Enron tax personnel, Enron's outside legal counsel and representations of Enron that this transaction "should" be sustained under IRC and relevant authoritative rules. We will accept a should tax conclusion as meeting the probability criteria described above. This is consistent with the Firm's position on other transactions. The transaction has also been discussed with Rick Peterson, PSG, who concurred with our conclusion above given the "should" opinion determination.

Chung Decl. Ex. D82 ("Project Cochise – Acquisitions of REMICs" memorandum to Enron Corp. Files by Herman Manis and Christopher Herbold dated Mar. 31, 1999, AASDTEX001068421 – AASDTEX001068427 at AASDTEX001068421, AASDTEX001068427).

**RESPONSE**:  **Disputed**.  Silvercreek disputes this document as inadmissible hearsay and no other support is proffered for the assertion in paragraph 93.  Given that Deutsche Bank never would have seen the document, it could not have been relied upon and is therefore, **immaterial**. Silvercreek disputes that APB 16 applied to the Steele transaction in the absence of a "business combination," and the above document applies APB 16 "business combination" accounting by analogy.  P-DB9 (Regan Expert Rpt.) at 231, 241.

**4.     The Tomas Transaction Was Independently Expertized**.

94.     Akin Gump represented Enron in the closing of the Tomas Transaction and provided a "should" opinion letter regarding the Federal tax issues in the Tomas Transaction. Chung Decl. Ex. D83 (Akin Gump tax opinion letter to Enron Corp. dated November 23, 1998, EC2 000033917 – EC2 000033979). Arthur Andersen independently concurred with this "should" level opinion:

> We have been informed by Bob Palmquist, engagement tax partner, (who has consulted with Mike Baldasaro, head of Corporate Transactions and Operations Tax Specialty Team[]) that they will be able to issue a "should" opinion with respect to the tax attributes associated with this transaction to support the "probable" assertion as described above.

Chung Decl. Ex. D275 ("Enron/Tax Efficient Lease monetization" memorandum to Enron Corp. Files by David. B. Duncan, H Ronald Weissman, and Roger D. Willard dated July 4, 1998, AA-EX00016779-90 at AA-EX00016790).

**RESPONSE**: **Disputed**. The cited document is inadmissible hearsay and no other support

is proffered for the assertion in paragraph 94. Given that Deutsche Bank never would have seen

the document, it could not have been relied upon and is therefore, immaterial.  Further, the claimed

fact mischaracterizes the Andersen memo as "concurring" with Akin Gump's should level opinion.

Such a reading is facially impossible as the Andersen memo was purportedly written four months

before the cited Akin Gump letter. *Compare*, Chung Decl. Ex. D83, *with*, Chung Decl. Ex. D275.

### D.     Arthur Andersen Concluded that Enron's Accounting for the Structured Tax Transactions Complied with GAAP and that Enron's Disclosures were Appropriate.

95.     In each year from 1997 to 2000, Enron's financial statements included a disclosure about the company's accounting for deferred income taxes. Chung Decl. Ex. D58 (Erickson Rpt. at 14).

**RESPONSE**: **Disputed**.   Silvercreek's experts dispute that the Deutsche Bank Tax

Transactions were adequately or appropriately disclosed in Enron's financial statements. P-DB9

(Regan Expert Rpt.) at 271; P-DB81 (Saunders Bank Rpt.) at 81-83; *see also* P-DB19 at 35, 41,

43.

96.     Enron also reported the effects of the Structured Tax Transactions in several places in its financial statements, including its balance sheet, income statement, statement of cash flows, and related footnotes. For example, in Enron's income statement, Enron's net income was higher

as a result of these transactions. Enron's balance sheets included deferred tax assets arising as a result of the transactions. With respect to both Enron's income statement and balance sheet, Enron's statement of cash flows contained a specific line item for the non-cash component of net income that was attributable to deferred taxes. Chung Decl. Exs. D58 (Erickson Rpt. at 14); D57 (Enron Accounting Summary, ERN0083020 – ERN0083043 at ERN0083029, ERN0083036).

**RESPONSE**: **Disputed**. Silvercreek disputes that the Deutsche Bank Tax Transactions were adequately or appropriately disclosed in Enron's financial statements. P-DB9 (Regan Expert Rpt.) at 271; P-DB81 (Saunders Bank Rpt.) at 81-83. Enron's post-Bankruptcy management also expressly "denied" that the effects of the Deutsche Bank Tax Transactions were disclosed in Enron's financial statements. D85 (Enron Responses to RFAs Nos. 69-72) at 22-23. **Further disputed** because D57 is an unverified and unauthenticated document created after the events at issue, which is inadmissible hearsay.

97.     Enron's income tax footnote likewise contained information about the effects of the Structured Deutsche Bank Tax Transactions. Specifically, the tax rate reconciliation in Enron's tax footnote included a line item "Basis and Stock sale differences." Included in that line item were the effects on Enron's income tax expense of the Teresa, Tomas, and Cochise Transactions. Reductions in income tax expense result in a corresponding increase in net income. With respect to the disclosure of "Basis and Stock sale differences" in Enron's financial statements, Wall Street analysts explicitly inquired about this line item during conference calls. Enron's management discussed the fact that its tax rate was lower than the statutory rate, and that management expected its tax rate to remain below the statutory rate. Enron's management also discussed the major factors that reduced Enron's tax rate, including asset and stock sale differences – a factor that reflected the effects of the Teresa, Tomas, and Cochise Transactions. Chung Decl. Exs. D58 (Erickson Rpt. at 14-15, 135-136); D57 (Enron Accounting Summary, ERN0083020 (October 2002) at ERN0083028, ERN0083036); D283 ("2000 Enron Corp Statutory to Effective Rate Reconciliation" Memorandum by Robert P. Plamquist, Michael D. Jones, Allen T. Pearl, and Christopher J. Herbold dated Jan. 20, 2001, AASDTEX000414443-414445); D282 (Transcript of Enron 1999 Second Quarter Results and Outlook Analyst Conference Call held on July 13, 1999); D85 (Enron Response to RFA No. 100).

**RESPONSE**: **Disputed**. Silvercreek disputes that the Deutsche Bank Tax Transactions were adequately or appropriately disclosed in Enron's financial statements. P-DB9 (Regan Expert Rpt.) at 271; P-DB81 (Saunders Bank Rpt.) at 81-83. **Further disputed** because Enron's unverified responses to Deutsche Bank's RFAs (D85) are inadmissible hearsay and in all events

Enron expressly "denied" that the effects of the Deutsche Bank Tax Transactions were disclosed in Enron's financial statements. D85 (Enron Resps. to DB RFAs Nos. 69-72) at 22-23. **Further disputed** because D57 is an unverified and unauthenticated document created after the events at issue, which is inadmissible hearsay.

98.     In addition, Enron's tax rate reconciliation contained in each year's 10-K reflected the effects of the Structured Deutsche Bank Tax Transactions. Chung Decl. Ex. D58 (Erickson Rpt. at 14). For example, Enron's 2000 10-K states in its "Summary of Significant Accounting Policies" section:

> Income Taxes. Enron accounts for income taxes using an asset and liability approach under which deferred assets and liabilities are recognized based on anticipated future tax consequences attributable to differences between financial statement carrying amounts of assets and liabilities and their respective tax bases.

Chung Decl. Ex. D58 (Erickson Rpt. at 35).

**RESPONSE**:  **Disputed**. Silvercreek disputes that the Deutsche Bank Tax Transactions were adequately or appropriately disclosed in Enron's financial statements. P-DB9 (Regan Expert Rpt.) at 271; P-DB81 (Saunders Bank Rpt.) at 81-83.  Enron's post-Bankruptcy management also expressly "denied" that the effects of the Deutsche Bank Tax Transactions were disclosed in Enron's financial statements. D85 (Enron Responses to RFAs Nos. 69-72) at 22-23.

99.     Arthur Andersen's and Enron's management were responsible for Enron's financial statements and the disclosures therein. As part of its financial statement audits of Enron, Arthur Andersen concluded that Enron's disclosures were appropriate. Chung Decl. Exs. D58 (Erickson Rpt. at 15); D273 ("Enron Corp - Income Tax Risk Assessment" Memorandum by Robert P. Palmquist, Allen T. Pearl, David B. Duncan, and Stanley W. Farmer, dated May 1999, AASDTEX000441995-441960).

**RESPONSE**:  **Disputed**.  Silvercreek disputes that Andersen concluded Enron's financial statements and disclosures were appropriate.  At a minimum, Enron announced it was restating its financial statements in November of 2001 at which time Andersen clearly did not believe Enron's disclosures were appropriate. P-DB9 (Regan Expert Rpt.) at 5. Further, Deutsche Bank knew the tax transactions would not be disclosed appropriately on Enron's financial statements.

100.     Enron did not record tax reserves post-closing in connection with the Teresa, Steele, Cochise, and Tomas Transactions. Chung Decl. Exs. D58 (Erickson Rpt. at 77, 79, 83).

**RESPONSE**:  **Undisputed** and **immaterial**.

101.     Under the guidance provided in SFAS No. 5 – <u>Accounting for Contingencies</u>, a tax reserve should be recorded when it is "probable" that the tax position will be disallowed and where the quantity of the tax reserve can be estimated with precision. Chung Decl. Ex. D58 (Erickson Rpt. at 78-79, 83). Specifically, SFAS No. 5 states:

> 8. An estimated loss from a loss contingency (as defined in paragraph 1) shall be accrued by a charge to income if *both* of the following conditions are met:
>
> a.   Information available prior to issuance of the financial statements indicates that it is <u>probable that an asset had been impaired</u> or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b.   The amount of the loss can be <u>reasonably estimated</u>.

Chung Decl. Exs. D84 (SFAS No. 5 – <u>Accounting for Contingencies</u>, *available at* <u>http://www.fasb.org/jsp/FASB/Document_C/DocumentPage?cid=1218220126761&acceptedDisclaimer=true</u> (underlined emphasis added; italics in original)); D58 (Erickson Rpt. at 79).

**RESPONSE**:   The financial accounting standards of SFAS 5 are generally not **disputed**.

**Disputed** that the financial accounting standards were properly applied to the Deutsche Bank Tax

Transactions is **disputed**. P-DB9 (Regan Expert Rpt.) at 74, 264, 268-271.

102.     Enron would have recorded such tax reserves if it believed that it was probable that it would not realize some or all of the contemplated tax savings due to disallowance of those benefits by the IRS. Chung Decl. Ex. D58 (Erickson Rpt. at 78).

**RESPONSE**: **Disputed**.   Silvercreek disputes this paragraph as this assertion is based on

pure conjecture and speculation by Deutsche Bank's expert, and is inconsistent with the fact that

Enron engaged in fraud in the Deutsche Bank Tax Transactions to increase the phantom income

reported in its financial statements.

103.     Responsibility for decisions about the necessity and quantity of a tax reserve rests with a firm's management and auditor – not with its investment bankers. Chung Decl. Exs. D58 (Erickson Rpt. at 9, 77, 86-89); D274 (McGuire Bankr. Dep. 146:12-25). Arthur Andersen reached

the conclusion that Enron's tax reserves were appropriate. Chung Decl. Ex. D58 (Erickson Rpt. at 83); D271 ("Enron Corp - Income Tax Risk Assessment" Memorandum by David B. Duncan, Robert P. Palmquist, Michael D. Jones, Chris Herbold, dated July 22, 2000, AASDTEX000414409); D272 ("2000 Audit - Tax Contingency Meeting" Memorandum by Michael D. Jones, Robert P. Palmquist, Allen T. Pearl, and Christopher J. Herbold, dated Jan. 16, 2001, AASDTEX000414414-414415).

**RESPONSE**:  **Disputed** and **immaterial** to Silvercreek's claims that Deutsche Bank had

knowledge of and failed to disclose appropriate tax and accounting treatment.  *See* PSOF ¶¶ 401-

07.

104.    Enron's post-Bankruptcy management admitted that no Deutsche Bank entity was responsible for auditing or preparing Enron's financial statements. Enron also admitted that no employee or representative of DB ever audited or approved Enron's financial statements prior to their publication. Chung Decl. Exs. D85 (Enron Plaintiffs' Answers to Deutsche Bank Entities' First Set of Requests for Admission, Dec. 15, 2005, Enron Corp. v. Citigroup Inc., 03-09266 (Bankr. S.D.N.Y.) (hereinafter "Enron Responses to RFA(s)") Nos. 63-66).

**RESPONSE**:   **Disputed** and **immaterial**.   Silvercreek disputes this document as

incomplete.   Post-bankruptcy management denied that Enron accounting for Teresa, Steele,

Cochise or Tomas complied with GAAP, denied that no Deutsche Bank representative ever

advised them on whether Enron should record valuation allowances, and denied that no Deutsche

Bank representative assisted in perpetrating a fraud. *See* PSOF ¶¶ 689-700.   Also, Enron's

unverified responses to RFAs are inadmissible hearsay and no other support is proffered for the

assertion in paragraph 104.

105.    Enron understood that it was responsible for preparing its financial statements and it accordingly vested Arthur Andersen with responsibility for auditing its financial statements. Chung Decl. Exs. D85 (Enron Responses to RFAs Nos. 67-68).

**RESPONSE**: **Disputed**. Enron's unverified responses to RFAs are inadmissible hearsay

and no other support is proffered for the assertion in paragraph 105.

106.    As a result, in addition to providing *ex ante* advice on the Structured Tax Transactions, Arthur Andersen reviewed Enron's tax and accounting treatment of the Structured Tax Transactions as part of its financial statement audits after the transactions closed. Arthur Andersen was engaged to issue an opinion on Enron's year-end financial statements for the fiscal

years ending December 31, 1997, December 31, 1998, December 31, 1999, and December 31, 2000. Arthur Andersen admitted that it performed audits of Enron's year-end financial statements for those years. Chung Decl. Ex. D86 (Arthur Andersen's Responses and Objections to Deutsche Bank's First Set of Requests for Admission, Response to Request for Admission No. 17 dated December 14, 2005).

**RESPONSE:**  Silvercreek **disputes** this document as inadmissible hearsay and no other

support is proffered for the assertion in paragraph 106.

107.    Arthur Andersen determined that Enron's deferred tax accounting for the Structured Tax Transactions was done "properly" and that Enron's disclosures were "adequate." Chung Decl. Ex. D58 (Erickson Rpt. at 49-50). For example, it stated with respect to the fiscal year ending December 31, 1999:

> As a result of our procedures, we concluded that the current and deferred income tax provisions and the deferred income tax liabilities as of and for the year ended December 31, 1999, are adequate but not excessive and have been <u>properly classified and disclosed</u> in the 1999 financial statements in all material respects.

Chung Decl. Exs. D87 ("Enron Corp – Income Tax Risk Assessment and Audit Plan" Memorandum by Robert P. Palmquist, Allen T. Pearl, David B. Duncan, and Christopher J. Herbold dated Feb. 26, 2000, AASDTEX000441962 (emphasis added)); D88 ("Income Tax Conclusion" Memorandum by Robert P. Palmquist and Allen T. Pearl dated December 31, 1999, AASDTEX000357118 (emphasis added)).

**RESPONSE**:  Silvercreek disputes this document as inadmissible hearsay and no other

support is proffered for the assertion in paragraph 107.

108.    With respect to the fiscal year ending December 31, 2000, Arthur Andersen found:

> As a result of our procedures, we concluded that the current and deferred income tax provision and the deferred income tax liabilities as of and for the year ended December 31, 2000 are <u>adequate</u> but not excessive and have been <u>properly classified and disclosed</u> in the 2000 financial statements in all material respects.

Chung Decl. Ex. D89 ("Enron Corp – Income Tax Risk Assessment and Audit Plan Conclusion" Memorandum by David B. Duncan, Robert P. Palmquist, Michael D. Jones, and Chris Herbold dated Feb. 18, 2001, AASDTEX000414412) (emphasis added).

**RESPONSE:**  Silvercreek disputes this document as inadmissible hearsay and no other

support is proffered for the assertion in paragraph 108.

109.    When Arthur Andersen audited Enron's accounting for the Teresa Transaction, it concluded that it was appropriate for Enron to recognize deferred tax assets on the dividends from

the partnership. Arthur Andersen explicitly concluded in 2000 that changes in the tax law had not invalidated its original "should" opinion about the Teresa Transaction. As of 2000, Arthur Andersen believed that it was probable that Enron would realize the tax benefits contemplated in the transaction and therefore did not believe that it was probable that the tax position would be disallowed. Chung Decl. Ex. D90 ("Project Teresa dividends and redemptions" Memorandum by Robert P. Palmquist, Michael D. Jones, Allen T. Pearl, and Chris Herbold dated December 31, 2000, AASDTEX000414477 – AASDTEX000414479 at AASDTEX000414477).

**RESPONSE**:   **Disputed**.   The independence of Arthur Andersen in looking at the transactions for Enron is **disputed**. Andersen was employed by Deutsche Bank in development of the Deutsche Bank Tax Transactions prior to presenting them to Enron and Deutsche Bank was involved in the creation of the SAS 50 letters. P-DB14 (Finley Dep.) at 69:17-72:2; 74:24-75:22; 80:19-82:15; 93:9-22; P-DB15 (Finley Sworn Statement) at 18:1-20. Whether Deutsche Bank deferred to the accounting development of Andersen is **disputed** as numerous Deutsche Bank people involved in developing the Deutsche Bank Tax Transactions worked at Andersen, including Thomas Finley, Christine Levinson, William Boyle, Brian McGuire, John Tsai, and Forest Gilman. P-DB14 (Finley Dep.) at 94:24-97:23. Deutsche Bank knew at the time of obtaining the SAS 50 letters from Andersen, that they would provide them to clients to support accounting results. P-DB228 (McGuire Bankr. Dep.) at 139:4-141:4. Andersen was suggested to Enron as knowing the tax transaction accounting details and participated in marketing the transactions to Enron. *See* PSOF ¶ 577.   In fact, to increase the potential acceptability of the transactions by companies, Deutsche Bank decided to limit marketing to companies that shared Andersen, King & Spalding or Akin Gump as clients. P-DB18 (1997 DB marketing email describing agreement between Finley, Kozak and Bijawat) at DBG027038 ¶ 1.   Additionally, the letters were based on certain representations, the truth of which are **disputed**. *See* PSOF ¶¶ 576, 586-89.

110.    Neither the SEC nor to DOJ has asserted that the Structured Tax Transactions were not properly disclosed. Chung Decl. Ex. D58 (Erickson Rpt. at 14).

**RESPONSE:  Disputed**. Deutsche Bank's Expert has no basis to know whether the SEC or DOJ asserted that the Structured Tax Transactions were improperly disclosed. Further, the absence of a public statement by the SEC and DOJ regarding the Enron Tax Transactions does not establish an admissible fact.

### E.     The Structured Tax Transactions had a Legitimate Non-Tax Business Purpose.

111.    The Structured Tax Transactions had legitimate non-tax business purposes in addition to the attainment of financial accounting benefits, including generation of investment profits and risk shifting. It was reasonable to believe that the Structured Tax Transactions had sufficient non-tax business purposes to withstand challenge from the IRS. Chung Decl. Ex. D58 (Erickson Rpt. at 12).

**RESPONSE**:  **Disputed**.  The Deutsche Bank Tax Transactions lacked legitimate non-tax purposes, and it is unreasonable to believe that they could withstand IRS challenge. P-DB9 (Regan Expert Rpt.) at 248, 258, 268, 271; P-DB35 (Income Tax Examination Changes, 1.k. Gain Project Tomas) at Ecggg000682427-Ecggg682452; P-DB36 (Shenkman Expert Rpt.) at 4, 15, 17, 19. Likewise, whether a transaction has a "business purpose" or "economic substance" is a legal conclusion not a fact.

Finally, Silvercreek **disputes** that engaging in transactions to generate financial accounting benefits, particularly when derived from the tax benefits, is a legitimate business purpose. P-DB28 (JCT Report) at 17, 25, 105 (attainment of financial statement benefits is not a valid business purpose to support a transaction); P-DB36 (Shenkman Expert Rpt.) at 4, 8-11.  Deutsche Bank's taxation expert could cite to no valid case authority holding that engaging in transactions to generate financial accounting benefits, particularly when derived from the tax benefits, is a legitimate business purpose. P-DB37 (Erickson Dep.) at 325:17-327:14.  The *Dow* opinion Erickson pointed to had indeed been overturned and does not support Deutsche Bank's position. *Dow Chemical v. United States*, 435 F.3d 594 (6th Cir. 2006).

Further, the Joint Committee on Taxation repeatedly stated the Deutsche Bank Tax Transactions lacked any business purpose as follows:

> This Report's detailed analysis of Enron's structured transactions reveals a pattern of behavior showing that Enron deliberately and aggressively engaged in **transactions that had little or no business purpose** in order to obtain favorable tax and accounting treatment.  P-DB28 at 16 (emphasis added).

> a bona fide business purpose, that is, a purpose other than to secure favorable tax and accounting treatment, was either lacking or tenuous in many of the transactions and clearly was not the impetus for the transactions. *Id*. at 21

> The documentation reviewed by the Joint Committee staff demonstrated no purpose for the transaction other than to facilitate the transfer of Federal income tax benefits, and the resulting financial accounting benefits to Enron. *Id*. at 145, 146.

> The Joint Committee staff believes that attainment of financial statement benefits based solely on Federal income tax savings is not a valid business purpose for purposes of evaluating a transaction or arrangement under Federal income tax laws. *Id*. at 25.

The Joint Committee further found, "Enron came to view the role of its Tax Department as more than managing its Federal income tax liabilities. Rather, Enron's Tax Department became a source for financial statement earnings, thereby making it a profit center for the company." *Id*. at 8.  The Joint Committee concluded, "In effect, the Tax Department was converted into an Enron business unit, complete with annual revenue targets. The Tax Department, in consultation with outside experts, then designed transactions to meet or approximate the technical requirements of tax provisions with the primary purpose of manufacturing financial statement income.  The slogan 'Show Me the Money!' exemplified this effort." P-DB28 at 21; P-DB38 (Enron Steele Presentation) at Ec2000038546.

112.    At the time of the Structured Tax Transactions, there existed a difference of opinion and practice with respect to whether the pursuit of accounting benefits constituted a valid business purpose under the tax law. Enron's prior experience with the IRS was consistent with financial accounting benefits being treated as a valid business purpose. Enron issued a security known as MIPS (monthly income preferred securities) in 1993. The IRS challenged the use of these securities, but Enron ultimately prevailed. The IRS noted that the accounting benefits of

transaction were a "business reason for entering into the transaction" and concluded that the transaction possessed "economic substance." Based on its previous experiences with the IRS, it was reasonable for Enron to believe that financial accounting benefits could be a legitimate business purpose and that the Structured Tax Transactions could withstand scrutiny from the IRS on such grounds. Chung Decl. Ex. D58 (Erickson Rpt. at 12).

**RESPONSE**: **Disputed**.  Silvercreek disputes the entire statement as unsupported.  IRS findings related to "MIPS" are inadmissible hearsay.  Further, Deutsche Bank's conclusion as to the reasonableness of Enron's beliefs is based on speculation and opinions masquerading as "fact." Not even Deutsche Bank's appointed taxation expert, Merle Erickson, could state that the IRS MIPS ruling was definitely based on a finding that financial accounting benefits are a legitimate business purpose. P-DB37 (Erickson Dep.) at 331:11-332:5, 334:18-335:9 (how the IRS computed this benefit of the debt to equity ratio I can't be sure).  Whether Enron even considered the MIPS decision is unknown.  Likewise, whether a transaction has a "business purpose" or "economic substance" is a legal conclusion not a fact.  Finally, Silvercreek disputes that engaging in transactions to generate financial accounting benefits, particularly when derived from the tax benefits, is a legitimate business purpose. P-DB28 (JCT Report) at 17, 25, 105 (attainment of financial statement benefits is not a valid business purpose to support a transaction); P-DB36 (Shenkman Expert Rpt.) at 4, 8-11, 17, 20, 28-29.  Deutsche Bank's taxation expert could cite to no valid case authority holding that engaging in transactions to generate financial accounting benefits, particularly when derived from the tax benefits, is a legitimate business purpose. P-DB37 (Erickson Dep.) at 325:17-327:14.  The *Dow* opinion Erickson pointed to had indeed been overturned and does not support Deutsche Bank's position. *Dow Chemical v. United States*, 435 F.3d 594 (6th Cir. 2006).

113.    Statements by Enron's post-Bankruptcy management support the conclusion that the Structured Tax Transactions had legitimate non-tax business purposes. The IRS audited the Tomas Transaction in part on the basis of the legitimacy of its non-tax business purpose. In 2003, Enron's post-Bankruptcy management protested the IRS's proposed treatment of the Tomas

Transaction, asserting that Enron had "strong business reasons, apart from tax planning reasons" for the transaction. Chung Decl. Ex. D58 (Erickson Rpt. at 13, 101); D280 ("Portland General Holdings, Capital Gain Income -- Primary Position (Project Tomas)," ECggg000682047-682066 at Ecggg000682047, Ecggg000682065). After the closing of the Tomas Transaction, Akin Gump noted that PGH had undertaken the transaction for a variety of business reasons. Chung Decl. Ex. D83 (Akin Gump tax opinion letter to Enron Corp. dated November 23, 1998, EC2 000033917 – EC2 000033979 at EC2 000033923). With respect to the Teresa Transaction, King & Spalding's tax opinion noted that there were additional purposes for the transaction other than generating income for financial accounting purposes. Chung Decl. Exs. D58 (Erickson Rpt. at 104-05); D67 (King & Spalding tax opinion letter to R. Davis Maxey dated May 14, 1997 by William S. McKee and Abraham Shashy, Jr., MN002908 – MN002936 at MN002912). In the Steele and Cochise Transactions, the should-level opinions from Akin Gump and McKee Nelson, respectively, included similar statements. Chung Decl. Exs. D74 (Federal tax opinion letter from Akin Gump to Maxey dated December 16, 1997, EC2 000033867- EC2 000033904 at EC2 000033872); D78 (McKee Nelson Ernst & Young tax opinion letter to R. Davis Maxey dated Mar. 21, 2001 by William S. McKee and James D. Bridgeman, EC2 000033988 – EC2 000034072 at EC2 000033999-34000).

**RESPONSE**: **Disputed**. Silvercreek disputes that the Deutsche Bank Tax Transactions had a legitimate non-tax business purpose. Further, Post-bankruptcy management denied that Enron accounting for Teresa, Steele, Cochise or Tomas complied with GAAP, denied that a Deutsche Bank representative never advised them on whether Enron should record valuation allowances, and denied that no Deutsche Bank representative assisted in perpetrating a fraud. *See* PSOF ¶¶ 689-699. Post-bankruptcy management also pled that, "Steele, Cochise, Teresa and Tomas were '**for the most part artificial transactions lacking a bona fide business purpose other than the creation of accounting income** for Enron . . . .'" *Id*. at ¶ 700 (emphasis added). Silvercreek disputes that engaging in transactions to generate financial accounting benefits, particularly when derived from the tax benefits, is a legitimate business purpose. P-DB28 (JCT Report) at 17, 25, 105 (attainment of financial statement benefits is not a valid business purpose to support a transaction); P-DB36 (Shenkman Expert Rpt.) at 4, 8-11, 17, 20, 28-29. Deutsche Bank's taxation expert could cite to no valid case authority holding that engaging in transactions to generate financial accounting benefits, particularly when derived from the tax benefits, is a

legitimate business purpose. P-DB37 (Erickson Dep.) at 325:17-327:14. The *Dow* opinion

Erickson pointed to had indeed been overturned and does not support Deutsche Bank's position.

*Dow Chemical v. United States*, 435 F.3d 594 (6th Cir. 2006).

Further, the Joint Committee on Taxation repeatedly stated that the Deutsche Bank Tax

Transactions lack a legitimate business purpose as follows:

> This Report's detailed analysis of Enron's structured transactions reveals a pattern of behavior showing that Enron deliberately and aggressively engaged in **transactions that had little or no business purpose** in order to obtain favorable tax and accounting treatment. (P-DB28 at 16 (emphasis added)).

> …a bona fide business purpose, that is, a purpose other than to secure favorable tax and accounting treatment, was either lacking or tenuous in many of the transactions and clearly was not the impetus for the transactions. *Id*. at 21

> The documentation reviewed by the Joint Committee staff demonstrated no purpose for the transaction other than to facilitate the transfer of Federal income tax benefits, and the resulting financial accounting benefits to Enron. *Id*. at 145, 146.

> The Joint Committee staff believes that attainment of financial statement benefits based solely on Federal income tax savings is not a valid business purpose for purposes of evaluating a transaction or arrangement under Federal income tax laws. *Id*. at 25.

The Joint Committee further found, "Enron came to view the role of its tax Department as more

than managing its Federal income tax liabilities. Rather, Enron's tax Department became a source

for financial statement earnings, thereby making it a profit center for the company." *Id*. at 8. The

Joint Committee concluded, "In effect, the tax Department was converted into an Enron business

unit, complete with annual revenue targets. The Tax Department, in consultation with outside

experts, then designed transactions to meet or approximate the technical requirements of tax

provisions with the primary purpose of manufacturing financial statement income. The slogan

'Show Me the Money!' exemplified this effort." P-DB38 (Enron Steele Presentation) at

Ec2000038546

The IRS did challenge and penalize Enron, finding that the Tomas transaction as accounted for as Deutsche Bank suggested, contained a "disguised sale," and "entered into for the purpose of tax avoidance" and subjected Enron to penalty. P-DB9 (Regan Expert Rpt.) at 268; P-DB35 (Income Tax Examination Changes, 1.k. Gain Project Tomas) at Ecggg000682427-Ecggg682452. In summary, the IRS found the contribution of Leased Assets to Seneca was a "disguised sale" of the Leased Assets to Seneca; Seneca was "formed or availed in connection with a transaction whose principle purpose was to reduce substantially the partners' aggregate federal tax liability"; and the transactions were "prearranged and predetermined ... and were entered into for the purpose of tax avoidance." P-DB9 (Regan Expert Rpt.) at 268; P-DB35 (Income Tax Examination Changes, 1.k. Gain Project Tomas) at Ecggg000682427-Ecggg682452.  The IRS concluded that for the taxable year ended December 31, 1998, Enron incurred a tax liability of $91,525,367 and related penalty of $18,305,074. Alternatively, if it was determined that the underpayment had occurred in taxable year ended December 31, 2000, the resulting tax liability would be $45,762,684 and related penalty would be $9,152,537. *Id*.

Non-tax business purposes stated in deal documents were mere window-dressing.  For example, in the Steele transaction, Deutsche Bank claimed that investment in bonds was a partial business purpose.  However, the bonds Enron purchased from Deutsche as part of the Steele transaction were not identified until days before the transaction closed and were probably not owed by Deutsche Bank until the day Steele closed. P-DB32 (Boyle Dep.) at 293:2-295:19, 307:6-8; P-DB39 (Project Steele Agenda) at AB00750094-AB00750095.  Deutsche Bank and Enron claim that leasing expertise was a non-tax business purpose for doing the Tomas transaction; however, by June 2000, Oneida had not done any leasing activities. P-DB228 (McGuire Bankr. Dep.) at 335:11-337:5; P-DB19 (Batson DB Rpt.) at 51.  Testimony on behalf of Deutsche Bank shows

very little support for any business purpose other than the principal purpose, which was phantom accounting income. *See* P-DB37 (Erickson Dep.) at 139:16-144:3.

Finally, on the topic of non-tax business purposes in the Deutsche Bank Tax Transactions, the Bankruptcy Examiner concluded there was little or none, as follows:

> The [Deutsche Bank] Tax Transactions were, for the most part, artificial transactions lacking a bona fide business purpose other than the creation of accounting income for Enron. The tax opinions obtained by Enron in the Teresa, Steele and Cochise Transactions explicitly recited the generation of financial accounting income as a "business purpose" for the transaction that was intended to support tax recognition of the form of the transaction.

> As discussed above, the Teresa Transaction involved the transfer of Enron's interest in its corporate headquarters building and stock and debt of Enron entities among Enron affiliates and SPEs. The Teresa Transaction, however, was not intended to save Enron taxes on a present value basis. Instead, the purpose of the Teresa Transaction was to create accounting income, taking advantage of the fact that the rules of FAS 109 ignore the time value of money.

> Although the Steele Transaction and the Cochise Transaction each involved the acquisition of REMIC Residual Interests and a limited amount of Facilitating Assets from [Deutsche Bank], Enron did not have a separate business purpose of investing in REMIC Residual Interests or low-yielding Facilitating Assets. Instead, even the tax opinions obtained by Enron in the Steele and Cochise Transactions, like the tax opinion in the Teresa Transaction, explicitly recognize the generation of financial accounting income as a "business purpose" for the transactions that was intended to support tax recognition of the form of the transaction.

> The Steele and Cochise Transactions, moreover, were designed to allow Enron to record the potential benefit of speculative future tax deductions for Phantom Losses from acquired REMIC Residual Interests as pre-tax income on its financial statements, rather than as after-tax income resulting from reduced tax expense in the tax provision of Enron's income statement. The characterization of those items as pre-tax income was misleading because readers of Enron's financial statements were unaware that those amounts arose from a tax-related transaction.

> The Tomas Transaction involved Enron's disposition of leased assets by contributing the leased assets to a partnership with [Deutsche Bank] and later receiving the stock of a subsidiary in exchange for its interest in the partnership. Enron intended to dispose of the leased assets, but the absence of leasing activity by the subsidiary is an indication that Enron did not have a bona fide intent to enter into a partnership with [Deutsche Bank] to engage in leasing activity.

P-DB19 (Batson DB Rpt.) at 72-73.

    **F.**    **Ex Poste Treatment of the Structured Tax Transactions Confirms Their Validity**.

    114.    The IRS did not disallow any of the tax deductions or tax bases claimed by Enron in connection with the Teresa, Cochise, and Steele Transactions. Chung Decl. Exs. D85 (Enron Responses to RFAs Nos. 130, 132, 134); D58 (Erickson Rpt. at 13, 90, 130).

    **RESPONSE**: **Disputed** and **immaterial**.  Enron's unverified responses to RFAs are also inadmissible hearsay and no other evidence is offered in support of paragraph 114.  Silvercreek also disputes that the IRS had any financial incentive to pursue claims against Enron in Bankruptcy and the IRS's non-pursuit of worthless claims does not establish any admissible evidence. Further, Enron had millions of dollars in net operating losses, so the tax savings that were created from the tax transactions on Enron's books never actually resulted in the IRS losing cash payments, only defrauding investors. P-DB28 (JCT Report) at 32.  The tax savings simply reduced net operating losses of Enron. *Id*. Additionally, Cochise, Steele and Teresa did not provide Enron with reductions in tax payments.  The Teresa transaction actually resulted in Enron paying $100 in taxes prior to Bankruptcy, which would not have otherwise been payable to the IRS.  The Joint Committee on Taxation stated:

> "Some of [Enron's] transactions resulted in the payment of some income tax in the early years, with significantly larger deductions to follow in later years.  This pattern makes it less likely that the IRS will identify and challenge the transaction. Further, Enron's recent position as a company with significant net operating losses worked to its advantage in IRS examination. A company with significant losses generally is of less immediate concern to the IRS because the losses will offset any increased taxable income arising from the audit. Thus, the IRS has less incentive to investigate and devote resources to such examinations. Enron's activities show that the IRS cannot minimize the importance of loss companies on examination because to do so would ignore a breeding ground for tax-motivated transactions that also could be used by taxpaying companies."

P-DB28 (JCT Report) at 23.

    115.    With respect to the Teresa Transaction, Enron paid over $100 million of federal income taxes prior to its Bankruptcy. Post-Bankruptcy, Enron received a refund from the U.S.

Treasury for these previously paid income taxes. That refund had to be approved by the Congressional and Joint Committee on Taxation ("JCT"). Chung Exs. D91 (IRS Refund Documentation, OPI, JCT Approval of Refunds for Organizational Partners, ECggg00727799-804); D58 (Erickson Rpt. at 11, 90, 97).

**RESPONSE**: **Disputed** and **immaterial**.  Silvercreek disputes that Enron received a refund.  Enron post-Bankruptcy management "denied" they received any refund as a result of the Teresa transaction. D85 (RFA Response No. 123) at 36.  Regardless of the tax consequences *vis-à-vis* the IRS, Deutsche Bank assisted Enron in defrauding investors such as Silvercreek who would have immediately discounted the income associated with the tax transactions if properly disclosed.

116.    The IRS did not impose penalties on Enron relating to the Teresa, Cochise, or Steele Transactions. Chung Decl. Exs. D85 (Enron Responses to RFA Nos. 131, 133, 135); D58 (Erickson Rpt. at 11, 90, 98).

**RESPONSE**: **Disputed** and **immaterial**. *See* PSOF ¶ 114.

117.    During its audit of Enron, the IRS asserted penalties for the Tomas Transaction. Enron ultimately agreed to pay about $8 million in penalties on Tomas but made no admission of wrongdoing. Chung Decl. Exs. D92 (E-mail from Ed Coats, ECggg000727678); D93 (Final Settlement Materials and Form 870-AD, ECggg000727677).

**RESPONSE**: **Disputed**.  Enron's payment of a penalty on Tomas and "no admission" in a settlement agreement is not an indication of approval of a transaction or an admission that penalties weren't applicable on other Deutsche Bank Tax transactions.  The documents in question do not state that Deutsche Bank is innocent of any wrongdoing.

118.    Enron's post-Bankruptcy management admitted that it did not restate its financial statements to reverse the effects of the Tomas Transaction and asserted to the IRS in 2003 that the as reported tax treatment of the Tomas Transaction was "correct" and that Enron acted in good faith in reporting the effects of the Tomas Transaction on its returns. Chung Decl. Exs. D85 (Enron Response to RFA No. 149); D281 ("Enron Corp. -- Substantial Underpayment Penalty (Project Tomas)" Memorandum, ECggg000682194-ECggg000682203 at ECggg000682194, ECggg000682202); D58 (Erickson Rpt. at 9, 13, 76, 90, 101-102). Enron also never restated its financial statements on account of the Teresa, Steele, and Cochise Transactions. Chung Decl. Ex. D85 (Enron Responses to RFAs Nos. 146, 147, 148).

**RESPONSE**:   **Disputed.**   Enron's unverified responses to RFAs in bankruptcy are inadmissible hearsay.   The statement that Tomas was "correct" is not an approval of the Tomas transaction or of Deutsche Bank's wrongful conduct.   The documents go on to make a provision for the fact that it may be "finally determined that [treatment of Tomas] was not correct . . .," and assessed an $18 million penalty for Tomas. D281 at ECggg000682194, ECggg000682202.   The Enron estate, like the IRS, simply had no economic rationale to pursue the matter.

119.     As in the Teresa Transaction, Enron filed for an income tax refund on the Tomas Transaction, and received $13 million from the IRS. Chung Decl. Ex. D58 (Erickson Rpt. at 90, 97).

**RESPONSE**:   **Disputed**. Silvercreek disputes that Enron received a refund and the Erickson Report cites no admissible evidence.   Enron post-Bankruptcy management "denied" they received any refund as a result of the Tomas transaction. D85 (RFA Response No. 125) at 36. Also, **immaterial** since the IRS's treatment of the transactions has no bearing on Silvercreek's claims against Deutsche Bank.

120.     Neither the SEC nor DOJ asserted that the accounting for the Structured Tax Transactions did not comply with GAAP. Chung Decl. Ex. D58 (Erickson Rpt. at 9).

**RESPONSE:**   **Disputed**.   Deutsche Bank's expert has no evidentiary basis to assert the statement in paragraph 120 as he cannot possibly know whether either the SEC or DOJ asserted otherwise in a non-public statement.   **Immaterial** in all events since the non-assertion of a position does not establish any fact in support of Deutsche Bank's motion.

121.     Claims of $257,255,850 were allowed as Deutsche Bank's direct and subordinated claims for the Steele Transaction in a Bankruptcy settlement that was approved by the Enron Bankruptcy court. Chung Decl. Ex. D94 (Bankruptcy Settlement).

**RESPONSE**:   **Disputed**.   Paragraph 121 mischaracterizes evidence and is incomplete. These claims were not allowed through fact finding efforts and do not represent "payment" to Deutsche Bank.   The results were part of a settlement where in Deutsche Bank agreed to pay $25

million to the Enron Creditors Recovery Corp and agreed to release and forever forego $416 million in claims Deutsche asserted in the Enron bankruptcy. P-DB244 (December 18, 2007 article on Deutsche bankruptcy settlement) at 1.  There was no trial in this case.  Had there been a trial, the Court would have heard the following factual findings by the Bankruptcy Examiner:

> BT/Deutsche Bank's conduct in the BT/Deutsche Bank Tax Transactions enabled Enron to: (i) erroneously record approximately $158 million of income from the two REMIC Carryover Basis Transactions, $143.7 million of which Enron erroneously recorded as pre-tax income; and (ii) erroneously record a $229 million increase in after-tax net income by reporting the Teresa Transaction in a manner that did not comply with GAAP.
>
> The evidence would allow a fact-finder to conclude that BT/Deutsche Bank:
>
> • acted as a conduit for the sale of the Cochise planes from Enron to Oneida Leasing, Inc. ("Oneida") in the second quarter of 2000 for the purpose of enabling Enron to erroneously report $36.5 million of gain on the sale, an amount equal to more than 10% of Enron's reported net income for the quarter;
>
> • designed, promoted and participated in the Teresa Transaction while knowing that the transaction was not expected to reduce Enron's tax liability on a present value basis and served no substantial business purpose for Enron other than enabling Enron to "generate income for financial accounting purposes";
>
> • designed, promoted and participated in the Steele Transaction while knowing that the transaction served no substantial business purpose for Enron other than enabling Enron to report the potential benefit of speculative future tax deductions in an erroneous and misleading manner as pre-tax income; and
>
> • designed, promoted and participated in the Cochise Transaction while knowing that the transaction served no substantial business purpose for Enron other than enabling Enron to report the potential benefit of speculative future tax deductions in an erroneous and misleading manner as gain on the sale of the Cochise planes and as other pre-tax income."

P-DB19 (Batson DB Rpt) at 2-4. Additionally,

> Deutsche's role in designing, promoting, implementing and participating in the BT/Deutsche Tax Transactions is evidence from which a fact-finder could conclude that BT/Deutsche had **actual knowledge of the wrongful conduct** giving rise to

breaches of fiduciary duty by Enron's Tax/Accounting Officer Group and gave substantial assistance to those officers.

*       *       *

Injury to the Debtors was the direct or reasonably foreseeable result of BT/Deutsche's conduct because the **transactions lacked business purpose and were structured to enable Enron to produce materially misleading financial statements**, which were disseminated to the public.

*Id.* at 80. With respect to all the Tax Transactions that Deutsche Bank was involved in, the

Examiner concluded that:

> "BT/Deutsche was responsible for designing, promoting and participating in the BT/Deutsche Tax Transactions. The BT/Deutsche Tax Transactions were intended to have, and in fact did have, the effect of increasing Enron's reported net income by approximately $423 million over the period from 1997 to 2001. However, Enron had little business purpose for the BT/Deutsche Tax Transactions other than creating accounting income.[6]

*       *       *

> BT/Deutsche Bank developed the basic tax and accounting structures of each of the BT/Deutsche Bank Tax Transactions. BT/Deutsche Bank prepared presentations to promote the structures to Enron as a means of generating accounting income and in effect sold the products to Enron."

P-DB19 (Batson DB Rpt) at 71.  With respect to the Teresa Transaction the Examiner concluded:

> "Because of BT/Deutsche Bank's role in developing and promoting the transaction, BT/Deutsche Bank was intimately familiar with the tax and accounting treatment of the Teresa Transaction. BT/Deutsche Bank knew that the tax benefit of the transaction would not be available for years, until the undetermined future date when the Enron North Building was eventually distributed to Enron and Enron began to take increased depreciation deductions. BT/Deutsche Bank knew that, on a present value basis, the Teresa Transaction was not expected to result in any tax savings to Enron. BT/Deutsche Bank knew that the purpose of the Teresa Transaction was to generate financial accounting income by recording Deferred Tax Assets well in advance of future tax deductions, and even before the increased basis resulting from the transaction could attach to a depreciable asset. The Examiner has concluded that the financial accounting for the Teresa Transaction was erroneous and misleading because Deferred Tax Assets were recorded prematurely, in violation of GAAP, long before the increased basis could attach to a depreciable asset."[7]

*Id*. at 47-48.  With respect to the Steele Transaction the Examiner noted that:

> BT/Deutsche Bank developed the Steele Transaction because it was looking for an efficient way to sell or monetize REMIC Residual Interests that it had acquired in the course of its business. The transaction that it developed could be used to generate significant accounting benefits for its counterparty. … BT/Deutsche Bank first promoted the Steele Transaction to Enron in June 1997. BT/Deutsche Bank marketed the transaction as a means of generating pre-tax financial accounting income."

*Id*. at 30.  With respect to the Cochise Transaction, the Examiner concluded that:

> [T]here is sufficient evidence to support a finding that the transfer of the Cochise planes to BT/Deutsche Bank should not have been recorded as a sale under GAAP because Enron and BT/Deutsche Bank had reached an understanding to return the Cochise planes to Enron by means of a transfer to Oneida.

*     *     *

> The Examiner has concluded that Enron's accounting treatment of the Cochise Transaction did not comply with GAAP and was misleading because a reader of Enron's financial statements had no way of knowing that purported pre-tax income from operations actually consisted of the potential benefit of speculative future tax deductions for Phantom Losses from acquired REMIC Residual Interests."

P-DB19 (Batson DB Rpt) at 57, 42. With respect to the Tomas Transaction, the Examiner concluded that:

> The tax planning for the Tomas Transaction relied on representations by Enron and BT/Deutsche Bank that Oneida would engage in a leasing business. . . . Prior to June 2000, however, when [Portland Holdings, Inc.] gave notice of its intent to withdraw from Seneca, Oneida had not engaged in any leasing business.  In order to give Oneida some semblance of having engaged in leasing activity, Enron and BT/Deutsch arranged to transfer the Cochise planes to Oneida."

*Id*. at 50-51.

To the extent the Court does allow this evidence, Silvercreek respectfully requests discovery from Deutsche Bank on the amount of claims made by Deutsche Bank, those surrendered by Deutsche Bank, how much Deutsche Bank actually was paid under the Bankruptcy proceeding and all other matters related to the Bankruptcy proceeding.

122.    Claims of $267,500,000 were allowed as Deutsche Bank's direct and subordinated claims for the Cochise transaction in a Bankruptcy settlement that was approved by the Enron Bankruptcy court. Chung Decl. Ex. D94 (Bankruptcy Settlement).

**RESPONSE**: *See* PSOF ¶ 121.

123.    Arthur Andersen personnel who were responsible for providing the SAS 50 letters on the hypothetical transactions and who were directly responsible for auditing the Structured Tax Transactions as completed did not have their CPA licenses revoked and were not subject to disciplinary action by their State Boards of Accountancy. Chung Decl. Ex. D58 (Erickson Rpt. at 10, 48).

**RESPONSE**: **Disputed** the cited evidence does not support the assertion but **immaterial**

in all events.

124.    In fact, the Arthur Andersen personnel did not retreat from the positions they took with respect to the Structured Tax Transactions after the fact. Robert Palmquist, the Arthur Andersen partner in charge of auditing Enron's income tax accounting, testified that Enron did not record reserves on the Structured Tax Transactions because he believed that Enron would prevail in court even if those transactions were disputed by the IRS.

> Q. I don't recall seeing a document in connection with the transactions that we reviewed earlier, including, in particular, Project Teresa, Project Steele, Project Cochise, and Project Tomas, that you made any similar recommendation that Enron consider a reserve for some portion of the tax benefit in those structures.
>
> My question is: Did you make such a recommendation with respect to those four structures? . . .
>
> A. In my role as tax partner with the Enron engagement, in connection with the accrual review at the end of the year, we discussed the amount of tax reserves available for contingencies and determined, each and every year, that they were adequate but not excessive. The transactions that you refer to, in my opinion, <u>did not warrant specific reserves or a general reserve</u> – not general, specific, or consideration at year end because <u>I believed at that time that Enron would win those particular issues</u>.

Chung Decl. Ex. D95 (Palmquist Bankr. Dep.) at 163:20-164:16 (emphasis added)).

**RESPONSE**:   The independence of Arthur Andersen in looking at the transactions for

Enron is **disputed**. Andersen was employed by Deutsche Bank in development of the Deutsche

Bank Tax Transactions prior to presenting them to Enron and Deutsche Bank was involved in the

creation of the SAS 50 letters. P-DB14 (Finley Dep.) at 69:17-72:2, 74:24-75:22, 80:19-82:15,

93:9-22; P-DB15 (Finley Bankr. Dep.) at 18:1-19:6. Whether Deutsche Bank deferred to the accounting development of Andersen is **disputed** as numerous Deutsche Bank people involved in developing the Deutsche Bank Tax Transactions worked at Andersen, including Thomas Finley, Christine Levinson, William Boyle, Brian McGuire, John Tsai, and Forest Gilman. P-DB14 (Finley Dep.) at 94:24-97:23. Deutsche Bank knew at the time of obtaining the SAS 50 letters from Andersen, that they would provide them to clients to support accounting results. P-DB228 (McGuire Bankr. Dep.) at 139:4-141:4. Andersen was suggested to Enron as knowing the tax transaction accounting details and participated in marketing the transactions to Enron. *See infra,* PSOF ¶ 577. In fact, to increase the potential acceptability of the transactions by companies, Deutsche Bank decided to limit marketing to companies that shared Andersen, King & Spalding or Akin Gump as clients. P-DB18 at DBG027038 ¶ 1(DB email noting agreement "that for transactions such as these, [DB] would limit the marketing process to our clients that were also clients of either King & Spalding, Akin Gump or Arthur Andersen"). Although its conviction for evidence tampering was overturned, Arthur Andersen was criminally prosecuted and no longer exists as a result of the Enron debacle. *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005).

125.    Palmquist continued by stating that "With respect to the other transactions [Teresa, Cochise, Steele, Tomas], I came to the conclusion that I did not believe they would be challenged [by the IRS]." Chung Decl. Ex. D95 (Palmquist Bankr. Dep. 165:9-12).

**RESPONSE**:    *See* PSOF ¶ 124 (Andersen not independent). **Undisputed** as to Mr. Palmquist's speculation about whether the "other transactions" would be challenged by the IRS but immaterial as his opinion is irrelevant to Silvercreek's claims against Deutsche Bank for aiding and abetting Enron's fraud.  Also **disputed** by Plaintiffs' expert.  P-DB9 (Regan Expert Rpt.) at 74, 268 (discussing IRS challenge to Tomas).

126.    Enron's senior in-house tax director, Robert Hermann, who ultimately played an important role in approving Enron's use of the Structured Tax Transactions, testified that he

believed that the transactions complied with the then-existing tax law and that he still believed that after the transactions had closed. Chung Decl. Ex. D96 (Hermann Bankr. Dep. 79:12-18); __ (Erickson Rpt. at 99). Hermann also testified that having two independent sets of professionals reaching the same "should" opinion with respect to the transactions "made me feel more strongly that they worked." Hermann stated that:

> A. . . . I don't think we ever used a law firm that I did not believe was one of the top firms in the country. And their professionalism and honesty was never in question. . . .

> Q. Just following up on that, did it worry you that the designer of the transaction – and they usually designed it for a promoter, for a Bankers Trust, Deutsche Bank. Did it worry you that the fact that they were involved in designing the transaction may have affected their . . . independence?

> A. No. Because the deals were not just turning just on one person's opinion that they worked. In every transaction, you had a minimum of two separate independent entities opining that it's a should. You had the person or firm give you a tax opinion that's a should, and then you had Arthur Andersen independently forming their own opinion that it should.

> So, no, it didn't occur to me that there was a whole bunch of collusion here and lack of independence on anybody's part. The fact that there were independent people coming to that conclusion that were basically adverse to each other made me feel more strongly that they worked.

Chung Decl. Ex. D96 (Hermann Bankr. Dep. 84:2-85:10).

**RESPONSE:**   Silvercreek disputes that Hermann gave much credence to the validity of the should opinion letters.  In fact, Bob Hermann did not himself believe in the accuracy of the should opinion letters.  He testified as follows:

> "Q.     Now, going back to this question of the facts, I take it it was important that the facts described in the opinion were the actual facts of your deals, is that correct, in terms of whether you could rely on the opinions?

> A.     I never believed I could rely on any of these opinions. I don't think that -- you know, they've got so many holes in them…."

P-DB24 (Hermann Bankr. Dep.) at 78:17-24.  One example is John Buser's opinion letter on Steele which relied upon the assumption that Enron would defer recognition of the tax deductions for many years such that Enron would not enjoy any present value benefit of the tax deductions (in excess of the transaction costs). P-DB25 (Buser Dep.) at 57:12-58:18.   Enron told the

Congressional Joint Committee on Taxation that it did not substantially defer the tax benefits from

Steele for many years, as Mr. Buser had assumed. P-DB26 (Skadden Arps Letter to JCT) at

AB000525602-AB000252605.

127.   Davis Maxey, the employee who led Enron's Corporate Tax Planning Group, also testified about the compliance of the transactions with the tax law. For example, with respect to the Teresa Transaction, he stated:

A.  I think we took some comfort in the fact that the – this transaction was pretty widely [vetted]. It was certainly discussed internally within the Enron tax department. There are some very capable technical people there, and they were comfortable with the transaction. Outside advisors were comfortable; in addition to King & Spalding, Arthur Andersen and probably several other firms, where the transaction was discussed on an informal basis. And there was a general agreement among everybody that the proper opinion level here was at a should level, and that parties were generally comfortable with the mechanics of the transaction.

Q.  But I guess you recognize that, let's say, seven or eight years down the road you're claiming a billion dollars of depreciation on a building with a billion dollars in basis, and you paid a whole lot less than that for the building, and its just been kind of doing things in your group that you recognize that the IRS might contest that big step-up?

A.  Well, certainly. I mean, if there were no – you can actually – as you well know, you can get a will-level opinion, and that is when a transaction is so certain that they're unlikely to contest it.

But here the general view was – among all of those parties and all of those advisors who were consulting on this, was that the company – that the position the company was taking was within the four corners of the tax laws everybody was analyzing. And everyone was comfortable with the analysis on that transaction [Teresa]. No one was willing to issue a will-level opinion, but they were comfortable at a should level. . . .

And in fact, they were – Mr. Coates [sic] and his Department had been – had looked at this transaction and all of the others and were – expressed general comfort with it.

Chung Decl. Ex. D97 (Maxey Bankr. Dep. 74:21-76:22) (emphasis added).

**RESPONSE**:  **Disputed**.  *See* PSOF ¶ 126; *see also* PSOF ¶¶ 90, 113.

128.   William McKee likewise testified that he stands behind the tax opinions he rendered in the Teresa and Cochise Transactions:

If the transaction[s] [were] a fraud, I wouldn't have given the tax opinion, the transactions were real, they are – they passed muster under all the applicable tax rules as I'm sure you know Project Cochise was audited by the Internal Revenue Service and they passed it along all right, said it was fine, I don't – certainly nothing – the transactions are bona fide transactions, they produced the tax consequences that [I] said [they] do and I'm comfortable with my tax opinions.

Chung Decl. Ex. D98 (McKee Dep. 363:16-25).

**RESPONSE**: **Disputed**.   Silvercreek disputes the objectivity of Bill McKee.  He was an attorney who represented Deutsche Bank (starting in the 1970s when it was Bankers Trust) and who also represented Enron in the Teresa and Cochise tax transactions.  P-DB3 (McKee Dep.) at 337:14–338:10. He had no restrictions upon the information he could share between Enron and Deutsche Bank. P-DB3 (McKee Dep.) at 338:12–340:4, 344:5–12.  He testified that members from Bankers Trust and Enron sat in conference rooms together when putting these transactions together, *id*. at 345:1-14, and that he believed the Teresa transaction was registered as a tax shelter, *id*. at 346:5-7.

Bob Hermann insisted that Teresa was a "William McKee-generated" transaction and "it came from him maybe with Deutsche Bank, but it was [McKee's] deal."  P-DB24 (Hermann Bankr. Dep.) at 36:14-21.  In discussing a tax opinion with Bob Hermann of Enron and Deutsche Bank, William McKee said he didn't care whether he wrote the tax opinion or not, because he would charge a $1 million fee for the transaction, with or without King & Spalding providing the tax opinion.  *Id*. at 39:4-8.

He admitted that some of the "assets" used in the Tax Transactions were, in essence, without value.  P-DB3 (McKee Dep) at 353–55. McKee understood that "these had little or no economics," and whatever value they had was not "commensurate with the tax aspects" *id*. at 359:4-17, yet Enron paid Deutsche millions in fees to structure these transactions for Enron's use. *Id*. at 360:21–361:4.  He acknowledged that "the principal purpose of the transaction was to obtain

the accounting benefits" and he never advised Enron on how to Rpt. these transactions to the public. *Id*. at 361:6-19.

Deutsche Bank employed the same group of outside law firms to develop the tax transactions as were used with tax opinions, P-DB15 (Finley Bankr. Dep.) at 65-66, 96; P-DB228 (McGuire Bankr. Dep.) at 95-96, 305; P-DB14 (Finley Dep.) at 131:10-132:13, and Deutsche Bank recommended those firms to Enron. P-DB14 (Finley Dep.) at 21-22, 65; See P-DB40 (Enron Transaction Memo) at DBG027035-DBG027036. Enron engaged the same law firms that worked on developing the transactions to render the should opinions. P-DB10 (King & Spalding Teresa Tax Opinion); P-DB11 (Steele Tax Opinion); P-DB12 (McKee Nelson Cochise Tax Opinion); P-DB13 (Akin Gump Tomas Tax Opinion); P-DB40 (Enron Transaction Memo) at DBG027035-DBG027036. William McKee, who represented Deutsche Bank on the Steele transaction, considered and refused to give the tax opinion to Enron on the Steele transaction because he thought IRC section 269 could apply to void it. P-DB3 (McKee Dep.) at 29:18-32:1; P-DB24 (Hermann Bankr. Dep.) at 86:21-88:1. According to Bob Hermann, Deutsche was probably in the room when McKee said he was not preparing the Steele should opinion. *Id*. at 86:21-88:1.

## IV.   THERE IS NO EVIDENCE THAT VALHALLA AND RENEGADE "TAX ACCOMMODATION" TRANSACTIONS WERE FRAUDULENT

### A.   Valhalla.

129.   In the Valhalla transaction, Enron obtained a $50 million net borrowing from Deutsche Bank and its affiliates while Deutsche Bank was able to take advance of preferential tax savings related to the treatment of debt and equity under U.S. and German tax laws. Chung Decl. Exs. D99 (Email from Steven Herrup to Calli Hayes et al. attaching Memorandum regarding "Project Valhalla" (Feb. 29, 2000) at DBF-044204 ("Project Valhalla Memo")); D100 (Email from Davis Maxey to Richard Causey attaching presentation entitled "Structured Transactions Group Business Review" (Oct. 2001) at EC2000038363 ("Project Valhalla Business Review")).

**RESPONSE**:  **Undisputed**.

130.   Two subsidiaries of Enron entered into an Agreement on Participation Rights with Deutsche Bank, AG through which Deutsche Bank paid $2 billion for the participation rights

issued by one of the Enron subsidiaries. The participation rights entitled Deutsche Bank to a 7.7% annual minimum distribution for the first five years of the agreement to the extent of available distributable profits. Chung Decl. Ex. D101 (Agreement on Participation Rights between Rheingold GmbH Eschborn, Valhalla GmbH and Deutsche Bank AG (May 2, 2000) at Clause 3, Section 3.3).

**RESPONSE**:  **Undisputed**.

131.     Enron and Deutsche Bank, New York entered into a structured note, through which Enron loaned Deutsche Bank $1.95 billion. Chung Decl. Ex. D102 (Promissory Note by Deutsche Bank AG in favor of Enron Corp. (May 2, 2000) at DBC-008807).

**RESPONSE**:  **Undisputed**.

132.     The net result of Project Valhalla left Enron with a five year net borrowing of $50 million. Deutsche Bank achieved tax benefits, through deduction of the interest it paid on the structured note and exemption from payments it received under its participation rights. Chung Decl. Exs. D103 (Project Valhalla Tax Overview (July 2002) at ERN0036817); D104 (Project Valhalla Presentation (Dec. 14, 1999) at ERN0037129).

**RESPONSE**:  **Undisputed**.

133.     Project Valhalla was reviewed by Vinson & Elkins for Enron, which issued a tax opinion on the treatment of the underlying transactions and concluded that the transactions should be treated as a loan for U.S. federal income tax purposes. Chung Decl. Ex. D105 (Letter from Vinson & Elkins regarding "Project Valhalla Financing Transaction" (Sept. 12, 2000) at ERN0036828).

**RESPONSE**:  **Undisputed**.

134.     Arthur Andersen advised as to the accounting treatment of Project Valhalla and stated that the debt treatment of the transactions was acceptable. Chung Decl. Ex. D106 (Letter from Arthur Andersen to Deutsche Bank (Sept. 22, 1999) at ERN0103665).

**RESPONSE**:  **Undisputed**.

135.     A claim for $102,304,668.35 from Project Valhalla was allowed as a Deutsche Bank direct claim in a Bankruptcy settlement which was approved by the Enron Bankruptcy court. Chung Decl. Ex. D94 (Settlement Agreement between Enron Creditors Recovery Corp. and Deutsche Bank (Dec. 17, 2005) at 12.

**RESPONSE**:  **Disputed**. Paragraph 135 as it mischaracterizes evidence and is incomplete.

These claims were not allowed through fact finding efforts and do not represent "payment" to

Deutsche Bank.  The results were part of a settlement where in Deutsche Bank agreed to pay $25

million to the Enron Creditors Recovery Corp and agreed to release and forever forego $416 million in claims Deutsche asserted in the Enron bankruptcy. P-DB244 at 1. There was no trial in this case. Had there been a trial, the Court would have heard the conclusions from the Bankruptcy Examiner's Reports.

136.   The Valhalla transaction was mistakenly booked within Deutsche Bank in the wrong internal operational system, which triggered a concern among some Deutsche Bank personnel that the transaction might violate German anti-money laundering laws. However, senior employees at Deutsche Bank looked into the potential issue and discovered the operational mistake such that there was no money laundering issue. Chung Decl. Ex. D107 (McGuire Dep. 322:6-325:6).

**RESPONSE**: **Disputed**. Silvercreek disputes whether Deutsche Bank appropriately handled the "money laundering" issue. As stated by Deutsche Bank operations personnel, Corinna Killian, on November 16, 2000, "[A]s I have already mentioned some weeks ago, I firmly believe that the booking of the Genußscheine from Rheingold is not correct." "And so I was asked to confirm in [writing] that this is a loan to Rheingold. I have stated very clearly that I won't do that, as I think that this is not correct." She further stated, "an account was opened for a client who has not signed an account opening form, who does not receive statements and who does not know about this account at all. (This is clearly against . . . money laundry law)." P-DB41 (October 11, 2000, Handling of Valhalla, Killian to Wilcox) at DBF001521.

**B.     Renegade**.

137.   In December 1998 Enron and Bankers Trust (London) closed Project Renegade which allowed Enron to obtain reduced rates of financing while enabling Bankers Trust to use tax savings related to the treatment of financial asset securitization trusts ("FASITs"). Chung Decl. Exs. D108 (Meeting Minutes of the Executive Committee of the Board of Directors of Enron Corp. (Dec. 8, 1998) at EC002557987); D100 (Email from Davis Maxey to Richard Causey attaching presentation entitled "Structured Transactions Group Business Review" (Oct. 2001) at EC2000038337 (Project Renegade Business Review).

**RESPONSE**: **Undisputed**.

138.   Through the Renegade transactions, an Enron subsidiary, ECT Equity Corp. ("ECT Equity") borrowed $320 million from Bankers Trust (London) ("BT London"). Chung Decl. Ex.

D109 (Promissory Note between ECT Equity and BT London (Dec. 23, 1998) at AB000145298). BT London sold the promissory note evidencing the loan to a newly created company, Wiltshire Financial Asset Company LLC ("Wiltshire") which elected to be treated as a FASIT for federal income tax purposes. Chung Decl. Exs. D110 (Agreement of Sale Between BT London and Wiltshire (Dec. 29, 1998) at AB000145427); D111 (Wiltshire LLC Agreement (Dec. 29, 1998) at AB000145346).

**RESPONSE**: **Undisputed**.

139.   ECT Equity loaned the proceeds to Enron Financial Holdings Corp. ("EFH"). Chung Decl. Exs. D112 (Deposit Agreement between ECT Equity and BT London (Dec. 23, 1998) at AB000145282); D113 (Deposit Agreement between EFH and BT London (Dec. 23, 1998) at AB000145289). EFH then used those proceeds to purchase $312 million of certificates in Wiltshire. Bankers Trust International PLC ("BT International") also purchased $8 million worth of certificates in Wiltshire. Chung Decl. D284 (Agreement of Sale between EFH, BT International, and Wiltshire (Dec. 29, 1998) at AB000145431).

**RESPONSE**: **Undisputed**.

140.   Project Renegade was reviewed by the law firm Brown & Wood for Wiltshire which issued a tax opinion stating that Wiltshire would validly be treated as a FASIT under the tax code. Chung Decl. Ex. D114 (Letter from Brown & Wood regarding "Wiltshire Financial Asset Company, LLC," (Dec. 29, 1998) at DBC 008444).

**RESPONSE**: **Undisputed**

141.   Enron received a $1.3 million fee for participating in Project Renegade. Chung Decl. Ex. D100 (Email from Davis Maxey to Richard Causey at "Structured Transactions Group Business Review" (Oct. 2001) at EC2000038337 (Project Renegade Business Review)).

**RESPONSE**: **Undisputed**.

142.   Enron's creditors and Deutsche Bank released each other from any claims, liabilities, or obligations in connection with Project Renegade in a court-approved Enron Bankruptcy settlement. Chung Decl. Ex. D94 (Settlement Agreement between Enron Creditors Recovery Corp. and Deutsche Bank (Dec. 17, 2005) at 12.

**RESPONSE**: **Undisputed** but **immaterial**.

## V.   THERE IS NO EVIDENCE THAT THE OSPREY, MARLIN, YOSEMITE, AND FIREFLY TRANSACTIONS WERE FRAUDULENT

### A.   Marlin I and II.

143.   In late 1998, Enron acquired the publicly held British water-utility company, Wessex Water plc ("Wessex") through its wholly owned indirect subsidiary, Azurix, for

approximately $2.4 billion. The Marlin transactions served to refinance this debt. Chung Decl. Ex. D115 (Marlin I Offering Memorandum ("OM") (Dec. 8, 1998) at 1.

**RESPONSE**:  **Undisputed** but **incomplete** because BT Alex. Brown Incorporated is a

predecessor entity to Deutsche Bank Alex.Brown and that it was an initial purchaser of and offered

as joint bookrunning managers the Senior Marlin Notes along with Donaldson, Lufkin & Jenrette

Securities Corporation ("DLJ" referred to here as "CSFB"). D115 at AASDTEX002438370.  *See*

PSOF ¶ 143.

144.    The Marlin transactions involved two offerings. The first offering, Marlin I, was completed in December 1998 and raised $1.024 billion of notes and $125 million of certificates. Id. at i. The second offering, Marlin II, was completed in July 2001 and raised approximately $915,000,000 through the issuance of notes denominated in both dollars and euros. Chung Decl. Ex. D116 (Marlin II OM (July 12, 2001) at i, 1).

**RESPONSE**:  **Undisputed**.

145.    BT Alex. Brown (a predecessor entity to Deutsche Bank Alex. Brown) acted as joint bookrunning manager with Donaldson, Lufkin & Jenrette. Affiliates of BT Alex. Brown also acted as the indenture trustee and Luxembourg paying agent and transfer agent. Chung Decl. Ex. __ (Marlin I OM at i, 112, AASDTEX002438370).

**RESPONSE**:  **U**ndisputed but incomplete. Deutsche Bank Alex. Brown also was an initial

purchaser of and offered the Senior Notes along with CSFB and acted as Luxembourg Paying and

Transfer Agent. D115 at AASDTEX002438370.

146.    The OM disclosed that Enron contributed various assets to Atlantic in exchange for a beneficial interest in Atlantic. Specifically, Enron contributed: 1) ownership of Azurix and related entities, including Wessex; 2) Enron's rights to repayment under a £73 million debt obligation ("the Azurix Europe Note"); and 3) $200 million in the form of a release of indebtedness owed to Enron by Enron Water L.L.C. Id. at 1, 5.

**RESPONSE**:  **Undisputed** but **incomplete**. The OM disclosed that Enron contributed: "(i)

its interest in Enron Water L.L.C., the parent of Azurix, (ii) its rights under the Azurix Europe

Note and (iii) $200 million in the form of a release of indebtedness in such amount owed to Enron

by Enron Water L.L.C. under the $1.1 billion Enron Acquisition Loan…." D115 at 1.

147.    The OM disclosed that Atlantic used $900 million of the funds contributed by Marlin to repay a portion of the indebtedness incurred to acquire Wessex. Atlantic contributed the remaining $249 million in cash, as well as the Azurix Europe Note, to Bristol Water Trust ("Bristol") as the reserve fund to support repayment of the Marlin securities. Id. at 5.

**RESPONSE**:  **Disputed** as incomplete. The OM disclosed that "Atlantic Water Trust will use the proceeds from the issuance of the Class A Beneficial Interest to contribute (i) $900 million to Enron Water L.L.C., which Enron Water L.L.C. will use to repay the $900 million balance of the Enron Acquisition Loan used to fund the Wessex Acquisition, and (ii) $249 million (the "Overfund Amount") to Bristol Water Trust. The Overfund Amount will be invested by Bristol Water Trust in Enron Debt Obligations or Permitted Investments, which will be pledged to Marlin and are intended to generate proceeds sufficient to pay the required interest and yield payments on the Securities through maturity. In addition, Atlantic Water Trust will contribute the Azurix Europe Note to Bristol Water Trust." D115 at 1.  As discussed below, the Overfund Amount as designed and structured by CSFB and Deutsche Bank "effectively guaranteed" repayment of the Marlin Certificates and therefore required consolidation on Enron's financial statements. **Disputed** in so far as the OM did not disclose this fact which was central to the accounting treatment proposed by Enron.  **Further disputed** in that any purported disclosures in the OM were not reflected in Enron's financial statements relied upon by Silvercreek and other investors in Enron.

148.    The OM disclosed that Enron contributed 204,800 shares of its preferred stock to the Preferred Share Trust. Id. at 5, 6, 127. The OM further disclosed that upon the occurrence of certain defined trigger events, Enron was required to issue additional amounts of shares to repay the Marlin I Notes. Id. at 20.

**RESPONSE**:  **Disputed**. Enron was to contribute 204,800 shares of Enron Preferred Stock with the Preferred Stock Depositary, which was defined in the OM as Enron and Bankers Trust Company as Depositary. D115 at 129. The OM stated that, "If the sale of the Enron Preferred Stock fails to generate sufficient proceeds to repay the Senior Notes, Enron has agreed, to the

72

extent permitted by law, to issue additional shares of Enron Common Stock, and if the Board of

Directors of Enron then approves, Enron Mandated Convertible Preferred Securities, to be sold by

the Remarketing Agents." *Id*. at 20. **Further disputed** in that any purported disclosures in the OM

were not reflected in Enron's financial statements relied upon by Silvercreek and other investors

in Enron.

149.    The OM disclosed risk factors relating to the issuance of the notes. The OM stated
there could be no assurance that the sale of the Enron preferred stock would be sufficient to repay
the notes in the event of the occurrence of certain defined trigger events. Id. at 19. The OM also
expressly disclosed the relationship between Enron, Atlantic, and Azurix and the resulting
potential conflicts of interest. Id. at 25.

**RESPONSE**:  **Disputed** in that any purported disclosures in the OM were not reflected in

Enron's financial statements relied upon by Silvercreek and other investors in Enron.  **Further**

**disputed** that the OM concealed the true purpose of Marlin, and therefore did not disclose all

potential conflicts of interest between Enron, Atlantic and Azurix or their true relationship.

150.    The Marlin trigger events included an event of default under the Marlin I indenture;
a failure to Deposit an amount equal to the repayment amount at least 120 days before the notes
became due; and a downgrading of Enron senior debt to below investment grade, among other
triggers. Id. at 8-9.

**RESPONSE**:  **Disputed**, **incomplete**.  The OM disclosed the trigger events as:

…(i) an Event of Default under the Indenture; (ii) at least 120 days prior to the
Maturity Date, an amount equal to the Repayment Amount has not been deposited
with the Indenture Trustee as to which amount the Indenture Trustee has received
an officer's certificate from Enron that the amount so deposited does not exceed the
aggregate net proceeds received from the sale on or after the Closing Date or equity
securities of Atlantic Water Trust or its subsidiaries or of Enron Common Stock or
Enron Mandatorily Convertible Preferred Securities or a combination of the
foregoing, less certain equity proceeds previously deposited with the Indenture
Trustee that were deducted in determining the Repayment Amount (iii) a
downgrading of Enron senior debt to below "Baa3" by Moody's, "BBB-" by S&P
or "BBB-" by DCR and a decline in the closing price of the Enron Common Stock
for three conseCutive Trading Days to below $37.84, after adjustment of such price
to reflect any split, stock dividend or certain other events occurring with respect to
the common stock of Enron ("Enron Common Stock") after the date of this Offering
Memorandum: (iv) the occurrence of any "event of default" pursuant to the terms

of any series of debt under the indenture dated as of November 1, 1985 between InterNorth, Inc. and Harris Trust and Savings Bank, as trustee, as amended (the "Enron Indenture") and such series of debt becomes due prior to its stated maturity as a result thereof; or (v) the failure by Enron or any of its principal subsidiaries to make any payment on any Indebtedness when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) after any applicable grace period, which Indebtedness exceeds $50 million in aggregate principal amount; and in the case of each of clauses (i), (ii), (iii), (iv) and (v) above, (A) the holders of the Senior Notes outstanding and the Issuers have not unanimously agreed, with each having the right not to agree in its sole, unfettered discretion, to reset the interest rate and maturity on the Senior Notes or (B) despite such unanimous agreement by the holders of the Senior Notes outstanding and the Issuers, Enron and Marlin have not agreed, with each having the right not to agree in its sole, unfettered discretion, to corresponding changes to the distribution provisions of the Atlantic Water Trust Agreement, all within two business days of such event. See "Description of the Senior Notes —Marlin Note Trigger Events and Remedies."

D115 at 8-9.

151.   Enron sought to have the notes rated. The presentations on Marlin I that Enron made to the ratings agencies expressly described the trigger events that could result in the issuance of Enron stock. Enron specifically described the anticipated sources of repayment on the notes, which included a future IPO of Azurix as well as the requirement of Enron to issue Enron mandatorily convertible preferred stock if no IPO occurred prior to maturity. Chung Decl. Exs. D117 (Presentation to Moody's Investors Service Regarding Project Marlin (Oct. 12, 1998) at 8, 17); D118 (Presentation to Standard & Poor's Regarding Project Marlin (Oct. 2, 1998) at 8, 17).

**RESPONSE**:   **Disputed**, **incomplete**. Presentations were made that described certain trigger events (D117 at 17) but not all trigger events (D115 at 8-9).  Presentations were made that described financing for Wessex acquisition with proceeds from the future IPO of Azurix, and listing Enron Mandatorily Convertible Preferred Stock commitment. D117 at 8. The details of the Marlin I presentation omitted key facts known only to Credit Suisse, Enron and their co-conspirator Deutsche Bank regarding the specifics of the trigger events, the "equity" provided by the Banks to Marlin Trust and the extent to which Enron retained control over the assets. Enron later revised its disclosures with respect to the Marlin and Osprey Trigger Events, essentially admitting its 1998-2000 financial statements were inadequate along with it Enron's presentation to Moody's.  *See* D44 at 33 (Enron Form 10-Q filed 11/19/2001) (disclosing for first time details

of Marlin and Osprey Trigger Events and Enron payment obligations).  *See also* PSOF ¶¶ 409-411.

152.    The Marlin I notes were rated Baa2 by Moody's, BBB by Standard and Poor's, and BBB by Duff & Phelps Credit Rating Co ("DCR").  Chung Decl. Exs. D115 (Marlin I OM at 7); D119 (Moody's Marlin I Rating Letter (Dec. 15, 1998) at DBK-0193301); D120 (Standard and Poor's Marlin I Rating Letter (Nov. 23, 1998) at DBK-0193303); D121 (DCR Marlin I Rating Letter (Dec. 3, 1998) at DBK-0193292).

**RESPONSE**:  **Undisputed**.  *But see* PSOF ¶ 151.

153.    The Marlin I offering was reviewed and approved by Enron's board of directors. Chung Decl. Ex. D122 (Enron Board of Directors Meeting Minutes (Dec. 8, 1998) at 5-11.

**RESPONSE**:  **Disputed**.  "Reviewed and approved" is undefined and Enron's Board of

Directors was not presented with all necessary information to "review" Marlin I. **Undisputed** that

Enron's board of directors approved the Marlin I offering.

154.    Vinson & Elkins reviewed the Marlin I transaction documents and stated the summary descriptions provided a fair summary of the transaction documents and further stated that the federal income and ERISA tax consequences were accurately described. Chung Decl. Ex. D123 (Letter from Vinson & Elkins to BT Alex Brown Inc. and Donaldson, Lufkin & Jenrette Securities Corp. (Dec. 17, 1998) at DBK-0193143).

**RESPONSE**:  **Disputed**. Vinson & Elkins' limited opinion concerned only that the OM

provided a fair summary of certain descriptive headings. D123 at DBK-0193143 ("The statements

set forth under the headings "Description of the Issuers," "Description of Atlantic Water Trust,"

"Description of Bristol Water Trust," "Description of the Senior Notes," "Description of the Marlin

Trust Certificates," "Description of the Azurix Europe Note," "Description of the Enron Preferred

Stock and deposit Agreement," "Description of Certain Transaction Documents" and "Description

of Certain Indebtedness" in the Offering Memorandum, insofar as such statements purport to

summarize certain provisions of the Transaction Documents, provide a fair summary of such

provisions."). The letter further stated that "The statements set forth under the headings "Certain

United States Federal Tax Considerations" and "Certain ER1SA Considerations," insofar as such

statements purport to address the federal income tax laws of the United States and the ER1SA

laws, respectively, are accurate in all material respects with respect to the matters discussed

therein." *Id*. In addition, Vinson & Elkins expressly excluded Enron's financial statements from

its statement that it did not have any facts to cause it to believe that the OM contains an untrue

statement of material fact. D123 at DBK-0193144 ("no facts have come to our attention that cause

us to believe that the Offering Memorandum (excluding financial statements and schedules and

exhibits and other financial, statistical or tabular data included therein, as to which we have not

been asked to comment) as of the date thereof contained, or as of the date hereof contains, an

untrue statement of a material fact or on the date of the Offering Memorandum omitted, or on the

date hereof omits, to state a material fact necessary to make the statements therein, in light of the

circumstances under which they were made, not misleading.").

155. Vinson & Elkins also reviewed several other aspects of the transaction. Chung Decl. Exs. D 124 (Letter from Vinson & Elkins to BT Alex Brown Inc. and Donaldson, Lufkin & Jenrette Securities Corp. (Dec. 17, 1998) at DBK-0193147 (stating no consolidation of entities involved in Marlin I would occur in Bankruptcy proceedings)); D125 (Letter from Vinson & Elkins to BT Alex Brown Inc. and Donaldson, Lufkin & Jenrette Securities Corp. (Dec. 17, 1998) at DBK-0193185 (certain corporate matters)); D126 (Letter from Vinson & Elkins to BT Alex Brown Inc. and Donaldson, Lufkin & Jenrette Securities Corp. (Dec. 17, 1998) at DBK-0193219 (English law)); D127 (Letter from Vinson & Elkins to BT Alex Brown Inc. and Donaldson, Lufkin & Jenrette Securities Corp. (Dec. 17, 1998) at DBK-0193230 (tax).

**RESPONSE**:  **Disputed** that Vinson & Elkins reviewed all material aspects of the

transaction. Vinson & Elkins outlined what it concluded and the bases for those conclusions. Also,

in the fall/summer 1998, V&E drafted proposed language for Enron to disclose the triggers for

Enron's contingent obligation with respect to Project Marlin. P-DB133 (11/10/98 Baird Memo)

at EVE 2270907.1-07.4. Enron did not accept V&E's proposed disclosures for its third quarter

1998 Form 10-Q. P-DB126 (8/14/03 Dilg Sworn Stmt.) at 54 ("they decided not to make as full a

disclosure as we may have initially recommended.").

156.    The Marlin structure was reviewed and approved by the accounting firm Arthur Andersen which issued a comfort letter dated December 8, 1998 in connection with the Marlin I OM. The letter stated that selected Enron financial statements included in the OM were accurate. Chung Decl. Ex. D128 (Letter from Arthur Andersen to BT Alex. Brown Incorporated (Dec. 8, 1998) at DBK-0191422.

**RESPONSE**:  **Disputed.** The structure was not reviewed and approved in all aspects; also, D128 does not assert that the statements are "accurate." In addition to reliance on Enron management to confirm assumptions, Andersen specifically noted the procedures Andersen performed "would not necessarily reveal any material misstatement of the amounts or percentages listed."  D128 at ¶ 7 (DBK-0191426).  Andersen also "make[s] no representations regarding the adequacy of disclosure or regarding whether any material facts have been omitted."  *Id*.

**Undisputed** that Arthur Anderson issued a comfort letter dated December 8, 1998 and stated that it has audited certain consolidated Enron balance sheets as of December 31, 1997 and 1996, and the related consolidated statements of income, cash flows and changes in shareholders' equity for each of the three years in the period ended December 31, 1997, all included in the March 19, 1998 Enron form 8-K and the 1997 Enron Form 10-K. D128 at DBK-0191423.

157.    In addition to the public disclosures and rating agency review, the Marlin I transactions were also covered publicly by financial industry reporters. Chung Decl. Exs. D129 (Standard & Poor's, "Research: Marlin Water Trust & Marlin Water Capital Rtd By S&P," (Dec. 1, 1998) at DBM 004415; D129 (Moody's, "Marlin Water Trust" (Mar. 2, 2001) at DBM 004418); D130 (Investment Dealers' Digest, "Enron goes to 144A well to fund new water business," (Dec. 14, 1998) at 1); D131 (Expert Rpt. of Stewart Myers (Mar. 17, 2006) at ¶ 11 (noting that "'off-balance-sheet' does not mean that large project-financing transactions are secret, hidden or undisclosed.") and ¶ 50 (noting that both Marlin and Osprey transactions were disclosed to the public)).

**RESPONSE**:  **Disputed** that the Marlin I transactions, including their true purpose, were fully disclosed to the public. The cited documents speak for themselves.  **Immaterial** in that the ratings noted that "Marlin Water Trust's ratings rely heavily on actions to be taken by Enron."

158.    In July 2001, Enron used Marlin Water Trust II ("Marlin II") to refinance the outstanding Marlin I notes. The Marlin II OM disclosed that Marlin II and Marlin Water Capital

77

Corp. II issued senior secured notes for a total U.S. value of approximately $915,000,000. Chung Decl. D116 (Marlin II OM (July 12, 2001) at ANTS000000001, 1).

**RESPONSE**: **Undisputed**.

159.    Deutsche Bank AG London acted as joint bookrunning agent with Credit Suisse First Boston for the Marlin II transactions. Id. at ANTS000000001. Deutsche Bank Luxembourg S.A. acted as the Luxembourg listing, paying, and transfer agent, while Deutsche Bank AG London acted as the Euro paying agent. Id. at ANTS000000174.

**RESPONSE**: **Disputed**, the cited document lists Deutsche Bank and Credit Suisse First

Boston as joint bookrunning managers for Marlin II. D116 at ANTS000000001.

160.    The OM disclosed that Marlin II would use the proceeds from the issuance to acquire a beneficial interest in Atlantic Water Trust. The funds would also be used to redeem Marlin I's outstanding indebtedness and pay the accrued and unpaid yield on the Marlin trust certificates. Id. at 1.

**RESPONSE**: **Undisputed**.

161.    The Marlin II OM disclosed several risk factors relating to the issuance of the notes. The OM stated there could be no assurance that the sale of the Enron preferred stock would be sufficient to repay the notes in the event of a trigger event. The OM also disclosed the relationship between Enron, Atlantic, and Azurix and the resulting potential conflicts of interest. Id. at 14, 17.

**RESPONSE**: **Disputed**, the Marlin II OM did not disclose all risk factors, including its

true purpose to continue Enron's fraud.

162.    As with the Marlin I offering, Enron sought to have the securities rated and presented the details of the Marlin II offerings to ratings agencies, including a description of the trigger events that could activate Enron's obligation to issue more shares. Enron specifically described the anticipated sources of repayment on the notes, which included asset sales proceeds as well as Enron's obligation to remarket the existing mandatorily convertible preferred shares. Chung Decl. Ex. D132 (Presentation to Moody's Investors Service Regarding Marlin Water Trust and Marlin Water Trust II (May 2001) at 12.

**RESPONSE**: **Disputed** that all details of Marlin II were presented, including that its true

purpose was to continue Enron's fraud and therefore the Marlin II presentations omitted key facts

known only to Enron, Deutsche Bank and CSFB regarding the specifics of the trigger events, the

guaranteed repayment of "equity" provided by the Banks to Marlin Trust and the extent to which

Enron retained control over the assets. **Undisputed** that the presentation states that the note holders will "look to" four sources for principal repayment.

163.     The Marlin II securities were rated Baa1 by Moody's, BBB by Standard and Poor's, and BBB by Fitch. Chung Decl. Exs. D116 (Marlin II OM at 6); D133 (Moody's Rating Letter (July 12, 2001) at DBK-0180762); D134 (Standard & Poor's Rating Letter (July 19, 2001) at DBK-0180766); D135 (Fitch's Rating Letter (July 17, 2001) at DBK-0180758.

**RESPONSE**:  **Undisputed**.

164.     Marlin II was covered by the public financial press. Chung Decl. Ex. D136 (Moody's, "Moody's Assigns Baa1 Rating to Marlin Water Trust II and Marlin Water Capital Corp. II" (July 12, 2001) at DBM 023414); D137 (Fitch, "Fitch Rts Marlin Water Trust II Sr Secured Notes Due 2003, 'BBB'" (July 18, 2001) at AB025202126).

**RESPONSE**:  **Disputed**. "Public financial press" is not a defined term. **Undisputed** that the cited documents are press releases issued by Moody and Fitch. **Disputed** that either rating agency is part of any undefined "public financial press."

165.     Enron's board of directors also reviewed and approved the Marlin II transactions. Chung Decl. Ex. D138 (Minutes, Special Meeting of the Board of Directors, Enron Corp. (June 13, 2001) at 15-21).

**RESPONSE**:  **Disputed** that all aspects of the Marlin II transactions were presented for review. **Undisputed** that Enron's board of directors approved the Marlin II transactions as described in D138 at 16.

166.     The Marlin structure was reviewed and approved by the accounting firm Arthur Andersen which issued a comfort letter dated July 12, 2001 in connection with the Marlin I OM. The letter stated that selected Enron financial statements included in the OM were accurate. Chung Decl. Ex. D139 (Letter from Arthur Andersen to Credit Suisse First Boston ("CSFB") (July 12, 2001) at DBK-0178917).

**RESPONSE**:  **Disputed**. No document is included in D139 and no evidence supports the assertions in this paragraph.

167.     Vinson & Elkins reviewed the Marlin II transaction documents and stated the summary descriptions provided a fair summary of the transaction documents and further stated that the federal income and ERISA tax consequences were accurately described. Chung Decl. Ex. D140 (Letter from Vinson & Elkins to CSFB (July 19, 2001) at EVE 1737000).

**RESPONSE**:  **Undisputed** that V&E provided a legal opinion that the Marlin Notes

Offering Memorandum provided a fair summary of transaction documents described therein.

**Disputed** in so far as the V&E letter expressly excludes from the scope of its review and opinion

any factual matters or financial data, among other limitations. D140 at 001. Also, in the

fall/summer 1998, V&E drafted proposed language for Enron to disclose the triggers for Enron's

contingent obligation with respect to Project Marlin.  P-DB133 (11/10/98 Baird Memo) at EVE

2270907.1-07.4.  Enron did not accept V&E's proposed disclosures for its third quarter 1998 Form

10-Q. P-DB126 (8/14/03 Dilg Sworn Stmt.) at 54 ("they decided not to make as full a disclosure

as we may have initially recommended.").

168.    Vinson & Elkins also reviewed several other aspects of the transaction. Chung
Decl. Ex. D141 (Letter from Vinson & Elkins to CSFB (July 19, 2001) at DBK-0180620 (stating
no consolidation of entities involved in Marlin II would occur in Bankruptcy proceedings)); D142
(Letter from Vinson & Elkins to CSFB (July 19, 2001) at DBK-0180694 (English law)); D143
(Letter from Vinson & Elkins to CSFB (July 19, 2001) at DBK-0180716 (tax)).

**RESPONSE**:  **Disputed** that Vinson & Elkins reviewed all material aspects of the

transaction. Vinson & Elkins outlined what it concluded and the bases for those conclusions.

Among other things, the V&E letter expressly excludes from the scope of its review and opinion

any factual matters or financial data, among other limitations. D142 at 001.

169.    The Marlin structure was reviewed and approved by Arthur Andersen who stated
that Enron did not have to consolidate either Atlantic or Marlin into its financial statements. Chung
Decl. Ex. D144 (Memorandum from Arthur Andersen to The Files regarding "Enron Corp. -
Wessex Acquisition- Joint Venture Structure" (Oct. 30, 1998) at 6-7).

**RESPONSE**:  **Disputed**. The document does not address "Atlantic," and therefore does

not support this statement.  Also **disputed**, as Arthur Anderson noted that the existence of Enron

mandatorily convertible preferred stock could under certain circumstances guarantee Marlin's

debt, which would potentially fail a requirement for consolidation that the SPE owner has not made

an initial substantive residual equity capital investment (3%) that is at risk during the entire term of the lease. D144 at 6-7. Further, the Andersen memorandum also noted a "corollary issue" of whether the "contingent issue of Enron convertible preferred stock should be considered a debt issuance by Enron because of the share-reset mechanism." *Id*. at 7 (noting SEC concluded a "equity" sale in analogous circumstances "should be accounted for as debt.").

A careful reading of the Marlin Trust agreement revealed that the $125 million note from Azurix Europe Ltd. ("AEL") was available to repay the Marlin "equity" certificateholders. Indenture Agreement for Marlin Water Trust § 5.09 (b) & (c) at 005710537-38; *see also* P-DB127 (Solomon Rpt.) at 261-63. An internal CSFB document shared with Deutsche Bank at the time of the Marlin transaction admits Marlin Trust lacked the requisite equity "at risk" because, according to CSFB, Enron was "**effectively guarantee[ing]**" the interest and yield on the Marlin Certificates – the supposedly independent equity. *See* P-CS 57 (Overview of Pricing for Marlin Water Trust, Azurix) at CSFBLLC005709835. Specifically, the CSFB Marlin Certificate presentation states:

**STEP 3: ENRON PROVIDES ADDITIONAL SUPPORT TO MARLIN**

▷ **In addition to its Investment in Azurix, Enron will provide additional interest and principal support to Marlin**

*Effective Interest Guarantee*

   Enron will effectively guarantee the interest and yield requirements on the Senior Notes and the Certificates
   – Bristol Trust will invest the Overfund Amount in Enron debt obligations ("Enron Debt Obligations")
   – Enron Debt Obligations will match the interest and yield on the Senior Notes and Certificates
   – Enron Debt Obligations will rank pari passu with existing Enron public debt securities

Enron personnel also knew and acknowledged that the Marlin Certificates were not truly at risk because of the Azurix Europe note.  *See* Marlin Trust Certificates Presentation, January 2001 at ECTe002386225-235 ("The Trust Certificates . . . are backstopped by the AEL Notes."); P-CS 58 (2/12/2001 Enron email) ("[W]e may not be able to amend the terms of the existing Certificates (i.e Yield) if we do not want to risk the current support structure (AEL Note). While

we could push AA on this, it may cause them to re-look at the structure and risk the support mechanism.")  Because there was no "at risk" equity, Marlin should have been consolidated on Enron's financial statement, causing Enron to record as much as $1,149 million as additional debt beginning with year-end 1998.  *See* P-DB127 (Solomon Rpt.) at 261-63.

170.    Enron disclosed the structure of the Wessex acquisition in its Form 10-K dated March 31, 1999. The 10-K disclosed that the acquisition would be "accounted for using the equity method" and that "Wessex is held through Azurix Corp" which was described as an "unconsolidated affiliate." The 10-K also specifically disclosed the Marlin trigger events. Chung Decl. Ex. D13 (Enron 1998 Form 10-K (Mar. 31, 1999) at Note 9, Unconsolidated Affiliates).

**RESPONSE**:  **Disputed**. Enron did not disclose all details of the structure to reveal its fraud with respect to Marlin II or the Wessex purchase. Enron's financial statements did not accurately or appropriately disclose the structure of the Marlin transaction, the basis for its use of the equity method, classifying Marlin as an unconsolidated affiliate or the importance of the stock trigger threat. P-DB127 (Solomon Rpt.) at 263-66. Specifically, Enron failed to disclose the quantity of shares it committed to sell, the approximate value of those shares, or the dollar amount Enron would be liable for it was were unable to sell the stock, all of which concealed the extent to which Enron was obligated to repay the Marlin debt. *Id.* Further, Enron later revised its disclosures with respect to the Marlin and Osprey Trigger Events, admitting its 1998-2000 financial statements were inadequate. *See* D44 (Enron Form 10-Q issued 11/19/2001) at 32 (disclosing for first time details of Marlin and Osprey Trigger Events and Enron payment obligations).  These disclosures remained inadequate with respect to the non-consolidation of Marlin Trust for the reasons discussed above.

A careful reading of the Marlin Trust agreement revealed that the $125 million note from Azurix Europe Ltd. ("AEL") was available to repay the Marlin "equity" certificateholders. *See* Indenture Agreement for Marlin Water Trust § 5.09 (b) & (c) at 005710537-38; *see also* P-DB127

(Solomon Rpt.) at 261-63. An internal CSFB document at the time of the Marlin transaction admits Marlin Trust lacked the requisite equity "at risk" because, according to CSFB, Enron was "**effectively guarantee[ing]**" the interest and yield on the Marlin Certificates – the supposedly independent equity. *See* P-CS 57 (Overview of Pricing for Marlin Water Trust, Azurix) at CSFBLLC005709835. Specifically, the CSFB Marlin Certificate presentation states:

> **Undisputed** that the quoted statements appear in the 10-K.

171.   Enron's creditors and Deutsche Bank released each other from any claims, liabilities, or obligations in connection with Marlin I and II in the Enron court-approved Bankruptcy settlement. Chung Decl. Ex. D94 (Settlement Agreement between Enron Creditors Recovery Corp. and Deutsche Bank (Dec. 17, 2005) at 17, 18).

**RESPONSE**:  **Undisputed** with respect to claims relating to the MegaClaim Litigation and MegaClaim Objection, subject to the terms and definitions listed in D94.  **Immaterial** to any issue in this case.

### B.   Osprey I and II.

172.   Enron created the Osprey structure in September 1999, with the purpose to redeem an equity interest of an unaffiliated equity investor in Whitewing LP and to purchase certain assets owned by Enron. Chung Decl. Exs. D145 (Osprey I OM (Sept. 16, 1999) at i); D146 (Osprey II OM (Sept. 28, 2000) at i).

**RESPONSE**:  **Disputed** as to "created." Deutsche served as a joint bookrunning manager. D146 at 1. **Undisputed** that the documents state, among other things, that the proceeds were to be used to purchase a limited interest in Whitewing and to purchase certain assets owned or originated by Enron.

173.   Osprey I closed in September 1999 and consisted of both an issuance of debt and equity certificates which were sold to Qualified Institutional Buyers and non-U.S. investors pursuant to Rule 144A and Regulation S of the 1933 Securities Act. The Osprey I OM disclosed that Osprey I would raise $1.5 billion through the sale of $1.4 billion in Senior Secured Notes (the "Osprey I Notes") and $100 million through the sale of trust certificates (the "Osprey Certificates"). Chung Decl. Ex. D145 (Osprey I OM at i, 9).

**RESPONSE**: **Undisputed** as to the transaction steps, however. Disputed in that through Osprey, Deutsche Bank helped Enron conceal in excess of $1.7 billion of additional debt. *See* D44 (Enron Form 10-Q issued 11/19/2001) at 33-34 (disclosing for first time details of Marlin and Osprey Trigger Events and Enron payment obligations). *See also* P-DB127 (Solomon Rpt.) at 42-47, *id*. at 247-278; P-CS 65 (Batson 2d Interim Rpt. Appx. G) at 67-78 (Whitewing Transaction).

174.    Deutsche Banc Alex. Brown, together with Donaldson, Lufkin & Jenrette served as joint book-running manager for the Osprey I transactions, with Deutsche Bank Securities Inc. serving as an initial purchaser. Bankers Trust Luxembourg S.A. served as the Luxembourg paying and transfer agent. Id. at i, DBB007111.

**RESPONSE**: **Undisputed**.

175.    The Osprey I OM disclosed that Osprey Trust ("Osprey") and Osprey I, Inc. co-issued the Osprey I Notes and Osprey Certificates. Osprey was a statutory business trust formed as of September 15, 1999 under the laws of Delaware. Osprey I, Inc. was a wholly owned special purpose subsidiary of Osprey, also incorporated under the laws of Delaware on September 15, 1999. Id. at 24, 25.

**RESPONSE**:   **Undisputed** that the Osprey OM stated as asserted in paragraph 175 **disputed** in so far as the OM did not disclose anything to the investing public. The OM (in which Deutsche Bank participated) omitted Deutsche Bank's understanding that Enron effectively guaranteed the Osprey debt and therefore "disguised debt" of Enron's, with the added benefit to Enron that Osprey was an off-balance sheet parking lot for Enron's distressed assets

176.    The Osprey I OM disclosed that Osprey invested substantially all of the $1.5 billion in cash proceeds in Whitewing Associates in exchange for a limited partner interest. The OM disclosed that Whitewing Associates used $578 million of the proceeds to redeem the interest of an existing equity investor in Whitewing LP. The OM disclosed that Whitewing Associates contributed $115.7 million in cash to the Condor Share Trust ("Condor Trust") for the reserve fund, which was invested in Enron notes or other permitted securities, and retained $807 million to be used for unspecified investments. Id. at 1, 4.

**RESPONSE**:   **Disputed**. The Osprey I OM stated that $578 million was used to redeem the interest of an existing equity investor in Whitewing LP that is not affiliated with Enron, and that the $115 million amount was to be invested in Enron Debt Securities or other Permitted

Investments as defined in the document, and the $807 million was to be used to purchase Designated Assets and Permitted Investments, as defined in the agreement. The OM (in which Deutsche Bank participated) also omitted Deutsche Bank's understanding that Enron effectively guaranteed the Osprey debt and therefore "disguised debt" of Enron's, with the added benefit to Enron that Osprey was an off-balance sheet parking lot for Enron's distressed assets

177.    The OM disclosed that Whitewing Associates became the 100% beneficial owner of the Condor Trust, which held assets designated to support repayment of the notes and certificates. Id. at 31.

**RESPONSE**:   **Disputed**. The OM stated that Whitewing LP will hold 100% of the beneficial ownership interests of the Share Trust "in exchange for its contribution, on the Closing Date, of cash in an amount equal to the Overfund Amount, its rights under the Enron Notes and the Enron Mandatorily Convertible Preferred Stock." D145 at 31. The OM (in which Deutsche Bank participated) also omitted Deutsche Bank's understanding that Enron effectively guaranteed the Osprey debt and therefore "disguised debt" of Enron's, with the added benefit to Enron that Osprey was an off-balance sheet parking lot for Enron's distressed assets

178.    The OM disclosed that Enron contributed 250,000 shares of Enron preferred stock and $139 million of Enron notes to Whitewing Associates. Whitewing Associates contributed the Enron shares and notes to the Condor Trust to support repayment of the notes and certificates. Id. at 4, 18, 55.

**RESPONSE**:   **Undisputed**.

179.    The OM disclosed that upon the occurrence of certain defined trigger events, Enron was required to issue additional amounts of shares to repay the Osprey I notes and, if there was still a shortfall on the notes, to pay an amount equal to any remaining deficiency. The Osprey trigger events included an event of default under the Osprey I indenture; a failure to deposit an amount equal to the repayment amount at least 120 days before the notes became due; and a downgrading of Enron senior debt to below investment grade, among other triggers. Id. at 1-2, 5, 7, 12-13, 66.

**RESPONSE**:  **Disputed** to the extent Deutsche Bank contends the OM "disclosed" anything to the investing public in comparison to Enron's reported financials which omitted all details regarding the stock trigger events.  Otherwise, the document speaks for itself.

180.    The OM disclosed that the Osprey I Notes were supported by the assets in Whitewing Associates, which included: 1) the Enron shares held by the Condor Trust; 2) Enron's obligation to issue additional equity as necessary to raise proceeds of a required amount at least equal to $1.4 billion; 3) the Whitewing Assets and 4) additional unspecified permitted investments. Id. at 1.

**RESPONSE**:  **Disputed** to the extent Deutsche Bank contends the OM "disclosed" anything to the investing public in comparison to Enron's reported financials which omitted all details regarding the stock trigger events.  Otherwise, the document speaks for itself.

181.    The OM disclosed that the Whitewing Assets consisted of Designated Assets, which were assets that Enron invested in and developed in its ordinary course of business. The Designated Assets were described as follows:

> In the implementation of several of Enron's core business strategies, Enron has frequent opportunities to invest in debt and equity interests of its customers and in projects it is developing, or originating through its wholesale operations and services, retail energy services and related financing activities (the "Designated Assets"). Enron periodically seeks to sell Designated Assets as a means to create liquidity for its business. . . . Whitewing LP will utilize a portion of the proceeds of Osprey's investment to acquire Designated Assets."

Id. at 1.

**RESPONSE**:  **Undisputed** the OM states as asserted.

182.    The Osprey I OM disclosed Whitewing Associates' asset acquisition process. In the section entitled "*Blind Pool,*" the Osprey I OM disclosed that Whitewing Associates held no Whitewing Assets prior to the Osprey I closing. The OM expressly disclosed that investors would not know what assets would be acquired by Whitewing Associates at the time of their investment. The Osprey I OM disclosed that "there can be no assurance as to any such acquisition or the terms thereof." The OM further disclosed that any future Whitewing Asset purchases were to "be at a price and on other terms determined by internal Enron negotiations conducted on an arms length basis, and the holders of the Osprey Trust Certificates (the "Certificateholders") will have certain consent rights to such acquisitions, but there can be no assurance that such prices and other terms will reflect those that would be agreed by unaffiliated third parties." Id. at 13.

**RESPONSE**:  **Undisputed**, except that the full title of the referenced section is "*Blind Pool; Uncertainty of Ability to Realize on Any Liquidation of the Whitewing Assets.*"

183.    In the section entitled "*Uncertainty of Ability to Realize on Any Liquidation of the Whitewing Assets*," the OM disclosed to investors that "[t]here may be no established market for the Whitewing Assets and there may be contractual or other limitations relating" to the sale of any of the Whitewing Assets. The OM also disclosed that "a sale of such assets may be difficult and there can be no assurance as to the proceeds thereof." Id. at 13.

**RESPONSE**:  **Disputed** to the extent Deutsche Bank contends the OM "disclosed" anything to the investing public in contrast to Enron's reported financials, which omitted all details regarding the stock trigger events.  Otherwise, the document speaks for itself.

184.    Enron sought to have the Osprey securities rated and gave presentations to rating agency analysts from Standard & Poor's and Moody's. These presentations set forth the general terms of the Osprey transaction and included disclosure of the trigger events, including Enron's commitment to issue additional shares in the event that liquidation of the mandatorily convertible preferred stock did not generate sufficient funds to pay back the debt holders. Chung Decl. Ex. D147 (Presentation to Standard & Poor's, Project Condor (Aug. 20, 1999) at 13, 18-19); D148 (Presentation to Moody's, Project Condor (Aug. 19, 1999) at 11, 17-18).

**RESPONSE**:  **Disputed**. The presentation (in which Deutsche Bank participated) omitted Deutsche Bank's understanding that the Osprey debt was effectively guaranteed by Enron and therefore "disguised debt" of Enron's, with the added benefit to Enron that Osprey was an off-balance sheet parking lot for Enron's distressed assets.  .

185.    Each of the rating agencies rated the Osprey I Notes investment grade. The Osprey I notes were given credit ratings of "BBB" by Standard & Poor's, "Baa3" by Moody's, and "BBB" by Duff & Phelps. Chung Decl. Exs. D149 (Standard & Poor's Rating Letter (Sept. 15, 1999) at E 147719); D150 (Moody's Rating Letter (Sept. 27, 1999) at E 147717); D 151 (Duff and Phelps' Rating Letter (Sept. 23, 1999) at E 147715).

**RESPONSE**:  **Undisputed**.  Further, CSFB bankers commented to each other in response to S&P's BBB rating of the Osprey notes: "As you probably know, Osprey is a vehicle enabling Enron to raise **disguised debt which appears as equity on Enron's balance sheet**. … Osprey

serves the added purpose for Enron of being an **off-balance sheet parking lot for certain assets.**"

P-DB198 at CSFBCO 005107202.

186.    Other public sources described the Osprey I transactions, including Enron's share commitment to support the notes. Chung Decl. Ex. D152 (Bloomberg News, <u>Enron Sells $1.4 Bln of Notes Via Trust to Reduce Interest Cost</u>, (Sept. 27, 1999) at EC46649A0032180-81 ("'What you are buying when you buy into these notes, when you really force the issue, is Enron credit' . . . [s]till, 'it doesn't throw debt onto their consolidated balance sheet.'" (quoting Bear Stearns analyst)); D153 (Duff & Phelps ratings Rpt. (Sept. 16, 1999) at EC46649A0032183 ("The company's rationale behind the sale of the notes and the purchase of the merchant assets is to allow ENE an efficient vehicle to monetize its merchant portfolio.")).

**RESPONSE**:   **Undisputed**. In addition, D152 states "'They're getting credit from an equity perspective for preferred securities issued in 1997,' said John O'Connor, who rated the Osprey for Duff & Phelps. The preferred securities are currently worth about $2.2 billion, so there is a wide cushion to protect buyers of the $1.4 billion in Osprey notes, he said.'" D152 at EC46649A0032181. Also, D153 states that additional security for the notes is the merchant asset portfolio, and "ENE marks to market its merchant assets with positive/negative impact reflected in ENE's financial statements. Favorably, ENE has not experienced any major write-downs over the last several years. The degree of cash flow derived from this segment of ENE's business has grown at a rather impressive pace over the last several years and represents an important consideration in evaluating ENE's consolidated credit quality." D153 at EC46649A0032184.

187.    Enron's board of directors reviewed and approved the Osprey I offering and structure. Chung Decl. Ex. D154 (Minutes, Special Mtg. of the Board of Directors, Enron Corp., (Sept. 17, 1999) at ENE 0000001026-033).

**RESPONSE**:   **Disputed** that Enron's board of directors were presented with all necessary information to "review" Osprey I. **Undisputed** that Enron's board of directors approved the Osprey I offering.

188.    The Osprey I transactions were reviewed by Vinson & Elkins, which issued opinions several aspects of the offering. Chung Decl. Exs. D155 (Letter from Vinson & Elkins to Deutsche Bank Securities Inc. (Sept. 24, 1999) at E 147614 (10b-5 due diligence opinion));

D156 (Letter from Vinson & Elkins to Deutsche Bank Securities Inc. (Sept. 24, 1999) at E 147618 (stating no consolidation of entities involved in Osprey I would occur in Bankruptcy proceedings)); D157 (Letter from Vinson & Elkins to Deutsche Bank Securities Inc. (Sept. 24, 1999) at E 147656 (certain corporate matters)); D158 (Letter from Vinson & Elkins to Deutsche Bank Securities Inc. (Sept. 24, 1999) at E 147670 (tax matters)).

**RESPONSE**:  **Disputed**. D155 at E 147614 states that only certain statements in the Offering Memorandum provide a fair summary of certain provisions, and that the primary purpose of the firm's engagement "was not to establish or confirm factual matters or financial or statistical data" and that the firm is "not passing upon and do[es] not assume any responsibility for the accuracy, completeness or fairness of the statements contained or incorporated by reference in the Offering Memorandum," except as to certain specific provisions. The firm states it has "not independently verified the accuracy, completeness or fairness of such statements [in the Offering Memorandum]" and states it assumes "no responsibility for and have not independently verified the accuracy, completeness or fairness of the financial statements and schedules and other financial, accounting and statistical data included or incorporated by reference in the Offering Memorandum, and we have not examined the financial, accounting or other records from which such financial statements and other financial and statistical data are derived."

189.    The Osprey structure was reviewed and approved by the accounting firm Arthur Andersen which issued a comfort letter dated September 16, 1999 in connection with the Osprey I OM. The letter stated that selected Enron financial statements included in the OM were accurate. Chung Decl. Ex. D159 (Letter from Arthur Andersen to Deutsche Bank Securities Inc. Sept. 16, 1999) at E 146241.

**RESPONSE**:  **Disputed** that Andersen reviewed and approved in all aspects.  D159 does not assert that the statements are "accurate." **Undisputed** that Andersen issued a comfort letter dated September 16, 1999 and stated that it has audited certain consolidated Enron balance sheets as of December 31, 1998 and 1997, and the related consolidated statements of income, cash flows and changes in shareholders' equity for each of the three years in the period ended December 31,

1998, all included in the March 18, 1999 Enron Form 8-K and the 1998 Enron Form 10-K. D169 at E 146241.

190.    Arthur Andersen stated in multiple memoranda dated March 10, 2000 that Enron did not have to consolidate Whitewing into its financial statements. Chung Decl. Exs. D160 (Memorandum from Arthur Andersen to The Files regarding "Creations of Whitewing LP" (Mar. 10, 2000) at AASDTEX000400244); D161 (Memorandum from Arthur Andersen to The Files regarding "Subsequent Activities of Whitewing LP" (Mar. 10, 2000) at AASDTEX000400251).

**RESPONSE**:  **Disputed** as to multiple memoranda and further **disputed** because to reach this conclusion Andersen ignored that the equity was either owned or controlled by related parties (LJM) or funded with non-recourse debt. If adjusted properly for these amounts, Whitewing should have been consolidated according to Andersen's own standards. *See* P-DB127 (Solomon Rpt.) at 272-74.

191.    Enron disclosed the Osprey trigger events in its Form 10-K dated March 30, 2000. which stated that "Enron could be obligated, under certain circumstances, to deliver additional shares of common stock or Series B Preferred Stock to Whitewing." Enron also disclosed the deconsolidation of Whitewing which resulted in "an increase in Enron's investment in unconsolidated equity affiliates of approximately $500 million, an increase in preferred stock of $1.0 billion and a decrease in minority interest of $500 million." Chung Decl. Ex. D36 (Enron 1999 Form 10-K (Mar. 30, 2000) at Note 9, Unconsolidated Equity Affiliates.

**RESPONSE**:  **Disputed.**  Enron's financial statements did not accurately or appropriately disclose the true nature of the Osprey transaction, the basis for classifying Osprey/Whitewing as an unconsolidated affiliate or the import of the stock trigger threat issue.  Specifically, Enron failed to disclose the quantity of preferred shares it pledged as collateral supporting $1.5 billion of notes and certificates issued by Osprey, the approximate value of those shares, or the Enron's exposure should it be unable to sell the stock, all of which concealed the extent to which Enron was obligated to repay the Osprey/Whitewing debt. The disclosures also fails to mention that $15 million of the "equity" certificates were owned by LJM, an Enron related party and Whitewing was investing $922 million in Enron merchant assets which Enron had the exclusive right to set the purchase

price.  *See* P-DB 127 (Solomon Rpt.) at 275-77.  Further, a year later, Enron revised its disclosures

with respect to the Marlin and Osprey Trigger Events, admitting its 1998-2000 financial statements

were inadequate.  *See* P-CS 10 (Enron Form 10-Q filed 11/19/2001) at 33-34 (disclosing for first

time details of Marlin and Osprey Trigger Events and consequent Enron payment obligations).

192.    In July 2000, additional Osprey certificates were sold for $70 million, the proceeds of which were invested in the Whitewing structure. Chung Decl. Exs. D162 (Osprey Trust Certificate Purchase Agreement (July 10, 2000) at AB000053144); D163 (Amendment No. 1 to Amended and Restated Trust Agreement of Osprey Trust (July 12, 2000) at AB000053164).

**RESPONSE**:  **Undisputed**.

193.    The Osprey II transaction was a subsequent offering to Osprey I in September 2000 and utilized the same structure established in Osprey I. The Osprey II Notes and Certificates were sold pursuant to 144A/Regulation S to Qualified Institutional buyers, and non-U.S. investors. Chung Decl. Ex. D146 (Osprey II OM (Sept. 28, 2000) at i, 4).

**RESPONSE**:  **Undisputed**.

194.    Deutsche Banc Alex. Brown, together with Donaldson, Lufkin & Jenrette ("DLJ") served as the joint bookrunning manager for the Osprey II transactions. Deutsche Bank Securities Inc. acted as an initial purchaser, Deutsche Bank Luxembourg S.A. acted as the Luxembourg listing, paying, and transfer agent, and Deutsche Bank AG London served as the Euro paying agent. Id. at i, CSFBLLC005523075.

**RESPONSE**:  **Undisputed**.

195.    Osprey and Osprey, Inc. issued an additional $1.027 billion of Osprey Notes and $50 million of Osprey Certificates (the "Osprey II offering", or "Osprey II"). The Osprey II Note issuance amount consisted of $750 million in U.S. dollar-denominated notes, and €315 million in Euro-denominated notes. Id. at i, 18.

**RESPONSE**:  **Undisputed**.

196.    The Osprey II OM disclosed that the $1.08 billion in proceeds from the sale of the notes and certificates were contributed by Osprey to Whitewing Associates in exchange for an increase in Osprey's limited partnership interest in Whitewing Associates. The Osprey II OM further disclosed that Whitewing Associates contributed $171 million of this amount to the Condor Trust to increase the assets held to support repayment of the Osprey I & II notes. The remainder was available to Whitewing Associates for investment in certain Designated Assets as defined in the Osprey II OM. Id. at 1.

**RESPONSE**:  **Disputed**, as the remaining proceeds were to be used to purchase Permitted

Partnership Investments, including Designated Assets, as defined in the document.  **Further**

**disputed** to the extent Deutsche Bank contends the OM "disclosed" anything to the investing

public in contrast to Enron's reported financials, which omitted all details regarding the stock

trigger events.  Otherwise, the document speaks for itself.

197.     The Osprey II OM disclosed Whitewing Associates' asset acquisition process. Like
the Osprey I OM, the Osprey II OM disclosed that any additional Whitewing Asset purchases were
to "be at a price and on other terms determined by internal Enron negotiations conducted on an
arms length basis, and the holders of the Osprey Trust Certificates (the "Certificateholders") will
have certain consent rights with respect to such acquisitions, but there can be no assurance that
such prices and other terms will reflect those that would be agreed by unaffiliated third parties."
Id. at 15.

**RESPONSE**:  **Disputed** to the extent Deutsche Bank contends the OM "disclosed"

anything to the investing public in contrast to Enron's reported financials, which omitted all details

regarding the stock trigger events.  Otherwise, the document speaks for itself.

198.     Additionally, just as in the Osprey I OM, the Osprey II OM also contained a section
entitled "Uncertainty *of Ability to Realize on Any Liquidation of the Whitewing Assets*" which
disclosed that "[t]here may be no established markets for the Whitewing Assets and there may be
contractual or other limitations relating" to the sale of any of the Whitewing Assets. This section
further disclosed that "a sale of such assets may be difficult and there can be no assurance as to
the proceeds thereof." Id. at 15.

**RESPONSE**:  **Disputed** that Osprey I OM has the same section title. **Undisputed** that the

quoted portion appears in the referenced document.

199.     Enron sought to have the Osprey II securities rated and each of these rating agencies
rated the Osprey II notes as investment grade. The Osprey II Notes were given credit ratings of
"BBB" by Standard & Poor's, "Baa2" by Moody's, and "BBB" by Fitch IBCA, Duff & Phelps
("Fitch"). Chung Decl. Exs. D146 (Osprey II OM at 82); D164 (Standard & Poor's Rating Letter
(Sept. 15, 2000) at E 28316); D165 (Moody's Rating Letter (Sept. 29, 2000) at E 28315); D166
(Fitch's Rating Letter (Sept. 26, 2000) at E 28314).

**RESPONSE**:  **Undisputed**.

200.   Moody's issued a credit research opinion update on October 2, 2000, which described the support underlying the securities as well as the Osprey trigger events. Chung Decl. Ex. D167 (Moody's Opinion Update (Oct. 2, 2000) at MDY 26150).

**RESPONSE**:   **Disputed** that the support underlying the securities and that all trigger events were outlined. **Undisputed** that Moody's issued a credit research opinion update on October 2, 2000.

201.   The Osprey II transactions were reviewed by Vinson & Elkins which issued opinions on several aspects of the offering. Chung Decl. Exs. D168 (Letter from Vinson & Elkins to Deutsche Bank Securities Inc. (Oct. 5, 2000) at E 28216 (10-b 5 due diligence opinion)); D169 (Letter from Vinson & Elkins to Deutsche Bank Securities Inc. (Oct. 5, 2000) at E 28221 (stating no consolidation of entities involved in Osprey II would occur in Bankruptcy proceedings)); D170 (Letter from Vinson & Elkins to Deutsche Bank Securities Inc. (Oct. 5, 2000) at E 28260 (certain corporate matters)); D171 (Letter from Vinson & Elkins to Deutsche Bank Securities Inc. (Oct. 5, 2000) at E 28272 (validity under English law)); D172 (Letter from Vinson & Elkins to Deutsche Bank Securities Inc. (Oct. 5, 2000) at E 28278 (tax matters)).

**RESPONSE**:   **Disputed** that Vinson & Elkins reviewed all aspects of the Osprey II transactions. D168 at E 28216 states Vinson & Elkins was only opining that certain statements in the Offering Memoranda provide a fair summary of certain provisions, and that the primary purpose of the firm's engagement "was not to establish or confirm factual matters or financial or statistical data" and that the firm is "not passing upon and do[es] not assume any responsibility for the accuracy, completeness or fairness of the statements contained or incorporated by reference in the Offering Memoranda," except as to certain specific provisions. The firm states it has "not independently verified the accuracy, completeness or fairness of the financial statements…incorporated by reference in the Offering Memoranda."

202.   The Osprey certificate holders had certain approval rights, which granted the holders approval authority over Osprey's initial asset purchases and any subsequent investments over $40 million. Chung Decl. Ex. D173 (Amended and Restated Limited Liability Company Agreement of Whitewing Management LLC (Sept. 24, 1999) at 6.06(b) and (c)).

**RESPONSE**:   **Disputed**. Such rights also required consent from the Osprey Trust. D173 at 6.06(c).

203.   The Osprey structure was reviewed and approved by the accounting firm Arthur Andersen which issued a comfort letter dated September 28, 2000 in connection with the Osprey II OM. The letter stated that selected Enron financial statements included in the OM were accurate. Chung Decl. Ex. D174 (Letter from Arthur Andersen to Deutsche Bank Securities Inc. (Sept. 28, 2000) at E 26792. Arthur Andersen reiterated its previous conclusion that Whitewing did not need to be consolidated in a memo dated Nov. 7, 2001. Chung Decl. Ex. D175 (Mem. by D. Duncan re: "Whitewing Analysis" (Nov. 7, 2001) at AASDTEX001041135).

**RESPONSE**:   **Disputed that** Anderson reviewed all aspects of the Osprey structure.

**Undisputed** that Andersen issued a comfort letter dated September 28, 2000 and stated that it has audited certain consolidated Enron balance sheets as of December 31, 1999 and 1998, and the related consolidated statements of income, comprehensive income, cash flows and changes in shareholders' equity for each of the three years in the period ended December 31, 1999, all included in the 1999 Enron Form 10-K and related financial statement schedule. D174 at E26792. D174 does not assert that the statements are "accurate."

204.   Enron's creditors and Deutsche Bank released each other from any claims, liabilities, or obligations in connection with Marlin I and II in the Enron court-approved Bankruptcy settlement. Chung Decl. Ex. D94 (Settlement Agreement between Enron Creditors Recovery Corp. and Deutsche Bank (Dec. 17, 2005) at 17, 18).

**RESPONSE**:   **Undisputed** with respect to claims relating to the MegaClaim Litigation and MegaClaim Objection, subject to the terms and definitions listed in D94. **Immaterial** as to any issue in dispute in this litigation.

C.   **Yosemite**.

205.   The Yosemite I transaction was an Enron credit-linked note financing designed to use a special-purpose entity to raise funds to purchase certain unspecified Enron-related debt obligations and high credit quality investments. Chung Decl. Ex. D176 (Yosemite I OM (Nov. 4, 1999) at i, 1). The Yosemite I OM outlined the terms of issuance for $750 million of Series 1999-A Linked Enron Obligations ("LEOs" or "Yosemite I notes") to be sold pursuant to Rule 144A and Regulation S to Qualified Institutional Buyers, and non-U.S. investors. Id. at CITINEWBY 00006980, 3.

**RESPONSE**:   **Undisputed**.

206.   Deutsche Bank Securities Inc. acted as an initial purchaser of the Yosemite I notes, while Bankers Trust Luxembourg S.A. served as the Luxembourg paying and transfer agent. Id. at

CITINEWBY 00007068. Deutsche Bank was allocated and sold approximately 11% of the Yosemite I Notes. Chung Decl. Ex. D177 (Yosemite I Note Purchase Agreement (Nov. 4, 1999) at Schedule A).

**RESPONSE**: **Undisputed**.

207.    The Yosemite I OM disclosed that the Yosemite I notes were issued by Yosemite I Trust ("YI Trust" or "Trust") an entity established in October 1999. Chung Decl. Ex. D176 (Yosemite I OM at 21). In addition to the Yosemite I notes, the YI Trust issued $75 million in certificates. Id. at 40. The Yosemite I financing closed on November 18, 1999. Id. at A-4.

**RESPONSE**: **Undisputed** the Yosemite I OM stated as quoted.

208.    The Yosemite I OM disclosed that the Trust would use the proceeds of the issuance to invest in unspecified Enron-related obligations and in certain high credit quality investments. Id. at 1.

**RESPONSE**: **Undisputed** the Yosemite I OM stated as quoted.

209.    The Yosemite I OM disclosed that the YI Trust was not required to disclose to holders of the Yosemite I notes any information relating to the specific YI Trust investments absent a default. Id. at 4.

**RESPONSE**: **Undisputed** the Yosemite I OM stated as quoted.

210.    The Yosemite I OM further disclosed that the YI Trust would invest the proceeds in "Permitted Investments" that were defined as certain unspecified high credit quality (such as triple A and U.S.) investments and unspecified payment obligations supported by Enron (the "Enron Investments"). The principal of the Yosemite I notes and certificates was payable through amounts received by the YI Trust investments from Citibank. Id. at 4, 5.

**RESPONSE**: **Undisputed** the Yosemite I OM stated as quoted.

211.    The Yosemite I OM disclosed that the Yosemite I financing included two swap transactions between Citibank and the YI Trust. Id. at 5-7. Under one swap, in the absence of an Enron credit default, Citibank agreed to pay amounts equal to the interest payments due on the Yosemite I notes and certificates. In return, Citibank was entitled to the actual yield generated by the Trust investments. Id. The other swap was disclosed as a credit-default swap which required Citibank to either financially or physically settle the swap in the event of an Enron Bankruptcy or other specified events. Id. at 5-7. Upon an election to physically settle the swap, Citibank was required to deliver to the YI Trust certain defined unsecured obligations of Enron. See id. The Yosemite I OM disclosed both swaps. Id. at 5-7, 42-57.

**RESPONSE**:  **Disputed**. The document defines one swap, the Citibank Swap, which

required, in the absence of a credit event, that the Trust will pay Actual Interest Receipts to

Citibank. D176 at 5.

212.    Enron sought to have the securities rated and, after performing their credit review
of the Yosemite I Offering, Standard & Poor's rated the Yosemite I notes "BBB+" and Moody's
rated the Yosemite I notes "Baa2." Chung Decl. Exs. D178 (Standard & Poor's Rating Letter (Nov.
18, 1999) at EVE38799; D179 (Moody's Rating Letter (Nov. 18, 1999) at EVE38801).

**RESPONSE**:  **Undisputed**.

213.    The ratings letter from Moody's disclosed the connection between the Yosemite I
securities and Enron's credit ratings. <u>Id.</u> ("The rating reflects the credit quality of the Enron
corporation ("Enron")) as well as the effectiveness of the documentation and of the structure in
conveying this credit quality to investors. In addition, the rating incorporates the financial strength
and additional risk presented by the swap arrangement with Citibank, N.A. ("Citibank"). The
rating of the Linked Enron Obligations will change with the ratings of the Enron and Citibank.").

**RESPONSE**:  **Disputed** as written. The ratings letter from Moody's disclosed that the

rating reflects Enron credit quality as well as the swap arrangement with Citibank.

214.    Yosemite I was covered by the public financial press, which also discussed the link
to Enron's credit. Chung Decl. Ex. D180 (Investment Dealers' Digest, "<u>Citi's LEOs spin bank
debt into synthetic bonds</u>" (Dec. 6, 1999) at 1-2 ("[T]he 8.25% five year LEOs . . . resemble
Enron's plain vanilla debt. . . . In fact, the structure is so effective in separating the structural and
credit risk that neither the deal's investors nor the rating agencies ever know exactly what assets
are in the trust. From their perspective it doesn't matter – the securities they are analyzing carry
only Enron credit risk.")).

**RESPONSE**:  **Disputed**. "Public financial press" is not a defined term. **Disputed** that

either rating agency is part of any undefined "public financial press." **Undisputed** that the quoted

portion appears in the referenced document.

215.    Vinson & Elkins reviewed the Yosemite I transaction documents and stated the
summary descriptions provided a fair summary of the transaction documents and further stated
that the federal income and ERISA tax consequences were accurately described. Chung Decl. Exs.
D181 (Letter from Vinson & Elkins to Deutsche Bank Securities Inc. (Nov. 18, 1999) at EVE
38739 (10-b 5 due diligence opinion)); D182 (Letter from Vinson & Elkins to United States Trust
Company of New York (Nov. 18, 1999) at EVE 38592 (enforceability of certain provisions
pertaining to closing agreement)); D183 (Letter from Vinson & Elkins to Deutsche Bank Alex.
Brown (Nov. 18, 1999) at EVE 38584 (enforceability of closing agreement)); D184 (Letter from

Vinson & Elkins to Citibank (Nov. 18, 1999) at EVE 38600 (enforceability of Enron agreement and fee letters)); D185 (Letter from Vinson & Elkins to Yosemite I (Nov. 18, 1999) at EVE 38606 (tax indemnification agreement)); D186 (Letter from Vinson & Elkins to United States Trust Company of New York (Nov. 18, 1999) at EVE 38742 (Enron debt security)). Vinson & Elkins also issued an opinion stating that, in the event of a Bankruptcy, the Yosemite I trust and Enron should not be consolidated. Chung Decl. Ex. D187 (Letter from Vinson & Elkins to Deutsche Bank Alex. Brown (Nov. 18, 1999) at EVE 38613).

**RESPONSE**:   **Disputed** that Vinson & Elkins reviewed all aspects of the Yosemite I transaction. D181 speaks for itself as to what was fairly summarized and regarding tax consequences, and contains several limitations on the firm's engagement and opinions. The remaining documents speak for themselves. D187 states that in a properly presented, contested and decided Enron Bankruptcy, a Bankruptcy court would determine the assets and liabilities of the trust would not be substantively consolidated with those of Enron.

216.    The Yosemite offering was reviewed and approved by the accounting firm Arthur Andersen which issued a comfort letter dated November 4, 1999 in connection with the Yosemite I OM. The letter stated that selected Enron financial statements included in the OM were accurate. Chung Decl. Ex. D188 (Letter from Arthur Andersen to Deutsche Bank Alex. Brown (Nov. 4, 1999) at DBK-0253642.

**RESPONSE**:   **Disputed**. Andersen did not review all aspects of the Yosemite offering. D188 does not assert that the statements are "accurate." **Undisputed** that Andersen issued a comfort letter dated November 4, 1999 and stated that it has audited certain consolidated Enron balance sheets as of December 31, 1998 and 1997, and the related consolidated statements of income, cash flows and changes in shareholders' equity for each of the three years in the period ended December 31, 1998, all included in the March 18, 1999 Enron Form 8-K and the 1998 Enron Form 10-K. D188 at DBK-0253642.

217.    Enron's creditors and Deutsche Bank released each other from any claims, liabilities, or obligations in connection with Yosemite in the Enron court-approved Bankruptcy settlement. Chung Decl. Ex. D94 (Settlement Agreement between Enron Creditors Recovery Corp. and Deutsche Bank (Dec. 17, 2005) at 17, 18).

**RESPONSE**:  **Undisputed** with respect to claims relating to the MegaClaim Litigation and MegaClaim Objection, subject to the terms and definitions listed in D94.

218.    Deutsche Bank sought to become involved in future Yosemite offerings stating in a letter to Enron that "[w]e believe that Deutsche Bank is very well-placed to contribute to future Yosemite financings. . ." Deutsche Bank's letter outlined what Deutsche Bank understood as Enron's objectives and suggested ideas for improving future Yosemite offerings. Deutsche Bank recommended increasing the transparency of the transaction because "the absence of a description of assets expected to be included in the trust, compelled investors to assume the worst, even though we understand from you that the Yosemite I and II assets are essentially direct, unsubordinated Enron payment obligations." Chung Decl. Ex. D189 (Letter from Deutsche Bank to Enron regarding "Structuring Future Yosemite Transactions" (Mar. 30, 2000) at 1-2).

**RESPONSE**:  First sentence **undisputed**. **Disputed** that D189 sets forth all of what Deutsche "understood" about Enron's objectives. *See* PSOF ¶¶ 338, 384, 407, 421, 429, 462, 493.

**Dispute** the third sentence as incomplete and inaccurate, as Deutsche recommended improving pricing by increasing transparency.

**D.    Firefly**.

219.    In July 1998, Enron purchased a 90% voting and approximately 46.6% economic stake in Elektro Eletricidade e Servicos S.A. ("Elektro") a power distribution company in Brazil for $1.3 billion. Project Firefly served to refinance a portion of the purchase price of the Elektro acquisition. Chung Decl. Ex. D190 (Presentation to Investors regarding "Up to $60,000,000 Certificates of Beneficial Ownership in Firefly Trust" (Dec. 1998) at 5, 6) ("Presentation to Investors").

**RESPONSE**:  **Undisputed**.

220.    On December 30, 1998, BT Alex. Brown Incorporated served as the syndication agent and Bankers Trust Company served as a senior lender for Project Firefly. Chung Decl. Ex. D191 (Senior Loan Agreement (Dec. 30, 1998) at DBK-0103847).

**RESPONSE**:  **Undisputed**.

221.    Project Firefly involved the issuance of $415 million of debt to a syndicate of lenders and a $60 million certificates of beneficial ownership. Chung Decl. Ex. D191 (Senior Loan Agreement, Recitals; D192 (Firefly Trust Certificate Purchase Agreement (Dec. 30, 1998) at Section 1.1.).

**RESPONSE**:  **Undisputed**.

222.     The Presentation to Investors disclosed that principal on the debt could be repaid from an Enron obligation to remarket existing Enron mandatorily convertible preferred shares and from proceeds from a purchase agreement with Enron. Chung Decl. Ex. D190 (Presentation to Investors at 9).

**RESPONSE**:  **Disputed** as incomplete. D190 at 9 states, concerning principal repayment:

The Firefly Senior Credit Facility holders will look to the following sources for principal repayment: (i) proceeds from a sale of Newco stock in Cayco or Midco (ii) proceeds from an Enron obligation to remarket existing Enron Mandatorily Convertible Preferred Shares (the "Remarketing Agreement"); (iii) proceeds from a purchase agreement with Enron.

223.     The Firefly transactions were reviewed and approved by Enron's board. Chung Decl. Ex. D122 (Minutes, Meeting of the Board of Directors, Enron Corp. (Dec. 8, 1998) at 11-18).

**RESPONSE**:  **Undisputed** that Enron's Board of Directors reviewed some amount of information about Firefly and approved the Firefly transactions.

224.     Arthur Andersen reviewed the Firefly transactions and concluded that the transactions "would meet the requirements . . . to qualify for non-consolidation at the date of acquisition." Chung Decl. Ex. D193 (Mem. by C. Bass, et al. re: "Temporary Control-Elektro Acquisition" (July 16, 1998) at 5. Arthur Andersen reiterated this conclusion in a subsequent memo and confirmed that Firefly did not need to be consolidated. Chung Decl. Ex. D194 (Mem. from Carl. Bass, Michael Jones re: "Enron International – Elektro Acquisition – Subsequent Joint Venture Structure" (Jan. 19, 1999) at 7, 8).

**RESPONSE**:  **Disputed**. D193 lists several criteria and states "Based on the above and considering management's assertions, subject to formalization of the BOD clarification at the date of acquisition, we concur with management's assertions that their plans would meet the requirements as mentioned above to qualify for non-consolidation at the date of acquisition." **Disputed** as to reiteration (citing to D194) as the first page of D194 references the Elektro Acquisition, but the subsequent pages cited are to an October 30, 1998 memorandum relating to the Wessex Acquisition. Therefore, the assertions in the second sentence are not supported by evidence.

225.     Vinson & Elkins reviewed the Firefly transaction documents and issued two opinions regarding the validity of the transaction documents and confirming certain tax aspects of

the transaction. Chung Decl. Exs. D195 (Letter from Vinson & Elkins to BT Alex. Brown Incorporated, (Dec. 30, 1998) at 2 (tax matters)); D196 (Letter from Vinson & Elkins to BT Alex. Brown Incorporated (Dec. 30, 1998) at 3 (certain corporate matters)).

**RESPONSE**: **Undisputed** that D195 provides an opinion concerning Firefly with respect to tax matters and that D196 provides opinions concerning certain corporate matters.

226.    Edward Osterberg, a tax partner at Vinson & Elkins who supervised the lead attorney on Firefly, testified that he didn't recall "anything improper about Project Firefly" and further said that he had didn't have "any recollection of anyone at Vinson & Elkins telling [him] there was anything improper about Firefly." Chung Decl. Ex. D197 (Osterberg Dep. 26:6-14, 194:16-196:1).

**RESPONSE**: **Disputed**. Mischaracterization of testimony. Mr. Osterberg, when asked whether he recalls Project Firefly, testified "I recall the name Project Firefly. I don't recall many of the particulars about Project Firefly." D197 at 194:9-13. He testified further that he asked one of the younger tax lawyers, Tim Devetski, to take the lead in working on it, and then he "kind of lost contact with the particulars…." *Id*. at 194:14-22. **Immaterial** in all events because Mr. Osterberg's recollection of the legality of Project Firefly is not relevant to any issue in this litigation.

227.    Enron disclosed the Elektro acquisition in its Form 10-K dated March 31, 1999. The 10-K stated that Enron's interest in Elektro would be held by "Jacaré Electrical Distribution Trust" which was an "unconsolidated affiliate." Enron disclosed that the Firefly securities were subject to trigger events that could cause the sale of Enron's convertible preferred stock. The 10-K described some of the trigger events, which included any default upon certain debt obligations of related entities or if, among other events, Enron's credit ratings fell below certain levels. Chung Decl. Ex. D13 (Enron 1998 Form 10-K (Mar. 31, 1999) at Note 2 (Business Acquisitions) Note 9 (Unconsolidated Affiliates).

**RESPONSE**: **Disputed.** The disclosure was not appropriate since Jacare should have been consolidated with Enron as of December 31, 1998, particularly since Enron acquired additional Elektro interest in February 1999 prior to Andersen signing off on Enron's financial statements. GAAP required the financial statements to be adjusted for changes resulting from such events. GAAP AU Section 560, *Subsequent Events*.  The purchase of the additional shares prior to the

issuance of the financial statements contradicts Enron's assertion of temporary control and, therefore, Jacare should have been consolidated as of year end 1998. P-DB127 (Solomon Rpt.) at 254; P-CS 62 (Batson Elektro Rpt.) at 2. The disclosure with respect to stock triggers should have specifically stated that Enron guaranteed it would sell 83,000 preferred shares with an aggregate liquidation preference of $415 million to repay the $415 million loan that CSFB and others made to the Firefly Trust. In addition, Enron should have disclosed that, in the event the proceeds from the sale of the preferred shares were insufficient, Enron was obligated to repay the debt directly to the lenders. *Id.*

228. Enron disclosed the consolidation of Jacaré in the 10-K dated March 30, 2000. The 10-K specifically disclosed that as a result of the consolidation, "Enron's investment in unconsolidated affiliates decreased by approximately $450 million and minority interests increased by approximately $890 million." Chung Decl. Ex. D36 (Enron 1999 Form 10-K (Mar. 30, 2000) at Note 2, Business Acquisitions and Dispositions).

**RESPONSE**: **Undisputed** Enron disclosed that it was consolidating Jacare but **disputed** the impact on Enron's financial statements should have been a reduction in minority interest of $475 million and a corresponding increase in debt of $475 million for the reporting periods beginning March 31, 1999 through June 30, 2000. P-DB127 (Solomon Rpt.) at 254.

229. Enron's creditors and Deutsche Bank released each other from any claims, liabilities, or obligations in connection with Firefly in the Enron court-approved Bankruptcy settlement. Chung Decl. Ex. D94 (Settlement Agreement between Enron Creditors Recovery Corp. and Deutsche Bank (Dec. 17, 2005) at 17, 18).

**RESPONSE**: **Undisputed** with respect to claims relating to the MegaClaim Litigation and MegaClaim Objection, subject to the terms and definitions listed in D94. **Immaterial** as to any issue in this litigation.

## VI.  DEUTSCHE BANK ONLY HAD A PASSIVE ROLE IN LJM2

230. LJM2 Co-Investment L.P. ("LJM2") was an investment fund designed and organized in late 1999 by Andrew Fastow. Chung Decl. Ex. D198 (LJM2 Co-Investment, L.P. Private Placement Memorandum at DBA 01744). LJM2 was a Delaware limited partnership managed by LJM2 Capital Management, L.P., as General Partner. Chung Decl. Ex. D199 (LJM2

Co-Investment, L.P. Closing Documents for Initial Closing (Dec. 20, 1999) at DBA 067, DBA 114). Enron officers Andrew Fastow and Michael Kopper were the Principals of LJM2. Id. at DBA 00209. LJM2 Capital Management, L.P. was owned by LJM2's Principals. Chung Decl. Ex. D198 (LJM2 Co-Investment, L.P. Private Placement Memorandum at DBA 017761).

**RESPONSE**:  **Disputed** to that part of the description suggesting that Andrew Fastow *solely* designed LJM2 Co-Investment, L.P. as unsupported by the referred document and a mischaracterization of the evidence.

Silvercreek does not dispute that LJM2 is described in the LJM2 Co-Investment, L.P. Private Placement Memorandum as being organized by Andrew Fastow. Deutsche Bank asked its lawyers to review the LJM2 Co-Investment, L.P. Agreement prior to Deutsche Bank's commitment to participating in LJM2. *See* P-DB122 (Walsh Dep.) at 91:23-97:24. Further, Deutsche Bank's lawyers suggested that the Advisory Committee's role be expanded and should include a "review [of] all transactions in which there potentially is a conflict . . ."and specifically requested that "a representative of [Deutsche Bank]. . . be considered for one of the Advisory Committee positions." P-DB123 at 63BOX002147-2148.

**Undisputed** that LJM2 Co-Investment L.P.'s general partner at the initial closing on December 20, 1999 was LJM2 Capital Management, L.P., that Supplement Number One to the Private Placement Memorandum dated December 15, 1999 changed the principals of LJM2 Capital Management, L.P. from Andrew Fastow, Michael Kopper and Ben Glisan, Jr. to just Andrew Fastow and Michael Kopper, and LJM2 Capital Management, L.P. was owned by either or both Andrew Fastow or Michael Kopper. Silvercreek **disputes** all remaining assertions as unsupported by the referenced documents.

231.    On December 20, 1999, Bankers Trust Investment Partners, Inc. ("BTIP") agreed to commit $10 million to become a limited partner of LJM2. Chung Decl. Ex. D200 (LJM2 letter to BTIP (Dec. 20, 1999) at DB 002048). LJM2 ultimately raised $391 million in capital commitments from its over fifty limited partner investors. Chung Decl. Ex. D201 (LJM2 Co-Investment, L.P. Limited Partners, Capital Commitments (Apr. 5, 2000) at CI000267064).

**RESPONSE**: **Undisputed** BT Investment Partners, Inc. and Deutsche Bank Securities, Inc., misidentified as Bankers Trust Investment Partners, Inc., collectively agreed to commit $10 million to LJM2 as a limited partner in exchange for the right to appoint a representative as a member of the LJM2 Advisory Committee. *See* D200 (LJM2 letter to BTIP (Dec. 20, 1999) at DB 002048-9).

232.    Over the course of LJM2's existence, BTIP satisfied capital calls for approximately $7.3 million. Chung Decl. Ex. D202 (Deutsche Bank AG's Amended Objections and Responses to the February 3, 2003, Rule 30(b)(6) Letter Requests (June 23, 2003) at 16-17).

**RESPONSE**: Silvercreek does not dispute that BT Investment Partners, Inc., misidentified as Bankers Trust Investment Partners, Inc., satisfied capital calls from LJM2 for approximately $7.3 million.

233.    Andrew Fastow provided Deutsche Bank with an introductory presentation on LJM2. Chung Decl. Exs. D203 (Andrew Fastow letter to BTIP (Sept. 27, 1999) at AB000550122); D204 (Walsh Dep. 26:6-27:13). One of the presentation slides, titled "Governance," stated that the Enron Board of Directors had waived the Enron "Code of Conduct" for Andrew Fastow's activities relative to LJM2. Chung Decl. Ex. D205 (LJM2 Co-Investment L.P. Presentation (Sept. 27, 1999) at DBD 004777).

**RESPONSE**:  Silvercreek does not dispute that Andrew Fastow provided a marketing presentation to Deutsche Bank related to LJM2 on or about September 27, 1999. The second sentence is **disputed** in that it mischaracterizes the slide titled "Governance" which states, in relevant part:

Legal: conflicts resolved by Limited Partner Advisory-Committee:

} Enron Board of Directors- has waived "'Code of Conduct" for

A. Fastow's activities relative to LJM2

} Advisory Board will resolve all potential conflicts of interest

*See* D205 (LJM2 Co-Investment L.P. Presentation) at DBD 004777.

234.   An LJM2 Private Placement Memorandum ("PPM") presented to investors contained a section titled "Conflicts of Interest" and indicated that the LJM2 Principals' dual roles in managing LJM2 while remaining employed as senior officers at Enron raised certain conflicts of interest. Chung Decl. Ex. D198 (LJM2 Co-Investment, L.P. Private Placement Memorandum at DBA 01775). Potential investors in LJM2 were told that the Enron board had established procedures to address these potential conflicts of interest on transactions between Enron and LJM2. Chung Decl. Ex. D204 (Walsh Dep. 33:6-34:3). Some of these procedures involved a process by which each transaction between Enron and LJM2 would be reviewed by Enron's Board of Directors, together with Arthur Andersen as Enron's outside auditor, and Kirkland & Ellis as Enron's outside counsel, to ensure that each transaction was negotiated at arms-length before granting final approval on the transaction. Chung Decl. Ex. D204 (Walsh Dep. 33:6-35:19).

**RESPONSE**:  **Disputed** because the recitation in this paragraph is materially incomplete.

The Conflict of Interest section provides that "The Principals intend to consult regularly with the

Advisory Committee regarding potential conflicts of interest regarding transactions with or

involving Enron and its affiliates." Also **disputed** because it mischaracterized the testimony from

Walsh, as the cited testimony indicates that Walsh understood a procedure was put in place by

Enron's Board of Directors with guidance as to the *procedure* provided by Author Andersen and

Kirkland & Ellis, but the cited testimony does *not* state that Andersen or Kirkland had any role in

the review of individual transactions. Moreover the testimony cited does not substantiate or

otherwise support Deutsche Bank's assertion that the goal of the review was to "to ensure that each

transaction was negotiated at arms-length before granting approval on the transaction."

Silvercreek does not dispute that Ex. 198's initial, but not yet supplemented, PPM

contained a "Conflict of Interest" section discussing the dual roles of Principals in LJM2 with their

fiduciary role as employees of Enron. Silvercreek also does not dispute that limited partners were

also told that Enron's Board of Directors had approved procedures to address conflicts of interest

between LJM2 and Enron.

235.   Herbert "Pug" Winokur, an outside Enron director, confirmed to Deutsche Bank that, at a minimum, the Finance Committee of the Enron Board reviewed all Enron-related LJM transactions, and that the full board was frequently present during those reviews. Chung Decl. Exs. D206 (Winokur Dep. 161:21-164:3); D207 (Paul Cambridge email to Deutsche Bank (Apr. 18,

2001) at DBB008673). Winokur added that when an LJM transaction was related to Enron, Andrew Fastow would either recuse himself from the approval process or leave the negotiation and investment decisions to LJM's people. Chung Decl. Ex. D207 (Paul Cambridge email to Deutsche Bank (Apr. 18, 2001) at DBB008673). Winokur also stated that Arthur Andersen vetted 90% of the proposed transactions at the Enron level before LJM became involved. Id.

**RESPONSE**:   **Disputed** as a mischaracterization of the testimony of Herbert "Pug" Winokur and D207 to the extent Deutsche is suggesting that Mr. Winokur specifically relayed any of the recounted information directly to Deutsche. Neither the referenced testimony nor the email from Paul Cambridge to other Deutsche representatives indicates that Mr. Winokur discussed the procedures specifically with Deutsche. To the extent that the Cambridge email (D207) attempts to recount a conversation which was had between Cambridge and unidentified Enron Board members it is inadmissible as hearsay. Mr. Winokur's testimony specifically relates to a report prepared in 2002 by a special investigative committee of the Enron Board of Directors and the cited testimony recites that initially when LJM2 was approved by the Board the controls put in place were (1) "Enron's Chief Accounting Officer, Rick Causey, and Chief Risk Officer, Rick Buy, would review and approve all transactions between Enron and LJM2" and (2) "The Audit and Compliance Committee of the Board would annually review all transactions from the last year and make any recommendations they deemed appropriate." See P-DB67 (Report of Investigation by the Special Investigative Comm. of the Board of Directors of Enron ("Powers Rpt.") & D206 (Winokur Dep.) at 161:21-162:15.

236.   As a limited partner, BTIP was a passive investor in the LJM2 partnership. Chung Decl. Ex. 198 (LJM2 Co-Investment, L.P. Private Placement Memorandum at DBA 01773). The LJM2 PPM, in a section titled, "Passive Investment in Interests," states that the limited partners will not be permitted to engage in the active management of LJM2. Id. The PPM also states that the LJM2 limited partners would be "relying entirely" on the General Partner to conduct and manage the affairs of LJM2. Id. This section further provides that "the Limited Partners must rely on the ability of the General Partner to make appropriate Investments for the Partnership and to dispose of such Investments and of the Manager to manage such Investments." Id.

**RESPONSE**:   **Disputed** because the assertions in this paragraph are incomplete and mischaracterize the referenced document. The Private Placement Memorandum relied upon in this paragraph was supplemented at the closing of the LJM2 partnership in December 1999. Deutsche Bank was not just a limited partner but also bargained for and secured membership on the Advisory Committee. *See* PSOF ¶ 231; *see also* D207 at DBB008673. The role of the Advisory Committee was described in the December 15, 1999 supplement to the LJM2 Private Placement Memorandum as follows:

> Advisory Committee:
>
> For the benefit of the Partnership, an Advisory Committee (the *"Advisory Committee")* of at least three individuals shall be annually appointed by the General Partner for a one-year term. The Advisory Committee shall periodically review the valuations of the Partnership's assets made by the General Partner, and shall provide such other advice and counsel as the General Partner requests in connection with Partnership investments, potential conflicts of interest and other Partnership matters. The General Partner (a) shall provide promptly to the members of the Advisory Committee information relating to any transaction between the Partnership and Enron or any of its subsidiaries, and (b) shall provide the members of the Advisory Committee with information relating to an Investment prior to the consummation of such Investment by the Partnership . . . .

D199 at DBA 212. Among the duties of the Advisory Committee outlined in the Partnership Agreement is the following:

> Section 6.5 Conflict of Interest; Fiduciary Duties:
> …
>
> (d) Nothing in this Section 6.5 shall preclude the Partnership or any LJM Related Person from investing in the securities of any Person or engaging in any other transaction otherwise proscribed by this Section 6.5 or in which an actual or potential conflict of interest exists if such transaction has been approved by the Advisory Committee.

D199 at DBA00090.

237.    In April 2000, BTIP was appointed a member of the LJM2 "Advisory Committee." Chung Decl. Ex. 208 (LJM2 letter to BTIP (Apr. 14, 2000) at LJM056504). Section 8.1 of the LJM2 Partnership Agreement states that "the General Partner shall retain ultimate responsibility for investment strategy and for making all decisions relating to the operation and management of the Partnership." Chung Decl. Ex. 209 (Third Amended and Restated Limited Partnership Agreement (Apr. 5, 2000) at DB 002246). BTIP and the other Advisory Committee members had no authority over the operation of the investment fund. Id.

**RESPONSE**:  **Undisputed** BT Investment Partners, Inc. was appointed to the Advisory Committee for the calendar year 2000. **Disputed** as to the recitation of the terms of the Third Amended and Restated Limited Partnership Agreement as incomplete in that it omits the provision requiring that transactions that involve an actual or potential conflict of interest must be approved by the Advisory Committee. *See* PSOF ¶ 236.

238.    Neither BTIP nor Deutsche Bank executed Acknowledgement Letters regarding any of LJM2's proposed investments. Chung Decl. Ex. D204 (Walsh Dep. 74:18-75:16).

**RESPONSE**:  **Disputed**.  The assertions in this paragraph mischaracterize the referenced testimony. At the cited testimony in his Deposition, William Walsh is asked about specific approval by BT Investment Partners, Inc. as a member of the Advisory Committee and concerning an LJM2 investment in Talon, LLC, a special purpose entity that was going to be entering into certain hedging transactions with Harrier, LLC, a wholly owned subsidiary of Enron. Mr. Walsh is shown the unsigned approval and simply asked "Is it possible that you could have signed such a document and not remember?" to which he replies "It would be unlikely that – it would be unlikely." *Id*. Nowhere in the cited testimony does Mr. Walsh testify regarding any other approvals for other transactions. Further, Section 8 of Third Amended and Restated Limited Partnership Agreement provides that the notice required to be made to the Advisory Committee for the transactions which involve an actual or potential conflict of interest is "deemed to have been satisfied with respect to the Initial Investments" of LJM2. P-DB229 at DB 002247.

239.    In October 2000, LJM2 held a Partnership Meeting for all LJM2 limited partners. Chung Decl. Ex. D210 (LJM Investments Annual Partnership Meeting (Oct. 26, 2000) at AB000209291)). No representative from either BTIP or Deutsche Bank attended this meeting. Id. at AB000209294; D204 (Walsh Dep. 59:21-59:24).

**RESPONSE**:  **Undisputed** LJM2 held a Partnership in October 2000 and that Walsh

claims not to have attended a meeting of the advisory committee in 2000 or 2001.  Otherwise,

disputed because the cited evidence does not support the assertions in paragraph 239 – the

presentation appears to have been prepared in advance and does not establish who were attendees

at the meeting.

## VII.    DEUTSCHE BANK'S ROLE IN THE ZERO NOTE OFFERING

### A.    Deutsche Bank Had A Limited Role In The Private Placement Offering for the Zero Notes.

240.    On January 31, 2001, Enron issued the Offering Memorandum for the issuance of $1,907,698,000 in Zero Notes.  Chung Decl. Ex. D211 (Zero Coupon Convertible Senior Notes Offering Memorandum ("Zero Notes OM") (Jan. 31, 2001) at CITYNEWBY 01859945).  The Offering Memorandum stated that Enron was offering the Zero Notes at an issue price of $655.24 per note and would pay noteholders $1000 per note at maturity on February 7, 2021.  Id.  Thus, although no interest would be paid on the notes, the yield to maturity (interest rate) would be 2.2125%.  The Zero Notes were convertible at the holder's discretion in to Enron common stock. Id.  The Zero Notes could be exchanged, at the holder's discretion, for $698.13 per note in lieu of stock on February 7, 2004.  Id.[8]

**RESPONSE**:  **Undisputed**.

241.    The Offering Memorandum identified Salomon Smith Barney, Deutsche Bank Alex. Brown, JP Morgan, Banc of America Securities LLC, and Barclays Capital as Initial Purchasers.  Id.  Sales of the notes by Initial Purchasers were limited to Qualified Institutional Buyers ("QIBs") pursuant to Rule 144a and to non-US entities pursuant to Regulation S.  Chung Decl. Ex. D211 (Zero Notes OM (Jan. 31, 2001) at CITYNEWBY at 01859945); see also Chung Decl. Ex. D212 (Zero Notes Purchase Agreement (Jan. 31, 2001) at ¶ 3(a)).  As an Initial Purchaser, Deutsche Bank agreed to underwrite 8% of the notes.  Chung Decl. Ex. D213 (Deutsche Bank memorandum to Commitment Comm. (Jan. 30, 2001) at DBN-297949).

---

[8] The Offering Memorandum for the Zero Notes private placement incorporated by reference Enron's 10-K filing for the year ended December 31, 1999, which included audited financial statements for the years ended December 31, 1999 and December 31, 1998.  Id. at CITYNEWBY 01859948; Chung Decl. Ex. D36 (Enron 1999 Form 10-K (Mar. 30, 2000) at Item 14).

**RESPONSE**:  **Disputed** due to incompleteness.  The sales of Zero Notes by the Initial

Purchasers was limited to QIBs *only* prior to registration of the Zero Notes. Deutsche Bank, among

others, was a party to a contemporaneous Registration Rights Agreement that required Enron to

register the Zero Notes within 180 days, or else pay liquidated damages to Deutsche Bank for

failure to do so. P-DB84 (Registration Rights Agreement) at SlvC0037764-65.

242.    Salomon Smith Barney was the lead bookrunner for the Zero Notes private offering
and held 80% of the Notes. Id.  As the sole book runner, Salomon Smith Barney was primarily in
charge of the private placement offering. Chung Decl. Ex. D214 (Mialkowski Dep. 15:23-24, 37:9-
38:23).  Deutsche Bank directed all inquiries regarding the Zero Notes to Salomon Smith Barney.
Id. at 15:20-24.

**RESPONSE**:    Silvercreek **disputes** this paragraph due to incompleteness and

mischaracterization of the evidence.  Deutsche Bank was invited to, and actually acted, as co-lead

manager of the Zero Notes offering. D213 at DBN-297948; *see also* P-DB230 (Mailkowski Dep.)

at 37:9-18.

243.    On February 7, 2001, Enron and the Initial Purchases entered into a Registration
Rights Agreement concerning the Zero Notes.  Chung Decl. Ex. D215 (Registration Rights
Agreement (Feb. 7, 2001) at SlvC003755).

**RESPONSE**:  **Undisputed**.

244.    On February 7, 2001, the Zero Notes were issued.  Chung Decl. Ex. D216 (Zero
Notes Prospectus (July 18, 2001) at SlvC001165).

**RESPONSE**:  **Undisputed**.

245.    Deutsche Bank earned $1,958,336.01 in fees in connection with its participation in
the Zero Notes private placement.   Chung Decl. Ex. 217 (Check from Salomon Smith Barney to
Deutsche Bank for underwriting the Zero Notes (May 8, 2001) at DBF 000599).

**RESPONSE**:  **Undisputed**.

**B.      Deutsche Bank Had A Limited Role in the Public Offering for the Zero
         Notes**.

246.    On June 1, 2001, Enron filed an S-3 Registration Statement for the Zero Notes
notifying the SEC of its intention to distribute the Zero Notes in a public offering.  Chung Decl.
Ex. D218 (Enron Form S-3 Registration Statement (June 1, 2001)).  The June, 1, 2001 Registration

Statement identified Deutsche Bank as one of 32 "selling securityholders." Id. at 40.  The only other references to Deutsche Bank are as an Initial Purchaser in the Rule 144A offering.  Id. ("[Enron] issued and sold the notes in a private placement to Salomon Smith Barney Inc., Deutsche Bank Alex. Brown In., J.P. Morgan Securities Inc., Banc of America Securities LLC and Barclays Capital Inc., and the notes were simultaneously sold by Salomon Smith Barney Inc., Deutsche Bank Alex. Brown Inf., J.P. Morgan Securities Inc., Banc of America Securities LLC and Barclays Capital Inc. to the selling security holders in transactions exempt from registration under the Securities Act.").  The Registration statement also cautions that the "selling securityholders listed in the above table may have sold or transferred, in transactions exempt from the registration requirements of the Securities Act, some or all of their notes or shares of our common stock since the date on which the information in the above table was provided to us."  Id. at 41 (emphasis added).  This disclaimer nowhere suggests that the selling securityholders were going to facilitate distribution of the Notes to the public.[9]  The Registration Statement incorporated by reference Enron's audited financial statements for the year ended December 31 2000.  Id. at 44.

**RESPONSE**:     Silvercreek **disputes** this paragraph due to incompleteness and

mischaracterization of the evidence.  It is disingenuous for Deutsche Bank to single out "this

disclaimer" as containing no suggestion "that the selling securityholders were going to facilitate

distribution of the Notes to the public" when, *inter alia*: (i) the Registration Statement elsewhere

states that the "selling securityholders [including Deutsche Bank] *intend to distribute the notes*";

and (ii) Deutsche Bank's status as a conduit to the public, ability to review and provide input into

the Registration Statement, and the connection of its name and reputation with the Zero Notes,

including in the Registration Statement, all facilitated the distribution of the Zero Notes to the

public.  D218 (Registration Stmt.) at 41(emphasis added)

247.    On July 13, 2001, Enron filed its first amendment to the registration statement for the Zero Notes.  Chung Decl. Ex. D219 (Enron Amendment No. 1 to Form S-3 Registration Statement (July 13, 2001)).  The July 13, 2001 Registration Statement identified Deutsche Bank as one of 43 "selling securityholders."  Id. at 45-46.

**RESPONSE**:  **Undisputed**.

---

[9] The Registration Statement also incorporated Enron's financial statements for the years ended December 31, 1999 and 2000.  Arthur Andersen had confirmed that these audited financials "present fairly, in all material respects, the financial position of Enron Corporation and subsidiaries of December 31, 2000 and 1999, and the results of their operations, cash flows and changes in shareholders' equity for each of the three years in the period ended December 31, 2000, in conformity with accounting principles generally accepted in the United States.  Chung Decl. Ex. D15 (Enron 2000 Form 10-K (Apr. 2, 2001) at 59).

248.    The prospectus issued in connection with the public offering became effective on July 18, 2001.  Chung Decl. Ex. D216 (Zero Notes Prospectus (July 18, 2001) at SlvC001165).  The prospectus identified Deutsche Bank as one of 48 "selling securityholders."   Id. at SlvC001249-50.

**RESPONSE**:  **Undisputed**.

249.    On August 3, 2001, Enron filed Prospectus Supplement No. 1 "to include additional entities as selling securityholders and to list the current amounts of securities held by securityholders previously listed."  Chung Decl. Ex. D220 (Zero Notes Prospectus Supplement No. 1 (Aug. 3, 2001) at 1).  Deutsche Bank was not identified as a "selling securityholder" in Prospectus Supplement No. 1.  Id.

**RESPONSE**:  **Undisputed**.

250.    On August 15, 2001, Enron filed Prospectus Supplement No. 2, again amending the original prospectus, as modified by Supplement No. 1, "to include additional entities as selling securityholders and to list the current amounts held by securityholders previously listed."  Chung Decl. Ex. D221 (Zero Notes Due Prospectus Supplement No. 2 (Aug. 15, 2001) at 1).  Deutsche Bank was not identified as a "selling securityholder" in Prospectus Supplement No. 2.  Id.

**RESPONSE**:  **Undisputed**.

251.    Two other supplements followed: Prospectus Supplement No. 3 on September 21, 2001 and Prospectus Supplement No. 4 on October 11, 2001.  Chung Decl. Exs. D222 (Zero Notes Prospectus Supplement No. 3 (Sept. 21, 2001)) D223 (Zero Notes Prospectus Supplement No. 4 (Oct. 11, 2001)).  Deutsche Bank was not identified as a "selling securityholder" in Prospectus Supplement Nos. 3 and 4.  See Chung Decl. Exs. D222 at 1, D223 at 1.

**RESPONSE**:  **Undisputed**.

252.    The financial statements incorporated into the Zero Note offering memorandum, registration statement, and prospectus were prepared by Enron and audited by Arthur Andersen.  Chung Decl. Ex. D224 (Arthur Andersen letter to SSB, et al. (Jan. 31, 2001) at AASDTEX000455993).

**RESPONSE**:  **Disputed** as to mischaracterization of the evidence. Per the document cited,

Andersen only audited certain annual Enron financial statements, as of December 31, 1999 and

December 31, 1998, but **none** of the quarterly financials that were also incorporated into the

offering memorandum. D224 at AASDTEX000455993. Andersen further stated in this document

that, "We have **not audited any** financial statements of Enron as of any date or for any period

subsequent to December 31, 1999," and warned that, regarding a lengthy list of post-December

31, 1999 financials incorporated into the offering memorandum, "we are unable to and *do not express any opinion*." *Id*. at AASDTEX000455994 (emphasis added).

### C.     Deutsche Bank's Due Diligence with the Zero Notes followed Applicable Custom, Practice, and Standards.

253.     Deutsche Bank conducted due diligence on the Zero Note offering before the February 2001 private placement that was consistent with all customary practices and procedures. Chung Decl. Exs. D214 (Mialkowski Dep. 85:11-18); D225 (Expert Rpt. of Robert Haft (Mar. 17, 2006) at 11-20). Deutsche Bank's investment banking, convertible origination, and credit groups participated in the diligence process. Chung Decl. Ex. D214 (Mialkowski Dep. 16:4-9, 85:19-86:12). The diligence log included a record of all diligence performed in connection with Deutsche Bank's prior transactions with Enron. Id. at 183:21-184:8. The investment banking group reviewed publically available information (including financial statements and press releases) and sales notes regarding the company and used this information to update its ongoing due diligence logs. Id. at 18:16-20:9; 71:15-72:22.    The credit group also reviewed financial statements and other publically available information on Enron to assess the bank's exposure levels with the company. Id. at 31:7-21. The convertible origination group reviewed the structure of the proposed convertible notes transactions. Id. at 29:11-20.

**RESPONSE**:  **Disputed** as to mischaracterization of the evidence. The first sentence is a conclusion, not a fact, and it is **disputed** that Deutsche Bank conducted due diligence on the Zero Notes that was either consistent with industry standards, or reasonable under the circumstances. P-DB231 (Purcell Rpt.) ¶¶ 20, 112. The paragraph is **further disputed** to the extent that Deutsche Bank invokes a "diligence log" (or logs) that it has not identified. The only "due diligence log" of which Silvercreek is aware is part of an internal Deutsche Bank memorandum to its Commitment Committee, which does not fit the description in this paragraph. D213 at DBN-297951. That document only reports Enron's own representation that it experienced no material changes since its last financial statements, and then lists some very general topics that co-lead underwriting manager Salomon Smith Barney is said to have covered in a questionnaire to Enron. *Id*. If Deutsche Bank is, in fact, referring to that "Due Diligence Log," then it has misrepresented the evidence, which shows a far more limited scope of due diligence than is claimed here. If Deutsche Bank is referring to a different diligence log, Silvercreek objects to the attempt to offer evidence of such a

112

log, which apparently has not been produced and/or has been destroyed. Indeed, intentional

spoliation of evidence is part of Deutsche Bank's standard operating procedure. Its internal Due

Diligence Procedures Policy provides that: "After the completion of the transaction … all personal

notes, drafts of the registration statement and other transaction documentation and internal

memoranda should be discarded. *Retention of such materials creates the possibility that it could*

*be discovered in an ensuing litigation*. P-DB231 (Deutsche Bank Policies and Procedures) at

DBG107998 (emphasis added).

254.    Deutsche Bank participated in a due diligence call with Enron on January 29, 2001, during which Enron answered questions posed by the lead underwriter, Salomon Smith Barney. Chung Decl. Exs. D213 (Deutsche Bank memorandum to Commitment Comm. (Jan. 30, 2001) at DBN-297948); D226 (Rick Pearson email to Krystian Mialkowski and Raymond Mak, with attached "Zero Convertible Due Diligence" presentation (Jan. 30, 2001) at DBN-297786-89).

**RESPONSE**:   **Disputed** as to incompleteness and mischaracterization. The cited

documents do not identify a single question supposedly posed to, or answered by, Enron, but only

describe topics of conversation. Moreover, it is **disputed** whether such solicitations of assurances

by Enron constitute "due diligence" for purposes of Deutsche Bank's attempted defense.

255.    The due diligence log relating to the Zero Notes showed that Enron had released fourth quarter 2000 and full year 2000 results in a press release on January 22.  The log also stated that "the Company feels that there are no material developments which would impact the syndicate or investors since this announcement." Chung Decl. Ex D213 (Deutsche Bank memorandum to Commitment Comm. (Jan. 30, 2001) at DBN-297951).

**RESPONSE**:   **Disputed** that reliance on such representations of Enron constitutes "due

diligence" for purposes of Deutsche Bank's attempted defense.

256.    Arthur Andersen issued a letter on January 31, 2001, in which it stated that based on its audit of the financial statements incorporated in Enron's 1999 10-K filing, its review of other available Enron financial statements from the 1999 and 2000 time period in a non-audit capacity, and its review of meeting minutes relating to certain Enron director and shareholder meetings:

> Nothing came to our attention as a result of the foregoing procedures . . . that caused us to believe that:

    a.  Any material modifications should be made to the unaudited consolidated financial statements described [herein], incorporated by reference in the Offering Memorandum, for them to be in conformity with accounting principles generally accepted in the United States. . . .

Chung Decl. Ex. D227 (Arthur Andersen letter to Salomon Smith Barney, et al. (Jan. 31, 2001) at AASDTEX000455995).  Arthur Andersen issued a supplement to its original letter on February 7, 2001, in which it re-affirmed the conclusions stated its original letter after the review of additional materials that had not been available on January 31.  Chung Decl. Ex. D228 (Arthur Andersen's amendment to its Jan. 31, 2001 letter to Salomon Smith Barney, et al. (Feb. 7, 2001) at AASDTEX000456098).

    **<u>RESPONSE</u>**:    Silvercreek **disputes** the contents as to incompleteness and mischaracterization. The letters referenced state that Andersen was "unable to and do[es] not express *any opinion* on the unaudited [Enron financial statements.]" D227 at AASDTEX000455994, (emphasis added). Andersen pointedly did *not* opine that such financial statements were prepared in accordance with GAAP, even though its own internal Due Diligence Procedures Policy required such a representation. P-DB231 (Deutsche Bank Policies and Procedures) at DBG107998.

    Further precluding any implication that Deutsche Bank was entitled to rely on these letters, Anderson stated therein that **Andersen** was relying on the representation of *Deutsche Bank* that *Deutsche Bank* had performed full due diligence: "This letter is being furnished in reliance upon *your* representation to *us* that … [i]n connection with the [Zero Notes] Offering Memorandum, the review process *you* have performed is substantially consistent with the due diligence review process that you would have performed if this placement of securities were being registered pursuant to the Act." D227 at AASDTEX000455993, AASDTEX000456098 (emphasis added). Further, Andersen notified Deutsche Bank that the procedures it employed "do not constitute an audit conducted in accordance with generally accepted auditing standards … [and] would not necessarily reveal matters of significance … [a]ccordingly, we make *no representations about the sufficiency the foregoing procedures for your purposes*." *Id*. at AASDTEX000455995 (emphasis

added). Anderson added, "such procedures would not necessarily reveal any material misstatement," and that it "make[s] no representations regarding the adequacy of disclosure or regarding whether any material facts have been omitted." D227, at AASDTEX000455997.

## VIII.  SILVERCREEK MADE ITS OWN PURCHASING DECISIONS WITH REGARD TO THE ZERO NOTES AND 7% EXCHANGEABLE NOTES

### A.  Background on Silvercreek.

#### 1.  Plaintiff Parties.

257.    Plaintiff Silvercreek Management Inc. is an Ontario corporation with its principal place of business in Toronto, Canada. (Compl. ¶ 8).

**RESPONSE**:  **Undisputed**.

258.    Pebble Limited Partnership is an Ontario limited partnership with its principal place of business in Toronto, Canada. (Compl. ¶ 9).

**RESPONSE**:  **Undisputed**.

259.    Silvercreek Limited Partnership is an Ontario limited partnership with its principal place of business in Toronto, Canada. (Compl. ¶ 10).

**RESPONSE**:  **Undisputed**.

260.    OIP Limited was an Ontario corporation with its principal place of business in Toronto, Canada. (Compl. ¶ 11).

**RESPONSE**:  **Undisputed**.

261.    Silvercreek II Limited is a Cayman Islands corporation with its principal place of business in the Cayman Islands. (Compl. ¶ 12).

**RESPONSE**:  **Undisputed**.

262.     Silvercreek Management Inc. managed and had sole investment discretion over the investments of Silvercreek Limited Partnership, Silvercreek II Limited, OIP Limited and Pebble Limited Partnership. Chung Decl. Exs. D229 (Morwick Dep. 115:8-116:16).

**RESPONSE**:  **Undisputed**.

### 2.      Silvercreek Witnesses.

263.      Louise Morwick was the portfolio manager, president, director and founder of Silvercreek. <u>Id.</u> at 142:14; Chung Decl. Exs. D229 (Resume of Louise Morwick at SlvC005463); D230 (Sworn Declaration of Louise Morwick (Sept. 12, 2005) at 6). Morwick made the investment decisions for Silvercreek. Chung Decl. Exs. D228 (Morwick Dep. 142:14-15); D231 (Kittel Dep. 321:4-5, 370:24-371:1). Morwick owned the majority of Silvercreek Management Inc. Chung Decl. Ex. D228 (Morwick Dep. 113:2-3).

<u>RESPONSE</u>:  **Undisputed** as to the first and third sentences.  As to the second sentence,

**undisputed** that with input from others at Silvercreek, Ms. Morwick made the final investment

decisions for Silvercreek during the 2001 timeframe and with respect to the Enron investment

decisions that are the subject of this dispute.

264.      Robert Kittel was Partner, Vice President and the research analyst for Silvercreek. Chung Decl. Ex. D232 (Sworn Declaration of Robert Kittel (Oct. 6, 2005) at 6); D228 (Morwick Dep. 142:11). Kittel "provide[d] investment research and analysis of [Silvercreek's] investments." Chung Decl. Exs. D228 (Morwick Dep. 142:8-16); D231 (Kittel Dep. 108:9-18).

<u>RESPONSE</u>:  **Undisputed** that Kittel was a partner, vice president and a research analyst

for Silvercreek with respect to the Enron investment, and that Mr. Kittel provided investment

research and analysis with respect to Silvercreek's investments in Enron debt securities.

### 3.      Silvercreek's Investment Strategy and Sophistication.

265.      Silvercreek and each of its funds ("Plaintiffs") qualifies as a Qualified Institutional Buyer under Rule 144A of the Securities laws. Chung Decl. Ex. D228 (Morwick Dep. 141:13-15, 142:1-3).

<u>RESPONSE</u>:  **Undisputed**.

266.      During the 2000 to 2001 period, Silvercreek had approximately $350 million assets under management. <u>Id.</u> at 121:21-122:3.

<u>RESPONSE</u>:   **Undisputed** that Silvercreek had approximately $350 million under

management in the October 2001 time period. **Disputed** that the cited evidence supports the same

conclusion for any other time period.

267.      Morwick testified that Silvercreek's returns are better when the companies they invest in do poorly. <u>Id.</u> at 165:1-3 ("Q. . . . [B]ut for your business, you do better when the company

does poorly? A Yes."). She further testified that that "[I]f a company runs into difficulty even if it's credit difficulty, we usually do well in those positions." Id. at 199:2-200:1. Silvercreek's marketing materials for investors in Silvercreek Limited Partnership state that it "delivers superior performance in weak equity markets." Chung Decl. Ex. D233 (Presentation regarding "Silvercreek Management Inc." (Jan. 2005) at SlvC010407).

**RESPONSE**:  **Disputed** as to the first sentence. Silvercreek is generally a convertible bond investor, which Silvercreek and Plaintiffs' expert regard as generally conservative, low-risk investments. P-DB232 (Morwick Dep.) at 143:9-14, 190:12-18, 434:20-24, 439:6-9. *See also* P-DB233 (Matthews Rpt.) at 2-3. Silvercreek is *not* a "vulture" or "distressed investor. *See* P-DB234 (Morwick Decl.) ¶ 2; P-DB232 (Morwick Dep.) at 430:19. Silvercreek does *not* specialize in the purchase of distressed or troubled debt. P-DB234 (Morwick Decl.) ¶ 2. Silvercreek has no employees who focus on distressed debt, and distressed debt is not a part of Silvercreek's investment strategy. *See* P-DB145 (Silvercreek's Interrog. Resps.) at 67.

In fact, the Enron bankruptcy was the first bankruptcy Silvercreek had ever experienced. P-DB232 (Morwick Dep.) at 430:20. Following Enron's bankruptcy filing, Ms. Morwick contacted a distressed investor she knew for advice. *Id.* at 430:14-431:18. As Ms. Morwick explained, "we were left holding, you know, what now is an obviously distressed security. We're not distressed investors. We'd never gone through a bankruptcy before. He's a distressed investor, so [I] was talking to him in terms of getting some advice from him." *Id.* at 430:14-22.

Further **disputed** as to the second sentence. The cited testimony is out of context in so far as it does not describe Silvercreek's investment strategy.

Further **disputed** as to the third sentence. The excerpt is an incomplete description of Silvercreek's marketing materials and its investment strategies.

268.    In making investment decisions, Morwick testified that Silvercreek "rel[ies] on our own work" Chung Decl. Ex. D228 (Morwick Dep. 166:8-14). Morwick also testified that in making investment decisions, Silvercreek looks "primarily at what our returns will be." Id. at 462:3-7. Additionally, Morwick testified that Silvercreek "will read whatever we can find and

come across related to the company. So we will read whatever information we find in the public realm, form our opinions. And it factors into primarily our analysis of the financial statements." Id. at 166:10-16.

**RESPONSE**:   **Disputed** as to the first and third sentences. The cited testimony is completely out of context and ellipses the "but" that follows and refutes the proposition asserted:

> Q.      And for [credit investments], you would want a fixed income or debt analyst reports; right?

> A.      We rely on our own work, **but** we will read whatever we can find and come across related to the company. So we will read whatever information we find in the public realm, form our opinions.  And it factors into primarily our analysis of the financial statements.

**Disputed** as to the second sentence as incomplete to the surrounding context where Ms. Morwick continued: "We don't do theoretical valuations of the components of the bonds. I look at, you know, what I can invest or make a purchase for today, a value investment today versus what I'm going to earn on the bond. Sorry. **We tend to be cash-flow-oriented fundamental investments**." P-DB232 (Morwick Dep.) at 462:8-14.

**B.     Silvercreek Followed Its Own Trading Strategy When Trading the Zero Notes**.

269.     As the portfolio manager for Silvercreek, Morwick made the investment decisions to buy and sell the Zero Notes. Id. at 142:14-15.

**RESPONSE**:  **Undisputed** that with input from others at Silvercreek, Ms. Morwick made the final investment decisions for Silvercreek during the 2001 timeframe with respect to the Enron investments decisions that are the subject of this dispute.

270.     Morwick first looked at the possibility of investing in the Zero Notes at the time of their issuance in February 2001 in the Rule 144A private offering, but decided not to purchase them because the return on the notes at the time was not sufficient. Id. at 85:12-14, 448:4-8, 448:18-20, 450:8-10.

**RESPONSE**:  **Undisputed** that Ms. Morwick first looked at Zero Notes when they were issued. Otherwise, **disputed**. The cited testimony is incomplete as to Ms. Morwick's explanation

118

of why Silvercreek did not purchase the Zero Notes when first offered, stating that "it didn't fit our strategy at that point in time" for a number of reasons detailed thereafter. P-DB232 (Morwick Dep.) at 446:16-23.

271.    Morwick revisited the possibility of purchasing the Zero Notes in the summer of 2001. Id. at. 450:12-451:2.

**RESPONSE**:  **Disputed**. The question asked was "When did you start to consider the 'zeroes' again?" To which, Ms. Morwick answered: "I revisited it in the summertime, just in terms of tracking it." P-DB232 (Morwick Dep.) at 450:12-15.  Further, Ms. Morwick's "analysis of the bond [at that time] is that it would be an interesting potential long bond investment, continue to watch it."  Silvercreek did not consider the Zero Notes again until October 18, 2001. Id. at 398:18-399:9; 453:4-456:5.

272.    Morwick testified that the Zero Notes at that time were "an interesting potential long bond investment" because "[t]he common stock price went down" and decided that she would "continue to watch it." Id.

**RESPONSE**:  **Disputed**. The testimony cited does not support the assertion suggested. The questions limited Ms. Morwick to answer "what about the economics made the investment right at this time? A. The return was more attractive. Q.  . . . explain to me why the return was   . . . the return on your investment looked better at this point.  A. …  [I]t was primarily because the equity price of Enron had declined in value from issue.  So the bonds were trading much closer to what's referred to as the bond floor. So they were trading as a straight senior bond investment as opposed to a convertible bond that has a fair bit of equity sensitivity. So the reason it became a better investment is Enron declined in value."  P-DB 232 (Morwick Dep.) at 461:2-17.

273.    Morwick testified that the decrease in the Enron common stock price at that time made "the price of the bond . . . more attractive in terms of the return you could earn on the investment." Id. at 451:4-11.

**RESPONSE**:  **Disputed**. See PSOF ¶ 271.

274.    Silvercreek purchased the Zero Notes through a series of trades executed between October 18, 2001 to October 31, 2001. Chung Decl. Ex. D234 (Silvercreek Zero Notes Trading Summary at SlvC005208).

**RESPONSE**:  **Disputed** as to October 31, 2001.  Silvercreek did not purchase Zero Notes

on October 31, 2001. P-DB 235 (Morwick Suppl. Decl.) ¶¶ 15-19. Although Silvercreek's trading

history reflects "FUSI" trades on October 31, 2001, no purchase was made on that date. *Id*. Rather,

the October 31, 2001 trade was a cross-trade between Silvercreek entities OIP Limited and

Silvercreek Limited Partnership to rebalance their respective Enron holdings. *Id*.  OIP Limited was

over-weighted in Enron and Silvercreek Limited Partnership was under-weighted, so the cross-

trade was booked simply to rebalance their Enron holdings.  This is evidenced by the fact that the

trade is an equal and offsetting buy and sells – there is no price difference and no cash difference.

P-DB 235 (Morwick Suppl. Decl.) ¶ 16. Moreover, the "DS" entries that appear on Silvercreek's

trading history for October 31, 2001 (D234) are not trades. Those entries show the quantity of

bonds as zero, and have small dollar values associated with them. These are bookkeeping

corrections to prior trades that had tiny cash differences upon settlement.  P-DB 235 (Morwick

Supp. Decl.) ¶ 18.

275.    Plaintiffs did not purchase any notes from Deutsche Bank or through Deutsche Bank as a broker-dealer. Id.; Chung Decl. Ex. D228 (Morwick Dep. 563:14-17). Additionally, Plaintiffs did not speak with any Deutsche Bank representatives in connection with the purchase of Zero Notes. Chung Decl. Ex. D228 (Morwick Dep. 557:2-7).

**RESPONSE**:  **Undisputed** that Silvercreek did not purchase any Zero notes from

Deutsche Bank or through Deutsche Bank as a broker-dealer. **Undisputed** that Silvercreek did not

speak with any Deutsche Bank representatives regarding the Zero Notes in particular, but **disputed**

in that Silvercreek did speak with Deutsche Bank regarding Enron during the October-November

2001 time period. P-DB232 (Morwick Dep.) at 557:8-558:10.

276.    Deutsche Bank did not have an equity analyst covering Enron during the time that Silvercreek purchased the Zero Notes. Chung Decl. Exs. D214 (Mialkowski Dep. 198:2-7); D6 (Tirello Dep. 57:2-6).

**RESPONSE**:  **Undisputed**.

277.    Morwick testified that at that time, she assessed whether the price of the Zero Notes was "right" and "where the bonds were trading" but she did "[n]ot [do] a lot" else before making the decision to invest "because . . . [she]'d done a fair bit of work in the past and was comfortable with the Enron credit." Chung Decl. Ex. D228 (Morwick Dep. 460:19-24.)

**RESPONSE**: **Disputed** the incomplete characterization of Ms. Morwick's testimony,

which is set forth in full at P-DB232 (Morwick Dep.) at 460:3-461:1.

278.    Kittel testified that he did not recall doing any work in connection with Silvercreek's purchase of the Zero Notes. Chung Decl. Ex. D231 (Kittel Dep. 235:4-19). Kittel also testified that he did not recall having any discussions with traders, salespersons or analysts from any investment banks regarding the Zero Notes. Id.

**RESPONSE**: **Undisputed** as to Mr. Kittel's recollection.

279.    Silvercreek's purchases of the Zero Notes took place after the August 14, 2001 resignation of Jeffrey Skilling as Chief Executive Office of Enron. Chung Decl. Exs. D235 (Enron Press Release (Aug. 14, 2001)); D234 (Silvercreek Zero Notes Trading Summary at SlvC0052087-11).

**RESPONSE**: **Undisputed** in part that on August 14, 2001, Enron announced that it had

accepted the resignation of Jeffrey Skilling, and quoted Skilling as saying: "I am resigning for

personal reasons."  Enron said Skilling would remain as a consultant to the Board and Lay would

resume as president and CEO. *Id.*

**Disputed** as to the effect on Silvercreek's investment decisions. Ms. Morwick explained

"I didn't take [Skilling's resignation] as a big negative towards the company. I really did believe

it was a personal decision. You know, he talked about somebody dying on side, and I think

sometimes people go through experiences like that, and they rearrange priorities. So, no, I didn't

view that as a tremendous negative." P-DB232 (Morwick Dep.) at 379:1-10. Moreover, "Ken Lay

had been the CEO up until February of that year, so he was stepping back in. So you definitely had continuity." *Id.* at 379:11-13.

**Further disputed** in that, consistent with Silvercreek's view, Deutsche Bank analysts wrote "we do not see the Skilling resignation as a credit/ratings/spread event for Enron and do not foresee any changes to the company's business model in its wake. Moreover, having Chairman Ken Lay re-assume his CEO duties and stay at the ENE helm a little while longer (now through 2005) is clearly not a bad outcome in our book." P-DB165 (Deutsche Bank High Grade Energy Weekly, Aug. 17, 2001) at DBN-0010576.

280.   Silvercreek's purchases of the Zero Notes took place after Enron's October 16, 2001 announcement of a $1 billion after-tax charge to its third quarter 2001 earnings to recognize asset impairments, restructuring costs and losses for certain investments. Chung Decl. Ex. D236 (Enron Press Release (Oct. 16, 2001) at SlvC000082). Plaintiffs were aware of the October 16 announcement. Chung Decl. Ex. D228 (Morwick Dep. 800:4-23).

**RESPONSE**: **Undisputed** but **incomplete** with respect to Enron's announcement. On October 16, Enron reported a $1 billion after-tax charge to its third quarter 2001 earnings.  The October 16, 2001 release, however, also reaffirmed "strong earnings growth and its previously stated targets of recurring earnings per diluted share" for 2001 and 2002.  D236.

**Undisputed** that Silvercreek was aware of Enron's announcement, but **disputed** as to its effect on Silvercreek's investment decision. Ms. Morwick testified: With respect to the October writedown, this was "not a devastating event for a company [like Enron]. Not in the context of, you know, the seventh largest company in the world, with 100 billion [dollars] in revenue." P-DB232 (Morwick Dep.) at 380:10-15, 800:13-23.   Not only that, but Enron "just had a restatement of a CEO. It's not unusual for someone to take over and decide to clear out – you know, to clear out issues that exist." *Id*. at 380:2-9.  Moreover, the negative news never remotely

suggested Enron was a bankruptcy candidate, or questioned Enron's perceived viability as a company.  *Id*. at 787:5-788:15, 788:24-790:24.

**Further disputed** in that, consistent with Silvercreek's view, Deutsche Bank analysts wrote:  "We view ENE's $1.0 billion 3Q01 write-down as a long-overdue deck-clearing exercise. … ENE management, under a re-engaged Ken Lay, has moved aggressively to address many of the investor concerns that have dogged the company since the beginning of the year. … [W]e believe that ENE's 3Q01 move puts the bulk of the write-down issue behind it.  In our opinion, ENE's write-down-[d]riven 3Q01 earnings release represents a ratings-neutral event that should prove positive for the company's bond spreads going forward. … Lastly, taking the write-down issue off the table (for the most part) should help refocus investors on ENE's strong underlying business fundamentals, which should prove recession-resistant over the near term." P-DB49 (Deutsche Bank Global Markets Research High Grade "Enron Corp" (Oct. 16, 2001) at DBN-0006596.

281.    Additionally on October 16, 2001, Moody's placed all of the long term debt obligations of Enron on review for downgrade. Chung Decl. Ex. D237 (report by Moody's (Oct. 16, 2001) at ANARPT009107).

**RESPONSE**:  **Undisputed** that Moody's put Enron's long-term debt on review for downgrade following Enron's announced writedowns and charges, but **disputed** in that the October 16, 2001 Moody's release also reaffirmed that Senior Unsecured debt was still investment grade.  And, although Moody's placed Enron on a credit watch, Ms. Morwick explained that both Standard & Poor's and Fitch "came out and affirmed ratings on the company."  P-DB232 (Morwick Dep.) at 375:10-23, 581:5-7; *see also* P-DB112 (Fitch Comments press release); P-DB180 (Standard & Poors Ratings Direct Report).

**Further disputed** because Deutsche Bank analysts wrote regarding the Moody's review announcement:  "We obviously disagree with Moody's negative watchlisting of ENE and note that it took ten years for Moody's to move the company up from Baa2 to Baa1 … While we are not sure what Moody's agenda is, we do expect ENE management to work closely with the recalcitrant rating agency over the coming weeks to head off a potential downgrade, and still think that a near-term Baa1 ratings affirmation is the most-likely outcome." P-DB49 (Oct. 16, 2001 Deutsche Bank Global Markets Research High Grade "Enron Corp") at DBN-0006597.

282.    On October 18, 2011, Silvercreek purchased Zero Notes and continued doing so the following day. Chung Decl. Ex. D234 (Silvercreek Zero Notes Trading Summary at SlvC0052088-11).

**RESPONSE**:  **Undisputed**.

283.    On October 22, 2001, the SEC announced that it was inquiring into a possible conflict of interest related to Enron's dealings with partnerships maintained by Enron's CFO Andrew Fastow. Chung Decl. Ex. D238 (Enron Press Releases (Oct. 22, 2001) at DBG 101964).

**RESPONSE**:  **Disputed**.  On October 22, 2001 Enron announced that the SEC requested that Enron voluntarily provide information regarding certain related-party transactions.  The release further notes that "[Enron's] internal and external auditors and attorneys reviewed the related party arrangements, the Board was fully informed of and approve these arrangements, and they were disclosed in the company's SEC filings."  D238.

Silvercreek also believed that Enron would be able to weather the SEC inquiry due to the company's mammoth size. As Ms. Morwick testified, the SEC inquiry was "something that the company could economically bear easily."  P-DB232 (Morwick Dep.) at 418:17-419:3. "Enron was an extremely large and, based on the public information, profitable business. The LPs [that were the subject of the SEC inquiry] were not significant or material in the context of this multi, multi billion dollar company." P-DB 232 at 785:18-787:4. Moreover, the negative news never

remotely suggested Enron was a bankruptcy candidate, or questioned Enron's perceived viability as a company. *Id*. at 787:5-788:15; 788:24-790:24. Also, on October 22, 2001 (the day the SEC inquiry was announced), Ms. Morwick spoke to several brokers about Enron. *Id.* at 788:24-789:9, 862:4-21. "[N]one of the brokers raised any negative points with respect to Enron. They all viewed this company as strong, successful business that—you know, **bankruptcy wasn't on people's radar screens**. It just would have been absurd to think about this company being a bankruptcy candidate." *Id*. at 788:24-792:4.

284.    Also on October 22, 2001, Plaintiffs continued to purchase Zero Notes. Chung Decl. Ex. D228 (Morwick Dep. 781:14-16).

**RESPONSE**:  **Undisputed**, but see PSOF ¶ 283.

285.    On October 23, 2001, Enron hosted a conference call to discuss the SEC inquiry. Chung Decl. Ex. D238 (Enron Press Releases (Oct. 22, 2001) at DBG 101968). Silvercreek did not listen to that call at that time and continued to purchase Zero Notes that day. Chung Decl. Ex. D239 (Notes regarding "Enron Corporation" (Oct. 28, 2001) at SlvC001986); D228 (Morwick Dep. 385:12-386:18). Plaintiffs did not listen to a recording of the Enron call until October 28, 2001. Id.

**RESPONSE**:  **Undisputed** that Enron hosted a conference call on October 23, 2001.

**Undisputed** that Silvercreek purchased Zero Notes on October 23, 2001. **Disputed** that the

evidence cited establishes that Silvercreek did not listen to the October 23, 2001 conference call.

286.    On October 24, 2001 Enron announced that its CFO, Andrew Fastow, was taking a leave of absence from the company. Chung Decl. Ex. D14 (Enron Press Release (Oct. 24, 2001)).

**RESPONSE**:  **Undisputed**, in part, but **incomplete**.  Lay also announced in the press

release that former treasurer Jeff McMahon was replacing Fastow because, according to Lay, "In

my continued discussions with the financial community, it became clear to me that restoring

investor confidence would require us to replace Andy as CFO." D14.

**Disputed** as to the effect on Silvercreek's investment decisions.  Morwick stated the

general belief about Enron was that "everything was above board and that they were just clearing

the noise out of the market. In order to do that, it made sense to put, you know, their CFO on a leave of absence. That was viewed somewhat positively, that they were proactively dealing with the situation."  P-DB232 (Morwick Dep.) at 379:16-22.

287.   Plaintiffs purchased additional Zero Notes on October 24, 2001.

**RESPONSE**:  **Undisputed**.

288.   On October 25, 2001 Enron drew down on committed lines of credit for cash liquidity in excess of $1 billion. Chung Decl. Exs. D240 (Enron Press Release (Oct. 25, 2001)); D241 (Enron Press Release (Oct. 25, 2001) at SlvC000067).

**RESPONSE**:  **Undisputed** but **incomplete** because the October 25, 2001 press release was spun as a positive by Enron.  McMahon announced that in drawing on its line of credit to provide cash liquidity, "We are making clear that Enron has the support of its banks and more than adequate liquidity to assure our customers that we can fulfill our commitments in the ordinary course of business. This is an important step in our plan to restore investor confidence in Enron. Additionally, we will update investors over the next several days regarding our plans to maintain our long-term credit rating."  D240.  In addition to the line of credit, Enron also announced that it had recorded more than 8,400 transactions with a total of 1,387 counterparties for a gross notional value of approximately $ 4 billion – "all above average levels."  *Id*.

289.   Also on October 25, 2001, Fitch put Enron on negative credit watch. Chung Decl. Ex. D242 (Fitch Press Release (Oct. 25, 2001) at ANARPT008899). Additionally, Standard & Poor's put Enron's outlook to negative. Chung Decl. Ex. D243 (Standard & Poor's Press Release (Oct. 25, 2001) at ANARPT009837).

**RESPONSE**:  **Undisputed** in part but **incomplete** and therefore **disputed**. Also on October 26, 2001, Deutsche Bank analysts wrote: "Notwithstanding the market speculation that continues to be fed by self-serving hedge funds and casual research observers, our view remains that ENE is not at risk of meltdown at this point given its solid business franchise and good

financial flexibility. We expect better news for ENE's beleaguered bondholders over the coming days." P-DB48 (Deutsche Bank U.S. Corporate Weekly (Oct. 26, 2001) at DBG084600.

290.    Plaintiffs purchased additional Zero Notes on October 25, 2001. Chung Decl. Ex. D234 (Silvercreek Zero Notes Trading Summary at SlvC005207-11).

**RESPONSE**: **Undisputed**.

291.    On October 26, 2001, Egan Jones lowered Enron's credit rating to below investment grade. Chung Decl. Ex. D244 (Egan Jones Rpt. (Oct. 26, 2001) at SlvC002002).

**RESPONSE**: **Undisputed** that Egan Jones issued the referenced Report. Also on October 26, 2001, Deutsche Bank analysts wrote: "Notwithstanding the market speculation that continues to be fed by self-serving hedge funds and casual research observers, our view remains that ENE is not at risk of meltdown at this point given its solid business franchise and good financial flexibility. We expect better news for ENE's beleaguered bondholders over the coming days." P-DB48 (Deutsche Bank U.S. Corporate Weekly) at DBG084600.

292.    Additionally, on October 26, 2001, there were Reports that Enron insiders were selling shares while the stock price was dropping. Chung Decl. Ex. D245 (Wall Street Journal article (Oct. 26, 2001) at SlvC000061).

**RESPONSE**: **Undisputed** that the October 26, 2001 edition of the Wall Street Journal contained an article about Enron employee stock sales, among other articles regarding Enron. Also on October 26, 2001, Deutsche Bank analysts wrote: "Notwithstanding the market speculation that continues to be fed by self-serving hedge funds and casual research observers, our view remains that ENE is not at risk of meltdown at this point given its solid business franchise and good financial flexibility. We expect better news for ENE's beleaguered bondholders over the coming days." P-DB48 (Deutsche Bank U.S. Corporate Weekly) at DBG084600.

293.    Plaintiffs continued to purchase Zero Notes on October 26, 2001. Chung Decl. Ex. D234 (Silvercreek Zero Notes Trading Summary at SlvC005210).

**RESPONSE**:  **Undisputed** that Silvercreek made two purchases of Zero Notes on October

26, 2001.

294.    On October 26, 2001, Morwick asked Robert Kittel, her analyst, to perform a more detailed analysis of Enron's credit situation. Over the course of the weekend on October 27-28, 2001, Kittel reviewed the prospectus for the Zero Notes, Enron's 10-K statements, and compiled an analysis of Enron's balance sheet. Chung Decl. Exs. D231 (Kittel Dep. 201:20-202:9, 306:20-308:5); D246 (Enron Corporation Balance Sheet Breakdown (June 30, 2001) at SlvC001991). This analysis included further review of Enron's debt levels. Chung Decl. Ex. D231 (Kittel Dep. 295:6-296:3). He continued to analyze Enron until late November and to pursue additional information regarding Enron's debt levels. Chung Decl. Exs. D247 (Notes regarding "Enron Corporation" (Oct. 30, 2001) at SlvC001359-60); D248 (Rob Kittel memorandum to Silvercreek (Mar. 19, 2002) at 1-3); D249 (Notes at SlvC001379-80); D250 (Notes regarding "Enron Corporation" at SlvC001383-84). Kittel had not performed any analysis of Enron's financial statements prior to October 26-28, 2001 time period. Chung Decl. Ex. D231 (Kittel Dep. 203:2, 308:9-12).

**RESPONSE**:    **Disputed**. Mr. Kittel responded to a question whether he specifically

recalled performing any analyses related to Enron's financial statements prior to October 24th,

2001 as follows: "Besides the prospectus review that I had done and that I testified earlier I don't

remember when I did it? No."   P-DB156 (Kittel Dep.) at 64:17-22. **Undisputed** that Kittel

performed work on Enron between October 26-28 and into November, 2001.

295.    On October 27, 2001, Kittel had a telephone conversation with Tim DeSpain at Enron to discuss the financial status of the company. They discussed Enron's assets, including its investments in unconsolidated affiliates, and its outstanding debts. Id. at 344:10-14; Chung Decl. Ex. D249 (Notes at SlvC001379-80).

**RESPONSE**:    **Disputed**. Kittel does not recall a call with Mr. DeSpain and a review of

D249 did not refresh his recollection regarding such call. Mr. Kittel does not know when the notes

contained in D249 were taken and does not know what part of the information contained in those

notes was communicated to him by Mr. DeSpain. D231 at 344:10-25.

296.    Kittel testified that he did not recall making an inquiry to anyone concerning the level of Enron's off-balance sheet debt prior to October 27, 2001. Chung Decl. Ex. D231 (Kittel Dep. 309:4-7).

**RESPONSE**:  **Disputed**. Mischaracterizes Mr. Kittel's testimony in that he did not recall one way or the other whether he made such an inquiry.

297.   On October 29, 2001, Moody's downgraded Enron's long term debt. Chung Decl. Ex. D251 (Moody's Rpt. (Oct. 29, 2001) at ANARPT009117).

**RESPONSE**:  **Undisputed**.

298.   On October 31, 2001, the SEC announced a formal investigation into Enron's financial accounting practices. Chung Decl. Ex. D252 (Wall Street Journal article (Oct. 31, 2001) at SlvC000090). On or around the time of this announcement, Robert Kittel had a telephone conversation with David Lebor at Enron Corporation. Chung Decl. Ex. D247 (Notes regarding "Enron Corporation" (Oct. 30, 2001) at SlvC001359-60). They discussed the status of the SEC investigation and Enron's current financial status. Id.; Chung Decl. Ex. D231 (Kittel Dep. 315:13-316:16).

**RESPONSE**:  **Undisputed** as to the first sentence. **Disputed** as to the second sentence. Mr. Kittel does not recall speaking with Mr. Leboe of Enron. D231 at 315:18-22. **Further disputed** as to what was discussed during a conversation that Mr. Kittel does not recall. **Undisputed** that Mr. Kittel identified his handwriting on the document D247 and testified that he believes them to be notes of a phone call with someone at Enron.

299.   On October 31, 2001, Silvercreek made its final purchase of Zero Notes. Chung Decl. Ex. D234 (Silvercreek Zero Notes Trading Summary at SlvC005210).

**RESPONSE**:  **Disputed**. Silvercreek did not purchase Zero Notes on October 31, 2001. *See* PSOF ¶ 274.

300.   On October 31, 2001, Silvercreek began to sell off its position in the Zero Notes. Id. at SlvC005209.

**RESPONSE**:  **Undisputed**.

301.   Morwick looked briefly into the possibility of purchasing an Enron put in late October 2001, to offset any potential losses in Silvercreek's convertible bond investments, but none were available. Chung Decl. Ex. D228 (Morwick Dep. 848:19-851:23); D253 (Silvercreek messaging thread (Oct. 31, 2001) at SlvC014111).

**RESPONSE**:  **Undisputed**.

302.     On November 1, Standard & Poor's lowered Enron's ratings and placed Enron on CreditWatch negative. Chung Decl. Ex. D254 (Standard & Poor's Press Release (Nov. 1, 2001) at ANARPT009839).

**RESPONSE**:     **Undisputed** and **immaterial** because the rating change was after Silvercreek purchased all 7% and Zero Notes at issue in this litigation. Further **disputed** because it was not until November 30, 2001, two days before Enron's bankruptcy filing, that Deutsche Bank removed Enron from its "short list of recommended high grade energy credits." P-DB222 (Deutsche Bank High Grade Energy Monthly) at DBN-0035965.

303.     On November 5, Fitch lowered Enron's ratings and maintained a negative watch. Chung Decl. Ex. D255 (Fitch Press Release (Nov. 5, 2001) at ANARPT008901).

**RESPONSE**:     **Undisputed** and **immaterial** because the rating change was after Silvercreek purchased all 7% and Zero Notes at issue in this litigation.

304.     On November 8, Enron announced the restatement of its financials for 1997-2000. Chung Decl. Ex. D238 (Enron Press Releases (Oct. 22, 2001) at DBG 101956).

**RESPONSE**:     **Undisputed** as to **announcement** but immaterial since the announced restatement was after Silvercreek purchased all Zero and 7% Notes at issue.

305.     Also on November 8, Enron confirmed discussions with Dynegy regarding a possible acquisition of Enron. Chung Decl. Ex. D256 (Enron Press Release (Nov. 8, 2001).

**RESPONSE**:     **Undisputed** but **immaterial** since the announcement was after Silvercreek purchased all Zero and 7% Notes at issue in this case.

306.     On November 10, Enron and Dynegy announced a merger agreement where Dynegy would buy Enron. Chung Decl. Ex. D257 (Enron Press Release (Nov. 9, 2001).

**RESPONSE**:     **Undisputed** but **immaterial** since the announcement was after Silvercreek purchased all Zero and 7% Notes at issue in this case.

307.     On November 28, S&P, Moody's and Fitch downgraded Enron's debt to below investment grade. Chung Decl. Exs. D258 (Fitch Press Release (Nov. 28, 2001) at ANARPT008911); D259 (Moody's Press Release (Nov. 28, 2001) at ANARPT009127); D260 (Standard & Poor's Press Release (Nov. 28, 2001) at ANARPT009879).

**RESPONSE**:  **Undisputed** but **immaterial** since the announced restatement was after Silvercreek purchased all Zero and 7% Notes.

308.   On November 28, 2001, Morwick purchased $150,000 of Zero Notes for her own portfolio. Chung Decl. Ex. D228 (Morwick Dep. 45:8-16).

**RESPONSE**:  **Undisputed** and **immaterial** to all claims at issue in this litigation.

309.   Also on November 28, Dynegy terminated the merger agreement with Enron. Chung Decl. Ex. D238 (Enron Press Releases (Oct. 22, 2001) at DBG 101946.

**RESPONSE**:  **Undisputed** but **immaterial** since the press release was after Silvercreek purchased all Zero Notes and 7% Notes.  It was not until November 30, 2001, two days before Enron's bankruptcy filing, that Deutsche Bank removed Enron from its "short list of recommended high grade energy credits." P-DB222 (Deutsche Bank High Grade Energy Monthly) at DBN-0035965.

310.   On December 2, Enron filed for Bankruptcy. Chung Decl. Ex. D261 (Enron Press Release (Dec. 2, 2001).

**RESPONSE**:  **Undisputed**.

311.   Thus, during the time that Silvercreek purchased Enron debt securities, it did not review the prices of Enron credit default swaps. Chung Decl. Ex. __ (Morwick Dep. 806:23-808:12, 810:4-10). An increase in the price of a credit default swap reflects the market's assessment of an increased risk of default. Chung Decl. Ex. D228 (Morwick Dep. 807:11-808:5). The credit default swap spreads for Enron debt obligations increased dramatically during the October 18-26 window during which Silvercreek was purchasing the Zero Notes. Institutions selling protection on Enron debt obligations were demanding nearly three times more from buyers of default protection during time that Silvercreek sought to increase its position on the Zero Notes. Chung Decl. Exs. D262 (Expert Rpt. of Suresh M. Sundaresan (July 17, 2006) at ¶¶ 22-23). Silvercreek had received information about the escalating market levels for Enron five-year credit default swaps. Chung Decl. Exs. D263 (Expert Rpt. of Tsvetan N. Beloreshki (July 17, 2006) at ¶¶ 11, 55-56; D264 (CSFB message to Robert Kittel (Oct. 15, 2001) at SlvC017488); D265 (CSFB message to Louise Morwick (Oct. 17, 2001) at SlvC013538); D266 (CSFB message to Louise Morwick (Oct. 25, 2001) at SlvC013879).

**RESPONSE**:  **Undisputed** that Silvercreek did not purchase credit default protection and did not consider doing so.  Ms. Morwick testified that there appeared to be no need to purchase

credit default swaps at the time Silvercreek placed its investments, and that had she believed an Enron bankruptcy was a possibility, Silvercreek would not have made the investment.  P-DB232 (Morwick Dep.) at 809:16-20, 884:18-885:3; *see also* P-DB 235 (Morwick Suppl. Decl.) ¶¶ 20-21 ("Purchasing credit default swaps is a complicated process, would have added extra expense, and given Enron's apparent creditworthy financial condition, an unnecessary expense as well.").

**Disputed** as to the implication that the market believed that Enron was at risk of bankruptcy in that Deutsche Bank, among others, continued to recommend Enron securities though they had access to the same EDF information.  *See* P-DB49 (Oct. 16, 2001 Deutsche Bank Global Markets Research High Grade "Enron Corp."); P-DB167 (Oct. 19, 2001 Deutsche Bank High Grade Energy Weekly); P-DB48 (Oct. 26, 2001 Deutsche Bank U.S. Corporate Weekly).

**Further disputed** in that according to the EDF score the risk of Enron bankruptcy before October 24, 2001, was between 4.93 and 5.26 percent. *See* Sundaresan Rpt. (D262) at ¶ 19 (risk of Enron bankruptcy according to EDF score was 4.93 on October 22 and 5.26% on October 23, before Silvercreek's October 24 purchase of 7% Notes).  In addition, Enron's Altman Z Score Model in the third quarter 2001, showed a very low probability of default based on Enron's reported financials.  *See* P-DB89 (Saunders Credit Rpt.) at 10-13 & Ex. 6.

**Further disputed** that based on the consensus of public information about Enron, Silvercreek's 7% Note investment, with EOG short, appeared to be a low-risk investment predicated on Enron not filing for bankruptcy.  *See* P-DB232 (Morwick Dep.) at 434:19-24, 295:22-297:6; *see also* P-DB233 (Matthews Rpt.) at 3-5 (Silvercreek's 7% investment and short sale of EOG stock was "low-risk" since only an Enron bankruptcy could have negated Silvercreek's fully hedged investment).

312.    Plaintiff's expert conceded that the negative information released into the market prior to Plaintiffs' investion "raise[d] questions" and "certainly mean[t] that [Plaintiffs] should deo

additional research and due diligence and found out what other people are thinkg."  Chung Decl. Ex. D267 (Matthews Dep. 239: 11-18, 209:11-210:6, 212:8-216:19).

**RESPONSE**:  **Disputed** as incomplete. Matthews testified that additional research should be done to find out what other people are thinking—but he already testified that, based on analyst research Reports, press coverage, and ratings at the time, Enron appeared to be a large, viable public company in October 2001. P-DB245 (Matthews Dep.) at 197:2-16, 197:24-198:23. He testified that he believes the market in October 2001 "viewed bankruptcy as an unlikely possibility, as a remote possibility" and that "[c]learly the opinion of the research analyst following the stock … they're consistently very positive and point to all the positive things in the future and so on." *Id*. at 120:13-122:11. He believed that the possibility of bankruptcy was, for the time period that Plaintiffs were looking at Enron, "not materially greater than zero." *Id*. at 122:12-19. He also testified that Plaintiffs' review was reasonable, and that with the benefit of hindsight more things could have been done. *Id*. at 220:14-221:1. He further opined that:

> [Plaintiffs' representative, Morwick, is] looking at -- she's looking at people who are looking at the security day by day. You've got analysts that are publishing here sometimes in consecutive days on the stock and who presumably, since this was one of the major companies they were following, were very much on top of the situation, in a way that nobody managing a diversified portfolio can do. She was, as I understand it, relying on the research Reports, which were saying such positive things about the company, recommending the stock, and saying how things were going to get better and how these announcements that had been affecting the stock during October did not affect the long-term outlook for the company. I think she reasonably relied on those. Could she have looked at other things? Yes. But I think that she had a valid basis for buying the shares when she did.

313.    Deutsche Bank assisted Silvercreek in five separate sales of the Zero Notes that took place between December 3, 2001 and January 22, 2002. Chung Decl. Ex. D234 (Silvercreek Zero Notes Trading Summary at SlvC005208, SlvC005210).

**RESPONSE**:  **Undisputed** and **immaterial**.

**C.    Silvercreek Followed Its Own Trading Strategy When Trading the 7% Exchangeable Notes**.

314.    There is no allegation that Deutsche Bank underwrote the offering for the 7% Exchangeable Notes (hereinafter "7% Notes") or that Plaintiffs executed any trades for the 7% Notes through Deutsche Bank. Chung Decl. Exs. D268 (Silvercreek 7% Notes trading history pre-Oct. 24, 2001 (Mar. 28, 2002) at SlvC004892); D269 (Silvercreek 7% Notes trading history post-Oct. 23, 2001 (Jan. 13, 2002) at SlvC005046); D228 (Morwick Dep. 560:21-562:13).

**RESPONSE**:  **Undisputed**.

315.    The 7% Notes were exchangeable for shares of common stock of Enron Oil & Gas Company ("EOG") on their maturity date of July 31, 2002. The 7% Notes paid quarterly interest payments equal to 7% per year and were mandatorily exchangeable on the maturity date. These notes were originally issued on August 10, 1999 as general senior unsecured obligations of Enron. The offering was made pursuant to a prospectus. Chung Decl. Ex. D270 (7% Notes Prospectus (Aug. 10, 1999) at SlvC000106-110).

**RESPONSE**:  **Undisputed**.

316.    The prospectus presented Enron's year-end financial data for the following five years: 1994, 1995, 1996, 1997, and 1998. The data included were derived from Enron's audited financial statements for those years. Id. at SlvC000126-128.

**RESPONSE**:  **Undisputed**, except that the prospectus also presented unaudited financial data, D270 at SlvC000126, and incorporated by reference Enron's Form 10-K for the year ended December 31, 1998, its Form 10-Q for the quarter ended March 31, 1999, its Forms 8-K filed on January 26, 1999 and March 18, 1999, as well as "any future filings made with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act until we sell all of the securities," *id.* at SlvC000163.

317.    Appendix A of the prospectus (hereinafter "Appendix A") likewise included EOG's year-end financial data for 1996, 1997, and 1998. Such data were also derived from audited financial statements. Id. at SlvC000177-180.

**RESPONSE**:  **Undisputed** except that the data presented was also derived from unaudited financial statements.  D270 at SlvC000177, 197, and also incorporated by reference EOG's Form 10-K for the year ended December 31, 1998, as amended, its Forms 10-Q for the quarters ending March 31, 1999 and June 30, 1999, as well as "any future filings made with the SEC under Sections

13(a), 13(c), 14 or 15(d) of the Securities Exchange Act until we sell all of the common stock," *id.* at SlvC000239.

318.    The prospectus incorporated by reference the consolidated financial statements included in Enron's [Current Report on] Form 8-K dated March 18, 1999 and consolidated financial statements and schedules included in Enron's [Annual Report on] Form 10-K for the year ended December 31, 1998. These consolidated financial statements were audited by Arthur Andersen, as indicated in their Reports with respect thereto, and were incorporated into the prospectus in reliance upon the authority of said firm as experts in giving said Reports. Id. at SlvC000165.

**RESPONSE**:  **Undisputed**.

319.    Arthur Andersen also consented to the incorporation by reference in Appendix A of its Report on the consolidated financial statements of EOG and subsidiaries dated March 5, 1999, included in EOG's Form 10-K, as amended, for the year ended December 31, 1999. Id. at SlvC000268.

**RESPONSE**:  **Undisputed**, except as to the relevant period governed by Andersen's consent and the related Form 10-K, which was for the year ended December 31, 1998. D270 at SlvC000268.

320.    The prospectus contained the following disclaimer:
YOU SHOULD NOT ASSUME THAT THE INFORMATION IN THIS PROSPECTUS OR IN ANY OTHER DOCUMENT INCORPORATED BY REFERENCE IN THIS PROSPECTUS IS ACCURATE AS OF ANY DATE OTHER THAN THE DATE ON THE FRONT OF THOSE DOCUMENTS.

Id. at SlvC000164.

**RESPONSE**:  **Undisputed**, but incomplete in that the prospectus also states that the "information incorporated by reference is an important part of this prospectus, and the information that we file later with the SEC will automatically update and supersede this information." D270 at SlvC000163.

321.    Deutsche Bank was not an underwriter of the 7% Notes. Id. at SlvC000107, SlvC000166.

**RESPONSE**:  **Undisputed**.

322.    Plaintiffs first purchased the 7% Notes in October 2000. Chung Decl. Ex. D268 (Silvercreek 7% Notes trading history pre-Oct. 24, 2001 (Mar. 28, 2002) at SlvC004890).

**RESPONSE**:  **Undisputed** but **immaterial**.

323.    Plaintiffs began to sell the 7% Notes on August 20, 2001. Their decision to unwind this position was based on what they could sell the position for at that point in time. When Plaintiffs made the investment in the 7% Notes, they anticipated a minimum return of approximately 21% assuming that they held the notes until the maturity date of July 31, 2002. When they sold a portion of the 7% Notes on August 20, 2001, they received a return of nearly 38% after holding the notes for essentially half of the period of time that they expected. Id.; Chung Decl. Ex. D228 (Morwick Dep. 314:22-25, 318:10-18, 322:13-22).

**RESPONSE**:  **Disputed** as to the characterization of Ms. Morwick's testimony, but

**undisputed** that Silvercreek unwound its position in the 7% Notes beginning in August 2001 based

on a combination of the following: that the investment had earned more than the minimum return

that Silvercreek expected if it held the position to maturity, and Silvercreek believed the return

going forward was not as attractive as other opportunities in the market. P-DB232 (Morwick Dep.)

at 315:9-317:5, 322:13-22, 324:17-325:1, 334:20-25, 335:24-336. Silvercreek "believed in the

stability and strength of Enron throughout the whole piece. Our decision to unwind this position

was based on the economics of the position and what we could sell the position for at that point in

time." *Id.* at 318:5-18.

324.    Plaintiffs continued to sell their position throughout September and October 2001, receiving an even "better" return and doing "very well on this investment." Chung Decl. Exs. D228 (Morwick Dep. 323:3-327:4, 333:2-22); D268 (Silvercreek 7% Notes trading history pre-Oct. 24, 2001 (Mar. 28, 2002) at SlvC004891-895, SlvC004897-898, SlvC0048900-901).

**RESPONSE**:  **Dispute** the incomplete characterization of the cited testimony, but

**undisputed** that Silvercreek continued to unwind its position in September and October 2001 for

the same reasons identified in PSOF ¶ 323. *See* P-DB232 (Morwick Dep.) at 332:20-337:8.

325.    On October 23, 2001, Plaintiffs sold the remainder of the 7% Notes and closed out their position. Plaintiffs had determined that the return on the investment from that day forward was not sufficiently attractive to hold their position. They believed that they could make better investments elsewhere. Chung Decl. Ex. D228 (Morwick Dep. 334:1-337:8, 340:3-9); D268

(Silvercreek 7% Notes trading history pre-Oct. 24, 2001 (Mar. 28, 2002) at SlvC004891-895, SlvC004897-898, SlvC0048900-901).

**RESPONSE**:   **Dispute** the incomplete characterization of the cited testimony, but

**undisputed** that Silvercreek closed out its position in the 7% Notes on October 23, 2001 for the

same reasons identified in PSOF ¶¶ 323-324.

326.    One day later, on October 24, 2001, Plaintiffs reversed course and began repurchasing the 7% Notes. Morwick did not consult with anyone at BT or Deutsche Bank regarding the 7% Notes. Chung Decl. Ex. D228 (Morwick Dep. 381:16-21, 383:4-384:13).

**RESPONSE**:   **Dispute** the characterization of and incomplete citation to Ms. Morwick's

testimony. **Undisputed** that Silvercreek sold 7% Notes on October 23, 2001 and bought 7% Notes

on October 24, 2001, which Ms. Morwick testified was "not that unusual in these investments."

P-DB232 (Morwick Dep.) at 381:16-382:4. **Disputed** that the cited evidence establishes "Morwick

did not consult with anyone at BT or Deutsche Bank regarding the 7% Notes."

327.    In the hour to an hour-and-a-half before Plaintiffs made their first purchase, Morwick "went and pulled or had the [Enron] file pulled just to revisit some of the terms." Plaintiffs reviewed the prospectus to make sure that it was fresh in their mind and then made a decision to re-establish the position. They also looked at the news from the four or five days that preceded their decision to re-invest. Id. at 402:2-403:10.

**RESPONSE**:   **Disputed**. The opportunity to purchase the 7% notes was recommended to

Silvercreek by more than one broker. P-DB232 (Morwick Dep.) at 401:2-402:21.   **Undisputed**

that Silvercreek reviewed the prospectus.   **Disputed** that Silvercreek "look at the news from the

four or five days that preceded their decision to re-invest," as Ms. Morwick testified that

Silvercreek was always looking at the news regarding Enron. Id. at 403:3-10. Ms. Morwick had

also reviewed Enron's third quarter results a few days prior. Id. at 753:4:21, 786:17-787:4.

328.    At this juncture, Plaintiffs knew of information concerning Enron that had been coming into the market the week prior to their purchase. They were also aware that Jeff Skilling, Enron's CEO, had resigned in mid-August. Id. at 397:12-15, 318:5-9.

**RESPONSE**:   **Undisputed**, but see PSOF ¶¶ 279-292 with respect to Silvercreek's consideration of the public information regarding Enron and Deutsche Bank's concurrent recommendations regarding Enron credit notwithstanding that information.

329.   Morwick believed that the sole risk associated with the decision to repurchase the 7% Notes was the risk of Enron's Bankruptcy. Id. at 884:18-885:3, 886:3-11. Plaintiffs did not, however, review any market indicators of Bankruptcy with respect to Enron, such as the Altman Z score, the KMV model, and the EDF score. Id. at 805:5-806:22. Plaintiffs also did not analyze indicators of Enron's risk of default, such as the prices of Enron credit default swaps. Id. at 806:12-807:2, 808:6-12. In addition, they also did not look at the pricing of other Enron bonds. Id. at 808:15-17.

**RESPONSE**:  **Disputed**. Silvercreek did not believe that there was any material risk that Enron would file for bankruptcy, based on its review of information directly relevant to that risk: Enron's current and historical financial statements, earnings releases, news releases, press coverage, the prospectus, and coverage ratios. P-DB232 (Morwick Dep.) at 802:12-803:6.

**Disputed** as to the Altman Z score. Ms. Morwick could not recall whether she looked at the Altman Z score for Enron at the time Silvercreek invested in the 7% Notes and Zero Notes in October 2001. P-DB232 (Morwick Dep.) at 803:17-24, 886:21-887:23.   As Ms. Morwick explained, "[t]he Z score wasn't really a relevant piece of analysis for Enron at that point in time" because Enron was not a distressed business or facing credit difficulty. Id. at 804:17-805:4. Further, The Altman Z score for Enron at the time Silvercreek made its October 2001 investment would have been above 3, based on the public information. Id. at 803:17-804:16, 886:21-887:10. As Ms. Morwick testified, "[j]ust with the earnings of the company, the composition of their balance sheet, their level of debt, you know their earnings power, their operating cash flow, yes, the Z score would not have indicated bankruptcy for Enron at that point in time." Id. at 803:17-804:16.

**Undisputed** that Ms. Morwick did not review the "KMV" model, but **disputed** that the cited evidence establishes the same as a "market indicator of bankruptcy." **Undisputed** that Ms. Morwick did not review prices for credit default swaps, but **disputed** that credit default protection was called for given the mix of information available to Silvercreek at the time of its purchases and **disputed** that a review of those prices would have led a reasonable investor not to invest. *See* PSOF ¶ 311.

330.    Plaintiffs continued to purchase the 7% Notes on October 25, 2001. Around 10:00 a.m. that day, one of Morwick's colleagues, Robert Kittel, received a message sent over Bloomberg from a broker at First Union. The broker asked Kittel to call her about the 7% Notes. She stated that people were "nervous" because the EOG stock was not held in trust and because it "could be a confusing situation" if it reached a "meltdown stage." Chung Decl. Ex. D285 (messaging thread to Robert Kittel (Oct. 25, 2001) at SlvC017745). Kittel testified that he did not recall reading this message and did not believe that he alerted Morwick to the broker's concerns. Chung Decl. Ex. D231 (Kittel Dep. 408:3-12).

**RESPONSE**:   **Undisputed** that a message was sent to Mr. Kittel from a broker at First Union, which speaks for itself but is not admissible for the truth of the matter asserted. **Disputed** whether Mr. Kittel read that message. Mr. Kittel testified he neither recalled the message nor recalled the substance of the message presented to him at his deposition. D231 at 408:3-12.

331.    Plaintiffs made additional purchases of 7% Notes on October 25, 2001 and October 26, 2001. Chung Decl. Ex. D269 (Silvercreek 7% Notes trading history post-Oct. 23, 2001 (Jan. 13, 2002) at SlvC005046-055).

**RESPONSE**:   **Undisputed**.

332.    By the afternoon of October 26, 2001, Plaintiffs again changed course and began to sell the 7% Notes. The change in strategy was precipitated by "a combination of information" including "what was happening in the market, which . . . did not make sense." Morwick elaborated that "[t]he people were just selling" and that, while people had also sold a lot over the previous two days, "the price continued to go down." Chung Decl. Ex. D228 (Morwick Dep. 407:6-408:5).

**RESPONSE**:   **Dispute** the incomplete characterization of Ms. Morwick's testimony regarding Silvercreek's decision to sell the 7% Notes on October 26, 2001. On October 26, 2001, the conversion premium turned negative. P-DB232 (Morwick Dep.) at 406:9-12, 418:1-9, 830:24-

831:25. A negative spread was very unusual and signaled to Silvercreek that "there's something, something wrong. Or the market is assuming something's wrong, or somebody's desperate to get out of this position for some reason, that, you know, they're selling hard into the market. It doesn't make sense." *Id*. at 406:13-19, 830:24-831:25. "Clearly somebody thought there was a problem . . . someone was selling in a fashion that was irrational." *Id*. at 407:12-16. "It didn't make sense in the context of the financials of the company." *Id*. at 416:11-20, 830:24-831:25. Although nothing had happened to change Silvercreek's view of Enron's credit, Ms. Morwick nevertheless was "nervous that somebody knows something that you potentially don't." P-DB232 at 407:6-408:5, 838:9-21. As Ms. Morwick explained, "all of a sudden, you hit this disconnect. Our view of the company and its financial strength is one thing, and the market is indicating that something is going on. Somebody knows something we don't know. It just didn't feel right. Something was off." *Id.* at 841:4-16.

333.    On the same days that Plaintiffs repurchased the 7% Notes, they engaged in short sales of the shares for which the 7% Notes were exchangeable. On October 26, 2001, Plaintiffs began buying back EOG common stock as they began selling the 7% Notes. Chung Decl. Ex. D269 (Silvercreek 7% Notes trading history post-Oct. 23, 2001 (Jan. 13, 2002) at SlvC005046-055).

   **RESPONSE**:  **Undisputed**.

334.    Plaintiffs did not undertake a detailed analysis of EOG stock to determine whether their short position was advantageous. They did not want to "take the risk of a naked short, and potentially making our loss even bigger" so they engaged in this strategy to "contain" the risk. Chung Decl. Ex. D228 (Morwick Dep. 435:6-436:5).

   **RESPONSE**:  **Undisputed**.

335.    Plaintiffs closed out of their EOG position in January 2002 and liquidated their entire position in the 7% Notes in November 2003. Chung Decl. Ex. D269 (Silvercreek 7% Notes trading history post-Oct. 23, 2001 (Jan. 13, 2002) at SlvC005046-055).

   **RESPONSE**:  **Undisputed**.

## SILVERCREEK'S COUNTERSTATEMENT OF DISPUTED FACTS

### IX.   <u>SUMMARY</u>

336.   Enron committed fraud by fraudulently manipulating its publicly reported financials. As Andrew Fastow declared, "I pleaded guilty to criminal charges resulting from my actions while Enron's CFO, including [manipulating and falsifying] the Company's financial statements. ...while CFO, I and other members of Enron's senior management fraudulently manipulated Enron's publicly reported financial results. Our purpose was to mislead investors and others about the true financial position of Enron and, consequently, to artificially inflate the price of Enron's stock and fraudulently maintain Enron's credit rating." P-DB2 (Fastow Decl.) at ¶ 4.

337.   Several officers ultimately entered into plea agreements and/or were convicted for their roles in perpetrating Enron's massive fraud. *See* D17 (Glisan Plea Agreement stating he was the treasurer at Enron and participated in a conspiracy to artificially manipulate Enron's financial statements); D32 (Fastow Plea Agreement detailing his participation in Enron's fraud and pleading guilty to two counts of wire and securities fraud); D34 (Causey Plea Agreement detailing his participation in Enron's fraud); P-DB224 (Cooperation Agreement of Michael Kopper, an Enron officer who reported to Fastow, pleading guilty to charges of money laundering and fraud) at 1-2; *see also U.S. v. Jeffrey Skilling and Kenneth Lay*, No. CR-H-04-25 (S.D. Tex.).

338.   With respect to Deutsche Bank's role in the Enron fraud, Enron's former Chief Financial Officer, Andrew Fastow, confirmed, under oath, the following facts:

> 7. ...My views are based on my experience as an Enron executive and my personal interaction with bankers, accountants, lawyers, and others. I and others, including certain of Enron banks worked together, intentionally and knowingly, to engage in transactions that would affect Enron's financial statements. I believe that an investor would have had great difficulty understanding the true financial condition of Enron due to certain transaction structures and how they were disclosed....
>
> *   *   *

57. Deutsche was one of Enron's Tier-1 Banks that designed and engaged in a number of transactions between 1997 and 2001 that had the effect of increasing Enron's reported earnings and funds flows from operations. I believe, based on the level of sophistication of its bankers and my conversations with them, that Deutsche understood the transaction structures would materially impact Enron's financial statements. Deutsche's Paul Cambridge, the bank's relationship manager for Enron, responded to my concern that Deutsche's fees were excessive, saying that the fees were cheap considering all the earnings we're generating for you.

58. Mike Jakubik, head of Deutsche's Finance Group, came to Enron from Bankers Trust. He worked at Enron for more than one year in the Global Finance Group. In that capacity, Mr. Jakubik attended finance meetings on a regular basis and discussed Enron's financial objectives. Before returning to BT/DB, he structured finance transactions that had a material impact upon Enron's reported financials and I discussed with him that Enron was not as healthy as the financial statements led investors to believe.

## A.    The Tax Transactions.

59. Enron used certain Deutsche structured-tax transactions in order to increase its reported earnings. I believe that these transactions were not business transactions that happened to have a tax benefit. Rather, it is my understanding that the tax transactions were done to create tax and accounting benefits. I believe that Enron would not have done the transactions had it not been for the tax and accounting benefits that they created. The benefits were twofold: First, the transactions reduced taxable income, which had the effect of increasing after-tax earnings-per-share. Second, the transactions were structured in a manner that allowed Enron to report future anticipated tax deductions as current-period, pre-tax income.

60. Deutsche sold certain tax structures to Enron, which were handled through Mr. Causey's Accounting group. I recall the bank communicating to us that it only did these tax deals with a few companies and that it expected to get paid well for these structures because, to avoid attracting IRS attention, they could only do the transactions a few times. Mr. Causey reported on these deals at some of the management-committee meetings that I attended. I recall that there were several Tax Transactions, including some with Deutsche, that lowered our taxable income or that increased pre-tax earnings. The Accounting department was credited within Enron for increasing reported earnings for Enron.

61. I understood from Mr. Causey's presentations that the Deutsche tax structures required Enron to represent it was in certain businesses that it really was not in, including third-party real-estate management and investing in corporate bonds.

## B.    Sutton Bridge.

62. Sutton Bridge was a structured financing that involved transfers of shares in an English power plant from Enron to an SPE. I recall Mr. Skilling joking that Enron

sold the Sutton Bridge power plant three times and booked profit all three times. Jeff McMahon and Deutsche designed the structure so that Deutsche would have little, if any, ownership risk. I recall that we accounted for each of these transfers as a true sale, but that Mr. McMahon claimed the de minimis risk transfers as one of his largest accomplishments for the year.

**C.     LJM2**.

63. As I've stated in this declaration, Enron used LJM2 to manage its balance sheet and earnings. Deutsche was a member of the LJM2 Advisory Committee, which was created at the insistence of Andersen. The Auditors required that the Advisory Committee have certain significant powers to ensure that I did not fully control LJM2. For instance, Andersen insisted that the Committee members have the power to remove me as General Partner without cause. The Committee had to be informed 10 days in advance of transactions that LJM2 entered into with Enron. With the exception of the initial investments, I believe that LJM2 provided members of the LJM2 Advisory Committee with the necessary information as required by Andersen. The members of the Committee were informed that Andersen had insisted on its creation. I believe they understood their obligations.

P-DB2 (Fastow Decl.) ¶¶ 7, 57-63.

339.     Fastow testified that someone looking at Enron's financial statements would have a false impression of the company. P-DB70 (Fastow Dep.) at 944:11-945:1. He also testified that "certain of the banks that intentionally and knowingly engaged in transactions that would affect Enron's financial statements" included Deutsche Bank. *Id*. at 945:17-22. Enron could not have perpetrated its massive fraud alone—it required help from, among others, Deutsche Bank. *See generally* P-DB2 (Fastow Decl.); P-DB71 (Cambridge Dep.) at 97:5-103:10 (discussing significance of tier 1 status, including that bank would use its balance sheet in whatever way it could to assist Enron, including by lending money, assisting in trading, and by stepping into transactions involving Enron and other banks).

## X.     ENRON FRAUD AND COLLAPSE

### A.     Financial Statements 1997–2001.

340.     Enron filed financial statements filed with the Securities and Exchange Commission ("SEC") for 1997 through 2001. *See* P-DB42-A (Form 10-Q filed Aug. 14, 1997); P-

DB42-B (Form 10-Q filed Nov. 14, 1997); P-DB42-C (Form 10-K for 1997, filed March 31, 1998) at EX.000000006; P-DB42-D (Form 10-Q filed May 14, 1998) at EX.000000007; P-DB42-E (Form 10-Q filed Aug. 13, 1998) at EX.000000008; P-DB42-F (Form 10-Q filed November 16, 1998) EX.000000009; P-DB42-G (Form 10-K filed March 29, 1999) at EX.000000010; P-DB42-H (Form 10-Q filed May 13, 1999) at EX.000000011; P-DB42-I (Form 10-Q filed Aug. 13, 1999) at EX.000000012; P-DB42-J (Form 10-Q filed November 15, 1999) at EX.000000013; D36 (Form 10-K for 1999, filed March 30, 2000); P-DB42-K (Form 10-Q filed May 12, 2000) at EX.000000015; P-DB42-L (Form 10-Q filed Aug. 14, 2000) at EX.000000016; P-DB42-M (Form 10-Q filed Nov. 14, 2000) at EX.000000017; D15 (Form 10-K for 2000, filed April 2, 2001); P-DB42-N (Form 10-Q filed May 13, 2001) at EX.000000019; P-DB42-O (Form 10-Q filed Aug. 14, 2001) at EX.000000020; P-DB42-P (Form 8-K Current Rpt. dated Nov. 8, 2001) at EX000000077.

341.    Those statements did not disclose Enron's significant off-balance sheet transactions and hidden liabilities. *See generally id*.

342.    Footnote 1 to the 2000 financial statements of Enron, as set forth on Form 10-K represented that the financial statements were in conformity with GAAP as to the consolidation in the financial statements of all subsidiaries controlled by Enron. D15 at 64.

343.    In its 2000 Form 10-K, Enron represented that its—

senior unsecured long-term debt is currently rated BBB+ by Standard & Poor's Corporation and Fitch IBCA and Baa1 by Moody's Investor Service. Enron's continued investment grade status is critical to the success of its wholesale businesses as well as its ability to maintain adequate liquidity. Enron's management believes it will be able to maintain its credit rating.

*Id*. at 47.

344.    In October 2001, Plaintiffs invested over $100 million in 7% Exchangeable Notes (the "7% Notes") and Zero Coupon Exchangeable Notes (the "Zero Notes") both of which were

issued by Enron Corporation ("Enron"). D234 (Silvercreek Zero Notes Trading Summary); D268 (Silvercreek 7% Notes trading history); *see also* D270 (7% Notes Prospectus dated Aug. 10, 1999); P-DB43 (7% Notes registration statement) at SlvC000106; D211 (Zero Notes Offering Memorandum); D216 (Zero Notes Prospectus dated July 18, 2001).

345.    On May 14, 1999, Enron filed with the SEC its financial statements for the first quarter of 1999 on Form 10-Q for the period ended March 31, 1999. P-DB42-H (Form 10-Q filed May 1, 1999) at EX.000000011. This financial statement, as well as Enron's Annual Report on Form 10-K for the year ended December 31, 1998, were incorporated by reference into the registration statement and prospectus for the 7% Notes. P-DB43 (7% Notes registration statement) at SlvC000163.

346.    The offering memorandum for the Zero Notes incorporated Enron's 1999 10-K. D211 at 4 (Zero Notes Offering Memorandum). Neither the financial statements, the 1999 10-K, nor the offering memorandum for the Zero Notes (which incorporated the 1999 10-K) disclosed the significant off-balance-sheet transactions and hidden liabilities described herein. *See generally id*. and D36 (Form 10-K for 1999, filed March 30, 2000).

347.    The 2000 10-K was later incorporated by reference into the registration statement and prospectus for the Zero Notes. D211 at 4 (Zero Notes Offering Memorandum) ("We also incorporate by reference all documents filed pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 after the date of this offering memorandum and prior to the termination of this offering."); D216 at SlvC001168 (Zero Notes Prospectus dated July 18, 2001) (same). The initial purchasers of the Zero Notes in stage one of the offering included Deutsche Bank. D211 at 45. Resellers in stage two of the offering included Deutsche Bank. D218 (June 1, 2001 Registration Stmt.) at 41: D216 (July 18, 2001 Zero Notes Prospectus) at SlvC001249-50.

Neither the financial statements, the 10-K, the offering memorandum, registration statement, nor the prospectus for the Zero Notes disclosed the significant off-balance-sheet transactions and hidden obligations described herein. *See generally* D15, D36, D211, D216.

348.    On May 15, 2001, Enron filed with the SEC its financial statements for the first quarter of 2001 on Form 10-Q for the period ended March 31, 2001. P-DB42-H (Form 10-Q for the period ended March 31, 1999, filed May 14, 1999). These financial statements were later incorporated by reference into the registration statement and prospectus for the Zero Notes. D211 at 4 (Zero Notes Offering Memorandum) ("We also incorporate by reference all documents filed pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 after the date of this offering memorandum and prior to the termination of this offering."); D216 at SlvC001168 (Zero Notes Prospectus dated July 18, 2001) (same). Neither the registration statement nor the prospectus for the Zero Notes disclosed the nature and magnitude of the off-balance-sheet transactions and liabilities of Enron. *See generally* D211, D216.

## B.    Enron's Financial Restatements.

349.    On October 31, 2001, the SEC began a formal investigation into Enron schemes. P-DB44 (October 31, 2001 PRNewsire *SEC Changes Inquiry to Formal Investigation*) at DBM029442.

350.    On November 1, 2001, Enron issued a press release stating:

ENRON SECURES COMMITMENTS FOR ADDITIONAL $1 BILLION IN FINANCING

Enron Corp. [] announced today that JPMorgan (the investment banking arm of JPMorgan Chase & Co.) and Salomon Smith Barney Inc. (the investment banking arm of Citigroup Inc.) as co-arrangers have executed commitment letters to provide $1 billion of secured credit lines. … The proceeds will be used to supplement short-term liquidity and to refinance maturing obligations.…

"With more than $1 billion in cash currently on our balance sheet, this additional credit capacity will further solidify Enron's standing as the leading market maker

in wholesale energy markets," said Kenneth L. Lay, Enron chairman and CEO. "We very much appreciate the support of two of our longstanding banking partners, JPMorgan and Citigroup."

"This is yet another step in our efforts to enhance market and investor confidence," said Jeffrey McMahon, Enron's chief financial officer. "We are moving aggressively to strengthen our balance sheet and maintain our investment grade credit rating."

P-DB45 at DBG115528.

351.    On November 8, 2001, Enron announced that it would be restating its audited annual financial statements for 1997, 1998, 1999, and 2000, and its quarterly financial statements for the first two quarters of 2001. P-DB46 (Enron Press Release, *Enron Provides Additional Information about Related Party and Off-Balance Sheet Transactions*) at DBG115531. Also on November 8, 2001, Enron filed a Form 8-K with the SEC, signed by Richard Causey as Enron's Executive Vice President and Chief Accounting Officer, which included its restated financials for 1997 through 2001, and disclosed partial information concerning its off-book, related party transactions. P-DB42-P (Form 8-K Current Rpt. dated Nov. 8, 2001) at 1, 17.

352.    In this filing, Enron stated that:

a.      It had been forced to restate its annual and quarterly financial statements for the years ended December 31, 1997 through December 31, 2000 and its quarterly financial statements for the periods ended March 31, 2001 and June 30, 2001;

b.      The quarterly and annual financial statements from 1997 through 2001 "should not be relied upon";

c.      The restatement of prior period financial statements would reflect and include: (1) a $1.2 billion reduction to shareholders' equity to be booked in the third quarter of 2001, related to a transaction that had been previously reported as an increase in assets and shareholders' equity; and (2) the consolidation of the financial statements of three entities which engaged in related party transactions with Enron and/or in which Enron had an ownership interest, as required under GAAP;

d.      That a Special Committee had been created, headed by a newly appointed

director, to review the related party, off-book transactions;

e.    That Enron's Chief Financial Officer Andrew Fastow ran related party limited partnerships, with which Enron engaged in off-book transactions, and for which Fastow received management fees of at least $30 million;

f.    The financial statements and financial activities of Chewco and JEDI should have been consolidated with the financial statements of Enron beginning in November 1997; and

g.    The financial statements and financial activities of a LJM1 subsidiary should have been consolidated with the financial statements of Enron beginning in 1999.

P-DB42-P (Form 8-K Current Rpt. dated Nov. 8, 2001) at 2-4, 7-8.

353.    Enron's annual financials were summarily restated as follows:

| RESTATEMENTS (Overstatements in Red/Understatements in Black) | | | | | | |
|---|---|---|---|---|---|---|
| | 1997 | 1998 | 1999 | 2000 | Q1 01 | Q2 01 |
| Net Income | $28,000,000 | $133,000,000 | $248,000,000 | $99,000,000 | $6 | $0 |
| Total Assets | $451,000,000 | $160,000,000 | $41,000,000 | $333,000,000 | $944,000,000 | $944,000,000 |
| Debt | $711,000,000 | $561,000,000 | $685,000,000 | $628,000,000 | $0 | $0 |
| Equity | $258,000,000 | $391,000,000 | $710,000,000 | $926,000,000 | $934,000,000 | $934,000,000 |

*See* P-DB9 (Regan Expert Rpt.) at 130.

354.    As Plaintiffs' expert Paul Regan has opined,

In general, a financial restatement results from the correction of errors contained in previously issued financial statements. Accounting Principles Board No. 20 ("APB") paragraph 13, defines "errors" in financial statements as resulting from, "Mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared." APB 20 is only applicable if a change or correction has a material effect on net income of the current period before extraordinary items, net income of the current period before the effect of the change, or on the net trend of earnings.

P-DB9 (Regan Expert Rpt.) at 6 ¶ 7.

355.    The restatement of its financial statements in November of 2001 constitutes an admission that the representations made in the original financial statements, including the asserted

compliance of those financial statements with GAAP, were materially false and misleading when made—and those material misstatements extend to any documents into which the misstated Reports were incorporated, including the offering memoranda. *See* P-DB9 (Regan Expert Rpt.) at 6, 128.

356.    At the time of the restatements in November of 2001, Enron had disclosed debt on its balance sheet of approximately $13 billion. P-DB42-P (Form 8-K Current Rpt. filed Nov. 8, 2001) at 4 ($12,812,000,000 "debt as reported" second quarter 2001); P-DB28 (JCT Report) at 107.

357.    Deutsche Bank was still recommending that investors purchase Enron securities on November 16, 2001. P-DB47 (November 16, 2001 On the Road to ENE recovery) at DBN0010614.

### C.    Public Statements by Deutsche about Enron in 2001.

358.    Enron and Deutsche Bank each made several statements about Enron's financial condition during the months leading up to Enron's financial collapse. On January 22, 2001, Enron released its financial results for the fourth quarter 2000, reporting earnings of $0.41 per share for the fourth quarter; Deutsche issued an analyst report the following day recommending Enron's bonds presented a "buying opportunity for high grade investors." P-DB218 (Jan. 23, 2001 Deutsche Bank Analyst Rpt.) at DBM-0011314. On March 22, 2001, Enron issued a press release in which it "reaffirmed today that the company continues to be confident with strong business prospects for 2001…recurring earnings of $1.70 to $1.75 per diluted share." P-DB225 (Mar. 22, 2001 Enron Press Release, *Enron Reaffirms Positive Outlook*…). On October 16, 2001, Enron issued its financial results for the quarter ending September 30, 2001. *See* P-DB226 (Oct. 16, 2001 Enron Press Release, *Enron Reports Recurring Third Quarter Earnings*) at 1. Deutsche issued an analyst report that same day, noting that Enron recorded a $1 billion after-tax charge to its third

quarter 2001 earnings due to "non-recurring charges" that "represents a ratings-neutral event that should prove positive for the company's bond spreads going forward." P-DB49 (Oct. 16, 2001 Deutsche Bank Analyst Rpt., 3Q01 results include $1.0 billion write down) at DBN-0006596.

359.   Deutsche Bank analysts advised issued a steady stream of upbeat Reports recommending the purchase of Enron securities and omitting material, adverse information about Enron. P-DB47 (Nov. 16, 2001, *On the Road to ENE recovery*) at DBN0010614; P-DB48 (Oct. 26, 2001, *All Eyes on Enron*) at DBG084600; P-DB49 (Oct. 16, 2001, *3Q01 results include $1.0 billion write down*) at DBN0006596; P-DB50 (Oct. 18, 1999, *3Q Earnings showed visible effects of long-term growth strategy*) at DBN178062; P-DB51 (May 30, 2000, *Maintaining Buy Rating, Credit Update*) at DBG041031; P-DB52 (Oct. 3, 2000, *Maintaining Buy Rating*) at DBM004276; P-DB53 (Feb. 13, 2001 ENE credit conference highlights: *Sustainable growth, EPS Focus, capital efficiency, risk conscious, 2-A ratings goal*) at DBN0059575; P-DB54 (Mar. 30, 2001 *Enron Corp. Confirms 2001 Guidance in wake of headline flurry and share decline*) at DBG084553. The October 26th report referred to The Wall Street Journal's reporting of Enron as having a "malevolent spin." P-DB48 at DBG084600. A November 16, 2001 Report by Deutsche Bank analysts Paul Tice and Stephen Levine was headlined "On the road to ENE recovery" and stated "The outstanding corporate and structured bonds of Enron Corp (ENE) continue on the road to price recovery this past week…." P-DB47 at DBN0010614. The Report did not even mention Enron's 8-K filing where Enron had already announced that it intended to restate earnings and reduce shareholder equity by $1.2 billion. *Id*. Deutsche Bank's analysts assured investors that they were comfortable "that ENE is not a near-term bankruptcy candidate." *Id*.

**D.    Enron's Financial Collapse.**

**1.    The Collapse of the Merger with Dynegy.**

360.   On November 9, 2001, Enron announced the signing of a definitive merger

agreement with its competitor Dynegy. P-DB56 (Nov. 9, 2001 Dynegy and Enron Announce Merger Agreement) at DBG101952.

361.    On November 27, 2001, it was reported that Dynegy may renegotiate the terms, including a buyout of Enron for as little as $6.00 per share. P-DB57 at DBN232914.

362.    On November 28, 2001, Dynegy announced the termination of the merger agreement with Enron, and S&P downgraded Enron's debt securities to "junk bond" status (*i.e.*, below investment grade). P-DB58 (November 11, 2001, Dynegy terminates Merger with Enron) at DBG022839; P-DB59 (November 28, 2001, Enron Announces Notification by Dynegy of Merger Termination) at DBG101946. After these announcements, the value of Enron's securities, both debt and equity, collapsed. P-DB60 at DBG090912; P-DB61 at DBG090928; P-DB62 at DBG02254.

### 2.    Enron's Chapter 11 Filing.

363.    On December 2, 2001, Enron filed Chapter 11 bankruptcy, constituting what was then the largest bankruptcy in U.S. history. D261 (December 1, 2001 Article on Enron bankruptcy filing); *In re: Enron Corp.*, No. 01-16034(AJG) before the United States Bankruptcy Court for the Southern District of New York. In addition to Enron's November 2001 restatements, Stephen F. Cooper, Chief Restructuring Officer for Enron, confirmed in an April 2002 court filing stated for Enron:

> [C]urrent management of the Company has not undertaken, and does not intend to undertake, a comprehensive review of accounting adjustments, including asset impairments and write-downs, relating to previously reported financial information, and has not prepared a consolidated balance sheet of the Company as of December 31, 2001 prepared in accordance with generally accepted accounting principles. However, current management believes that, if such a review were conducted and balance sheet prepared, a significant write-down of assets on such balance sheet would be required, which current management estimates would be approximately $14 billion. …
>
> [A] material portion of such estimated amount would relate to valuations of several

assets the historical carrying value of which current management believes may have been overstated due to possible accounting errors or irregularities.

In addition to the aforesaid write-down of assets, current management has identified potential downward adjustments on certain price risk management assets and collateral subject to set-off. … [C]urrent management believes that these adjustments could fall in the range of $8 billion – $10 billion.

364.    Although ultimately overturned within a few months, its auditor, Arthur Andersen LLP ("Andersen") was found guilty of criminal violations and was, for all intents and purposes, forced out of business. *See Arthur Andersen, LLP v. United States*, 544 U.S 696 (2005).

365.    After Enron filed for bankruptcy, Enron's equity and debt securities were practically worthless and the 7% Notes were trading at approximately five cents on the dollar. P-DB232 (Morwick Dep.) at 679:25-681:6.

366.    The U.S. Senate Permanent Subcommittee on Investigations reviewed and reported on evidence relating to Enron's fraud in documents titled "The Role of the Financial Institutions in Enron's Collapse." P-DB64 (US Senate Subcommittee "The Role of the Board of Directors in Enron's Collapse" ("PSI Report") at 1. The Court appointed examiner, Neal Batson (the "Examiner") under 11 U.S.C. 1104(c) in Enron's filing in the Bankruptcy Court for the Southern District of New York, to investigate Enron transactions, including the tax transactions and share trusts, and entities involved in those transactions. *See* P-DB65 (Nov. 4, 2001, Neal Batson Final Rpt.) at 19-20. According to the Examiner, "Enron so engineered its reported financial position and results of operations that its financial statements bore little resemblance to its actual financial condition or performance." P-DB65 at 18. "Deutsche Bank had actual knowledge of the wrongful conduct giving rise to" Enron's breaches of fiduciary duty. P-DB19 (Batson DB Rpt) at 2; *see also* P-DB65 (Batson Final Rpt.) at 18 (citing, *inter alia*, Enron's use of six accounting techniques in the year 2000 alone which produced 96% of Enron's reported net income and 105% of its reported

funds flow from operating activities and enabled it to report $10.2 billion of debt rather than $22.1 billion of debt).

## XI.   ENRON TRANSACTIONS.

### A.   Failure to Consolidate Special Purpose Entities in Violation of GAAP.

367.   Enron's financial statements from 1997 through 2001 were materially false and misleading, and therefore had to be restated, primarily because of the improper use of so-called special purpose entities, such as LJM, Chewco and JEDI, to engage in off-book or off-balance-sheet transactions with Enron. P-DB9 (Regan Expert Rpt.) at 5. Enron would purport to "sell" assets to special purpose entities at prices that Enron never could have received in a true arms-length sale, creating the appearance that Enron was generating cash from operations, rather than from financing through non arms-length deals. P-DB6 (Hayes Dep.) (admitting Deutsche's participation in the SPE facility) at 585:2–9. One credit report issued by Deutsche Bank's Calli Hayes and Paul Cambridge regarding the Hawaii 125-0 SPE described the transaction as a place where permissible assets would be "parked" and where Enron could accelerate the sale of those assets on its corporate balance sheet. P-DB66 (June, 2000 Credit Rpt.) at DBB000014. Calli Hayes' job at Deutsche Bank was to assess the credit quality of persons receiving loans from Deutsche, or entering into transactions with Deutsche. P-DB6 (Hayes Dep.) at 35:6–19.

368.   The effect of these SPE and share trust transactions was to artificially inflate Enron's revenue, earnings and cash flow from operations, and improperly exclude billions of dollars of debt from Enron's balance sheet. *See* P-DB2 (Fastow Decl.) ¶¶ 4–7, 49, 62.

### B.   The Raptors.

369.   Another example of Enron's undisclosed off-the-book transactions were purported ''hedging'' transactions known as the Raptor Transactions. P-DB243 (Levitin Expert Rpt.) at 54, 68-69. Four special purpose entities known as Raptor I, Raptor II, Raptor III, and Raptor IV

(collectively, the "Raptors") were created in 2000 to allow Enron to supposedly "hedge" market risk in certain of its investments. *Id.* at 68 and P-DB67 (Powers Report) at 97-98. The Powers Report described them as an improper attempt by Enron to use the value of its own stock to offset losses in its investment portfolio and "a highly complex accounting construct that was destined to collapse." P-DB67 (Powers Report) at 98 and 132. In effect, Enron was using the Raptors to hedge with itself. *Id.* at 97.

370.     The Raptor transactions had a very large impact on Enron's financial statements. P-DB243 (Levitin Expert Rpt.) at 77. The Raptors were funded principally with Enron's own stock (or contracts for the delivery of Enron stock) that was intended to hedge against declines in the value of a large group of Enron's merchant investments. P-DB67 (Powers Report) at 13. LJM2 also invested in the Raptors. *Id.* at 97. As part of the capitalization of these entities, Enron issued common stock in exchange for a note receivable. *Id.* at 125-126. Enron increased notes receivable and shareholders' equity to reflect the transactions. *Id.*

371.     Under GAAP, the note receivable should have been booked as a reduction to shareholders' equity (similar to a shareholder loan) not as an increase in assets and increase in shareholders' equity. *Id.* at 125-126. Accordingly, in violation of GAAP, the financial statements of Enron overstated both notes receivable and shareholders' equity by approximately $172 million in each of Enron's second quarter, third quarter, and year-end financial statements for the year 2000. *Id.* and P-DB243 (Levitin Expert Rpt.) at 68-69.

372.     In the Raptor transactions, Enron and the investment banks created four SPEs and arranged for LJM2 to invest $30 million. P-DB67 (Powers Report) at 128. This investment was deemed to be the "independent equity" necessary to permit the SPEs to qualify for separate accounting treatment, *i.e.*, to not be consolidated with Enron's financials. P-DB9 (Regan Expert

Rpt.) at 127, 131-135, 142-145. Enron guaranteed LJM2 that it would recoup its money and make an additional profit within six months of each SPE's creation. P-DB243 (Levitin Expert Rpt.) at 70, 72. These payments took place as promised, giving LJM2 not only its $30 million but also between $9.5 and $11 million profit on each Raptor deal. P-DB67 (Powers Report) at 100-102, 112-113, and 116-117. According to an October 2000 Report to LJM2 investors, the rates of return on the four Raptor Transactions were 193%, 278%, 2500%, and a projected 125% respectively. *Id.* at 128 and P-DB215 (LJM2 Partnership Mtg.) at DBB010444. In addition, in September 2001, Enron paid LJM2 another $35 million to wind-up the Raptors. P-DB67 (Powers Report) at 127-128.

373.    Enron asserted that it could use these "hedges" to offset growing losses in other investments it would otherwise have to report. *Id.* at 128. In a little over a year Enron hid almost $1 billion in losses through the LJM2 ruse. *Id.* at 132.

374.    The Raptors were not well-planned or executed. P-DB67 (Powers Report) at 157, and 165-166. The assets declined in value, the value of Enron stock and contracts supporting the Raptors' creditworthiness also fell. *Id.* at 98. As a result, there was no economic value to the Raptors. *Id.* at 97. Enron engaged in several schemes to prop up the Raptors, to no avail. *Id.* at 119-125. The last restructuring effort occurred in March 2001 and entailed placing additional Enron shares at risk in exchange for additional notes receivable. *Id.* at 122-125.

375.    Once again, Enron increased notes receivable and shareholders' equity to reflect this transaction. *Id.* 124-126. And once again, under GAAP, the note receivable should have been booked as a reduction to shareholders' equity, not as an increase in assets and increase in shareholders' equity. *Id.* Accordingly, through use of LJM2, Enron financial statements for the first quarter of 2001 overstated both notes receivable and shareholders' equity by $828 million;

this overstatement reached $1 billion by the end of June 2001. *Id.* at 125-126.

376.    According to the U.S. Senate Permanent Subcommittee Report ("PSI"), by the Fall

of 2001, quoting a September 2001 internal Enron memo:

> …Andersen had "changed their opinion of the proper accounting" for the Raptors and no longer supported the capacity of the Raptor SPEs to continue to "hedge" Enron's investment losses.
>
> The result was that, in October at the end of the third quarter of 2001, Enron terminated the Raptor "hedges" and recorded a $710 million charge to earnings and a $1.2 billion reduction in shareholder equity. The earnings charge reflected the investment losses that the Raptors no longer concealed, while the equity reduction reflected an accounting charge that Andersen made after determining that an earlier methodology it had used for the Raptors did not comply with generally accepted accounting principles. (footnotes omitted)

P-DB210 (PSI Report) at 45.

377.    The impact of the Raptors transactions is summarized in the table below:

| Quarter | Income Reported ($ millions) | Income Excluding Raptors Transactions ($ millions) | Impact from Raptors ($ millions) |
|---|---|---|---|
| Sept. 30, 2000 | $364 | $295 | $69 |
| Dec. 31, 2000 | $286 | ($176) | $462 |
| Mar. 31, 2001 | $536 | $281 | $255 |
| June 30, 2001 | $530 | $490 | $40 |
| Sept. 30, 2001* | ($210) | ($461) | $251 |
| **Total** | **$1,506** | **$429** | **$1,077** |

*See* P-DB67 (Powers Report) at 133 ("Third quarter 2001 figures exclude the $710 million pre-

tax charge to earnings related to the termination of the Raptors.").

**C.    Tax Transactions Briefly**.

378.    Deutsche Bank proposed the Tax Transactions to Enron. P-DB70 (Fastow Dep.)

at 959:18-21. In looking at the Enron's tax strategies, the Joint Committee of Taxation ("JCT

Report") stated the following:

As Enron's management realized that tax motivated transactions could generate financial accounting benefits, Enron looked to its tax department to devise transactions that increased financial accounting income. In effect, the tax department was converted into an Enron business unit, complete with annual revenue targets. The tax department, in consultation with outside experts, then designed transactions to meet or approximate the technical requirements of tax provisions with the primary purpose of manufacturing financial statement income. The slogan 'Show Me the Money!' exemplified this effort.

P-DB28 (JCT Report) at 21.

379.    As former Enron managing director and general counsel Robert J. Hermann, told The Washington Post in May 2002, "In 2000 alone, $296 million, or 30 percent of the profit that Enron recorded in its annual report to shareholders, came from these one-time tax-saving strategies – rather than the company's energy supply and trading businesses…." P-DB68 (May 22, 2002, Enron's Other Strategy 296 Million Tax Strategy) at 1.

380.    Enron completed 11 tax deals over seven years, from 1995 to 2001. P-DB28 (JCT Report) at 107. The idea for the transactions were brought to Enron's Bob Hermann or Davis Maxey by promoters comprised of a select group of investment banks, law firms and accounting firms. P-DB19 (Batson DB Rpt.) at 1, 15-17.

381.    Enron made clear that the accounting benefits were the key to all of its tax transactions. P-DB24 (Hermann Bankr. Dep.) at 45:24-46:18.

382.    Enron's income from tax transactions through 2001 was over $650 million and projected to total over $2 billion through the life of the projects. P-DB28 (JCT Report) at 107. Enron deliberately and aggressively engaged in transactions that had little or no business purpose in order to obtain favorable tax and accounting treatment. *Id.* at 16. A bona fide business purpose, that is, a purpose other than to secure favorable tax and accounting treatment, was either lacking or tenuous in many of the tax transactions and clearly was not the impetus for the transactions. *Id.* at 21. Documents reviewed by the Joint Committee on Taxation demonstrated no purpose for the

transaction other than to facilitate the transfer of Federal income tax benefits, and the resulting financial accounting benefits to Enron. *Id.* at 145-146.

383.     Deutsche Bank's Cambridge could think of no other non-tax or business purposes for Enron engaging in the transactions. P-DB71 (Cambridge Dep.) at 434:21-436:9, 438:16-439:6. The Deutsche Bank-designed tax transactions had little to no economic substance, were unrelated to Enron's business activities, created one-time phantom profits and generated no real income and little or no cash for Enron. P-DB9 (Regan Expert Rpt.) at 74. The tax transactions reviewed by Silvercreek's experts resulted in material overstatement of Enron's business operations and mislead users of Enron's financial statements. *Id.*

384.     In his testimony to the Senate Permanent Subcommittee on Investigations, the Chief Investigator said:

> Numerous major financial institutions, both here and abroad, engaged in extensive and complex financial transactions with Enron. The evidence we reviewed showed that, in some cases, the financial institutions were aware that Enron was using questionable accounting. Some financial institutions not only knew, they actively aided Enron in return for fees and favorable consideration in other business dealings. The evidence indicates that Enron would not have been able to engage in the extent of the accounting deceptions it did, involving billions of dollars, were it not for the active participation of major financial institutions willing to go along with and even expand upon Enron's activities. **The evidence also indicates that some of these financial institutions knowingly allowed investors to rely on Enron financial statements that they knew or should have known were misleading**.

P-DB69 (July 23, 2002 Robert Roach Testimony) at 1 (emphasis added).

## XII.   DEUTSCHE BANK'S INVOLVEMENT.

**A.     Deutsche Bank and Enron shared a close Relationship, conspired with each other to manufacture tax benefits, and shared non-public information.**

**1.     Deutsche Bank was a Tier 1 Enron bank—and received huge fees for its role in helping Enron perpetuate its fraud.**

385.     Enron considered Deutsche Bank a "Tier 1" bank, and before its acquisition by

Deutsche Bank, Bankers Trust also was rated a "Tier 1" bank. P-DB71 (Cambridge Dep.) at 96:7-19, 100:14-101:5. Paul Cambridge and Fastow testified that Deutsche was a "Tier 1" bank to Enron for some, if not all, of the time that Fastow served as CFO and head of Enron's global finance division. P-DB70 (Fastow Dep.) at 275:15-23; P-DB71 (Cambridge Dep.) at 100:14-101:21.

386.    Deutsche Bank was very important to Enron. Enron consistently ranked Deutsche Bank as a Tier 1 bank. P-DB2 (Fastow Decl.) at ¶ 57.

387.    Being a Tier 1 Enron Bank meant Deutsche would use its balance sheet in whatever way Deutsche could to assist Enron. P-DB71 (Cambridge Dep.) at 97:5-100:12. That included lending money, assisting in trading or other instruments, and that Deutsche was expected to step into transactions involving Enron and other banks. In return Deutsche would be paid huge fees. *Id*. at 97:5-100:12;103:3-10 (Enron was Deutsche largest worldwide client in 2000). By November of 2000 George Tyson and Marcus Tarkington exchanged an email summing up Deutsche's relationship with Enron as follows:

> As a tier 1 bank, we are frequently brought into unique and lucrative transactions for Enron, such as the highly successful Marlin and Osprey trust Transactions that we developed with DLJ . . . . To maintain this position with Enron, we need to demonstrate that we execute transactions quickly when necessary.
> *       *       *
> During the past four years, we have earned gross advisory, underwriting and structuring fees as follows: $10 million in 1997, $20 million in 1998, $7 million in 1999, and $2 million plus annual tax benefits resulting from a structured Tax Transaction of $50 million in 2000.

P-DB73 (November 29, 2000 Email and Document re Enron Relationship) at DBG079774.

388.    From 1997 until Enron filed for bankruptcy, Deutsche Bank charged Enron $45 million in fees associated with the Tax Transactions, approximately $11 million in fees associated with other lending and structured finance and $18 million in fees associated with public and private securities offerings. P-DB9 (Regan Rpt.) at 227. Deutsche's payment for its Tax Transactions was

subject to forfeiture if Enron did not receive the "expected accounting reporting treatment" desired due to an accounting rule or law change. P-DB16 (McGuire Dep.) at 237:7-239:17; P-DB191 (Deutsche Bank Engagement Letter) at DBG 024674.

389.    As stated by Tom Finley to Deutsche Bank Chairman Frank Newman and Vivian Moy touting the value of closing the Steele transaction to Deutsche Bank, "[o]verall, we believe the [Tax] Transaction has significantly enhanced [Deutsche Bank's] relationship as a major investment bank for Enron." P-DB72 (1997 Finley memo to Newman) at DBF031849.

390.    The development and implementation of the tax transactions played a notable and positive role in Deutsche Bank being considered a tier 1 bank for Enron. P-DB71 (Cambridge Dep.) at 445:15-446:3.

391.    Deutsche was an initial purchaser of Enron's $750 million in senior notes in the 1999 Yosemite transaction. D176 at i, CITINEWBY00007068. Deutsche was also the joint book running manager for the following transactions:

- the 1998 Marlin I transaction ($1.024 billion in senior notes);

- the 1999 Osprey I offering ($1.4 billion in senior notes);

- the 1999 Osprey II offering ($750 million/ €350 million senior notes);

- the 2001 Marlin II transaction ($475 million/€515 million in senior notes).

P-DB27 (Deutsche Bank Responses to Examiner) at 10-11, ¶¶ (i), (k)

392.    Deutsche was active in trading Marlin and Osprey notes on the secondary market. P-DB241 (Rubin Dep.) at 62:16-63:13, 82:14-83:3; P-DB139 (Orchant Dep.) at 168:20-169:8; P-DB134 (Marlin Water Trust) at DBK152867; P-DB135 (Marlin Trust II) at DBK160304; P-DB27 (Deutsche Bank Responses to Letter Requests) at 10-11.

393.    As one of Enron's Tier 1 banks, Deutsche Bank participated in a number of

different transactions with Enron – ranging from traditional commercial lending to participation in debt and equity offerings, as well as structured financings through the Tax Transactions. P-DB2 (Fastow Decl.) ¶¶ 57, 59, 63. Deutsche Bank knew that it was engaged in fierce competition for Enron business with other investment banks. P-DB138 (Jakubik Bankr. Dep.) at 46:20-47:2.

### 2.      Deutsche maintained a close relationship with Enron.

394.    Fastow confirmed he had direct dealings with Deutsche Bank. According to Fastow, Deutsche Bank had a close relationship with Enron. P-DB2 (Fastow Decl.) ¶ 57. Paul Cambridge was Deutsche Bank's senior relationship manager for Enron, meaning he was the person "known through the [Deutsche Bank] organization" and people would go to him "if they had a particular product or an idea they wanted to market to the client" and he was also "responsible for talking to the client, understanding what their financial objectives were, figuring out a strategy to deliver the bank's products into that strategy -- or set of objectives." P-DB71 (Cambridge Dep.) at 40:24-41:13. Fastow talked with Cambridge reasonably frequently, at least once a month. P-DB70 (Fastow Dep.) at 41:6-18; *see also* P-DB71 (Cambridge Dep.) at 513:6-24 (Cambridge met regularly with Enron executives, had dinners with and met with Fastow, and spoke with him at least two to three times a quarter).

395.    On average, Cambridge "talked to somebody at Enron, either personally in meetings or on the telephone, two to three times a week," though "clearly when we're in the middle of a transaction, the contact level would go through the roof." P-DB71 (Cambridge Dep.) at 563:22-564:6.

396.    Cambridge noted in his sworn statement, the access Deutsche Bank had to senior Enron executives (and at least two Board members) enabled it to understand "the facts behind the numbers" with respect to Enron's financial reporting. P-DB223 (Cambridge Bankr. Dep.) at 124:7-125:12; *see also* P-DB71 (Cambridge Dep.) at 465:22-467:9; P-DB176 at DBB008673.

Cambridge admitted that in their periodic meetings with Enron where he sought clarifying information on Enron's books, he could have received information that was unavailable to the public. P-DB71 (Cambridge Dep.) at 465:22-466:25. Cambridge testified "[i]t is quite possible that information I may have received would create the situation where I would be considered an insider [at Enron], yes." *Id.* at 532:19-25; *see also* P-DB223 (Cambridge Bankr. Dep.) at 129:15-23.

397.     Fastow also knew Mike Jakubik, who left Bankers Trust to join Enron's global finance division when Jeff McMahon recruited Jakubik to Enron. P-DB70 (Fastow Dep.) at 49:17-50:4. Cambridge knew Michael Jakubik well—Jakubik had been at Bankers Trust, spent time at Enron, and was then recruited back to Bankers Trust by Cambridge. P-DB71 (Cambridge Dep.) at 563:8-17. While Jakubik was at Enron, Cambridge "had full access" to him. *Id.* at 563:18-21. Cambridge was also close friends with Pug Winokur, who was Cambridge's primary contact on the Enron board. P-DB70 (Fastow Dep.) at 958:18-959:17; P-DB71 (Cambridge Dep.) at 491:14-19. Yves DeBalman, a senior Deutsche manager, went to college with Jeff Skilling. *Id.* at 528:14-529:7.

398.     Deutsche Bank's top officials had frequent communications with Enron's executives about Enron's business and financial situation. Cambridge testified that he did as much as he could to keep current with respect to Enron's financial condition. P-DB71 (Cambridge Dep.) at 465:2-21. Cambridge stated that he had access to members of Enron's management from whom he could, "[hold] individual meetings with them where we had questions with regard to their financial statements, and during the course of [the] week to week dialogue with the company, [he] would have the ability where [he] saw or read something which [he] felt needed -- to the extent [he] could get it -- further explanation, [he] could call the company and ask for that." *Id.*

399.     Cambridge socialized "a lot more often" with Ben Glisan and Jeffrey McMahon,

had dinners with them frequently, and socialized with Paul Chivers who was in London. *Id*. at 527:18-528:8. Cambridge and other "Tier 1" Enron bankers went to a social event hosted by Enron in Las Vegas "just to be with management and socialize." *Id.* at 513:25-514:24. Deutsche Bank's contacts with Enron were so extensive that Deutsche Bank could and did set up meetings with Enron officers to discuss "the facts behind the numbers" in Enron's financial statements. *Id*. at 465:22-466:25, 532:19-25; *see also* P-DB177 (Cambridge Email re Update on Project Valhalla) at DEU006682 ("I am closest to Andy Fastow CFO, Ben Glisan the newly announced Treasurer, Jeff McMahon (the exiting Treasurer…Paul Chivers, Treasurer Enron Europe and Mike Jakubik, CFO Enron North America….").

400.     In roughly September 1999, Deutsche was invited, through Paul Cambridge, to join in and commit to invest $10 million in Fastow's LJM2 entity. P-DB71 (Cambridge Dep.) at 306:14-24; P-DB75 (Fastow Ltr. to Cambridge re LJM2 Co-Investment) at AB000550122. Cambridge knew Fastow was going to be financially benefitted from sales between Enron and LJM2. P-DB71 (Cambridge Dep.) at 299:21-302:6. Returns on the LJM2 investment were suggested to be 30 to 40%. *Id.* at 311:17-25, 312:13-17. Due to its close ties to Enron, Deutsche also was given a designee on the LJM2 Advisory Committee. P-DB70 (Fastow Dep.) at 286:13-24.

### 3.     Deutsche knew non-public information about Enron's true financial condition.

401.     Deutsche Bank Credit Officer Calli Hayes testified that, from the point in time she was a credit officer for Enron she had a practice of reviewing quarterly and annual Reports, and that process included speaking directly to someone within Enron. P-DB221 (Hayes Bankr. Dep.) at 79:16-80:9 ("we might have had discussions with people at the company, like a Rick Buy or someone else, to understand some other aspects of their business away from the financials, for

example, the trading book"). One issue she focused on in a face-to-face meeting with Enron executives was the extent of Enron's dependency on trading activity—the volume of trading activity was increasing but margins were decreasing. *Id*. at 186:13-23. Ms. Hayes testified that she was not able to discern—from her review of Enron's financial statements, the extent of Enron's off-balance sheet obligations. *Id*. at 75:5-8. To gather this information, she asked Paul Cambridge—she would talk to him, and they would talk to Enron. *Id*. at 75:9-13. Her focus on this went back to 1999 or 2000. *Id*. at 74:7-75:23. Calli Hayes also met privately with Enron executives Tim DeSpain, Rick Buy (a former Deutsche employee and subsequent Enron officer) and Ben Glisan for an explanation of Enron's financials. *Id*. at 76:10-77:3, 79:23-81:10.

402.    In his sworn statement, Cambridge indicated that one of the key objectives of having private meetings with Enron was to enable Deutsche Bank to determine Enron's total debt in one form or another in order to assess whether Enron's financial reporting "reflected reality." P-DB223 (Cambridge Bankr. Dep.) at 162:20-163:5. Deutsche Bank met with Enron senior management to discuss Enron's 2000 annual report; Deutsche Bank's objective was to ascertain the extent to which sales of merchant assets to SPEs contributed to Enron's reported cash flow from operating activities. *Id*. at 74:7-77:18.

403.    In his June 4, 2001 email to Enron's Greg Caudell, Marcus Tarkington of Deutsche Bank, noted that they needed a meeting with Enron to discuss items in "Enron financial statements." P-DB76 at DBG087165. Specifically, Deutsche Bank was concerned about the "Comparison of 9/30/00 and 12/31/00 Cash Flow Statements" seeing that "Cash from operations was [$100M] at 9/30 and [$4,779M] at 12/31." P-DB78 at DBG078063.

404.    Calli Hayes indicated that Enron consistently reported off-balance-sheet obligations of $9 billion to $10 billion to Deutsche Bank during these meetings. P-DB6 (Hayes

Dep.) at 412:11-413:9.

405.    Hayes testified that she could not recall any companies other than Enron that recognized pretax income as a result of future tax deductions. *Id*. at 474:7-15. Hayes testified that she could not recall ever seeing a disclosure that Enron recognized pretax income as a result of future tax deductions. *Id*. at 471:7-477:11.

406.    In his sworn statement, Paul Cambridge confirmed that Deutsche Bank was aware of its own work for Enron in structuring transactions for "balance sheet management" purposes, including liquidating assets Enron no longer wished to carry on its balance sheet, moving debt off the balance sheet, and improving Enron's accounting ratios. P-DB223 (Cambridge Bankr. Dep.) at 69:10-71:14. Osprey and Marlin are examples of Deutsche Bank helping Enron manage its balance sheet through removal or reduction in Enron's debt. *Id*. at 71:10-23. Deutsche was aware that Enron engaged in other structured transactions such as prepay transactions, though it did not structure a prepaid contract for Enron that closed. *Id*. at 79:2-12. Fastow described Marlin as "a structured-finance transaction that had the intent of understating Enron's debt." P-DB70 (Fastow Dep.) at 952:2-6.

407.    Cambridge testified that other than for Enron's prepay transactions, Deutsche Bank generally knew what structured deals were in the market and how those transactions were being reported in the financials. P-DB223 (Cambridge Bankr. Dep.) at 161:17-162:19 ("We, on a fairly frequent basis, would have discussions internally about what our best estimate was of their off-balance sheet debt and as far as possible, would try to confirm that with the company. Usually verbally. . . . So, both from the Enron presentations and our own knowledge, were able, I think, to get fairly close to that and we would from, time to time, talk to Enron and say does this look right."). The amount of off-balance sheet debt at Enron was important to Deutsche because it goes

to Enron's creditworthiness. *Id*. at 162:20-23. Fastow testified in his deposition that he believed, "based on conversations with certain bankers, that they knew that the prepays and some of the share-trust transactions created the false appearance of funds flow," and that one of those banks was Deutsche Bank. P-DB70 (Fastow Dep.) at 942:14-943:1, 943:23-944:2.

**B.** **Deutsche Bank actively sought to reduce its exposure to Enron while its analysts continued to issue "buy" recommendations**.

408.   The Amended Minutes of Deutsche Bank's Underwriting Committee meeting on October 6, 2001 show that Deutsche Bank refused to authorize any additional Enron credit exposure, despite the "deal team's request (that team included Paul Cambridge and Mike Jakubik):

> Risk Appetite. The Committee declined to increase the Bank's approved final target from EUR440mn to EUR500 mn as requested by the deal team. The Bank currently has commitments of EUR592 mn. While the Company is externally rated "BBB+/Baal", the Committee noted (i) that **Enron has considerable off balance sheet liabilities (ii) lacks transparency with respect to its hedging activities (despite a number of Company visits)** and (iii) deal team had previously committed to reduce the Bank's exposure to EUR440 mn. … …the Committee agreed that both the deal team and GCP Portfolio Management further investigate the possibility and cost of buying additional credit protection so as to reduce the Bank's exposure or the sell-down of our exposure.

P-DB204 at DBG 043695 (emphasis added). Deutsche intended that any future increase in aggregate exposure be "on a temporary basis only." *Id*.

409.   Internal Deutsche Bank emails detail the "paper trail" evidencing just how "increasingly uncomfortable" Deutsche Bank's Underwriting Committee was with Enron Credit. *See* P-DB79 (Nov. 15, 2001 Email re Enron) at DBG025527. On April 25, 2000, Deutsche approved a temporary increase in Enron exposure "clearly on the basis that a path to get the exposure quickly down to Eur 350 million was demonstrated by the deal team." *Id*. at DBG025527. On December 1, 2000, the Committee indicated again that it was uncomfortable with increased exposure up to 696 million Euros. *Id*. at DBG025527, DBG025530. On May 7, 2001 the prospect of purchasing credit protection to bring Enron exposure down to 400 million Euros was discussed.

*Id*. at DBG025527, DBG025533.

410.    Additional emails at Deutsche Bank further demonstrate its efforts to reduce its overall exposure to Enron. P-DB177 at DEU006682; P-DB178 at DDB008664; P-DB179 (September 10, 2001 email) at DBN125219 ("**It is imperative that we get our exposure down**.") (emphasis added).

411.    Hayes described Cambridge's advocacy of Enron, including that for Deutsche to continue to transact business with Enron it may have to add to Deutsche's credit exposure. P-DB221 (Hayes Bankr. Dep.) at 94:9-95:23. In May 2001, Deutsche was asked to renew and increase a "364-day unsecured USD 1.75 bn Revolving Credit Facility" for Enron, and to approve "a new USD 16.7 mn participation in a 364-day unsecured USD 500mn Letter of Credit Facility." P-DB182 (Underwriting Committee Minutes of May 7, 2001) at DBG067377. The Committee approved the recommendation, noting "that the relationship is projected to generate fees of ca. USD 10 mn this year and that the deal team is supportive of pursuing this transaction." *Id.* Deutsche Bank, through its Committee, also stated "the deal team continue to pursue options to reduce the bank's overall exposure to the Enron Group, while retaining a Tier 1 relationship with the Company." *Id.* Deutsche reminded that the prior December it had "requested that the Bank's overall exposure be reduced to ca. USD400 mn." *Id.* At the same time, Deutsche Bank purchased **$25 million of credit default protection** relating to Enron in the derivative market. *Id*. (emphasis added).

412.    In response to a request for another increase in Deutsche's exposure to Enron in July 2001, Calli Hayes responded, "Given our already significant Enron exposure, I cannot approve the below additional exposure." P-DB181 (July 17, 2001 email from Hayes) at DBM000153.

413.    Deutsche Bank employees, including Calli Hayes, were concerned about Enron's creditworthiness in the fall of 2001. P-DB6 (Hayes Dep.) at 225:9-13. They were actually concerned well before that time, in November 2000. P-DB7 at DBG079615 (expressing concerns that exposure was too high and stating with respect to Enron's electric generating program "it is yet another deal, structured and lead by someone else, and we are being asked to just step in and save the day."); P-DB184 at DBN124492-93 ("I'm developing a serious case of heartburn" and citing concerns over a forward-equity sale at Marlin; asking how Enron would finance additional asset purchases, envisioning "**an escalating debt mountain**" that is "not comforting" and concluding "**I do not like where we are. My biggest concern is Enron-they are moving at 100 mph and taking huge bets all over the world**") (emphasis added).

414.    While Deutsche Bank was seeking to reduce its overall exposure to Enron investments from (at minimum) December 2000 through November 2001, Deutsche Bank analysts issued a steady stream of upbeat reports recommending the purchase of Enron securities and omitting material, adverse information about Enron. P-DB47 (Nov. 16, 2001 Deutsche Bank High Grade Energy Weekly, *On the road to ENE recovery*) at 1; P-DB 48 (Oct. 26, 2001 Deutsche Bank US Corporate Weekly, *All eyes were on Enron*) at DBG084600; P-DB49 (Oct. 16, 2001 Deutsche Bank Analyst Rpt., *3Q01 results include $1.0 billion write-down, which should prove therapeutic for ENE spreads despite Moody's over-reaction*) at 1; P-DB50 (Oct. 18, 1999 Deutsche Bank Global Corporate Weekly, *3Q Earnings showed visible effects of long-term growth strategy*) at 1; P-DB51 (May 30, 2000 Deutsche Bank Analyst Rpt., *Maintaining Buy Rating, Credit Update*) at 1; P-DB52 (Oct. 3, 2000 Deutsche Bank Analyst Rpt., *Maintaining Buy Rating, Credit Update*) at 1; P-DB53 (Feb. 13, 2001 Deutsche Bank Analyst Rpt., *2001 ENE credit conference highlights: sustainable growth, EPS focus, capital efficiency, risk conscious, 2-A ratings goal*) at DBN-

0059575 ("ENE's risk assessment/control function is built on a solid foundation of top-quality people and state-of-the-art technology and is closely monitored by senior management and the ENE Board of Directors."); P-DB54 (March 30, 2001 Deutsche Bank Global Corporate Weekly, *Enron Corp. confirms 2001 guidance in wake of headline flurry and sharp share price decline*) at DBG084553 ("we do not view the above-noted ENE developments as a credit/ratings/spread event and note that the recent hammering that ENE's share price has taken is consistent with the recent profit-taking trend around most of the similarly high-flying natural gas stocks.").

415.    Deutsche Bank published analyst and investment research Reports that improperly touted Enron's financial strength and performance, and recommended that investors purchase Enron securities. P-DB48 (October 26, 2001, Paul Tice, Energy Report "All Eyes on Enron") at DBG084600.

416.    Positive Equity Research Reports issued by Deutsche Bank regarding Enron include, but are not limited to, Reports dated: January 13, 1999; January 20, 1999; April 13, 1999; May 7, 1999; May 25, 1999; July 13, 1999; November 8, 1999; January 28, 2000; April 14, 2000; May 26, 2000; July 19, 2000; July 25, 2000; and September 15, 2000. P-DB146 (ENE Corp "Buy") at DBG098181; P-DB147 (Multex ENE Rpt.) at DBG098188; P-DB148 (Multex ENE Strong 1Q) at DBG086890; P-DB149 (Multex ENE Rpt.) at DBG098191; P-DB150 (ENE Produced Strong Q2) at DBG086904; P-DB151 (ENE Wow Raising Target Price) at DBG098286; P-DB152 (ENE 1Q Analysts Meeting Notes-Buy) at DBG086893; P-DB153 (Business Really Booming) at DBN253415; P-DB154 (Industry Excellence) at DBG008685-DBG008708; P-DB155 (Multex Notes from the Road) at DBG086898; P-DB157 (Divesting Portland General, 3.1 Billion) at DBG098252; P-DB158 (Corporate Pricing US Dominating) at DBG086053-054; P-DB159

(Another First) at DBG086907.

417.    Deutsche Bank also issued misleading fixed-income Research Reports regarding Enron including, but are not limited to, Reports dated: May 12, 2000; May 25, 2000; May 30, 2000; September 11, 2000; October 3, 2000; October 6, 2000; January 23, 2001; February 13, 2001; March 30, 2001; June 26, 2001; July 12, 2001; August 17, 2001; October 5, 2001; October 16, 2001; October 19, 2001; October 26, 2001; November 2, 2001; and November 9, 2001. P-DB160 (Maintaining Buying Rating) at DBG032939; P-DB161 (4Q Results and 2001 guidance) at DBN169310; P-DB162 (Maintaining Buy Rating) at DBN0010684; P-DB163 (Retail Sector Update) at DBN215372; P-DB54 (March 30, 2001 Enron Corp Confirms 2001 Guidance in wake of headline flurry and share decline, DBG084553-DBG084554; P-DB164 (Consensus-beating results) at DBN0006406; P-DB165 (DYN MND merger) at DBN0010576; P-DB166 (Average Bench Mark Bonds) at DBG084594; P-DB49 (October 16, 2001, 3Q01 results include $1.0 billion write down, DBN0006596; P-DB167 (Earnings Release takes center stage) at DBN0010584; P-DB48 (October 26, 2001, All Eyes on Enron) at DBG084600-DBG084602; P-DB168 (ENE Roller Coaster Ride Continues) at DBN0011205; P-DB169 (All's well that ends well) at DBN0010603; P-DB170 (Results California exposure) at DBG035753; P-DB52 (Maintaining Buy Rating) at DBM004276; P-DB171 (Maintaining Buy Rating) at DBG-031454; P-DB172 (Building Products) at DBN189458; P-DB173 (M&A Montage) at DBN0003308; P-DB54 (Benchmark Bonds) at DBG084553; P-DB48 (All Eyes on Enron) at DBG084600; P-DB174 (European bond market overview) at DBN0003315; P-DB175 (2001 ENE Credit Conference highlights) at DBG103322.

418.    Paul Cambridge testified he regularly read analyst reports, including Paul Tice's Reports on Enron, and even met with Paul Tice from time to time to discuss Enron. P-DB223 (Cambridge Bankr. Dep.) at 128:5-129:14. **He testified that there may be a "Chinese wall in**

terms of the numbers, but we would compare notes on public statements of strategy." *Id.*
(emphasis added). He also confirmed that "[i]t is likely" that he obtained non-public information
in his meetings with Enron. *Id.* at 129:15-23.

419.    On May 30, 2000, Craig Orchant admitted in an email that Deutsche uses Paul
Tice's research and analyst reports to assist in marketing transactions. P-DB160 (May 30, 2000
email from Orchant) at DBG032938 ("Please find attached a recently published fixed income
research report on Enron prepared by Paul Tice. **The research was prepared to assist in the
marketing of the Margaux transaction**. Since the decision was made to postpone the
contemplated financing for Margaux, we thought it still made sense to distribute these positive
credit comments broadly to accounts in the US and Europe") (emphasis added). The practice
continued through at least June of 2001. P-DB170 (June 26, 2001 Email from Orchant to Despain)
at DBG035752.

420.    The November 16, 2001 Report by Deutsche Bank analysts Paul Tice and Stephen
Levine was headlined "On the road to ENE recovery" and stated "The outstanding corporate and
structured bonds of Enron Corp (ENE) continue on the road to price recovery this past week…."
P-DB47 (November 16, 2001 Deutsche Bank High Grade Energy Weekly) at DBN0010614.
Deutsche Bank's analysts assured investors that they were comfortable "**ENE is not a near-term
bankruptcy candidate**." *Id.*

421.    In November 2001, Calli Hayes wrote a post-mortem analysis that made certain
admissions about early warning signs known privately to Deutsche Bank. P-DB183 (Hayes Post
Mortem Analysis) at DBG066926-27. Among these signs, Deutsche Bank knew that Enron's
financial disclosures were purposely "inadequate and vague" and that there was a growing problem
with Enron's use of increased off-balance-sheet transactions. P-DB6 (Hayes Dep.) at 559:7-

561:14, 569:15; P-DB7 (November 11, 2000 Email) at DBG079615; *see also* P-DB203 (Oct. 5, 2001 Deutsche Bank Credit Memo) at DBG-041580 ("The DB Action Plan is to continue to reduce the Enron Corp. global exposure to the targeted Euro 440 million level" and as a "Tier 1 relationship" bank "we are expected to provide balance sheet support for key Enron transactions").

422.   Disputing any purported "Chinese wall" between analysts and investment bankers, in 2004, Deutsche Bank entered into an $87.5 million settlement of claims brought by the SEC and other entities "following investigations of allegations that investment banking interests had undue influence on securities research at brokerage firms." P-DB195 (SEC Release: Deutsche Bank Securities to pay $87.5 Million, Including Penalty of $7.5 Million) at 1 (Aug. 26, 2004). The enforcement actions alleged that "from approximately mid-1999 through mid-2001, the firms engaged in acts and practices that created or maintained inappropriate influence by investment banking over research analysts, thereby imposing conflicts of interest on research analysts that the firms failed to manage in an adequate or appropriate manner." *Id*. at 2. The enforcement action further alleged Deutsche Bank "issued research Reports that were not based on principles of fair dealing and good faith and did not provide a sound basis for evaluating facts, contained exaggerated or unwarranted claims about the covered companies, and/or contained opinions for which there were no reasonable bases in violation of NYSE Rules 401, 472, and 476(a)(6), and NASD Rules 2110 and 2210 as well as state statutes." *Id*.

423.   As confirmed by Silvercreek's investment banking expert's review of the evidence, Deutsche Bank "understood the implications of the structured finance transactions for the analysis of Enron's creditworthiness and took steps to protect [itself] from the material and detrimental impact of these deals on [its] exposure to Enron credit risk, while at the same time hiding the relevant information from investors and credit rating agencies." P-DB81 (Saunders Expert Rpt.)

at 5-6, 116.

**C.    Deutsche Bank participated in several Enron schemes**.

424.    Deutsche Bank directly participated in the following Enron schemes:

• Deutsche Bank helped to create and fund LJM2 and committed to invest $10 million in LJM2 and participate on an Advisory Board overseeing transactions (P-DB211 (LJM2 Co-Investment, L.P. Closing Document) at DBA00120-121 and 235) knowing that it was designed to enable Enron insiders to deal with themselves and profit. P-DB211 (LJM2 Co-Investment, L.P. Closing Document) at DBA00165, DBA00167.

• Deutsche Bank managed the sale of Marlin Water Trust bonds in 1998 and 2001. P-DB134 (Marlin Water Trust) at DBK0152867; P-DB135 (Marlin Trust II) at DBK0160304. Enron used the Marlin transaction to move its Azurix water utility assets and related debt off of Enron's books. P-DB 138 (Jakubik Bankr. Dep.) at 74:16-77:18, 149:23-151:2. Deutsche Bank was also an underwriter for the Osprey I and Osprey II Notes. P-DB139 (Orchant Dep.) at 168:20-169:8. In both vehicles, Enron pledged of its own stock to support the structures, a significant obligation for Enron that was unknown to Enron's investors. P-DB138 (Jakubik Bankr. Dep.) at 146:1-148:14, 185:16-186:16; P-DB241 (Rubin Dep.) at 103:3-106:2.

• Deutsche Bank acted as an underwriter in one of the Yosemite offerings, to repay obligations under a Prepay Transaction which enabled Enron to record loans as operating cash flow and to hide debt. P-DB139 (Orchant Dep.) at 157:8-158:16; DB71 (Cambridge Dep.) at 279:12-280:3, 285:12-23, 288:10-25, 290: 6-15.

• Deutsche Bank and Enron engaged in a money laundering scheme through the $2 billion Valhalla Transaction. P-DB41 (October 11, 2000, Handling of Valhalla, Killian to Wilcox) at DBF001521.

• Deutsche Bank structured at least four tax-driven transactions (the "Tax Transactions") pursuant to which Enron created over $400 million in false income and Deutsche Bank received over $40 million in fees. P-DB9 (Regan Expert Rpt.) at 227.

425.    A timeline showing the extent of the Deutsche/Enron relationship are as follows:

| | |
|---|---|
| January 1997 | |
| February 1997 | |
| March 1997 | **Teresa Transaction closed** |
| April 1997 | |
| May 1997 | |
| June 1997 | |
| July 1997 | Sutton Bridge Financing closed |
| August 1997 | |
| September 1997 | |
| October 1997 | SBI2 Financing closed |
| | **Steele Transaction closed** |
| November 1997 | |
| December 1997 | |
| January 1998 | |
| February 1998 | |
| March 1998 | Northern Borders Financing closed |
| April 1998 | |
| May 1998 | |
| June 1998 | LNG Power II & Enron Europe Power II Ltd Financing close |
| July 1998 | |
| August 1998 | Elektro Acquisition closed |
| September 1998 | **Tomas Transaction Closed** |
| October 1998 | |
| November 1998 | |
| December 1998 | Renegade Transaction closed |
| | **Issuance of Marlin Notes** |
| January 1999 | **Cochise Transaction closed** |
| February 1999 | |
| March 1999 | |
| April 1999 | |
| May 1999 | |
| June 1999 | |
| July 1999 | |
| August 1999 | |
| September 1999 | **Issuance of Osprey I Notes** |
| October 1999 | |
| November 1999 | Initial Purchase of a portion of Yosemite I Notes |
| December 1999 | Commitment to invest $10 million in LJM2 |
| January 2000 | |
| February 2000 | |
| March 2000 | |
| April 2000 | |
| May 2000 | **Valhalla Transaction closed** |
| June 2000 | Issuance of Enron Capital Trust III Notes |



P-DB19 (Batson DB Rpt.) at 14-15.

    **1.**    **Tax Transactions**.

    426.    Silvercreek has attached summaries of voluminous records outlining the basic details of the transactions and Deutsche Bank's involvement with Teresa, Steele, Cochise and Tomas tax transactions. P-DB90 (Tax Transaction Summaries).

    427.    Deutsche Bank's involvement in Enron tax transactions is not surprising given Deutsche Bank's extensive involvement in the marketing and promotion of illegal tax shelter transactions to individuals in the same time frame, involving many of the same Deutsche Bank Structured Transaction Group executives.   In December 2010, Deutsche Bank entered into a nonprosecution agreement ("NPA") with the U.S. Attorney for the Southern District of New York and the Tax Division of the Department of Justice with respect to tax evasion and tax fraud. P-DB192 at 1. Deutsche admitted that between 1996 and 2002 it "participated in and implemented fraudulent tax shelters." *Id*. Deutsche Bank accepted and acknowledged the statement of facts

attached to the NPA (*id*. at 2) including that, at the time it participated in the tax shelters, Deutsche Bank knew or should have known that its participation "was intended to create the appearance of investment activity" but that the taxpayers entered into the transactions "for the primary purpose of avoiding taxes, as opposed to making profits on the transactions." *Id*. at SOF ¶ 3. Deutsche's tax shelter transactions involved at least 1,300 deals and more than 2,100 customers. *Id*. at SOF ¶ 5.

428.    In a separate Stipulation and Order of Settlement and Dismissal in Case No. 1:14-cv-09660-LAK, Deutsche Bank agreed to pay the United States $95 million to resolve claims that in May 2000 Deutsche was also involved in setting up several entities to "avoid having to pay the built-in tax liability associated with [a share purchase]." P-DB227 (Stipulation and Order of Settlement and Dismissal, *U.S. v. Deutsche Bank, A.G., et al.*, No. 14 Civ. 9669 (S.D.N.Y. Dec. 23, 2016) at 3-5, ¶¶ 2.e, 2.1.3.

429.    In the Stipulation and Order of Settlement and Deutsche Bank admitted, acknowledged and accepted responsibility for the following facts:

a. On March 13, 2000, Deutsche Bank acquired Charter.

b. Charter's principal asset was the Bristol-Myers shares.

c. The Bristol-Myers shares had appreciated significantly in value since they were originally obtained by Charter. As a result, if Charter sold the Bristol-Myers shares, it would have incurred substantial federal taxable income.

d. Between March 2000 and May 2000, Deutsche Bank negotiated certain transactions with third parties relating to the sale of Charter and the Bristol-Myers shares.

e. To implement these transactions, one of the third parties created several new entities, including BMY Statutory Trust, BMY Acquisition LLC, and BMY Acquisition Corporation (collectively, "BMY") in May 2000.

f. Deutsche Bank knew that BMY had no material assets and no operating business.

g. On May 18,2000, the following transactions occurred (collectively, the "May 2000 Transaction"):

      i.   Deutsche Bank sold Charter to BMY.

      ii.   BMY liquidated Charter, such that BMY directly owned the Bristol-Myers shares.

      iii.   BMY then sold the Bristol-Myers shares to Deutsche Bank Securities Inc., as agent for Deutsche Bank, A.G.

h.  Each aspect of the May 2000 Transaction steps was pre-planned.

i.  BMY paid a price for Charter that was substantially higher than the value of Charter if the built-in tax liability associated with the appreciation of the Bristol Myers shares had been accounted for in the purchase price.

J.  As a result of the May 2000 Transaction, BMY realized substantial taxable gain.

k.  Deutsche Bank knew or, had it made reasonable inquiries, would have known that BMY did not have legitimate tax losses to offset this gain.

l.  BMY reported the gain resulting from the May 2000 Transaction on its tax return for its tax year ending April30, 2001, but claimed that no tax was due because the income was offset by unrelated foreign currency transaction losses.

m. The claimed foreign currency transaction losses were attributable to a tax shelter known as a Currency Option Investment Strategy ("COINS") tax shelter.

      i.   Deutsche Bank participated in this COINS tax shelter.

      ii.   As Deutsche Bank admitted in 2010, the COINS shelter, in which it participated willfully and knowingly, was a fraudulent tax shelter, and it was unlawful for Deutsche Bank to have participated in the COINS tax shelter.

n.  IRS disallowed BMY's claimed foreign currency transaction losses and assessed BMY tens of millions of dollars of tax (plus interest and penalties) resulting from the sale of the Bristol-Myers shares.

o.  BMY has not paid the tax liability resulting from the sale of the Bristol-Myers shares.

p.  Deutsche Bank knew or should have known that as a result of the May 2000 Transaction, BMY lacked the funds necessary to pay the substantial taxes resulting from the sale of the Bristol-Myers shares.

q.  Deutsche Bank engaged in the May 2000 Transaction in order to avoid having to pay the built-in tax liability associated with the Bristol-Myers shares.

*Id.* at 2-4, ¶¶ 2.e, 2.q, 3.

430.   In the Deutsche Bank Examiner Report provided the Bankruptcy Court, a substantial and comprehensive volume of evidence with respect to Deutsche Bank's role in the Enron fraud. The Examiner concluded that:

BT/Deutsche Bank's conduct in the [Deutsche Bank] Tax Transactions enabled

Enron to: (i) erroneously record approximately $158 million of income from the two REMIC Carryover Basis Transactions, $143.7 million of which Enron erroneously recorded as pre-tax income; and (ii) erroneously record a $229 million increase in after-tax net income by reporting the Teresa Transaction in a manner that did not comply with GAAP.

The evidence would allow a fact-finder to conclude Deutsche Bank:

- acted as a conduit for the sale of the Cochise planes from Enron to Oneida Leasing, Inc. ("Oneida") in the second quarter of 2000 for the purpose of enabling Enron to erroneously report $36.5 million of gain on the sale, an amount equal to more than 10% of Enron's reported net income for the quarter;

- designed, promoted and participated in the Teresa Transaction while knowing that the transaction was not expected to reduce Enron's tax liability on a present value basis and served no substantial business purpose for Enron other than enabling Enron to "generate income for financial accounting purposes";

- designed, promoted and participated in the Steele Transaction while knowing that the transaction served no substantial business purpose for Enron other than enabling Enron to report the potential benefit of speculative future tax deductions in an erroneous and misleading manner as pre-tax income; and

- designed, promoted and participated in the Cochise Transaction while knowing that the transaction served no substantial business purpose for Enron other than enabling Enron to report the potential benefit of speculative future tax deductions in an erroneous and misleading manner as gain on the sale of the Cochise planes and as other pre-tax income.

P-DB19 (Batson DB Rpt.) at 2-4.

431.    After fully analyzing the transactions and relationship between Deutsche and Enron, the Court appointed Examiner in the Enron Bankruptcy concluded as follows:

Deutsche's role in designing, promoting, implementing and participating in the BT/Deutsche Tax Transactions is evidence from which a fact-finder could conclude that BT/Deutsche had actual knowledge of the wrongful conduct giving rise to breaches of fiduciary duty by Enron's Tax/Accounting Officer Group and gave substantial assistance to those officers.

. . .

Injury to the Debtors was the direct or reasonably foreseeable result of BT/Deutsche's conduct because the transactions lacked business purpose and were

structured to enable Enron to produce materially misleading financial statements, which were disseminated to the public.

*Id*. at 80, 121.

432.    Plaintiffs' investment banking due diligence expert, William Purcell, agreed with the Bankruptcy Examiner on these points. Purcell found after reviewing of the evidence that it would be inconceivable that, after participating in 11 complex transactions with Enron, Deutsche Bank did not know the inner workings of Enron's financials and structured financings and did not know how various financing and tax transactions were being accounted for, *i.e.*, that Enron debt was being understated and that cash flow from operations as well as net income were being overstated. P-DB82 (Purcell Expert Rpt.) at 44-49. Plaintiffs' additional investment banking expert Saunders – Professor of Finance and Chair of the Department of Finance at NYU's Stern School of Business – concurred. P-DB81 (Saunders Bank Rpt.) at 92-97.

433.    Fastow testified that Deutsche Bank proposed certain tax transactions to Enron, and that Enron entered into these transactions for the purpose of intentionally affecting how the financial statements would appear. The primary result of these transactions was to cause Enron's income to be higher. P-DB70 (Fastow Dep.) at 281:11-24.

434.    According to Plaintiffs' accounting expert D. Paul Regan, Deutsche designed, created and sold the structured tax transactions and each were of little economic substance, were unrelated to Enron's stated business activities, created one-time paper profits, and generated no real income and little or no cash for Enron. P-DB9 (Regan Expert Rpt.) at 74.

435.    The primary objective of these four tax transactions was the creation of financial statement income. This was accomplished principally through the exploitation of differences in tax accounting and GAAP accounting. P-DB9 (Regan Expert Rpt.) at 226.

436.    As recognized by both the 2003 Joint Congressional Committee on Taxation and a

1997 memo regarding Deutsche's first Structured Transaction Group and Corporate Tax Department effort, Deutsche utilized the anomalous results that occur between GAAP accounting rules and IRS reporting requirements to manufacture phantom "financial statement" income to Enron and others. P-DB31 (June 2, 1997 "de-linking the accounting benefits" letter from Boyle to McKee) at AB000187766; P-DB28 (JCT Report) at 30.

437.    Silvercreek's accounting expert D. Paul Regan, further opined that the benefits from the tax transactions bolstered Enron's net income by increasing income before taxes and/or reducing income tax expense recorded by Enron in its financial statements. P-DB9 (Regan Expert Rpt.) at 226. These "enhancements" to Enron's reported performance derived from the manipulation of differences in tax accounting and GAAP accounting, and were not at all related to Enron's normal business operations. *Id*.

438.    He further opined that "[u]sers of Enron's financial statements, however, could not have obtained an understanding of the nature of these tax transactions and their impact on Enron's financial performance from reading the financial statements and the accompanying footnotes." *Id*. "As a result, such users were deprived of this knowledge and were mislead." *Id*.

439.    Deutsche purposely designed and sold these structured tax transactions to allow Enron to report increased accounting income before taxes or increased net income after taxes. Cambridge testified to receiving countless memos describing the Tax Transactions between 1997 and 2000 demonstrating to him that the purpose of the Tax Transactions was to generate accounting income for Enron. P-DB71 (Cambridge Dep.) at 418:18-425:20; P-DB119 (March 1997 Approval Memo re Partnership Transaction) at DBC012766-67; P-DB206 (September 15, 1997 Memorandum Finley to Hayes) at DBF044298, DBF044301; P-DB207 (Feb. 1998 Memorandum re Steele transaction) at DBC009220-21 ("we believe the Transaction has

significantly enhanced BTCo's relationship as a major investment bank for Enron. Furthermore, we are currently exploring opportunities to provide additional services to Enron and we look forward to servicing Enron on future endeavors."); P-DB219 (Aug. 1998 Memo re Project Tomas) at DBC054607 ("Enron will be able to largely mitigate the build-in taxable gain while still realizing the portfolio's net worth. At the same time, as a consequence of the mechanism used, Enron will be able to currently book a pre-tax gain of approximately $60 million").

440.    By designing and facilitating the execution of these tax transactions, Deutsche assisted Enron in: overstating the results from its stated business operations and/or misleading the users of the financial statements by not disclosing, reporting, and characterizing the transactions in an understandable, useful, reliable, relevant, and meaningful way. P-DB9 (Regan Expert Rpt.) at 226-227; *see also* P-DB81 (Saunders Bank Rpt.) at 92-97.

441.    The tax transactions were designed to and did allow Enron to overstate the company's income, distort its financial performance, and as a result caused Enron's financial statements to be material misleading. P-DB9 (Regan Expert Rpt.) at 271; *see also* P-DB81 (Saunders Bank Rpt.) at 92-97.

442.    Cambridge had to acknowledge, in all his involvement with Enron offerings, the tax transactions were done without explicit disclosure to the readers of Enron's financial statements and absent a footnoted disclosure, there would be no way for a reader to know that Enron's improved financial statement were the result of future speculative tax savings. P-DB71 (Cambridge Dep.) at 446:20-447:24.

443.    Deutsche's successful structuring and promoting of the four Deutsche Bank Tax Transactions to Enron resulted in $45 million in fees charged by Deutsche. P-DB9 (Regan Rpt.) at 227. Andrew Fastow testified that he joked to Deutsche's Paul Cambridge that its fees were

high, and that Cambridge's response about the excessiveness of Deutsche Bank's fees was, ". . . [Cambridge] didn't think they were, given the amount of earnings that the deals -- that Deutsche Bank was doing was generating for Enron." P-DB70 (Fastow Dep.) at 279:23-280:12.

444.    Bankers Trust Vice President William Boyle also justified Deutsche Bank's huge fees in part by reference to the large amount of accounting income the tax transactions would generate. P-DB32 (Boyle Dep.) at 263:23-266:18 ("My understanding is [clients] would be willing to pay for the benefits associated with" the financial accounting benefit associated with transaction No. 3) (referenced in P-DB31 (June 1997 "de-linking the accounting benefits" letter from Boyle to McKee) at AB000187758, AB000187760.

445.    None of these tax transactions complied with the requirements of the "economic substance" doctrine. P-DB36 (Shenkman Expert Rpt.) at 9, 4, 8-11; P-DB9 (Regan Expert Rpt.) at 74.

446.    Fastow stated that the transactions were done without legitimate business purpose, except that which was "found" for the purpose of justifying the tax effects. P-DB70 (Fastow Dep.) at 282:4-9, *id.* at 281:25-284:6.

447.    Fastow testified that Causey was told that Enron would have to feign that it was in the real estate management business to get the benefit of one of the tax transactions, and that he recalls a number of people laughing at that because Enron only managed its own properties, not third-party property. *Id.* at 283:10-284:6.

448.    The Deutsche Bank Tax Transactions were not designed to save current or near-term future taxes; they were designed to help Enron manipulate and falsify its SEC-filed financial statements by increasing Enron's earnings per share. P-DB9 (Regan Expert Rpt.) at 226; P-DB70 (Fastow Dep.) at 281:11-282:9.

449.     Fastow testified that Paul Cambridge with Deutsche informed Enron it only did these tax deals with a few companies, and it expected to get paid well for these structures because, to avoid attracting IRS attention, they could only do the transactions a few times. P-DB70 (Fastow Dep.) at 961:14 – 962:17.

450.     Fastow remembered a conversation with Deutsche's Cambridge, when Cambridge told Fastow that Deutsche Bank did not want too many people looking at the tax deals and understood that if the deals became pervasive, they would be more likely to catch the IRS' attention, and the IRS would potentially deem them unlawful. *Id*.

451.     Thomas Finley who designed and managed several of the Enron/DB tax transactions, knew that before Enron could enjoy the accounting benefits of a tax transaction "you first have to have a real business deal which has real business substance." P-DB14 (Finley Dep.) at 227:9-23.

452.     According to United States Tax Code § 269, and as concluded by the Joint Committee on Taxation, a transaction is subject to challenge unless it has a legitimate business purpose and the creation of financial accounting benefits is not a sufficient business purpose. P-DB28 (JCT Report) at 17, 25, 105 (attainment of financial statement benefits is not a valid business purpose to support a transaction); P-DB36 (Shenkman Expert Rpt.) at 8.

453.     Deutsche Bank was the creator and facilitator of the tax transactions and they were structured to generate current financial accounting income for Enron – including large amounts of pre-tax income – through the exploitation of differences in tax accounting and GAAP accounting. P-DB9 (Regan Expert Rpt.) at 226.

454.     The Bankruptcy Examiner quotes Robert J. Hermann, former head of Enron's tax department, as describing Enron's reliance on BT/Deutsche Tax Transactions for balance-sheet

manipulation as "kind of like cocaine-they got kind of hooked on it." P-DB83 (Batson 2d Interim Rpt.) at 87, n.169.

455.     Each and every Enron 10-K or 10-Q filed after the first quarter of 1997 was materially impacted by one or more of the Deutsche Tax Transactions. *See* P-DB9 (Regan Expert Rpt.) at 227.

456.     The following table summarizes the impact of the four Tax Transactions on Enron's net income and the associated fees to Deutsche Bank:

| Transaction | Closing Date | Impact on Net Income | Deutsche Bank Fees (Original) | Deutsche Bank Fees (Collected) |
|---|---|---|---|---|
| Teresa | 3/97 | $228.7 million | $10 million | $6.6 million |
| Steele | 10/97 | $61.2 million | 10 million | 8.2 million |
| Tomas | 9/98 | $52.8 million | 10 million | 11.9 million |
| Cochise | 1/99 | $96.1 million | 15 million | 11.3 million |
| Total | | $438.8 million | $45 million | $38.0 million |

*Id*. at 227.

457.     On the two tax transactions designed and promoted to Enron by Arthur Andersen in 1995 and 1996, Tanya and Valor, Andersen was paid a total of $100,000 and $500,000 for their services having comparable benefits to Enron. P-DB28 (JCT Report) at 107.

458.     With respect to all the Tax Transactions that Deutsche Bank was involved in, the Examiner concluded that:

> BT/Deutsche was responsible for designing, promoting and participating in the BT/Deutsche Tax Transactions. The BT/Deutsche Tax Transactions were intended to have, and in fact did have, the effect of increasing Enron's reported net income by approximately $423 million over the period from 1997 to 2001. However, Enron had little business purpose for the BT/Deutsche Tax Transactions other than creating accounting income.

P-DB19 (Batson DB Rpt.) at 71.

459.    Deutsche Bank developed the basic tax and accounting structures of each of the Deutsche Bank Tax Transactions. P-DB15 (Finley Bankr. Dep.) at 15:23-17:15, 90:8-91:23, 144:6-17. Deutsche Bank prepared presentations to promote the structures to Enron as a means of generating accounting income and in effect sold the products to Enron. P-DB31 (June 2, 1997 Boyle REMIC Memo) at AB000187758; P-DB85 (May 1996 Banker's Trust Discussion Materials for Enron Corp.) at DBC013816; P-DB20 (January 28, 1999 Final Project Cochise) at DBF044014. Deutsche designed the Tomas structure to meet Enron's requirements. P-DB228 (McGuire Bankr. Dep.) at 297:7-19 (Enron approached Deutsche looking for ways to monetize and risk manage or transfer the Portland General lease portfolio and after presenting some options Deutsche recommended the structure that became Project Tomas); P-DB15 (Finley Bankr. Dep.) at 144:6-17 (Tomas transaction originated after Maxey phoned Finley and said Enron purchased Portland General Holdings and had a portfolio of low basis leased investments they were looking for a tax-efficient way of disposing).

460.    The impact of the Deutsche Bank tax transactions on Enron's net income was as follows: P-DB9 (Regan Expert Rpt.) at (PDF page) 324 (Exhibit E-1, Summary of Financial Statement Impacts):

| Period | Enron Reported Net Income (1) | Impact on Net Income | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Steele | Cochise(2) | Teresa | Tomas (1) | Total Impact of DB tax transactions |
| 12/31/1997 | $105,000,000 | $4,000,000 | - | $52,100,000 | - | $56,100,000 |
| 12/31/1998 | $703,000,000 | $14,500,000 | - | $25,300,000 | $18,100,000 | $57,900,000 |
| 12/31/1999 | $893,000,000 | $16,800,000 | $27,600,000 | $21,200,000 | - | $65,600,000 |
| 12/31/2000 | $979,000,000 | $14,900,000 | $33,600,000 | $120,100,000 | $34,700,000 | $203,300,000 |
| 9/30/2001 | $225,000,000 | $1,000,000 | $18,200,000 | $10,000,000 | - | $39,200,000 |

(1) Year-to-date 9/30/2001 reported net income is restated
(2) Excludes $16,700,00 of operating earnings for 1998 through 2000, due to lack of available information

### a.   Teresa Transaction.

461.    Teresa, the first of the Tax Transactions, was developed by Deutsche Bank and promoted to Enron in 1996 as a method for generating financial accounting income. P-DB86 (March 1997 DB Memo) at DBC012896-7 (allows Enron to "create significant amounts of future accounting income"); P-DB15 (Finley Bankr. Dep.) at 17:7-20 (for Project Teresa, Deutsche used outside accounting advisors to help design and structure); P-DB17 (Bankers Trust Presentation to Enron) at DBC013815, DBC013827 (through structure designed by Deutsche, Enron creates a $26.04 million "deferred tax asset as a credit to income").

462.    According to Deutsche's corporate representative David Bailey, Deutsche Bank's due diligence team on Teresa knew that the transaction would result in $240 million of after-tax book-only income for Enron. P-DB87 (Bailey Dep.) at 156:14-158:9.

463.    From Deutsche Bank memoranda, Teresa was not intended to give Enron present-value tax savings, but was predominantly designed to generate financial accounting benefits. P-DB88 at DBC012906, 08 (Deutsche's "Structured Transaction Group will soon be mandated by Enron to structure a partnership transaction utilizing a property partnership structured developed by [Deutsche's] Structured Transaction Group and the Corporated Tax Department," giving Enron

"the opportunity to record approximately $240 million of after-tax accounting earnings over the next six years").

464.    A tax opinion letter requested by Deutsche Bank and authored by King & Spalding for the Teresa transaction states that Enron's predominant business purposes for entering into the Tax Transactions was to generate income for financial accounting purposes. P-DB10 (1997 King & Spalding Tax Opinion) at AB000151587.

465.    Thomas Finley described the purpose of Teresa as "creating significant amounts of future accounting income." P-DB88 (Deutshe 1997 Memo. Network Comm. Approval in P'ship Trans. – Enron Corp.) at DBC012906.

466.    The crux of the Teresa transaction from Bill McKee's standpoint was to make sure the transaction was revenue neutral "**because we felt that if there were no tax avoidance motivation and no revenue to be gained by the government from attacking the transaction that the tax aspects of the transaction would – would – would not be challenged.**" P-DB3 (McKee Dep.) at 85:17-86:11 (emphasis added).

467.    The details of the Teresa transaction were convoluted, involving a series of transactions and numerous Enron and Deutsche Bank-controlled SPEs. P-DB9 (Regan Expert Rpt.) at 252-256; P-DB3 (McKee Dep.) at 81:21-82:4.

468.    An internal Deutsche Bank memo states that "Enron will have the opportunity to record approximately $240 million of after-tax accounting earnings over the next six years." P-DB88 (March 10, 1997 Memorandum Network Committee Approval in Partnership Transaction – Enron Corp.) at DBC012908.

469.    Tom Finley conveyed to Enron that Teresa would allow Enron to "create future after-tax accounting income of approximately $229 million to be recognized over the next five

years." P-DB187 (Finley to Maxey Economic Model Joint Venture) at DBC13636.

470.    According to the Joint Committee investigation, in February 1997, at a meeting between Enron, Deutsche Bank and King & Spalding representatives to work through the details of the Teresa transaction, Enron indicated it required a "should" level tax opinion for the transaction. P-DB28 (JCT Report) at 166-167.   William McKee indicated that he didn't care whether he wrote the Teresa tax opinion or not, because he would charge a $1 million fee for the transaction regardless of whether King & Spalding provided the tax opinion. P-DB24 (Hermann Bankr. Dep.) at 39:4-8. Ultimately, it was decided that King & Spalding would provide the tax opinion to Enron. P-DB28 (JCT Report) at 166-167.

471.    Bob Hermann insisted that Teresa was a "William McKee-generated" transaction and "it came from him maybe with Deutsche Bank, but it was [McKee's] deal." P-DB24 (Hermann Bankr. Dep.) at 36:14-21.

472.    The SPE formed for the Teresa Transaction was Enron Leasing Partners, L.P. in which Organizational Partner, Inc. ("OPI") was a 98% limited partner. P-DB9 (Regan Expert Rpt.) at 252-53, 255. Deutsche Bank assisted Enron in issuing shares of OPI stock to third parties in order to prevent OPI consolidation with Enron. Id. at 259.   Some of the stock Deutsche Bank helped Enron issue went to an affiliate of Deutsche Bank, Potomac. Id.

473.    As Paul Regan opined,

The ultimate goal of the Teresa transaction was to create tax deductions in the form of enhanced depreciation deductions on the leasehold interest of the Enron North Office Building. The tax basis on the leasehold interest was to be increased over a period of years through a series of related party stock redemptions. This would eventually result in additional tax basis to Enron, which under the strategy devised in Project Teresa, would provide greater depreciation deductions on the leasehold interest in Enron's North Office Building over a 39.5 year period, potentially beginning in 2003. However, the key to this strategy was Enron's ability to record, for financial statement purposes, the potential benefit of that increased depreciation as the stock redemptions occurred.

P-DB9 (Regan Expert Rpt.) at 255.

474.     Based on a bankruptcy claim made by OPI, Enron, through OPI, willingly incurred and paid approximately $107 million in federal income taxes that would not have been due absent the Teresa transaction. P-DB28 (JCT Report) at 165 n.389.

475.     Deutsche Bank listed as a benefit to the Teresa transaction that it was "revenue neutral to the IRS. Thus, there is little motivation for the Service to challenge this structure upon audit." P-DB189 (March 1997 Deutsche Presentation to Enron) at EC2000037929.

476.     Enron could not do a tax deal if the purpose was solely to derive a financial statement benefit. P-DB28 (JCT Report) at 17, 25, 105 (attainment of financial statement benefits is not a valid business purpose to support a transaction); P-DB36 (Shenkman Rpt.) at 8. Deutsche Bank knew the tax benefits of the Teresa transaction would not be available for years, until the undetermined future date when the Enron headquarters building was eventually distributed to Enron and Enron began to take increased depreciation deductions. P-DB15 (Finley Bankr. Dep.) at 83:1-84:14. Deutsche was well aware that, on a present-value basis, Teresa would not provide Enron with tax savings. *Id.* at 82:15-25. This structure, however, was in accord with Enron's goal of generating financial accounting income by recording deferred tax assets in advance of future tax deductions – even before the resulting increased basis could attach to a depreciable asset. P-DB9 (Regan Expert Rpt.) at 255; P-DB3 (McKee Dep.) at 82:6-24 (testifying he understood that the reason the property was chosen was "to help effectuate the tax structure that then ultimately lead [sic] to the accounting benefits").

477.     Expert, Paul Regan, opined,

The bottom line of this gimmick is that from 1997 through 2001 Enron was recognizing the increased tax depreciation on the Enron North office building that was projected to occur during the 39.5 years starting some time in 2003. The $229 million recognized is the equivalent of $817.9 million of the total increased

189

depreciation ($239 million *l* $.28).

P-DB9 (Regan Expert Rpt.) at 258.

478. The effects that the Teresa transaction had on Enron's income statement for 1997 through Q3 2001 are as follows (in millions): P-DB9 (Regan Expert Rpt.) at 257.

| Year | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|
| Tax Provision Benefit/(Expense) | $52.10 | $25.30 | $21.20 | $120.10 | $10 |

479. This creative $229 million in income was reported on Enron's financial statements between 1997 and 2001. *Id*. "The impact was the greatest in 2000, enabling Enron to increase its net income by $120.1 million from $859 million to $979" producing an increase to net income of 14% created from Teresa alone. *Id*.

480. The $120.1 million increase in Enron's net income can be described as follows: for each dollar of dividend received by the Enron subsidiary funded through Deutsche's efforts, Enron recorded a deferred tax asset of $.28; this represented an amount equal to a 35% tax rate multiplied by the 80% dividend received deduction; and the offset to this deferred tax asset was an immediate reduction of income tax expense. *Id*.

481. As part of Teresa, Deutsche Bank set up a Deutsche Bank company (EN-BT) through which it contributed in the transaction by purchasing approximately $12.4 million of the OPI stock to accomplish transaction. *Id*. at 253. Deutsche Bank also acted as placement agent for OPI preferred stock to fund Teresa transaction for $2 million fee and split the $2 million fee with Potomac. *Id*. at 259. Deutsche Bank, through its affiliate EN-BT, contributed approximately $12.4 in exchange for 11 million shares of OPI stock. *Id*. at 253.

482. For its exclusive services, Deutsche required Enron to pay $10 million of net advisory and placement fees as follows: (i) at closing, Deutsche receives $2 million of net fees ($3

million of placement fees less $1 million of placement fees paid to another investor, Potomac) and (ii) $8 million advisory fees payable over a period beginning in May 15, 1997 and ending December 31, 2001. *Id*. at 259. Deutsche would forfeit part of its payment if Enron did not receive all of its accounting benefits. P-DB77 (March 27, 1997 Teresa Exclusive Advisor Engagement Letter) at DBC060178; P-DB74 (March 27, 1997 Teresa Placement Fee Letter) at DBC013536.

483.   Additionally, Deutsche Bank internally expected a return on its investment into the Teresa entities as follows:

| Residual Value of Buildings ($ millions) | Percentage of Assumed Value | BT [Deutsche] Sub Return (Fees Not Included) | BT [Deutsche] Sub Return (Fees Included) |
|---|---|---|---|
| $129.20 | 125% | 10.57% | 19.13% |
| $103.30 | 100% | 10.45% | 19.02% |
| $77.50 | 75% | 10.33% | 18.92% |
| $51.70 | 50% | 10.21% | 18.81% |
| $25.80 | 25% | 10.08% | 18.70% |
| $0 | 0% | 9.96% | 18.60% |

*Id.* at 259-260.

484.   In order to record the Deferred Tax Asset, GAAP requires that it is "probable" that the tax position that gave rise to the recording of the Deferred Tax Asset can be sustained. P-DB55 (Solomon Dep.) at 57:21-58:15; P-DB101 (Solomon Rebuttal Rpt.) at 69-70.

485.   Andersen understood that under FAS 109, GAAP does not permit the deduction of temporary differences (and the corresponding recording of a Deferred Tax Asset) related to an investment in a partnership unless they will reverse in the "foreseeable future." P-DB105 (Andersen memo to file) at AB000187886. Andersen linked "foreseeable future" to the definition of a "measurement date" included in the Accounting Principles Board Opinion Number 30, which provides that the "measurement date" is the date that management commits itself to a formal plan of disposal. *Id.*

486.    In the Teresa Transaction, Enron had no formal plan of disposal prior to 2004 at the earliest. P-DB106 (Minutes of Executive Committee of Enron Board of Directors with Teresa presentation) at AB000188326-27, AB000188334.

487.    GAAP requires a "valuation allowance" (*i.e.*, tax cushion) if, based on the available evidence, it is more likely than not that some or all of the deferred tax asset will not be realized. P-DB9 (Regan Expert Rpt.) at 271-272. The accounting for the Teresa Transaction did not provide a valuation allowance for either: (i) the risk that there would not be sufficient taxable income available to benefit from the increased depreciation due to the increased tax basis; or (ii) the risk that the IRS would successfully challenge the structure in its entirety. *Id.*; P-DB33 (Batson Tax Transactions Rpt.) at 66-68.

488.    Partnership anti-abuse provisions of the Treasury Regulations on partnership taxation state that if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate Federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Commissioner can recast the transaction for Federal tax purposes to achieve tax results that are consistent with the intent of subchapter K. P-DB28 (JCT Report) at 178-179.

489.    The Joint Committee on Taxation documented that the partnership in Teresa, ELP, was formed with the predominant purpose of generating income for financial accounting purposes, the accounting income was solely attributable to shifting the tax basis to depreciable assets, and the accounting benefits were not accomplishable without the partnership. P-DB28 (JCT Report) at 178-179.

490.    ELP violated Partnership anti-abuse laws. *Id.*

491.    The Teresa transaction was "neutral" as to the net present value of the tax

deductions considering costs, but if it were NPV positive then anti-abuse rules would kick in. P-DB14 (Finley Dep.) at 191:18-24, 197:17-198:8.

492.    The Teresa transaction lacked profit potential and had no real economic substance. P-DB36 (Shenkman Expert Rpt.) at 9, *also* 4, 8-11; P-DB101 (Solomon Rebuttal Rpt.) at 47-50.

493.    With respect to the Teresa Transaction the Examiner concluded:

> Because of BT/Deutsche Bank's role in developing and promoting the transaction, BT/Deutsche Bank was intimately familiar with the tax and accounting treatment of the Teresa Transaction. BT/Deutsche Bank knew that the tax benefit of the transaction would not be available for years, until the undetermined future date when the Enron North Building was eventually distributed to Enron and Enron began to take increased depreciation deductions. BT/Deutsche Bank knew that, on a present value basis, the Teresa Transaction was not expected to result in any tax savings to Enron. BT/Deutsche Bank knew that the purpose of the Teresa Transaction was to generate financial accounting income by recording Deferred Tax Assets well in advance of future tax deductions, and even before the increased basis resulting from the transaction could attach to a depreciable asset. The Examiner has concluded that the financial accounting for the Teresa Transaction was erroneous and misleading because Deferred Tax Assets were recorded prematurely, in violation of GAAP, long before the increased basis could attach to a depreciable asset.

P-DB19 (Batson DB Rpt.) at 47-48.

### b.    Steele Transaction.

494.    Steele closed in October of 1997 and was the first of two REMIC Carryover Basis Transactions ("the REMIC transactions") designed by Deutsche for Enron. P-DB9 (Regan Expert Rpt.) at 228; P-DB19 (Batson DB Rpt) at 27. The second REMIC transaction was Cochise. P-DB19 (Batson DB Rpt) at 36.

495.    "REMIC" refers to a Real Estate Mortgage Investment Conduit and, according to Deutsche's Tom Finley, is an entity (corporation, partnership or trust) owning mortgage-backed securities. P-DB92 (DB Email for Credit Approval in ECT Partners) at DBN-126870, n.1. If the REMIC meets IRS requirements, these entities are not subject to double taxation rules. *Id.*

496.    Deutsche outlined the importance of financial accounting results in William

Boyle's memo regarding the design of the REMIC transactions. P-DB31 (June 1997 Boyle Letter "de-linking the accounting benefits") at AB000187758-59. Boyle had input from Tom Finley, Brian McGuire and Arthur Anderson. P-DB32 (Boyle Dep.) at 93:19-98:10). Boyle stated in Section 1 of the memo, "[financial] accounting is often called the language of business as it is the primary method of communicating a business entity's activities." P-DB31 at AB000187761. "The information provided in the financial statements help [investors] to evaluate the performance of the entity in generating profits and to predict the ability of the entity to generate future profits." *Id*. More pertinently, "[t]he executive officers of business entities also have significant interest in the financial statements of the entity which they manage…," because, "…compensation of such managing executives is usually dependent on the business entities profitability," and "pay bonuses to managing executives based directly on financial results…." *Id*. Thus, "the financial decisions of executives are largely based on predictions of the impact such decisions will have on an entity's financial statements…." *Id*.

497.   The Boyle memo concludes that of the transactions they are looking to propose to Enron, the transaction providing the most financial accounting income the quickest would also provide the largest and most "**substantial fee**" to Deutsche. P-DB9 (Regan Expert Rpt.) at 245, ¶ v (emphasis in original); P-DB31 at AB000187776. As it turns out, the fee charged by Deutsche Bank was over $10 million for Steele to be paid over four years and Deutsche Bank agreed to "forfeit" any unpaid portion of its fee if a change in law or accounting rule "reduces [Enron's] expected accounting reporting treatment." P-DB103 at AB000187816.

498.   In describing Project Steele's earning benefits, Enron's presentation demonstrated that Deutsche Bank's Steele transaction was going to "Show Me the Money!" in the form of $132.8 million "Pre-Tax Operating Earnings." P-DB38 (Enron Steele Presentation) at Ec2000038546.

499. McKee described the REMIC residuals as non-economic pieces of paper. P-DB3 (McKee Dep.) at 354:14-16.

500. REMICs produce income and/or loss for tax purposes, but they do not produce cash and the cash provided, if any, does not match the taxable income or loss. So for the Steele and Cochise transaction, Enron was not going to put the financial statement income on the books and then have a deposit at the bank for the amount of money recorded in the books. *Id.* at 355:23-356:17.

501. Deutsche's Peggy Capomaggi testified that Deutsche Bank would review the accounting possibilities for structured transactions and did so for the Steele transaction. P-DB93 (Capomaggi Dep.) at 137:14-140:4, 142:13-147:22. In a September 10, 1997 internal Email from Capomaggi to Finley and a number of other Deutsche bankers, Capomaggi expressed doubts that Enron's acquisition of assets from the Bank properly constituted a "business combination"—a requirement to comply with the IRS Code—and that other accounting alternatives should be discussed. P-DB94 at DBC0092589-DBC009590; P-DB93 (Capomaggi Dep.) at 145:8-147:22.

502. Expert Paul Regan substantially set forth the Steele transaction details as follows:

- Deutsche Bank and Enron form limited partnership, ECT Investing Partners, LP ("ECT");

- According to the First Amended and Restated Limited Partnership Agreement of ECT Investing Partners, L.P., Enron contributed the following assets:
    - $48 million in cash
    - Preferred stock of Enron Liquids Corporation with a value of $93,500,000
    - 3 leased aircraft with an aggregate fair market value of $42,645,177 (and assumed debt of $42,645,177)
- According to the First Amended and Restated Limited Partnership Agreement of ECT Investing Partners, L.P., Enron received:
    - 1,096,296.93 shares of Class A ECT stock
    - 20,000 shares of Class B ECT stock

- According to the First Amended and Restated Limited Partnership Agreement of ECT Investing Partners, L.P., Deutsche contributed the following assets:
    - $4,402,955 cash
    - Real Estate Mortgage Investment Conduit Residual Interest ("REMIC") with a stated fair value of $7,595,045

- According to the First Amended and Restated Limited Partnership Agreement of ECT Investing Partners, L.P., Deutsche received:
    - 75,300 shares of Class B ECT stock representing an equity contribution of $7,530,000
    - A promissory note from ECT of $4,468,000.

P-DB9 (Regan Expert Rpt.) at 228-230.

503. Paul Regan noted that:

i.      According to the Arthur Andersen memo discussing the acquisition of the interests in the REMIC, the REMIC had a tax basis of $234 million and a fair value of $8 million. This difference between the book basis and tax basis resulted in the creation of a deferred tax asset.

ii.     The deferred tax asset recorded in the Steele Transaction was calculated as follows:
- Deferred Tax Asset – Base of $79.2 million, appears to be equal to 35% times the amount that the tax basis exceeds the book basis in the REMIC.

- Deferred Tax Asset – Gross-up of $42.6 million, appears to be equal to the base deferred tax asset divided by (1-35%) less the base of the deferred tax asset.

iii.    Using the cash received, ECT Partners purchased bonds from Deutsche in the amount of $51.2 million.

iv.     Deutsche was fully aware of the accounting treatment the transaction would receive and the manner in which Enron would receive accounting benefits from the transaction. In an internal memo authored by Deutsche titled "Closing of Project Steele Transaction," Deutsche discussed the general accounting treatment that Enron could use to account for Steele. In this memo, Deutsche stated that based on its interpretation of APB No. 16 and FASB No. 109, Enron should record deferred tax assets or liabilities associated with the acquired assets on Enron's financial statements at the time of the acquisition.

*Id.* at 230-231.

504.    Regan further noted that,

[a]ccording to the Deutsche closing memo, based on APB No. 16 and a
perceived 'bargain purchase' of assets, Enron would record a deferred credit
on its balance sheet. According to the same memo, the deferred credit 'is
then reversed into pre-tax accounting income over time using a rational and
systematic method. The method used in the Transaction is to first allocate
the total Deferred Credit between acquired Corporate Bonds and RRIs
[REMIC] based on the relative fair market values. Accordingly, the
Corporate Bonds was [sic] allocated approximately $104 million of the
deferred credit…. The $104 million is then amortized over the remaining
five year term to maturity of the Corporate Bonds. Accordingly,
approximately $20.8 million of pre-tax earnings is generated in each of the
next five years. The remaining $16 million of Deferred Credit allocated to
the RRis is amortized into income over the remaining life of the RRis
(approximately 25 years).

*Id*. at 231.

505.    The financial effect of Steele on Enron's consolidated income statement through

Q3 2001 in millions is as follows:

| Year | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|
| **Other Revenue** | 6.1 | 22.3 | 25.9 | 22.9 | 17 |
| **Deferred Tax Benefit/(Exp)** | (2.10) | (7.80) | (9.10) | (8.00) | (6.00) |
| **Net Income Effect** | 4 | 14.5 | 16.8 | 14.9 | 11 |

*Id*. at 232.

506.    Enron and Deutsche recognized that the accounting literature required a rational,

systematic method with respect to the amortization period. *Id*. at 231, ¶ v.

507.    They also knew that accounting for the deferred tax assets was attributed to REMIC

Residual Interests with an estimated life of 27 years. *Id*. at 231, ¶ v, 240. However, as designed by

Deutsche Bank, Enron amortized the deferred credit over five years — the life of the corporate

bonds — rather than the life of the REMIC Residual Interests. *Id*. at 240.

508.    Maxey, in his statement to the Bankruptcy Examiner and cited in Batson DB Rpt., testified that the low-yield corporate bonds were acquired simply to provide an artificially short, useful life of five years over which to amortize the credit. P-DB19 (Batson DB Rpt.) at 30; P-DB95 (Maxey Bankr. Dep.) at 125:7-12.

509.    Neal Batson described the REMICS transactions (Steele and Cochise) as follows:

> Although the REMIC Carryover Basis Transactions appear complex, each transaction basically involved the acquisition of REMIC Residual Interests and a limited amount of additional assets (the "Facilitating Assets"). The Facilitating Assets had low economic returns and were acquired for the purpose of enabling Enron to portray the potential benefit of speculative future tax deductions for Phantom Losses as pretax income for financial accounting purposes.

P-DB19 (Batson DB Rpt.) at 28.

510.    Finley testified that Deutsche Bank knew that in designing the transaction that became Steele, a client would pay a significant fee for the accounting benefit and a much greater fee if Deutsche Bank could "accelerate the accounting benefit." P-DB14 (Finley Dep.) at 301:12-302:20.

511.    The Steele Transaction, which closed in October 1997, allowed Enron to record $121.8 million of pre-tax financial statement income based on the potential benefit of speculative future tax deductions for phantom losses from acquired REMIC Residual Interests. *See* P-DB9 (Regan Expert Rpt.) at 240 ¶ a. The amortization of the Deferred Credit into pre-tax income and the selection of the period over which to amortize the Deferred Credit were the two most aggressive and misleading aspects of Enron's accounting for the Steele Transaction. *See id.* at 240 ¶ c.

512.    Leon Kozak of Deutsche Bank testified: "I believe an articulated reason for the Steele Transaction in part were accounting benefits." P-DB96 (Kozak Dep.) at 222:12-18; P-DB97 (January 1999 Deutsche Structured Transaction Group Memo re Enron/REIT) at DBN104195

("The princnipal purpose of the Transaction for Enron will be to generate significant amounts of accounting earnings and investmen income.").

513.     William Boyle testified that the corporate bonds contributed by Deutsche Bank as part of the Steele transaction were not identified until as late as a week before Steele closed and were probably were not owned by Deutsche Bank until the day Steele closed. P-DB32 (Boyle Dep.) at 293:2-295:19, 307:6-8; P-DB39 (September 1997 Project Steele Agenda) at AB00750094 (assets not yet identified days before closing).

514.     Deutsche Bank's entire selling point for the transaction was generating "accounting income" rather than tax savings, as shown in a June 1997 PowerPoint presentation for Enron in which Deutsche Bank promoted Steele as a transaction designed to create approximately $121.8 million of pre-tax financial statement income for Enron. P-DB98 (Discussion Materials Bankers Trust to Enron) at DBC060251.

515.     Deutsche Bank's June 2, 1997 memo to Bill McKee, which was shared with Davis Maxey of Enron, advised that "the accounting benefits of the Steele transaction are derived from treating the transaction as a 'bargain purchase' of assets for accounting purposes, **even though there is no bargain purchase** from an economic perspective. . . ." P-DB99 (Finley to Maxey, Bargain Purchase) at AB000187758.

516.     Akin, Gump, engaged by Enron to offer a tax opinion, stated: (i) "The Company and the Enron Subsidiaries undertook the [Steele] Transaction for the principal purpose of generating financial accounting benefits to the Company's accounting group . . ." and (ii) Enron "would not have entered into the Transaction in the absence of the anticipated accelerated accounting benefit…." P-DB100 (Akin, Gump Tax Opinion) at EC2000033873.

517.     Finley notified Enron that Akin Gump specifically required Enron to represent that

Enron would not have closed the Steele transaction without receiving the accounting benefits. P-DB30 (Letter from Deutsche to Enron) at DBC009411.

518.   Enron would not have closed Steele but for its accounting benefits. P-DB24 (Hermann Bankr. Dep.) at 45:24-46:18 ("we didn't need any tax deductions. We had debt to choke a horse..." and accounting was "critical" to the tax transactions). Deutsche Bank knew Enron represented that the only reason for doing the Steele transaction, was the receipt of the accounting benefits. P-DB30 at DBC009411. Brian McGuire agreed that Deutsche Bank knew Enron would not have engaged in the Steele and Cochise transactions without the financial accounting benefits. P-DB16 (McGuire Dep.) at 68:3-25.

519.   As part of Steele, Deutsche Bank operated BT Green, Inc. through which it contributed REMIC residuals. P-DB9 (Regan Expert Rpt.) at 234, 253.

520.   The Steele Transaction violated GAAP. P-DB9 (Regan Expert Rpt.) at 240-243, 247-250, 270-272.

521.   As Paul Regan concluded,

> In the early 1980s the FASB confronted a similar mismatch in amortization periods that was a gimmick used by Banks and Thrift Institutions. The gimmick began with an acquisition by one thrift or bank by another. The acquirer would write down various assets of the acquired institution and increase various liabilities. This would usually result in a balancing entry that was recorded as goodwill. Following the acquisition, the liabilities would be amortized into income rapidly while the goodwill would be amortized as an expense, sometimes over a period as long as 40 years. This mismatch would artificially create income to the institution that led to higher earnings, higher stock prices, bonuses to management, and dividends to the stockholders. But it was fiction. As the chairman of the SEC mentioned in his speech on Accounting Gimmicks, this was an early use of "Merger Magic."

P-DB9 (Regan Expert Rpt.) at 241. The FASB issued Statement of Financial Accounting Standards No. 72 and tried to put an end to "Merger Magic." *Id*. at 241-43. Steele is another form of "Merger Magic." *Id.* at 243.

522.   GAAP requires that the amortization period for the Steele deferred credits be determined with reference to the asset giving rise to the deferred tax benefit. *Id*. In the Steele Transaction the deferred tax asset should have been amortized with reference to the REMIC residual interests and not the short dated corporate bonds (*i.e.*, the facilitating asset). *Id*. By using an artificially short-dated reference asset, the benefit was overstated, making it misleading. *Id*.

523.   Neal Batson also concluded that the Steele transaction "did not comply with GAAP" and was "misleading" because a reader of Enron's financial statements could not know that Enron claimed pre-tax income from speculative future tax deductions for phantom REMIC losses. P-DB19 (Batson DB Rpt.) at 35.

524.   To the extent that the phantom losses were a tax position that could be sustained, GAAP requires a "valuation allowance" (*i.e.*, tax cushion) if, based on the available evidence, it is more likely than not that some or all of the deferred tax asset will not be utilized. P-DB9 (Regan Expert Rpt.) at 240-243, 271-272.

525.   The accounting for the Steele Transaction did not provide a valuation allowance for either risk that there would not be sufficient taxable income available to benefit from the phantom losses or risks that the IRS would deny the deduction for the phantom losses. *Id*.

526.   Deutsche Bank developed the Steele Transaction because it was looking for an efficient way to sell or monetize REMIC Residual Interests that it had acquired in the course of its business. P-DB228 (McGuire Bankr. Dep.) at 83:14-84:15, 91:16-92:14. The transaction that it developed could be used to generate significant accounting benefits for its counterparty. P-DB15 (Finley Bankr. Dep.) at 90:17-92:16, 107:13-108:14.

527.   Deutsche Bank first promoted the Steele Transaction to Enron in June 1997. P-DB102 (DB Evaluation Material) at AB000318164.

528.   The Examiner concluded the following regarding the Steele structure:

Enron's accounting treatment of the Steele Transaction did not comply with GAAP and was misleading because a reader of Enron's financial statements had no way of knowing that purported pre-tax income from operations actually consisted of the potential benefit of speculative future tax deductions for Phantom Losses from acquired REMIC Residual Interests.

P-DB19 (Batson DB Rpt.) at 35.

### c.   Cochise Transaction.

529.   In June of 1998, Deutsche Bank approached Enron and presented Cochise (a variation on the Steele Transaction) as another transaction for generating accelerated pre-tax accounting income. P-DB107 (McGuire Memo forwarding June 1998 Cochise Presentation) at ECv001153438.

530.   Deutsche Bank sold the structure to Enron by claiming that Cochise could generate $75 million in pre-tax accounting income and $79 million in accounting earnings from the future benefit of future tax deductions. P-DB108 (Cochise Early Presentation) at EC2000037381.

531.   Like the prior tax transactions, the fee agreement for Cochise reflected that the accounting results needed by Enron were essential to the deal, so that if the accounting benefits could not be achieved through December 2002, a portion of the Deutsche fee was forfeited. P-DB16 (McGuire Dep.) at 290:21-291:20. Enron and Tom Finley had originally discussed a $15 million fee for Cochise, but Brian McGuire sought $20 million due to the "risk to BT" and the accounting benefit to Enron. *Id*. at 288:6-289-10. Ultimately, Deutsche charged Enron a $15 million fee for devising and implementing Cochise. P-DB109 (Cochise Engagement to Enron) at EC2000037418; P-DB9 (Regan Expert Rpt.) at 227.

532.   Cochise took on the form of transaction number 3, described in Deutsche Bank's memo to William McKee. P-DB9 (Regan Expert Rpt.) at 250-251, 243-247; P-DB31 (1997 Boyle Letter to McKee) at AB000187760.

533.    The Cochise transaction details were as follows:

i. Maliseet Properties Inc. was restructured and the capitalization was changed to include Common Stock, Series A Preferred Stock and Series B Preferred Stock;

ii. Enron purchased $24,798,594.21 million portfolio of mortgage securities from BT Green, an entity controlled by Deutsche;

iii. ECT Investments Holding Corp., an indirect wholly owned subsidiary of Enron purchased two leased airplanes $46,695,699 (including broker fees) from BT Ever, Inc., a Deutsche subsidiary;

iv. Deutsche purchased 1,000 shares of Maliseet Common Stock from Enron Corp. for $1,250,000;

v. Maliseet was organized as a REIT;

vi. Enron and Bankers Trust contributed capital to Maliseet;

vii. Enron contributed the following assets to Maliseet:

- $24.8 million portfolio of mortgage securities (purchased from BT Green)

- 2 leased airplanes (purchased by ECT from BT Ever)

vii. Enron received:

- 100% of outstanding Series A Preferred Stock of Maliseet

- 100% of Series B Preferred Stock of Maliseet

ix. Deutsche acquired and contributed the following assets to Maliseet:

- $2,724,817.80 portfolio of mortgage securities (Deutsche purchased from BT Green)

- REMIC Securities valued at $165,000, with a tax basis of $120 million.

x. Deutsche received:

- 1,000 shares of Common Stock with an agreed value of $1,250,000

- $5,396,318 promissory note with an agreed value of $1,639,818

xi. 104 individuals, including 6 Enron officers, purchased one share of Maliseet Series B Preferred Stock for approximately $12,500 to satisfy a requirement that a REIT have at least 100 shareholders. This reduced Enron's ownership percentage of Series B Preferred Stock to 82%.

P-DB9 (Regan Expert Rpt.) at 233-235; *see also* P-DB97 (1999 McGuire to Hayes Structured Transaction Group Memo re Enron/REIT) at DBN104196-97 (describing transaction steps, including round trip sales back and forth with Enron/DB); P-DB16 (McGuire Dep.) at 261:1-19.

534.    In June 2000 (18 months after Cochise closed), Maliseet Properties Inc. sold the airplanes back to Deutsche Bank for $36.5 million as suggested in the June 1997 Deutsche Bank model. P-DB9 (Regan Expert Rpt.) at 238.

535.    "Because the book value of the airplanes was written down to $0 at the inception of Cochise, the purchase of the airplanes for $46.7 million in 1999 resulted in a gain from the sale of these assets of $36.5 million in 2000. In fact, rather than an economic gain of $36.5 million, Enron experienced an economic loss of $10.2 million from the sale of the airplanes." *Id*. Enron's misleading accounting entry was not materially different from the entry Deutsche Bank suggested in its internal memos regarding Cochise. *Id*. at 238-39.

536.    The impact of Cochise on Enron's consolidated income statement through Q3 2001 was as follows (in millions):

| Year | 1999 | 2000 | 2001 |
|---|---|---|---|
| Gain on Sale of Assets | - | 36.5 | - |
| Other Revenue | 4.3 | 4.7 | 3.6 |
| Deferred Tax (Expense) | (4.10) | (16.50) | (1.30) |
| Deferred Tax Benefit | 27.4 | 25.6 | 15.9 |
| **Net Income Effect** | 27.6 | 50.3 | 18.2 |

*Id*. at 239.

537.    The primary purpose of Cochise (like Steele) was to create the appearance of revenue and pre-tax income for financial statement purposes. As stated in two internal Deutsche Bank January 1999 memos:

> The principal purpose of the transaction for Enron will be to generate significant amounts of accounting earnings and investment income. For its participation, BT Co would be paid a significant advisory fee and would earn an attractive return on its investment in the REIT.

P-DB110 (Cochise REIT Transaction to DB Credit Committee) at DBC060387; P-DB97 (Structured Transaction Group Memo re Enron/REIT) at DBN104195.

538.    In an early Project Cochise presentation, Deutsche states, "The Transaction is structured in a manner which allows the benefit of the bargain purchase to be recognized into pre-tax income over a relatively short time frame." P-DB108 (Cochise Early Presentation) at EC2000037381.

539.    The Cochise Facilitating Assets differed from those used in Steele. While Steele used corporate bonds,

> [i]n the Cochise transaction, the leased assets were used to offset the deferred credit, resulting in a zero book basis for the aircraft. The remaining deferred credit was amortized into income over the life of the aircraft. When the aircraft were sold 18 months after the inception of the transaction, the sales price of the aircraft was recognized entirely as a gain on their sale. In doing so, the deferred credit originally created based on a so-called "bargain purchase" was accelerated into income in a manner even faster than if the deferred credit had been amortized into income over time.

P-DB9 (Regan Expert Rpt.) at 240.

540.    According to Paul Regan,

> [t]he accounting for the deferred credit in both the Steele and Cochise transactions did not result in relevant, reliable, and useful financial presentations for several reasons. Enron's choice (suggested by Deutsche) of different amortization periods for the deferred debits and the deferred credits resulted in a mismatch of revenue and expense (a shorter time into revenue and a longer time into expense). Additionally, the revenue was presented as other revenue while the expense was added to tax expense. As recognized in Deutsche's pitch to Enron, this difference results in a valuable advantage to Enron when viewed by financial statement users (as long as the reason for this difference is not disclosed to the financial statement user).

*Id.* at 240-241.

541.    Similar to Steele, the evidence is that the assets transferred into the Cochise transaction were not purchased by Deutsche Bank until shortly before the transaction closed. P-DB16 (McGuire Dep.) at 464:13-466:7.

542.    Acting on attorney Bill McKee's concerns about whether the entities involved in the Cochise transaction acquired the transaction assets shortly before closing, Enron and Deutsche

Bank (McGuire) exchanged correspondence where they would remove pages from the Cochise presentation binder materials and change language in the cover pages so as to not, "…[draw] attention to the fact that [certain Cochise assets] were acquired only days/hours before the closing of the transaction." P-DB111 (Cochise Memo to McGuire, Binding Changes) at DBC044412; P-DB16 (McGuire Dep.) at 464:13-466:7.

543.    "Just as with the Steele transaction, the primary purpose for the Cochise transaction was to create income for financial statement purposes. As stated in an internal Deutsche memo dated January 10, 1999:

> The principal purpose of the Transaction for Enron will be to generate significant amounts of accounting earnings and investment income. For its participation, BTCo would be paid a significant advisory fee and would earn an attractive return on its investment in the REIT.

P-DB9 (Regan Expert Rpt.) at 251 (quoting P-DB208 (Cambridge memo to McGuire) at DBC048003).

544.    Just as described in the June 2, 1997 memo, the Cochise transaction was treated as another so-called "bargain purchase" of assets resulting in the creation of a deferred credit balance. The deferred credit was offset against the value of the airplanes, reducing the book value of the airplanes to $0. The airplanes, which were originally purchased from Deutsche, were then sold back to Deutsche with the entire purchase price (since the book value had been reduced to zero as explained above) recorded as a gain on sale of assets. *Id.* at 250.

545.    Amortizing the credit over five years was not rational or allowable from an accounting standpoint because the deferred tax assets were attributable solely to REMIC Residual Interests with a much longer life and as such violated GAAP. *Id.* at 240-241.

546.    According to a draft March 2000 Tax Opinion from McKee Nelson, Ernst & Young

LLP to Enron, "[t]he three most important purposes of [the members of the Enron Affiliated Groups] for participating" in the Cochise Transaction were increasing "[pre-tax] financial accounting income and the net earnings on the Enron consolidated financial statements as a result of the Transactions." P-DB113 at MN008433.

547.    In looking at the arguments against the Cochise transaction, a Stanford law professor consulted by McKee wrote:

> First, it is important to point out here that **there are no significant tax benefits being sought or obtained here**. There are very significant accounting benefits which some might think are troubling and perhaps should be the topic of further legislation and discussion, but tax benefits are not at issue.

P-DB8 (Mills letter to McKee re Cochise) at OUTREB0000699.

548.    As a result of the above analysis, Silvercreek's accounting expert Regan concluded that the Cochise Transaction plainly violated GAAP. P-DB9 (Regan Expert Rpt.) at 240-243, 244-250, 268-272.

549.    Like the Steele transaction, Cochise is another form of "Merger Magic." *Id.*; *see also* P-DB9 (Regan Expert Rpt.) at 241.

550.    To the extent that the phantom losses were a tax position that could be sustained, GAAP required a "valuation allowance" (*i.e.*, tax cushion) if, based on the available evidence, it is more likely than not that some or all of the deferred tax asset will not be realized. P-DB9 (Regan Expert Rpt.) at 240-243, 271-272. The accounting for the Cochise Transaction did not provide a valuation allowance for either risk that there would not be sufficient taxable income available to benefit from the phantom losses or risks the IRS would deny the deduction for the phantom losses. P-DB9 (Regan Expert Rpt.) at 240-243, 271-272;

551.    With respect to the Cochise Transaction, the Examiner concluded that:

[T]here is sufficient evidence to support a finding that the transfer of the Cochise

207

planes to [Deutsche Bank] should not have been recorded as a sale under GAAP because Enron and [Deutsche Bank] had reached an understanding to return the Cochise planes to Enron by means of a transfer to Oneida.

P-DB19 (Batson DB Rpt.) at 57.

552.   He also concluded that:

Enron's accounting treatment of the Cochise Transaction did not comply with GAAP and was misleading because a reader of Enron's financial statements had no way of knowing that purported pre-tax income from operations actually consisted of the potential benefit of speculative future tax deductions for Phantom Losses from acquired REMIC Residual Interests.

P-DB19 (Batson DB Rpt.) at 42.

### d.   Tomas Transaction.

553.   The Tomas Transaction was brought to Enron's tax department by Deutsche Bank in 1998. P-DB15 (Finley Bankr. Dep.) at 144:6-17; P-DB191 (September 15, 1998 Engagement Letter) at DBG 024673. The Tomas Transaction arose out of a portfolio of leased assets with a low tax basis Enron acquired with its purchase of Portland General Holdings. Enron asked Deutsche Bank to identify a manner for Enron to dispose of those assets in a "tax efficient way." P-DB15 (Finley Bankr. Dep.) at 144:6-17; P-DB9 (Regan Expert Rpt.) at 261-262

554.   PowerPoint presentation material prepared by Deutsche Bank boasted of the benefits Tomas provided to Enron: "This structure generated tax basis in a portfolio of 'burnt out' leveraged lease assets, which Portland General originally acquired and provided a mechanism for liquidating the portfolio at a substantial gain." P-DB114 (Tomas Business Review Presentation) at EC2000038343.

555.   Deutsche Bank created Tomas so Enron could dispose of certain leased assets having a low tax-basis without recognizing taxable income, while also recognizing accounting income gain on the dispositions. *Id*.

556.   Acting as Enron's exclusive financial advisor on the Tomas Transaction, Deutsche

Bank received $10 million dollars in fees. P-DB191 (Tomas Deutsche Engagement Ltr) at DBG024674; P-DB9 (Regan Expert Rpt.) at 267.

557.    Deutsche Bank and Enron worked out a structured transaction that included the formation of an SPE named Seneca Leasing Partners, L.P. and the involvement of another Enron affiliate named Oneida. P-DB9 (Regan Expert Rpt.) at 261-62.

558.    Silvercreek's expert Regan described the steps as follows:

i. In its February 16, 1998 memo, Deutsche Bank summarized a hypothetical transaction and tax and accounting results that became Tomas as follows:

- The Client would contribute a portfolio of Leased Assets subject to nonrecourse debt to a new Partnership in return for a general partnership interest.

  ▪ Client's $0 tax basis in Leased Assets carries over to the Partnership.

  ▪ Client has a $0 basis in the Partnership.

- The Client would contribute cash to an existing Client wholly owned subsidiary. The cash, financed by recourse debt would be used for investment in Leased Assets.

  ▪ Client would have a tax basis in the stock of the wholly owned subsidiary equal to the cash contributed.

  ▪ Wholly owned subsidiary has a tax basis in the Leased Assets equal to the cash contributed.

- The Client would contribute the stock of the wholly owned subsidiary to the Partnership. The Partnership would assume the recourse debt.

  ▪ Client's tax basis in the wholly owned subsidiary carries over to the Partnership.

  ▪ Client increases its tax basis in the Partnership to the cash contributed.

- Client would receive a Liquidation Right available at any time after two years.

  ▪ Deutsche assumes a deferred tax liability is already recorded on the financial statements of the Client for the difference between the book basis and $0 tax basis of the Leased Assets held by the Client at the time the Leased Assets are contributed to the Partnership.

▪ Further, the memo states: "However, FAS 109 also provides that tax planning strategies may be considered where such strategies provide a method for eliminating the disparity between book and tax bases without triggering the recognition of taxable income. In the Transaction, the Liquidation Right. .. provides such a strategy for Client"

▪ "Since the actual liquidation of [Clients'] interest in Partnership is not expected to occur for at least two years, there will be some recognition of the deferred tax liability on the Leased Assets for the intervening period. Accordingly, [Client] would be allowed to reverse only the portion of its deferred tax liability that it expects will not be recognized prior to the exercise of its Liquidation Right. .. The precise methodology for eliminating the deferred tax liability depends on the specific accounting used for the Leased Assets."

- More than two years later, Client could exercise its Liquidation Right and liquidate its interest in the Partnership.

▪ Prior to the Liquidation, the value of each Leased Asset would be determined based on an open "Bidding Process."

▪ The distribution would reduce the Client's basis in the Partnership to zero.

▪ The zero balance attaches to the property, including any Leased Assets, distributed upon Liquidation.

▪ The Leased Assets held by the wholly owned subsidiary retain their full tax basis.

P-DB9 (Regan Expert Rpt.) at 263-65.

559.   Following the February 16, 1998 proprietary Deutsche Bank structure, the Tomas

transaction occurred substantially as follows:

i. On September 9, 1998 Portland General Holdings, Inc., a wholly-owned Enron subsidiary ("Enron") BT Leasing Corp. and EN-BT Delaware, Inc. (collectively referred to as "Deutsche") formed Seneca Leasing Partners, L.P.

ii. Preceding any Partners' contributions to Seneca, Bankers Trust issued a $252,521,946 Demand Promissory Note to Oneida Leasing, a dormant wholly-owned subsidiary of Portland General Holdings, Inc.

iii. Enron, the General Partner, contributed the following:

- Leased assets with a fair value of $279,678,051 subject to nonrecourse debt of $169,555,556.

- Oneida Stock, 100 shares with a fair value of $252,521,946

- Assumption by Seneca of recourse debt of $252,521,946

iv. Enron received 95% Initial Percentage Interest

v. Deutsche, the Limited Partners, contributed the following:

- $11,215,807 in cash

vi. Deutsche received:

- 5% Initial Percentage Interest

P-DB9 (Regan Expert Rpt.) at 261-62.

560.    The Tomas transaction had the following effect on Enron's income statement, including allowing Enron to book $64 million in pre-tax gains in 1998 and $45 million in pre-tax gains in 2000:

| Year | 1998 | 1999 | 2000 |
|---|---|---|---|
| Income | 64 | 0 | 45 |
| Deferred Tax Expense | 7.5 | 0 | 0 |
| Permanent Current Tax Benefits | 25.6 | 0 | 18 |

P-DB9 (Regan Expert Rpt.) at 266.

561.    The Seneca partnership agreement gave Portland General Holdings the right to compel Seneca to liquidate its partnership interest at any time after two years in exchange for assets designated by PGH. *See* P-DB9 (Regan Expert Rpt.) at 264-65.

562.    McGuire understood Enron selected two years to avoid sham transaction rules and had a presumption existed for a shorter time period, Enron would have chosen that time period before Seneca could be unwound. P-DB16 (McGuire Dep.) at 153:20-156:18.

563.    Enron and Deutsche Bank understood and agreed the structure would be unwound in two years. P-DB24 (Hermann Bankr. Dep.) at 182:16-19. The Seneca partnership was to stay

alive a minimum of two years because the parties wanted to take advantage of "partnership allocation rules and presumptions." P-DB24 (Hermann Bankr. Dep.) at 182:16-22.

564.    Paul Regan described the IRS' tax examination of Tomas as follows:

An IRS Corporate Income Tax Examination of the Tax Years Ended December 31, 1996 through December 31, 2001 concluded that Enron failed to report a gain from the sale or disposition of Leased Assets to Seneca in the amount of $261,501,050 for the taxable year ended December 31, 1998. In summary, the IRS found the contribution of Leased Assets to Seneca was a "disguised sale" of the Leased Assets to Seneca; Seneca was "formed or availed in connection with a transaction whose principle purpose was to reduce substantially the partners' aggregate federal tax liability"; and the transactions were "prearranged and predetermined ... and were entered into for the purpose of tax avoidance."

P-DB9 (Regan Expert Rpt.) at 268 (quoting P-DB35 (Income Tax Examination Changes, Project Tomas) at Ecggg000682427).

565.    "The IRS concluded that for the taxable year ended December 31, 1998, Enron incurred a tax liability of $91,525,367 and related penalty of $18,305,074. Alternatively, if it was determined that the underpayment had occurred in taxable year ended December 31, 2000, the resulting tax liability would be $45,762,684 and related penalty would be $9,152,537." *Id*.

566.    "[I]n recording the Tomas transaction the way Deutsche had suggested, Enron's financial statements had understated income tax expense in either 1998 or 2000 by between $45,762,684 and $91,525,367." *Id*.

567.    Enron's transfer of the airplanes was not a "sale" recognizable under GAAP and it should not have recognized any income from the transfer of the airplanes. P-DB9 (Regan Expert Rpt.) at 238-39, 242-43, 250.

568.    Enron and Deutsche Bank engaged in a two-step transaction to allow Enron to claim the transfer of the Cochise planes as a sale, a transfer which allowed Enron to get the planes back after selling them; this accounting did not comply with GAAP and reflected a $36.5 million gain to Enron, when the sale and purchase of the planes by Enron actually resulted in a $10.2 million

net loss. *Id.* at 238-239; P-DB116 (Memo re: Leased Assets United-Continental) at DBF002632 (explaining structure was "to accomplish certain accounting goals").

569.    Deutsche Bank and Akin Gump discussed having Deutsche Bank act as an intermediary on the plane sales that was going to hold the planes for only ten days. P-DB116 (Memo re: Leased Assets United-Continental) at DBF002632; P-DB117 (Deutsche Email re resale of planes to Oneida Leasing) at AGS36084 .

570.    In her May 23, 2000 Email, Akin Gump attorney Sarah Kight stated a direct sale of the planes to Oneida would not "achieve Enron's goals from an accounting perspective" and suggested that Enron was pursing "the possibility of a sale to a DB [Deutsche Bank] entity (with a possible "**follow on**" transfer to Oneida)." P-DB21 at AGS35929.

571.    Brian McGuire testified the transfer of the Cochise planes to Deutsche was done on as short a time frame as possible to allow Enron to recognize its accounting benefits:

> Q. In order to accomplish certain accounting goals, and as you'll note in the attached material, the structure would call for a direct acquisition of such aircraft by BT Leasing Corp., a BT subsidiary, with a subsequent sale approximately ten business days later to Oneida." That was accurate, right, in order to accomplish those accounting goals, we've talked about that; right?
>
> A. To accomplish Enron's goal of recognizing the gain, they needed to sell it to someone other than Oneida, correct.
>
> Q. Right. So that part at least of this memo you got right?
>
> A. Correct.
>
> Q. You have the approximately ten business days later to two weeks. Do you know why at the time of this memo in June of 2000, that was the time frame?
>
> A. There was no specific time frame. I was giving an illustrative indication so that she understood it was expected that we would pursue that in short order.
>
> Q. Right. Why did you choose approximately ten business days?

213

A. To give the indication that would happen in a short time frame, that we would take steps to pursue that in a short time frame.

Q. And then it ended up being about a month; right?

A. Correct.

P-DB16 (McGuire Dep.) at 248:11-249:19.

572.     With respect to the Tomas Transaction, the Examiner concluded that:

The tax planning for the Tomas Transaction relied on representations by Enron and BT/Deutsche Bank that Oneida would engage in a leasing business. . . . Prior to June 2000, however, when [Portland Holdings, Inc.] gave notice of its intent to withdraw from Seneca, Oneida had not engaged in any leasing business.

P-DB19 (Batson DB Rpt.) at 50; P-DB13 (1998 Akin Gump Tomas Tax Opinion) at AB000151735-36.

573.     In order to give Oneida some semblance of leasing activity, Enron and BT/Deutsche arranged to transfer the Cochise planes to Oneida. P-DB22 at DBF002636-37 ("In order to achieve certain accounting benefits on Enron's side, we would have a BT company other than Oneida buy the planes and then (shortly thereafter) sell such planes to Oneida."); P-DB118 ("It is planned that Oneida will be distributed out to Enron by year-end in redemption of Enron's interest in Seneca Leasing. In the interim, Oneida needs to acquire certain assets to satisfy the original structural requirements of the transaction.").

**D.     Deutsche Bank knew "expertized" documents defied reality and overstepped accountant and lawyer independence**.

**1.     Deutsche's manner of developing the Tax Transactions did not allow Andersen to act with professional objectivity or independence**.

574.     Numerous Deutsche Bank people involved in developing the tax transactions previously worked at Andersen, including Thomas Finley, Christine Levinson, William Boyle, Brian McGuire, John Tsai, and Forest Gilman. P-DB14 (Finley Dep.) at 94:24-97:23.

575.     Deutsche Bank employed Andersen in development of the Deutsche Tax Transactions prior to presenting them to Enron, and Deutsche Bank was also involved in the creation of the SAS 50 letters ultimately issued by Andersen. P-DB14 (Finley Dep.) at 69:17-72:2, 74:24-75:22, 80:19-82:15, 93:9-22; P-DB15 (Finley Bankr. Dep.) at 18:1-20; P-DB16 (McGuire Dep.) at 126:21-127:2; P-DB97 at DBN104200 (DB Approval Memo noting that Deutsche already had Andersen "accounting opinion" and Akin Gump tax memo).

576.     Deutsche Bank knew at the time of obtaining the SAS 50 letters from Andersen, that they would provide them to clients to support accounting results. P-DB16 (McGuire Dep.) at 126:13-20.

577.     Deutsche recommended Enron engage Andersen based on the accounting firm's purported knowledge of the tax transaction accounting details, and Andersen participated in marketing the transactions to Enron. *See* P-DB17 (Deutsche Fax to Enron re Discussion Materials) at DBC013815 (cover page notes "Baldasaro [Andersen] will be giving you a call tomorrow to discuss the structure"). Deutsche's Sanjai Bijawat stated that after a failed attempt to market to Dow Chemical, he, Tom Finley and Leon Kozak agreed that for transactions such as the "Leasing Partnership," they would limit the marketing process to Deutsche Bank clients that were also clients of King & Spalding, Akin Gump or Arthur Andersen. P-DB18 (August 14, 1997 DB marketing email describing agreement between Finley, Kozak and Bijawat) at DBG027038 ¶ 1.

578.     Although its "honest services" conviction for evidence tampering was overturned, Arthur Andersen was criminally prosecuted and no longer exists as a result of the Enron debacle. *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005).

579.     Finley principally used the same individuals, Mike Baldasaro and Ron Weissman, he knew from Andersen to get the SAS 50 letter and taxation information in development. P-DB14

(Finley Dep.) at 463:6-25; P-DB15 (Finley Bankr. Dep.) at 18:1-19:6. When Enron hired Andersen to work on the tax transactions, they used the same two people, Mike Baldasaro and Ron Weissman. P-DB24 (Hermann Bankr. Dep.) at 47:15-24.

580.   Hermann knew Baldasaro was one of Andersen's "top 20 partners." *Id*. at 47:25-48:5.

581.   When asked whether Andersen people had different views on the tax transactions, Hermann responded "all the time" and for "Every one." P-DB24 (Hermann Bankr. Dep.) at 48:22-49:3.

582.   For example, Richard Petersen raised questions about using financial reporting to satisfy business purpose requirements in the REMIC transactions. P-DB23 at PSI00021882.

583.   In connection with the REMIC transactions, Richard Petersen stated, "The only other thing I can think of that we need to be careful about is any assertion by the company (for example, as part of their tax documentation) that the transaction was entered into primarily for its financial reporting impact. **Such an assertion would be a problem**." P-DB188 (October 30, 1997 Petersen email to Willard) at AB078502530 (emphasis added).

584.   Hermann told Dave Maxey to go to Baldasaro and have "[him] tell [others at Andersen] what the answer is since he's already decided it." P-DB24 (Hermann Bankr. Dep.) at 49:1-16.

585.   Tom Finley, of Deutsche Bank, used Mike Baldasaro to help promote the first tax transaction, Teresa, to Enron. P-DB17 (May 28, 1996 Finley to Hermann, Fax Discussion Materials Bankers Trust to Enron) at DBC013815 at 1.

   **2.     Reliance on SAS 50 letters is unjustified as they are based on hypothetical versions of transactions**.

586.   Andersen's SAS 50 letters are opinions as to hypothetical versions of Cochise,

Steele, and Teresa. P-DB14 (Finley Dep.) at 516:4-10, 515:17-527:16. SAS 50 letters were based on hypothetical facts, and were not an audit, approval or opinion of actual transaction facts. *Id*. at 518:1-11; 520:5-521:17. In reference to the SAS 50 letters, Bob Hermann testified "the deals always changed, so the letters didn't make any difference anyway." P-DB24 (Hermann Bankr. Dep.) at 47:5-14. Because they were issued well before the tax transactions were actually done, the Andersen SAS 50 letters could not take into consideration whether the client actually had the requiste ability and intent to utilize the purported tax deductions and losses derived from them. *Id*. at 521:18-524:15.

587.    Andersen ***assumed*** Enron had both "the ability and intent" to utilize the tax deductions and losses made available by the tax transactions and made the assumption based on the representations made by Deutsche. P-DB24 at 521:3-8, 523:12-20, 515:17-527:16.

588.    Thomas Finley testified, that Andersen's SAS 50 letters were premised upon the assumption that the counterparties in the Tax Transactions had both the "ability and intent" to utilize the tax deductions and losses and that the accounting treatment relied on this premise. *Id*. at 521:18-524:15.

589.    Accounting firms no longer provide SAS 50 letter, and it makes sense to Finley based on the timing that accounting firms stopped the practice after Enron. *Id*. at 516:19-517:25.

590.    Enron had millions of dollars in net operating losses, so the tax savings that were created from the Deutsche Bank Tax Transactions were unusable. P-DB28 (JCT Report) at 42-43. Simply put, Enron did not do any tax transactions for tax deduction, because they had plenty and "didn't need deductions;" to Enron the phatom accounting income was the "critical" key. P-DB24 (Hermann Bankr. Dep.) at 46:6-18.

591.    To support the necessary SAS 50 requirements for the eventual closing of Steele,

Enron told Andersen, "the acceleration of the financial statement benefits in advance of the tax

benefits is not the sole reason for doing this transaction." P-DB29 (October 29, 1997 Letter

Hermann and Causey with Enron, to Arthur Andersen) at AA000006608.

592.     Deutsche Bank, however, represented the exact opposite to Enron's tax counsel in

pitching the transactions: "the principal purpose of [the company] in entering the transaction was

to achieve the accelerated accounting benefits resulting therefrom." P-DB30 (June 1997 Deutsche

Letter to Enron) at DBC009410.

### 3.     Deutsche knew the "should" opinions required and contained unsupportable representations.

593.     Andersen's discomfort with the tax transactions led to the should opinions. As Bob

Hermann testified regarding the view of Enron:

> …the agreement required a should the agreement with Andersen
> originally, after the first more likely than not deal that they
> themselves brought to us, was that we weren't going to -- they didn't
> like a lot of things at Enron about accounting. . . . I got the feeling
> that the Tax department was just making them less comfortable, and
> therefore, I was told that they weren't going to allow us to do any
> accounting benefits on less than they should, and so that became a
> standard. We had to have a should.

P-DB24 (Hermann Bankr. Dep.) at 76:12-23.

594.     Bob Hermann did not himself believe in the accuracy of the should opinion letters.

He testified as follows:

> Q.     Now, going back to this question of the facts, I take it was important that
> the facts described in the opinion were the actual facts of your deals, is that
> correct, in terms of whether you could rely on the opinions?

> A.     I never believed I could rely on any of these opinions. I don't think that --
> you know, they've got so many holes in them….

P-DB24 (Herman Bankr. Dep.) at 78:17-24.

595.     In his examination regarding conversations with Deutsche Bank related to the tax

transactions, Hermann's stated "I can remember telling people that we were only interested in structured transactions where we got a financial income benefit." P-DB24 (Hermann Bankr. Dep.) at 156:3-17; 46:3-18.

596.    Mr. John Buser, who advised Enron on the Steele transaction stated, "If the tax benefits were not substantially deferred, our tax opinion would become inapplicable because we – [sic] we were opining on a certain set of facts. If those weren't the facts, our opinion would no longer be relevant." P-DB25 (Buser Dep.) at 57:12-58:18.

597.    Buser's lawyer told the Enron bankruptcy Examiner that his Steele tax opinion was premised upon certain factual assumptions represented to him and that, if those assumptions were not true, his opinion letter could not be relied upon. P-DB196 (June 9, 2003 Buser Counsel Letter to Examiner) at BUSER00457, 462, 526.

598.    Buser's opinion letter relied upon the assumption that Enron would defer recognition of the tax deductions from Steele for many years such that Enron would not enjoy any present value benefit of the tax deductions (in excess of the transaction costs). *Id.* at BUSER0462; P-DB11 (December 16, 1997 Steele Opinion Letter) at EC2000033873 ¶ 1.

599.    Buser testified that he made Deutsche Bank (through Boyle) and Enron (through Maxey) aware that substantial deference of tax benefits was a requirement for the Steele transaction to withstand IRC Section 269 applicability and disallowance of Enron's tax deductions. P-DB25 (Buser Dep.) at 52:12-56:19.

600.    Enron Corporation told the Congressional Joint Committee on Taxation that it did not substantially defer the tax benefits from Steele for many years, as Mr. Buser had assumed. P-DB26 (January 31, 2003 Letter to Joint Committee on Taxation) at AB000525602.

601.    Bill McKee's Cochise tax opinion letter was issued two years after Cochise closed

and assumed that the purchase benefit was more important than the carryover benefit. P-DB12 (March 3, 2001 McKee Cochise Tax Opinion) at AB000151806 ¶ 7.

602.    Brian McGuire was directly involved in discussing the Cochise transaction with Enron and stated that the carryover (pretax) benefits were a "significant" and principal purpose of the Cochise transaction. P-DB16 (McGuire Dep.) at 35:6-21, 453:17-24, 456:4-457:12. If the representation is untrue, then the transaction falls under IRC § 269 and would fail. P-DB3 (McKee Dep.) at 193:3-10.

603.    Deutsche Bank knew potential target companies would put much greater importance on pre-tax (carryover) versus post-tax (purchase) benefits in its development letter to William McKee outlining transactions that became the Steele and Cochise transactions. P-DB31 (1997 Boyle Letter to McKee) at AB000187766. The letter was co-written by William Boyle, Thomas Finley, Brian McGuire of Deutsche Bank Structured Transaction Group, with input from Arthur Andersen. P-DB32 (Boyle Dep.) at 93:19-98:10. The letter stated,

> The distinction between Above-the-Line and Below-the-Line is critically important in a number of respects. **Most significantly, stock analysts and valuation specialists utilize this concept when analyzing a particular corporate business entity** and determining the appropriate value and stock price for the corporation. Commonly, such analysis relies heavily on Earnings Before Interest, Taxes, Depreciation and Amortization.
>
> \*          \*          \*
>
> Thus, **stock analysts and valuation specialists generally ignore the tax expense line** of an income statement . . . in determining a corporation's true market or trading value. Accordingly, since the compensation of a business entity's executive offices is often tied to the market or trading value of the entity, **such executives place much greater priority on increasing Pre-Tax Income** and are generally less concerned about the entity's [post-tax income].

P-DB31 at 6 (emphasis added).

604.    This same letter further concludes, "In summary, it should be apparent from the above discussion that **the Transaction is a deal driven by the [pre-tax] accounting benefits**. If

a client were interested in the tax benefits, other less expensive alternatives exist….” *Id.* (emphasis added).

605.    Bankruptcy Examiner, Neal Batson, agreed that there is “significant factual uncertainty whether Enron’s representation that the Carryover Benefit was more important to it that the Purchase Benefit was accurate when made. P-DB33 (Batson Tax Transactions Rpt.) at 33.

606.    Deutsche Bank’s internal memos on what would become the Steele and Cochise transactions further demonstrate Deutsche Bank’s understanding that clients would be most interested in the transaction for the “generation of pre-tax income.” P-DB34 (July 1997 STG Memo) at DBF044288 (“The principal purpose of the Transaction for the Client will be to generate significant amounts of pre-tax accounting and investment income.”); *see also*, P-DB9 (Regan Rpt.) at 243-251.

607.    The tax opinion for Tomas was premised on the assumption that Deutsche would actively manage the assets Enron contributed to the structure. P-DB13 (1998 Akin Gump Tomas Tax Opinion) at AB000151727-28 at I.B.

608.    Akin Gump lawyer Buser testified that to comply with the tax law, Tomas had to have a valid business purpose which he believed included Enron’s actual desire to have Deutsche manage the assets Enron contributed to the structures, which he later came to understand was a false representation from Deutsche Bank:

> Q:    Did Deutsche Bank represent to Akin Gump that it would actively manage the partnership in the Tomas transaction?
>
> A:    I believe Deutsche Bank represented these things word for word.
>
> *       *       *
>
> Q:    . . . you had said previously, when analyzing the structure [Tomas], that it was important to you that – that Deutsche Bank actively manage the assets in the partnership, correct?

A:       …It was important to me that the assets be actively managed.

*       *       *

Q:       Okay. So was it your understanding at the time when you rendered this opinion that Deutsche Bank [represented that it] would be participating in the partnership and that the partnership would be actively managed?

A:       Yes.

*       *       *

Q:       …do you know if the partnership was, in fact, actively managed after the fact, after the transaction [Tomas] initially closed?

A:       I know that …the [Tomas] transaction was going to be unwound and there had not been significant changes in the leased assets.

*       *       *

Q:       . . . do you believe that what, in fact, occurred is inconsistent with the facts that you relied upon in draft your opinion letter?

A:       Yes.

P-DB25 (Buser Dep.) at 327:13-332:24.

609.     In the Tomas tax opinion, it was assumed that Enron desired the management of Deutsche and to expand its leased asset portfolio. P-DB13 (November 23, 1998 Akin Gump Tomas Tax Opinion) at AB000151727-28.

610.     Brian McGuire testified that the entity that was to manage leasing assets, Oneida Leasing, was essentially a shell: it had no offices, no employees and that he, as a director, does not remember doing anything for the company. P-DB16 (McGuire Dep.) at 356:20-360:15, 361:22-366:6.

611.     McGuire "believed" he was an Oneida Leasing director for some period of time, but did not recall doing anything for other entities set up for the Tomas transaction, BT Leasing Corporation, or for EN-BT Delaware. *Id*. at 361:22-366:6.

612.     McGuire also testified that Deutsche Bank records indicate he was on the board for nineteen separate corporations; but, he did not recall doing anything as a director for any of them. *Id*. at 379:20-386:5.

613.     Deutsche Bank and [Enron] represented that Oneida, the Enron SPE involved in Tomas, would engage in a leasing business. However, by June 2000, Oneida was only holding a Deutsche Bank note and had no leasable assets. P-DB95 (Maxey Bankr. Dep.) at 180:7-13; P-DB228 (McGuire Bankr. Dep.) at 335:11-337:5; P-DB19 (Batson DB Rpt.) at 50-51. Deutsche Bank did not focus on leasing activities and, contrary to the representation assumed true in the Tomas tax opinion, no leasing activities occurred according to Davis Maxey. P-DB95 (Maxey Bankr. Dep.) at 180:14-181:11.  While McGuire could give no estimation of time spent in leasing activities, Oneida purchased no leasable assets for 18 months after Tomas closed. P-DB16 (McGuire Dep.) at 166:17-167:24. The only leasable assets ever acquired by Oneida after the closing of Tomas were the planes (which were also part of an Enron/Deutsche Bank agreement to flip the planes into Oneida to show a gain for Enron). *Id.*

614.     In Teresa, the purported business purposes included shifting risk on contributed assets and raising minority equity capital. P-DB10 (1997 King & Spalding Teresa Tax Opinion) at AB000151620-21.

615.     Enron was the guarantor of the $1.097 billion HLP note transferred to OPI in the Teresa transaction and the lessee of the Enron North Building. P-DB101 (Solomon Rebuttal Rpt.) at 50.

616.     Regarding risks taken by Enron in the Teresa transaction, Finley's internal credit memo states, "[t]he credit worthiness of Enron is an important aspect of the overall credit quality of the [Teresa] transaction. Enron will guarantee the obligations of Enron SPVCo . . . ." P-DB119 (Deutsche Credit Memo) at DBC012765. Thomas Finley testified that he did not recall any management activities of the leased building by Deutsche Bank after Teresa closed, and the building was the only leased asset in the partnership. P-DB14 (Finley Dep.) at 118:6-120:2.

617.   The Joint Committee on Taxation staff noted several times in its Enron report concerns with tax advisors' willingness to not look behind "representations" of clients, indicating that the "should" level tax opinions were premised upon false assumptions stating:

> In transaction after transaction, Enron obtained sophisticated advice, and in most instances received assurances that the proposed transaction "should" comply with technical tax law requirements. Often, these assurances were based on highly technical interpretations of the law even though the transaction produced surprising and questionable outcomes**.** Many of the opinions hinged on a determination that the transaction had sufficient business purpose. Enron represented the business purpose of the transaction, and Enron's counsel did not bother to look beyond the representation.
>
> *      *      *
>
> The Joint Committee staff is concerned about the willingness of tax advisors …to render opinions that…relied on [Enron's] purported factual representations.
>
> *      *      *
>
> Reliance on answers given to unimaginable hypothetical transactions, especially when evaluating a taxpayer's non-tax business purposes, may call into question the reasonableness and objectivity of the advice given….

P-DB28 (JCT Report) at 25, 16, 144.

618.   Under his fee arrangement with Enron on the Teresa transaction, McKee was to receive a flat $1 million fee, plus disbursements, for each transaction but only if the transactions actually closed. P-DB5 (McKee Teresa engagement letter with Enron) at AB00750044. If the transaction did not close, McKee only received his "customary hourly charges plus disbursements" for writing the should opinion. *Id.*

619.   Under his attorney fee arrangement with Enron on the Cochise transaction, "[i]f the transaction closes" the fee will be $1 million, plus disbursements, for each transaction. P-DB194 (McKee Cochise engagement letter with Enron) at MN006725. If the transaction did not close, McKee only received his "customary hourly charges plus disbursements" for writing the should

opinion. *Id.*

620.    Under its attorney fee arrangement with Enron on the Steele transaction, Akin Gump received a flat $1 million in fees, plus disbursements, for each transaction only if the transactions actually closed. P-DB91 (Akin Gump Steele engagement letter with Enron) at AB00750019. If the Steele transaction did not close for any reason other than Akin Gump failing to provide a legal opinion, Akin Gump only received disbursements and "70% of the legal fees billed in connection with the Transaction; <u>provided</u>, that in no event shall Enron's payment for legal fees exceed $350,000." *Id.* If Akin Gump failed to deliver a legal opinion on Steele, Enron's fees would be capped at $100,000. *Id.*

**E.    Deutsche was the center of the hub connecting all the other participants and objectivity was lost**.

621.    Bill McKee, an attorney who represented Deutsche Bank (starting in the 1970s when it was Bankers Trust) and who simultaneously represented Enron (in the Teresa and Cochise tax transactions) and Deutsche on different matters,[10] had <u>no</u> restrictions upon the information he could share among Enron and Deutsche Bank. P-DB3 (McKee Dep.) at 338:12-340:4; *id*. at 344:5-12 ("It was my belief that I could represent Enron on those matters and discuss anything about those matters that I knew about with Enron" even if he learned issues on that matter from Bankers Trust). He testified that members from Bankers Trust and Enron sat in conference rooms together when putting these transactions together, *id*. at 345:1-14, and that he believed the Teresa transaction was registered as a tax shelter. *Id*. at 346:5-7.

622.    When McKee was asked whether Deutsche Bank was a promoter of a tax shelter to Enron, he testified that Deutsche Bank "introduce[d] the idea to Enron." P-DB3 (McKee Dep.) at

---

[10] P-DB3 (McKee Dep.) at 337:14-338:19.

346:8–347:14.

623.    McKee explained that Enron was a potentially liable party under the tax code if it did not register a qualifying transaction as a tax shelter. *Id*. at 348:6–17. He admitted that the Teresa and Cochise transactions had "tax consequences but we discussed their principal goal for entering into for financial accounting purposes." *Id*. at 349:6–12. That is, their "principal objective" was to "put financial accounting income on the books of Enron." *Id*. at 349:9–14.

624.    McKee hid behind his "specific narrow representation about tax matters" when asked about whether he ever advised Enron that it should obtain an opinion as to whether Deutsche Bank could legally sell such tax structures. *Id*. at 350:1–24. He was not asked and did not advise as to whether these transactions – which he admitted were specifically designed to put income on Enron's books – complied with federal banking regulations. P-DB3 (McKee Dep.) at 351:3–6. He admitted that some of the "assets" used in these transactions were, in essence, without value. *Id*. at 353–55.

625.    McKee testified the REMIC residuals "which are creatures of tax law" that Enron used to "increase financial accounting income as a result of these transactions." *Id*. at 354:14–355:4 The REMIC transactions "do not produce cash," meaning Enron was not going to account for the REMIC transaction "and then have a deposit at the bank for that amount of money." *Id*. at 355:23–356:17. McKee understood that "these had little or no economics," and whatever value they had was not "commensurate with the tax aspects" (*id*. at 359:4–17)—yet Enron paid Deutsche millions in fees to structure these transactions for Enron's use. *Id*. at 360:21–361:4 (testifying he knew the deals "were being structured by Deutsche Bank and Enron was paying a fee involved in the participation"). Deutsche sold the Tax Transactions to Enron for tens of millions in fees. P-DB70 (Fastow Dep.) at 962:14-21. He acknowledged that "the principal purpose of the transaction

was to obtain the accounting benefits" and he never advised Enron on how to report these transactions to the public. *Id.* at 361:6–19.

626.    Teresa closed in 1997, allowing Enron to report about $229 million in income and to give Enron a $1.3 billion tax basis step-up for its Houston corporate building. P-DB9 (Regan Expert Rpt.) at 256.

627.    McKee had "no view at all" as to whether it was fair to let Enron's public filings show hundreds of millions of dollars on Enron's books when those transactions had no true economic value. P-DB3 (McKee Dep.) at 362:11-21. Nor did he have any way of knowing whether the transactions Deutsche Bank designed—which were for the purpose of putting income on Enron's books—complied with generally accepted accounting principles or GAAP. *Id.* at 364:2-19.

628.    Deutsche Bank employed the same lawyers to develop the tax transactions as were used to provide supposedly independent "should" tax opinions. P-DB15 (Finley Bankr. Dep.) at 64:24-66:6, 95:23-96:5; P-DB228 (McGuire Bankr. Dep.) at 96:2-8, 305:14-23; P-DB14 (Finley Dep.) at 131:10-132:13. Deutsche Bank recommended those firms to Enron. P-DB15 (Finley Bankr. Dep.) at 21:2-22:6, 64:24-65:6; P-DB40 (Deutsche Memo re Teresa) at DBG027036 ("Enron was represented by King & Spalding (at [Deutsche Bank's] suggestion) . . . ."

629.    Enron engaged the same law firms that worked on developing the DB Tax Transactions to render the should opinions on those transactions. P-DB12 (2001 McKee Nelson Cochise Tax Opinion) at AB000151794; P-DB10 (1997 King & Spalding Teresa Tax Opinion) at AB000151584; P-DB13 (1998 Akin Gump Tomas Tax Opinion) at AB000151727; P-DB104 (Akin Gump Engagement letter) at AB00750018 (no conflict disclosure).

630.    William McKee, who represented Deutsche Bank on the Steele transaction,

considered and refused to give the tax opinion to Enron on the Steele transaction because he thought IRC section 269 could apply to void it. P-DB3 (McKee Dep.) at 29:18-32:7; P-DB24 (Hermann Bankr. Dep.) at 86:21-88:2.

631.    According to Bob Hermann, Deutsche was probably in the room when McKee said he would not prepare the Steele should opinion. P-DB24 (Hermann Bankr. Dep.) at 86:21-88:1.

632.    On June 2, 1997, Tom Finley, William Boyle, Christine Levinson and Brian McGuire prepared a memo to William McKee to better explain the Steele transaction because he was "confused by the concept of accounting benefit and the accounting treatment that was expected . . . ." P-DB31 at AB000187758; P-DB228 (McGuire Bankr. Dep.) at 105:2-106:18; P-DB15 (Finley Bankr. Dep.) at 100:15-102:5.

633.    On June 24, 1997, Tom Finley sent Enron a letter listing the additional representations Akin Gump needs to satisfy IRC sec 269 requirements in order to get a "should" opinion issued on the Steele transaction. P-DB30 at DBC009410-411.

634.    King & Spalding (Bill McKee) represented Deutsche Bank on development of Teresa and represented Enron in the closing of Teresa, providing Enron the should opinion, and Akin Gump represented Deutsche Bank. P-DB15 (Finley Bankr. Dep.) at 19:15-19, 20:8-18; P-DB228 (McGuire Bankr. Dep.) at 110:20-111:1. King & Spalding (Bill McKee) then represented Deutsche Bank on developing and closing Steele. P-DB3 (McKee Dep.) at 29:18-20. Akin Gump represented and provided a should opinion for Enron on Steele. P-DB16 (McGuire Dep.) at 43:10-44:11. King & Spalding and Bill McKee initially represented Deutsche Bank on developing Cochise, but then represented and provided a should opinion to Enron during closing and Akin Gump represented Deutsche Bank. P-DB3 (McKee Dep.) at 203:25-206:13; P-DB16 (McGuire Dep.) at 272:21-24. In Tomas, Akin Gump represented Deutsche Bank in developing the structure

and then provided a should opinion and represented Enron in the closing. P-DB120 (Akin Gump Memo to Deutsche and Enron) at DBF043731; P-DB121 (Akin Gump Memo to Enron re Project Tomas) at AB00742261 (confirming Enron's approval to allow Akin to provide updated tax memo re Tomas to Deutsche).

### F.   The absence of IRS challenge is not approval.

635.   Enron had millions of dollars in net operating losses, so the tax savings that were created from the tax transactions on Enron's books never actually resulted in the IRS losing cash payments. P-DB28 (JCT Report) at 15; P-DB55 (Solomon Dep.) at 204:12-17; P-DB101 (Solomon Rebuttal Rpt.) at 86. In reference to tax savings claimed by Enron, the Joint Committee on Taxation stated, "[b]ecause Enron had net operating losses for many of the years the benefits resulted in increased net operating losses rather than an immediate reduction in taxes." P-DB28 (JCT Report) at 10, n.3. Cochise and Teresa provided Enron with no tax deductions through 2001. *Id* at 10.

636.   The Teresa transaction actually resulted in Enron paying over $100 million in taxes between 1997 and 2000, which would not have otherwise been payable to the IRS. P-DB28 (JCT Report) at 165, n.389. The Joint Committee on Taxation stated:

> Some of [Enron's] transactions resulted in the payment of some income tax in the early years, with significantly larger deductions to follow in later years. This pattern makes it less likely that the IRS will identify and challenge the transaction. Further, Enron's recent position as a company with significant net operating losses worked to its advantage in IRS examination. A company with significant losses generally is of less immediate concern to the IRS because the losses will offset any increased taxable income arising from the audit. Thus, the IRS has less incentive to investigate and devote resources to such examinations. Enron's activities show that the IRS cannot minimize the importance of loss companies on examination because to do so would ignore a breeding ground for tax-motivated transactions that also could be used by taxpaying companies.

*Id*. at 23.

### G.   Tax Accommodation Transactions.

637.   Further evidencing their close relationship and readiness to engage in accounting

fraud, Deutsche Bank and Enron entered into the Valhalla Transaction in May 2000. The transaction was structured as a $50 million loan; Deutsche Bank in Frankfurt loaned $2 billion to Rheingold (an Enron subsidiary) and Enron in turn loaned $1.95 billion to Deutsche Bank in New York. P-DB16 (McGuire Dep.) at 335:5-336:17. Unlike the Tax Transactions, the Valhalla Transaction did not produce significant tax or accounting benefits to Enron but did produce favorable tax benefits for Deutsche Bank. P-DB228 (McGuire Bankr. Dep.) at 368:3-369:10. From Deutsche Bank's perspective the transaction was structured to create $50 million of annual tax benefits for Deutsche Bank. P-DB16 (McGuire Dep.) at 338:13-18. In entering into the Valhalla Transaction, Deutsche Bank knew that it was engaging in a money laundering scheme. In a November 2000 email regarding the handling of Project Valhalla, a Deutsche Bank representative in Germany stated, "[A]s I have already mentioned some weeks ago, I firmly believe that the booking of the Genußscheine from Rheingold is not correct...This is clearly against … money laundry law." P-DB41 (Nov. 16, 2000 Email re Handling of Valhalla) at DBF001521.

638.    Deutsche Bank and Enron entered into another improper tax transaction, "Project Renegade," also for the benefit of Deutsche Bank. In exchange for Enron's agreement to participate in Renegade, Deutsche Bank reduced its fee as financial advisor on Teresa by $1.2 million. P-DB19 (Batson DB Rpt.) at 19-20; P-DB228 (McGuire Bankr. Dep.) at 68:20-69:14, 363:8-19.

## H.    Structured Transactions With Disguised Enron Affiliates.

### 1.    LJM2.

639.    LJM2 Co-Investment, L.P., commonly referred to LJM2, was a private investment limited partnership formed in 1999. P-DB211 (LJM2 Co-Investment, L.P. Closing Documents) at DBA00067, 159 and 165. LJM2 was proposed to Enron's Board of Directors as a second larger partnership to buy assets from Enron in the same way as its predecessor LJM1. P-DB67 (Powers

Report) at 70-71. Andrew Fastow solicited prospective investors for LJM2 using a Private Placement Memorandum ("PPM") that touted the benefits of "unusually attractive investment opportunities" resulting from the partnership's connection to Enron, and Fastow's "access to Enron's information pertaining to potential investments will contribute to superior returns." P-DB211 at DBA00165, DBA00167. It explained that "[t]he Partnership expects that Enron will be the Partnership's primary source of investment opportunities" and that it "expects to benefit from having the opportunity to invest in Enron-generated investment opportunities that would not be available otherwise to outside investors." *Id.* at DBA00165, DBA00166. The PPM also noted that LJM2 intended to generate an internal rate of return of at least 30%. *Id.* Enron would benefit from doing business with LJM2 because it intended to treat deals with LJM2 as third party transactions in order to enable Enron to improve its financial picture to meet "investor's expectations." P-DB67 (Powers Report) at EX.000000638 at 134; P-DB212 (Andrew Fastow Plea Agreement) at 22-23.

### a. Deutsche had direct input on the role of the LJM2 Advisory Committee.

640.    Fastow solicited investors in LJM2 from Enron's numerous financial partners, including Deutsche, with the lure of the potential of extraordinary returns on investment. P-DB213 (LJM2 Co-Investment L.P. Presentation) at DBD004764, 4766, 4796, 4797 and 4800. Paul Cambridge, Ted Virtue, Charlie Kiley, and Bill Walsh participated in an initial meeting with Fastow regarding Deutsche Bank's possible commitment to investing in LJM2. P-DB122 (Walsh Dep.) at 26:6-21. Presentation materials, used to promote investment in LJM2, described proposed partnership governance whereby the partnership agreement would contain "[p]rovisions to allow L.P.'s to act as "temporary" G.P. when G.P. determines it would otherwise breach its fiduciary responsibility to Enron or LJM2." P-DB197 (LJM2 Presentation) at MLNBY 0052952. In fact, this is consistent with LJM2 presentation materials from Deutsche Bank's own records –

"Conflicts resolved by Limited Partner Advisory Committee… Advisory Board will resolve all potential conflicts of interest." *Id*. at DBD004777.

641.     During the marketing phase of LJM2, Deutsche Bank asked its own lawyers to review the proposed LJM2 Limited Partnership Agreement prior Deutsche Bank's willingness to commit to participate. P-DB122 (Walsh Dep.) at 91:23-97:24. Deutsche Bank's lawyers suggested that "the [A]dvisory [C]ommittee should review all transactions in which there potentially is a conflict" and specifically requested that "a representative of [Deutsche Bank] be considered for one of the [A]dvisory [C]ommittee positions." *Id.* at 91:23-97:24; P-DB123 (Fax to Deutsche and Kirkland re LJM2 Co-Investment, L.P.) at 63BOX002147-48.

642.     The role of the Advisory Committee was described thereafter in the December 15, 1999 supplement to the LJM2 Private Placement Memorandum:

Advisory Committee:

For the benefit of the Partnership, an Advisory Committee (the *"Advisory Committee"*) of at least three individuals shall be annually appointed by the General Partner for a one-year term. The Advisory Committee shall periodically review the valuations of the Partnership's assets made by the General Partner, and shall provide such other advice and counsel as the General Partner requests in connection with Partnership investments, potential conflicts of interest and other Partnership matters. The General Partner (a) shall provide promptly to the members of the Advisory Committee information relating to any transaction between the Partnership and Enron or any of its subsidiaries, and (b) shall provide the members of the Advisory Committee with information relating to an Investment prior to the consummation of such Investment by the Partnership . . . .

P-DB211 (LJM2 Co-Investment, L.P. Closing Documents) at DBA00212.

        **b.     Deutsche had direct participation in the LJM2 Advisory Committee.**

643.     Deutsche Bank not only agreed to participate in LJM2 as an investor by committing to invest $10 million, but it also secured a seat on LJM2's Advisory Committee. *Id*. at DBA00120-121, 235. As set forth in a December 20, 1999 letter from Michael Kopper to Paul Cambridge and

Bill Walsh, Deutsche Bank (via its controlled subsidiaries BT Investment Partners, Inc. and Deutsche Bank Securities, Inc.) would have the right to appoint and maintain a member of the Advisory Committee, and to remove that member at Deutsche Bank's will. *Id*.

644.     Initially, Deutsche Bank was one of only three limited partner members to the Advisory Committee, the others being CIBC Capital Partners and J.P. Morgan Partnership Investment Corp. *Id.* at DBA00120-157. Among the duties of the Advisory Committee outlined in the Partnership Agreement "Section 6.5 Conflict of Interest; Fiduciary Duties" provided:

> Nothing in this Section 6.5 shall preclude the Partnership or any LJM Related Person from investing in the securities of any Person or engaging in any other transaction otherwise proscribed by this Section 6.5 or in which an actual or potential conflict of interest exists if such transaction has been approved by the Advisory Committee.

*Id.* 6.5(d) at DBA00090.

645.     Deutsche Bank, as a member of the LJM2 Advisory Committee, received updates and other correspondence concerning LJM2 business transactions, including review of transactions prior to consummation. *Id.* at DBA00101-102

646.     From June 1999 through June 2001, Enron entered into more than 20 transactions with the LJM1 and LJM2 partnerships. These were of two general types: asset sales and purported ''hedging'' transactions (such as the Raptors, discussed *supra*). *See* P-DB67 (Powers Report) at 11-12. Many of the transactions involved an accounting structure known as a "special purpose entity" or "special purpose vehicle" (referred to as an "SPE"). *Id.* at 5.

647.     "A company that does business with an SPE may treat that SPE as if it were an independent, outside entity for accounting purposes if two conditions are met: (1) an owner independent of the company must make a substantive equity investment of at least 3% of the SPE's assets, and that 3% must remain at risk throughout the transaction; and (2) the independent owner

must exercise control of the SPE. In those circumstances, the company may record gains and losses on transactions with the SPE, and the assets and liabilities of the SPE are not included in the company's balance sheet, even though the company and the SPE are closely related." *Id.*

648.    One such asset sale involved an Enron affiliate, Enron Broadband Services ("EBS") and the sale of certain of its nationwide fiber optic network. In June 2000, under pressure to meet financial targets for the second quarter and unable to find an outside buyer, Enron arranged the "sale" of the fiber optic network assets to LJM2. P-DB125 (Ken Rice Plea Agreement, Ex. A) at 16 and P-DB214 (Enron Transaction Support Summary of LJM Transactions) at AB 025205387. The terms of the sale to LJM2 called for Enron to continue to market the network after completion of the sale and LJM2 was promised an 18% capped return if Enron resold the fiber within two years, and a 25% capped return if Enron sold the fiber after two years. P-DB67 (Powers Report) at 144. This sale to LJM2 ostensibly generated $67 million in income and approximately $100 million in sale proceeds for Enron. P-DB214 (Enron Transaction Support Summary of LJM Transactions) at 3. In less than six months, LJM2 transferred the assets to another Enron SPE, earning a very attractive $2.4 million return on capital in the process. *Id.* at page 5.

## 2.    Marlin I and II, Osprey I and II, and Yosemite.[11]

649.    In general, the share-trust transactions involved the following steps: Enron and an entity known as the "issuing trust" ("Issuer") formed a holding company ("HoldCo"). Enron contributed mandatorily convertible preferred stock ("MCPS") and demand notes to HoldCo, which in turn contributed both to a share-trust entity ("Share Trust'). The Issuer issued debt (the "Notes") and equity (the "Certificates") into the institutional market, and contributed the proceeds raised to HoldCo. HoldCo then used the funds to purchase assets from Enron, which were held in

---

[11] Silvercreek incorporates by reference as if fully set forth here paragraphs 893-965 from its Counterstatement of Facts in Opposition to Credit Suisse's Motion for Summary Judgment relating to the Marlin and Osprey Share Trust Transactions.

various investment entities, 100% owned by HoldCo ("Investment Entities"). P-DB127 (Solomon Rpt.) at 43-46.

650.    Enron, using the share trust structure, avoided recording $4.3 billion as debt on its balance sheet.  *Id*. at 42-43. Because Enron did not consolidate the share trusts, the Company overstated cash flow from operations by approximately $0.9 billion at year-end 1999 and $1.5 billion at year-end 2000. Enron's debt was understated by $1.6 billion at year-end 1998, $2.9 billion at year-end 1999, $3.6 billion at year-end 2000, and $3.6 billion at the end of the third quarter 2001. Enron also violated GAAP by inadequately disclosing its obligations under the share trust transactions. *Id*

651.    In late 1998, Enron completed the acquisition of a publicly held British water-utility company, Wessex Water Plc. With Enron and its controlled subsidiaries incurring approximately $1.9 billion of debt to finance the acquisition. P-DB138 (Jakubik Bankr. Dep.) at 74:17-77:21. Enron, with the aid of Deutsche Bank, created the Marlin Transaction to remove Enron's water business – Wessex– from Enron's balance sheet.  *Id*.

652.    When first meeting to set up Marlin, Seth Rubin emailed Paul Tice on August 4, 1998, assuring Tice that Rubin was fully aware that Enron's objectives for the Marlin transaction were "to keep below the radar of the rating agencies and to ensure that any financing will not effect [sic] the rating of Enron corp." P-DB242 (Rubin Email to Tice) at DBN180892; P-DB241 (Rubin Dep.) at 35:15-20, 44:9-45:12.

653.    According to the sworn statement of Deutsche Bank banker Jakubik to the Examiner:

> Deutsche understood that Enron's objectives in developing the Marlin structure were to avoid having the rating agencies treat the structure as debt, avoid an adverse impact on its credit rating, have the debt treated as off-balance-sheet financing and avoid having to currently issue Enron stock.

P-DB 138 (Jakubik Bankr. Dep.) at 79:6-80:10, 82:11-20, 84:3-15.

654.    Marlin Water Trust was set up as the SPE entity to hold Enron's water utility assets. P-DB138 (Jakubik Bankr. Dep.) at 74:4-77:24. The Marlin bonds were backed by a pledge of Enron stock to make up for any potential shortfall in the value of Marlin's assets. P-DB190 (Dec. 8, 1998 Marlin OM) at AASDTEX002438173.  If Enron's credit rating declined to a certain point, Enron would issue new shares of stock to Marlin to pay back bondholders. *Id*.  The Marlin offering did not disclose the details of the Enron's stock pledge supporting the Marlin certificates and debt. *Id*.

655.    Deutsche Bank was a joint book-running manager with CSFB (then operating as Donaldson, Lufkin & Jenrette) for both the Marlin I and Marlin II Transactions. P-DB27 (Deutsche Bank Responses to Examiner) at 10; P-DB134 (Marlin Water Trust) at DBK0152867; P-DB135 (Marlin Trust II) at DBK0160304.

656.    The Marlin I offering consisted of approximately $1.024 billion in Marlin's 7.09% Senior Secured Notes due December 2001 (the debt component) and $125 million of certificates (the equity component). P-DB27 (Deutsche Bank Responses to Examiner) at 10; P-DB241 (Rubin Dep.) at 62:16-63:13; P-DB134 (Marlin Water Trust) at DBK0152867.

657.    Deutsche Bank and Enron structured Marlin such that Enron contributed shares of preferred stock (convertible into shares of Enron common stock) to the Marlin Preferred Share Trust. P-DB138 (Jakubik Bankr. Dep.) at 79:20-80:10. Because of Enron's control and assumption of risk through its stock contribution and assumption of share trust liabilities, Enron should have consolidation Marlin in its financial statements. P-DB55 (Solomon Dep.) at 447:9-24.

658.    In 2001, the Marlin II Transaction was used to refinance the outstanding Marlin I notes raising $950 million in senior notes. P-DB138 (Jakubik Bankr. Dep.) at 90:23-91:9; P-DB27

(Deutsche Bank Responses to Examiner) at 10.

659.    Like Marlin I, in Marlin II Enron stock secured the note repayment if the assets fell short and Deutsche Bank was aware that the value of the Azurix asset had been impaired. *Id*. at 91:18-92:9.  Deutsche Bank made $10 million on its work with Enron on Marlin I and II. P-DB27 (Deutsche Bank Responses to Examiner) at 10-11.

660.    A May 2001 email from Deutsche Bank's George Tyson to Cambridge contained an attachment titled "Discussion of Refinancing Alternatives for Marlin Water Trust dated February 15, 2001" and Deutsche Bank's presentation acknowledges that Enron's primary objective was "keeping all of the Azurix and Marlin debt off-balance-sheet." P-DB142 (Tyson Final Presentation) at DBN0036072; P-DB143 (Discussion of Refinancing, Marlin Water Trust) at DBN0036076. Tyson's email emphasized Enron's sensitivity to the ratings impact of refinancing Marlin. *Id*.  A July 2001 internal Deutsche presentation to Enron prepared in connection with the Marlin II offering acknowledges that Deutsche Bank's Marlin I structure was intended to "maintain deconsolidation," and that one of the "key sales points" of Marlin II was allowing Enron to remain "committed to balance sheet management" through the use of "structured" financings like Marlin. P-DB124 (Marlin Water Trust II, July 2001 Presentation) at DB 000046-DB 000066.

661.    Fastow testified that the Marlin transaction was one of the transactions that had the effect of making Enron's financial statements deceptive, and that Deutsche Bank was involved in that transaction. P-DB70 (Fastow Dep.) at 963:5-15.

662.    Craig Orchant described Deutsche Bank's role, including underwriter, in the Osprey transaction as follows:

> We, you know, kept aware of progress on the transaction. We provided input on
> the marketability of the transaction, in terms of the timing of it, the maturity

structure of the transaction, what might be the expectations in terms of yield that investors would require on the transaction. And, you know, in that respect, you know, kind of followed the process through the development of the transaction documentation,  the offering materials. Helped educate our sales force with respect to the transaction, our sales force being the group that distributed  securities. And then helped organize the marketing  presentations for the issuer, in this case Enron representing the issuer, to describe  the transaction to investors. And then help support our sales force in obtaining information   to provide to their institutional accounts who  expressed interest in purchasing the securities. That was kind of a summary of what our role was as a debt capital markets.

P-DB139 (Orchant Dep.) at 149:19-151:7, 156:11-157:5, 159:15-160:13.

663.   Like Marlin, the Osprey Trust was designed to remove non or poorly performing assets from Enron's balance sheet, and also contained a "stock trigger" feature which created billions in potential obligations for Enron. P-DB138 (Jakubik Bankr. Dep.) at 146:22-148:6; P-DB241 (Rubin Dep.) at 103:3-106:2.  The following demonstrates Deutsche Bank's knowing and substantial participation in Enron's misuse of Osprey as a parking lot of distressed assets:

- To meet Enron's September 30, 1999 deadline to satisfy debt obligations for two power plants, Sarlux and Trakya, Enron and Deutsche Bank attempted to refinance these assets in a transaction called "Margaux" in May 1999. P-DB71 (Cambridge Dep.) at 131:15-24, 132:23-134:6, 145:18-24, 185:8-14. But, Cambridge did not believe the market would accept a purchase of these assets at the amounts Enron needed to cover the debt owed. *Id.* at 117:5-118:25; *see also* P-DB130 (Margaux Cost Analysis) at AB000504619-621; P-DB137 (Jakubik Dep.) at 192:8-193:23.

- In August of 1999, Deutsche determined that Margaux would not close in time for the Sarlux and Trakya refinancing, so Michael Jakubik started discussions with Whitewing/Osprey. P-DB137 (Jakubik Dep.) at 229:7-230:21. Transfer restrictions and changes in control were two complications that would delay closing. *Id.*

- Osprey purchased Sarlux and Trakya for the amount of Enron's outstanding debt—approximately $355 million and $102 million respectively; this debt then remained off Enron's balance sheet. P-DB137 (Jakubik Dep.) at 206:8-207:2; P-DB129 (Whitewing asset proposal) at DBI045224, DBI045234. Cambridge knew Enron wanted to move those assets into Osprey prior to closing Osprey I note and certificate offerings. P-DB71 (Cambridge Dep.), at 181:25-183:17, 188:20-25.

- The value of these assets was important because their liquidation through the sale of ownership interest was a source of principal repayment for Osprey investors. P-DB71 (Cambridge Dep.) at 254:15-22. Deutsche Bank did not question how the transactions could possibly be "arm's length" within Enron. P-DB139 (Orchant Dep.), at 216:22-220:25.

- Deutsche knew about the assets' transfer restrictions, and had the responsibility to complete due diligence on these transfer restrictions as part of the Margaux transaction. P-DB71 (Cambridge Dep.) at 171:21-177:13, 228:6-18. While Sarlux and Trakya are mentioned in the Osprey I offering memorandum. (D145 at DBB007049), Cambridge could point to no language in the Osprey offering memorandum that notified an investor of how transfer restrictions might significantly reduce the asset's value. P-DB71 (Cambridge Dep.) at 272:5-15, 223:23-225:19.

- Prior to putting Sarlux into Osprey, SARAS was 55% owner of the Sarlux plant with Enron holding 45% and the Sarlux shareholders agreement restricted Enron's ability to transfer ownership. P-DB131 (January 31, 2002 Letter re: SARAS arbitration request), at AB000452415-17. In January of 2002, SARAS exercised its option to purchase the Sarlux asset from Enron (*id*. at AB000452417-18), ultimately paying approximately $140 million for Sarlux. P-DB132 (April 24, 2006 SARAS Press Release announcing arbitrators' ruling). Thus, Sarlux sold in the open market at 50% less than Enron's "sale" to Osprey.

664. The Osprey structures originated from Enron's desire to "expand the balance sheet capacity" of an entity called "Whitewing" involved in the Nighthawk transaction, which was used to fraudulently understate Enron's debt by $500 million in 1997. P-DB127 (Solomon Rpt.) at 36-41 & Table 4. Nighthawk itself had no real business purpose. P-DB2 (Fastow Decl.) at ¶ 10. Though Osprey I presented a convoluted array of limited partnerships, limited liability companies, shell entities, and subsidiaries, none of these actually served a true business purpose, "Enron effectively controlled the vehicles." P-DB2 (Fastow Decl.) at ¶ 50. Because Enron employees were managers in the Whitewing investment entities, rights the Osprey Trust ostensibly had to effect control over WW LP were "largely circumvented." P-DB128 (Solomon Appx.) at 272. Enron could act through these employees to control the subject assets, WW LP should have been consolidated with Enron, and the assets transferred should have remained on the Enron's balance

sheet. *Id*. at 269. Fastow characterized Osprey as a parking lot for assets. P-DB70 (Fastow Dep.) at 977:20-23.

665.    Paul Cambridge sent an email in November 2000, to Amsterdam-based Deutsche Bank banker Jur Holierhoek explaining, "The Osprey transaction was a highly tailored structured finance, designed to meet certain balance sheet and income statement goals of Enron." P-DB63. In discussing the possibility of pitching the same transaction to another Deutsche client, Cambridge notes "Marrying the accounting and tax objectives of the client and the structure are also extremely important." *Id*.

666.    Deutsche Bank worked with CSFB on the Osprey I and II offerings as joint lead manager and joint book runners. P-DB27 (Deutsche Bank Responses to Examiner) at 11; P-DB139 (Orchant Dep.) at 168:20-169:8. In describing the Osprey structure, CSFB stated, "As you probably know, Osprey is a vehicle enabling Enron to raise disguised debt which appears as equity on Enron's balance sheet" . . . . " Osprey serves the added purpose for Enron of being an off-balance sheet parking lot for certain assets. P-DB198 (Osprey Disguised Debt Email from Jonathan Yellen) at CSFBLLC005129123.

667.    Cambridge testified he was required by the terms of his employment to comply with Deutsche's document retention policy which instructed employees to destroy their notes—and that he did comply with that directive. P-DB71 (Cambridge Dep.) at 531:7-21.

668.    In all, the Marlin I and II transactions and the Osprey I and II transactions permitted Enron to move more than $2 billion dollars in debt off its balance sheet. D115 at i); D145 at i); D146 at i); D116.

669.    On October 23, 2001,Deutsche Bank's Seth Rubin and Craig Orchant shared the following email string:

|        |                                                                          |
|--------|--------------------------------------------------------------------------|
| Rubin:   | "do I . . . "torch the marlin files?"                                  |
| Orchant: | "what marlin files? not sure i'm familiar with that deal."             |
| Rubin:   | "exactly . . . dont know about firefly, rawhide o[r] osprey either."    |

P-DB209 (Oct. 23, 2001 Email re Torch the Marlin Files) at DBC182289.

670.    The same day, on October 23, 2001, Deutsche Bank's Seth Rubin emailed Kevin
Wolf with Lehman about Enron stating, "something funky . . . in those ene books." P-DB237 at
DBN182291.

671.    On November 7, 2001, Seth Rubin wrote about the impact of stock triggers in deals
like Osprey and Marlin, "if they go junk several line will be pulled and they will default on off-
balance sheet structures." P-DB238 at DBN182311; P-DB241 (Rubin Dep.) at 191:10-20.

672.    On November 8, 2001 when Enron restated its earnings, Seth Rubin received an
email from Robert Morrison with Deutsche Bank in London stating, "Apparently the SEC has been
given your name in its investigations as one of those aiding and abetting Enron in doing these types
of deals!!" P-DB240 at 182307; P-DB241 (Rubin Dep.) at 141:5-142:13.

673.    On November 28, 2001, Rubin writes to Kevin Wolf about the Dynegy deal falling
through, "knew that deal was not going to go through as strucutred [sic] . . . too many hookers in
that house!" P-DB239 at DBN181946.

674.    Deutsche Bank was an underwriter in one of the Yosemite offerings. P-DB139
(Orchant Dep.) at 157:8-158:16. Yosemite funds were being used to pay off an obligation of Enron
to Citibank and Citibank did not want to disclose the nature of that obligation. P-DB71 (Cambridge
Dep.) at 279:12-280:3. Discussions of the fact that the underlying obligations were prepay
transactions funds, may have come up in conversations with Paul Cambridge and underwriters. *Id.*
at 285:12-23, 288:10-25. Investors in Yosemite could not have known their funds were paying off

Enron/Citibank prepay obligations. *Id*. at 290: 6-15.

675.     In a March 2000 letter regarding "Structuring Future Yosemite Transactions" from Craig Orchant and Ross Newman of Deutsche Bank to Doug McDowell and Craig Clark of Enron Global Finance it states, "We appreciate that disclosure on the trust assets is a sensitive issue. We do not believe that full disclosure on the underlying trust assets, such as the commercial terms of prepay transactions, would be needed." P-DB144 (Structuring Future Yosemite Transaction) at DBG058028. Orchant and Newman gave advice to Enron on how to structure future Yosemite transactions. *Id.*

676.     Enron would ask Deutsche Bank to close if at all possible, by the end of the quarter. P-DB138 (Jakubik Bankr. Dep.) at 150:20-151:11.

677.     In correspondence with Craig Orchant regarding finishing up the Marlin investment offerings, Seth Rubin stated that the Marlin transaction sales of equity were "pricey [because] lots and lots of hair on this structure and [because] they haad [sic] to get it done pre xmas." P-DB236 at DBN0015492; P-DB241 (Rubin Dep.) at 220:11-221:23.

**I.      Plaintiffs' Expert Anthony Saunders**.

678.     Plaintiffs' expert Professor Anthony Saunders has more than 35 years of experience in assessing the financial health of companies, with a specialized focus on banking practices and the behavior of financial institutions and markets. P-DB81 at 5.  Mr. Saunders is Professor of Finance and Chair of the Department of Finance at NYU's Stern School of Business. Professor Saunders concludes, among other things, that CSFB and the other bank defendants failed to conform to accepted norms of investment banking practices, risk management, industry custom and bank conflict of interest rules, by assisting and participated with Enron to deceive investors and credit rating agencies, utilizing complex structured finance transactions designed to disguise Enron's true level of indebtedness and inflate operating cash flows.  P-DB81 at 6-7.  Professor

Saunders concluded, based on his vast investment banking experience, that Deutsche Bank had knowledge about the true nature of the asset sales and other structured finance transactions because, among other things:

> As a developer of the structured finance deals, BT/Deutsche Bank was well aware of the nature of the transactions. Indeed, Cambridge testified in a Sworn Statement [P-DB223 (Cambridge Bankr. Dep.) at 124] that they regularly contacted Enron's senior management in order to discuss "the facts behind the numbers" in Enron's financial statements.

P-DB81 (Saunders Bank Expert Rpt.) at 93.

679.    He also opines that Deutsche "was well aware that Enron's financial statements did not disclose relevant information about the company's creditworthiness" based on its October 2001 Underwriting Committee minutes, which are discussed *supra*. *Id*.

680.    Saunders also opined that:

> The Tax Transactions pioneered by BT/Deutsche Bank disguised debt and inflated cash flows. For example, the January 10, 1999 internal BT memo explaining one of the Tax Transactions [] states, "THE REMIC Residual Interests generate non-cash 'phantom' taxable income in the early years and an equal amount of non-cash phantom taxable losses in later years." Although often funded using "preferred stock," the conduits formed to implement the Tax Transactions were not allowed to issue large amounts of debt, *i.e.*, "the Preferred Stock would represent the most senior obligation of Enron SPVCo." [] Thus, the preferred stock was the senior claimant and performed like debt. BT/Deutsche Bank understood this because they discuss Enron's creditworthiness and the fact that "Enron Corp. will guarantee the payment of interest and principal on the Original Notes and the New Notes.

*Id*. (citing, *inter alia*, P-DB205 (Finley Memorandum to Hayes re Enron Credit Approval) at DBN126872).

681.    Saunders further opined "BT/Deutsche Bank was well aware that Enron's structured finance transactions disguised debt as off-balance sheet activities." *Id.* (citing a sworn statement of Craig Orchant which "stated that Enron's primary objective was keeping all of the

Azurix and Marlin debt off-balance sheet. Thus, BT/Deutsche Bank was well aware of the economic nature of the asset sales.").

682.    Saunders continued, opining that Deutsche Bank substantially assisted Enron and participated with Enron because, among other things:

- "BT/Deutsche Bank innovated the Tax Transactions and assisted Enron in the asset sales and other structured finance transactions. For example, March 10, 1997 Approval Memo states, 'The Enron [Tax] Transaction would be the third transaction closed by the Structured Finance Group utilizing a proprietary structure developed by the Structured Transaction Group and the Corporate Tax Department.'" *Id*. at 94 (quoting P-DB86 (March 10, 1997, Memo, Finley, Levinson, Tsai to Classon, Hayes) at DBC012891-92).

- "George Tyson emailed Marcus Tarkington on November 29, 2000 stating, 'Deutsche Bank is one of Enron's eight Tier 1 banks. As a Tier 1 bank, we are frequently brought into unique and lucrative transactions for Enron, such as the highly successful Marlin and Osprey Trust transactions that we developed with DLJ. By having this unique access to a very innovative client, we have been able to develop products that we are aggressively marketing to other clients. To maintain this position with Enron, we need to demonstrate that we execute transactions quickly when necessary.'" *Id*. (quoting P-DB73 (November 29, 2000, Tarkington to Tyson, Email and Document re Enron Relationship) at DBG079774).

- "BT/Deutsche Bank assisted Enron in setting up special purpose entities to implement the structured finance transactions. A March 1, 1999 message from Debra Benning states, 'Oneida is indeed an affiliate of BT and is wholly controlled by BT.'" *Id*.

- "When there was a problem with the accounting treatment of the sale of the Cochise Planes to an Enron subsidiary, BT/Deutsche Bank participated in the subversion of accounting standards by purchasing the planes, holding them for one month and then transferring them back to the Enron subsidiary. Thus, BT/Deutsche Bank assumed a leadership role in facilitating Enron's market deception." *Id*. at 95.

683.    Saunders also opines that Deutsche Bank knew, or should have known, that the lack of transparency and structure of the deals would mislead market participants about Enron's lack of creditworthiness because, among other things,

> In a Memorandum dated March 10, 1997, [] Thomas Finley stated that the Tax Transactions created "significant amounts of future accounting income" for Enron. BT bankers knew that this income was fictitious and would mislead investors and credit rating agencies trying to assess Enron's

> financial condition. In an Accounting Memorandum, [] Boyle states, "The accounting benefits of the transaction are derived from treating the transaction as a 'bargain purchase' of assets for accounting purposes, even though there is no bargain purchase from an economic perspective…the transaction is a deal driven by the accounting benefits."

*Id*. (quoting P-DB86 at DBC012896; P-DB199 at AB000187758).

684.    Saunders opines that "BT/Deutsche Bank knew that Enron's condition was precarious" and that, "despite its need to do deals in order to preserve access to this 'unique client,' [Enron]," Deutsche's "George Tyson expresse[d] the desire to cut down the bank's exposure to Enron risk…." *Id*. at 95-96 (quoting P-DB73 at DBG079774) ("Our relationship philosophy with respect to Enron is that we will manage an exposure level of $350-$450 million with expectation that we will flex that level to $700-$800 million, but always with a view toward bringing the exposure back to the normal range …It is important to note that no other Tier 1 bank has an exposure level less than $1 billion.").

685.    In fact, "despite the investment grade credit rating, BT/Deutsche Bank's internal rating for Enron was below investment grade" and "[t]his was, of course, hidden from external credit rating agencies." *Id*. at 96 (citing P-DB200 at DBG023376; P-DB201 at DBG023381-95; P-DB202 at DBG029101).

686.    Saunders opines that—

> BT/Deutsche Bank participated in the obfuscation of Enron's true financial condition, knowing that it would mislead investors and the credit rating agencies. For example, in a Sworn Statement, Orchant…stated, "What was intended by this [balance sheet management] was that they had maintained, you know, reasonable discipline in their debt financing and equity financing to maintain strong investment grade ratings, as opposed to really what the assets and liabilities were, that they had effectively continued to rebalance the capital structure of the company in a way that the rating agencies viewed as providing stability in the credit ratings." Thus, BT/Deutsche Bank knew that the reported debt on Enron's financial statements was not "really what the assets and liabilities were," and that this would provide a false "stability in the credit ratings." Orchant testified further that Enron wanted Osprey debt to be "off-credit" so that it would not be included by the rating agencies

245

in Enron's debt calculation. …Thus, BT/Deutsche Bank assisted Enron in managing the company's credit ratings by designing deceptive structured finance transactions.

*Id*. at 96-97 (quoting, *inter alia*, P-DB223 (Cambridge Bankr. Dep.) at 75:20-76:19) (testifying that in any given transaction Enron's goal was to get an "A" rating, so discussions with Enron always revolved around their rating and monetizing and/or creating liquidity)).

687.     "BT/Deutsche Bank assisted Enron in managing the company's credit ratings by designing deceptive structured finance transactions." *Id*. at 97. Deutsche also "[a]ssisted and participated with Enron in its deception of investors and credit rating agencies by designing, participating in, and implementing structured finance transactions with the objective of hiding debt, inflating earnings and operating cash flows, and obscuring the true financial condition of Enron from full disclosure. *Id*. at 116.

688.     Deutsche Bank's actions caused Enron's operating cash flows to be overstated and its indebtedness to be understated. *Id*. at 6.

## XIII.  POST-BANKRUPTCY MANAGEMENT.

689.     The Enron post-bankruptcy management denied that the Teresa, Steele, Cochise and Tomas transactions complied with GAAP. P-DB186 (Enron Responses to Deutsche Bank RFA Nos. 1, 2, 3, 4) at 8.

690.     The Enron post-bankruptcy management denied that the Teresa, Steele, Cochise and Tomas transactions were accounted for in accordance with GAAP. P-DB186 (Enron Responses to Deutsche Bank RFA Nos. 5, 6, 7, 8) at 8-9.

691.     The Enron post-bankruptcy management denied that the Teresa, Steele, Cochise and Tomas transactions were accounted for consistent with the SAS-50 letter issued by Arthur Andersen. P-DB186 (Enron Responses to Deutsche Bank RFA Nos. 9, 10, 11, 12) at 9-10.

692.    The Enron post-bankruptcy management denied that no Deutsche Bank employee or representative ever advised them on whether Enron should record valuation allowances. P-DB186 (Enron Responses to Deutsche Bank RFA Nos. 45, 46, 47, 48) at 17-18.

693.    The Enron post-bankruptcy management denied that Enron did not seek advice from Deutsche Bank on whether Enron should record valuation allowances. P-DB186 (Enron Responses to Deutsche Bank RFA Nos. 53, 54, 55, 56) at 19-20.

694.    The Enron post-bankruptcy management denied that the effects of the Teresa, Steele, Cochise and Tomas transactions were disclosed on Enron's financial statements. P-DB186 (Enron Responses to Deutsche Bank RFA Nos. RFAs 69, 70, 71, 72) at 22-23.

695.    The Enron post-bankruptcy management denied that no Deutsche Bank employee or representative had knowledge of a fraud on Enron. P-DB186 (Enron Responses to Deutsche Bank RFA No. 106) at 32.

696.    The Enron post-bankruptcy management denied that the effects of the Teresa, Steele, Cochise and Tomas transactions were disclosed on Enron's financial statements. P-DB186 (Enron Responses to Deutsche Bank RFA Nos. 69, 70, 71, 72) at 22-23.

697.    The Enron post-bankruptcy management denied that no Deutsche Bank employee or representative assisted in perpetrating a fraud on Enron. P-DB186 (Enron Responses to Deutsche Bank RFA No. 107) at 32.

698.    The Teresa Transaction was registered as a tax shelter. P-DB186 (Enron Responses to Deutsche Bank RFA No. 122) at 36.

699.    The sale of the Cochise planes to BT Leasing Corp was made with the intention that Enron would reacquire the aircraft. P-DB186 (Enron Responses to Deutsche Bank RFA Nos. 167, 168) at 46-47.

700.    Enron post-bankruptcy management stated the following in relation to Deutsche Bank's role with Enron and the Tax Transactions:

> BT/Deutsche Bank's involvement in the Insiders' manipulation of Enron's financial condition was also necessary to the Insiders' scheme. BT/Deutsche Bank knew the Insiders were using SPE transactions improperly to inflate income on Enron's financial statements and to remove debt. From at least 1997, BT/Deutsche Bank helped the Insiders achieve their improper goals by designing, financing, and/or implementing several important tax transactions. Together, these transactions allowed the Insiders improperly to record more than $400 million in income on Enron's financial statements.

> The Enron Examiner reviewed the BT/Deutsche Bank tax transactions discussed here: Steele, Cochise, Teresa, Tomas, Renegade, and Valhalla. The Enron Examiner concluded that Steele, Cochise, Teresa, and Tomas were "for the most part, artificial transactions lacking a bona fide business purpose other than the creation of accounting income for Enron," that BT/Deutsche Bank knew these transactions had no purpose except to enable the Insiders to incorrectly Rpt. income for accounting purposes, and that BT/Deutsche Bank substantially assisted the Insiders' fraud because it "developed [Steele, Cochise, Teresa, and Tomas's] basic tax and accounting structures . . . promoted them to Enron, and participated in the transactions, often as the only party other than Enron affiliates." [Batson DB Rpt at 72-73].

> When Deutsche Bank AG acquired Bankers Trust Corporation ("Bankers Trust") in June 1999, Deutsche Bank AG and Bankers Trust each enjoyed a longstanding relationship with Enron. By that time, both were Tier 1 banks. The combined institution was a Tier 1 bank, as well. All three (Deutsche Bank AG, Bankers Trust, and BT/Deutsche Bank) proposed and engaged in a wide variety of transactions with Enron, worldwide. One was BT/Deutsche Bank's $10 million investment in LJM2 in December 1999, which was made at Fastow's invitation. BT/Deutsche Bank also placed a designee on the LJM2 Advisory Committee. The six tax transactions discussed below became one of BT/Deutsche Bank's most important areas of involvement with Enron. In a November 29, 2000 internal e-mail, BT/Deutsche Bank described part of Enron's importance to the bank: "By having this unique access to a very innovative client, we have been able to develop products that we are aggressively marketing to other clients." DBG 079773-774 (quoted in Batson DB Rpt. at 11).

> From 1997 through 2001, BT/Deutsche Bank received $72 million in fees from transactions with Enron.

> In 1997, Enron Insider Maxey formed a Corporate Tax Planning Group within Enron's corporate tax department. Thereafter, the tax transactions became one of BT/Deutsche Bank's most important areas of involvement with Enron.

Periodically, BT/Deutsche Bank met with Maxey's group to consider structures BT/Deutsche Bank developed that would satisfy Enron's goals. Among these structures were the highly complex Projects Teresa, Steele, Cochise, and Tomas. These tax transactions were designed, developed and promoted to Enron by BT/Deutsche Bank, which acted as Enron's exclusive advisor and retained and worked in combination with Arthur Andersen to manipulate the potential accounting effects of these deals.

Because Enron had huge amounts of net operating losses available to it prior to entering into any of the tax transactions, they were not designed to save current or near-term future taxes. Indeed, the tax transactions had nothing to do with "normal tax savings techniques" and went well beyond "typical corporate 'tax shelter' transactions." [Batson Second Interim Rpt., Appendix J, at 1]. Rather, these were a "new genre" of transactions designed to "generate" accounting income from projected future tax savings. *Id.* Basically, BT/Deutsche Bank structured transactions that generated current financial accounting income for Enron – including large amounts of pre-tax income – by creating questionable future tax deductions. Enron would quantify the speculative future tax benefit as a deferred tax credit, which Enron would take into accounting income over the lifetime of the credit. But as structured by BT/Deutsche Bank, the tax transactions created artificially short lives for the deferred tax credits. This allowed Enron to include large amounts of accounting income on its statements over just a few years even though the deferred tax asset involved might reflect a projected tax deduction often years or even decades in the future. The Insiders also failed to set up a reserve in case the speculative tax benefit was never realized.

In exchange for designing and assisting the Insiders in implementing these tax transactions, BT/Deutsche Bank received over $43 million in fees from Enron. William Boyle, a Bankers Trust vice president, justified BT/Deutsche Bank's huge fees in part by reference to the significant amount of accounting income the tax transactions generated. AB000187757-77. Robert J. Hermann, who headed Enron's corporate tax department, provided an illuminating metaphor: to Enron, the tax transactions were "kind of like cocaine – they got kind of hooked on it." [Batson Second Interim Rpt., Appendix J, at 87, fn 169]. BT/Deutsche Bank also was an investor in three of the transactions – Teresa, Steele, and Cochise.

P-DB185 (Reorganized Debtor's Fourth Amended Compl.) at 152-154.

701.    As part of its settlement in the Enron bankruptcy, Deutsche Bank agreed to pay $25 million to the Enron Creditors Recovery Corp. P-DB244 at 1.

702.    As part of its settlement in the Enron bankruptcy, Deutsche Bank agreed to release and forever forego $416 million in claims Deutsche asserted in the Enron bankruptcy. *Id*.

703.     As part of its settlement in the Enron bankruptcy, Deutsche Bank agreed to sell all interests in Steele and Cochise entities, including ECTIP, ECTIC, and EFHC, Maliseet and Wilshire providing approximately $100 million to Enron Credit Recovery Corp. *Id.*

## XIV. AS AN UNDERWRITER IN THE ZERO NOTE OFFERING, DEUTSCHE BANK IS LIABLE FOR THE FALSITY OF THE ZERO NOTES REGISTRATION STATEMENT.

### A.     Deutsche Bank was an underwriter of the Zero Notes.

704.     Deutsche Bank agreed to underwrite 8% of the Zero Notes. DB SOF ¶ 241.

705.     An internal Deutsche Bank memorandum to its Commitment Committee identifies Deutsche Bank (a/k/a "DBAB") in the "Terms" summary as one of the "Underwriters" of the Zero Notes. P-DB80 (Jan. 2001 Note Offering) at DBN-297948.

706.     Deutsche Bank was invited to co-lead manage the Zero Notes offering, and actually did so. *Id.*; P-DB230 (Mialkowski Dep.) at 37:9-18.

707.     In order to ensure its ability to sell promptly to the investing public, Deutsche Bank entered into a Registration Rights Agreement with the issuer, Enron, pursuant to which the Zero Notes would be registered no later than 180 days after the initial offering – and, if Enron failed to do so, Deutsche Bank would be entitled to liquidated damages. P-DB84 (Registration Rights Agreement) at SlvC003755, 761-65; P-DB115 (Registration Statement) at 28. The Registration Rights Agreement provided that the registration rights provided therein were given, "[t]o induce the Initial Purchasers [including Deutsche Bank] to enter into the Purchase Agreement." P-DB84 (Registration Rights Agreement) at SlvC003755.

708.     Deutsche Bank received an underwriter's discount and commission from Enron in connection with the Zero Notes offering. D211 (Offering Memorandum) at 45; P-DB230 (Mialkowski Dep.) at 100:23-101:6, 134:5-135:21, 178:25-179:9.

709.    Deutsche Bank was specifically identified in the registration statement as an initial purchaser. P-DB115 (Registration Statement) at 40.

710.    The Zero Notes registration statement states that the "selling securityholders [the list of which includes Deutsche Bank] *intend to distribute the notes*." P-DB115 (Registration Statement) at 40, 42 (emphasis added).

711.    Deutsche Bank was prominently featured on the front page of the initial offering memorandum. D211 (Offering Memorandum) at CITINEWBY 01859945.

712.    Deutsche Bank had the right to participate in the preparation of the registration statement and prospectus for the Zero Notes, and also had the right to conduct due diligence, with full access to Enron's books, records, and personnel. P-DB84 (Registration Rights Agreement) at SlvC003769-70.

713.    The Zero Notes registration statement stated that the resellers in the public offering, including Deutsche Bank, would be required to provide the prospectus to purchasers, would be "subject to certain of the civil liability provisions under the Securities Act in connection with such sales," and "may be deemed to be 'underwriters' within the meaning of the Securities Act." P-DB115 (Registration Statement) at 42.

714.    Deutsche Bank promptly sold its Zero Notes after their registration became effective. *See* DBSOF ¶¶ 246, 248; *see also* D213 at DBN-297948.

**B.    Deutsche Bank did not perform a good faith, meaningful "due diligence" investigation regarding the Zero Notes registration statement**.

**1.    Deutsche Bank knew that Enron's financial statements were false**.

715.    Deutsche Bank substantially and materially aided Enron in completing sham transactions and in misrepresenting its financial condition and financial statements, and thus had

actual knowledge that Enron's financial statements were false. P-DB19 (Batson DB Rpt.) at 121; P-DB82 (Purcell Expert Rpt.) at ¶¶ 11, 13, 94-101; P-DB81 (Saunders Expert Rpt.) at 92-97.

716.    Deutsche Bank was one of Enron's "Tier 1" banks, and designed and engaged in a number of transactions between 1997 and 2001 that had the effect of increasing Enron's reported earnings and funds flows from operations. Deutsche Bank knew full well of the effect this had on Enron's financial statements. P-DB2 (Fastow Decl.) at 18 ¶ 57. Between 1997 and the Zero Notes offering, Deutsche Bank had participated in raising over $7.4 billion for Enron, charging approximately $33 million in fees. P-DB80 (Jan. 2001 Note Offering) at DBN-297948.

717.    Silvercreek's expert found it "almost inconceivable that [Deutsche Bank] did not know and understand almost everything about Enron's finances and financial structure," as well as "how various financing and tax transactions were being accounted for, *i.e.*, that Enron debt was being understated and that cash flow from operations as well as net income were being overstated." *Id.* at ¶¶ 96-97. He further noted that Deutsche Bank's "own internal communications and memorandums leave very little doubt about [its] intent and knowledge." *Id.* at ¶ 98.

**2.    Deutsche Bank knew of "red flags" that it did not investigate**.

718.    Deutsche Bank was a member of the Advisory Committee for LJM2, a private equity fund whose purpose was to create sham transactions to inflate Enron's revenues while enriching LJM2's investors. P-DB2 (Fastow Decl.) at 14 ¶¶ 41-42, 20 ¶63. Fastow told Deutsche Bank no later than August 1999 that LJM2 was to engage in transactions to "manage" Enron's balance sheet and income statement; this "was understood to mean making the numbers what Enron desired them to be … allow[ing] Enron to create the false appearance of earnings and funds flow, and lower debt, thereby obfuscating the true underlying economic performance and health of the Company." *Id.* at 14 ¶ 42.

719.     Deutsche Bank was aware – because Deutsche Bank was the one that structured them – that Enron entered into numerous transactions with no business purpose other than to create tax and accounting benefits. P-DB2 (Fastow Decl.) at 19 ¶ 59. So blatantly illegitimate were these transactions that Deutsche Bank told Enron that it used them with very few companies, and at exorbitant fees, because of the risk of "attracting IRS attention." *Id.* at 19 ¶ 60. Among other things, these transactions "required Enron to represent it was in certain businesses that it really was not in." *Id.* at 20 ¶ 61.

720.     Deutsche Bank designed the structure of the multiple transfers of the Sutton Bridge power plant to one of Fastow's SPEs, about which Enron boasted that it booked profits each of the three times it "sold" Sutton Bridge. *Id.* at 20 ¶ 62. Deutsche Bank deliberately designed the structure to ensure that the supposed sales were nothing of the kind, essentially eliminating any ownership risk to Deutsche Bank. *Id.*

721.     Deutsche Bank judicially admits that it made no additional investigation or inquiry into any "red flags" identified during its due diligence regarding the Zero Notes registration statement. *See* DB Brief at 37 (asserting that there were no "red flags").

### 3.     Deutsche Bank did not endeavor to verify Enron's representations in connection with the Zero Notes registration statement.

722.     The industry standard for an due diligence requires an underwriter to apply "professional skepticism," acting as a devil's advocate "by digging and probing within a company," including "cross examin[ing] participants by asking many questions," and following up on the information obtained, particularly any "red flags." P-DB82 (Purcell Expert Rpt.) ¶ 109. With regard to financial statements, they "should *not* merely be accepted at face value without questioning a company's accounting officers and its auditors." *Id.* at ¶ 110 (emphasis in original). The bank is "expected to conduct *independent* investigations to test the representations of

management which, depending on the circumstances, include[s] such things as hiring independent consultants, if needed." *Id.* at ¶ 111 (emphasis in original).

723. Deutsche Bank's "Due Diligence Log," contained in an internal Commitment Committee memorandum, Reports that Deutsche Bank did no more than rely on Enron's own representation that it experienced no material changes since its last financial statements, and on Salomon Smith Barney's discussion with Enron regarding some very general topics. P-DB80 (Jan. 2001 Note Offering) at DBN-297951. It discloses no efforts to independently verify these representations, no questions asked of Enron's accounting officers or auditors, no follow-up regarding apparent red flags, and no retention of any independent consultants. *Id.*

724. The January 31, 2001 "comfort letter" Deutsche Bank received from Arthur Andersen (including a February 7, 2001 update) warned Deutsche Bank that Andersen was "unable to and do[es] not express *any opinion* on the unaudited [Enron financial statements.]" P-DB126 (January 31, 2001 Andersen letter) at AASDTEX000455994 (emphasis added). The letter further informed Deutsche Bank that all Andersen had done was to read minutes of certain Enron meetings, as well as certain unaudited financials provided by Enron, and accept the apparently oral representations of "certain officials of Enron" that its unaudited income statements were compiled using similar procedures as those that had been audited, and that there had not been any material changes in Enron's financial condition. *Id.* at AASDTEX000455994-95, AASDTEX000456098-99.

725. In its "comfort letter," Andersen Anderson not only made no representation that it had performed due diligence on Enron's financial Reports on which Deutsche Bank could rely, but demanded a representation that *Deutsche Bank* had performed thorough due diligence:

> This letter is being furnished in reliance upon your representation to us that
> … [i]n connection with the [Zero Notes] Offering Memorandum, the review

> process you have performed is substantially consistent with the due
> diligence review process that you would have performed if this placement
> of securities were being registered pursuant to the Act.

*Id*. at AASDTEX000455993, AASDTEX000456098.

726.    Andersen further warned Deutsche Bank that the procedures it employed:

> do not constitute an audit conducted in accordance with generally accepted
> auditing standards … [and] would not necessarily reveal matters of
> significance … [a]ccordingly, we make *no representations about the*
> *sufficiency the foregoing procedures for your purposes*.

*Id*. at AASDTEX000455995 (emphasis added). Anderson added, "such procedures would not

necessarily reveal any material misstatement," and that it "make[s] no representations regarding

the adequacy of disclosure or regarding whether any material facts have been omitted." *Id*. at

AASDTEX000455997.

727.    Plaintiffs' expert, William Purcell, found that Deutsche Bank, "at best recklessly

failed to perform adequate and appropriate due diligence." P-DB82 (Purcell Expert Rpt.) at ¶ 20.

He noted that, due to Enron's complexity and (publicly known) degree of leverage, an

underwriter's "due diligence should have been particularly thorough." *Id*). Instead, Deutsche Bank

"failed to undertake the basic steps of due diligence, *i.e.*, they did *not* exercise independent

judgment; they did *not* verify information; they did *not* act as a 'devil's advocate'; and, among

other things, they did *not* investigate any 'red flag' warning signals." *Id.* (emphasis in original).

As Mr. Purcell concluded, Deutsche Bank's due diligence "did not come close to meeting [the]

industry standards and requirements." *Id.* at ¶ 112.

## XV.    PLAINTIFFS PURCHASE ENRON DEBT SECURITIES FROM CREDIT SUISSE AND OTHERS.

### (i)    Background

728.    Plaintiff Silvercreek Management Inc. ("Silvercreek") is an institutional money

manager based in Toronto, Ontario. Ms. Morwick owns the majority of Silvercreek Management,

and is the President and Director.  Silvercreek's client base includes individuals, pension funds, and corporations. From March 2000 through 2001, Silvercreek managed money for Plaintiffs Silvercreek II Limited, Silvercreek Limited Partnership, OIP Limited, and Pebble Limited Partnership. In or around September and October 2001, Silvercreek's assets under management for these funds were approximately $350 million.  P-DB234 (Morwick Decl.) ¶ 2; P-DB232 at 89:2-91:3, 121:21-122:3.

### (ii)    Silvercreek's Core Investment Strategy

729.    Silvercreek is an investor specializing in publicly-traded convertible bonds. P-DB232 (Morwick Dep.) at 143:9-14, 190:12-18. It looks for what it determines to be conservative, low-risk investments.  *Id*. at 434:20-24, 439:6-9.  "Silvercreek invests primarily in convertible securities, employing a strategy that focuses on cash flow and the fundamental valuation of companies." P-DB234 (Morwick Decl.) at ¶ 2.  Silvercreek does not and has never engaged in the more risky, delta hedging arbitrage strategy employed by most convertible arbitrage investors in the United States. *Id*.; P-DB232 (Morwick Dep.) at 207:13-208:19, 209:24-210:8.

730.    Silvercreek's investments generally fall into one of two categories: (a) outright long convertible bond positions or (b) hedged convertible bond positions, including exchangeable securities (which, unlike most convertible bonds, are exchangeable into a security other than the issuer's). P-DB145 (Silvercreek's Interrog. Resps.) at 63; P-DB232 at 138:12-25, 191:1-8, 194:16-25; *see also* P-DB234 (Morwick Decl.) ¶¶ 3, 3(i), 3(ii).  Both are yield-oriented investments. *Id*.; P-DB232 (Morwick Dep.) at 157:21-25.

731.    **Outright Convertible Bonds**: For its outright long convertible bond investments, Silvercreek purchases a bond and earns interest until the bond matures or is redeemed by the company. P-DB234 (Morwick Decl.) ¶ 3(i). It looks for conventional bonds where the equity price (the issuer's stock) has declined in value, because the bond price yields a more favorable return.

P-DB232 at 191:18-193:2.  The expected return to maturity is known at the time of placing the investment, and Silvercreek earns a positive return as long as the company stays solvent. Thus, the only risk in this type of investment is bankruptcy. P-DB234 (Morwick Decl.) ¶ 3(i); P-DB232 (Morwick Dep.) at 574:9-18.

732.    Because these bonds are convertible into common equity, they provide the added benefit that if a company's equity increases in value, Silvercreek may participate in the increase. As such, Silvercreek makes these types of investments in companies with a good credit profile and where there is potential for an increase in the common equity price. P-DB234 (Morwick Decl.) ¶ 3(i).

733.    The Zero Notes are an example of an outright long convertible bond investment. P-DB234 ¶ 3(i); P-DB156 (Kittel Dep.) at 130:10-14.

734.    **Hedged Exchangeable Bonds**:  In a hedged exchangeable investment, Silvercreek purchases a convertible bond and simultaneously pre-sells (*i.e.*, shorts) the underlying security into which the bond converts to lock in a principal amount and ensure a fixed minimum return upon maturity. P-DB145 (Silvercreek Interrog. Resps.) at 64, 69; P-DB232 (Morwick Dep.) at 574:9-18.  In so doing, Silvercreek hedges the equity risk on the value of the underlying security, making this an inherently low-risk investment.  The only real risk to these investments is the bankruptcy of the company issuing the bond. *See* P-DB232 (Morwick Dep.) at 123:18-124:6, 125:11-16, 145:15-20, 822:9-11; P-DB234 (Morwick Decl.) ¶ 3(ii).

735.    The 7% Notes are an example of a hedged exchangeable investment. P-DB145 at 64, 69; *see also* P-DB156 (Kittel Dep.) at 130:7-9.

**(iii)    Silvercreek Is Not and Has Never Been a Distressed Debt Investor.**

736.    Silvercreek is *not* a "vulture" or "distressed" investor. P-DB234 (Morwick Decl.) ¶ 2; P-DB232 (Morwick Dep.) at 430:16-22. It does *not* specialize in the purchase of distressed or troubled debt. *Id*.

737.    Silvercreek has no employees who focus on distressed debt, and distressed debt is not a part of Silvercreek's investment strategy. P-DB145 (Silvercreek Interrog. Resps.) at 67.

738.    In purchasing the Zero and 7% Notes, Silvercreek was "not buying distressed securities. [It was] buying senior bonds of a BBB+ rated highly regarded company" with "a multi-billion dollar equity market capitalization and a long history of stable financial performance." P-DB234 (Morwick Decl.) ¶ 4.

739.    The Enron bankruptcy was the first that Silvercreek had ever gone through. P-DB232 (Morwick Dep.) at 430:20. In fact, following Enron's collapse, Silvercreek sought advice from a colleague who was a distressed investor, because Silvercreek was "trying to figure out what to do. We don't make distressed investments." *Id*. at 430:9-431:8.

**(iv)    Silvercreek's Investment Process.**

740.    As a convertible bond investor, Silvercreek continuously evaluates convertible bonds that come to market and looks for investment opportunities. P-DB232 (Morwick Dep.) at 143:6-24, 190:12-18. In 2000 and 2001, Louise Morwick and Robert Kittel were the two Silvercreek employees involved in Silvercreek's investment decisions. Ms. Morwick was the portfolio manager and ultimate decision-maker. *Id*. at 142:4-16; P-DB156 (Kittel Dep.) at 109:3-13. Mr. Kittel was a research analyst, and he conducted investment research and analysis of Silvercreek's investments. P-DB232 at 142:12-16; P-DB156 (Kittel Dep.) at 108:9-22.

741.    Before making any investment decisions, Ms. Morwick and Mr. Kittel would perform their own analyses of the companies. P-DB232 at 167:23-168:2. They would each model any potential convertible bond investments, and discuss their analyses and the mathematics of the

position. *Id*. at 167:7-168:2. As the ultimate decision-maker, Ms. Morwick relied on her own analysis about an investment, but in so doing also took Mr. Kittel's analysis into consideration. *Id*. at 142:20-143:1, 168:8-14.

742.    Silvercreek's analysis includes modeling each prospective investment. *Id*. at 143:9-144:2. Modeling a bond involves "looking specifically at the economics of the bond. What's the price of the bond? What interest does it pay? What's the return on that bond? So it's looking specifically at the mathematics of the particular investment." P-DB232 (Morwick Dep.) at 144:8-12.

743.    In addition, Silvercreek's analysis always included reviewing a host of documents relating both to the investment and to the company issuing the bond. P-DB232 (Morwick Dep.) at 162:8-166:16; P-DB156 (Kittel Dep.) at 144:9-24. Before investing in any convertible bond, Ms. Morwick and Mr. Kittel always reviewed the prospectus, which Ms. Morwick testified was "the key document that we review for every investment." P-DB232 (Morwick Dep.) at 162:8-17, 251:10-13; P-DB234 (Morwick Decl.) ¶ 5; P-DB145 at 11. Silvercreek would also review any offering memorandum. P-DB145 at 65.

744.    In addition, Ms. Morwick and Mr. Kittel would review the financial information available about the company, such as annual Reports, 10-Ks, other SEC filings, press releases, and analyst reports.  P-DB232 (Morwick Dep.) at 162:8-164:11; P-DB156 (Kittel Dep.) at 144:9-24. They would also review whatever other information they could find in the public realm relating to the company, to help inform their analysis of the company's financial statements. P-DB232 at 166:8-16. If, after reviewing the written materials, Ms. Morwick and Mr. Kittel still had questions about the company, they may also communicate with the issuer and underwriter of the bond. P-DB232 at 168:8-169-5.

745.     Analyzing a company's historical performance and financial information was an important part of Silvercreek's investment process. P-DB234 (Morwick Decl.) ¶ 7; P-DB145 at 64-65. Historical performance was an important indicator that the company was stable, that it consistently demonstrated the ability to generate cash to meet its obligations, and that it was able to weather different economic environments. P-DB234 (Morwick Decl.) ¶ 7; P-DB145 at 11, 64-65.

746.     Historical information would also reveal any unusual trends, such as in the company's debt levels and coverage, which was very important to a debt investor like Silvercreek. Having accurate information regarding the magnitude of a company's obligations, and its ability to generate cash to meet those obligations, is critical. P-DB234 (Morwick Decl.) ¶ 7; P-DB145 at 64-65.

747.     The reason for reviewing such a broad spectrum of information about an investment was to develop a comprehensive view of the company and the value of the business. P-DB232 (Morwick Dep.) at 164:20-165:7.

**(v)     Silvercreek's First Round Purchasing the 7% Notes.**

748.     Silvercreek's first investment in Enron occurred in October 2000, when it first purchased the 7% Notes. P-DB232 (Morwick Dep.) at 237:24-238:3, 240:13-241:8.

749.     The 7% Notes were Enron convertible bonds that, upon maturity, were exchangeable into common shares of EOG Resources, Inc. ("EOG"). P-DB234 (Morwick Decl.) ¶ 3(ii); P-DB232 (Morwick Dep.) at 123:18-124:6, 138:20-25, 147:17-22. EOG had been spun-off from Enron and was a completely separate company. P-DB232 (Morwick Dep.) at 259:18-261:3; P-DB234 (Morwick Decl.) ¶ 16.

750.    The 7% Notes were set to mature in July 2002, at which point Enron was contractually obligated to deliver a minimum of .8475 EOG shares per note. P-DB232 at 147:11-22, 195:8-19, 296:25-297:6. In the meantime, the notes paid quarterly interest. *Id.* at 321:17-322:1.

751.    Silvercreek understood, including from the prospectus and related materials, that Enron owned sufficient EOG common shares to satisfy the principal repayment for the 7% Notes —*i.e.*, .8475 shares per note. P-DB234 ¶ 3(ii).

752.    Silvercreek's objective in investing in the 7% Notes was to have a lower-risk investment. P-DB232 at 123:18-124:2; *see also id.* at 146:9-14. If Silvercreek were to purchase the 7% Notes without shorting the EOG common stock, the value of Silvercreek's investment would fluctuate with the value of EOG, making for a riskier investment. P-DB234 at ¶ 3(ii).

753.    Accordingly, Silvercreek pre-sold the EOG shares at the same time that it purchased the 7% Notes, to minimize risk. This served to hedge against the variability of the bond by removing the market risk on the value of the EOG common stock. *Id.* P-DB232 (Morwick Dep.) at 123:18-124:6, 125:11-16, 145:15-146:6.  It also served to fix the minimum principal amount and lock in a minimum return that Silvercreek would earn on the investment. P-DB232 at 145:21-148:15, 150:16-21, 156:14-22.

754.    The only risk that remained was if Enron went bankrupt before the 7% Notes matured. P-DB234 (Morwick Decl.) ¶ 3(ii); P-DB232 at 129:8-13, 156:14-22, 295:22-296:2, 296:25-297:6, 434:19-24, 451:12-452:1.

755.    Silvercreek viewed its investment in the 7% Notes as a short-term investment in Enron credit. P-DB232 at 261:25-262:7, 269:10-18. Hence, information about Enron's credit was very important to Silvercreek's decision to invest. P-DB234 (Morwick Decl.) ¶¶ 3(ii), 28.

**(vi)    Silvercreek's Work on and Analysis of Enron.**

756.    Before Silvercreek made its initial investment in the 7% Notes in October 2000, Ms. Morwick and Mr. Kittel analyzed the position and familiarized themselves with Enron's business. *See* P-DB232 (Morwick Dep.) at 241:9-245:5. Central to Silvercreek's analysis was Ms. Morwick's and Mr. Kittel's review of the prospectus. *Id*. at 241:14-245:5; P-DB145 at 15, 65. The prospectus was one of Silvercreek's primary sources of information, both with respect to the 7% Notes and about Enron, generally. P-DB234 ¶ 5; P-DB145 at 10.

757.    Ms. Morwick and Mr. Kittel read the prospectus "essentially from front to back." P-DB232 at 267:6-268:25; P-DB156 (Kittel Dep.) at 135:10-25. They relied on the prospectus – not only for the terms of the bonds and the risk factors of the investment, but also for the financial information it contained about Enron. P-DB232 (Morwick Dep.) at 241:14-245:5, 267:6-268:25; P-DB234 (Morwick Decl.) ¶ 5.

758.    The prospectus included Enron's historical financial information from 1994 to 1999.  P-DB232 at 241:14-245:5, 802:1-803:6; P-DB145 at 19, 65. In reviewing this information, Ms. Morwick and Mr. Kittel paid particular attention to the debt levels, historical trends in debt levels, cash flow from operations, and the overall financial condition of Enron, to ensure that Enron would be able to pay both the interest and principal. P-DB232 (Morwick Dep.) at 267:6-268:25, 802:1-803:6; P-DB145 at 11, 20. The prospectus did not disclose the multibillion-dollar off-balance sheet obligations of Enron, which was a critical factor to weighing the risks of the investment and assessing Enron's creditworthiness. P-DB234 (Morwick Decl.) ¶ 8.

759.    In addition to the prospectus, Ms. Morwick reviewed other sources of Enron's financial information. Ms. Morwick reviewed Enron's 10K and annual report for 1999 (which also included the financial information for 1998), and Enron's 10Qs for 1999 and 2000. P-DB232 (Morwick Dep.) at 241:14-245:5; P-DB145 at 15.

760.     Ms. Morwick also looked at press releases, analyst reports, and news Reports about Enron, as well as the registration statements for the 7% Notes. P-DB232 (Morwick Dep.) at 243:5-245:18, 255:25-256:5; P-DB145 at 15-16.

761.     As part of Silvercreek's analysis, Ms. Morwick and Mr. Kittel also considered the return opportunity on the investment, as well as the ability to buy the convertible bond and sell the underlying equity. P-DB232 at 241:12-23.

762.     Ms. Morwick also performed some work on EOG, but it was more limited than the work Silvercreek performed on Enron. The value of EOG did not matter for purposes of Silvercreek's investment because the EOG stock had been pre-sold to eliminate equity risk and Silvercreek's decision to invest in the 7% Notes was driven solely by the fixed, Enron-driven return.  P-DB232 (Morwick Dep.) at 123:18-124:6, 125:11-16, 145:15-146:6, 147:11-16, 150:8-23, 259:18-262:7; P-DB234 (Morwick Decl.) at ¶ 3(ii).

763.     Ms. Morwick testified that, after reviewing the public information on Enron, "[t]here were no questions that arose. It was fairly straightforward. I mean, it was a very solid, profitable company you're talking about. Triple B plus investment grade, multi, multi billion market company and a very short-term investment. In terms of, you know, assessing risk and your protection, it certainly appeared there was a lot of protection." P-DB232 (Morwick Dep.) at 269:10-18; P-DB234 ¶ 4.

764.     Only after Silvercreek conducted a thorough review of the 7% Notes and Enron's financial position did Silvercreek decide to invest in the 7% Notes. P-DB145 at 65.

765.     Silvercreek's decision to invest was based primarily on its belief in the accuracy of Enron's financial information and financial statements. P-DB145 at 65; P-DB234 ¶ 6; P-DB232 at

254:14-25. As Ms. Morwick testified, Silvercreek was "relying on [Enron's] financial information and financial statements being correct." *Id*. at 254:14-25.

766.    Silvercreek's trust in the accuracy of Enron's financial information was, itself, well-founded. Ms. Morwick placed great weight on the fact that Enron's financials – both the financials that she reviewed directly (*e.g.*, for 1999), and the ones included through the prospectus (*e.g.*, for 1994-1999) – had been audited and certified by Arthur Andersen. P-DB232 (Morwick Dep.) at 241:14-245:5, 252:17-253:2, 269:1-4. Ms. Morwick also understood and relied on the fact that the investment banks that underwrote the deal performed due diligence and, thus, similarly attested to the accuracy of Enron's information. *Id*. at 254:14-25.

767.    Based on the public information about Enron, including investment-grade credit ratings, the 7% Notes appeared to be a low-risk investment. P-DB232 (Morwick Dep.) at 434:19-24, 841:7-8. The sole risk to Silvercreek's investment in the 7% Notes was an Enron bankruptcy. *Id*. at 295:22-296:2, 296:25-297:6, 434:19-24.

768.    In October 2000, when Silvercreek invested in the Enron 7% Notes, Silvercreek viewed the risk of an Enron bankruptcy as "remote" and "an impossibility" based on the public information that was available. *Id*. at 129:8-20, 297:7-17. As Ms. Morwick explained, "certainly you would never expect, barring a fraud, that a company can be worth close to zero . . . based on the information." *Id*. at 297:25-298:9.

**(vii)    Silvercreek's Enron Debt Security Purchases**

769.    Silvercreek purchased the 7% Notes (and pre-sold the corresponding EOG shares) in October 2000, November 2000, January 2001, March 2001, April 2001, and June 2001. P-DB232 at 302:18-303:2.

770.    Once Silvercreek made the initial investment in October 2000, both Ms. Morwick and Mr. Kittel continued to track and monitor Enron almost daily. P-DB232 (Morwick Dep.) at

304:17-20, 306:20-307:12, 314:6-12.   They reviewed press Reports, listened to investor conference calls with Enron management, reviewed Enron's financial information (such as in Enron's 10-Ks and/or 10-Qs), and monitored prices relating to the underlying investment, among other things. *Id*. at 304:17-24, 307:1-12, 387:2-388:16; P-DB145 at 15, 17, 62, 65; P-DB156 (Kittel Dep.) at 155:12-15, 156:4-7.

771.   The public information about Enron was important to Silvercreek's ongoing analysis of the company. P-DB232 at 388:22-389:1. Based on the public information available about Enron, Silvercreek maintained "a positive view of the credit and stability of Enron throughout this entire period of time." *Id*. at 315:9-16.

772.   Although Silvercreek had originally intended to hold the 7% Notes to maturity (*i.e.*, July 2002), it ultimately unwound the position through a series of trades between August 20, 2001 and October 23, 2001. P-DB232 at 314:22-315:2, 340:3-9; D268 (Trading History in 7% Notes).

773.   Silvercreek unwound its position because the investment already had earned more than the minimum return that Silvercreek expected if it held the position to maturity, and Silvercreek believed the return going forward was not as attractive as other opportunities in the market. P-DB232 at 315:9-317:5, 322:13-22, 324:17-325:1, 334:20-25, 335:24-336:9. Silvercreek "believed in the stability and strength of Enron throughout the whole piece. Our decision to unwind this position was based on the economics of the position and what we could sell the position for at that point in time." *Id*. at 318:5-18.

**(viii)   Silvercreek's Second Round Purchasing the 7% Notes.**

774.   The day after Silvercreek closed out its position in the 7% Notes, it began re-purchasing the 7% Notes. P-DB232 at 359:18-22. Silvercreek purchased the 7% Notes on October 24, October 25, and into the morning of October 26, 2001. *Id*. at 402:22-403:20, 404:7-11, 405:12-15.

775.    Silvercreek went from selling the 7% Notes on October 23, 2001 to buying them on October 24, 2001 due to the changing economics and returns associated with the position. P-DB232 at 359:10-360:3, 381:16-382:4. Ms. Morwick explained that "the return for the nine-month investment was not attractive on October 23rd, but you could make the purchase on October 24th and 25th at a return that was much more attractive." *Id*. at 359:18-360:3. Going from being a seller one day to a buyer the next was "not that unusual in these investments." *Id*. at 381:22-382:4.

776.    Silvercreek did not consider re-establishing a position in the 7% Notes until brokers from several investment banks contacted Ms. Morwick on October 24, 2001 about purchasing the 7% Notes. P-DB232 at 352:8-15, 391:16-392:23, 401:2-23. The brokers described the 7% Notes as "a very good investment opportunity. Strong company. You know, bit of noise in the markets currently, but you know, very strong credit. This company is . . . too big to ever fail. It's Enron, the seventh largest company in the world. Have a look at this bond. Why don't you buy us some." *Id*. at 391:16-392:23, 398:18-23, 459:19-23, 799:4-800:3.

777.    Ms. Morwick testified "certainly conversations with the brokers, you know, do have some influence. Certainly information we learn from the research analysts' Reports, you know, it all factors into [Silvercreek's analysis]. They're a source of information. . . . So, yes, it does influence our decisions." P-DB232 at 395:11-23. And the message the brokers conveyed was "this company was too big to fail. [The brokers] viewed it as a good credit. The prices were attractive. There wasn't a question that this company was going to go bankrupt." *Id*. at 671:1-5.

778.    Once the investment opportunity was brought to Silvercreek's attention, Ms. Morwick pulled out the Enron file and reviewed the prospectus again to re-familiarize herself with the terms of the 7% Notes. P-DB232 at 402:22-403:2. She also looked at the news that had come

out recently about Enron, and had reviewed Enron's third quarter results a few days prior. *Id*. at 403:3-10, 753:4-21, 786:17-787:4.

779.    Ms. Morwick also had the benefit of the cumulative work she had done on Enron in the year leading up to this investment. Over the past year, Silvercreek had "looked at the financials of the company. We read the financial Reports. We read analysts' Reports. We went through the news releases. We listened to quarterly earnings calls. We followed the news related to this company and looked at their financial position. We read the prospectus. We looked at coverage ratios and the financial information history going back to . . . 1994. So we looked at the historic financial information related to Enron for at least the five years leading up to the date of purchase." P-DB232 at 802:12-803:6.

780.    As Ms. Morwick testified, "[t]his was a company that we were familiar with, or believed that we knew. We'd been following it for the past year. And we were prepared to make an investment because we'd looked at Enron." P-DB232 at 374:3-14. "We understood the company fundamentally. We reviewed the third-quarter financials. We knew the business. So . . . in terms of understanding the business and the senior bond investment, we understood it. So in terms of making the decision to buy, it was driven by the economics of the investment opportunity on [October 24, 2001]." *Id*. at 384:4-13. "We saw an attractive return based on an Enron credit so it was an investment in a company we believed was an incredibly successful, strong business." *Id*. at 380:20-23.

781.    Ms. Morwick then decided to re-establish a position in the 7% Notes (and short the corresponding EOG shares). D269 (Trading History in 7% Notes After 10/23/2001); *see also* P-DB232 at 359:18-22.

782.     Silvercreek also based its decision to invest "on [its] belief in the financial strength of the company." P-DB232 at 381:12-13. Silvercreek relied on the current state of Enron, and its outlook going forward. *Id*. at 378:3-18, 830:12-23. "You are also looking at the current position of the company and going forward. You want to make sure that you're going to be repaid. It's the whole combination." *Id.* at 378:3-18.

783.     Silvercreek placed particular importance on Enron's historical financial information. P-DB232 at 378:3-18. As Ms. Morwick explained, "[h]istorical figures are a very important element of looking at the stability of a company and whether you think the business is viable. Clearly you're looking at the historical information to develop comfort and picture that this has been a stable business for a long period of time. Certainly Enron had had an investment-grade credit rating for a long period of time." *Id*. at 378:3-18.

784.     When Silvercreek re-established its position in the 7% Notes, the strength and viability of Enron never seemed in question. P-DB232 at 801:2-23. Silvercreek was investing in a company with "a triple B plus credit, a stable rating by S&P, highly recommended by all the analysts in the street." *Id*. at 376:11-13.  Enron was the seventh largest company in the world. *Id*. at 668:21-22; *The 500 Largest U.S. Corporations*, Fortune, 2001, P-CS 138 at 1. As Ms. Morwick summarized,

> [Enron was believed to have approximately] 100 billion in revenue, a billion in earnings. [Enron had just] come out with their third quarter results, which the core operations and earnings of the business were very strong, up 26 percent. The company looked financially very strong. It was a $20 billion company equity value at the time we started this investment. Had disclosed debt in the order of 13 billion. It was an investment grade rated company. All the analysts in the street had buy recommendations, strong buy recommendations. It was an investment, certainly, that was brought to our attention by a couple of brokers that believed strongly or certainly professed to believe strongly in the viability of this business. It looked—at the time we made this investment, it looked inconceivable that it would go bankrupt, certainly not within a nine-month timeframe. I don't think that's ever happened in the history of the United States, as far as I'm aware,

that a company that would rank in the top 10 of the world would go bankrupt in a one-month timeframe . . . Barring fraud.

P-DB232 at 668:24-669:22.

785.    When challenged on this point during her deposition, Ms. Morwick testified as follows:

> Q.    The bottom line is you made a bet against the market. Right?
> A.    No. We looked at the fundamentals of this business. We were investing in Enron . . . . I think the market cap, you know, certainly the combined total cap is 20, 25 billion dollars. It's an investment based on the financials of this company and the business strength of this company. ***And the financials that we were basing our investment decision on were just complete garbage. They were completely wrong. They weren't even close to reality***.

*Id*. at 374:15-25, 381:12-15 (emphasis added); *see also* P-DB232 (Morwick Dep.) ¶ 4.

786.    When Silvercreek re-established its position in the 7% Notes on October 24, 2001, the price of the investment was declining and the spread between the price of the Enron bonds and the underlying equity (*i.e.*, the conversion premium) was narrowing. P-DB232 at 359:10-360:3; 381:16-382:4, 405:19-406:12, 797:21-798:15, 820:15-821:9.

787.    Ms. Morwick attributed the change in bond price, at least in part, to the significant increase in supply of the bonds due to investors selling bonds into the market. P-DB232 at 361:16-362:25, 371:11-21. She also attributed the lower prices of Enron securities to the fact that 2001 was a bear market. *Id*. at 150:4-7, 465:16-25.

788.    The prices of the Enron bonds were not unusually low but, rather, were in line with where Silvercreek had been able to establish positions in Enron previously, and where Silvercreek had been able to establish positions in other 7% Notes in the market. P-DB232 at 519:5-15. As Ms. Morwick explained, "[i]f you look at the investment over the 24th, 25th, timeframe, those investments were made in line with where we'd been able to make these investments in the past,

including our experience buying Enron in October, 2000 . . . [so] it didn't look out of line." *Id*. at 843:24-844:11.

789.    Silvercreek made additional purchases of the 7% Notes on October 25, 2001 and into the morning of October 26, 2001. P-DB232 at 402:22-403:2, 404:7-11, 405:12-15; P-DB156 (Kittel Dep.) at 294:12-17; D269 (Trading History in 7% Notes After 10/23/2001).

790.    On October 26, 2001, the conversion premium turned negative. P-DB232 at 406:9-12, 418:1-9, 830:24-831:25. A negative spread was very unusual and signaled to Silvercreek that "there's something, something wrong. Or the market is assuming something's wrong, or somebody's desperate to get out of this position for some reason, that, you know, they're selling hard into the market. It doesn't make sense." *Id*. at 406:13-19, 830:24-831:25. "Clearly somebody thought there was a problem. . . . someone was selling in a fashion that was irrational." *Id*. at 407:12-16. "It didn't make sense in the context of the financials of the company." *Id*. at 416:11-20, 830:24-831:25.

791.    Although nothing had happened to change Silvercreek's view of Enron's credit, Ms. Morwick nevertheless was "nervous that somebody knows something that you potentially don't." P-DB232 at 407:6-408:5, 838:9-21. As Ms. Morwick explained, "all of a sudden, you hit this disconnect. Our view of the company and its financial strength is one thing, and the market is indicating that something is going on. Somebody knows something we don't know. It just didn't feel right. Something was off." *Id.* at 841:4-16.

792.    Silvercreek decided to stop buying the 7% Notes, and to reduce its position size, that day (October 26, 2001). P-DB232 at 419:12-420:15, 840:2-5, 841:17-25. It tried to cancel a buy order placed earlier that morning. *Id.* at 419:19-420:11

793.    Silvercreek started selling the 7% Notes the afternoon of October 26, 2001. P-DB232 at 404:12-18, 405:12-18; P-DB234 ¶ 32. There were not many buyers in the market. P-DB232 at 414:12-22. Silvercreek was not able to sell as many 7% Notes as it wanted to, and what it was able to sell was at a discount. *Id*. at 414:12-22, 421:14-17.

794.    Silvercreek continued to sell the 7% Notes through the end of 2001, and throughout 2002. It was not able to fully unwind it position until November 2003. P-DB232 at 414:23-415:7, 432:15-18; D269 (Trading History in 7% Notes After 10/23/2001).

**(ix)    Silvercreek's Investment in Enron Zero Notes**

795.    The Zero Notes were a short-term bond with a $69.813 cash redemption option on February 7, 2004. P-DB234 (Morwick Decl.) ¶ 3(i); P-DB232 (Morwick Dep.) at 446:17-447:5, 462:15-463:11. Silvercreek intended to hold the Zero Notes just until the cash redemption option became available in February 2004. P-DB232 at 462:15-463:11.

796.    Silvercreek knew what its expected return would be when the Zero Notes matured, provided Enron did not go bankrupt before then. P-DB232 at 451:12-452:1. As with the 7% Notes, the only risk to Silvercreek's investment was an Enron bankruptcy. *Id*. at 451:12-452:1.

797.    Silvercreek first considered the Zero Notes as a potential investment when they were issued in February 2001. *Id*. at 443:13-21; C246 (Prospectus for Zero Coupon Notes Due 2021 (July 18, 2001)).   Silvercreek reviewed the offering memorandum, but passed on the investment. P-DB232 (Morwick Dep.) at 443:22-448:8, 450:9-11, 536:13-19; P-DB234 (Morwick Decl.) ¶ 5.

798.    The public offering of the Zero Notes was initially in July 2001. C246 (Prospectus for Zero Coupon Notes Due 2021 (July 18, 2001)).   Silvercreek revisited the Zero Notes in the summer of 2001. P-DB232 (Morwick Dep.) at 450:9-452:6. By that point, Silvercreek already felt

very familiar with Enron, because it had been following Enron throughout 2001 due to the investments it held with Enron. *Id*. at 452:11-22.

799.    Ms. Morwick reviewed the terms of the bonds, the current prices, and where the bonds were trading in the market. P-DB232 at 452:11-22. Even though the return on the Zeroes was becoming more attractive in the summer of 2001, the return was still not attractive enough to Silvercreek compared to other opportunities available in the market. *Id*. at 450:9-452:6.

800.    Silvercreek did not consider the Zero Notes again until October 18, 2001, when Sara Randell from CSFB contacted Ms. Morwick. P-DB232 at 398:18-399:9, 453:4-456:5, 459:25-460:2. Silvercreek had a longstanding business relationship with Credit Suisse and Ms. Randell; Silvercreek has completed over a 1,000 trades with Credit Suisse and paid them over $1 million in commissions in 2001 alone. P-DB235 (Morwick Suppl. Decl.) ¶¶ 9-12. At the time, Ms. Morwick spoke to Ms. Randell on a daily basis. P-DB232 (Morwick Dep.) at 399:16-400:3, 536:20-537:8. Ms. Randell would call Ms. Morwick with "particular ideas or things that were relevant for us." Id. at 856:19-857:1. Ms. Randell told Ms. Morwick that the Zero Notes were an interesting investment, because they offered "a good yield for a good credit." *Id*. at 457:16-458:8.

801.    After the call, Ms. Morwick reviewed the investment, looked at what the price was, calculated what the return would be, and reviewed recent news about Enron. *Id*. at 459:9-13, 770:18-772:5.  She wanted to get a sense of whether "that price seemed right in the context of the current market, where the bonds were trading," and what the returns would be. *Id*. at 460:16-18, 462:5-7, 770:18-773:1.

802.     In deciding to invest in the Zero Notes, Ms. Morwick drew on the considerable amount of work Silvercreek had done on Enron throughout the past year.  P-DB232 (Morwick Dep.) at 459:9-13, 460:16-461:1, 771:1-15. By that point, she had already reviewed the prospectus

(which included Enron historical financial information for 1999 and 2000) and the offering memorandum. *Id*. at 536:13-19; P-DB234 (Morwick Decl.) ¶ 5; P-DB145 (Silvercreek Rog. Resps.) at 10-11, 15, 19-20.

803.    In addition, she already had "the historical financials going back through history right up to the most recent quarter," had just reviewed Enron's third-quarter results, and had been keeping up on news related to the company. P-DB232 at 753:4-21, 770:18-772:5, 786:17-787:4. By this point, Silvercreek had done "a lot of fundamental work on the company," and so it was already comfortable with Enron's credit. *Id*. at 453:4-11, 460:21-24, 463:4-11, 771:1-15.

804.    Silvercreek established a position in the Zero Notes on October 18, 2001. D234 (Trading History in Zero Notes).  Silvercreek's decision to invest was based primarily on its belief that Enron's financial information and financial statements were accurate. P-DB234 (Morwick Decl.) ¶ 6.

805.    Ms. Morwick continued speaking to Ms. Randell on a daily basis in October 2001. P-DB232 (Morwick Dep.) at 399:16-400:3, 536:20-537:8, 861:7-11. For example, on October 22, 2001 (the day the SEC inquiry was announced), Ms. Morwick spoke to several brokers, including Ms. Randell, about Enron. *Id*. at 788:24-789:9, 862:4-21. "[N]one of the brokers raised any negative points with respect to Enron. They all viewed this company as a strong, successful business that—you know, bankruptcy wasn't on people's radar screens. It just would have been absurd to think about this company being a bankruptcy candidate." *Id*. at 788:24-792:4.

806.    Silvercreek made additional Zero Note purchases on October 19, 22, 23, 24, 25, and 26 of 2001. *Id*. at 464:6-9. It stopped buying Zero Notes on October 26, 2001—the same day it decided to stop purchasing the 7% Notes.

807.     In late October 2001, the price of the investment was declining, and it continued to go down. *Id*. at 796:13-22. On November 8, 2001, Silvercreek began to unwind its position in the Zeroes. D234 (Trading History in Zero Notes).  It did not fully unwind its position until January 2002. *Id*.

(x)     **Assessing Enron's Bankruptcy Risk**

808.     When Silvercreek invested in the 7% Notes and Zero Notes in October 2001, it did not believe there was any real risk of an Enron bankruptcy.  P-DB232 (Morwick Dep.) at 668:24-669:22, 788:24-792:4, 801:8-16.  Silvercreek held that belief based on its thorough analysis of the company over the past year. *Id*. at 802:12-803:6.

809.     An Altman Z score is a numerical measure of a company's bankruptcy risk, and it can be calculated from a company's financial information. P-DB232 at 803:7-804:7. If a company has an Altman Z score over a measure of 3, the company has a low risk of bankruptcy. *Id*. at 804:8-15. If the Altman Z score is less than 1.8, then the company is at risk of bankruptcy. P-DB232 at 804:8-16. Ms. Morwick could not recall whether she looked at the Altman Z score for Enron at the time Silvercreek invested in the 7% Notes and Zero Notes in October 2001. *Id*. at 803:17-24, 886:21-887:23.   As Ms. Morwick explained, "[t]he Z score wasn't really a relevant piece of analysis for Enron at that point in time" because Enron was not a distressed business or facing credit difficulty. *Id*. at 804:17-805:4.

810.     The Altman Z score for Enron at the time Silvercreek made its October 2001 investment would have been above 3, based on the public information. P-DB232 at 803:17-804:16, 886:21-887:10. As Ms. Morwick testified, "[j]ust with the earnings of the company, the composition of their balance sheet, their level of debt, you know their earnings power, their operating cash flow, yes, the Z score would not have indicated bankruptcy for Enron at that point in time." *Id*. at 803:17-804:16.

811.    There did not appear to be a need to purchase credit default swaps at the time Silvercreek placed its investments. P-DB232 (Morwick Dep.) at 807:2-21.  Had Ms. Morwick believed Silvercreek needed credit protection on its Enron investments, she never would have had Silvercreek make the investments.  *Id*.; P-DB235 (Morwick Suppl. Decl.) ¶¶ 20-21.

### (xi)    Negative News about Enron

812.    Silvercreek had been following news about Enron throughout 2001. P-DB232 (Morwick Dep.) at 403:3-10. Accordingly, Ms. Morwick was aware of news about Enron in the weeks and months preceding Silvercreek's October 2001 purchase of the 7% Notes and Zero Notes—including news of Jeff Skilling's resignation as CEO, Enron's announcement of a $1 billion charge in its third-quarter 2001 earnings, Moody's placing Enron's credit rating on a review for downgrade, Andrew Fastow's leave of absence, and the announcement of the SEC inquiry. *Id*. at 363:1-366:21.

813.    Silvercreek factored this news about Enron into its analysis, which did not change Silvercreek's overall positive view of Enron and its continued viability. P-DB232 at 378:19-380:15; 419:9-11; P-DB234 (Morwick Decl.) ¶ 6.

814.    The reported events at Enron did not materially impact the core of Enron's business, which appeared to remain solid:

> Q.    These events that I've just described in a black and white world are negative, not positive; correct?
> A.    The particular events that you have highlighted are negative events, but the fundamental business of Enron, which reported its third-quarter results on October 16th, was tremendously positive. If you look at the core business of the company, they had increasing earnings per share. I believe it was 26 percent. All of their core businesses were doing extremely well. All of the analysts came out with positive comments on the quarterly results. The strength of this business was strong buy ratings on this company.
> So the overall news was positive. Certainly there were these negative items. If you look at each of them specifically in the context of the size of Enron, they weren't material.

P-DB232 (Morwick Dep.) at 366:22-367:14; *see also*  P-DB234 (Morwick Decl.) ¶ 6.

815.    The negative news did not remotely suggest that Enron was a bankruptcy candidate, or alter Enron's perceived viability as a company. *See* P-DB232 at 786:17-788:15, 788:24-790:24.

816.    With respect to Jeff Skilling's resignation, Ms. Morwick explained "I didn't take it as a big negative towards the company. I really did believe it was a personal decision. You know, he talked about somebody dying on site, and I think sometimes people go through experiences like that, and they rearrange priorities. So, no, I didn't view that as a tremendous negative." *Id*. at 379:1-10. "Ken Lay had been the CEO up until February of that year, so he was stepping back in. So you definitely had continuity." *Id*. at 379:11-13.

817.    Silvercreek believed that a reported request for information from the Securities and Exchange Commission did not threaten Enron's viability. The SEC inquiry was "something that the company could economically bear easily."  *Id*. at 418:17-419:3. As Ms. Morwick testified, "Enron was an extremely large and, based on the public information, profitable business. The LPs [that were the subject of the SEC inquiry] were not significant or not material in the context of this multi, multi billion dollar company." *Id*. at 785:18-787:4.

818.    Enron's contemporaneous public statements assuaged many concerns about the inquiry. *See* P-DB234 (Morwick Decl.) ¶ 14. In a press release issued the same day that the inquiry was announced, Ken Lay stated, "'We welcome this request. We will cooperate fully with the SEC and look forward to the opportunity to put any concern about these transactions to rest.'" *Id*.  Mr. Lay reassured the public that Enron's internal and external auditors and attorneys reviewed the related party arrangements, that the Board was fully informed of and approved these arrangements, and that the arrangements were disclosed in the company's SEC filings. *Id*. Third, an SEC inquiry is not a sign of impending bankruptcy. *Id.*

819.    Enron's announcement of one-time non-recurring charges of $1.01 billion in its third quarter 2001 results did not change Silvercreek's view regarding the fundamental strength of the company. P-DB234 at ¶¶ 6, 10. These charges were largely non-cash (hence, would have only limited impact on the company's ability to pay interest) and represented a small percentage of the company's equity. *Id.* The write-down was "not a devastating event for a company [like Enron]. Not in the context of, you know, the seventh largest company in the world, with 100 billion [dollars] in revenue." P-DB232 (Morwick Dep.) at 380:10-15, 800:13-23; *see also* P-DB234 ¶ 10.

820.    Mr. Fastow was placed on a leave of absence as a result of investor questions regarding conflicts of interest related to Enron partnerships; he continued to receive the full public support of Ken Lay. P-DB234 ¶ 15. In light of the perceived conflict of interest issues related to Mr. Fastow, this step was seen positively, and like Enron was "proactively dealing with the situation." *Id.* ¶ 15; P-DB232 (Morwick Dep.) at 379:16-22.

821.    Although Moody's placed Enron on a credit watch, both Standard & Poor's and Fitch "came out and affirmed ratings on the company," and all three rating agencies had investment-grade ratings on the company. P-DB232 (Morwick Dep.) at 375:10-23, 581:5-7; P-DB234 (Morwick Decl.) ¶ 10. Silvercreek relied on credit rating information when deciding to invest in Enron. P-DB145 at 16; P-DB232 (Morwick Dep.) ¶¶ 3, 28.

822.    Silvercreek viewed the reported negative news about Enron to be "financial noise" that was obscuring the strength of Enron's core business, because Silvercreek "believed in the public financial information of Enron." P-DB232 (Morwick Dep.) at 408:6-19, 409:12-15, 519:5-15; P-DB234 ¶¶ 6, 30. "We believed that the public information related to Enron was correct. You know, it was our belief in that financial information that certainly would give us the confidence to make the investment." P-DB232 at 417:2-25; P-DB234 ¶ 11. "[I]f you looked at Enron's financial

statements, if their financial statements were accurate, there was virtually no way they can go bankrupt in nine months. It was just an impossibility. So you were faced with financial statements, business results from the third quarter that were strong. This was not a company that was a bankruptcy candidate." P-DB232 at 417:2-25; P-DB156 (Kittel Dep.) at 410:2-5 ("To us solvency was not an issue at the time.").

     **(xii)**    **Silvercreek's reliance upon analyst coverage of Enron.**

823.    Silvercreek's assessment of Enron's continuing strength and viability found considerable support in analyst reports and broker recommendations, which commented favorably on Enron and continued putting buy recommendations on Enron securities. P-DB 3 (Matthews Expert Rpt.) at 11-15, 20-24; P-DB232 (Morwick Dep.) at 375:2-3, 375:25-376:3, 519:23-520:8, 521:4-8.

824.    As negative news was reported in the press, "the analysts were recommending the stock," and the brokers with whom Ms. Morwick communicated actively recommended that that Silvercreek purchase the 7% Notes.  P-DB232 (Morwick Dep.) at 375:2-3, 519:23-520:8, 521:4-8. "All of the equity research analysts were recommending that this company be purchased, that the equity had significant value. It was an opportunity to buy." *Id*. at 375:25-376:3.  And the feedback that Ms. Morwick got from brokers and people that knew Enron was that "Enron was a great company" and "it's a good investment opportunity." *Id*. at 519:23-520:8, 521:4-8.

825.    Silvercreek reviewed and relied on analyst reports and investment comments, including those issued by Credit Suisse, when investing in Enron. P-DB145 at 11-15, 20-24. With so many banks awarding Enron at least a "buy" rating (including Credit Suisse), Silvercreek did not believe that Enron's long-term viability as an entity was at all in jeopardy or that there was any real risk of an Enron bankruptcy. *Id.* at 12-13, 20-24, 64-65; P-DB232 at 521:9-11.

826.   As Ms. Morwick explained, "[b]ecause we were investing in senior bonds, Enron would have had to lose at least $20 billion of equity value before our investment would potentially start to be impaired." P-DB234 (Morwick Decl.) ¶ 4. Stated differently, "if the equity has value and is a strong buy – if the market cap is 20 billion dollars, you have to lose 20 billion dollars before our senior debt even starts to become a risk." P-DB232 (Morwick Dep.) at 375:7-10, 580:14-581:1. "If the equity has value, our debt is not at risk." *Id*. at 376:15-16, 580:14-581:1.

**(xiii)   Steps After Enron's Bankruptcy**

827.   After Enron's bankruptcy filing, Ms. Morwick contacted a distressed investor she knew for advice. *Id*. at 430:9-431:18. As Ms. Morwick explained, "we were left holding, you know, what now is an obviously [] distressed security. We're not distressed investors. We'd never gone through a bankruptcy before. He's a distressed investor, so [I] was talking to him in terms of getting some advice from him." *Id*. at 430:14-22. Silvercreek ultimately decided to sell the Notes "at various points in time in the market and not wait for proceeds of the liquidation. It's not what we do." *Id*. at 432:7-14.

828.   Silvercreek used proceeds from some of the sales to cover the EOG shorts for the 7% Notes, because "we didn't want to take the risk of a naked short, and potentially make[] our loss even bigger. You need to contain it." *Id*. at 432:19-436:5.

DATED: March 15, 2018                    Respectfully submitted,


                                         By: /s/ Scott F. Hessell
                                             Scott F. Hessell

BRUCE S. SPERLING (pro hac vice)
EUGENE J. FRETT (pro hac vice)
SCOTT F. HESSELL (pro hac vice)
55 West Monroe, Suite 3200
Chicago, IL 60603
(312) 641-3200
Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I, Scott F. Hessell, hereby certify that on March 15, 2018, I caused a true and correct copy of the foregoing **Silvercreek's Response to Deutsche Bank's Rule 56.1 Statement & Counterstatement of Disputed Facts** to be served upon the counsel of record via *ECF* transmission:

Richard W. Clary
Winnifred A. Lewis
CRAVATH, SWAINE & MOORE LLP 825
Eighth Avenue
New York, New York 10019-7475
Telephone: (212) 474-1227
rclary@cravath.com
wlewis@cravath.com

*ATTORNEYS FOR DEFENDANTS CREDIT SUISSE FIRST BOSTON (USA), INC. (N/K/A CREDIT SUISSE (USA), INC.), CREDIT SUISSE FIRST BOSTON LLC (N/K/A CREDIT SUISSE SECURITIES (USA) LLC) AND PERSHING LLC (F/K/A DONALDSON, LUFKIN & JENRETTE SECURITIES CORP.)*

Owen C. Pell
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020-1095
Telephone: (212) 819-8891
opell@whitecase.com

*ATTORNEYS FOR DEFENDANTS DEUTSCHE BANK AG AND DEUTSCHE BANK ALEX. BROWN, INC. (N/K/A DEUTSCHE BANK SECURITIES INC.)*

C. Robert Mace
Tekell Book Allen & Morris, L.L.P.
1221 McKinney, 43rd Floor
Houston, TX 77010
Telephone: (713) 222-9542
bmace@tekellbook.com

*ATTORNEY FOR RICK CAUSEY*

Adam S. Hakki
Daniel Lewis
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-7216
ahakki@shearman.com
daniel.lewis@shearman.com

*ATTORNEYS FOR DEFENDANT MERRILL LYNCH & CO., INC. (N/K/A BANK OF AMERICA CORPORATION)*

Daniel M. Petrocelli
Jeffrey A. Barker
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Telephone: (310) 553-6700
dpetrocelli@omm.com
jbarker@omm.com

*ATTORNEYS FOR JEFFREY K. SKILLING*

/s/  Scott F. Hessell
　　　　　Scott F. Hessell