UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SILVERCREEK MANAGEMENT, INC., *et al.*,

                                   Plaintiffs,

        v.

CITIGROUP, INC., *et al.*,

                                   Defendants.

Civil Action No.
02-cv-08881-JPO

**ECF CASE**

**ORAL ARGUMENT
REQUESTED**

**REPLY MEMORANDUM OF DEFENDANT MERRILL LYNCH & CO., INC.
IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**SHEARMAN & STERLING LLP**
Adam S. Hakki
Daniel Lewis
Mary C. Pennisi
599 Lexington Avenue
New York, NY 10022
212-848-4000

*Attorneys for Merrill Lynch & Co., Inc.*

NYDOCS04/616765.21A

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT .......................................................................................1

ARGUMENT ....................................................................................................................2

    I.      PLAINTIFFS FAIL TO ESTABLISH PROXIMATE CAUSE ..............................2

           A.     Merrill Lynch's Limited Involvement with Enron Was Too Remote ........3

           B.     Alleged Collusion between Enron and Others was not Foreseeable ..........3

           C.     Numerous Intervening Transactions Defeat Proximate Cause ...................5

           D.     Merrill Lynch Did Not Create a Concealed Risk of Bankruptcy................5

           E.     Plaintiffs' Alleged "Single Injury" Does Not Prove Proximate Cause.......8

    II.     MERRILL LYNCH IS ENTITLED TO SUMMARY JUDGMENT ON
            PLAINTIFFS' NEGLIGENT MISREPRESENTATION CLAIM ......................10

           A.     No Evidence that Merrill Lynch Had a Special Relationship with
                 Plaintiffs.................................................................................................10

           B.     No Evidence of Negligence in Connection with Analyst Reports............12

           C.     No Evidence of Direct or Reasonable Reliance........................................13

    III.    AIDING AND ABETTING FRAUD ....................................................................16

           A.     No Evidence Merrill Lynch Had Actual Knowledge of Enron's Fraud ....16

           B.     No Evidence Merrill Lynch Substantially Assisted Enron's Fraud..........19

    IV.    AIDING AND ABETTING NEGLIGENT MISREPRESENTATION ...............21

           A.     No Special Relationship Between Enron and Plaintiffs ...........................21

            B.     Merrill Lynch Was Not Also Negligent....................................................23

    V.      CONSPIRACY .....................................................................................................23

CONCLUSION................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Case**                                                                                                    **Page(s)**

*Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519 (6th Cir. 2000) ...............................17

*AIG Fin. Prods. Corp. v. ICP Asset Mgmt., LLC*, 108 A.D.3d 444 (2013) ...........................16, 19

*In re Allou Distribs., Inc.*, 446 B.R. 32 (Bankr. E.D.N.Y. 2011) ......................................16, 23

*AUSA Life Ins. Co. v. Ernst & Young*, 119 F. Supp. 2d 394 (S.D.N.Y. 2000) ..............................4

*AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202 (2d Cir. 2000) .........................................6, 7

*AHW Inv. P'Ship v. Citigroup Inc.*, 980 F. Supp. 2d 510 (S.D.N.Y. 2013), *aff'd*,
    661 F. App'x 2 (2d Cir. 2016) ...........................................................................21

*Bacchus v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 214 (E.D.N.Y. 2015)...................................14

*Barron Partners, LP v. LAB123, Inc.*, 593 F. Supp. 2d 667 (S.D.N.Y. 2009) ...........................22

*Baxter v. A.R. Baron & Co.*, 1995 WL 600720 (S.D.N.Y. Oct. 12, 1995)...................................9

*Bloor v. Carro*, 754 F.2d 57 (2d Cir. 1985)...................................................................9, 20

*Chemtex, LLC v. St. Anthony Enters., Inc.,* 490 F. Supp. 2d 536
    (S.D.N.Y. 2007)....................................................................................18, 19

*Chipman v. Balmer*, 77 N.Y. 51 (1879)....................................................................10

*In re Credit Suisse First Boston Corp.*, 431 F.3d 36 (1st Cir. 2005)...........................................13

*de Abreu v. Bank of Am. Corp.*, 812 F. Supp. 2d 316 (S.D.N.Y. 2011) ...................................19

*Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308 (1980) .........................................5

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, 511 F. Supp. 2d 742 (S.D.
    Tex. 2005) .........................................................................................20

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, 2010 WL 9077875
    (S.D. Tex. Jan. 19, 2010) .........................................................................22

*Fidelity Funding of Cal., Inc. v. Reinhold*, 79 F. Supp. 2d 110 (E.D.N.Y. 1997) ........................25

*Filler v. Hanvit Bank*, 2003 WL 2210773 (S.D.N.Y. Sept. 12, 2003).........................................24

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994)...................................7

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349
(S.D.N.Y. 2007) ...................................................................................................16

*Gov't Emps. Ins. Co. v. Infinity Health Prods., Ltd.*, 2012 WL 1427796 (E.D.N.Y.
Apr. 6, 2012) .......................................................................................................8

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ...................................................24

*Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614 (2d Cir. 1996)........................................14

*Johnson v. Nextel Comm'ns, Inc.*, 660 F.3d 131 (2d Cir. 2011)....................................23

*JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393 (S.D.N.Y. 2004) ................16

*In re JWP Inc. Sec. Litig.*, 928 F. Supp. 1239 (S.D.N.Y. 1996) ....................................12

*Kimmel v. Schaefer*, 89 N.Y.2d 257 (1996)...................................................................12

*King Cty., Wash. v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288
(S.D.N.Y. 2012), *rev'd in part*, 2012 WL 11896326 (S.D.N.Y. Sept. 28, 2012)...................23

*Krys v. Pigott*, 749 F.3d 117 (2d Cir. 2014) ..................................................................19

*Leeds v. N.Y. Tel. Co.*, 178 N.Y. 118 (1904) ............................................................9, 10

*Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading
Co.*, 179 F. Supp. 2d 118 (S.D.N.Y. 2000)........................................................11

*In re Lehman Bros. Sec. & ERISA Litig.*, 2015 WL 5294759 (S.D.N.Y. Sept. 10,
2015) ..................................................................................................................20

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005).........................................7

*Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229 (S.D.N.Y 2006) ........................................6

*Lumbard v. Maglia, Inc.*, 621 F. Supp. 1529 (S.D.N.Y. 1985) ....................................10

*Miele v. Am. Tobacco Co.*, 2 A.D.3d 799 (2003) .........................................................23

*Miller v. Schweickart*, 413 F. Supp. 1062 (S.D.N.Y. 1976) ......................................5, 8

*In re Monahan Ford Corp. of Flushing*, 340 B.R. 1 (Bankr. E.D.N.Y. 2006)...............25

*In re Nat'l Century Fin. Enters., Inc.*, 846 F. Supp. 2d 828 (S.D. Ohio 2012) ............17

*Oster v. Kirschner*, 77 A.D.3d 51 (2010) ....................................................................16

*In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668 (S.D.N.Y. 1990)........................22

*In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472 (S.D.N.Y. 2005)...................................19

*Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572 (2d Cir. 1969)......................14

*Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450 (S.D.N.Y. 2001) ...............20

*Quaak v. Dexia, S.A.*, 445 F. Supp. 2d 130 (D. Mass. 2006)........................................13

*Ravo by Ravo v. Rogatnick*, 70 N.Y.2d 305 (1987).......................................................10

*Ruback v. McCleary*, 220 N.Y. 188 (1917) ....................................................................10

*Ryan v. Hunton & Williams*, 2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ................19

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428 (S.D.N.Y. 2017)..............11, 21

*Soanes v. Empire Blue Cross/Blue Shield*, 970 F. Supp. 230 (S.D.N.Y. 1997)............24

*SPV Osus Ltd. v. UBS AG*, 882 F.3d 333 (2d Cir. 2018)...........................................6, 21

*Stanford v. Kuwait Airways Corp.*, 89 F.3d 117 (2d Cir. 1996) ...................................4

*Suria v. Shiffman*, 67 N.Y.2d 87 (1986) .........................................................................9

*Teamsters Local 282 Pension Tr. Fund v. Angelos*, 762 F.2d 522 (7th Cir. 1985) .....................22

*In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993) .....................................21

*Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of New York*, 734 F. Supp. 2d 368 (S.D.N.Y. 2010)....................................................................................................13

*Tyman v. Pfizer, Inc.*, 2017 WL 6988936 (S.D.N.Y. Dec. 27, 2017) ............................22

*Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304 (S.D.N.Y. 2011) .............................19

*Vanguard Mun. Bond Fund, Inc. v. Cantor, Fitzgerald L.P.*, 40 F. Supp. 2d 183 (S.D.N.Y. 1999)................................................................................................................22

*In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) ....................................6, 22

*Wells Fargo Bank, N.A. v. Nat'l Gasoline, Inc.* 577 F. App'x. 58 (2d Cir. 2014)........................10

*WM High Yield Fund v. O'Hanlon*, 2013 WL 3230667 (E.D. Pa. June 27, 2013)........................9

*Yacoub v. Natt Leasing, Inc.*, 2014 N.Y. Slip Op. 51551(U), (N.Y. Sup. Ct. Oct. 30, 2014)..................................................................................................................6, 9

*Youngers v. Virtus Inv. Partners Inc.*, 2017 WL 5991800 (S.D.N.Y. Dec. 4, 2017) .................19

Merrill Lynch[1] respectfully submits this reply memorandum of law.

