UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SILVERCREEK MANAGEMENT, INC., et al.,

                              Plaintiffs,              02-CV-8881 (JPO)

            -v-                                        OPINION AND ORDER

CITIGROUP, INC., et al.,

                              Defendants.

J. PAUL OETKEN, District Judge:

Plaintiffs, a group of investment funds known as "Silvercreek," brought this action

against Defendants, a set of financial institutions, for conduct relating to the issuance of debt

securities by Enron Corporation ("Enron").[1]  Plaintiffs assert claims under New York state tort

law and under federal and Texas securities laws.  Defendants Credit Suisse, Deutsche Bank, and

Merrill Lynch each move for summary judgment.  (Dkt. Nos. 114–15, 121.)  For the reasons that

follow, the motions are granted in part and denied in part.

I.      **Background**

Like many of the others to have emerged from the Enron bankruptcy, this is a case whose

"facts are difficult to detail but easy to summarize."  *Regents of Univ. of Cal. v. Credit Suisse*

---

[1]         "Plaintiffs" refers to Silvercreek Management Inc., Pebble Limited Partnership,
Silvercreek Limited Partnership, OIP Limited, and Silvercreek II Limited, all of which will also
be referred to collectively as "Silvercreek."  (*See* Dkt. No. 10-115 ("TAC") ¶¶ 8–13.)
"Defendants" refers to the financial institution defendants presently moving for summary
judgment:  Credit Suisse (Credit Suisse First Boston LLC n/k/a Credit Suisse Securities (USA)
LLC, Credit Suisse First Boston (USA), Inc. n/k/a Credit Suisse (USA), Inc., and Pershing LLC
(f/k/a Donaldson, Lufkin & Jenrette Securities Corp.)) (Dkt. No. 114); Deutsche Bank (Deutsche
Bank Alex. Brown, Inc. n/k/a Deutsche Bank Securities Inc., and Deutsche Bank AG) (Dkt. No.
121); and Merrill Lynch (Merrill Lynch & Co., Inc.) (Dkt. No. 115).  Plaintiffs also have claims
pending against two individual defendants, Jeffrey Skilling and Richard Causey.  (Dkt. Nos. 27,
93.)  Neither individual defendant has moved for summary judgment.

*First Bos. (USA), Inc.*, 482 F.3d 372, 377 (5th Cir. 2007). Familiarity with the factual

background of this particular dispute is presumed based on this Court's prior opinion on

Defendants' motion to dismiss, *see Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d

428, 434–36 (S.D.N.Y. 2017), and the relevant facts will be detailed with greater particularity

below. The following general background is drawn primarily from the parties' Rule 56.1

statements and is not subject to genuine dispute unless otherwise noted.

Between October 18, 2001, and October 26, 2001, Plaintiffs invested over $100 million

in two different Enron securities: the 7% Exchangeable Notes (the "7% Notes") and Zero

Coupon Exchangeable Notes (the "Zero Notes" or "Zeros"). (Dkt. No. 221 ("DBSUF") ¶ 344;

Dkt. No. 215 ("CSSUF") ¶¶ 118, 127; Dkt. No. 220 ("MLSUF") ¶¶ 218, 250, 253.) Plaintiffs'

purchase of the notes came at a turbulent time for Enron. Cautionary signs regarding the

company's stability were beginning to emerge, including the departure of some high level

executives, revised financial statements, and the announcement of an SEC inquiry into Enron's

financials. (MLSUF ¶ 256; CSSUF ¶ 693.) But balanced against these warning signs was

Enron's continued issuance of positive press releases confirming its financial solvency.

(MLSUF ¶¶ 259–60.) And analyst and credit agency reports around this key eight-day period

were mixed, with some downgrading their assessments of Enron's credit-worthiness but most

continuing to recommend Enron as a strong buy or safe investment. (MLSUF ¶¶ 266–84; *see

also generally* Dkt. No. 139-79.) Some of the many positive reports about Enron issued in

October 2001 came from the Defendants in this case. (*See, e.g.*, MLSUF ¶¶ 270–71, 275, 279,

281–82, 284; Dkt. No. 168-45 at 2 (October 26, 2001 Credit Suisse analyst report listing Enron

as "strong buy"); DBSUF ¶¶ 358–59.)

Unfortunately for Plaintiffs, time would soon vindicate those skeptical of Enron's

financials. On November 8, 2001, Enron was forced to again issue restatements of its audited

financials, this time correcting all of its annual reports going back to 1997 as well as its first two

2001 quarterly reports, resulting in billion-dollar changes to reported shareholder equity and

balance sheet debt.[2]  (CSSUF ¶¶ 714–17; DBSUF ¶¶ 351–56.)  On December 2, 2001, Enron

filed for Chapter 11 Bankruptcy, wiping out practically the entire value of Plaintiffs'

late-October investments in Enron's securities.  (DBSUF ¶¶ 363, 365.)  Plaintiffs' resulting

losses on these investments, along with Defendants' alleged role in perpetrating Enron's fraud

and influencing Plaintiffs' purchase of Enron's overvalued securities, form the crux of this suit.

Enron's corrections to its financial statements, issued in the weeks following Plaintiffs'

investments, stemmed primarily from the company's practice of engaging in transactions with

unconsolidated special purpose entities ("SPEs") and off-balance-sheet transactions.  (DBSUF ¶

367.)  Enron would conduct transactions with these SPEs—which Enron or its executives

nominally controlled but whose assets and debts were not consolidated with Enron's—in order to

hide debt and generate income, thereby producing a deceptive picture of Enron's financials.  (*Id.*)

Each Defendant played some role in designing, marketing, funding or implementing a number of

the transactions that Enron used to cook its books.  (*See, e.g.*, DBSUF ¶¶ 378, 639–48; CSSUF

¶¶ 758–68, 800; MLSUF ¶¶ 341–45.)  Each of the Defendants was also involved to varying

degrees with the marketing and distribution of the 7% Notes and Zero Notes that Plaintiffs had

purchased in late October 2001.  (*See, e.g.*, MLSUF ¶ 245; CSSUF ¶¶ 120–26; DBSUF ¶¶ 704–

13.)

Plaintiffs assert a number of claims based on Defendants' involvement in the transactions

underlying Enron's fraud, as well as each Defendant's role in directly marketing Enron's

---

[2]     Enron had incorporated many of these financial statements in their original,
uncorrected form into the registration statements and prospectuses for the securities that
Plaintiffs purchased prior to the November 8, 2001 corrections.  (CSSUF ¶¶ 710–13, 716;
DBSUF ¶¶ 345–48; Dkt. No. 229 at 1–2.)

securities to Plaintiffs. Specifically, at issue in these motions are six causes of action: claims against all three Defendants for (1) aiding and abetting Enron's fraud, (2) aiding and abetting Enron's negligent misrepresentation, and (3) conspiracy with Enron to commit fraud; claims against Credit Suisse and Merrill Lynch for (4) negligent misrepresentation; and claims against Credit Suisse and Deutsche Bank for violations of (5) Section 11 of the Securities Act, 15 U.S.C. § 77k(a), and (6) the Texas Securities Act ("TSA"). All of the Defendants now move for summary judgment on all claims.[3]

While the parties do not generally dispute the foregoing facts, they sharply contest the extent to which the Defendants understood Enron's overall scheme and the legal significance of their contributions to Enron's fraud. Despite turning on a wide range of materials and evidence, the parties' disputes can largely be boiled down to a few core questions:

- Were the Defendants' transactions with Enron inherently fraudulent, or was it only Enron's deceitful reporting of these otherwise legitimate transactions that formed the basis of the underlying fraud? (Dkt. No. 217 ("DB Reply") at 6–14.)

- To what extent was each Defendant aware of Enron's overall fraudulent scheme, and to what extent can each Defendant's transactions be said to have actually furthered Enron's overall fraudulent scheme? (Dkt. No. 219 ("ML Reply") at 2–8, 16–19.)

- Can Plaintiffs establish that they relied on Enron's false financial statements, or on Defendants' own inaccurate assessments of Enron's financial stability, when purchasing the Enron securities? (Dkt. No. 214 ("CS Reply") at 7–13.)

  Did either Enron or the Defendants directly owe Plaintiffs a duty to accurately report information regarding Enron's financial solvency and the value of its securities? (CS Reply at 3–7; ML Reply at 21–22.)

Each of these questions is addressed in detail below.

## II. Legal Standard

---

[3]     Defendants Merrill Lynch and Deutsche Bank each incorporate by reference the arguments of the other Defendants. (Dkt. No. 127 ("DB Brief") at 1 n.1; Dkt. No. 129 ("ML Brief") at 1 n.1.) Credit Suisse does not purport to do so. (*See generally* Dkt. No. 132 ("CS Brief").)

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)).

Where the nonmoving party will bear the burden of proof at trial, the moving party may establish the propriety of summary judgment by "point[ing] to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). Once the moving party has done so, the burden shifts to "the nonmoving party [to] come forward with admissible evidence sufficient to raise a genuine issue of fact for trial" on each essential element of their claims. *Id.*

To defeat summary judgment, the nonmoving party cannot rely merely on "some metaphysical doubt as to the material facts" or on "conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citations omitted). Instead, the nonmoving party must point to concrete "evidence on which the jury could *reasonably* find for the plaintiff." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In evaluating whether the nonmoving party has met their burden, courts are to construe the evidence in the light most favorable to the nonmoving party and draw all inferences in their favor, asking "not whether . . . the evidence unmistakably favors one[] side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 553 (quoting *Anderson*, 477 U.S. at 252).[4]

---

[4] Defendants each emphasize that many of Plaintiffs' claims are subject to a "clear and convincing" standard of proof. (*See, e.g.*, ML Brief at 32; DB Brief at 28; CS Brief at 23.)

## III.      Discussion

The Court addresses Defendants' motions for summary judgment on each of Plaintiffs' claims in turn.

### A.      Aiding and Abetting Fraud

Silvercreek brings claims of aiding and abetting fraud against all of the Defendants. (TAC ¶¶ 802–13.)  The elements of an aiding-and-abetting-fraud claim brought under New York law are: (1) an underlying fraud; (2) the defendant's actual knowledge of the fraud; and (3) the defendant's substantial assistance to the fraud.  *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014); *Oster v. Kirschner*, 905 N.Y.S.2d 69, 72 (N.Y. App. Div. 1st Dep't 2010).  Because at trial "[a] claim for aiding and abetting fraud must be proven by clear and convincing evidence[,] . . . to survive summary judgment, Plaintiffs must have adduced sufficient evidence to meet this standard at trial."  *See de Abreu v. Bank of Am. Corp.*, 812 F. Supp. 2d 316, 322 (S.D.N.Y. 2011) (citation omitted).

### 1.      Underlying Fraud by Enron

As a threshold matter, Plaintiffs must establish an underlying fraud by Enron.  For purposes of summary judgment, this means that Plaintiffs must produce evidence sufficient to permit a reasonable jury to find by clear and convincing evidence that (1) Enron issued a statement containing a material misrepresentation or omission of fact; (2) Enron had knowledge

---

The Court is cognizant of Plaintiffs' burden, but is also cognizant that this burden does not alter the nature of the Court's inquiry for purposes of Defendants' motion.  *See Anderson*, 477 U.S. at 255–56 ("Our holding that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury. . . . The evidence of the non-movant is [still] to be believed, and all justifiable inferences are [still] to be drawn in his favor. . . .  [T]he appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown [all of the elements of their claim] by clear and convincing evidence or that the plaintiff has not.").

of the falsity of the statement; (3) Enron had an intent to defraud; (4) Plaintiffs reasonably relied on Enron's fraudulent statements; and (5) Plaintiffs suffered damages. *See Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006). No party contests that Enron knowingly and intentionally issued false financial statements or that Plaintiffs suffered damages when Enron's fraud came to light and its stock prices collapsed. But Defendants Merrill Lynch and Credit Suisse each move for summary judgment on element four of Silvercreek's underlying fraud claim, namely whether Silvercreek reasonably relied on Enron's fraudulent statements. (CS Brief at 18–23; ML Brief at 32.)

### a.    Actual reliance

Credit Suisse and Merrill Lynch maintain that there is no evidence that Silvercreek actually relied on Enron's financial statements prior to purchasing the Enron notes in October 2001. (*Id.*) Instead, Credit Suisse and Merrill Lynch assert that Plaintiffs purchased the Enron notes "based solely on [their] price." (CS Brief at 18; *see also* ML Brief at 32 ("Plaintiffs' investments were based solely on Enron's stock and bond prices.").) But the record contains ample evidence showing that Plaintiffs' analysis into whether to purchase the Enron 7% Notes and Zero Notes was more complex and nuanced than Defendants represent. As Louise Morwick—Silvercreek's founder, director, president, portfolio manager, and the woman responsible for making its final investment decisions (CSSUF ¶¶ 8–9)—summarized at one point in her deposition:

> We looked at the fundamentals of this business. We were investing in Enron. . . . I think the market cap, you know, certainly the combined total cap is 20, 25 billion dollars. It's an investment based on the financials of this company and the business strength of this company. And the financials that we were basing our investment decision on were just complete garbage. They were completely wrong. They weren't even close to reality.