## PRELIMINARY STATEMENT

This Court found Plaintiffs' *allegations* to be sufficient to state a claim, providing Plaintiffs with an opportunity to prove their claims against Merrill Lynch even though Merrill Lynch's involvement with Enron was remote in time from Plaintiffs' investments and had no impact on the price of the securities they bought.  Plaintiffs fail to provide any evidence to support these allegations, many of which Plaintiffs have now abandoned, and summary judgment should be granted to Merrill Lynch for multiple, independent reasons.

First, Plaintiffs cannot prove proximate cause as to Merrill Lynch.  The Opposition essentially concedes that Plaintiffs have no evidence linking Merrill Lynch to their losses.  Instead, Plaintiffs resort to an entirely novel legal argument that, as long as they can demonstrate that Enron's overall scheme caused their losses, Merrill Lynch can be held jointly and severally liable for all of those losses.  Plaintiffs' arguments cannot be reconciled with the fundamental principles of proximate causation requiring them to prove that *Merrill Lynch* caused their losses, which they cannot, and do not do.

Second, Plaintiffs cannot prove direct or reasonable reliance.  Plaintiffs' negligent misrepresentation claim has been reduced to a claim that the "Buy" rating contained in a single half-page analyst report about the Zeroes (one of the two classes of Notes that Plaintiffs purchased) was misleading.  Plaintiffs do not claim that they "relied" on this report, which was published nine days before they began to purchase the Zeroes, and it merited no mention in Plaintiffs' complaints or depositions.  Now, however, in a self-serving declaration, Plaintiffs claim only that this report put the Zeroes on their "radar," not that they relied on it.  (Plaintiffs

---

[1] Merrill Lynch incorporates the arguments in the replies filed by the other defendants to the extent applicable. Defined terms and abbreviations have the same meaning as in Merrill Lynch's memorandum of law in support of its motion for summary judgment ("Opening Brief" or "Br.").

say nothing about how the report could have been relied on for their purchases of the Exchangeables.)  This is not reliance.  Even if it were, Plaintiffs concede they are sophisticated investors who undertook *no* additional due diligence before their purchases, even though bad news about Enron was flooding the market throughout their purchases.  New York law requires more from sophisticated investors, and Plaintiffs cannot prove their reliance was reasonable.

Third, the undisputed evidence confirms Plaintiffs did not have a special relationship with Merrill Lynch or Enron as required for their negligent misrepresentation and aiding and abetting negligent misrepresentation claims.  Plaintiffs also *concede* they cannot prove that the opinions of any Merrill Lynch analysts were not genuinely-held.  Moreover, the undisputed evidence confirms that Plaintiffs' aiding and abetting claims fail because Merrill Lynch did not have *actual* knowledge of Enron's overall scheme.  Plaintiffs resort to arguments about what might have happened "but for" Merrill Lynch's involvement with Enron, which only underscores Plaintiffs' failed attempt to prove substantial assistance.

Plaintiffs' claims fail for these and many other reasons, and summary judgment should be granted in favor of Merrill Lynch.

## ARGUMENT

## I.   PLAINTIFFS FAIL TO ESTABLISH PROXIMATE CAUSE

It remains undisputed that Merrill Lynch's involvement with Enron was limited to two transactions at the end of 1999—the Barge Transaction and Electricity Trades—and, indirectly, working with Fastow in connection with the formation of LJM2 in early 2000.[2]  It also remains undisputed that the Barge Transaction and Electricity Trades contributed $62 million of non-recurring income to Enron's total $3.28 billion pre-tax income (only a 1.89% contribution) and

---

[2] Memorandum of Law in Opposition to Merrill Lynch's Motion for Summary Judgment ("Opposition" or "Opp.") 19.

understated Enron's $12.87 billion of debt by only $7 million (an understatement of 0.05%), and that this financial impact was eliminated by the fall of 2000.[3]  Each claim requires Plaintiffs to prove proximate cause.  The Opposition confirms they cannot as to Merrill Lynch.  Br. 19.

### A.      Merrill Lynch's Limited Involvement with Enron Was Too Remote

As discussed in the Opening Brief, the undisputed two-year temporal gap between Merrill Lynch's involvement with Enron and Plaintiffs' losses by itself defeats any attempt to prove proximate cause.  Br. 20-21 (collecting cases).  To try to fill this gap, Plaintiffs point to unspecified analyst reports published by Merrill Lynch in 2000 and 2001.[4]  As discussed below, Plaintiffs fail to prove that these analyst reports give rise to any claims, and they therefore cannot point to them as a basis for proving proximate cause.  See *infra* Sections II-III.  In any event, there is no genuine dispute that these analyst reports reflected opinions honestly held by the analysts, lagged behind reports published by other financial institutions and had no impact on Enron's stock price.[5]  Moreover, there is no evidence the reports had any effect on the prices for the Notes.  Plaintiffs also fail to explain *how* the publication of analysts' opinions could have *caused* Enron to misstate its financial condition, much less go bankrupt in 2002.  This failure to prove the analyst reports caused Plaintiffs' damages means they cannot fill the two-year gap.

### B.      Alleged Collusion between Enron and Others was not Foreseeable

Plaintiffs argue they can prove proximate cause because it supposedly was foreseeable to Merrill Lynch that Enron would engage in separate transactions with other financial institutions that would ultimately cause Enron's bankruptcy.[6]  While courts can consider foreseeability when

---

[3] Opp. 18-19 (failing to refute Barge Transaction and Electricity Trades were eliminated from Enron's books in 2000); Plaintiffs' Response to Merrill Lynch's Rule 56.1 Statement & Counterstatement of Disputed Facts, dated March 2, 2018 ("PSOF") ¶¶ 83, 84, 625; Br. 11; Expert Report of Frederick Dunbar, Jul. 17, 2006, 22-27.

[4] Opp. 20.

[5] Opp. 21-22; PSOF ¶ 145 (Plaintiffs do not address the issue of whether the reports lagged the market, but instead emphasize their allegedly positive nature).

[6] Opp. 21.

evaluating whether proximate cause can be proven, foreseeability cannot be based on hindsight:

> Hindsight is always 20/20. Once a result is known, along with all the intervening events which caused it, it is all but humanly impossible to put that knowledge out of mind when determining whether those occurrences could reasonably have been anticipated. But the present inquiry demands that we strive as scrupulously as possible to view the situation as it existed at the time . . . , with the knowledge [Merrill Lynch] then had, and without the knowledge we now have of what actually happened thereafter.

*AUSA Life Ins. Co. v. Ernst & Young,* 119 F. Supp. 2d 394, 402 (S.D.N.Y. 2000).  It remains undisputed that Merrill Lynch's view into Enron's business as a Tier 3 bank was narrow and based only on its own limited transactions, including because Fastow did not want any single bank to see the "full kimono" of its various transactions.[7]  As such, "there was no reason for [Merrill Lynch] to foresee that such gilding of the financial lily would lead to [Enron's] default on the notes" or that Enron would subsequently engage in transactions that would push Enron into bankruptcy.  *AUSA Life Ins. Co.*, 119 F. Supp. 2d at 402.