(Dkt. No. 168-1 at 374:17–25; *see also* Dkt. No. 168-2 ¶ 6.)  Indeed, in numerous different depositions, interrogatory responses, and declarations submitted over this case's years-long discovery period, Morwick and her associates have consistently recounted how important their optimistic assessment of Enron's long-term financial stability was to Silvercreek's late-October 2001 purchases.  (*See generally* CSSUF ¶¶ 659–66; 698–707.)

Defendants urge that Plaintiffs cannot establish the reliance element of their underlying fraud claim against Enron absent evidence that anyone at Silvercreek had read and relied on any of Enron's fraudulent financial statements at the precise time of their investment.  (CS Brief at 22; ML Brief at 32.)  But even if Morwick did not reread Enron's fraudulent financial reports immediately prior to making her late October 2001 purchases of the notes, there is still ample evidence to support a conclusion that she actually relied on the false statements contained therein at the time she authorized Silvercreek's purchases.  For example, the record reflects that she had previously carefully reviewed Enron's false annual reports prior to past investments in Enron.  (CSSUF ¶¶ 202–05, 637–49.)  The record also includes evidence showing that Morwick continued to stay abreast of developments at Enron between that time and the October 2001 purchases, including by rereading the prospectuses of the relevant notes, reading select quarterly reports, tracking media and analyst reports, and listening to Enron's quarterly earnings calls.  (CSSUF ¶¶ 652, 659–60; Dkt. No. 168-1 at 771–72, 802–03.)  All of these sources of information either directly included fraudulent statements by Enron or themselves incorporated and were based on those statements.

Defendants also make much of Silvercreek's concession that the drop in the price of Enron's securities directly precipitated its purchase of the 7% Notes and Zero Notes.  (CS Brief at 18–19; ML Brief at 32.)  But the fact that an investor took price into account when purchasing a bond is hardly remarkable, and that investor's admitting that she did so is not tantamount to

admitting that she considered *only* price. Morwick repeatedly stated that even though she

ultimately chose to purchase the notes only once she found the price-point sufficiently favorable,

her decision to purchase was fundamentally founded on her prior assessments of Enron's

financial stability, which itself was based on Enron's fraudulent financial statements. (CSSUF

¶¶ 619, 660–61, 664–65, 698–707; *see also* Dkt. No. 168-1 at 802–03.) Crediting as true

Morwick's testimony regarding her Enron investment strategy for purposes of this motion, the

Court concludes that there is a sufficient basis from which a jury could reasonably find that

Silvercreek actually relied on Enron's fraudulent depiction of its financial stability, and not only

on price, at the time it purchased Enron's securities.

### b.      Reasonable Reliance

"In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire

context of the transaction, including factors such as its complexity and magnitude, the

sophistication of the parties, and the content of any agreements between them." *Emergent

Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003). A claim of

reasonable reliance can be defeated where it is clear that "a party has been put on notice of the

existence of material facts which have not been documented and [ ] nevertheless proceeds with a

transaction" because in doing so the party "may truly be said to have willingly assumed the

business risk that the facts may not be as represented." *Id.* (quoting Rodas v. Manitaras, 552

N.Y.S.2d 618, 620 (N.Y. App. Div. 1st Dep't 1990)). Still, where the circumstances and facts

underlying a plaintiff's reliance are subject to genuine dispute, courts are reluctant to summarily

dispose of fraud claims on the basis of unreasonable reliance. *See De Sole v. Knoedler Gallery,

LLC*, 139 F. Supp. 3d 618, 643 (S.D.N.Y. 2015) ("Under New York's contextual approach, the

question of what constitutes reasonable reliance is always nettlesome because it is so

fact-intensive. Reasonable reliance is therefore a question normally reserved for the finder of

fact and not usually amenable to summary judgment." (brackets, internal quotation marks, and citations omitted)). Accordingly, it is "a rare circumstance in which the issue of reasonable reliance can be resolved at the stage of summary judgment." *Glob. Minerals & Metals Corp. v. Holme*, 824 N.Y.S.2d 210, 215 (N.Y. App. Div. 1st Dep't 2006).

Credit Suisse and Merrill Lynch both rely on *In re Livent, Inc. Noteholder Securities Litigation*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001), to argue that Plaintiffs' reliance on Enron's financial statements was unreasonable as a matter of law. (ML Brief at 32; CS Brief at 22.) *In re Livent* involved Section 10(b) securities fraud claims brought by investors directly against a securities issuer based on false financial statements. *Id.* at 439–40. On a motion to dismiss under Rule 12(b)(6), the court dismissed the claims on the basis of plaintiffs' failure to adequately plead reasonable reliance. *Id.* In doing so, the court emphasized that some of the plaintiffs' purchases had come after the securities issuer had already declared bankruptcy, and that the earliest purchases had come after the company had already issued statements explicitly disclaiming the accuracy of its past financial statements and warning that it was "virtually certain that the company's financial results for [the relevant periods] will need to be restated." *Id.*

The timeline before the court in *In re Livent* simply does not map onto the timeline at issue in this case. Here, all of Silvercreek's purchases of the Enron 7% Notes and Zero Notes came *before* Enron declared bankruptcy. (CSSUF ¶¶ 118, 127; DBSUF ¶ 363.) And although Enron had issued some mixed signals leading up to Silvercreek's investment (MLSUF ¶ 256), Enron announced strong quarterly earnings just two days before Silvercreek began purchasing the Enron notes, telling investors that the recent write-down would be a one-time nonrecurring charge with no impact on Enron's strong outlook moving forward (MLSUF ¶¶ 259–60). The fact that the plaintiffs in *In re Livent* had already been expressly told *not* to rely on the

company's past financial statements, while Plaintiffs here were expressly told that they *could* continue to rely on the company's past financial statements, readily distinguishes the two cases.

Defendants also rely on New York cases for the proposition that a sophisticated party with warning signs regarding a statement's falsity has a duty to inquire further into the truthfulness of those statements. (CS Brief at 22; ML Brief at 29.) Courts have certainly granted summary judgment where "sophisticated investors [fail] to protect themselves from misrepresentations made during business acquisitions by investigating the details of the transactions and the business they are acquiring," but they will do so only where "the facts are abundantly clear as to why [ ] reliance was unreasonable." *Glob. Minerals & Metals Corp.*, 824 N.Y.S.2d at 215–16. Indeed, in all of the cases Defendants rely on, courts were able to identify basic types of due diligence that the relying party should have conducted to prevent its injury but concededly did not. *See, e.g.*, *id.* at 216 ("At a minimum, [plaintiff] should have contacted [parties with more information]. Even if they refused to provide further information, [plaintiff] should have sought to condition the settlement on the truth of the representations . . . ."); *In re Livent*, 151 F. Supp. 2d at 439 ("[B]asic inquiries would have revealed the truth[.]"); *Stuart Silver Assocs. v. Baco Dev. Corp.*, 665 N.Y.S.2d 415, 418 (NY App. Div. 1st Dep't 1997) ("[Plaintiffs] invest[ed] in a real estate venture without conducting a 'due diligence' investigation or consulting their lawyers and accountants . . . [and] did not even read the *prospectus*[.]").

On the basis of these cases, Defendants assert that Plaintiffs ought to have also conducted an independent "analysis" of Enron's financial records. (CS Brief at 21; ML Brief at 32.) This argument is insufficient to warrant summary judgment for three distinct reasons.

First, in contrast to cases in which a party's reliance was unreasonable as a matter of law, the record now before the Court does not contain "facts [that] are abundantly clear as to why [Silvercreek's] reliance was unreasonable." *Glob. Minerals & Metals Corp.*, 824 N.Y.S.2d at

216.  Instead, Plaintiffs here have produced facts sufficient to support a conclusion that they did reasonably inquire into the truth of Enron's statements.  As the Court has already explored, Silvercreek consulted a host of different sources in the months leading up to its October 2001 investments, including not only Enron's own financial statements but also the assessments of a number of third-party experts.  *See supra* Section III.A.1.a.  The Defendants may dispute whether Plaintiffs' inquiry was sufficient given the mixed news about Enron issuing at the time of the investment.  (MLSUF ¶¶ 256–60.)  But given the evidence that Plaintiffs did conduct some inquiry into Enron's financials, and that their inquiry revealed dozens of similarly positive assessments of Enron's securities repeatedly issuing from credit agencies, brokers, and analysts during the relevant period (MLSUF ¶¶ 268–86)—some of which came from the very Defendants now moving for summary judgment on the question of Plaintiffs' reasonable reliance (Dkt. No. 168-45; Dkt. No. 193-10)—the Court cannot now say that Plaintiffs' reliance on Enron's representations regarding its financial status in October 2001 was unreasonable as a matter of law.

Second, Defendants cannot identify with specificity any type of further inquiry Plaintiffs could have conducted that would not have been stonewalled by Enron's fraud itself.  Indeed, Defendants appear to concede that they could not possibly do so, because each acknowledges that Enron's fraud was premised on Enron's ability to conceal the true state of its financials, such that it was knowable only to a select few insiders.  (*See, e.g.*, CS Brief at 36 ("The undisputed evidence thus shows that Credit Suisse took reasonable steps to obtain information about Enron's debt but was stonewalled by Enron."); DB Brief at 4 ("[T]he Enron accounting fraud was premised on secrecy, agreements among key Enron insiders, and transactions that were not public transactions[.]"); ML Brief at 6 ("Enron's operations were known to be complex, opaque, and 'impenetrable.'  [Enron's former CFO] acknowledged that Enron's true financial condition

would not have been apparent to anyone based on its certified financial statements through 2001." (footnote omitted)).) The Court does not fault Defendants for arguing in the alternative, but simply recognizes that the question of what should have been discoverable based on publicly available information about Enron in October 2001 is an extremely fact-dependent inquiry subject to the oft-conflicting assessments of numerous experts, witnesses, and the parties. As such, it is a question on which summary judgment would be improper.

Third, and finally, the case law on reasonable reliance makes clear that when trading securities on an open market based on representations in registration statements or from underwriters and credit agencies, even "sophisticated plaintiffs are not required to 'conduct their own audit' in order to rely on a defendant's allegedly fraudulent representations." *Landesbank Baden-Württemberg v. RBS Holdings USA Inc.*, 14 F. Supp. 3d 488, 512 (S.D.N.Y. 2014) (quoting *DDJ Mgmt., LLC v. Rhone Grp. LLC,* 15 N.Y.3d 147, 156 (2010)). As the MDL Court that oversaw this case's discovery explained in denying a motion to dismiss New York law fraud and negligent misrepresentation claims brought against a different set of financial institutions:

> [A] company's annual and quarterly financial statements filed with the SEC and incorporated into the offering memoranda and prospectuses of the notes, in accordance with their *raison d'etre*, are standardly used by the market to, and here allegedly constituted Plaintiffs' primary sources for historical information, to gauge Enron's long-term financial stability, the critical factor in evaluating the risk for debt securities.

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, No. MDL 1446, 2003 WL 23305555, at *8 (S.D. Tex. Dec. 11, 2003). A similar conclusion is appropriate here, particularly because Plaintiffs' inquiry went beyond blind reliance on Enron's annual and quarterly statements but also incorporated credit agency and analyst assessments of Enron's viability. Defendants' proposed construction of reasonable reliance would essentially "require[ any] prospective purchaser to assume that the credit ratings assigned to the securities were fraudulent and to verify

them through a detailed retracing of the steps undertaken by the underwriter and credit rating agency." *IKB Int'l S.A. v. Morgan Stanley*, 36 N.Y.S.3d 452, 456 (N.Y. App. Div. 1st Dep't 2016). The Court declines to "impose a requirement on sophisticated investors that is inconsistent with the philosophy of disclosure at the heart of the Exchange Act . . . [by] requir[ing them] to seek out information above and beyond what was publicly available before purchasing [a] stock." *Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 57–58 (E.D.N.Y. 2011).

In denying Defendants' motions on the reliance element of Plaintiffs' underlying fraud claim against Enron, the Court emphasizes that its role on a motion for summary judgment is not to ask "whether . . . the evidence unmistakably favors ones side or the other but [only] whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Jeffreys*, 426 F.3d at 554 (quoting *Anderson*, 477 U.S. at 252). Here, in crediting as true the testimony of Plaintiffs' witnesses as to their investment strategy and assessment of Enron's financial stability during the key period of October 18, 2001, through October 26, 2001, the Court cannot now hold that no reasonable jury could find in Plaintiffs' favor, even under the clear and convincing standard. Accordingly, Defendants' motion for summary judgment on the reliance element of Plaintiffs' underlying fraud claim against Enron is denied.

### 2.     Actual Knowledge and Substantial Assistance

In addition to an underlying fraud, Silvercreek's claim for aiding and abetting fraud requires proof that Defendants had actual knowledge of Enron's fraud and provided Enron with substantial assistance. *See Oster*, 905 N.Y.S.2d at 72. Each Defendant moves for summary judgment on both of these elements. (CS Brief at 24–37; ML Brief at 32–37; DB Brief at 17–26.)