To support that Merrill Lynch *should have* foreseen that other banks engaged in "suspect" transactions with Enron, Plaintiffs do not point to evidence, but instead cite *Stanford v. Kuwait Airways Corp.*, a decision in which the court found that terrorists had capitalized on known security differences in Middle East airports.  89 F.3d 117, 120, 127 (2d Cir. 1996).[8]  While the Second Circuit found that proximate cause could potentially be established by evidence that the defendant airline was on notice of this specific risk *and* knowledge that it had a commensurate duty to protect those within a foreseeable scope of danger, there is no evidence that Merrill Lynch had anything beyond a general awareness that Enron worked with dozens of other banks.  "To accept plaintiffs' theory would extend liability for fraud beyond the immediate and foreseeable consequences of one's wrongdoing and in effect make [Merrill Lynch] the

---

[7] PSOF ¶¶ 25, 26.
[8] Opp. 21.

permanent accomplice [of Enron] in all [its] subsequent . . . transactions with others. . . .  This is causation run riot."  *Miller v. Schweickart*, 413 F. Supp. 1062, 1067–68 (S.D.N.Y. 1976).

### C.    Numerous Intervening Transactions Defeat Proximate Cause

Plaintiffs concede that Enron entered into over $20 billion of intervening transactions from 2000 to 2001 that did not involve Merrill Lynch.[9]  These transactions broke any causal connection between Merrill Lynch's relatively small transactions in late 1999 and early 2000 and Plaintiffs' losses in 2002.  Br. 20-21 (collecting cases).  Plaintiffs do not present any evidence linking Merrill Lynch's transactions to their losses.  Instead, Plaintiffs argue that the intervening transactions were part of "one Enron fraud," and, citing *Derdiarian v. Felix Contracting Corp.*, argue that a "subsequent negligent act [is] not an intervening cause where the act is related to the defendant's prior negligent act."[10]  51 N.Y.2d 308, 316 (1980); Opp. 20-21.  The reasoning of *Derdiarian*, a personal injury case concerning a car accident involving two separate but temporally close acts of negligence, does not apply when intervening acts are either "independent of or far removed from the defendant's conduct."  51 N.Y.2d at 315.  For the reasons discussed in the Opening Brief, the intervening acts (*i.e.*, Enron's myriad transactions with other counterparties) are independent *and* far removed from Merrill Lynch's activities.  Br. 20-23.

### D.    Merrill Lynch Did Not Create a Concealed Risk of Bankruptcy

As an alternative, Plaintiffs argue that proximate cause can be established because Enron's bankruptcy constituted a materialization of a concealed bankruptcy risk.[11]  The record cannot sustain this theory as to Merrill Lynch for multiple reasons.

---

[9] PSOF ¶ 88 ("in addition to Merrill Lynch, Enron did structured finance transactions and deals with other banks [and] some of those transactions occurred after certain of Merrill Lynch's transactions"); ¶ 619 ("[i]n 2000, Enron completed 52 transactions for $19 billion of financings—$16 billion of this was structured paper…CSFB, Chase, Citigroup and Bank of America all have in excess of $1.0 billion of exposure to Enron.").

[10] Opp. 21.

[11] Opp. 14-15.

*First*, there is no evidence that Merrill Lynch's activities concealed Enron's alleged bankruptcy risk, much less that a bankruptcy risk existed in 1999 and early 2000.  *See Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 240 (S.D.N.Y. 2006) (first step in analyzing claim based on materialization of risk is to identify "risk concealed").[12]  As discussed above, Plaintiffs concede that the Barge Transaction and Electricity Trades understated Enron's debt by only $7 million and contributed only non-recurring income that is not relevant to debt investors.[13]  *See, e.g., AUSA Life Ins. Co.*, 206 F.3d 202, 227 (2d Cir. 2000) (Jacobs, J., concurring) (because misrepresentations did not impact actual cash flow or debt, they did not conceal risk eventually leading to loss).[14]  Plaintiffs' theory is that "Enron *may* have well missed its end of year (1999) earnings targets with a negative effect on its stock price and potentially its credit ratings" without the transactions.[15]  Plaintiffs concede, however, that they did not have exposure to Enron stock and that "a decline in the stock price of an investment grade company is not a sign of an impending bankruptcy."[16]  Moreover, there is no evidence that Merrill Lynch's transactions, which impacted reported debt by 0.05%, could have had an impact on Enron's credit ratings.

Elsewhere, Plaintiffs suggest *but for* Merrill Lynch's help in setting up LJM2, Enron might not have pursued transactions with counterparties.[17]  As a matter of black-letter law, however, "but for" causes and speculation about what could have happened are not sufficient grounds to prove proximate cause.[18]  *See* Br. 22-23 (collecting cases); *see also SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 344 (2d Cir. 2018) ("but for" causation insufficient); *Yacoub v. Natt*

---

[12] Opp. 2.

[13] PSOF ¶¶ 20, 81, 84, 625; Supplement to the Expert Report of Saul Solomon, Jan. 17, 2006, Schedules 3-6.

[14] The case Plaintiffs' cite, *In re Vivendi, S.A. Sec. Litig.*, addressed whether the "actual filing of bankruptcy is the *necessary* 'materialization of risk' that must occur in order for the company to have caused investors any loss under [section] 10(b)" of the Exchange Act of 1934.  838 F.3d 223, 262 (2d Cir. 2016).  Here, any impact from the Barge Transaction and Electricity Trades ceased by the end of 2000.

[15] PSOF ¶ 453; Expert Report of Anthony Saunders on Role of Banks, June 1, 2006, 72; Opp. 15, 19.

[16] Opp. 9 n.3; PSOF ¶ 233.

[17] Opp. 19-20; PSOF ¶ 73-77, 547, 549, 550.

[18] Br. 22, 35.

*Leasing, Inc.*, 2014 N.Y. Slip Op. 51551(U), at *4 (N.Y. Sup. Ct. Oct. 30, 2014) ("proximate cause must nevertheless be conclusively established and cannot be based on speculation").

*Second*, Plaintiffs' materialization of risk theory also fails because Plaintiffs cannot show that the relationship between Merrill Lynch's involvement with Enron and Plaintiffs' "investment loss" was "sufficiently direct." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005). In making this determination, courts consider whether "(1) the misrepresented value of the property was substantially above its actual value *at the time* of the misrepresentation, (2) the injury was sustained soon after the misrepresentation, and (3) external factors did not contribute to the injury." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 770 (2d Cir. 1994) (emphasis added) (citations omitted); *AUSA Life Ins. Co.*, 206 F.3d at 227–28. It is undisputed that the Barge Transaction and Electricity Trades did not cause Enron's stock to trade "substantially above its actual value" at the time.[19] Indeed, it is undisputed that Enron's stock price *dropped* after the year-end 1999 results were announced and there is no evidence of any impact on the Notes.[20] Indeed, the Zeroes were not even trading until July 2001.

Plaintiffs also cannot prove that the relationship between Merrill Lynch's conduct and its losses was direct, because Enron's October 2001 collapse was not "soon after" Merrill Lynch's active involvement with Enron, but instead, nearly two years and billions of dollars of allegedly fraudulent transactions (not involving Merrill Lynch) later.[21] By the time Plaintiffs invested, any

---

[19] PSOF ¶ 41 (undisputed as to the impact of the transactions on the stock price); ¶ 625 (Plaintiffs state that Merrill Lynch's involvement in the 1999 year end transactions "added some $.08 in reported earnings per share for the year").

[20] Opp. 19 (failing to dispute that the Barge Transaction and Electricity Trades were eliminated from Enron's books in subsequent years); PSOF ¶¶ 41, 49, 67, 68, 83, 84, 625.

[21] Br. 21; Third Amended Complaint ("TAC") ¶¶ 218-19, 242, 245, 247, 254, 259, 261, 421, 571, 604-06, 619, 638 (alleging billions of dollars' worth of complex transactions); Lewis Decl. Ex. M64 [Expert Report of Anthony Saunders on Role of Banks, Jun. 1, 2006, 24-28, 35-37, 47-48, 56-63 (same)].

impact of Merrill Lynch's transactions on Enron's financial statements had been eliminated,[22] Merrill Lynch was not actively involved in LJM2 in any way, and any "link" between Merrill Lynch's conduct and Plaintiffs' losses "bec[a]me too tenuous" to support a finding of proximate cause. *Miller*, 413 F. Supp. at 1068 (citations omitted).  Finally, as argued above, a plethora of factors external to Merrill Lynch's transactions involving Enron contributed to Plaintiffs' injury. *See supra* Section I.C.