"New York law requires that the alleged aider and abettor have 'actual,' as opposed to merely constructive, knowledge of the primary wrong." *Chemtex, LLC v. St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536, 546 (S.D.N.Y. 2007). Accordingly, evidence that a defendant could or should have been able to deduce the fact of an underlying fraud on the basis of red flags or warning signs is not a substitute for actual knowledge. *See Nathel v. Siegal*, 592 F. Supp. 2d 452, 468–69 (S.D.N.Y. 2008). But while constructive knowledge alone cannot support a claim for aiding and abetting fraud, circumstantial evidence can be sufficient to support a finding of actual knowledge. *See id.* at 468 ("[A]llegations of constructive knowledge or recklessness are insufficient . . . [but an] allegation of actual knowledge does not have to be based on defendant's explicit acknowledgment of the fraud."); *see also Oster*, 905 N.Y.S.2d at 72 ("Participants in a fraud do not affirmatively declare to the world that they are engaged in the perpetration of a fraud. The [New York] Court of Appeals has stated that an intent to commit fraud is to be divined from surrounding circumstances.").

Substantial assistance constitutes "a substantial contribution to the perpetration of the fraud." *JPMorgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 257 (S.D.N.Y. 2005). It exists "where a defendant 'affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed.'" *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001) (quoting *Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.*, No. 98 Civ. 4960, 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999)). The MDL Court that oversaw discovery in this case made clear that substantial assistance "can take many forms," such as "[e]xecuting transactions" or helping a firm to present an "enhanced financial picture to others." *In re Enron Corp.*, 511 F. Supp. 2d 742, 806 (S.D. Tex. 2005) (quoting *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 511 (S.D.N.Y. 2001)).

Also embedded into the substantial assistance element is a proximate cause analysis, which requires a showing that "a defendant's participation [was] the proximate cause of plaintiff's injury." *Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 167 (S.D.N.Y. 2003). An aider and abettor's substantial assistance to a fraud can be considered a proximate cause where a plaintiff's injury was "a direct or reasonably foreseeable result of the defendant's conduct." *Filler v. Hanvit Bank*, Nos. 01 Civ. 9510, 02 Civ. 8251, 2003 WL 22110773, at *2 (S.D.N.Y. Sept. 12, 2003).

The parties have each proffered substantial evidence regarding actual knowledge and substantial assistance. In evaluating each party's showing, the Court is mindful that its only task at this stage is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

### a.   Credit Suisse

Plaintiffs have produced ample evidence to support their allegations that Credit Suisse had actual knowledge of and substantially assisted Enron's fraud. Credit Suisse marshals a range of different responses to much of this evidence, but they all go to the persuasiveness and credibility of various portions of Plaintiffs' showing, but not to its sufficiency as a matter of law. As another court once explained in rejecting similar arguments from Credit Suisse on a set of nearly identical claims, "Credit Suisse's attempt to give an explanation for each piece of evidence submitted by the Noteholders" does nothing "to force a conclusion that genuine issues of fact do not exist. Rather, at best [Credit Suisse's] Reply Statement of Facts takes small chips out of the mountain of evidence presented by the Noteholders." *In re Nat'l Century Fin. Enters., Inc.*, 846 F. Supp. 2d 828, 871 (S.D. Ohio 2012).

### i.   Credit Suisse employee testimony

Perhaps most damning to Credit Suisse's motion are the numerous statements and emails in which various Credit Suisse employees appear to explicitly acknowledge their awareness of Enron's fraud.  As a lens through which to analyze Credit Suisse's different types of rebuttals and challenges to this category of evidence, the Court begins its analysis by focusing on the statements of one particular Credit Suisse employee, Robert Jeffe, who described in strikingly clear terms his understanding of the fraudulent nature of one of the transactions between Enron and LJM1, an SPE wholly controlled by Enron's CFO:

> [T]he idea of somebody selling something to themselves representing both sides was something I had never seen. . . .  There were reservations amongst some of the members of the [Credit Suisse] team regarding the kind of compensation that [Enron's CFO] would receive by completing this transaction. . . .  [I]t struck me as a lot of money, number one, but, number two, the Enron people were paying themselves a lot of money.  And the part of it that troubled me the most was . . . conflict issues.  And it was astonishing that the board of directors, that [Enron's law firm and accounting firm] all had, quote, unquote, signed off on this transaction.  It was also troubling from the standpoint of [Enron's CFO] personally wanting to do the transaction.  Because I think we all told him at various times that at some point this transaction would come to light and he would look very, very bad.

(Dkt. No. 169-23 at 26–27.)  This same employee also described Enron's CFO's behavior more generally as crossing "lines of proper behavior in terms of the way you comport yourself, and this was something that I never ever would consider doing myself even if I had approval from the President of the United States or the U.S. Supreme Court."  (Dkt. No. 169-23 at 42.)

Credit Suisse addresses this portion of Jeffe's testimony in its reply Local Rule 56.1 Statement, arguing that this testimony is most fairly construed as reflecting Jeffe's initial concerns about the LJM1 deals, concerns that were addressed by the eventual auditing and third-party vetting of those deals.  (CSSUF ¶ 763.)  Credit Suisse's construction of this testimony appears to run up directly against the actual content of

Jeffe's testimony, which reflects that he already knew and was "astonish[ed]" by the fact that Enron's law firm and accounting firm "all had, quote, unquote, signed off on this transaction." (Dkt. No. 169-23 at 27.) But regardless of the merits of Credit Suisse's interpretation of Jeffe's testimony, consideration of Credit Suisse's alternative interpretation properly belongs to a jury. Viewed in the light most favorable to Plaintiffs, as the Court must view it, Jeffe's testimony evinces Jeffe's understanding of the wrongdoing inherent in LJM1 transacting with Enron.

Further undermining Credit Suisse's alternative construction of Jeffe's testimony are Jeffe's emails and subsequent testimony, in which he acknowledged his awareness of Enron's failure to disclose billions of dollars of off-balance sheet debt. These later statements stemmed from an August 2001 meeting between Jeffe and Enron's then-CFO Andrew Fastow. (*See generally* CSSUF ¶¶ 506–17.) Jeffe testified that he had been under the assumption that Enron had in the range of sixteen or seventeen billion dollars of total debt, but Fastow revealed to him at that meeting that Enron actually had thirty-six billion dollars of debt. (CSSUF ¶¶ 506–07.) Jeffe testified that he found this number difficult to process, and he referred it to his colleagues at Credit Suisse. (CSSUF ¶¶ 508–12.) Jeffe's colleagues at Credit Suisse then tried to follow up with Enron for more information about this figure, but Enron rebuffed Credit Suisse's inquiries. (CSSUF ¶¶ 509, 516–17.)

As Credit Suisse would have it, Jeffe's testimony about the August 2001 meeting demonstrates that Credit Suisse's knowledge of Enron's fraud was limited because Enron's actual off-balance sheet debt far exceeded Jeffe's initial understanding. (CS Brief at 36.) Credit Suisse also argues that this testimony further buttresses its claims that Credit Suisse was kept in the dark by Enron as to the true extent of its debt. (*Id.*)

But the Court cannot adopt Credit Suisse's interpretation of this testimony at this stage. Rather, the Court must read the evidence in the light most favorable to Plaintiffs. Viewed in this manner, Jeffe's testimony reveals that a Credit Suisse employee entered a meeting with Enron in August 2001 already knowing that Enron had billions of dollars of unreported debt, which by itself would support a finding of actual knowledge of Enron's fraudulent accounting practices. *See Nat'l Century*, 846 F. Supp. 2d at 872 ("Credit Suisse may not have known all of the intricacies . . . but substantial evidence exists to support a conclusion that Credit Suisse had sufficient knowledge to appreciate that [Enron's] representations to investors [regarding its volume of debt] were untrue."). That Jeffe then learned that he was correct in assuming that Enron had billions of dollars of concealed debt, but that Enron's concealed debt actually extended far beyond what he had previously surmised, does not undermine the relevance of this testimony to Plaintiffs' case.

Again, the Court has undertaken this careful exploration Jeffe's testimony, and Credit Suisse's attempts to rebut its persuasiveness, only to highlight the legal insufficiency of Credit Suisse's arguments for purposes of a motion for summary judgment. The record in fact contains a plethora of similar statements from a number of Credit Suisse employees acknowledging their awareness of Enron's wrongdoing and the fraudulent nature of its financials. (*See generally* Dkt. No. 165 ("PCS Brief") at 14–16; *see also* Dkt. No. 169-33 (August 16, 2000 email from Credit Suisse banker saying he would "need to go take a shower and go to confession soon" prior to accepting Fastow's invitation to participate in future LJM transactions); Dkt. No. 150-19 (October 19, 2001 email to Credit Suisse banker who worked extensively with Enron reflecting "every time I read about [E]nron's latest travails I think about your ominous warnings 2 years ago

that the 'house of cards' may someday collapse. . . . [H]opefully, we're still making good money on that account anyway. [I]t seems like we are."); Dkt. No. 171-22 (October 22, 2001 email from Credit Suisse banker with subject "I hope you listened to me on [Enron]......." reflecting his understanding that "these partnerships . . . [are] all smoke [and] mirrors accounting" but that Credit Suisse "made a bundle").)

As with Jeffe's testimony cited above, Credit Suisse also offers alternative explanations for the speaker's intended meaning for each of these statements. (*See* CSSUF ¶¶ 796, 519–23, 1008.) The Court does not address any of these explanations, because they belong to a jury to evaluate. The Court holds only that these statements provide a sufficient basis for a reasonable jury to find that Credit Suisse had actual knowledge of Enron's fraud under the clear and convincing evidence standard.

### ii.    LJM1

Plaintiffs highlight a number of specific Enron deals and transactions on which Credit Suisse worked. Credit Suisse's extensive involvement with any number of these transactions could provide probative evidence of Credit Suisse's actual knowledge of and substantial assistance to Enron's fraud. The Court addresses one such set of deals in detail, and holds that Plaintiffs' evidence of Credit Suisse's involvement in these deals alone is sufficient to establish the actual knowledge and substantial assistance elements of Plaintiffs' aiding and abetting fraud claim.

LJM1 was a partnership and SPE formed and controlled by Enron's CFO Andrew Fastow. (CSSUF ¶ 762.) Fastow formed this entity for the purpose of conducting deals with Enron designed to move certain volatile assets off of Enron's books. (CSSUF ¶¶ 758–60.) Because Enron was essentially selling the assets to itself, Enron was able to obtain better prices for these assets than it would have been able to obtain on the open

market. (CSSUF ¶ 770.) Enron failed to properly account for sale of and income generated by these assets, primarily because Enron treated the sale as if it were to a third party and not to one of Enron's wholly controlled SPEs. (CSSUF ¶¶ 767–68.) Enron's failure to properly account for its dealings with LJM1 played a substantial role in producing its misleading financials, as was highlighted by Enron when it announced its November 2001 write-downs. (Dkt. No. 169-18 at 5.) That November 2001 disclosure revealed that Enron's prior reporting of income from deals involving LJM1 inflated Enron's reported income in the years 1999 and 2000 by over one hundred million dollars. (CSSUF ¶ 774; Dkt. No. 169-18 at 11.)

Despite Jeffe's misgivings about Enron's proposed use of LJM1 (*see* CSSUF ¶ 763; Dkt. No. 169-23 at 26–27), Credit Suisse still ended up helping to form LJM1 and funded LJM1 as a limited partner (CSSUF ¶¶ 379, 758–62). According to testimony from numerous other employees of both Enron and Credit Suisse, at the time Credit Suisse "invested" in LJM1, Enron had already told Credit Suisse that its investment was fully guaranteed and would be repaid at a premium (CSSUF ¶ 376; Dkt. No. 181-2 ¶¶ 12–13; Dkt. No. 169-21)—evincing Credit Suisse's knowledge that at the time it funded the deals it knew them to be sham transactions. This same testimony also reveals that Credit Suisse contributed to the design and structuring of the LJM1 partnership and certain of its deals with Enron (CSSUF ¶¶ 764–65; Dkt. No. 181-2 ¶ 54), facts from which a jury could reasonably infer Credit Suisse's actual knowledge of Enron's fraudulent purpose and use of this entity.

Credit Suisse disputes whether its role in the LJM1 deals was itself problematic, and instead urges that it was only Enron's misreporting of deals with LJM1 that was fraudulent. (*See, e.g.*, CSSUF ¶ 768.) Credit Suisse emphasizes that the LJM1 deals

were all vetted by third parties and publicly disclosed to the SEC, and that therefore

Plaintiffs cannot rely on Credit Suisse's role in these deals to support its aiding-and-

abetting-fraud claims.  (*See* CS Reply at 16–17.)

This argument fails for two reasons.  First, the evidence of outside approval of

Enron's LJM1 transactions does not definitively establish that Credit Suisse lacked actual

knowledge of Enron's fraudulent purpose in pursuing the deals.  As Jeffe's own

testimony reveals, insiders at Credit Suisse characterized these approvals as

"astonishing," and they found these deals problematic despite evidence that outsiders "all

had, quote, unquote, signed off on this transaction."  (Dkt. No. 169-23 at 27.)  Moreover,

Plaintiffs have also produced evidence showing that Credit Suisse knew that Enron would

game the system to obtain such third-party approval, because Credit Suisse itself helped

to restructure other Enron deals in order to obtain such third-party approval from auditors

and law firms.  For example, Enron's former CFO testified that he recalled Credit Suisse

pitching specific methods it had devised to obtain auditor and law firm approval for deals

designed to inflate Enron's reported income.  (*See* Dkt. No. 216-11 at 1803–05.)  Indeed,

when Credit Suisse presented these deal structures it described them as proprietary to

Credit Suisse, demanding that Enron sign nondisclosure agreements prior to its pitches.