### E.      Plaintiffs' Alleged "Single Injury" Does Not Prove Proximate Cause

Plaintiffs attempt to sidestep the problems they have in proving proximate cause by arguing they suffered a "single indivisible injury."[23]  This argument conflates the analysis required for proximate cause with the damages concept of joint and several liability (a concept often invoked when defendants "acted jointly and/or concurrently to produce a single injury") and fails for multiple reasons.  *Gov't Emps. Ins. Co. v. Infinity Health Prod., Ltd.*, 2012 WL 1427796, at *10 (E.D.N.Y. Apr. 6, 2012), *report and recommendation adopted*, 2012 WL 1432213 (E.D.N.Y. Apr. 25, 2012).

*First*, the "single injury" doctrine does not apply in this case, because Plaintiffs cannot prove they suffered a single injury.  *Gov't Emps.*, 2012 WL 1427796, at *10.  In *Government Employees*, for example, the district court rejected a "single injury" argument, holding that defendants involved in an allegedly fraudulent invoice scheme could not be held liable for damages on invoices they did not participate in submitting.  *Id.* at *11.  This same reasoning that limits a defendant's liability to losses that can be attributed to the defendant's own alleged misconduct is regularly applied in securities cases involving multi-defendant schemes in which investors suffer what could be characterized as a single investment loss, such that the plaintiffs

---

[22] Opp. 19-21 (failing to refute that the transactions were eliminated from Enron's books in subsequent years); PSOF ¶¶ 45, 49, 64, 66, 67, 68, 83, 84; Dunbar Report 22-27.
[23] Opp. 14-15.

are still required to present event studies or other economic evidence to isolate the impact of each

defendant's conduct.  *See Bloor v. Carro,* 754 F.2d 57, 61 (2d Cir. 1985); *Baxter v. A.R. Baron*

*& Co.*, 1995 WL 600720, at *6 (S.D.N.Y. Oct. 12, 1995); *WM High Yield Fund v. O'Hanlon*,

2013 WL 3230667, at *12 (E.D. Pa. June 27, 2013) (dismissing claims because plaintiffs failed

to show which portion of investment losses was related to defendant's alleged misconduct).

Plaintiffs acknowledge they have no such evidence as to Merrill Lynch.  Opp. 16.

  *Second*, the "single injury" doctrine does not apply because Plaintiffs at most allege

"wrongs [that] are independent and successive."  *Suria v. Shiffman*, 67 N.Y.2d 87, 98 (1986).

Where, as here, parties that contribute to the injury "neither act in concert nor contribute

concurrently to the same wrong, they are not joint tort-feasors" with respect to an alleged single

injury.  *Id*.  It is undisputed that Merrill Lynch was not involved in any of Enron's transactions

with other financial institutions, and that Merrill Lynch was not privy to the full scope of Enron's

alleged scheme.  Plaintiffs thus at most allege independent and successive wrongs between

Enron and other counterparties.  Their suggestion Merrill Lynch's transactions enabled Enron's

transactions with other banks to occur or continue is not sufficient to prove proximate cause.

*Yacoub*, 2014 N.Y. Slip Op. 51551(U), at *5 ("The law draws a distinction between a condition

that merely sets the occasion for and facilitated an accident and an act that is a proximate cause

of the accident; the latter and not the former giving rise to liability.  Stated differently, if a

defendant's negligence is not the immediate effective cause of an accident, it cannot be said, that

such negligence proximately caused the accident.") (citations omitted); *Leeds v. N.Y. Tel. Co.*,

178 N.Y. 118, 122 (1904) (same).

  Finally, the "single injury" cases Plaintiffs cite analyze whether defendants are jointly

liable *after* the defendant's liability has already been established.[24]  This is consistent with the well-settled principle that the conduct of each defendant must itself be a substantial cause of a plaintiff's injury for there to be joint and several liability.  *Leeds*, 178 N.Y. at 121; *see also Ruback v. McCleary*, 220 N.Y. 188, 195 (1917) ("The rule is well settled that where there are several possible causes of injury, for one or more of which a defendant is not responsible, plaintiff cannot recover without proving that the injury was sustained wholly or in part by a cause for which defendant was responsible.  If the matter is left in doubt, and it is just as probable that the injury was the result of one cause as the other, there can be no recovery.").

The analysis cannot be flipped as Plaintiffs propose in order to create joint liability from an alleged single injury.  *See Chipman v. Palmer*, 77 N.Y. 51, 53 (1879) ("defendant's act, being several when it was committed, cannot be made joint because of the consequences which followed in connection with others who had done" similar acts).  While it might be difficult to separate Plaintiffs' injury, that difficulty does not justify why "one *tort feasor* should be liable for the acts of others who have no association and do not act in concert with him."  *Id.*; *see also Ravo by Ravo v. Rogatnick*, 70 N.Y.2d 305, 312 (1987) ("[c]ertainly, a subsequent tort-feasor is not to be held jointly and severally liable for the acts of the initial tort-feasor with whom he is not acting in concert in every case where it is difficult, because of the nature of the injury, to separate the harm done by each tort-feasor from the others").

## II.   MERRILL LYNCH IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' NEGLIGENT MISREPRESENTATION CLAIM

### A.   No Evidence that Merrill Lynch Had a Special Relationship with Plaintiffs

Plaintiffs acknowledge they must prove they had a "special relationship" with Merrill

---

[24] For example, in *Lumbard v. Maglia, Inc.*, the discussion of joint and several liability implies that joint and several liability be considered after determining actual liability on the claims.  621 F. Supp. 1529, 1536 (S.D.N.Y. 1985).  Likewise, *Wells Fargo Bank, N.A. v. Nat'l Gasoline, Inc.* addressed a damages award after a party was found liable.  577 F. App'x. 58, 60 (2d Cir. 2014).

Lynch to sustain their negligent misrepresentation claim.  As discussed in the Opening Brief, a broker-customer relationship involving a non-discretionary account cannot create this special relationship.[25]  Plaintiffs concede that Merrill Lynch had no discretion over their investments and was not involved in and had no knowledge of their purchases of the Notes.[26]  Likewise, no evidence substantiates Plaintiffs' allegations in the Third Amended Complaint about direct communications with Merrill Lynch employees about the Notes, which the Court relied on to allow their negligent misrepresentation claim to proceed.  *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 453 (S.D.N.Y. 2017).  Under Second Circuit and New York law, Plaintiffs' concessions and failures of proof are dispositive, and Plaintiffs cannot prove a special relationship with Merrill Lynch.  Br. 25-26 (collecting cases).

Plaintiffs argue that this law should not apply because their relationship with Merrill Lynch was "longstanding" and included trades and communications with "bond specialists on a regular basis."[27]  However, Plaintiffs' allegations describe nothing more than typical interactions a hedge fund would have with brokers competing for its business.  Indeed, the record demonstrates that Merrill Lynch was just one of many of Plaintiffs' broker-dealers.[28]  Plaintiffs point to no authority that the number of trades or length of a relationship can give rise to a special relationship.  Nor do Plaintiffs point to any evidence suggesting Merrill Lynch solicited Plaintiffs' investment in the Notes, offered to provide Plaintiffs "comfort" about it, or was

---

[25] Br. 25-26 (collecting cases).  *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 118, 154 (S.D.N.Y. 2000), cited by Plaintiffs, Opp. 38, is irrelevant because it did not address the existence of a special relationship after deciding whether a fiduciary relationship existed.

[26] It is undisputed that Merrill Lynch executed trades for Plaintiffs and maintained a nondiscretionary account for Plaintiffs.  PSOF ¶ 137.  It also is undisputed that Merrill Lynch did not execute any transactions involving the Notes on behalf of Silvercreek.  PSOF ¶¶ 139-40.

[27] Opp. 38.

[28] Br. 14.  The length of the relationship between Plaintiffs and Merrill Lynch likely reflects the relationship between Morwick and her sister, who was employed by Merrill Lynch in Canada.

11

different in any way from their other brokers.[29]  *See Kimmell v. Schaefer*, 89 N.Y.2d 257, 261–62 (1996) (finding a special relationship when defendant solicited investors, represented that the "project was a good investment with earnings better than anticipated," encouraged plaintiffs to review the numbers he provided, and offered to "give . . . 'hot comfort'" on the investment).