(Dkt. No. 216-11 at 1805.)  This evidence provides a basis from which a jury could infer

Credit Suisse's awareness that Enron would use flawed outside vetting of its deals in

order to further its fraud, and it supplements Plaintiffs' otherwise strong showing of

Credit Suisse's employees' knowledge of Enron's fraudulent use of LJM1.  Credit

Suisse's evidence of outside auditing of the LJM1 deals thus at most produces a genuine

dispute of fact insufficient to warrant summary judgment.

Second, even accepting as true Credit Suisse's arguments that Enron's LJM1 deals were properly vetted but only later misreported by Enron subsequent to Credit Suisse's involvement, Credit Suisse's assistance to Enron in initially completing those deals is still sufficient to support Plaintiffs' claims. A party's contribution to "atypical financing transactions" where that party "devised the marketing and financing scheme" may provide a circumstantial basis for inferring actual knowledge and substantial assistance when that scheme is subsequently put to fraudulent use by a primary tortfeasor, regardless of whether that party's role itself involved wrongdoing. *See In re Gas Reclamation, Inc. Sec. Litig.*, 659 F. Supp. 493, 504 (S.D.N.Y. 1987). As the MDL Court explained, "[s]ubstantial assistance can take many forms. Helping to mak[e] it possible for [a primary fraudster] to claim that the [performance] reports were based on objective valuations is one. . . . Executing transactions, even ordinary course transactions, can [thus] constitute substantial assistance under some circumstances[.]" *In re Enron Corp.*, 511 F. Supp. 2d at 806 (citations and internal quotation marks omitted). The MDL Court emphasized that one such circumstance is where the aider and abettor had "extraordinary economic motivation to aid in the fraud." *Id.* Plaintiffs' evidence that Credit Suisse was guaranteed exorbitant returns on its LJM1 investment prior to funding the partnership satisfies that condition. (*See* Dkt. No. 169-21 (listing income Credit Suisse would be guaranteed in return for its participation in LJM1); (Dkt. No. 169-33 (Credit Suisse employee describing Fastow's guaranteed returns to Credit Suisse as a "quid associated with this pro quo" of continued Credit Suisse funding for new LJM enterprises).) Viewing these returns in conjunction with Credit Suisse employees' admitted awareness of problems with LJM1's dealings and Credit Suisse's own role in devising LJM1's deals, the Court concludes that Plaintiffs' evidence of Credit Suisse's involvement in

LJM1 is sufficient to satisfy their burden of producing sufficient evidence of a genuine factual dispute as to actual knowledge and substantial assistance.

### iii.    Enron CFO Andrew Fastow's testimony

Finally, the Court examines statements from Enron's former CFO Andrew Fastow regarding Credit Suisse's involvement with Enron's fraudulent scheme. Fastow's statements regarding his recollection of Credit Suisse's role in devising, financing, and executing that scheme are highly probative of Credit Suisse's actual knowledge and substantial assistance.

Before reviewing Fastow's testimony, the Court first addresses Credit Suisse's arguments that Enron CFO Andrew Fastow's testimony regarding its involvement is inadmissible for lack of foundation. (CS Brief at 27–28.) For purposes of this motion, the Court assumes that Credit Suisse is correct that Fastow's testimony regarding what Credit Suisse actually knew would likely be inadmissible at trial. *See* Fed. R. Evid. 602. Thus, the Court does not consider any of those portions of Fastow's testimony. But it would be preposterous to conclude that Fastow, Enron's CFO and the primary architect of its financial fraud, lacks foundation to testify about how that very fraud unfolded. Fastow's personal experiences provide foundation for his recollection of interactions with Credit Suisse employees and of specific deals on which he worked with Credit Suisse. (*See* Dkt. No. 181-2 ¶¶ 2–3.) Moreover, Fastow's recollection of specific statements by Credit Suisse personnel may be highly indicative of the company's actual knowledge, and are at the very least relevant circumstantial evidence from which a jury could infer actual knowledge.

Credit Suisse also argues that the credibility of Fastow's testimony is colored by the context in which it was given: Fastow's incarceration for his role in Enron's fraud and

his extensive cooperation with lead plaintiffs' counsel during the MDL proceedings. (CS Brief at 27–28.) Fastow's cooperation with similar plaintiffs may persuasively cast doubt on his credibility, but it does not undermine the relevance and admissibility of his testimony. Similarly, Credit Suisse's citations to inconsistent portions of Fastow's testimony or to statements describing how he hid the extent of Enron's fraud from Credit Suisse may undercut the probative value of his testimony or impeach his credibility. But evaluating Fastow's credibility or the probative value of his testimony is a task for the jury. For purposes of this motion, the Court is required to credit Fastow's detailed account of his cooperation with Credit Suisse as true and view this testimony in the light most favorable to Plaintiffs.

Doing so here reveals additional evidence that might support a finding of actual knowledge and substantial assistance as to Credit Suisse. Fastow described Credit Suisse as one of Enron's "Tier-1 Banks," and he specifically highlighted Credit Suisse as among the banks he "told . . . of our financial objectives and they, in many instances, created solutions." (Dkt. No. 181-2 ¶¶ 3, 8, 47.) Fastow related that he paid banks like Credit Suisse "a premium . . . in order to engage in structured-finance transactions that contributed to causing Enron to report its financial statements in a desired manner." (Dkt. No. 181-2 ¶ 8.) Fastow testified to having told Credit Suisse that Enron would retain control of certain assets sold to its SPEs, including LJM1, and that because those assets were never truly sold to third parties he could guarantee the banks certain returns on their investments. (Dkt. No. 181-2 ¶¶ 2, 12–13.) Finally, Fastow described how Credit Suisse would help Enron design transactions or participate in presentations with the goal of helping Enron obtain credit approval from rating agencies. (Dkt. No. 181-2 ¶¶ 14, 48; Dkt. No. 216-11 at 1804–05.)

Fastow's testimony regarding his recollection of Credit Suisse's role in Enron's fraudulently reported transactions is highly probative, particularly when viewed in conjunction with Credit Suisse's own statements evincing its awareness of its role in that fraud and the record of its involvement in specific transactions such as LJM1. Given all of this evidence, the Court concludes that there is a genuine dispute of material fact as to whether Credit Suisse had knowledge of and substantially contributed to Enron's fraud. Accordingly, Credit Suisse's motion for summary judgment on Plaintiffs' aiding-and-abetting-fraud claim against Credit Suisse is denied.

### b.     Deutsche Bank

Plaintiffs have marshaled a similarly substantial body of evidence supporting Deutsche Bank's actual knowledge of and substantial assistance with Enron's fraud. The Court does not detail Deutsche Bank's challenges to the credibility, weight, or sufficiency of each individual piece of evidence, both because these challenges are largely duplicative of Credit Suisse's and because it is not the Court's task in evaluating this motion to consider them.

As with Credit Suisse, Plaintiffs have produced statements from Deutsche Bank employees evincing their knowledge of Enron's fraud. For example, on October 23, 2001, as Enron's stock was collapsing, a Deutsche Bank employee, Seth Rubin, emailed his colleague about a prior deal with Enron known as "Marlin" to ask "do I . . . torch the [M]arlin files?" (Dkt. No. 198-9.) When his colleague responded "what [M]arlin files? [N]ot sure I'm familiar with that deal," the employee responded "exactly . . . don't know about [F]irefly, [R]awhide o[r] [O]sprey either," referring to three other Enron deals. (*Id.*) Another Rubin email from that same day evinced his knowledge of "something funky . . . in those [Enron] books." (Dkt. No. 202-7.) In a later email, a colleague told Rubin that he was implicated in the developing SEC inquiry "for aiding and abetting Enron in doing these types of deals." (DBSUF ¶ 672.) Deutsche Bank's

reply Local Rule 56.1 statement introduces testimony from Rubin characterizing these statements as jokes.  (*See* DBSUF ¶¶ 669–72.)  Silvercreek is entitled to have a jury hear Rubin testify about these statements and evaluate his credibility.

As with Credit Suisse, Plaintiffs have also produced evidence detailing Deutsche Bank's involvement in specific deals that Enron used to produce a misleading picture of its financials. The evidence of Deutsche Bank's role in designing and implementing the Marlin and Osprey transactions referenced in Rubin's email is alone sufficient to meet Plaintiffs' burden on both the actual knowledge and substantial assistance elements of its claim for aiding and abetting fraud. Testimony from Deutsche Bank employees supports a finding that Deutsche Bank helped designed these transactions knowing that Enron's purpose was to hide billions of dollars of debt. (DBSUF ¶¶ 651–53, 662–63; *see also* Dkt. No. 191-18 at 74–77.)  With respect to the Marlin transaction, Deutsche Bank employees revealed in correspondences amongst themselves their understanding that that their task for Enron was "to keep it below the radar of the rating agencies and to ensure that any financing will not effect [sic] the rating of Enron [C]orp."  (Dkt. No. 202-12.)  Deutsche Bank processed these transactions knowing that Enron's goal was to get this debt off its own balance sheet and onto Marlin's, despite Enron's in effect retaining the debt in the form of a pledge of its own stock to Marlin investors in the event Marlin's assets declined in value.  (DBSUF ¶ 654; Dkt. No. 191-18 at 78–80, 84.)  Deutsche Bank helped raise hundreds of millions of dollars in outside investments for Marlin, and it received fees from Enron in the tens of millions for doing so.  (*See, e.g.*, DBSUF ¶¶ 658–59.)  Deutsche Bank's role in the Osprey transactions was similar in terms of the extent of its participation as well as in its purpose and scale.  (*See, e.g.*, DBSUF ¶ 663.)

Much like Credit Suisse, Deutsche Bank argues that the Marlin and Osprey deals cannot support Plaintiffs' claims against Deutsche Bank because these deals were publicly disclosed and

independently vetted.  (DB Brief at 8–9.)  But again, Plaintiffs have also produce evidenced showing that Deutsche Bank knew that Enron would work to restructure certain deals in order to obtain third-party approval.  (*See, e.g.*, DBSUF ¶¶ 575–76, 632–34.)  Indeed, at times Deutsche Bank itself helped Enron do so.  (*Id.*)  Thus, Deutsche Bank's evidence that external entities reviewed and approved the Marlin and Osprey deals at best creates only a genuine dispute of fact as to what exactly Deutsche Bank knew when it assisted Enron.  Similarly, Deutsche Bank's argument that there "is no evidence that Deutsche Bank was—or could have been—aware of Enron's *subsequent* misuse of these transaction structures" (DB Brief at 2 (emphasis in original)), runs directly into testimony from Deutsche Bank's own employees that they were aware of Enron's intended use of those structures at the time they orchestrated the deals (*see* Dkt. No. 191-18 at 83–84; Dkt. No. 202-12).  Thus, this evidence also does nothing more than establish a genuine dispute of fact as to what Deutsche Bank actually knew when it assisted Enron with the Marlin and Osprey transactions.

Deutsche Bank also argues that even if it provided substantial assistance to Enron's fraud, Silvercreek proximately caused its own injury when it failed to independently inquire into Enron's financials prior to investing.  (DB Brief at 25.)  But for reasons already discussed, there exists a genuine dispute of material fact as to whether Silvercreek's reliance on Enron's financial statements in October 2001 was reasonable.  *See supra* Section III.A.1.b.  It is well settled that "[p]roximate cause, and the determination of whether an intervening act will serve to cut off liability, necessitates a fact-intensive analysis."  *In re Sept. 11 Prop. Damage & Bus. Loss Litig.*, 468 F. Supp. 2d 508, 519 (S.D.N.Y. 2006).  To the extent a jury finds that Silvercreek's reliance was in fact reasonable, Deutsche Bank could be liable for proximately causing Silvercreek's injury through any knowing and substantial contribution to transactions that produced the misleading financials on which Silvercreek relied.

Finally, as discussed above, Andrew Fastow's testimony is highly probative in assessing the sufficiency of Plaintiffs' evidence in support of their claim against Deutsche Bank for aiding and abetting fraud. Fastow described Deutsche Bank as one of Enron's Tier-1 banks with which he worked directly and extensively. (Dkt. No. 181-2 ¶ 3.) Fastow averred to having told a Deutsche Bank employee that Enron's financials were inaccurate, and that this same employee worked on a number of transactions that helped produce those inaccuracies. (Dkt. No. 181-2 ¶ 58; *see also* Dkt. No. 191-18 at 74–79 (testimony from the same Deutsche Bank employee about Marlin ).) At the very least, Fastow's testimony, if believed, would confirm the veracity of the many statements from Deutsche Bank's own employees admitting their involvement in and understanding of the purpose behind transactions they facilitated on behalf of Enron. Viewing all of this evidence together, the Court concludes that the record before it provides a sufficient basis for a jury to find in Plaintiffs' favor on the actual knowledge and substantial assistance prongs of their aiding-and-abetting-fraud claims against Deutsche Bank. Accordingly, Deutsche Bank's motion for summary judgment on that claim is denied.