Plaintiffs also argue that there was a special relationship because, "from time to time," they received "recommended trades for Silvercreek to consider" from Merrill Lynch, and because Merrill Lynch "regularly sent selected Merrill analyst reports."[30]  However, Plaintiffs have no basis to argue that the analyst reports published to a wide audience by Merrill Lynch were directed specifically to Plaintiffs.[31]  It is undisputed that a special relationship cannot arise from being included on a customer distribution list.  *See In re JWP Inc. Sec. Litig.*, 928 F. Supp. 1239, 1254 (S.D.N.Y. 1996), as clarified (S.D.N.Y. June 12, 1996) (holding that there must be information "prepared for a particular purpose or for the benefit of a particular plaintiff").  To hold otherwise would mean that any investor that receives analyst reports from a broker-dealer would be able to allege a special relationship, but this is not the law.  *Id*.

### B.    No Evidence of Negligence in Connection with Analyst Reports

The testimony by Merrill Lynch analysts John Olson and Donato Eassey that they did not have access to non-public information about Enron in October of 2001 and that opinions in their reports were their own remains undisputed.[32]  Plaintiffs ignore and thereby concede that these or any other analysts' genuinely held opinions about Enron securities are not actionable as negligent misrepresentations.  Br. 28 (collecting cases).  Plaintiffs also concede they cannot prove that any Merrill Lynch analyst was in a position to know Enron's true financial condition

---

[29] Opp. 38; PSOF ¶¶ 161-65.
[30] Opp. 38; PSOF ¶¶ 161-65.
[31] Opp. 38; PSOF ¶¶ 161-65, 245; Morwick Supp. Decl. ¶ 8, P-M 3.
[32] PSOF ¶¶ 149-50.  Plaintiffs fail to identify any other analysts who *might* have had any non-public information that influenced Merrill Lynch's coverage of Enron and/or published allegedly misleading reports.

and could have been negligent when providing opinions.  Plaintiffs also fail to identify a single

misrepresentation in any analyst report that was actually a misrepresentation upon which they

relied, which provides an additional ground for summary judgment.[33]

        With nothing left to argue, Plaintiffs suggest – without any factually analogous legal

support – that "Merrill Lynch" should have breached its own information barriers and client

confidentiality obligations to correct research reports that explicitly were based on public

information only.[34]  Ironically, Plaintiffs seem to be simultaneously suggesting (without

evidence) that Merrill Lynch may have failed to separate its banking and research functions, and

(without legal authority) that it should not have separated them.[35]  Even if there were such an

obligation, Plaintiffs fail to specify what information *Merrill Lynch* had as a result of its limited

transactions with Enron and LJM2 that it was obligated to disclose as a result of some

(unspecified) statement in some (unspecified) analyst report.

        **C.      No Evidence of Direct or Reasonable Reliance**

        Plaintiffs concede they must prove direct reliance on Merrill Lynch's alleged negligent

misrepresentations, and, contrary to their allegations,[36] no Merrill Lynch employee

communicated with Plaintiffs about their purchases of the Notes in October 2001.[37]  Instead,

Plaintiffs claim generally that they reviewed analyst reports published by Merrill Lynch and then

point to only *one* report on the Zeroes published on October 9, 2001, nine days before Plaintiffs

---

[33] *See Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of New York*, 734 F. Supp. 2d 368, 385 (S.D.N.Y. 2010).

[34] Opp. 40.  Plaintiffs cite a District of Massachusetts case that is clearly distinguishable because the plaintiffs in that case laid out a "very specific scheme" through which the analyst "work[ed] from fraudulent financial data Defendant helped create."  *Quaak v. Dexia, S.A.*, 445 F. Supp. 2d 130, 141 (D. Mass. 2006).  The court distinguished these facts against a case in which the Plaintiffs, similar to here, "merely [pled] a generally corrupt environment" amounting to "'gauzy generalities' not linked to specific statements" that was insufficient to plead scienter.  *Id.* at 140 (citing *In re Credit Suisse First Boston Corp.*, 431 F.3d 36, 48–50 (1st Cir. 2005)).

[35] Opp. 31.

[36] TAC ¶¶ 792-800.

[37] PSOF ¶¶ 103-4, 110, 112, 127-28.

began purchasing their purchases.[38]  No evidence suggests the analyst who prepared this report

did not genuinely hold the opinions it expresses, and it is not actionable.  *See supra* II.B.

Regardless, there are no internal business records or memoranda indicating that Plaintiffs

considered or factored any information from Merrill Lynch (or its analyst reports) into their

investment decision.[39]  Plaintiffs' only evidence of direct reliance is the conclusory statement in

the Supplemental Declaration of Louise Morwick that this half-page report "put the Zeros back

on Silvercreek's radar for possible future investment."[40]  This analyst report is not identified in

Plaintiffs' Third Amended Complaint and was not mentioned during the three days of Ms.

Morwick's deposition.  Plaintiffs' eleventh-hour attempt to manufacture a fact issue through

such a conclusory statement should be excluded.  *See Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d

614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in

opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's

previous deposition testimony," and "factual issues created solely by an affidavit crafted to

oppose a summary judgment motion are not 'genuine' issues for trial.") (citing *Perma Research

& Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)); *see also Bacchus v. N.Y.C. Dep't of

Educ.*, 137 F. Supp. 3d 214, 225–26 (E.D.N.Y. 2015) (rejecting portions of an affidavit

submitted in opposition to summary judgment that raise factual issues for the first time).

Even if the conclusory statement in Morwick's Declaration were not rejected, however, it

does not suffice to prove direct reliance on Merrill Lynch's analyst reports.  First, the report

relates only to the Zeroes.[41]  The Exchangeables presented a different investment opportunity,[42]

and Plaintiffs fail to identify any reports that Plaintiffs reviewed concerning the Exchangeables

---

[38] Opp. 39; PSOF ¶ 245.
[39] PSOF ¶ 143.
[40] Morwick Supp. Decl. ¶ 8.
[41] Opp. 39.
[42] PSOF ¶¶ 174, 190-191 (explaining Exchangeables investment) and ¶¶ 171, 240 (explaining Zeroes).

or explain how they relied on the report on the Zeroes in deciding to invest in the Exchangeables two weeks later.[43]  Thus, Plaintiffs' negligent misrepresentation claim must be dismissed to the extent it is based on the Exchangeables.[44]

With respect to the Zeroes, Morwick merely states that the report put the investment on her "radar."[45]  This is not the same thing as relying on something.  Indeed, Plaintiffs concede Morwick "did not consider investing in the Zeros again until October 18, 2001," and then it still was not until Morwick obtained information from sources other than Merrill Lynch that she decided to invest in the Zeroes.[46]  Timing is important here because, after October 9 but before Plaintiffs first purchase of the Zeroes, Enron announced a $618 million loss and a $1.2 billion write off on October 16, 2001.  Moreover, Plaintiffs do not explain how they relied on the report for their successive purchases of Zeroes as more information about Enron came out.  Thus, Plaintiffs cannot prove direct reliance on analyst reports published by Merrill Lynch nine days before their first investment.

Plaintiffs also cannot establish reasonable reliance.  Although Plaintiffs dispute its import for their decision to invest in the Notes, Plaintiffs concede that there was a flood of negative news and information about Enron released prior to their investment.[47]  Moreover, although Plaintiffs quibble with Merrill Lynch's characterization of Silvercreek as a "vulture investor," it is undisputed that Plaintiffs are highly sophisticated.[48]  Plaintiffs also do not dispute that they failed to undertake any *additional* or special due diligence when deciding to invest in the Notes

---

[43] Plaintiffs did not invest in the Exchangeables following the October 9 report: it is undisputed that as of October 23, 2001 Plaintiffs were still selling the remainder of their earlier position in the Exchangeables, did not intend to make any additional purchases of the Exchangeables, and did not change their minds until October 24, 2001, when they began purchasing the Exchangeables.  PSOF ¶¶ 109-110.
[44] PSOF ¶ 110.
[45] Morwick Supp. Decl. ¶ 8.
[46] Morwick Supp. Decl. ¶ 8.
[47] Opp. 29-31.
[48] Opp. 5-6, 8-9.

despite all of the negative information about Enron.[49]  This conceded failure to look any harder

before deciding to invest means Plaintiffs cannot prove reasonable reliance.  *See* Br. 29-30

(collecting cases).  This issue is acute as to Merrill Lynch, because Plaintiffs took no additional

steps between purportedly reviewing the half-page October 9 report and purchasing the Zeroes

nine days later on October 18, 2001, even though Enron announced over $600 million in losses

and over $1 billion in write-offs.[50]  *Id.*

This is not, as Plaintiffs argue, a matter of requiring them to conduct a separate audit of

Enron's financials or an argument Plaintiffs should have discovered Enron's fraud before their

investments.[51]  As discussed in the Opening Brief, it was not reasonable for a sophisticated

investor to do nothing more than rely on heavily caveated analyst reports and a Prospectus

drafted prior to negative news and the commencement of the SEC's inquiry when deciding to

invest in the Notes.  Br. 29-31 (collecting cases).  Moreover, the single case cited by Silvercreek

is clearly distinguishable, because the negative Enron-related news emerging prior to Plaintiffs'

investment rose far above mere "hints of falsehood," falling stock prices and "mixed" analyst

reports.  *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 411–12 (S.D.N.Y. 2004).