### c.  Merrill Lynch

Plaintiffs' evidence with respect to Merrill Lynch's involvement with and knowledge of Enron's fraud differs in certain respects from the evidence as to Credit Suisse and Deutsche Bank. The record is devoid of blunt statements from Merrill Lynch employees regarding the need to "torch [Enron] files" or describing Enron as a "house of cards." (Dkt. No. 198-9; Dkt. No. 150-19.) And as the Court explores below, the clearest statements from Merrill Lynch employees directly evincing understanding of Enron's fraudulent purposes involved deals whose effects had been erased from Enron's books by 2000, over a year before Plaintiffs' relevant investments. Still, the Court is mindful that generally "[p]articipants in a fraud do not affirmatively declare to the world that they are engaged in the perpetration of a fraud," and for

that reason a jury may divine an "intent to commit fraud . . . from surrounding circumstances." *Oster*, 905 N.Y.S.2d at 72. And here, it must view statements evincing Merrill Lynch's understanding of the fraudulent nature of its 1999 deals with Enron alongside the firm's continued leadership role in subsequent deals. Accordingly, even under the clear and convincing standard, the Court cannot say that there is insufficient evidence in the record as a matter of law for a jury to find that Merrill Lynch knowingly and substantially assisted Enron's fraud.

The Court begins with an examination of the two specific deals for which the record does contain statements demonstrating Merrill Lynch's understanding of Enron's fraudulent purpose. These two deals, known as the Barges and Electricity Trades transactions, were designed to help Enron meet its 1999 revenue targets by temporarily selling assets to Merrill Lynch that Enron was otherwise unable to move before the close of the year. (MLSUF ¶¶ 385, 388–91, 454–56.) The understanding between the parties was that Merrill Lynch would purchase these assets from Enron before the close of the year, thereby generating reportable income for Enron, under the condition that Enron promised to have an SPE repurchase those same assets or to "unwind" the transaction after the close of the year at a significant profit for Merrill Lynch. (MLSUF ¶¶ 391–93, 463–65.) These deals helped Enron report upwards of sixty million dollars of additional income in 1999. (*See* ML Brief at 11; MLSUF ¶ 461.)

The record demonstrates that Merrill Lynch employees understood the fraudulent nature of the Barges and Electricity Trades transactions. In internal meeting notes and memoranda, Merrill Lynch employees described these deals as "income statement manipulation." (MLSUF ¶¶ 399, 404, 432.) The employees understood that they would be unable to obtain written confirmation of Enron's promise to repurchase the assets in 2000 because it would defeat Enron's purpose of doing the deals, namely "their accounting treatment." (MLSUF ¶ 417.) Merrill Lynch employees described themselves as "doing a favor" for Enron

and participating only because Merrill Lynch was "trying to improve business relations with Enron." (MLSUF ¶ 411.) They participated despite recognizing the "reputational risk" associated with their "aid[ing]/abet[ting] Enron's financial statement manipulation." (MLSUF ¶ 405.) Merrill Lynch eventually entered into a settlement with the SEC in connection with these deals, repaying all of its $37.5 million in fees as disgorgement (plus interest) and paying an equal amount in civil penalties. (Dkt. No. 180 ¶ 85.) As part of the terms of the settlement, Merrill Lynch agreed to accept responsibility for its employees' criminal conduct in connection with these deals and to make assertions contradicting its responsibility. (*Id.*)

After Enron repurchased the Nigerian Barge assets back from Merrill Lynch in 2000, it was able to resell them at a profit that same year, thereby erasing any effects of those deals from Enron's financial statements. (Dkt. No. 180 ¶¶ 83–84; MLSUF ¶ 450.) The Electricity Trades were also unwound shortly after Enron had obtained its sought-after reportable 1999 income. (MLSUF ¶¶ 520, 522.) Merrill Lynch argues that because the effects of these fraudulent deals had been erased from Enron's books by the time Plaintiffs purchased the 7% Notes and Zero Notes in October 2001, their contributions to Enron's fraudulent scheme cannot possibly be construed as a proximate cause of Plaintiffs' injuries. (ML Brief at 19–22.)

The Court does not reach this question, however, because Plaintiffs need not rely exclusively on these two transactions to support their secondary-liability claims against Merrill Lynch. Plaintiffs have also produced evidence that would permit a reasonable jury to infer Merrill Lynch's knowledge of and substantial assistance with Enron's fraudulent use of a separate SPE, the LJM2 partnership. Viewing this evidence alongside the evidence regarding the earlier fraudulent Barges and Electricity Trades transactions, the Court cannot take from the jury the question whether there is clear and convincing evidence of Merrill Lynch's actual knowledge of and substantial assistance with Enron's overall fraud.

Like LJM1, LJM2 was a partnership wholly controlled by Enron insiders that Enron utilized to create the misleading appearance of high income and low debt. (MLSUF ¶¶ 528–29.) Enron failed to properly account for these transactions because it treated LJM2's assets and debts as those of a separate and unconsolidated entity. (MLSUF ¶¶ 525–26.) As a result of the LJM2 deals, Enron was able to produce hundreds of millions of dollars of reportable but fictitious income and to hide similar amounts of debt, numbers that remained hidden within Enron's financials until the November 2001 write-downs. (MLSUF ¶¶ 591, 606; Dkt. No. 169-18 at 11–12.)

Given the extent of Enron's misreporting of it deals with LJM2, Plaintiffs' claim against Merrill Lynch for aiding and abetting fraud could survive based exclusively on a showing that Merrill Lynch knowingly and substantially assisted Enron with its fraudulent use of LJM2. Plaintiffs have produced extensive evidence supporting such a finding. The Court begins with statements by Merrill Lynch employees showing their understanding of Enron's purpose in pursuing deals with LJM2. Internal Merrill Lynch memoranda circulated in response to Enron's invitation to become a founding investor in LJM2 explained that LJM2 would provide "preferred access to a large amount of proprietary deal flow created by Enron" that "otherwise would not be available to outside investors" given LJM2's ability "to evaluate investments with 'full' knowledge of the assets" to be traded. (MLSUF ¶¶ 530–31.) A Merrill Lynch employee described LJM2's dealings as "a bunch of balance sheet deals similar to [Enron's] barge deal." (MLSUF ¶ 532 (quoting Dkt. No. 203-14).) Merrill Lynch's arguments that it did not understand Enron's purpose in pursuing the LJM2 deals lose credibility in light of the evidence that its own employees compared the LJM2 deals to the Barge deals for which Merrill Lynch has conceded wrongdoing. (Dkt. No. 180 ¶ 85.)

There is also circumstantial evidence of Merrill Lynch's actual knowledge and substantial assistance in the form of Merrill Lynch's extensive role in forming and marketing LJM2 and the fees it obtained for doing so. Merrill Lynch concedes that it set up LJM2 and served as its exclusive private placement agent. (MLSUF ¶¶ 533–34.) Indeed, Merrill Lynch designed the presentation used by Fastow to market LJM2 to potential investors. (MLSUF ¶ 539.) These marketing materials clearly reflected LJM2's value-add came from its ability to deal directly with Enron and thereby help Enron "[m]anage its balance sheet" and income statements. (MLSUF ¶ 541.) Similar statements reflecting the way in which LJM2 would operate can be found throughout LJM2's marketing materials. (MLSUF ¶¶ 542–46.) The close involvement between Merrill Lynch and Enron's insiders in devising LJM2, and statements in LJM2's marketing materials foreshadowing the way in which it would be used to help Enron report favorable financial results, both belie Merrill Lynch's contentions that it lacked actual knowledge of Enron's intended fraudulent use of LJM2.

With respect to Merrill Lynch's fees, Plaintiffs might rely on testimony from Fastow, who avers that he directly told Merrill Lynch his intended purpose in conducting deals between LJM2 and Enron, and explained that doing so allowed him to guarantee Merrill Lynch certain returns on its investments. (Dkt. No. 181-2 ¶¶ 12–13, 41–42.) Finally, Plaintiffs can present to the jury internal memoranda showing that Merrill Lynch invested in LJM2 transactions expecting rates of return upwards of 75%. (MLSUF ¶¶ 602, 605–06.) Merrill Lynch's "clear opportunity and a strong financial motive" provide a further legally sufficient basis for inferring its actual knowledge of the fraudulent purpose behind Enron's use of LJM2. *Wight v. BankAmerica Corp.*, 219 F.3d 79, 92 (2d. Cir. 2000).

On the basis of all of the foregoing evidence, the Court concludes that there are genuine disputes of fact as to whether Merrill Lynch had actual knowledge of and substantially assisted

Enron's underlying fraud.  Accordingly, Plaintiffs' aiding-and-abetting-fraud claim against

Merrill Lynch survives summary judgment.

### B.  Aiding and Abetting Negligent Misrepresentation

Silvercreek brings claims against all three Defendants for aiding and abetting Enron's

negligent misrepresentation in violation of New York state law.  (TAC ¶¶ 830–42.)  As the Court

explained at the motion to dismiss stage, Plaintiffs may recover on a claim of aiding and abetting

negligent misrepresentation if they can establish that "[1] Enron negligently breached its duty to

disclose certain information in its securities prospectuses, and Defendants [2] knew and [3]

substantially assisted Enron in doing so."  *Silvercreek*, 248 F. Supp. 3d at 455.  Defendants move

for summary judgment on all three elements of Plaintiffs' claim.  (CS Brief at 17–37; DB Brief

at 26–28; ML Brief at 37–39.)[5]

As a threshold matter, Plaintiffs must establish all of the elements of the underlying tort,

namely Enron's negligent misrepresentation.  To do so, Plaintiffs must show that "(1) the parties

stood in some special relationship imposing a duty of care on the defendant to render accurate

information, (2) the defendant negligently provided incorrect information, and (3) the plaintiff

reasonably relied upon the information given."  *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*,

10 F. Supp. 3d 504, 525 (S.D.N.Y. 2014) (quoting *Saltz v. First Frontier, LP*, 782 F. Supp. 2d

61, 82 (S.D.N.Y. 2010)).  None of the Defendants questions Plaintiffs' claim that Enron

negligently provided incorrect information in their financial reports, but the Defendants do

---

[5]      Each of the Defendants also asks the Court to reconsider its prior holding as to the existence and elements of Plaintiff's claim for aiding and abetting negligent misrepresentation. The Court declines to do so now for the same reasons set forth in *Silvercreek*, 248 F. Supp. 3d at 454–55; *see also Miele v. Am. Tobacco Co.*, 770 N.Y.S.2d 386, 392 (N.Y. App. Div. 2d Dep't 2003) ("The concerted action theory of liability for injury to a third party will attach when one knows that another's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other[.]").

contest whether Plaintiffs have produced evidence sufficient to show that Enron owed them a duty of accurate reporting (CS Brief at 17 n.8; ML Brief at 38), and whether Plaintiffs reasonably relied upon any the information Enron provided (CS Brief at 18–23; ML Brief at 37–38).

The Court turns first to the question whether Enron and Plaintiffs had "some special relationship imposing a duty of care on [Enron] to render accurate information." *LBBW Luxemburg*, 10 F. Supp. 3d at 525 (quoting *Saltz*, 782 F. Supp. 2d at 82). Defendants cite clear law from both the Second Circuit and this District holding that no such special relationship exists between the issuer of a stock and the investing public for purposes of a negligent misrepresentation claim. *See, e.g.*, *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 271 (2d Cir. 1993) ("New York strictly limits negligent misrepresentation claims to situations involving actual privity of contract . . . . The exceptions . . . have been held not to apply to the investing public." (internal quotation marks omitted)); *Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 388 (S.D.N.Y. 2011) (dismissing negligent misrepresentation claim where plaintiff "'was simply one more customer that relied on the misrepresentations allegedly made by the defendants to the public when it purchased' [defendant's] securities" (quoting *Prime Mover Capital Partners, L.P. v. Elixir Gaming Tech., Inc.*, 793 F. Supp. 2d 651, 674 (S.D.N.Y. 2011))). For this reason, Plaintiffs cannot establish that Enron engaged in an actionable negligent misrepresentation as a matter of law, so the assignment of secondary liability to the Defendants must fail as well.

Plaintiffs dispute this conclusion. But the cases they rely on to establish the duty of a securities-issuer to accurately report certain information do not involve the special relationship element of a New York negligent misrepresentation claim (*see* Dkt. No. 179 ("PML Brief") at 33), and are therefore inapposite. *See, e.g.*, *In re Enron Corp.*, No. MDL 1446, 2010 WL 9077875, at *41 (S.D. Tex. Jan. 19, 2010) (considering Enron's duty to disclose in context of

reliance element of Texas common law fraud claim); *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 528 (7th Cir. 1985) (considering securities-issuer's duty to disclose in context of Section 10(b) of the Securities Exchange Act of 1934).

Because there is no "special relationship" between Enron (the issuer of securities) and Plaintiffs (the purchasers of those securities) for purposes of establishing an underlying actionable negligent misrepresentation claim under New York law, the Court grants Defendants' motion for summary judgment as to Plaintiffs' claims for aiding and abetting negligent misrepresentation.

### C.    Common Law Conspiracy

Silvercreek brings a claim of conspiracy to commit fraud against all of the financial-institution Defendants.  (TAC ¶¶ 814–29.)  Each Defendant moves for summary judgment on Plaintiffs' conspiracy claims.  (DB Brief at 28–29; ML Brief at 39–40; CS Brief at 17–18, 23–24.)