## III.   AIDING AND ABETTING FRAUD

### A.   No Evidence Merrill Lynch Had Actual Knowledge of Enron's Fraud

Plaintiffs concede that aiding and abetting claims require actual, not constructive,

knowledge, and that Merrill Lynch was a Tier 3 Bank that was not viewed by Enron to be as

important as others.[52]  Plaintiffs also concede that Merrill Lynch did considerably less work

---

[49] Opp. 6; Morwick Supp. Decl. ¶ 8, P-M 3; Morwick Dep. 376:17-4, 378:19-379:10.
[50] PSOF ¶ 95.
[51] Opp. 6-8.
[52] Opp. 25, 28.  The cases cited by Plaintiffs all hold that actual, not constructive knowledge is required to prove aiding and abetting fraud.  *In re Allou Distribs., Inc.*, 446 B.R. 32, 51 (Bankr. E.D.N.Y. 2011); *Oster v. Kirschner*, 77 A.D.3d 51, 56 (2010); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007); *AIG Fin. Prods. Corp. v. ICP Asset Mgmt., LLC*, 108 A.D.3d 444, 445 (2013); PSOF ¶ 22.

involving Enron after the 1999 transactions, with most work done in 1999.[53]  Plaintiffs also

concede that any actual knowledge that Merrill Lynch had about Enron's accounting treatment

for its various transactions was confined to the Barge Transaction and Electricity Trades, and

that Merrill Lynch did not have knowledge of any other alleged mis-accounting.[54]

Plaintiffs' suggestion that courts do not require "all-encompassing" knowledge of a

primary violator's scheme is not supported by the cases they cite.[55]  In *Aetna Cas. & Sur. Co. v.

Leahey Const. Co.*, for example, the court held after trial that the alleged aider and abettor had

actual knowledge of the *overall* scheme, just not every *detail* of that scheme.  219 F.3d 519,

535–36 (6th Cir. 2000).  Realizing their limited legal arguments, Plaintiffs point to LJM2 as

potentially covering the gap.  As Plaintiffs concede however, even in describing Merrill Lynch as

one of the more "active" banks involved with LJM2, Fastow only points to Merrill Lynch's

involvement in setting up and initially marketing LJM2.[56]  The full context of Fastow's

testimony confirms that Merrill Lynch did not participate in LJM2's operations or serve on any

of its committees,[57] did not bring any investment opportunities to LJM2,[58] did not structure any

transactions of LJM2,[59] and did not draft or revise documents governing the terms of the LJM2

---

(Undisputed that Merrill Lynch was a Tier 3 Bank because it could not lend sufficiently large amounts to Enron).
Meanwhile, the court in *In re Nat'l Century Fin. Enterprises, Inc.* which held actual knowledge is required,
concluded on summary judgment there was sufficient evidence of actual knowledge to create a genuine dispute for a
number of reasons, including because of evidence regarding the allegedly high level of the defendant bank's
involvement in multiple transactions that is not present here.  846 F. Supp. 2d 828, 872, 892–93 (S.D. Ohio 2012).

[53] PSOF ¶ 378 (from 1997 through 2001, Merrill Lynch "earned over $60 million in fees"); PSOF ¶ 360 (Merrill
Lynch received "$40 to $50 million in fees from Enron in 1999 alone").

[54] All instances that Plaintiffs claim provided Merrill Lynch with actual knowledge of Enron's accounting
treatment were limited to these two transactions and occurred in 1999 or early 2000.  PSOF ¶ 76 (undisputed that
with the exception of the Barge Transaction, Merrill Lynch was never a counterparty to any LJM2 transactions),
PSOF ¶ 77 (undisputed that Fastow did not recall informing limited partners about the decision to backdate
documents in connection with Yosemite certificate), PSOF ¶ 78 (undisputed that Fastow did not recall Merrill
Lynch transmitting information to Arthur Andersen regarding any transaction between Enron and LJM2, and that
John Stewart had no knowledge of any contacts between anyone on Arthur Andersen's team and Merrill Lynch).

[55] Opp. 24.

[56] PSOF ¶¶ 535-537; Lewis Decl. Ex. M6 [Fastow Dep. 359:21-361:3, 1338:15-1340:10].

[57] Lewis Decl. Ex. M6 [Fastow Dep. 1352:8-25].

[58] *Id.* [Fastow Dep. 1357:18-22].

[59] *Id.* [Fastow Dep. 1357:23-1358-3].

transactions.[60]  In other words, after its early involvement, Merrill Lynch was no differently

situated than any other passive investor and had no role in operating LJM2.

Faced with this reality, Plaintiffs point to initial marketing materials, LJM2's allegedly

outsized investment returns, and investor updates circulated to all investors in LJM2.[61]  The first

two of these at most give rise to arguments about what Merrill Lynch should have known about

how LJM2 could or would be used by Fastow, which cannot satisfy Plaintiffs' "heavy burden" of

proving actual knowledge.  *Chemtex, LLC v. St. Anthony Enters., Inc.,* 490 F. Supp. 2d 536, 546

(S.D.N.Y. 2007) (holding that the "burden of demonstrating actual knowledge, although not

insurmountable, is nevertheless a heavy one.") (citations omitted).

As to the investment updates, no evidence indicates that Merrill Lynch or its employees

actually read them.  Indeed, the testimony of Schuyler Tilney that he did not read any LJM2

updates and that, as a "limited partner," he "had no control over what was going on in the

investment" remains undisputed.[62]  Moreover, Plaintiffs point to no evidence that Merrill Lynch

was privy to Enron's accounting for any of its transactions with LJM2.[63]  At best, Plaintiffs can

therefore show only that Merrill Lynch was aware that LJM2 entered into transactions with

Enron that allowed Enron to manage its balance sheet.  However, balance sheet management is

---

[60] *Id.* [Fastow Dep. 1358:4-12].

[61] Opp. 28.

[62] Lewis Decl. Ex. M20 [Tilney Dep. 337:24-339:1]; PSOF ¶ 79; Opp. 20, 28.  Plaintiffs' claim that "Merrill" was "specifically informed" about the Raptor transactions greatly overstates the evidence on that issue.  The record confirms that Merrill Lynch was not involved in structuring or executing the Raptor transactions and could not have unilaterally prevented LJM2 from participating in the Raptors transactions as a limited partner.  Fastow Dep. 376:20-377:25; 1340:11-1341:1.  There is also no evidence Merrill Lynch knew how Enron accounted for the Raptor transaction, and it is undisputed that Merrill Lynch played no role in distributing financial statements impacted by the Raptor transactions.  Moreover, although Fastow testified that he recalls "discussing" the Raptors with Tilney and David Sullivan, he provided no details about the substance of what was discussed.  Fastow Dep. 376:6-19.  Indeed, Fastow at most testified that the Raptors were explained "in detail" during a call with limited partners, and elsewhere claims to have discussed the Raptors with unspecified "Merrill bankers, as I did with other limited partners."  *Id.* at 377:22-379:4.

[63] Opp. 24-25.

not unlawful.[64]  Thus, to the extent that Plaintiffs allege constructive notice – which Plaintiffs

have not proved and cannot prove – from a general awareness that Enron engaged in transactions

with LJM2, such constructive knowledge or red flags is not enough to sustain an aiding and

abetting claim.[65]  Br. 32; *see also Chemtex,* 490 F. Supp. 2d at 546; *Ryan v. Hunton & Williams*,

2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000).

 Even if actual knowledge could arise from the investor updates, Plaintiffs do not address

and therefore concede that any knowledge Merrill Lynch employees gained from personal

investments in LJM2 cannot be imputed to Merrill Lynch.  Br. 34.  Moreover, Plaintiffs concede

that ML IBK Positions, Inc., a Merrill Lynch subsidiary, was only a limited partner in LJM2.[66]

Any knowledge it gained cannot be imputed to Merrill Lynch.  *Youngers v. Virtus Inv. Partners

Inc.*, 2017 WL 5991800, at *5 (S.D.N.Y. Dec. 4, 2017) ("[A] parent-subsidiary relationship is

not on its own sufficient to impute the scienter of the subsidiary to the parent or affiliate."); *see

also Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 317 (S.D.N.Y. 2011) (same).