"To establish a claim of civil conspiracy, plaintiff must demonstrate the underlying tort [—here, fraud—], plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a common purpose or plan; and, (4) resulting damage or injury."  *De Sole*, 139 F. Supp. 3d at 659 (quoting *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 759 F. Supp. 2d 363, 386 (S.D.N.Y. 2010)) (alterations in original).

The same evidence that was sufficient to preclude summary judgment on Plaintiffs' aiding-and-abetting-fraud claims also suffices for purposes of Plaintiffs' civil-conspiracy claims against Defendants.  Just as there is sufficient evidence to permit a reasonable jury to find an underlying fraud by Enron, knowingly and substantially assisted by Defendants, *see supra* Section III.A, so too could a reasonable jury find that Defendants knowingly agreed to further

Enron's underlying fraud in conducting certain transactions. Accordingly, Defendants' motions for summary judgment on Plaintiffs' civil-conspiracy claims are denied.

### D.     Negligent Misrepresentation

Silvercreek brings claims for negligent misrepresentation against Defendants Credit Suisse and Merrill Lynch based on misrepresentations in marketing the Zero Notes and 7% Notes. (TAC ¶¶ 861, 870–78.) For these claims to survive summary judgment, Plaintiffs must produce facts sufficient to permit a reasonable jury to find: (1) the existence a special relationship between Defendants and Plaintiffs; (2) Defendants' negligent provision of incorrect information; and (3) Plaintiffs' reasonable reliance on that information. *See LBBW Luxemburg*, 10 F. Supp. 3d at 525. Merrill Lynch moves for summary judgment on all three elements of Plaintiffs' claims, while Credit Suisse moves for summary judgment on elements one and three. (CS Brief 8–17; ML Brief 25–31.)

#### 1.     Special Relationship

The Court first examines whether Plaintiffs have sufficiently demonstrated the existence of a "special relationship."

"Liability for negligent misrepresentation may be imposed 'only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.'" *Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 778 (S.D.N.Y. 2011) (quoting *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263 (1996)). In order to establish a special relationship, a plaintiff must show that their relationship with defendant was "sufficiently close that it approaches privity." *In re JWP Inc. Sec. Litig.*, 928 F. Supp. 1239, 1253 (S.D.N.Y. 1996). Factors relevant to "the nature and caliber of the relationship between the parties" for purposes of a negligent misrepresentation claim include: "[1] whether the person making the representation held or

appeared to hold unique or special expertise; [2] whether a special relationship of trust or confidence existed between the parties; and [3] whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Kimmell*, 89 N.Y.2d at 264. "[W]here no triable issue of fact as to the 'special relationship' element exists, summary judgment on the negligent misrepresentation claim is appropriate." *St. Paul Fire & Marine Ins. Co. v. Heath Fielding Ins. Broking Ltd.*, 976 F. Supp. 198, 204 (S.D.N.Y. 1996).

As a general matter, the broker-customer relationship does not usually constitute a "special relationship" because a broker's responsibilities are typically limited to completing specific transactions. *SEC v. Lee*, 720 F. Supp. 2d 305, 329 (S.D.N.Y. 2010); *de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1310 (2d Cir. 2002). But as the Court explained in denying Defendants' motions to dismiss, "[t]he existence of a special relationship is a 'fact-intensive, case-by-case inquiry.'" *Silvercreek*, 248 F. Supp. 3d at 452 (quoting *In re Vivendi Universal, S.A.*, 2004 WL 876050, at *13 (S.D.N.Y. Apr. 22, 2004)). Accordingly, the Court permitted these claims to proceed to discovery on the theory that Plaintiffs' allegations could support a finding of a "long-standing" broker-customer relationship such that when "the banks[] provid[ed] Silvercreek with information[, ] they knew [it] would be used by Silvercreek in making its investment decisions." *Id.* at 453. In other words, Plaintiffs' allegations could be sufficient to demonstrate negligent misrepresentation if they produced evidence showing that, at the time the Defendants recommended that Silvercreek purchase Enron's securities, "there [wa]s an awareness that the information provided [would] be relied upon for a particular purpose by [Plaintiffs] in furtherance of that purpose, and some conduct by the [Defendants] linking [them] to [Plaintiffs] and evincing the [Defendants'] understanding of [Plaintiffs'] reliance." *Id.* at 453–54 (quoting *Houlihan/Lawrence, Inc. v. Duval*, 644 N.Y.S.2d 553, 554 (N.Y. App. Div. 2d Dep't 1996)).

### a.    Merrill Lynch

Discovery has failed to establish that requisite set of conditions with respect to Merrill Lynch.  Specifically, Plaintiffs have failed to identify any "conduct by [Merrill Lynch] linking it to [Silvercreek] and evincing [Merrill Lynch's] understanding of their reliance" on any of Merrill Lynch's assessments of the viability of Enron's securities.  *Id.* at 454.  Even crediting as true all of Plaintiffs' factual assertions as to their longstanding relationship with Merrill Lynch, the Court holds that Silvercreek has failed to produce facts sufficient to support a finding that Merrill Lynch understood Silvercreek to be "a member of some very small group of persons for whose guidance the representation [about Enron] was made."  *Houlihan/Lawrence, Inc.*, 644 N.Y.S.2d at 554 (quoting Prosser & Keeton, Torts § 107, at 747 (5th ed.)).

In illustrating the nature of their relationship with Merrill Lynch, Plaintiffs describe a long history of deals, meetings, and conversations with Merrill Lynch about various potential investments.  (*See* PML Brief at 38.)  But while long-standing, discovery has revealed nothing to distinguish Plaintiffs' relationship with Merrill Lynch from their relationships with numerous other banks and brokers.  Indeed, Plaintiffs' employees themselves had difficulty doing so in their depositions.  (*See, e.g.*, Dkt. No. 142-48 at 754 ("Who all did we trade with?  I don't know if I can give you an exhaustive list.  Goldman Sachs, First Boston, Merrill Lynch, Morgan Stanley, [F]irst Union, now Wachovia, Jeffries, KBC Financial."); *id.* at 864 (Silvercreek confirming that it "typically had daily conversations with [different] brokers").)  Plaintiffs' exposition of their prior relationship with Merrill Lynch thus does not by itself depict an especially close broker-customer relationship sufficient to justify deviating from the general rule that the obligations inherent to the broker-customer relationship do not extend beyond completing specific transactions.  *See Lee*, 720 F. Supp. 2d at 329; *de Kwiatkowski*, 306 F.3d at 1310.

Even so, the Court would be willing to entertain the possibility that this long-standing, but typical, broker-customer relationship could constitute a "special relationship" if Plaintiffs could identify with specificity "some conduct by [Merrill Lynch] . . . evincing [its] understanding of [Plaintiffs'] reliance" on its statements about Enron. *Silvercreek*, 248 F. Supp. 3d at 454 (quoting *Houlihan/Lawrence, Inc.*, 644 N.Y.S.2d at 554).

But Plaintiffs identify no such conduct. They present no evidence of ever consulting directly with Merrill Lynch regarding Enron. (*See, e.g.*, MLSUF ¶ 269.) The record here demonstrates that Plaintiffs used half a dozen different brokers to process their purchases of the Enron notes. (CSSUF ¶¶ 119, 128.) The record also shows specific brokers and firms with whom Plaintiffs discussed the Enron notes and on whom they relied. (Dkt. No. 142-48 at 391–93.) None of these was Merrill Lynch.

Furthermore, the record is replete with October 2001 reports from Merrill Lynch analysts assessing Enron positively. (MLSUF ¶¶ 270–71, 275, 279, 281–82, 284.) But Plaintiffs identify only one such report that they claim Merrill Lynch sent directly to Plaintiffs and on which they claim to have relied: an October 9, 2001 analyst report about the Zero Notes generically addressed to "fixed income buyers," which nowhere identifies Silvercreek as a specifically intended recipient. (*See* PML Brief at 38, 40 (citing MLSUF ¶¶ 161–65, 245); Dkt. No. 193-10.) This report identified itself as intended for "general circulation" and explicitly disclaimed any "regard to the specific investment objections, financial situation[,] and the particular needs of any specific person who may receive this report."[6] (Dkt. No. 193-10 at 3.) Silvercreek also does

---

[6]    The report's disclaimer provides in full:  "This research report is prepared for general circulation and is circulated for general information only.  It does not have regard to the specific investment objections, financial situation and the particular needs of any specific person who may receive this report.  Investors should seek financial advice regarding the appropriateness of investing in any securities or investment strategies discussed or recommended in this report . . . ."  (Dkt. No. 193-10 at 3.)

not offer any evidence regarding how or from whom it received the report.  (MLSUF ¶ 245; Dkt. No. 183-3 ¶¶ 7–8.)  As such, there is no evidence from which one could conclude that in sending this report to Silvercreek, Merrill Lynch understood it to be "a member of some very small group of persons for whose guidance the representation was made."  *Houlihan/Lawrence, Inc.*, 644 N.Y.S.2d at 554  (quoting Prosser & Keeton, Torts § 107, at 747 (5th ed.)); *see also Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, No. 08 Civ. 7508, 2013 WL 837536, at *6 (S.D.N.Y. Mar. 6, 2013) (granting summary judgment on negligent misrepresentation claim where plaintiffs did "not put forth evidence beyond generic communications regarding potential investment . . . [which] suggest[ed] that [defendant] was [nothing] more than a typical Placement Agent").

The facts of *In re JWP Inc. Securities Litigation* are illustrative.  *See* 928 F. Supp. at 1245–46.  That case involved disputes stemming from the collapse of JWP Inc., a utility that suddenly collapsed into bankruptcy, leaving its securities worthless.  *Id.*  Certain investors brought negligent misrepresentation claims against JWP Inc.'s former auditor for its inaccurate audits of the company.  *See id.* at 1253.  Like here, the investors' negligent misrepresentation claims survived a motion to dismiss "because their complaint [had set] forth allegations that, taken as true, satisf[ied the] standard" for special relationships.  *Id.*  But the court reached a different result on summary judgment, holding that plaintiffs had failed to produce sufficient evidence of a special relationship with respect to all of the defendant-auditor's representations.  *Id.* at 1253–54.

The court did allow some of the investors' negligent misrepresentation claims to proceed past summary judgment, but did so only for those claims based on misstatements by the auditor where it was "clear from the face of the [statements] that their purpose [was] to aid the [] plaintiffs in determining whether JWP has complied with its obligations under the note

agreements." *Id.* at 1253. Because those statements clearly "nam[ed] the [] plaintiffs" as intended recipients, the court held that the defendant-auditor had "engaged in conduct evincing its awareness that the [] plaintiffs would rely on the [audit reports]." *Id.* at 1253–54.

In contrast, the court granted summary judgment and dismissed those claims premised on other "unqualified audit reports [that] were not issued primarily for the benefit of the [] plaintiffs." *Id.* at 1254. As the court reasoned, "The New York Court of Appeals has held that in the absence of indications that an audit report was prepared for a particular purpose or for the benefit of a particular plaintiff, that plaintiff may not recover on a claim for negligent misrepresentation based on alleged misstatements contained in that audit report." *Id.* On this basis, the court concluded that the investor-plaintiffs' reliance on generic audit reports could not establish the existence of a "special relationship" as a matter of law. *Id.*

A similar result is warranted here. According to Silvercreek, it directly received and relied on only one analyst report from Merrill Lynch in which the bank negligently misrepresented the value of the Enron notes. (*See* PML Brief at 38, 40 (citing MLSUF ¶¶ 161–65, 245); *see also* Dkt. No. 193-10.) And that generic report did not specifically target Silvercreek. (*See* Dkt. No. 193-10.) Given the "absence of indications that [this] report was prepared for . . . the benefit of" Silvercreek, and Plaintiffs' failure to identify "any direct communication between the parties that could supply the otherwise absent linking conduct" between Merrill Lynch and Silvercreek, Plaintiffs "may not recover on a claim for negligent misrepresentation based on alleged misstatements contained in that [] report." *In re JWP Inc. Sec. Litig.*, 928 F. Supp. at 1254 (citing cases).

The Court does not now hold that a broker's practice of sending generically addressed analyst reports to specific customers could never support negligent misrepresentation liability. If, for example, plaintiffs showed that they had reached out to a bank to request insight into the

value of a security prior to receiving an analyst report, or the bank specifically and regularly singled out plaintiffs for the receipt of such reports, the result might be different.  Either of these hypothetical showings would demonstrate at least "*some* conduct by the [bank] linking it to the relying party and evincing the [bank]'s understanding of their reliance."  *Houlihan/Lawrence, Inc.*, 644 N.Y.S.2d at 554 (emphasis added).

But Plaintiffs have made no such showing here.  The October 9, 2001 analyst report is the only communication between Plaintiffs and Merrill Lynch regarding Enron identified in the record.   Plaintiffs provide no evidence to support the conclusions that (a) Merrill Lynch directed that report to Silvercreek *specifically*, so that Silvercreek in particular would rely on it, or (b) that the nature and caliber of their relationship were such that someone at Merrill Lynch would have foreseen Silvercreek's particular reliance on those generically addressed representations.  Accordingly, Merrill Lynch is entitled to summary judgment on the special relationship element of Plaintiffs' negligent misrepresentation claim.[7]

### b.      Credit Suisse

A different result is warranted with respect to Credit Suisse.  Because the record contains evidence that Credit Suisse directly solicited Plaintiffs' Enron investments and acted as Plaintiffs' broker for their purchase of the Enron notes, a jury could reasonably conclude that Credit Suisse and Plaintiffs had a special relationship for purposes of Plaintiffs' negligent misrepresentation claim.