 **B.** **No Evidence Merrill Lynch Substantially Assisted Enron's Fraud**

 Plaintiffs acknowledge they must prove that Merrill Lynch substantially assisted Enron's

alleged fraud.  Plaintiffs' theory is that Merrill Lynch's transactions and analyst reports helped

Enron "maintain" and "continu[e]" its fraud.[67]  However, as a matter of settled law, which

Plaintiffs do not address, this type of "but for" conduct is insufficient to prove substantial

---

 [64] *Krys v. Pigott*, 749 F.3d 117, 133 (2d Cir. 2014) (back-to-back loan transactions not inherently fraudulent), *affirming*, 2012 WL 3126834, at *2 (S.D.N.Y. Jul. 30, 2012); *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 505 n.162 (S.D.N.Y. 2005) ("[A] bank's use of special purpose corporate entities in connection with financing and other investment arrangements is neither unusual nor deceptive in and of itself.").

 [65] In *AIG Fin Prods. Corp.*, the court determined that allegations concerning defendants purposeful structuring of a forward purchasing agreement to deplete assets set forth sufficient "surrounding circumstances" to support a reasonable inference that the defendants knew about a fraud and ignored it.  108 A.D.3d at 446–47.  While the rational inference of knowledge sufficed at pleadings stage, allegations of knowledge due to surrounding circumstances is not the clear and convincing evidence of actual knowledge needed to overcome summary judgment.  *de Abreu v. Bank of Am. Corp.*, 812 F. Supp. 2d 316, 322 (S.D.N.Y. 2011).

 [66] PSOF ¶¶ 548, 552.

 [67] Opp. 19.

assistance.  Br. 35; *see also Bloor*, 754 F.2d at 62–63; *In re Lehman Bros. Sec. & ERISA Litig.*,

2015 WL 5294759, at *4 (S.D.N.Y. Sept. 10, 2015).

Moreover, Plaintiffs concede Merrill Lynch did not *assist* Enron in preparing or

distributing the allegedly fraudulent financial statements.  Because such a condition is required

under New York law for aiding and abetting claims involving allegedly misleading financial

statements, this provides an additional ground to hold Plaintiffs cannot prove substantial

assistance by Merrill Lynch.  Br. 36 (collecting cases).  The cases Plaintiffs cite acknowledge

this settled law, and the narrow exceptions they apply are inapposite.[68]

Plaintiffs also argue that analyst reports published by Merrill Lynch substantially assisted

Enron's alleged fraud.[69]  However, it remains undisputed that the analyst reports published by

Merrill Lynch (i) repeated information already published by Enron, (ii) had no effect on the

prices of Enron's securities, and (iii) contained multiple caveats and limitations.[70]  Recognizing

this, Plaintiffs argue that Merrill Lynch misused its analysts by allowing them to publish reports

without disclosing other information that other affiliates or entities might have had about

Enron.[71]  As discussed above, however, the argument that a parent of an investment bank and

---

[68] The cases Plaintiffs cite do not justify deviating from this settled law.  In *Primavera Familienstifung v. Askin*, for example, the court acknowledged the general rule that a defendant who plays no role in distributing the misrepresentation cannot be liable for aiding and abetting fraud.  130 F. Supp. 2d 450, 512 (S.D.N.Y. 2001), *amended on reconsideration in part*, 137 F. Supp. 2d 438 (S.D.N.Y. 2001), *abrogated on other grounds by Casey v. Merck & Co.*, 653 F.3d 95 (2d Cir. 2011).  It held, however, that this general rule might not apply when there is a "symbiotic fraudulent scheme" between the aider and abettor and the primary violator, and that such a scheme had been proven "weak[ly]" with respect to a defendant who provided over half of the allegedly misleading information for over two years.  *Id.*  Similarly, *In re Enron Corp. Sec., Derivative & ERISA Litig.* declined to dismiss a complaint because it plausibly alleged a law firm provided Enron with opinions in connection with 28 transactions and "a number of unwindings" over three years, four of which allowed Enron to understate its debt by $700 million. 511 F. Supp. 2d 742, 807 (S.D. Tex. 2005).  Merrill Lynch's involvement with Enron amounted to a low single digit percentage impact on a single year of Enron's financial statements.

[69] Opp. 30-31.

[70] PSOF ¶¶ 145-146, 148.

[71] Plaintiffs raise a "conduit" theory that Merrill Lynch "misused" analysts to assist Enron's fraud.  Opp. 30 n.19.  The Court already dismissed this theory.  *Silvercreek Mgmt., Inc.*, 248 F. Supp. 3d at 442.  ("[w]hile Silvercreek alleges at a high level the possibility that there was pressure exerted on analysts to positively cover Enron, Silvercreek's pleading does not describe the nature of that pressure, or any specific interactions between insiders and analysts with sufficient specificity to make out a claim under a theory of conduit liability.")  On

broker dealer must disclose client confidences as a result of published analyst reports has no legal basis whatsoever.  *See supra* Section III.A.  Moreover, there is no evidence indicating Merrill Lynch had any information to disclose in October 2001.  Even if Merrill Lynch had such information, Plaintiffs do not contest that where alleged aiding and abetting rests on alleged omissions of entities with knowledge, Plaintiffs must prove that such entities had an independent duty to Plaintiffs.  *SPV Osus Ltd. v. UBS AG*, 882 F.3d at 346 ("the mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiffs") (citation omitted).  Plaintiffs fail to prove that Merrill Lynch entities that allegedly had and withheld knowledge about Enron had any independent duty to Plaintiffs.

## IV.     AIDING AND ABETTING NEGLIGENT MISREPRESENTATION

Plaintiffs' claim for aiding and abetting negligent misrepresentation fails for the same reasons the aiding and abetting fraud claims fail and for two additional independent reasons.

### A.     No Special Relationship Between Enron and Plaintiffs

Plaintiffs concede they must prove that they and Enron shared a special relationship in order to prove there was a negligent misrepresentation that Merrill Lynch aided and abetted.[72] However, the only connection between Plaintiffs and Enron is Plaintiffs' arms-length investment in the Notes.[73]  Under controlling authority, this does not satisfy the special relationship requirement.  *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 271–72 (2d Cir. 1993) ("The exceptions, embracing cases in which defendants make negligent misrepresentations intending that identified persons rely on the misrepresentations, have been held not to apply to the investing public."); *see also AHW Inv. P'Ship v. Citigroup Inc.*, 980 F. Supp. 2d 510, 524

---

summary judgment, Plaintiffs still fail to muster any evidence to meet this burden and have mustered no evidence to refute the testimony of John Olson and Donato Eassey that they had no pressure or interactions with alleged "insiders" or anyone else in Merrill Lynch's investment bank that influenced their opinions.

[72] Opp. 33; *see also* Br. 38.

[73] PSOF ¶¶ 189-255.

(S.D.N.Y. 2013) ("Here, because Citigroup is an issuer of shares to public investors, defendants are not in a special privity-like relationship with the investing public, or with actual purchasers.") *aff'd,* 661 F. App'x 2 (2d Cir. 2016); *Barron Partners, LP v. LAB123, Inc.*, 593 F. Supp. 2d 667, 674 (S.D.N.Y. 2009) (dismissing negligent misrepresentation claim where plaintiff and defendant "were merely a buyer and seller of corporate stock"); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 686 (S.D.N.Y. 1990) (same); *Vanguard Mun. Bond Fund, Inc. v. Cantor, Fitzgerald L.P.*, 40 F. Supp. 2d 183, 190–91 (S.D.N.Y. 1999) (collecting cases).

Because Plaintiffs cannot prove a link between themselves and Enron, Plaintiffs point to statutory requirements for Enron to truthfully represent its financial status in prospectuses.[74]  To hold that the "special relationship" requirement is satisfied on this basis would be to hold that Enron had a "special relationship" with anyone who considered investing in the company.  That is inconsistent with settled law.  *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. at 686 ("[P]laintiffs were not such a particularized group when the misrepresentations were made, but simply members of the general investing public….  Moreover, the alleged misstatements were made in annual reports, quarterly reports, press releases, a magazine article and documents filed with the SEC, indicating that they were not directed…at any specific group.").[75]

---

[74] Opp. 33.