Perhaps most significantly, Credit Suisse acted as a broker for Plaintiffs on specific deals involving both the 7% Notes and Zero Notes.  (CSSUF ¶¶ 119, 128.)  The Second Circuit has

---

[7]      Because the Court grants Merrill Lynch's motion for summary judgment on the "special relationship" element, the Court does not address Merrill Lynch's arguments as to the other two elements of Plaintiffs' negligent misrepresentation claim.

explained that a broker's duty to its customers may be analyzed on a "transaction-by-transaction basis, [and once triggered] the broker owes duties of diligence and competence in executing the client's trade orders, and is obliged to give honest and complete information when recommending a purchase or sale." *de Kwiatkowski*, 306 F.3d at 1302. Based on the fact that Credit Suisse was acting as Plaintiffs' broker for their investments in the Enron notes, it would be far from unreasonable for a jury to conclude that Credit Suisse also knew that the information about those investments it was "providing Silvercreek . . . would be used by Silvercreek in making its investment decisions."[8] *Silvercreek*, 248 F. Supp. 3d at 453.

Plaintiffs have also produced evidence showing that Credit Suisse directly solicited Plaintiffs' initial purchases of the Enron Zero Notes. Specifically, there is evidence that Plaintiffs' contact at Credit Suisse, Sara Randell—with whom Plaintiffs had worked for more than two years and corresponded regularly—called Plaintiffs to recommend the Zero Notes, explaining that the notes offered "a good yield for a good credit." (CSSUF ¶¶ 108, 681.) According to Louise Morwick, Silvercreek's portfolio manager and President (CSSUF ¶ 8–9), it was this call from Credit Suisse that prompted Plaintiffs' decision to invest in the Zeros (CSSUF ¶ 681). Plaintiffs began purchasing the Zeros later that same day, with Credit Suisse acting as broker. (CSSUF ¶ 119.) In fact, Randell herself was the Credit Suisse broker who processed Plaintiffs' transactions. (CSSUF ¶ 222.) This sequence of events provides a strong basis from

---

[8]  The parties further dispute whether Credit Suisse also sold the Zero Notes to Plaintiffs as principal seller. (CS Brief at 14; PCS Brief at 26–27.) While some of the relevant documents clearly delineate Credit Suisse's status as "agent," others indicate that Credit Suisse was selling the notes as a principal. (*See generally* CSSUF ¶¶ 123–26; *see also* Dkt. No. 168-19 at 2 (indicating Credit Suisse sold Zero Notes directly to Plaintiffs "as principal and for our own account").) The Court does not address that dispute here, because it concludes that evidence of Credit Suisse's direct solicitation of Plaintiffs' investment and its subsequent role as Plaintiffs' broker for the purchases of the Enron notes is otherwise sufficient to defeat summary judgment on the special relationship element of Plaintiffs' claim.

which a jury could infer "an awareness that the information [Randell] provided [would] be relied upon for a particular purpose by [Plaintiffs] in furtherance of that purpose, and some conduct by [Randell] linking [her] to [Plaintiffs] and evincing [her] understanding of [their] reliance." *Silvercreek*, 248 F. Supp. 3d at 453–54 (quoting *Houlihan/Lawrence, Inc.*, 644 N.Y.S.2d at 554).

A number of other courts have denied summary judgment on the special relationship element of a negligent misrepresentation claim where a plaintiff produces evidence that a defendant both directly solicited and then subsequently processed a specific deal on a plaintiff's behalf. *See, e.g.*, *Abu Dhabi Commercial Bank*, 2013 WL 837536, at *6 (denying summary judgment where defendant "acted as more than a mere agent" but rather "affirmatively solicited [plaintiffs'] investment, made numerous in-person, email and telephone communications over significant periods of time, provided individualized memoranda and, in some cases made additional overtures"); *Smith v. Ameriquest Mortg. Co.*, 876 N.Y.S.2d 447, 450 (N.Y. App. Div. 2d Dep't 2009) ("[Defendants] personally solicited the plaintiff to refinance her mortgage with Ameriquest, and . . . provide[d] her with information about the transaction in an effort to convince her that the transaction was in her best interests. Under these circumstances, there is a triable issue of fact as to whether the nature of the relationship between the parties imposed a duty of care upon the defendants.").

The Court recognizes that "[i]t is not easy to draw the line between the typical relationship of a [broker] and a sophisticated investor, and one which goes beyond an arms length transaction giving rise to a duty of care regarding commercial speech." *Abu Dhabi Commercial Bank*, 2013 WL 837536, at *6. Accordingly, it is important to remember that "[w]hether such a 'special relationship' exists in the commercial context is 'highly fact specific' and is not generally amenable to summary disposition." *Id.* at *3 (quoting *Century Pac., Inc. v. Hilton Hotels Corp.*, No. 03 Civ. 8258, 2004 WL 868211, at *8 (S.D.N.Y. Apr. 21, 2004)). If

credited as true, Plaintiffs' account of Credit Suisse's direct solicitation and its subsequent role as Plaintiffs' broker for the Enron investments supports the conclusion that Credit Suisse had an "awareness that the information [it] provided [would] be relied upon for a particular purpose by [Silvercreek]." *Silvercreek*, 248 F. Supp. 3d at 453–54 (quoting *Houlihan/Lawrence, Inc.*, 644 N.Y.S.2d at 554). Accordingly, because there is a genuine dispute of fact as to the nature of the parties' communications and business relationship, Credit Suisse's motion for summary judgment on the special relationship factor of Silvercreek's negligent misrepresentation claim is denied.

### 2. Reliance

Credit Suisse also moves for summary judgment on the question whether Silvercreek reasonably relied on the misrepresentations made by Randell in recommending the Enron notes. (CS Brief at 9–11.) All of Credit Suisse's challenges to Plaintiffs' evidence of its actual and reasonable reliance, however, go to the weight of the evidence rather than to its sufficiency as a matter of law. Accordingly, Credit Suisse is not entitled to summary judgment on the reliance element of Plaintiffs' negligent misrepresentation claim.

### a. Actual reliance

Silvercreek's portfolio manager and President, Louise Morwick, testified that it was a phone call from Credit Suisse broker Randell that led her to purchase the Enron Zero Notes. (CSSUF ¶ 681; *see also* Dkt. No. 142-48 at 392, 457–58.) Morwick said she could recall specific conversations with Randell in which Randell represented that Enron had "good credit" and that its securities offered "an attractive yield upon a good credit." (Dkt. No. 142-48 at 457–58; *see also id.* at 390–93.) She further represented that she continued to speak with Randell by phone daily throughout October 2001, and that Randell was among the brokers who during that period repeatedly told her they "viewed [Enron] as a strong, successful business." (CSSUF

¶ 686.)  Silvercreek has also emphasized the importance of this continued stream of positive

broker reports in the information it relied on when developing investment strategy and assessing

Enron's financial viability, especially given the negative news surrounding the company.

(CSSUF ¶¶ 704–06.)

This evidence is enough to defeat summary judgment on the question of actual reliance.

Credit Suisse questions whether Silvercreek's description of its decision-making process and its

deponents' recollections of their conversations with Credit Suisse are accurate, complete or

believable.  (CS Brief at 9–10.)  But it is well established that the "weighing of the evidence, [ ]

drawing of inferences . . . , and [ ] assessments of [a party's] credibility[ are] matters that [are]

not within the province of the court on a motion for summary judgment."  *Fischl v. Armitage*,

128 F.3d 50, 57 (2d Cir. 1997).  Silvercreek's consistent description of its own investment

strategy—primarily based on statements by the individual who purchased the relevant Enron

securities directly from Credit Suisse—provides a sufficient basis for a jury to conclude that

Silvercreek actually relied on Credit Suisse's positive assessments of Enron's financial stability.

Though Credit Suisse's arguments as to the persuasiveness of Silvercreek's evidence may prove

effective at trial, choosing between Silvercreek's account of its investment decisions and Credit

Suisse's contrary assessment is not the province of this Court on summary judgment.

### b.  Reasonable Reliance

Credit Suisse also moves for summary judgment on whether Silvercreek's reliance on

Randell's assessments was reasonable.  (CS Brief at 11.)

Credit Suisse first argues that Randell's recommendation of the Enron notes was only a

statement of opinion, "mere puffery," or a speculative assessment about future events, such that

reliance on it was unreasonable as a matter of law.  (*Id.*)  But the cases cited by Credit Suisse in

which courts dismissed negligent misrepresentation claims based on "puffery" either do not

describe the content of the "puffery" such that it can be compared to the statements here, *see Sheth v. N.Y. Life Ins. Co.*, 709 N.Y.S.2d 74 (N.Y. App. Div. 1st Dep't 2000), or involved statements founded entirely on speculation concerning future profits from proposed business endeavors, *see Dorfman Org. v. Greater N.Y. Mut. Ins. Co.*, 719 N.Y.S.2d 573, 573 (N.Y. App. Div. 1st Dep't 2001) (involving "assertion that the new account would be profitable and would double the brokers' account"); *Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 21 (2d Cir. 2000) (involving "energy output predictions" that "were mere promises of future output as opposed to present representations of existing fact").

Credit Suisse's argument fails because Randell's recommendation of the Enron notes included the misrepresentation of a present fact, namely the status of Enron's creditworthiness. When representing to Plaintiffs the likelihood of their obtaining a high yield from the Enron notes, Randell also represented to Plaintiffs that Enron was a "strong company" and that its notes rested on a "good credit." (Dkt. No. 142-48 at 392, 457–58.) And under the case law of this Circuit, offering "misrepresentations of existing facts"—such as stating that a situation was "in good shape" or "under control" while they allegedly knew that the contrary was true—is actionable. *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000). Though the concept of creditworthiness necessarily involves some forward-looking assessment of a company's future performance, the status of Enron's creditworthiness in October 2001 was a present fact. So too was its status as a "strong company." If representing a business's present inventory as being "in good shape" can constitute an actionable misrepresentation of a present fact, *see Novak*, 216 F.3d at 315, so too can statements representing that a company has "good credit" or is a "strong, successful business" at a given moment (CSSUF ¶¶ 681, 686). Randell's alleged representations are thus not puffery or speculative opinion, and Silvercreek's reliance on them was not unreasonable as a matter of law.

Finally, Credit Suisse contends that it would have been unreasonable for Silvercreek, a sophisticated entity, to rely exclusively on Randell's "say-so" in making this investment. (CS Brief at 11.) But Silvercreek disputes that it relied blindly on Randell's pitch, and instead avers that it reasonably took her assessment into account "as part of the mix of information it considered" before investing in Enron in October 2001. (CSSUF ¶¶ 704, 706; Dkt. No. 168-18 ¶¶ 8, 12.)

"In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Capital Inv. Mgmt.*, 343 F.3d at 195. Here, the facts most relevant to assessing these factors are genuinely disputed by the parties. For example, as discussed above, the parties genuinely dispute whether Silvercreek appropriately took account of the worrisome news regarding Enron that was being issued in October 2001, *see supra* Section III.A.1, as well as the precise nature of the business relationship between Credit Suisse and Silvercreek, *see supra* Section III.D.1.b. Whether Silvercreek's reliance on Credit Suisse's assessment of Enron's financial stability was reasonable given Silvercreek's sophistication and the negative information swirling about Enron is quintessentially a question for the jury. *See De Sole*, 139 F. Supp. 3d at 643 ("Under New York's contextual approach, the question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive. Reasonable reliance is therefore a question normally reserved for the finder of fact and not usually amenable to summary judgment." (brackets, internal quotation marks, and citations omitted)).

Accordingly, the Court denies Credit Suisse's motion for summary judgment on the reasonableness of Plaintiffs' reliance on Credit Suisse's representations. And for all of the

foregoing reasons, Plaintiffs' negligent misrepresentation claim against Credit Suisse survives summary judgment.

### E. Section 11 Claim

Silvercreek brings claims against Deutsche Bank and Credit Suisse under Section 11 of the Securities Act based on their alleged roles as underwriters in the distribution of the Zero Notes. (TAC ¶¶ 879–91.) Credit Suisse and Deutsche Bank move for summary judgment on these claims, arguing that Silvercreek has failed to produce facts sufficient to establish that either party was an "underwriter" for purposes of Section 11 liability. (CS Brief at 37–40; DB Brief at 30–32.)

Section 11 of the Securities Act of 1933 "allows purchasers of a registered security to sue certain enumerated parties [including underwriters] in a registered offering when false or misleading information is included in a registration statement." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983); *see also* 15 U.S.C. § 77k(a). The act defines an underwriter as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking." 15 U.S.C. § 77b(a)(11). Determining whether a party is an underwriter is an objective and fact-specific inquiry. *See SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 432 (S.D.N.Y. 2007).[9]

---

[9] Because the "underwriter inquiry is objective," it "markedly does not incorporate consideration of the actor's subjective understandings." *Universal Express*, 475 F. Supp. 2d at 432. Accordingly, though the parties go to great lengths to construe various statements by their opponents as admissions or denials of underwriter-status (*e.g.*, CS Brief at 37–38; Dkt. No. 176 ("PDB Brief") at 29), these statements have little bearing on the Court's analysis and the Court therefore declines to address them.