[75] *Teamsters Local 282 Pension Tr. Fund v. Angelos*, 762 F.2d 522, 528 (7th Cir. 1985), *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 2010 WL 9077875, at *41 (S.D. Tex. Jan. 19, 2010), and *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 258, cited by Plaintiffs, Opp. 33, have nothing to do with the "special relationship" requirement. Moreover, Plaintiffs' attempt to extend *Greene v. Gerber Products* (a consumer products case) to fashion a legal rule that a duty to truthfully represent a company's financial status to the public creates a special relationship is inconsistent with the controlling authorities cited above and has been not been extended in other contexts.  262 F. Supp. 3d 38, 74–75 (E.D.N.Y. 2017); *see, e.g.*, *Tyman v. Pfizer, Inc.*, 2017 WL 6988936, at *15–16 n.16 (S.D.N.Y. Dec. 27, 2017), *report and recommendation adopted*, 2018 WL 481890 (S.D.N.Y. Jan. 18, 2018) (declining to extend *Greene*).  Moreover, Plaintiffs' selective quotation of *Greene* reveals it does not stand for the proposition for which Plaintiffs cite it.  *Compare* Opp. 33 ("Special relationship does not require fiduciary duty, only a 'relationship imposing a duty on the defendant to impart correct information to the plaintiff . . . .'") *with Greene*, 262 F. Supp. 3d at 74 ("It is well settled that [a] claim for negligent misrepresentation requires the plaintiff to demonstrate (1) *the existence of a special or privity-like* relationship imposing a duty on the defendant to impart correct information to the plaintiff . . . ." (citation omitted)) (emphasis added to show words Plaintiffs omitted).

B.      **Merrill Lynch Was Not Also Negligent**

As discussed in the Opening Brief, New York authority suggests that secondary liability

for aiding and abetting a negligent act is unavailable.[76]  *See, e.g.*, *King Cty., Wash. v. IKB*

*Deutsche Industriebank AG*, 863 F. Supp. 2d 288, 315 (S.D.N.Y. 2012), *rev'd in part*, 2012 WL

11896326 (S.D.N.Y. Sept. 28, 2012).  However, even if such a claim is available, the exception

in Restatement § 876 relied on by the Court in concluding the claim was available extends joint

liability to one for another's negligent tort only when two parties each commit negligent acts but

only one act causes injury.[77]  Summary judgment on the aiding and abetting negligent

misrepresentation claim is thus warranted for the additional reason that Plaintiffs do not show

that Merrill Lynch was negligent.  *See supra* Section II.B.

V.      **CONSPIRACY**

As discussed in the Opening Brief, Plaintiffs' conspiracy claim must be dismissed

because it is duplicative of their aiding and abetting claims.[78]  Plaintiffs mischaracterize this

argument as focused on whether the *legal elements* are the same for both claims.[79]  However, the

argument is based on the fact that the conduct alleged by Plaintiffs to support both claims is

duplicative.  *See In re Allou Distribs.*, 446 B.R. at 60–61 (granting summary judgment because

"Plaintiffs have not identified 'independent acts' in support of this claim beyond those alleged in

support of their aiding and abetting claims.").

Summary judgment on Plaintiffs' conspiracy claim also should be granted, because there

---

[76] Br. 37 n.131 (collecting New York opinions).
[77] Br. 38-39. Neither of the two cases Plaintiffs cite to support their argument: *Miele v. Am. Tobacco Co.*, 2 A.D.3d 799, 805 (2003) and *Johnson v. Nextel Comm'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011). Neither citation is availing.  First, the facts of *Miele* actually support Merrill Lynch's proposition because the defendants in that case all engaged in the same allegedly negligent conduct, *i.e.*, promoting and selling cigarettes without the requisite warnings.  *Id.*  Second, *Johnson*, is inapposite because the claim at issue was aiding and abetting a breach of fiduciary duty, not negligent misrepresentation.  660 F.3d at 142.
[78] Br. 39.
[79] Opp. 34-35.

is no evidence Merrill Lynch and Enron shared a common purpose.[80]  In this regard, the

undisputed facts show, and Plaintiffs concede, that Merrill Lynch engaged in transactions with

Enron and Fastow to earn fees and never entered into an agreement to participate in Enron's

alleged overall scheme.[81]  Instead of presenting evidence Merrill Lynch agreed to be part of

Enron's larger conspiracy, Plaintiffs argue that conspiracy requires a lesser degree of proof than

aiding and abetting.[82]  However, Plaintiffs ignore that while conspiracy may require less in terms

of what *action* must be proved as compared to aiding and abetting (*compare* "substantial

assistance" with "acts in furtherance of the conspiracy"), conspiracy requires Plaintiffs to prove

more with respect to *mens rea—i.e.*, knowledge *and an agreement.  See Filler v. Hanvit Bank*,

2003 WL 22110773, at *2–3 (S.D.N.Y. Sept. 12, 2003) (conspiracy requires an agreement in

addition to knowledge); *Halberstam v. Welch*, 705 F.2d 472, 478 (D.C. Cir. 1983) ("There is a

qualitative difference between proving an *agreement to participate* in a tortious line of conduct,

and proving *knowing action* that substantially aids tortious conduct.  In some situations, the trier

of fact cannot reasonably infer an agreement from substantial assistance or encouragement.").

        Because it is undisputed that Fastow did not share everything with Merrill Lynch, a Tier

3 Bank with limited transactions with Enron and/or Fastow, there is no genuine dispute of

material fact that Merrill Lynch did not and could not have agreed to be a part of Enron's overall

alleged scheme.  *Cf.*, *Soanes v. Empire Blue Cross/Blue Shield*, 970 F. Supp. 230, 240–42

(S.D.N.Y. 1997) (granting judgment after trial on RICO conspiracy claim because no proof

beyond defendant's own wrong-doing showing defendant was actually aware of "larger fraud").

        Plaintiffs argue that the "requisite agreement is amply demonstrated by the Barges,

---

[80] Opp. 35-36; *see also* Br. 39-40.
[81] Opp. 21, 29 n.18; PSOF ¶¶ 25-27.
[82] Opp. 35.

Electricity Trade, and LJM2 transactions."[83]  However, because it is undisputed that Merrill

Lynch was not privy to Enron's dealings with other counterparties (who were Merrill Lynch's

competitors), there is no link between the transactions in which Merrill Lynch participated and

all of Enron's alleged co-conspirators.[84]  Conspiracy requires more than actual knowledge, and

no evidence indicates that Merrill Lynch agreed to pursue a multi-year, multi-party, multi-billion

dollar conspiracy with Enron.  Plaintiffs' conspiracy claim thus fails for this independent reason.

*See, e.g.*, *In re Monahan Ford Corp. of Flushing*, 340 B.R. 1, 36 (Bankr. E.D.N.Y. 2006)

(finding that while it was plausible that defendant individually engaged in a fraudulent act,

defendant did not have actual knowledge of related fraudulent schemes perpetrated by alleged

co-conspirators, and therefore could not be found to have entered into agreement with them).

Finally, even if Plaintiffs were able to prove an alleged scheme, Merrill Lynch's

interactions with Enron at most amounted to a rimless hub-and-spoke conspiracy where Merrill

Lynch's liability is limited to its own individual acts.[85]  Plaintiffs' suggestion that this concept is

only applicable in the criminal context is wrong.  *Fidelity Funding of Cal., Inc. v. Reinhold*, 79 F.

Supp. 2d 110, 123–26 (E.D.N.Y. 1997); *In re Monahan Ford Corp. of Flushing*, 340 B.R. at 36.

Plaintiffs cannot prove proximate cause as to Merrill Lynch's alleged spoke.

## CONCLUSION

For the foregoing reasons, Merrill Lynch respectfully requests summary judgment in its

favor on all claims.

---

[83] Opp. 35.
[84] Plaintiffs again raise arguments about joint and several liability, but that is a damages concept, not a paradigm for analyzing liability.  Br. 39.
[85] Br. 39-40.

Dated:  New York, New York
May 10, 2018

Respectfully submitted,

SHEARMAN & STERLING, LLP


By:   */s/ Daniel Lewis*                          
        Adam S. Hakki
        Daniel Lewis
        Mary C. Pennisi
        599 Lexington Avenue
        New York, New York 10022
        Telephone:  212-848-4000
        Facsimile:  212-848-7179

        *Attorneys for Merrill Lynch & Co., Inc.*

26