Section 11 liability extends only to underwriters for registered public offerings, and not to underwriters for private placements or distributions. *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 181 (2d Cir. 2011). In addition, a party is to be considered an underwriter for purposes of Section 11 liability only if it contributed to "the actual distribution of securities," *i.e.*, the actual offering, buying, or selling of securities; "persons not themselves participating in such purchases, offers, or sales" are not subject to Section 11 liability as underwriters, even if their "actions may facilitate the participation of others in such undertakings." *Id.* at 176–77.

### 1. Deutsche Bank

The parties do not dispute that Deutsche Bank served as an underwriter for the initial Rule 144A private placement of the Zero Notes. (DBSUF ¶ 241.) But Deutsche Bank contends that its role in that initial Rule 144A private placement "cannot render Deutsche Bank an underwriter for Section 11 purposes because this offering was independent from any registered public offering by Enron." (DB Brief at 31.) The Court agrees. In addressing Deutsche Bank's same contention at the motion to dismiss stage, the Court explained that "[c]ourts in this District generally . . . avoid treating purchasers in [an initial private placement] as purchasers pursuant to a [subsequent] public offering for the purposes of liability under the Securities Act." *Silvercreek*, 248 F. Supp. 3d at 449. Instead, courts extend liability to private-placement underwriters only where there is "evidence support[ing] a finding that the [two transactions] constituted a single transaction, both in the minds of the parties and in terms of the effect on the investing public." *Id.* (quoting *SEC v. Lybrand*, 200 F. Supp. 2d 384, 395 (S.D.N.Y. 2002))*; see also In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 627–28 (S.D.N.Y. 2007) (finding "no persuasive reason why the Rule 144A offering should be treated as public within the meaning of" the Securities Act absent evidence that "the Rule 144A offering was directed at the general investing public").

As the Second Circuit has explained, only "the actual distribution of securities" can expose a party to Section 11 underwriter liability, *see In re Lehman Bros.*, 650 F.3d at 178, and the Court sees no reason why that requirement would not extend to its analysis of whether to integrate Deutsche Bank's role in the Rule 144A private offering with the public distribution of the Zero Notes. Accordingly, when denying Deutsche Bank's motion to dismiss Plaintiffs' Section 11 claims, the Court emphasized one of Plaintiffs' particular allegations in their complaint, namely that "Deutsche Bank . . . solicited, offered and sold the Zero Notes to the investing public pursuant to the registration statement." *Silvercreek*, 248 F. Supp. 3d at 450. At that time, the Court rejected as unripe Deutsche Bank's arguments "that it did not, in fact, sell the securities pursuant to the registration statements, [because] its objections only raise questions of fact and are thus not sufficient to prevail at the motion-to-dismiss stage." *Id.*

A different result is warranted on summary judgment. Plaintiffs have failed to produce any evidence supporting their allegation that Deutsche Bank in fact sold the Zero Notes as part of the public offering. Though Plaintiffs' summary judgment brief describes "Deutsche's prompt post-registration sale of Zeros" (PDB Brief at 30 (citing DBSUF ¶ 714)), Plaintiffs have offered no evidence to support a finding that such a sale ever actually occurred. They cite only Deutsche Bank's *private placement* memorandum regarding the Rule 144A offering (Dkt. No. 139-21) and Enron's own prospectuses and registration statements describing Deutsche Bank as a *potential* seller of the notes (Dkt. No. 139-24 at 86; Dkt. No. 139-28 at 11). None of this evidence establishes that Deutsche Bank ever in fact participated in "the actual distribution of securities" to the investing public. *In re Lehman Bros.*, 650 F.3d at 178. Absent evidence that Deutsche

Bank participated in that public distribution, the Court cannot integrate Deutsche Bank's underwriting role in the initial Rule 144A offering with the public offering.[10]

Seeking to fill this gap, Plaintiffs list a number of different ways in which Deutsche Bank provided support for Enron's public offering of the Zero Notes other than as direct distributors: for example, by serving as a co-lead manager in the private placement, accepting an underwriter discount and commission in the private placement, allowing itself to be identified as an initial purchaser in the registration statement, allowing its name to be featured on the front page of the initial private offering memorandum, and obtaining the right to conduct due diligence into the notes as part of the preparation of the registration statement.  (PDB Brief at 29–30.)  Though exhaustive, this evidence generally only goes to further highlight Deutsche Bank's key role in the initial *private* placement, which, for reasons already addressed, has no bearing on its status as an underwriter for purposes of Section 11 liability.

Perhaps more importantly, none of this evidence can serve as a substitute for evidence of "actual distribution," which is *the* essential element of underwriter status.  *In re Lehman Bros.*, 650 F.3d at 177 ("Nothing in [the Securities Act's] text supports expanding the definition of underwriter to reach persons not themselves participating in such purchases, offers, or sales, but whose actions may facilitate the participation of others in such undertakings.").  The statutory

---

[10]    After Deutsche Bank highlighted Plaintiffs' failure to produce evidence of "actual distribution" during oral argument (Dkt. No. 229 at 77), Plaintiffs submitted a letter to the Court asserting that "there *is* record evidence that Deutsche Bank acted as a selling securityholder in the Zero Notes public offering."  (Dkt. No. 229 at 2.)  But Plaintiffs again fail to point to any such record evidence.  Instead, Plaintiffs cite evidence that shows only that Deutsche Bank purchased the notes prior to the public offering and that Deutsche Bank was listed as a prospective seller, neither of which establishes "the actual distribution of securities."  *See In re Lehman Bros.*, 650 F.3d at 178.  And in support of their reference to "trading data showing sales of Zero Notes in the immediate aftermath of the registration of the Zero Notes, beginning on July 27, 2001," Plaintiffs do not cite any evidence in the record presently before the Court, instead alluding only to documents allegedly produced by Deutsche Bank during MDL discovery.

definition of underwriter simply "does not reach . . . persons [like Deutsche Bank] who provide services that facilitate a securities offering, but who do not themselves participate in the statutorily specified distribution-related activities." *Id.* at 176. Accordingly, Plaintiffs' substantial evidence that Deutsche Bank took "steps that facilitate[d] the eventual sale of a registered security" does nothing to establish that Deutsche "fits the statutory definition of underwriter." *Id.* at 177. Therefore, summary judgment must be granted in favor of Deutsche Bank as to Plaintiff's Section 11 claims.[11]

### 2. Credit Suisse

In contrast, Plaintiffs have produced evidence sufficient to create a genuine dispute of fact as to whether Credit Suisse directly distributed the Zero Notes to the public after their registration. (CSSUF ¶¶ 123–26; *see also* Dkt. No. 168-19 at 2 (indicating that Credit Suisse sold Zero Notes directly to Plaintiffs "as principal and for our own account").) Accordingly, there is evidence that would allow a jury to reasonably find that Credit Suisse played an actual role "in offering or selling securities for an issuer in connection with a [public] distribution." *In re Lehman Bros.*, 650 F.3d at 182; *see also In re Livent*, 151 F. Supp. 2d at 432 (dismissing Section 11 claims against Rule 144A distributors that "were not directly involved in the preparation of the registration statement or in the subsequent exchange" but recognizing that sellers of *registered* notes "may stand in a very different position from [Rule 144A participants] because [they] . . . sold notes directly to" plaintiffs).

With that established, the Court concludes that Credit Suisse's role in the public dissemination of the notes is sufficient to establish its status as an underwriter. For example, the

---

[11] Deutsche Bank also argues in the alternative that even if it is a statutory underwriter, it is entitled to the "due diligence" defense to Section 11 liability as enumerated in 15 U.S.C. § 77k(b)(3). (DB Brief at 32–38.) Because the Court holds that Deutsche Bank was not an underwriter of the Zero Notes, it need not reach this argument.

Zero Notes' public registration statement indicated that Credit Suisse, as a reseller of the notes, "may be deemed to be [an] 'underwriter[]' within the meaning of the Securities Act." (Dkt. No. 146-57 at 30.)  And the Second Circuit has previously held such a statement alone to be sufficient to establish a party's status as an underwriter.  *See Byrnes v. Faulkner, Dawkins & Sullivan*, 550 F.2d 1303, 1311–12 (2d Cir. 1977) (construing appellants as "participants in the . . . distribution and accordingly . . . underwriters" where they "arranged to have their stock included in one of the . . . registration statements and were identified as putative underwriters in the . . . prospectus").[12]  In addition, Plaintiffs point to a number of other important roles Credit Suisse played in the public distribution of the Zero Notes, including contributing to preparation of the registration statement and having access to Enron's internal books and records for purposes of conducting due diligence.  (PCS Brief at 36; Dkt. No. 146-51 at 18.)

In response to all of this evidence, Credit Suisse essentially repeats arguments that the Court already addressed and rejected at the motion to dismiss stage: that Credit Suisse's minor intermediary role bridging the initial private issuance of the Zero Notes with their ultimate public dissemination is insufficient to establish that it underwrote the Zero Notes offering.  (CS Brief at 38–40.)  As the Court explained at that time, evidence that Credit Suisse "indirectly participated in the purchase of the Zero Notes from Enron with a view to the [public] distribution of the Notes . . . is sufficient for underwriter status because it is 'essential in the actual distribution of securities.'"  *Silvercreek*, 248 F. Supp. 3d at 450 (quoting *In re Lehman Bros.*, 650 F.3d at 178).

---

[12]       The Court recognizes that Deutsche Bank was similarly described in the Zero Notes' registration statement, but emphasizes again that Plaintiffs' failure to adduce evidence that Deutsche Bank actually participated in the public "distribution" of the Zeros defeats any attempt at relying on this statement as to Deutsche Bank.  In contrast, the underwriters in *Byrnes*, like Credit Suisse, clearly engaged in actual "distribution" of the relevant securities.  550 F.2d at 1306.

And as the Court addressed above, Plaintiffs have produced sufficient evidence making such a showing.

Credit Suisse also emphasizes the small number of Zero Notes it purchased prior to the public offering. (CS Brief at 39.) But it points to no case supporting a theory that a minimal role in the distribution of a security is insufficient to establish underwriter status as a matter of law. Such a theory would be at odds with the plain language of Section 11, which allows for liability against "*every* underwriter," 15 U.S.C. § 77k(a)(5)(emphasis added), as well as this District's precedents interpreting the scope underwriter status, s*ee Lybrand*, 200 F. Supp. 2d at 393 ("Congress enacted a broad definition of underwriter status in order to include as underwriters *all* persons who might operate as conduits for securities being placed into the hands of the investing public." (emphasis added, internal quotation marks and citations omitted)). The Court declines to adopt such a theory here.

Accordingly, Plaintiff's Section 11 claim against Credit Suisse survives.

**F.      Texas Securities Act Claim**

Silvercreek brings claims under Article 581-33F(2) of the Texas Securities Act ("TSA") against Deutsche Bank and Credit Suisse. (TAC ¶¶ 913–24.) To establish liability for aiding and abetting violations of Texas securities law under Article 581-33F(2) of the TSA, a plaintiff must show: "(1) the existence of a primary violation of the securities laws, (2) that the aider has a general awareness of its role in the violation, (3) that the aider gave substantial assistance in the violation, and (4) that the aider intended to deceive the plaintiff or acted with reckless disregard for the truth of the representations made by the primary violator." *In re Enron Corp.*, 235 F. Supp. 2d 549, 568 (S.D. Tex. 2002); *see also* Tex. Rev. Civ. Stat. Ann. art. 581-33. Defendants Credit Suisse and Deutsche Bank move for summary judgment on Silvercreek's TSA claims, arguing that Plaintiffs cannot satisfy their burden of demonstrating Defendants' substantial

assistance, knowledge, or intent regarding Enron's underlying violations. (DB Brief at 38–39; CS Brief at 23–37.)

As explained above, Silvercreek has adequately demonstrated that genuine disputes of material fact exist as to Defendants having substantially assisted in Enron's fraud with knowledge and intent to do so. *See supra* Section III.A. That is sufficient to defeat summary judgment on Plaintiffs' TSA claims.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. All of the Defendants' motions for summary judgment on Plaintiffs' aiding and abetting fraud and civil conspiracy claims are DENIED. All of the Defendants' motions for summary judgment on Plaintiffs' aiding and abetting negligent misrepresentation claim are GRANTED. Defendant Deutsche Bank's motion for summary judgment on Plaintiffs' Section 11 claim is GRANTED. Defendant Deutsche Bank's motion for summary judgment on Plaintiffs' Texas Securities Act claim is DENIED. Defendant Merrill Lynch's motion for summary judgment on Plaintiffs' negligent misrepresentation claim is GRANTED. Defendant Credit Suisse's motion for summary judgment on Plaintiffs' negligent misrepresentation, Section 11, and Texas Securities Act claims is DENIED.

The parties are directed to confer regarding trial dates and to submit a joint letter by October 22, 2018 that estimates the length of trial and proposes dates within the next six months for a trial.

The Clerk of Court is directed to close the motions at Docket Numbers 114, 115, and

121.

SO ORDERED.

Dated: September 28, 2018
New York, New York

_____
J. PAUL OETKEN
United States District Judge